# Exhibit 370





**THOMAS A. CLARE, P.C.**                                                    **MEGAN L. MEIER**

December 18, 2020

*Via Email*

Robert Herring                                           Bruce Littman
Chief Executive Officer, OANN                           Executive Vice President, OANN
Email: bobby@awetv.com                                  Email: bruce.littman@oann.com

Charles Herring
President, OANN
Email: charles.herring@oann.com

> **Re:     *OANN's Publication of False Accusations About Dominion***

Dear Messrs. Herring and Mr. Littman:

We represent US Dominion Inc. and its wholly owned subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation (collectively, "Dominion").

We understand that OANN is planning to broadcast an "exclusive investigation" into the 2020 election—titled "Dominion-izing The Vote" at 10:00 pm EST on Saturday, December 19, 2020. We write for two reasons: (1) to put OANN on formal written notice of the facts so that there is absolutely no doubt at a future date about the information that was known to OANN before that program is broadcast; and (2) to demand retraction, pursuant to all applicable law, of OANN's previous false accusations about Dominion.

**I.      Facts about Dominion and the 2020 U.S. Presidential Election.**

1.      <u>Dominion plays a very limited role in elections</u>.

Dominion provides tools such as voting machines that accurately tabulate votes for the thousands of bipartisan poll workers, poll watchers, and local election officials across the country who work tirelessly to run elections and ensure accurate results.  Dominion's machines count votes from county-verified voters using a durable paper ballot.

2.      <u>The vote counts from Dominion's machines have been verified by independent audits and recounts of paper ballots</u>.

There are mountains of hard evidence conclusively debunking claims of vote manipulation and election rigging against Dominion—namely, the mountains of paper ballots that local election officials and volunteers recounted by hand, proving beyond any shadow of a doubt that the vote counts from Dominion's machines were accurate.



*Poll workers count paper ballots while poll watchers observe in Gwinnett County, Georgia on November 14, 2020.*

3. <u>Dominion did not pay kickbacks to secure a "no-bid" contract in Georgia and claims to the contrary are based on doctored "evidence" submitted by a facially unreliable source with a powerful financial motive to lie.</u>

After Trump-supporting Republicans in Georgia debunked Sidney Powell's election-rigging claims by announcing the results of the paper ballot recount and refusing to overturn Georgia's election results, Ms. Powell attempted to discredit them by falsely accusing Dominion of paying them kickbacks to get a "no-bid" contract for the use of its systems in the 2020 election. As set forth in our demand letter to her (which is attached for your review as Exhibit 1), Ms. Powell is an unreliable source who has misrepresented and manufactured evidence to support her false accusations, which she uses to solicit millions of dollars. Ms. Powell has never put forward any evidence—except for a ***doctored*** Secretary of State certificate—in support of these false accusations. No such evidence exists because her accusations are categorically false. Indeed, public records show that there ***was*** a bid process for the contract in Georgia and that Dominion offered Georgia the lowest-cost system among three companies that submitted bids, one of which—as explained below—was Smartmatic, an entirely separate company and competitor to Dominion.[1]

---

[1] Georgia Secretary of State, *Elections Security Is Our Top Priority: Security-Focused Tech Company, Dominion Voting to Implement New Verified Paper Ballot System*, available at, https://sos.ga.gov/securevoting/.

4.      Dominion's founder never claimed he could "change a million votes, no problem at all" and he cannot, in fact, do so.

Sidney Powell has also claimed that there is a video of Dominion's founder admitting that he "can change a million votes, no problem at all." She promised to tweet out the video, but she never did. Nor has anyone else ever produced any video of Dominion's founder making such a claim. This is because no such video exists. Dominion's founder never made such a claim because Dominion cannot change votes. Its machines simply tabulate the paper ballots that remain in the custody of the local election officials—nothing more, nothing less.

5.      Dominion is not Smartmatic and it has no connection to Hugo Chavez, Venezuela, China, or George Soros.

As is readily apparent from documents in the public domain, **Hugo Chavez's elections were _not_ handled by Dominion**, but by an entirely different company—Smartmatic. Dominion and Smartmatic are entirely separate companies who compete against each other. Indeed, as reflected in records from the Georgia Secretary of State, Dominion and Smartmatic competed against each other for the contract to provide vote counting machines for the 2020 election.

Dominion was not created in or for Venezuela, has never been located there, and is not owned by Smartmatic or Venezuelan or Chinese investors. Dominion has never provided machines or any of its software or technology to Venezuela, nor has it ever participated in any elections in Venezuela. It did not receive $400 million from the Chinese in the weeks before the 2020 election or otherwise. It has no ties to the Chinese government, the Venezuelan government, Hugo Chavez, Malloch Brown, or George Soros. And Dominion does not use Smartmatic's software or machines, nor was there Smartmatic technology in any of Dominion's voting machines in the 2020 election.

## II.     There is no reliable evidence to support the defamatory falsehoods about Dominion.

Numerous credible sources have uniformly confirmed that there is no reliable evidence to support accusations of vote manipulation or election rigging against Dominion. By way of example:

- By November 10, 2020, a spokesperson for the Michigan Secretary of State confirmed, "We have not seen any evidence of fraud or foul play in the actual administration of the election. What we have seen is that it was smooth, transparent, secure and accurate."[2]

- On November 12, 2020, the Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees released a joint statement confirming that there is "**_no evidence_** that any voting system

---

[2] Nick Corasaniti, Reid J. Epstein & Jim Rutenberg, _The Times Called Officials in Every State: No Evidence of Voter Fraud_, The N. Y. Times (Nov. 10, 2020), available at, https://www.nytimes.com/2020/11/10/us/politics/voting-fraud.html.

3

deleted or lost votes, changed votes, or was in any way compromised" and that the 2020 election was the most secure in American history.[3]

- On November 16, 2020, fifty-nine specialists in election security issued a statement that "**no credible evidence** has been put forth that supports a conclusion that the 2020 election outcome in any state has been altered through technical compromise."[4]

- On November 17, 2020, the Chairman of the Maricopa County Board of Supervisors released a statement explaining, "The evidence overwhelmingly shows the system used in Maricopa County is accurate and provided voters with a reliable election ... The Dominion tabulation equipment met mandatory requirements during logic and accuracy testing before the Presidential Preference Election, the Primary Election and the General Election.  And after each of these 2020 elections, the hand count audit showed the machines generated an accurate count."[5]

- On November 19, 2020, the Trump-supporting Republican Secretary of State Brad Raffensperger explained that "Georgia's historic first statewide audit reaffirmed that the state's new secure paper ballot voting system accurately counted and reported results."[6] And, Georgia's Trump-supporting Republican Governor Brian Kemp likewise refused to overturn the state's election results.

---

[3] Cybersecurity & Infrastructure Security Agency, *Joint Statement From Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees* (Nov. 12, 2020), available at https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election (emphasis added).

[4] *See Scientists say no credible evidence of computer fraud in the 2020 election outcome, but policymakers must work with experts to improve confidence* (Nov. 16, 2020), available at, https://www.mattblaze.org/papers/election2020.pdf.

[5] Letter from Clint Hickman to Maricopa Cty. Voters (Nov. 17, 2020), available at, https://www.maricopa.gov/DocumentCenter/View/64676/PR69-11-17-20-Letter-to-Voters#:~:text=Here%20are%20the%20facts%3A&text=The%20evidence%20overwhelmingly%20shows%20the,voters%20with%20a%20reliable%20election.&text=As%20required%20by%20law%20(A.R.S,used%20in%20any%20Arizona%20elections.

[6] Georgia Secretary of State, *Historic First Statewide Audit of Paper Ballots Upholds Result of Presidential Race*, available at, https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_result_of_presidential_race#:~:text=2020%20Qualifying%20Packet-,Historic%20First%20Statewide%20Audit%20of%20Paper%20Ballots%20Upholds%20Result%20of,machine%20tally%20of%20votes%20cast.

- On December 1, 2020, Trump loyalist U.S. Attorney General Bill Barr issued a statement that "we haven't seen *anything* to substantiate" allegations that "machines were programmed essentially to skew the election results."[7]

- On December 7, 2020, after Ms. Powell submitted her "evidence" to a federal judge in Michigan, the judge observed that she had submitted "*nothing but speculation and conjecture* that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden." Op. & Order Den. Pl.'s Emer. Motion. for Decl., Emer., and Inj. Relief at 34, *King v. Whitmer*, No. 20-cv-12134 (E.D. Mich. Dec. 7, 2020) [Dkt. 62].

Ms. Powell, on the other hand, has not presented a shred of actual evidence in support of any of her accusations against Dominion. But OANN was not alone in failing to obtain any evidence from Ms. Powell: Fox News was equally unsuccessful in persuading Ms. Powell to reveal the "evidence" she claimed to have in support of her outlandish accusations. Tucker Carlson called her out publicly for failing to do so.[8] Nor, apparently, has Ms. Powell disclosed her top-secret evidence to Trump loyalist and U.S. Attorney General Bill Barr, who issued a statement that "we haven't seen *anything* to substantiate" allegations that "machines were programmed essentially to skew the election results."[9] With no real evidence to support her claims, Ms. Powell's team deliberately misrepresented that a person who had *never* worked in military intelligence was actually a "military intelligence expert."[10] And, from the near-verbatim manifestos in the Venezuelan declarations attached to her court filings, it is painfully obvious to even a casual observer that those witnesses did not write their declarations independently.

## III.   Proven liars, conspiracy theorists, and anonymous sources are not reliable sources of information.

To be sure, some people have claimed that Dominion was created in Venezuela with Chinese money to rig elections for the now-deceased Venezuelan dictator Hugo Chavez and that Dominion rigged the 2020 U.S. Presidential Election by manipulating votes from a control room in Spain or Germany, all as part of a decades-long international conspiracy involving George Soros, President

---

[7] Michael Malsmo, *Disputing Trump, Barr says no widespread election fraud*, Associated Press (Dec. 1, 2020), available at, https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d.

[8] *Tucker Carlson SLAMS Sidney Powell for not Providing Evidence Election was Taken from Trump*, YouTube (Nov. 19, 2020), available at, https://www.youtube.com/watch?v=57l56J47xhk.

[9] Michael Malsmo, *Disputing Trump, Barr says no widespread election fraud*, Associated Press (Dec. 1, 2020), available at, https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d.

[10] Emma Brown, Aaron C. Davis & Alice Crites, *Sidney Powell's secret 'military intelligence expert,' key to fraud claims in election lawsuits, never worked in military intelligence*, Washington Post (Dec. 11, 2020), available at, https://www.washingtonpost.com/investigations/sidney-powell-spider-spyder-witness/2020/12/11/0cd567e6-3b2a-11eb-98c4-25dc9f4987e8_story.html.

George H.W. Bush's father, the Muslim Brotherhood, leftists, Republican state officials in Georgia, and thousands of bipartisan local election volunteers across the United States.

Some people will say anything for their fifteen minutes of fame. But proven liars, conspiracy theorists, and anonymous sources are not reliable sources of information about anything—let alone something as important as the legitimacy of American democracy. So we write to make sure there is no dispute whatsoever that you are aware of the below information, all of which we expect you are already aware of because it is readily available in the public domain.

- **Sidney Powell**. As detailed extensively in our December 16 letter to her (Ex. 1), Ms. Powell is a proven liar who has actively misrepresented and manufactured evidence and lied about having recordings that do not exist.

- **Rudy Giuliani**. Mr. Giuliani's assertions about Dominion are based on what Sidney Powell told him. Enough said.

- **Mellissa Carone**. OANN has published the false claims of Mr. Giuliani's star witness, Mellissa Carone, who notoriously went viral—in the bad way—when Mr. Giuliani had to "shush" her for leveling unhinged accusations at Republican officials in Michigan who asked her follow-up questions about her dubious claims. A judge determined that her accusations were "simply not credible."[11]

- **Purported "Experts" Put Forward by Sidney Powell**. After Ms. Powell submitted the declarations of so-called "experts" in her "Kraken" litigation in Arizona, the federal judge observed that the attachments to Ms. Powell's complaint were "only impressive for their volume" and included "expert reports" that "reach implausible conclusions, often because they are derived from *wholly unreliable sources*." Order at 24-25, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84] (Ex. 2). Ms. Powell's sources in that litigation included Harri Hursti, Alex Halderman, William Briggs, Russell Ramsland, and Josh Merritt aka "Spyder."

- **Josh Merritt aka "Spyder"**. Josh Merritt, a top-secret witness code-named "Spyder" by Sidney Powell, knowingly signed, under penalty of perjury, an admittedly "misleading" declaration falsely claiming he was a "military intelligence expert" even though he has *never* worked in military intelligence and even though a spokesperson for the U.S. Army Intelligence Center of Excellence says he "kept washing out" of courses.[12]

---

[11] *See Mich. Fraud Witness Debunks Dominion CEO Testimony, Says Poulos Falsely Denied Internet Connection & Ballot Dumps*, OANN (Dec. 16, 2020), available at https://www.oann.com/mich-fraud-witness-debunks-dominion-ceo-testimony-says-poulos-falsely-denied-internet-connection-ballot-dumps/; Op. & Order at 7, *Constantino v. City of Detroit*, No. 20-014780 (Mich. 3d Jud. Dist. Ct. Nov. 13, 2020).

[12] Emma Brown, Aaron C. Davis & Alice Crites, *Sidney Powell's secret 'military intelligence expert,' key to fraud claims in election lawsuits, never worked in military intelligence*, Washington Post (Dec. 11, 2020),

- **<u>Russell Ramsland</u>**.  Russell Ramsland is a failed Republican congressional candidate and a deep-state conspiracy theorist who claimed, among other facially ludicrous and inherently improbable things, that George Soros, while less than 10 years old, helped form the "Deep State" in Nazi Germany in the 1930s—along with President George H.W. Bush's father, the Muslim Brotherhood, and leftists.[13]  Not only has Mr. Ramsland been called out for referencing and citing to locations in Minnesota when alleging voter fraud in Michigan,[14] but his report on voting results in Antrim County was deemed by Antrim County's own bi-partisan election officials as "riddled with false and unsupported claims, baseless attacks, and incorrect use of technical terms."[15]   And the former acting director of the Election Assistance Commission's Voting System Testing and Certification program—who is ***actually*** an expert in in election voting systems—said that the report showed "a grave misunderstanding" of Antrim County's voting system and "a lack of knowledge of election technology and process," resulting in "a preposterous conclusion."[16] Proving just how baseless Mr. Ramsland's report is, a hand recount of Antrim County completed on December 17, 2020 "confirmed the truth and affirmed the facts: Dominion's voting machines accurately tabulated the votes cast for president in Antrim County."[17]

- **<u>William Briggs and Matt Braynard</u>**.  William Briggs's claims are based on a list—compiled by Matt Braynard—of allegedly ineligible Georgia voters who allegedly voted illegally.  In fact, Mr. Braynard's list included voters who were, in fact, eligible to vote and was rejected by a federal judge for its "sheer unreliability."[18]

---

available at, https://www.washingtonpost.com/investigations/sidney-powell-spider-spyder-witness/2020/12/11/0cd567e6-3b2a-11eb-98c4-25dc9f4987e8_story.html.

[13] John Savage, *Texas Tea Partiers Are Freaking Out Over 'Deep State' Conspiracy Theories*, Vice (Sept. 30, 2018), available at, https://www.vice.com/en/article/mbwgxx/texas-tea-partiers-are-freaking-out-over-deep-state-conspiracy-theories.

[14] Clara Hendrickson, *Affidavit in Michigan lawsuit seeking to overturn election makes wildly inaccurate claims about vote*, PolitiFact (Dec. 4, 2020), available at, https://www.politifact.com/factchecks/2020/dec/04/russell-james-ramsland-jr/affidavit-michigan-lawsuit-seeking-overturn-electi/.

[15] *See Report spreads debunked claims about Dominion machines in Michigan county*, AP News (Dec. 15 2020), available at, https://apnews.com/article/fact-checking-afs:Content:9847904839.

[16] *See Former election security chief for Trump knocks down Antrim County report*, The Detroit Free Press (Dec. 16, 2020), available at https://www.freep.com/story/news/politics/elections/2020/12/16/antrim-county-report-debunked-by-former-trump-election-official/3923499001/.

[17] *See Trump still wins small Michigan county after hand recount*, AP News (Dec. 18, 2020), available at https://apnews.com/article/election-2020-joe-biden-donald-trump-michigan-elections-07e52e643d682c8033a0f26b0d863387.

[18] Order at 26, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84] (Ex. 2); Michelle Ye Hee Lee, *Here's what happened when a Georgia lawmaker scrutinized the Trump campaign's list of allegedly illegal votes*, Washington Post (Dec. 10, 2020), available at,

- **Navid Keshavarz-Nia**.  Navid Keshavarz-Nia's claims about the 2020 election were described by then-CISA director and Trump-appointee Chris Krebs as "nonsense." [19] That description is bolstered by the fact that Mr. Keshavarz-Nia declared, under penalty of perjury, that there was a pattern of improbable vote reporting in "Edison County, Michigan"—a county that does not exist in the state of Michigan.

- **Ana Mercedes Diaz Cardozo and Sidney Powell's Anonymous Venezuelan Source Claiming to Have Been Selected for the "National Security Guard Detail of the President of Venezuela."**  Above and beyond the fact that Ms. Powell's anonymous Venezuelan witness refuses to publicly stand by his wild accusations of a decades-old international conspiracy, his explanation for why he purportedly came forward is nearly word-for-word identical to the explanation in the declaration signed by Ana Mercedes Diaz Cardozo, proving that they did not write the declarations independently. [20]

- **Ronald Watkins**.  OANN has previously given airtime and credence to known conspiracy theorist Ronald Watkins, calling him a "cyber analyst." [21]  Mr. Watkins is the 33-year-old former administrator of 8chan (now 8kun) and son of Jim Watkins, who is widely considered to be the "Q" of QAnon [22]—whose proponents believe that Trump is battling a cabal of Satanic pedophiles that originated in a D.C. pizza parlor—and who has himself been accused of hosting "child porn domains." [23]

- **Joe Oltmann**.  Joe Oltmann is a Twitter-banned "political activist" who lives in Colorado, where it is perfectly legal to record your phone calls without the knowledge of the other people on the line.  He would have people believe that he went to the trouble of "infiltrating Antifa" but didn't bother to record his "conference call" with them, instead electing to take "notes" of a Dominion employee supposedly assuring "Antifa" that he would rig the election.  Of course, except for that Dominion employee—who received death threats after OANN identified him by name to a global internet

---

https://www.washingtonpost.com/politics/heres-what-happened-when-a-georgia-lawmaker-scrutinized-the-trump-campaigns-list-of-allegedly-illegal-votes/2020/12/10/1400d628-3b06-11eb-bc68-96af0daae728_story.html.

[19] Zach Montellaro and Kyle Cheney, *Pro-Trump legal crusade peppered with bizarre blunders*, Politico (Dec. 3, 2020), available at, https://www.politico.com/news/2020/12/03/sidney-powell-trump-election-lawsuit-442472.

[20] *Compare Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-2 at ¶ 4] *with Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-3 at ¶ 3].

[21] *See Cyber Analyst On Dominion Voting: Shocking Vulnerabilities*, OANN (Nov. 15, 2020), available at, https://www.oann.com/cyber-analyst-on-dominion-voting-shocking-vulnerabilities/.

[22] *See The men behind QAnon*, ABC (Sept. 22, 2020), available at, https://abcnews.go.com/Politics/men-qanon/story?id=73046374.

[23] *See QAnon Is Supposed to Be All About Protecting Kids. Its Primary Enabler Appears to Have Hosted Child Porn Domains*, MotherJones (Oct. 29, 2020), available at https://www.motherjones.com/politics/2020/10/jim-watkins-child-pornography-domains/.

audience—Mr. Oltmann has not identified any of the other "Antifa members" who he claims were on the call.[24]

We have no doubt that you can find other people who are upset about the results of the election and will say anything to get on television. But OANN's job—as a media organization—is to vet the credibility of sources before relying on them and publishing their claims to a global internet audience, especially when—as here—their claims put people's lives in danger, are inherently improbable, and have already been conclusively debunked by a mountain of paper ballots, bipartisan public servants, election volunteers, and people who actually have expertise in election security.

**IV.    OANN recklessly disregarded the truth, evidence, and reliable sources when it pursued a preconceived narrative and published the inherently improbable and debunked claims of facially unreliable sources.**

In reckless disregard of the evidence and facts set forth above—which are readily available in the public domain—OANN set out to make the facts conform to the false, preconceived (and profitable) narrative that the election was illegitimate. It then repeatedly published the inherently improbable and debunked claims of facially unreliable sources, recklessly disregarding that those statements were false and that publishing them would endanger Dominion's business and the lives of its employees.

OANN did not simply publish the claims of its facially unreliable sources; it adopted their claims as its own and held them out as credible, both through the words of OANN personalities themselves and through the title "Dominion-izing the Vote," which falsely conveys that Dominion had tampered with and rigged the vote.[25]

In so doing, OANN acted with actual malice. *See St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (the publication of allegations that are "inherently improbable" is strong evidence of actual malice); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) ("evidence that the story was so inherently improbable that only a reckless person would have put it in circulation" is "likely [to] support a finding of actual malice"); *St. Amant*, 390 U.S. at 732 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant."); *Wells v. Liddy*, 186 F.3d 505, 542-43 (4th Cir. 1999) (actual malice may be shown where publisher had reason to believe a source might not be credible); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016) (relying on a facially unreliable source is evidence of actual malice); *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 124 (2d Cir. 2013) ("'evidence of an intent to avoid the truth ... [can be] sufficient to satisfy the [actual malice standard]'") (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 693 (1989)); *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 106 (D.D.C. 2009) ("Purposeful avoidance of truth can constitute actual malice"); *Harris v. City of Seattle*, 152 F.

---

[24] *See Dominion Executive: Trump Is Not Going To Win. I Made F\*\*\*Ing Sure Of That*, OANN (Nov. 24, 2020), available at  https://www.oann.com/dominion-executive-trump-is-not-going-to-win-i-made-fing-sure-of-that/.

[25]    *See Dominion-izing The Vote*, YouTube (Nov. 21, 2020) https://www.youtube.com/watch?v=746HTjhFifA

App'x 565, 568 (9th Cir. 2005) (quoting 1 Rodney Smolla, Law of Defamation § 3:71 (2d ed.)) ("[E]vidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence."); *Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir. 1992) (financial motive is evidence of actual malice).

We therefore demand, pursuant to all applicable law, that OANN retract the falsehoods identified in this letter that were published by OANN in the following broadcasts:

- *Clinton Ties To Dominion Voting System, Which 'Glitched' For Biden* (Nov. 11, 2020), available at https://www.oann.com/clinton-ties-to-dominion-voting-system-which-glitched-for-biden/;

- *Cyber Analyst On Dominion Voting: Shocking Vulnerabilities* (Nov. 15, 2020), available at https://www.oann.com/cyber-analyst-on-dominion-voting-shocking-vulnerabilities/;

- *Dominion Scandal Goes Worldwide With Michael Johns* (Nov. 18, 2020), available at https://www.oann.com/dominion-scandal-goes-worldwide-with-michael-johns/;

- *Dominion Voting Systems Under Scrutiny For Security* (Nov. 18, 2020), available at https://www.oann.com/dominion-voting-systems-under-scrutiny-for-security/.

- *Dominion Executive: Trump Is Not Going To Win. I Made F\*\*\*Ing Sure Of That* (Nov. 24, 2020), available at https://www.oann.com/dominion-executive-trump-is-not-going-to-win-i-made-fing-sure-of-that/;

- *Reports: Ga. Gov. Kemp Awarded Dominion Voting Contract After Meeting With Chinese Consulate Official In Atlanta* (Dec. 10, 2020), available at https://www.oann.com/reports-ga-gov-kemp-awarded-dominion-voting-contract-after-meeting-with-chinese-consulate-official-in-atlanta/;

- *Mich. Fraud Witness Debunks Dominion CEO Testimony, Says Poulos Falsely Denied Internet Connection & Ballot Dumps* (Dec. 16, 2020), available at https://www.oann.com/mich-fraud-witness-debunks-dominion-ceo-testimony-says-poulos-falsely-denied-internet-connection-ballot-dumps/; and

- *Dominion Falsely Claims QR Codes Protect Against Fraud* (Dec. 16, 2020), available at https://www.oann.com/dominion-falsely-claims-qr-codes-protect-against-fraud/.

- *Dominion-izing' the Vote with Chanel Rion* (Nov. 21, 2020), available at https://www.youtube.com/watch?v=746HTjhFifA.

A refusal to retract these defamatory falsehoods will be viewed as additional evidence of actual malice.  *See Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987) ("[r]efusal to retract an exposed error tends to support a finding of actual malice.").

**V.     Going forward, if OANN repeats or republishes any of the falsehoods identified in this letter, there will be no question that it is doing so with <u>actual</u> knowledge that those statements are false.**

As a media organization, we expect that you were already well aware of the facts set forth in this letter, which are readily available in the public domain.  Now that we have sent you this letter, there can be no dispute that you are in full possession of the facts.  As such, if OANN elects to repeat or republish any of the falsehoods identified in this letter—whether in tomorrow's "exclusive investigation" or otherwise—it will be doing so with actual knowledge that those statements are false.

\*       \*       \*

We expect that OANN will treat this matter with the seriousness it deserves.  Indeed, OANN has made it very clear that it believes that libel suits play an important role in holding the media accountable—and that when a member of the media commits "false and malicious libel," they should "answer for it in a court of law."[26]  We could not agree more.

Until these claims are resolved, please ensure that you preserve and retain all emails, text messages, audiovisual recordings, voice mails, drafts, notes, communications, documents, data, and electronically stored information of any kind that relates in any way to these matters.  Please confirm receipt of this letter and that you intend to adhere to our request to retain documents as set forth above.

This is not a complete recitation of our client's rights and remedies, all of which are expressly reserved.

We look forward to your prompt response.

Regards,

Thomas. A. Clare, P.C.

Megan L. Meier

Enclosures

---

[26] *One America News Fires Back Against Rachel Maddow, MSNBC And Comcast With A Defamation Lawsuit*, OANN (Sept. 9, 2019), available at https://www.oann.com/rachel-maddow-lawsuit/.

# Exhibit 1



## C L A R E   L O C K E
L L P

THOMAS A. CLARE, P.C.                                           MEGAN L. MEIER

December 16, 2020

*Via Email, Federal Express, & Hand Delivery*

Sidney Powell, P.C.                              Sidney Powell
2911 Turtle Creek Blvd, Suite 300               Defending the Republic
Dallas, Texas 75219                             10130 Northlake Blvd. #214342
Email: sidneypowell@federalappeals.com          West Palm Beach, Florida 34412

        Re:    *Defamatory Falsehoods About Dominion*

Dear Ms. Powell:

        We represent US Dominion Inc. and its wholly owned subsidiaries, Dominion Voting
Systems, Inc. and Dominion Voting Systems Corporation (collectively, "Dominion").  We write
regarding your wild, knowingly baseless, and false accusations about Dominion, which you made on
behalf of the Trump Campaign as part of a coordinated media circus and fundraising scheme
featuring your November 19 press conference in Washington, D.C. and including your "Stop the
Steal" rally and numerous television and radio appearances on—and statements to—Fox News, Fox
Business, Newsmax, and the Rush Limbaugh Radio Show, among others.





I.   **Your reckless disinformation campaign is predicated on lies that have endangered Dominion's business and the lives of its employees.**

Given the sheer volume and ever-expanding set of lies that you have told and are continuing to tell about Dominion as part of your multi-media disinformation "Kraken" fundraising campaign, it would be impractical to address every one of your falsehoods in this letter. Without conceding the truth of any of your claims about Dominion, we write to demand that you retract your most serious false accusations, which have put Dominion's employees' lives at risk and caused enormous harm to the company.

For example, you falsely claimed that Dominion and its software were created in Venezuela for the purpose of rigging elections for the now-deceased Venezuelan dictator Hugo Chavez, that Dominion paid kickbacks to Georgia officials in return for a "no-bid" contract to use Dominion systems in the 2020 election, and that Dominion rigged the 2020 U.S. Presidential Election by manipulating votes, shifting votes, installing and using an algorithm to modify or "weight" votes such that a vote for Biden counted more than a vote for Trump, trashing Trump votes, adding Biden votes, and training election workers to dispose of Trump votes and to add Biden votes.

By way of example only, just last week, you made the following false assertions about Dominion to Jan Jekielek at *The Epoch Times:*[1]

Effectively what they did with the machine fraud was to, they did everything from injecting massive quantities of votes into the system that they just made up, to running counterfeit ballots through multiple times in multiple batches to create the appearance of votes that weren't really there.  They trashed votes.

These statements are just the tip of the iceberg, which includes similar and other false claims you made at your Washington, D.C. press conference and to other media outlets with global internet audiences.

Your outlandish accusations are demonstrably false.  While soliciting people to send you "millions of dollars"[2] and holding yourself out as a beacon of truth, you have purposefully avoided naming Dominion as a defendant in your sham litigations—effectively denying Dominion the opportunity to disprove your false accusations in court.  Dominion values freedom of speech and respects the right of all Americans—of all political persuasions—to exercise their First Amendment rights and to disagree with each other.  But while you are entitled to your own opinions, Ms. Powell, you are not entitled to your own facts.  Defamatory falsehoods are actionable in court and the U.S.

---

[1]   The Epoch Times, *American Thought Leaders* (Dec. 13, 2020), available at, https://www.theepochtimes.com/exclusive-sidney-powell-on-election-lawsuits-supreme-court-decision-and-the-flynn-case_3617067.html.

[2] *Sidney Powell's Legal Defense Fund*, Defending the Republic, https://defendingtherepublic.org/.



Supreme Court has made clear that "there is no constitutional value in false statements of fact." *Gertz v. Welch, Inc.*, 418 U.S. 323, 340 (1974). Dominion welcomes transparency and a full investigation of the relevant facts in a court of law, where it is confident the truth will prevail. Here are the facts:

1. <u>Dominion's vote counts have been repeatedly verified by paper ballot recounts and independent audits.</u>

Dominion is a non-partisan company that has proudly partnered with public officials from both parties in accurately tabulating the votes of the American people in both "red" and "blue" states and counties. Far from being created to rig elections for a now-deceased Venezuelan dictator, Dominion's voting systems are certified under standards promulgated by the U.S. Election Assistance Commission ("EAC"), reviewed and tested by independent testing laboratories accredited by the EAC, and were designed to be auditable and include a paper ballot backup to verify results. Indeed, paper ballot recounts and independent audits have repeatedly and conclusively debunked your election-rigging claims, and on November 12, 2020, the Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees released a joint statement confirming that there is "***no evidence*** that any voting system deleted or lost votes, changed votes, or was in any way compromised" and that the 2020 election was the most secure in American history.[3] The Joint Statement was signed and endorsed by, among others, the National Association of State Election Directors, National Association of Secretaries of State, and the U.S. Cybersecurity & Infrastructure Security Agency ("CISA")—then led by a Trump appointee, Chris Krebs.

In addition, your false accusation that Dominion rigged the 2020 election is based on a demonstrably false premise that wildly overstates Dominion's very limited role in elections. Dominion provides tools such as voting machines that accurately tabulate votes for the bipartisan poll workers, poll watchers, and local election officials who work tirelessly to run elections and ensure accurate results. Dominion's machines count votes from county-verified voters using a durable paper ballot. Those paper ballots are the hard evidence proving the accuracy of the vote counts from Dominion's machines. If Dominion had manipulated the votes, the paper ballots would not match the machine totals. In fact, they do match. Recounts and audits have proven that Dominion did what it was designed and hired to do: accurately tabulate votes.

---

[3] Cybersecurity & Infrastructure Security Agency, *Joint Statement From Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees* (Nov. 12, 2020), available at, https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election.



2.    <u>Dominion has no connection to Hugo Chavez, Venezuela, or China.</u>

As you are well aware from documents in the public domain and attached to your court filings, *Hugo Chavez's elections were <u>not</u> handled by Dominion*, but by an entirely different company—Smartmatic. This is a critical fact because you have premised your defamatory falsehoods on your intentionally false claim that Dominion and Smartmatic are the same company even though you know that they are entirely separate companies who compete with each other. Dominion was not created in or for Venezuela, has never been located there, and is not owned by Smartmatic or Venezuelan or Chinese investors. Dominion has never provided machines or any of its software or technology to Venezuela, nor has it ever participated in any elections in Venezuela. It did not receive $400 million from the Chinese in the weeks before the 2020 election or otherwise. It has no ties to the Chinese government, the Venezuelan government, Hugo Chavez, Malloch Brown, George Soros, Bigfoot, or the Loch Ness Monster. Dominion does not use Smartmatic's software or machines, and there was no Smartmatic technology in any of Dominion's voting machines in the 2020 election.

3.    <u>You falsely claimed that Dominion's founder admitted he "can change a million votes, no problem at all" and that you would "tweet out the video later"—but you never did so because no such video exists.</u>

During at least one of your many media appearances, you promised to "tweet out [a] video" of Dominion's founder admitting that he "can change a million votes, no problem at all." Your assertion—to a global internet audience—that you had such damning video evidence bolstered your false accusations that Dominion had rigged the election. Yet you have never produced that video because, as you know, it does not exist. Dominion's founder never made such a claim because Dominion cannot change votes. Its machines simply tabulate the paper ballots that remain the custody of the local election officials—nothing more, nothing less.

4.    <u>You falsely claimed that you have a Dominion employee "on tape" saying he "rigged the election for Biden"—but you know that no such tape exists.</u>

In peddling your defamatory accusations, you also falsely told a national audience that you had a Dominion employee "on tape" saying that "he rigged the election for Biden." Your own court filings prove that no such tape exists. In them, you cited an interview of Joe Oltmann, a Twitter-banned "political activist" who—far from claiming he had that shocking alleged confession "on tape"—claimed he took "notes" during a conference call he supposedly joined after "infiltrating Antifa." This is a facially ludicrous claim for a number of reasons, including the fact that he lives in Colorado, where it would have been perfectly legal to record such a call if it had actually happened. As a result of your false accusations, that Dominion employee received death threats.

4



II.   **Because there is no reliable evidence supporting your defamatory falsehoods, you actively manufactured and misrepresented evidence to support them.**

Despite repeatedly touting the overwhelming "evidence" of your assertions during your media campaign, every court to which you submitted that so-called "evidence" has dismissed each of your sham litigations, and even Trump appointees and supporters have acknowledged—including *after* you filed your "evidence" in court, posted it on your fundraising website, and touted it in the media—that there is *no evidence* that actually supports your assertions about Dominion. Indeed:

- One federal judge observed that you submitted "nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden." Op. & Order Den. Pl.'s Emer. Motion. for Decl., Emer., and Inj. Relief at 34, *Whitmer v. City of Detroit*, No. 20-cv-12134 (E.D. Mich. Dec. 7, 2020) [Dkt. 62].

- Another federal judge commented that the attachments to your complaint were "only impressive for their volume," are "largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections," and include "expert reports" that "reach implausible conclusions, often because they are derived from wholly unreliable sources." Order at 24-25, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84].

- Despite your claim that you have so much "evidence" that it feels as if you are drinking from a "fire hose," when asked by your interviewers and other media outlets to provide that evidence, you have failed to do so each and every time. Conservative television host Tucker Carlson even called you out for failing to provide any evidence to support your assertions.[4]

- After you put the purported "evidence" in your court filings, Trump loyalist and U.S. Attorney General Bill Barr stated, "There's been one assertion that would be systemic fraud and that would be the claim that machines were programmed essentially to skew the election results. And the DHS and DOJ have looked into that, and so far, *we haven't seen anything to substantiate that*."[5]

---

[4] *Tucker Carlson SLAMS Sidney Powell for not Providing Evidence Election was Taken from Trump*, YouTube (Nov. 19, 2020), available at, https://www.youtube.com/watch?v=57l56J47xhk.
[5] Michael Malsmo, *Disputing Trump, Barr says no widespread election fraud*, Associated Press (Dec. 1, 2020), available at, https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d.



- Long-time Trump ally Chris Christie said your claims were a "national embarrassment."[6]

- Trump appointee Chris Krebs, then the director of CISA, determined that the "Hammer and Scorecard" conspiracy theory advanced by your so-called cybersecurity expert, Navid Keshavarz-Nia, was "nonsense."[7] And Mr. Keshavarz-Nia's "expert" declaration alleges a pattern of improbable vote reporting in "Edison County, Michigan," even though no county by that name exists in Michigan.

- Similarly, another one of your so-called "experts," Russell Ramsland, in alleging fraud in Michigan, discussed places in Minnesota. He also falsely claimed that voter turnout in Detroit was 139.29% and that turnout in North Muskegon was an eye-popping 781.97%; in reality, the turnout in those places was 50.88% and 78.11%, respectively.[8] But Mr. Ramsland did not just make sloppy and inexcusable mistakes. He is also a notorious conspiracy theorist, having given a presentation in 2018 in which he claimed that the "Deep State" was formed when the Muslim Brotherhood, President George H.W. Bush's father, leftists, and George Soros came together in Nazi Germany in the 1930s—notwithstanding the fact that Mr. Soros was born in 1930.[9]

- Another one of your "experts" relied on a list of allegedly ineligible Georgia voters who allegedly voted illegally; but that data included voters who were, in fact, eligible to vote and was rejected by a federal judge for its "sheer unreliability."[10]

---

[6] Paul Kane and Felicia Sonmez, *Chris Christie calls the conduct of Trump's legal team a 'national embarrassment'*, Washington Post (Nov. 22, 2020), available at, https://www.washingtonpost.com/politics/republicans-christie-trump-concede/2020/11/22/05c280e6-2cda-11eb-bae0-50bb17126614_story.html.

[7] Zach Montellaro and Kyle Cheney, *Pro-Trump legal crusade peppered with bizarre blunders*, Politico (Dec. 3, 2020), available at https://www.politico.com/news/2020/12/03/sidney-powell-trump-election-lawsuit-442472.

[8] Clara Hendrickson, *Affidavit in Michigan lawsuit seeking to overturn election makes wildly inaccurate claims about vote*, PolitiFact (Dec. 4, 2020), available at, https://www.politifact.com/factchecks/2020/dec/04/russell-james-ramsland-jr/affidavit-michigan-lawsuit-seeking-overturn-electi/.

[9] John Savage, *Texas Tea Partiers Are Freaking Out Over 'Deep State' Conspiracy Theories*, Vice (Sept. 30, 2018), available at, https://www.vice.com/en/article/mbwgxx/texas-tea-partiers-are-freaking-out-over-deep-state-conspiracy-theories.

[10] Order at 26, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84]; Michelle Ye Hee Lee, *Here's what happened when a Georgia lawmaker scrutinized the Trump campaign's list of allegedly illegal votes*, Washington Post (Dec. 10, 2020), available at, https://www.washingtonpost.com/politics/heres-what-happened-when-a-georgia-lawmaker-



- Although you cherry-picked statements by Princeton professor Andrew W. Appel in support of your election-rigging claims, he and 58 other specialists in election security have forcefully rebutted your claims, explaining that they "have never claimed that technical vulnerabilities have actually been exploited to alter the outcome of any US election."[11]  They further explained that "**no credible evidence** has been put forth that supports a conclusion that the 2020 election outcome in any state has been altered through technical compromise."[12]

Recognizing the obvious deficiencies and credibility problems of your "evidence," you actively misrepresented and manufactured evidence to support your defamatory falsehoods.  For example:

- You deliberately misrepresented that you had a top secret "military intelligence expert" code-named "Spyder" supporting your defamatory accusations about Dominion.  But your purported "military intelligence expert" has now admitted that he never actually worked in military intelligence and that the declaration your team wrote for him to sign is misleading.[13]  This was no good faith mistake.  He has confirmed that the original paperwork he sent to you didn't say that, and that your clerks wrote the misleading statement even though he "was trying to backtrack" on it.[14]

- Two of the Venezuelan declarations attached to your court filings contain nearly identical explanations for why the "witnesses" purportedly claim they came forward, proving that those witnesses did not each write their declarations independently and strongly suggesting that the below manifestos and allegations of a decade-old international conspiracy were written or edited by you or your team—not by the witnesses themselves.

---

scrutinized-the-trump-campaigns-list-of-allegedly-illegal-votes/2020/12/10/1400d628-3b06-11eb-bc68-96af0daae728_story.html.

[11] *See Scientists say no credible evidence of computer fraud in the 2020 election outcome, but policymakers must work with experts to improve confidence* (Nov. 16, 2020), available at, https://www.mattblaze.org/papers/election2020.pdf.

[12] *Id.*

[13] Emma Brown, Aaron C. Davis & Alice Crites, *Sidney Powell's secret 'military intelligence expert,' key to fraud claims in election lawsuits, never worked in military intelligence*, Washington Post (Dec. 11, 2020), available at, https://www.washingtonpost.com/investigations/sidney-powell-spider-spyder-witness/2020/12/11/0cd567e6-3b2a-11eb-98c4-25dc9f4987e8_story.html.

[14] *Id.*



| Declaration of an anonymous source claiming to have been selected for the "national security guard detail of the President of Venezuela." *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-2 at ¶ 4]. | Statement by Ana Mercedes Diaz Cardozo, *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-3 at ¶ 3]. |
|---|---|
| "I want to alert the public and let the world know the truth about the corruption, manipulation, and lies being committed by a conspiracy of people and companies intent upon betraying the honest people of the United States and their legally constituted institutions and fundamental rights as citizens. This conspiracy began more than a decade ago in Venezuela and has spread to countries all over the world. It is a conspiracy to wrongfully gain and keep power and wealth. It involves political leaders, powerful companies, and other persons whose purpose is to gain and keep power by changing the free will of the people and subverting the proper course of governing." | "I want to alert the public and let the world know the truth about corruption, manipulation, and lies being committed through a conspiracy of individuals and businesses with the intention of betraying the honest people of the United States and its legally constituted institutions and fundamental rights as citizens. This conspiracy began more than a decade ago in Venezuela and has spread to countries all over the world. It is a conspiracy to unjustly gain and maintain power and wealth. It involves political leaders, powerful companies, and other persons whose purpose is to gain and maintain power by changing people's free will and subverting the proper course of governing." |

- It also appears that you or your team doctored and misrepresented at least one government document in support of your defamatory accusations about Dominion, attaching and citing an "undated" copy of a certificate from Georgia's Secretary of State and insinuating that the fact that it was undated supported your defamatory falsehoods. That too was false. In reality, the authentic certificate is both dated and publicly available online.[15]

In sum, knowing that you had no reliable evidence, you were actively involved in creating and misrepresenting the so-called "evidence" that you touted during your defamatory media campaign.

---

[15]   Georgia Secretary of State, *Dominion Certification* (Aug. 9, 2019), available at, https://sos.ga.gov/admin/uploads/Dominion_Certification.pdf.



III.    **You have intentionally disregarded the reliable evidence conclusively debunking your claims and have manufactured defamatory accusations in an effort to discredit the Republican state officials who confirmed the validity of Georgia's election results.**

Your falsehoods have been repeatedly and conclusively debunked by the real evidence—*i.e.*, the independent audits and hand recounts of paper ballots that have verified the election results, as confirmed by both Democratic and Republican state officials.  For example:

- A spokesperson for the Michigan Secretary of State confirmed, "We have not seen any evidence of fraud or foul play in the actual administration of the election.  What we have seen is that it was smooth, transparent, secure and accurate."[16]

- In Arizona, the Chairman of the Maricopa County Board of Supervisors released a statement explaining, "The evidence overwhelmingly shows the system used in Maricopa County is accurate and provided voters with a reliable election ... The Dominion tabulation equipment met mandatory requirements during logic and accuracy testing before the Presidential Preference Election, the Primary Election and the General Election.  And after each of these 2020 elections, the hand count audit showed the machines generated an accurate count."[17]

- And in Georgia, the Trump-supporting Republican Secretary of State Brad Raffensperger explained that "Georgia's historic first statewide audit reaffirmed that the state's new secure paper ballot voting system accurately counted and reported results."[18]  And, Georgia's Trump-supporting Republican Governor Brian Kemp likewise refused to overturn the state's election results.

---

[16] Nick Corasaniti, Reid J. Epstein & Jim Rutenberg, *The Times Called Officials in Every State: No Evidence of Voter Fraud*, The N. Y. Times (Nov. 10, 2020), available at, https://www.nytimes.com/2020/11/10/us/politics/voting-fraud.html.

[17] Letter from Clint Hickman to Maricopa Cty. Voters (Nov. 17, 2020), available at, https://www.maricopa.gov/DocumentCenter/View/64676/PR69-11-17-20-Letter-to-Voters#:~:text=Here%20are%20the%20facts%3A&text=The%20evidence%20overwhelmingly%2 0shows%20the,voters%20with%20a%20reliable%20election.&text=As%20required%20by%20la w%20(A.R.S.used%20in%20any%20Arizona%20elections.

[18] Georgia Secretary of State, *Historic First Statewide Audit of Paper Ballots Upholds Result of Presidential Race*, available at, https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_ result_of_presidential_race#:~:text=2020%20Qualifying%20Packet- ,Historic%20First%20Statewide%20Audit%20of%20Paper%20Ballots%20Upholds%20Result%2 0of,machine%20tally%20of%20votes%20cast.



In order to punish and discredit these "disloyal" Republicans for daring to debunk your false accusations, you falsely accused Dominion of paying them kickbacks to get a "no-bid" contract for the use of its systems in the 2020 election. You have never put forward even a shred of evidence—except perhaps for the doctored Secretary of State certificate—in support of these false bribery accusations. No such evidence exists because your accusations are categorically false. Indeed, public records show that, contrary to your false accusations, there was a bid process for the contract in Georgia and that Dominion offered Georgia the lowest-cost system among three companies that submitted bids.[19] Notably, publicly-available records on the Georgia Secretary of State's website also reflect that *Smartmatic* was one of the other companies that competed with Dominion for that contract, further debunking your false assertions that Dominion and Smartmatic are the same company. *Id.*

## IV.    There is clear and convincing evidence that you acted with actual malice in making your false and defamatory accusations about Dominion.

While there is no reliable evidence supporting your wild accusations—and compelling reliable evidence debunking them—there is clear and convincing evidence that you knowingly or recklessly disregarded that your claims about Dominion were false and made them anyway, and therefore acted with actual malice. In addition to the direct evidence that you deliberately misrepresented and manufactured purported "evidence" to support your claims, there is also a wealth of circumstantial evidence that you acted with actual malice.

*First*, your accusations—essentially that Dominion conspired with Republican state officials and thousands of local election workers across the country to perpetrate the greatest fraud in human history—are inherently improbable. You need look no further than the incontrovertible facts that numerous counties in Wisconsin and Pennsylvania that used Dominion systems went for Trump[20] and that some states that used Dominion systems were projected to go for Biden, but actually ended up going for Trump. For example, in the final polls, Florida, which uses Dominion systems,[21] was

---

[19] Georgia Secretary of State, *Elections Security Is Our Top Priority: Security-Focused Tech Company, Dominion Voting to Implement New Verified Paper Ballot System,* available at, https://sos.ga.gov/securevoting/.

[20] *See Wisconsin presidential results,* Politico, available at, https://www.politico.com/2020-election/results/wisconsin/; *Pennsylvania presidential results,* Politico, available at, https://www.politico.com/2020-election/results/pennsylvania/; Verified Voting, available at https://verifiedvoting.org/verifier/#mode/search/year/2020/state/55/make/Dominion%20Voting%20Systems; Verified Voting, available at https://verifiedvoting.org/verifier/#mode/search/year/2020/state/42/make/Dominion%20Voting%20Systems.

[21] *See* Verified Voting, available at https://verifiedvoting.org/election-system/dominion-imagecast-evolution/; Verified Voting, available at https://verifiedvoting.org/election-system/dominion-imagecast-central/.



projected to be a Biden win.  Instead, Trump won the state by over 3%.[22]  Similarly, Ohio was projected to be extremely close, with some polls even showing Biden in the lead.  Yet, on election day, Ohio, which also used Dominion systems,[23] went for Trump by over 8%.[24]  Indeed, across the board in all of the swing states, Trump greatly outperformed the polling averages and final polls.[25]

Even if we entertain your fantasy for just a moment, why would Dominion have rigged the election for the Democratic nominee for President, but let Democrats lose ground in the House and let the Georgia Senate races proceed to a run-off, rather than handing the Senate majority to the Democrats on November 3?[26]  Indeed, Dominion systems were used in Iowa,[27] Alaska,[28] and Georgia[29]—and yet, none of the four Democratic candidates in those races won the election even though just two wins would have secured the Senate for the Democrats.

---

[22]   *See*   RealClear   Politics,   *Florida:   Trump   vs.   Biden*,   available   at, https://www.realclearpolitics.com/epolls/2020/president/fl/florida_trump_vs_biden-6841.html (final RCP polling average in Florida was Biden +0.9 and the final result was Trump +3.3).

[23]   *See* Verified Voting, *ImageCast X*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-x/;   Verified   Voting,   *ImageCast   Evolution*,   available   at, https://verifiedvoting.org/election-system/dominion-imagecast-evolution/;   Verified   Voting, *ImageCast Central*, available at https://verifiedvoting.org/election-system/dominion-imagecast-central/.

[24]   *See*   RealClear   Politics,   *Ohio:   Trump   vs.   Biden*,   available   at, https://www.realclearpolitics.com/epolls/2020/president/oh/ohio_trump_vs_biden-6765.html (final RCP polling average for Ohio was Trump +1.0 and final result was Trump +8.2).

[25] *See* RealClear Politics, *Top Battlegrounds: Wisconsin, Michigan, Pennsylvania, North Carolina Florida, Arizona*, available at, https://www.realclearpolitics.com/elections/trump-vs-biden-top-battleground-states/.  Trump beat the polling average in Michigan by 1.5%, Wisconsin by 6%, and Arizona by 0.6%.

[26]   *See*   Fox   News,   *Presidential   Election   Results*,   available   at, https://www.foxnews.com/elections/2020/general-results.  At present, Republicans have gained at least 8 House seats with 2 races still too close to call.

[27]   *See* Verified Voting, *ImageCast X*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-x/;   Verified   Voting,   *ImageCast   Precinct*,   available   at, https://verifiedvoting.org/election-system/dominion-imagecast-precinct/.

[28]   *See* Verified Voting, *ImageCast X*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-x/;   Verified   Voting,   *ImageCast   Remote*,   available   at, https://verifiedvoting.org/election-system/dominion-imagecast-remote/;   Verified   Voting, *ImageCast Precinct*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-precinct/.

[29]   *See* Verified Voting, *ImageCast X*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-x/;   Verified   Voting,   *ImageCast   Precinct*,   available   at, https://verifiedvoting.org/election-system/dominion-imagecast-precinct/.



Although the indisputable facts all point to the conclusion that this was a free and fair election, you launched a media circus and fundraising campaign that undermined confidence in American democracy and peddled false, inherently improbable, and defamatory claims about Dominion participating in an international conspiracy to rig the election, deeply damaging Dominion's hard-earned reputation and business in the process. Your conduct is evidence of actual malice. *See St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (the publication of allegations that are "inherently improbable" is strong evidence of actual malice); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) ("evidence that the story was so inherently improbable that only a reckless person would have put it in circulation" is "likely [to] support a finding of actual malice").

**Second**, as set forth above, you had multiple reasons to know that your sources were not reliable, including their lack of relevant credentials, sloppy work product (*e.g.*, confusing Michigan and Minnesota and relying on unreliable data claiming that eligible Georgia voters were not eligible), and unwillingness to be identified publicly. In addition, you had Joe Oltmann's interview making it clear that he does ***not*** have any recording to substantiate his ludicrous claim that he infiltrated Antifa and heard a Dominion employee saying he rigged the election. Your reliance on these facially unreliable sources—and your ***knowing*** lie that there was a recording substantiating Mr. Oltmann's claim—is evidence that you acted with actual malice. *See St. Amant*, 390 U.S. at 732 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant."); *Wells v. Liddy*, 186 F.3d 505, 542-43 (4th Cir. 1999) (actual malice may be shown where publisher had reason to believe a source might not be credible); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016) (relying on a facially unreliable source is evidence of actual malice); *Celle v. Filipino Rep. Enters., Inc.*, 209 F.3d 163, 190 (2d Cir. 2000) (same).

**Third**, you intentionally disregarded the key sources who have forcefully, publicly, and repeatedly debunked your dubious claims—namely, the state officials, including respected Republicans like Secretary of State Brad Raffensperger and Governor Brian Kemp, who have confirmed the validity of the election results after hand recounts of paper ballots. Your intentional disregard of these sources is evidence of actual malice. *See e.g., Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 124 (2d Cir. 2013) ("'evidence of an intent to avoid the truth ... [can be] sufficient to satisfy the [actual malice standard]'") (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 693 (1989)); *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 106 (D.D.C. 2009) ("Purposeful avoidance of truth can constitute actual malice").

**Fourth**, you made these false accusations because they conformed to your preconceived storyline—despite the inherent improbability of your accusations, the unreliability of your sources, and the credibility of the sources debunking your assertions. This too is evidence of actual malice. *Harris v. City of Seattle*, 152 F. App'x 565, 568 (9th Cir. 2005) (quoting 1 Rodney Smolla, Law of Defamation § 3:71 (2d ed.)); *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir. 1982) ("'[E]vidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual



malice, and may often prove to be quite powerful evidence.'"). Indeed, you were peddling your false and preconceived storyline before the polls closed on election day.[30]

*Fifth*, you had a financial incentive in making the defamatory accusations. Your own conduct and statements at the press conference, media tour, and on your websites make it clear that you were publicizing your wild accusations as part of a fundraising scheme and in order to drum up additional business and notoriety for yourself. Your financial incentive and motive to make the defamatory accusations is further evidence of actual malice. *See Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir. 1992); *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 288 (S.D.N.Y. 2016).

*Sixth*, you cannot simply claim ignorance of the facts. As a licensed attorney, you were obligated to investigate the factual basis for your claims before making them in court.[31] There is no factual basis for your defamatory accusations against Dominion and numerous reliable sources and documents in the public domain have repeatedly debunked your accusations. As such, you either conducted the inquiry required of you as a licensed attorney and violated your ethical obligations by knowingly making false assertions rebutted by the information you found, or you violated your ethical obligations by purposefully avoiding undertaking the reasonable inquiry required of you as a member of the bar. Either is additional evidence of actual malice.

Taken together, your deliberate misrepresentation and manufacturing of evidence, the inherent improbability of your accusations, your reliance on facially unreliable sources, your intentional disregard of reliable sources, your preconceived storyline, your financial incentive, and your ethical violations are clear and convincing evidence of actual malice. *See Eramo v. Rolling Stone*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016) (denying defendant's motion for summary judgment and finding "[a]lthough failure to adequately investigate, a departure from journalistic standards, or ill

---

[30] *See* OAN, *Sidney Powell: Dems will use 'lawfare' to alter election*, YouTube (Nov. 3, 2020), available at, https://www.youtube.com/watch?v=Vh5U_6apzvI&feature=emb_logo.

[31] *See, e.g.*, Fed. R. Civ. P. 11(b) ("By presenting to the court a pleading, written motion, or other paper ... an attorney ... certifies that to the best of that person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery"); Texas Disciplinary Rules of Professional Conduct 3.01 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless the lawyer reasonably believes that there is a basis for doing so that is not frivolous."); *id.*, Comment 2 ("All judicial systems prohibit, at a minimum, the filing of frivolous or knowingly false pleadings, motions or other papers with the court or the assertion in an adjudicatory proceeding of a knowingly false claim or defense."); *id.*, Comment 3 (prohibiting a filing "if it contains knowingly false statements of fact.").



will or intent to injure will not singularly provide evidence of actual malice, the court believes that proof of all three is sufficient to create a genuine issue of material fact").

## V.    Your false and defamatory accusations must be retracted.

Your false accusations about Dominion are defamatory *per se* and have exposed you, the entities you control, and the Trump Campaign to substantial legal risk for defamation. As a result of your false accusations, Dominion has suffered enormous harm, and its employees have been stalked, have been harassed, and have received death threats.   For the safety of Dominion's employees and for the sake of the truth and confidence in American democracy, we demand that you immediately and publicly retract your false accusations and set the record straight.  If you refuse to do so and instead choose to stand by your defamatory falsehoods, that will be viewed as additional evidence of actual malice. *See Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987) ("[r]efusal to retract an exposed error tends to support a finding of actual malice.").

Until these claims are resolved, please ensure that you, your principals, and all your sources are preserving and retaining all emails, text messages, audiovisual recordings, voice mails, drafts, notes, communications, documents, data, and electronically stored information of any kind that relates in any way to these matters.  Without limitation, this requires you to preserve all financial and corporate records of your "legal defense fund" Defending the Republic, all versions of all documents attached to any of your lawsuits relating to the election, including the undoctored and doctored version of the Secretary of State certificate referenced above, all drafts of and comments to all declarations attached to your complaints, and all communications with:

- Any member, volunteer, staff, or employee of the Trump Campaign;

- Your associates, clerks, and paralegals; and Rudy Giuliani, Jenna Ellis, Lin Wood, and each of their associates and paralegals;

- Every individual who submitted a declaration attached to any of your complaints relating to the election;

- Every reporter, editor, blogger, host, or other member of the media with whom you communicated about Dominion or the 2020 election, regardless of whether they published any of your claims; and

- Donors to your "legal defense fund," Defending the Republic.



Your document preservation obligations apply both to you individually, as well as to any entities you control, including but not limited to your law firm and your "legal defense fund," Defending the Republic.  Please confirm receipt of this letter and that you intend to adhere to our request to retain documents as set forth above.  This is not a complete recitation of our client's rights and remedies, all of which are expressly reserved.

We look forward to your prompt response.

Regards,

Thomas. A. Clare, P.C.

Megan L. Meier

15

# Exhibit 2

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tyler Bowyer, et al., | No. CV-20-02321-PHX-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| Doug Ducey, et al., | |
| Defendants. | |

Plaintiffs bring their Complaint seeking injunctive relief from this Court, specifically, to "set aside the results of the 2020 General Election," because they claim the election process and results were "so riddled with fraud, illegality and statistical impossibility . . . that Arizona voters, courts and legislators cannot rely on or certify" its results. (Doc. 1 at 2). By any measure, the relief Plaintiffs seek is extraordinary. If granted, millions of Arizonans who exercised their individual right to vote in the 2020 General Election would be utterly disenfranchised. Such a request should then be accompanied by clear and conclusive facts to support the alleged "egregious range of conduct in Maricopa County and other Arizona counties . . . at the direction of Arizona state election officials." (*Id.*) Yet the Complaint's allegations are sorely wanting of relevant or reliable evidence, and Plaintiffs' invocation of this Court's limited jurisdiction is severely strained. Therefore, for the reasons stated herein, the Complaint shall be dismissed.

## I.     Background

In Arizona, more than 3.4 million voters participated in the November 3, 2020,

General Election.  Thereafter, pursuant to A.R.S. § 16-602, several counties performed a hand count of sample ballots to test the tabulation equipment, and either no discrepancies were found or, if there were, they were "within the acceptable margin."[1]  Arizona law also requires the secretary of state, in the governor's presence, to certify the statewide canvas on the fourth Monday after a general election.  A.R.S. § 16-648.  On November 30, 2020, Secretary of State Katie Hobbs, in the presence of Governor Doug Ducey, certified the statewide canvas.  (Doc. 40 at 4).  The Canvas shows that former Vice President Joseph Biden prevailed over President Donald Trump by more than ten thousand votes.[2]  On that same day, Governor Ducey signed the Certificate of Ascertainment for Vice President Biden's presidential electors.  (Doc. 40 at 4).  The Certificate was then transmitted to the United States Archivist pursuant to the Electoral Count Act.  (Id.); see also 3 U.S.C. § 6.

In their Complaint and the accompanying Motion for Temporary Restraining Order ("TRO") filed on December 2, Plaintiffs "contest" the election and ask this Court to compel the Governor to "de-certify" these results. (Docs. 1 ¶ 145; 2 at 10).  The Complaint also requests that this Court grant a permanent injunction "enjoining Secretary Hobbs and Governor Ducey from transmitting the currently certified election results to the Electoral College," declare the election results unconstitutional, and seize all voting machines, equipment, software, and other election-related records and materials, including all ballots cast.[3]  (Doc. 1 at 51–52).  The Complaint claims to show "multifaceted schemes and artifices implemented by Defendants and their collaborators" to defraud the election.  (Id. at ¶ 3).  And these schemes allegedly resulted in "the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots."  (Id.)

---

[1] Ariz. Sec'y of State, Summary of Hand Count Audits–2020 General Election (Nov. 17, 2020), https://azsos.gov/election/2020-general-election-hand-count-results.

[2] Ariz. Sec'y of State, State of Arizona Official Canvass, https://azsos.gov/sites/default/files/2020_General_State_Canvass.pdf.

[3] Under 3 U.S.C. § 5, if a state enacts and applies procedures to decide election controversies before election day, and a decision regarding a contested election is made at least six days before the electors' meetings, then the decision is conclusive and will apply in counting the electoral votes.  That deadline, referred to as the "safe harbor" deadline, was December 8, 2020, as the Electoral College will meet on December 14, 2020.  See 3 U.S.C. § 7.

Of the fourteen named Plaintiffs, three are registered voters and GOP Chairs for various Arizona counties. (*Id.* at ¶¶ 29–31). The remaining eleven are Republican nominees for Arizona's presidential electors. (*Id.* at ¶ 28). One of the eleven, Dr. Kelli Ward, filed suit in state-court over allegations of fraud in this election. *See Ward v. Jackson*, Case No. CV2020-015285, slip. op. (Ariz. Super. Ct. Dec. 4, 2020) (finding no evidence of alleged fraud and dismissing claims of election misconduct); (Doc. 55-1). In that case, on December 8, 2020, the Arizona Supreme Court affirmed the Maricopa County Superior Court's findings that there was no evidence of fraud or misconduct in Arizona's election. (*Ward v. Jackson*, CV2020-015285 (Ariz. 2020); (Doc. 81-1).

Plaintiffs' Complaint contains four counts, three of which assert 42 U.S.C. § 1983 claims for violations of the Constitution's Elections and Electors Clauses, as well as the Fourteenth Amendment's Due Process and Equal Protection guarantees. (Doc. 1 ¶¶ 103–34). The final count, which does not specify a cause of action, is for "Wide-Spread Ballot Fraud." (*Id.* at ¶¶ 135–41).

On December 3, the day after Plaintiffs filed their Complaint, the Court received a Motion to Intervene from the Arizona Democratic Party, which was subsequently denied.[4] (Docs. 26 and 69). The Court also received a Motion to Intervene from the Maricopa County Board of Supervisors and Maricopa County Recorder Adrian Fontes, which was granted. (Docs. 27 and 32). The Court held a status conference on the same day, in which it scheduled a December 8 hearing on the TRO. (Doc. 28). By subsequent Order (Doc. 43), the Court converted that hearing to oral argument on the Motions to Dismiss filed on December 4. (Docs. 36, 38, and 40). Plaintiffs have filed their Response to the Motions (Doc. 44), and Defendants have filed their Replies. (Docs. 53, 54, and 55). On December 8, 2020, the Court held oral argument on the Motions to Dismiss and took this matter under advisement. Being fully briefed on the matter, the Court now issues its ruling.

…

---

[4] The Arizona Democratic Party sought intervention under theories of permissive joinder. While the Court did not believe the Motion was inappropriate, the Court did not find their presence necessary to this lawsuit and therefore denied the Motion to Intervene.

## II.    Analysis

Given the import of the overarching subject—a United States Presidential Election—to the citizens of Arizona, and to the named Plaintiffs, the Court is compelled to make clear why it finds it inappropriate to reach the merits of Plaintiffs' Complaint and why it must grant the Motions to Dismiss this matter in its entirety.  The Court will endeavor to lay bare the independent reasons for its conclusions, including those related to Article III standing, abstention, laches, mootness, and the federal pleading standards, which govern its review.

### A.    Article III Standing

"To ensure that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society, a plaintiff may not invoke federal-court jurisdiction unless he can show a personal stake in the outcome of the controversy." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (internal citations omitted).  Article III provides that federal courts may only exercise judicial power in the context of "cases" and "controversies."  U.S. Const. art. III, § 2, cl. 1; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992).  For there to be a case or controversy, the plaintiff must have standing to sue. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("*Spokeo II*").  Whether a plaintiff has standing presents a "threshold question in every federal case [because it determines] the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 341 (2006).  A suit brought by a plaintiff without Article III standing is not a "case or controversy," and an Article III federal court therefore lacks subject matter jurisdiction. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998).

"[A] plaintiff seeking relief in federal court must first demonstrate . . . a personal stake in the outcome," *Baker v. Carr*, 369 U.S. 186, 204 (1962), distinct from a "generally available grievance about government," *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per

curiam).  "That threshold requirement ensures that we act as judges, and do not engage in policymaking properly left to elected representatives."  *Gill*, 138 S. Ct. at 1923.  To establish standing, a plaintiff has the burden of clearly demonstrating that she has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo II*, 136 S. Ct. at 1547 (*quoting Warth*, 422 U.S. at 518); *accord Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting the party asserting jurisdiction bears the burden of establishing subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss).

To establish an injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo,* 136 S. Ct. at 1548 (*quoting Lujan,* 504 U.S. at 560).  "When we have used the adjective 'concrete, we have meant to convey the usual meaning of the term—'real,' and not 'abstract.'"  *Id.*  The plaintiff must establish a "particularized" injury, which means that "the injury must affect the plaintiff in a personal and individual way."  *Raines v. Byrd*, 521 U.S. 811, 819 (1997).  Moreover, "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Where a plaintiff has not established the elements of standing, the case must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

Rule 12(b)(1) authorizes a court to dismiss claims over which it lacks subject-matter jurisdiction.  A Rule 12(b)(1) challenge may be either facial or factual.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In a facial attack, the court may dismiss a complaint when the allegations of and documents attached to the complaint are insufficient to confer subject-matter jurisdiction.  *See Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).  In this context, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir.

1996).  In contrast, when a court evaluates a factual challenge to jurisdiction, a court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Safe Air for Everyone*, 373 F.3d at 1039 ("In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment.").

### 1.  Elections and Electors Clause – Count One

Plaintiffs allege in Count One that Defendants violated the Elections and Electors Clauses and 28 U.S.C. § 1983 by, among other things, losing or destroying absentee ballots, and/or replacing those ballots with "blank ballots filled out by election workers, Dominion or other third parties" sending thousands of absentee ballots to someone besides the registered voter that "could have been filled out by anyone."  (Doc. 1 at 41).  Defendants argue that Plaintiffs do not have standing to assert such a claim.  (Doc. 40 at 8–9).

The Elections Clause of the United States Constitution states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]"  U.S. Const. art. I, § 4, cl. 1.  The Elections Clause authorizes the state governments to regulate federal elections held in the state, while Congress retains "exclusive control" to alter a state's regulations.  *Colegrove v. Green*, 328 U.S. 549, 554 (1946).  A separate provision, the "Electors Clause" of the Constitution, states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors . . . ."  U.S. Const. art. II, § 1, cl. 2.[5]

Plaintiffs' Complaint alleges that Defendants violated the Elections Clause.  However, the Complaint does not allege grounds for standing to assert this claim, nor does it distinguish between the status of the groups of Plaintiffs.  At oral argument, Plaintiffs'

---

[5] While the Electors Clause and Elections Clause are separate Constitutional provisions, they share "considerable similarity."  *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839, (2015) (Roberts, C.J., dissenting).  These provisions are therefore often considered together.  *See Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 348–52 (3d Cir. 2020) (analyzing standing for Elections Clause and Electors Clause under the same test); *Wood v. Raffensperger*, 2020 WL 6817513, at *1 (N.D. Ga. Nov. 20, 2020) (same); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05 (1995) (holding that state's "duty" under Elections Clause "parallels the duty" described by Electors Clause).  Plaintiffs do not meaningfully distinguish between the two clauses in their Complaint or briefing.

counsel stated that eleven of the Plaintiffs were Republican Party nominees to be electors, and the other three were county GOP Chairs.  As an initial matter, Plaintiffs' briefing does not contain any arguments that the GOP Chairs have standing to assert this claim and the Court will dismiss the claim as to the GOP Chairs outright.

Plaintiffs argue that the Plaintiff Electors should be considered "candidates," and thus that they have standing under the Electors and Elections Clause pursuant to an Eighth Circuit case, *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020).  (Doc. 44 at 5).  That case, which is based on the operation of Minnesota state election law, allowed electors to bring claims under the Elections Clause because electors were treated as candidates for office under Minnesota law and thus would be injured by the governor's failure to seat them if chosen as the state's electors.  *See Carson*, 978 F.3d at 1057.

Plaintiff Electors likewise assert that under Arizona law they should also be considered "candidates."  (Doc. 44 at 5–6) (citing A.R.S. § 16-344).  However, the Electors are not candidates for office as the term is generally understood.  Arizona law makes clear that the duty of an Elector is to fulfill a ministerial function, which is extremely limited in scope and duration, and that they have no discretion to deviate at all from the duties imposed by the statute.  *See* A.R.S. § 16-212(C) ("After the secretary of state issues the statewide canvass containing the results of a presidential election, the presidential electors of this state ***shall cast their electoral college votes for the candidate for president and the candidate for vice president who jointly received the highest number of votes*** in this state as prescribed in the canvass.") (emphasis added).  Arizona voters do not show up to vote for any single Electors listed next to the presidential candidates' names; they vote for their preferred presidential candidate.  By specifying that the electors "shall be enclosed in a bracketed list" next to "the surname of the presidential candidate and vice-presidential candidate," A.R.S. § 16-507(B) clarifies and distinguishes the Electors' ministerial status from that of the presidential candidate running for office, the latter who unquestionably suffers the discrete injury required for standing.[6]  Notably, the Republican candidate whose

---

[6] A.R.S. § 16-507(B) in its entirety reads: "Presidential electors, which, shall be enclosed in a bracketed list and next to the bracketed list shall be printed in bold type the surname

name was on the ballot is not a plaintiff in this case.

Other circuit courts to reach the issue have cited the *Carson* decision with disapproval, noting that there was no precedent for expanding standing in the way that it did.[7] *See Bognet v. Sec'y of Commonwealth of Pa*., 980 F.3d 336, 351 n.6 (3d Cir. 2020) ("Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond* [*v. United States*, 564 U.S. 211 (2011)] to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots. . . . The *Carson* court appears to have cited language from *Bond* without considering the context—specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none.").  Indeed, as numerous other courts have held, where, as here, the injury alleged by plaintiffs is that defendants failed to follow the Elections Clause, the Supreme Court has stated that the "injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance." *Lance*, 549 U.S. at 442.

Elector Plaintiffs have not established they can personally bring suit, and therefore, they do not have standing to bring Count One.[8]  Therefore, the Court will dismiss Count

---

[7] *See also Carson,* 78 F.3d at 1063 (Kelly, J., dissenting) ("I am not convinced the Electors have Article III standing to assert claims under the Electors Clause. Although Minnesota law at times refers to them as 'candidates,' *see, e.g.*, Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood. Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president. *Id*. § 208.04 subdiv. 1 ('[A] vote cast for the party candidates for president and vice president shall be deemed a vote for that party's electors.'). They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals.").

[8] The Court notes that Count One of the Complaint makes passing references to the "VRA and HAVA," (the Voting Rights Act and the Help America Vote Act of 2002) but does not bring any claims under these statutes.  (Doc. 1 ¶ 106).

The indicator for the selection of the presidential and vice-presidential candidates shall be directly next to the surname of the presidential candidate, and one mark directly next to a presidential candidate's surname shall be counted as a vote for each elector in the bracketed list next to the presidential and vice-presidential candidates."

One.

## 2.    Vote Dilution – Count Two

In Count Two, Plaintiffs allege Equal Protection violations based on Defendants' failure to comply with Arizona law by permitting "illegal votes," allowing "voting fraud and manipulation," and in preventing "actual observation and access to the elector process," which allegedly resulted in "the dilution of lawful votes . . . and the counting of unlawful votes." (Doc. 1 at 45).  Plaintiffs ask the Court to order that "no ballot processed by a counting board in Arizona can be included in the final vote tally unless a challenger [i]s allowed to meaningfully observe the process."  (Doc 1 ¶ 120).  Absent from the Complaint is an allegation that Plaintiffs (or any registered Arizona voter for that matter) were deprived of their right to vote.  Instead, they bring baseless claims of "disparate treatment of Arizona voters, in subjecting one class of voters to greater burdens or scrutiny than another." (Doc. 1 ¶ 115).  They do not allege what "class" of voters were treated disparately.  Nor do the Elector Plaintiffs cite to any authority that they, as "elector delegates," are a class of protected voters.  Defendants contend that Plaintiffs do not have standing to assert these claims and point out that these allegations are nothing more than generalized grievances that any one of the 3.4 million Arizonans who voted could make if they were so allowed.  The Court agrees.

Here, Plaintiffs have not alleged a concrete harm that would allow the Court to find Article III Standing for their vote dilution claim.  As courts have routinely explained, vote dilution is a very specific claim that involves votes being weighed differently and cannot be used generally to allege voter fraud.  "Contrary to the Voter Plaintiffs' conceptualization, vote dilution under the Equal Protection Clause is concerned with votes being weighed differently." *Bognet*, 980 F.3d at 355; *see also Rucho v. Common Cause*, –– U.S. ––––, 139 S. Ct. 2484, 2501 (2019) ("[V]ote dilution in the one-person, one-vote cases refers to the idea that each vote must carry equal weight.").  "This conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment.  Violation

of state election laws by state officials or other unidentified third parties is not always amenable to a federal constitutional claim." *Bognet*, 980 F.3d at 355; *see also Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution."); *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970) (rejecting Equal Protection claim where allegations of state's erroneous counting of votes cast by voters unqualified to participate).

Additionally, Plaintiffs cannot sustain their Equal Protection Clause claim on a vote dilution theory. *See Bognet*, 980 F.3d at 355 (rejecting Equal Protection theory and explaining "[t]his conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment"); *see also Shipley*, 947 F.3d at 1062 ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution") (internal citations omitted); *Am. Civil Rights Union v. Martinez-River*a, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) (holding that allegations of "vote dilution" as a result of alleged voting process irregulates "[are] speculative and, as such, are more akin to a generalized grievance about the government than an injury in fact."); *Powell*, 436 F.2d at 88 (rejecting Equal Protection Clause claim arising from state's erroneous counting of votes cast by voters unqualified to participate in closed primary); *Snowden v. Hughes*, 321 U.S. 1, 11 (1944) ("It was not intended by the Fourteenth Amendment . . . that all matters formerly within the exclusive cognizance of the states should become matters of national concern.").

Setting aside that Plaintiffs' claims regarding the election are not viable vote dilution claims, Plaintiffs also have not requested relief that is redressable in a tailored way as is required. *See Gill*, 138 S. Ct. at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *see also Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). Therefore, even if Plaintiffs could somehow establish that

1   their vote dilution claim was more than a generalized grievance to the point of asserting an
2   injury, Plaintiffs have not established that the Court can redress this grievance. To give
3   Plaintiffs the relief they desire would disenfranchise the nearly 3.4 million Arizonans that
4   voted in the 2020 General Election. Under Plaintiffs' theory of dilution, this would
5   transform all of the alleged diluted votes from being "diluted" to being destroyed. As
6   Plaintiffs raise "only a generally available grievance about government—claiming only
7   harm to his and every citizen's interest in proper application of the Constitution and laws,
8   and seeking relief that no more directly and tangibly benefits him than it does the public at
9   large," the Court finds that Plaintiffs' Count Two "does not state an Article III case or
10  controversy." *See Lance*, 549 U.S. 437 at 439. Therefore, Plaintiffs do not have standing
11  to bring suit in this forum.[9]

12      **B.    Abstention**

13      Defendants also argue the Court should abstain from reaching Plaintiffs' claims
14  based on their similarities with ongoing state court cases. Yesterday, the Arizona Supreme
15  Court ruled on one such case—filed by Dr. Kelli Ward—seeking to "set aside the 2020
16  General Election results." *See Ward*, CV 2020-015285 (Ariz. 2020); (Doc. 81-1). That
17  case was filed pursuant to A.R.S. § 16-672 and was also filed after Governor Ducey
18  certified the election results on November 30, 2020. (Doc. 58-1 at 17). The *Ward* plaintiffs
19  alleged an insufficient opportunity to observe election officials, an overcounting of mail-
20  in ballots by not adequately comparing signatures on the ballot envelopes, and errors in the
21  ballot duplication process. (*Id.* at 17–21). After an evidentiary hearing, the Maricopa
22  County Superior Court issued a ruling on December 4, 2020, finding that there was no
23  misconduct, fraud, or effect on the outcome of the election.[10]  (*Id.*)  This ruling was

---

[9] Having established that the Court does not have jurisdiction over Plaintiffs' Counts One through Three, the Court will decline to exercise supplemental jurisdiction over Count Four, which pleads no federal cause of action and is entirely based on alleged fraud under Arizona law.

[10] Judge Randall H. Warner of the Maricopa County Superior Court addressed Ward's allegations of election misconduct. First, Ward argued that there was an insufficient opportunity to observe the actions of election officials. The State Court dismissed that claim as untimely, holding that "[t]he observation procedures for the November general election were materially the same as for the August primary election, and any objection to

unanimously affirmed by an *en banc* panel of the Arizona Supreme Court on expedited review.[11]

Here, Plaintiffs' Complaint similarly relies upon A.R.S. § 16-672 and its provisions related to bringing suit for alleged election misconduct, including illegal votes and erroneous counting.  (Doc. 1 at ¶ 15).  A.R.S. § 16-672 also provides that an elections contest brought under this statute should be filed in the superior court of the county in which the person contesting resides or in the superior court of Maricopa county.  A.R.S. § 16-672(B).  Plaintiffs aver that their claims seek federal action under federal statutes, and therefore, their claims are distinguishable from the claims being litigated in the state court. The Court disagrees.

Generally, a federal court has a duty to exercise the jurisdiction conferred by Congress.  However, under certain circumstances, it is prudent for a federal court to abstain from hearing a matter.  "Indeed, we have held that federal courts may decline to exercise its jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest."  *Quackenbush v. Allstate Ins.*

---

them should have been brought at a time when any legal deficiencies could have been cured," and citing *Lubin v. Thomas*, 144 P.3d 510, 511 (Ariz. 2006) ("In the context of election matters, the laches doctrine seeks to prevent dilatory conduct and will bar a claim if a party's unreasonable delay prejudices the opposing party or the administration of justice.").  Second, Ward alleged that "election officials overcounted mail-in ballots by not being sufficiently skeptical in their comparison of signatures on the mail-in envelope/affidavits with signatures on file."  The state court allowed Ward to examine a sampling of mail-in ballots, and the court held that "[t]he evidence does not show that these affidavits are fraudulent, or that someone other than the voter signed them. There is no evidence that the manner in which signatures were reviewed was designed to benefit one candidate or another, or that there was any misconduct, impropriety, or violation of Arizona law with respect to the review of mail-in ballots."  Lastly, Ward alleged errors with duplication of ballots.  The state court also allowed Ward to examine a sampling of duplicate ballots and held that '[t]he duplication process prescribed by the Legislature necessarily requires manual action and human judgment, which entail a risk of human error. Despite that, the duplication process for the presidential election was 99.45% accurate. And there is no evidence that the inaccuracies were intentional or part of a fraudulent scheme. They were mistakes. And given both the small number of duplicate ballots and the low error rate, the evidence does not show any impact on the outcome." The state court concluded by holding that "[t]he Court finds no misconduct, no fraud, and no effect on the outcome of the election."  *Ward*, CV 2020-015285 (Ariz. Super. Ct. Dec. 4, 2020); (Doc. 58-1).

[11] "The Court concludes, unanimously, that the trial judge did not abuse his discretion in denying the request to continue the hearing and permit additional inspection of the ballots." *Ward*, CV 2020-015285, at *7 (Ariz. 2020); (Doc. 81-1).

- 12 -

*Co.*, 517 U.S. 706, 716 (1996) (citing *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959)).  Abstention may be "warranted by considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration."  *Id.* *Colorado River* abstention permits a federal court to abstain from exercising jurisdiction over a matter in deference to a state court suit regarding similar claims and allegations. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 817 (1976).

The Ninth Circuit has enumerated an eight-part test for whether *Colorado River* abstention is warranted, stressing that the factors are "not a mechanical checklist," with some factors that "may not have any applicability to a case."  *Seneca Ins. Co., Inc. v. Strange Land, Inc.*, 862 F.3d 835, 841–42 (9th Cir. 2017).  The factors are: (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.  *Id.*

Factors two through seven all support abstaining from this case.[12]  To begin, this federal forum is less convenient than the state forum, considering the state election law violations alleged, the claims are brought against state actors, and the interplay of state election law.  Moreover, the present suit reflects the very essence of "piecemeal litigation," with many of the same parties and attorneys litigating related matters in both forums.  As to the primacy of cases, this case was the last filed case.  All of the state court litigation filed related to the election preceded this action.  As to the nature of the claims, while Plaintiffs bring their claims under federal laws, the crux of their arguments, and the statutes upon which they rely, involve Arizona election law and the election procedures carried out at the county and state level by state officials.  The state courts are adequately equipped to

---

[12] The Court finds that the first factor is not relevant to the facts alleged herein.

protect the rights of the named Plaintiffs, especially considering that Plaintiff Ward already pursued her grievances there. Moreover, as Congress has conferred concurrent jurisdiction on state courts to adjudicate Section 1983 claims, there is no concern that the state is unable to adjudicate Plaintiffs' Section 1983 claims. *Felder v. Casey*, 487 U.S. 131, 139 (1988). Lastly, abstention would alleviate the necessity to consider whether this matter was filed in this Court as a form of forum shopping, especially considering that a number of other related state court lawsuits have already been disposed of. The eighth factor is the only factor that weighs against abstention, as it does not appear that Plaintiffs' allegations of widespread fraud in relation to the tabulation systems and software were before the state court. However, as discussed *infra*, the Court finds that claim lacks Rule 9(b) particularity and plausibility.

Moreover, when considering abstention, "proper constitutional adjudication, regard for federal-state relations, or wise judicial administration," also inform this Court. *Quackenbush*, 517 U.S. at 716. If the Court were to reach the merits of Plaintiffs' claims, it would be entirely possible today for it to reach a different legal determination, or the same conclusion but with a different analysis, than the Arizona Supreme Court reached in *Ward v. Jackson*. The Court cannot think of a more troubling affront to "federal-state relations" than this. *See Quackenbush*, 517 U.S. at 716. Therefore, the Court finds that abstention of these parallel issues is appropriate and indeed necessary.

## C.   Eleventh Amendment

Defendants also argue that the Eleventh Amendment bars Plaintiffs' demands for relief because they, as state officials who have not consented to being sued, are immune from suit. Further, they argue that no exception applies, that the relief Plaintiffs seek is not prospective, and that the claims are barred.

The Eleventh Amendment to the Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

- 14 -

U.S. Const. amend. XI.  Such immunity applies when a citizen brings a claim against their own state.  *See Hans v. Louisiana*, 134 U.S. 1, 19 (1890).  The immunity extends to "suit[s] against state officials when the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  "This jurisdictional bar applies regardless of the nature of the relief sought." *Id.*  "When the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself." *Id.* at 101.  "The general rule is that a suit is against the sovereign . . . if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620 (1963).

There are three recognized exceptions to the above: (1) Congress has abrogated the immunity within a federal statute; (2) the State has waived immunity and allowed individuals to sue it pursuant to specific state statutes; and (3) in "claims seeking *prospective* injunctive relief against state officials to remedy a state's *ongoing* violation of *federal* law." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 865 (9th Cir. 2016) (citing *Ex parte Young*, 209 U.S. 123 (1908)) (emphasis added).

None of these exceptions are present here.  As for Plaintiffs' 42 U.S.C. § 1983 claims, Congress did not abrogate the states' immunity from suit in the enacting language of Section 1983, and therefore, the Eleventh Amendment bars those claims.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989) (holding that Section 1983 "does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties").  Plaintiffs provided no argument or authority that the state has explicitly waived its immunity for elections challenges.  Therefore, the second exception does not apply.  As for the remaining claims, the Court must determine whether Plaintiffs are seeking prospective relief to cure an ongoing violation of federal law.

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645

1    (2002) (internal citations omitted).  However, where the claims are state law claims,

2    masked as federal law claims, *Ex parte Young* is inapplicable and the Eleventh Amendment

3    clearly bars the suit.  *See Massey v. Coon*, 865 F.2d 264 (9th Cir. 1989) (affirming dismissal

4    where "on its face the complaint states a claim under the due process and equal protection

5    clauses of the Constitution, [but] these constitutional claims are entirely based on the

6    failure of defendants to conform to state law"); *see also Pennhurst*, 465 U.S. at 90 ("[W]hen

7    a plaintiff alleges that a state official has violated state law" and "when a federal court

8    instructs state officials on how to conform their conduct to state law, this conflicts directly

9    with the principles of federalism that underlie the Eleventh Amendment.").  This is true

10   whether the relief requested is "prospective or retroactive" in nature.  *Pennhurst*, 465 U.S.

11   at 106.

12       Here, Plaintiffs face a number of difficulties in their attempt to pierce Defendants'

13   sovereign immunity.  Defendants argue that all of Plaintiffs' allegations are actually state

14   law allegations masked under federal law.  Defendants point to numerous instances in

15   Plaintiffs' Complaint where Arizona state election law is relied on, including their catch-

16   all fraud claims, which are entirely based on state law.  The Eleventh Amendment clearly

17   bars such claims.  *See Pennhurst*, 465 U.S. at 106 ("On the contrary, it is difficult to think

18   of a greater intrusion on state sovereignty than when a federal court instructs state officials

19   on how to conform their conduct to state law.").

20       However, even assuming that Plaintiffs established that their claims are indeed

21   independent federal claims, it is unclear what *ongoing* violation of federal law is being

22   asserted.  Plaintiffs allege Due Process and Equal Protection claims, along with a catch-all

23   fraud claim, that arise from Defendants' alleged failure to follow Arizona state election

24   laws.  (Doc. 1 at ¶¶ 106–120).  These numerous alleged violations—related to alleged

25   issues with signature verification, ballot duplication, and poll observation—concern past

26   conduct.[13]   The relief requested—compelling the Governor to decertify the election—

27   ――――――――――――――――
     [13] These include objections regarding poll watchers' ability to observe ballot counting,
28   issues related to the manner and process by which Arizona election officials matched
     signatures on absentee ballots (Doc. 1 at ¶¶ 46–48); issues related to the process and role
     assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49);

1    similarly seeks to alter past conduct.  Plaintiffs have not identified an ongoing violation to

2    enjoin.   In short, "Plaintiffs are seeking to undo what has already occurred, as their

3    requested relief reflects."  *See King v. Whitmer*, 2020 WL 7134198, at *5 (E.D. Mich. Dec.

4    7, 2020).

5            The Eleventh Amendment bars the injunctive relief sought.

6        **D.    Laches**

7            Defendants also argue that the doctrine of laches bars Plaintiffs' claims.  Laches

8    will bar a claim when the party asserting it shows the plaintiff unreasonably delayed in

9    filing the action and the delay caused prejudice to the defendant or the administration of

10   justice.  *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951–52 (9th Cir. 2001) (noting that

11   laches requires a "defendant [] prove both an unreasonable delay by the plaintiff and

12   prejudice to itself").  Laches can bar untimely claims for relief in election cases, even when

13   the claims are framed as constitutional challenges.   *Soules v. Kauaians for Nukolii

14   Campaign Comm.*, 849 F.2d 1176, 1181 (9th Cir. 1988); *U.S. v. Clintwood Elkhorn Min.

15   Co.*, 553 U.S. 1, 9 (2008) ("[A] 'constitutional claim can become time-barred just as any

16   other claim can.'") (*quoting Block v. North Dakota ex rel. Board of Univ. and School

17   Lands*, 461 U.S. 273, 292 (1983)).

18           Plaintiffs filed their Complaint and request for TRO seeking to "de-certify" the

19   election results on December 2, 2020, nearly a month after the General Election on

20   November 3, 2020.  Plaintiffs conclusively argue that they waited this long because they

21   "could not have known the basis of their claim, or presented evidence substantiating their

22   claim, until after the election."  (Doc. 44 at 9).  They further state that, because "Arizona

23   election officials and other third parties did not announce or publicize their misconduct,

24   and in fact prevented Republican poll watchers from observing the ballot counting and

25   handling, it took Plaintiffs additional time post-election to gather the fact and expert

26   witness testimony presented in the Complaint."  (*Id.*)  During oral argument, Plaintiffs'

27   counsel repeatedly stated that the alleged fraud related to the Dominion voting machines

28   ────────────────────────────
     "irregularities" with the voting machines (*Id.* at ¶¶ 50–52); and certification of the
     Dominion voting system on November 18, 2020 (*Id.* at ¶ 53).

- 17 -

was not known until election night, when their experts noted a "blip" in their reporting data that showed an increase in votes for Joe Biden around 8:00 p.m.  Plaintiffs also argue that A.R.S. §16-673 supports the timeliness of their Complaint because it requires an elector to file a challenge to the election in state court within five days of certification of the election.

Plaintiffs' Complaint includes a hodge-podge of alleged misconduct by Arizona elections officials, occurring on various dates over the past weeks, months, and even years. In addition to the objections regarding poll watchers' inability to observe ballot counting and handling, Plaintiffs also object to the manner and process by which Arizona election officials matched signatures on absentee ballots (Doc. 1 ¶¶ 46–48); to the process and role assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49); to "irregularities" with the voting machines on Election Day and before (*Id.* at ¶¶ 50–52); and to the certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53).

The affidavits or declarations upon which Plaintiffs rely clearly shows that the basis for each of these claims was either known well before Election Day or soon thereafter, and thus cannot be excused by a lack of knowledge nor an inability to substantiate their claims through December 2.  For example, Plaintiffs' Complaint cites to documents showing that Plaintiffs were in possession of information about suspected irregularities with the Dominion voting machines as early as 2018.  (*Id.* at ¶¶ 21, 69, 71–73) (referencing "publicly available evidence (including judicial and administrative proceedings)" that discuss concerns with security flaws in Dominion voting machines dating back to 2018); (Doc. 1-10 at 19, Ex. 20, Declaration of Mark Paul Law dated November 24, 2020 (describing his concerns over Maricopa County Dominion voting machine security and observations while poll watching on October 25, 2020 and November 1, 2020); *id.* at 30, Ex. 22, Declaration of Gregory Wodynski dated November 23, 2020 (describing his concerns over Maricopa County Dominion voting machine security and his perception that "Bruce," a Dominion employee, could manually manipulate voter data files while poll watching on October 24, 2020 and November 1, 2020).

Plaintiffs also include documents showing that the facts underlying their allegations

of ballot counting and verification misconduct occurred weeks before Election Day. Canvassing in Arizona began in October, and the poll watcher declarations and affidavits attached to the Complaint object to the signature verification and ballot process during this time. (*See* Doc. 1-3 at 7, Ex. 5) (containing unsigned Declaration dated October 25, 2020 from poll watcher objecting to "NO EFFECTIVE oversight" in signature verification rooms); *id.* at 9, Ex. 5A (document listing poll watcher objections made on 10/7/20, 10/23/20, 10/24/20, 10/29/20); (Doc. 1-10 at 25, Ex. 21) (containing a Declaration of poll watcher Judith Burns dated November 16, 2020 and noting her objections in observing the signature verification and ballot processing on October 17, 2020 and October 21, 2020). In a statement from Ms. Linda Brickman, the First Vice-Chair of the Maricopa County Republican Committee, she represents that she had ongoing concerns regarding the signature verification for early and mail-in ballots during her time as an elections worker "from 10/19/20 to 11/11/20" (Doc. 1-10 at 38, Ex. 23) and had objections to the Logic and Accuracy Certification of the Dominion voting systems that occurred on November 18, 2020. (*Id.* at 35). Indeed, at least one Plaintiff has already raised some of these complaints in state court.[14] *Ward*, CV2020-015285 (Super. Ct. of Ariz. Dec. 4, 2020) (dismissing the Petition with prejudice); (Doc. 58-1 at 14, Ex. B). Dr. Ward clearly knew the basis of her claim before December 2, 2020 but offers no reasonable explanation for the delay in bringing this suit in federal court. When contesting an election, any delay is prejudicial, but waiting until a month after Election Day and two days after certification of the election is inexcusable. *See Kelly v. Penn.*, 2020 WL 7018314, at *1 (Pa. Nov. 28, 2020) ("Petitioners failed to act with due diligence in presenting the instant claim" when they waited until November 21 to sue to invalidate Pennsylvania's election); *Kistner v. Simon*, No. A20-1486, slip op. at 3–4 (Minn. Dec. 4, 2020); *see also, e.g., Ariz. Libertarian Party*

---

[14] As she does here, Ms. Ward's state court action claimed that poll watchers were given insufficient opportunity to observe the actions of election officials. Notably, the state court judge found this claim barred by the doctrine of laches, as Ms. Ward had failed to assert it during a time when it could have been corrected. (Doc. 1-10 at 19 ("The observation procedures for the November general election were materially the same as for the August primary election, and any objection to them should have been brought at a time when any legal deficiencies could have been cured.").

*v. Reagan*, 189 F. Supp. 3d 920, 922–23 (D. Ariz. 2016).

The Court does not find that the Arizona state election challenge deadline excuses delay on Plaintiffs' part in these circumstances. *See* A.R.S. §16-673. As noted above, the facts underlying the suspected irregularities complained of were either known to Plaintiffs prior to Election Day or soon thereafter. Although Arizona electors may have a deadline by which to file election contests in Arizona state court, Plaintiffs here opted to file their federal constitutional challenges in federal court. The exhibits to the Complaint confirm that the events complained of occurred on or before Election Day. Accordingly, the Court rejects Plaintiffs' self-serving statement that they did not know the basis for their claims before December 2, 2020. The documents they submit with their Complaint plainly shows the contrary is true, and the delay—which has resulted in a rush by this Court and Defendants to resolve these issues before the Electoral College meeting deadline of December 14, 2020—is unreasonable.

The second part of the laches test—prejudice—is also unquestionably met. First, the prejudice to the Defendants and the nearly 3.4 million Arizonans who voted in the 2020 General Election would be extreme, and entirely unprecedented, if Plaintiff were allowed to have their claims heard at this late date. *SW Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) ("Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented."). As an Eastern District of Michigan Court stated in a nearly identical case, "[the prejudice] is especially so considering that Plaintiffs' claims for relief are not merely last-minute—they are after the fact. While Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified. The rationale for interposing the doctrine of laches is now at its peak." *King*, 2020 WL 7134198, at *7.

Second, the challenges that Plaintiffs assert quite simply could have been made weeks ago, when the Court would have had more time to reflect and resolve the issues. "Unreasonable delay can prejudice the administration of justice by compelling the court to steamroll through . . . delicate legal issues in order to meet election deadlines." *Arizona*

1    *Libertarian Party*, 189 F. Supp. 3d at 923 (quotation marks and citations omitted).

2    Plaintiffs offer no reasonable explanation why their claims were brought in federal court

3    at this late date.  Their delay and the resulting prejudice bars their claims by laches.

4        **E.    Mootness**

5        Defendants also argue that this case is moot. (Docs. 38 at 5; 40 at 22).  The Court

6    agrees.  "Mootness is a jurisdictional issue, and 'federal courts have no jurisdiction to hear

7    a case that is moot, that is, where no actual or live controversy exists.'" *Foster v. Carson*,

8    347 F.3d 742, 745 (9th Cir. 2003) (quoting *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d

9    986, 989 (9th Cir. 1999)).  In addition, a case is moot when a party cannot obtain relief for

10   its claim.  *Id.*; *see also Ruvalcaba v. City of L.A.*, 167 F.3d 514, 521 (9th Cir. 1999).

11       Plaintiffs request an injunction that (a) enjoins Governor Ducey from transmitting

12   the certified results, (b) orders Defendants to "de-certify" the election results, (c) nullifies

13   votes tabulated by uncertified machines, (d) declares that illegal ballot fraud occurred in

14   violation of the Electors and Elections Clauses and the Fourteenth Amendment's Due

15   Process and Equal Protections Clauses, (e) mandates a manual recount or statistical

16   sampling of all mail-in and absentee ballots, and (f) allows Plaintiffs to seize and inspect

17   voting hardware and software as well as security camera recordings "of all rooms used in

18   Maricopa County" from November 3 to 4.  (Doc. 1 at ¶ 145).

19       Obviously, the Court cannot enjoin the transmission of the certified results because

20   they have already been transmitted.  (Doc. 40 at 4).  Plaintiffs' counsel orally argued that

21   Defendants had the power to de-certify the election under 3 U.S.C. § 6.  Nothing in that

22   statute authorizes this Court to de-certify the results.  The manner provided to contest

23   elections under Arizona law requires election contest claims to be brought, "in the superior

24   court of the county in which the person contesting resides or in the superior court of

25   Maricopa County." A.R.S. § 16-672.  Therefore, if de-certification were possible, it would

26   only be possible through an action brought in Arizona superior court.  In other words, this

27   Court has no power to de-certify the results.  But even assuming the Court were able to

28   grant the extraordinary relief requested, ordering Governor Ducey to de-certify the

1   election, such relief would necessarily run afoul of 3 U.S.C. § 6 by ignoring Arizona law.

2   In this instance, the Court cannot allow Plaintiffs to circumvent both federal and Arizona

3   law.

4   Because this Court cannot de-certify the results, it would be meaningless to grant

5   Plaintiffs any of the remaining relief they seek.  *See Wood v. Raffensperger*, 2020 WL

6   7094866, at *6 (11th Cir. Dec. 5, 2020) ("[I]t is not possible for us to delay certification

7   nor meaningful to order a new recount when the results are already final and certified.");

8   *King*, 2020 WL 7134198, at *5 n.3 ("[T]he evidence Plaintiffs seek to gather by inspecting

9   voting machines and software and security camera footage only would be useful if an

10  avenue remained open for them to challenge the election results.").  Plaintiffs' claims are

11  moot.

12         **F.      Failure to State a Claim**

13         "A motion to dismiss a complaint or claim 'grounded in fraud' under Rule 9(b)[15]

14  for failure to plead with particularity is the functional equivalent of a motion to dismiss

15  under Rule 12(b)(6) for failure to state a claim."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d

16  1097, 1107 (9th Cir. 2003).  In a Rule 12(b)(6) context, courts must consider all well-

17  pleaded factual allegations as true and interpret them in the light most favorable to the

18  plaintiff.  *Schlegal v. Wells Fargo Bank, NA,* 720 F.3d 1204, 1207 (9th Cir. 2013).

19  Dismissal is proper when there is either (1) a lack of a cognizable legal theory or (2)

20  insufficient facts to support a cognizable legal claim.  *Conservation Force v. Salazar*, 646

21  F.3d 1240, 1242 (9th Cir. 2011), *cert. denied, Blasquez v. Salazar*, 565 U.S. 1261 (2012).

22         When pleading allegations concerning fraudulent conduct, Rule 9(b) requires

23  something more than Rule 8: particularity.  *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009);

---

[15] Although Plaintiffs strenuously argue that they can bring their Arizona election law-based claims in federal court because of the presence of federal allegations, they also boldly assert in their Reply that they need not follow the heightened pleading standard of Federal Rule of Civil Procedure 9(b) in pleading their fraud claims with particularity, because the federal rules are somehow abrogated by "controlling Arizona Supreme Court precedent.[15]" (Doc. 44 at 23).  Plaintiffs cannot have it both ways.  Plaintiffs have not provided any authority that a state court decision can alter the pleading requirements in federal court established by United States Supreme Court precedent and the Federal Rules of Civil Procedure.

*see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "This particularity requirement demands a higher degree of notice than that required for other claims. The claim must identify who, what, where, when, and how." *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003).

Moreover, "claims of fraud or mistake . . . must, in addition to pleading with particularity, also plead plausible allegations. That is, the pleading must state enough facts to raise a reasonable expectation that discovery will reveal evidence of the misconduct alleged." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc*., 637 F.3d 1047, 1055 (9th Cir. 2011) (internal citations omitted). Indeed, "Rule 9(b) serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also 'to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.'" *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) (citing *In re Stac Elec. Sec. Litig*., 89 F.3d 1399, 1405 (9th Cir. 1996)).

Establishing the plausibility of a complaint's allegations is a two-step process that is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. 679. First, a court must "identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. Then, assuming the truth only of well-pleaded factual allegations, a court must "determine whether they plausibly give rise to an entitlement to relief." *Id*.; *see also Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (identifying the two-step process for evaluating pleadings). Although a plaintiff's specific factual allegations may be consistent with a plaintiff's claim, a district court must assess whether there are other "more likely explanations" for a defendant's conduct such that a plaintiff's claims cannot cross the line "'from conceivable to plausible.'" *Iqbal*, 556 U.S. at 680

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard represents a balance between Rule 8's roots in relatively liberal notice pleading and the need to prevent "a plaintiff with a largely groundless claim" from "'tak[ing] up the time of a number of other people, with the right to do so representing an *in terrorem* increment of settlement value.'" *Twombly*, 550 U.S. at 557–58 (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

Advancing several different theories, Plaintiffs allege that Arizona's Secretary of State and Governor conspired with various domestic and international actors to manipulate Arizona's 2020 General Election results allowing Joseph Biden to defeat Donald Trump in the presidential race. The allegations they put forth to support their claims of fraud fail in their particularity and plausibility. Plaintiffs append over three hundred pages of attachments, which are only impressive for their volume. The various affidavits and expert reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections. Because the Complaint is grounded in these fraud allegations, the Complaint shall be dismissed. *Vess*, 317 F.3d at 1107 ("When an entire complaint, or an entire claim within a complaint, is grounded in fraud and its allegations fail to satisfy the heightened pleadings requirements of Rule 9(b), a district court may dismiss the complaint or claim.").

Plaintiffs first "describe specific violations of Arizona law" to support their fraud claims.[16] In doing so, they attach declarations from poll watchers that observed election officials during the November General Election. (Doc. 1 ¶¶ 46–53). As Intervenor-Defendant Maricopa County points out, these are the only declarants offered by Plaintiffs with first-hand observation of the election administration. (Doc. 36 at 4). But these four declarants do not allege fraud at all. (*See* Doc. 1-10 at 18–24). Instead, they raise objections to the manner and process by which Arizona election officials matched signatures on absentee ballots (Doc. 1 ¶¶ 46–48); to the process and role assigned to poll

---

[16] Plaintiffs' often scattershot pleadings allege that "Defendants failed to administer the November 3, 2020 election in compliance with the manner prescribed by the ***Georgia legislature***." (Doc 2 at 6) (emphasis added). Plaintiffs also nonsensically include references to Wisconsin state statutes. (Doc. 1 at 33).

referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49); to "irregularities" with the voting machines on Election Day and before (*Id.* at ¶¶ 50–52); and to the certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53). These objections to the manner in which Arizona officials administered the election cannot serve to overturn the results of the 2020 presidential election in Arizona because they fail to present evidence that supports the underlying fraud claim. At most, these are the type of "garden variety election irregularities" federal courts are "not equipped nor empowered to supervise . . . ." *Griffin v. Burns*, 570 F.2d 1065, 1076, 1077 (1st Cir. 1978) ("If every election irregularity or contested vote involved a federal violation, the court would be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitioners, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law.").

Plaintiffs next argue that they have expert witnesses who can attest to widespread voter fraud in Arizona. As an initial matter, none of Plaintiffs' witnesses identify Defendants as committing the alleged fraud, or state what their participation in the alleged fraudulent scheme was. Instead, they allege that, absentee ballots "*could have* been filled out by anyone and then submitted in the name of another voter," "*could be* filled in by third parties to shift the election to Joe Biden," or that ballots were destroyed or replaced "with blank ballots filled out by election workers, Dominion or other third parties." (Doc. 1 ¶¶ 54–58) (emphasis added). These innuendoes fail to meet Rule 9(b) standards. But perhaps more concerning to the Court is that the "expert reports" reach implausible conclusions, often because they are derived from wholly unreliable sources.

Plaintiffs' expert Mr. William Briggs ("Briggs"), for example, concludes that "troublesome" errors by Arizona election officials "involving unreturned mail-in ballots [] are indicative of voter fraud" and that the election should consequently be overturned. (Doc. 1 at ¶ 54). Briggs relies on data provided by an unknown person named "Matt Braynard," a person who may or may not have tweeted a "Residency Analysis of ABS/EV Voters" on his Twitter account on November 20, 2020 (Doc. 1-2 at 14, Ex. 2); (*Id.* at 52,

Ex. 3). Apart from a screenshot of Mr. Braynard's tweets that day, Plaintiffs offer nothing further about Mr. Braynard's identity, qualifications, or methodologies used in conducting his telephone "survey." But according to the Briggs' report, Mr. Braynard conducted his survey of unknown size and to unknown persons in Georgia, Michigan, Wisconsin, Arizona, and Pennsylvania regarding absentee ballots, and his "findings" were conveyed to Mr. Briggs. (*Id.*) In concluding that there were "clearly a large number of troublesome ballots in each state," Mr. Briggs assumed Mr. Braynard's "survery [sic] respondents [were] representative and the data [was] accurate." (*Id.*) This cavalier approach to establishing that hundreds of thousands of Arizona votes were somehow cast in error is itself troublesome. The sheer unreliability of the information underlying Mr. Briggs' "analysis" of Mr. Braynard's "data" cannot plausibly serve as a basis to overturn a presidential election, much less support plausible fraud claims against these Defendants.

The Complaint is equally void of plausible allegations that Dominion voting machines were actually hacked or compromised in Arizona during the 2020 General Election. Plaintiffs are clearly concerned about the vulnerabilities of voting machines used in some counties across Arizona and in other states. They cite sources that attest to knowledge of "well-known" vulnerabilities, have included letters from concerned citizens, Arizona elected officials, and United States senators. Plaintiffs even attach an affidavit of an anonymous witness with connections to the late Venezuelan dictator Hugo Chavez claiming to be privy as to how officials in Venezuela rigged their elections with the help of a voting systems company whose software "DNA" is now used in voting machines in the United States. (Doc. 1-1, Ex. 1). These concerns and stated vulnerabilities, however, do not sufficiently allege that any voting machine used in Arizona was in fact hacked or compromised in the 2020 General Election. Rather, what is present is a lengthy collection of phrases beginning with the words "could have, possibly, might," and "may have." (Doc. 1 ¶¶ 8, 53, 55, 57, 60, 66, 77, 88, 91, 108, 109, 122). To lend support to this theory, Plaintiffs offer expert Russell Ramsland, Jr., who asserts there was "an improbable, and *possibly impossible* spike in processed votes" in Maricopa and Pima Counties at 8:46 p.m.

on November 3, 2020.  (Doc. 1 ¶ 60); (Doc. 1-9, Ex. 17) (emphasis added).  He suggests that this spike "could easily be explained" by presuming that Dominion "pre-load[ed] batches of blank ballots in files such as Write-Ins or other adjudication-type files then casting them almost all for Biden using the Override Procedure . . . ." (Doc. 1-9 at 9, Ex. 17).  This scenario is conceivable.  However, Defendant Hobbs points to a much more likely plausible explanation: because Arizona begins processing early ballots before the election, the spike represented a normal accounting of the early ballot totals from Maricopa and Pima Counties, which were reported shortly after in-person voting closed.  (Doc. 40 at 17–18).  Thus, the Court finds that while this "spike" *could* be explained by an illicit hacking of voting machinery in Arizona, the spike is "not only compatible with, but indeed was more likely explained by, lawful, unchoreographed" reporting of early ballot tabulation in those counties.  *See Iqbal*, 556 U.S. at 680.  Plaintiffs have not moved the needle for their fraud theory from conceivable to plausible, which they must do to state a claim under Federal pleading standards.  *Id.*

Because Plaintiffs have failed to plead their fraud claims with particularity and because the Complaint is grounded in these claims, it must be dismissed.[17]

### G.    Motion for TRO and Preliminary Injunction

There are multiple independent grounds upon which to dismiss Plaintiffs' Complaint.  Accordingly, it is not necessary to reach the merits of Plaintiffs' requests for a temporary restraining order and preliminary injunction and the Court will therefore only briefly addresses those Motions here.

"The standard for issuing a temporary restraining order is identical to that for issuing a preliminary injunction." *Taylor-Failor v. Cty of Hawaii*, 90 F. Supp. 3d 1095, 1098 (D. Haw. 2015).  Under normal circumstances, both are extraordinary and drastic remedies,

---

[17] Throughout their pleadings, Plaintiffs allege that there were "spikes" of votes for Joe Biden that occurred in Arizona, which also occurred in other states that certified the election for Joe Biden, including Georgia, Wisconsin, Michigan, and Pennsylvania. Regardless of whether these "spikes" shifting the vote majorities from President Trump to Vice President Biden occurred in other states, Plaintiffs have presented nothing to support the claim that these same "spikes" occurred in Arizona, where Biden never trailed Trump in the vote tally.

1    and "should not be granted unless the movant, by a clear showing, carries the burden of

2    persuasion.'"  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v.*

3    *Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def.*

4    *Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy

5    never awarded as of right.") (citation omitted).  A plaintiff seeking a temporary restraining

6    order or preliminary injunction must show that (1) he or she is likely to succeed on the

7    merits, (2) is likely to suffer irreparable harm without an injunction, (3) the balance of

8    equities tips in his or her favor, and (4) an injunction is in the public interest.  *Winter*, 555

9    U.S. at 20.

10          Plaintiffs simply cannot establish they have a likelihood of success on their claims.

11   Plaintiffs face serious jurisdictional impediments in bringing their claims to federal court

12   at the eleventh hour.  These insurmountable legal hurdles are exacerbated by insufficiently

13   plead allegations of fraud, rendered implausible by the multiple inadmissible affidavits,

14   declarations, and expert reports upon which their Complaint relies.

15          Furthermore, granting Plaintiffs the injunctive relief they seek would greatly harm

16   the public interest.  As stated by Defendant Hobbs, "the requested relief would cause

17   enormous harm to Arizonans, supplanting the will of nearly 3.4 million voters reflected in

18   the certified election results and potentially imperiling Arizona's participation in the

19   Electoral College.  It would be more difficult to envision a case in which the balance of

20   hardships would tip more strongly against a plaintiff."  (Doc. 40 at 24).  The Court agrees.

21   The significant weight of these two *Winters* factors requires that the Court deny Plaintiffs'

22   requests for injunctive relief. [18]

23   **III.    Conclusion**

24          Not only have Plaintiffs failed to provide the Court with factual support for their

25   extraordinary claims, but they have wholly failed to establish that they have standing for

26   the Court to consider them.  Allegations that find favor in the public sphere of gossip and

27   innuendo cannot be a substitute for earnest pleadings and procedure in federal court.  They

---

[18] The Court will vacate the hearing on Plaintiffs' TRO and Request for Preliminary Injunction scheduled for December 10, 2020.

most certainly cannot be the basis for upending Arizona's 2020 General Election.  The Court is left with no alternative but to dismiss this matter in its entirety.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Governor Doug Ducey, Secretary of State Katie Hobbs, and Intervenor Defendants Maricopa County Board of Supervisors and Adrian Fontes' Motions to Dismiss the Complaint (Docs. 36, 38, and 40) are **GRANTED** for the reasons stated herein.

**IT IS FURTHER ORDERED** that all remaining pending motions (Docs. 14, 62, 65 and 66) are **denied as moot,** and the hearing on Plaintiffs' TRO and Preliminary Injunction set for December 10, 2020 is **vacated**.

**IT IS FINALLY ORDERED** that this matter is dismissed, and the Clerk of Court is kindly directed to terminate this action.

Dated this 9th day of December, 2020.

_____
Honorable Diane J. Humetewa
United States District Judge