IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

US DOMINION, INC., *et al.*,

        Plaintiffs

    v.

HERRING NETWORKS, INC., *et al.*,

        Defendants

No. 1:21-cv-02130-CJN

Judge Carl J. Nichols

**ORAL ARGUMENT REQUESTED**

**<u>DEFENDANTS' MOTION TO DISMISS, STAY, OR TRANSFER</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

Statement of Points and Authorities ............................................................................................. 1

I.      Introduction ............................................................................................................. 1

II.     Factual and Procedural Background ........................................................................ 3

III.    Argument ............................................................................................................... 10

        A.      This case should be dismissed in its entirety based on abstention ...................... 10

        B.      Alternatively, the case should be transferred to Colorado ................................. 16

                1.      The private-interest factors heavily favor transfer ................................. 16

                2.      The public-interest factors also heavily favor transfer ........................... 22

                3.      The fact that the *Coomer* Action was filed first favors transfer ............. 25

        C.      Even if the case is not dismissed or transferred in its entirety, it should be
                dismissed as to OAN, Charles Herring, and Robert Herring, Sr. because
                Dominion has failed to adequately plead personal jurisdiction as to these
                defendants ......................................................................................................... 27

IV.     Conclusion ............................................................................................................ 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amr v. Virginia*,
  58 F. Supp. 3d 27 (D.D.C. 2014) ..............................................................................27

*Annapolis Citizens Class Overcharged for Water-Sewer, by Loudon Operations,*
  *LLC v. Stantec, Inc.*, 2021 WL 75766 (D.D.C. Jan. 8, 2021) ..................................28

*Armco Steel Co., L.P. v. CSX Corp.*,
  790 F. Supp. 311 (D.D.C. 1991) ..............................................................................21

*Bader v. Air Line Pilots Association, International*,
  63 F. Supp. 3d 29 (D.D.C. 2014) ..............................................................................25

*\*Beall v. Edwards Lifesciences LLC*,
  310 F. Supp. 3d 97 (D.D.C. 2018) .....................................................................17, 19

*Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cnty.*,
  137 S. Ct. 1773 (2017) ..............................................................................................28

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ..................................................................................................32

*California Farm Bureau Fed'n v. Badgley*,
  2005 WL 1532718 (D.D.C. June 29, 2005) ..............................................................22

*Citizen Advocates for Responsible Expansion, Inc. v. Dole*,
  561 F. Supp. 1238 (D.D.C. 1983) ............................................................................17

*\*Colorado River Water Conservation Dist. v. U.S.*,
  424 U.S. 800 (1976) .......................................................................................... *passim*

*\*Coomer v. Donald J. Trump For President, Inc., et al.*,
  Case No. 2020CV034319 (Denver County District Court, Colorado) .......... *passim*

*Curling v. Raffensperger*,
  493 F. Supp. 3d 1264 (N.D. Ga. 2020) ..................................................................3, 4

*\*Daimler AG v. Bauman*,
  571 U.S. 117 (2014) ............................................................................................27, 28

*Dano Resource Recovery, Inc. v. District of Columbia*,
  1992 WL 165977 (D.D.C. 1992) ..............................................................................12

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Davis Aviation Specialties, Inc. v. Trace Engines, L.P.*,
  2009 WL 10675003 (E.D. Tenn. Dec. 29, 2009)....................................25

*Diversified Management, Inc. v. Denver Post, Inc.*,
  653 P.2d 1103 (Colo. 1982)........................................13, 14, 24

*Federal Housing Finance Agency v. First Tennessee Bank Nat. Ass'n*,
  856 F. Supp. 2d 186 (D.D.C. 2012) ..........................................22

*Fort Knox Music Inc. v. Baptiste*,
  257 F.3d 108 (2d Cir. 2001)................................................26

*Foster-el v. Beretta U.S.A. Corp.*,
  163 F. Supp. 2d 67 (D.D.C. 2001) .....................................11, 13

*Foxfield Villa Associates, LLC v. Regnier*,
  918 F. Supp. 2d 1192 (D. Kan. 2013)........................................11

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)........................................................14

*Green v. Aranas*,
  775 Fed. App'x. 310 (9th Cir. 2019) .......................................10

*Gregorio v. Hoover*,
  238 F. Supp. 3d 37 (D.D.C. 2017) ..........................................10

*Groesbeck v. Bumbo Intern. Trust*,
  2013 WL 3157922 (S.D. Tex. June 20, 2013) ................................26

*Helmer v. Doletskaya*,
  393 F.3d 201 (D.C. Cir. 2004)..............................................27

*Holland v. A.T. Massey Coal*,
  360 F. Supp. 2d 72 (D.D.C. 2004) ..........................................25

*Howard Acquisitions LLC v. Giannasca New Orleans LLC*,
  2009 WL 10684988 (E.D. La. Oct. 7, 2009) ................................26

*International Shoe Co. v. State of Washington, Office of Unemployment
  Compensation & Placement*, 326 U.S. 310 (1945).............................31

*Intravascular Research Ltd. v. Endosonics Corp.*,
  994 F. Supp. 564 (D. Del. 1998)...........................................11

**TABLE OF AUTHORITIES**
(continued)

Page

*J. McIntyre Mach., Ltd. v. Nicastro,*
  564 U.S. 873 (2011) ..................................................................................................30

*Jaffery v. Atlantic County Prosecutor's Office,*
  695 Fed. App'x. 38 (3d Cir. 2017) ...........................................................................10

*Keeton v. Hustler Magazine, Inc.,*
  465 U.S. 770 (1984) ..................................................................................................31

*Kowal v. MCI Commc'ns Corp.,*
  16 F.3d 1271 (D.C. Cir. 1994) ..................................................................................29

*\*Livnat v. Palestinian Authority,*
  851 F.3d 45 (D.C. Cir. 2017) ........................................................................27, 28, 29

*Majid v. Federal Bureau of Investigation,*
  245 F. Supp. 3d 63 (D.D.C. 2017) ..........................................................................3, 18

*Mazzarino v. Prudential Ins. Co. of America,*
  955 F. Supp. 2d 24 (D.D.C. 2013) .............................................................................16

*Moldea v. New York Times Co.,*
  15 F.3d 1137 (D.C. Cir. 1994) ..................................................................................24

*Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,*
  460 U.S. 1 (1983) ......................................................................................................11

*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.,*
  190 F.3d 963 (9th Cir. 1999) ...............................................................................14, 18

*Platinum Partners Value Arbitrage Fund, L.P. v. TD Bank, N.A.,*
  2011 WL 3329087 (D.N.J. Aug. 2, 2011) .................................................................26

*Raflo v. U.S.,*
  157 F. Supp. 2d 1 (D.D.C. 2001) ..............................................................................23

*Rosenbloom v. Metromedia, Inc.,*
  403 U.S. 29 (1971) ....................................................................................................14

*Sheehan v. Koonz,*
  102 F. Supp. 2d 1 (D.D.C. 1999) ..............................................................................12

*Spherion Corp. v. Cincinnati Fin. Corp.,*
  183 F. Supp. 2d 1052 (N.D. Ill. 2002) ......................................................................26

**TABLE OF AUTHORITIES**
(continued)

Page

*Thayer/Patricof Education Funding v. Pryor Resources Inc.*,
  196 F. Supp. 2d 21 (D.D.C. 2002) .......................................................17

*Tice v. Pro Football, Inc.*,
  812 F. Supp. 255 (D.D.C. 1993) ..........................................................25

*Tonnessen v. Denver Pub. Co.*,
  5 P.3d 959 (Colo. Ct. App. 2000) ........................................................24

*Trout Unlimited v. United States Dep't of Agriculture*,
  944 F. Supp. 13 (D.D.C. 1996) ............................................................17

*Turner v. Harrah's New Orleans Hotel & Casino*,
  2011 WL 1666925 (C.D.Cal. Apr. 7, 2011) ........................................26

*US Dominion Inc., et al., v. Fox News Network LLC*,
  C.A. No. N21C-03-257 EMD (Del. Super. Ct.) ...................................17

*Walden v. Fiore*,
  134 S. Ct. 1115 (2014) ...................................................................27, 28

*U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*,
  771 F. Supp. 2d 42 (D.D.C. 2011) .......................................................22

*Wiggins v. Equifax Inc.*,
  853 F. Supp. 500 (D.D.C. 1994) ..........................................................31

*Wilderness Society v. Babbitt*,
  104 F. Supp. 2d 10 (D.D.C. 2000) .......................................................17

*Wolken v. Lufkin*,
  1995 WL 704773 (N.D. Ill. Nov. 28, 1995) ..............................12, 13, 15

*Zichichi v. Jefferson Ambulatory Surgery Center, LLC*,
  2007 WL 3353304 (E.D. La. Nov. 7, 2007) .......................12, 13, 14, 15

**Rules**

FED. R. CIV. P. 12(b)(1) ..............................................................1, 10, 11

FED. R. CIV. P. 12(b)(2)................................................................1, 3, 27

FED. R. CIV. P. 12(b)(6) ......................................................................10

# TABLE OF AUTHORITIES
(continued)

**Page**

**Statutes**

28 U.S.C. § 1404(a) ................................................................................ *passim*

C.R.S. § 13-20-1101 .............................................................................. *passim*

D.C. Code § 13-422 ...................................................................................27

D.C. Code § 13-423 ...................................................................................29

**Other Authorities**

2020 Election Security, C-SPAN (Jan. 9, 2020), https://www.c-
span.org/video/?467976-1/2020-election-security (last visited Nov. 17, 2021) .......................4

https://www.hbo.com/documentaries/kill-chain-the-cyber-war-on-americas-
elections (last visited Nov. 17, 2021) ...........................................................................3

James Bedell, *Clearing the Judicial Fog: Codifying Abstention*, 68 Case W. Res.
L. Rev. 943, 946 (2018) .................................................................................15

Restatement (Second) of Conflict of Laws § 145 (Am. L. Inst. 1971) ...........................24

Pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(2) and 28 U.S.C. § 1404(a), defendants Herring Networks, Inc., d/b/a One America News Network ("OAN"), Christina Bobb, Chanel Rion, Charles Herring, and Robert Herring, Sr. move to dismiss (or stay) this action or, alternatively, to transfer the action to the U.S. District Court for the District of Colorado. And if the Court does not dismiss, stay, or transfer the case in its entirety, Defendants move to dismiss the claims against OAN, Charles Herring, and Robert Herring, Sr., for failure to adequately plead personal jurisdiction. In support of this Motion, Defendants state as follows:

## STATEMENT OF POINTS AND AUTHORITIES

**I.    Introduction**

Long before the 2020 presidential election, the voting machines and software created or owned by Dominion[1] were under intense public scrutiny for their lack of security and reliability. Then, in the weeks leading up to Election Day and shortly thereafter, Colorado became the focal point for concerns about Dominion's security and objectivity when in-person and online clashes between right-wing and left-wing activists in that state led to widespread reporting by multiple media outlets that Colorado resident Dr. Eric Coomer, then the Director of Product Strategy and Security for Dominion, participated in a conference call with members of antifa and had a Facebook page filled with radical, violent, and incendiary left-wing talking points, criticism of then-President Donald Trump, and sympathy for antifa.

Like most national media outlets, OAN covered the matters of global public concern regarding the security and reliability of Dominion voting systems before the election and continued to do so after President Trump and his lawyers and campaign surrogates made newsworthy

---

[1] Plaintiffs US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation are collectively referred to as "Dominion."

statements about the results of the election and Dominion's role in it — including a focus on the events transpiring in Colorado related to Dr. Coomer.  Rather than look inwardly and try to improve its systems in light of sincere concerns raised by public officials across the political spectrum, Dominion has launched a series of meritless lawsuits against media outlets and individuals who exercised their First Amendment rights to comment on matters of public concern. This is one such lawsuit.

But critically, this is ***not the first lawsuit*** brought against OAN for its coverage of Dominion.  Nearly ***eight months*** before this case was filed, Dr. Coomer filed suit against OAN and Rion (as well as others) — for news about Dominion, statements made by Dr. Coomer, and the election — in *Coomer v. Donald J. Trump For President, Inc., et al.*, Case No. 2020CV034319 (Denver County District Court, Colorado) (the "*Coomer* Action").  Many of the same statements placed at issue in this case by Dominion are at issue in the *Coomer* Action, as are the questions of whether those statements are true and whether OAN and Rion acted with actual malice. Accordingly, in the interests of efficiency and to avoid inconsistent findings of fact and conclusions of law (as well potentially conflicting judgments), this case should proceed in Colorado.

To accomplish that, the Court should dismiss (or at minimum stay) this case based on abstention so that these issues can properly be litigated in Colorado.  Alternatively, the Court should transfer this case to the U.S. District Court for the District of Colorado under 28 U.S.C. § 1404(a) because the convenience factors heavily favor litigating the case in Dominion's ***home forum***, most notably because key witnesses (including Dr. Coomer, who no longer works for Dominion) reside in Colorado and are beyond the subpoena power of this Court.

But even if the Court does not dismiss, stay, or transfer the case, the Court should dismiss the claims against OAN, Charles Herring, and Robert Herring, Sr. under Rule 12(b)(2) because Dominion has failed to adequately plead personal jurisdiction over those defendants. Of course, the Court does not even need to address this personal jurisdiction challenge if the entire case is dismissed (or stayed) based on abstention or transferred under Section 1404(a).

## II.   Factual and Procedural Background

Dominion had been on the proverbial "hot seat" for years leading up to the 2020 election. In 2017, Georgia voters filed a lawsuit related to the security of Dominion voting machines, and in October 2020, the federal judge in that case credited testimony from an "array of experts and subject matter specialists [that] provided a huge volume of significant evidence regarding the security risks and deficits in the [Dominion] system," finding that those risks were neither "hypothetical nor remote." *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1278, 1341 (N.D. Ga. 2020). Similarly, in January 2020, the state of Texas refused to certify Dominion's system, questioning whether it "is safe from fraudulent or unauthorized manipulation." *See* **Exhibit A**.[2] Dominion also was one of the subjects of the HBO documentary *Kill Chain: The Cyber War on America's Elections*, which was released in March 2020 and featured several prominent Democrats talking about their concerns about election security in the 2016 presidential election. *See* https://www.hbo.com/documentaries/kill-chain-the-cyber-war-on-americas-elections (last visited Nov. 17, 2021).

All along the way, Dr. Coomer was at the forefront of this discussion (and he in fact appears in *Kill Chain* as a spokesperson for Dominion). As early as August 26, 2016, Dr. Coomer was

---

[2] "The court may take judicial notice of matters of public record." *Majid v. Federal Bureau of Investigation*, 245 F. Supp. 3d 63, 68 (D.D.C. 2017). This applies not only here, but also to other public documents cited throughout this brief.

publicly advocating on behalf of Dominion to address concerns about its voting systems, speaking to the Illinois State Board of Elections at a public meeting. *See Coomer* Action, Docket No. A7DA5EF84102C, at n. 10.[3]  In 2018, he appeared on behalf of Dominion at a similar public meetings in Harrisburg, Pennsylvania, *id.*, and he participated in the Cyber Security Task force assembled by the National Association of Secretaries of State. *See* Declaration of Eric Coomer, *Coomer* Action, Filing ID E9E5DD591D201, Exh. A to Plaintiff's Omnibus Response to All Defendants' Special Motions to Dismiss, attached as **Exhibit C**.  In 2020, Dr. Coomer was seated directly behind Dominion CEO John Poulos as Poulos gave nationally televised testimony before the U.S. House Administration Committee. *See* 2020 Election Security, C-SPAN (Jan. 9, 2020), https://www.c-span.org/video/?467976-1/2020-election-security (last visited Nov. 17, 2021). Dr. Coomer also gave testimony over multiple days in the *Curling* litigation. *Coomer* Action, Docket No. A7DA5EF84102C, at n. 10.  Thus, in many ways, Dr. Coomer was one of the public faces of Dominion's efforts to fend off critics.

That reality is what makes the discoveries in fall 2020 by Colorado businessman and political podcaster Joe Oltmann so shocking.  There long had been questions about Dominion's security and reliability, but what Mr. Oltmann discovered suggested a new possibility: That there could be ***intent*** behind the problems that had been identified in Dominion's voting systems, fueled by Dr. Coomer's radical political beliefs.

In fall 2020, Mr. Oltmann had been on a mission to identify and reveal Colorado journalists who he believed were members of antifa. *See Coomer* Action, Docket No. 6A78E5F1E0F74, Exh. G to OAN Defendants' Reply in Support of Special Motion to Dismiss, attached as **Exhibit D**

---

[3] A copy of the full briefing (without voluminous exhibits) on OAN's and Rion's anti-SLAPP motion in the *Coomer* Action is attached as **Exhibit B**.

("Oltmann Dep."), at 50:7-10.[4]   After an incident on September 23, 2020, in which fellow Colorado resident and right-wing activist Joey Camp had clashed with the leaders of a Black Lives Matter protest in the Denver area led by Colorado resident and Denver Board of Education member Tay Anderson, an anonymous source provided Mr. Oltmann with credentials to join a conference call among left-wing leaders.  *See Coomer* Action, Docket No. E9E5DD591D201, Exh. U to Plaintiff's Omnibus Response to All Defendants' Special Motions to Dismiss, attached as **Exhibit E** ("Anderson Decl."), at ¶ 8.  Mr. Oltmann secretly joined that call — which appears to have occurred on September 25, 2020 — along with about 15-20 other people, including Mr. Anderson.  (Oltmann Dep., 52:19-21; 71:10-15; Anderson Decl., ¶ 8).  Mr. Oltmann has alleged that during the call, he heard someone who was identified only as "Eric from Dominion" say, "Trump is not going to win.  I made effing sure of that."  (Compl., ¶ 135).

Mr. Oltmann did not immediately understand the significance of this revelation, but the next day (on September 26, 2020), Mr. Oltmann first searched via Google for "Eric," "Dominion," and "Denver" and learned who Dr. Coomer was.  (Oltmann Dep., 72:1-8).  In the weeks that followed, another anonymous source provided Mr. Oltmann with a series of Dr. Coomer's Facebook posts, which were even more disturbing.  (Oltmann Dep., 85:14-22).  Dr. Coomer routinely ranted online about his deep loathing of President Trump and sympathy for antifa, including posting an "antifa manifesto."  (Oltmann Dep., 125:7-9; *Coomer* Action, Docket No. 6A78E5F1E0F74, Exh. A to OAN Defendants' Reply in Support of Special Motion to Dismiss, attached as **Exhibit F** ("Coomer Dep."), at 25:5-12; Exh. P23 to Coomer Dep., p. 009,

---

[4] This document and several others attached for ease of reference and subject to the Court's judicial notice were originally filed under seal based on a protective order in the *Coomer* Action.  However, the Colorado court amended the protective order on October 8, 2021, and removed the protection from these documents.  *See Coomer* Action, Oct. 8, 2021 Order.

attached as **Exhibit G**).  Dr. Coomer also tied his views to his employer, saying that that "[o]nly an absolute FUCKING IDIOT could ever vote for that wind-bag fuck-tard FASCIST RACIST FUCK" and that his opinions were his own and "not necessarily the thoughts of my employer, though if not, I should probably find another job . . . Who wants to work for complete morons?" (Exh. G, p. 0072).  After initially denying these posts were his in a guest editorial in the *Denver Post* (*Coomer* Action, Docket No. 6A78E5F1E0F74, Exh. D to OAN Defendants' Reply in Support of Special Motion to Dismiss, attached as **Exhibit H**) and an interview in the *Ark Valley Voice* (*Coomer* Action, Docket No. 6A78E5F1E0F74, Exh. E to OAN Defendants' Reply in Support of Special Motion to Dismiss, attached as **Exhibit I**), Dr. Coomer has since admitted these posts were authentic and authored by him.  (Coomer Dep., 51:25-52:1).

Upon learning this information, Mr. Oltmann understandably had concerns about the integrity of the election and began reporting about Dr. Coomer and Dominion on his *Conservative Daily* podcast.  *See Coomer* Action First Amended Complaint, attached as **Exhibit J** ("*Coomer* Compl."), at ¶ 52.  After various other national news outlets also had published this information, OAN eventually included interviews with Mr. Oltmann about Dr. Coomer as part of its coverage of Dominion and President Trump's allegations of a stolen election.  (*Coomer* Compl., ¶ 61).

Nearly eight months before this case was filed on August 10, 2021 (ECF 1), the *Coomer* Action was filed on December 22, 2020 in Colorado state court.  Dr. Coomer (who was still employed by Dominion at the time) brought suit against 14 defendants, including OAN and Rion, alleging that their statements about him, Dominion, and the 2020 presidential election had defamed him.  The alleged defamatory statements made by OAN and Rion "of and concerning" Dr. Coomer are all at issue in this case as well, as set forth in the chart below.

| ***COOMER* COMPLAINT** | ***DOMINION* COMPLAINT** |
|---|---|
| "Dominion Director of Strategy and Security, #EricCoomer: 'Trump won't win. I made F***ing sure of that.'" (*Coomer* Compl., ¶ 61). | "Trump won't win. I made F'ing sure of that." (Compl., ¶ 305(f), p. 163). |
| "In Coomer's case, he was in a position of power to actually act on his rage against Trump and Trump voters. What does he mean when he says 'Trump won't win. I made f-ing sure of that.' Nothing?" (*Coomer* Compl., n. 83). | "In Coomer's case, he was in a position of power to actually act upon his rage against Trump and Trump voters. What does he mean when he says Trump won't win. I made F'ing sure of that. Nothing?" (Compl., ¶ 305(f), p. 163). |
| Publishing Oltmann saying, "Eric Coomer was this, you know, he's not just Antifa, he was responsible for putting his finger on the scales of our election" and adding "If Coomer is investigated and found to have indeed tampered with a presidential election, such an action could be tried for treason. Unfortunately, the question is, will the FBI step up to investigate?" (*Coomer* Compl., n.83). | Publishing Oltmann saying, "Eric Coomer was this, you know, he was not just Antifa. He was responsible for putting his finger on the scales of our election." (Compl., ¶ 305(f), p. 163). |

Dr. Coomer also has argued that other statements made by OAN about Dominion are defamatory as to him personally. *See, e.g., Coomer* Compl., n. 84. At pages 56-58 of Dr. Coomer's anti-SLAPP Response in the *Coomer* Action, he argues that criticism of Dominion and criticism of Dr. Coomer are one and the same. *See* Exh. B. Dr. Coomer has alleged that the following statements about ***Dominion*** are defamatory as to ***him*** — and Dominion has challenged these same statements in this case.

| ***COOMER* BRIEFING** | ***DOMINION* COMPLAINT** |
|---|---|
| "How compromised was the 2020 election? Dominion Voting Systems, which is used in 29 states, has had a history of problems. Stolen laptops, 'switched' votes, Clinton ties, Antifa CEOs, undeniable data… Join One America's @ChanelRion for this exclusive investigation #OANN" (Dr. Coomer's Defamatory Statement Spreadsheet, Exh. A-1 to Plaintiff's Omnibus Response to All Defendants' Special Motions to Dismiss, attached as **Exhibit K**, p. 9).[5] | "For example, on November 17, 2020, OAN posted on Twitter: 'How compromised was the 2020 election? Dominion Voting Systems, which is used in 29 states, has had a history of problems. Stolen laptops, "switched" votes, Clinton ties, Antifa CEOs, undeniable data… Join One America's @ChanelRion for this exclusive investigation! #OANN.'" (Compl., ¶ 305(f), pp. 158-59). |
| "Why must citizens, lawyers, and @OANN do the FBI's job for them? Why are Dominion employees scrambling, hiding, and emptying out offices? Do they know they've been caught? Debuting TONIGHT my special investigation: 'Dominion-izing the Vote' 10pm EST." (Exh. K, p. 11). | "OAN and Rion posted a video to Twitter promoting 'Dominion-izing the Vote,' in which Rion asked the rhetorical questions, 'Why are Dominion employees scrambling, hiding, and emptying out offices? Do they know they've been caught?'" (Compl., ¶ 305(f), p. 159). |
| "Watkins, referring to the vote review panel, told Rion, 'your votes doesn't matter in these districts with the Dominion machines in them, because these two-to-six people trained by Dominion have ultimate control.'" (Exh. B, p. 56 to the Response). | "Watkins: Your vote doesn't matter in these districts with the Dominion machines in them, because these two to six people trained by Dominion have ultimate control. It doesn't take a genius to realize that setting the gamma levels incorrectly makes all the battle become anomalies, which you can then go through later and adjudicate. . . ." (Compl. ¶ 305(f), p. 162). |
| "Rion's report also includes Watkins stating that 130,000 votes were adjudicated for Biden because there was a change in gamma settings to the Dominion software to allow for hand-checking or changing the votes." (Exh. B, p. 58 to the Response). | "Watkins: The biggest issue here is that the system for detecting anomalies can be set up by altering gamma settings on the scanner so that every ballot has an anomaly. Thus, in effect, by altering gamma settings on the scanner so that every ballot has an anomaly this in effect allows those two to six trained people to go through and hand check every single ballot before they're verified and cast into the tabulation system as an actual vote. |

---

[5] These statements were ***not*** alleged in the *Coomer* Complaint, and OAN and Rion have challenged their inclusions in the Colorado anti-SLAPP briefing under the *in haec verba* doctrine, which requires a plaintiff to plead the language of defamatory statements with specificity.

| ***COOMER* BRIEFING** | ***DOMINION* COMPLAINT** |
|---|---|
|  | That last point explains to me how certain candidates can get 130,000 votes at once with zero votes going to the other candidate." (Compl. ¶ 305(f), p. 161). |

And of course, both complaints highlight OAN's program titled *Dominion-izing the Vote*. *Compare Coomer* Compl., n. 83 *with, e.g.,* Compl., ¶¶ 125-137.  Thus, the same factual and legal analysis regarding these statements and segments must occur in both the *Coomer* Action and this case, including whether the statements are true, whether the statements are subject to any statutory and/or common law privileges, and whether the statements were made with actual malice.

Because the *Coomer* Action was filed so long ago, it is in an advanced procedural posture. OAN and Rion, along with the other defendants, have filed motions to dismiss under Colorado's anti-SLAPP statute, and, after the Court allowed wide-ranging one-way discovery by Dr. Coomer (including the depositions of all defendants and the production of documents), the anti-SLAPP motions are now fully briefed and argued (via a two-day in-person hearing October 13 and 14, 2021) in Colorado state court.  *See* Exh. B.

Colorado is, of course, a familiar venue for Dominion.  As admitted in the Complaint, both US Dominion, Inc. and Dominion Voting Systems, Inc. have their principal places of business in Denver, Colorado, and they have alleged no connection to this jurisdiction.  (Compl., ¶¶ 14-15).  Former Dominion employee Dr. Coomer, who is referenced at least 19 times in the Complaint, is also a resident of Colorado and chose to sue OAN and Rion for defamation in that state.  *See Coomer* Compl., ¶ 10; *see Coomer* Decl., at ¶ 2.  Mr. Oltmann, a key witness and source in this controversy who is mentioned at least 18 times in the Complaint, also resides in Colorado.  *See*

*Coomer* Compl., ¶ 16; Coomer Decl., at ¶ 34.  And as set forth in greater detail below, *infra* pp. 19-21, there are numerous other known witnesses residing in Colorado.

Meanwhile, the allegations related to OAN, Charles Herring, and Robert Herring, Sr. demonstrate that they have insufficient contacts with this jurisdiction to hale them into court here. Dominion admits that OAN is headquartered in California, and Dominion makes no effort to plead OAN's corporate registration.  (Compl., ¶ 17).[6]  As for Charles Herring, Dominion makes no allegation as to his residence beyond alleging without support that "Twitter and LinkedIn locations place him in Washington, D.C." (Compl., ¶ 20).  And Dominion makes no allegations whatsoever regarding the residency of Robert Herring, Sr.  *See generally* Compl.  But the case caption in the Complaint includes addresses for both Charles Herring and Robert Herring, Sr. in California, indicating that Dominion is well-aware that they do not reside in Washington, D.C.

## III.   Argument

### A.   This case should be dismissed in its entirety based on abstention.

Because the *Coomer* Action involving the same allegedly defamatory statements at issue in this case is so far advanced, the Court should dismiss this case in its entirety based on abstention. Abstention can result in a dismissal or a stay, but in analyzing an abstention request, the Court should treat the request as "more analogous to Federal Rule of Civil Procedure 12(b)(1) dismissals for lack of subject matter jurisdiction than for Rule 12(b)(6) dismissals for failure to state a claim." *Green v. Aranas*, 775 F. App'x 310, 311 (9th Cir. 2019); *see also Jaffery v. Atlantic County Prosecutor's Office*, 695 F. App'x 38, 40 (3d Cir. 2017) (affirming Rule 12(b)(1) dismissal based on *Younger* abstention); *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 45 (D.D.C. 2017) (analyzing

---

[6] OAN is a California corporation.  *See Coomer* Compl., ¶ 24; Registration with California Secretary of State, attached as **Exhibit L**.

ecclesiastical abstention under Rule 12(b)(1)).[7]  The Court's "task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court;" rather the Court should determine "whether there exist 'exceptional' circumstances, the 'clearest of justifications,' . . . to justify the surrender of jurisdiction."  *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 25-26 (1983) (emphasis in original).

Abstention is justified here under the doctrine of "*Colorado River* abstention."  *See Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 818 (1976).  "[W]ise judicial administration" calls for the "dismissal of a federal suit due to the presence of a concurrent state proceeding."  *Colorado River*, 424 U.S. at 818.  "In assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction, a federal court may also consider such factors as the inconvenience of the federal forum, . . . the desirability of avoiding piecemeal litigation . . . and the order in which jurisdiction was obtained by the concurrent forums." *Id*.  "The Supreme Court has articulated the following factors that district courts need to consider in determining whether a case qualifies as exceptional under the *Colorado River* doctrine: (1) whether one court assumed jurisdiction over property first; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order of jurisdiction in the concurrent forums; . . . (5) whether the case involves federal law; and (6) whether the state-court proceeding can adequately protect the parties' rights." *Foster-el v. Beretta U.S.A. Corp.*, 163 F. Supp. 2d 67, 71

---

[7] Because this Motion is brought under Rule 12(b)(1), Defendants do not intend to file an answer at this time.  *See Foxfield Villa Associates, LLC v. Regnier*, 918 F. Supp. 2d 1192, 1196 (D. Kan. 2013) (considering a "motion to stay or dismiss under the *Colorado River* doctrine" as a "pre-answer motion"); *Intravascular Research Ltd. v. Endosonics Corp.*, 994 F. Supp. 564, n. 3 (D. Del. 1998) (considering a pre-answer *Colorado River* abstention motion and noting that "motions to stay have been recognized as tolling the time period for answering a complaint because pre-answer consideration of these motions have been found to maximize the effective utilization of judicial resources").

(D.D.C. 2001) (staying case based on abstention).  "*Colorado River* abstention is not based upon 'considerations of proper constitutional adjudication and regard for federal-state relations,' but on considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'"  *Sheehan v. Koonz*, 102 F. Supp. 2d 1, 3 (D.D.C. 1999) (dismissing case based on abstention); *see also Dano Resource Recovery, Inc. v. District of Columbia*, 1992 WL 165977 (D.D.C. 1992) (staying case based on abstention).

The case of *Wolken v. Lufkin*, 1995 WL 704773 (N.D. Ill. Nov. 28, 1995), is analogous and instructive.  In *Wolken*, a defamation defendant sought a stay based on *Colorado River* abstention because the plaintiff's employer had already filed a defamation claim against the defendant in Illinois state court relating to the same allegedly defamatory statements.  *Id.* at *1.  The court granted the motion, holding that although the state and federal actions did not involve identical issues, "the defamation claims in both courts arise from the same operative facts and involve virtually identical allegations of tortious conduct."  *Id.*  The court also held that the issues were substantially the same, and the parties involved were substantially the same because the two plaintiffs (employee and employer) had "nearly identical" interests in the litigation.  *Id.*  In short, "[b]oth [employer] and [employee] have alleged and seek to prove that [defendant] made three false and defamatory statements concerning [employer] and [employee]."  *Id.*  Thus, "simultaneous litigation of both suits would likely result in undesirable piecemeal litigation.  Because both courts would be required to resolve the same issue — whether [defendant] made false and defamatory statements concerning [employer] and [employee] — judicial efforts would be duplicative and wasteful, and might result in inconsistent resolutions of the same issue."  *Id.* at *2; *see also Zichichi v. Jefferson Ambulatory Surgery Center, LLC*, 2007 WL 3353304, *8 (E.D. La. Nov. 7, 2007) (staying defamation case pending resolution of parallel state law claim).

-12-

As in *Wolken*, this case involves a case in which an employer (Dominion) and its then-employee (Dr. Coomer) have each filed defamation claims against the same defendants (OAN and Rion) relating to the same allegedly defamatory statements.  Requiring OAN and Rion to litigate these two cases simultaneously in two different forums would result in duplicative, piecemeal litigation as the courts seek to resolve the same questions related to falsity and actual malice (among other issues), possibly with inconsistent results.

Moreover, as in both *Wolken* and *Zichichi*, the six-factor test strongly favors abstention. First, there is no "property" over which either court can assume jurisdiction, so this prong is inapplicable.  *See Foster-El*, 163 F. Supp. 2d at 71 ("This case, however, does not involve jurisdiction over property. Accordingly, this first factor does not weigh in favor of or against abstention.").  The second factor weighs in favor of abstention because, as set forth in greater detail in Section III.B, *infra*, this Court is an inconvenient forum.  The third factor also favors abstention because litigating the same questions in two different jurisdictions will ensure piecemeal litigation and could lead to inconsistent results — particularly if different legal standards are applied in the two jurisdictions. *See Wolken*, 1995 WL 704773 at *2; *Zichichi*, 2007 WL 3353304 at *8.  Fourth, there can be no dispute that the order of jurisdiction in the concurrent forums favors abstention in this case because the *Coomer* Action was filed nearly eight months before this case and is much further along.

The fifth factor is particularly noteworthy in this case because Colorado state law on defamation applies and provides ***greater*** protection than federal First Amendment jurisprudence. In *Diversified Management, Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1105-08 (Colo. 1982), the Colorado Supreme Court held that the actual malice standard for fault in a defamation case under Colorado law applies as long as the speech at issue involved a matter of public concern, regardless

-13-

of whether the plaintiff is a public figure.  In so doing, the court adopted the standard set forth by

a plurality of the U.S. Supreme Court in *Rosenbloom v. Metromedia, Inc*., 403 U.S. 29, 44 (1971),

that the actual malice standard applied to "all discussion and communication involving matters of

public or general concern."   But a majority of the U.S. Supreme Court declined to adopt the

*Rosenbloom* plurality standard in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).  The law

in Colorado therefore goes further to protect speech than the federal standard because the Colorado

Supreme Court concluded that:

> [A] simple negligence rule would have a chilling effect on the press that would be
> more harmful to the public interest than the possibility that a defamed private
> individual would go uncompensated.  In order to honor the commitment to robust
> debate embodied in the first amendment and to ensure sufficient scope for first
> amendment values, we chose to extend constitutional protection to any discussion
> involving matters of public concern, irrespective of the notoriety or anonymity of
> those involved.

*Diversified*, 653 P.2d at 1106.   Additionally, Colorado has its own statute targeted at avoiding

"strategic lawsuits against public policy," C.R.S. § 13-20-1101 (the "anti-SLAPP statute"), which

would apply to an action in Colorado.[8]

Thus, while it may be tempting to say that this case involves federal law because free

speech and a free press are protected by the First Amendment, "federal law does not provide the

rule of decision for the state law tort claim."  *Zichichi*, 2007 WL 3353304 at *8.  And because of

the additional protections afforded by Colorado law, the presentation of any constitutional issues

arising in this case could be fundamentally altered — and "the state court has greater expertise in

---

[8] Notably, if the *Coomer* Action is not dismissed, Defendants intend to bring Dominion in as a
third-party defendant in that case.  And if the *Coomer* Action is dismissed, Defendants plan to
litigate against Dominion in Colorado federal court, where the anti-SLAPP statute (modeled after
California's) should apply pursuant to persuasive California law applying the California anti-
SLAPP statute in federal court.  *See U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*,
190 F.3d 963, 972-73 (9th Cir. 1999).

adjudicating those standards." *Wolken*, 1995 WL 704773 at *2. Finally, given that Dominion's claims are state law defamation claims, there is no reason to believe a state-court proceeding cannot adequately protect the parties' rights. *See id.* ("[T]he state court action will adequately protect [plaintiff's] rights."); *Zichichi*, 2007 WL 3353304 at *8 ("[T]he state proceedings will adequately protect the plaintiff's rights."). Moreover, as set forth *infra* p. 23, the choice of law analysis here demonstrates that Colorado state law should apply to this case regardless of venue. Accordingly, application of the *Colorado River* factors heavily favors abstention. This is one of the cases in which there is a "clear justification" for this Court to surrender jurisdiction, and the Court "should not look for reasons" to keep this case.

Dominion may argue that this case should stay in this Court because the cases they brought against other individuals related to their statements about the election are pending in this Court. *See US Dominion, Inc., et al. v. Powell, et al.*, Case No. 21-cv-00040; *US Dominion, Inc., et al. v. Giuliani*, Case No. 21-cv-00213; *US Dominion, Inc., et al. v. My Pillow, Inc., et al.*, Case No. 21-cv-00445; *US Dominion, Inc., et al. v. Byrne*, Case No. 21-cv-02131. In fact, Dominion filed notices of related cases to that effect. *See* ECF Nos. 5-8. But those cases involve statements by other individuals, not Defendants, and those cases were filed many months before Dominion chose to bring suit against Defendants. Additionally, the Court's interests are not served by slowing progress of those earlier filed cases to accommodate this case.

Abstention is appropriate here and the Court should either dismiss or stay this case. A stay is appropriate "when there remains a federal interest aside from the state interest in the case, and the litigants are invited to continue in federal court at a later time if necessary." James Bedell, *Clearing the Judicial Fog: Codifying Abstention*, 68 Case W. Res. L. Rev. 943, 946 (2018). But here, there will be no remaining federal interest once the state-law defamation claims are resolved.

Moreover, as set forth in greater detail below, this forum is inconvenient in any event, thus the Court should exercise its power to dismiss this case in its entirety.

**B.      Alternatively, the case should be transferred to Colorado.**

If the Court does not dismiss (or stay) this case based on abstention, the Court should transfer this case to the U.S. District Court for the District of Colorado under Section 1404(a). "Section 1404(a) authorizes a district court to exercise its discretion in adjudicating motions to transfer on case-by-case considerations of convenience and fairness."  *Mazzarino v. Prudential Ins. Co. of America*, 955 F. Supp. 2d 24, 27 (D.D.C. 2013).  "To succeed on a motion to transfer, the moving party must first establish that the action could have originally been brought in the proposed transferee district.  28 U.S.C. § 1404(a). . . .  Second, the movant must demonstrate that considerations of convenience and the interest of justice weigh in favor of transfer."  *Id.* at 28.

Here, it is clear that this case could have originally been brought in the U.S. District Court for the District of Colorado.  The proposed transferee district is Dominion's home district in the U.S., thus there is no question that Dominion is subject to personal jurisdiction in that district.  As for Defendants, OAN did not challenge personal jurisdiction in the *Coomer* Action, and the remaining Defendants would stipulate to personal jurisdiction in Colorado for the purposes of this case.  Accordingly, this case could have originally been brought in Colorado, and the Court should proceed to analyze the convenience and justice factors.

**1.      The private-interest factors heavily favor transfer.**

In evaluating convenience and justice, the Court may weigh various private and public interest factors.  "The private-interest considerations include: (1) the plaintiff's choice of forum; (2) the defendant's preferred forum; (3) the location where the claim arose; (4) the convenience of the parties; (5) the convenience of witnesses; and (6) ease of access to sources of proof."  *Id.*  "The most critical factor to examine under 28 U.S.C. § 1404(a) is the convenience of the witnesses."

*Beall v. Edwards Lifesciences LLC*, 310 F. Supp. 3d 97, 105 (D.D.C. 2018).  The balance of these factors weighs heavily in favor of transferring this case:

- **Plaintiff's choice of forum**: Although Dominion's choice of this Court as the forum for its lawsuit weighs against transfer, that weight should be minimal considering that Dominion is not located in this District, the claims at issue in this case (as set forth in greater detail *infra* p. 29) did not arise in this District, and Defendants are seeking transfer to Dominion's home District.  *See Thayer/Patricof Education Funding v. Pryor Resources Inc.,* 196 F. Supp. 2d 21, 31 (D.D.C. 2002) (explaining that plaintiff's choice of forum is "ordinarily afforded great deference, except where the plaintiff is a foreigner in that forum"); *Wilderness Society v. Babbitt*, 104 F. Supp. 2d 10, 12-13 (D.D.C. 2000) (noting that plaintiff's choice of forum is entitled to less deference where there is an inadequate factual nexus between the chosen forum and the events in dispute); *Trout Unlimited v. United States Dep't of Agriculture*, 944 F. Supp. 13, 17 (D.D.C. 1996) (noting that the showing a defendant must make in order to overcome the deference afforded to plaintiff's choice of forum "is lessened . . . where . . . transfer is sought to the forum with which plaintiffs have substantial ties and where the subject matter of the lawsuit is connected to that state"); *Citizen Advocates for Responsible Expansion, Inc. v. Dole*, 561 F. Supp. 1238, 1239 (D.D.C. 1983) (finding that defendant's "burden is substantially diminished where . . . transfer is sought to the forum where plaintiffs reside").  Additionally, it is notable that Dominion chose to assert similar claims against Fox News in ***Delaware*** state court.  *See US Dominion Inc., et al., v. Fox News Network LLC*, C.A. No. N21C-03-257 EMD (Del. Super. Ct.).  Dominion's filing of this lawsuit in this District — rather than in Colorado, where Dominion is based, or California, where OAN is based — is apparent gamesmanship to avoid an anti-SLAPP motion in light of what has transpired in the *Coomer* Action.  Unlike in this District, the federal courts in California have held that the

state anti-SLAPP statute applies in federal court, *see Newsham*, 190 F.3d at 972-73, and the court

in the *Coomer* Action has held that Colorado follows California law on anti-SLAPP issues.  Thus,

Dominion's choice of forum should have minimal impact on this analysis.

- **Defendants' preferred forum**: Defendants' preferred forum in Colorado weighs

in favor of transfer not only because it is Defendants' preference, but also because Defendants are

advocating for transfer to ***Dominion's*** home jurisdiction in the U.S. (where Dominion's former

head of security and sales sued OAN and Rion and where he resides).  Defendants are seeking

transfer in the interests of efficiency, rather than trying to bring this case to their home jurisdiction

and gain some sort of hometown advantage.

- **Location where the claim arose:** Despite Dominion's efforts to suggest that its

claims somehow arose in this District (Compl., ¶¶ 43-47), the allegedly defamatory segments and

statements were broadcast to audiences nationwide and around the world.[9]  The reality is that the

harm (if any) occurred in Dominion's home District — i.e., Colorado — not in the District of

Columbia.   And to the extent the alleged defamatory statements involve Mr. Oltmann's

accusations about Dr. Coomer, these are statements made by a Colorado resident, in Colorado,

about another Colorado resident.  (Compl., ¶ 305(f), p. 162).  These claims arose in Colorado.

- **Convenience of the parties:** The convenience of the parties favors transfer.

Dominion cannot reasonably argue that it would be less convenient to litigate this case in its home

district than in this Court.  And while none of Defendants resides in Colorado, OAN and Rion are

already litigating substantially similar claims in Colorado state court, meaning there are obvious

---

[9] As a factual matter, Dominion also is incorrect that OAN "broadcasted" any segments from the District of Columbia.  All of OAN's broadcasting is done from its headquarters in San Diego, California.  *See* FCC Public Notice granting approval for OAN's Fixed Earth Station satellite broadcasting service, attached as **Exhibit M**, at p. 2 (highlighting added); *see Majid*, 245 F. Supp. 3d at 68 (judicial notice).

efficiencies.   Moreover, while not their home state, Colorado is much more convenient for California residents OAN, Charles Herring, and Robert Herring, Sr. than the District of Columbia (in part because OAN and Rion are already litigating these issues there).   Dominion may argue that this District is presumptively convenient for Rion and Bobb because they reside here, but as noted above, Rion is already litigating these same issues in Colorado and Bobb is an OAN employee who would benefit from the convenience afforded to OAN.   Any minor convenience to Bobb is clearly outweighed by Colorado being the more convenient forum for all other parties.

- **Convenience of the witnesses:**   The convenience of the witnesses, which is the "most critical factor to examine," *Beall*, 310 F. Supp. 3d at 105, weighs dramatically in favor of transfer.   The Complaint does not identify a single non-party witness who is located in the District of Columbia.   But it repeatedly references Dr. Coomer and Mr. Oltmann, both of whom are critical witnesses who reside in Colorado, outside the subpoena power of the Court.   And importantly, Dr. Coomer no longer works for Dominion and thus is outside of its control.   (Compl., ¶ 121; Coomer Decl., ¶ 2).   Defendants also are aware of many other non-party witnesses in Colorado who will be the subject of discovery in this case related to Mr. Oltmann's claims of participating in the conference call.   The full list of currently known non-parties located in Colorado includes *at least* the following individuals:

| WITNESS | SIGNIFICANCE |
|---|---|
| Dr. Eric Coomer | Colorado resident and former Director of Product Strategy and Security for Dominion who was at the center of the controversy surrounding Dominion before, during, and after the 2020 election |

| WITNESS | SIGNIFICANCE |
|---|---|
| Joseph Oltmann | Colorado resident and businessman and right-wing activist who has testified under oath repeatedly that he heard Dr. Coomer on the antifa conference call and uncovered his violent and extremely left-wing Facebook postings |
| Joey Camp | Colorado resident and right-wing activist whose encounter with Tay Anderson at a Black Lives Matter protest led to the antifa conference call |
| Tay Anderson | Colorado resident and Black Lives Matter leader whose encounter with Joey Camp led him to initiate and lead the antifa conference call. *See* Exh. E. |
| Heidi Beedle | Colorado resident and journalist who submitted an affidavit in the *Coomer* Action. *See* Declaration of Heidi Beedle, *Coomer* Action, Filing ID E9E5DD591D201, Exh. Q to Plaintiff's Omnibus Response to All Defendants' Special Motions to Dismiss, attached as **Exhibit N**. |
| Erik Maulbetsch | Colorado resident and journalist who submitted an affidavit in the *Coomer* Action. *See* Declaration of Erik Maulbetsch, *Coomer* Action, Filing ID E9E5DD591D201,  Exh. T to Plaintiff's Omnibus Response to All Defendants' Special Motions to Dismiss, attached as **Exhibit O**. |
| Anonymous individual known as "RD" | This is the person who provided Mr. Oltmann access to the antifa call.  He is presumed to be Colorado resident because the first time he introduced himself to Mr. Oltmann was at a meeting in Castle Rock, Colorado.  (Oltmann Dep., 25:7-11). |

| **WITNESS** | **SIGNIFICANCE** |
|---|---|
| Anonymous individual who provided Dr. Coomer's Facebook posts to Mr. Oltmann | He or she is presumed to be a Colorado resident because of the individual's connections to Mr. Oltmann and the fact that Mr. Oltmann accessed the posts for the first time from Colorado.  (Oltmann Dep., 109:1-2). |
| Representative of the *Denver Post* | The *Post* published a guest editorial from Dr. Coomer in which he claimed the Facebook posts were not authentic. |
| Jan Wondra | Colorado resident and reporter for the *Ark Valley Voice* who wrote an article in which Dr. Coomer claimed the Facebook posts were not authentic. |
| At least six other potential witnesses, including: <br> -An individual identified as "Brian" <br> -An individual identified as "Bev" <br> -An individual identified as "Sam" <br> -An individual identified as "Yan-ni" <br> -An individual identified as "Chrissy, Chris, or Kris" <br> -An individual identified as "Nick" | These are all individuals who participated in the antifa conference call and appeared in Mr. Oltmann's notes of that call.  *See* Joseph Oltmann's antifa call notes, *Coomer* Action, Filing ID E9E5DD591D201, Exh. F-2 to Plaintiff's Omnibus Response to All Defendants' Special Motions to Dismiss, attached as **Exhibit P**.  They presumably are Colorado residents, given that the call focused on Mr. Anderson's encounter with Mr. Camp at a Black Lives Matter protest in Colorado. |

Thus, transferring this case to Colorado would be much more convenient for ***at least 16 non-party witnesses*** and would facilitate subpoenas to, depositions of, and testimony from those non-party witnesses without the need for ancillary enforcement actions.  *See Armco Steel Co., L.P. v. CSX Corp.*, 790 F. Supp. 311, 324 (D.D.C. 1991) ("'[C]omparative abilities of the transferor and transferee forums to subpoena nonparty witnesses is a critical factor in determining the interests of justice' in deciding a § 1404(a) motion.").  Other potential witnesses in Colorado include other former employees of Dominion who previously worked at Dominion's U.S.

headquarters in Colorado (these individuals will have information related to Dominion's status before these statements were made and will be more likely to provide an accurate depiction of Dominion's operations than current employees) and individuals with knowledge of Dr. Coomer's fairly extensive criminal history.  Thus, the convenience of the witnesses alone justifies transfer.

- **Ease of access to sources of proof:**  There is no doubt that transferring this case to Colorado "will lead to a net increase in convenience for all parties." *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 771 F. Supp. 2d 42, 47 (D.D.C. 2011).  Transferring the case to Dominion's home district will make it easier for Dominion to access relevant documents and records and will make it easier and more efficient for Dominion's party witnesses to participate in the litigation.  Transfer will also make it easier for non-party witnesses to participate, and because a substantially similar case is already pending Colorado, the parties will have the benefit of discovery in that case.

Accordingly, it is clear that an analysis of the private-interest factors favors transfer of this case to the U.S. District Court for the District of Colorado.

## 2. The public-interest factors also heavily favor transfer.

The public-interest factors "include: (1) the local interest in making local decisions regarding local controversies; (2) the relative congestion of the transferee and transferor courts; and (3) the potential transferee court's familiarity with the governing law." *Federal Housing Finance Agency v. First Tennessee Bank Nat. Ass'n*, 856 F. Supp. 2d 186, 193 (D.D.C. 2012). "Another paramount consideration is 'the compelling public interest in avoiding duplicative proceedings . . . and potentially inconsistent judgments.'" *Id.*; *see also California Farm Bureau Fed'n v. Badgley*, 2005 WL 1532718, *2 (D.D.C. June 29, 2005) ("[A] significant risk that this court and the California court would issue inconsistent orders subjecting [defendant] to

inconsistent obligations . . . weigh[s] heavily in favor of transfer.").  These factors also heavily favor transfer.

Dominion's domestic entities are Colorado corporations that were harmed (if at all) first and foremost in the state of Colorado, and Dominion's former employee, Dr. Coomer, has already brought suit in Colorado alleging that some of the same statements at issue in this case harmed him in Colorado.  Thus, the state of Colorado has a clear interest in making local decisions regarding these local controversies, and the first public interest factor weighs in favor of transfer.

The relative docket congestion in the two courts also supports transfer.  As of June 30, 2021, this Court had 5,946 pending cases and an average of 40 months for a case to reach trial. *See* Judicial Caseload Profiles for D.D.C. and D. Colo., attached as **Exhibit Q**.  By comparison, the U.S. District Court for the District of Colorado has 3,948 pending cases and an average of 32.8 months for a case to reach trial.  *Id.*  Thus, the parties can anticipate a faster and more efficient resolution of this matter if the case is transferred.

Transfer also is supported because Colorado law should govern here, and the transferee court will be more familiar with Colorado defamation law than this Court.  Regardless of where this case proceeds, Colorado law should apply based on the applicable choice of law analysis.  "In diversity cases, a federal court must follow the choice of law rules of the forum state in which it is sitting to determine which state's law to apply."  *Raflo v. U.S.*, 157 F. Supp. 2d 1, 4-5 (D.D.C. 2001).  In this case, that means the Court must apply the District of Columbia's choice of law rules.  "In determining which state's substantive law to apply to a tort case, the District of Columbia's choice of law rules require this Court to use the 'governmental interests' analysis approach."  *Id.* at 5.  "This approach adheres to a two-step inquiry: 1) identifying the governmental policies underlying the applicable laws; and 2) determining which state's policy would be most

advanced by having its law applied to the facts of this case." *Id.* "To evaluate which state has the stronger interest, the four factors enumerated in the Restatement (Second) of Conflict of Laws § 145 are also considered: 1) the place where the injury occurred; 2) the place where the conduct causing the injury occurred; 3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and 4) the place where the relationship is centered." *Id.*

Applying these factors to this case, Colorado law should apply because that is the place where the injury (if any) primarily occurred, it is the place where at least some of the alleged conduct causing the alleged injury occurred (including the statements by Mr. Oltmann and the broadcasting of the statements by Mr. Oltmann from Colorado), and Dominion resides in Colorado (and OAN does not reside in the District of Columbia). The fourth factor is neutral because there is no relationship between the parties. Thus, the Restatement factors favor the application of Colorado law.

Familiarity with Colorado defamation law is critical because it is distinct from District of Columbia law in at least three material respects. First, as discussed *supra* p. 13, the Colorado Supreme Court in *Diversified* broke with the federal framework and many states to impose a heightened standard of fault for reporting on matters of public concern. *See* 653 P.2d at 1105-08. Additionally, the Colorado anti-SLAPP statute would apply to an action in Colorado. *Supra* p. 14, n. 8. Finally, while the D.C. Circuit does not recognize the incremental harm doctrine in defamation cases, *see Moldea v. New York Times Co.,* 15 F.3d 1137, 1149 (D.C. Cir. 1994), it applies under Colorado law as a defense at the damages stage. *See Tonnessen v. Denver Pub. Co.,* 5 P.3d 959, 965 (Colo. Ct. App. 2000). Thus, the third public-interest factor favors transfer because the transferee court will be more familiar with the unique aspects of Colorado law.

The last public interest factor is the risk of inconsistent judgments.  There is a particularly high risk of inconsistent judgments if this case is not transferred because this case and the *Coomer* Action involve many of the exact same allegedly defamatory statements.  Thus, this Court and the court in the *Coomer* Action could reach different conclusions about whether the statements were true or substantially true, whether they were subject to any applicable privilege, and/or whether Defendants acted with actual malice.  Such a result would be unjust and inefficient, and that possibility weighs heavily in favor of transfer.  Accordingly, all of the public-interest factors weigh in favor of transfer.

### 3.   The fact that the *Coomer* Action was filed first favors transfer.

Finally, in this unique scenario where there are overlapping claims pending in state court in the proposed transferee district, the Court can take into account which case was filed first in granting transfer.  There can be no dispute that the *Coomer* Action is the first-filed case.  *See Bader v. Air Line Pilots Association, International*, 63 F. Supp. 3d 29, 36 (D.D.C. 2014) ("The cases are based on the same or largely overlapping set of operative facts, will likely involve much overlapping evidence, and there is no compelling reason that two related cases should be tried separately in different forums."); *Tice v. Pro Football, Inc.*, 812 F. Supp. 255, 257 (D.D.C. 1993) ("It is pointless to keep separate two highly related cases").  "[T]he fact that there is an ongoing case dealing with similar issues in another jurisdiction weighs very heavily in favor of a transfer under § 1404(a)."  *Holland v. A.T. Massey Coal*, 360 F. Supp. 2d 72, 77 (D.D.C. 2004).

Although the "first-filed rule" does not apply here because there are not two federal cases at issue, the fact that the *Coomer* Action was filed long before this case weighs in favor of transfer.  *See, e.g., Davis Aviation Specialties, Inc. v. Trace Engines, L.P.*, 2009 WL 10675003, *9 (E.D. Tenn. Dec. 29, 2009) (granting Section 1404(a) transfer from E.D. Tennessee to W.D. Texas, in part because there was state court litigation pending between the parties in that judicial district);

*Howard Acquisitions LLC v. Giannasca New Orleans LLC*, 2009 WL 10684988, *5 (E.D. La. Oct. 7, 2009) (granting Section 1404(a) transfer from E.D. Louisiana to D. Maryland, in part because the case was related to ongoing Maryland state court litigation and "for the parties and witnesses already involved in the litigation in Maryland state court, proceeding in the same city about an overlapping issue would be more practical — easier and less expensive.  Even though it is not possible for the similar litigation to be consolidated, the Court finds that this factor favors transfer."); *Platinum Partners Value Arbitrage Fund, L.P. v. TD Bank, N.A.*, 2011 WL 3329087, *6 (D.N.J. Aug. 2, 2011) (granting Section 1404(a) transfer from D.N.J. to S.D. Florida, finding that the existence of pending related litigation — both state and federal cases — on the same subject as the case at bar weighed in favor of transfer).

Because all of the relevant factors strongly favor transfer, the Court should transfer this case to the U.S. District Court for the District of Colorado if the case is not dismissed based on abstention.[10]

---

[10] This is particularly true in light of the personal jurisdiction challenges raised below.  "It is well established that a court may order a convenience transfer before addressing personal jurisdiction" and can "avoid" difficult personal jurisdiction questions by transferring to a court where the moving party has conceded jurisdiction.  *Groesbeck v. Bumbo Intern. Trust*, 2013 WL 3157922, *2 (S.D. Tex. June 20, 2013); *see also Fort Knox Music Inc. v. Baptiste,* 257 F.3d 108, 112 (2d Cir. 2001) ("The district court has this power to transfer venue even if it lacks personal jurisdiction over the defendants."); *Turner v. Harrah's New Orleans Hotel & Casino*, 2011 WL 1666925, *3 (C.D.Cal. Apr. 7, 2011) (exercising "its discretion to first consider the issue of venue because a substantial dispute concerning the proper exercise of personal jurisdiction is avoided" and collecting cases); *Spherion Corp. v. Cincinnati Fin. Corp.*, 183 F. Supp. 2d 1052, 1057 (N.D. Ill. 2002) (discussing the avoidability of difficult personal jurisdiction and improper venue issues because the court has the power to transfer an action in the interest of justice).

C.     **Even if the case is not dismissed or transferred in its entirety, it should be dismissed as to OAN, Charles Herring, and Robert Herring, Sr. because Dominion has failed to adequately plead personal jurisdiction as to these defendants.**

As set forth above, this case should be dismissed (or stayed) based on *Colorado River* abstention or transferred under Section 1404(a), in which case the Court need not address personal jurisdiction at all.   But if this case remains in this District, the claims against OAN, Charles Herring, and Robert Herring, Sr. should be dismissed because Dominion has failed to adequately plead personal jurisdiction as to those defendants.   "Under Rule 12(b)(2), a defendant may move to dismiss a complaint for lack of personal jurisdiction. . . .   The plaintiff bears the burden of making a *prima facie* showing that the court has personal jurisdiction over the defendants. . . .   To meet his burden, *'[a] plaintiff must plead specific facts providing a basis for personal jurisdiction*.'"   *Amr v. Virginia*, 58 F. Supp. 3d 27, 34 (D.D.C. 2014) (emphasis added).

There are two types of personal jurisdiction.   "The first, general jurisdiction, 'permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit.'"   *Livnat v. Palestinian Authority*, 851 F.3d 45, 56 (D.C. Cir. 2017) (citing *Walden v. Fiore*, 134 S. Ct. 1115, 1121 n.6, (2014)).   Due process permits general jurisdiction based on "only a limited set of affiliations with a forum," in which the defendant can be "fairly regarded as at home." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).   For corporations, this is generally limited to the place of incorporation or principal place of business.   *Id.*   To that end, the District of Columbia long-arm statute states that District of Columbia courts have personal jurisdiction when the defendant is "domiciled in, . . . or maintaining . . . its principal place of business in, the District of Columbia as to any claim for relief."   D.C. Code § 13-422.   The District of Columbia long-arm statute is "coextensive with the due process clause."   *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004).

Here, Dominion has not pled sufficient facts to make a *prima facie* case of general jurisdiction as to OAN, Charles Herring, and Robert Herring, Sr.  With respect to Charles Herring and Robert Herring, Sr., the analysis is simple: The Complaint alleges no facts whatsoever related to their citizenship and residence, and the caption contains California addresses for both.  *See generally* Compl.  Accordingly, there is no general jurisdiction over them.  As for OAN, Dominion admits that OAN's principal place of business is San Diego (Compl., ¶ 17) and does not allege OAN's place of corporate registration.  Dominion contends that OAN "maintains a substantial operation in Washington, D.C., including its Washington, D.C. news bureau" (Compl., ¶ 17), but even "continuous and systematic" contacts with the forum are not enough to create general jurisdiction — the contacts must be "so 'continuous and systematic' as to render [it] essentially at home in the forum."  *Daimler*, 571 U.S. at 139.  Dominion has not pled sufficient facts to establish that this is an "exceptional case" in which "truly unusual circumstances create a new 'home' for the corporation."  *Annapolis Citizens Class Overcharged for Water-Sewer, by Loudon Operations, LLC v. Stantec, Inc*., 2021 WL 75766, *7 (D.D.C. Jan. 8, 2021) (citing *Daimler*).  Accordingly, Dominion has not pled sufficient facts to establish general personal jurisdiction over OAN, Charles Herring, or Robert Herring, Sr.

"The second type of personal jurisdiction, specific jurisdiction, requires an 'affiliation between the forum and the underlying controversy.'"  *Livnat*, 851 F.3d at 56 (citing *Walden*).  The affiliation "must arise out of contacts that the 'defendant *himself*' creates with the forum State. . . . [O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  *Walden*, 134 S. Ct. at 1122 (emphasis in original).  "In order for a state court to exercise specific jurisdiction, 'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the forum.'"  *Bristol-Myers Squibb Co. v. Superior*

*Court of California, San Francisco Cnty.*, 137 S. Ct. 1773, 1780 (2017).  The plaintiff must "make a *prima facie* showing of the pertinent jurisdictional facts" and it is not enough to make "conclusory statements."  *Livnat*, 851 F.3d at 56-57.  Moreover, the Court "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts."  *Id.* (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

Dominion's argument for the exercise of specific personal jurisdiction over OAN, Charles Herring, and Robert Herring, Sr. (Compl., ¶¶ 43-45), relies on the District of Columbia long-arm statute.  The long-arm statute dictates that a District of Columbia court has personal jurisdiction over a non-resident defendant if the claim arises from the defendant's conduct in:

> (1) transacting any business in the District of Columbia;
>
> (2) contracting to supply services in the District of Columbia;
>
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
>
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia

D.C. Code § 13-423.

But Dominion makes no more than conclusory allegations relating to the jurisdictional elements (Compl., ¶¶ 43-45) and, importantly, Dominion cannot establish that its claims arise out of or relate to the defendants' alleged contacts in the forum.  In fact, Dominion's allegations show just the opposite.  Dominion alleges that Defendants defamed Dominion "throughout OAN's television and digital media platforms to an audience of tens of millions who placed credence in OAN as a news source, and the falsehoods ultimately and foreseeably were republished repeatedly on social media."  (Compl., ¶ 314).  Dominion goes on to allege that Defendants "reached millions

of people in the United States and worldwide and caused enormous economic harm to Dominion." (Compl., ¶ 315).  Thus, despite the conclusory allegations made by Dominion in its boilerplate personal jurisdiction paragraphs, Dominion's actual claims relate not to Defendants' alleged activities in this District, but rather to Defendants' nationwide activities on broadcast television and online that reached "millions."  Allowing personal jurisdiction under these circumstances would amount to universal jurisdiction, which the Supreme Court has rejected.  *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 886 (2011) (holding that it is the defendant's "purposeful contacts with [the state], not with the United States, that alone are relevant").

Moreover, it is clear that the alleged harms to Dominion did not occur in the District of Columbia.  Dominion alleges that "Dominion employees have been stalked, have been harassed, and have received death threats; Dominion's offices have been attacked; Dominion has been forced to make an expenditure of money to remedy the defamation and to protect the lives of its employees; Dominion has lost profits; Dominion has suffered a loss of goodwill; and Dominion's enterprise value has been irreparably damaged." (Compl., ¶ 315).  Dominion's U.S.-based entities are Denver-based companies, whose employees, offices, and profit centers are based in Colorado, not the District of Columbia.  And to the extent Dominion Voting Systems Corporation, a wholly owned subsidiary with its principal place of business in Canada (Compl. ¶ 16), may allege that it was separately damaged, those damages certainly did not occur in this District.  Thus, despite the conclusory assertions that OAN, Charles Herring, and Robert Herring, Sr., somehow caused injuries in this District (Compl., ¶¶ 43-45), the facts as alleged by Dominion disprove that theory.

Dominion's claim for specific personal jurisdiction is particularly weak as to Charles Herring and Robert Herring, Sr., because Dominion fails to allege ***any*** concrete facts to establish that they ever set foot in this District, much less transacted business or caused tortious injury.  The

Complaint does not allege that Charles Herring or Robert Herring, Sr. made *any* defamatory statements, and neither Charles Herring nor Robert Herring, Sr. can be held liable for any statements by OAN because of the corporate shield doctrine. *See Wiggins v. Equifax Inc.*, 853 F. Supp. 500, 503 (D.D.C. 1994) ("Personal jurisdiction over the employees or officers of a corporation in their individual capacities must be based on their personal contacts with the forum and not their acts and contacts carried out solely in a corporate capacity."). The best Dominion can muster with respect to Charles Herring is that "on information and belief, based upon his Twitter and LinkedIn locations, [he] is a resident of the District of Columbia." (Compl., ¶ 45). But this conclusory allegation is flatly inconsistent with the fact that the case caption lists a *California* address for serving Charles Herring, and the Complaint is otherwise silent on the residency of Charles Herring. The allegations related to Charles Herring's connections to Washington, D.C. are little more than a threadbare recitation of the long-arm statute.

The allegations related to Robert Herring, Sr., are even thinner — and "[e]ach defendant's contacts with the forum . . . must be assessed individually." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984). Dominion does not even attempt to allege that Robert Herring, Sr., was ever present in the District, instead contending that minimum contacts were established simply by "supervising and exercising editorial control over broadcasting" allegedly coming from the District of Columbia. (Compl., ¶ 44). Again, such conclusory allegations fall well short of Dominion's burden to plead facts sufficient to make a *prima facie* case of specific personal jurisdiction.

Finally, Dominion also must establish that the exercise of personal jurisdiction would be consistent with traditional notions of fair play and substantial justice. *See International Shoe Co. v. State of Washington, Office of Unemployment Compensation & Placement*, 326 U.S. 310, 316

(1945).  The Supreme Court outlined a non-exhaustive list of factors that can be considered as part

of the fairness analysis in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985):

> the burden on the defendant, the forum State's interest in adjudicating the dispute,
> the plaintiff's interest in obtaining convenient and effective relief, the interstate
> judicial system's interest in obtaining the most efficient resolution of controversies,
> and the shared interest of the several States in furthering fundamental substantive
> social policies.

Dominion contends, in conclusory fashion, that due process is satisfied here because Dominion

claims that Defendants made defamatory statements about Dominion from within the District of

Columbia.  (Compl., ¶ 48).  This, of course, improperly lumps Defendants together in a manner

that is inconsistent with the individualized personal jurisdiction analysis — for example, this seems

to suggest that Charles Herring and Robert Herring, Sr., "made" defamatory statements about

Dominion even though that is not alleged anywhere else in the Complaint.  This flawed pleading

approach alone should justify dismissal.

But it also is apparent from the *Burger King* factors that due process is not satisfied.  The

burden on a San Diego-based company and its two California-resident executives to litigate across

the country in the District of Columbia is obviously significant.  Meanwhile, the District of

Columbia has no meaningful interest in adjudicating a dispute between California residents and a

Colorado resident, and Dominion's interest in obtaining convenient and effective relief is not

served by litigating far outside its home jurisdiction, in a place where it suffered no harm.  As set

forth at length above, the interstate judicial system's interest in obtaining the most efficient result

would be best served if this case was in Colorado, and there is no substantive social policy served

by litigating this case in this District.

Because Dominion has failed to plead general or specific personal jurisdiction over OAN,

Charles Herring, and Robert Herring, Sr., and because the exercise of personal jurisdiction over

OAN, Charles Herring, and Robert Herring, Sr. would be inconsistent with the notions of fair play and substantial justice, the claims against these three defendants should be dismissed (if the entire case is not otherwise dismissed, stayed, or transferred).

IV.    **Conclusion**

For the foregoing reasons, the Court should dismiss (or stay) this case based on the *Colorado River* abstention doctrine.  Alternatively, the Court should transfer this case to the U.S. District Court for the District of Colorado under Section 1404(a).  And if the Court does not dismiss or transfer this case in its entirety, the Court should dismiss the claims against OAN, Charles Herring, and Robert Herring, Sr. for failure by Dominion to adequately plead personal jurisdiction.

Respectfully submitted,


By:  /s/ Blaine C. Kimrey
               Counsel for all defendants

Blaine C. Kimrey
bkimrey@vedderprice.com
Jeanah Park
jpark@vedderprice.com
Bryan Clark
bclark@vedderprice.com
Brian Ledebuhr
bledebuhr@vedderprice.com
Julia Koechley
jkoechley@vedderprice.com
VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, IL 60601
T:  +1 312 609 7500
F:  +1 312 609 5005

Brian K. McCalmon, Bar No. 461196
bmccalmon@vedderprice.com
VEDDER PRICE P.C.
1401 New York Ave NW, Suite 500
Washington, DC 20005
T:  +1 202 312 3320
F:  +1 202 312 3322

Dated: November 18, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of November 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which I understand to have served on the following counsel for the parties:

Thomas A. Clare, Esq.
tom@clarelocke.com
Megan Lambart Meier, Esq.
megan@clarelocke.com
Dustin Andrew Pusch, Esq.
dustin@clarelocke.com
Clare Locke LLP
10 Prince Street
Alexandria, VA 22314

Davida Brook, Esq.
dbrook@susmangodfrey.com
Stephen Shackelford, Jr., Esq.
sshackelford@susmangodfrey.com
Justin A. Nelson, Esq.
jnelson@susmangodfrey.com
Susman Godfrey L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019

/s/ Blaine C. Kimrey
Blaine C. Kimrey