IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

US DOMINION, INC., *et al.*,

               Plaintiffs,

    v.

HERRING NETWORKS, INC., *et al.*,

               Defendants.

No. 1:21-cv-02130-CJN

Judge Carl J. Nichols

# <u>EXHIBIT B</u>

| | |
|---|---|
| ERIC COOMER, Ph.D.,<br>Plaintiff<br><br>vs.<br><br>DONALD J. TRUMP FOR PRESIDENT, INC., et al.,<br>Defendants | DATE FILED: April 30, 2021 6:54 PM<br>FILING ID: A7DA5EF84102C<br>CASE NUMBER: 2020CV34319 |
| Eric P. Early<br>eearly@earlysullivan.com<br>Jeremy Gray<br>jgray@earlysullivan.com<br>Peter Scott<br>pscott@earlysullivan.com<br>Early Sullivan Wright Gizer & McRae LLP<br>6420 Wilshire Boulevard, 17th Floor<br>Los Angeles, California 90048<br>323-301-4667 / 323-301-4676—Facsimile<br><br>Stuart D. Morse, SBN 16978<br>smorse@sdmorselaw.com<br>Stuart D. Morse & Associates LLC<br>5445 DTC Parkway, Suite 250<br>Greenwood Village, CO 80111<br>303-996-6661 / 303-996-0908/Facsimile<br><br>Attorneys for Defendants Herring Networks, Inc. dba One America News Network and Chanel Rion | Case Number: 2020cv034319<br><br><br><br>Division Courtroom:  409 |

**DEFENDANTS HERRING NETWORKS, INC.'S DBA ONE AMERICA NEWS NETWORK AND CHANEL RION'S MOTION TO DISMISS PURSUANT TO COLORADO'S ANTI-SLAPP STATUTE, COLO. REV. STAT. § 13-20-1101**

## **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................................ 1

    A.   Background. ............................................................................................... 1

    B.   Colorado's Anti-SLAPP Law. ................................................................... 3

II.  THE FAC'S ALLEGATIONS ........................................................................... 6

    A.   Nationwide Claims of Election Fraud Dominated the News Cycle. ......... 6

    B.   Oltmann's Reports About Coomer And Subsequent Reporting. ............... 7

    C.   The Paltry, and Unsustainable, Claims Against OAN and Rion. .............. 8

III. COLORADO'S  ANTI-SLAPP  STATUTE  BARS  COOMER'S  CLAIMS  AGAINST OAN AND RION ........................................................................... 10

IV.  ARGUMENT ................................................................................................... 11

    A.   Coomer's Claims Seek To Punish Protected Statements Made in a Public Forum in Connection With An Issue of Public Interest. ......................... 11

    B.   Coomer Cannot Establish That There Is A Reasonable Likelihood That He Will Prevail On His Claims. ...................................................................... 13

        1.   Coomer Has No Reasonable Likelihood of Prevailing On His Defamation Claim. ................................................................................................ 13

            a)  The  Statements  Are  Protected  By  The  First  Amendment  And Therefore They Are Not Defamatory (Element One) And Were Not Uttered With Any Fault (Element Three). ......................................... 14

            b)  The  Statements  Themselves  Are  Not  Defamatory  (Element  One). .............................................................................................................. 16

            c)  The Statements Were Not Made With "Actual Malice". ................... 18

        2.   Coomer Has No Reasonable Likelihood of Prevailing on His Intentional Infliction Claim ........................................................................................ 22

        3.   Coomer Has No Reasonable Likelihood of Prevailing on His Conspiracy Claim ............................................................................................................ 23

        4.   Absent  His  Other  Claims,  Coomer  Cannot  Prevail  On  His  Injunctive Relief Claim ........................................................................................... 25

V.   CONCLUSION ................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page**

Cases

*Bd. Of Cnty. Commis v. Park Cnty. Sportsmen's Ranch, LLP*, 271 P. 3d 562 (Colo. App. 2013)23

*Bridges v. California*, 314 U.S. 252 (1941)......................................................... 14, 15

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1109 (10th Cir. 2017) ..... 11

*Cianci v. New Times Publishing Co.*, 639 F.2d 54 (2nd Cir. 1980) ............................................. 15

*Colorado Community Bank v. Hoffman*, 338 P. 3d 390 (Colo. App. 2011) ................................ 23

*Connick v. Myers*, 461 U.S. 138 (1983)........................................................................... 14

*Curling v. Raffensperger*, 2020 WL 5994029 (N.D. Ga. Oct. 11, 2020).................................... 21

*Dallnan v. Ritfer*, 225 P.3d 610 (Colo.App. 2010) ........................................................ 25

*DiLeo v. Koltnow*, 200 Colo. 119, 613 P.2d 318 (1980)........................................................ 20

*Diversified Management, Inc. v. Denver Post, Inc*., 653 P.2d 1103 (Colo.1982) ........................ 20

*Edwards v. National Audubon Society, Inc*. 556 F.2d 113 (2nd Cir. 1977) .......................... 12, 14

*Finton Constr., Inc. v. Bidna & Keys APLC*, 190 Cal. Rptr. 3d 1, 11 (Cal. App. 2015) .............. 10

*Gordon v. Boyles*, 99 P.3d 75 (Colo. App. 2004) ............................................... 16, 22, 23

*Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) ...................................................... 17

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50-51 (1988)................................................ 14, 23

*Jet Courier Serv., Inc. v. Mulei*, 771 P. 2d 486 (Colo. 1989) ........................................ 24

*Kuhn v. Tribune–Republican Publishing Co.*, 637 P.2d 315 (Colo.1981).................................. 19

*Lefebvre v. Lefebvre*, 199 Cal. App. 4th 696, 702 (2011)....................................................... 13

*Lewis v. McGraw-Hill Broad. Co*., 832 P. 2d 1118 (Colo. App. 1992) ................................ 13, 18

*McDougal v. Fox News Network, LLC*, 2020 WL 5731954 (S.D.N.Y. Sept. 24, 2020) .............. 17

*McIntyre v. Jones*, 194 P. 3d 519, 523-24 (Colo. App. 2008) ................................................. 13, 16

*New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).......................................................... 14, 18

*Pullum v. Johnson*, 647 So. 2d 254, 257-58 (Fla. 1st DCA 1994) ................................................ 17

*Rosenberg v. Helinski*, 616 A.2d 866 (1992) ............................................................................ 15

*Rugg v. McCarty*, 476 P. 2d 753 (Colo. 1970) ......................................................................... 22

*Seible v. Denver Post, Corp.*, 782 P.2d 805 (Colo.App.1985) ..................................................... 19

*Snyder v. Phelps*, 562 U.S. 443, 452 (2011) .......................................................................... 12, 14

*Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1035 (10th Cir. 2013) ....... 11

*St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).......................... 19

*Stevens v. Mulay*, 2021 WL 1153059 (D. Colo. Mar. 26, 2021) ................................................. 13

*Tonnessen v. Denver Publishing Co*., 5 P. 3d 959 (2000) ...................................................... 15, 16

*Walker v. Van Laningham*, 148 P. 3d 391 (Colo.App. 2006) ...................................................... 24

*Williams v. Cont'l Airlines, Inc.*, 943 P.2d 10, 17 (Colo. App. 1996) .......................................... 11

*Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979)............ 20

## **Statutes**

Colo. Rev. Stat. § 13-20-1101 ................................................................................. 1, 2, 4, 10, 12

Pursuant to Colorado's anti-SLAPP statute, Colo. Rev. Stat. § 13-20-1101 ("Anti-SLAPP Statute"), Defendants Herring Networks, Inc. d/b/a/ One America News Network ("OAN") and Chanel Rion ("Rion") (collectively "Defendants") submit this Special Motion to Dismiss, which seeks a dismissal of all claims against Defendants in the First Amended Complaint ("FAC"), a stay of discovery, and an award in favor of Defendants and against Plaintiff Eric Coomer ("Plaintiff" or "Coomer") of Defendants' fees as permitted by the statute.[1]  As grounds for this Motion, Defendants state the following:

## CERTIFICATE OF CONFERRAL

The undersigned certifies that he has conferred with counsel for Coomer regarding this Motion.  Coomer opposes this Motion.

## I.      INTRODUCTION

On July 1, 2019, Colorado became the thirtieth state (including the District of Columbia) to enact an anti-SLAPP statute.  On June 3, 2019, House Bill 19-1324 was signed into law by Colorado's Governor Jared Polis.   The bill is modeled after (copied almost verbatim from) California's anti-SLAPP statute.[2]  The instant case exemplifies why the anti-SLAPP statute was enacted.

### A.      Background.

OAN is a prominent 24-hour national news network which reports on national and international news daily around America.  It is headquartered in San Diego, California and

---

[1]       Pursuant to the Order dated March 23, 2021, the Court granted Defendants' Motion for an Enlargement of Deadline to File Special Motion to Dismiss Under Anti-SLAPP law, providing a deadline of April 30, 2021.  Thus, this Motion is timely.

[2]       https://www.rcfp.org/colorado-anti-slapp-protections.

operates news bureaus in Washington, D.C. and New York City.  Defendant Chanel Rion is the Chief White House Correspondent for OAN.[3]

During the time period spanning the allegations in the FAC, the subject of the November 3, 2020 Presidential Election was the most important and most dominant news story in America, covered widely and around-the-clock on television and radio, in newspapers, and on social media.

After the mainstream media called the 2020 election for Joseph Biden, President Donald Trump and others generated the biggest news story in decades, asserting he had won the election and that victory had been stolen from him.  Tens of millions of Americans have reached similar conclusions.  Tens of millions of other Americans disagree with those conclusions.  Over the ensuing months, countless stories were published by the entire media spectrum portraying myriad examples of improprieties and alleged malfeasance involving the vote and vote counts. The story was also driven in one way, shape or form by elected officials of all political parties who had the ability to get in front of a microphone, as well as by the President himself, his lawyers, his family and other surrogates and their political opponents. At least sixty lawsuits were filed regarding the election in courts throughout the land. One lawsuit was joined by more than one-hundred members of Congress.

---

[3]     On February 24, 2021, Rion served and filed a Motion to Dismiss for Lack of Personal Jurisdiction.  Thus, Rion brings this Motion subject to her Motion to Dismiss and expressly reserving her rights in this regard.  The jurisdictional challenge is currently before the Court and Rion believes that the Court's ruling on that Motion to Dismiss will moot this Motion as to Rion because, by dismissing for lack of personal jurisdiction, the Court will not be able to rule on the merits of Coomer's claims against Rion.  However, due to the Court's Order requiring all defendants to file any special motions to dismiss by April 30, 2021, Rion brings this Motion to preserve her rights under COLO. REV. STAT. § 13-20-1101 should the Court find that it has personal jurisdiction over Rion.  *Wakefield v. Brit. Med. J. Publ'g Grp., Ltd.*, 449 S.W.3d 172, 183 (Tex. App.—Austin 2014) (holding that defendant does not waive personal jurisdiction by filing Anti-SLAPP motion subject to personal jurisdiction challenge in light of strict timing requirements of Anti-SLAPP statute).

The voting machines used in the Presidential Election and their manufacturers were the subject of thousands of media reports published throughout the entire media spectrum. Coomer was and is employed as Director of Product Strategy and Security by Dominion Voting System's Inc. ("Dominion"), which manufactured and supported the voting machines used in several swing states, including Michigan and Georgia.

On about November 9, 2020, a private citizen named Joseph Oltmann came forward and claimed to have overheard a conversation in which Coomer told others, "Don't worry about the election, Trump is not gonna win. I made f-ing sure of that. Hahahaha." Oltmann reported that he had identified Coomer as the speaker and that he was an executive at Dominion. Oltmann further reported that he had accessed and retrieved a number of vitriolic and depraved Facebook posts published before the election by Dominion's Strategy and Security Chief Coomer that were frighteningly critical of President Trump.

Oltmann first reported these matters on his Podcast, and later in interviews with Gateway Pundit, Newsmax, Michele Malkin. More significantly, Oltmann's claims were set forth in a sworn Affidavit for use by President Trump's legal team in their election challenges. President Trump's lawyers addressed Oltmann's claims about Coomer in the media and in a press conference where they directly tied Coomer's alleged statement to the President's election legal challenges. Coomer first came to OAN's/Rion's attention *after* these others had reported and publicly discussed the statements attributed to Coomer by Oltmann. FAC ¶¶ 52 -64.

**B.     Colorado's Anti-SLAPP Law.**

The Colorado Anti-SLAPP Statute allows a defendant to file a "special motion to dismiss" claims arising from the "act in furtherance of a person's right of petition or free

speech," including "any written or oral statement or writing made in a public forum in connection with an issue of public interest." Colo. Rev. Stat. § 13-20-1101(1), (3)(a)-(c).  If the Court finds, upon the filing of such a motion, the defendant has satisfied the first prong of the statute, then the claims must be dismissed "unless the court determines that the plaintiff has established that there is a reasonable likelihood that the plaintiff will prevail on the claim."  *Id*.

In the instant case, both elements of the Anti-SLAPP Statute test have been met.  First, Coomer's claims undeniably arise from OAN's and Rion's furtherance of their right of free speech in connection with a public issue.  Their reporting about the 2020 Presidential Election and the massive and widespread concerns regarding voting integrity, which included coverage of the statements attributed to Coomer, is an issue of significant public concern and interest.  Every news organization in America, big and small, and including Defendants, covered the story that the election had been stolen.

Second, because OAN and Rion have satisfied the first prong of the Anti-SLAPP Statute – namely that Coomer's claims undeniably arise from the furtherance of their right of free speech in connection with an issue of public interest – such claims must be dismissed "unless the court determines that the plaintiff has established that there is a reasonable likelihood that the plaintiff will prevail on the claim."  For the reasons demonstrated in detail below in Section IV, ***all*** of the claims alleged against OAN and Rion fail.  There is ***no likelihood*** (much less a reasonable likelihood) that Coomer will prevail on any of his claims.

Coomer's claim for Defamation fails because OAN's and Rion's reporting is protected by the First Amendment which provides an absolute defense against Coomer's state law claims.  OAN and Rion did not defame Coomer.  And even assuming *arguendo* that they defamed

4

Coomer (and they manifestly did not), there is no showing whatsoever that OAN's and Rion's statements were made with "actual malice" as required by Colorado law to maintain this claim. The evidence submitted herewith shows that, other than Coomer's own self-serving denials, OAN and Rion did not have any indication that their reporting with respect to Coomer is untrue and, indeed, they believed it to be true and accurate when reported.  (Declaration of Charles Herring ("Herring Decl.); Declaration of Chanel Rion ("Rion Decl.").)

Coomer's claim for Intentional Infliction of Emotional Distress fails because OAN and Rion did not engage in any "outrageous" conduct whatsoever, much less the requisite conduct required to prevail on this claim.  To the contrary, OAN and Rion are merely alleged to have *reported* what Oltmann was claiming, just as virtually all other news outlets did.  This is the opposite of outrageous conduct.  News reporting and the First Amendment are one of the dearest liberties in this country.

Coomer's claim for Civil Conspiracy fails because it does not provide an independent basis for relief.  And even assuming *arguendo* an independent claim for Civil Conspiracy existed under Colorado law, this claim also fails because Coomer cannot show that there has been a "meeting of the minds" among OAN and Rion on the one hand, and their competitors in the media and anyone else, on the other hand, to do anything whatsoever, much less some agreement to defame or inflict distress upon Coomer.  Again, and at best, all Plaintiff's FAC does as to these Defendants is attack a news service for reporting a newsworthy story

Coomer's claim for Preliminary and Permanent Injunctive relief fails because it does not constitute an independent claim for relief.

In sum, Coomer has no reasonable likelihood of prevailing on any of his claims.[4]   For these reasons and those demonstrated below, OAN's and Rion's Motion pursuant to the Anti-SLAPP Statute should respectfully be granted, discovery should be stayed, and they should be awarded their fees as permitted by the statute.

## II.    THE FAC'S ALLEGATIONS

### A.    Nationwide Claims of Election Fraud Dominated the News Cycle.

The FAC admits that that there was no bigger news story during the time period in issue than the alleged theft of the 2020 election.  Coomer alleges that following the November 3, 2020 presidential election, "the former President, his campaign, his agents and many of his supporters began alleging widespread voter fraud . . .."  FAC at ¶ 4.  At least 60 separate lawsuits were filed challenging the election, many brought by the President and/or his campaign.  *Id*. at ¶ 50.  The FAC alleges that the story of election fraud dates back to 2016 when the Trump Campaign allegedly "fomented" election fraud conspiracies.  *Id*. at ¶ 63.  The FAC does not, because it cannot, allege that these claims were not newsworthy.  *Id*. at ¶¶ 46-50.  They obviously were.

A central figure in the nationwide allegations of fraud was Dominion.  FAC at ¶ 1.  At the time of the election, Coomer worked (and still works) as Dominion's Director of Product Strategy and Security.  *Id*. at ¶¶ 1 & 43.  Dominion provides a wide array of election support services including "election set-up, ballot layout . . . machine set-up and systems testing.  *Id*. at ¶

---

[4]       This Motion is submitted while OAN's 12(b)(5) Motion to Dismiss (in which Rion joined) is pending before the Court.  Defendants note that the standards of review on the 12(b)(5) Motion to Dismiss are different from those on this Anti-SLAPP Motion.  Consequently, assuming *arguendo* that the Court denies the 12(b)(5) Motion before the instant Motion is heard, Defendants note that the present Motion is not decided on whether Coomer has properly pled his claims (and OAN and Rion submit that Coomer has not done so).  Rather, for the instant Motion, Coomer cannot show—as he must—that he has a likelihood of prevailing on his claims.

44. Dominion provided these services in at least thirty different states during the 2020 election. *Id*. at ¶ 45.

Every news organization in America, big and small, and including defendant OAN, covered the story that the election had been stolen. Coomer allegedly became newsworthy after multiple of OAN's competitors, and the President's lawyers, reported the statements attributed to Coomer by Joseph Oltmann.  *Id*. at ¶¶ 52 -64.

**B.     Oltmann's Reports About Coomer And Subsequent Reporting.**

The FAC alleges that on November 9, 2020, defendant Oltmann reported on his podcast that he overheard Coomer speak at a meeting of people that he understood to be affiliated with Antifa.  *Id*. at ¶ 52.  According to Oltmann, Coomer (who was identified as being affiliated with Dominion) said, "Don't worry about the election, Trump is not gonna win. I made f-ing sure of that. Hahahaha."  *Id*.  Oltmann also reported that he had accessed Coomer's Facebook page which included posts highly critical of President Trump.  *Id*. at ¶ 53.  Coomer admits that he made these posts criticizing President Trump.  *Id*. at ¶ 54.

Four days later, on November 13, 2020, Gateway Pundit published a story reporting the substance of Oltmann's podcast and adding additional content.  *Id*. at ¶ 57.  That same day, television personality (and another defendant in this case) Michelle Malkin hosted an interview with Oltmann on her personal YouTube channel.  *Id*. at ¶ 58.  Oltmann repeated his claims in this interview.  *Id*.  Malkin followed this interview with related Tweets.  *Id*.   The next day, November 14, 2020, Gateway Pundit published additional articles on the topic of Coomer.  *Id*. at ¶ 60.

The FAC also alleges, ***significantly***, that on or about November 14, 2020, Oltmann prepared a sworn "***affidavit for the Trump campaign***" for use in its lawsuits challenging the election and which included his description of what he heard Coomer say at the Antifa meeting. *Id*. at ¶ 63 n.100 (emphasis added).

On November 17, 2020 Newsmax began covering Coomer and his alleged role in President Trump's claims of voter fraud. *Id*. at ¶ 62.

Also, on November 17, 2020 Eric Trump, the son of the President of the United States, tweeted out a link to the Gateway Pundit story about the statement attributed to Coomer. *Id*. at ¶ 63.

On November 19, 2020, President Trump's lawyers – Sidney Powell, Rudolph Giuliani and Jenna Ellis – conducted a press conference about their various election legal challenges. *Id*. at ¶ 64. The FAC alleges that this press conference was carried live by C-SPAN and "substantially reported" on at least CNN, Fox and the New York Times. *Id*. Both Ms. Powell and Mr. Giuliani repeated Oltmann's claims about Coomer and tied Coomer directly to the President's election legal challenges. *Id*.

### C.       The Paltry, and Unsustainable, Claims Against OAN and Rion.

Nether OAN, nor Rion, reported on the Coomer allegations until November 17, 2020. *Id*. at ¶ 61. According to the FAC, on that date, Rion simply tweeted out a link to a Gateway Pundit story about Coomer and highlighting the statement attributed to Coomer by Oltmann ("Trump won't win. I made F***ing sure of that.") *Id*. at ¶ 61. OAN/Rion did not broadcast its report about Coomer until November 21, 2021. *Id*.

Coomer reveals the weakness of his claims against OAN and Rion by burying them in two footnotes in the apparent hope that these defendants will be swept along with the others. FAC at ¶ 61 n. 83 & 84.  Footnote 83 itemizes three purportedly defamatory statements which were made about Coomer by either Rion or Oltmann in programs broadcast by OAN:

Rion: "In Coomer's case, he was in a position of power to actually act on his rage against Trump and Trump voters."  This statement is a true (or substantially true) comment about Coomer's position and role at Dominion and his rage and therefore not defamatory.

Rion: "What does he mean when he says 'Trump won't win. I made f-ing sure of that.' Nothing?" This comment by Rion, raising a question about the statement reported by Oltmann is precisely the type of debate protected from civil actions by the First Amendment.

Oltmann: "Eric Coomer was this, you know, he's not just Antifa, he was responsible for putting his finger on the scales of our election . . . ***If Coomer is investigated and found to have indeed*** tampered with a presidential election, such an action could be tried for treason. Unfortunately, the question is, will the FBI step up to investigate."  (Emphasis added).  This statement makes plain that the ultimate question of whether Coomer acted inappropriately remains open, and thus, this statement lacks the requisite definitiveness to sustain a defamation claim.  More importantly, this "statement" ***was not*** made by OAN or Rion, but rather consists of OAN/Rion quoting someone else (Oltmann) – regarding a national news event of tremendous importance.

Then, in footnote 85, Coomer purports to allege that OAN's reporting about his employer ***Dominion***, somehow gives rise to a claim by Coomer that ***he*** was defamed.  *Id*. at ¶ 61 n. 85. Footnote 85 does nothing more than list several links to OAN news stories about Dominion, not

about Coomer, including references to statements made by President Trump's lawyers.  *Id*. Tellingly, however, the FAC does not even attempt to allege how these stories defamed Dominion, much less Coomer individually. Put simply, footnote 85 fails to identify a single specific statement attributable to OAN and Rion, when it was made, who made it, and how it amounts to defamation of ***Coomer***.  *Id*.  Colorado law does not permit a party to dump a bunch of links to news stories in a footnote and then claim – *voila* – defamation.

## III.    COLORADO'S ANTI-SLAPP STATUTE BARS COOMER'S CLAIMS AGAINST OAN AND RION

Colorado enacted a strong anti-SLAPP law in 2019.  Colo. Rev. Stat. § 13-20-1101.  The statute allows a defendant to file a "special motion to dismiss" claims arising from the "act in furtherance of a person's right of petition or free speech," including "any written or oral statement or writing made in a public forum in connection with an issue of public interest." Colo. Rev. Stat. § 13-20-1101(1), (3)(a)-(c).  Upon the filing of such a motion, if the Court finds that the defendant has satisfied the first prong of the statute, then the claims must be dismissed "unless the court determines that the plaintiff has established that there is a reasonable likelihood that the plaintiff will prevail on the claim."  *Id*.

At the second stage of the analysis, a plaintiff has the burden of establishing—not merely alleging—facts.  For this reason, a plaintiff may not rest on his pleadings.  "An anti-SLAPP motion is an evidentiary motion.  Once the court reaches the second prong of the analysis, it must rely on admissible evidence, not merely allegations in the complaint or conclusory

statements by counsel." *Finton Constr., Inc. v. Bidna & Keys APLC*, 190 Cal. Rptr. 3d 1, 11 (Cal. App. 2015).[5]

## IV.    ARGUMENT

### A.    Coomer's Claims Seek To Punish Protected Statements Made in a Public Forum in Connection With An Issue of Public Interest.

The first prong of the Anti-SLAPP Statute test is satisfied here.  Coomer's claims clearly arise from OAN's and Rion's furtherance of their right of free speech in connection with a public issue.  *See Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1109 (10th Cir. 2017) (recognizing that under Colorado law, a matter is of public concern whenever it embraces an issue about which information is needed or is appropriate, "or when the public may reasonably be expected to have a legitimate interest in what is being published") (citing *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1035 (10th Cir. 2013) (quoting *Williams v. Cont'l Airlines, Inc.*, 943 P.2d 10, 17 (Colo. App. 1996)).

For example and without limitation, the FAC alleges that "this case is based on Defendants' false and baseless assertions that ***Dr. Coomer, an employee of Dominion Voting Systems, Inc. (Dominion) sits at the center of a national conspiracy to fraudulently elect the President of the United State****s*."  FAC ¶ 1 (emphasis added).  Coomer further admits that "Defendants, by their actions, have elevated Dr. Coomer ***into the national spotlight***, invaded his privacy, threatened his security, and fundamentally defamed his reputation across this country,"

---

[5]    Colorado's Anti-SLAPP statute is modeled after California's Anti-SLAPP statute.  Thus, California's statute is persuasive authority for interpreting the Colorado statute.  Calif. Code of Civ. Proc. § 425.16.

among other things.  *Id*. (emphasis added).)  In line with these allegations and various others,[6] it is difficult to conceive of a matter of greater public concern and interest than an alleged conspiracy to fraudulently elect the President of the United States involving a widespread scheme of voter fraud through the illicit use of voting machines.  FAC ¶ 63.

The FAC admits that there was no bigger news story during the relevant time period than the alleged theft of the 2020 election and was widely reported on by the press.  FAC ¶¶ 49, 50, 57-71.  Coomer alleges that following the November 3, 2020 presidential election, "the former President, his campaign, his agents and many of his supporters began alleging widespread voter fraud . . .."  FAC ¶ 4.  At least 60 separate lawsuits were filed challenging the election, many brought by the President and/or his campaign.  *Id*. ¶ 50.  These issues were obviously newsworthy and of public interest.  *Id*. ¶¶ 46-50.[7]

Under the "free speech clause" of the First Amendment, when publishing on matters of significant public interest, the press is afforded the leeway to report statements which are inherently newsworthy, even when they turn out to be false.  *Edwards v. National Audubon Society, Inc*. 556 F.2d 113, 120 (2nd Cir. 1977); *see also Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection.").  Where the fact of an allegation is newsworthy, the press is entitled to report on it without fear of a defamation suit.  *Edwards*, 556 F.2d at 120.

---

[6]     *See also* FAC ¶¶ 2-4, 49, 50, 57-71 (alleging "widespread voter fraud" and admitting that such allegations were widely reported on by the press).

[7]     Coomer has admitted in various filings in this matter, including by way of example his own declaration, that allegations of voter fraud by Dominion were the subject of "numerous national broadcasts."  Declaration of Eric Coomer filed in support of Response to Defendant Rudolph Guiliani's Motion to Dismiss, dated April 13, 2021, ¶ 9.

In short, Coomer's claims arise from OAN's and Rion's acts in furtherance of their right of free speech in connection with a public issue, as the subject statements were made in a public forum in connection with an issue of public interest.  *See* Colo. Rev. Stat. § 13-20-1101(1), (3)(a)-(c).  Thus, OAN and Rion have satisfied the first prong of the statute, and Coomer's claims must be dismissed "unless the court determines that the plaintiff has established that there is a reasonable likelihood that the plaintiff will prevail on the claim."  *Id*.

**B.     Coomer Cannot Establish That There Is A Reasonable Likelihood That He Will Prevail On His Claims.**

A reasonable likelihood on the merits means a plaintiff must show that he/she has a reasonable probability of prevailing.  *Stevens v. Mulay*, 2021 WL 1153059, at *3 (D. Colo. Mar. 26, 2021) (citing *Lefebvre v. Lefebvre*, 199 Cal. App. 4th 696, 702 (2011)).

**1.     Coomer Has No Reasonable Likelihood of Prevailing On His Defamation Claim.**

"In Colorado, the elements of a cause of action for defamation are:  (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication." *McIntyre v. Jones*, 194 P. 3d 519, 523-24 (Colo. App. 2008).[8]

Moreover, where, as here, the statements involve "a matter of public concern," the plaintiff cannot prevail absent proof, by clear and convincing evidence, "that the defendant

---

[8]     When evaluating a defamation claim, the interest in protecting an individual's reputation can be outweighed by the interest in fostering vigorous public debate protected by the First Amendment and Article II, section 10 of the Colorado Constitution (providing that "No law shall be passed impairing the freedom of speech…").  *Id*. at 524.

published the defamatory statement with actual malice" *i.e.*, knowledge of falsity or in reckless disregard of the truth. *Lewis v. McGraw-Hill Broad. Co*., 832 P. 2d 1118, 1122-23 (Colo. App. 1992). "Actual malice" is also required if the plaintiff is a public figure.

<blockquote>

a)      **The Statements Are Protected By The First Amendment And Therefore They Are Not Defamatory (Element One) And Were Not Uttered With Any Fault (Element Three).**

</blockquote>

The "free speech clause" of the First Amendment which states in pertinent part, "Congress shall make no law . . . abridging the freedom of speech, or of the press", can serve as a defense in state tort suits. *See*, *e.g., Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50-51 (1988) (emphasis added). The First Amendment implements a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open*." New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). The protection offered by the First Amendment is at its strongest for speech on matters of public concern. *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Snyder*, 562 U.S. at 452 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted) (emphasis added)). The First Amendment's specific use of the word "press" is "intended to give to liberty of the press" the "broadest scope that could be countenanced in an orderly society." *Bridges v. California*, 314 U.S. 252, 265 (1941).

When publishing on matters of significant public interest, the press is afforded the leeway to report statements which are inherently newsworthy, even when they turn out to be false. *Edwards*, 556 F.2d at 120. Where the fact of an allegation is newsworthy, the press is entitled to

14

report on it without fear of a defamation suit. *Id*. This remains true even where the press has "serious doubts" about the veracity of the allegation. *Id*.

Moreover, under the "fair report" privilege, the right to publish without fear of liability is even stronger where the allegations are included in legal proceedings. *Tonnessen v. Denver Publishing Co*., 5 P. 3d 959, 964-65 (2000) (citing *Rosenberg v. Helinski*, 616 A.2d 866 (1992); *Cianci v. New Times Publishing Co*., 639 F.2d 54 (2nd Cir. 1980)). The press possesses a privilege to report defamatory statements made in legal proceedings, even where the statements are believed or known to be false. *Id*. Indeed, the privilege is not limited to the media but extends to all other persons as well. *Id*.

In *Tonnessen*, a wife's testimony at trial portrayed her ex-husband as a rapist. *Id*. The wife's sister, who was not present in the courtroom made a similar statement. *Id*. The defendant newspaper published both statements and was sued for defamation. *Id*. The *Tonnessen* court held that the newspaper could not be held liable for either statement under the "fair report" privilege, even though the sister was not present in court but was merely repeating what she had heard. *Id*.

Application of the above-cited principles to Coomer's allegations against OAN and Rion requires the dismissal of the defamation claim. *Sullivan* at 270; *Falwell* at 50-51; *Snyder at 452;* and *Bridges* at 265. It is difficult to conceive of a matter of greater public concern and interest than the serious and pervasive claims made during the time period encompassing Coomer's allegations of a stolen presidential election. Millions of people to this day believe the claims. Millions of people to this day doubt the claims. Coomer alleges and admits that the statements attributed to him by Oltmann concerned the very heart of the election fraud claims being made

15

by many people nationwide, and Oltmann set forth these claims in a sworn affidavit for use by the President and his lawyers in challenging the election results.  *See Tonnessen*, 5 P. 3d at 964-65 (upholding and applying the "fair report" privilege even for attenuated uses of judicial statements).

The First Amendment protects Defendants' right to report on Oltmann's accusations which were sworn under oath, widely reported, and repeated by many including the President's attorneys.  By law and undisputed fact, Coomer cannot show that there is a likelihood of prevailing on this claim.

### b)    The Statements Themselves Are Not Defamatory (Element One).

It is a fundamental precept of any claim for defamation that the statement at issue must be false, *i.e.*, truth is an absolute defense.  *Gordon v. Boyles*, 99 P.3d 75, 81 (Colo. App. 2004) ("Truth is a complete defense to defamation. However, absolute truth is not required; instead, a defendant need only show substantial truth…").  Moreover, courts must analyze statements in the full context in which they are made.  *McIntyre v. Jones*, 194 P.3d 519, 525 (Colo. App. 2008) (court must analyze "the content, form, and context of statements, in conjunction with the motivation or 'point' of the statements as revealed by the whole record.").  Applying these basic rules to the statements alleged to be defamatory reveals that Coomer cannot prevail on his defamation claim.

First, Rion is alleged to have said that, "[i]n Coomer's case, he was in a position of power to actually act on his rage against Trump and Trump voters." This statement is plainly true which is an absolute defense to defamation.  *Gordon*, 99 P.3d at 81. ("Truth is a complete defense to defamation.").  Coomer alleges that during the 2020 election, he was the Director of Product

Strategy and Security for the voting machine company, Dominion. Dominion's machines were used in key swing states such as Michigan and Georgia. Accordingly, it is simply a fact that Coomer was "in a position" to "act" whether or not he in fact did.  As for Coomer's "rage against Trump and Trump voters," look no further than Exhibit A to the accompanying Rion Decl.

Second, Rion is alleged to have asked: "What does he mean when he says 'Trump won't win. I made f-ing sure of that.' Nothing?" Rion does nothing more than take the statement attributed to Coomer by Oltmann and ask an obvious question about it. When this question is considered in the context of the right of the press to engage in robust debate and discussion, this statement is simply not defamatory. *McIntyre,* 194 P.3d at 525.  Indeed, Rion's question is at the very heart of OAN's First Amendment right to engage in a robust discussion about matters of public concern.  *Sullivan* at 270.  The question attributed to Rion is far milder than the robust invective inherent in modern political dialogue which courts find non-defamatory.  *See*, *e.g.*, *McDougal v. Fox News Network, LLC*, 2020 WL 5731954 (S.D.N.Y. Sept. 24, 2020); *Pullum v. Johnson*, 647 So. 2d 254, 257-58 (Fla. 1st DCA 1994) (calling plaintiff a "drug pusher" in a political broadcast was rhetorical hyperbole); *Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) (charge of "accomplice to homicide" during heated television interview on abortion was hyperbole).  In *McDougal*, the Court found that Tucker Carlson's use of the word "extortion" to describe the conduct by a former paramour of President Trump was not defamatory and granted the network's motion to dismiss.  *McDougal*, 2020 WL 5731954, at *6.  The Court recognized that such "hyperbolic" language is inherent in modern political commentary and that, when read in context (as the law requires) did not rise to the level of defamation.  *Id*.  Rion's purported

question is far milder than the use of the inflammatory word "extortion," and, accordingly is insufficient to sustain a claim for defamation.

Third, Oltmann is alleged to have said: "Eric Coomer was this, you know, he's not just Antifa, he was responsible for putting his finger on the scales of our election . . . such an action could be tried for treason. Unfortunately, the question is, will the FBI step up to investigate." Here again, Rion was simply reporting on what someone else said – a statement by Oltmann which he qualifies by saying "***If*** Coomer is investigated ***and found*** to have indeed tampered with a presidential election . . ." When Oltmann's statement is read in context – as is required in ascertaining whether a statement is defamatory – it is clear that Oltmann is saying that Coomer's participation in election fraud remains in question. *McIntyre* at 525 (statements must be read in their entire context and for their point). Like the statements at issue in *McDougal*, the context and qualifying language in which the subject statement was made make it clear that Coomer was not actually being accused of a committing a crime. *McDougal*, 2020 WL 5731954, at *6.

Regardless, Rion reported the statement of another which she believed to be true. (Rion Decl. ¶ 10.)

### c)      The Statements Were Not Made With "Actual Malice".

Coomer's Defamation claim also fails for the separate and independent reason that he has no likelihood of prevailing on his claim because he cannot prove "actual malice" against OAN and Rion.  "Actual malice" must be shown: (a) if the statement in question was of a matter of public concern; or (2) if the plaintiff is a public figure.  Both of these exist here. *Lewis v. McGraw-Hill Broad. Co.*, 832 P.2d 1118, 1122–23 (Colo. App. 1992); *New York Times Co. v.*

*Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Coomer has not and cannot come close to satisfying this daunting standard.

To prove "actual malice", the plaintiff must demonstrate that the defendant in fact entertained serious doubts as to the truth of the statement, *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Seible v. Denver Post, Corp.,* 782 P.2d 805 (Colo.App.1985), or acted with a high degree of awareness of its probable falsity. *Kuhn v. Tribune–Republican Publishing Co.,* 637 P.2d 315 (Colo.1981). Predictably, Coomer's FAC never plausibly suggests he can satisfy this prerequisite. Nor could it. Coomer has no clue at all what OAN and Rion subjectively think about Coomer and about the statements Rion made regarding Coomer.[9]

OAN/Rion reported on the statements of various sources, conducted independent research to corroborate the reporting and indeed, to this day, OAN/Rion have no proof that any of the statements about Coomer were not true. (Rion Decl. ¶¶ 5-10.) The FAC does not, and cannot, allege that OAN has ever expressed or demonstrated any doubt of the truth of its reporting. "A plaintiff must prove by 'clear and convincing evidence' that the speaker made the statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id*. at 240. A defamation suit by one who must prove actual malice must plead "that the

---

[9]     Taking Coomer's often times manically deranged and extreme hate-filled statements that he directed to former President Trump and his supporters on his Facebook account (which he deleted before filing this lawsuit) (the Facebook posts we were able to find accompany this Motion as Exhibit "A" to the Rion Decl.), together with Coomer's incredibly prominent role in, and involvement with Dominion and the very machines used to collect and tabulate votes in the Presidential Election, and it was and remains entirely understandable why the defendants believed Coomer capable of severe and pervasive election misconduct. Coomer was not simply a random nut spouting anti-Trump hate on social media. Rather, he was and is ***Dominion's Director of Strategy and Security*** with highly advanced degrees and an intimate knowledge of how to program and manipulate the very software and hardware at the center of the alleged voter fraud, and with direct access thereto, that undeniably had a massive impact on the Presidential Election.

defendant must have made the false publication with a high degree of awareness of probable falsity, or 'must have entertained serious doubts as to the truth of his publication.'" *Id*. (citation omitted).

Coomer's status as a "public figure" provides a separate and independent reason for the requirement that he must prove "actual malice" in order to prevail on his Defamation claim. The concept of a limited purpose public figure has been explicated in several Colorado cases. *See Diversified Management, Inc. v. Denver Post, Inc.,* 653 P.2d 1103 (Colo.1982); *DiLeo v. Koltnow,* 200 Colo. 119, 613 P.2d 318 (1980); *Walker v. Colorado Springs Sun, Inc.* These cases apply the United States Supreme Court's definition of limited purpose public figure set out in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

The court in *Gertz* identified a limited purpose public figure as one who "voluntarily injects [herself] or is drawn into a particular controversy and thereby becomes a public figure for a limited range of issues" such that the person has achieved "special prominence in the resolution of public questions."   Limited purpose public figure status focuses on two questions: the threshold question of whether the defamatory statement involves a matter of public concern and, more importantly, whether the level of plaintiff's participation in the controversy invites scrutiny. *Wolston v. Reader's Digest Ass'n,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); *Gertz v. Robert Welch, Inc., supra.*

Applying these criteria to instant case, Coomer is clearly a limited purpose public figure. The defamatory statements at issue here concerning widespread voter fraud through the illicit use of voting machines are a matter of public concern and, Coomer's participation in this activity through the use of Dominion's voting machines invites public scrutiny to this public issue.

Indeed, Coomer has been the front man for Dominion over the past decade, soliciting publicity, business, and status in the international voting machine community.  He has deliberately and intentionally made himself a public figure to benefit the profitability of Dominion, and has intentionally made himself a public authority on the issue of automated voting security.  He has appeared in numerous public fora, giving interviews and opinions designed to influence public perception of the safety and security of Dominion's machines, and his own patents and stock prices, and has made public appearances before legislative committees on behalf of both Dominion and himself, at the state and national level.  *See e.g. Curling v. Raffensperger*, 2020 WL 5994029, at *17 (N.D. Ga. Oct. 11, 2020) (Coomer acted as testifying witness for Dominion in support of State of Georgia in major voting rights litigation).[10]

---

[10]     As Director of Product Strategy and Security for Dominion, Coomer has appeared at election security forums, such as one hosted by the U.S. Cybersecurity & Infrastructure Security Agency. *See* https://us-cert.cisa.gov/sites/default/files/2019-09/2019_Cybersecurity_Summit_Agenda_S508C_13.pdf.  Coomer is the interface between Dominion and local election officials.  *See Curling*, 2020 WL 5994029, at *9 n.23.  He regularly makes presentations to election officials in open meetings (see https://www.youtube.com/watch?v=UtB3tLaXLJE, https://www.youtube.com/watch?v=BbCmq0jPUxY&t=447s) and has provided support to state officials in the form of testimony explaining how the system works and how Dominion coordinates with election officials. *See Curling*, at *10 (noting that Georgia officials relied on Coomer's testimony on cybersecurity issues); Associated Press, "Lawyers spar over Georgia voting machine glitch, planned fix," September 29, 2020; Niesse, Mark, "Fix coming to Georgia touchscreens to restore missing Senate candidates," *Atlanta Journal Constitution*, September 28, 2020. Coomer has plainly "injected himself" into public controversies about election security and the Dominion voting systems. Moreover, a hallmark of a public figure is its access to the press and its ability to counteract false statements. *Gertz*, 418 U.S. at 344. The fact that Coomer was quoted on issues related to election security prior to the allegedly defamatory statements weighs strongly in favor of this finding. *See Thompson v. Nat'l Catholic Reporter Pub. Co.*, 4 F. Supp. 2d 833, 838 (E.D. Wis. 1998) (executive who had access to media and was quoted on matters related to the controversy was limited purpose public figure). Coomer clearly has access to the media given the publication of his OpEd in the Denver Post on December 8, 2021, denying election fraud took place.  Dominion provides voting systems for numerous states or localities, *see Curling*, at *7, for which, as noted above, Coomer serves as primary interface. Coomer designed key voting systems and wrote the code for them. *Id.* at *9 n.23. In *Curling*, he effectively spoke on Georgia's behalf. *Id.* at *9. Thus, it is clear that his role in elections "is likely to attract or warrant scrutiny by members of the public." *Young v. CBS Broad., Inc.*, 212 Cal. App. 4th 551, 560 (3d Dist. 2012); *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966) (actual malice applies where the plaintiff's role "has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it"). Effective supervisory authority over such a critical aspect of voting procedure certainly "warrant[s] scrutiny" by the public.

21

Notably, Coomer became a national public figure due to Oltmann shining a spotlight on Coomer and reporting by others ***before*** any reporting by Defendants.

In sum, given that this lawsuit involves a matter of public concern and also that Coomer is a "public figure," he must prove more than just "negligence" to meet to prevail on this claim. Coomer must but has not and cannot demonstrate facts sufficient to show a likelihood of proving by clear and convincing evidence that Defendants' statements about him were made with "actual malice."

### 2. Coomer Has No Reasonable Likelihood of Prevailing on His Intentional Infliction Claim.

Like the Defamation claim, Coomer has no reasonable likeliness of prevailing on his Intentional Infliction of Emotional Distress claim.  As a preliminary matter, this claim is also subject to the Anti-SLAPP Statute, as it arises out of OAN's and Rion's furtherance of their right of free speech in connection with a public issue—OAN's broadcast of a television program in which three allegedly defamatory statements were made.  FAC ¶ 88.

For a plaintiff to prevail on an intentional infliction of emotional distress claim, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Gordon v. Boyles*, 99 P. 3d 75, 82 (Colo. 2004) (citing *Rugg v. McCarty*, 476 P. 2d 753, 756 (Colo. 1970).

In *Gordon*, the plaintiff (a police officer) alleged that a radio host had said that the plaintiff had stabbed someone and engaged in an extramarital affair.  *Id.* at 78.  The court concluded that these statements were defamatory. However, the *Gordon* court held that the

accusation that someone had stabbed another, or engaged in an affair, were insufficient to sustain a claim for intentional infliction of emotional distress. *Id* at 82.

Consequently, under *Gordon*, the alleged conduct by OAN and Rion falls woefully short of meeting the "outrageous" element of a claim for intentional infliction – as it must given that OAN and Rion did not defame Coomer in the first place. Here, Coomer claims that OAN broadcast a television program in which three allegedly defamatory statements were made. These statements, on their face do not come close to amounting to going "beyond all possible bounds of decency." *Id*. at 82.

Moreover, even if there was a reasonable likelihood that Coomer could prove the requisite "outrageous conduct" and he cannot, this claim also is trumped by the First Amendment. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50-51 (1988) (First Amendment is a defense to state claim for intentional infliction of emotional distress.).

For these reasons, Coomer cannot show that there is a reasonable likelihood of prevailing on his intentional infliction of emotional distress claim.

### 3. Coomer Has No Reasonable Likelihood of Prevailing on His Conspiracy Claim.

Coomer's civil conspiracy claim is also subject to the Anti-SLAPP Statute, as it is predicated on OAN's broadcast of a television program containing three allegedly defamatory statements. FAC ¶ 92, 93.

Civil conspiracy is not an independently actionable claim. *Colorado Community Bank v. Hoffman*, 338 P. 3d 390, 397 (Colo. App. 2011) (citing *Bd. Of Cnty. Commis v. Park Cnty. Sportsmen's Ranch, LLP*, 271 P. 3d 562, 572 (Colo. App. 2013). Conspiracy claims are derivative of other actionable claims. *Id*. Thus, in *Hoffman*, when the underlying claims were

disposed of a summary judgment the civil conspiracy claims were automatically dismissed as derivative.  *Id.*

There are five elements required to establish civil conspiracy in Colorado.  There must be:  two or more persons (or corporations); (2) an object to be accomplished; (3) a meeting of the minds on the object or a course of action; (4) one or more overt acts; and (5) damages.  *Walker v. Van Laningham*, 148 P. 3d 391, 396 (Colo.App. 2006) (citing *Jet Courier Serv., Inc. v. Mulei*, 771 P. 2d 486, 502 (Colo. 1989)).

In the instant case, Coomer generally alleges that there was some undefined conspiracy that the election had been stolen from Mr. Trump.  *See*, *e.g*., FAC at ¶ 1.  But this has nothing to do with the purported conspiracy alleged in the FAC.

Coomer may be a conspiracy theorist, but his vague conspiracy theory fails to support a conspiracy claim.  *Walker* at 396.  Coomer suggests that all of the defendants agreed, with each other, that they would create a false narrative about the election and then an objective of this agreement was to defame and inflict distress upon Coomer.  FAC at ¶ 61.  However, Coomer does not come close to alleging a single fact that would meet the third element of a conspiracy claim, *i.e*., some meeting of the minds between OAN/Rion, on the one hand, and one or more of the other persons or entities that reported on Oltmann's claims about Coomer, on the other hand, much less to defame him as part of some wider collective scheme to reelect President Trump. The allegations do nothing more than describe the normal course of a news story—one person or entity investigates and reports, and others follow.

Consequently, Coomer has no likelihood of prevailing on this Civil Conspiracy claim.

24

### 4. Absent His Other Claims, Coomer Cannot Prevail On His Injunctive Relief Claim.

Coomer's Fourth Cause of Action seeks an injunction against all defendants, including OAN and Rion, "to remove all Defendants' defamatory statements upon final adjudication of the claims at issue." FAC at ¶ 98. Injunction is not a separate claim, however, but rather a remedy ancillary to a substantive claim upon which a litigant prevails on the merits, or, in the case of a preliminary injunction, shows a likelihood of prevailing. *See Dallnan v. Ritfer*, 225 P.3d 610, 621 n. 11 (Colo.App. 2010). Like Coomer's other causes of action, this one is also subject to the Anti-SLAPP Statute, as it is predicated on OAN's broadcast of a television program in which three allegedly defamatory statements were made. FAC ¶ 96, 97.

Because Coomer's independent causes of action fail, as demonstrated above, this additional cause of action for injunctive relief necessarily fails as well.

## V. CONCLUSION

Based on the foregoing, it is respectfully submitted that OAN's and Rion's Anti-SLAPP Motion be granted in its entirety, discovery with respect to OAN and Rion be stayed, and OAN and Rion be awarded their fees as permitted by the Anti-SLAPP Statute.[11]

---

[11] In other states that have anti-SLAPP statutes, documentation of reasonable attorney's fees is generally submitted by separate motion for approval of the amount of the award. *See e.g., American Humane Ass'n v. Los Angeles Times Communications*, 92 Cal. App. 4th 1095, 1103–1104 (2001) (holding that documentation of fees could be submitted in separate, later-filed motion because "the moving defendant will be able to more accurately document the fees and costs actually incurred if the amount is fixed at a later date"). Accordingly, in the event that OAN and Rion prevail on this Motion, they will present evidence, including relevant invoices, of their attorney's fees and costs in connection with the defense of Coomer's claims to date.

Respectfully submitted this 30th day of April 2021.

/s/ Eric P. Early

Eric P. Early
eearly@earlysullivan.com
Jeremy Gray
jgray@earlysullivan.com
Peter Scott
pscott@earlysullivan.com
Early Sullivan Wright Gizer & McRae LLP
6420 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048
323-301-4667 / 323-301-4676—Facsimile


Stuart D. Morse, SBN 16978
smorse@sdmorselaw.com
Stuart D. Morse & Associates LLC
5445 DTC Parkway, Suite 250
Greenwood Village, CO 80111
303-996-6661 / 303-996-0908/Facsimile

**Attorneys for Defendants Herring Networks, Inc. dba One America News Network and Chanel Rion**


## CERTIFICATE OF SERVICE


I certify that on April 30, 2021, a true and accurate copy of the foregoing document were e-served via ICCES on all counsel of record.


/s/ Robie Atienza-Jones

26

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: September 17, 2021 8:12 PM<br>FILING ID: E9E5DD591D201<br>CASE NUMBER: 2020CV34319 |
| ERIC COOMER, Ph.D.,<br>Plaintiff<br><br>vs.<br><br>DONALD J. TRUMP FOR PRESIDENT, INC., et al.,<br>Defendants | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiff**<br>Charles J. Cain, No. 51020<br>ccain@cstrial.com<br>Steve Skarnulis, No. 21PHV6401<br>skarnulis@cstrial.com<br>Bradley A. Kloewer, No. 50565<br>bkloewer@cstrial.com<br>Zachary H. Bowman, No. 21PHV6676<br>zbowman@cstrial.com<br>**CAIN & SKARNULIS PLLC**<br>P. O. Box 1064<br>Salida, Colorado 81201<br>719-530-3011 /512-477-5011 (Fax)<br><br>Thomas M. Rogers III, No. 28809<br>trey@rklawpc.com<br>Mark Grueskin, No. 14621<br>mark@rklawpc.com<br>Andrew E. Ho, No. 40381<br>andrew@rklawpc.com<br>**RECHTKORNFELD PC**<br>1600 Stout Street, Suite 1400<br>Denver, Colorado 80202<br>303-573-1900 | Case Number: 2020cv034319<br><br>Division Courtroom:   409 |

### PLAINTIFF'S OMNIBUS RESPONSE TO ALL DEFENDANTS' SPECIAL MOTIONS TO DISMISS PURSUANT TO C.R.S. § 13-20-1101

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ................................................................................... i

INDEX OF AUTHORITIES ........................................................................... iv

I.     INTRODUCTION ........................................................................... 1

II.    BACKGROUND FACTS ...............................................................11

    A.     Dr. Coomer's private employment ....................................11

    B.     Defendants inject Dr. Coomer into conspiracy theories ........................12

    C.     Oltmann, FEC United, Inc., and Shuffling Madness Media, Inc.'s defamation of Dr. Coomer ....................................13

    D.     Hoft and TGP Communications, LLC's defamation of Dr. Coomer ..................33

    E.     Malkin's defamation of Dr. Coomer ....................................41

    F.     Metaxas's defamation of Dr. Coomer ....................................46

    G.     Rion and One America News Network's defamation of Dr. Coomer .................51

    H.     Powell, Powell, P.C., and Defending the Republic's defamation of Dr. Coomer ....................................62

    I.     The Trump Campaign's defamation of Dr. Coomer ...........................66

    J.     Giuliani's defamation of Dr. Coomer ....................................72

    K.     Official rejections of the conspiracy theories ........................79

    L.     Dr. Coomer's litigation against Defendants ........................81

III.   STANDARD OF REVIEW ....................................................82

IV.   EVIDENCE ...............................................................85

V.    OBJECTIONS ...........................................................87

VI.   ARGUMENT ...................................................................................................88

A.   Colorado's anti-SLAPP statute does not apply because Defendants' defamation of Dr. Coomer is not a protected act ....................................................89

i.   Defendants have failed to carry their burden in demonstrating that the Colorado anti-SLAPP statute applies to Dr. Coomer's claims ...........89

ii.   Defendants' statements were not made in connection with a matter of public interest ......................................................................93

iii.   Defendants' statements were not made in connection with an official proceeding ..............................................................102

B.   Dr. Coomer has more than sufficient evidence to establish a reasonable likelihood of success on his claims ..................................................108

i.   Dr. Coomer has established a prima facie showing of defamation ..........109

a.   Defendants negligently published defamatory statements concerning a private individual ...................................................111

b.   The heightened fault standard does not apply, but even if it did Defendants defamed Dr. Coomer with actual malice ...........119

ii.   Dr. Coomer has established a prima facie showing of intentional infliction of emotional distress claim .......................................124

a.   Defendants engaged in extreme and outrageous conduct ...........125

b.   Defendants acted recklessly and with intent to cause severe emotional distress ......................................................128

c.   Defendants caused Dr. Coomer severe emotional distress ..........129

iii.   Dr. Coomer has established a prima facie showing of civil conspiracy claim ....................................................................129

a.   Defendants agreed, by words or conduct, to defame Dr. Coomer ..............................................................................130

b.   Defendants defamed Dr. Coomer and intentionally inflicted emotional distress ......................................................133

   c. Dr. Coomer suffered injuries caused by Defendants' defamation and intentional infliction of emotional distress.........134

  iv. Defendants fail to establish affirmative defenses to avoid liability for their defamation ...........................................134

  v. Dr. Coomer has established a prima facie showing for injunctive relief ...................................................................................144

 C. Defendants are not entitled to attorney's fees for their special motions to dismiss, and any award of fees to either party should be addressed by a separate proceeding................................................................................147

VII. CONCLUSION.................................................................................149

PRAYER.................................................................................................149

CERTIFICATE OF SERVICE .................................................................151

# INDEX OF AUTHORITIES

**CASES**                                                          **Page**

*Am. Humane Ass'n v. L. A. Times Commc'n*,
    92 Cal. App. 4th 1095 (2001) ....................................................................148

*Ampex Corp. v. Cargle*,
    128 Cal. App. 4th 1569 (2005) ..................................................................110

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).....................................................................................110

*Archer v. Farmer Bros. Co.*,
    70 P.3d 495 (Colo. App. 2002)...................................................................125

*Aversa v. U.S.*,
    99 F.3d 1200 (1st Cir. 1996)......................................................................142

*Awai v. Kotin*,
    872 P.2d 1332 (Colo. App. 1993)........................................................139, 140

*Baral v. Schnitt*,
    376 P.3d 604 (Cal. 2016) ...................................................................... *passim*

*Barrett v. Rosenthal*,
    146 P.3d 510 (Cal. 2006) ...........................................................................143

*Beauharnais v. People of State of Ill.*,
    343 U.S. 250 (1952).....................................................................................144

*Begley v. Ireson*,
    399 P.3d 777 (Colo. App. 2017)................................................................140

*Begley v. Ireson*,
    490 P.3d 963 (Colo. App. 2020)................................................................140

*Briggs v. Eden Council for Hope & Opportunity*,
    969 P.2d 564 (Cal. 1999) ......................................................................89, 106

*Briscoe v. Reader's Digest Ass'n, Inc.*,
    483 P.2d 34 (Cal. 1971) ...............................................................................95

*Broker's Choice of Am., Inc. v. NBC Universal, Inc.*,
  861 F.3d 1081 (10th Cir. 2017) ...............................................................110, 111

*Brown v. Petrolite Corp.*,
  965 F.2d 38 (5th Cir. 1992) ...............................................................................120

*Brown v. Teitelbaum*,
  830 P.2d 1081 (Colo. App. 1991) ..................................................................87, 91

*Burns v. McGraw-Hill Broad. Co., Inc.*,
  659 P.2d 1351 (Colo. 1983) ......................................................................... *passim*

*Cache la Poudre Feeds, LLC v. Land O'Lakes, Inc.*,
  438 F. Supp. 2d 1288 (D. Colo. 2006) ..............................................................139

*Celle v. Filipino Rep. Enters., Inc.*,
  209 F.3d 163 (2d Cir. 2000) ...............................................................................120

*Club Valencia Homeowners Ass'n, Inc. v. Valencia Assocs.*,
  712 P.2d 1024 (Colo. App. 1985) ......................................................................140

*Culpepper v. Pearl St. Bldg. Inc.*,
  877 P.2d 877 (Colo. 1994) .................................................................................128

*Curtis Publ'g Co. v. Butts*,
  388 U.S. 130 (1967) ...............................................................................135, 145

*Dickey v. CBS Inc.*,
  583 F.2d 1221 (3d Cir. 1978) ............................................................................137

*Digerati Holdings, LLC v. Young Money Entm't*,
  194 Cal. App. 4th 873 (2011) ............................................................................106

*DiLeo v. Koltnow*,
  613 P.2d 318 (Colo. 1980) ...........................................................................96, 111

*Diversified Mgmt., Inc. v. Denver Post, Inc.*,
  653 P.2d 1103 (Colo. 1982) ......................................................................... *passim*

*Dixson v. Newsweek, Inc.*,
  562 F.2d 626 (10th Cir. 1977) ....................................................................117, 137

*Doe v. Gangland Prods., Inc.*,
  730 F.3d 946 (9th Cir. 2013) .......................................................................91, 102

*Donaldson v. Am. Banco Corp. Inc.*,
    945 F. Supp. 1456 (D. Colo. 1996) ................................................................. 126

*Dove Audio, Inc. v. Rosenfield Meyer & Susman*,
    47 Cal. App. 4th 777 (1996) ......................................................................... 134

*Edwards v. Nat'l Audubon Soc., Inc.*,
    556 F.2d 113 (2d Cir. 1977) ................................................................... 136, 137

*Ellis v. Buckley*,
    790 P.2d 875 (Colo. App. 1990) .................................................................... 126

*Eramo v. Rolling Stone, LLC*,
    209 F. Supp. 3d 862 (W.D. Va. 2016) ........................................................... 120

*Fashion 21 v. Coal. For Humane Immigrant Rights of L.A.*,
    117 Cal. App. 4th 1138 (2004) ....................................................................... 85

*Ferraro v. Convercent, Inc.*,
    No. 17-CV-00781-RBJ, 2017 WL 4697499 (D. Colo. Oct. 19, 2017) ........................ 130

*FilmOn.com Inc. v. DoubleVerify Inc.*
    439 P.3d 1156 (Cal. 2019) ................................................................. 82, 88, 92

*Flatley v. Mauro*
    139 P.3d 2 (Cal. 2006) ................................................................... 101, 102

*Flowers v. Carville*,
    310 F.3d 1118 (9th Cir. 2002) ....................................................................... 111

*Freeman v. Schack*,
    154 Cal. App. 4th 719 (2007) ........................................................................ 90

*Fry v. Lee*,
    408 P.3d 843 (Colo. App. 2013) .................................................................... 125

*Galella v. Onassis*,
    487 F.2d 986 (2d Cir. 1973) ......................................................................... 135

*Gardner v. Martino*,
    563 F.3d 981 (9th Cir. 2009) ........................................................................ 111

*Gates v. Discovery Comm.*,
  101 P.3d 552 (Cal. 2004) .............................................................................96

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)........................................................................... *passim*

*Gilbert v. Sykes*,
  147 Cal. App. 4th 13 (2007) .....................................................................111

*Gilmore v. Jones*,
  370 F. Supp. 3d 630 (W.D. Va. 2019) ......................................................120

*Gordon v. Boyles*,
  99 P.3d 75 (Colo. App. 2004) ...............................................115, 118, 128

*Gray v. Udevitz*,
  656 F.2d 588 (10th Cir. 1981) ...................................................................97

*Green Acres Trust v. London*,
  688 P.2d 617 (Ariz. 1984)...............................................................106, 138

*Han Ye Lee v. Colorado Times, Inc.*,
  222 P.3d 957 (Colo. App. 2009) ..................................................... *passim*

*Hanover Ins. Co. v. Fremont Bank*,
  68 F. Supp. 3d 1085 (N.D. Cal. 2014) ............................................90, 92, 102

*Harris v. City of Seattle*,
  152 Fed. App'x 565 (9th Cir. 2005) ..........................................................120

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989).......................................................................119, 120

*Hayes v. Todd*,
  15 So. 752 (Fla. 1894).............................................................................145

*Herbert v. Nat'l Acad. of Sci.*,
  974 F.2d 192 (D.C. Cir. 1992) ..............................................................87, 136

*Hilton v. Hallmark Cards*,
  599 F.3d 894 (9th Cir. 2010) .....................................................................91

*Hirsch v. Ireson*,
  No. 20SC979, 2021 WL 3713342 (Colo. Aug. 16, 2021) ...............................140

*Hustler Magazine, Inc. v. Falwell,*
    485 U.S. 46 (1988) ................................................................................ 125

*Hutchinson v. Proxmire,*
    443 U.S. 111 (1979) ........................................................................... 92, 96

*Hylton v. Frank E. Rogozienski, Inc.,*
    177 Cal. App. 4th 1264 (2009) ............................................................... 92

*In Interest of L.B.,*
    413 P.3d 176 (Colo. App. 2017) .............................................................. 87

*In re Foster,*
    253 P.3d 1244 (Colo. 2011) .................................................................. 105

*In re Lipsky,*
    411 S.W.3d 530 (Tex. App.—Fort Worth 2013, no pet.) .............................. 108

*Jankovic v. Int'l Crisis Grp.,*
    822 F.3d 576 (D.C. Cir. 2016) .............................................................. 120

*Johnson v. Bradley,*
    841 P.2d 990 (Cal. 1992) ...................................................................... 92

*Keith v. Kinney,*
    140 P.3d 141 (Colo. App. 2005) .......................................................... 87, 91

*Kemp v. State Bd. of Agric.,*
    803 P.2d 498 (Colo.1990) ..................................................................... 99

*Keohane v. Stewart,*
    882 P.2d 1293 (Colo. 1994) ........................................................... *passim*

*Khawar v. Globe Int'l, Inc.,*
    965 P.2d 696 (Cal. 1998) .................................................................... 137

*Kieu Hoang v. Phong Minh Tran,*
    60 Cal. App. 5th 513 (2021) ........................................................ 83, 89, 90

*Kleier Advert., Inc. v. Premier Pontiac, Inc.,*
    921 F.2d 1036 (10th Cir. 1990) ............................................................ 139

*Knight First Amend. Inst. at Columbia Univ. v. Trump*,
  928 F.3d 226 (2d Cir. 2019)..................................................................142

*Knight First Amend. Inst. at Columbia Univ. v. Trump*,
  141 S. Ct. 1220 (2021)........................................................................142

*Kuhn v. Trib.-Republican Pub. Co.*,
  637 P.2d 315 (Colo. 1981)..............................................120, 123, 124

*Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*,
  37 Cal. App. 4th 855 (1995) ..............................................................91

*Langlois v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*,
  78 P.3d 1154 (Colo. App. 2003) .......................................................144

*Lee v. State Farm Mut. Auto. Ins. Co.*,
  249 F.R.D. 662 (D. Colo. 2008) .......................................................130

*Lewis v. McGraw-Hill Broad. Co., Inc.*,
  832 P.2d 1118 (Colo. App. 1992) ................................................ *passim*

*Lieberman v. KCOP Television, Inc.*,
  110 Cal. App. 4th 156 (2003) .............................................................95

*Lohrenz v. Donnelly*,
  223 F. Supp. 2d 25 (D.D.C. 2002) ...................................................120

*M.G. v. Time Warner Inc.*,
  89 Cal. App. 4th 623 (2001) ...............................................................95

*Mackall v. JPMorgan Chase Bank, N.A.*,
  356 P.3d 946 (Colo. App. 2014) .......................................................125

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*,
  141 S. Ct. 13 (2020).........................................................................142

*Mann v. Quality Old Time Serv., Inc.*,
  139 Cal. App. 4th 328 (2006) ...........................................................147

*Mass v. Martin Marietta-Corp.*,
  805 F. Supp. 1530 (D. Colo. 1992)...................................................126

*Mathiew v. Subsea 7 (US) LLC*,
   No. 4:17-CV-3140, 2018 WL 1515264 (S.D. Tex. Mar. 9, 2018) ...................................90

*Mauff v. People*,
   123 P. 101 (Colo. 1912)................................................................................................92

*McConnell v. Innovative Artists Talent & Literary Agency, Inc.*,
   175 Cal. App. 4th 169 (2009)..............................................................103, 104, 105

*McGarry Univ. of San Diego*,
   154 Cal. App. 4th 97 (2007) ......................................................................................111

*McIntyre v. Jones*,
   194 P.3d 519 (Colo. App. 2008)................................................94, 95, 98, 110

*Meiter v. Cavanaugh*,
   580 P.2d 399 (Colo. App. 1978) .............................................................................126

*Merrick v. Burns, Wall, Smith & Mueller, P.C.*,
   43 P.3d 712 (Colo. App. 2001) ................................................................................140

*Metro Moving & Storage Co. v. Gussert*,
   914 P.2d 411 (Colo. App. 1995) .............................................................................111

*Miles v. Ramsey*,
   31 F. Supp. 2d 869 (D. Colo. 1998).......................................................................125

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990).......................................................................111, 114, 115

*Montoya v. Bebensee*,
   761 P.2d 285 (Colo. App. 1988).............................................................................126

*Moran v. Endres*,
   135 Cal. App. 4th 952 (2006) ..................................................................................148

*Navellier v. Sletten*,
   52 P.3d 703 (Cal. 2002) .............................................................................................92

*NBC Subsidiary, Inc. v. The Living Will Center*,
   879 P.2d 6 (Colo. 1994)................................................................................111, 114

*Neitert v. Overby*,
   816 F.2d 1464 (10th Cir. 1987) ..............................................................................141

*Neville v. Chudacoff*,
 160 Cal. App. 4th 1255 (2008) ...................................................................106

*N.Y. Times Co. v. Sullivan*,
 376 U.S. 254 (1964)...........................................................................97, 111

*Operation Rescue Nat. v. U.S.*,
 975 F. Supp. 92 (D. Mass 1997) ................................................................142

*Operation Rescue Nat. v. U.S.*,
 147 F.3d 68 (1st Cir. 1998)........................................................................142

*Patterson v. James*,
 454 P.3d 345 (Colo. App. 2018) ................................................................138

*Paul v. Friedman*,
 95 Cal. App. 4th 853 (2002) ..............................................................103, 105

*Paulson v. State Farm Mut. Auto. Ins. Co*.,
 867 F. Supp. 911 (C.D. Cal. 1994) ............................................................129

*Pierson v. Orlando Reg'l Healthcare Sys., Inc.*,
 619 F. Supp. 2d 1260 (M.D. Fla. 2009).....................................................132

*Pott v. Lazarin*,
 47 Cal. App. 5th 141 (2020) ........................................................................98

*Quigley v. Rosenthal*,
 327 F.3d 1044 (10th Cir. 2003) ........................................................ *passim*

*Quigley v. Rosenthal*,
 43 F. Supp. 2d 1163 (D. Colo. 1999)..........................................................118

*Rand Res., LLC v. City of Carson*,
 433 P.3d 899 (Cal. 2019) ....................................................................105, 106

*Rosenblatt v. Baer*,
 383 U.S. 75 (1966).......................................................................................97

*Rosenbloom v. Metromedia, Inc.*,
 403 U.S. 29 (1971).............................................................................97, 111

*Rugg v. McCarty*,
 476 P.2d 753 (Colo. 1970) .........................................................................126

*Saint John Church in Wilderness v. Scott*,
  194 P.3d 475 (Colo. App. 2008) ...................................................................131

*Schneider v. Midtown Motor Co.*,
  854 P.2d 1322 (Colo. App. 1992) ..........................................................130, 131

*Seible v. Denver Post Corp.*,
  782 P.2d 805 (Colo. App. 1989) .....................................................................111

*Seidl v. Greentree Mortg. Co.*,
  30 F. Supp. 2d 1292 (D. Colo. 1998) ................................106, 138, 139, 140

*Silver v. Quora, Inc.*,
  666 F. App'x 727 (10th Cir. 2016) .................................................................142

*Smiley's Too, Inc. v. Denver Post Corp.*,
  935 P.2d 39 (Colo. App. 1996) ......................................................................111

*Snead v. Redland Aggregates, Ltd.*,
  998 F.2d 1325 (5th Cir.1993) ...........................................................................96

*Spacecon Specialty Contractors, LLC. v. Bensinger*,
  782 F. Supp. 2d 1194 (D. Colo. 2011) ..........................................................120

*Spacecon Specialty Contractors, LLC v. Bensinger*,
  713 F.3d 1028 (10th Cir. 2013) .....................................................................120

*St. Amant v. Thompson*,
  390 U.S. 727 (1968)..........................................................111, 119, 120, 137

*Sunward Corp. v. Dun & Bradstreet, Inc.*,
  568 F. Supp. 602 (D. Colo. 1983)..................................................................144

*Sweetwater Un. High Sch. Dist. v. Gilbane Bldg. Co.*,
  434 P.3d 1152 (Cal. 2019) ...............................................................................85

*Taus v. Loftus*,
  151 P.3d 1185 (Cal. 2007) ...............................................................................97

*Trilogy at Glen Ivy Maint. Ass'n. v. Shea Homes, Inc.*,
  235 Cal. App. 4th 361 (2015) ..........................................................................92

*Trinity Risk Mgmt., LLC v. Simplified Labor Staffing Solutions, Inc.*,
    59 Cal. App. 5th 995 (2021) ...............................................................................106, 134

*U.S. v. Smith*,
    499 U.S. 160 (1991)..................................................................................................142

*Vackar v. Package Mach. Co.*,
    841 F. Supp. 310 (N.D. Cal. 1993) ...........................................................................125

*Walker v. Colo. Springs Sun, Inc.*,
    538 P.2d 450 (Colo. 1975).........................................................................................111

*Walker v. Van Laningham*,
    148 P.3d 391 (Colo. App. 2006) ...............................................................................130

*Wallman v. Kelly*,
    976 P.2d 330 (Colo. App. 1998) .................................................................................87

*Wells v. Liddy*,
    186 F.3d 505 (4th Cir. 1999) .....................................................................................120

*Westfield Dev. Co. v. Rifle Inv. Assocs.*,
    786 P.2d 1112 (Colo. 1990).......................................................................................140

*Williams v. Cont'l Airlines, Inc.*,
    943 P.2d 10 (Colo. App. 1996).......................................................................94, 95, 98

*Williams v. Dist. Court, Second Judicial Dist., City & Cty. of Denver*,
    866 P.2d 908 (Colo. 1993).........................................................................................109

*Wyatt v. Union Mortgage Co.*,
    598 P.2d 45 (Cal. 1979) .............................................................................................131

*Young v. CBS Broad., Inc.*,
    212 Cal. App. 4th 551 (2012) .............................................................................97, 110

*Zimmerman v. Al Jazeera Am., LLC*,
    246 F. Supp. 3d 257 (D.D.C. 2017) ...........................................................................120

**STATUTES**

C.R.S. § 1-13-703 ............................................................................................................116

C.R.S. § 13-20-1101 .............................................................................................. *passim*

**RULES**

Colo. R. Evid. 401.................................................................................................87, 88, 113

Colo. R. Evid. 404.........................................................................................................87, 88

Colo. R. Evid. 601.........................................................................................................87, 88

Colo. R. Evid. 602.................................................................................................87, 88, 113

Colo. R. Evid. 608.........................................................................................................87, 88

Colo. R. Evid. 702.........................................................................................................87, 88

Colo. R. Evid. 801.........................................................................................................87, 88

Colo. R. Evid. 802.........................................................................................................87, 88

Colo. R. Evid. 805.........................................................................................................87, 88

Colo. R. Evid. 901.........................................................................................................87, 88

**OTHER AUTHORITIES**

Carol Leonnig & Philip Rucker, I ALONE CAN FIX IT:
    DONALD J. TRUMP'S CATASTROPHIC FINAL YEAR, (Penguin Press, 2021)........................8

Diane L. Zimmerman, *Curbing the High Price of Loose Talk*,
    18 U.C.Davis L.Rev. 359 (1985) ...................................................................................146

# I.    INTRODUCTION[1]

Dr. Coomer has been defamed, harassed, threatened, traumatized, and thrust into the conspiratorial pro-Trump 2020 Presidential election fraud narrative.  As it turns out, the actual fraud in this case originated with an Antifa-obsessed businessman, who fed a false and uncorroborated narrative about Dr. Coomer to the media and the politically savvy Defendants. The Defendants then amplified this false narrative because it comported with various voter fraud theories they were already peddling.

In their anti-SLAPP motions, Defendants broadly invoke the First Amendment as a defense with no real analysis for when and how it applies.  But there is no constitutional value in defamation.  Defamation does not advance public debate.  While there are constitutional protections for speech, those protections have limits.  They are balanced against competing liberty interests in privacy and reputation.  Applying heightened constitutional protections requires an existing matter of public concern involving the plaintiff—not one that Defendants manufacture. Defendants ignore this and advance standards that do not exist—that by presenting themselves as members of the media or members of a legal team, they are permitted to defame with impunity and are absolved from the consequences of profiteering from the dissemination of irresponsible, inaccurate, and unreliable information.  Defendants then claim that the Colorado anti-SLAPP law requires the Court to dismiss this case in its infancy and award sanctions against Dr. Coomer for

---

[1] This Omnibus Response responds to all Defendants' special motions to dismiss, with the exception of Newsmax given the settlement and dismissal of claims, and includes a supplement to Defendant Eric Metaxas's response, as reserved, based on court-ordered discovery.  *See* Oltmann, et al. Mot., Apr. 30, 2021; Hoft-TGP Mot., Apr. 30, 2021; Malkin Mot. Apr. 30, 2021; Metaxas Mot., Mar. 01, 2021; OAN-Rion Mot., Apr. 30, 2021; Giuliani Mot., Apr. 30, 2021; Powell Mot., Apr. 30, 2021; Defending the Republic Mot., Apr. 30, 2021; Trump Campaign Mot., Apr. 30, 2021; *see also* Pl.'s Resp. to Metaxas Mot., § IV, Apr. 07, 2021.

pursuing recourse against Defendants' tortious conduct.   Neither the First Amendment nor Colorado's anti-SLAPP statute justifies such an outcome.

Dr. Coomer requests that the Court deny Defendants' special motions to dismiss for two primary reasons: (1) Colorado's anti-SLAPP statute does not apply and (2) even if it applies, Dr. Coomer has more than sufficient evidence to establish a prima facie showing of his case as a matter of law.   The supporting evidence includes Dr. Coomer's own Declaration wherein he swears that Joseph Oltmann's claims about him are patently false; that he is not a member of any Antifa-related organizations; that he did not boast about rigging the election on a call of any kind; that he did not take any action to change votes or rig the election in any way, and that he was, in fact, busy working with county and state officials in the lead-up to the 2020 Presidential election, as opposed to participating in an Antifa call or seeking to subvert the election.   Dr. Coomer explains in detail how the Defendants' concerted efforts to cast him as a key election fraudster forced him into hiding for months, caused extreme emotional distress from the countless public and private threats, and ultimately ended his sixteen-year career supporting local and national elections.

The supporting evidence includes the Declaration of Professor Alex J. Halderman, Ph.D., an election security expert who is often cited by Defendants in support of the potential technical vulnerabilities in Dominion's election systems (Dr. Halderman even makes a brief appearance in the "Dominion-izing the Vote" broadcast).   Among other things, Dr. Halderman is currently serving as an expert for the plaintiffs in the *Curling* case in Georgia—the same case where Oltmann falsely claims Dr. Coomer lied under oath.   Dr. Halderman unsparingly debunks the Defendants' central premise that Dr. Coomer either did or would have had the ability to affect the outcome of

the election.  Dr. Halderman labels Defendants' accusations as "inherently improbable" and the Antifa call narrative as "the height of cartoonish buffoonery."  Dr. Halderman notes that Dr. Coomer's patents (as inventor) insured *more* transparency during the vote adjudication process in the 2020 Presidential election, not the opposite, as Defendants claim.

The supporting evidence includes the Declaration of Fred Brown, Jr., a forty-year Denver Post reporter and editor and a retired University of Denver journalism instructor.  Like Dr. Halderman, Brown debunks the notion that the media and journalism Defendants could credibly rely on a single source—Oltmann—for such a dynamic charge.  Brown opines that, among other things, the Defendants' "grossly inadequate" failure to double-check allegations or even attempt to verify the facts through "obvious sources" is evidence of their reckless disregard for the truth.

The supporting evidence includes the Declaration of Mike Rothschild, author of *The Storm is Upon Us*: *How QAnon Became a Movement, Cult, and Conspiracy Theory of Everything*.  Like Dr. Halderman, Rothschild attacks some of the Defendants' reliance on Ron Watkins, the former 8chan administrator and likely Q poster who, despite having no experience in election administration, serves as OAN's "expert" in the "Dominion-izing the Vote" report.  Rothschild describes how Defendants boosted various QAnon conspiracy theories, as part of their preconceived conspiratorial voter fraud theories—ultimately including the false allegations against Dr. Coomer—in the event Trump lost the election.  Rothschild notes that Defendants used an inherently improbable story about Dr. Coomer as a tool to further the preconceived QAnon election-fraud narrative.

The supporting evidence includes the Declaration of Martin (Marty) Golingan, a long-time OAN producer who was fired by OAN after he and other producers went on the record to discuss OAN's disinformation about voter fraud and the insurrection in an April 18, 2021 New York Times article.[2]  Golingan provides an insider's view of OAN's top down content and editorial decision-making (supported by internal emails), as well as the "Dominion-izing the Vote" segment.  His testimony shines a light on OAN's preconceived storyline, designed to support Trump by promoting baseless election fraud claims while building a brand and financial success as a "pro-Trump" news outlet.  Golingan labelled the Coomer story an "H story," which was run with Charles Herring's express approval.  The story was not fact-checked by OAN newsroom staff in San Diego, and Chanel Rion's sources were not verified.  According to Golingan, Rion was one of the "untouchables" whose work product could not be validated because she had the express approval the Herrings.  As a five-year veteran of OAN, Golingan believes the story "should never have aired," violated basic journalistic standards, and was broadcast with reckless disregard for the truth.

The supporting evidence includes the Declaration of Individual 3.  Oltmann falsely claimed that Individual 3 was a "key actor," an identified leader of Our Revolution, and an "Antifa leader."  None of that is true.  Despite Oltmann's claim of 70-80% certainty of Individual 3 being on the Antifa call, Individual 3 avers that he/she was absolutely not on the alleged Antifa call, does not know Dr. Coomer, and does not think it is credible that a man in his 50s with a Ph.D. in nuclear physics would ever be welcome or trusted amongst individuals affiliated with Antifa.  None of the

---

[2] *See* Rachel Abrams, *One America News Network Stays True to Trump*, N.Y. TIMES, Apr. 18. 2021, https://www.nytimes.com/2021/04/18/business/media/oan-trump.html.

Defendants ever contacted Individual 3 except for Oltmann, and Oltmann only did so in order to harass him/her (the harassing emails are attached to his/her Declaration).

The supporting evidence includes the Declaration of Individual 1.  Individual 1 is specifically listed in Oltmann's notes, which he claims were taken contemporaneously during the alleged Antifa call.  Individual 1's Declaration provides details of a Zoom meeting that he/she initiated on September 25, 2020, involving 15-20 activists.  We know from Oltmann's recent deposition that Oltmann now claims the Antifa call was a Zoom call that occurred before September 26.  The primary purpose of the meeting hosted by Individual 1 was to deal with concerns raised about Individual 2, a right-wing agitator and criminal who is also featured prominently in Oltmann's notes, and not the presidential election as Oltmann alleged.  According to Individual 1's Declaration, Dr. Coomer was not a participant on this call.  Indeed, Individual 1 had never met nor heard of Dr. Coomer prior to this lawsuit.

The supporting evidence includes the Declaration of Doug Bania, an expert in intellectual property, social media and internet infringement, and other intangible assets.  By analyzing more than eight months of relentless threats on social media, Bania provides a glimpse of the nightmare that Defendants have unleashed on Dr. Coomer.  He notes that nearly 9,000 distinct QAnon-related Twitter accounts mentioned Dr. Coomer in the months after the November 2020 election, with as many as 2,500 mentions in a single day.  Bania's research confirms that more than a thousand unique accounts have mentioned Dr. Coomer in the same post with terms such as "kill," "die," "shoot," "treason," "hang," "traitor," "arrest," and/or "attack."

Further, due to the Court's limited discovery order, the supporting evidence attached hereto includes Defendants' own documents, words, and conduct.  It can be fairly stated that some of the

media Defendants such as Eric Metaxas, Jim Hoft, and Michelle Malkin simply did not concern themselves at any level with the credibility of who or what they were relying upon as part of their publications or the accuracy of what they were reporting.  Malkin epitomizes this particular brand of incurious journalism.  Instead of reporting verifiable facts or even conducting a cursory investigation of those facts before sponsoring them on her now-defunct show Sovereign Nation, Malkin viewed her role as simply "giv[ing] a platform to people who are being censored [*i.e.*, banned from Twitter] for disseminating what is considered dangerous or dissident information."  This imprudent view of journalism, of course, is part of a dangerous trend among unscrupulous media publishers of printing or broadcasting salacious content, while attempting to disclaim responsibility for the accuracy of that content.

In a similar manner, Sidney Powell was too focused on publicly promoting her precipitous "Kraken" litigation efforts to conduct the due diligence inquiry required as an attorney of her sources, including Oltmann.  Her research on Oltmann was limited to "watching the video with Michelle Malkin."  In Powell's mind, Dr. Coomer was "minor" and a "gnat" in the "tsunami" of election fraud rumors and innuendo she was using in her since-soundly rebuffed lawsuits.

Powell believes, incorrectly, that she has legal cover from a defamation claim because she was entitled to rely upon the affidavit from Oltmann filed in connection with contemplated or pending legal proceedings.  However, as U.S. District Judge Linda Parker concluded in her August 25, 2021 Opinion and Order, Powell subverted the judicial process by making spurious claims that were not backed by law or evidence and that constituted a "historic and profound abuse

of the judicial process."[3]  An attorney cannot rely on an affiant as a reliable source when they are willing to declare demonstrably false statements.  One need not look any further than Dr. Halderman's Declaration to see that Powell's conduct here is no different than what led to her sanctions in the Eastern District of Michigan.  Moreover, Powell misconstrues the boundaries of the litigation privilege, which generally only extends to false statements involving litigants or other participants in a trial authorized by law—not a press conference.

For its part, the Trump Campaign produced only one substantive document during the limited discovery process.  This document, however, turned out to be an internal "smoking gun" memo prepared by the Trump Campaign's research staff shortly after the election on November 14, 2020. This memo completely contradicts the Trump Campaign's public representations about Dr. Coomer, Dominion, Hugo Chavez, George Soros, vote-counting in Spain, and Smartmatic, among other things.  As to Dr. Coomer, the internal memorandum specifically states: "However, There Is No Evidence That Eric Coomer Is A Supporter of Antifa In Any Way."  And yet, the Trump Campaign allowed Rudolph Giuliani and Powell to publicly state the opposite on multiple occasions while spreading the lie about Dr. Coomer's alleged role in rigging the election.  Despite this tactic, the Trump Campaign could not articulate a single theory that the election was rigged beyond a general "feeling" that it was.  Nonetheless, the Trump Campaign, like the other Defendants (with the exception of former defendant Newsmax), has refused to retract its defamatory statements despite a recent retraction demand on August 18, 2021, issued after Oltmann failed to appear for his court-ordered deposition.

---

[3] *See* Exhibit V-4, Order, No. 20-13134 (E.D. Mich.), at *1, 66 (finding "no reasonable attorney would accept the assertions in those reports and affidavits as fact . . . no reasonable attorney would repeat them as fact or as support for factual allegations without conducting the due diligence inquiry required under Rule 11(b).").

For his part, Giuliani appeared to receive most of his information about Dr. Coomer from Col. Phil Waldron, a conspiracy theorist who appeared at Mike Lindell's Cyber Symposium. Giuliani was recently quoted as telling former President Trump, much to the shock of White House advisers, to just declare victory on election night.[4] Giuliani clearly had a preconceived plan to falsely declare victory and then grasp at and eventually discard "facts" that supported his narrative. When asked in his deposition about his election night quote, the following exchange occurred:

Q.      You were quoted as being in a room and saying that to Mark Meadows –

A.      In order to evaluate the credibility of a quote, I have to know who said it. There's not a tape recording of it.

Q.      No, nor was there one of Dr. Coomer's alleged call, was there?

MR. ZAKHEM:      Object to form.

THE WITNESS:      It was a totally different thing.

Of course, it was not and is not a totally different thing.

Giuliani took over the Trump Campaign shortly after the election and defamed Dr. Coomer during the Trump Campaign's infamous November 19 press conference. Giuliani railed against the internal Trump Campaign memo that debunked his own narrative, calling it a "corporate document fed to the campaign." Giuliani continued to spread the same election fraud claims, this time under oath, that led to his suspension by the New York State Bar. And, ultimately, after the Trump Campaign was repeatedly defeated in court, Giuliani abandoned the false narrative against Dr. Coomer in favor of lobbying state legislatures to overturn the election. Indeed, he never filed suit on behalf of the Trump Campaign based on the Coomer allegations, and, thus, his statement

---

[4] Carol Leonnig & Philip Rucker, I ALONE CAN FIX IT: DONALD J. TRUMP'S CATASTROPHIC FINAL YEAR, 344 (Penguin Press, 2021).

about Dr. Coomer at the press conference displayed the type of recklessness that ultimately led to the temporary revocation of his law license and this lawsuit.

When OAN and Chanel Rion were deposed, they were unaware Dr. Coomer had already obtained the Declaration of their former news producer, Marty Golingan.  Both OAN and Rion denied the existence of "H stories"—a reference to OAN's ownership-driven programming—even though OAN's own news director, Lindsey Oakley, sent a memo on January 14, 2021 to the producers demanding they be run eight hours a day.  Both OAN and Rion doubled down on the credibility of their QAnon source, Ron Watkins, while rejecting the opinions of credible and qualified election experts.  Both allowed Oltmann to have a free and unchallenged platform during OAN's prerecorded election report to defame Dr. Coomer and to suggest that he "tipped the scales" of the election in favor of President Biden.  According to Plaintiff's journalism expert, OAN and Rion's conduct as a news organization and their reporting on Dr. Coomer was biased (by their own admission), subject to a clear conflict of interest, speculative, and may be legitimately characterized by its reckless disregard for the truth.  As of today, OAN has refused to retract its reporting about Dr. Coomer.

The limited discovery allowed under the Court's order was important to secure facts needed for this Response.  But the key witness—Oltmann and representatives of his entities—did not cooperate and refused to answer key questions that were the subject of the Court's August 29, 2021 Order Regarding Plaintiff's Motion for Sanctions.  Oltmann would not provide the name, address, and phone number of the individual who provided him access to the alleged conference call.  Instead, he provided only his source's initials.  If he testified truthfully (which he did not), Plaintiff would still be unable to identify his source.  Oltmann could also not identify other

participants on the call (with the possible exception of Individual 3), nor would he disclose how he accessed Dr. Coomer's private Facebook posts.  He remains in contempt of this Court's orders.

Further, in one of the corporate representative depositions, it came to light that there were still outstanding emails that had not been produced.  Oltmann testified on behalf of CD Solutions that his Conservative Daily email account had received emails from a source known only as "The Researcher."  The Researcher emails attached intrusive, personal information about Dr. Coomer, his family and friends, as well as information on Dominion and its employees.  Emails and other documents revealed in the deposition were produced after its conclusion, and it was impossible to take a complete deposition.  A motion for sanctions on these issues will be filed soon.

The limited discovery allowed to prepare this Response has made it clear that Defendants worked together and used the story about Dr. Coomer in a shared desire for fame, fortune, proximity to power, or a combination thereof.  Each Defendant conspired with Oltmann, retelling his fable unquestioningly to advance their shared goals.  Oltmann became a budding personality on the far right.  Media defendants got eyeballs and clicks.  Powell and Defending the Republic got national attention and a platform for fundraising.  Giuliani got additional media attention and access to power through the Trump Campaign.

But there are other connections.  From Giuliani it was learned that he and the Trump Campaign made a secret deal with OAN and Herring to allow reporter Christina Bobb to also work on the campaign's legal team, without disclosure to OAN viewers.  And Bobb, Giuliani, and others came together on January 5, 2021 at the Willard Hotel, in the campaign's war room for the Stop the Steal rally the next day.  Most shockingly, emails produced from Oltmann indicate that he offered access to raw election data from Antrim County, Michigan in January 2021, to Powell in

an effort to shore up her floundering "Kraken" suits.  The same emails suggest that Oltmann may have engaged, and may still be engaged, in criminal conduct in Colorado by "gaining access to the Dominion systems under the radar" with "several county clerks cooperating."

Oltmann's ongoing conduct seeks to validate the fantasy he created of a rigged election orchestrated by Dr. Coomer and his unidentified co-conspirators.

## II.        BACKGROUND FACTS

### A.        *Dr. Coomer's private employment.*

1.        Plaintiff Dr. Eric Coomer was a private individual, privately employed, and privately conducting his work before Defendants' knowing and reckless defamation campaign against him.[5]  Dr. Coomer was the Director of Product Strategy and Security for Dominion Voting Systems, Inc. (Dominion), a voting equipment production company based in Denver, Colorado.[6] Dominion provides election support services across the United States, including from initial project implementation through election set-up, ballot layout, multiple language audio, machine set-up, and system testing.[7]  Dominion provided election related services to at least thirty different states during the 2020 Presidential election.[8]  Dr. Coomer, as an employee of Dominion, assisted with these services.

---

[5] *See* Exhibit A, Coomer Dec. at ¶ 10; *see also* Pl.'s Amend. Compl. at ¶¶ 9, 83.

[6] *See* Exhibit A, Coomer Dec. at ¶ 2; *see also* Pl.'s Amend. Compl. at ¶¶ 4, 10, 43.

[7] *See* Exhibit A, Coomer Dec. at ¶ 9; *see also* Pl.'s Amend. Compl. at ¶¶ 4, 44.

[8] *See* Exhibit A, Coomer Dec. at ¶ 9; *see also* Pl.'s Amend. Compl. at ¶ 45.

**B.**      ***Defendants inject Dr. Coomer into conspiracy theories.***

2.      On November 3, 2020, the presidential election was held across the United States.[9] As the vote count proceeded, it became apparent that former President Trump was likely to lose.[10] Former President Trump, his campaign, his agents, and many of his supporters—including Defendants—began alleging widespread voter fraud and perpetuating baseless conspiracies in attempts to explain the loss.[11]   In fact, many of their claims of election fraud predated the election itself and were the product of QAnon-style conspiracy theories attempting to explain Trump's projected loss before it happened.[12]   On November 7, 2020, the Associated Press formally called the election for President Joseph Biden.[13]   However, the fact that President Biden won the popular vote by more than seven million votes and 306 electoral votes did nothing to stop the conspiracy theories already surrounding the election.[14]

3.      Voting machine conspiracies were especially popular.   QAnon adherents started spreading allegations about Dominion as early as November 5, and tweets with #Dominion went from 75 per day to 35,700 per day by November 13.[15]   Oltmann's fantastical story about Dr. Coomer arose in the middle of that week-long time frame, adding fuel to a wildfire.

---

[9] *See* Exhibit A, Coomer Dec. at ¶ 12; *see also* Pl.'s Amend. Compl. at ¶ 2.

[10] *See* Exhibit A, Coomer Dec. at ¶ 12; *see also* Pl.'s Amend. Compl. at ¶ 3.

[11] *See id.*

[12] *See* Exhibit M-1, Trump Campaign, Aug. 9, 2021, PX 62, at 24, 32; Exhibit P, Rothschild Dec. at ¶¶ 4, 18-21, 85; Exhibit A, Coomer Dec. at ¶¶ 12, 15, 17, 22, 25, 30, 32, 34, 35

[13] *See* Exhibit A, Coomer Dec. at ¶ 13; *see also* Pl.'s Amend. Compl. at ¶ 2.

[14] *See id.*; *see also* Pl.'s Amend. Compl. at ¶ 46.

[15] *See* Ben Collins, *OAnon's Dominion voter fraud conspiracy theory reaches the president*, NBC NEWS, Nov. 13, 2020,  https://www.nbcnews.com/tech/tech-news/q-fades-qanon-s-dominion-voter-fraud-conspiracy-theory-reaches-n1247780.

4.      And former President Trump and his allies eagerly embraced the false narrative that Dominion conspired to rig its equipment and the election in favor of President Biden.[16] Defendants made Dr. Coomer, the Director of Product Strategy and Security for Dominion, the face of these false claims and inextricably linked Dr. Coomer with allegations of voter fraud involving Dominion.[17]

**C.      Oltmann, FEC United, Inc., and Shuffling Madness Media, Inc.'s defamation of Dr. Coomer.**

5.      The false allegations against Dr. Coomer began with Defendant Joseph Oltmann. Oltmann is a political activist, business owner, and co-host of the Conservative Daily podcast.  At all relevant times, Oltmann was also an agent for both the nonprofit corporation that he formed, FEC United, Inc. (FEC United), which includes a paramilitary civilian defense group, and Shuffling Madness Media, Inc. (SMM), which until very recently conducted business under the trade name Conservative Daily.[18]  Playing the part of the reluctant right-wing hero, Oltmann catapulted himself from an apparently successful private businessman and obscure podcaster to a national MAGA election fraud conduit.  His Coomer narrative propelled him to a two-day spot on the stage with Mike Lindell (where he repeated his false allegations against Dr. Coomer), secured him a prominent role in the movie *The Deep Rig*, and insured that he would be booked as a frequent guest on right-wing media shows such Steve Bannon's *War Room*.[19]  Oltmann has now made so

---

[16] *See* Exhibit A, Coomer Dec. at ¶ 14; *see also* Pl.'s Amend. Compl. at ¶ 4.

[17] *See id.*; *see also infra* at §§ II(C)–(J); Pl.'s Amend. Compl. at §§ I, IV(B)–(C).

[18] *See* Exhibit D-2, Oltmann-Shuffling Madness Media, Sept. 9, 2021 Depo. Tr. 14:11-23.

[19] *See* Bannon's War Room, Episode 1.165 – The Receipts Are Being Shown (w/David Clements, Joe Oltmann, David Zere), Aug. 11, 2021, https://www.iheart.com/podcast/867-war-room-impeachment-52276954/episode/episode-1165-the-receipts-are-85768111/; *see also* Exhibit A-1, at S. 184-185.

many media appearances defaming Dr. Coomer that it is impossible to incorporate all the material into this Response.

6.      But Oltmann's origin story, the alleged unmasking of a prominent Antifa operative at Dominion, is so fanciful on its face that it strains credulity to believe Defendants' contention that they were not aware of its falsity.  His defamation of Dr. Coomer began publicly after the results of the election were called for President Biden and after advancing other baseless allegations of voter fraud leading up to and immediately after the election.[20]  On November 9, 2021, Oltmann co-hosted an episode of his Conservative Daily podcast where he alleged to have learned almost two months earlier of a conspiracy to elect Biden as president.[21]  Oltmann's comments were part of the broader conspiracy narrative that the results of 2020 Presidential election were fraudulent.[22]  However, Oltmann claimed he gained specific information about such fraudulent schemes after infiltrating Antifa and alleged Dr. Coomer was behind these alleged schemes.[23]

7.      Specifically, on this November 9, 2020 podcast, Oltmann claimed he had "infiltrated an Antifa conference call" sometime in late September with unknown and unverified

---

[20] *See* Exhibit A, Coomer Dec. at ¶ 15; Exhibit B-8, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Sept. 9, 2020); Exhibit B-9, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Aug. 5, 2020); Exhibit B-10, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 5, 2020); Exhibit B-11, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 6, 2020); *see also* Pl.'s Amend. Compl. at ¶ 53.

[21] *See* Exhibit B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Exhibit B-4, Nov. 9, 2020 Conservative Daily Podcast Tr., 18:19-21:11; *see also* Pl.'s Amend. Compl. at ¶¶ 5, 52-53.

[22] *See* Exhibit B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Exhibit B-4, Nov. 9, 2020 Conservative Daily Podcast Tr., 2:25-3:5, 8:25-9:10; *see also* Pl.'s Amend. Compl. at ¶¶ 4, 8, 52-53, 56-71, 85, 91-94.

[23] *See* Exhibit B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Exhibit B-4, Nov. 9, 2020 Conservative Daily Podcast Tr., 18:19-21:11; *see also* Pl.'s Amend. Compl. at §§ I, IV(B)-(C).

participants.[24]   Oltmann claimed while on this purported call that one of these unknown participants was referred to as "Eric" and another allegedly explained "Eric is the Dominion guy."[25]  Oltmann went on to claim when another unknown participant asked, "What are we gonna do if f-ing Trump wins?"  The unknown "Eric" responded, "Don't worry about the election, Trump is not gonna win.  I made f-ing sure of that. Hahahaha."[26]  Afterwards, Oltmann alleged his efforts to identify the unknown speakers of this purported call were limited to Googling "Eric," "Dominion," and "Denver, Colorado."[27]  With no legitimate attempt to confirm the identity of the alleged speaker, Oltmann falsely attributed these alleged statements to Dr. Coomer and Dominion.[28]  Oltmann then used these anonymous statements to falsely assert that Dr. Coomer subverted the results of the election despite having no actual evidence.

8.     Oltmann has repeated these defamatory statements across media platforms, including in interviews with Malkin, OAN, and Metaxas.  Hoft and The Gateway Pundit published the same claims, and Giuliani and Powell repeated them as well.[29]

---

[24] *See id.*; *see also* Exhibit F-1, Malkin, July 27, 2021, PX 15; Exhibit G-1, Metaxas, Aug. 13, 2021, PX 97, Tr. 3:15-25, 6:6-7:3; Exhibit G-2, The Eric Metaxas Radio Show, YOUTUBE (Nov. 24, 2020).

[25] *See* Exhibit B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Exhibit B-4, Nov. 9, 2020 Conservative Daily Podcast Tr., 19:8-23; *see also* Pl.'s Amend. Compl. at ¶ 52.

[26] *See* Exhibit B-3, Joseph Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Exhibit B-4, Nov. 9, 2020 Conservative Daily Podcast Tr., 19:24-20:7; *see also* Pl.'s Amend. Compl. at ¶ 52.

[27] *See* Exhibit G-2, The Eric Metaxas Radio Show, *Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss*, YOUTUBE (Nov. 24, 2020); Exhibit G-1, Metaxas, Aug. 13, 2021, PX 97, Tr. 8:20-25; *see also* Pl.'s Amend. Compl. at ¶ 52; n.74.

[28] *See* Exhibit G-2, The Eric Metaxas Radio Show, *Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss*, YOUTUBE (Nov. 24, 2020); Exhibit G-1, Metaxas, Aug. 13, 2021, PX 97, Tr. 8:20-9:24; *see also* Pl.'s Amend. Compl. at ¶¶ 6, 59; n.80, 115.

[29] *See* Exhibit B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020) at 14:50; Exhibit A-1, Pub. 3, Oltmann et. al., CONSERVATIVE DAILY PODCAST (Nov. 11, 2020) at 7:05; Exhibit F-1, Malkin, July 27, 2021, PX 15, at 3:51; Exhibit E-1, Hoft-TGP, Aug. 10, 2021, PX 86; Exhibit A-1, Pub. 11, Oltmann et. al., WAKE UP! WITH RANDY CORPORON (Nov. 14, 2020) at 43:10; Exhibit A-1, Pub. 13, Oltmann et. al., THE DEB FLORA SHOW (Nov. 15, 2020) at 3:40; Exhibit A-1, Pub. 11, Oltmann et. al., THE GATEWAY PUNDIT (Nov. 16, 2020) at 0:15; Hoft-TGP, Aug. 10,

9.     This defamation is ongoing.  It is unclear how many false statements Oltmann has made against Dr. Coomer to date, but he frequently devotes episodes of his podcast to Dr. Coomer and this litigation.  There have been scores of podcasts and hundreds of defamatory statements. But what is clear is that Oltmann defamed Dr. Coomer for political and financial advancement. With every additional defamatory podcast, Conservative Daily climbed the rankings.[30]  With every additional defamatory interview, Oltmann gained national exposure and additional business and political connections.  However, his underlying story about Dr. Coomer is obviously false and bears all the indicators that his statements about Dr. Coomer were made with actual malice, to the extent that standard applies here.

10.     First, Oltmann's allegations against Dr. Coomer were fabricated by a witness with no actual personal knowledge of Dr. Coomer and have been constructed so that Oltmann and Oltmann alone can verify them.  Defendants have described Oltmann as their singular source, but Oltmann has never met and does not know Dr. Coomer such that he might be able to identify him

---

2021, PX 87; Exhibit A-1, Pub. 22, Oltmann et. al., THE PETER BOYLES SHOW, (Nov. 17, 2020) at 24:29; Exhibit A-1, Pub. 23, Oltmann et. al., THE PETER BOYLES SHOW, (Nov. 18, 2020) at 6:14; Exhibit A-1, Pub. 24, Oltmann et. al., CONSERVATIVE DAILY PODCAST (Nov. 19, 2020); Exhibit A-1, Pub. 33, Oltmann et. al., WAKE UP! WITH RANDY CORPORON (Nov. 21, 2020) at 30:02; Exhibit I-1, Herring-OAN, July 30, 2021, PX 32 at 22:00; Exhibit G-2, THE ERIC METAXAS SHOW (Nov. 24, 2020) at 4:58; Exhibit F-1, Malkin, July 27, 2021, PX 17 at 11:55; Exhibit A-1, Pub. 61, Oltmann et. al., THE PROFESSOR'S RECORD, (Apr. 20, 2021), at 16:00; THE DEEP RIG (Zero Hour Alchemy, 2021); Exhibit A-1, Pub. 63, Oltmann et. al., FRANK TV (May 3, 2020) at 6:18; Exhibit A-1, Pub. 68, Oltmann et. al., STEEL TRUTH PODCAST (June 22, 2021); Exhibit A-1, Pub. 64, Oltmann et. al., THE CHUCK AND JULIE SHOW (May 5, 2020) at 28:26; Exhibit A-1, Pub. 72, Oltmann, Speech at Reawaken America Tour, (July 18, 2021) at 3:07; Exhibit A-1, Pub. 73, Oltmann et. al., INTHEMATRIXXX PODCAST (Aug. 4, 2021) at 5:09; Exhibit A-1, Pub. 74, Oltmann et. al., MIKE LINDELL CYBER SYMPOSIUM (Aug. 11, 2021) at 6:34; Exhibit A-1, Pub. 75, Oltmann et. al., STEVE BANNON'S WAR ROOM PODCAST (Aug. 11, 2021) at 1:35.

[30] See Exhibit D-4, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 5, 2020) (identifying podcast as #119 most popular political podcast in America), (Nov. 6, 2020) (identifying podcast as #108 most popular political podcast in America), (Nov. 9, 2020) (identifying podcast as #81 most popular political podcast in America), (Nov. 10, 2020) (identifying podcast as #62 most popular political podcast in America), (Nov. 14, 2020) (identifying podcast as #53 most popular political podcast in America), (Nov. 19, 2020) (identifying podcast as #28 most popular political podcast in America), (Dec. 2, 2020) (identifying podcast as #8 most popular political podcast in America).

on a call.[31]   Oltmann has brought forward no other witnesses with personal knowledge of Dr. Coomer to testify about the call (including his alleged conduit who he still will not identify).[32] Oltmann did not see Dr. Coomer's name, his Antifa nickname, or his face—conveniently, there was no video—on the purported Zoom call.[33]   Oltmann has come forward with no other witnesses with personal knowledge of Dr. Coomer who could identify Dr. Coomer on this purported call other than Dr. Coomer himself (who denies being on the call).[34]   He has no other evidence that Dr. Coomer was on this purported call.[35]   Indeed the sole witness Oltmann has identified specifically as very likely on the call, Individual 3, denies being on the call and having the associations Oltmann claims he/she has.[36]   Instead, Oltmann based his allegations on an alleged Google search and alleged YouTube videos of Dr. Coomer he claims to have subsequently watched to confirm his findings at some later undisclosed time.[37]   However, Oltmann does not claim to have expertise in vocal identification and utilized no reliable methodology for identifying an anonymous speaker on a purported call after it occurred (such as recorded voice recognition software).   Instead, this is pure speculation by an unqualified witness.

---

[31] *See* Exhibit A, Coomer Dec. at ¶ 15.

[32] *See id.*

[33] *See id.*; Exhibit B-2, Oltmann, Sept. 8, 2021 Depo. Tr. 15:18-16:1; 74:23-75:4.

[34] *See* Exhibit B-2, at 75:18-76:3.

[35] *See* Exhibit B-2, Oltmann, Sept. 8, 2021 Depo. Tr. 15:20-16:1.

[36] *See* Exhibit Q, Individual 3 Dec. at ¶¶ 12-17.

[37] *See* Exhibit F-3, at 6:8-7:8.

11.     Second, Oltmann has no personal knowledge of any election fraud, let alone fraud involving Dr. Coomer.[38]  He has no witnesses with personal knowledge of any fraud committed by Dr. Coomer.[39]  And he has no evidence, himself, of election fraud committed by Dr. Coomer.[40]

12.     Third, instead of evidence, Oltmann obtained and built his allegations on speculation from Dr. Coomer's personal Facebook posts.[41]  These posts do not reference an Antifa call or plot to subvert the election.  Like most Facebook posts, these posts are limited to Dr. Coomer's personal and political beliefs and experiences, which neither prove nor disprove Oltmann's allegations.[42]  Whether Dr. Coomer did or did not support President Trump is not evidence of election fraud.  Whether Dr. Coomer referenced Antifa in a satirical post is not evidence of any phone call or plan to subvert the election.  The Facebook posts themselves have no probative value, and Oltmann's use of them is again limited to speculation by an unqualified witness.

13.     Fourth, Oltmann's allegations are based on anonymous sources—specifically unknown and unverified speakers on an Antifa call he allegedly infiltrated.  Oltmann has repeatedly made this clear in his descriptions of the alleged Antifa call and participants therein, including by acknowledging that the purported "Eric" on the call was only identified as "Eric" by another anonymous source that Oltmann cannot identify or verify.[43]  Only after Dr. Coomer filed

---

[38] *See* Exhibit V-5, at 52:10-53:6.

[39] *Id.*

[40] *Id.*

[41] *See* Exhibit B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Exhibit B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. 19:8-13.

[42] *See* Exhibit A, Coomer Dec. at ¶ 48

[43] *See* Exhibit B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Exhibit B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. 19:8-20:15.

suit did Oltmann claim to have personal knowledge of other participants on the purported call.[44]

However, those alleged other participants have not come forward, and Oltmann has refused to

disclose the identities of these alleged other participants.[45]   Regardless, knowledge of other

participants does not impute knowledge of the relevant unknown and unverified speakers on which

Oltmann based his claims.  Those alleged speakers remain anonymous.

14.     Fifth, there is no evidence corroborating Oltmann's allegations.  This is significant

as there should be clear record evidence of the purported Antifa call.   Such records are

contemporaneously made with phone calls across platforms and would provide information that

could be utilized to determine the veracity of the allegations, including the date, time, and method

of the respective call or now, Zoom.  Yet Oltmann has refused to even disclose basic details about

the call, let alone produce records establishing the purported call's existence.[46]  Despite common

knowledge of such records, none of the other Defendants sought them from Oltmann before

adopting his story.[47]   Further, there is no recording of the alleged Antifa call.[48]   Oltmann

understands the significance of a recording.  In a highly acerbic email to Individual 3 on October 19,

2020 (after the supposed September Antifa call, but before his November 9 Conservative Daily

podcast where he exposed "Eric") Oltmann wrote to Individual 3: "We have taped conversations

---

[44] *See* Exhibit V-5, at 29:13-17.

[45] *See* Exhibit B-1, Oltmann, Sept. 8, 2021 Depo. Tr. 15:20-20:18.

[46] *Id.* at 71:10-72:15.

[47] *See* Ex. E-1 at 32:17-33:12; Exhibit F-1, Malkin, July 27, 2021 Depo. Tr. 126:8-20; Exhibit G-1, Metaxas, Aug. 13, 2021 Depo. Tr. 28:5-30:5; Exhibit H-1, Rion, Aug. 9, 2021 Depo. Tr. 79:22-80:17, 80:23-81:15, 84:1-13; Ex. I-1, at 19:19-20:6; Exhibit J-1, Giuliani, Aug. 14, 2021 Depo. Tr. 59:5-60:5, 133:2-134:15; Exhibit K-1, Powell, July 20, 2021 Depo. Tr. 34:5-35:20, 46:20-23.

[48] *See* Exhibit B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Exhibit B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. 19:8-20:15, 75:25-76:21; *see also* Pl.'s Amend. Compl. at ¶ 6; n.80, 115.

with other Antifa members bragging about using animal records to dox Tig [Tiegen], and we sent a record up to the FBI about illegally accessing information including John Tiegen's address."[49] Oltmann knew the importance of gathering "evidence" as part of his attack on various journalists or Antifa members who he believed had wronged him.   Yet, Oltmann failed to employ this recording technique when it came to an Antifa call he had allegedly infiltrated?

15.     Similarly, there should be other witnesses who have knowledge of this purported call.  Yet Oltmann again has refused to disclose the identity of any alleged participant on the call or the identity of the person who gave him access to it.[50]  And, once again, none of the other Defendants cared to ask.[51]  Indeed, based on emails and testimony, it appears that Fox News was consulted about airing Oltmann's allegations and declined to do so.[52]  Oltmann's excuse—concern for the safety of the source—has already been addressed by the Court's Protective Order.  Instead, Oltmann attempts to base his account on information that can only be corroborated by Oltmann and Oltmann alone.  Despite these efforts to prevent verification of his claims, Oltmann's notes revealed that a call may have occur in late September—just not the call that Oltmann alleged.[53] Dr. Coomer has obtained a Declaration from one of the alleged participants on that call who confirms that the call was not an Antifa call; there were no statements made on that call by an "Eric" from "Dominion" intending to subvert the election; and, further, he has never heard of or

---

[49] See Exhibit Q-2, Oltmann emails (Oct. 19, 2020).

[50] See Exhibit B-1, Oltmann, Sept. 8, 2021 Depo. Tr. 11:13-22, 56:1-62:2.

[51] See infra at §§ II(D)–(J).

[52] See Ex. I-1, PX 38.

[53] See Ex. F-2.

met Dr. Coomer and does not believe he was on the call.[54]  The only two other individuals that

Oltmann has ever identified as being members of "Antifa," Individual 3 and Individual 4, have

also both provided Declarations confirming that they were not on any "Antifa" call, have no idea

what call Oltmann could be referring to, and do not know and have never met Dr. Coomer.[55]

Further, no one on Oltmann's alleged Antifa call has come forward to support his account.  Indeed,

as Dr. Coomer has stated, if he was on the alleged call, then he would have some idea as to both

who was on the call or who Oltmann's source was.[56]  He does not.

16.     Moreover, there should be some evidence of election fraud committed by

Dr. Coomer.  Yet, Oltmann has none.  Instead, when asked about Oltmann's evidence for how

Dr. Coomer subverted the election, Oltmann gave this sworn testimony:

> Eric Coomer, in a video from 2016, in 2017 showed how you could switch votes.
> Eric Coomer on a hacking call, which they have since taken down, so most of the
> videos that are out there that I had access to show Eric Coomer bragging about what
> the system could do.  Eric Coomer stood in front of the legislative area in Arizona
> and in Georgia and talked about the capabilities of the system.  So, there is massive
> amounts of information out there corroborating it.  There is also a gentleman, whose
> name is Chris York, who worked with Eric Coomer back in 2007, 2008.  There is
> also a few people that worked for Dominion that have come forward that signed
> affidavits that will talk about Eric Coomer's mental state and the things that he has
> done and building codes.  There is also Eric Coomer's own speech, things that he
> has said that—it's not—there's mountains of evidence.  Mountains.[57]

Notably, none of this alleged evidence was included with Oltmann's special motion to dismiss.

None of this is evidence of Dr. Coomer actually committing fraud.  Instead, this is utter nonsense

and further speculation by an unqualified witness with no knowledge or expertise in elections

---

[54] *See* Exhibit U, Individual 1 Dec.

[55] *See* Exhibit Q, Individual 3 Dec.; *see also* Exhibit T, Individual 4 Dec.

[56] *See* Ex. K-1, PX 2.

[57] Exhibit V-5, Digital Recording Transcript (July 7, 2021) at 52:21-53:5.

systems.  "Switching votes" appears to be a reference to Dr. Coomer's explanations on adjudication.  Adjudication is a decades-old practice of determining voter intent when there is an ambiguity on a marked ballot.  Dr. Halderman gives a clear explanation of adjudication, as well as the *transparency* that Dr. Coomer brought to the adjudication process with his patented adjudication technology.[58]  Similarly Oltmann's references to an "ARIMA analysis," "artificial intelligence," "neural networks," and "chaos theory" are easily debunked mumbo jumbo that simply serves as a supposed cover for Oltmann's preconceived voter fraud crusade.[59]  They are intended to position Oltmann as an expert in a field in which he has no expertise or training and are rejected by actual experts in that field.  Moreover, Oltmann has no spreadsheets, graphs, or explanation of his alleged calculations, much less how any such math would relate to Dr. Coomer.

17.    Sixth, the vagueness and inconsistency in Oltmann's allegations further indicate the unreliability of his allegations.  For example, Oltmann has never actually identified when the Antifa call occurred or how he gained access to it, and the Defendants never questioned him on this fundamental issue.[60]  In his November 13 affidavit, he swears the call occurred "on or about the week of September 27, 2020." [61]   September 27, 2020 was a Sunday and the week of September 27 would be September 27 through October 3.  Oltmann claims he did a Google search on "Eric," "Dominion," and "Denver Colorado" after hearing him being identified on the call.  However, the screen shots from that Google search show that it occurred on September 26, 2020,

---

[58] See Exhibit O, Halderman Dec. at ¶¶ 40-48.

[59] *See id.* at ¶¶ 29-30.

[60] *See* Exhibit B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Exhibit B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. 8:5-8; *see also* Pl.'s Amend. Compl. at ¶ 59.

[61] *See* Ex. K-1, PX 2.

thereby placing the Google research before the call.[62]  In other venues, Oltmann has tended to place the call in the mid-to late-September time frame.[63]  But, conveniently, his alleged notes of the call are undated.[64]  Oltmann's lack of specifics on this crucial issue should have raised an obvious red flag to the other Defendants.  Similarly, Oltmann has never identified when or how he obtained access to screen shots of Dr. Coomer's private Facebook account.  In his affidavit, Oltmann merely states that he "turned [his] attention to Eric Coomer's Facebook profile and page" after November 6, 2020.[65]  As it stands, it is just as possible that Oltmann obtained access to that account prior to the alleged Antifa call and then used that material as a justification for placing Dr. Coomer on the call.  And Oltmann's story of how he got onto the call in the first place has changed significantly since he first made his allegations against Dr. Coomer.  In the beginning, Oltmann claimed that he had gained access to the call by some nondescript series of events related to Individual 3.[66]  Charles Herring confirmed in his deposition that he understood Individual 3 to have been the link between Oltmann and the alleged call.[67]  But Individual 3 swears he/she has no idea what call Oltmann could be talking about, was not on the call, does not have the affiliations Oltmann has claimed he/she does, does not know Dr. Coomer, and has never met him.[68]  Now, Oltmann's story about accessing the call has conveniently changed to not require any reference to

---

[62] *See* Exhibit B-5.

[63] *See* Exhibit B-1, Oltmann, Sept. 8, 2021 Depo Tr. 71:10-72:15.

[64] *See id.*

[65] *See* Exhibit K-1, Powell, July 20, 2021, PX 2.

[66] *See* Exhibit B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Exhibit B-4, Nov. 9, 2020 Conservative Daily Podcast Tr., 18:4-24.

[67] *See* Ex. I-1, at 27:16-23.

[68] *See* Exhibit Q, Individual 3 Dec.

Individual 3.  Instead, he now claims that an unnamed Antifa member got him access to the call.[69]

As for Individual 3, Oltmann acknowledged under oath that his prior and repeated claim that he/she

was on the call, apparently including when he made that claim in his sworn affidavit, was a "wild

guess."[70]

18.     Seventh, the timing of Oltmann's allegations is suspect.  Oltmann, like the other

Defendants, had preconceived intentions to allege election fraud, but did not have his sudden

awakening regarding Dr. Coomer until after the results of the election were announced.[71]  This

passive approach was directly criticized by U.S. District Judge Parker in her August 25 order

sanctioning Powell, to wit:

> This game of wait-and-see shows that counsel planned to challenge the legitimacy
> of the election if and only if Former President Trump lost.  And if that happened,
> they would help foster a predetermined narrative making election fraud the culprit.
> These things—separately, but especially collectively—evince bad faith and
> improper purpose in bringing this suit.[72]

19.     Oltmann's delay in bringing his allegations against Dr. Coomer to light is

consistent with the Defendants' preconceived plan to declare the election a fraud only if their

candidate of choice lost.[73]

---

[69] *See* Exhibit B-1, Oltmann, Sept. 8, 2021 Depo. Tr. 22:12-22.

[70] *See id.* at 54:10-23.

[71] *See* Exhibit B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Exhibit B-4, Tr. Nov. 9, 2020 CONSERVATIVE DAILY PODCAST, 21:23-22:12; *see also* Exhibit G-2, The Eric Metaxas Radio Show, *Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss*, YOUTUBE (Nov. 24, 2020); Exhibit G-1, Metaxas, Aug.13, 2021, PX 97 at 11:13-12:23; *see also* Pl.'s Amend. Compl. at ¶¶ 52-53; Exhibit P, Rothschild Dec. at ¶¶ 4-12.

[72] *See* Exhibit V-4, Order, No. 20-13134 (E.D. Mich.), at *96.

[73] Exhibit P, Rothschild Dec. at ¶¶ 4-22.

20.     Eighth, Oltmann's story is inherently improbable.  As Dr. Halderman notes in his Declaration, "[a]nyone asserting that a U.S. election was 'rigged' is making an *extraordinary* claim, one that must be supported by persuasive and reliable evidence."[74] Any such plot "would have required complex manipulation of highly monitored systems across multiple states" and the "detection and thwarting of the attempt (and subsequent prosecution of the perpetrators) would have been likely."[75]  Utilization of the adjudication process to rig the election, as many defendants have suggested, is especially implausible.  Any such attempt would require "manually clicking through hundreds of thousands of ballots to alter the Presidential votes" and is a process that "would likely take days, and it would leave clear traces in multiple sets of data and logs."[76]  High ranking members of former President Trump's own administration repeatedly denied that any such conduct had occurred.[77]  Multiple post-election audits and manual recounts of paper ballots in multiple states across the country provide further confirmation of the legitimacy of the election results, and would require extraordinary evidence of a nationwide scheme likely including thousands across multiple jurisdictions to challenge.[78]  And, of course, the notion of a highly paid corporate executive in his 50s joining an "Antifa conference call" where he supposedly bragged to strangers about rigging the most watched election on the planet, all while deeply involved in

---

[74] Exhibit O, Halderman Dec. at ¶ 14 (emphasis in original).

[75] *Id*. at ¶ 25.

[76] *Id*. at ¶ 46.

[77] *See* Pl.'s Amend. Compl. at ¶¶ 48-49.

[78] *Id*.

complex litigation in another state, is ridiculous and absurd on its face.[79]  Any reasonable person would be skeptical of Oltmann's claims.

21.     Ninth, at no point did Oltmann or any of the Defendants contact Dr. Coomer or Dominion to confirm his involvement in this purported call.[80]  This failure is completely in line with their preconceived election fraud narrative—they did not want to know the response because it did not fit their narrative.  This fundamental failure is what Fred Brown refers to as a journalistic "reckless disregard for the truth."[81]  It violates the most basic ethical tenet.

22.     Tenth, Oltmann has continually defied court-ordered discovery related to this matter; refused to produce relevant evidence; refused to disclose alleged information; and refused to provide relevant deposition testimony.[82]  This conduct is not new.  Since the inception of Oltmann's allegations, he has failed to provide any evidence in support of his claims.  Yet, every other Defendant in this litigation relied on Oltmann as the source of the allegations against Dr. Coomer and refuses to this day to retract their defamatory statements.  Oltmann's convenient excuse—that he fears his source will be subjected to some unspecified harm—only serves to highlight his deception.  Like his unnamed, unsubstantiated source, Oltmann has put forth no credible evidence of an acute threat to anyone in this case—except Dr. Coomer.

23.     Oltmann's entities are completely intertwined with his defamatory campaign against Dr. Coomer.  FEC United (Faith, Education and Commerce) was founded by Oltmann in

---

[79] Ex. Q, Individual 3 Dec. at ¶ 19; *see also* Exhibit A, Coomer Dec. at ¶ 18.

[80] *See* Exhibit A, Coomer Dec. at ¶¶ 16, 23, 34, 36; *see also* Pl.'s Amend. Compl. at ¶ 51.

[81] *See* Exhibit N, Brown Dec. at ¶¶ 14, 130-134.

[82] *See* Exhibit B-1, Oltmann, Sept. 8, 2021 Depo. Tr. 22:3-24:17.

the spring of 2020, to start the Reopen Colorado movement to resist governmental Covid preventive measures.[83]  It is a 501(c)(4).[84]  Oltmann is the chairman of the board.[85]

24.     Oltmann's affidavit in Powell's "Kraken" suits states that he became a target of Antifa journalists through his involvement with FEC United.[86]  According to Oltmann, Individual 5, the mystery connection to the Antifa call, approached him at more than one FEC United meeting.[87]  That is how he met Individual 5.[88]  But Oltmann (i) could not find FEC United meeting sign-in sheets with Individual 5's name; (ii) did not find an email address from FEC United meetings that matched Individual 5; (iii) did not find Individual 5 in the membership database; and (iv) could not identify other FEC United members who know Individual 5.[89]

25.     FEC United advertised on Conservative Daily, and Oltmann frequently discusses the organization on his podcast and in interviews.[90]  Oltmann used FEC United to generate publicity for Conservative Daily through his story about Dr. Coomer.  For example, Oltmann used an FEC United email to correspond with Rion and OAN prior to his appearance on two segments, including the "Dominion-izing the Vote" segment.[91]  His FEC United email is also how he gave

---

[83] *See* Exhibit C-2, Oltmann-FEC United, Sept. 9, 2021 Depo. Tr. 8:25-9:8.

[84] *Id.* at 12:10-12.

[85] *Id.* at 14:2-3.

[86] *See* Exhibit K-1, Powell, July 20, 2021, PX 2.

[87] *See* Exhibit C-2, Oltmann-FEC United, Sept. 9, 2021 Depo. Tr. 22:18-24:23

[88] *See id.*

[89] *See id.* at 23:13-24:12.

[90] *See id.* at 18:5-19:22; 26:5-8.

[91] *See* Exhibit B-2, Oltmann, Sept.8, 2021, PX 103 (20CV34319-JOdisclosures 0799-0801).

them access to Dr. Coomer's Facebook posts. [92]   Both segments led with FEC United introductions.[93]

26.     FEC United is also how Oltmann contacted Metaxas.[94]  And significant time was devoted on Metaxas' nationally syndicated show to promote FEC United.  On Michelle Malkin Live, approximately the last seven minutes were a discussion of FEC United.[95]

27.     Oltmann's FEC United email was used to deliver his affidavit to Powell.[96]  Oltmann also reached out to Powell via his FEC United email to let her know in January 2021 he was getting access to Dominion systems, with the help of cooperative county clerks in Colorado:[97]



Joe Oltmann <joe@fecunited.com>

**Catching up.**
23 messages

Joe Oltmann <joe@fecunited.com>                                   Fri, Jan 22, 2021 at 10:15 AM
To: Sidney Powell <sidney@federalappeals.com>
Cc: Lyn Duden <lduden@pinbn.com>

    Sidney,

    Might be a good idea to connect. We have some interesting information on Eric Coomer. You also
    need to be aware of what we are doing in Colorado in gaining access to the Dominion systems under
    the radar. We have several county clerks cooperating. Need to settle down the chaos so you can get a
    grasp on all of the information. The audit in Antrim county is something that will help in your lawsuit
    against Dominion as well. They are puffing their chest but the reality is we already have the data to
    show they are a fraudulent company with a system that is designed to defraud the American people.

---

[92] *See id.* at 821-23.

[93] *See* Ex. I-1, PX 32.

[94] *See* Ex. B-2, PX 103 (20CV34319-JOdisclosures-0828-38).

[95] *See* Exhibit F-1, Malkin, July 27, 2021, PX 15.

[96] *See* Ex. B-2, PX 103 (20CV34319-JOdisclosures 0841-48).

[97] *See* Ex. B-2, PX 103 (20CV34319-JOdisclosures 0864).

28.     On January 22, 2021, Oltmann also promised to deliver 103 GB of raw election data from Antrim County Michigan to Powell, and subsequently sent password information in order to do so:

> **Joe Oltmann** <joe@fecunited.com>                                    Fri, Jan 22, 2021 at 1:12 PM
> To: Sidney Powell <sidney@federalappeals.com>
> Cc: Lyn Duden <lduden@pinbn.com>, Howard Kleinhendler <howard@kleinhendler.com>, "Jesse R. Binnall"
> <jbinnall@harveybinnall.com>, Abigail Frye <afrye@harveybinnall.com>
>
> Howard, Jesse,
>
> Good to meet you. Sidney is going to need the Antrim county raw files and the three other red team analysis for
> Dominion. It should make this case stronger. I can give you access to those 103GB of data as well as the updated
> Antrim County report. Enclosed is the one pager diagram. It is how they did the big con and the little cons. This is not
> some guess as to the vulnerabilities or how they stole it, it is fact. I am, or was until the vile attacks on the left the CEO
> of a data company (I still own 80% of the company so I am fine). You have to stack math and science on validated
> data and you cannot look at Dominion state by state, so you have to stack the incidents AND all the states and
> compress the system processes to expose the vulnerabilities and how they did it.  Unfortunately, it was not until the
> final hour that everyone started listening and setting aside personal interest that made it impossible to stop the steal…
> too little too late. it shows that Dominion is in fact a fraud as are the people in it. Available to help. Lyn will connect us.
>
> God bless you all and in all this, He is at work.

If true, these are both potentially felonious acts.

29.     Finally, FEC United email was used to correspond with Hoft and TGP.[98]  And FEC United was mentioned in several TGP posts.[99]  While Oltmann claims that FEC United membership has not grown through the publicity related to the Coomer story, and the growth of viewership for Conservative Daily, he admitted that membership in the organization has grown.[100] Oltmann also admitted that prior to the Coomer allegations, FEC United did not appear on platforms such as OAN, Metaxas, and Newsmax.[101]  FEC United's national profile was enhanced significantly by the organization's integral part in the defamatory publications.

---

[98] *See* Ex. B-2, PX 103 (20CV34319-JOdisclosures 0878-79).

[99] *See* Ex. E-3.

[100] *See* Exhibit C-2, Oltmann-FEC United, Sept. 9, 2021 Depo. Tr. 28:14-34:10.

[101] *See* Exhibit D-2, Oltmann-SMM, Sept. 9, 2021 Depo. Tr. 35:23-37:14.

30.     SMM dba Conservative Daily has been a defendant in this lawsuit from the beginning. Although it is not raised in the anti-SLAPP motion (nor has it been challenged in another pleading), Oltmann now contends that the proper entity that controls and operates the Conservative Daily podcast is CD Solutions, LLC (CD Solutions).[102]  The Court allowed corporate representative depositions for both entities.  FEC United, SMM, and CD Solutions share office space in Greenwood Village, Colorado.[103]

31.     SMM registered the trade name Conservative Daily with the Colorado Secretary of State and held that name until filing a notice of withdrawal on July 9, 2021, months after this litigation commenced.[104]  CD Solutions has never had the trade name Conservative Daily registered in the state of Colorado.[105]  In fact, the registration for CD Solutions with the state of Colorado expired in January 2019 and was expired at the time of the first publication about Dr. Coomer.[106]

32.     The issue of which entity is ultimately liable for the litany of defamatory publications made on Conservative Daily (likely numbering in the hundreds and continuing to this day) is not before the Court.  But important additional evidence was obtained with the deposition of the corporate representative of CD Solutions.

---

[102] *Id.* at 9:8-10:23.

[103] *See* Exhibit C-2, Oltmann-FEC United, Sept. 9, 2021 Depo. Tr. 17:7-10; Exhibit D-1, Pappas-CD Solutions, Aug. 11, 2021, PX 93; Exhibit D-1, Pappas-CD Solutions, Aug. 11, 2021 Depo. Tr. 39:20-25.

[104] *See* Exhibit D-2, Oltmann-SMM, Sept. 9, 2021 Depo. Tr. 14:9-23, 18:18-19:6; PX 92; PX 93.

[105] *Id.* at 19:7-16.

[106] *Id.* at 20:9-21:7.

33.     Oltmann appeared as the representative and took responsibility for the investigation and the decision to publish statements about Dr. Coomer.[107]  When challenged about whether the podcast considered other credible sources such as Chris Krebs and the Cybersecurity and Infrastructure Security Agency (CISA), or Attorney General William Barr, Oltmann gave lengthy diatribes explaining why neither were credible.[108]

34.     During the deposition, Oltmann was played a clip from the November 9 podcast when he first told his story about Dr. Coomer.  In the short clip, he alleged that Dr. Coomer held a very large amount of shares in Dominion.[109]  When asked about whether there was any evidence of this, Oltmann said "I was told by someone that was credible that sent me a thing. . ." and suggested that it was "researcher."[110]  In one clip, Oltmann alleged Dr. Coomer had "shell corporations" and "foreign corporations," with Oltmann saying that if he can find them, the FBI should as well.[111]  When pressed for where these claims were supported, Oltmann eventually revealed that it was "From a gentleman that goes by The Researcher."[112]  Oltmann either did not know his name or would not reveal it.[113]

35.     A lengthy discussion ensued because no emails had been produced from The Researcher, and it became clear that Conservative Daily email addresses (including one from

---

[107] *See* Exhibit D-3, Oltmann-CD Solutions, Sept. 9, 2021 Depo. Tr. 25:25-26:12.

[108] *See id.* at 28:23-32:2.

[109] *See id.* at PX 135.

[110] *See id.* at 36:18-24.

[111] *See id.* at PX 136.

[112] *See id.* at 44:19-45:15.

[113] *See id.* at 44:25-45:8.

Oltmann's alias, Joe Otto) had not been disclosed.[114]   Following the deposition, additional documents were provided, including three emails signed by The Researcher, with an email address as theresearcher2020@yandex.com.[115]   The first email was dated January 5, 2021 and attached three documents with staggering amounts of incredibly private information about Dr. Coomer, his family and friends—none of which supports Oltmann's allegations against Dr. Coomer .[116]

36.     The main document, entitled "ERIC COOMER: PAWN, PLANT OR PERP?" can only be described as an incredibly intrusive 118-page dossier about Dr. Coomer's private life.[117] Due to the sensitive personal information, this evidence is filed as suppressed.   There is no information about shell corporations, offshore corporations, or accounts.  The document does say that Dr. Coomer is one of the "major shareholders in Dominion," but provides no evidence in support.[118]  Oltmann could not have been truthful about his alleged reliance on information from The Researcher when he made the allegations on November 9.  He did not receive the dossier until nine weeks later.[119]

37.     Unsatisfied with defamation alone, Oltmann has gone to great lengths to torment and harass both Dr. Coomer and those around him.  He has admitted to having Dr. Coomer under nearly constant surveillance and has reveled in the fact that he drove Dr. Coomer into hiding.[120] He has published a photo of Dr. Coomer's home and told his thousands of online followers that

---

[114] *See id.* at 47:24-66:8.

[115] *See* Exhibit D-5, Email (Jan. 05, 2021).

[116] *See id.*

[117] *See* Exhibit D-3, Oltmann-CD Solutions, Sept. 9, 2021, PX 137 (filed as Exhibit D-6 suppressed).

[118] *See id.*

[119] *See* Ex. D-3, PX 137 (filed as Ex. D-6 suppressed).

[120] *See* Exhibit A-1, Pub. 3, Oltmann et. al. CONSERVATIVE DAILY PODCAST (Nov. 11, 2020).

"[I]t is up to you.  Blow this shit up.  Share, put his name everywhere.  No rest for this shitbag. Eric Coomer, Eric Coomer, Eric Coomer . . . Eric we are watching you . . ."[121]  For months on end, he has publicly described Dr. Coomer as mentally ill and has referred to him as an "unhinged sociopath."[122]  He has made unsolicited contacts with Dr. Coomer's acquaintances, and threatened to dox and harass them too if they would not provide incriminating information on Dr. Coomer.[123] And he has taken credit[124] for the publication of a million dollar "bounty" for what Defendants James Hoft and The Gateway Pundit cavalierly referred to as Dr. Coomer's "comeuppance" just a week after they were sued.[125]

**D.**       ***Hoft and TGP Communications, LLC's defamation of Dr. Coomer.***

        38.       Defendant James Hoft is the founder and editor of The Gateway Pundit (TGP), a far-right online blog, and he is the author of most of TGP's numerous posts accusing Dr. Coomer of having the means and motive to personally rig the election against Donald Trump, intending its readers to draw the conclusion that he had done so.[126]  Hoft and TGP published a series of articles, some with directly defamatory assertions, others insinuating nefarious conduct.  Taken together, they are a shocking patchwork quilt of baseless attacks.

        39.       TGP's attacks on Dr. Coomer began with an article written by Hoft on November 13, 2020.  Its lede, "Dominion Voting Systems Officer of Strategy and SECURITY

---

[121] *See* Ex. I-1, PX 46.

[122] *See* Ex. E-3.

[123] *See* Ex. E-3a at 17:31.

[124] *See* Ex. B-6.

[125] *See* Ex. E-11.

[126] *See* Hoft-TGP Mot. at § I.

Eric Coomer Admitted in 2016 Vendors and Election Officials Have Access to Manipulate the Vote" is a misleading and untrue attempt to suggest that a 2016 video of Dr. Coomer presenting the adjudication functions (and security features) of Dominion's systems was, instead, an presentation of how to rig elections.[127]  In the article, Hoft first introduces TGP's readers to Joe Oltmann, saying that he researched Dominion and did a "deep dive" on Dr. Coomer.[128]  The article concludes with a link to the "Antifa Manifesto" re-post from Dr. Coomer's private Facebook page, a widely-shared satirical and sardonic "letter" to Donald Trump and signed by "Antifa."[129]  The post is written with the author's (not Dr. Coomer) tongue firmly in cheek, asking for aspirational reforms in government and expressing concerns that under President Trump, our nation was precariously close to fascistic control, as with the regimes of autocrats in history.[130]  TGP asked its readers to share the post, clearly intending harassment of Dr. Coomer.[131]

40.     TGP upped the ante the very next day, with a story entitled "Report: Anti-Trump Dominion Voting Systems Security Chief Was Participating in Antifa Calls, Posted Antifa Manifesto Letter to Trump Online."[132]  The headline is unequivocal: TGP's reporting concludes that Dr. Coomer "was participating in Antifa calls."  TGP's source for the article seems to be merely watching Michelle Malkin's streamed interview of Oltmann.[133]

---

[127] *See* Ex. E-1, PX 86.

[128] *See id.*

[129] *See id.*

[130] *See id.*

[131] *See id.*

[132] *See* Ex. E-1, PX 87.

[133] *See id.*

41.     The Dominion conspiracy continued in TGP the next day, November 15, with an article promising that Sidney Powell would reveal shocking news about Dominion in her "Kraken" suits.[134]  On November 16, Hoft followed with a story and an audio interview with Oltmann.  The story, entitled "Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath — His Internet Profile Is Being Deleted and Erased," included an interview in which Hoft unquestioningly presents Oltmann with a 21-minute platform to retell Oltmann's allegations and with Hoft agreeing, confirming facts, and egging him on.[135]  Shockingly, at one point in the audio, Oltmann brags about doxing Colorado journalists who he claims are Antifa, and even brags about threatening Dr. Coomer's friends with doxing and harassment if they would not provide incriminating information on Dr. Coomer.[136]

42.     A November 23 article, "BREAKING: SECOND VIDEO REVEALED of Dominion Voting System's Eric Coomer Explaining to Elections Officials How to Switch Votes (VIDEO)" again falsely and misleadingly twists a video of Dr. Coomer explaining how adjudication is performed—in 2016.[137]  Two articles were then posted the next day, with one stating plainly that "Coomer was found to be a Trump-hating Antifa sociopath."[138]  Hoft's twin brother, Joe Hoft, posted an article linking Dr. Coomer to new conspiracy theories: "Not Only Was Dominion Prone to Attack from China and Iran – It Was Also Connected to Pro-Obama Entity

---

[134] *See* Ex. E-2.

[135] *See* Ex. E-3.

[136] *See* Ex. E-3a.

[137] *See* Ex. E-4.

[138] *See* Ex. E-5; Ex. E-6.

Known as ACORN."[139]  And on November 27, Hoft and TGP published an article stating (without any evidence whatsoever) that Dr. Coomer contradicted Dominion's statements about the security of its systems.[140]

43.     TGP continued its assault through several articles in December.  On December 17, 2020, TGP posted "More On Dominion Voting Machines: They Could Easily Duplicate Votes and Security Threats Were Virtually Ignored."[141]  The article quotes tweets from Kyle Becker reframing quotes from Dr. Coomer discussing recertification.[142]  TGP concludes that "there may be a good case for perjury" against Dr. Coomer.[143]  On December 27, TGP posted a story entitled "Developing: Dominion's Anti-Trump Executive Eric Coomer Owns Patents on Adjudication Process That Investigators Found Skimmed Votes from Trump in Michigan."  The story quotes Oltmann as saying that Dr. Coomer is mentally ill and a sociopath, and falsely ties the adjudication process to rumored problems in Antrim County.[144]  The Antrim rumors were quickly and thoroughly debunked, even in a Michigan Republican investigation.[145]

44.     On December 28, 2020, Hoft and TGP published perhaps the most egregious piece in their serial attack on Dr. Coomer.  "WAKE UP AMERICA! Bold Billionaire Offers $1 Million Bounty for Dominion's, Eric Coomer's Comeuppance" is a call to action for TGP readers, encouraging them to provide evidence about Dr. Coomer to Alki David, allegedly a billionaire,

---

[139] *See* Ex. E-7.

[140]*See* Ex. E-8.

[141] *See* Ex. E-9.

[142] *See id.*

[143] *See id.*

[144] *See* Ex. E-10.

[145] *See* Ex. B-2, PX 107.

who offered the bounty.[146]  TGP's article does not say what is intended by "comeuppance" in its headline, but the article continues its narrative about Dr. Coomer, and adds a new false allegation that patents secured by Dr. Coomer are controlled by China.[147]  The declaration of elections expert Dr. Halderman states clearly that the patents that Dr. Coomer worked on were anything but nefarious—they made elections more secure and provided transparency.[148]

45.     A January 4, 2021 article linked Dr. Coomer to (Republican) Secretary of State Brad Raffensperger in Georgia and alleged the connection was to allow for fraud in the election.[149] But from there TGP's allegations about Dr. Coomer fizzled without substantiation, as they did with the other media Defendants.  Absent real proof of prior accusations, Dr. Coomer then became the target of innuendo.  Subsequent articles from TGP implied misconduct by publishing photos of Colorado officials at a barbecue hosted by Dr. Coomer, suggesting that any connection to him or Dominion was related to election fraud.[150]  Hoft had received the photos of Dr. Coomer, his house, and the barbecue from Oltmann, unsolicited.[151]

46.     To this day Hoft and TGP assert without evidence that the allegations about Dr. Coomer and Dominion are true.[152]  Instead, Hoft and TGP base their allegations on specious and debunked evidence and other sources that equally have no knowledge or evidence of the

---

[146] See Ex. E-11.

[147] See id.

[148] See Ex. O at 17-18.

[149] See Ex. E-1, PX 88.

[150] See Ex. E-10; Ex.-11; Ex. 12.

[151] See Ex. E-1, at 76:3-80:15 (discussing photos sent by Oltmann and identifying attendees of the article).  Hoft admitted TGP did a story about a Republican official from one of the photos.

[152] See Hoft-TGP Mot. at 19.

allegations made.[153]   For example, they confuse speculation over Texas' decision not to buy Dominion machines with proof that Dominion's machines and Dr. Coomer were complicit with election fraud.[154]  With *Curling,* the case in which Plaintiff's expert Dr. Halderman served as an expert, they raise the specter of a *potential* vulnerability and treat their speculation as evidence of fraud, when in reality, there is nothing in the *Curling* case that suggests that either Dr. Coomer or Dominion rigged the 2020 Presidential election.[155,156]  Hoft and TGP also rely on the far-right website The Epoch Times as authority, again without evidence.[157] They identify Jovan Pulitzer, a widely discredited inventor of a tool allegedly designed to find counterfeit Arizona ballots (from bamboo fibers linking them to China) in the Cyber Ninja's failed "audit," as a source about Dr. Coomer and as an "elections expert," of course with no supporting declaration.[158] Defendants cite Democratic senators' investigation of the security of voting machines in 2019 where most of the authorities cited are quite partisan.[159]  Defendants even cite as a "Dominion whistleblower" Melissa Carone, Giuliani's star witness at an unofficial Michigan hearing.  Giuliani even tried to shush her at one point, and Dominion later said that she was a one-day contract worker hired to wipe down the machines.[160]

---

[153] *See id.* at 3-7.

[154] *See id.* at 3.

[155] *See id.*

[156] *See* Exhibit A, Coomer Dec. at ¶¶ 40-47.

[157] *See id.* at 4; *see also* Ex. E-15.

[158] *See* Hoft-TGP Mot. at 4-5.  Footnote 2 even cites to TGP's own article reposting a Pulitzer tweet accusing Dr. Coomer of an admission that voting machines are vulnerable.

[159] *See id.* at p. 5, n.7-8 (citing a Republican "hearing" in Georgia December 20, 2020, and former White House Adviser Peter Navarro's The Navarro Report, a three-part publication concluding the election was stolen and former President Trump actually won).  Note also that the motion cites TGP articles authoritatively in several places.

[160] *See* Ex. E-16.

47.     Of course, in contrast Hoft and TGP ignore numerous credible sources that concluded there was no evidence of real election fraud, including Trump appointee, Chris Krebs, and Trump's own Attorney General, William Barr.

48.     Hoft's and TGP's deposition testimony did not help with their positions.  Hoft had never heard of Eric Coomer prior to Oltmann's story.[161]  Hoft testified that TGP's articles are "news with opinion," but the readers are left on their own to determine which part of an article is either.[162]  Hoft utterly relied on Oltmann as his source, admittedly with no attempt to find corroborating evidence.[163]  Hoft found Oltmann to be credible primarily because Michelle Malkin had interviewed him.[164]  As with all Defendants in this case, Hoft and TGP did not contact Dr. Coomer to ask whether Oltmann's fantastic allegations were true.[165]  And like all Defendants, Dr. Coomer and Dominion fit neatly into a preconceived narrative that if Biden won the election, it could only be due to fraud.[166]

49.     Hoft had no training in journalism, apart from attending seminars years ago.[167]  He has not studied journalism ethics.[168]  Hoft and TGP are not affiliated with the Society of Professional Journalists, the American Society of News Editors, or the National Conference of

---

[161] *See* Ex. E-1, at 22:15-22.

[162] *See id.* at 10:11-11:7.

[163] *See id.* at 32:17-33:6.

[164] *See id.* at 33:7-12.

[165] *See id.* at 20:25-21:22.

[166] *See id.* at 62:18-63:18; *see also* Rothschild Dec. at ¶¶ 4, 18-21, 85.

[167] *See id.* at 12:19-13:4.

[168] *See id.* at 14:3-9.

Editorial Writers.[169]  TGP's editorial standards are on the website's "About" page, and they expressly state that the site espouses politically conservative views.[170]  The page further states that TGP is owned "100%" by Jim Hoft.[171]

50.    The story about Dr. Coomer was not the only election fraud story TGP published. Hoft stated that TGP published articles about election fraud even before November 3, 2020, including the Hammer and Scorecard theory advanced by Sidney Powell (*infra*).[172]  Post-election, TGP posted a number of election fraud allegations, including witness affidavits, unofficial hearings in several states, video from inside the TCF Center, the story of a vanload of ballots dropped on election night, election observers in Georgia leaving for the night and having workers pull ballots from under the table to count, multiple counts of ballots and ballots dropped for Biden in the middle of the night.[173]

51.    Plaintiff's journalism ethics expert, Professor Brown, concludes:

> Hoft's cynical conclusion (that the election was fraudulent simply because his candidate lost) is based on mere supposition, not on fact, and in my opinion does not follow the basic journalistic principle of searching for, collecting and reporting all relevant information about a subject.[174]

Simply put, Hoft and TGP did not act as journalists.  The allegations about Dr. Coomer, like any election fraud rumor, were scandalously published with no attempt to verify the inherently improbable story.  But according to Hoft, the benefits to TGP for election fraud coverage included

---

[169] *See id.* at 16:11-18.

[170] *See* THE GATEWAY PUNDIT, https://www.thegatewaypundit.com/about/ (last visited Sept. 17, 2021).

[171] *See id.*

[172] *See* Ex. E-1, at 62:18-64:11.

[173] *See id.* at 66:19-69:21.

[174] *See* Exhibit N, Brown Dec., at ¶ 91.

being viewed as a pro-Trump grassroots leader, as well as increased subscriptions and advertising.[175]

### E.   *Malkin's defamation of Dr. Coomer.*

52.    Michelle Malkin is a political commentator and host of #MalkinLive based in Colorado.[176] Malkin was one of the first of the Defendants to interview Oltmann with many of the other Defendants crediting Malkin with raising Oltmann and his allegations to their attention.[177] On November 13, 2020, Malkin gave Oltmann a platform on her #MalkinLive livestream just four days after Oltmann first published his allegations against Dr. Coomer on the Conservative Daily podcast.[178] Oltmann used this platform to repeat his allegations against Dr. Coomer, which included the same weaknesses in his original story—unknown and unverified speakers on an alleged call and no personal knowledge, evidence, or qualifications to support the allegations he raised.[179] Yet Malkin presented Oltmann as an "eyewitness account of the fraud that's going on" in light of Oltmann being censored by Twitter for "telling the truth."[180] Malkin pitched the entire Oltmann interview about Dr. Coomer as "information vital to the systemic stealing of the election."[181] Malkin informed her viewers "[t]hat's how we go from conspiracy theory to

---

[175] *See* Exhibit E-1, at 73:4-74:20.

[176] *See* Exhibit F-1, Malkin, July 27, 21 Depo. Tr., PX 15, PX 17.

[177] *See* Malkin Mot. at Ex. A (Malkin Dec.), ¶ 2; *see also* OAN-Rion Mot. at Rion Dec., ¶ 4; Powell Mot. at 15; Defending the Republic Mot. at 16.

[178] *See* Exhibit F-1, Malkin, July 27, 2021, PX 15.

[179] *See id.*

[180] *See* Exhibit F-3, Malkin, #MalkinLive Tr. at 2-3.  Notably, the last ten minutes of #MalkinLive is devoted to Oltmann promoting FEC United.

[181] *See* Exhibit F-3, at 2.

conspiracy truth!"[182] Despite Malkin's subsequent assertions, she never makes *any* disclaimer during the entirety of this show regarding Oltmann's claims.  Instead, she went on to repeatedly promote the interview on Twitter, stating:

> Joe Oltmann (now banned on Twitter) exposes pro-Antifa, cop hatred-inciting rants of #EricCoomer, VP of strategy/security on Dominion Voting Systems. "What if I told you he is a major shareholder' in Dominion & owns patents associated with other voting systems?" #MalkinLive.

> Full interview with #joeoltmann on #ericcoomer # dominion here ==>

> What are they trying to hide? #DominonVotingSystems.

> In case you missed it: My interview with #JoeOltmann from six days ago exposing #EricCoomer #Antifa #ExposeDominion.[183]

53.     Malkin again interviewed Oltmann, this time on her Newsmax-aired Sovereign Nation program, entitled "Hacking the Vote" that aired on November 28, 2020.[184]   Again, Malkin invited Oltmann to repeat his defamatory statements about Dr. Coomer without challenge to his false narrative.[185]   Like her initial interview, this broadcast consisted of rank conspiracy theories about election fraud framed around the untrue assertion that Dr. Coomer admitted to subverting the election.[186]   Malkin's limited qualifications at this time, stating "I think it is important to make explicit that, at this point, *at least publicly*, there is no evidence that Eric Coomer made good on his threat" and "[s]o many questions Joe, and we're only getting started," do not change the gist

---

[182] *See generally* Exhibit F-3.

[183] *See* Ex. F-1, PX 19-23.

[184] *See* Ex F-1, PX 17.

[185] *See* Ex. F-3, at 4:20-7:8, 9:23-13:19, 14:24-16:4, 20:12-21:7, 26:8-29:17; *see also* Ex. F-1, PX 17; Malkin Mot. at Ex. A-2, 7:5-13:2.

[186] *See* Malkin Mot. at Ex. A-2, 7:5-13:2.

of the statements she published regarding Dr. Coomer.[187]  Instead, they only imply that there is undisclosed evidence and more Malkin and Oltmann plan to uncover.  Further, these qualifications that Malkin touts as exculpatory failed to address the defamatory comments head on—it is defamatory to suggest an election worker confessed to a crime when he did not commit the crime.

54.     In addition to the two Oltmann broadcasts, Malkin also reposted the defamatory TGP article and other false claims made by Oltmann, including that he was a major shareholder of Dominion.[188]

55.     Ultimately, Malkin failed in her most basic duties as a journalist.  Prior to the livestream, Malkin did little to no pre-interview and inexplicably claims she did not have time to vet Oltmann's story and did not even know what Oltmann was going to talk about.[189]  This did not stop her from publishing and promoting the interview after it occurred.  To this day it is still accessible online and Malkin has refused to retract it.[190]  Two weeks later, she republished the same story on Sovereign Nation again with no intervening attempt to fact check Oltmann's claims.[191]  In both broadcasts, she never asked obvious questions about Oltmann's story, including whether he had a recording of the call or how he was able to access the call in the first place.[192]  She never asked to see Oltmann's notes from the call and even denied that she had an obligation as a journalist to present verifiable facts.[193]  She did not ask how Oltmann could be certain it was

---

[187] *See id.* at 11:2-4.

[188] *See* Ex. F-1, PX 19-20, PX 22-24.

[189] *See* Ex. F-1, 16:23-17-18; 29:22-30:4.

[190] *See* Exhibit V-1, Cain Dec., Demand for Retraction.

[191] *See* Ex. F-1, 65:24-66:18; 69:20-71:22.

[192] *See generally* Ex. F-3; Ex. F-1, PX 17; Malkin Mot. at Ex. A-2.

[193] *See id.*

Dr. Coomer on the call; rather Malkin made it a point of presenting Oltmann's story "because he had been censored on Twitter from saying it."[194] Had she simply viewed the entire November 9 Conservative Daily Podcast instead of the "snippets" Malkin alleges, she would have seen Oltmann state on three separate occasions that he could not be sure it was Dr. Coomer on the call.[195] In effect, Malkin relied on a single "source" who gave her no actual corroboration for his story while failing to note the limitations of her own reporting. Moreover, Malkin herself is unable to explain how Dr. Coomer *could* have rigged the election, making the entire premise for her broadcasts inherently improbable.[196] Instead, Malkin bases her defamation on Dr. Coomer's Facebook posts and the proposition that Dr. Coomer's disdain for former President Trump and support of causes like Black Lives Matter suggests he would be more likely to have been on the Antifa call and to have committed election fraud.[197] However, speculation is not fact and these Facebook posts are not probative evidence for the allegations she asserts.

56.    Malkin further admitted that if the Antifa call took place, there would be other witnesses who could corroborate the story.[198] Naturally, she made no effort to interview any of them, including Dr. Coomer (who would have been a witness had he been on the call) and never asked Oltmann for this type of confirming information or even if he knew the identities of anybody else on the alleged call.[199] She had no excuse for failing to contact Dominion. She never tried,

---

[194] *See* Ex. F-3, 44:3-7.

[195] *See id*. at 11:21-12:13; *see also* Exhibit B-4, Oltmann, Conservative Daily Transcript (Nov. 9, 2020) at 19-20, 60.

[196] *See* Ex. F-1, 73:18-25.

[197] *See id.* at 9-10.

[198] *See* Ex. F-1, Malkin, July 27, 2021 Depo. Tr. 126:8-15.

[199] *See id*. at 71:8-22.

even though Dominion's "Contact" link was prominently displayed on their website.  Malkin recklessly turned a blind eye to readily available facts that might disprove the false narrative regarding Dr. Coomer.  During her deposition, when asked to admit that verifying facts was part of her responsibility as a journalist, Malkin failed to answer the question and instead spoke of her "imperative" to "to give a platform to people who are being censored for disseminating what is considered dangerous or dissident information."[200]

57.     Malkin's own news organization issued a written and broadcast public retraction and apology to Dr. Coomer due to Malkin's reporting.[201]  In it, Newsmax states: "Newsmax has found no evidence that Dr. Coomer interfered with Dominion voting machines or voting software in any way, nor that Dr. Coomer ever claimed to have done so.  Nor has Newsmax found any evidence that Dr. Coomer ever participated in any conversation with members of 'Antifa,' nor that he was directly involved with any partisan political organization."[202]  While Malkin disagrees with this retraction, indeed she recently refused to issue a retraction in response to a recent demand on August 18, 2021[203] (which was sent after Oltmann failed to appear for his court-ordered deposition), she cannot get around the fact that her reporting about Dr. Coomer was based on an imagined story from a noncredible source.

58.     Malkin further ignored obvious actual credible sources in order to support her preconceived voter fraud narrative.  She eschewed both the CISA and the Department of Homeland

---

[200] *Id.* at 44:9-19.

[201] *See* Ex. F-1, PX 30.

[202] *See id.*

[203] *See* Exhibit V-1, Cain Dec., Demand for Retraction.

Security as authoritative sources on election fraud issues in favor of Glenn Chong,[204] a Filipino politician she featured with Oltmann on her Sovereign Nation show.[205]  Chong helped create the voter fraud tale in the Philippines regarding Smartmatic,[206] which, in turn, gave credence to the Coomer story.

59.     In response, Dr. Coomer has provided the Court with the Declaration of Fred Brown who opines that Malkin failed to report on widely accepted, verifiable information that conflicted with her assumptions which may legitimately be characterized as a reckless disregard for the truth.[207]  This opinion from a credible journalism expert is sufficient, in and of itself, to constitute prima facie evidence of this Malkin's actual malice.

### F.    Metaxas's defamation of Dr. Coomer.

60.     Defendant Eric Metaxas is an author, speaker, and host of The Eric Metaxas Radio Show.  Metaxas is employed by Salem Media and broadcasts his show across various media networks and platforms, including the Trinity Broadcasting Network, as well as 215 radio stations

---

[204] Exhibit F-1, at 73:4-16; 109:20-113:14; PX 17.

[205] See Exhibit F-1, Malkin, July 27, 2021 Depo. Tr. 72:25-73:16; 109:9-110-20; 112:21-113:14.

[206] UNTV News, GIS Exclusive: Glenn Chong to push for election reforms if elected to Senate, UNTV (Feb. 9, 2019) https://www.untvweb.com/news/gis-exclusive-atty-glenn-chong-to-push-for-election-reforms-if-elected-to-senate/ (last visited Sept. 17, 2021).

[207] See Exhibit N, Brown Dec. at ¶¶ 65-78, 130-134.

across the United States.[208]  As Metaxas noted in his separate motion to dismiss, he commands a

significant public platform with a large public following.[209]

61.     Metaxas says that he has the freedom to do his show as he pleases.[210]  Metaxas is

unaware of any written standards or requirements for shows to observe.[211]  He admits there is no

investigation as a part of show preparation, stating:

> It's--I'm kind of a fly by the seat of my pants guy in that we don't have the budget
> or bandwidth or the time to do anything like that.  So usually, it's like, that seems
> interesting.  That book seems interesting.  And I kind of respond in the moment, so
> it's not—it wouldn't be my inclination to do that. But we—I don't think we would
> be able to do that anyway, you know.[212]

62.     Prior to Oltmann's appearance on his show, Metaxas was promoting election fraud

theories.  A November 7, 2020 tweet is indicative:[213]



---

[208] *See* Pl.'s Resp. to Metaxas 12(b)(2) Mot. at Coomer Dec., ¶¶ 6, 9.

[209] *See* Metaxas 12(b)(5) Mot., filed Feb. 22, 2021, at p. 2 ("Defendant Eric Metaxas is a bestselling author and host of the radio program The Eric Metaxas Radio Show.").

[210] *See* Exhibit G-1, Metaxas, Aug. 13, 2021 Depo. Tr. 14:1-13.

[211] *See id.* at 15:3-21.

[212] *See id.* at 15:22-16:9.

[213] *See* Exhibit G-5.

63.     While Metaxas does not remember how he heard about Oltmann's allegations, he understood what they would be prior to having him on the show.[214]  He thought it would be interesting, and "fun" for his audience.[215]  Neither Metaxas nor his staff did any investigation of Oltmann prior to having him on the show.[216]  Metaxas was unaware that Oltmann had advanced other election fraud theories on Conservative Daily.[217]

64.     Metaxas alleges he did not find the Antifa conference call to be implausible, nor did it occur to him that Oltmann might have had a recording.[218]  In fact, Metaxas would not even agree that a recording would be important evidence.[219]  And, as with all the Defendants, Metaxas did not reach out to Dr. Coomer to verify Oltmann's claims.[220]

65.     On November 24, 2020, Metaxas hosted an interview with Oltmann, on his radio talk show and podcast.[221]  Metaxas published this interview across various media platforms, including his YouTube channel, The Eric Metaxas Radio Show, which currently has approximately 206,000 subscribers.[222]  Although Metaxas knew nothing about Dr. Coomer, he introduced Oltmann by saying that he would tell the story of Eric Coomer of Dominion, who "is

---

[214] See Ex. G-1, at 21:10-23:10.

[215] See id. at 23:2-10.

[216] See id. at 23:11-20.

[217] See id. at 23:21-25.

[218] See id. at 27:9-29:9.

[219] See id. at 29:10-21.

[220] See id. at 30:3-5.

[221] See Exhibit G-2; Ex. G-1, PX 97 at 2:8-17; see also Pl.'s Amend. Compl. at ¶ 59.

[222] See Exhibit A, Coomer Dec. at ¶ 35; see also Pl.'s Amend. Compl. at ¶ 59.

also involved with Antifa."[223]  And Metaxas alleges he did not know whether he gave thought to what his listeners would think of Dr. Coomer, or whether it might lead to threats.[224]

66.      During the Metaxas interview, Oltmann again falsely alleged that Dr. Coomer was an anonymous Antifa activist on a call Oltmann claimed to have infiltrated.[225]  Metaxas remarked that Dr. Coomer's background reminded him of the Unabomber.[226]  Oltmann again claimed that he determined from this call that Dr. Coomer subverted the presidential election.[227]

67.      Metaxas did not challenge or question statements by Oltmann that Dr. Coomer was involved in influencing the outcome of a 2012 Mongolian election, despite its facially improbable nature.[228]  At one point in the interview, Metaxas reacted to Oltmann, saying, "It's extremely criminal, and these folks know they're going to jail for the rest of their lives."[229]

68.      Following this interview, Metaxas published additional false statements in tweets, promoting his interview of Oltmann and additional interviews perpetuating these allegations of fraud to his followers.[230]

---

[223] *See* Ex. G-1, at 57:8-58:20.

[224] *See id.* at 58:21-59:11.

[225] *See* Exhibit G-2; Exhibit G-1, PX 97 at 3:15-25, 6:6-7:3; *see also* Pl.'s Amend. Compl. at ¶ 59.

[226] *See* Ex. G-1, at 63:12-25.

[227] *See* Ex. G-1, PX 97 at 14:7-16, 18:10-19:17, 28:7-16.

[228] *See* Ex. G-1, at 66:24-69:5.

[229] *See id.* at 79:4-22; PX 97 at 29:8.

[230] *See* Exhibit A, Coomer Dec. at ¶ 36; Exhibit G-6, Eric Metaxas, *Joe Oltmann*, THE ERIC METAXAS SHOW PODCAST (Nov. 25, 2020); Exhibit G-7, Eric Metaxas, *Kevin McCullough*, THE ERIC METAXAS SHOW PODCAST (Dec. 3, 2020); Exhibit G-8, Eric Metaxas, *Steve Bannon*, THE ERIC METAXAS SHOW PODCAST (Dec. 21, 2020); Exhibit G-3, Eric Metaxas (@ericmetaxas), TWITTER (Nov. 24, 2020, 5:26 PM); Exhibit G-4, Eric Metaxas (@ericmetaxas), TWITTER (Jan. 4, 2021, 2:21 PM); *see also* Pl.'s Amend. Compl. at ¶ 59; n.72-76.

69.     At the time Metaxas published all of these statements, Metaxas had no credible evidence that an "Antifa conference call" actually happened; that Dr. Coomer was present on the call; that the comments attributed to Dr. Coomer were actually spoken; or that the alleged election fraud actually occurred.[231]  Metaxas took no actions or efforts to corroborate or verify Oltmann's allegations before publishing them.[232]  Metaxas perpetuated this defamation despite numerous credible sources refuting it.[233]  Metaxas alleges he knew of no federal agency or body that had determined the 2020 election was fraudulent.[234]  He alleges he was unaware that Chris Krebs, a Trump appointee to CISA, had reported there was no evidence of fraud on November 12, 2020.[235] He alleges he was unaware that all states participating in the U.S. Election Assistance Commission had pre- and post-election security measures.[236]  There was apparently no consideration given to credible sources refuting allegations such as those leveled by Oltmann.

70.     Metaxas has demonstrated ill will towards Dr. Coomer and financial and personal benefit in defaming him.[237]  To this day—despite overwhelming, independent evidence that conclusively establishes the falsity of his statements about Dr. Coomer—Metaxas has never retracted any of these statements.[238]

---

[231] *See supra* at § II(C); *see also* Pl.'s Amend. Compl. at ¶ 59.

[232] *See id.*; *see also* Exhibit A, Coomer Dec. at ¶ 36; Pl.'s Amend. Compl. at ¶ 59.

[233] *See id.*; *see also* Pl.'s Amend. Compl. at ¶¶ 46-50.

[234] *See* Ex. G-1, at 39:15-19.

[235] *See id.* at 39:20-25.

[236] *See id.* at 46:19-47:1.

[237] *See* Exhibit A, Coomer Dec. at ¶¶ 35-36; Exhibit G-2, The Eric Metaxas Radio Show, *Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss*, YOUTUBE (Nov. 24, 2020); Exhibit G-6, Eric Metaxas, *Joe Oltmann*, THE ERIC METAXAS SHOW PODCAST (Nov. 25, 2020); *see also* Pl.'s Amend. Compl. at ¶¶ 59, 71, 85.

[238] *See* Exhibit V-1, Cain Dec., Demand for Retraction.

### G.    *Rion and One America News Network's defamation of Dr. Coomer.*

71.    OAN and Rion's anti-SLAPP motion describes the network as a "prominent 24-hour national news network which reports on national and international news daily around America."[239]   OAN operates news bureaus in San Diego, Washington, D.C., and New York City.[240]  Its Chief White House Correspondent is Defendant Chanel Rion (Rion).[241]

72.    OAN was launched on July 4, 2013.[242]  It does not operate under a published journalistic code of ethics; in fact, the link to its "Founding Principles" returns the message: "It seems we can't find what you're looking for.  Perhaps searching can help."[243]  Its president, Charles Herring, admits the network has a "pro-Trump bias."[244]  The network is owned and closely controlled by the Herring family (father, Robert, and sons, Charles and Bobby, collectively, the "Hs"), and, in addition to no published ethical standards, it also has no journalistic standards for its reporters to follow.[245]

73.    OAN places an emphasis on tailoring its news stories to viewer input from their website while running stories that are of interest to the Hs, known internally as "H stories."  Under oath, Charles Herring denied the existence of "H stories," but Plaintiff has attached an internal OAN email to this Response from OAN's News Director, Lindsey Oakley, demanding "H stories"

---

[239] *See* OAN-Rion Mot. at 1.

[240] *See id.* at 1-2.

[241] *See id.* at 2.

[242] *See* Exhibit I-1, OAN, July 30, 2021 Depo Tr. 76:2-7.

[243] *See* Exhibit N, Brown Dec. at ¶ 19.

[244] *See* Exhibit I-1, OAN, July 30, 2021 Depo Tr. 97:22-98:2.

[245] *See* Ex. I-1, at 10:22-23:6; *see also* Exhibit H-1, Rion, Aug. 9, 2021 Depo. Tr. 31:1-16; Exhibit R, Golingan Dec. at ¶ 5.

be run at least eight hours a day.[246]  The defamatory report about Dr. Coomer in "Dominion-izing

the Vote," discussed below, was an H story.[247]

74.     OAN has frequently supported and publicized former President Trump's

preconceived election fraud narrative.[248]  Shortly after the election, OAN made a deal with

Giuliani and the Trump Campaign to loan one of its reporters, Christina Bobb, to assist the

campaign in its efforts to challenge the 2020 Presidential election.[249]  Christina Bobb and Rion

also operate a nonprofit called "Voices & Votes," which has donated $605,000 to the Arizona

"audit."[250]  Ms. Bobb still reports regularly on that audit for OAN and, generally speaking, OAN's

audience is unaware or does not care that OAN's reporters are driving the very story they are

covering.

75.     Rion was hired by OAN in 2019.[251]  She had no prior experience as a journalist.[252]

She was hired by Charles Herring after one screentest.[253]  Rion was immediately given the role of

OAN's weekend White House correspondent.[254]  OAN did not have any written journalistic

standards for Rion to follow.[255]  Instead, Rion received on-the-job training by OAN's Washington

---

[246] *See* Exhibit R, Golingan Dec. at Ex. C.

[247] *See id.* at ¶ 11.

[248] *See* Rothschild Dec. at ¶¶ 4, 18-21, 49-64, 85; *see also* Exhibit I-2, OAN Newsroom, *Several States Investigating Accounts Of Mail-In Voter Fraud* (Sept. 3, 2020); Exhibit I-3, OAN Newsroom, *President Trump Slams Mail-In Voting As A 'Scam,' Says It Will Be 'A Disaster'* (Sept. 19, 2020); Exhibit I-4, OAN Newsroom, *AG Barr: Mail-In Ballots Enable Fraud, Voter Coercion* (Sept. 27, 2020)

[249] *See* Exhibit J-1, Giuliani, Aug. 14, 2021 Depo Tr. 87:15-94:12

[250] *See* https://voicesandvotes.org/ (last visited Sept. 17, 2021).

[251] *See* Exhibit H-1, Rion, Aug. 8, 2021 Depo. Tr. 30:10-19.

[252] *See id.* at 29:10-14.

[253] *See id.* at 30:10-19.

[254] *See id.* at 30:20-25.

[255] *See id.* at 31:1-10.

D.C. bureau chief, John Hines, and its then chief investigative reporter, Neil McCabe.[256]  Rion is now OAN's Chief White House Correspondent, where she works exclusively out of OAN's Washington D.C. bureau.[257]

76.     OAN's newsroom is in San Diego, as are the bulk of its employees.[258]  Rion, however, writes and produces her own stories in Washington D.C., often with direct input and approval from Charles Herring.[259]  Traditionally, it is unusual for the ownership of a news organization to substantially involve itself in editorial or production matters regarding individual stories.[260]  Most journalists reject this type of interference as it compromises their independence. OAN is an exception.[261]

77.     Rion began working on the Coomer story in mid-November, 2020.[262]  Dr. Coomer was not known to her at the time, so she had to familiarize herself with his role at Dominion.[263] To Rion, Oltmann's status as a conservative activist seeking to expose Antifa journalists only served to affirm his credibility.[264]  In conducting research before allowing Oltmann on her show, Rion did not ask Oltmann to identify any other potential witnesses on the call, saying that was not "relevant" to her.[265]  She was willing to rely on one "source" and did not concern herself with

---

[256] *See id.* at 31:11-16.

[257] *See id.* at 14:5-10, 67:3-6.

[258] *See id*. at 66:19-67:6.

[259] *See id*. 14:5-10, 63:25-65:2

[260] *See* Exhibit R, Golingan Dec. at ¶¶ 5-6.

[261] See *id*., at ¶¶ 14-15; *see also* Exhibit N, Brown Dec. at ¶¶ 20.

[262] *See* Ex. H-1, at 115:2-23.

[263] *See id.* at 115:2-23.

[264] *See id.* at 88:16-25.

[265] *See id*. at 79:22-80:17.

verifying what occurred on the call because it was "not the focus of our story about Eric Coomer."[266]   Rion did not request Oltmann's notes from the call, saying "there were about as relevant to her as 'Mike Tyson's bodyguard.'"[267]   Rion claims to have put some effort into trying to contact Dr. Coomer before her report aired, but she did not even attempt to contact Dominion to request they make Dr. Coomer available.[268]   Rion never got any documentation showing that Dr. Coomer was a shareholder of Dominion despite her specific request to Oltmann.[269]

78.     OAN was aware there was no video or audio recording of the alleged Antifa call.[270] OAN believed that Oltmann was able to access the Antifa call through the "loose lips" of Individual 3, but again ignored him/her as a potential source.[271]   OAN nonetheless contends that Oltmann is a credible source, but admits he is biased.[272]

79.     On November 15, 2020, after an introduction from Randy Corporon, Oltmann sent Rion screen captures from Dr. Coomer's Facebook account.[273]   Incidentally, these images were also sent to the Hannity show, which did not publish them.[274]

80.     On November 17, 2020, Rion tweeted #EricCoomer with the quote: "Trump won't win.  I made F***ing sure of that."[275]   The tweet appended another tweet from Ron Watkins

---

[266] *See id.* at 80:23-81:15.

[267] *See id.* at 84:1-13.

[268] *See id.* at 89:13-90:20.

[269] *See id.* at 131:6-23.

[270] *See* Ex. I-1, at 21:20-22:9.

[271] *See id.* at 27:17-23; 32:24-34:5.

[272] *See id.* at 38:23-39:23.

[273] *See* Ex. I-1, PX 38.

[274] *See id.*

[275] *See* Ex. I-1, PX 33.

(@CodeMonkeyZ) that highlighted Dominion's voting software "Allows staff to adjust tally based

on review of scanned ballot images."

81.     On November 21, Rion tweeted again, this time complaining about the lack of

interest from criminal investigators on the Coomer footage:[276]



82.     OAN broadcast "Dominion-izing the Vote" later that evening.[277]  The report was consistent with OAN's ongoing election fraud reporting.  Rion interviewed Ron Watkins, who she alleges is still credible to this day.[278]  Watkins is closely linked to QAnon and has no experience, education, or training in election security.[279]  In choosing Watkins, Rion picked a known conspiracy theorist as opposed to any of the 59 election experts who signed a letter on November 16, 2020 affirming that there was no credible evidence of computer fraud in the 2020 election outcome.[280]  Of those 59, only Dr. Halderman appeared in "Dominion-izing the Vote," presumably given his prior research in exposing election vulnerabilities.

83.     Watkins states in his interview that adjudication "would allow enormous batches [of ballots] by the hundreds of thousands to be decided on by a few unmonitored workers."  This is false.[281]  Watkins, referring to the vote review panel, told Rion, "your votes doesn't matter in these districts with the Dominion machines in them, because these two-to-six people trained by Dominion have ultimate control."  Rion concluded the segment by wondering aloud, "to what extent was this actually designed by the top on purpose?"  This segue led into an interview with Oltmann that focused on Dr. Coomer.  Rion also stated that Coomer "holds several patents with Dominion" regarding adjudication.

---

[277] *See* Ex. I-1, PX 32.

[278] *See* Ex. H-1, at 112:19-25.

[279] *See* Ex. P, Rothschild Dec. at ¶¶ 9-12; Exhibit O, Halderman Dec. at ¶¶ 36-38.

[280] *See* Ex, H-1, PX 58.

[281] *See* Exhibit O, Halderman Dec. at ¶¶ 36-48.



*OAN's Alleged Election Security Expert, Ron Watkins*

84.    According to Dr. Halderman, Watkins and OAN present an absurd mischaracterization of the adjudication process.[282]  Use of adjudication provides added assurance that if you make a common mistake on a ballot your vote will still count.[283]  Use of adjudication to change or discard "enormous batches" of ballots without detection is not possible as jurisdictions typically use ballot reconciliation procedures to track the number of ballots cast, independently of the electronic adjudication process.[284]

85.    Further, vote review panels typically involve bipartisan participation or monitoring, a fact that OAN is both aware of but did not include in its report.[285]  Every decision the reviewers make is subject to extensive electronic logging.[286]  There is also no "mass adjudication" feature; the review panel must inspect ballots one at a time and make any necessary corrections to each

---

[282] *Id.*

[283] *Id.*

[284] *Id.*

[285] *Id.*

[286] *See* Ex. I-1, at 85:20-86:4; *see also* Exhibit O, Halderman Dec. at ¶ 46.

before saving it and moving on.[287]  Even if the entire vote review panel (and any observers) conspired to commit fraud, manually clicking through hundreds of thousands of ballots to alter the presidential votes would likely take days, and it would leave clear traces in multiple sets of data files and logs.[288]  Finally, like cheating due to an "algorithm," large-scale cheating via adjudication would be revealed in manual recounts and post-election audits of the original paper ballots.[289] Several states have conducted such reviews without detecting any evidence of fraud.[290]

86.     OAN and Rion's reference to Dr. Coomer's patents in the report fails to note that these patents actually led to an improvement to electronic adjudication that makes it even *more* traceable: appending information about the adjudicated result to the image of the ballot.[291]  This does not make fraud easier; it makes it easier to detect.[292]

87.     Rion's report also includes Watkins stating that 130,000 votes were adjudicated for Biden because there was a change in gamma settings to the Dominion software to allow for hand-checking or changing of the votes.[293]  Charles Herring, however, testified that OAN is not aware of any evidence that gamma settings were tampered with by Dr. Coomer or anyone at Dominion to increase the anomalies during the election.[294]

---

[287] *See* Exhibit O, Halderman Dec. at ¶ 46.

[288] *Id.*

[289] *Id.* at ¶ 47.

[290] *Id.*

[291] *Id.* at ¶ 48.

[292] *Id.*

[293] *See* Ex. I-1, PX 32.

[294] *See* Ex. I-1, at 86:6-87:6.

88.     After Watkin's framed the story of potential massive Dominion-related fraud, Rion

played a pre-recorded interview with Oltmann where she asks him to describe the Antifa call:

> Rion:   In September 2020, FEC United founder Joe Oltmann had infiltrated Antifa
> to uncover journalists who were active members of the Antifa group attacking his
> company in Colorado.   Joe, you infiltrated an antifa conference call this past
> September and accidentally came upon a top Dominion Voting Systems executive
> named Eric Coomer.   Describe that call and what it led you to find.
>
> Oltmann:  It was interesting how the call started. Somebody said, 'Who's Eric?' He
> said, 'Eric is the Dominion guy.'   Somebody said, 'You know, hey go ahead, told
> him to continue speaking, um, and someone interrupts and says, 'Hey what are we
> going to do if f-ing Trump wins, and Eric responds, and I'm paraphrasing this, by
> the way, 'Um, don't worry about the election, Trump is not going to win, I made f-
> ing sure of that.'   And then they started laughing and someone says, 'f-ing right.'
> So I just put it, a simple Google search to start, which was 'Eric Dominion Denver
> Colorado.'   And Eric Coomer came up immediately under Dominion Voting
> Systems.

89.     Later in the broadcast, Oltmann makes the assertion that Dr. Coomer tipped the

scales of the election.[295]  Rion concurs and states that "[i]n Coomer's case, he was in a position of

power to actually act on his rage against Trump and Trump voters.  What does he mean when he

says, 'Trump won't win, I made effing sure of that?'  Nothing?".  OAN entitled their publication

"Dominion-izing the Vote" to clearly communicate that the vote had been tampered with and then

went on to state expressly and implicitly that Dr. Coomer was the one who tampered with that vote.

Rion's above rhetorical question does not change the gist of these communications.  Rather, it only

reinforces the implication they intended—that Dr. Coomer was in a position to and did in fact

subvert the election.

90.     Around the time "Dominion-izing the Vote" aired, OAN was quietly working with

the Trump Campaign to support the various challenges to the 2020 Presidential election.  It placed

---

[295] *See* Ex. I-1, PX 32; *see also* Ex. I-1, at 94:4-95:1.

its reporter Christina Bobb as a lawyer with the Trump Campaign.[296]  Charles Herring, when asked about this unprecedented move (discussed *infra* in the Giuliani section), denied any knowledge of the deal, even though he made it directly with Giuliani.[297]

91.     Bobb and Rion also formed their own nonprofit organization, "Voices & Votes,"[298] as a vehicle to raise money in support of the election fraud narrative.  This nonprofit reportedly has contributed over $600,000 to the Arizona "audit" effort.[299]  This sealed OAN's all-in gamble on supporting the election fraud narrative and going where their competitors would not dare.  While Bobb and Rion are certainly entitled to pursue their personal political agendas, doing so while reporting election disinformation as "fact" does not comport with their journalistic obligations.

92.     After the January 6 insurrection, OAN reportedly suffered an exodus of news producers after a New York Times reporter, Rachel Abrams, interviewed 18 current and former employees that condemned the network's dedication to misinformation.[300]  Following the publishing of her story, OAN doxed Ms. Abrams' email account and fired one of its long-time producers, Marty Golingan, whom she quoted in the story.[301]

---

[296] *See* Exhibit J-1, Giuliani, Aug. 14, 2021 Depo Tr. 30:4-20.

[297] *See* Exhibit I-1, OAN, July 30, 2021 Depo Tr. 113:12-23.

[298] *See* https://voicesandvotes.org/ (last visited Sept. 17, 2021).

[299] *See* H-1, Rion, Aug. 9, 2021 Depo Tr. 40:11-41:21; *see also* Rosalind Helderman, *Arizona's GOP-backed ballot review has raised nearly $5.7 million in private donations, organizers say*, Washington Post (July 28, 2021) https://www.washingtonpost.com/politics/arizona-ballot-review-costs/2021/07/28/d9b093c6-f010-11eb-bf80-e3877d9c5f06_story.html (last visited Sept. 17, 2021).

[300] *See* Rachel Abrams, *One America News Network Stays True to Trump*, N.Y. Times, Apr. 18. 2021, https://www.nytimes.com/2021/04/18/business/media/oan-trump.html.

[301] *See* Jon Jackson, *Marty Golingan Fired by OAN After Saying Staff Doesn't Think Many Stories Aired on Network Are True*, Newsmax. Apr. 19, 2021, https://www.newsweek.com/oan-fires-producer-1584799; s*ee also* Exhibit R, Golingan Dec. at ¶ 16.

93.     Golingan had been employed by OAN for five years before he was fired.[302]  He worked in the San Diego bureau, the situs for OAN's broadcasts.[303]  Golingan directly observed the control of the network by the Hs and their commitment to publishing what the news director called "H stories."[304]  He saw that the network operated as a business model as opposed to a journalistic model.[305]  He saw how the Hs would entertain conspiracy theories reported by viewers on OAN's website, including the faking of Ashli Babbitt's death by Antifa actors.[306]  He saw how the network devolved into a Trump sycophant network that wouldn't let producers call President Biden by his presidential title or let them call the insurrectionists at the Capitol "rioters."[307]  He saw how Rion was considered an "untouchable" due to her relationship with the Hs.[308]  He saw how Rion violated normal journalistic standards as one of the "untouchables," thus allowing her to produce her own reports in Washington D.C. and then air them in San Diego without fact-checking by staff.[309]  He saw how Rion failed to verify the credibility of her sources such as Ron Watkins, who Golingan knew to be associated with QAnon.[310]  He knew the "Dominion-izing the Vote" report was false and "should have never aired" but it was nonetheless required to be run because it was approved directly by the Hs.[311]  He knew that OAN ran the Coomer story with

---

[302] *See* Exhibit R, Golingan Dec. at ¶ 4.

[303] *See* Exhibit R, Golingan Dec. at ¶¶ 4, 11, 14; Ex. C.

[304] *See* Exhibit R, Golingan Dec. at ¶¶ 5, 14; Ex. C.

[305] *See* Exhibit R, Golingan Dec. at ¶ 5.

[306] *See* Exhibit R, Golingan Dec. at ¶ 7.

[307] *See* Exhibit R, Golingan Dec. at ¶¶ 8-10.

[308] *See id.* at ¶ 15.

[309] *See id.*

[310] *See id.* at ¶ 11.

[311] *See id.*

reckless disregard for the truth.[312]  And he saw how OAN relished the receipt of Dominion's cease and desist letter because the publicity, even if bad, was good for the network.[313]

**H.**     ***Powell, Powell, P.C., and Defending the Republic's defamation of Dr. Coomer.***

94.     On November 19, 2020, the Trump Campaign provided an update on its legal challenges to the election from the Republican National Committee in Washington D.C.  Among those who spoke at the press conference were personal attorneys for President Trump and attorneys for the Trump Campaign, including (at that time) Sidney Powell, Rudolph Giuliani, and Jenna Ellis.  During the press conference, Powell falsely stated:

> Speaking of Smartmatic's leadership, one of the Smartmatic patent holders, Eric Coomer I believe his name is, is on the web as being recorded in a conversation with Antifa members, saying that he had the election rigged for Mr. Biden, nothing to worry about here, and he was going to, they were going to f- Trump.  His social media is filled with hatred for the President, and for the United States of America as a whole, as are the social media accounts of many other Smartmatic people.[314]

95.     These statements are false.[315]   Dr. Coomer is not part of Smartmatic.  There is no recording on the Web or anywhere else.  Dr. Coomer never had a conversation with anyone claiming to be Antifa, he never uttered words suggesting he would rig the election, and he never took actions to rig the election.[316]  Dr. Coomer's social media was private, and, of course, under the First Amendment to the Constitution, he is entitled to his political opinion.[317]

---

[312] *See id.* at ¶ 17.

[313] *See id.*

[314] *See* Ex. K-1, PX 3 at 35.

[315] *See* Exhibit A, Coomer Dec. at ¶¶ 18, 38-39.

[316] *See id.*

[317] *See id.* at ¶ 48.

96.     As the press conference continued, Powell then rattled off a stream-of-consciousness diatribe about Dominion and Smartmatic,[318] saying that "people can go in and change what they want," and that the ratio of votes can be weighted by the use of a mysterious algorithm.[319]  Powell declared that votes were "injected into the machine."[320] She went on about hacking, mentioning another algorithm for "vote-flipping," and likely referring to the video of Dr. Coomer explaining the adjudication process, falsely said there is video of "him" admitting that they changed a million votes with no problem.[321]   Dr. Coomer is the only person Powell specifically named during her speech, making him the face of the Dominion and Smartmatic conspiracy theory.

97.     Ronna McDaniel, the chairwoman of the Republic National Committee, has since expressed regret over letting Powell and Giuliani hold this press conference, stating "When I saw some of the things Sidney was saying, without proof, I certainly was concerned it was happening in my building."[322]

98.     On November 20, 2020, Newsmax host Howie Carr interviewed Powell on "The Howie Carr Show" and asked her to confirm that there was alleged evidence of widespread voter fraud, that votes cast had been changed through voting machines, that millions of votes had been removed from President Trump and given to President Biden, and that Dr. Coomer through

---

[318] Many of the Defendants are confused about alleged ties between Dominion and Smartmatic, unaffiliated competitors in the election technology space.  Smartmatic was not a factor in any battleground state, as its software was only used in Los Angeles County, California for the 2020 election.  *See* Smartmatic Fact Checks, https://www.smartmatic.com/us/lawsuit-updates-fact-checks/ (last visited Sept. 17, 2021).

[319] *See* Ex. K-1, PX 3 at 32-33.

[320] *Id.* at 33.

[321] *See id.* at 33-34; *see also* Ex. E-1, PX 86.

[322] *See* Ex. K-3.

Dominion was part of this conspiracy to subvert the presidential election.[323]  Carr asked Powell whether Dr. Coomer actually stated, "Don't worry about President Trump, I already made sure that he's going to lose the election."  Powell was unequivocal, stating with certainty, "Yes, it's true.[324]  We have an affidavit to that effect, and I think we have a copy of the call."[325]  She further alleged Dr. Coomer had disappeared, and Dominion had closed its offices in Denver and Toronto. Powell had no "copy of the call" or recording.[326]  Dr. Coomer had not "disappeared."[327]  And Dominion had not closed its offices.[328]  These allegations were capable of verification.  But Powell closed her appearance by saying, "It's called a confession in a courtroom, it's called a confession."[329]

99.     The same day, Powell continued her press junket, attacking Eric Coomer.  On November 20, Powell appeared on Mornings with Maria Bartiromo, and said:

> We've got Eric Coomer admitting on tape that he rigged the election for Biden and hated Trump . . . We have pictures of him in other countries helping people rig elections.  So he's got a long history of accomplishing the result that they want accomplished, and I'm sure that it's for money.[330]

100.    This time, instead of saying that she "thinks we have a copy of the call" Powell boldly asserted that she had an admission on tape.  She said she had pictures of Dr. Coomer rigging other countries' elections.  And she sums it up as a long history of what "they" want, and she is

---

[323] *See* Ex. K-4.

[324] *See id.*

[325] *See id.*

[326] *See* Ex. K-1, at 56:7-20.

[327]  *See* Exhibit A, Coomer Dec. at ¶¶ 19-20.

[328] *See id.*

[329] *See* Ex. K-4.

[330] *See* Ex. K-1, PX 5.

sure it was for money.  But there was no tape.[331]  There were no pictures.  She had no evidence of money paid to Dr. Coomer for whatever result she implies.

101.     Powell had no knowledge of how or whether Dr. Coomer could have changed even one vote in the 2020 election.[332]  Powell's knowledge was only through Oltmann, and she did not vet his affidavit or its contents other than through watching his interview with Malkin.[333]  Powell explained away her references to having a tape, but she said she thought she had heard it.[334]  She agreed that such a recording would have been a huge piece of evidence.[335]  Powell admitted that she may have misspoken about Dr. Coomer holding Smartmatic patents.[336]  Ultimately, Powell testified that the allegations against Dr. Coomer amounted to an accusation of serious criminal conduct.[337]  But she also said that Dr. Coomer was minor; a "gnat in the tsunami of information" she had.[338]  Still, she chose to call him out on a national—and international—stage.[339]

102.     The lines were blurred as to when Powell was acting individually, on behalf of the Trump Campaign, Defending the Republic, or her law firm, Sidney Powell, P.C.  President Trump tweeted on November 14, 2020 that Powell was on the legal team, and Giuliani introduced her as a part of the team at the November 19 press conference.[340]  A Defending the Republic website

---

[331] *See* Ex. K-1, at 81:21-23.

[332] *See* Ex. K-1, at 10:14-12:21.

[333] *Id.* at 24:15-27:4.

[334] *Id.* at 64:19-65:2.

[335] *Id.* at 82:8-15.

[336] *Id.* at 64:15-19.

[337] *Id.* at 74:19-22.

[338] *Id.* at 13:9-17.

[339] *Id.* at 61:2-17.

[340] *See* Ex. K-1, PX 6; PX 3.

appears to have been established as early as November 10, and was promoted on Fox News' Lou Dobbs Tonight.[341]  The site was used to solicit funds for the "Kraken" suits, which included Oltmann's affidavit regarding Dr. Coomer.[342]  But Powell also testified that she was representing Sidney Powell, P.C. in her legal efforts to overturn the election, although she hoped to be paid from Defending the Republic donations at some point.[343]

103.    On November 2, 2020, Powell appeared on Steve Bannon's podcast to warn that a supercomputer called Hammer could run a program called Scorecard to switch three percent of the votes.[344]  When rumors about Dominion and Dr. Coomer surfaced, that story fit neatly into her pre-election fraud narrative.[345]

## I.    *The Trump Campaign's defamation of Dr. Coomer.*

104.    Immediately after the election in the early morning hours of November 4, 2020, before the total votes were ever counted, Donald J. Trump announced "This is a fraud on the American public. This is an embarrassment to our country.  We were getting ready to win this election. Frankly, we did win this election."[346]  This narrative would continue to be advanced by

---

[341] *See* Ex. L-2.

[342] *See, e.g.*, Ex. K-5 (promoting the "Kraken" suits and seeking donations on behalf of Defending the Republic as a 501(c)(4) organization).

[343] *See* Ex. K-1, at 98:21-99:4; 101:16-102:1.

[344] *See id.* at 104:21-107:10. Powell agreed that both the Hammer and the Dominion allegations involved vote-switching by computers.

[345] *See* Ex. P, Rothschild Dec. at ¶¶ 4, 65-72, 83-86.

[346] *See* Ex. M-1, PX 65.

the Trump Campaign, even when it had no facts supporting it, and worse, when it had facts directly refuting it.

105.    The representative for the Trump Campaign, Sean Dollman, could only explain that the Trump Campaign "felt like" there was "some type of fraud" immediately after November 3, 2020, but could not give detail on why, and was admittedly still "looking into the facts" at the time.[347]  Even today the Trump Campaign, through its representative, stated there was some kind of fraud but could not state why.[348]

106.    That unsubstantiated "feeling" of fraud accompanied the Trump Campaign's continued fundraising, both to contest the election and to re-pay Trump Campaign debt.[349] Immediately after Joe Biden was declared the winner on November 7, 2020, Giuliani appeared in a hastily assembled press conference in front of Four Seasons Total Landscaping to make multiple bizarre accusations of voter fraud.[350]  Giuliani alleged that votes for Trump had "disappeared," and that Philadelphia had a "history of voter fraud," even including alleged dead voters.[351]  The Trump Campaign made no effort to correct statements made by Giuliani, and stated that "at this point in time, . . . [they] were still investigating and trying to get facts together."[352]

---

[347] *See* Ex. M-1, at 25:6-20; 20:19-24.

[348] *See* Ex. M-1, at 27:5-11.

[349] Ex. M-1, at 30:11—13; 32:19-24; *see also* Exhibit M-2, Trump Campaign, Aug. 13, at 46:20-47:5 (admitting fundraising efforts likely involved challenging election results).

[350] Ex. M-1, PX 65.

[351] *Id.*

[352] *See* Ex. M-1, at 38:10-16.

107.    During this time frame, Giuliani and his legal team set up their offices in Trump Campaign headquarters.[353]  At that time, the Trump Campaign let everything it had previously done to filter internal research to its communications and legal departments go out the window:

> So when Mr. Giuliani came in as legal – or as a lawyer, he – he and his team took over a conference room.  And we spent, I mean, years setting up an internal process of where documents would go, who sees them, and then making sure that people review them, and approvals.
>
> But when Mr. Giuliani came in with his team, the – that whole approval chain, that whole – everything pretty much went out the window.[354]

108.    However, within days the Trump Campaign did its own research into the accusations regarding Dr. Coomer and Dominion.  In the only email chain produced by the Trump Campaign, Zach Parkinson, the person who requested the research only hours before, stated, "Let's cut this off at 10:30.  Have more dead voters we'll need to get to in the morning."[355] Apparently the Trump Campaign was hurriedly looking into every absurd theory it could to contest the election results.  Even the Trump Campaign's representative admitted he did not think the research team had enough time to research the questions at issue.[356]

109.    Nevertheless, the memo produced by the Trump Campaign shows that, at least internally, the Trump Campaign found there was no evidence to support the conspiracy theories regarding Dominion and Dr. Coomer.  That memo found in part:

- "Dominion and Smartmatic Are Independent Companies that Split from Each Other in 2012";
- "Dominion Has Not [Sic] Direct Ties to Venezuela";

---

[353] *See id.* at 44; *see also* Ex. J-1, Rudolph Giuliani, Aug. 14, 2021, Depo. Tr. 29:22—30:25.

[354] *See* Ex. M-1, at 44:8-10, 47:8-15.

[355] *See* Ex. M-1, PX 68 at TC-01.

[356] *See* Ex. Ex. M-1, at 54:22-55:23.

- "There Is No Evidence That Dominion's CEO Or Any Other Leader Of The Group Has Ties to Antifa"; and
- "There is no evidence Coomer is a member or has any ties to Antifa."[357]

110.    The memo apparently never made it to Giuliani, despite the fact he continued to act as the agent and spokesman for the Trump Campaign's allegations regarding election fraud.[358] The Trump Campaign continued to allow its agents like Rudolph Giuliani, Sidney Powell, and Eric Trump to advance debunked conspiracy theories and defame Dr. Coomer, apparently without providing them with their own research debunking those theories.[359]   Days after the memo was prepared, Giuliani appeared with Powell at the RNC, where Powell continued to make wild allegations that Dominion's software was designed by Venezuela at the direction of Hugo Chavez.[360]   Giuliani's statements included alleging that Dr. Coomer had committed a crime:

> Good afternoon and thank you very much for coming.  This is representative of our legal team.  We're representing President Trump and we're representing the Trump Campaign. When I finish, Sidney Powell and then Jenna Ellis will follow me.[361]
>
>         . . . .
>
> And, by the way, the Coomer character who is close to Antifa took off all of his social media. Ah-ah, but we kept it, we've got it.  The man is a vicious, vicious man.  He wrote horrible things about the President.  He is completely – he is completely biased.  He's completely warped and he specifically says that they're gonna fix this election.
>
>         . . . .

---

[357] See Ex. M-1, PX 68 at TC-03-04.

[358] See Ex. M-1, at 62:19-63:24; see also Ex. J-1, at 162:13-163:24.

[359] See id.

[360] See Ex. K-1, at 64:5-16; PX 3.

[361] Despite the Trump Campaign's assertion that Giuliani was not an agent of the Trump Campaign, the Trump Campaign could not identify any other representative or agent who was publicly making statements regarding allegations of election fraud or crimes against Dominion Voting Systems or Dr. Coomer.  See Ex. M-2, at 12:7-16.

> I've tried a hundred cases. I prosecuted some of the most dangerous criminals in the world.  I know crimes.  I can smell them. You don't have to smell this one. I can prove it to you 18 different ways.[362]

111.   By as early as November 12, 2020, President Trump himself was tweeting the allegation that Dominion had "deleted 2.7 million Trump votes Nationwide."[363]  These allegations continued despite CISA's joint statement with other governmental entities that "There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."[364]  On November 17, 2020, Chris Krebs, the head of CISA, was fired.[365]  President Trump went on to retweet Rion's story "Dominion-izing the Vote" for OAN on November 21, 2020.[366]

112.   On November 17, 2020, Eric Trump (who the Trump Campaign refers to as a "surrogate speaker" for the Trump Campaign) retweeted the story from TGP and quoted the alleged statement by Dr. Coomer stating "Don't worry about the election, Trump's not gonna win. I made f*cking sure of that!"[367]

113.   The Trump Campaign stated in its motion that the "Campaign and its alleged agents had every reason to rely on the accuracy of Defendant Oltmann's reports regarding Plaintiff."[368] But during the Trump Campaign's deposition, it refused to offer any support for why it could rely

---

[362] *See* Ex. K-1, PX 3 at RG 1, 49-50.

[363] *See* Ex. M-1, PX 66.

[364] *See* Ex. M-1, PX 67.

[365] *See* David E. Sanger and Nicole Perlroth, *Trump Fires Chris Krebs, Official Who Disputed Election Fraud Claims*, N.Y. Times, Nov. 17, 2020, https://www.nytimes.com/2020/11/17/us/politics/trump-fires-christopher-krebs.html.

[366] *See* Ex. M-1, PX 70-71.

[367] *See* Ex. M-1, at 58:12-15; PX 69.

[368] *See* Trump Campaign Mot. at 17.

on Oltmann because of its counsel's instruction that such information would be privileged.[369]  The Trump Campaign's failure to offer any evidence in support of its conclusory assertion renders it meaningless.  The Trump Campaign also claimed to be unaware that Oltmann was the host of a conservative podcast who had held rallies in support of President Trump and made allegations of election fraud even before the election.[370]

114.    On November 22, 2020, news reported that Giuliani's office saw the need to publicly sever ties with Powell, stating that "Sidney Powell is practicing law on her own," and "is not a member of the Trump Legal Team."[371]  But no representative of the Trump Campaign or Giuliani's legal team ever issued a clarification or retraction of defamatory statements made by Powell.

115.    The Trump Campaign continued to capitalize on the allegations of voter fraud and raise funds for the efforts to contest the election results.  In its representative's own words:

> I think there was a lot of people within the United States that were – wanted answers and wanted to entrust their funds and their money to the campaign, to look into it, right?
>
> They had nowhere – not nowhere else to turn, but the President and the campaign was an entity they put their donations and money behind before.[372]

116.    But none of the lawsuits filed by the Trump Campaign alleged Dr. Coomer or Dominion had any role in changing the election results.[373]  Nevertheless, the Trump Campaign never made any retraction or clarification regarding defamatory statements by its agents or

---

[369] *See* M-2, at 37:4-24, 44:2-12.

[370] *See id.* at 38:6—39:19.

[371] *See* Ex. K-1, PX 7 at 2.

[372] *See* Ex. M-1, at 73:1-7.

[373] *See id.* at 25:10-18.

representatives.[374]  Even today, the Trump Campaign somehow continues to take the position that

the election was the result of fraud, but has no facts it can point to in support of that:

> Q.    Is it still the Trump campaign's position today that the election was
>        somehow fraudulent?
>
> A.     Yes, sir.
>
> Q.    What is that opinion based on?
>
> A.     Just – we have no underlying definite facts that it wasn't.
>
> Q.    You believe that it was fraudulent because you have no underlying
>        facts to support that it was not fraudulent? Is that your position?
>
> A.     Yeah.
>
> Q.    Did Eric Coomer influence the outcome of the election?
>
> A.     I don't know.[375]

## J.    Giuliani's defamation of Dr. Coomer.

117.    Given Giuliani's role as both former President Trump's personal lawyer and as the

primary lawyer for the Trump Campaign, the actions he took on behalf of the Trump Campaign

discussed above also serve as a basis for his personal liability.   Accordingly, Dr. Coomer

incorporates by reference the above Trump Campaign section herein to avoid duplication.

118.    Giuliani had a preconceived plan to allege election fraud without evidence as a

means of protecting former President Trump's political fate.  Giuliani was at the White House on

---

[374] *See id.* at 32:21-33:3. When asked whether anyone at the Trump Campaign asked Giuliani to stop making allegations regarding Dominion or Dr. Coomer, the Trump Campaign's representative said he could not answer due to privilege.  *See id.* at 17:15-18:17.

[375] *See* Ex. M-1, at 74:19-75:6.

election night, November 3, 2020.[376]  When it appeared the election results were not favorable to

Trump, Giuliani was quoted as saying, "Just say we won."[377]  Giuliani then reportedly informed

Bill Stepien, the Trump Campaign director, Chief of Staff Mark Meadows, and White House

adviser Jason Miller of his strategy.[378]  Mark Meadows reacted negatively to the suggestion.[379]

119.    When questioned under oath about the reported "Just say we won" strategy,

Giuliani denied the allegation.[380]  Giuliani then demanded to know whether there was a recording

of his statement, the irony of the lack of a recording of the Antifa call apparently lost on him.[381]

120.    President Trump appeared to take Giuliani's advice when he stated, "Frankly, we

did win this election," during the early morning hours of November 4.  After an Oval Office

meeting with former President Trump later that day, Giuliani took over the Trump Campaign's

legal team.[382]  He received no compensation for his role other than reimbursement of expenses.[383]

121.    The first formal public presentation of the Trump Campaign's fraud claims and

plan for lawsuits occurred at the ill-fated Four Seasons Total Landscaping press conference on

---

[376] *See* Exhibit J-1, Giuliani, Aug. 14, 2021 Depo Tr. 168:21-24.

[377] Carol Leonnig & Philip Rucker, *I Alone Can Fix It: Donald J. Trump's Catastrophic Final Year*, 340, 344 (Penguin Press, 2021).

[378] *See* Ex. J-1, at 168:21-24.

[379] *See id.*

[380] *See id.* at 170:13-24.

[381] *See id.* at 174:12-175:23.

[382] *See id.* at 27:6-28:3.

[383] *See id.* at 27:6-13.

November 7.[384]  At around that time, Giuliani and his team physically moved into the Trump Campaign's headquarters.[385]

122.    Sidney Powell was present and working with the Campaign's legal team, although Giuliani testified that she was actually not a member of their team.[386]  When questioned about why he announced Powell as a member of the Campaign's legal team during the press conference, Giuliani had no explanation other than he spoke too "loosely."[387]

123.    Prior to the November 19 press conference, Christina Bobb of OAN had been approved as part of the Trump Campaign's legal team.[388]  Giuliani had gotten to know OAN's president, Charles Herring, "very well" when Rion and OAN did a documentary with Giuliani on "Ukrainian collusion." [389]  Bobb provided the Trump Campaign with alleged election fraud information she gathered about Arizona, Michigan, and eventually Georgia.[390]

124.    Perceiving the conflict of interest, Giuliani reached an oral agreement with Charles Herring about the terms of the arrangement:

> I talked to Charles myself and I said if she has to hold this confidential from you, that doesn't mean there won't be things that you can then if they are okay then the benefit to you is you'll have like an extra, you'll have an extra edge on everybody else that will benefit you, but you're going to have to agree to something that I know our news networks won't agree to, which is there may be things that you just can't do and she's got to separate her role as a lawyer and if she wants to share things with you, she will have to get my permission or one of my people.  Now we had done that before and it had worked out really well, nothing had leaked, nothing had

---

[384] *See* Ex. M-1, PX 65.

[385] *See* Ex. J-1, at 29:22-30:3.

[386] *See* Ex. J-1, at 66:19-67:6.

[387] *See id.* at 27:6-13.6:15-21.

[388] *See id.* at 30:4-20.

[389] *See id.* at 88:3-13.

[390] *See id.* at 88:21-89:14.

come out, nothing had been compromised and the situation you gave was far more dangerous because there was some risk to it which I was very impressed that Chanel was willing to take so they promised and she came to work for us.[391]

125.    Christina Bobb ultimately took over a lot of the Trump Campaign's investigation in Michigan.[392]

126.    Giuliani spent virtually no time investigating Dr. Coomer or the Antifa call.  When asked what his theoretical (since he was not being paid) attorney bill would be on "Coomer time" before the November 19 press conference, Giuliani stated, "Before the press conference, gosh almighty, I bet it's not an hour."[393]

127.    Giuliani also relied on Col. Phil Waldron of ASOG for his information on Dr. Coomer.[394]  ASOG stands for Allied Security Operations Group.  The group is headed by Russ Ramsland, a Deep State conspiracy theorist.  ASOG performed a forensic audit of voting tabulators in Antrim County, Michigan.  ASOG then issued a report of its findings.  This report was debunked by Dr. Halderman.[395]  It was also debunked by the Michigan Senate Oversight Committee (lead by a Republican state senator), which found that ASOG misrepresented facts about vote totals, leading citizens to conclude the election results were suspiciously changing for over a month after the election.[396]  ASOG refused to retract its assertions even after a hand recount verified the results in Antrim County.[397]

---

[391] *See id.* at 89:23-91:22, 93:23-94:3.

[392] *See id.* at 65:8-66:4.

[393] *See id.* at 45:10-25.

[394] *See id.* at 41:7-43:9, 46:14-50:17.

[395] *See* Exhibit B-2, Oltmann, Sept. 8, 2021, PX 106.

[396] *See* Exhibit B-2, Oltmann, Sept. 8, 2021, PX 107 at 15.

[397] *See id.* at 17.

128.     Giuliani had about a four-minute conversation with Waldron regarding Dr. Coomer.[398]  Giuliani was told (and apparently believed) that there was a recording of the Antifa call and there were "a couple of witnesses" who could corroborate the story.  Giuliani had read some media reports about Dr. Coomer and some of his social media posts. [399]

129.     That was the extent of his investigation.  He never spoke to Oltmann (who he referred to as Olzheimer);[400] did not have any information as to whether Oltmann was credible (or not);[401] never tried to listen to the (non-existent) recording he thought actually existed;[402] did not try to talk to the other "Antifa people" on the call;[403] does not recall reviewing Oltmann's notes of the alleged call;.[404] did not reach out to Dr. Coomer or Dominion;[405] and had access to research by the communications department but did not receive a copy of the research on Coomer, Dominion, and Smartmatic. [406]  Instead, Giuliani stated on multiple occasions that he was allegedly constrained by time and was unable to conduct his own investigation of Dr. Coomer.[407]

130.     Giuliani stated that there were three "active supervisors" handling the Trump Campaign's fraud investigation—himself, Sidney Powell, and Jenna Ellis.  He believed

---

[398] *See* Ex. J-1, at 40:10-44:5, 44:23-45:9; *see also* THE DEEP RIG (Zero Hour Alchemy, 2021) (wherein Waldron acknowledges reliance on Oltmann's allegations); Ex. A-1, at Pub. 75.

[399] *See id.* at 47:19-55:12.

[400] *See id.* at 60:18-61:18.

[401] *See id.* at 120:8-20.

[402] *See id.* at 133:6-11.

[403] *See id.* at 133:12-19.

[404] *See id.* at 133:20-134:8.

[405] *See id.* at 134:9-15.

[406] *See id.* at 134:16-136:20.

[407] *See, e.g., id.* at 120:8-122:13.

Powell was "carrying the ball" on Dr. Coomer and Dominion.[408]  Powell's ultimate separation from the Campaign's team on November 22 "largely did not relate to Coomer," according to Giuliani.[409]

131.    In his deposition, Giuliani acknowledged that if Dr. Coomer had rigged the election it would have been a crime and likely would have been in concert with Dominion.[410]  Generally, throughout his deposition, Giuliani continued to maintain the validity of his various election fraud theories involving Dominion, Smartmatic, and Sequoia; the existence of  "fugazi" voting machines; fraud in various battleground states; and the same theories that lead to the suspension of his law license in New York.[411]  But, when asked for his theory on Dr. Coomer's participation in this fraud, Giuliani stated, "I mean I could guess but it would not be an educated guess."[412]

132.    Giuliani discounted any official sources that found no widespread evidence of election fraud.  He discounted CISA even though he was on the cybersecurity advisory committee when CISA was created; he called CISA's election security report a "totally phony report"; and he said the Department of Homeland Security was afraid to investigate the fraud claims.[413]

133.    Likewise, Giuliani discounted the Trump Campaign's internal memo on Dr. Coomer/Dominion/Smartmatic, calling it a "corporate document" and explaining that there were members of the Trump Campaign who were trying to undermine his efforts because "they

---

[408] *See id.* at 62:12-63:6, 66:13-18.

[409] *See id.* at 67:21-68:10.

[410] *See id.* at 58:10-22.

[411] *See id.* at 71:19-83:20, 104:9-108:4.

[412] *See id.* at 83:21-84:3.

[413] *See id.* at 160:11-161:15, 164:21-165:24.

wanted Trump to lose because they could raise more money."[414]  Giuliani further stated that the

Trump Campaign was trying to keep things from him and undermine the litigation, citing to alleged

RNC memos and internal Trump Campaign memos telling campaign officials not to cooperate

with Giuliani and Jenna Ellis.[415]

134.   Ultimately, Giuliani filed no litigation involving Dr. Coomer. [416]   Giuliani

explained that the Trump Campaign's strategy changed in December 2020, and they had given up

on the courts in favor of a strategy of going directly to various state legislatures.[417]  At that point,

Dr. Coomer became a "small player."[418]

135.   When Giuliani was asked why he felt he needed to speak about Dr. Coomer at the

press conference (as opposed to saying nothing), Giuliani replied:

> It was my obligation at that time to give the public all the facts that I had because
> we had had an unprecedented three weeks of censorship unheard of in the United
> States which had followed three months of censorship on the Hunter Biden hard
> drive, which the American people elected a president without knowing the
> complete evidence of how he was engaged for 30 years of taking bribes through his
> son, which his son spells out in great deal in the hard drive and the American people
> have never seen it. The son points out that for 30 years he collected money for his
> father and he gave him half of it. Very few people know that because NBC, ABC,
> CBS, all the other BB's numbers, the New York Times, the New York Post, almost
> every major newspaper but the New York Post, every one of the cable stations
> except FOX, OAN and Newsmax refused to print the words of Hunter Biden and
> instead created the completely false story that it was Russian disinformation which
> has been completely –
>
> BY MR. CAIN:        Sir, we're not talking about Hunter Biden.

---

[414] *See id.* at 159:9-160:7.

[415] *See id.* at 139:14-144:20.

[416] *See id.* at 108:16-109:7.

[417] *See id.* at 98:16-99:23.

[418] *See id.* at 104:9-23.

A.      No, no, what we're talking about is the atmosphere in which I was conducting this investigation.  This wasn't a fair and balanced atmosphere.  I was conducting this investigation in an atmosphere in which if you were to say anything unfavorable to Biden, it didn't get published. . . .[419]

Similar to other Defendants' testimony regarding the desire to present alternative "dangerous or dissident" information without verifying any facts,[420] Giuliani was apparently intending to present whatever allegations he could to support the preconceived narrative regarding election fraud, regardless of how outrageous they were, whether they were verifiable, and what harm they would inflict.  In accusing Dr. Coomer of a crime, he effectively altered the rest of Dr. Coomer's life, all based on what he admitted was probably less than an hour of time spent before the press conference discussing the allegations.[421]

### K.      Official rejections of the conspiracy theories.

136.      Independent agencies early on rejected these election fraud conspiracy theories as baseless.  On November 10, 2020, a spokesman for the Michigan Secretary of State said, "We have not seen any evidence of fraud or foul play in the actual administration of the election. What we have seen is that it was smooth, transparent, secure and accurate."[422]  The New York Times also contacted election officials in every state to ask whether they had seen evidence of fraud or

---

[419] *Id.* at 124:8 - 125:22.

[420] *See* Ex. K-1, at 44:9–19.

[421] *See* Ex. J-1, at 45:10-25.

[422] Nick Corasaniti et. al., *The Times Called Officials in Every State: No Evidence of Voter Fraud*, N.Y. TIMES, Nov. 11, 2020, https://www.nytimes.com/2020/11/10/us/politics/voting-fraud.html.

other irregularities during the election.[423]  Officials in forty-nine states said they had not, with the remaining state, Texas, failing to respond.[424]

137.    On November 12, 2020, CISA, a standalone federal agency under the Department of Homeland Security, issued a Joint Statement from the Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees confirming that there is "***no evidence*** that any voting system deleted or lost votes, changed votes, or was in any way compromised" and that the 2020 election was the most secure in American history.[425]

138.    Then U.S. Attorney General William Barr confirmed "to date, we have not seen fraud on a scale that could have effected a different outcome in the election."[426]

139.    Dr. Halderman's Declaration in support of this brief is definitive.  "There is not, and never has been, credible evidence that the outcome of the 2020 Presidential election was 'rigged' by anyone, let alone by Dr. Eric Coomer."[427]  Dr. Halderman appeared on Fox News on November 13 and 14, 2020 to rebuff allegations about Dominion, noting the absolute lack of evidence.[428]  He was joined by 58 other leading election security specialists in a November 16, 2020 open letter on the implausibility of the many conspiracy theories.[429]  The letter was widely

---

[423] *See id.; see also* Exhibit O, Halderman Dec. at ¶ 17.

[424] *See id.*

[425] *See* Ex. B-2, PX 111; *see also* Pl.'s Amend. Compl. at ¶ 47.

[426] Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, AP, Dec. 1, 2020, https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d; *see also* Pl.'s Amend. Compl. at ¶ 49.

[427] *See* Exhibit O, Halderman Dec. at ¶ 7.

[428] *See id.* at ¶ 12.

[429] *See id.* at ¶ 13.

covered in the press, and the Defendants in this case should have been aware of it. Dr. Halderman

and his co-signatories Harri Hursti, Matt Blaze, and Andrew Appel have been repeatedly cited by

Defendants and others on the far right in support of their conspiracy theories.[430]  Leaving no doubt

about the specious nature of the claims, the letter stated:

> We are aware of alarming assertions being made that the 2020 election was
> "rigged" by exploiting technical vulnerabilities.  However, in every case of which
> we are aware, these claims either have been unsubstantiated or are technically
> incoherent. To our collective knowledge, no credible evidence has been put forth
> that supports a conclusion that the 2020 election outcome in any state has been
> altered through technical compromise.[431]

140.    Despite these and other official verifications of the election proceedings,

Defendants continued to falsely accuse Dr. Coomer of conspiring with Antifa to commit election

fraud and perpetuate baseless conspiracy theories.[432]

### L.      Dr. Coomer's litigation against Defendants.

141.    As a direct consequence of Defendants' false statements, Dr. Coomer faced an

onslaught of harassment, threats of violence, and credible death threats against himself, his family,

and his home.[433]  False allegations regarding the integrity of the election have already led to

violence with the insurrection on the U.S. Capitol on January 6, 2021, making Defendants' refusal

to retract the false and defamatory statements against Dr. Coomer all the more incendiary.[434]

Ultimately, Defendants' actions left him with no choice but to pursue civil recourse.  Dr. Coomer

---

[430] *See id.*

[431] *See id.* at ¶ 15.

[432] *See supra* at §§ II(B)–(K).

[433] *See* Exhibit A, Coomer Dec. at ¶ 53; *see also* Pl.'s Amend. Compl. at § IV(D); *see also* Exhibit W, Bania Dec. at ¶ 12.

[434] *See* Shelly Tan, et. al., *How One of America's Ugliest Days Unraveled Inside and Outside the Capitol*, WASH. POST, Jan. 9, 2021, https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

sued Defendants for their defamatory and outrageous conduct.  The allegations contained in this lawsuit are narrowly tailored to Defendants' specific, defamatory statements, which include the following:

- Defendants falsely stated and falsely implied that Dr. Coomer was on an alleged "Antifa conference call."

- Defendants falsely stated and falsely implied that Dr. Coomer stated he intended to subvert the presidential election on the alleged "Antifa conference call."

- Defendants falsely stated and falsely implied that Dr. Coomer, through his private employment, did subvert the presidential election.[435]

142.    Dr. Coomer now seeks an opportunity to redeem his good name and stop the defamatory attacks against him.

## III.    STANDARD OF REVIEW

143.    Anti-SLAPP laws serve a limited purpose—to dismiss frivolous claims targeting constitutional rights.  These laws were enacted specifically to combat SLAPPs—strategic lawsuits against public participation.  They are intended to enable courts to dismiss frivolous cases brought with the intent to chill a person's constitutional rights.  *FilmOn.com Inc. v. DoubleVerify Inc.*, 439 P.3d 1156, 1160 (Cal. 2019).  To be clear, they are a procedural mechanism invoked in limited circumstances and solely for the purpose of dismissing meritless claims.  *Baral v. Schnitt*, 376 P.3d 604, 608 (Cal. 2016) ("The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech.  It only provides a procedure for

---

[435] *See supra* at §§ II(B)–(J).

weeding out, at an early state, *meritless* claims arising from protected activity") (emphasis in original).  They do not bar meritorious claims.

144.    Colorado has recently enacted an anti-SLAPP statute to prevent the "abuse of the judicial process" through frivolous lawsuits that are strategically filed to unfairly subject individuals to costly, meritless litigation.    *See*  C.R.S. § 13-20-1101(1)(a). [436]    Similar to anti-SLAPP laws generally, the statute is limited to dismissal of meritless claims arising from protected activity and, otherwise, expressly requires courts to "protect the rights of persons to file meritorious lawsuits for demonstrable injury."    *See* C.R.S. § 13-20-1101(1)(b).    The statute imposes a two-step analysis.

145.    First, courts must determine whether the statute applies.   Under this step, the movant bears the initial burden to show the anti-SLAPP statute applies to a plaintiff's claims.  *Kieu Hoang v. Phong Minh Tran*, 60 Cal. App. 5th 513, 524-25 (2021).  The statute applies when a claim arises from any action taken "in furtherance of the person's right of petition or free speech under the United States constitution or the state constitution *in connection with a public issue*."  C.R.S.  § 13-20-1101(3)(a)  (emphasis added).    The statute identifies four specific acts that constitute protected activity under the statute, which include: (1) statements "made before a legislative, executive or judicial proceeding or any other official proceeding authorized by law;" (2) statements "made in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other official proceeding authorized by law;" (3) statements "made in a place open to the public or a public forum in connection with an issue of public interest;"

---

[436] Because of how recently Colorado enacted its anti-SLAPP statute, there are limited appellate decisions analyzing its application.  Therefore, Dr. Coomer relies on California's and other states' law due to the similarities of the Colorado statute with California's statute, along with other states' anti-SLAPP laws.

and (4) "[a]ny other conduct or communication in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." *Id.* at § 13-20-1101(2)(a)(I-IV). However, each of these categories can be distilled down to two necessary bases for a protected act under the statute—there must be an official proceeding or there must be a matter of public concern. *See id*. These bases correspond to the rights of petition and freedom of speech, in which not every statement made constitutes a protected act. *See* C.R.S. § 13-20-1101(3)(a). Rather, there are necessary balances under the law that limit these rights to equally preserve the rights to privacy and reputation. Defendants have the burden to establish their actions giving rise to Dr. Coomer's claims meet these bases and constitute protected activity.

146. Second, if the statute applies, then the plaintiff must establish that there is a reasonable likelihood that the plaintiff will prevail on each claim to which the statute applies. C.R.S. § 13-20-1101(3)(a). This is a low burden in which the plaintiff merely has to show that a legally sufficient, or prima facie, factual basis exists for his claims. *Baral*, 376 P.3d at 608-09. In evaluating whether a plaintiff has made a prima facie showing, courts do not weigh the evidence or resolve conflicting factual claims. *Id.* Instead, courts accept the plaintiff's evidence as true and limit their evaluation of a "defendant's showing only to determine if it defeats the plaintiff's claims as a matter of law." *Id.* Claims with the requisite minimal merit proceed. *Id.* This review is described as a "summary-judgment like procedure," wherein courts consider the pleadings as well as affidavits and other evidence to determine whether the plaintiff has satisfied this minimal burden. *See id.* at 608; *see also* C.R.S. § 13-20-1101(3)(b). At this stage of the proceeding, evidence merely must be "capable of being admitted at trial, i.e., evidence which is competent, relevant and

not barred by a substantive rule." *See Sweetwater Un. High Sch. Dist. v. Gilbane Bldg. Co.*, 434 P.3d 1152, 1161-63 (Cal. 2019) (citing *Fashion 21 v. Coal. For Humane Immigrant Rights of L.A.*, 117 Cal. App. 4th 1138, 1145 (2004)). Courts have recognized to strike a complaint for failure to meet evidentiary obstacles that may be overcome at trial would not serve the anti-SLAPP statute's protective purposes, which are to end meritless suits early, not to abort potentially meritorious claims due to lack of discovery. *See id.* at 1163.

## IV.   EVIDENCE

147.    In support of Dr. Coomer's Omnibus Response to Defendants' motions to dismiss, Dr. Coomer relies on and incorporates by reference his First Amended Complaint, his responses to Rule 12(b)(2) and 12(b)(5) motions to dismiss and evidence therein, his April 7 response to Metaxas's special motion to dismiss and evidence therein, and his response to Rule 12(e) motion on file with the Court.[437]

148.    Pursuant to C.R.S. § 13-20-1101(3)(b), Dr. Coomer also gives notice of his intent to rely on evidence not on file with the Court. This evidence, which Dr. Coomer incorporates by reference as if fully restated here in its entirety, is attached to this Response and summarized in the attached Appendix 1.

149.    On June 8, 2021, the Court ordered limited discovery in relation to the pending special motions to dismiss. Pursuant to this order, Dr. Coomer served requests for production and conducted limited depositions. Of these, Oltmann, FEC United, and SMM did not produce responsive documents and refused to be deposed or produce witnesses knowledgeable of the topics

---

[437] Hoft and TGP raise similar arguments in the special motion to dismiss that were raised in their 12(e) motion filed on July 21, 2021. However, Defendants' arguments are moot given the Court's recent order denying Hoft-TGP's motion. *See* Sept. 15, 2021 Order.

noticed for deposition despite a court order compelling attendance.  In response, Dr. Coomer filed a Motion for Sanctions Pursuant to C.R.C.P. 37 and C.R.C.P. 107 and Request for Order to Show Cause, and the Court again ordered the production of documents and depositions.  However, as noted above, there was only partial compliance.  Oltmann refused to identify his source for the alleged Antifa call and for his access to Dr. Coomer's Facebook posts.[438]  He refuses to identify other participants on the alleged call, that we now understand was an alleged Zoom meeting.[439]  It was also learned that document production, both for Oltmann and Powell, had withheld critical evidence.[440]  Given the status of discovery, Dr. Coomer reserves his right to supplement evidence in support to any evidence received through Court-ordered discovery pursuant to C.R.S. § 13-20-1101(6), as well as any additional evidence produced prior to and at the hearing on this Motion for Sanctions.  Dr. Coomer reserves his right to rely on evidence offered by any other party in this litigation.  Dr. Coomer also reserves his right to seek sanctions in relation to Oltmann' discovery abuses.

150.    Additionally, given the status of the court-ordered discovery at the time of his response to Metaxas's special motion to dismiss, Dr. Coomer reserved his right to supplement or amend evidence in support.  *See* Resp. to Metaxas Mot., Apr. 7, 2021.  Dr. Coomer supplements that evidence with the evidence included herein.

---

[438] *See supra* at § II(C).

[439] *See id.*

[440] *See id.*

# V.   OBJECTIONS

151.    Defendants primarily rely on conclusory statements and legal arguments to support of their special motions to dismiss.  This is not competent evidence.  *See Keith v. Kinney*, 140 P.3d 141, 153 (Colo. App. 2005) (finding conclusions unsupported by facts are not competent evidence); *Brown v. Teitelbaum*, 830 P.2d 1081, 1084-85 (Colo. App. 1991) (finding mere argument of counsel is not competent evidence).  Further, some of the Defendants attempt to put forward inadmissible evidence in support of their special motions to dismiss.[441]

152.    Dr. Coomer also anticipates Defendants may attempt to offer additional evidence (beyond the court-ordered discovery) with their replies in support of their special motions to dismiss.  Dr. Coomer objects to this evidence as untimely.  *See Wallman v. Kelly*, 976 P.2d 330, 332 (Colo. App. 1998); *see also In Interest of L.B.*, 413 P.3d 176, 184 (Colo. App. 2017).  Generally, reply briefs are limited to addressing arguments and evidence raised in a motion and response.  The reasons for this are pragmatic and plain.  To consider evidence offered for the first time in reply would be manifestly unfair to the nonmoving party who has had no opportunity for written response.  *See Herbert v. Nat'l Academy of Sciences*, 974 F.2d 192, 196 (D.C. Cir. 1992).  Additionally, Dr. Coomer expects the evidence offered to mirror objectionable evidence some of

---

[441] For example, multiple Defendants have attempted to introduce documents pertaining to alleged vulnerabilities in Dominion Voting Systems technology, often with respect to reports or studies conducted years prior to the events at issue in this case. *See, e.g.,* Oltmann, et al. Mot., Apr. 30, 2021, Exhibit C; Hoft-TGP Mot., Apr. 30, 2021, Appendix §§ 1-3. Similarly, multiple Defendants have expressed an intention to introduce evidence pertaining to Dr. Coomer's Facebook posts. *See, e.g.*, Powell Mot. for Forthwith Order Granting Limited Discovery, Aug. 27, 2021; OAN-Rion Resp. to Plaintiff's Mot. for Sanctions, Aug. 25, 2021; *see also* Sept. 8, 2021 Order, at 3 (finding that "the connections between personal Facebook posts that express political ideology and the Defendant's statements at issue in this lawsuit are remote.")  To the extent any of Defendants' proffered evidence is irrelevant, is promulgated by sources that lack personal knowledge or expertise of the subject matter, is hearsay, or presents impermissible character evidence, Dr. Coomer objects as such evidence is inadmissible. *See* Colo. R. Evid. 401-04, 601-02, 608, 702, 801-02, 805, 901.

the Defendants have previously attempted to put forward.[442]   To the extent this evidence is irrelevant, is promulgated by sources that lack personal knowledge or expertise of the subject matter, is hearsay, or presents impermissible character evidence, Dr. Coomer objects as such evidence is inadmissible.  *See* Colo. R. Evid. 401-04, 601-02, 608, 702, 801-02, 805, 901.

## VI.   ARGUMENT

153.   Anti-SLAPP laws were created to prevent powerful companies from strategically filing meritless lawsuits to chill the First Amendment rights of private individuals and non-profit corporations.  *FilmOn.com Inc.*, 439 P.3d at 1160.  Here, the reverse has happened.  Defendants— powerful public figures—knowingly and recklessly defamed Dr. Coomer—a private individual— to millions of people.  Defendants now strategically seek to shield themselves from liability for their tortious conduct by arguing that the Colorado anti-SLAPP statute bars Dr. Coomer from having his day in court. Defendants' arguments fly in the face of Colorado law. *See* C.R.S. § 13-20-1101(1)(a)-(b) (noting that the Colorado anti-SLAPP statute was passed to prevent the "abuse of the judicial process," not to prevent "meritorious lawsuits").

154.   Defendants' anti-SLAPP motions should be denied for several reasons.  First, Defendants have failed to establish that the Colorado anti-SLAPP statute applies.  In fact, the statute does not apply to Defendants' defamatory publications at issue because they do not involve matters of public concern and were not made in connection with an official proceeding.  Second, even if the statute does apply, Dr. Coomer has evidence establishing a prima facie case for all of

---

[442] *See* Order Granting Motion to Strike, Apr. 27, 2021; *see* Pl.'s Resp. to OAN-Rion 12(b)(5) Mot. to Dismiss at ¶ 11, n.18.

his claims.  Far from being an abuse of the judicial process, Dr. Coomer's claims are his only chance to redeem his good name.

**A.   Colorado's anti-SLAPP statute does not apply because Defendants' defamation of Dr. Coomer is not a protected act.**

155.   Defendants have the initial burden to show that Colorado's anti-SLAPP statute applies to Dr. Coomer's claims.  *See Kieu Hoang*, 60 Cal. App. 5th at 524-25.  To establish that the statute applies, Defendants must demonstrate that Dr. Coomer's claims arise out of protected conduct that is connected with a matter of public concern or an official proceeding.  *See* C.R.S. § 13-20-1101(3)(a); *see also Briggs v. Eden Council for Hope & Opportunity*, 969 P.2d 564, 581 (Cal. 1999) ("[T]he statute applies only to lawsuits which are based upon activities closely tied to the right to petition and the freedom of speech.").

156.   For at least three reasons, Defendants have failed to carry their initial burden.  First, Defendants' conclusory assertions that the anti-SLAPP statute applies are insufficient to meet their burden in showing that their statements are protected acts under the anti-SLAPP statute.  Second, even if Defendants' motions had engaged with the merits of Dr. Coomer's claims, the statute does not apply because Dr. Coomer's claims do not arise out of conduct that relates to an issue of public interest.  Third, the statute does not apply because Defendants' statements were not made in connection with an official proceeding.  Defendants have failed to establish that the anti-SLAPP statute applies, and their motions should be denied, accordingly.

**i.   Defendants have failed to carry their burden in demonstrating that the Colorado anti-SLAPP statute applies to Dr. Coomer's claims.**

157.   Defendants' special motions to dismiss fail to establish that their defamation of Dr. Coomer were protected acts subject to the anti-SLAPP statute.  Under the first step of anti-

SLAPP analysis, Defendants have the burden to prove that the statute applies to Dr. Coomer's claims. *See Kieu Hoang*, 60 Cal. App. 5th at 524-25 ("To prevail on an anti-SLAPP motion, the movant must first make a threshold showing that the challenged cause of action arises from [protected activity] in connection with a public issue."); *Mathiew v. Subsea 7 (US) LLC*, No. 4:17-CV-3140, 2018 WL 1515264, at *5 (S.D. Tex. Mar. 9, 2018), *report and recommendation adopted*, 4:17-CV-3140, 2018 WL 1513673 (S.D. Tex. Mar. 26, 2018) (explaining that the defendant's failure to explain how his statement connected with an issue of public interest failed to carry his burden under the first prong of anti-SLAPP analysis).

158.    To satisfy this burden, a defendant must show that the challenged causes of action arise from a protected activity. *Freeman v. Schack*, 154 Cal. App. 4th 719, 730 (2007) (cautioning that the "'arising from' requirement is not always easily met."). Courts have specifically cautioned that "collateral allusions to protected activity *should not* subject the cause of action to the anti–SLAPP statute." *Id.* at 727 (emphasis added); *see also Hanover Ins. Co. v. Fremont Bank*, 68 F. Supp. 3d 1085, 1097 (N.D. Cal. 2014) (noting a distinction between actions that are triggered by protected activity, which are not protected by anti-SLAPP laws, and actions that arise from protected activity).

159.    Here, Defendants have failed to carry their burden of proof. Looking to the motions, Defendants varied in what protected acts they alleged applied.[443]   Some Defendants—without

---

[443] *See* Hoft-TGP Mot. at 9-10, 12-13 (alleging sections III, IV); Malkin Mot. at 5-7 (alleging sections II, III); Metaxas Mot. at 7-11 (alleging sections II, III); OAN-Rion Mot. at 11-13 (alleging section III); Giuliani Mot. at 6-9 (alleging sections III, IV); Powell Mot. at 7-11 (alleging sections III, IV); Defending the Republic Mot. at 8-12 (alleging sections III, IV); Trump Campaign Mot. at 7-11 (alleging sections III, IV).

support—attempt to expand the acts that are protected under the statute.[444]   Some—without

support—argue that all media publications are protected acts.[445]   Some do not even identify a

protected act under the statute.[446]   Despite these various arguments, all of the protected acts

delineated under the statute can be distilled down to two necessary bases: an official proceeding

or a matter of public concern.   *See* C.R.S. § 13-20-1101(2)(a)(I)-(IV).   To constitute a protected

act, the actionable statements at issue must be made in connection with either a matter of public

concern or an official proceeding.   *See id.*   Neither of these bases are present in this case.

160.   Defendants know this, which is why they made no effort to identify a specific

official proceeding connected with their defamation or offer evidence establishing Dr. Coomer

was a matter of public concern prior to their defamation of him.[447]   Instead, Defendants only offer

conclusory statements that the election was a general matter of public concern or that the election

was being litigated, which have no evidentiary value.[448]   *See Keith*, 140 P.3d at 153; *Brown*,

830 P.2d at 1084-85.   Further, this superficial analysis only identifies a general matter of public

---

[444] *See* Powell Mot. at 10-11 (claiming Powell's statements were protected because "she was acting in furtherance of her First Amendment right to petition the government for redress of grievances"); Defending the Republic Mot. at 11 (same).

[445] *See* Metaxas Mot. at 9 (misstating the holding in *Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.,* 37 Cal.App.4th 855, 862-64 (1995), which stands for the limited position that news reporting can constitute protected speech and was not excluded under the anti-SLAPP statute).

[446] *See* Oltmann, et al. Mot. at 5-15.

[447] *See* Oltmann, et al. Mot. at 5-15; Hoft-TGP Mot. at 12-13; Malkin Mot. at 5-7; Metaxas Mot. at 7-11; OAN-Rion Mot. at 11-13; Giuliani Mot. at 6-9; Powell Mot. at 7-11; Defending the Republic Mot. at 8-12; Trump Campaign Mot. at 7-11.

[448] Some of the Defendants also made conclusory statements that pre-publication or pre-production acts such as investigating, newsgathering, and conducting interviews can constitute conduct that furthers the right of free speech. *See Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 953-54 (9th Cir. 2013); *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010).   It is unclear what Defendants are referring to as all issues here concern statements Defendants made to the public (*i.e.*, press conferences, broadcasts, etc.), not pre-publication conduct.   *See supra* §§ II(C)-(J); *see also* Pl.'s First Amend. Compl. at § I, IV, V.

interest, one that applies to every employee of Dominion, every election worker, and every voting

person in the United States—not a particular public interest in Dr. Coomer.  *See Hutchinson v.*

*Proxmire*, 443 U.S. 111, 135 (1979) (distinguishing general matters of public interest from

particular matters of public interest); *see also FilmOn.com Inc.,* 439 P.3d at 1166-67 (recognizing

that defendants cannot merely offer a "synecdoche theory" of public interest, defining their narrow

dispute by its slight reference to the broader public).  This is insufficient to carry Defendants'

burden to show that the statute does in fact apply to this case.[449]  Despite Defendants' efforts to

collapse any distinction, Dr. Coomer is not "the election."  Dr. Coomer was not a party to litigation

involving the election.  And Dr. Coomer did not sue Defendants for their statements concerning

the election or concerning litigation involving the election.[450]  Rather, the gravamen of

Dr. Coomer's claims is Defendants' public defamation of Dr. Coomer—a private individual and

his private employment.[451]  *See Hanover Ins. Co.*, 68 F. Supp. at 1097 (finding courts look to the

"principal thrust or gravamen of the plaintiff's cause of action [to] determine whether the anti-

SLAPP statute applies.").  Dr. Coomer's pleadings make this clear and do not obscure the claims

at issue.[452]

---

[449] The only authority some Defendants cite in support misapplies legally and factually distinct cases involving separate election-related issues concerning legislative authority over elections, not constitutional protections for speech or protected activity under the anti-SLAPP statute.  *See, e.g.*, *Mauff v. People*, 123 P. 101, 101-04 (Colo. 1912); *Johnson v. Bradley*, 841 P.2d 990, 1003 (Cal. 1992).

[450] *See* Pl.'s Amend. Compl. at §§ I, IV, V.

[451] *See id.*

[452] It is unclear what artifice in pleadings some Defendants argue, especially given Dr. Coomer's complaint does not assert the torts for breach of contract or breach of fiduciary duties at issue in their cited authority.  *See Navellier v. Sletten*, 52 P.3d 703, 711 (Cal. 2002) (merely finding that claims for breach of contract can also implicate protections under the anti-SLAPP statute when the terms of the contract affect protected activities, such as the breach of an agreement not to petition by filing a petition); *Hylton v. Frank E. Rogozienski, Inc*., 177 Cal. App. 4th 1264, 1269-75 (2009) (finding the anti-SLAPP statute did not apply to breach of fiduciary duty claims even when those claims arise from an attorney's misconduct with petitioning activity on behalf of the client; *Trilogy at Glen Ivy Maint. Assn. v.*

161.     Dr. Coomer also identified the actionable statements at issue—namely, that Defendants falsely stated and falsely implied that: Dr. Coomer participated in an alleged Antifa conference call; declared in that call he would subvert the election; and then did subvert the election. [453]   Dr. Coomer's claims for defamation, civil conspiracy, intentional infliction of emotional distress, and request for injunctive relief all arise from these statements.[454]   Defendants make no attempt to explain why the Colorado anti-SLAPP statute applies to those statements.  Nor can they.  Dr. Coomer was neither a matter of public interest nor a party to an official proceeding prior to Defendants' defamation of him.[455]   As such, Defendants' defamation was not a protected act subject to the anti-SLAPP statute.

162.     Because Defendants have failed to put forward any evidence to carry their threshold burden in establishing that the anti-SLAPP statute applies to the *actual* claims Dr. Coomer asserts, Defendants' special motions to dismiss should be denied.

ii.     **Defendants' statements were not made in connection with a matter of public interest**.

163.     Even if Defendants had attempted to engage with the merits of Dr. Coomer's claims, they could not establish that they arise out of a matter of public concern under the anti-SLAPP statute.  The Colorado anti-SLAPP statute was recently enacted with limited case law interpreting its terms.  However, Colorado courts have addressed the constitutional issues underlying the statute, including matters of public concern.  Whether a statement is a matter of public concern is a legal

---

*Shea Homes, Inc.*, 235 Cal. App. 4th 361, 367 (2015) (finding anti-SLAPP statute did not apply to breach of fiduciary claims at issue).

[453] *See supra* at § II(C)-(J); *see also* Pl.'s Amend. Compl. at §§ I, IV, V.

[454] *See* Pl.'s Amend. Compl. at § V.

[455] *See* Exhibit A, Coomer Dec. at ¶ 10.

determination based on "the content, form, and context of the statements, in conjunction with the motivation or 'point' of the statements as revealed by the whole record." *McIntyre v. Jones*, 194 P.3d 519, 525 (Colo. App. 2008). Because the boundaries of what constitutes a public concern are not clear, courts make this determination on a case-by-case basis. *See Williams v. Cont'l Airlines, Inc.*, 943 P.2d 10, 17-18 (Colo. App. 1996). Here, Defendants seek to collapse those boundaries between public and private concerns and efface any constitutional protections for an individual's reputation. *See Keohane v. Stewart*, 882 P.2d 1293, 1297-98 (Colo. 1994) (recognizing the individual's right to be free from false and defamatory assertions); *Diversified Management, Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1111-15 (Colo. 1982) (dissent, J. Erickson) (identifying public policy concerns in expanding protections for matters of public concern at the expense of private individuals' reputations). That is not the law. Generally, a matter is of public concern only when the public has a "*legitimate* interest in what is being published" or when it involves an issue "about which information is needed or appropriate." *Williams*, 943 P.2d at 17 (emphasis added). When determining whether a matter is of public concern, courts have considered factors including the nature and scope of the alleged public interest, the plaintiff's involvement in that interest, and the existence of that interest prior to the defamation.

164. Specifically, in *Diversified*, the seminal Colorado case on matters of public concern, the Colorado Supreme Court found that public interest existed in a widespread and ongoing land-development scheme then under investigation because the nature and scope of the plaintiffs' activities directly implicated the public. *See* 653 P.2d 1103, 1105-08 (Colo. 1982). There, plaintiffs actively sought prospective buyers in their land development while it was under investigation by the Colorado Real Estate Commission, the U.S. Department of Housing and

Urban Development, *and* "a variety of other federal and state regulatory and law enforcement agencies." *See id.* This created a direct nexus between the plaintiffs' activities and the public giving rise to a matter of public concern. *See id.* Further, this public interest existed prior to and separate from the defendants' alleged defamation. *See id.*

165.   In contrast, courts have consistently found that private individuals and their private employment are not matters of public concern. In *Williams*, the Colorado Supreme Court declined to find allegations of illegal and violent conduct against a privately employed pilot were matters of public concern, despite the prominence of the airline at issue and the effect of the allegations on the pilot's coworkers. *See* 943 P.2d at 17-18. In *McIntyre*, the Colorado Supreme Court again declined to find allegations of fraud against a privately employed bookkeeper for a homeowners' association to be matters of public concern and clarified the distinction between acts of a private employee and acts of a homeowners' association. *See* 194 P.3d at 525-27. In *Quigley v. Rosenthal*, the Tenth Circuit declined to find a matter of public concern when statements "were not asserted against a public employer, nor were they asserted against any entity or person with which the general public had contact." 327 F.3d 1044, 1059-61 (10th Cir. 2003). There, the court went on to find that allegations in a pending lawsuit alone were not sufficient to establish a matter of public concern and rejected arguments that a defendant's statements to the press could then make those allegations matters of public concern. *See id.* Despite some Defendants' assertions, the act of holding a press conference does not elevate an issue to a matter of public concern.[456]

---

[456] In fact, Defendants misstate the authority they relied upon, which did not involve press conferences, election fraud, statements regarding ongoing litigation, or claims for defamation. *See Lieberman v. KCOP Television, Inc.*, 110 Cal. App. 4th 156, 162 (2003) (analyzing publication of recordings obtained through newsgathering); *M.G. v. Time Warner Inc.*, 89 Cal. App. 4th 623, 626 (2001) (analyzing publication of private photographs); *Briscoe v. Reader's Digest*

166.    Similarly, in the context of limited purpose public figures, which is also premised on the existence of a public concern, courts have found a private individual's private acts to be of public interest only when the individual invited public scrutiny.  *Compare DiLeo v. Koltnow*, 613 P.2d 318, 322 (Colo. 1980) (finding a plaintiff's discharge from the police force was a matter of public concern solely because the plaintiff sought press coverage instead of "quietly seeking to exert his legal rights") *and Lewis v. McGraw-Hill Broad. Co., Inc.*, 832 P.2d 1118, 1122-23 (Colo. App. 1992) (finding a prominent civil rights case was a matter of public concern in part because plaintiff's counsel actively sought community involvement and conducted public interviews with the press), *with Hutchinson*, 443 U.S. at 135 (finding a researcher's receipt of a federal grant was insufficient to establish a particular matter of public concern and, instead, only established a general concern about public expenditures that would apply "to everyone who received or benefitted from the myriad public grants for research").  Further, any reliance by Defendants on *Lewis* is misplaced as it turned on conduct by the plaintiff, not the defendants, and the public interest arose from that conduct rather than the defendants' defamation.  *See* 832 P.2d at 1122-23.

167.    This is also consistent with well-settled constitutional doctrine that precludes defendants from creating their own defense.  *Hutchinson*, 443 U.S. at 135 ("Those charged with alleged defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.").  In other words, defendants cannot manufacture the public concern.  *Snead v. Redland Aggregates, Ltd.*, 998 F.2d 1325, 1330 (5th Cir. 1993) (holding that "[a] speaker cannot turn his speech into a matter of public concern simply by issuing a press release" or by "drawing

---

*Ass'n, Inc.*, 483 P.2d 34, 36 (1971), *overruled on other grounds by Gates v. Discovery Comm.*, 101 P.3d 552 (2004) (analyzing publication of private individual's criminal admission).

the plaintiff into [the] controversy against their will.").  Defendants cannot define the scope of a constitutional privilege by their own determination of what they choose to publish.  *Diversified Mgmt.*, *Inc.*, 653 P.2d at 1107.  Defendants cite no authority that would permit their defamation to serve as the basis for the public concern, regardless of whether they originated the defamation or republished it.[457]

168.    Here, the content, form, and context of the statements, when viewed alongside factors courts have considered in determining this issue, weigh in favor of finding Defendants' defamation of Dr. Coomer was not a matter of public concern.[458]   Rather, Dr. Coomer was unquestionably a private individual about whom the public had no legitimate interest before Defendants' collective defamatory campaign against him.[459]   *See Rosenbloom*, 403 U.S. at 86 (dissent, J. Marshall) (defining private figures as "persons first brought to public attention by the defamation that is the subject of the lawsuit").  Dr. Coomer's private employer provided election equipment and services to governmental bodies.[460]   However, neither Dominion nor Dr. Coomer controlled the election or those governmental bodies.[461]   Defendants' efforts to suggest his private

---

[457] The only authority some Defendants put forward is a factually distinguishable case that did not involve the republication of defamation, but, rather, the publication of a subsequent article by two psychologists of their review and investigation of a case study published in a scientific journal concerning repressed memories of abuse.  *See Taus v. Loftus*, 151 P.3d 1185, 1190-1204 (Cal. 2007).

[458] Defendants cite pivotal cases that delineate the boundaries between and protections for public and private issues that support this determination. *See, e.g.*, *N.Y. Times v. Sullivan*, 376 U.S. 254, 269-70  (1964); *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 46-52 (1971); *Gertz*, 418 U.S. at 346-48; *Diversified Mgmt., Inc.*, 653 P.2d at 1108.

[459] *See* Exhibit A, Coomer Dec. at ¶ 10; *see also* Pl.'s Amend. Compl. at § IV(D), ¶ 83.

[460] *See* Exhibit A, Coomer Dec. at ¶ 9; *see also* Pl.'s Amend. Compl. at §§ I, IV.

[461] Defendants cite no authority in support of a private employee of a private business constituting a public official. *See Rosenblatt v. Baer*, 383 U.S. 75, 85-87 (1966) (analyzing statements made broadly against elected officials and the operations of government, not private businesses); *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981) (finding police officers constitute public officials, not private businesses); *Young v. CBS Broad.*, 212 Cal. App. 5th 551, 559-61 (2012) (finding a court appointed conservator was a public official as she became the face of the government given the court appointment and sovereign control she had over the individual).

employment made him a public official or public figure have no basis in law or fact.[462]  And Defendants' efforts to suggest Dr. Coomer's private Facebook posts made him a matter of public concern strain credulity. [463]  Instead, there was no public interest in Dr. Coomer's private employment or private job performance before the 2020 election.[464]  *See Williams*, 943 P.2d at 17-18; *McIntyre*, 194 P.3d at 525-26.  There is no credible evidence of any nexus between Dr. Coomer's private employment and Defendants' allegations of election fraud.[465]  *See Quigley*, 327 F.3d at 1061.  Rather, the public interest in Dr. Coomer's employment was manufactured by and only arose from Defendants' collective defamation. [466]  *See id.*  Defendants perpetuated baseless allegations that Dr. Coomer subverted the presidential election.[467]  Under well-settled law, Defendants are not permitted to manufacture their defense to defamation through their own defamatory conduct.  Similarly, Dr. Coomer's efforts to respond to and correct that defamation does not forfeit his right to privacy or the protection of his reputation.[468]

---

[462] Both the public official and public figure classifications are not applied lightly and require the plaintiff to have invoked public scrutiny to the *particular* issue as well as the increased risk for defamation, which is not present here. *See, e.g., Diversified Mgmt., Inc.*, 653 P.2d at 1105-08 (finding plaintiff was neither a public official nor public figure and clarifying "[w]e are reluctant to make too easy a finding that one is a public figure."); *see also Gertz*, 418 U.S. at 351-52 (finding plaintiff was neither a public official nor public figure and cautioning "[w]e would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes").

[463] Dr. Coomer's political beliefs are not probative of Defendants' allegations of election fraud.  *See supra* at ¶ 10.  That they were privately published to Dr. Coomer's friends and family on Facebook does not make them a public concern.  *See Pott v. Lazarin*, 47 Cal. App. 5th 141, 148-49 (2020) (finding the content of the Facebook posts addressed a matter of public concern, not that such posts created a public concern).

[464] *See* Exhibit A, Coomer Dec. at ¶ 10; *see also* Pl.'s Amend. Compl. at § IV(B)–(D).

[465] *See* Exhibit A, Coomer Dec. at ¶ 10; *see also* Pl.'s Amend. Compl. at § IV(B)–(C).

[466] *See id.*

[467] *See id.*

[468] *See Diversified Mgmt., Inc.*, 653 P.2d at 1107-08 (finding "[a] private figure subjected to unfavorable publicity should not forfeit protection from defamation as a price of his response.").

169.    Defendants avoid this analysis and, instead, broadly invoke First Amendment protections without explaining how such protections apply.  However, there is no constitutional value in defamation generally and no protection for malicious publications specifically.  *See Gertz v. Robert Welch, Inc.*, 443 U.S. 111, 135 (1979) ("[T]here is no constitutional value in false statements of fact."); *see also Diversified, Mgmt., Inc.,* 653 P.2d at 1105-06.  Courts have considered evidence of actual malice when determining whether there is a matter of public concern.  Specifically, when defendants are in a position to know, and indeed knew or should have known, that the allegations raised are baseless, they cannot then avail themselves of the constitutional protection of a heightened fault standard by simply alleging a "public concern." *Quigley*, 327 F.3d at 1061 (citing *Kemp v. State Bd. of Agric.*, 803 P.2d 498, 504 (Colo.1990)).  The Tenth Circuit directly addresses this issue.  In *Quigley*, a couple accused their neighbors of anti-Semitic discrimination and harassment.  327 F.3d at 1053.  The couple's attorney, who was the director of the Anti-Defamation League's local office, released a press statement at the ADL's office and participated in a radio broadcast in which he stated that the neighbors committed some of the most serious, anti-Semitic harassment campaigns that the ADL had ever seen. *Id.*  The neighbors subsequently sued the attorney for defamation, and the court had to decide whether the attorney's statements amounted to matters of public concern under Colorado law. *Id.*

170.    The *Quigley* court found that the specific context of the statements and the motivations of the speaker weighed against finding that the matter was of public concern:

> Accordingly, we are unable to conclude that Rosenthal's comments at the press conference and on the radio show involved matters of "public concern" since Rosenthal and the ADL knew or should have known that the Aronsons' allegations of racial discrimination/harassment were not colorable.

327 F.3d at 1061.  In making its ruling, the Tenth Circuit noted that Colorado courts have found *colorable* discrimination claims in the context of *public* employment to be matters of public concern, not private.  *Id.*  Further, the lynchpin in the Tenth Circuit's determination in *Quigley* that the statements there did not involve a matter of public concern was that the underlying claims of the statements were not colorable.  *See id.*  Under Colorado law, the public has no interest in such matters.

171.     The claims involving Dr. Coomer are even less colorable than those in *Quigley*. With no personal knowledge or evidence, Oltmann falsely accused Dr. Coomer of participating in an Antifa conference call; of stating that he intended to rig the election; and then of actually rigging the election.[469]  Oltmann's story lacks any indicia of reliability or authenticity—he claims to have infiltrated a conference call where some unidentified speaker—who Oltmann had never heard before—claimed to be "Eric" from "Dominion."[470]  Oltmann provided no explanation for how he learned of this purported call or gained access to it.[471]  Oltmann could not identify the speakers on it and had no specialized training or experience in vocal identification.[472]  Instead, Oltmann relied on the unsound methodology of a Google search of limited terms to speculate that Dr. Coomer was the speaker on this alleged conference call and then listened to YouTube videos to unreliably confirm his speculation.[473]  To this day, there has never been any recording produced or any other credible evidence verifying that such an Antifa conference call took place, much less that

---

[469] *See supra* § II(C); *see also* Pl.'s Amend. Compl. at §§ I, IV(B)–(C).

[470] *See id.*

[471] *See id.*

[472] *See id.*

[473] *See id.*

Dr. Coomer was on such a call.[474]  Only after the election did Oltmann conveniently remember this Antifa conference call and from it speculate—again with no evidence or personal knowledge of election fraud—that Dr. Coomer did subvert the election.[475]

172.    Such allegations cannot serve as a basis for public concern because they are not colorable.  Like the attorney in *Quigley*, Defendants had every reason to know, or should have known, that Oltmann's absurd accusations that Dr. Coomer is a treasonous criminal who conspired to subvert the election are baseless.[476]  Defendants' decision to republish these unsupported and facially impossible statements further forecloses any argument that the defamatory statements about Dr. Coomer involve a matter of public concern.

173.    The California Supreme Court has likewise declined to apply anti-SLAPP protections to statements that would otherwise constitute matters of public concern if the statements were conclusively illegal.  *Flatley v. Mauro*, 139 P.3d 2, 15 (Cal. 2006).  In *Flatley*, the California Supreme Court recognized the purpose of the anti-SLAPP statute is to protect the valid exercise of the constitutional rights of speech.  *Id.* at 21.  However, the court there recognized there is no constitutional protection for unlawful conduct.  *Id.* (finding "[e]xtortion is not a constitutionally protected form of speech.").  As in this case, the underlying unlawful conduct at issue in *Flatley* was undisputed,[477] and thus the issue concerned whether the defendant was entitled

---

[474] *See* Exhibit A, Coomer Dec. at ¶ 18; *see also* Pl.'s Amend. Compl. at §§ I, IV(B)–(C).

[475] *See supra* § II(C); *see also* Pl.'s Amend. Compl. at ¶ 53.

[476] *See supra* §§ II(B)–(K); *see also* Pl.'s Amend. Compl. at § IV(B)–(C).

[477] Defendants do not challenge that they published the statements at issue.  *See* Oltmann, et al. Mot. at 5-6, 9-12; Hoft-TGP Mot. at 7; Malkin Mot. at 2, 4; Metaxas Mot. at 6-7; OAN-Rion Mot. at 8-10; Powell Mot. at § III; Defending the Republic Mot. at III; Trump Campaign Mot. at 7-10; Giuliani Mot. at 10-16.  There is no credible dispute premised on facts as to the falsity of these statements.  *See infra* at § VI(B)(i)(a).

to the benefit of the anti-SLAPP statute despite such illegality.  The Court held that when the activity at issue is not constitutionally protected, it cannot serve as the basis for a motion to dismiss under the anti-SLAPP statute.[478]  *See id.* at 21-24.  Similarly, the United States Supreme Court has long recognized, only *truthful* factual statements are entitled to such protections.  "[T]here is *no* constitutional value in *false* statements of fact."  *Gertz*, 418 U.S. at 340 (emphasis added).  When a media organization, or any person, engages in *defamatory* conduct, and knows or should have known that the statements are false, such actions *are not* protected by the First Amendment.  *See Quigley*, 327 F.3d at 1061.  Because such statements are not constitutionally protected, they cannot serve as the basis for Defendants' special motions to dismiss under the anti-SLAPP statute.

### iii.   Defendants' statements were not made in connection with an official proceeding.

174.   Without support, some Defendants have also argued the anti-SLAPP statute applies to their defamatory statements because they allegedly made them in connection with an issue under consideration or review by a judicial body.[479]  For statements to be made "in connection with" an issue under review by a judicial body, they must have a direct connection with issues under review in a judicial proceeding and must be directed to persons with an interest in the proceeding.  *See Hanover Ins. Co.*, 68 F. Supp. 3d at 1101 (declining to find that statements were made in

---

[478] Some of the Defendants mistakenly rely on *Doe v. Gangland Prods. Inc.* to avoid the *Flatley* exception.  *See* Metaxas Mot. at 7.  However, the Ninth Circuit in *Doe* expressly recognized *Flatley* and clarified that *Flatley* was not raised in that case where there were factual disputes concerning the illegal conduct.  *See* 730 F.3d at 954, n.2.

[479] *See* Metaxas Mot. at 7-8; OAN-Rion Mot. at 15-16; Trump Campaign Mot. at 12-14; *see also* C.R.S. § 13-20-1101(2)(a)(II).

connection with an official proceeding when the statements did not reference attorneys in the litigation or the litigation itself).  Defendants cannot establish these factors here.

175.     Defendants have failed to identify the specific judicial proceedings and how their defamation of Dr. Coomer connected to them.  Instead, Defendants rely on the existence of judicial proceedings generally concerning the election.  However, to make a prima facie showing that a statement was made in connection with an official proceeding, it is insufficient to argue that a statement is tangentially connected to issues under review.  *See McConnell v. Innovative Artists Talent & Literary Agency, Inc.*, 175 Cal. App. 4th 169, 178 (2009).  As courts have recognized, anti-SLAPP protection does not apply when the connection is remote:

> [The defendant's] motion to strike . . . rested principally on the ground that any conduct in connection with an official proceeding is protected by the statute.  As we have already observed, that view is erroneous.  The statute does not accord anti-SLAPP protection to suits arising from any act having any connection, however remote, with an official proceeding.

*Paul v. Friedman*, 95 Cal. App. 4th 853, 866 (2002).  Instead, there must be a sufficient, causal nexus between the statements and the issues under review.  *See id.*  The boundaries of this protected activity are similar to the boundaries found with other defenses connected to ongoing litigation and the right to petition.[480]  Those boundaries do not extend to Defendants' defamation.

176.     *McConnell* helps illustrate why Defendants' statements do not have this causal nexus.  In *McConnell*, two agents sued their employer.  175 Cal. App. 4th at 172.  After the lawsuit was filed, the employer sent letters to the agents limiting their roles and effectively prohibiting performance of their job duties.  *Id.*  The employer argued that these letters were necessary as part of its investigation of the agents' claims.  *Id.*  The agents subsequently amended their claims to

---

[480] *See infra* at § VI(B)(iv) (analyzing the litigation and fair report privileges).

add wrongful termination and retaliation in light of the employer's letters. *Id.* The employer then

filed a motion to dismiss under California's anti-SLAPP statute, arguing that its letters were made

in connection with a judicial proceeding and were therefore protected acts. *Id.*

177. The court in *McConnell* rejected the employer's argument. *Id.* at 176-77. The court

explained that the fact the letters had a tangential connection to the agents' litigation was

insufficient to support a finding that the letters were made in connection with an official proceeding.

*Id.* The court found that even if a lawsuit precipitates the allegedly protected conduct, the conduct

must be directed specifically at the contents of the litigation to qualify as connected with the

judicial proceeding. *Id.* The court also found it relevant that the letter did not reference the lawsuit

or any of the specific claims in it. *Id.* at 177.

178. Similarly, here, Defendants rely on conclusory assertions that their defamatory

statements were connected with unidentified issues under review in various unrelated lawsuits.[481]

Defendants do not identify which specific lawsuits their defamatory statements were made in

connection with; they only broadly state that there were ongoing lawsuits about the election.[482]

Similarly, at the time Defendants made their defamatory statements about Dr. Coomer, they did

not reference any lawsuits or any of the specific claims in lawsuits.[483] Significantly, Defendants

provide no explanation for how their defamation of Dr. Coomer actually *connected to* these

---

[481] For example, Defendants reference cases filed by the Trump campaign prior to and after the election and yet fail to mention that none of these cases concerned Dr. Coomer or their false allegations asserted against him. *See* Malkin Mot. at 5; Metaxas Mot. at 8; OAN-Rion Mot. at 2, 6, 12; Trump Campaign Mot. at 13, n.3; Giuliani Mot. at 12-13, n.5.

[482] *See* Malkin Mot. at 5; Metaxas Mot. at 8; OAN-Rion Mot. at 2; Powell Mot. at 6, 12, 15-16; Defending the Republic Mot. at 2, 7, 13, 16-18; Trump Campaign Mot. at 2, 13; Giuliani Mot. at 12-13, 15-16.

[483] *See supra* at §§ II(B)–(K); *see also* Pl.'s Amend. Compl. at § IV.

unidentified proceedings.[484]  Dr. Coomer was not a party to such proceedings.  Dr. Coomer was

not at issue in proceedings pending at that time.[485]  Instead, Defendants seemingly argue that so

long as both their defamation and these other proceedings involved the election, their statements

were made in connection with litigation.  This would effectively permit anyone to claim a protected

act so long as some case somewhere had some topic in common.  This is not supported under the

law as courts have consistently held that the statements at issue must have some direct connection

with an actual issue under review.  *See e.g.*, *Rand Res., LLC v. City of Carson*, 433 P.3d 899, 906

and 911 (Cal. 2019) (finding the anti-SLAPP statute must be in connection with an issue under

review in an official proceeding); *McConnell*, 175 Cal. App. 4th at 178; *Paul*, 95 Cal. App. 4th at

866.  This is not supported under the plain language of the statute.  *See* C.R.S. § 13-20-

1101(2)(a)(II) (limited to statements "made *in connection with an issue* under consideration or

review by a legislative, executive, or judicial body").  Some of the Defendants assert their

statements to the press were pursuant to their rights to petition, with one referring to it as an

opening statement for anticipated litigation.[486]  Opening statements are made in courts of law, not

the court of public opinion.[487]  And Colorado courts are clear that press conferences are not acts

---

[484] *See* Malkin Mot. at 5; Metaxas Mot. at 8; OAN-Rion Mot. at 2; Powell Mot. at 6, 12, 15-16; Defending the Republic Mot. at 2, 7, 13, 16-18; Trump Campaign Mot. at 2, 13; Giuliani Mot. at 12-13, 15-16.

[485] Defendants also cite subsequent cases filed by Powell that they fail to mention were filed *after* Defendants began defaming Dr. Coomer.  *See* Powell Mot. at 6, 12, 15-17; Defending the Republic Mot. at 2, 7, 13, 16-18; Trump Campaign Mot. at 13, n.4-5.

[486] *See* Powell Mot. at 10-11; Defending the Republic Mot. at 11-12; Trump Campaign Mot. at 5-14; Giuliani Mot. at n.4.

[487] *See* Exhibit V-4, Order, No. 20-13134 (E.D. Mich.), at *1.  Giuliani mischaracterizes the holding of *In re Foster*, which in no way supports the proposition that his defamation could be considered "opening statements."  253 P.3d 1244, 1251 (Colo. 2011).

of petition.[488]  *See Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292, 1314-15 (D. Colo. 1998); *see also Green Acres Trust v. London*, 688 P.2d 617, 623 (Ariz. 1984).  Further, anticipated litigation must be considered in good faith, which Defendants cannot establish.[489]  *See Trinity Risk Mgmt., LLC v. Simplified Labor Staffing Solutions, Inc.*, 59 Cal. App. 5th 995, 1005 (2021); *see also* Exhibit V-4, Order, No. 20-13134 (E.D. Mich.), at *103, 108 (sanctioning Powell for filing claims "in bad faith and for an improper purpose" and referring the matter "for investigation and possible suspension or disbarment to the appropriate disciplinary authority for every state bar and federal court in which each attorney is admitted."); *see also* Exhibit V-2, Opinion, No. 2021-00506 (N.Y. App. Div. [1st Dept.]), at *2 (suspending Giuliani for false statements of election fraud).  Some of the Defendants attempt to connect their statements to an affidavit that they did not reference in a case that was not filed at the time of their defamation.[490]  These arguments are unavailing and fail to establish a protected act subject to the anti-SLAPP statute.  *See Rand Res., LLC*, 433 P.3d at 906 ("It is insufficient to assert that the acts alleged were 'in connection with' an official proceeding.").

---

[488] Defendants cite no authority that supports finding statements made in press conferences to be prelitigation communications in connection with an official proceeding.  *See Trinity Risk Mgmt., LLC v. Simplified Labor Staffing Solutions, Inc.*, 59 Cal. App. 5th 995, 1005-07 (2021) (finding internal statements—not statements to the public at large—between relevant parties regarding claims at issue prior to filing suit were statements made in good faith anticipation of litigation); *Digerati Holdings, LLC v. Young Money Ent't*, 194 Cal. App. 4th 873, 887-888 (2011) (same); *Briggs*, 969 P.2d at 568-69 (same); *Neville v. Chudacoff*, 160 Cal. App. 4th 1255, 1262-70 (2008) (same).

[489] It is unclear what anticipated litigation Giuliani and the Trump Campaign refer to since they have never raised issues concerning Dr. Coomer in a court of law.  This is understandable given the Trump Campaign's internal memo on November 14, 2020, finding such claims were baseless.  *See* Ex. M1, PX 68 ("There is no evidence Coomer is a member or has any ties to Antifa.").

[490] *See* Malkin Mot. at 8; OAN-Rion Mot. at 3, 8, 16; Powell Mot. at 9, 19, 21, 23, 25; Defending the Republic Mot. at 10, 20, 22, 26; Trump Campaign Mot. at 17.  Further, Defendants' publications extend well beyond reporting the allegations in the affidavit.  *See infra* at ¶ 220.

179.    Further, Defendants seek to use their abuse of judicial proceedings to protect themselves from their defamation outside of those proceedings.[491]  The cases Defendants filed were never about fraud—they were about "undermining the People's faith in our democracy and debasing the judicial process to do so."[492]  Notably, these cases have been dismissed.  Defendants who filed these cases are the subject of sanctions or related investigations.  Specifically, in relation to litigation that Powell filed, one court found:

> What is most important, and what very clearly reflects bad faith is that Plaintiff's attorneys are trying to use the judicial process to frame a public "narrative."  Absent evidentiary or legal support for their claims, this seems to be one of the primary purposes of this lawsuit.
>
> Second, there is a basis to conclude that Plaintiff's legal team asserted the allegations in their pleadings as opinion rather than fact, with the purpose of furthering counsel's political positions rather than pursuing any attainable legal relief.[493]

180.    Similarly, in relation to Giuliani, another court found:

> . . . there is uncontroverted evidence that respondent communicated demonstrably false and misleading statements to courts, lawmakers and the public at large in his capacity as lawyer for former President Donald J. Trump and the Trump Campaign in connection with Trump's failed effort at reelection in 2020.  These false statements were made to improperly bolster respondent's narrative that due to widespread voter fraud, victory in the 2020 United States presidential election was stolen from his client.  We conclude that respondent's conduct immediately threatens the public interest and warrants interim suspension from the practice of law . . .[494]

Their misconduct there should not serve as a basis for protection for themselves or others here.

---

[491] *See* Exhibit V-4, Order, No. 20-13134 (E.D. Mich.), at *103, 108; *see also* Exhibit V-2, Opinion, No. 2021-00506 (N.Y. App. Div. [1st Dept.]), at *2.

[492] *See* Exhibit V-4, Order, No. 20-13134 (E.D. Mich.), at *3.

[493] *See id.* at *89.

[494] *See* Exhibit V-2, Opinion, No. 2021-00506 (N.Y. App. Div. [1st Dept.]), at *2.

181.     Because Defendants have failed to carry their burden in showing that Dr. Coomer's claims arise out of Defendants' protected conduct, Dr. Coomer respectfully requests that the Court deny Defendants' special motions to dismiss.

**B.     Dr. Coomer has more than sufficient evidence to establish a reasonable likelihood of success on his claims.**

182.     Regardless of whether the Colorado anti-SLAPP statute applies (and it does not), this case should not be dismissed because Dr. Coomer's claims are meritorious.  In the second step of anti-SLAPP analysis, a court must assess whether a plaintiff has sufficient evidence to establish a "reasonable likelihood that the plaintiff will prevail on the claim[s]" to which the statute applies. C.R.S. § 13-20-1101(3)(a).  California's anti-SLAPP statute has nearly identical language for the evidentiary standard that a plaintiff must meet to defeat an anti-SLAPP motion.  *See* Code Civ. Proc., § 425.16(b)(1) (stating that, if the anti-SLAPP statute applies to any of the plaintiff's claims, the court should still not dismiss the claims if the plaintiff establishes "that there is a probability that the plaintiff will prevail on the claim.").  California interprets this to mean that, so long as a plaintiff can present evidence of a prima facie showing for each claim, the court must not dismiss the claims.  Other states likewise only require a prima facie showing of evidence to defeat dismissal under the anti-SLAPP statute. *See, e.g.*, *In re Lipsky*, 411 S.W.3d 530, 543 (Tex. App.—Fort Worth 2013, no pet.).  This is a low burden for plaintiffs to carry.

183.     In making this assessment, the Court only looks to whether the plaintiff "has stated a legally sufficient claim and made a prima facie factual showing." *Baral*, 376 P.3d at 608.  The Court should not weigh the evidence and must accept all evidence in the plaintiff's favor as true. *Id.* at 608–609.  As the California Supreme Court noted in *Baral*:

> The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity.

*Id.* (emphasis in original).  Once a plaintiff provides the minimum quantum of evidence to show a legally cognizable claim, the plaintiff has satisfied its burden under the second-prong.  *See id.*

184.    Defendants argue that the anti-SLAPP statute applies to all claims that Dr. Coomer has brought against them for (1) defamation, (2) intentional infliction of emotional distress, (3) civil conspiracy, and (4) request for permanent injunction.[495]  Although Defendants advance different bases, they collectively argue that Dr. Coomer cannot establish a likelihood of success on his claims.  However, Dr. Coomer has more than sufficient evidence to make a prima facie showing for his claims and those claims are viable under Colorado law.  Because Dr. Coomer can establish a prima facie evidentiary basis for his claims, Defendants' special motions to dismiss should be denied.

      **i.**      **Dr. Coomer has established a prima facie showing of defamation.**

185.    Under Colorado law, the elements for defamation are: (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication."  *Williams v. Dist. Court, Second Judicial Dist., City & Cnty. of Denver*, 866 P.2d 908, 911 n.4 (Colo. 1993).

186.    If a defamatory statement does not involve a public official, public figure, or a matter of public concern, the plaintiff must only prove defamation by a preponderance of the

---

[495] *See generally* Oltmann, et al. Mot.; Hoft-TGP Mot.; Malkin Mot.; Metaxas Mot.; OAN-Rion Mot.; Powell Mot.; Defending the Republic Mot.; Trump Campaign Mot.; Giuliani Mot.

evidence.  *McIntyre*, 194 P.3d at 524.  However, if the statement does pertain to a matter of public

concern or a public official or figure, there are two additional burdens: (1) the plaintiff must prove

the statement's falsity by clear and convincing evidence and (2) the plaintiff must prove that the

defendant published the statement with actual malice.  *Id.*; *see also Broker's Choice of Am., Inc.*

*v. NBC Universal, Inc.*, 861, F.3d 1081, 1110 (10th Cir. 2017) (recognizing truth is strictly a

defense unless the plaintiff is a public official, figure, or matter of public concern where heightened

constitutional protections apply).  In determining whether a plaintiff can make a prima facie

showing of a claim, the clear and convincing standard is not applied at this stage.  *See Han Ye Lee*

*v. Colorado Times, Inc.*, 222 P.3d 957, 962-63 (Colo. App. 2009) (noting that the clear and

convincing standard in a defamation claim goes to a plaintiff's burden of proof and is not

applicable at the summary judgment stage); *see also Baral*, 376 P.3d at 608 (identifying review

under the anti-SLAPP statute is a "summary-judgment like procedure").  First, the heightened fault

standard does not apply here because Dr. Coomer is not a public official, a public figure, or a

matter of public concern.[496]  Second, even if the heightened fault standard applied, the court would

merely determine whether there is prima facie evidence that it is met (*i.e.* whether the plaintiff

established a reasonable probability that he will be able to produce at trial clear and convincing

evidence of actual malice).  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see*

*also Young v. CBS Broad., Inc.*, 212 Cal. App. 4th 551, 562 (2012); *Ampex Corp. v. Cargle*, 128

Cal. App. 4th 1569, 1576 (2005).  Some of the Defendants recognize this standard.[497]  Whereas

the remaining Defendants attempt to advance a heightened evidentiary burden at this stage of the

---

[496] *See supra* at § VI(A)(ii)–(iii).

[497] *See* Powell Mot. p. 19; Defending the Republic Mot. at 20; Giuliani Mot. at 18.

proceeding that misstates applicable law—either by citing California case law that expressly recognized and applied the prima facie burden of proof at the anti-SLAPP stage[498] or by citing inapposite case law that neither involved anti-SLAPP statutes nor addressed the requisite burden of proof at the anti-SLAPP stage.[499]

### a.   Defendants negligently published defamatory statements concerning a private individual.

187.   Dr. Coomer has prima facie evidence establishing that Defendants defamed him. First, Defendants made defamatory, false statements of fact directly about Dr. Coomer.[500]  The Court has already addressed this issue, finding "Plaintiff's pleadings, and indeed the pleadings of some of the Defendants, have established a prima facie case that the statements at issue contain 'provably false factual assertions.'"[501]  This is consistent with well-settled law.  For a statement to be actionable as defamatory, it must at least express or imply a verifiably false fact about the plaintiff.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990); *Burns v. McGraw-Hill Broad. Co., Inc.*, 659 P.2d 1351, 1360 (Colo. 1983).  Statements of opinion are also actionable if they imply provably false facts or rely upon stated facts that are provably false.  *See Milkovich*, 497 U.S. at 20.  In deciding whether a statement expressed or implied a false statement of fact,

---

[498] *See, e.g.*, *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 18 and 26-34 (2007); *McGarry Univ. of San Diego*, 154 Cal. App. 4th 97, 108 and 118-23 (2007); *Gardner v. Martino*, 563 F.3d 981, 986 and 988-89 (9th Cir. 2009).

[499] *See, e.g.*, *Rosenbloom*, 403 U.S. at 43; *Sullivan*, 376 U.S. at 279-80; *St. Amant v. Thompson*, 390 U.S. 727 (1968); *NBC Subsidiary, Inc. v. The Living Will Center*, 879 P.2d 6, 11 (Colo. 1994); *Seible v. Denver Post Corp.*, 782 P.2d 805, 808 (Colo. App. 1989); *DiLeo*, 613 P.2d at 324; *Diversified Mgmt., Inc.*, 653 P.2d at 1106; *Lewis*, 832 P.2d at 1122-23; *Walker v. Colo. Springs Sun, Inc.*, 538 P.2d 450, 457 (Colo. 1975); *Metro Moving & Storage Co. v. Gussert*, 914 P.2d 411, 414 (Colo. App. 1995); *Smiley's Too, Inc. v. Denver Post Corp.*, 935 P.2d 39, 42 (Colo. App. 1996); *Flowers v. Carville*, 310 F.3d 1118, 1129 (9th Cir. 2002); *Broker's Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1110 (10th Cir. 2017).

[500] *See supra* at §§ II(C)-(J).

[501] *See* June 8, 2021 Order at *2.

courts consider the entire statement, the context in which it was made, and whether a reasonable person would conclude that the statements at issue expressed or implied a false fact. *See Burns*, 659 P.2d at 1360.[502]  Defendants' efforts to select discrete words or sentences that are divorced from the context of their published statements are unavailing.[503]  Instead, their statements must be reviewed in whole and, when fully reviewed, reveal that Defendants defamed Dr. Coomer.[504]  As the court determined in *U.S. Dominion, et al. v. Powell, et al.* when reviewing similar statements, this is not a close call.[505]

188.    Here, all of the Defendants alleged that Dr. Coomer was on an Antifa conference call.[506]  This is not opinion or hyperbolic rhetoric.  It is a simple statement of fact—one that is verifiably false.[507]  All of the Defendants also alleged that Dr. Coomer stated on the purported Antifa conference call that he intended to subvert the presidential election.[508]  Again, this is a statement of fact that is subject to verification.  Dr. Coomer either made these statements or he did not.  Finally, all of the Defendants alleged either expressly or implicitly that Dr. Coomer subverted the results of the presidential election.[509]  Again, these allegations are subject to verification—

---

[502] For purposes of this analysis, "reasonable person" does not implicate a majority of the community but, rather, a substantial and respectable minority of the community.  *See Keohane*, 882 P.2d at 1299, n.9.

[503] *See* Oltmann, et al. Mot. at 5, 9, 11; Hoft-TGP Mot. at 12-13, 16-17, 21; Malkin Mot. at 4; OAN-Rion Mot. at 8-10, 17-18; Powell Mot. at 8, 10; Defending the Republic Mot. at 8, 11; Trump Campaign Mot. at 7-9, 12-13; Giuliani Mot. at 7.

[504] *See supra* at § II(C)-(J); *see also* Pl.'s Amend. Compl. at §§ I, IV, V.

[505] *See* Exhibit V-3, Opinion, Nos. 1:21-cv-00040, 1:21-cv-00213, 1:21-cv-0045 (D.D.C.), at *16.

[506] *See supra* at § II(C)-(J) (Giuliani); *see also* Pl.'s Amend. Compl. at §§ I, IV, V.

[507] *See* Exhibit A, Coomer Dec. at ¶ 18; *see also* Pl.'s Amend. Compl. at ¶ 7.

[508] *See supra* at § II(C)-(J); *see also* Pl.'s Amend. Compl. at §§ I, IV, V.

[509] *See id.*  Defendants admit to these statements when arguing that statements concerning election fraud are a matter of public concern.  *See* Oltmann, et al. Mot. at 6-9; Hoft-TGP Mot. at 12-13; Malkin Mot. at 6-7, 13; Metaxas Mot. at 9-11; OAN-Rion Mot. at 4, 11-13, 15-16, 20-21; Powell Mot. at 8-11; Defending the Republic Mot. at 9-12; Trump Campaign Mot. at 9-11; Giuliani Mot. at 8-9.

either Dr. Coomer committed election fraud or he did not.  And Dr. Coomer has unequivocally

declared that these statements are false, which is competent and admissible evidence.[510]  For

purposes of the anti-SLAPP statute, Dr. Coomer's evidence is accepted as true.  *See Baral*, 376

P.3d at 608-09.  However, this evidence is also uncontroverted.  Dr. Coomer is the only witness

with personal knowledge of the allegations made.  In contrast, Defendants have no evidence in

support of their allegations.[511]  Defendants admit they relied on Oltmann as the "source" of their

defamation.  As such, they built their defamation on the speculation of a witness who admitted he

had no personal knowledge or evidence of the allegations made.[512]  Speculation is not evidence

and could never amount to evidence.[513]  Subjective beliefs without facts are not evidence,

regardless of whether they are in an affidavit.[514]  Even inferences must be based on provable facts,

which Defendants do not have.[515]  Without facts, Oltmann's statements amounted to nothing more

than fabrication.  Defendants' republication of these statements does not change the fact that they

are fabricated.  Despite this, a substantial portion of the public believed Defendants' statements to

be true.[516]

---

[510] *See* Exhibit A, Coomer Dec. at ¶ 18; *see also* Pl.'s Amend. Compl. at ¶ 7.

[511] *See supra* at § III; *see also supra* at § II(C)-(J).

[512] *See supra* at § II(C)-(J); *see also* Pl.'s Amend. Compl. at §§ I, IV, V.

[513] *Compare* Colo. R. Evid. 401 and 602, *with* Exhibit V-4, Order, No. 20-13134 (E.D. Mich.), at *3, 66-67, 76, 102 (recognizing that speculation, conjecture, and guess-work are not evidence).

[514] *Compare* Colo. R. Evid. 401 and 602, *with* Exhibit V-4, Order, No. 20-13134 (E.D. Mich.), at *78 (recognizing that "an affiant's subjective belief that an event occurred does not constitute evidence that the event in fact occurred").

[515] *Compare* Colo. R. Evid 401 and 602, *with* Exhibit V-4, Order, No. 20-13134 (E.D. Mich.), at *70 (recognizing "[i]nferences must be reasonable and come from facts proven, not speculation or conjecture") (internal citations omitted).

[516] *See* Exhibit A, Coomer Dec. at ¶¶ 19-20; Exhibit W, Bania Dec. at ¶ 12; Exhibit W-1, ADI Report; *see also* Pl.'s Amend. Compl. at § IV(D).

189.   Second, Defendants' opinions are also actionable as they are built on false statements of fact.[517]  *See Milkovich*, 497 U.S. at 20 (finding opinions are actions when they imply or rely upon provably false facts).  When some Defendants have stated that Dr. Coomer is "evil," "a sociopath," "a criminal," similar to "the Unabomber," and that he should be jailed, it was because of the above false facts.[518]  Defendants made this clear when they published their opinions in conjunction with those false facts.[519]  Some of the Defendants contend they are not liable for their opinions because they fully disclosed the facts upon which they relied in making those opinions.[520]  These arguments are without legal or factual support.  Legally, Defendants' publications of false facts are themselves actionable and not obviated by the fact that Defendants also formed opinions on them.  *See Milkovich*, 497 U.S. at 18-19; *see also NBC Subsidiary, Inc. v. The Living Will Center*, 879 P.2d 6, 11 (Colo. 1994); Restatement (Second) of Torts § 566, cmt. c.  Factually, Defendants also purposefully withheld information and positioned themselves to be perceived as having additional knowledge.  *See Burns*, 659 P.2d at 1360-61; *Keohane,* 882 P.2d 1302-04 (finding opinions are actionable if the facts disclosed are incorrect or incomplete such that they imply a false assertion of fact).  For example, Defendants published statements alleging there were notes and recordings of the purported call that do not exist or were not disclosed.[521]  Defendants have published statements that expressly or implicitly alleged there were other

---

[517] Some of the Defendants mistakenly confuse the opinion analysis with the heightened fault standard for actual malice, which is separately addressed.  *See infra* at § VI(B)(1)(b).

[518] *See* Ex. B-4, 91:2-6; Ex. E-3; Ex. G-1, at 15:2-15, 29:7-14, 63:12-25*;* Ex. K-1, PX 3 at RG 1 49-50; *see also* Pl.'s Amend. Compl. at § IV(C)–(D).

[519] *See supra* at § II(C)-(J).

[520] *See* Oltmann et al. Mot. at 9; Hoft-TGP Mot. at 17-21; Powell Mot. at 24-25; Defending the Republic Mot. at 25-26.

[521] *See supra* at § II(C)-(J); *see also* Pl.'s Amend. Compl. at § IV(C).

witnesses to this call that do not exist or were not disclosed.[522]  Defendants have published statements alleging to have video evidence that Dr. Coomer showed how votes could be altered that does not exist or was materially altered.[523]  Defendants have published statements expressly or implicitly alleging that they have evidence of election fraud that does not exist.[524]  Significantly, all of the Defendants built their opinions on Oltmann's defamation and presented him as a witness of that defamation when in fact he had no personal knowledge or evidence of the allegations he made.[525]  They legitimized the illegitimate and gave a baseless conspiracy a national platform. Despite Defendants' assertions, they cannot now avoid liability for either their opinions or the false statements of fact that underlie those opinions.  *See Milkovich*, 497 U.S. at 19.

190.    Regardless, Colorado courts have also found that accusations of criminal activity, even if in the form of opinion, are not constitutionally protected and are actionable.  *See Keohane*, 882 P.2d 1304.  Defendants' statements about Dr. Coomer impute a criminal offense—here, election fraud—against him and, therefore, are actionable regardless of whether they are in the form of an opinion.[526]  Further, statements that impute a criminal offense on a person are also defamatory per se.  *Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004) (holding that a radio talk show host's statements that a police officer had stabbed someone was defamatory per se because it imputed a criminal offense to the officer).  Some of the Defendants have conceded that the

---

[522] *See id.*

[523] *See id.*

[524] *See id.*

[525] *See supra* at § II(C)-(J); *see also* Pl.'s Amend. Compl. at §§ IV(B)–(C).

[526] *See id.*

115

statements about Dr. Coomer impute a criminal offense.[527]   Regardless, the substance of the allegations Defendants expressly or implicitly made—that Dr. Coomer conspired to steal votes for President Biden by corrupting statewide voting systems—is a criminal offense under Colorado law.  *See* C.R.S. § 1-13-703(1).

191.    Third, Defendants published their statements across numerous media platforms, including press conferences, television broadcasts, radio broadcasts, and social media websites.[528] These publications provide prima facie evidence that Defendants did in fact publish defamatory statements about Dr. Coomer.  There is no real dispute surrounding these publications.  Instead, some of the Defendants attempt to avoid their liability for their publications.  For example, the Trump Campaign without support challenges its vicarious liability for publications.[529]  There is no basis for this argument as there is more than sufficient evidence to establish the Trump Campaign's liability for its agents' acts.[530]   For purposes of this motion, the Trump Campaign opted to incorporate past briefing by reference rather than restate the merits of its challenge here.  As such, Dr. Coomer similarly incorporates by reference his past response.[531]  Similarly, some Defendants argue that they cannot be liable for republishing Oltmann's statements.[532]   However, this is

---

[527] *See* Exhibit G-1, PX 97 at 29:7-14 (describing the accusations against Dr. Coomer and stating they were "extremely criminal, and these folks know they're going to go to jail for the rest of their lives"); Exhibit A-1, Pub. 26, Giuliani, Nov. 19, 2020 Press Conference ("It is not made up.  It is not – there is nobody here that engages in fantasies.  I've tried a hundred cases.  I've prosecuted some of the most dangerous criminals in the world.  I know crimes.  I can smell them.  You don't have to smell this one.  I can prove I to you eighteen different ways.").

[528] *See supra* at §§ II(C)–(J); *see also* Pl.'s Amend. Compl. at § IV(B)–(C).

[529] *See* Trump Campaign Mot. at 6; Ex. M-1, at 19:5-18, 28:22-29:13, 30:18-32:13.

[530] *See supra* at § II(H) (Powell); § II(I) (Trump Campaign); § II(J) (Giuliani); *see also* Pl.'s Amend. Compl. At § IV(C).

[531] *See* Pl.'s Resp. filed May 14, 2021.

[532] *See* OAN-Rion Mot. at 8-10, 17-18; *see also* Malkin Mot. at 10-11.

contrary to black letter law.  *See Dixson v. Newsweek, Inc.*, 562 F.2d 626 (10th Cir. 1977) ("the republication of false defamatory statements is as much a tort as the original publication"); *see also* Colo. Jury Instr., Civil 22:7 (citing Restatement (Second) of Torts § 578 (1977)) ("Each time that libelous matter is communicated by a new person, a new publication has occurred, which is a separate basis of tort liability . . . It is no defense that the second publisher names the author or original publisher of the libel.  Thus, a newspaper is subject to liability if it republishes a defamatory statement, although it names the author and another newspaper in which the statement first appeared.").  This is especially true here where Defendants knew of Oltmann and his allegations in advance and purposefully sought to interview him as a guest so as to publish those statements.[533]  Any assertion by Defendants that they did not review those statements in advance shows conscious avoidance and an intentional or reckless disregard for the truth.[534]  Furthermore, not only did Defendants adopt Oltmann's statements while interviewing him, but they actively promoted those statement across media platforms after interviewing him.[535]  These publications are still accessible online.[536]  Further, none of the Defendants have retracted their statements.[537]

192.   Fourth, Defendants negligently published their defamatory statements. Specifically, Oltmann fabricated a conspiracy involving Dr. Coomer.[538]  No reasonable person would accept

---

[533] *See supra* at § II(D)-(G); *see also* Pl.'s Amend. Compl. at § IV(C).

[534] *See id.*

[535] *See id.*

[536] *See id.*

[537] Exhibit V-1, Cain Dec., Demand for Retraction.

[538] *See supra* at § II(C); *see also* Pl.'s Amend. Compl. at § IV(B).

these allegations as fact when based solely on speculation and conjecture.[539]  No reasonable person would repeat them as fact without investigating the allegations and obtaining corroborating evidence.[540]  Yet, the remaining Defendants relied on Oltmann, a uncredible source with no personal knowledge or evidence of his allegations as the basis for their statements about Dr. Coomer.[541]  These allegations were inherently improbable on their face.[542]  Yet, none of the Defendants contacted Dr. Coomer to corroborate the evidence.[543]  None of the Defendants investigated the allegations prior to publishing them.[544]  All of the Defendants rejected credible sources of information that debunked these allegations.[545]  Defendants' failure to investigate and reliance on unreliable sources that were improbable on their face was negligent.  *See Quigley*, 43 F. Supp. 2d at 1180 ("Failure to investigate obvious sources of refutation or corroboration of statements, especially when there is no time-pressure on their publication, may indicate not only negligence, but the higher standard of actual malice.").

193.    Fifth, Dr. Coomer does not need to establish special damages because Defendants' statements are defamatory per se.  *Gordon*, 99 P.3d at 79 ("If a libelous communication is defamatory per se, damage is presumed, and a plaintiff need not plead special damages."); *Han Ye*

---

[539] *See supra* at § II(C); *see also* Exhibit N, Brown Dec.; Exhibit O, Halderman Dec.; *see also* Exhibit V-4 (finding "no reasonable attorney would accept the assertions in those reports and affidavits as fact . . . no reasonable attorney would repeat them as fact or as support for factual allegations without conducting the due diligence inquiry required under Rule 11(b).").

[540] *See id.* Exhibit V-1, Cain Dec., Demand for Retraction.

[541] *See supra* at §§ II(D)–(J); *see also* Pl.'s Amend. Compl. at § IV(B)–(C).

[542] *See supra* at § II(C).

[543] *See* Exhibit A, Coomer Dec. at ¶¶ 16, 23, 34, 36; *see also* Pl.'s Amend. Compl. at ¶ 51.

[544] *See supra* at §§ II(C)–(J); *see also* Pl.'s Amend. Compl. at § IV(B)–(C).

[545] *See supra* at § II(K); *see also* Pl.'s Amend. Compl. at § IV(A).

*Lee*, 222 P.3d at 961.  Regardless, Dr. Coomer has suffered serious emotional distress, pecuniary loss, and other damages that was directly caused by Defendants' defamatory statements.[546]

194.     Because Dr. Coomer has a prima facie showing for every essential element of his defamation claim, the Court should deny Defendants' special motions to dismiss Dr. Coomer's defamation claims.

> **b.     The heightened fault standard does not apply, but even if it did Defendants defamed Dr. Coomer with actual malice.**

195.     Because Dr. Coomer is not a public official or figure, and because Defendants' statements regarding Dr. Coomer do not involve a matter of public concern, Dr. Coomer does not need to prove actual malice as an element of his defamation claim.[547]  However, even were the heightened actual malice standard to apply, Dr. Coomer has more than sufficient evidence to establish that Defendants acted with actual malice in publishing his defamatory statements.

196.     Actual malice "requires at a minimum that the statements were made with reckless disregard for the truth."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989); *Diversified Mgmt., Inc.*, 653 P.2d at 1110-11.  To prove actual malice, "the plaintiff must demonstrate that the defendant in fact entertained serious doubts as to the truth of the statement . . . or acted with a high degree of awareness of its probable falsity."  *Lewis,* 832 P.2d at 1122-23.  Reckless disregard "cannot be fully encompassed in one infallible definition" and is not limited to specific bases.  *See St. Amant*, 390 U.S. at 730.  Instead, actual malice can be inferred from objective circumstantial evidence, which can override a defendant's protestations of good faith.

---

[546] *See* Exhibit A, Coomer Dec. at ¶ 53; *see also* Pl.'s Amend. Compl. at §§ IV(D), V.

[547] *See supra* §§ VI(A)(ii)-(iii).

*See Brown v. Petrolite Corp.*, 965 F.2d 38, 46-47 (5th Cir. 1992) (finding circumstantial facts can "provide evidence of negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice"). Courts have considered countless circumstantial factors as sufficient to establish that a defendant has acted with actual malice, including: when a story is fabricated by a defendant or is the product of his imagination;[548] when a defendant relies on anonymous sources;[549] when a defendant had reason to know his source was unreliable;[550] when the allegations made are inherently improbable that only a reckless person would publish them;[551] when a defendant intentionally avoids the truth;[552] when a defendant's allegations conform to a preconceived storyline;[553] and when a defendant has a financial incentive to make the defamatory statements.[554]

197. Defendants' recklessness and bad faith in publishing these baseless allegations is clear.[555] Dr. Coomer has more than sufficient evidence to establish all of the above bases for actual

---

[548] *St. Amant*, 390 U.S. at 731-32.

[549] *Id.*; *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016).

[550] *St. Amant*, 390 U.S. at 732; *Celle v. Filipino Rep. Enters., Inc.*, 209 F.3d 163, 190 (2d Cir. 2000); *Wells v. Liddy*, 186 F.3d 505, 542–43 (4th Cir. 1999); *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 283 (D.D.C. 2017); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016).

[551] *St. Amant*, 390 U.S. at 732; *Spacecon Specialty Contractors, LLC. v. Bensinger*, 782 F. Supp. 2d 1194, 1201 (D. Colo. 2011), *aff'd sub nom. Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028 (10th Cir. 2013); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), *aff'd.*, 350 F.3d 1272 (D.C. Cir. 2003).

[552] *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 693; *Kuhn v. Trib.-Republican Pub. Co.*, 637 P.2d 315, 319 (Colo. 1981); *Burns*, 659 P.2d at 1361.

[553] *Harris v. City of Seattle*, 152 Fed. App'x 565, 568 (9th Cir. 2005); *Gilmore v. Jones*, 370 F. Supp. 3d 630, 674-75 (W.D. Va. 2019); *Eramo*, 209 F. Supp. at 872.

[554] *See Brown*, 965 F.2d at 47.

[555] Courts that have considered similar issues have found the same. *See* Exhibit V-3, *US Dominion, Inc. et al. v. Powell, et al.*, Nos. 1:21-cv-00040, 1:21-cv-00213, 1:21-cv-00445, at *19-24 (finding adequate allegations of actual malice); *see also* Exhibit V-4, Order, No. 20-13134 (E.D. Mich.), at *103, 108 (sanctioning Powell for filing claims "in bad faith and for an improper purpose"); Exhibit V-2, June 24, 2021 Opinion, N.Y. App. Div. [1st Dept.], at *2 (suspending Giuliani for false statements of election fraud).

malice against Defendants.[556]  First, Oltmann fabricated the false allegations against Dr. Coomer, which Defendants adopted.[557]  Second, Oltmann's story was premised on anonymous sources, which Defendants equally relied upon.[558]  Third, Defendants had several reasons to know that their source, Oltmann, was unreliable and his story inherently improbable.  Oltmann has no personal knowledge of the claims he advanced.[559]  Oltmann does not have any relevant credentials or official verification of his hearsay claims about Dr. Coomer.[560]  Oltmann conducted no legitimate investigation in support of his story and purposefully avoided the truth of it.[561]  Oltmann had no evidence in support of his story.[562]  Instead, Oltmann's story is built on an alleged Google search of anonymous speakers from an unrecorded call that he claims to have infiltrated.[563]  Oltmann then kept this alleged call secret for two months—despite almost daily podcasts—only to remember *after* the election and *after* advancing other election fraud theories.[564]  Oltmann's financial motivations in these allegations were apparent.[565]  Fourth, in contrast, the story he advanced involves facially impossible election interference.[566]  Fifth, like all Defendants, Oltmann had a

---

[556] This includes related expert reports.  *See* Exhibit N, Brown Dec.; Exhibit O, Halderman Dec.; Exhibit P, Rothschild Dec..

[557] *See supra* at §§ II(C)–(J); *see also* Pl.'s Amend. Compl. at §§ I, IV(B)–(C).

[558] *See id.*

[559] *See supra* at § II(C); *see also* Pl.'s Amend. Compl. at § IV(B).

[560] *See id.*

[561] *See id.*

[562] *See supra* at §§ II(C)–(J); *see also* Pl.'s Amend. Compl. at § IV(A)–(C).

[563] *See id.*

[564] *See id.*

[565] *See id.*; *see also* Pl.'s Amend. Compl. at § V(C).

[566] *See supra* at § II(C) (Oltmann, et al.); *see also* Pl.'s Amend. Compl. at § IV(A)–(C).

preconceived storyline of election fraud and desire to prove it.[567]  Prior to the election, Defendants began advancing various baseless allegations of elections fraud in the event their preferred candidate lost—as was projected.[568]  When their candidate did in fact lose, Defendants sought another baseless conspiracy to explain that loss, this one centered on Dr. Coomer.[569]  Sixth, like all Defendants, Oltmann had political motivations and general ill will.[570]  Seventh, like all Defendants, Oltmann had financial incentive to defame Dr. Coomer.[571]  That Defendants relied on Oltmann, an unqualified witness with no personal knowledge or evidence of the allegations he asserted and who had questionable motivations in asserting them, as their sole source to advance allegations against Dr. Coomer constitutes actual malice.[572]  Eighth, Defendants intentionally avoided the truth.  Several Defendants reference alleged vulnerabilities in Dominion's election software,[573] but as Dr. Coomer's elections expert, Dr. Halderman, makes clear, such vulnerabilities are not evidence of actual fraud let alone fraud committed by Dr. Coomer.[574]  Defendants did not contact Dr. Coomer or Dominion regarding the allegations; disregarded reliable sources with actual election expertise refuting the allegations; and conducted no

---

[567] *See supra* at §§ II(C)–(J); *see also* Pl.'s Amend. Compl. at § IV(B)–(C).

[568] *See id.*

[569] *See id.*

[570] *See id.*

[571] *See supra* at §§ II(C)–(J); *see also* Pl.'s Amend. Compl. at §§ IV(A)–(C), V(C).

[572] Oltmann describing the statements as "absolute fact" does not make it so and does not absolve Defendants of complying with journalistic standards.  *See* Metaxas 12(b)(5) Mot., filed Feb. 22, 2021 at 9; *see also* Exhibit N, Brown Dec. at ¶¶ 17, 130-134.

[573] *See* Hoft-TGP Mot. at 3-7; OAN-Rion Mot. at n.10; Giuliani Mot. at n.7; Powell Mot. at 19-21; Defending the Republic Mot. at 20-22.

[574] *See* Exhibit O, Halderman Dec. at ¶ 9.

investigation before actively promoting the allegations.[575]  Ninth, Defendants have yet to issue a retraction or remove all of the defamatory posts, further evidencing their actual malice.[576]  This evidence more than supports a prima facie showing that Defendants acted with actual malice when they published the false statements about Dr. Coomer.[577]

198.    Further, Defendant's reckless conduct is clear under Colorado law.  In *Kuhn v. Trib.-Republican Publishing Company*, the Supreme Court of Colorado found clear and convincing evidence of actual malice where a reporter "admitted that he had no bases for most of his erroneous statements, and that he failed to take the time to corroborate allegations made in the article." 637 P.2d at 319 (holding "a reporter's failure to pursue the most obvious available sources of possible corroboration or refutation may clearly and convincingly evidence a reckless disregard for the truth.").  This "[f]ailure to verify the statements made meant that many of the 'facts' . . . were, essentially, fabrications." *Id.*  Fabrications of facts do not enjoy First Amendment protections." *Id.*  Similarly, in *Burns v. McGraw-Hill Broadcasting Company*, the Colorado Supreme Court found clear and convincing evidence of actual malice where a reporter had reasons to question the reliability of the source and information; failed to investigate other sources of possible corroboration or refutation before publishing; and had no factual support for the allegations made.  659 P.2d at 1361-62.  In contrast, in *Lewis* the Colorado Supreme Court found that there was not sufficient evidence of actual malice where the defending television station and

---

[575] *See supra* at § II(C)–(J); *see also* Ex. B-2, PX 111 (confirming that there is "*no evidence* that any voting system deleted or lost votes, changed votes, or was in any way compromised" and that the 2020 election was the most secure in American history); Pl.'s Amend. Compl. at § IV.

[576] *See* Exhibit V-1, Cain Dec., Demand for Retraction.

[577] While ill-will or improper motive alone may not establish actual malice, Dr. Coomer has proffered much more. *See* Ex. V-3, at \*19-24.

reporter had actually investigated the claims alleged.  832 P.2d at 1119–21.  Their investigation

turned to official, credible sources with the Aurora Police Department.  *Id.*  The television station

and reporter had a years-long relationship with this source who had previously always provided

accurate information.   *Id.*   That credible source relied on an official report in the police

department's system to determine the plaintiff had a prior criminal history.  *Id.*  Upon learning this,

the television station and reporter tried to contact plaintiff's representatives before reporting that

information.   *Id.*   When the television station and reporter learned this information was in error

due to a mix up of names, they then immediately issued a retraction to correct the false statement.

*Id.*  Here, Defendants took none of the actions identified in *Lewis*.  Instead, like *Kuhn* and *Burns*,

Defendants published their statements despite having reasons to question Oltmann's allegations

against Dr. Coomer.[578]  As such, Defendants' failures to investigate and corroborate the allegations

before publishing them is evidence of their actual malice.

      199.    Because Dr. Coomer has evidence establishing a prima facie case for every

essential element of his defamation claim—including, out of an abundance of caution, for actual

malice—Defendants' special motions to dismiss should be denied.

      **ii.**    **Dr. Coomer has established a prima facie showing of intentional infliction of emotional distress claim.**

      200.    Dr. Coomer has a prima facie showing for intentional infliction of emotional

distress.  The facts supporting that claim include and build upon the facts underlying Dr. Coomer's

defamation claim.  A claim for intentional infliction of emotional distress requires proof that "(1)

the defendant(s) engaged in extreme and outrageous conduct, (2) recklessly or with the intent of

---

[578] *See supra* at §§ II(C)–(J).

causing the plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress." *Mackall v. JPMorgan Chase Bank, N.A.*, 356 P.3d 946, 955 (Colo. App. 2014) (citing *Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2002), *aff'd*, 90 P.3d 228 (Colo. 2004)).

201.    Because Dr. Coomer is not a public official or figure, and because Defendants' statements regarding Dr. Coomer do not involve a matter of public concern, Dr. Coomer does not need to prove actual malice as an element of his intentional infliction of emotional distress claims. However, Dr. Coomer has more than sufficient evidence to establish Defendants' actual malice. Despite Defendants' assertions, *Hustler Magazine, Inc. v. Falwell* does not hold that the First Amendment immunizes Defendants from Dr. Coomer's claims. *See* 485 U.S. 46, 50-52 (1988). Rather, it stands for the limited position that actual malice applies to claims for intentional infliction of emotional distress when it also applies to the underlying defamation claims (*i.e.,* when a plaintiff is a public figure or public official). *See id.* Because Dr. Coomer can establish a prima facie case for all of his claims, the remaining cases cited by Defendants are similarly unavailing.[579]

### a.    Defendants engaged in extreme and outrageous conduct.

202.    Defendants engaged in extreme and outrageous conduct when they defamed Dr. Coomer. Extreme and outrageous conduct exists when "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim,

---

[579] *See Fry v. Lee*, 408 P.3d 843, 856 (Colo. App. 2013) (dismissing ancillary claims where underlying defamation claims failed); *Miles v. Ramsey*, 31 F. Supp. 2d 869, 880 (D. Colo. 1998) (same); *Vackar v. Package Mach. Co.*, 841 F. Supp. 310, 315 (N.D. Cal. 1993) (same); *Lewis*, 832 P.2d at 1124-25 (same).

'Outrageous!'" *Han Ye Lee*, 222 P.3d at 963. Courts have found allegations of extreme and outrageous conduct sufficient in:

- Unverified statements by a newspaper that a wife failed to testify in her husband's murder trial, impugning the wife's integrity and implying the wife was disloyal;[580]

- Statements that a tenant would have special influence in a judicial proceeding against a landlord and mocking the landlord's serious and unfortunate physical condition;[581]

- Reports of child abuse by an unlicensed mental health provider when allegedly made in bad faith;[582]

- Repeated accusations of theft with no evidence beyond a polygraph test when questioning the employee;[583]

- Repeated requests for payment and threats to garnish wages without judgment;[584]

- Derogatory comments by a supervisor to pregnant employees;[585] and

- Racial slurs directed in an employment setting.[586]

These cases illustrate that statements—when they defame, denigrate, harass, and threaten—can constitute extreme and outrageous conduct. Such a finding is not necessarily predicated on a pattern of conduct. This is best illustrated in *Han Ye Lee*. There, a plaintiff sued a newspaper for causing her severe emotional distress with a defamatory newspaper article that falsely reported

---

[580] *Han Ye Lee*, 222 P.3d at 963-65.

[581] *Meiter v. Cavanaugh*, 580 P.2d 399, 401 (Colo. App. 1978).

[582] *Montoya v. Bebensee*, 761 P.2d 285, 286-90 (Colo App. 1988).

[583] *Ellis v. Buckley*, 790 P.2d 875, 877 (Colo. App. 1990).

[584] *Rugg v. McCarty*, 476 P.2d 753, 754-56 (Colo. 1970).

[585] *Donaldson v. Am. Banco Corp. Inc.*, 945 F. Supp. 1456, 1465-66 (D. Colo. 1996).

[586] *Mass v. Martin Marietta Corp.*, 805 F. Supp. 1530, 1543-44 (D. Colo. 1992).

that she declined to testify in her husband's murder trial. *Han Ye Lee*, 222 P.3d at 964. The article implied that the plaintiff was disloyal to her husband and impugned her integrity. *Id.* Further, the evidence established that the defendants published the article recklessly and without verifying the information. *Id.* The court in *Han Ye Lee* explained that a reasonable jury could find such defamatory statements by a newspaper article were extreme and outrageous. *Id.*

203.   Like *Han Ye Lee*, Defendants have impugned Dr. Coomer's integrity, his reputation, and his patriotism by accusing him of defrauding the American public from democratically electing their next president. It is difficult to comprehend statements more extreme and more damaging than the ones Defendants have made regarding Dr. Coomer both in nature and scope, especially given the fact that Dr. Coomer has dedicated his professional career to ensuring free and fair elections. Defendants repeatedly, without evidence, falsely accused Dr. Coomer of conspiring to overturn the presidential election.[587] This is alleged criminal conduct committed against every citizen of the United States. Without verifying their information, Defendants branded Dr. Coomer a traitor, impugned his personal and professional reputation, and incited the threat of real violence against Dr. Coomer.[588] Oltmann, for example, has repeatedly claimed that Dr. Coomer has committed treason and sedition, and that he may face the death penalty as a result.[589] He has accused Dr. Coomer of being mentally ill, a sociopath, and claimed that "not one person has said that this person is a decent human being."[590] Malkin has branded Dr. Coomer an

---

[587] *See supra* at §§ II(C)–(J); *see also* Pl.'s Amend. Compl. at §§ I, IV, V.

[588] *See id.*

[589] *See* Exhibit A-1, Pub. 2, Oltmann et. al., CONSERVATIVE DAILY PODCAST (Nov. 11, 2020); Exhibit A-1, Pub. 3, Oltmann et. al., CONSERVATIVE DAILY PODCAST (Nov. 12, 2020); Exhibit F-1, Malkin July 27, 2021, PX 15.

[590] *See* Exhibit A-1, Pub. 52, Oltmann et. al., WAKE UP! WITH RANDY CORPORON (Dec. 19, 2020).

"Antifa radical."[591]  Hoft and TGP labeled Dr. Coomer an "unhinged sociopath" in the headline of

an article that went on to be shared with millions by Eric Trump, acting on behalf of the Trump

Campaign.[592] Powell said that Dr. Coomer's social media posts demonstrated hatred "for the

United States of America as a whole."[593] Giuliani called him a "vicious, vicious man" who "is

completely warped."[594] OAN and Chanel Rion described him as an "antifa drenched engineer"

who was "hellbent on deleting half of America's voice."[595]  Metaxas went so far as to compare

Dr. Coomer to the Unabomber, describe him as evil, and state that he should be locked away for

the rest of his life.[596]  This is more than sufficient to establish a prima facie showing that

Defendants' defamatory statements were extreme and outrageous.[597]

> **b.   Defendants acted recklessly and with intent to cause severe emotional distress.**

204.    Dr. Coomer can also establish that Defendants were reckless or intended to cause

Dr. Coomer emotional distress.  Intent exists when a defendant engages in conduct with the

purpose of causing severe emotional distress to another person or knows that his conduct is certain

or substantially certain to have that result.  *Culpepper v. Pearl St. Bldg. Inc.*, 877 P.2d 877, 882-

83 (Colo. 1994).  Recklessness exists when, at the time of the conduct, a defendant knew or

---

[591] *See* Exhibit A-1, Pub. 6, Malkin, TWITTER (Nov. 13, 2020).

[592] *See* Exhibit E-3; Exhibit M-1, Trump Campaign, Aug. 9, 2021, PX 69; *see also* Exhibit A-1, Pubs. 19-20.

[593] *See* Exhibit K-1, Powell, July 20, 2021, PX 3 at 32:10-13; *see also* Exhibit A-1, Pub. 26.

[594] *See* Exhibit K-1, Powell, July 20, 2021, PX 3 at 49:14-23; *see also* Exhibit A-1, Pub. 26.

[595] *See* Exhibit I-1, OAN, July 30, 2021, PX 32; *see also* Exhibit A-1, Pub. 33.

[596] *See* Exhibit G-1, Metaxas, Aug. 13, 2021, PX 97 at 15:2-15, 29:7-14.

[597] *Compare Han Ye Lee*, 222 P.3d at 963–64 (finding newspaper's unverified statements that wife's absence at trial caused husband's murderer to walk free could be sufficiently outrageous), *with Gordon*, 99 P.3d at 82 (finding radio host's statements that sources indicated police officer was involved in stabbing and extramarital affair were not sufficiently outrageous).

reasonably should have known that there was a substantial probability that his conduct would cause another severe emotional distress.  *Id.*  Given the nature and scope of Defendants' defamation, at a minimum they knew or should have known there was a substantial probability that their conduct would cause Dr. Coomer severe emotional distress.[598]

### c.       Defendants caused Dr. Coomer severe emotional distress.

205.    Defendants' outrageous statements about Dr. Coomer caused him severe emotional distress.[599]  Dr. Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by Defendants' statements.[600]  *See Paulson v. State Farm Mut. Auto. Ins. Co.*, 867 F. Supp. 911, 919 (C.D. Cal. 1994) (noting that, in order to establish severe emotional distress, the plaintiff must "prove that he suffered objective symptoms of distress.").  Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

206.    Dr. Coomer has established a prima facie showing for every essential element of his intentional infliction of emotional distress claims against Defendants.  Defendants' Motions should be denied, accordingly.

### iii.    Dr. Coomer's has established a prima facie showing of civil conspiracy claim.

207.    Dr. Coomer has established that Defendants engaged in civil conspiracy.  The facts underlying his civil conspiracy claims include and build upon the facts that support Dr. Coomer's

---

[598] *See* Exhibit A, Coomer Dec. at ¶ 53; *see also* Pl.'s Amend. Compl. at §§ I, IV, V.

[599] *See id.*

[600] *See* Exhibit A, Coomer Dec. at ¶ 53; *see also* Pl.'s Amend. Compl. at § IV(D).

defamation and intentional infliction of emotional distress claims.[601]   To prevail on a claim for

civil conspiracy, a plaintiff must prove five elements: "(1) two or more persons, and for this

purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on

the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the

proximate result thereof."  *Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo. App. 2006).

208.    Because Dr. Coomer is not a public official or figure, and because Defendants'

statements regarding Dr. Coomer do not involve a matter of public concern, Dr. Coomer does not

need to prove actual malice as an element of his conspiracy claims.  *See supra* at § VI(B)(ii).

However, again Dr. Coomer has more than sufficient evidence to establish Defendants' actual

malice.

### a.    Defendants agreed, by words or conduct, to defame Dr. Coomer.

209.    Dr. Coomer does not need to prove express agreement to establish conspiracy.  *See*

*Schneider v. Midtown Motor Co.*, 854 P.2d 1322, 1326-27 (Colo. App. 1992).  Rather, conspiracy

may be implied by course of conduct or other circumstantial evidence providing some indicia of

agreement.  *Id.* at 1327; *Ferraro v. Convercent, Inc.*, No. 17-CV-00781-RBJ, 2017 WL 4697499,

at *5 (D. Colo. Oct. 19, 2017).  Indeed, because few, if any, "smoking guns" are ever discovered,

most conspiracy claims are established by circumstantial evidence.  *Lee v. State Farm Mut. Auto.*

*Ins. Co.*, 249 F.R.D. 662, 669 (D. Colo. 2008) ("Circumstantial evidence is not only permissible

in determining whether there is illicit conduct or agreement, it is indeed the usual and customary

basis for doing so.  Direct evidence is seldom available and few so-called 'smoking guns' are ever

discovered.  What individuals actually do—and perhaps more significantly what they do not do—

---

[601] *See* Pl.'s Amend. Compl. at §§ IV(B)-(C); V(C).

is more probative.").  As such, an agreement to conspire may "be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances."  *Wyatt v. Union Mortgage Co.*, 598 P.2d 45, 52 (Cal. 1979). "Tacit consent as well as express approval will suffice to hold a person liable as a coconspirator."  *Id.*

210.    The appellate court in *Schneider* recognized that conspiracy may be implied by a course of conduct and other circumstantial evidence providing "some indicia of agreement in an unlawful means or end."  *See* 854 P.2d at 1326-27.  There the court found that a car dealership's sales to an unlicensed motorist at discount prices to encourage repeat purchases while knowing of the motorist's reckless driving was sufficient evidence for a jury to find a tacit agreement between the dealership and motorist to commit a tortious act.  *See* 854 P.2d at 1326-27.  Similarly, the appellate court in *Saint John Church in Wilderness v. Scott* found protestors' promotion, preparation, and participation in a protest were sufficient evidence to establish a conspiracy to commit a private nuisance.  *See* 194 P.3d 475, 480 (Colo. App. 2008).

211.    Here, circumstantial and direct evidence indicates that at a bare minimum each of the Defendants conspired with Oltmann to defame Dr. Coomer and intentionally cause Dr. Coomer emotional distress.[602]  Conspiracy only requires an agreement between two people to commit an unlawful or tortious act.  Here, each Defendant obtained their information from Oltmann.[603]  Each Defendants utilized Oltmann as the sole source of their information regarding Dr. Coomer.[604]  Each Defendant agreed to and did republish Oltmann's defamation against Dr. Coomer, either by

---

[602] *See supra* at §§ II(C)–(J); *see also* Pl.'s Amend. Compl. at §§ IV, V.

[603] *See supra* at §§ II(C)–(J); *see also* Pl.'s Amend. Compl. at § IV(B)–(C).

[604] *See id.*

publishing their interview of Oltmann directly or by publicly restating Oltmann's allegations.[605] This alone is sufficient to establish conspiracy between each of the Defendants and Oltmann in this case.[606]

212.     However, there is also sufficient circumstantial and direct evidence to indicate that this conspiracy extended across all Defendants.   First, this conspiracy is unique among conspiracies in that the conspirators were overtly public in their efforts.  With this publicity, the Defendants were aware of one another's defamation and would have been cognizant of the effects of their collective defamation of Dr. Coomer.   Several of the Defendants have acknowledged this.[607] Second, each Defendant entered the same agreement with Oltmann to publish the same defamation, necessarily connecting the Defendants through Oltmann.   Third, the Defendants shared comparable personal, political, and financial motivations to defame Dr. Coomer and challenge the results of the election.[608]  When former President Trump publicly raised allegations of election fraud and demanded support, each of the Defendants complied.[609]  Each of the Defendants sought to undermine the results of the election and utilized Dr. Coomer as the means to accomplish that goal.[610]  Fourth, each of the Defendants published this defamation with similar

---

[605] *See id.*

[606] Defendants' conduct grouped the Defendants together, not Dr. Coomer. *Cf. Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1271 (M.D. Fla. 2009), *aff'd*, 451 F. App'x 862 (11th Cir. 2012).

[607] *See* Powell Mot. at 15; Defending the Republic Mot. at 16; OAN-Rion Mot., Rion Dec. at ¶ 4; Exhibit E-1, TGP-Hoft, Aug. 10, 2021 Depo. Tr. 30:3-15, 33:6-34:17, 37:19-38:2, 124:10-21; Exhibit G-1, Metaxas, Aug. 13, 2021 Depo. Tr. 69:18-70:2; Exhibit H-1, Rion, Aug. 9, 2021 Depo. Tr. 15:21-16:1, 18:12-19:7, 73:16-20, 81:16-82:15, 115:2-7, 116:23-117:17, 150:14-19, 160:15-23; Exhibit I-1, OAN, July 30, 2021 Depo. Tr. 11:22-12:21, 14:6-14, 28:17-22, 30:17-19, 62:4-9; Exhibit K-1, Powell, July 20, 2021 Depo. Tr. 10:14-21, 11:20-12:1, 15:10-18, 26:15-27:4, 41:13-16, 57:22-58:3, 65:22-66:8, 72:15-23, 73:8-15, 88:22-89:6, 92:11-22, 96:4-16, 98:10-15, 108:22-109:7.

[608] *See supra* at §§ II(C)–(J); *see also* Pl.'s Amend. Compl. at § IV(B)–(C).

[609] *See id.*

[610] *See id.*

actual malice, further indicating a shared unlawful basis.[611]  They proffered baseless conspiracy as fact without any evidence in support of their claims and actively avoided evidence debunking these claims.[612]  Fifth, many of the Defendants have yet to retract these statements, despite their clear fabrication, further indicating agreement to defame.[613]  Sixth, several of the Defendants coordinated with one another in relation to this defamation beyond Oltmann.  For example, there was clear coordination between the Trump Campaign, Giuliani, Powell, OAN, and Rion.[614]  The nature of these acts, the relation between the parties, and their shared interests sufficiently give rise to a prima facie showing of agreement to defame.  Where evidence was lacking, Defendants relied on one another to bolster their defamation.  They successfully utilized baseless allegations to cast doubt on the results of the election and provide support for former President Trump, while destroying Dr. Coomer's reputation in the process.

### b.    Defendants defamed Dr. Coomer and intentionally inflicted emotional distress.

213.    Defendants did in fact defame Dr. Coomer and intentionally inflict emotional distress.[615]

---

[611] *See* Pl.'s Amend. Compl. at § IV(A)–(C).

[612] *See supra* at § VI(B)(i)(b).

[613] *See* Exhibit V-1, Cain Dec., Demand for Retraction.

[614] *See supra* at §§ II(C)–(J); *see also* Ex. K-1, PX 6.

[615] *See supra* at § V(B)(i)-(ii).

### c. Dr. Coomer suffered injuries caused by Defendants' defamation and intentional infliction of emotional distress

214.     Dr. Coomer suffered serious injuries caused by Defendants' defamatory statements and intentional infliction of emotional distress.[616]

215.     Because Dr. Coomer has made a prima facie showing of his conspiracy claim, Defendants' special motions to dismiss should be denied.

### iv. Defendants fail to establish affirmative defenses to avoid liability for their defamation.

216.     Defendants further attempt to avoid liability for their defamation of Dr. Coomer by raising various unsupported affirmative defenses.  Generally, Defendants have the burden to prove their affirmative defenses.  In the context of the anti-SLAPP statute, that does not change.  To the extent Defendants put forward evidence in support of an affirmative defense, Dr. Coomer must overcome that evidence to demonstrate a probability of prevailing.[617]  However, Dr. Coomer's burden of proof at this stage of the proceeding remains a prima facie burden.  *See Baral*, 376 P.3d at 608-09.  Here, Defendants generally provide no evidence in support of their defenses.  In

---

[616] *See* Exhibit A, Coomer Dec. at ¶ 53; *see also supra* at §§ V(B)(i), V(B)(ii)(c).

[617] *See Trinity Risk Mgmt., LLC*, 59 Cal. App. 5th at 1005-07 (affirming dismissal of claims because plaintiff failed to overcome evidence of litigation privilege based on the court's review of emails exchanged between participants of litigation in anticipation of litigation and during litigation); *Dove Audio, Inc. v. Rosenfield Meyer & Susman*, 47 Cal. App. 4th 777, 781-82 (1996) (affirming dismissal of claims because plaintiff failed to overcome evidence of litigation privilege based on the court's review of letters exchanged between a law firm and persons with potential claims, seeking support for filing of a claim, in preparation for an official proceeding).

contrast, Dr. Coomer provides more than sufficient evidence to meet his prima facie burden of proof to overcome these alleged defenses.

217.    First, some of the Defendants advance a blanket immunity for defamation by media defendants under the First Amendment that does not exist.[618]  Despite Defendants' assertions, there is no special immunity to defame.  *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 151 (1967) ("The publisher of a newspaper has no special immunity from the application of general laws.  He has no special privilege to invade the rights and liberties of others.") (internal quotations omitted); *see also Galella v. Onassis*, 487 F.2d 986, 995 (2d Cir. 1973) (holding that defendant's tortious conduct was not immunized by First Amendment despite being committed during newsgathering process). The First Amendment recognizes both "the interests of the community in free circulation of information and those of individuals in seeking recompense for harm done by the circulation of defamatory falsehood." *Curtis Pub. Co.*, 388 U.S. at 153.  A person's right to protect their good name "reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *Gertz*, 418 U.S. at 341 (internal quotations omitted).  For this reason, the U.S. Supreme Court has never "embraced . . . the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation," because "absolute protection for the communications media requires a total sacrifice of the competing value served by the law of defamation." *Id.*  Instead, Colorado courts extend First Amendment protections to matters concerning public officials, public figures, and matters of public concern.  Those protections, when they apply, do not immunize all defamation but, rather, require a heightened fault standard for establishing that defamation.  *See*

---

[618] *See* Malkin Mot. at 3, 11; Metaxas Mot. at 3; OAN-Rion Mot. at 12, 14-16.

*Diversified Mgmt., Inc.*, 653 P.2d at 1105-10; *see also Herbert*, 441 U.S. at 171 ("Spreading false information in and of itself carries no First Amendment credentials.").  As discussed above, those heightened protections do not apply because Defendants' defamation of Dr. Coomer did not concern a public official, public figure, or matter of public concern.[619]  Given the lack of any credible journalism performed here, it is questionable whether Defendants should be afforded those protections in the first place.  Even so, Dr. Coomer has more than established the requisite culpability.

218.    Further, any efforts by non-media Defendants like Powell to equate their election-related litigation with journalism for purposes of these First Amendment protections have already been rejected[620]—and should also be rejected here.

219.    Second, some of the Defendants advance a "newsworthy" exception to defamation that does not exist.[621]  There is no such exception.  In fact, Colorado courts expressly reject protecting speech based solely on what a news organization deems newsworthy.  *See Diversified Mgmt., Inc.*, 653 P.2d at 1107.  Instead, Defendants seemingly confuse this purported exception with the neutral reporting privilege created by the Second Circuit in *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 120 (2d Cir. 1977).  In *Edwards*, the Second Circuit held that media defendants are not liable for defamation for the publication of *neutral* and *accurate* reports of newsworthy charges made by responsible and prominent organizations against public figures.  556 F.2d at 120.  This privilege has never been adopted by the U.S. Supreme Court, the Tenth Circuit,

---

[619] *See supra* at § VI(A)(ii)-(iii).

[620] *See* Exhibit V-4, Order, No. 20-13134 (E.D. Mich.), at *82-83 ("Attorneys are not journalists.").

[621] *See* OAN-Rion Mot. at 12.

or Colorado state courts.  The Third Circuit has gone so far as to expressly reject the privilege, noting that allowing publication "without fear of a libel suit even if the publisher 'has serious doubts regarding their truth' . . . is contrary to the Supreme Court's ruling in *St. Amant*" and inconsistent with its ruling in *Gertz*.  *Dickey v. CBS Inc.*, 583 F.2d 1221, 1225, 1226 n.5 (3d Cir. 1978).  Even were this privilege recognized in Colorado, which it is not, it would not apply here. Defendants cannot establish any neutral or accurate report of newsworthy charges made, especially given the prominent and credible reports rejecting their allegations at that time.[622]  *Cf. Edwards*, 556 F.2d at 120 (finding the article's author "did not in any way espouse the Society's accusations," but instead was the "exemplar of fair and dispassionate reporting").  Oltmann could never be classified as responsible or prominent.  *Cf. Edwards*, 556 F.2d at 116 (involving statements made by a nationally known ornithological society).   And Dr. Coomer is not a public figure.[623] *See Dixson*, 562 F.2d at 631 (rejecting application of *Edwards* where victim was a private individual); *Khawar v. Globe Int'l, Inc.*, 965 P.2d 696, 707 (Cal. 1998) (recognizing an absolute privilege against private figures "would be inconsistent with the United States Supreme Court's insistence on the need for balancing the First Amendment interest in promoting the broad dissemination of information relevant to public controversies against the reputation interests of private figures").

220.    Third, some of the Defendants assert without support that their statements are protected under the fair report privilege.  Specifically, Defendants argue that the filing of an affidavit by Oltmann in subsequent judicial proceedings immunizes them from liability for their

---

[622] *See supra* at § II(K); *see also* Pl.'s Amend. Compl. at § IV(A).

[623] *See supra* at § VI(A)(ii).

defamation.[624]   Again, Defendants' reliance on this privilege is misplaced.   The fair report privilege protects reports of judicial proceedings that are fair and substantially correct.   *See Quigley*, 327 F.3d at 1062.   It does not apply to reporting before any judicial action has been taken; does not extend to reporting on preliminary pleadings; and cannot extend beyond accurate reporting of the judicial proceedings.   *See id.*   Defendants' claim that the privilege applies because Oltmann memorialized some of his allegations against Dr. Coomer in an affidavit misses the mark. Dr. Coomer's claims are based on Defendants' defamation—which extended well beyond any reporting of Oltmann's sworn statements in a judicial proceeding.[625]

221.   Fourth, some of the Defendants argue that their various election-related lawsuits immunize their defamation of Dr. Coomer under the litigation privilege.[626]   Defendants' misapplication of the litigation privilege has already been briefed and considered by the Court in the discovery context.[627]   The same analysis applies here.   The litigation privilege (or shield) is not intended to immunize any and all statements an attorney may make on a client's behalf.   Instead, application of the privilege requires a court to "consider the nature of the duties performed and whether such duties are an essential and integral part of the judicial process."   *Patterson v. James*, 454 P.3d 345 (Colo. App. 2018) (internal quotations omitted).   The litigation privilege does not apply to statements made to the news media.   *See Seidl*, 30 F. Supp. 2d at 1314-15; *see also Green*

---

[624] *See* OAN-Rion Mot. at 15-16.

[625] *See supra* at §§ II(C)(J).

[626] *See* Powell Mot. at § III(D); Defending the Republic Mot. at § III(D); Trump Campaign Mot. at 11-14; Giuliani Mot. at 9-16.

[627] Dr. Coomer hereby incorporates by reference this briefing and the Court's subsequent order.   *See* Pl.'s Mot. for Reconsideration, filed June 1, 2021; Pl.'s Resp to. Metaxas's Mot. for Reconsideration, filed June 4, 2021; June 8, 2021 Order.

*Acres*, 688 P.2d at 623 (holding there was no privilege where attorneys made statements in a press conference). This limitation is to afford a measure of protection to a victim for publication to the public at large. *Cache la Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 438 F. Supp. 2d 1288, 1294 (D. Colo. 2006). Defamation by publication to the public at large is precisely what happened here. Powell and Giuliani repeated Oltmann's false claims about Dr. Coomer on national television, exposing themselves—as well as Powell, P.C., Defending the Republic, and the Trump Campaign—to liability for defamation. *See Seidl*, 30 F. Supp. 2d at 1315.

222.     The Court has already recognized that Colorado law—not California law—controls the application of the litigation privilege here.[628]   The consistent reasoning in cases applying the litigation privilege in Colorado "is that each non-judicial officer performed a function pursuant to a court directive, which was related to the judicial process." *Awai v. Kotin*, 872 P.2d 1332, 1336 (Colo. App. 1993). In asserting this privilege, Defendants rely on various lawsuits they filed to challenge the election results. Curiously, Giuliani and the Trump Campaign even rely on lawsuits filed by Powell to which they were not parties nor participants and for which Powell has been sanctioned.[629]   However, Dr. Coomer's claims are based on Defendants' repeated attacks on Dr. Coomer through national media—not on statements made in those lawsuits. These attacks do not meet Colorado's standard for this privilege. Any election-related litigation filed before or after these attacks is, therefore, irrelevant. *See Kleier Advert., Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1043-44 (10th Cir. 1990).

---

[628] *See* June 8, 2021 Order at 2.

[629] *See* Trump Campaign Mot. at 13, n.4-5; Giuliani Mot. at 12-13.

223.     Moreover, Defendants' statements, even if made by means other than press conference or media appearance, are still actionable because there is no evidence Defendants considered, in good faith, pursuing litigation against Dr. Coomer.  *See Begley v. Ireson*, 399 P.3d 777, 782 (Colo. App. 2017) ("As to communications preliminary to a proposed judicial proceeding the [litigation privilege] applies only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration.").  In fact, the cases eventually brought by the Trump Campaign dealt broadly with the election and did not make any mention of Dr. Coomer or the acts of which he was publicly accused.   The other cases brought by Powell reference Dr. Coomer but were not served in any integral way by Defendants' defamatory statements.  *See Awai*, 872 P.2d at 1336 ("[I]it is still necessary to establish that the acts performed were intimately related and essential to the judicial decision-making process.").

224.     Here, Dr. Coomer's claims are not based on any statements made in the course of pending or contemplated litigation, but rather Defendants' out-of-court defamatory campaign against him.[630]  None of the cases cited by Defendants involve similar claims or conduct.[631] Defendants took the risk of litigating the reliability of the election results in the press, based on one person's inherently unreliable and uncorroborated report.  *See e.g., Seidl*, 30 F. Supp. 2d at 1315.   Defendants' arguments have already, rightfully, failed in other jurisdictions.[632]   The privilege relies on good faith, which does not exist here, and which Defendants cannot establish

---

[630] *See supra* at §§ II(C)(J); *see also* Pl.'s Amend. Compl. at §§ I, IV, V.

[631] *See Club Valencia Homeowners Ass'n, Inc. v. Valencia Assocs.*, 712 P.2d 1024, 1028 (Colo. App. 1985); *Begley*, 399 P.3d at 779; *Begley v. Ireson*, 490 P.3d 963, 973, *reh'g denied* (Colo. App. 2020), *cert. denied sub nom. Hirsch v. Ireson*, No. 20SC979, 2021 WL 3713342 (Colo. Aug. 16, 2021); *Westfield Dev. Co. v. Rifle Inv. Assocs.*, 786 P.2d 1112, 1116 (Colo. 1990); *Merrick v. Burns, Wall, Smith & Mueller, P.C.*, 43 P.3d 712, 714 (Colo. App. 2001).

[632] *See* Ex. V-3, Ex. V-4.

following express findings of bad faith.  Such unnecessary and harmful conduct is insufficient to trigger application of the litigation shield.

225.    Fifth, the Trump Campaign argues that it is immune from liability under the Westfall Act because former President Trump was acting within the scope of his federal employment when he posted defamatory statements about Dr. Coomer on his Twitter account.[633] While the Westfall Act does provide immunity for federal employees acting within the scope of their office or employment, it does not grant absolute immunity for that employee's conduct. 28 U.S.C. § 2679(b)(1), (d).  Rather, if the Attorney General certifies that an employee was acting within the scope of their employment at the time the tortious conduct occurred, the United States will be substituted as the defendant in the litigation.  *Id.* at § 2679(d)(1).  If the Attorney General refuses to provide this certification, the employee must obtain such certification from the Court. *Id.* at § 2679(d)(3).  Under Colorado law, an act falls within an employee's scope of employment "if it bears some reasonable relation to and connection with the duties and responsibilities of the [employee] and is not manifestly or palpably beyond the [employee's] authority."  *Neitert v. Overby*, 816 F.2d 1464, 1466 (10th Cir. 1987).

226.    The Trump Campaign offers no certification from the Attorney General nor does it expressly seek one from the Court.  The Trump Campaign fails altogether to identify the President's scope of employment or explain how defaming a private individual falls within it.[634] The suggestion that President Trump's use of his official Twitter account sufficiently establishes he was acting within the scope of his employment at the time of his defamation is unpersuasive

---

[633] *See* Trump Campaign Mot. at 18.

[634] *See id.*

and without support.[635]  More importantly, the Trump Campaign fails to explain how the Westfall Act precludes its own liability, especially considering former President Trump has not been sued in his individual capacity.  Dr. Coomer's claims against the Trump Campaign are based on far more than President Trump's tweets.[636]  Though these tweets represent a ratification of Oltmann's statements by the Trump Campaign, they are not necessary to establish the Trump Campaign's liability to Dr. Coomer for defamation.

227.    Sixth, the Trump Campaign also argues that it is immune from liability under the Communications Decency Act (CDA) because Eric Trump was a "mere distributor/re-publisher" when he posted Oltmann's defamatory statements about Dr. Coomer on his Twitter account.[637] The United States Supreme Court has recently cautioned against the "sweeping immunity" courts have read into the CDA, noting that "[e]xtending [this] immunity beyond the natural reading of the text can have serious consequences." *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 18 (2020).  The CDA states that providers and users of interactive computer services shall not be treated as the publisher or speaker of information originating from third parties, creating a federal immunity for such providers and users from state law causes of action.  *See* 47 U.S.C. § 230(c)(1), (e)(3); *see also Silver v. Quora, Inc.*, 666 F. App'x 727, 729 (10th Cir. 2016). This immunity does not extend to a provider's or user's own statements.  *See* 47 U.S.C. § 230 (requiring information be provided by another party).   President Trump has previously

---

[635] None of the cases cited by the Trump Campaign involve defamation through social media.  *See Operation Rescue Nat. v. U.S.*, 975 F. Supp. 92, 94-96 (D. Mass 1997), *aff'd* 147 F.3d 68 (1st Cir. 1998); *Aversa v. U.S.*, 99 F.3d 1200, 1204 (1st Cir. 1996); *U.S. v. Smith*, 499 U.S. 160, 162-63 (1991); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 230-33 (2d Cir. 2019), *cert. granted, judgment vacated, and remanded on other grounds*, 141 S. Ct. 1220 (2021).

[636] *See supra* at § II(I); *see also* Pl.'s Amend. Compl. at §§ I, IV, V.

[637] *See* Trump Campaign Mot. at 20.

acknowledged these limitations, noting that Section (c)(1) "merely states that a provider shall not be treated as a publisher or speaker for making third-party content available and does not address the provider's responsibility for its own editorial decisions." *See* Exec. Order No. 13925, 85 F.R. 34079 (May 28, 2020), *revoked by* Exec. Order No. 14029, 86 F.R. 27025 (May 14, 2021).

228.   Here, Eric Trump did not merely republish the linked article.  He directly attributed false statements about the election to Dr. Coomer and, in the process, published his own defamatory statements to his millions of Twitter followers.[638]  Thus, the sole case cited by the Trump Campaign is inapposite.  *See Barrett v. Rosenthal*, 146 P.3d 510, 514 (2006) (where defamation hinged only on republication of defamatory article rather than user's added commentary).  Even were Eric Trump considered a "mere distributor/re-publisher," the Trump Campaign is still liable. The Trump Campaign acknowledges that immunity does not extend to a provider's or user's distribution of information it knew or had reason to know was defamatory but ignores that both Eric Trump and the Trump Campaign had reason to know Oltmann's statements about Dr. Coomer were false.[639]

229.   The Trump Campaign again fails to explain how the CDA precludes its own liability given Eric Trump has not been sued.  Dr. Coomer's claims against the Trump Campaign are not based solely on Eric Trump's tweet but on the countless other statements and representations made by its agents.[640]  Though Eric Trump's tweet represents another ratification

---

[638] *See* Ex. M-1, PX 69.

[639] *See* Ex. M-1, PX 68.

[640] *See supra* at § II(I); *see also* Pl.'s Amend. Compl. at §§ I, IV, V.

of Oltmann's statements by the Trump Campaign, it is not necessary to establish the Trump Campaign's liability to Dr. Coomer for defamation.

230.    Because Defendants affirmative defenses are unsupported and Dr. Coomer has more sufficient evidence establishing a prima facie case for defamation against Defendants, Defendants' special motions to dismiss should be denied.

> **v.    Dr. Coomer has established a prima facie showing for injunctive relief.**

231.    Dr. Coomer requests a permanent injunction against Defendants in the event he prevails on his claims for defamation and intentional infliction of emotional distress.  To this day, Defendants have refused to retract any of the defamatory publications.[641]  To prevail on a request for permanent injunction, a party must prove: "(1) he or she has achieved actual success on the merits; (2) irreparable harm will result unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause to the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."  *Langlois v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 78 P.3d 1154, 1158 (Colo. App. 2003).

232.    Injunctive relief is appropriate where—as here—a defendant continues to publish defamatory statements about an individual.  *Sunward Corp. v. Dun & Bradstreet, Inc.*, 568 F. Supp. 602, 609 (D. Colo. 1983), *rev'd on other grounds*, 811 F.2d 511 (10th Cir. 1987) ("First Amendment rights are not absolute, and if the First Amendment right is not deemed paramount, injunctive relief is appropriate if there is no adequate remedy at law."); *see also Beauharnais v. People of State of Ill.*, 343 U.S. 250, 256, (1952) (noting that defamatory statements are not entitled to First Amendment protection).  Many of the Defendants have left their false and

---

[641] *See* Exhibit V-1, Cain Dec., Demand for Retraction.

defamatory statements about Dr. Coomer published.[642]  Injunctive relief prohibiting the continued

publication of these defamatory statements is, therefore, appropriate.

233.    Dr. Coomer has evidence supporting a prima facie showing for each of the elements

in his request for permanent injunctive relief against Defendants.  First, while Dr. Coomer cannot

show that he has achieved actual success on the merits of his case until the conclusion of trial, he

has established that he has a reasonable probability of prevailing on each of the civil claims he has

brought against Defendants.[643]  Because Dr. Coomer has a reasonable probability of prevailing on

these claims, he has a substantial likelihood of succeeding on the merits of his case.  Further, the

permanent injunction will only issue if Dr. Coomer succeeds on the merits of his other claims.

234.    Second, if and when Dr. Coomer's claims for defamation and intentional infliction

of emotional distress are decided in his favor, allowing Defendants' false and defamatory

statements to remain published would result in irreparable harm to Dr. Coomer.  As the Colorado

Supreme Court has noted:

> [D]efamatory statements are so egregious and intolerable because the statement
> destroys an individual's reputation: a characteristic which cannot be bought, and
> one that, once lost, is extremely difficult to restore.

*Keohane*, 882 P.2d at 1298 (citing *Curtis Pub. Co.*, 388 U.S. at 152 (noting that libel is as serious

as the keeping of dangerous animals and the use of explosives); *Hayes v. Todd*, 15 So. 752, 755

(Fla. 1894) (discussing why there is such a compelling interest in preventing *and redressing*

*attacks* upon an individual's reputation) (emphasis added)).  Courts have long recognized the

irreparable, incalculable injuries people suffer from defamatory statements.  *See id*.  The damage

---

[642] *See supra* at §§ II(C)–(J); *see also* Pl.'s Amend. Compl. at §§ IV, V.

[643] *See supra* at §§ V(B)(i)-(iii).

Dr. Coomer continues to suffer to his reputation, privacy, and safety establishes that irreparable harm will result if an injunction against Defendants does not issue.[644]

235.    Third, Dr. Coomer's injury to his reputation, privacy, and safety outweigh any personal interest Defendants have in wanting to publish specific, defamatory statements about Dr. Coomer.  A permanent injunction will only issue if Dr. Coomer has in fact succeeded on the merits of his claim.  And if he has succeeded, then the Court has definitively ruled that Defendants' statements are defamatory, and Defendants would have no First Amendment right to continue to publish his defamatory statements.  *See Gertz*, 418 U.S. at 340 ("[T]here is no constitutional value in false statements of fact.").  However, Dr. Coomer will continue to suffer harm if the defamatory statements remain published.  Therefore, Dr. Coomer has a prima facie showing that his injury outweighs any interest Defendants have in continuing to repeat the defamatory statements.

236.    Fourth, the injunction will not adversely affect a public interest.  There is no constitutional value in false statements of fact.  *See Gertz*, 418 U.S. at 340.  To the contrary, the public has an active interest in ensuring that there are remedies for defamatory statements.  *See Keohane*, 882 P.2d at 1298; Diane L. Zimmerman, *Curbing the High Price of Loose Talk*, 18 U.C.Davis L.Rev. 359, 360 (1985) ("In modern times, the potential for the careless, or worse, the intentional falsehood to destroy livelihoods, disrupt families, and damage friendships has been viewed almost without exception by English and American judges as so serious a wrong that no judicial system would dare abandon a remedy for it.")).  Here, there will be no adverse public interest if Defendants cannot publish statements determined to be defamatory.

---

[644] *See* Exhibit A, Coomer Dec. at ¶ 53; *see also* Pl.'s Amend. Compl. at § IV(D), V(D).

237.    To be clear, Dr. Coomer does not seek a preliminary injunction.    Instead, if Defendants have not retracted their defamatory statements by the time Dr. Coomer prevails on his claims for defamation and intentional infliction of emotional distress, Dr. Coomer would be entitled to permanent injunctive relief.  Because Dr. Coomer has made a prima facie showing for every essential element of his request for permanent injunction, Dr. Coomer respectfully requests that the Court deny Defendants' motions to dismiss this claim.

**C.    Defendants are not entitled to attorney's fees for their special motions to dismiss, and any award of fees to either party should be addressed by a separate proceeding.**

238.    The purpose of the Colorado anti-SLAPP statute is to ensure that "participation in matters of public significance" is not "chilled through abuse of the judicial process."  C.R.S. § 13-20-1101(1)(a).  At the same time, the Colorado Legislature sought to "protect the rights of persons to file meritorious lawsuits for demonstrable injury." C.R.S. § 13-20-1101(b).

239.    In line with that purpose, section (4)(a) of the statute provides in part that "a prevailing defendant on a special motion to dismiss is entitled to recover the defendant's attorney's fees and costs."  C.R.S. § 13-20-1101(4)(a).  Conversely, the statute provides that "[i]f the court finds that a special motion to dismiss is frivolous or is solely intended to cause unnecessary delay . . . the court shall award costs and reasonable attorney fees to a plaintiff prevailing on the motion." *Id.*  The statute does not define "prevailing," nor have any courts in Colorado interpreted this provision.  Under California law, the determination as to whether a party "prevails" on an anti-SLAPP motion lies with the discretion of the trial court.  *See Mann v. Quality Old Time Serv., Inc.*, 139 Cal. App. 4th 328, 340 (2006).

240.    Because any award of fees largely depends on the nature of the Court's order on the pending motions, the Court's decision whether to award fees to Plaintiff or defendants would

be better addressed by separate motion after the Court's ruling.  *See e.g., Am. Humane Ass'n v. Los Angeles Times Commc'n*, 92 Cal. App. 4th 1095, 1103–04 (2001).  Courts interpreting the similar California statute have held that "fees awarded to a defendant who was only partially successful on the anti-SLAPP motion should be commensurate with the extent to which the motion changed the nature and character of the lawsuit in a particular way."  *Mann*, 139 Cal. App. 4th at 340.  In certain cases, a defendant's success at only dismissing certain claims can be an "illusory victory" if it fails to change the landscape of facts relevant to determining the rest of the lawsuit, thus making an award of any fees inappropriate.  *See Moran v. Endres*, 135 Cal. App. 4th 952, 954 (2006).

241.    At the same time, a denial of any Defendants' motions to dismiss would entitle Dr. Coomer to attorney's fees and costs for motions that are deemed frivolous or solely intended to cause unnecessary delay.  *See* C.R.S. § 13-20-1101(4)(a).

242.    Dr. Coomer remains steadfast that Defendants' motions should not even be partially successful, and that even if any individual claims are dismissed, a fee award to Defendants would be inappropriate.  Dr. Coomer also reserves the right to move for attorney's fees for frivolous motions (especially in the case of Oltmann given the fact that he is simultaneously seeking a dismissal of this case while treating the Court's orders and the Court itself with contempt) or motions solely intended to cause unnecessary delay after the Court's order granting or denying the motions.  However, it would better serve the interest of efficiency and justice for any argument regarding whether fees should be awarded and the amount of any attorney's fees after the Court rules on the pending motions.  Dr. Coomer reserves the right to argue in support of his recovery of attorney's fees and costs and/or against any fee award to any defendant after the Court's ruling.

## VII.    CONCLUSION

243.    This is a case where Defendants published serious and outrageous statements about a private citizen—and in so doing, destroyed his privacy, safety, and reputation.  Defendants never had a shred of reliable proof that any of their defamatory statements about Dr. Coomer were true, and Defendants knew and should have known that these statements were baseless and false. Neither the First Amendment nor the Colorado anti-SLAPP statute insulates Defendants from these tortious acts.

244.    Defendants' special motions to dismiss under the Colorado anti-SLAPP statute have no merit because Defendants did not engage in protected acts and because Dr. Coomer's claims against them are meritorious.  Dr. Coomer respectfully requests that the Court deny Defendants' special motions to dismiss because the statute does not apply and because Dr. Coomer has made a prima facie evidentiary showing for each of his claims.  Further, Dr. Coomer respectfully requests all such other and further relief to which the Court deems him to be justly entitled.

## PRAYER

Plaintiff Eric Coomer, Ph.D., prays this Court dismiss Defendants' special motions to dismiss pursuant to C.R.S. § 13-20-1101 and grant him such other and further relief to which he may be entitled.

Respectfully submitted,


_____*/s/ Charles J. Cain*_____

Charles J. Cain, No. 51020
Steve Skarnulis, No. 21PHV6401
Bradley A. Kloewer, No. 50565
Zachary H. Bowman, No. 21PHV6676
Thomas M. Rogers III, No. 28809
Mark Grueskin, No. 14621
Andrew Ho, No. 40381

## CERTIFICATE OF SERVICE

On September 17, 2021, I hereby certify that a true and correct copy of the foregoing Omnibus Response has been served on all parties receiving notice through ICCES.  The Omnibus Response is filed in response to the following:

- Joseph Oltmann, FEC United, Inc., and Shuffling Madness Media, Inc. dba Conservative Daily's Special Motion to Dismiss Pursuant to C.R.S. § 13-20-1101 filed 04-30-21

- James Hoft and TGP Communications, LLC.'s Motion to Dismiss Pursuant to C.R.S. § 13-20-1101 filed 04-30-21

- Michelle Malkin's Special Motion to Dismiss Pursuant to C.R.S. § 13-20-1101 filed 04-30-21

- Eric Metaxas's Special Motion to Dismiss Pursuant to C.R.S.A. § 13-20-1101 filed 03-01-211

- Herring Networks, Inc. dba One America News Network and Chanel Rion's Motion to Dismiss Pursuant to Colorado's anti-SLAPP Statute, Colo. Rev. Stat. § 13-20-1101 filed 04-30-21

- Sidney Powell and Sidney Powell P.C.'s Special Motion to Dismiss Pursuant to C.R.S. § 13-20-1101 filed 04-30-21

- Defending the Republic's Special Motion to Dismiss Pursuant to C.R.S. § 13-20-1101 filed 04-30-21

- Donald J. Trump for President, Inc.'s Motion to Dismiss Pursuant to C.R.S. § 13-20-1101 filed 04-30-21

- Rudolph Giuliani's Special Motion to Dismiss Pursuant to C.R.S. § 13-20-1101 filed 04-30-21

_/s/ Charles J. Cain_
Charles J. Cain, No. 51020

| | |
|---|---|
| DISTRICT COURT FOR THE CITY AND COUNTY OF DENVER, COLORADO<br><br>Address of Court:    1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: October 4, 2021 9:00 AM<br>FILING ID: 6A78E5F1E0F74<br>CASE NUMBER: 2020CV34319 |
| **Plaintiff**:  ERIC COOMER, Ph.D.<br><br>v.<br><br>**Defendants**:  DONALD J. TRUMP FOR PRESIDENT, INC., *et al.* | ▲ **COURT USE ONLY** ▲ |
| **Attorneys for defendants Herring Networks, Inc., d/b/a One America News Network, and Chanel Rion:**<br>Richard A. Westfall, No. 15295<br>Westfall Law, LLC<br>5842 W. Marquette Drive<br>Denver, Colorado 80235<br>Telephone:  (720) 904-6022<br>Email: rwestfall@westfall.law<br><br>Blaine C. Kimrey (*Pro Hac Vice*)<br>Jeanah Park (*Pro Hac Vice*)<br>Bryan K. Clark (*Pro Hac Vice*)<br>Julia L. Koechley (*Pro Hac Vice*)<br>Vedder Price P.C.<br>222 N. LaSalle Street, Suite 2600<br>Chicago, IL 60601<br>Telephone:  (312) 609-7500<br>Facsimile:  (312) 609-5005<br>Email: bkimrey@vedderprice.com<br>         jpark@vedderprice.com<br>         bclark@vedderprice.com<br>         jkoechley@vedderprice.com | Case Number:  2020CV034319<br><br>Courtroom:  409 |

### DEFENDANTS HERRING NETWORKS, INC., D/B/A ONE AMERICA NEWS NETWORK, AND CHANEL RION'S REPLY IN SUPPORT OF THEIR SPECIAL MOTION TO DISMISS PURSUANT TO C.R.S. § 13-20-1101

*CONTAINS CONFIDENTIAL INFORMATION*
*ACCORDING TO OMNIBUS PROTECTIVE ORDER*

## <u>TABLE OF CONTENTS</u>

**Page**

I.      Introduction ................................................................................................................... 1

II.     Anti-SLAPP discovery has confirmed that Dr. Coomer's case has no merit, and
        the Response omits or diminishes the significance of key facts ...................................... 3

III.    Argument ....................................................................................................................... 6

        A.      The anti-SLAPP statute applies ........................................................................ 6

        B.      Dr. Coomer can't prevail on the merits of his defamation claim .......................... 8

                1.      There is no *prima facie* evidence of falsity or defamatory meaning
                        in statements made by OAN and/or Rion concerning Dr. Coomer ........... 9

                2.      There is no *prima facie* evidence of actual malice ................................. 14

                3.      Dr. Coomer's claims are barred by the incremental harm doctrine ......... 18

        C.      Dr. Coomer cannot make a *prima facie* showing of intentional infliction of
                emotional distress claim ................................................................................... 20

        D.      Dr. Coomer cannot make a *prima facie* showing of conspiracy ........................ 20

        E.      Dr. Coomer cannot make a *prima facie* showing for injunctive relief ............... 21

IV.     Conclusion ................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baral v. Schnitt*,
   376 P.3d 604 (Cal. 2016) ..........................................................................................8

*Bridges v. California*,
   314 U.S. 252 (1941)..................................................................................................3

*Christian Rsch. Inst. v. Alnor*,
   148 Cal. App. 4th 71 (2007) .....................................................................................9

*Connick v. Myers*,
   461 U.S. 138 (1983)..................................................................................................2

*Curling v. Raffensperger*,
   493 F. Supp. 3d 1264 (N.D. Ga. 2020) ..............................................................6, 14

*Curto v. N.Y. Law Journal*,
   144 A.D.3d 1543 (N.Y. App. Div. 2016) ...............................................................18

*Deatley v. Allard*,
   2015 WL 134271 (D. Colo. Jan. 9, 2015)...............................................................10

*DiLeo v. Koltnow*,
   613 P.2d 318 (Colo. 1980).........................................................................................7

*Diversified Management, Inc. v. Denver Post, Inc.*,
   653 P.2d 1103 (Colo. 1982)...........................................................................7, 8, 14

*Equilon Enterprises v. Consumer Cause, Inc.*,
   52 P.3d 685 (Cal. 2002) ............................................................................................1

*First Natl. Bank of Boston v. Bellotti*,
   435 U.S. 765 (1978)..................................................................................................2

*Garrison v. Louisiana*,
   379 U.S. 64 (1964)....................................................................................................2

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974)................................................................................................14

*Gomba v. McLaughlin*,
   180 Colo. 232 (1972) ..............................................................................................17

*Gordon v. Boyles,*
    99 P. 3d 75 (Colo. 2004) ........................................................................................20

*Harte-Hanks Communications, Inc. v. Connaughton,*
    491 U.S. 657 (1989) ...............................................................................................18

*Hu & Assocs., LLC v. New Life Senior Wellness Ctr., LLC,*
    2018 WL 8755870 (C.D. Cal. Dec. 10, 2018) .........................................................8

*Hustler Magazine, Inc. v. Falwell,*
    485 U.S. 46 (1988) .................................................................................................20

*Lewis v. McGraw-Hill Broad. Co., Inc.,*
    832 P.2d 1118 (Colo. App. 1992) .......................................................................7, 15

*Lininger v. Knight,*
    123 Colo. 213 (1951) ..............................................................................................10

*Martinez v. Winner,*
    548 F. Supp. 278 (D. Colo. 1982) ............................................................................9

*N.Y. Times v. Sullivan,*
    376 U.S. 254 (1964) ..................................................................................................2

*OAO Alfa Bank v. Ctr. for Pub. Integrity,*
    387 F. Supp. 2d 20 (D.D.C. 2005) ..........................................................................16

*Provisional Gov't of Republic of New Afrika v. Am. Broad. Companies, Inc.,*
    609 F. Supp. 104 (D.D.C. 1985) .............................................................................10

*Quigley v. Rosenthal,*
    326 F.3d 1044 (10th Cir. 2003) ................................................................................7

*Quintana v. City of Westminster,*
    8 P.3d 527 (Colo. Ct. App. 2000) ...........................................................................13

*Reed v. Gallagher,*
    248 Cal. App. 4th 841 (2016) ...................................................................................9

*Seelig v. Infinity Broad. Corp.,*
    97 Cal. App. 4th 798, 119 Cal. Rptr. 2d 108 (2002) ...............................................11

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ..................................................................................................2

*Spacecon Specialty Contractors, LLC v. Bensinger,*
    713 F.3d 1028 (10th Cir. 2013) ..............................................................................16

*St. Amant v. Thompson,*
  390 U.S. 727 (1968) .............................................................................................15, 18

*Stump v. Gates,*
  777 F. Supp. 808 (D. Colo. 1991) ...........................................................................10

*Tonnessen v. Denver Pub. Co.,*
  5 P.3d 959 (Colo. Ct. App. 2000) ............................................................................19

*U.S. Dominion, Inc., et al. v. Powell, et al.,*
  Case No. 21-cv-00040 (D.D.C.) ................................................................................7

*W. & English Sales Ass'n v. Gc Merch. Mart LLC,*
  2020 Colo. Dist. LEXIS 4610 (Colo. D. Ct. Dec. 29, 2020) ...................................21

*Walters v. Linhof,*
  559 F. Supp. 1231 (D. Colo. 1983) ............................................................................9

*Wibby v. Boulder County Board of County Commissioners,*
  409 P.3d 516 (Colo. App. 2016) ..............................................................................21

**Statutes**

C.R.S. § 13-20-1101 ....................................................................................................6, 8

**Other Authorities**

Colo. R. Evid. 201.........................................................................................................6

Colo. R. Evid. 704.......................................................................................................13

Colo. R. Evid. 801.........................................................................................................4

Colo. R. Evid. 902.........................................................................................................4

## I.     Introduction

As does his lawsuit generally, plaintiff Eric Coomer's anti-SLAPP response brief ("Response") essentially mocks the Colorado anti-SLAPP statute.  On May 21, 2021, Judge Rappaport soundly reasoned, "Anti-SLAPP laws are designed 'to prevent SLAPPs [strategic lawsuits against public participation] by ending them early and without great cost to the SLAPP target.'"  May 21, 2021 Order, p. 2 (citing *Equilon Enterprises v. Consumer Cause, Inc.*, 52 P.3d 685, 693 (Cal. 2002)).  But this Court reversed Judge Rappaport's well-reasoned discovery stay, and several months of wide-ranging discovery ensued at great expense to Defendants.  And now Dr. Coomer has filed not only his 150-page Response, but also 182 exhibits totaling 10 gigabytes of data (equivalent to about 5,100 pages and more than 50 hours of audio and video files, most of which have nothing to do with OAN or Rion).[1]  Dr. Coomer apparently hopes to overwhelm the Court with the sheer size of his Response — in an effort to mask its lack of any meaningful substance, particularly as to OAN and Rion.

Despite his brief's length, Dr. Coomer's legal analysis lumps all Defendants together as if they're a monolith.  But OAN (as a national news media company) and Rion (as OAN's chief White House correspondent) are fundamentally distinct from the other defendants.  OAN and Rion diligently covered a controversy with dramatic global implications whose genesis preceded any statements by OAN or Rion.  The Court should analyze each defendant independently.

Setting aside the attempted "shock and awe" of Dr. Coomer's bloated briefing, Dr. Coomer actually confirms key facts supporting the allegedly defamatory statements by OAN and Rion.  As such, Dr. Coomer has affirmatively shown the absence of any false or defamatory statements by

---

[1] OAN and Rion incorporate by reference the evidentiary objections in their Motion to Strike and for Extension filed on September 22, 2021.  (Filing ID D98938CEAED81).  As set forth in that brief, the Court should strike the nine declarations submitted by Dr. Coomer.

OAN or Rion, as well as the absence of actual malice by them.

Dr. Coomer also ignores his own fatal credibility problems.  For instance, Dr. Coomer initially denied authorship of his profane, violent, offensive, and extremely left-wing Facebook broadcasts, only to later admit in *New York Times Magazine* that he **lied** about not being the author of those posts.[2]  In his deposition on September 23, 2021, Dr. Coomer made numerous additional admissions that doom his case and validate the reporting done by OAN and Rion.  *See* Deposition of Eric Coomer ("Coomer Dep."), attached as **Exhibit A**.[3]

Coomer's defamation claims against OAN and Rion are particularly flawed because of the special protections afforded to a free press covering matters of global concern.  The First Amendment embodies a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964).  It offers the highest protection to speech on matters of public concern.  *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).  Indeed, such speech is "at the heart of the First Amendment's protection," *First Natl. Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978), and "occupies the highest rung of the hierarchy of First Amendment values," *Connick v. Myers*, 461 U.S. 138, 145 (1983), because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964).  That principle applies with even greater force to news coverage and commentary on matters of public concern because the First Amendment protects not only freedom of speech, but also freedom of the press and is

---

[2] In one of many efforts to circumvent the 150-page briefing "limit," Dr. Coomer, in his declaration but not in his brief, limply attempts to rationalize his about-face on his Facebook posts as a misunderstanding.  (Response, Exh. A, ¶ 51).  But his lie followed by his admissions speak for themselves.

[3] Because of citations to the Coomer Deposition and other information covered by the Omnibus Protective Order, OAN and Rion have filed this brief under seal.  However, as stated in their motion challenging those confidentiality designations (Filing ID C4B754893D0BD), sealing this content is inappropriate under Colorado's sunshine law.

"intended to give to liberty of the press" the "broadest scope that could be countenanced in an orderly society." *Bridges v. California*, 314 U.S. 252, 265 (1941).

Accordingly, OAN's and Rion's anti-SLAPP motion should be granted, the claims against OAN and Rion should be dismissed with prejudice, and OAN and Rion should be awarded their fees and costs for being forced by Dr. Coomer to defend their First Amendment rights in the context of a very public and newsworthy controversy.

**II.      Anti-SLAPP discovery has confirmed that Dr. Coomer's case has no merit, and the Response omits or diminishes the significance of key facts.**

Dr. Coomer spends 71 pages outlining his purported understanding of the facts but fails to address the very public lies that Dr. Coomer told related to his Facebook broadcasts.  After the antifa call in which defendant Joseph Oltmann heard Dr. Coomer say he had ensured that President Trump would not win reelection in 2020, Mr. Oltmann gained access to Dr. Coomer's Facebook page.  That Facebook page revealed numerous radical, profane, violent, police-hating, Trump-bashing posts showing Dr. Coomer's deep loathing of Trump and sympathy for antifa.  *See* Coomer Dep., Exh. P23, attached as **Exhibit B**.  The Facebook posts confirmed that Dr. Coomer held views consistent with the comment Mr. Oltmann heard on the antifa call.  *See* Deposition of Chanel Rion ("Rion Dep."), **Exhibit C**, 118:11-20.  For instance, on July 21, 2016, Dr. Coomer published on Facebook to approximately 300 "friends" that "[o]nly an absolute FUCKING IDIOT could ever vote for that wind-bag fuck-tard FASCIST RACIST FUCK" and stated that his opinions were his own and "not necessarily the thoughts of my employer, though if not, I should probably find another job . . . Who wants to work for complete morons?"  Exh. B, p. 0072.

On December 8, 2020, Dr. Coomer wrote a guest editorial in *The Denver Post*.  *See* Editorial attached as **Exhibit D**.[4]  In that editorial, he said in no uncertain terms: "*[A]ny posts* on social media channels purporting to be from me have also been fabricated." *Id.* (Emphasis added.) Dr. Coomer later reiterated in an interview with the *Ark Valley Voice* that "his Facebook account was dormant for about three and a half years,[5] until the George Floyd murder.  At that point he began posting here and there.  ***He was not the author of the wild posts being circulated***." *See* Article attached as **Exhibit E** (emphasis added).

But on August 24, 2021, *New York Times Magazine* published a stunning and devastating admission from Dr. Coomer in a profile about him: "***the Facebook posts were, in fact, authentic***." *See* Article attached as **Exhibit F** (emphasis added).[6]  Dr. Coomer told the *Times* that "he believed every word of what he said on Facebook, but when colleagues later asked him what he was thinking, he was frank: He ***had screwed up***." *Id.* (Emphasis added.)  This means not only that the Facebook posts providing factual background for the segments published by OAN and Rion were accurate, but also that Dr. Coomer had lied about them to curtail the fallout.

In the *Times* profile, Dr. Coomer still maintained that he never joined an antifa call, but information submitted with the Response ***confirms*** key aspects of a call that match Mr. Oltmann's description.  In numerous podcasts, news reports, and his deposition in this case, Mr. Oltmann described listening via Zoom to a call in late September 2020 among antifa leaders.  *See* Deposition of Joe Oltmann ("Oltmann Dep."), attached as **Exhibit G**, at 15:18-19, 51:16-24, 71:10-15.  He

---

[4] Pursuant to Colo. R. Evid. 902(6), newspaper articles are self-authenticating documents.  To the extent there is any argument that these statements are hearsay, they are admissions by Dr. Coomer that are admissible under Colo. R. Evid. 801(d)(2).  Moreover, Dr. Coomer authenticated the article in his deposition.  (Coomer Dep. 43:22-44:3).

[6] Dr. Coomer confirmed this article — and the authenticity of the Facebook posts — in his deposition.  (Coomer Dep., 17:7-15, 36:9-15).

- 4 -

was not focused on (or familiar with) Dr. Coomer before the call, but rather joined the call to identify antifa journalists.  *Id.* at 50:7-10.  Mr. Oltmann noted that the call focused in part on right-wing activist Joey Camp.  *Id.* at 76:10-20.

The Declaration of Individual 1, attached as Exhibit U to the Response, begins by noting that Individual 1 encountered Camp at a protest on ***September 23, 2020***.  (Response, Exh. U, ¶ 8).  Individual 1 then ***admits*** that he (a leader in the Black Lives Matter community) hosted a Zoom conference call on ***September 25, 2020*** that 15-20 activists joined to discuss escalating tactics from Camp.  (*Id.*, ¶ 10).  This is an exact match to the call described by Mr. Oltmann, and the call occurred ***one day*** before Mr. Oltmann first searched Google for "Eric," "Dominion," and "Denver" on ***September 26, 2020***.  (Oltmann Dep., 72:1-8).[7]  There can be no doubt that this is the call that formed the basis for Mr. Oltmann's future statements.

It is not surprising that Individual 1 and others on the call might deny that they are "antifa," but a collection of left-wing activists discussing how to counter efforts by a right-wing activist would fit Mr. Oltmann's definition of antifa.  *See* Oltmann Dep., 41:14-18 (describing an antifa member as "[a] radical leftist that communicates openly with other radical leftists that stand for antifa being antifascist. . . [t]ypically white extremist liberals").  Thus, based on the evidence provided ***by Dr. Coomer himself***, an antifa call (as that would be defined by Mr. Oltmann) ***did*** happen.[8]

---

[7] In the deposition, Mr. Oltmann authenticated a "screenshot" of his search, which has been produced in discovery. (Oltmann Dep., 72:1-8).  That screenshot is attached as **Exhibit H**.

[8] Five individuals referenced in the Response are given confidential treatment.  This is notable because the applicable Protective Order states that "the Court has determined that information concerning ***the identity of persons involved in the alleged 'Antifa conference call'*** at issue in this case (referred to herein as Confidential Information) is highly relevant to the claims at the heart of this suit and is discoverable."  (Emphasis added).  Thus, Dr. Coomer's treatment of these five individuals suggests that they were, or Dr. Coomer believes they may have been, on the antifa call. Individuals 1, 3, and 4, all of whom were in Mr. Oltmann's notes as possibly being on the call, apparently have denied being on any "antifa call," but Individual 1 has specifically described a

### III.     Argument

### A.     The anti-SLAPP statute applies.

The Colorado anti-SLAPP statute applies — if it did not apply, Dr. Coomer should have briefed that legal question months ago, without engaging in extensive "anti-SLAPP discovery." Judge Rappaport presumed application of the anti-SLAPP law in denying discovery to Dr. Coomer.  *See* May 21, 2021 Order.  And in the Court's Order reversing Judge Rappaport and allowing discovery, the Court applied the anti-SLAPP standards, with no argument from Dr. Coomer that the statute did not apply.  *See* June 8, 2021 Order.

As Dr. Coomer acknowledges, the anti-SLAPP statute applies to an "act in furtherance of a person's right of petition or free speech," including "any written or oral statement or writing made . . . in a public forum in connection with an issue of public interest."  C.R.S. § 13-20-1101. Questions about the adequacy of Dominion voting machines and their use in elections were publicly debated long before the 2020 presidential election.  In 2017, Georgia voters filed a lawsuit regarding the security of Dominion machines, and in October 2020, the federal judge in that case credited testimony from an "array of experts and subject matter specialists [that] provided a huge volume of significant evidence regarding the security risks and deficits in the [Dominion] system," finding that those risks were neither "hypothetical nor remote." *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1278, 1341 (N.D. Ga. 2020).  Similarly, in January 2020, the state of Texas refused to certify Dominion's system, questioning whether it "is safe from fraudulent or unauthorized manipulation."  *See* **Exhibit I**.[9]  A more robust history of the controversies involving Dominion can be found in the Counterclaim filed by Sidney Powell against Dominion in *U.S. Dominion, Inc.,*

---

call on September 25, 2020, that matches the description of what Mr. Oltmann refers to as the antifa call, and Individuals 3 and 4 have ***not*** denied being on that same call (whether labeled as "antifa," "BLM," or "liberal").  *See* Response, Exhs. Q and T.

[9] The Court can take judicial notice of public documents pursuant to Colo. R. Evid. 201.

*et al. v. Powell, et al.*, Case No. 21-cv-00040 (D.D.C.), attached as **Exhibit J**, at pp. 32-37.

In the context of these public controversies, rather than shying from the spotlight, Dr. Coomer "invited public scrutiny." (Response, ¶ 166). *See DiLeo v. Koltnow*, 613 P.2d 318, 322 (Colo. 1980); *Lewis v. McGraw-Hill Broad. Co., Inc.*, 832 P.2d 1118, 1122-23 (Colo. App. 1992). Like the plaintiffs in *DiLeo* and *Lewis*, Dr. Coomer was not an average employee; he was and is a public figure who has made numerous public appearances to speak about and advocate for Dominion. *See* Motion, p. 21, n. 10 (describing multiple public appearances by Dr. Coomer on behalf of Dominion). Contrary to Dr. Coomer's argument, his behavior was entirely distinguishable from the plaintiff in *Quigley v. Rosenthal*, 326 F.3d 1044, 1059-61 (10th Cir. 2003), or other similar cases cited by Dr. Coomer, in which the statements were made against a "person with which the general public had [no] contact." Dr. Coomer was, and had been for years, a public advocate for Dominion, particularly when issues arose about election security. For example, in 2018, Dr. Coomer "was invited to join the Cyber Security Task Force assembled by the National Association of Secretaries of State." (Response, Exh. A, ¶ 4). He also has been "an active participant in the development of the Institute of Electrical and Electronics Engineers (IEEE) common data format for elections systems" and "developed Dominion's Coordinated Vulnerability Disclosure Program in conjunction with several third-party industry researchers in 2020." (*Id.*). Dr. Coomer then doubled down on his solicitation of public scrutiny after the 2020 election, giving inaccurate interviews and publishing a false editorial. *Supra* p. 4. As in *Diversified Management, Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1105-08 (Colo. 1982) (which Dr. Coomer calls the "seminal Colorado case on matters of public concern," Response, ¶ 164), there is a nexus between the public and Dr. Coomer's work as head of security for an election company that was facing public scrutiny (before the 2020 election), giving rise to a public interest

separate and apart from the alleged defamation.

But even if there was not public interest in Dr. Coomer's actions before the 2020 election, there was certainly public interest in his activities before *OAN and Rion* reported on the controversy.  The claims against OAN and Rion must be evaluated in light of the unique facts and law relevant to them.  In the Defamatory Statement Spreadsheet submitted with the Response, Dr. Coomer identified *20 different statements* by various individuals and media outlets before OAN and Rion ever reported on Dr. Coomer.  (Resp., Exh. A-1).  Thus, regardless of whether there was a public interest in Dr. Coomer before the 2020 election (and there was), there undoubtedly was a public interest in Dr. Coomer when OAN and Rion first reported on him on November 17, 2020. OAN and Rion did nothing to manufacture that public interest.

Accordingly, the challenged statements by OAN and Rion involve core First Amendment speech made on issues of pre-existing public interest, and the anti-SLAPP statute applies.  For Dr. Coomer to suggest otherwise demonstrates once again that he simply is not credible.

### B.      Dr. Coomer can't prevail on the merits of his defamation claim.

Given that the anti-SLAPP statute applies, Dr. Coomer bears the burden of establishing a reasonable likelihood that he will prevail on each of his claims.  C.R.S. § 13-20-1101(3)(a).  Dr. Coomer must show a *prima facie* basis for his claims.  *Baral v. Schnitt*, 376 P.3d 604, 608-09 (Cal. 2016).  The Court must engage in a "summary-judgment like procedure" to evaluate all available evidence and decide whether Dr. Coomer has met his burden.  *Id.* at 608.  Dr. Coomer has not.

To prevail, Dr. Coomer would need to establish his claim by "clear and convincing" evidence, which the Colorado Supreme Court has held to be the constitutionally required standard. *Diversified*, 653 P.2d at 1109.  And in California, the state after which Colorado modeled its anti-SLAPP statute, plaintiffs are required to present "clear and convincing evidence" of actual malice to survive an anti-SLAPP motion.  *See, e.g. Hu & Assocs., LLC v. New Life Senior Wellness Ctr.,*

*LLC,* 2018 WL 8755870, *6 (C.D. Cal. Dec. 10, 2018); *Christian Rsch. Inst. v. Alnor*, 148 Cal. App. 4th 71, 84 (2007); *Reed v. Gallagher*, 248 Cal. App. 4th 841, 862 (2016).

Dr. Coomer cannot establish his claim by "clear and convincing evidence" because (1) Dr. Coomer cannot demonstrate false and defamatory statements, (2) Dr. Coomer cannot demonstrate actual malice, and (3) Dr. Coomer's claims are barred by the incremental harm doctrine.

   1.   **There is no *prima facie* evidence of falsity or defamatory meaning in statements made by OAN and/or Rion concerning Dr. Coomer.**

The Court suggested in both the July 2 and July 7, 2021 hearings that there was evidence of "probable falsity" of Mr. Oltmann's alleged statements, but OAN and Rion urge the Court to closely reexamine those conclusions in light of the evidentiary record.  The evidence ***presented by Dr. Coomer*** confirms many of the details in the antifa call that Dr. Coomer claims never happened, and the admissions by Dr. Coomer in the *Times* article and in his deposition confirm facts in support of the allegedly defamatory statements by OAN and/or Rion and demonstrate that Dr. Coomer lacks credibility.  The Court should find that there is no *prima facie* evidence of falsity or defamatory meaning relating to any statements by OAN or Rion.

Dr. Coomer's Response, through the "Defamatory Statement Spreadsheet," attempts to increase the number of allegedly defamatory statements at issue, but this is not appropriate. Colorado courts have held that the content of the alleged defamation must be pled with particularity.  *Martinez v. Winner*, 548 F. Supp. 278, 307 (D. Colo. 1982); *Walters v. Linhof*, 559 F. Supp. 1231, 1234 (D. Colo. 1983).  Accordingly, Dr. Coomer was required to plead ***in his complaint*** the specific language that he claims is defamatory as to each defendant.

The Complaint identifies only the following allegedly defamatory statements by OAN and/or Rion:

   1.   "On November 17, 2020, OANN Chief White House Correspondent Chanel Rion published false statements regarding Dr. Coomer, tweeting 'Dominion Director of

Strategy and Security, #EricCoomer: "Trump won't win. I made F***ing sure of that.""[10]  (Compl., ¶ 59).

2.     "Chanel Rion, Dominion-izing the Vote, Nov. 21, 2020, YOUTUBE (saying 'In Coomer's case, he was in a position of power to actually act on his rage against Trump and Trump voters. What does he mean when he says "Trump won't win. I made f-ing sure of that." Nothing?')." (Compl., n.74).

3.     "Top Dominion Exec: Trump Is Not Going to Win. I Made F**ing Sure of That, Nov. 29, 2020, YOUTUBE (publishing Oltmann saying 'Eric Coomer was this, you know, he's not just Antifa, he was responsible for putting his finger on the scales of our election' and adding '*If* Coomer is investigated and found to have indeed tampered with a presidential election, such an action could be tried for treason. Unfortunately, the question is, will the FBI step up to investigate?')." (Compl., n.74) (emphasis added).

The Complaint also includes hyperlinks to multiple OAN segments that had nothing to do with Dr. Coomer, or even Dominion.  (Compl., n.76).  But even if the Complaint could be read as alleging that all statements by OAN and/or Rion about Dominion were defamatory against Dr. Coomer (as Dr. Coomer seems to suggest at pp. 56-58 of the Response, where he goes on at length about the contents of "Dominion-izing the Vote" and an interview with Ron Watkins that does not mention Dr. Coomer), those claims must be dismissed because the statements about *Dominion* are not defamatory as to *Dr. Coomer*.  *See Stump v. Gates*, 777 F. Supp. 808, 826 (D. Colo. 1991); *Deatley v. Allard*, 2015 WL 134271, *5 (D. Colo. Jan. 9, 2015).  If it is Dr. Coomer's position that statements about Dominion are also statements about him, he must plead evidence supporting that conclusion to establish defamation *per se.  See also Lininger v. Knight*, 123 Colo. 213, 221 (1951).  Bottom line, allegedly defamatory statements about Dominion are not "of and concerning" Dr. Coomer because Dominion and Dr. Coomer are not synonymous.  *See, e.g., Provisional Gov't of Republic of New Afrika v. Am. Broad. Companies, Inc.*, 609 F. Supp. 104, 108 (D.D.C. 1985) ("[S]tatements which refer to an organization do not implicate its members.").  In fact, Dr. Coomer no longer works for Dominion (and may have been fired because of this controversy).

---

[10] That Dr. Coomer would say something like this — given what he broadcast on Facebook — is completely consistent with his penchant for incendiary, over-the-top, profane, extremist ranting.

Thus, Dr. Coomer's claims against OAN and Rion relate **only** to Statements 1, 2 and 3 above.  Dr. Coomer claims that these statements (1) allege that Dr. Coomer was on an antifa call, (2) allege that Dr. Coomer threatened to undermine the integrity of the election, and (3) allege that Dr. Coomer actually did influence the election.  (Response, ¶ 188).  As to the third point, this is plainly incorrect.  Statement 1 clearly does not allege that Dr. Coomer influenced the election.  Statement 2 simply makes the truthful factual assertion that Dr. Coomer "was in a position of power to actually act" with respect to the election and asks the very legitimate question of how the reported statement made during the antifa call should be interpreted.  And Statement 3 raises the question of what would happen **if** Dr. Coomer were found to have tampered with the election.

Dr. Coomer's claims against OAN and Rion therefore come down to whether an "antifa call" occurred and what was said on that call.  Regardless of whether there was a call (and all evidence points to the fact that there was), saying someone participated in an antifa call is not defamatory.  Indeed, most Americans — including Dr. Coomer — consider themselves to be "antifascist."  *See* Coomer Dep., 108:1-2 ("Q: Are you antifascist? Dr. Coomer: Absolutely.").  Moreover, Dr. Coomer maintains that antifa is not an organization to which someone could be a member.  *Id*. at 34:5-12.  And he stated in his deposition that he does not know what antifa is.  *Id.* at 111:7-8 ("I don't know what Antifa refers to.").  It is difficult to imagine how Dr. Coomer can credibly claim to have been defamed by a word he cannot define.  What is or is not an "antifa call" is inherently subjective and not capable of defamatory meaning.  *Seelig v. Infinity Broad. Corp*., 97 Cal. App. 4th 798, 119 Cal. Rptr. 2d 108 (2002) (reversing lower court's denial of anti-SLAPP motion and finding statement that participant was a "big skank" was not actionable because it was too vague to be proven true or false).

Dr. Coomer argues that the occurrence of the antifa call is "a simple statement of fact" that

is "verifiably false" (Response, ¶ 188), but the reality is to the contrary.  As set forth *supra* pp. 4-5, the evidence submitted with the Response actually ***confirms*** key aspects of the call.  The only remaining points of dispute are whether Dr. Coomer participated and whether he said what Mr. Oltmann has quoted him as saying.  Dr. Coomer claims that he did not participate in an antifa call (whatever that means to him) (Response, Exh. A, ¶ 18), but he importantly does ***not*** deny having been on the September 25, 2020 call with Individual 1.  In fact, he acknowledges that he spent a portion of that day "on conference calls" and says only that he did not "participate in any 'Antifa' conference call on that day."  (Response, Exh. A, ¶ 40).  Individual 1 also does not deny that Dr. Coomer was on the call.  He only claims that "no one mentioned 'Eric from Dominion'" during the call and he does "not know Eric Coomer, nor have I ever met him."  (Response, Exh. U, ¶¶ 11-12).  And Individual 1 apparently did not know who all of the participants on the call were, given that he did not know Mr. Oltmann was on the call — and he could not have identified Dr. Coomer if he did not even know Dr. Coomer, as he attests.  Thus, despite months of discovery, Dr. Coomer has only managed to ***confirm*** that the call described by Mr. Oltmann occurred, and Dr. Coomer has failed to provide any evidence that he was not on the call (whether it be called an "antifa call," a "BLM call," a "beware Joey Camp call," or anything else).

Both Dr. Coomer and Individual 1 claim that Dr. Coomer made no statements in the call about the election, but both are known liars.  With respect to Individual 1, a charitable explanation could be that he simply did not hear the statement — Individual 1 has produced no notes from the call that would contradict Mr. Oltmann's contemporaneous notes.  But Individual 1 also has credibility problems.  The same day his Declaration was submitted to the Court, Individual 1 was censured by the school board on which he sits after an investigation concluded Individual 1 had flirted online with a 16-year-old student and made coercive and intimidating social media posts.

*See* **Exhibit K**.  And days later, hundreds of high school students in Individual 1's school district staged a walkout to force his resignation and at least one editorial board for a Denver newspaper has called for his resignation.  *See* **Exhibits L, M**.

As for Dr. Coomer, he has significant motivation to lie about the statements made during the call, and he has already proven himself to be dishonest, having lied about his Facebook posts before coming clean in the *Times*.  *Supra,* p. 4.  Moreover, the suggestions in the Response that Dr. Coomer could not have been on the call because he would not "be welcome or trusted amongst individuals affiliated with Antifa" as a man in "his 50's with a PhD" (Response, p. 4 and Ex. Q, ¶ 19) are flawed.  The declaration submitted by Dr. Coomer on this point amounts to inappropriate expert testimony and should be disregarded.  *See* Colo. R. Evid. 704; *Quintana v. City of Westminster*, 8 P.3d 527, 530 (Colo. Ct. App. 2000) (noting that an expert may not usurp the function of a court by expressing an opinion of the applicable law or legal standards).  Regardless, this line of argument is unreasonable because (1) antifa is not a defined group with an established membership (Coomer Dep., 34:5-12), (2) Dr. Coomer's aggressive, profane, violent, antifa-supporting, extremely left-wing Facebook posts suggest that he would be very comfortable in whatever Mr. Oltmann considered to be an antifa call (Oltmann Dep., 41:14-18), and (3) Dr. Coomer has in fact described himself as being "antifascist," and Dr. Coomer admits that "antifa" is a truncation of "antifascist."  (Coomer Dep., 108:1-23).

On the other hand, Mr. Oltmann has told a consistent truth, with many of the details now corroborated by Dr. Coomer.  As Mr. Oltmann testified under oath, "It's not a story.  It's what happened.  So it's not a story.  It's exactly what happened."  *See* Deposition of FEC United, attached as **Exhibit N**, at 25:25-26:2.  Even with four months of discovery and 500 pages of exhibits, Dr. Coomer has failed to give *prima facie* evidence of falsity or defamatory meaning.

### 2.   There is no *prima facie* evidence of actual malice.

Given that this press coverage was and still is a matter public concern, *supra* p. 6, Dr. Coomer must establish actual malice to prevail on his defamation claim. The Colorado Supreme Court has held that "first amendment values would be better honored by adopting the same definition of 'reckless disregard' in cases involving public officials, public figures, ***and matters of public or general concern.***" *Diversified*, 653 P.2d at 1106. (Emphasis added). Although Dr. Coomer wishfully contends that the actual malice standard does not apply (Response, ¶ 194), Dr. Coomer sought — and the Court granted — anti-SLAPP discovery for the express purpose of establishing actual malice.[11]   *See* June 8, 2021 Order, at p. 3. That simply confirms what is obvious: The actual malice standard applies because this case involves a matter of public concern.

Dr. Coomer also is a public figure because of his public activities on behalf of a highly public election company ***before*** the controversy arose surrounding the 2020 election. "In determining whether a person is a public figure, a court must examine the 'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.'" *Diversified*, 653 P.2d at 1107. In this case, as set forth *supra* pp. 6-7, Dr. Coomer was heavily and publicly involved in the controversy surrounding Dominion that existed before the 2020 election. Indeed, part of Dr. Coomer's argument that he could not have been on the antifa call is that he spent the weeks leading up to the election giving public testimony in the *Curling v. Raffensperger* litigation. (Response, Exh. A, ¶ 40). Given his very public role in defending Dominion from concerns about election security, it is inconceivable that Dr. Coomer is not, at minimum, a limited public figure on the issues of election security and integrity involving Dominion. *See Gertz v. Robert Welch,*

---

[11] Notably, although Dr. Coomer only sought discovery on actual malice and conspiracy issues, Dr. Coomer inappropriately used anti-SLAPP discovery to address the other elements of his claims.

*Inc.,* 418 U.S. 323, 351 (1974) (defining a limited purpose public figure as one who "voluntarily injects himself or is drawn into a particular controversy and thereby becomes a public figure for a limited range of issues"); *Lewis*, 832 P.2d at 1122 ("Limited purpose public figure status focuses on two questions: the threshold question of whether the defamatory statement involves a matter of public concern and, more importantly, whether the level of plaintiff's participation in the controversy invites scrutiny.").

Dr. Coomer's Facebook activity also belies the notion that he was "private" on matters of public concern, like the election.  Dr. Coomer regularly broadcast his thoughts on politics and the election to an audience of more than 300 people who were not under his control.  As noted in the *Times* article, "any one of Coomer's 'friends'— and he had several whom he knew to be Trump supporters — could have taken screenshots of his posts and sent the information along to someone who could use it."  *See* Exh. E.  Dr. Coomer, purportedly an expert in digital security, should have known that broadcasting his thoughts to an audience of 300 individuals was no more "private" than posting a billboard on the highway.  Accordingly, by any test, Dr. Coomer should be treated as a public figure (particularly as to this very public controversy).

Thus, both as a matter of public concern and because Dr. Coomer is a public figure, he must make a *prima facie* case of actual malice to avoid dismissal.  The Colorado Supreme Court has applied "the *St. Amant* definition of 'reckless disregard' in cases involving matters of public or general concern, as well as in cases involving public officials and public figures."  *Id.* at 1110.  The U.S. Supreme Court in *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968), held that reckless disregard could be found only if there was "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."  No such evidence exists here, and Dr. Coomer's claims against OAN and Rion thus fail at the anti-SLAPP stage.

Relying largely on inappropriate and inadmissible "expert" testimony, Dr. Coomer tries to establish actual malice based on alleged bias or alleged lack of journalistic ethics. OAN was not biased in its legitimate, hard-news reporting, but even if it were, bias is not equivalent to actual malice. *See Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1043 (10th Cir. 2013) ("[A] publisher's 'adversarial stance' may be 'fully consistent with professional, investigative reporting' and is not necessarily 'indicative of actual malice.'"). Additionally, OAN was ethical in its reporting, but, even if it weren't, ethical lapses do not equate to actual malice. *See OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 56 (D.D.C. 2005) (granting motion to dismiss that an expert's claim that defendant violated journalistic ethics supports a finding of "at most . . . negligence or bad journalism not actual malice"). Accordingly, Dr. Coomer's attacks on OAN and Rion (which have nothing to do with this case and include an affidavit from a former employee with an axe to grind because he was fired) are irrelevant.

Dr. Coomer provides a laundry list of issues he has with the way Mr. Oltmann went about gathering his information (Response, ¶ 197), but Dr. Coomer provides no case law indicating that these considerations are evidence of actual malice. And Dr. Coomer fails to show how ***OAN and Rion***, after the events became public in multiple other national publications, exhibited actual malice.[12] Dr. Coomer only alleges, in broad and conclusory terms, that Defendants failed to "investigate and corroborate the allegations before publishing them." (Response, ¶ 199). But Dr. Coomer's own investigation in this case shows this is false. A national cable news network publishing on a daily schedule cannot possibly be expected to engage in the level of effort Dr. Coomer has futilely engaged in here, and Dr. Coomer's Response shows that even if OAN and

---

[12] In fact, when asked at his deposition to identify the right-wing commentators whom he claimed had spread election disinformation, ***he did not mention Rion or anyone else associated with OAN***. *See* Coomer Dep., 44:12-17.

Rion had done so, they would have ***affirmed*** Mr. Oltmann's reliability, affirmed the truth of his allegations about Dr. Coomer's vile Facebook posts, affirmed Mr. Oltmann's allegations about a call that could reasonably be cast as an "antifa call," and affirmed Dr. Coomer as a far-left-wing radical with the power and motive to influence the election (and the lack of self-control to suggest (perhaps facetiously but nevertheless recklessly) that he had in fact done so).  *See Gomba v. McLaughlin*, 180 Colo. 232, 236 (1972) (holding that the existence of substantial truth depends on whether the publication as a whole "produces a different effect upon the reader than that which would be produced by the literal truth of the matter").

Moreover, the facts gathered in discovery show that OAN and Rion engaged in significant thought and effort before reporting on Dr. Coomer.  OAN and Rion did not rush any segment to air, even as other defendants and media outlets nationwide covered the same news.  Indeed, the special on "Dominion-izing the Vote" was in the works long before Mr. Oltmann's November 9 podcast about Dr. Coomer.  *See* Deposition of Charles Herring ("Herring Dep."), attached as **Exhibit O**, at 11:22-16:8, 26:8-32:20, 71:12-25, 117:6-118:1; Rion Dep., at 12:8-13:17, 18:22-19:7, 115:2-7, 117:15-17.  OAN and Rion did not hear about Dr. Coomer and craft a narrative, but rather learned additional information about apparent biases held by a high-ranking Dominion employee that were consistent with their other reporting.  *See* Rion Dep., 74:20-75:20.  OAN and Rion then followed their usual practices and review and written approval sign-off procedures.  *See* Herring Dep., 47:21-48:3, 159:14-161:19; Rion Dep., 63:4-17.[13]

---

[13] Dr. Coomer attempts to improperly rely on the declaration of retired journalist Frederick W. Brown, Jr. (who purports to provide expert testimony despite not having been presented as an expert) to argue that OAN should have reported its segments differently.  These arguments are improper legal opinions on actual malice and without merit.  It also is ironic that Brown spent his career at *The Denver Post*, which failed to identify the clear false statements in Dr. Coomer's editorial about himself before it was published.  *Supra*, p. 4.

OAN sought opportunities to interview Dr. Coomer, but at that time he had gone into hiding and OAN could not locate him.  *See* Herring Dep., 18:17-24, 28:10-29:2; Rion Dep., 89:13-90:13. Moreover, as Dr. Coomer has acknowledged, Dr. Coomer greeted at least one individual attempting to talk to him with a shotgun, meaning there was significant risk associated with seeking comment from him.  *See* Response, Exh. A, ¶ 20 ("In one instance, someone came to my house while I was home and started shouting through the door at me and asking about election fraud.  I warned him that I was armed with a shotgun and that he was trespassing and told him to leave immediately.").  And regardless, "it is well settled that there is no requirement that the publication report the plaintiff's side of the controversy."  *Curto v. N.Y. Law Journal*, 144 A.D.3d 1543, 1544 (N.Y. App. Div. 2016).

Dr. Coomer's argument for actual malice boils down to this: Dr. Coomer does not believe OAN and Rion did enough to investigate Mr. Oltmann's claims and corroborate them.  As shown above, this is not true.[14]  But even if it were, failure to investigate before publishing does not establish reckless disregard for the truth.  *See Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).  And lack of support (which OAN and Rion have in spades, especially after all of the lies and admissions by Dr. Coomer) also does not come close to actual malice, which requires something akin to outright fabrication.  *St. Amant*, 390 U.S. at 732.  Dr. Coomer can provide no *prima facie* evidence of actual malice (and certainly no "clear and convincing" evidence), and the Complaint should be dismissed with prejudice against OAN and Rion.

### 3.    Dr. Coomer's claims are barred by the incremental harm doctrine.

Even if Dr. Coomer had *prima facie* evidence of false, defamatory statements and actual

---

[14] Additional details about the extensive investigation are set forth in OAN's and Rion's Response to Plaintiff's Motion for Sanctions (File ID 24C55AB2C9077), at pp. 7-12, which is incorporated by reference here.

malice (which he does not), Dr. Coomer's claims still would be barred by the incremental harm doctrine. "[W]hen unchallenged or nonactionable parts of a particular publication are damaging, another statement, though maliciously false, may not be actionable because it causes no harm beyond the harm caused by the remainder of the publication." *Tonnessen v. Denver Pub. Co.*, 5 P.3d 959, 965 (Colo. Ct. App. 2000).

In this case, the segments published about Dr. Coomer's statements in the antifa call also referred to his violent, profane, offensive, left-wing Facebook posts, which Dr. Coomer has now **admitted** in the *Times* and in his deposition were his posts.[15] The Facebook posts show extreme bias for someone who was in a significant position of power and control at one of the companies charged with supplying voting machines for American elections. Regardless of whether the antifa call occurred as Mr. Oltmann has credibly testified under oath and penalty of perjury, the confirmed Facebook posts from Dr. Coomer would have had the same impact on his reputation and career prospects — indeed, it is difficult to imagine how Dominion or any voting machine company could employ someone with such unhinged partisan biases, which likely is why Dr. Coomer lied about his Facebook postings and why Dr. Coomer no longer works for Dominion. The Facebook posts show Dr. Coomer to be a vile, profane, craven, and dangerous extremist. Moreover, Dr. Coomer's lies about his Facebook posts show that he lacks credibility. Put simply, Dr. Coomer is solely responsible for destroying Dr. Coomer's reputation.

The antifa call is thus inconsequential to Dr. Coomer's reputation, and neither OAN nor Rion ever said Dr. Coomer actually rigged the election (nor are they alleged by Dr. Coomer to have done so). But even if OAN and/or Rion had said that, it would have done no more damage to Dr. Coomer than the damage he's done to himself on Facebook, in *The Denver Post*, in the *Ark*

---

[15] This argument was not raised in OAN and Rion's original motion because at that time, Dr. Coomer had not yet made his startling admissions to the *Times* and in his deposition in this case.

*Valley Voice*, and in *New York Times Magazine*.  Nor would such a statement do any more damage

than Dr. Coomer has done to himself by bringing this SLAPP and inadvertently revealing further

his malevolent, spiteful, dishonest, and dangerous character.  The claims against OAN and Rion

therefore fail under the incremental harm doctrine and should be dismissed with prejudice.

**C.      Dr. Coomer cannot make a *prima facie* showing of intentional infliction of
emotional distress claim.**

Dr. Coomer acknowledges, as he must, that a plaintiff must prove actual malice to establish

an intentional infliction of emotional distress ("IIED") claim when the plaintiff is a public figure.

(Response, ¶ 201).  *See also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988) ("We

conclude that public figures and public officials may not recover for the tort of intentional infliction

of emotional distress by reason of publications such as the one here at issue without showing in

addition that the publication contains a false statement of fact which was made with 'actual

malice.'").  As set forth above, Dr. Coomer cannot make a *prima facie* showing of actual malice

by clear and convincing evidence.  *Supra* pp. 14-18.  Accordingly, this claim fails for the same

reason as Dr. Coomer's defamation claim.

Additionally, to prevail on an IIED claim, the conduct at issue must "go beyond all possible

bounds of decency, and to be regarded as atrocious."  *Gordon v. Boyles*, 99 P. 3d 75, 82 (Colo.

2004).  Given the confirmed Facebook posts by Dr. Coomer and the fact that numerous aspects of

the antifa call have now been confirmed, OAN and Rion cannot be said to have engaged in any

such conduct.  This claim should also be dismissed against OAN and Rion, with prejudice.

**D.      Dr. Coomer cannot make a *prima facie* showing of conspiracy.**

Despite claiming that he needed anti-SLAPP discovery to uncover details of the so-called

"conspiracy" (June 8, 2021 Order, p. 3), Dr. Coomer has presented no facts to support the existence

of a conspiracy among any defendants, and particularly with respect to OAN and Rion.  Nothing

- 20 -

Dr. Coomer has described about OAN and Rion's conduct — running newsworthy segments about a matter of public interest after it has been covered by various other media entities — is different from any other scenario where a major news story breaks and various networks cover it.  By Dr. Coomer's logic, every major network must be involved in a "conspiracy" with the President each time the State of the Union speech occurs and then is reported.  The fact that multiple individuals and news outlets chose to discuss and cover the same newsworthy issue is not a conspiracy, and Dr. Coomer's theory to the contrary is nonsensical (and extremely dangerous to a free press).

Moreover, because Dr. Coomer's other claims fail (as set forth above), he cannot assert a claim for conspiracy.  *See W. & English Sales Ass'n v. Gc Merch. Mart LLC,* 2020 Colo. Dist. LEXIS 4610, *26 (Colo. D. Ct. Dec. 29, 2020) ("A conspiracy is a derivative claim, not independently actionable.").  Accordingly, this claim should be dismissed, with prejudice.[16]

### E.      Dr. Coomer cannot make a *prima facie* showing for injunctive relief.

Because Dr. Coomer cannot make a *prima facie* showing on any of his other claims, his injunctive relief claim (which isn't really a freestanding claim) fails as well.  *See Wibby v. Boulder County Board of County Commissioners,* 409 P.3d 516, n. 2 (Colo. App. 2016) (noting that injunctive relief is a remedy, not a substantive claim for relief).  Because all of Dr. Coomer's claims are without merit, this claim should be dismissed against OAN and Rion as well.

## IV.    Conclusion

Dr. Coomer's Complaint should be dismissed with prejudice as to OAN and Rion, and OAN and Rion should be awarded their fees and costs under the anti-SLAPP statute.[17]

---

[16] The allegation that OAN reporter Christina Bobb worked collaboratively with the Trump Campaign (Response, ¶¶ 123-125) has no bearing on this claim because, among other reasons, Dr. Coomer has presented no evidence that Bobb did any work on matters related to Dr. Coomer. (Herring Dep., 112:22-25).  And Dr. Coomer has alleged no defamatory statements by Ms. Bobb.

[17] OAN and Rion submit this 21-page brief based on their pending unopposed motion for leave to file an anti-SLAPP reply of this length.  (File ID C095E95D380A2).

Respectfully submitted on October 4, 2021,


BY: s/ Richard A. Westfall
    Richard A. Westfall, No. 15295
    5842 W. Marquette Drive
    Denver, Colorado 80235
    Telephone:  (720) 904-6022
    Email: rwestfall@westfall.law


By: s/ Blaine C. Kimrey
    Blaine C. Kimrey (*Pro Hac Vice*)
    Jeanah Park (*Pro Hac Vice*)
    Bryan Clark (*Pro Hac Vice*)
    Julia L. Koechley (*Pro Hac Vice*)
    Vedder Price P.C.
    222 N. LaSalle Street, Suite 2600
    Chicago, Illinois 60601
    Telephone:  (312) 609-7865
    Facsimile:  (312) 609-5005
    Email:  bkimrey@vedderprice.com
    jpark@vedderprice.com
    bclark@vedderprice.com
    jkoechley@vedderprice.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of October 2021, a true and correct copy of the foregoing was electronically served via the Integrated Colorado Courts E-Filing System (ICCES) and has been e-served via ICCES on all counsel of record.


s/ Richard A. Westfall