IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| US DOMINION, INC., *et al.*, | | |
| Plaintiffs, | | No. 1:21-cv-02130-CJN |
| v. | | |
| HERRING NETWORKS, INC., *et al.*, | | Judge Carl J. Nichols |
| Defendants. | | |

# **EXHIBIT D**

DATE FILED: October 4, 2021 9:00 AM
FILING ID: 6A78E5F1E0F74
CASE NUMBER: 2020CV34319

# Exhibit G

```
1    DISTRICT COURT, COUNTY OF DENVER,
     STATE OF COLORADO
2
3    Court Address:
     1437 Bannock Street
4    Denver, CO 80202              ^ COURT USE ONLY ^
     _____
5
6    ERIC COOMER, Ph.D.,                Case No. 20CV34319
7          Plaintiff,                   Courtroom 409
8    vs.
9    DONALD J. TRUMP FOR PRESIDENT, INC.,
     SIDNEY POWELL, SIDNEY POWELL, P.C.
10   RUDOLPH GIULIANI, JOSEPH OLTMANN,
     FEC UNITED, SHUFFLING MADNESS
11   MEDIA, INC., d/b/a CONSERVATIVE DAILY,
     JAMES HOFT, TGP COMMUNICATIONS LLC
12   d/b/a THE GATEWAY PUNDIT, MICHELLE
     MALKIN, ERIC METAXAS, CHANEL RION,
13   HERRING NETWORKS, INC.,
     d/b/a ONE AMERICA NEWS NETWORK,
14   and NEWSMAX MEDIA, INC.,
15              Defendants.
     _____
16
        VIDEO VIDEOCONFERENCED DEPOSITION OF JOSEPH OLTMANN
17                   September 8, 2021
     _____
18
19
20
21
22
23
24
25
```

```
 1        VIDEOCONFERENCED APPEARANCES:
 2      ON BEHALF OF THE PLAINTIFF:
                  CHARLES J. CAIN, ESQ.
 3                BRAD KLOEWER, ESQ.
                  STEVE SKARNULIS, ESQ.
 4                ZACH BOWMAN, ESQ.
                  Cain & Skarnulis PLLC
 5                P.O. Box 1064
                  Salida, California  81201
 6                Phone:  719-530-3011
                  Email:  ccain@cstrial.com
 7                Email:  bkloewer@cstrial.com
                  Email:  skarnulis@cstrial.com
 8                Email:  zbowman@cstrial.com
 9      ON BEHALF OF THE PLAINTIFF:
                  THOMAS M. ROGERS III (TREY), ESQ.
10                Recht Kornfeld PC
                  1600 Stout Street, Suite 1400
11                Denver, Colorado  80202
                  Phone:  303-573-1900
12                Email:  trey@rklawpc.com
13      ON BEHALF OF THE DEFENDANT DONALD J. TRUMP
        FOR PRESIDENT, INC.:
14                ERIC R. HOLWAY, ESQ.
                  BETH CHAMBERS, ESQ.
15                Jackson Kelly PLLC
                  1099 18th Street, Suite 2150
16                Denver, Colorado  80202
                  Phone:  303-390-0016
17                Email:  eric.holway@jacksonkelly.com
                  Email:  beth.chambers@jacksonkelly.com
18
        ON BEHALF OF THE DEFENDANT DEFENDING THE REPUBLIC:
19                CHRISTOPHER SEERVELD, ESQ.
                  Dymond • Reagor, PLLC
20                8400 East Prentice Avenue, Suite 1040
                  Greenwood Village, Colorado  80111
21                Phone:  303-734-3400
                  Email:  cseerveld@drc-law.com
22
23
24
25

                                          Page  2
```

```
 1       VIDEOCONFERENCED APPEARANCES (Cont'd):
 2      ON BEHALF OF THE DEFENDANT SIDNEY POWELL AND
        SIDNEY POWELL PC:
 3              BARRY ARRINGTON, ESQ.
                Arrington Law Firm
 4              3801 East Florida Avenue, Suite 830
                Denver, Colorado  80210
 5              Phone:  303-205-7870
                Email:  barry@arringtonpc.com
 6
        ON BEHALF OF THE DEFENDANTS JOSEPH OLTMANN, FEC UNITED,
 7      and SHUFFLING MADNESS MEDIA, INC., d/b/a CONSERVATIVE DAILY:
                ANDREA M. HALL, ESQ.
 8              The Hall Law Office, LLC
                P.O. Box 2251
 9              Loveland, Colorado  80539
                Phone:  970-419-8234
10              Email:  andrea@thehalllawoffice.com
11      ON BEHALF OF THE DEFENDANTS JOSEPH OLTMANN, FEC UNITED,
        and SHUFFLING MADNESS MEDIA, INC., d/b/a CONSERVATIVE DAILY:
12              INGRID J. DEFRANCO, ESQ.
                The Law Office of Ingrid J. Defranco
13              P.O. Box 128
                Brighton, Colorado  80601
14              Phone:  303-443-1749
                Email:  defrancoi@yahoo.com
15
        ON BEHALF OF THE DEFENDANTS JAMES HOFT AND
16      TGP COMMUNICATIONS, LLC d/b/a THE GATEWAY PUNDIT:
                JONATHAN BURNS, ESQ.
17              The Burns Law Firm
                P.O. Box 191250
18              St. Louis, Missouri  63119
                Phone:  314-329-5040
19              Email:  tblf@pm.me
20      ON BEHALF OF THE DEFENDANTS JAMES HOFT AND
        TGP COMMUNICATIONS, LLC d/b/a THE GATEWAY PUNDIT:
21              RANDY CORPORON, ESQ.
                Law Offices of Randy B. Corporon, PC
22              2821 South Parker Road, Suite 555
                Aurora, Colorado  80014
23              Phone:  303-749-0062
                Email:  rbc@corporonlaw.com
24
25
```

Page  3

```
 1      VIDEOCONFERENCED APPEARANCES (Cont'd):
 2    ON BEHALF OF THE DEFENDANT MICHELLE MALKIN:
              GORDON QUEENAN, ESQ.
 3            Patterson & Ripplinger, PC
              5613 DTC Parkway, Suite 400
 4            Greenwood Village, Colorado  80111
              Phone:  303-741-4539
 5            Email:  gqueenan@prpclegal.com
 6    ON BEHALF OF THE DEFENDANT ERIC METAXAS:
              MARGARET BOEHMER, ESQ.
 7            Gordon & Rees
              555 17th Street, Suite 3400
 8            Denver, Colorado  80202
              Phone:  303-534-5160
 9            Email:  mboehmer@grsm.com
10    ON BEHALF OF THE DEFENDANT CHANEL RION And ONE AMERICA
      NEWS NETWORK:
11            BLAINE KIMREY, ESQ.
              BRYAN CLARK, ESQ.
12            Vedder Price
              222 North LaSalle Street
13            Chicago, Illinois  60601
              Phone:  312-609-7865
14            Email:  bkimrey@vedderprice.com
              Email:  bclark@vedderprice.com
15
      ON BEHALF OF THE DEFENDANTS CHANEL RION and ONE AMERICA
16    NEWS NETWORK:
              STEPHEN DEXTER, ESQ.
17            Lathrop GPM LLP
              1515 Wynkoop Street, Suite 600
18            Denver, Colorado  80202
              Phone:  720-931-3200
19            Email:  stephen.dexter@lathropgpm.com
20    ON BEHALF OF THE DEFENDANTS CHANEL RION and HERRING
      NETWORKS, INC. d/b/a ONE AMERICA NEWS NETWORK:
21            PETER SCOTT, ESQ.
              JEREMY GRAY, ESQ.
22            Early Sullivan Wright Gizer & McRae LLP
              6420 Wilshire Boulevard, 17th Floor
23            Los Angeles, California  90048
              Phone:  970-419-8234
24            Email:  pscott@earlysullivan.com
              Email:  jgray@earlysullivan.com
25
```

Page  4

```
 1              PURSUANT TO WRITTEN NOTICE and the
 2    appropriate rules of civil procedure, the video
 3    videoconferenced deposition of JOSEPH OLTMANN, called for
 4    examination by the Plaintiff, was taken remotely,
 5    commencing at 10:04 a.m. on September 8, 2021, before
 6    Laurel S. Tubbs, a Registered Professional Reporter,
 7    Certified Realtime Reporter and Notary Public in and for
 8    the State of Colorado.
 9                           INDEX
10    EXAMINATION:                                        PAGE
11    By Mr. Cain                                            7
      By Ms. Hall                                          146
12    By Mr. Arrington                                     148
13    EXHIBITS:                                           PAGE
14    Exhibit 2   Affidavit of Mr. Oltmann                117
15    Exhibit 29  Notes of Mr. Oltmann                     12
16    Exhibit 46  Document Entitled "Parley"               96
17    Exhibit 103 Email Stream                            137
18    Exhibit 104 IOS IMESSAGE/SMS/MMS                     93
19    Exhibit 131 Post by Mr. Camp                         80
20
21
22
23
24
25
                                              Page 5
```

```
 1                    P R O C E E D I N G S

 2                    THE VIDEOGRAPHER:  Here begins the

 3       deposition of Joseph Oltmann.  Today's date is

 4       September 8th, 2021.  The time on the video is 10:04.

 5                    Counsel, please identify yourselves for

 6       the record and state whom you represent.

 7                    MR. CAIN:  Charlie Cain for the Plaintiff.

 8                    MS. DEFRANCO:  Ingrid DeFranco and Andrea

 9       Hall for Mr. Oltmann.

10                    THE VIDEOGRAPHER:  Will the court reporter

11       please swear in the witness after her read.

12                    THE REPORTER:  The attorneys participating

13       in this deposition acknowledge that I am not physically

14       present in the deposition room and that I will be

15       reporting this deposition remotely.  They further

16       acknowledge that in lieu of an oath administered in

17       person, the witness will verbally declare his testimony

18       in this matter is under penalty of perjury.  The parties

19       and their counsel consent to this arrangement and waive

20       any objections to this manner of reporting.  Please

21       indicate your agreement by stating your name and your

22       agreement on the record, beginning with the taking

23       attorney.

24                    MR. CAIN:  Charlie Cain.  I agree.

25                    MS. HALL:  Andrea Hall and Ingrid
```

Page  6

```
1    DeFranco.  We agree.
2                    JOSEPH OLTMANN,
3    having been first duly sworn or affirmed, was examined and
4    testified as follows:
5                    EXAMINATION
6    BY MR. CAIN:
7         Q.   State your full name, please.
8         A.   Joseph Oltmann.
9         Q.   Mr. Oltmann, you understand you're here to
10   give testimony as a result of a court order issued by
11   Judge Moses in this case, correct?
12        A.   I do.
13        Q.   Part of what she asked us to do is to
14   provide exhibits to you via your counsel.  We did so last
15   night.  Those exhibits were to be printed out and put in a
16   binder.
17             Do you have a binder of exhibits in front
18   of you?
19        A.   I do not.  I have a computer screen with
20   those up, though.
21        Q.   Mr. Oltmann, instead of being in person, we
22   are obviously conducting this deposition via Zoom, so I'm
23   not there to -- to look at what you're looking at or
24   perceive any information that you're getting outside of
25   the context of my questions and your answers.  So let me
```

Page 7

1    explain a couple of things to you.

2                       First of all, you are to not have any

3    recording devices in your office.  You are in your office,

4    are you not?

5                  A.   It doesn't matter where I am.  It's not

6    relevant.

7                  Q.   You are in your office?

8                  A.   It's not relevant.

9                  Q.   Let me explain to you, sir, how this is

10   going to go.  I'm going to ask the questions.  You're

11   going to answer my questions.  It's up to your counsel to

12   advise you if they perceive that there's a privilege issue

13   or some other reason that you shouldn't answer my

14   questions.

15                      Are you in your office or not?

16                  A.   (No Response.)

17                      MS. HALL:  Objection, Charlie.  It's not

18   relevant.  Move on.

19                      MR. CAIN:  Are you instructing your client

20   not to answer the questions where he's physically

21   located?

22                      MS. HALL:  Move on.

23                      MR. CAIN:  Yes or no.

24                      MS. HALL:  I said, Yes.  Move on, Charlie.

25   It's not relevant.

                                                    Page 8

```
 1                    MR. CAIN:  Don't talk over me.
 2            Q.   (By Mr. Cain)  It's important, Mr. Oltmann,
 3      that you and I understand each other.  If there's some
 4      reason that you don't understand my questions, will you
 5      stop me, ask me to rephrase the question, so that I can be
 6      sure that you understand what I'm asking you and you're
 7      answering the question that I'm asking?
 8            A.   Yes.
 9            Q.   Are you recording -- do you have a
10      recording device with you where you're sitted -- or
11      seating now currently?  Are you recording this?
12            A.   No.  This is being recorded.
13            Q.   No, I understand that.
14                 My question is:  Are you recording it
15      separately?
16            A.   No.
17            Q.   Mr. Oltmann, you are to not communicate
18      outside the parties during the course of this deposition.
19      That would include getting instructions on how to answer
20      questions from your counsel.
21                 Do you understand that?
22            A.   Yes.
23            Q.   I want only your testimony and your
24      testimony alone.  Who else is with you physically right
25      now?
```

                                                      Page 9

1            MR. CAIN:  Charlie, I'm going to object to

2     this line of questioning.  How is this relevant?  You've

3     not done this with one other person that you've done a

4     deposition over Zoom with.  So I suggest you start asking

5     questions because your time is running.

6            Q.   (By Mr. Cain)  Who else is with you

7     physically present --

8            MR. CAIN:  And I'm not going to allow

9     speaking objections, and I will ask for more time if you

10    keep it up.

11           Q.   (By Mr. Cain)  Who else is with you,

12    Mr. Oltmann?

13           A.   My attorneys.

14           Q.   Anyone else?

15           A.   No.

16           Q.   Mr. Oltmann, have you reviewed the

17    protective order that Judge Moses entered in this case?

18           A.   No.

19           Q.   Are you aware that there's a protective

20    order that would prohibit the disclosure of individuals

21    that were on the antifa call or your conduit to that call,

22    disclosure outside of these proceedings?  Are you aware of

23    that?

24           A.   Yes.

25           Q.   Are you prepared to testify today regarding

                                                    Page 10

```
 1    the identity of your conduit to the antifa call?

 2            A.   Can you repeat that question again?

 3            Q.   Are you prepared to testify today

 4    concerning the identity of the individual or individuals

 5    who gave you access to the antifa call?

 6            A.   To a certain extent.

 7            Q.   To what extent?

 8            A.   To the extent that I give you what

 9    information is readily available.

10            Q.   Who provided you access -- what's the

11    identity of the individual or individuals who provided you

12    access to the antifa call?

13            A.   I made a commitment not to disclose the

14    name of that person.  Unfortunately, that person who is

15    known to me is actually in my notes.

16            Q.   In the notes of the call?

17            A.   Yes.

18            Q.   Okay.  Who is it?

19            A.   That's all I'm going to say.

20            Q.   You understand the Court has ordered you to

21    provide us that information.  You understand that?

22            A.   I'm not going to provide that information.

23            Q.   I'm sorry?

24            A.   Mr. Coomer is on this call.  Mr. Coomer is

25    the one that presented the antifa manifesto in his social
```

Page 11

```
1    media.  Mr. Coomer was the one that was on that call.  So
2    as a result of that, no protection order would protect
3    this individual.
4              Q.   Who is the -- who is the person that was
5    your conduit?  Give me the identity of that person.
6                   Are you refusing to answer my question?
7              A.   I answered your question already.  You
8    just didn't like the answer.
9              Q.   No.  I didn't get the answer to the
10   question.  The question was:  Who is the person or persons
11   who served as the conduit for you to be on the antifa
12   call?  Give me the name.
13             A.   I gave you the information as it relates
14   to the information that's in my notes, and you have my
15   notes.  So therefore you have that name.
16             Q.   Joey Camp?
17             A.   No.
18             Q.   All right.  Who?
19             A.   The information as to who gave me access
20   to that call is inside of the notes.
21             Q.   All right.  One of the documents that I
22   identified for you was Plaintiff's Exhibit 29, which I
23   understand to be your notes.
24                  Do you have that?
25             A.   Hold on one second.
```

Page 12

```
 1                    MR. KIMREY:  Mr. Cain, this is Blaine
 2     Kimrey.  Have these exhibits been provided to the other
 3     counsel of record in this case?
 4                    MR. CAIN:  Yes.
 5                    MR. KIMREY:  I will note for the record
 6     that I did not receive copies of these exhibits.  I am
 7     counsel for OANN and Chanel Rion.  Can you have your
 8     office forward to me a file of the exhibits right now?
 9                    MR. CAIN:  No.  I think, Blaine -- and
10     welcome to the case -- you should have the Exhibit Share
11     function and you can -- you can view them on that through
12     Veritext.  But I don't want to waste time on the record
13     with this right now.
14                    MR. KIMREY:  Okay.  Fair enough.
15                    MR. CAIN:  We can talk about it off-line.
16             Q.    (By Mr. Cain)  Do you have Exhibit 29 up,
17     Mr. Oltmann?
18             A.    I'm actually not seeing Exhibit 29.
19             Q.    It's a copy of your notes.
20             A.    Okay.  I'm looking at it now.
21             Q.    All right.  And these are notes, correct me
22     if I'm wrong, that you say were taken contemporaneously by
23     you while you were on that call; is that true?
24             A.    Yes.
25             Q.    Okay.  And this is one, two, three -- four
```

1    pages of notes, correct?

2              A.   Yes.

3              Q.   Where in your notes is the identity of your

4    conduit to the call reflected?

5              A.   It is -- it is on this page, yes.

6              Q.   Which page?  There's a Bates stamp -- what

7    we call Bates stamp down on the bottom right.  205, 206,

8    207, 208 are the page numbers on these notes.  Which page?

9              A.   There's no stamp on this page.  Oh, there

10   it is.  205.

11             Q.   All right.  So 205 starts, Who is Eric

12   Dominion guy.  Is that the one you're looking at?

13             A.   It is.

14             Q.   Denver, Colorado Springs, question mark?

15   Then there's the Brian.  Who's Brian?  If I'm reading that

16   correctly.  Does that say Brian?

17             A.   That is not -- that is not who gave me

18   access to the call.

19             Q.   Who is Brian?

20             A.   He's an antifa member.  He's a journalist,

21   I think.

22             Q.   What's his last name?

23             A.   I don't know.

24             Q.   Was he on the call?

25             A.   I don't recall actually.  I'd have to go

                                                    Page 14

```
 1     through my notes.
 2             Q.   The next name is -- that appears to be a
 3     name is Bev, B-e-v.  Who is that?
 4             A.   How do I get to the other pages?
 5                  MS. HALL:  Just scroll up.
 6                  THE DEPONENT:  Oh, scroll up.  Okay.  Got
 7     it.
 8             Q.   (By Mr. Cain)  Who is Bev, that's the
 9     question I asked?
10             A.   Bev is the name of somebody that came up
11     on the call.
12             Q.   What do you mean?  You saw a name appear?
13             A.   Yes.
14             Q.   Okay.  Do you have a last name?
15             A.   No.
16             Q.   Do you know who she is?
17             A.   No.
18             Q.   Was this a Zoom?  Was this a Zoom call?
19             A.   Yes.
20             Q.   So you could see the name of the
21     participants that had logged into the call, at least with
22     respect to Bev, right?
23             A.   Yes.
24             Q.   Okay.  Did you see Eric Coomer on the Zoom
25     call reflected?
```

Page 15

```
 1                A.    No.

 2                Q.    Sam -- well, actually before I move off of

 3     Bev.  Have you subsequently learned who this person is,

 4     Bev?

 5                A.    Yes.  It's an antifa member.

 6                Q.    Okay.  What do you know about her?

 7                A.    Not a lot, actually.

 8                Q.    All right.  What do you know?

 9                A.    Not a lot.  I'd have to review my notes.

10                Q.    Is there something -- when you say your

11     notes, are you referring to Exhibit 29 or some other

12     notes?

13                A.    Just information that I would have

14     on -- on her.

15                Q.    Okay.  Are those reflected on Exhibit 29 or

16     some other notes?

17                A.    It wasn't pertaining to any of this

18     hearing, so I don't even -- I know that --

19                      THE REPORTER:  I'm sorry, but there's too

20     much background noise.  I can't understand the witness.

21                      Could I have the answer repeated, please?

22                      THE DEPONENT:  There's no noise on my

23     side.

24                Q.    (By Mr. Cain)  Can you repeat your answer?

25     She didn't hear you.  She needs to get it down for the
```

Page 16

1    record.

2              A.   I did collect notes on some of these

3    people.  So if I have notes on her, then it would

4    be -- it wouldn't be in these notes, though.

5              Q.   Okay.  But you do have notes reflecting

6    some investigation of who she was?

7              A.   I have questions that I asked when I

8    started contacting other people that were doing research

9    on antifa specifically.

10             Q.   Okay.  So do you have notes that reflect

11   who she is -- who her identity is?

12             A.   I was -- I was never able to uncover who

13   she is, specifically.

14             Q.   How about any organization she's involved

15   with?  Do you know that?

16             A.   Antifa.

17             Q.   The next name is Sam with a question mark.

18   Who are you referring to there?  Is that your conduit?

19             A.   No.

20             Q.   Who is Sam?  What information do you have

21   on this person?

22             A.   He's an antifa member.

23             Q.   How do you know?

24             A.   Because he was on the call.

25             Q.   Do you have a last name?

Page 17

```
 1                    A.    No, no, not as it pertained to the

 2       information I was able to collect here.

 3                    Q.    Well, why did you qualify that?  Do you

 4       have any identifying information on this Sam who was on

 5       the call?

 6                    A.    I was told by someone else that a man that

 7       went by the name of Sam died a couple months ago.  He was

 8       heavily involved in antifa.

 9                    Q.    Who told you that?

10                    MS. HALL:  Object to form.

11                    Q.    (By Mr. Cain)  You can answer.

12                    A.    It doesn't --

13                    THE REPORTER:  I'm sorry.  I just --

14                    A.    I said it doesn't have to do with Eric.

15                    Q.    (By Mr. Cain)  Who told you that is the

16       question?  You can answer the question.

17                    A.    Joey Camp.

18                    Q.    Yan-ni is the next name.  And then there's

19       a dash RD knows.

20                    Is Yan-ni the conduit to your participation

21       on this call?

22                    A.    No.

23                    Q.    Do you know who Yan-ni is?  Do you have a

24       last name or any other identifying information?

25                    A.    He goes by the name of Yan or Yan-ni.  He
```

Page 18

```
 1    seems to be an enforcer for the Antifa/BLM movement.
 2              Q.   Were you able to identify this person
 3    beyond that?
 4              A.   To some degree, yes.
 5              Q.   Okay.  Tell me -- do you have an address?
 6    Do you have a last name?  What identifying information do
 7    you have?
 8              A.   Just information related to the fact that
 9    he was not a journalist.  I wasn't able to disqualify him
10    from being a journalist.
11              Q.   How?
12              A.   By looking up all known people that go by
13    Yan or Yan-ni.
14              Q.   When you were looking up all known people
15    that go by Yan or Yan-ni, were you able to determine who
16    this person is specifically?  Is he a mechanic in the
17    Springs?
18              A.   No.  Because that's not what I was looking
19    for.
20              Q.   So if -- if you wanted to get in touch with
21    Yan-ni at this point -- or Yan, you wouldn't know how to
22    do it?
23              A.   I didn't try to get in touch with an
24    antifa member.  I didn't try.
25              Q.   Okay.  So you -- you don't have any
```

                                                    Page 19

```
1     information beyond what you told me about Yan or Yan-ni;

2     is that true?

3               A.   No, that's not true.

4               Q.   What other information do you have on this

5     person?

6               A.   That he's an antifa member.

7               Q.   You've already told me that.  I said what

8     other information.

9               A.   I'm trying to find the information.  So

10    hold on a second.  I'll see if I can pull up a --

11              Q.   Tell me what you're doing when you're doing

12    it too.  Are you on --

13              A.   I'm just searching files to see anything

14    that I have on Yan or Yan-ni.

15              Q.   I only have so much time, so if you can't

16    find it now, then at a break we can see if we can pull

17    that information down.

18              A.   All right.  Sounds good.

19              Q.   Then there's a dash RD knows.  Who's RD?

20    What do those initials stand for?

21                   What are you looking at, Mr. Oltmann?

22              A.   My attorney.

23              Q.   Who is RD?  The lawyer can't give you the

24    answer.  I can't -- this is not their deposition.  This is

25    your deposition.
```

Page 20

```
1              A.    I'm not sure you understand the
2     significance of what we're dealing with.  As a matter of
3     fact, I don't think you care.  So I'm going to answer
4     it -- I'm going to answer it this way.  You asked me for
5     an answer, I'm going to give you an answer.
6                    In the last two weeks we've had two antifa
7     members that have targeted and tried to kill other
8     people.  We have one that tried to assassinate a guy in
9     Olympia, Washington.  We have another guy in California
10    that was hunted for stabbing someone at a protest, who is
11    a known antifa member.
12                   We have Joey Camp who's currently in
13    hiding and had to move locations twice in the last couple
14    of months due to antifa putting a hit out on his life.
15    There's another gentleman that worked for Project Veritas
16    out of New York and in 2019/2020 had a posted bounty for
17    his head.
18                   And then there's the dark web of the
19    bounty that's currently on my head by antifa in Colorado
20    and other states.  So you want me to divulge information
21    which, frankly, would need someone like Eric Coomer back
22    to this individual for retribution.  And since we know
23    that the history of Coomer is to have retribution against
24    people, there's a hesitation on my side to divulge
25    anything based on the imminent danger to that particular
```

Page 21

1    individual.

2                    MR. CAIN:  Objection.  Nonresponsive.

3              Q.   (By Mr. Cain)  Who is RD?  And I'm going to

4    ask the Court for more time if this continues.  I want

5    responses to my questions.

6              A.   I answered the question.

7              Q.   Who is RD?

8              A.   I'm asking for the truth, and you can't

9    handle the truth.  Or you don't care about the trust,

10   which is obvious by how you act in a courtroom and how

11   you lie in your proceedings.

12             Q.   Who is RD?  Are you going to answer my

13   question or not?  What does that stand for?

14             A.   That stands for the individual that gave

15   me access to the call.

16             Q.   What's the name?

17             A.   That's his name.

18             Q.   RD is his name?

19             A.   Is his name.

20             Q.   What's his last name?

21             A.   RD.

22             Q.   No, sir.  That -- that's not his name.

23             A.   That's his --

24             Q.   Give me the name.

25             A.   That's the information I have on that

                                              Page 22

```
 1    individual.
 2                Q.    Pardon?
 3                A.    That is the information that I have on
 4    that individual.
 5                Q.    That's the entirety of the information.
 6    You know this person by RD, period?
 7                A.    I know that person by RD.
 8                Q.    And you don't know his first name?
 9                A.    I know that person by RD.
10                Q.    Do you know his actual first name or not?
11                MS. HALL:   Objection.
12                Q.    (By Mr. Cain)  Let's quit playing games.
13                MR. CAIN:   Counsel, I'm asking a question.
14                MS. HALL:   He's answered you three times.
15                A.    I answered the question.
16                MS. HALL:   You don't like the answer.   He
17    told you he knows the individual by the initials RD.
18                Q.    (By Mr. Cain)  Do you know his actual name,
19    is the question.
20                A.    His name is RD.   That is his name.
21                Q.    Do you know -- what's his last name?
22                A.    RD is his name.   If you know anything
23    by --
24                Q.    What is his last name, sir?   What is his
25    last name?
```

Veritext Legal Solutions
800-336-4000

```
 1                 A.    If you know anything about the antifa
 2      movement, everyone in antifa uses names -- other names.
 3      That is the name that he gave me.
 4                 Q.    What is Eric Coomer's antifa name?
 5                 A.    What do you mean Eric Coomer's antifa
 6      name?
 7                 Q.    You said everybody in antifa uses other
 8      names.  What is his -- Eric Coomer's antifa name?
 9                 A.    I believe Eric Coomer loves his notoriety.
10      I believe Eric Coomer is one that likes to be in the
11      middle of the limelight.  I believe Eric Coomer is the
12      one that wants to be the one in charge.  And frankly, on
13      the call, no one knew -- or there were people that didn't
14      know who he was because they asked who he was.
15                 Q.    Sir, you're being evasive.  I --
16                 A.    That is not evasive.  That is the answer
17      to the question.  You asked a question; I answered it.
18                 Q.    I know.  I asked a different question that
19      you didn't answer.
20                 A.    What was that?
21                 Q.    So let me ask this question again.
22                       Are you in contact with RD --
23                 A.    I'm not.
24                 Q.    -- or not?
25                       When is the last time you spoke with this
```

Page 24

```
 1   individual?

 2           A.   Five months ago, six months ago.

 3           Q.   Where does this person live?

 4           A.   I do not know.

 5           Q.   In Colorado?

 6           A.   I do not know.

 7           Q.   How did you get in touch with this person

 8   initially?

 9           A.   He showed up at an FEC meeting.

10           Q.   Where?

11           A.   In Castle Rock, Colorado.

12           Q.   Is he a member of FEC?

13           A.   I do not know the answer to that.

14           Q.   Who would?

15           A.   I would have to check and see if the

16   member --

17                THE REPORTER:  I'm sorry, sir.  Just a

18   moment.  I'm sorry.  I just didn't hear or understand the

19   last part of the answer.  Can you repeat, please?

20                THE DEPONENT:  I would have to check with

21   FEC to see if they have a record of him in their

22   memberships.

23           Q.   (By Mr. Cain)  Can you do that for me since

24   we're taking FEC's deposition tomorrow?

25           A.   Hold on.
```

Page 25

```
 1                    Q.   All right.  I'm going to circle back to
 2      what I was asking you about RD.  Do you know this person's
 3      actual name or not?
 4                    MS. HALL:  Object to form.
 5                    A.   He presented himself as RD.
 6                    MR. CAIN:  Objection.  Nonresponsive.
 7                    Q.   (By Mr. Cain)  My question is:  Do you
 8      know --
 9                    MS. HALL:  He answered the question.  You
10      don't like the answer.  That's your problem.  You've
11      asked this question at least five times.  He's answered
12      the question.  And you keep asking the same question, and
13      you don't like the answer.
14                    MR. CAIN:  Ms. Hall, you can guarantee
15      that I'm going to be asking for more time if you keep
16      interrupting my questions.
17                    Q.   (By Mr. Cain)  My question was:  Do you
18      know his actual ID beyond these initials?  Do you know his
19      name, and you're just not providing it to me?
20                    A.   He was known to me as RD.  He was very,
21      very careful and very, very scared about himself coming
22      out in any of this.  I've already given you more
23      information than I think I'm probably -- that I've been
24      told I can give.
25                    Q.   (By Mr. Cain)  Told by whom?
```

Page 26

```
 1                    MS. HALL:  Objection.
 2            A.   I've given -- I've answered your question.
 3            Q.   (By Mr. Cain)  No, you haven't.
 4                 My question is this:  You say he presented
 5     himself as RD.  That's fine.  I understand your testimony
 6     there.  But my question wasn't how he presented himself.
 7     My question was:  Do you actually know his -- his full
 8     name -- his identification and you're just not providing
 9     that to me?
10            A.   I do not know his full name.
11            Q.   Do you know his first name?
12            A.   I've never verified his identity.
13            Q.   So you don't know his first name?
14            A.   He was known to me as RD.  I've given you
15     the information of who he is.
16            Q.   RD isn't a first name.  And my question is:
17     Do you know what the R stands for?
18            A.   No.
19            Q.   Let's go about it that way.  Richard?
20     Roger?  Rick?  Do you know?
21            A.   I do not know what the R stands for.
22            Q.   Do you know what the D stands for?  His
23     last name, perhaps?
24            A.   I do not know what the D stands for.
25            Q.   Do you have contact information for him?  A
```

Page 27

```
 1    phone number?

 2                    THE REPORTER:  I'm sorry.  The answer?

 3                    THE DEPONENT:  I do not.

 4            Q.   (By Mr. Cain)  You said five or six months

 5    ago was the last time you were in contact with him.  Is

 6    that your testimony?

 7            A.   To the best of my recollection, yes.

 8            Q.   How did you get in touch with him?

 9            A.   Through a Signal.

10            Q.   What is his Signal handle?

11            A.   RD.

12            Q.   Have you produced your communications from

13    Signal to your counsel with RD?

14                    MS. HALL:  Objection.  You're asking for

15    attorney-client privileged information.  He's not

16    answering that question.

17                    MR. CAIN:  No, I'm not asking for

18    attorney-client information.  The fact of providing the

19    information to counsel isn't privileged.

20                    MS. HALL:  Yes, it is.

21                    MR. CAIN:  It doesn't fall under advice.

22            Q.   (By Mr. Cain)  Do you have access to your

23    Signal communications with RD, Mr. Oltmann?

24            A.   No.

25            Q.   Why not?
```

Page 28

1          A.    Because Signal deletes after 5 minutes,

2     10 minutes.  Those communications are deleted inside the

3     app.

4          Q.    So there -- there is information that you

5     have in terms of communications with your conduit that

6     have been deleted as a result of the use of the Signal

7     app?  Is that your testimony?

8          A.    That's not what I said.

9          Q.    What's -- what's incorrect about my

10    statement?

11         A.    When someone communicates with you via

12    Signal, they set the standard for what can be kept inside

13    of that conversation.

14         Q.    Okay.

15         A.    It's a limitation of the technology.

16         Q.    I understand that.  But my -- my question

17    was, there are communications or were between you and RD

18    that have been deleted?

19         A.    Not true.

20         Q.    So you still have them?

21         A.    I do not have them.

22         Q.    Because they have been deleted?

23         A.    That is not true.  That is a play on words

24    by you.  That is not what happened.  What happened is, is

25    the app limitation is that those are deleted.  When

Veritext Legal Solutions
800-336-4000

1    someone communicates with you, they set the standard by

2    which you can keep those communications.

3             Q.    When did you initially contact -- or make

4    contact with RD?

5             A.    End of July, I believe, early September.

6             Q.    2020?

7             A.    Yes.

8             Q.    Describe the -- your initial contact with

9    this person.

10            A.    I was at a meeting.  He walked up to me

11   and said that he was a part of antifa and he was leaving

12   it, and that it was not the same organization as when it

13   started and something to that effect.  And I basically

14   glad handed him and said, I'm glad you're not a part of

15   antifa anymore.  Shook his hand and told him to stick

16   around and get involved.

17            I shook probably another 100, 150 other

18   people's hands at the same time.  That was the first -- I

19   think that was the first time I met him.

20            Q.    How is it that -- well, just walk me

21   through the progression, Mr. Oltmann, that you shook his

22   hand at an FEC meeting in you said July or September.

23            When was your next contact with him?  Walk

24   me through that progression, please.

25            A.    He made a couple of attempts to contact

Page 30

1      me.

2                    Q.    How?

3                    A.    Through Signal.  I think -- let me -- let

4      me go back a little bit.  I think through Signal.  I

5      can't find any text communication from him, and I don't

6      think I gave him my email -- or my phone number.  I know

7      he made a couple of -- he made a couple of attempts to

8      contact me, and I did not return his call or I did not

9      respond.

10                   Q.    When he attempted to contact you, what was

11     he saying?

12                   A.    I don't remember.  I don't recall.  I

13     probably get somewhere between 3 and 400 people in a

14     given week to try to contact me.

15                   Q.    Did you ever communicate with him via cell

16     phone number?

17                   A.    No.

18                   Q.    Via email?

19                   A.    No.

20                   Q.    Via regular text?

21                   A.    No.

22                   Q.    All the communications with RD that weren't

23     in person were through Signal?

24                   A.    I believe so.  Yes.

25                   Q.    So when he attempted to contact you a few

                                                  Page 31

1   times, you didn't respond to those, then what happened

2   next?

3              A.   He showed up at another FEC meeting, which

4   was -- I think it was the beginning of September, to the

5   first week of September.  And this time he walked up to

6   me again and said, you know, I've been trying to reach

7   out to you.  I -- I can get you access to these --

8   getting in the antifa call.

9              Q.   How did he know you wanted access?

10             A.   I don't think he knew that I wanted access

11  or didn't want access.  He had just made a statement at

12  the previous conversation that he was a part of antifa

13  and that these people that are writing things about you,

14  they're antifa members inside of -- they're antifa

15  journalists.

16                  And so it piqued my interest before, but I

17  wasn't -- I was not surprised.  And this time by telling

18  me he can give me access to that call, definitely piqued

19  my interest.

20             Q.   This FEC meeting that you just testified

21  about, was this also in Castle Rock?

22             A.   Yes.

23             Q.   Are those meetings -- do you have sign-ins

24  sheets or anything that would identify who attended the

25  meetings?

Veritext Legal Solutions
800-336-4000

```
 1                    A.   I think we started to do that, yes.

 2                    Q.   Do you still have FEC meeting sign-in

 3      sheets from this time period?

 4                    A.   No.

 5                    Q.   Why not?

 6                    A.   Because they're not kept.  They're written

 7      in papers.  We wouldn't keep those -- that information.

 8                    Q.   Well, you -- you acquire the information.

 9      Do you then convert it into an electronic record?

10                    A.   We take the emails and convert those into

11      electronic records, yes.

12                    Q.   Okay.  Did -- did RD provide an email?

13                    A.   I do not know.  I did tell you that I

14      would check the logs for members for the deposition

15      tomorrow.

16                    Q.   All right.  While you're at it, can you

17      also look at the sign-in sheets or however that's now

18      notated to see if you have information for RD?

19                    MS. HALL:  Charlie, just for the record,

20      he told you that he did not keep those.  If anything,

21      there would be an email address.  And he already

22      confirmed that he would look that up.

23                    A.   I will check for that information,

24      nonetheless.

25                    Q.   (By Mr. Cain)  You said that he indicated
```

Page 33

 1     that he had some information on antifa journalists.  Who

 2     did he say he had information on?

 3              A.   I do not believe at that time he told me

 4     about any one person in particular.

 5              Q.   Okay.  What happened next with respect to

 6     this guy?

 7              A.   He became more agitated.  He contacted me

 8     and told me what day that was going to happen, which I

 9     don't recall the actual day.  It was a pretty busy time

10     for us at FEC and a pretty busy time for us as a country.

11     I invited him to come to my office.

12              Q.   Where you're sitting now?

13              MS. HALL:  Objection.

14              Q.   (By Mr. Cain)  Is that where you -- you met

15     with him where you're sitting now?

16              MS. HALL:  Objection, Charlie.  I told you

17     it's not relevant and he's not answering the question.

18              Q.   (By Mr. Cain)  Are you going to not answer

19     my question?  Did you meet with RD where you're sitting

20     now?

21              A.   The purpose of this deposition being

22     remote is to protect me.  I have to sit here for three

23     hours, and there is no way I'm going to disclose where I

24     am right now that could lead anybody on your side to

25     become here and do harm to me.  So I will not divulge

Veritext Legal Solutions
800-336-4000

```
 1   where I'm --
 2              Q.   Mr. Oltmann, you know what, I've listened
 3   to you say our side wants to do harm to you --
 4              A.   I am.
 5              Q.   -- multiple times.
 6              You don't have any evidence of that, and
 7   there's absolutely no reason we would want any harm to
 8   come to you.  I want you to be sitting there at -- during
 9   trial.  Okay?
10              Do you understand that?
11              A.   You ask me a question; I'll answer the
12   question.  You want to put your -- your
13   little -- whatever you want to call what you said, your
14   opinion, I have no interest in listening to you.
15              I will answer your questions.  I'm here
16   for three hours to answer your questions.  Not to be
17   badgered by some prick.  So you figure out what questions
18   you want to ask me.  You ask me those questions, and I
19   will answer those questions.
20              Q.   Okay.  Did you meet with RD there where
21   you're sitting?
22              MS. HALL:  Objection.  Charlie, I told
23   you, move on.  He's not answering that question.  You
24   already went down this road.  And it's not relevant to
25   the issue of defamation where he met with this person.
```

Page 35

```
 1                    Q.   (By Mr. Cain)  Let me ask you this way --
 2                    MS. HALL:  And whether or not he's there
 3      now.
 4                    MR. CAIN:  Ms. Hall, enough.
 5                    Q.   (By Mr. Cain)  Let me ask you this:  You
 6      said he was agitated, and you had a meeting with him,
 7      correct?
 8                    A.   Yes.
 9                    Q.   Describe his appearance for me.
10                    A.   I'm sorry?
11                    Q.   If I need to pick him out of a line-up,
12      describe his appearance.  How tall is he?  What color of
13      hair?  How old is he?  What race or ethnicity?
14                    A.   This is unbelievable.
15                    Q.   Describe him.
16                    They can't answer your questions.  They can
17      make legal objections, not speaking objections.  They
18      can't answer the questions that I'm asking you.  This is
19      why I wanted this in the courthouse.
20                    A.   You want it in the courthouse because you
21      wanted to have me arrested.  You said so in -- with
22      conferral with counsel.
23                    Q.   Describe --
24                    A.   Exact words, actually.  Even though in the
25      courtroom you lied to me.
```

Page 36

```
 1                   Q.   I did not say that.  That's false.  I did
 2        not say that to your counsel.
 3                        MS. HALL:  Charlie, I'm not going to get
 4        into this during this deposition, but you did say that on
 5        the phone.
 6                        MR. CAIN:  I did not.
 7                        MS. HALL:  Okay.  Well --
 8                        MR. CAIN:  I never said I want to get him
 9        arrested.  And you're wasting my time.
10                   Q.   (By Mr. Cain)  Describe the physical
11        appearance of RD.
12                   A.   He's a white male.
13                   Q.   How old?
14                   A.   Under 30.
15                   Q.   Do you know his educational background,
16        where he went to school?
17                   A.   I do not.
18                   Q.   Do you know what he does for a living?
19                        MS. HALL:  Objection.  Relevance.
20                   Q.   (By Mr. Cain)  Do you know what he does for
21        a living?
22                   A.   I'm not going to answer that question.
23                   Q.   Do you know?
24                   A.   I'm not going to answer that question.
25                   Q.   Why not?  This is identity of your conduit.
```

Page 37

1    You're under a court order to answer these questions.

2                A.    Oh, I'm very aware of that.

3                Q.    Okay.

4                A.    I'm also aware that the judge in this case

5    marched in June of 2020 in an antifa protest.  I'm also

6    aware of that.

7                Q.    And, in fact, you've called her an antifa

8    judge, haven't you?

9                MS. HALL:  Charlie, what's the relevance

10   of this?  Like, I mean, what he believes of the judge or

11   what he's done on his own time is not relevant to a

12   defamation case with your client Eric Coomer.

13               MR. CAIN:  I don't think you know what is

14   relevant, and quit interrupting this.

15               MS. HALL:  No.  I have the ability to --

16               Q.    (By Mr. Cain)  Haven't you referred to --

17               MR. CAIN:  No, we're going to get into

18   what is antifa and what isn't, which is highly relevant

19   to this.  And he's called Eric Coomer a member of antifa.

20   We're going to talk about that.

21               Q.    (By Mr. Cain)  You've called the judge an

22   antifa judge, haven't you?  I want to know what qualifies

23   someone to be part of antifa?

24               Why did you call the judge an antifa judge?

25               MS. HALL:  Objection.  Relevance.

Page 38

```
 1              Q.   (By Mr. Cain)  What makes someone a member
 2     of antifa?  That's the point of my question.
 3              A.   It's a pretty well-organized organization
 4     for something they say isn't organized.
 5              Q.   Okay.  But what makes someone part of
 6     antifa?  Are you going to answer my question?
 7              You called the judge an antifa judge in our
 8     case.  You've referred to Dr. Coomer as a member of
 9     antifa.  What makes either of them part of antifa?
10              MS. HALL:  Objection with regard to the
11     judge.
12              A.   Eric being on an antifa call.  Eric
13     putting up posts that were pro antifa, anti-American,
14     anti-police.  Posting literally right after antifa put
15     the manifesto out there, the next day he posted it on his
16     social media.
17              Q.   (By Mr. Cain)  Anything else?
18              Marching in a rally, marching in a Black
19     Lives Matter protest, does that make someone a member of
20     antifa?
21              MS. HALL:  Objection.  Relevance.
22              A.   I think being on an antifa call where you
23     say that somebody is not going to win, and you made sure
24     of it, probably makes you a part of antifa.
25              Q.   (By Mr. Cain)  We'll get to that.
```

Page 39

```
1                   A.   Communicating with journalists, who are
2         antifa journalists, journalists that stand up for the
3         fascist/antifascist movement, would probably qualify them
4         as antifa.
5                   Q.   Anything else you can think of?  You've
6         called the judge an antifa judge.  That's why I'm asking
7         you what -- what about that would qualify -- our judge
8         would qualify her as part of antifa?
9                        MS. HALL:  Objection, Charlie.  Move on
10        with this questioning with regard to the judge.  It is
11        not relevant to your defamation case.
12                       MR. CAIN:  Yeah, it is.  I want to know
13        what -- what makes someone antifa.
14                       MS. HALL:  But you keep referring --
15                       MR. CAIN:  Calling my client -- I'm not
16        debating with you, Ms. Hall.
17                       MS. HALL:  Well, then I'm going to start
18        instructing my client not to answer your question.  It's
19        not relevant to your lawsuit.  What is going on with the
20        judge, what he said about the judge is not relevant to
21        Eric Coomer.
22                       MR. CAIN:  I'm talking about antifa.
23                       MS. HALL:  No, you're not.  You keep
24        referring to the judge.
25                       MR. CAIN:  I'm not asking you, Ms. Hall.
```

Page 40

```
 1    Ms. Hall, we're trying to figure out in your client's
 2    mind what makes someone a member of antifa.  He's called
 3    the judge an antifa judge because she marched in a --
 4    allegedly, I have no knowledge of this -- in a rally or
 5    some form of a protest.
 6              Q.   (By Mr. Cain)  What makes that -- take the
 7    judge out of it.  What makes someone who's involved in
 8    that activity antifa?
 9              MS. HALL:  That's been asked and answered.
10              MR. CAIN:  He hasn't answered it.
11         A.   I did answer it.
12              Q.   (By Mr. Cain)  What makes someone, in your
13    mind, an antifa journalist?
14         A.   A radical leftist that communicates openly
15    with other radical leftists that stand for antifa being
16    antifascist, who are then themselves are the racist
17    pedophiles and racists of our society.  Typically white
18    extremist liberals.
19              Q.   And they have to be racist and pedophiles?
20    Is that part of your definition?
21         A.   This isn't a deposition.
22              Q.   It is a deposition.
23         A.   This is a battering session for you
24    because you don't like the fact that I call you out.  And
25    I'm --
```

Page 41

```
 1                Q.    I don't --

 2                A.    I'm sorry I hurt your feelings.

 3                Q.    I could care less about anything --

 4                A.    Let's talk about -- let's talk about

 5     antifa and what antifa does.  And let's talk about the

 6     qualifications of the judge because that's what you

 7     wanted to ask.  So I'll talk about that.

 8                     MS. HALL:  No, don't.

 9                Q.    (By Mr. Cain)  No, sir.  I just want

10     answers, and you're being evasive.

11                A.    I'm not being evasive.

12                Q.    If you can't tell me who this person is

13     that was your conduit beyond a white male under 30 with

14     the initials RD.

15                     Do you have anything else going back to RD

16     that would inform me on who this person is?

17                A.    No.

18                Q.    You would not identify where he works.

19                A.    I don't know where he works.  And that

20     wasn't your previous question.

21                Q.    Did you ever know where he was employed?

22                A.    No.

23                Q.    Do you have any employment information on

24     him?

25                A.    No.
```

Page 42

```
 1                    Q.    Do you know what city he lived in during

 2      the period of time you were dealing with him?

 3                    A.    Denver Metro area.

 4                    Q.    Do you know anybody else who knows him,

 5      friends of his, family?

 6                    A.    I've given you all the information on him.

 7      That is what I'm under a court order to disclose, and

 8      I've disclosed that.

 9                    Q.    You didn't answer my question.

10                          Do you know any of his friends,

11      people -- other people who know him?  Family members?

12                          Either you know it or you don't.

13                    A.    (No response.)

14                    Q.    I'm going to reclaim this time at some

15      point.  So there's no point in you just sitting there and

16      not responding to me.

17                          Do you know the answer to my question?

18                    A.    (No response. )

19                    Q.    Family members?  Friends?

20                    A.    (No response. )

21                    Q.    I'm taking by your silence that you do.  Do

22      you know, sir?

23                    A.    I know that the goal of this is to uncover

24      this individual, so this --

25                    Q.    Absolutely.
```

                                                            Page 43

```
 1                  A.   -- so this person is put in danger.
 2                  Q.   Not true.
 3                  A.   If you put the person in danger, you hope
 4        to punish this person the same way that I'm being
 5        punished with a court order --
 6                  Q.   Sir?
 7                  A.   The same way that the couple thousand
 8        people that have signed affidavits across the country
 9        have been punished and threatened.
10                  Q.   You have no evidence that we want to do
11        anything like that and nothing could be further from the
12        truth.
13                       What I want to know is what happened on
14        this call, and who got you on it and who else was there,
15        which you haven't provided to anyone at this point.  So
16        that's why I'm asking these questions.
17                       Do you know friends or family of this RD,
18        and you're just not telling me?
19                       Are you refusing to give me that
20        information?
21                  A.   (No response.)
22                  Q.   Okay.
23                  A.   I don't want to speculate.
24                  Q.   Did your counsel just provide you with
25        information?  I didn't -- I couldn't hear it, but off
```

Page 44

```
 1    camera I want to make sure that Ms. Tubbs got that.
 2                    MS. HALL:  I told him not to speculate.
 3                    THE REPORTER:  I cannot hear the
 4    whispering.
 5              Q.   (By Mr. Cain)  Okay.  But I'm not asking
 6    you to speculate.
 7                    THE REPORTER:  I cannot hear the
 8    whispering.
 9              A.   He did not show up to these meetings
10    alone.
11              Q.   (By Mr. Cain)  Okay.  Who did he show up
12    with.
13              A.   I don't know.
14              Q.   Describe him.  Same person?  Multiple
15    people?
16              A.   No.  The same person, yes.
17              Q.   What's the name of the person he showed up
18    with?
19              A.   I don't remember.
20              Q.   Male or female?
21              A.   Male.
22              Q.   Friend?
23              A.   I assume so.
24              Q.   Okay.  So you know he has a friend that
25    showed up at the meetings.  Is that person still part of
```

Page 45

1    FEC?  Does he show up at meetings still?

2          A.   He was not an FEC person, I think they

3    brought him in.  I think it's just another person that

4    came with him.

5          Q.   Okay.  But this other individual -- do you

6    know who they are?  Are they showing up at FEC meetings?

7          A.   No.

8          Q.   Okay.

9          A.   And I'm not at many of the FEC meetings

10   currently.

11         Q.   All right.  So you said that -- you

12   mentioned that RD was agitated during one of your meetings

13   where you, I guess, won't identify where you were at at

14   this particular meeting.

15              But what was he agitated about,

16   Mr. Oltmann?

17         A.   So maybe agitated is probably the wrong

18   word.  Scared, paranoid.  Wouldn't meet me for coffee at

19   a coffee shop.  Would make sure that I was -- he was

20   10 minutes late.  I would ask him questions about, you

21   know, who he is as a person.  Typical things that I would

22   do when trying to mentor someone who I think is going

23   down the wrong path.

24         Q.   Okay.  And then how did this develop to him

25   getting you on an antifa call, as you define it?

Page 46

```
 1                 A.    I don't understand the question.

 2                 Q.    Well, you were meeting with him.  You said

 3     you had coffee.  He was scared and paranoid.  I want you

 4     to walk me through the history of -- of your relationship

 5     with this person and how he got you on the call.

 6                 A.    And the history was pretty vanilla.  I met

 7     with him for coffee, as I do many people.  I met with him

 8     at a park.  Just having conversations about who he is, to

 9     validate who he is, up to the point where I was on the

10     call.  I think it was more for -- as much for him as it

11     was for me.

12                 Q.    What did you learn about him that you

13     haven't testified to during this getting-to-know-you

14     process?  You said you were at a park.  You learned about

15     who he is.  What did you learn?

16                 A.    I learned that he has family members that

17     are part of antifa.

18                 Q.    And?  Is that it?

19                 A.    I learned that he just wanted to do good

20     and he thought that antifa was truly doing good.

21                 Q.    Okay.  Anything else?

22                 A.    I learned that he had kids.

23                 Q.    Is he married?

24                 A.    And I learned that his fear is, is that

25     his kids would grow up under the same thing that he went
```

Page 47

```
1     through when he grew up, and that they would be dragged

2     into something like this that would take him down a path

3     that he couldn't get them off of.

4              Q.   Did you learn whether he was married or

5     not?

6              A.   He's in a relationship, yes.

7              Q.   Do you know who his partner is?

8              A.   I have not.

9              Q.   Never met him or her?

10             A.   I have not.

11             Q.   All right.  So this -- this

12    getting-to-know-you process occurred during what period of

13    time?  The summer of 2020?

14             A.   No.  It happened -- it went back in time

15    and said July to September, I met with him a couple

16    times.  It was a pretty busy time given all the unrest

17    that was happening in Denver.

18             Q.   Okay.  Then where did the idea come that he

19    would provide you access to a call?

20             A.   At first he said that he didn't have the

21    information for when the call would occur.  And I believe

22    he called me a couple days before the call to ask me

23    questions, and then we had the -- the call itself.

24                  Now, I did attempt to -- I think I can

25    divulge this.  I did attempt to gather the information
```

Page 48

1    related to that call some months later.

2              Q.   What do you mean?  I don't understand that.

3              A.   I attempted to contact Zoom and see if

4    they could, given a certain period of time, find out --

5    and given a certain IP address or bank of IPs -- how I

6    could recover that particular call.

7              Q.   Why?  Why did you do that?

8              A.   To have more concrete, tie it down to the

9    actual number itself or access code that would give me

10   access to that information so that I could then subpoena

11   that information for -- access that information related

12   to this.

13             Q.   And did Zoom provide any information to you

14   that was of use?

15             A.   No.  But it's well-documented.

16             Q.   What do you mean?

17             A.   It's documented.  I went to someone within

18   my company and asked that person to do this research for

19   me.

20             Q.   Do you have some record of the research

21   results?

22             A.   I can check.  I don't think so, but I can

23   check.  I'm sure that there's conversations that happened

24   related to it, yes.

25             Q.   All right.  If you can put that on your

Page  49

1    list, I'd like to get that information if it's available.

2              All right.  So when -- did you -- did you

3    get a sense from RD that he had been on calls like this in

4    the past and, therefore, thought this particular call

5    would be of interest to you?  Describe how, you know, that

6    came about.

7              A.   Oh, at that point the only focus was

8    antifa journalists.  That is the only focus I had

9    throughout the entire thing is the things that people

10   were saying about me.

11             Q.   You didn't like what was being written

12   about you by certain members of the media at the time?

13             A.   I don't think it was as much being written

14   about me as it was being written about FEC United.

15             Q.   Okay.  And who were the journalists that

16   bothered you in particular?

17             A.   Be Sean Beedle, down in Colorado Springs.

18   Sean Heidi Beedle.

19             Q.   Okay.  Anyone else?

20             A.   Yeah.  Eric -- I don't know how to say his

21   last name.

22             Q.   Mobich [phonetic]?

23             A.   Mobich.  Oh, yeah, you know him, huh?

24             Q.   Anyone else?

25             A.   Yeah.  Kyle Clark.  I don't know if Kyle

Page 50

1    Clark was before or after.  But I certainly know that

2    he's affiliated with antifa.

3              Q.   So he too is an antifa journalist?

4              A.   I guess you could call him that.

5              Q.   All right.  I'm not going to call him that.

6    I asked you the question.

7              A.   I mean, in my opinion I would call him

8    that, yes, I would call him an antifa journalist.

9              Q.   Okay.  So I've heard the storey before, of

10   course, that you were concerned about these journalists

11   and what they were saying about you.  So is it fair then

12   to say that your -- your interest in RD was, he was going

13   to be able to put you on a call with some of these

14   journalists who were writing bad things about you?

15             A.   Yes.

16             Q.   Okay.  And in were any of these journalists

17   that you mentioned actually on this Zoom call?

18             A.   There -- there was a couple journalists on

19   there, but they weren't doing -- and I only take this by

20   the friendliest comment related to the call.  I was

21   somewhat underwhelmed by the conversations because it was

22   filled with rhetoric.  But it was fascinating because of

23   the planning and the fact that they were very, very well

24   organized on how they communicated on these calls.

25             Q.   All I'm asking you about right now is -- is

Page 51

1       the identity of the people that were on the call itself.

2               A.   I believe if you check my notes, you will

3       walk, through, and I started putting down information

4       related to who I thought was on the call.

5               Q.   Okay.  Let's do that, then.  Let's segue

6       into that.  We'll come back to how you got on the call in

7       a minute.  I can't define from your notes who was on the

8       call or who was just being discussed.

9                    So referring to Plaintiff's Exhibit 29,

10      your notes, who was it that you can say for a fact was on

11      the call, journalists or otherwise, besides yourself, and

12      as you claim, Mr. Coomer?

13              A.   Well, the information from that call led

14      me to information about Heidi Beedle.  I thought she was

15      on that call, but then again, nobody used names on the

16      call.  No one used names.  The only one that popped up

17      was the Bev that popped up.  And I wrote that down as it

18      came up.

19              Q.   Okay.  You've said, I think in the past,

20      that you thought there were about 15 to 20 people on the

21      call while you were on the call; is that right?

22              A.   Yes.

23              Q.   Okay.  Why can't -- I'm sorry.  Go ahead.

24              A.   Go ahead.

25              Q.   So why can you not positively identify

                                                Page 52

1    Heidi Beedle being on the call, or can you?

2            A.   I cannot because no one had names to

3    verify that.  So the only names that came up during this

4    are the names that I wrote down.

5            Q.   Well, you wrote down Heidi.  Did you write

6    Ron at one point?

7            A.   I suspected that that was the person that

8    was beginning to speak at the beginning of the call.

9            Q.   What do you -- what do you recall her

10   saying?

11           A.   The -- that particular person was talking

12   about the Colorado Springs Independent, which is why I

13   thought that was Heidi because it sounded like Heidi, but

14   I wasn't sure.  So the more that that person talked, the

15   more I wrote down information related to that person to

16   hone in on that particular conversation.

17           Q.   Okay.  Did you ever learn subsequent to

18   this call whether it was Heidi, in fact, that was on the

19   call?

20           A.   You mean did I definitely say that that

21   was him?

22           Q.   Yes.

23           A.   I don't think that -- I think I was able

24   to validate that he was an antifa journalist, yes.

25           Q.   I'm just asking -- you did research after

                                                  Page 53

```
 1    this call on Dr. Coomer.  Did you research -- do any
 2    research to try to authenticate whether Heidi was on the
 3    call or not?
 4                A.   I authenticated Beedle as being an antifa
 5    journalist based on this conversation and this call, yes.
 6                Q.   Okay.  That's a different answer to the
 7    question I asked.  Did you do any research --
 8                A.   I did -- I did do research on Mr. Beedle,
 9    yes.
10                Q.   Okay.  As you sit here today, what level of
11    certainty do you have as to whether she was on the call or
12    not?
13                A.   I don't.  I don't have a level of
14    certainty.  I have a level of certainty that she is an
15    antifa journalist.
16                Q.   Okay.
17                A.   If I had to give you a degree of
18    certainty, that degree of certainty would probably be in
19    the 70 to 80 percent range.
20                Q.   I don't know the pronoun of this person.
21    He or she was on the call, you would say you're 70 to
22    80 percent certain of that?
23                A.   I'm taking a wild guess.
24                Q.   That's your best -- best estimate based on
25    your perception in what you've learned about Ms. Beedle;
```

Page 54

```
 1    is that fair?
 2              A.   I would say that Mr. Beedle is a pretty
 3    disgusting human being, and I learned a lot about
 4    Mr. Beedle.
 5              Q.   That's not responsive.  I was saying that's
 6    your best estimate based on participating in this call and
 7    what you subsequently learned, you're about 70 to
 8    80 percent sure that Heidi Beedle was on this call; is
 9    that fair?
10              A.   The basis for this call was to uncover
11    antifa journalists.  During the course of this call, I
12    uncovered an antifa journalist, a person that actively is
13    an activist rather than a journalist that writes slanted
14    and defamatory articles about people of the opposite
15    political affiliation.  That is what I learned by this.
16    I learned that this person is, in fact, an antifa
17    journalist.
18              Q.   But that -- again, sir, that's not what I
19    was asking you.  You had said -- I had asked you how
20    certain you were that she was on this call, and you said
21    you're about 70 to 80 percent certain that she was
22    actually a participant.
23              And my question is:  Is that your
24    testimony?  Is that a fair estimate?
25              A.   That's me taking a wild guess.
```

Page 55

1          Q.   All right.  From your notes, can you

2     identify anybody else -- or actually, I'm not going to

3     hamstring you to your notes.  But either through referring

4     to your notes from the call or other observations, can you

5     identify anyone else who you can testify with certainty

6     was on the call?

7          A.   Eric Coomer.

8          Q.   We'll get to Mr. Coomer -- Dr. Coomer in a

9     minute, but excluding him, because that's obviously in

10    dispute.  Anybody other than, as you say, Dr. Coomer and

11    yourself that you can identify as having been on this

12    call?

13         A.   I think that they do that on purpose where

14    they hide their identities on these calls.  If you'll

15    look at subsequent disclosures of antifa communication

16    across the country, this is -- what I'm telling you right

17    now about their communication on this particular call,

18    and how they spread out communication across different

19    devices and different platforms, is that they often use

20    either names -- code names or don't use any names at all

21    in order to -- in order to have those conversations as

22    anonymous as possible.

23         Q.   That's an explanation, but it's not -- it's

24    not an answer to what I asked you.  I said:  Is there

25    anyone else on this call that you can identify with

Page 56

1    certainty by name?

2            A.   Eric Coomer.

3            Q.   A code name or -- or anything like that.  I

4    just want to know who could authenticate, besides

5    yourself, and as you would say, Dr. Coomer since you claim

6    he was on the call.  But who can -- who can you

7    authenticate that was on the call so that we could talk to

8    them about what occurred?

9            A.    Well, if Eric Coomer wasn't on the call,

10   why did he clean up all of his social media platforms?

11   Totally wipe the internet of his name or -- or any of

12   the --

13           Q.   That's not a response to my question.

14           A.   Let me finish.  You asked me a question,

15   and I get to answer that question.  Now, at the end of me

16   answering that question, if you want to ask me or tell me

17   that that's not answering the question --

18           Q.   I didn't ask you about Eric Coomer deleting

19   anything.  I asked you, who can you identify with

20   certainty was on the call?

21           A.    And I answered that question with 100

22   percent certainty that Eric Coomer was on that call.

23           Q.    And I already told you we're going to deal

24   with that in a minute.  I want to know, other than

25   yourself, and as you claim Dr. Coomer, is there anyone

Page 57

```
 1      that you can say was on the call with certainty?
 2              A.   I mean, I know for certainty that other
 3      people were on the call, yes.  But I don't know for
 4      certainty the direct identity of those people.
 5              Q.   So you were -- it's now a year since
 6      you -- approximately, since you say this call occurred.
 7      And a year later, as you sit here, you cannot identify a
 8      single person other than Dr. Coomer, as you claim, and
 9      yourself that was on this call; is that true?
10              A.   I'm -- I'm fairly sure that of the other
11      people that were on this call, that if I had -- if I had
12      to take a guess -- and the problem with taking a guess
13      and pinpointing those people is that I did an amazing
14      amount of research on antifa journalists to find more
15      information that would corroborate the fact that they
16      were, in fact, acting as a proxy for the antifa movement.
17                   So at the time this was not my focus.  My
18      focus was not who necessarily is on the call.  My focus
19      was on the people that were out there actively writing
20      things about FEC and others that correlated with antifa
21      and were doing so, in other words, because they were
22      politically motivated.
23                   So at the time, my whole thing was to
24      un-demask antifa journalists.  I used this as a catalyst
25      to do that.  So to my mindset when all this occurred was
```

Page 58

1    strictly to get as much information as possible so that I

2    knew that I could identify those people that were inside

3    of our journalist environment who are really just

4    actively antifa members that were just defaming and

5    slandering people because they didn't agree with them on

6    a political level.

7              Q.   That's an explanation, but it's not an

8    answer to my question.

9              A.   Well, it actually is an answer because the

10   answer that I gave you directly correlates to the fact

11   that I was looking for evidence that these were actually

12   people that were inside of the journalistic environment.

13   I found that.  I used that information in order to go

14   down a path to figure out who these people are.

15             Q.   You can't tell me another person that was

16   on this call, can you, other than yourself, and as you

17   claim, Dr. Coomer?

18             A.   I have a pretty high degree of likelihood

19   that Mr. Beedle was on that call.

20             Q.   Okay.

21             A.   I have a high --

22             Q.   Understood that?

23             A.   -- high likelihood correlates to

24   Mr. Beedle's massive involvement in the antifa movement,

25   a massive involvement in our revolution, a massive

                                        Page 59

```
 1    involvement in writing a Marxist manifesto herself.

 2            Q.    Okay.  Thank you.  We're building a list.

 3                  You have certainty with respect to two

 4    individuals:  Yourself and Dr. Coomer.  You have a high

 5    level of certainty with respect to Heidi Beedle.

 6                  Is there anyone else that you can identify

 7    with either certainty or a high level of certainty that

 8    you believe was on this call?

 9            A.    The interesting part about -- and if I can

10    clarify the information about Beedle.  The interesting

11    part about Beedle is that she had been communicating on

12    Twitter with another individual dating back to June of

13    2020 by the name of Will Coomer, William Coomer.  Back

14    into June of last year, I believe, they were

15    communicating via Twitter, William Coomer underneath,

16    Heidi Beedle on the Twitter account.

17                  This has continued all the way into 2021

18    where Will Coomer, just -- I guess you could say it's a

19    coincidence by your -- by your terms -- is still

20    communicating with Heidi Beedle on Twitter.

21                  So if -- if I had to just correlate those

22    two together, that would -- we've been able to do a lot

23    of research on William Coomer, and so I would say that

24    there's a high likelihood based on all that information.

25                  Again, I don't want to say 100 percent of
```

Page 60

```
1     the -- of the time that this the smoking gun.  I think
2     that antifa members are very careful not to have smoking
3     guns as you'll see in this election, but -- although I do
4     think there are some.  But I would use that as a
5     correlation to Coomer being on the call and Beedle having
6     a probability of being on that call.
7           Q.   And the Coomer you're referring to, though,
8     in that -- in your last part of your answer is William
9     Coomer?
10          A.    No.  The last part of my answer is William
11    Coomer communicating with Heidi Beedle via Twitter, and
12    the correlation of Eric from Dominion being on that call.
13    And the fact that I had written down, first off, in my
14    notes, that Heidi Beedle is this Navy, probably inside of
15    my notes on page 1.
16          Q.    Okay.  You lost me with respect to the
17    William Coomer aspect.  My question wasn't about the
18    Twitter communications.  My question was who with a high
19    degree of certainty or certainty can you identify as being
20    on the call?
21          A.    Well, Heidi Beedle has paid a lot of
22    attention to me over the last nine months and has gotten
23    into --
24          Q.    No, sir.  I -- I'm not asking about Heidi.
25    You've already identified her as someone.  So I'm asking
```

Page 61

```
 1    for anyone else.

 2              A.    No.

 3              Q.    No.  That's it?

 4              A.    I gained more information as this

 5    progressed.  But, no --

 6              Q.    Okay.

 7              A.    -- on this call.

 8              Q.    And are you saying that William Coomer has

 9    some relation to Dr. Eric Coomer?

10              A.    I'm not saying anything at this point.

11              Q.    Do you know if -- I had understood

12    someone -- well, strike that.

13                    Do you know whether he's related to

14    Dr. Coomer?

15                    MS. HALL:  Objection.

16              A.    I don't know.  I mean, I was told

17    that -- that -- that there was a relation, but I'm yet to

18    fully verify that.

19              Q.    (By Mr. Cain)  All right.  So --

20                    MS. HALL:  Charlie, could we take a break?

21                    MR. CAIN:  Yeah, that's fine.  How long

22    have we been on the record?

23                    THE VIDEOGRAPHER:  One hour, 19 minutes.

24                    MR. CAIN:  Yeah, let's -- let's take a

25    break.
```

Page 62

```
 1                    THE VIDEOGRAPHER:  Going off the record.
 2      The time is 11:23.
 3                    (Discussion off the record.)
 4                    (Recess from 11:23 a.m. to 11:42 a.m.)
 5                    THE VIDEOGRAPHER:  We're back on the
 6      record.  The time is 11:42.
 7               Q.   (By Mr. Cain) All right.  Mr. Oltmann, I
 8      want to kind of pick up where we left off.  But before I
 9      do that, I had a note here -- I looked at my Signal app
10      during the break and observed that it's phone
11      number-based.  And so if -- did you say you still have
12      access to your Signal app and RD to where you can provide
13      us with his phone number?
14               A.   No.  I did try -- I did try to recover
15      that information through counsel.
16               Q.   What happened to the information?
17               A.   I believe my phone was replaced sometime
18      in the middle of my security and there were a number of
19      changes.  So if someone removed you as a contact, you
20      don't have access to that information.  But I went
21      through and scoured it looking for any conversations that
22      I had during that time period, and that -- at the request
23      of counsel.
24               Q.   So let me make sure I understand.  I know
25      there were some pictures that we were provided that looked
```

Page 63

```
1    like a phone had -- had some damage to -- done to it.  Is
2    that what you're referring to?  You had some damage to
3    your phone?
4              A.   I was asked to provide a picture of the
5    damaged phone.  I was asked to provide a picture for the
6    new contract when I had the phone replaced.  I replied --
7    I gave that information as a request, I think on your
8    side or the Court's side, to provide that information
9    relevant to what information I was or was not able to
10   recover on the phone.
11             Q.   Okay.  And I -- and you've said many times
12   you're a tech guy.  I'm not.  In terms of the Signal app,
13   you have that installed on your phone currently, right?
14             A.   I do.
15             Q.   But you weren't able to recover the contact
16   that you had for RD in order to provide us with a number
17   that -- that you were given, the actual cell number?
18             A.   No.  So I don't know the technology for
19   this specifically, but if somebody removes you, then you
20   will not see them in your contacts.
21             Q.   And you don't have any other record of the
22   cell phone number for RD?
23             A.   I was never contacted on a cell phone
24   record, no.
25             Q.   Well, I know.  But when you -- when you
```

Page 64

```
 1    associate someone on Signal, you have to -- you get their
 2    cell number.  They have to provide that information.  So
 3    at one point you had it.
 4              A.   I don't believe that you're correct.  I
 5    believe that you can use -- you do not have to use your
 6    cell phone number in order to log in to Signal.  I don't
 7    believe that that is a requirement.
 8              Q.   If you wanted to contact RD now, how would
 9    you go about doing so?
10              A.   I have been trying.  Knowing that I was
11    going to have this information, I was trying.
12              Q.   Okay.  What -- what efforts have you gone
13    to?  When you said you've been trying, what have you done
14    specifically?
15              A.   I've reached out to people that have
16    information about antifa members.  I've reached out to
17    people that are deep in the researching or investigations
18    of antifa members.  I've asked if they could uncover
19    information that would lead to them to have a
20    conversation with this individual, or any information
21    that I did disclose could put this person in danger.
22                   THE REPORTER:  I'm sorry.  I'm having
23    trouble understanding and hearing the deponent.  Could
24    you get closer to the phone or the computer to pick you
25    up better?
```

Page 65

```
1                    THE DEPONENT:  All right.  Is that better?

2                    THE REPORTER:  Yes.

3                    MR. CAIN:  Yes.

4                    THE DEPONENT:  Okay.

5          Q.   (By Mr. Cain)  You are muffled.

6          A.   I'm trying to write while I'm talk- --

7    take notes while I'm --

8          Q.   Okay.  So I guess to summarize, you don't

9    have access to any information right now that

10   would -- that would put us or anyone in touch with RD,

11   true?

12         A.   True.

13         Q.   You've identified for us some members that

14   were on the call.  We've already discussed that.  You have

15   said that the purpose for being on this call was to

16   uncover antifa journalists, fair?  Is that a fair

17   statement?

18         A.   Yes.

19         Q.   All right.  And as a result of the call,

20   you uncovered Heidi Beedle as an antifa journalist, right?

21         A.   I did not 100 percent confirm that, but

22   that was my -- in my notes.  That was my -- that was my

23   recollection.  That was my opinion of who was on the

24   call, yes.

25         Q.   All right.  And you mentioned two others,
```

Page 66

1    Eric Mobich and Kyle Clark.  Were either of those

2    individuals on the call, if you know?

3                A.   No.  They talked about them as being

4    friendlies.

5                Q.   Okay.

6                A.   They didn't actually talk about Kyle

7    Clark.  They talked about another individual related to

8    that --

9                THE REPORTER:  I'm sorry, sir.  I can't

10   understand you still.  Can you get closer -- I don't

11   know.  Can we go off the record a minute?

12               MR. CAIN:  Sure.

13               THE VIDEOGRAPHER:  Going off the record.

14   The time is 11:47.

15               (Discussion off the record.)

16               (Recess from 11:47 a.m. to 11:50 a.m.)

17               THE VIDEOGRAPHER:  We're back on the

18   record.  The time is 11:50.

19               Q.   (By Mr. Cain)  Okay.  This RD, was this --

20   the call -- the antifa call that we've been discussing,

21   was that the first antifa call that he arranged for you to

22   be on?

23               A.   Yeah.  No.  Well, actually, yes, yes.

24               Q.   Because you've indicated in the past that

25   you've -- you were on more than one.  You infiltrated more

Page 67

1    than one call, right?

2            A.   Well, I said that I've infiltrated other

3    communications, yes.

4            Q.   Okay.  What do you mean by that?

5            A.   I mean, I've been involved in -- and I

6    didn't say that I had, but we had.  We had infiltrated

7    other things, other meetings, other communication, other

8    protests.

9            Q.   Okay.  And you're using the royal "we."

10   Who are you referring to when you say "we had"?

11           A.   Other people that were involved in or

12   associated with FEC or knew ADF.

13           Q.   Okay.  Can you -- is there a point person

14   or a core group of people that you can identify that were

15   involved in this?  By name.

16           A.   I don't understand.  So there's lots of

17   research being done on antifa.

18           Q.   Okay.  All right.  Well, let me backtrack a

19   second.

20                Other than the call that we've described

21   where you -- obviously you didn't identify yourself on

22   this Zoom call in question, right?

23           A.   I did not.

24           Q.   My question earlier was geared towards

25   that, other calls that you were able to get on through a

                                                    Page 68

```
1    conduit such as RD.  Was this the only one?
2              A.   No.  The only call that I was on related
3    to this was this call.  The previous time that I had a
4    scheduling conflict, I could not get on the previous
5    call.  So this was the call that I could actually be on
6    at my -- you know, at my office.
7              Q.   Okay.  And that's -- that was the point.
8              So as far as this -- this scenario where
9    someone gets you on a call that you can monitor
10   anonymously, this is the only one that you can testify to
11   as having been on under these circumstances?
12             MS. HALL:  Objection.  Relevance.
13             A.   I -- can you repeat the question?
14             Q.   (By Mr. Cain) Yeah.  I'm just trying
15   to -- you said in the past that you had infiltrated antifa
16   calls.  I'm trying to find out how many other calls you
17   were on such as this one.
18             MS. HALL:  Charlie -- I'm trying to -- I'm
19   trying to figure out why this is relevant to limited
20   discovery.  We're here for one specific call that dealt
21   with your client, not other calls.
22             THE DEPONENT:  Is that an objection?
23             MR. CAIN:  No.  It's a speaking objection,
24   and it's waived.
25             He's testified to this and provided
```

Page 69

```
 1    information on this, and I want to get an answer to my
 2    question.
 3               Q.   (By Mr. Cain)  Are there other calls or was
 4    this --
 5               MS. HALL:  Again, it's not relevant.
 6               MR. CAIN:  I don't -- either make an
 7    instruction, but quit interrupting my questions, please.
 8               MS. HALL:  I did.  I'm objecting.
 9               Q.   (By Mr. Cain)  So --
10               MR. CAIN:  Okay.  Make your objection and
11    then I will ask the question.  He'll answer it unless you
12    make an instruction.
13               Q.   (By Mr. Cain)  Let's just focus on RD.  Was
14    this the only call that this particular conduit got you
15    on?
16               A.   Yes.
17               Q.   Okay.  Were there other similar calls
18    relating to uncovering antifa members besides the one in
19    question that you were on?
20               MS. HALL:  Objection.
21               A.   Any type of communication or ways that
22    antifa communicated that we were able to get on or be at,
23    whether it be a meeting or otherwise, we did so legally.
24               Q.   (By Mr. Cain)  I don't -- I don't -- I'm
25    not asking about legality at this point.  I'm just asking:
```

Page 70

```
1      Is there any other calls such as the one that you've been
2      describing that you were on.  Either yes or no.  I'm not
3      asking about whether it was legal.
4                    MS. HALL:  Objection.
5           A.   That I was on?
6           Q.   (By Mr. Cain)  Yes, that you were on.
7           A.   Okay.  That I was on, no.
8           Q.   Okay.
9           A.   Personally.
10          Q.   Now, going back to the antifa call, I have
11     seen various dates -- or a range of dates that this call
12     was alleged to occur.  What specific date did this Zoom
13     call occur?
14          A.   It happened between the mid and end of
15     September.
16          Q.   Right.  And so my question was,
17     specifically.  We have notes from the call that are not
18     dated, correct?
19          A.   Correct.
20          Q.   And you've said in your affidavit that it
21     was on or about the week of September 27th of 2020.  And
22     then you've said in testimony -- including just now -- mid
23     to late.
24               Why can you not provide us the actual date
25     that the call occurred?
```

Page 71

```
 1                 A.    Because it wasn't on my calendar.  And the
 2      only thing that I can do is get within a few days of the
 3      September 26th screenshot, which is when I did the
 4      information search related to Eric Dominion, Denver,
 5      Colorado.
 6                 Q.    Right.  Because we have a screenshot of you
 7      doing that on September 26th, right?
 8                 A.    Yes.
 9                 Q.    So the call obviously would have occurred
10      prior to that, based on your prior testimony, correct?
11                 A.    It would have, yes.
12                 Q.    And so your best recollection, I guess,
13      would have been that the call would have been within a few
14      days of September 26th prior to that?
15                 A.    That's me guessing.  Yes.
16                 Q.    Well, that's the most likely scenario, is
17      it not, based on your recollection?
18                 A.    It's been a year, so I don't know.
19                 Q.    And you -- do you keep a calendar?
20                 A.    I do.
21                 Q.    Is it an electronic calendar or a
22      handwritten one, old-fashioned?
23                 A.    Sometimes a little bit of both.
24                 Q.    Okay.  What were you doing -- what do you
25      remember doing on the date that this call occurred?
```

Page 72

1              A.    I don't.  I mean, I can't go back that far

2      and give you that information.  I mean, I can check my

3      calendar to see what I was doing on those dates, but

4      that's as close I can get.

5              Q.    Well, have you tried to go back -- I mean,

6      has anybody asked you to triangulate the actual date?  I

7      don't want to ask you about your lawyers.  But has anybody

8      asked you to do that?  Any of the other defendants, to try

9      to get an actual date?

10             A.    No.  My lawyer has asked me those

11     questions, yes, and I've gone back and done as much

12     research as I possibly can.  There's a lot of moving

13     parts happening at the same time.  I also ran a company

14     at the same time I was involved in building up FEC

15     United, and the same time that I was advocating for

16     people's rights in this community related to faith,

17     education, and small businesses.

18                   THE REPORTER:  I'm sorry.  And small

19     businesses?

20                   THE DEPONENT:  Yes.  Yes, ma'am.  Small

21     businesses.

22             Q.    (By Mr. Cain)  All right.  So as you sit

23     here today, your testimony is it would have been -- within

24     a few days is your best estimate that the antifa call

25     occurred; is that fair?

                                                      Page 73

```
 1                    MS. HALL:  Objection.
 2           A.    I'd rather not speculate, which is why I
 3      said from the middle to end of September.  I know it
 4      happened before the 26th of September.
 5           Q.    (By Mr. Cain)  And you can't -- despite
 6      efforts in looking at your calendar, you can't recreate
 7      your schedule in order to get us a specific date, true?
 8           A.    I've attempted to.
 9           Q.    The book that has your notes in it --
10           A.    Yes.
11           Q.    -- do you still have that book?
12           A.    I do.
13           Q.    Does it have other notes besides the notes
14      relating to the antifa call?
15           A.    It does.
16           Q.    In other words, subsequent to these notes,
17      are you able to look at any material that would help you
18      nail down the date in question?
19           A.    No.  My schedule is pretty tight.  I'm
20      fairly busy on a daily business.  It's one of the key
21      complaints that my attorneys have in me getting back to
22      them promptly.
23           Q.    Okay.  Back to the Zoom call.  Was there
24      any video associated with this particular call?
25           A.    We were not in a video set, no.  We
```

Page 74

1    weren't video'ing the call.

2              Q.   Right.  I understand you weren't on video.

3    But were other people on the call on video?

4              A.   No.

5              Q.   And the person RD, was he with you during

6    the course of this call?

7              A.   For part of it.

8              Q.   Okay.  Explain which part he was with you.

9    Just to get you on the call?

10             A.   No.  He was here for part of the call.

11             Q.   Okay.  So you two were there in your office

12   and you started the call, and then he left?

13             A.   I think he came in and out, yes.

14             Q.   In and out.

15             Did he hear -- was he there during the time

16   that this conversation about Eric from Dominion occurred?

17             A.   I believe so, yes.

18             Q.   And since he was associated with antifa, as

19   you understood it before, did he identify for you anyone

20   else that was on the call from his -- from his own

21   knowledge?

22             A.   I believe he gave me some context behind

23   this Yan guy or Yan-ni guy.

24             Q.   So you think he knew him?

25             A.   I do, yeah.

Veritext Legal Solutions
800-336-4000

1          Q.    All right.  Anything else that you can
2     recall?
3          A.    Not that I can recall.
4          Q.    There's other names on your notes that we
5     didn't discuss on the first page, on Bates 205.  I think
6     we've -- we've discussed everybody but Joey Camp.
7                Joey Camp was not on this call, I take it,
8     right?
9          A.    I do not believe so.
10         Q.    Was part of the discussion on this call
11    about Joey Camp?
12         A.    Yes.  At that point I had never met Joey
13    Camp, and I really didn't know who he was.
14         Q.    Okay.  Can you -- is it fair to say that
15    Mr. Camp was one of the -- one of the primary topics of
16    this call?
17         A.    No.
18         Q.    All right.  And how much time was spent
19    discussing Joey Camp while you were on the call?
20         A.    A few minutes probably.
21         Q.    Do you remember what was said about him?
22         A.    Yeah, that he's a rat.  They had a lot of
23    choice things to say about him.
24         Q.    Okay.  A rat meaning -- meaning what?  What
25    did you understand that to be referring to?

Veritext Legal Solutions
800-336-4000

1           A.    They were not talking about him in

2     endearing terms.

3           Q.    And then you also have listed -- I don't

4     think we got to them -- you put rat in your notes, I do

5     believe.

6           A.    Yeah.

7           Q.    Help contact this Joey.  So is that your

8     note to yourself to say you need to get in touch with him

9     as a result of what was said about him?

10          A.    Yes.

11          Q.    I mean, the idea of being an enemy of

12    antifa as a potential friend or alley for you?

13          A.    It was just another point of data.

14          Q.    Then you say under that note about Joey,

15    Tay, hyphen, question mark.  This guy is antifa, two

16    question marks.

17                What is the -- why did you write that down?

18          A.    They were talking about Tay Anderson.  And

19    that -- it came up because of connection between the -- I

20    think it was PSL and antifa.  I think that that's the

21    socialist movement on DSL.  I think it's DSL.

22          Q.    Okay.  Well, what was the discussion about

23    Mr. Anderson?

24          A.    Mr. Anderson was, I guess, involved in

25    organizing protests and was standing up.  And I don't

                                                      Page 77

```
 1    remember the context behind it.  It was just the context
 2    of them bringing in someone that is a school board member
 3    into the conversation.
 4             Q.   Did RD tell you who actually organized this
 5    Zoom call?
 6             A.   No.
 7             Q.   And you don't know?
 8             A.   No, no.  But nobody questioned -- well, it
 9    doesn't matter.
10             Q.   Nobody questioned what?
11             A.   Nobody questioned him being on the call.
12             Q.   Oh, RD.  Okay.
13                  Do you know whether Tay Anderson was a part
14    of this call at any point?
15             A.   I can't say for certain, no.
16             Q.   Were you on the call when it began?
17             A.   No.
18             Q.   Were you on the call when it ended?
19             A.   No.
20             Q.   So you don't know how long the call was in
21    total?
22             A.   I can speculate.  But, no, I don't.
23             Q.   How -- approximately how long were you on?
24             A.   40 minutes, I believe is what I recall,
25    45 minutes.  Maybe a little less, a little more.
```

Page 78

1          Q.   You -- you say in your notes, quote, Four

2     to five, close quote, training.

3          A.   What page are you on?

4          Q.   And then -- I'm sorry?

5          A.   What page is that on?  I'm sorry.

6          Q.   Bates 208 at the top.  I've actually

7     bookmarked that for a second.

8               These notes are not in order, are they?

9     Like in the order you wrote them.

10         A.   Based on what I'm looking at, no, they're

11    not.

12         Q.   Okay.  In fact, what is the first page of

13    the note?  Antif- -- is it -- is it 206 where you say

14    antifa call - RD?

15         A.   Yes.

16         Q.   Okay.  So 206 is page 1?

17         A.   Yes.

18         Q.   What is page 2?

19         A.   Page 2 is "fortify training."

20         Q.   So that's --

21         A.   The next one is 208.

22         Q.   208 is page 2.

23         A.   Then page 3 is, Contact this Joey.  And

24    then page 4 is, Who is.

25         Q.   Okay.  So then when you got on your first

Veritext Legal Solutions
800-336-4000

1   note was, Who is this woman?  That's referring to Heidi

2   Beedle.  When you got off, your last note was Jojo, Joey

3   Camp, media, question mark.  Hit this guy.

4               Is that a reference to contacting him?

5               A.   No.  I think it was a reference to them

6   wanting to go after this guy.

7               Q.   Okay.

8               A.   Somebody referred to him as Jojo and

9   somebody referred to him as Joey Camp.  And at that

10   point, I didn't know who Joey Camp was.

11               Q.   But you do now?

12               A.   I do.

13               Q.   Actually, while I'm thinking about it,

14   let's -- I just received this -- I'm going to see if I can

15   share my screen with you because this is not -- it's

16   probably something that you have in front of you.

17               This is Plaintiff's Exhibit 131.  This was

18   posted, I think yesterday, on GAB by Joey Camp.  And it's

19   a two-page document.

20               Did you see this posting, Mr. Oltmann?

21               MS. HALL:  Charlie, we don't see anything

22   on the screen.

23               THE DEPONENT:  I see nothing on the

24   screen.

25               MR. CAIN:  Well, let's see.

Veritext Legal Solutions
800-336-4000

```
 1                      MR. BURNS:  For what it's worth, Charlie,
 2      I was able to see it.
 3                      THE REPORTER:  Who just said that?
 4                      MR. BURNS:  John Burns.
 5                      THE DEPONENT:  I think you've made me the
 6      spotlight, so everyone else can see it, but I can't see
 7      it.  So hold on a second.  No.  Well, I can't see it.
 8                      MR. CAIN:  Let's do this.  I don't want to
 9      waste time on this.  Let's go off the record for a
10      minute.
11                      THE VIDEOGRAPHER:  Going off the record.
12      The time is 12:09.
13                      (Recess from 12:09 p.m. to 12:17 p.m.)
14                      THE VIDEOGRAPHER:  Okay.  We're back on
15      the record.  The time is 12:17.
16              Q.   (By Mr. Cain)  All right.  Mr. Oltmann,
17      before the technical issues, we were talking about Joey
18      Camp that is referenced in your notes.  And then I had
19      marked Exhibit 131, tried to share my screen, and
20      that -- I understand you have it actually in front of you;
21      is that true?
22              A.   I do.
23                      MR. CAIN:  And for the record, Exhibit 131
24      was posted on GAB.  It hasn't been produced by any
25      parties.  We were made aware of it last night.  And it
```

                                                        Page 81

```
1    purports to be a posting from Joey Camp at Joey Camp
2    2020.
3              Q.   (By Mr. Cain)  Do you recognize -- well,
4    let me ask it a little different way.  Do you follow
5    Mr. Camp on GAB?
6              A.   No.
7              Q.   Have you ever seen this posting before now?
8              A.   I have not.
9              Q.   Are you in communication with Mr. Camp?
10             A.   From time to time, yes.
11             Q.   All right.  Well, this may be helpful or it
12    may not be since you hadn't seen it, but he makes some
13    statements that I wanted to ask you about.
14                  At the beginning of this document, he says,
15    When my team preserved material from Eric Coomer, we did
16    so because of his connection to antifa, not because of his
17    connection to Dominion, which we didn't even know existed
18    before --
19                  Do you know what he's referring to --
20                  MS. HALL:  Objection.
21             Q.   (By Mr. Cain)  -- with that comment?
22                  MS. HALL:  I apologize, Charlie.
23    Objection.  Calls for speculation.
24             A.   No.
25             Q.   (By Mr. Cain)  In other words, have you
```

Page 82

```
1     received material regarding Eric Coomer from Mr. Camp or

2     his team?

3              A.   I don't believe so, no.  I have gotten

4     emails from Joey, but that's about it.

5              Q.   Do any of those relate to Dr. Coomer?

6              A.   I do not believe so.  If they did, they

7     would be in the discovery request.

8              Q.   Then on the bottom of -- well, actually,

9     let me ask you one other thing.

10              In this posting, in the middle of the

11     posting, there's a paragraph that says, During the phone

12     call with Eric Coomer on the line with other known members

13     of antifa nationwide, one of the antifa members spoke

14     about finding and killing me.  That was end of last year.

15              Now, as far as you know, Mr. Camp was not

16     on the call that you have been describing, right?

17              A.   Not -- not that I'm --

18              MS. HALL:  Objection.  He can only answer

19     this question if it doesn't deal with attorney-client

20     privilege.

21              Q.   (By Mr. Cain)  Yeah, I'm not asking if your

22     lawyers told you anything about this.  It's just

23     like -- my question was:  As far as you know, Mr. Camp was

24     not on this call, correct?

25              A.   Correct.
```

Page 83

1          Q.   Have you spoken to Mr. Camp about what
2     occurred on this call?
3          A.   No.
4          Q.   So you don't have any idea where he's
5     getting this particular information from; is that fair?
6               MS. HALL:   Objection.   He can only answer
7     that question if it does not relate to attorney-client
8     privilege.
9          Q.   (By Mr. Cain)  And that's fine.   If this --
10         A.   On this --
11         Q.   No, no, I don't -- not -- not if it's just
12    repeating something your lawyer said.   I'm interested in
13    your testimony, not theirs.
14         A.   Okay.   Can you repeat the question?
15         Q.   Probably not.
16              MR. CAIN:   Laurel?
17              (The last question was read.)
18         A.   Correct.
19         Q.   (By Mr. Cain)  And was Mr. Camp or
20    anyone -- any team members, as he calls them -- did they
21    provide you with Dr. Coomer's Facebook pages?
22         A.   No.
23         Q.   The screenshot of the pages?
24         A.   No.
25         Q.   Because you -- let me actually back up for

                                             Page 84

1    a second.

2              You provided -- I think it was counsel for

3    Sidney Powell and Defending the Republic, you provided

4    them with sworn testimony on or about August 18, I

5    believe, of this year, correct?

6         A.   Yes.

7         Q.   And part of -- and that's testimony that,

8    as you sit here today, you were under oath, you swore that

9    it was true, and that testimony is true and accurate,

10   correct?

11        A.   Correct.

12        Q.   I don't want -- I don't want to repeat or

13   reinvent anything from it.

14             But one of the things that you refer to is

15   getting screenshots of Dr. Coomer's Facebook pages.  And

16   as I appreciate your testimony, those screenshots did not

17   come from Joey Camp; is that fair?

18        A.   That is fair.

19        Q.   All right.  So who did -- who did you get

20   the screenshots of the Facebook pages from?

21        A.   I got those screenshots from someone who

22   had access to that legally.

23        Q.   Yeah.  And you've said that.

24        A.   Can we take a quick break?  I need to use

25   the restroom.  I just drank a bunch of water.

Page 85

```
 1                    Q.    Well, let me -- let me ask you a follow-up,
 2          then we can take the break, it relates to the question
 3          that I just asked you.
 4                    A.    All right.  I'll answer it.
 5                    Q.    The -- the question was whose -- who gave
 6          you -- this is along the lines of the other question about
 7          the conduit, RD -- who is the person who gave you access
 8          to the Facebook pages by giving you screenshots?
 9                    A.    Someone that had legally -- legal access
10          to those screenshots.
11                    Q.    I'm asking you for the name.
12                    A.    I won't give you the name.  I will not
13          answer that question.
14                    Q.    You've been ordered by the Court to answer
15          that question.
16                    A.    I understand.  I also understand the
17          consequences that come from not answering that question.
18                    Q.    What's the basis for refusing to answer the
19          question?
20                    A.    Eric Coomer's lack of control, and his
21          ability to and desire to hurt those that speak out
22          against him.
23                    Q.    How has --
24                    A.    There's -- let me -- let me actually
25          finish that.  There's also another problem in that that
```

Page 86

1    person is not protected under any protection order.   And

2    at the point that he would be protected under a

3    protection order, I would seek that that protection order

4    also prohibit Eric Coomer from having access to that

5    information as well.

6              Q.   In the hearing, we stipulated that the

7    protective order would be covered by the Facebook conduit

8    as well.   So they are protected, and that's our position

9    and stipulation.   So --

10             A.   It is my position that that has not been

11   stipulated.   It is also my position that having Eric

12   Coomer have access to this individual would be a danger

13   to this person, given Eric Coomer's history with antifa.

14             Q.   Sir, you're -- I just want to make sure

15   that you understand what you're doing.   The Court has

16   ordered you to provide that information to us.   And -- and

17   you are aware that there's an order in place to that

18   effect, right?

19             A.   I also understand that on --

20             Q.   But just answer that question first.   Can

21   you answer that?

22             A.   I'm answering that question for you right

23   now.   On December 8th, Mr. Coomer said specifically that

24   those posts were fabricated.   He furthermore said that he

25   had no -- never had any sort of desire to push out

Page 87

1    anything that would be politically motivated or biased.

2    That was, I think, paragraph 3.

3              So as far as Mr. Coomer is concerned, I

4    fabricated those.  Now, you want me to come forward with

5    the person that gave me access to that information.  Even

6    given the history of Mr. Coomer even as -- as recently as

7    a couple months ago where he got in a bar fight.

8              So, I mean, you want me to give you

9    information related to this individual to a person who

10   has a history of flying off the -- off the handle, and I

11   don't think that that is appropriate.  So given that, I

12   understand the consequences.  I understand we'll go back

13   in front of the Court.  I will not divulge that

14   information unless I feel that that person is safeguarded

15   against Mr. Coomer specifically.

16             MS. HALL:  Charlie, and I'm going to at

17   this point say we need to take a break and go off the

18   record.

19             MR. CAIN:  I'm not agreeing to it.  I

20   mean, you can do what you want, but I want to get to the

21   bottom of this.

22             MS. HALL:  And I understand -- there's no

23   question posed, and he asked for a break about four

24   questions ago.  So I'm asking for a break.

25             A.   Just a quick break just to use the

                                          Page 88

1    restroom, and I'll be right back.

2                Q.   (By Mr. Cain)  You're going to do it no

3    matter what.  I'm just saying I'm in the middle of a

4    topic, and so I'm not -- it's not an agreed-upon break.

5                MS. HALL:  Okay.  Break.  We'll come back

6    in a few minutes.  Thank you.

7                THE DEPONENT:  I'm just going to use the

8    restroom.  I'll be right back.

9                THE VIDEOGRAPHER:  Going off the record.

10   The time is 12:26 p.m.

11               (Recess from 12:26 p.m. to 12:34 p.m.)

12               THE VIDEOGRAPHER:  We're back on the

13   record.  This is the beginning of Media Number 2.  The

14   time is 12:34.

15               Q.   (By Mr. Cain)  Okay.  Mr. Oltmann, before

16   the break, I was asking you about the access to the

17   Facebook pages.  It wasn't an agreed break.  I don't want

18   to know if you -- the substance of your conversations, but

19   did you confer with counsel during the last break?

20               MS. HALL:  Objection.

21               A.   I didn't, no.  I went to the bathroom like

22   I told you I was going to.

23               Q.   (By Mr. Cain)  So you didn't confer with

24   counsel?

25               A.   I did not.

                                              Page 89

1          Q.    Having had time to visit the restroom, I'm

2    going to give you one more shot.  Are you going to respond

3    to my question as to who the person was that gave you

4    access to Dr. Coomer's Facebook pages?

5          A.    No.  Put it in the protective order, and I

6    feel that that person is protected, then I may be

7    compelled to release that information.  But given, again,

8    the irrational nature of Mr. Coomer, I'm not -- I'm not

9    prepared to do that right now.

10         Q.    All right.  Well, I'll bite on -- and I

11   don't agree with you, I do believe it's protected.  We've

12   already stipulated that it's protected and it's been

13   ordered.  So --

14         A.    That doesn't stop -- that doesn't stop

15   Eric Coomer from being on this call right now and for him

16   getting access to that information.

17         Q.    Right.

18               And you're speculating, though, as to what

19   anyone would do with that information.

20         A.    I'm not speculating.  I'm using -- I'm

21   using the habits and behavior of Mr. Coomer himself in

22   order to dictate what I think he will do in the future.

23         Q.    Okay.  I'm going to burn a minute on this

24   because we're going to have to address this with the

25   Court.

Page 90

```
 1                  You said because of Dr. Coomer's lack of
 2      control, you mentioned a bar fight.  What specifically are
 3      you saying presents a danger to the Facebook page person
 4      by Dr. Coomer?
 5              A.   His -- his own writings that date back all
 6      the way back to 1996.  His involvement with the
 7      skinheads.  His previous addiction to heroin.  His
 8      multiple arrests for DUI.  His inability to control
 9      himself, comments and things that he's done in the past.
10                  I mean, he's just a wrecking ball.
11      Writing stuff publicly about how he abused his wife at
12      the time.  I didn't write these things, he did.  And
13      those aren't the writings of someone who is a sane
14      individual.  So I used his own writings and the things
15      that he wrote in order to come to a conclusion on what
16      he's likely to do to someone else based on his
17      recklessness with his own life.
18              Q.   This -- this individual, as you understand
19      it -- but you also mentioned a bar fight.  What does that
20      have to do with this?
21              A.   I mean, you have a bar fight in the middle
22      of all of this.  I mean, I don't know.  I -- I don't --
23              Q.   Who told you he had a bar fight?
24              A.   Someone in the -- someone in the Salida
25      area.
```

Page 91

1              Q.   You mentioned, I think in the past, maybe

2     it was on one of your shows, that Dr. Coomer you said

3     assaulted two individuals.  Is that -- is that what you're

4     referring to?

5              A.   That is the information that was provided

6     to me, yes.

7              Q.   Okay.  So do you know whether or not

8     Dr. Coomer was charged with assault in this alleged bar

9     fight?

10             A.   I do not believe he was.

11             Q.   Right.

12                  And, in fact, do you know whether the other

13    individuals involved in this incident were charged

14    criminally?

15             A.   I do not know that as well.

16             Q.   You don't have any firsthand knowledge of

17    anything related to a bar fight in Salida, do you?

18             A.   I hired a private investigator through

19    counsel.

20             Q.   Right.

21                  Is Dr. Coomer under surveillance right now?

22                  MS. HALL:  Objection.

23             A.   No.

24             Q.   (By Mr. Cain)  Has he been in the past?

25                  MS. HALL:  Objection.

Page 92

```
1                    A.   I don't know what my attorneys have done
2        in order to garner information about Mr. Coomer.
3                    Q.   (By Mr. Cain)  I'm not asking you about
4        your attorneys.  I'm talking specifically about whether
5        you have him under surveillance.
6                    A.   I personally do not have him under
7        surveillance, no.
8                    Q.   Have you ever sent someone to Dr. Coomer's
9        house to surveil him?
10                   A.   No.  Somebody volunteered to go by his
11       home to see if he was there because I was asked by
12       someone else if I'd seen Eric Coomer.  Lots of people
13       reached out to me all over, giving me information about
14       Mr. Coomer.
15                   Q.   Can you see my screen?
16                   A.   I cannot.  You have to hit the share
17       screen button at the bottom.
18                   Q.   I'm screen sharing.  In the exhibits, it's
19       Exhibit 104.  You can't see it, I guess, because of your
20       setup, but it's on the screen.
21                   A.   Hold on.  Let me go to Exhibit 104.
22                   Q.   It was produced by Mr. Hoft.
23                   A.   Okay.
24                   Q.   It comes from the phone number
25       303-667-5105.  Is that your phone number?
```

Page 93

```
 1                    A.    It is.
 2                    Q.    Is that your text to him, I sent someone to
 3        his house and no sign of him?
 4                    A.    I don't have that text in any of my texts.
 5        And I don't understand the context of this.
 6                    Q.    I asked you, Have you sent people to his
 7        house to surveil him?  You said, No, that you had
 8        volunteers.
 9                          Did you send this text and did you send
10        someone to Dr. Coomer's house in November of 2020?
11                    A.    I did not send someone to his house.  I
12        sent someone to see if he was there.  Because they called
13        me and said, I'm here.  I can check and see if he's at
14        his house.
15                    Q.    Okay.  Who did you send to his house?
16                    A.    It was a guy that lives in Salida that
17        reached out to me via Signal and said I live in Salida.
18        There's a lot of really bad people that live here.  Those
19        are his exact words.  How can I help?
20                    Q.    Okay.  And my question is:  Just like all
21        these other questions that you're not answering, who is
22        this person?
23                    A.    I've answered every single one of your
24        questions.
25                    Q.    Who is the individual that you sent to
```

Page 94

1      Dr. Coomer's house?  What's his name or her?

2                      MS. HALL:  Objection.

3               Q.   (By Mr. Cain)  Who?

4               A.   His name is Dave.

5               Q.   Last name?

6               A.   I actually don't have his last name.

7               Q.   Oh.  Convenient.

8                      MS. HALL:  Charlie, we don't need the side

9      comments.

10              Q.   (By Mr. Cain)  All right.  Dave in Salida,

11     you sent to Dr. Coomer's house in November, or at least he

12     volunteered to do it, right?

13              A.   He actually said that he would go by

14     there.

15              Q.   Is this the same person who provided you

16     information about some so-called bar fight?

17              A.   No.  It was a private investigator that

18     got that information.

19              Q.   So did you send this text or not on

20     Exhibit 104?

21              A.   I'd have to see the text in order to see

22     that, if I did or didn't.

23              Q.   The text is Exhibit 104, sir.  It's in the

24     Exhibit Share.  It's a one-liner.  It has your phone

25     number on it, you testified to, and is says, I sent

                                                    Page 95

1    someone to his house and no sign of him.

2                     MS. HALL:  Charlie, you have cherry-picked

3    one sentence.  This thread shows that there's 14 text

4    messages.

5              A.   Where are the rest?

6              Q.   (By Mr. Cain)  I'm not going to ask about

7    the rest.  I have limited time.  I want to know the answer

8    to my question.  Did you send this text or not?

9              A.   Well, I can't see the context of this

10   text.  I don't have this text in my possession, because

11   when my phone was replaced, that did not go with it.  So

12   if you can show me the rest of the text, I can tell you

13   whether or not I sent it in the context of --

14             Q.   This is what I have.  You can go back and I

15   guess talk to Mr. Hoft and review the records with your

16   counsel.

17                  My question is:  Did you send the text?  As

18   you sit here, do you know or not?

19             A.   I don't know.  I mean, I'll assume that I

20   did if it came from Mr. Hoft, but I don't know.  I don't

21   have this text in my possession.

22             Q.   You talked about Dr. Coomer lacking control

23   and that's why you're not telling me the Facebook conduit.

24                  I'm going to show you what's been marked

25   previously as Exhibit 46.  This is a Parlor post.  You --

Page 96

```
 1      I'm sharing my screen, but you can't see it, so I guess

 2   this is for the benefit of everyone else.

 3                    Do you have that up?

 4           A.    Yeah.  What day was this?

 5           Q.    Does it matter?

 6           A.    Yeah.

 7           Q.    I don't know.  You sent it, didn't you?

 8           A.    I did not send that.  That was what's

 9   called an echo.

10           Q.    Okay.  Tell me what that is.

11           A.    An echo is where you share somebody else's

12   post, and you can add your own thing to it.

13           Q.    Okay.

14           A.    But I do --

15           Q.    I'm sorry.  Go ahead.

16           A.    I do believe that when your family gets

17   threatened, when you have to surround your bed with metal

18   plates because you're afraid someone is going to come

19   kill your family, and you have to higher personal

20   security detail when people send you powder in the mail,

21   when people come to your house with a gun, those are all

22   things -- by the way, I didn't attack Dominion.  I went

23   after the credibility of Eric Coomer and his connection

24   to the election fraud based on his own words.  Right?

25                    So that happened within a couple of days
```

Page 97

```
 1   of -- of me actually coming out that Monday.  So I
 2   didn't -- you don't cut the tongue out of the person
 3   that's lying.  You cut the tongue out of the person who's
 4   telling the truth.
 5             When you get attacked with such -- with
 6   such vitriol, you have a tendency to get really pissed
 7   off, especially when your kids and your wife are in
 8   danger.  So, yeah, emotions fly high.
 9             So I don't know when this was written.  My
10   guess is that the top section was written
11   somewhere -- somewhere after or before he put up a post
12   related to the fact that those posts were manufactured.
13        Q.   Okay.  You don't remember the con- -- the
14   circumstances that caused to you put this post up?
15        A.   I'm sure it was anger.
16        Q.   Okay.
17        A.   I'm sure it was written out of anger.
18        Q.   You're not denying that this is your post,
19   are you?
20        A.   Well, I don't -- I don't know because I
21   don't have that post anywhere in any of the posts that I
22   have on Parlor.  It does not exist.
23        Q.   Okay.  Well, we were able to get it from
24   Parlor, obviously.  Are you denying that you sent --
25        A.   Hold on a second.  You got this from
```

Page 98

1    Parlor?

2                Q.    Yes.

3                A.    You said you got this from Parlor.  You

4    got this from Parlor.  So Parlor gave you this post?

5                Q.    No.  It was posted to your Parlor account.

6                A.    Well, I went to Parlor and asked them if I

7    could get a record of my previous posts that did not show

8    up, and they denied me.

9                Q.    Are you denying that you posted this, yes

10   or no?

11               A.    I don't know if I posted it.  To me,

12   something like that would be an echo.  It would not

13   be -- an echo is where you basically repost somebody

14   else's post.

15               Q.    Okay.  So did you repost -- when you say,

16   I've been busy doing 15 interviews in the last two days,

17   are you saying someone else posted that and then you just

18   reposted someone who had been doing 15 interviews in the

19   last two days?

20               A.    No, no, no.  You don't understand how

21   Parlor works.  So you'll repost the post, which is a

22   picture, and then above it you just put your own -- your

23   own stuff into it.

24               Q.    Okay.  So the picture was posted, and you

25   grabbed the -- the screenshot.  This is of Dr. Coomer's

                                                   Page 99

```
 1   house, isn't it, in Salida?
 2            A.   I think so.  I've never been there.
 3            Q.   Okay.  That was your understanding, though,
 4   when you echoed that picture?
 5            A.   Sure.  If I did it, yeah.
 6                 I've never -- I've never seen this post.
 7            Q.   Well, you typed it, didn't you?
 8            A.   Again, I went back in Parlor and I don't
 9   have any access to any of those records.  It's kind of
10   like the stuff with YouTube.  So you can tell me that I
11   posted this, but I can't find it anywhere.
12            Q.   Well, do you remember doing it?  Do you
13   remember saying, So it's up to you, blow this shit up.
14   Share.  Put his name everywhere.  No rest for this
15   shitbag.  Eric Coomer.  Eric Coomer.  Eric Coomer.  This
16   shitbag and the corrupt ass hats in Dominion voting
17   systems must not steal our election and our country.
18   Eric, we are watching you.
19                 You don't remember typing that?
20            A.   No.  But it's possible that I did type it.
21            Q.   You did, didn't you?
22            A.   I just answered your question.
23            Q.   And you wanted people to go to his house.
24   That's why you reposted -- or echoed that picture?
25            A.   You want to restate your question?
```

Page 100

```
 1                    Q.   Yeah.  What do you mean by "blow this shit
 2      up"?
 3                    A.   I'm not even sure I wrote it.
 4                    Q.   So you're not standing by this?
 5                    A.   I can't find it anywhere at Parlor.  You
 6      said you got it from Parlor, yet conveniently I can't go
 7      to Parlor and get any posts previously.  Nor are you
 8      willing to give me the date that this was supposedly
 9      posted.
10                    Q.   Did you delete this post?
11                    A.   I did not.  I've deleted nothing.
12                    Q.   You're under oath, sir.
13                    A.   Unlike your client.  Unlike your client, I
14      have deleted nothing.
15                    Q.   Including the Facebook video that you took
16      while you were in Grand Junction the other day that you
17      deleted?
18                    A.   What do you mean I deleted?  I didn't
19      delete it.
20                    Q.   Yeah, you did.  It was taken down.
21                    A.   That's not true.
22                    Q.   Who took it down?
23                    A.   It was never taken down.
24                    Q.   So that Facebook -- you're actually on
25      record saying you had to delete it.
```

Page 101

```
 1              A.    You cannot be this stupid.  Maybe you are.
 2    Maybe you don't use social media.  But all's I have to
 3    do, and all's Eric had to do on all of those posts that
 4    he deleted was change the settings so that they were not
 5    public, and that he was the only one that could have
 6    access to them.  So that's what I did.  I preserve
 7    everything.  And you're the one that came out and said
 8    that you preserved them as well.
 9              Q.    Oh.
10              A.    So you want to have a debate about your
11    client, we can have a debate about your client.  If you
12    want to ask me questions related to your client and
13    his -- and whether or not he was on that call, whether or
14    not he was a part of election fraud, you know, we can
15    just starting mounting up the evidence.  I've been
16    through all your photos and exhibits.
17                   So if you'd like to ask me questions about
18    those, I'm prepared to answer those.  But this subjective
19    stuff that you want to throw in the middle of it and ask
20    me questions about things that either are not relevant or
21    not true, I'm not going to sit here and stand for it.
22    You can bully someone else.  You're not going to bully
23    me.
24              Q.    Are you through?
25              A.    Are you?
```

Veritext Legal Solutions
800-336-4000

1          Q.    Nope.

2          A.    Then let's go.

3          Q.    So you said online that you took down the

4    video the other day from Grand Junction.

5          A.    Yes.

6          Q.    Okay.  So where you're quibbling with me is

7    deleting it versus taking them down?

8          A.    That's what you said.

9          MS. HALL:  And, Charlie, how is this

10   relevant?  What is this have to do with your client Eric

11   Coomer?  Does the video have something to do with your

12   client?  Because if not, please move on.

13         MR. CAIN:  It's my time, Counsel.

14         MS. HALL:  Then we'll sit here and you can

15   stare at my client, because the questions are not

16   relevant.  You're going beyond the scope of limited

17   discovery.  And you've done this with all of the

18   defendants, and I'm not cool with it anymore.

19         MR. CAIN:  You've got intentional -- well,

20   first of all, I'm not going to debate you because it's a

21   waste of time.  He testified that my client lacked

22   control.  I've got an intentional infliction claim.  And

23   your client is unwilling to own up to what he posted on

24   Parlor as Exhibit 46.

25         A.    No.  You're not asking me questions.  I

                                          Page 103

```
 1    will answer those questions.  When you purposely lie to

 2    me, as you have to the judge and in this case, which you

 3    have done, then I'm going to correct that.

 4              You said that I deleted those posts.  Your

 5    words, not mine.  I did not delete those posts.  I made

 6    them private.  There's a difference between making

 7    something private and preserving those things and

 8    deleting them.  I did not delete them.

 9        Q.   (By Mr. Cain)  You took them down.  Then if

10    that's the issue that you have, then I stand corrected.

11              MS. HALL:  Charlie, he did not take them

12    down.  He just told you he made the post private.  So

13    that means you and all of your team and all of your

14    experts and everything that you're doing to follow my

15    client 24 hours a day can no longer see that.  It is

16    still on his Facebook page.  If you are friends with Joe

17    Oltmann, you can go on his Facebook page --

18              THE DEPONENT:  No, you can't.  No.

19              MS. HALL:  -- and see it.

20              THE DEPONENT:  No, but I'll show it to

21    him.

22        Q.   (By Mr. Cain)  All right.  I'm going to

23    move on.  I can -- I guess what I can conclude from this

24    is that it's possible that you posted an echo of a picture

25    of Dr. Coomer's house and you wrote these words, but you
```

```
 1    won't confirm that for me?
 2            A.    There you go.  There's my video.  See,
 3    this is Facebook.  See that?  That's the video you said I
 4    took down.  It's still up on Facebook.
 5            Q.    That's the video you said you took down.
 6            A.    I'm sorry?
 7            Q.    That's the video you said you took down.
 8            A.    No.  Okay.  Anyway --
 9            Q.    You're -- you're starting -- well, I'm not
10    going to comment.
11                  What we'll do is, I guess, move on to --
12            A.    It's a good idea.
13            Q.    -- to another topic.
14                  Actually, you know what?  I'm going to take
15    a bathroom break.
16                  MS. HALL:  Oh, we object, Charlie.
17                  THE DEPONENT:  No, we don't.  Stop it.
18    Stop.  Please stop.  Charlie, take a bathroom break.  Do
19    you want a bathroom break, seriously?
20                  MR. CAIN:  Yeah.  We're going to go off
21    the record because we've got limited amount of time and
22    we've wasted a lot of it.  And I need to kind of organize
23    what I'm going to cover with you because I suspect your
24    lawyers are not going to agree to go past three hours
25    today.
```

Page 105

```
 1                    THE DEPONENT:  They may not agree but, I
 2      mean, obviously, I --
 3                    MS. HALL:  Sure.
 4                    MR. CAIN:  Let's go off the record.
 5                    THE VIDEOGRAPHER:  Going off the record.
 6      The time is 12:55.
 7                    (Recess from 12:55 p.m. to 1:02 p.m.)
 8                    THE VIDEOGRAPHER:  We're back on the
 9      error.  The time is 1:02.
10              Q.   (By Mr. Cain)  Mr. Oltmann, since we have
11      45 minutes, I'll probably jump around a little bit.  I
12      like to call it the lightening round.
13                    But before I get off on some topics, I was
14      informed by one of our lawyers that the Parlor post was on
15      or about December 5th, which would have been before they
16      took the Parlor down and I think there was some loss of
17      data.
18                    Does that help you in terms of your
19      recollection as to whether you posted that echo?
20              A.   No, because once I saw this post, which
21      I've seen before, I went back to Parlor to try and
22      recover some of the information on Parlor to see if I had
23      posted that, in fact.  And I could find no record of it,
24      not at Parlor.
25                    But again, I guess that when the tech
```

Page 106

1    giants decided that they were going to sensor half of
2    America, they in essence deleted history and part of that
3    is the stuff that was up on Parlor.
4           Q.   All right.  So did anybody else in December
5    of 2020, did anybody else have access to your Parlor
6    account besides yourself?
7           A.   I'm not sure I understand the question.
8           Q.   Well, someone posted this from your Parlor
9    account.  The point of my question is:  Did someone else
10   have access?  Could someone else have posted this?
11          A.   Well, I can't authenticate that post.  I
12   mean, that post doesn't show that there's any comments.
13   That post doesn't show that there's any -- it doesn't
14   show anything.  It doesn't look like what Parlor looks
15   like today, which is the reason why I went back to Parlor
16   to ask them if this is a post that they could recover for
17   me.
18          Q.   And it's your sworn testimony that you
19   don't recall -- or you can't recall having actually made
20   that post?
21          A.   No.  But I've called Eric Coomer a shitbag
22   numerous times.
23          Q.   Okay.  So you stand by the content.  It's
24   just you don't know if that's actually your post?
25          A.   I stand by that comment.

                                        Page 107

1        Q.   All right.  So let's -- let's talk a little

2    bit about -- we talked about the antifa call, and your

3    conduit has been identified as RD., and that's essentially

4    it.  We've talked about Facebook.  I want to follow-up on

5    the Facebook question now.

6             You -- when you got this -- the original

7    screenshots from Dr. Coomer's Facebook account, were you

8    located at that elk hunt home that you had referred to in

9    some of your prior testimony?

10       A.   Yes.

11       Q.   Okay.  So just help me a little bit about

12   the timeline.  You had testified that you were -- you had

13   this epiphany when you were at this elk hunt.  This would

14   have been November 6 of 2020; is that correct?

15       A.   I never had an epiphany.

16       Q.   Okay.  Well, I don't mean to -- whatever it

17   was, on November 6th is when you started looking back at

18   Dr. Coomer as a result of an article that you read; is

19   that fair?

20       A.   Correct.  Correct.

21       Q.   And that's why you were out elk hunting, I

22   think in New Mexico; is that right?

23       A.   I was not elk hunting in New Mexico.

24       Q.   Okay.  What were you doing?

25       A.   I was elk hunting.

Page 108

```
 1              Q.   Okay.  Where were you?

 2              A.   In Colorado.

 3              Q.   All right.  And in terms of getting access

 4     to the Facebook post, how did you go about actually

 5     getting that data?

 6              A.   Somebody gave me access to it.

 7              Q.   Okay.  And the somebody is the person

 8     you're not going to reveal, correct?

 9              A.   I'm not going to reveal that person

10     because Eric Coomer is on this call, and the subject is

11     not subject, thus, I can see to the protection order by

12     giving you that information.

13              Q.   Was it -- well, I'm not going to give you

14     too many names.  Was it Ryan McBride?

15              A.   I -- I am not going to disclose who the

16     person is.

17              Q.   Do you know Mr. McBride?

18              A.   I'm not going to disclose -- yes, I do.

19              Q.   And you're not going to tell me whether it

20     was him that gave you access?

21              A.   I'm not going to tell you -- I'm not going

22     to tell you who gave me access.

23              Q.   Okay.  Was November 6th the day that you

24     first received screenshots from the Facebook page?

25     November 6.
```

Page 109

```
 1              A.   Yes.

 2              Q.   Okay.  And had you already been talking to

 3    one of Dr. Coomer's Facebook friends about getting access

 4    to his Facebook page prior to that point?

 5              A.   No.

 6              Q.   Did you know -- well, strike that.

 7                   Had you had access to Dr. Coomer's Facebook

 8    account prior to November 6?

 9              A.   No.

10              Q.   Walk me through the steps on November 6th

11    that you took in order to get access.

12                   And I understand you're not going to tell

13    me the names -- or name, but -- and I don't agree with

14    that, obviously.  But just kind of walk me through how you

15    were able to do that.

16              A.   Okay.  Repeat your -- is that a question

17    or what --

18              Q.   Yes.  Walk me through how you got access to

19    the Facebook page.

20              A.   Somebody sent me the Facebook post.

21              Q.   I get that.

22                   You must have called someone.  Tell me --

23    tell me how it came about.

24              A.   I reached out to numerous people to see

25    who'd be willing to give me information.
```

Page 110

```
1              Q.   Okay.  But specifically Facebook
2    information.  Why did you think Facebook might have
3    information on Dr. Coomer?
4              A.   I didn't.  I wanted to validate the
5    information that I had previously.
6              Q.   So you just started calling or reaching
7    out, as you said, to various people to see if they could
8    get you access to his Facebook?
9              A.   I started doing research on the 6th to get
10   access to information that would have corroborated the
11   information that I had previously going back to
12   September.
13             Q.   Okay.  And then how did you -- did you find
14   someone in your -- in your investigation who told you,
15   Hey, I can get you access to the Facebook account?
16             A.   No.  I just started doing research.
17             Q.   Okay.  You're being evasive.  I'm trying to
18   get --
19             A.   Actually, that's exactly what I did.  I
20   started doing research.  I started doing research on
21   social media accounts.  And was able to uncover Instagram
22   account, Twitter account that had been previously
23   deactivated.  A Facebook account that was not
24   deactivated.
25                       I started looking at pictures that were
```

Page 111

```
 1    publicly available of people that were connected to those
 2    people, and looked to see if there was a 2 degree
 3    separation of Eric Coomer and other people that I could
 4    get access to that information.
 5               Q.   And so you found through looking at -- or
 6    doing that research, someone that you recognized as a
 7    friend of Dr. Coomer?
 8               A.   Not right away, no.
 9               Q.   Well, you got the information on the 6th,
10    right?  You were able to get screenshots that day,
11    correct?
12               A.   Yes.  Some of them on that day, yes.
13               Q.   All right.  And so how did you receive
14    those?  How were they transmitted to you?
15               A.   Signal.  I believe Signal, yeah.
16               Q.   And same thing with -- well, were all of
17    the Facebook pages sent to you via Signal?
18               A.   Again, the best I can recollect.  I don't
19    have access to my previous phone content.
20               Q.   Is the person who gave you the Facebook
21    pages still a contact on your Signal account?
22               A.   I haven't looked at it, but probably.
23               Q.   Take a look real quick.  I want to know.
24               THE REPORTER:  I'm sorry.  I didn't
25    understand.
```

Page 112

```
 1                    THE DEPONENT:  I just have to keep going

 2      backwards in time.

 3              Q.   (By Mr. Cain)  If you're not going to find

 4      it, I don't have time.  Certainly don't stall the process.

 5              A.   You asked me to look for it.  I'm looking

 6      through every conversation that I've had.

 7              Q.   All right.  Well, then we'll go off the

 8      record and you can do it off the record.

 9                    THE VIDEOGRAPHER:  We're going off the

10      record.  The time is 1:12.

11                    (Recess from 1:12 p.m. to 1:13 p.m.)

12                    THE VIDEOGRAPHER:  Back on the record.

13      The time is 1:13.

14              Q.   (By Mr. Cain)  All right.  You indicated

15      off the record, Mr. Oltmann, that through your search

16      function, you're not able to pull up messages from the

17      Facebook contact; is that true?

18              A.   That is true.

19              Q.   You'd have to individually go through that.

20      And we don't have time for that, at least today we don't.

21                    You mentioned also that you had reached out

22      to a number of people to do some invest- -- or in your

23      investigation of Dr. Coomer on the 6th.  Who else did you

24      reach out to?

25              A.   Publicly available people that were -- you
```

Page 113

1   know, the same thing.  Just trying to figure out if

2   somebody would give me access to that information, that

3   would be friendly to the idea of validating who Eric

4   Coomer is.

5           Q.   Okay.  And as you sit here today, are you

6   able to -- if you know, to pull up from Signal the

7   transmittal of the Facebook pages to you?

8           A.   I'm not sure I understand the question.

9           Q.   Well, is that -- is that transmittal data

10  still on your Signal app, if you know?

11          A.   Well, if it was on my Signal app, I would

12  have been able to find it, so, again, I believe that the

13  Signal when I downloaded the information did not carry

14  through -- carry over.

15          Q.   Did you ask that the information be sent

16  via Signal to you?

17          A.   I don't -- I don't recall, no.

18          Q.   Is there any way as you sit here to trace

19  the information of when and from whom you received the

20  Facebook pages?

21          A.   I'm not sure I understand the question.

22          Q.   Well, I'm just -- if I want to show the

23  Court, Here is evidence of when these Facebook pages were

24  transmitted to Joe Oltmann, as I sit here, I don't have

25  anything but your word.

                                            Page 114

```
 1                     So is there any physical evidence that you
 2      can think of that would show that transmission?
 3                     A.    Yeah.   I mean, I don't know.   As I sit
 4      here right now, no, but if I'm given more time to think
 5      about it, I can probably come up with some sort of record
 6      of where it came from.
 7                     Q.    But you're certain, as I understand your
 8      testimony, that this person that gave you the screenshots
 9      was one of Dr. Coomer's friends on his Facebook page at
10      the time?
11                     A.    Yeah, I think still friends.
12                     Q.    Did he or she -- is it a he or she, can you
13      at least tell me that?
14                     A.    No.
15                     Q.    Did he or she explain to you why they were
16      willing to provide you access to this information; what
17      their motivation was?
18                     A.    Yeah.   I don't -- I don't think they
19      probably had a motivation other than my explanation of
20      what I was dealing with.   I mean, look it's a pretty
21      heavy conversation, right?   It's not something to
22      be -- you know, to take lightly.
23                     Q.    Did you have to convince this person the
24      reason for --
25                     THE DEPONENT:   Sorry.
```

Page 115

```
 1                    (Phone ringing.)
 2          A.    Apologies.  Can you repeat that question?
 3          Q.    (By Mr. Cain)  Yeah.
 4                Did you have to convince this person to
 5     provide you this information?  In other words, were they
 6     reluctant to do so?
 7          A.    No.
 8          Q.    And again, the reason you're not giving
 9     this to me is because you think that their -- that the
10     reveal of their identity would subject them to some form
11     of retribution by Dr. Coomer?
12                MS. HALL:  Objection, Charlie.  He has
13     told you 5 to 10 times already.  He doesn't believe it's
14     in the protected order.
15                MR. CAIN:  I've already stipulated to
16     that.  I'm --
17                MS. HALL:  I understand what you've said
18     on this deposition.  There is nothing in the protective
19     order that was previously filed with the Court that
20     addresses what the Court just said the last time we were
21     there.  So I get what your position is.  You've heard
22     what my clients' is, and I guess we'll take it up with
23     the court.
24                MR. CAIN:  Oh.  So let's assume for the
25     sake of argument that -- that that needs to be buttoned
```

Page 116

```
 1    up.  I don't believe that's the case.  And I already told
 2    you that our view is that it's subject to the protective
 3    order.
 4              Q.   (By Mr. Cain)  But assuming that
 5    information -- or that protective order was extended to
 6    this information, would you be willing to provide us with
 7    that testimony at that -- at that time?
 8              A.   I think that I would give up more
 9    information if I knew that Eric was not going to get
10    access to that information.
11              Q.   Okay.  Would you provide us with the
12    identity of this person?
13              A.   If Eric did not have access --
14              MS. HALL:  Objection.
15              Q.   (By Mr. Cain)  Is that a Yes?
16              A.   I can't speculate.
17              Q.   Okay.  Let's -- let's talk a little bit
18    about your affidavit.  We've spent almost all this
19    deposition talking about the antifa call and some of this
20    Facebook stuff.
21              The affidavit which is Plaintiff's
22    Exhibit 2, I provided that to you previously, was signed
23    by you -- I believe on November 13 of 2020; is that
24    correct?
25              A.   Yes.  Is that -- Exhibit 2?
```

Page 117

```
 1                    MR. KIMREY:  Mr. Cain, I have a question,
 2       a point of clarification.  Shall we deem all exhibits
 3       that you are referring to within this deposition as
 4       exhibits to this deposition?
 5                    MR. CAIN:  Yes.
 6                    MR. KIMREY:  Thank you.
 7             Q.   (By Mr. Cain)  Are you with me,
 8       Mr. Oltmann?
 9             A.   Yes.
10             Q.   Okay.  So this affidavit you signed
11       November 13, right?
12             A.   Yes.
13             Q.   And the purpose --
14             A.   November 13th, you said?
15             Q.   Yes, sir.  1-3.
16             A.   All right.  Perfect.  Okay.
17             Q.   Who asked you to sign an affidavit?
18             A.   I don't remember the person.
19             Q.   Who were they associated with?
20             A.   With Sidney Powell, I do believe.
21             Q.   You understood that this affidavit
22       potentially was going to be used by Ms. Powell in
23       connection with litigation?
24             A.   Yes.
25             Q.   Okay.  And you allowed this affidavit to be
```

Page 118

```
1    filed of record in lawsuits that Ms. Powell was associated
2    with?
3              A.   No.  I just filed an affidavit, and I
4    signed it.
5              Q.   Okay.  But your expectation was that this
6    could be used as evidence in a lawsuit Ms. Powell was
7    involved with?
8              A.   The only expectation I had was that I was
9    going to sign an affidavit of what I knew.
10             Q.   Okay.  Well, in terms of what you knew,
11   just looking at the affidavit, I have a few questions.
12   You go over, of course, the antifa call, right?
13             A.   Yep.  Yes.
14             Q.   On page 2.
15                  You refer to the call as being on or about
16   the week of September 27.  But that's not correct, right?
17   It was prior to that week, true?
18             A.   I think that's why I wrote -- they put "on
19   or about."  So I had this -- they drafted this.  I gave
20   them information.  They drafted it.  And then I signed
21   it.  So there's parts of this that were not complete, or
22   that had pulled stuff out and made it so that the context
23   could be changed.
24                  But overall, the information is still
25   accurate because they did put on or around, I think.
```

Page 119

1    Actually, I can't -- yeah, on or about --

2                    THE REPORTER:  I'm sorry.  Whoa, whoa,

3    whoa.

4            Q.   (By Mr. Cain)  But it's more accurate --

5                    THE REPORTER:  I just didn't get the last

6    part of your statement, sir.  You dropped your voice.

7                    THE DEPONENT:  I said on or about the week

8    of September 27th.

9                    MR. KIMREY:  And I just note for the

10   record that Plaintiff's Exhibit 2 is Bates Powell 206

11   through Powell 211.

12                   THE REPORTER:  Who just spoke?

13                   MR. KIMREY:  That was Blaine Kimrey.

14                   THE REPORTER:  Thank you.

15           Q.   (By Mr. Cain)  All right.  To be more

16   accurate, the -- the antifa call -- you say meeting here,

17   but was prior to September 26, not during the week of

18   September 27th, true?

19           A.   Well, it says on or about the week of

20   September 27th.  So that was still on or about the week.

21   So this had happened before the 26th.  So, yes, then this

22   would be factually accurate.

23           Q.   And this -- well, this affidavit was done

24   less than two months after the call, right?

25           A.   Yes.

                                        Page 120

```
 1                    Q.    And so you did your best to be as complete

 2        and accurate in this affidavit as possible, right?

 3                    A.    I -- I gave them a bunch of information.

 4        I don't think I gave them completely all the information.

 5        Just the information I felt was important to the

 6        affidavit.

 7                    Q.    Right.

 8                          And no one from the Powell camp asked you

 9        any of these questions about how did you get on the call

10        in terms of your conduit and that sort of thing, did they?

11                    A.    I think there's a lot of moving parts at

12        the time, and the things that they were more concerned

13        with was the litany of affidavits that were coming in

14        from across the nation.  And it was getting as much of

15        this information as possible so that they could do

16        fact-finding and figure out what the credibility was of

17        all that information collectively, in the middle of

18        having SISA and other organizations within days of the

19        election say that there's nothing to see here, this is

20        the safest election ever, without even doing any sort of

21        discovery into the sheer volume of fraud that was

22        existing across our nation.

23                          MR. CAIN:   Objection.   Nonresponsive.

24                    Q.    (By Mr. Cain) All I'm asking is:   No one

25        from the Powell camp that was involved in obtaining this
```

Page 121

```
 1    affidavit asked to speak to your conduit or interview them

 2    associated with confirming your story, fair?

 3              A.   I didn't have a credibility issue.  I

 4    didn't have an issue where you --

 5              Q.   No, sir.  I asked you if they asked for

 6    that information.  Yes or no?

 7              A.   No.

 8              Q.   You say in here, and you wrote in your

 9    notes -- you use the word in your notes, "fortifying."

10    But when you're talking about Eric speaking on this -- and

11    this is on the middle of page 2 of the affidavit, Powell

12    207 -- Eric continued with fortifying the groups and

13    recruiting.

14              Okay.  Are you referring to Eric Coomer in

15    that sentence?

16              A.   Where is this part?

17              Q.   It's in -- a little higher than the middle

18    of the page on the second page of your affidavit.  You go,

19    The conversation went like this.

20              And then you described the conversation

21    about Eric being the Dominion guy, et cetera?

22              A.   What -- what page are you referring to?

23              Q.   Sir, I don't -- I've already said that

24    twice now.  The second page of your affidavit, Powell 207

25    is the Bates number on the bottom right.
```

Page 122

```
1              A.    Okay.
2              Q.    You're talking about the conversation on
3    the antifa call.  At the middle of it, you say, Eric
4    continued with fortifying the groups and recruiting.
5              My question was:  You're referring there,
6    obviously, to Eric Coomer, correct?
7              A.    I am.
8              Q.    All right.  I want you to tell me what you
9    remember Eric Coomer saying about fortifying the groups
10   and recruiting specifically.
11             A.    So there's a ton of rhetoric going on on
12   the call itself and the comments made about keeping up
13   and fortifying their efforts.  There was a bunch of
14   people talking all at the same time.  So, you know, Eric
15   was in the middle of communicating on the call, along
16   with all these other people.
17             So when I talk about being excentric and
18   boisterous, it's the -- it's the vulgarness of -- by
19   which they all seem to communicate.  The F word is
20   probably every other word.
21             Q.    Yes, sir.  But you say and swore in this
22   affidavit that Eric did and said certain things.  He
23   talked about fortifying the groups and recruiting.
24             A.    Right.
25             Q.    What specifically did he talk about in
```

Page 123

1    terms of fortifying the groups and recruiting?

2           A.   So I just answered that question as it

3    relates to them talking about fortifying, right?  Again,

4    I referred back to my notes when I had -- when I was

5    writing this stuff, and some of this information is

6    missing other paragraphs that I would have left in it.

7    Right.

8           So the fortifying and saying that, Hey, we

9    need to keep up the pressure, those comments came out of

10   Eric's mouth.  Those comments came out of other people's

11   mouths.  It was -- it was a centric bit of hyperbole.

12          Q.   All right.  So you say, Keep up the

13   pressure.  You're attributing words to that effect -- to

14   Eric Coomer.  What was he referring to about keeping up

15   the pressure?

16          A.   I don't know.  I would assume it's related

17   to antifa and the things that they are doing across the

18   state of Colorado and the country at that point.  I mean,

19   they were terrorizing communities and burning down

20   buildings and looting and shooting and stabbing and

21   throwing frozen water bottles and feces.

22          So it probably had something to do with

23   that.

24          Q.   Let me -- let me ask you.  You've done a

25   lot of research into antifa, it's clear.  What evidence do

Page 124

1    you have that Dr. Coomer was involved, outside of this

2    call, as you've alleged, was involved in any

3    activity -- antifa-related activities, whether it's March

4    or speaking at a rally or throwing feces, as you say?

5    What evidence do you have that he actually was part of an

6    antifa movement?

7              A.   So -- well, first of all, he posted the

8    antifa manifesto on his Facebook page on, I think,

9    June 5th or June of 6th.

10             Q.   And we've talked about the Facebook.  I'm

11   talking about --

12             A.   We haven't specifically talked about that

13   particular post.

14             Q.   Right.  I'll exclude since we don't have

15   time, and we know what -- we can look to in terms of

16   Facebook.  I'm asking, based on the amount of time that

17   you spent looking into Eric Coomer and his association

18   with antifa, carving out any kind of Facebook --

19             A.   Okay.  I'll bite.  All right.  Let me walk

20   through -- let me walk through all the information that I

21   learned about Eric Coomer.

22             Q.   I'm asking a specific question.  Not --

23             A.   That's the specific question.  You

24   can't -- you can't carve it out and say you don't want me

25   to answer the question.

                                          Page 125

1          Q.    Here's the question.  Here's the question.

2    Listen to my question.

3          A.    Okay.

4          Q.    What information do you have that -- that

5    puts Eric Coomer in an antifa event, rally, as a speaker,

6    as a member of an association that you -- that you equate

7    with antifa?  What specifically do you know about that?

8          A.    I know that I was on this call, and I know

9    that Eric at Dominion was on that call.  I know that I

10   walked through and listened to other videos that had Eric

11   Coomer on it, and it was the same voice that was on this

12   call, who was on those other calls doing demonstrations

13   across the country.

14              So I know that I did an amazing amount of

15   due diligence to tie back the Eric who was on the antifa

16   call to the Facebook posts, and the likelihood of that

17   happening.  And then going even further into that and

18   finding information related to owning the adjudication

19   process -- or excuse me, being a patentholder for the

20   adjudication process for the Dominion voting systems, as

21   well as the numerous affidavits across the country, which

22   as it came to light even after this time, tied back

23   improprieties to Dominion, such as the fact that there is

24   a modum inside the machine, yet the CEO of the Dominion

25   voting system said that there was no modem inside it.

                                              Page 126

1              They now have amended that and said, Oh,

2      there is one, but it's not used and it wasn't turned on

3      during the course of the election.

4          Q.   I'm asking you about motives.

5              Did you -- have you seen Dr. Coomer at a --

6      at an antifa really?

7          A.   You asked me what information would be

8      provided that would lead me to believe that Eric Coomer

9      was, in fact, a part of antifa and what other information

10     do you have that would lead me to that conclusion.  I'm

11     trying to give that you information that led me to that

12     conclusion, and you don't want to hear my opinions.  Not

13     because it's not --

14         Q.   Sir, you're wasting time again.

15             Have you seen -- let me -- let me break it

16     down for you.

17             Have you seen video evidence or in-person

18     evidence of Dr. Coomer at what you would consider an

19     antifa rally, yes or no?

20         A.   No.

21         Q.   Have you seen him speak at -- or at a

22     movement or some event that involved antifa?

23         A.   Yes.

24         Q.   Which one?

25         A.   This call that I was on back in September.

Page 127

```
 1              Q.   All right.  I'm talking about any kind of

 2     public event that -- that antifa was associated with.

 3     Speaker at a rally or anything like that.

 4              A.   Well, I didn't attend antifa rallies.

 5              Q.   Have you seen any evidence of that, videos

 6     of Dr. Coomer speaking at an antifa rally?

 7              A.   I have not reviewed any of the antifa

 8     videos, and everyone during the summer of 2020 was

 9     wearing masks and covering their identity.  So getting

10     access --

11              Q.   So your answer is no --

12                   THE REPORTER:  Just a moment.  One at a

13     time.

14                   THE DEPONENT:  Apologies.

15                   THE REPORTER:  Still, one at a time.

16              Q.   (By Mr. Cain)  Go ahead.

17              A.   The difficulty in uncovering who was at

18     any of these antifa rallies, even given the videos that

19     you have there, would be very difficult because of the

20     fact that all their faces were covered.

21                   So, you know, can I say for -- with

22     certainty that -- that he was at a -- at an antifa rally,

23     the answer to that question is no.  Can I say that he

24     wasn't?  The answer to that question would be no, as

25     well.
```

Page 128

1           Q.   Well, you're certain -- and you've said

2     this previously about Heidi Beedle -- that she's part of a

3     group called Revolution, I think; is that right?

4           A.   Yes.

5           Q.   Yeah, that's your testimony on that.

6                What group, if you know, is Dr. Coomer

7     involved with that you view as an antifa-related

8     organization?

9           A.   Well, most of the antifa members of the --

10    how you say an idea and not an organization, although

11    it's a very, very well-run organization, do not make

12    themselves known.  They do not make themselves

13    associated, because by that association, they would

14    associate with murderers and rapists and people that hurt

15    people in the community and bully them to get them to, I

16    guess, stay in their homes.  Intimidate them.

17          Q.   So you can't identify a specific

18    organization that you've been able to research and

19    conclude that Dr. Coomer is involved with some leftist

20    organization?

21          A.   Yes, I can actually.  He proclaimed

22    himself that he was a part of the skinhead movement and

23    in the article written in the New York Times by Susan

24    Dominus, he admitted that he was a part of the skinheads,

25    but it was a special group of skinheads that are against

                                              Page 129

1     racism.

2                 So that is a far left organization that

3     has strong ties to communism and Marxism, and he was

4     by -- self-proclaimed a part of that even dating back to

5     his time in Denver, Colorado.

6          Q.   Thanks.  So skinhead organization.  Is that

7     it?

8          A.   I don't -- I don't know.  I haven't

9     done -- I will say for right now, to answer your

10    question, yes.

11         Q.   All right.  So when he was talking about,

12    as you say in your affidavit, recruiting -- antifa

13    recruiting, what specifically was Dr. Coomer saying he

14    wanted to do to recruit new members of this group?

15         A.   Well, I think it was the comments that

16    they have collectively where they were agreeing with and

17    talking to them about keeping the pressure on and staying

18    the course that were directly related to that

19    recruitment.

20                 I don't use it from recruiting from the

21    standpoint of walk through a door, knock, knock.  Just

22    recruitment of making sure we get more people to show up

23    to these events.

24         Q.   Would you describe Dr. -- I'm sorry.  I

25    thought you were finished.

Page 130

```
 1                A.   No.

 2                Q.   Would you describe --

 3                A.   Go ahead.

 4                Q.   Would you describe Dr. Coomer as being one

 5      of the leaders of the antifa group that was assembled on

 6      this call?

 7                A.   No.  Nor did I at the time believe that he

 8      was actually -- after doing research, that he would

 9      associate himself with antifa.

10                Q.   You mention -- I don't want to spend a lot

11      of time on this.

12                     So at the end of your affidavit, the last

13      full paragraph, you talk about you used ARIMA, A-R-I-M

14      analysis to show trends.

15                A.   Yeah.

16                Q.   Do you remember that?

17                A.   Yeah.

18                Q.   Okay.  Do you have that analysis handy

19      still?

20                A.   I have some of the information related to

21      what I did on the -- on other analyses later, but ARIMA

22      is -- uses -- I mean, do you know what ARIMA is.

23                Q.   I know what it stands for.  But I guess my

24      question is:  If I -- you talk about it in your affidavit.

25      If you have datasets involved with that, if you have
```

Page 131

1    some -- some analysis, I'd like to see it.

2                    Have you produced any of that information

3    to anyone, either the defendants in this case or other

4    experts?

5           A.   No, but I created a chart.  So this is the

6    stuff that I can get into more specifically.  But I

7    created a chart that looked at the voting probability of

8    people voting a certain way during a time series, and

9    then voting a certain way after that time series and the

10   likelihood of that actually happening by using previous

11   lags as opposed to what happened in the future.

12                   So using a stationary point, and then

13   creating a plotted chart to show me whether or not

14   there's any irregularities or errors in the data that

15   were -- that would not be probable based upon the

16   information that was input.

17          Q.   So my question is that the charting that

18   you used and the datasets -- or the charting that you

19   created and the datasets, do you still have that

20   information?

21          A.   I think so.

22          Q.   Did you -- and you -- but you didn't

23   provide it to anybody outside of your own group; is that

24   correct?

25          A.   So that's not necessarily true.  I brought

                                        Page 132

1    some of those charts to Washington, D.C. in early

2    January.  I provided that information as it relates to

3    Dominion voting systems and the vulnerabilities that they

4    had in the Dominion voting systems.  And the process of

5    walking a through path of Dominion to the Black Box, to

6    how they recover those votes, how it's transferred over

7    to SCYTL, how SCYTL goes on to Edison, how Edison then

8    translates that over to the New York Times.

9         Q.   Right.  And you talked about that in your

10   August 18 testimony from -- when Sidney Powell's lawyers

11   were asking you about this issue, right?

12        A.   Yes.

13        Q.   And you said then that you know how

14   Dr. Coomer can flip the Election, to use your words,

15   right?

16        A.   Is that what I said?

17        Q.   Yes.  You said you know how Dr. Coomer

18   flipped the election.

19        A.   Is that what I said?

20        Q.   Yes.

21        A.   I haven't seen the transcript.

22             MS. HALL:  Well, Charlie, the reason he's

23   asking you is you obviously have a copy of the

24   transcript.  We haven't seen the transcript yet.  So

25   where did you get the transcript?

Veritext Legal Solutions
800-336-4000

1                    MR. CAIN:  Sidney Powell's lawyers sent it

2      to everybody.

3                    MS. HALL:  Well, I haven't seen it.  I

4      didn't get it.

5                    MR. CAIN:  Well, that's not on me.

6                    MS. HALL:  I didn't say it was.  I'm just

7      saying he hasn't seen the transcript.

8                    THE DEPONENT:  No.  Show me

9      the transcript.

10                    MR. CAIN:  All right.  So here on

11     page 181 --

12                    MR. ARRINGTON:  This Barry Arrington.  I'm

13     going to put on the record that I sent the transcript to

14     everyone.

15                    THE REPORTER:  Who just spoke?

16                    MR. ARRINGTON:  This is Barry Arrington.

17                    I don't know why you're saying you haven't

18     seen it.  I sent it to everyone.

19                    MS. HALL:  I'm not saying you didn't,

20     Barry.  I'm just saying I did not receive anything, and

21     neither did Ingrid.  So that's all I'm saying.

22                    Q.   (By Mr. Cain)  I'll go about it this way

23     since we don't have --

24                    A.   Therefore, I haven't reviewed it.

25                    Q.   Outside of the transcript -- I mean, you

Page 134

1    can just testify now.  Do you or do you not know how

2    Dr. Coomer flipped the Election?

3            A.   I believe I know how the election was

4    influence and/or stolen, yes.

5            Q.   And I -- you used a passive.  I asked -- I

6    said Dr. Coomer.  You know how Dr. Coomer, at least

7    according to your -- your analysis, how he was involved in

8    flipping the election, true?

9            A.   I know that Coomer was a director of

10   strategy and security for Dominion voting systems, and in

11   that capacity and owning the adjudication process

12   in -- in that system, I know where the election

13   was -- was affected, yes.  I know where it was

14   compromised.

15           And Eric Coomer is responsible for those

16   things, and therefore, I think that I know -- actually I

17   know that I know -- how Dominion was able to affect or

18   leave open vulnerabilities to allow for the election to

19   be stolen.

20           Q.   Right.  And you've testified -- you've

21   testified at length in questions from Ms. Powell's lawyers

22   about that specific topic, right?

23           A.   Yep.

24           Q.   Just a few weeks ago.  And you said that

25   you hadn't reduced, as of that time, your analysis to some

Page 135

```
 1    written format or report.

 2                    Have you done that now?  Have you prepared

 3    a report reflecting your analysis?

 4                    MS. HALL:  Objection.  Relevance.

 5            A.    No.  I did.  I provided a diagram -- a

 6    very crude diagram that the public can understand.  I

 7    worked on the deviations between the -- four deviations

 8    that happened inside the Dominion system.

 9            Q.    (By Mr. Cain)  Okay.  Let me make sure -- I

10    want to make sure we get this on the record.

11            A.    Can you hear me?

12            Q.    Yeah, who's speaking?

13                    MR. KIMREY:  I'm sorry.  This is Blaine

14    Kimrey.

15                    So we're new to this matter.  I'm

16    wondering, just for clarification, Mr. Cain, if you have

17    a copy of the sworn statement, could you enter it in the

18    deposition since you're talking about it a lot?

19    And Mr. Oltmann has acknowledged that he did give a sworn

20    statement, so maybe if we could actually see it and he

21    could confirm it as entered in the deposition, that would

22    make everything easier to follow.  Just a suggestion.

23                    MR. CAIN:  I appreciate it.  I'm moving

24    off that now because I asked him the question outside of

25    this sworn statement, and I'm not -- I just don't have
```

Page 136

1    time to address that.

2              Q.   (By Mr. Cain)  So let me -- let me get back

3    on to what I was talking about.  You had testified that

4    you -- that you had done analysis in this -- of behavioral

5    deviations and tech deviations, it's part of what you

6    said.

7              And then I asked you, Has this been reduced

8    to writing?  And you said it -- you referenced a schematic

9    or something that we could all understand.  Is that fair?

10             A.   Yes.  So I've been assisting with

11   gathering information related to how the Dominion system

12   works.  So I was able to -- I've done it in different

13   parts, related to even like the ICX machine, the ability

14   to bypass the ICX in cases of balance outstanding or the

15   alignment being off.

16             So I've done multiple things where I've

17   written out diagrams on how the system can be

18   manipulated -- be manipulated inside of the -- inside of

19   the Dominion system, depending on which part you have.

20             Q.   Well, we'll conclude on this as probably

21   the last topic.  On Exhibit 103, which we previously

22   marked from your recent disclosures, this is

23   Document 0 -- I believe it's small -- but it is 0881,

24   which is a diagram -- it looks like a voting system

25   diagram.  I want you to --

                                              Page 137

```
 1                    (Phone ringing.)

 2                    THE REPORTER:  Just a moment.  I can't

 3    hear.

 4                    THE DEPONENT:  I don't know why it came

 5    through my phone.  Hold on.

 6            Q.   (By Mr. Cain)  So Exhibit 103 has a diagram

 7    that I think is what you're referring to.  Can you confirm

 8    that this is the diagram that you were just talking about?

 9            A.   Yes.

10            Q.   Okay.  So the -- the work that you've done

11    regarding -- at least as of this date regarding

12    Dr. Coomer's participation in flipping the election, in

13    part, is reflected on this particular diagram that we're

14    looking at, correct?

15            A.   Those -- that diagram walks through the

16    vulnerabilities of the Dominion voting systems and the

17    possible ways to, what I call, big cons and small cons.

18    Small cons to keep you distracted, and the big con of how

19    you were able to take invalidated fraudulent votes and

20    then reconnect them with people that vote.

21            Q.   And your -- your conclusion is that

22    Dr. Coomer's part of the big con; is that right?

23            A.   My conclusion is that -- that Eric made

24    comments related to making sure that President Trump was

25    not going to win.  And I did not make statements related
```

                                                    Page 138

```
1    to that Biden was going to win because I didn't hear

2    that.  I just heard that President Trump was not going to

3    win, and those came from him.

4              And I validated him, and then after that I

5    validated his social posts, which are very boisterous

6    and -- that validate that -- number one, he's not in a

7    position where he could influence it.  And number 2, he

8    said he would influence it.  And number 3, that his clear

9    bias and hatred for just the country, police officers,

10   and his support for antifa was -- was well noted.

11             Q.   (By Mr. Cain)  Okay.  Well, that's

12   different than what you've testified to before in terms

13   of --

14             A.   How is that different?

15             Q.   -- to actually having -- I had understood

16   that you said from a technical standpoint, Dr. Coomer was

17   involved in rigging the election, which would affect

18   results, and you even testified to this -- in places like

19   Antrim County; in Mesa County, Colorado; and Cobb County,

20   Georgia?

21             A.   That he would have the ability to do that

22   and he's in a position to do that, absolutely.

23             Q.   Okay.

24             A.   I was very clear on that.  I've been clear

25   the entire time.  I've never once changed anything about
```

Page 139

1    what I've said, not once.

2              Q.   Well, and you've said, in fact, that

3    he -- you -- at least in your last testimony, that you're

4    95 percent sure that he actually engaged in that activity

5    of flipping the election.

6              A.   I don't have a transcript.

7              THE REPORTER:  I'm sorry.  I can't

8    understand Ms. Hall.

9              A.   I don't even know if that's a question or

10   not.

11             Q.   (By Mr. Cain)  Yeah.  You have a high

12   degree of certainty -- you've testified already --

13             A.   I do.

14             Q.   -- in the deposition with the Powell

15   attorneys that you have a 95 percent degree of certainty

16   that Dr. Coomer was involved in flipping the election.

17             A.   Yes.

18             Q.   All right.  By the way, while I'm thinking

19   about it, you -- do you hold yourself out as an election

20   security expert?

21             MS. HALL:  Objection.  Relevance.

22             A.   No, I'm a data guy.

23             Q.   (By Mr. Cain)  Okay.  So you would agree

24   with me that you are not an election security expert?

25             MS. HALL:  Objection.

Page 140

```
 1                    THE DEPONENT:  Should I answer?
 2          A.    Okay.  So I built a system that
 3    develops --
 4                    THE REPORTER:  I'm sorry.  I'm sorry, sir.
 5    Can you slow down just a bit?
 6          A.    I built a system that creates quality
 7    scores, relevant inspectors, and correlations of data on
 8    individual DNA of an individual.  I built the
 9    architecture behind a system that allows for us to
10    perform very well, actually above anyone else in the
11    country related to how we position messaging in front of
12    millions of people.  I built that.
13                    We're one of the largest first-party data
14    aggregators in the nation when I ran my company.  I know
15    that within a couple of days of me coming out and talking
16    about what information I did have, I had death threats.
17    I know that that -- those death threats have continued
18    through the last nine months.
19          Q.    (By Mr. Cain)  Sir, my question was
20    election security expert.  Do you hold yourself out as an
21    expert in election security issues?
22          A.    I would hold myself out as an expert in
23    system architecture.  I would hold myself out at -- and I
24    can prove over time as a two-time Ernst & Young
25    entrepreneur of the year nominee and one-time finalist in
```

Page 141

```
 1    2020, after going through some rigorous tests by many of
 2    the people on those panels, that I know what I'm talking
 3    about when it comes to code and when I'm talking about
 4    when you are talk about the Black Box, RUP kits, having
 5    people overseas write code for you.  What the
 6    implications are of having connections to different
 7    systems that are not secured.  Having internet access
 8    with the ability to access those systems.
 9                 From an architecture standpoint, I could
10    punch holes in what Dominion has built over and over and
11    over again.  I don't need to know that you have to take a
12    stack of votes and put it through the system.  I have to
13    know that you can secure those votes through technology
14    that allows for transparency, which is what the system is
15    supposed to be built on.
16         Q.    You're -- you're speaking quickly, which is
17    find except for Laurel.  She's probably going to kill both
18    of us after this deposition.
19                 My -- you're not answering my question.
20         A.    I did answer your question.
21         Q.    Have you -- let me ask a different question
22    and see if you can answer this one.
23                 Do you have any experience working in
24    elections or in election security?
25                 MS. HALL:  Objection.  Relevance.
```

Page 142

```
 1                  Q.   (By Mr. Cain)  You can answer.

 2                  MS. HALL:  Please explain how this is

 3       relevant to your defamation claim, Charlie.

 4                  MR. CAIN:  Nope.

 5                  MS. HALL:  Okay.  Well, then move on.  And

 6       you're done.

 7                  MS. DEFRANCO:  He's done.

 8                  MS. HALL:  What's the time?

 9                  THE VIDEOGRAPHER:  It's three hours and

10       three minutes.

11                  MS. HALL:  Thanks.  We're done, Charlie.

12             A.   Can I answer this last question?

13             Q.   (By Mr. Cain)  Yeah.  You're going to

14       answer potentially more, but why don't you finish

15       this with -- we have tomorrow, obviously set aside as

16       well, but go ahead.

17                  MS. HALL:  No.  Charlie.  You have PCU

18       United tomorrow, Shuffling Madness, and CD Solutions.  So

19       there will be no questions that are posed to Mr. Oltmann.

20             A.   I'm going to answer this question if I can

21       because it's fresh in my mind.

22                  THE DEPONENT:  Can I answer it?

23             A.   Okay.  I have not worked in Dominion,

24       Sequoia, ESNS, Hart, Clear Ballot, I've never worked

25       inside of an election system.  With that said, there are
```

                                              Page 143

1    certain things that you have to do in order to secure a

2    system.

3              I did and was a CEO of a company that did

4    MSP services, so I understand that's Managed Service

5    Provider, which is the IOT of an internet of things --

6              THE REPORTER:  I'm sorry.  Of the

7    internet?  I just didn't hear the word.

8              THE DEPONENT:  Internet of things.

9         Q.   (By Mr. Cain)  I-O-T.

10        A.   We also have an e-commerce platform that

11   is a headless design.  It services some fortune 100

12   companies in the United States.  So I'm very familiar

13   with security, and as it relates to how the systems

14   interconnect and the API that are available, how to move

15   things offline and online.  How to find out or discover

16   whether or not something is or is not connected to the

17   internet, and the probability of those things being

18   connected to the internet by way of looking at the math

19   and science, which is why I used mathematical equations

20   to figure out whether or not this is probable.

21             So it leads me back to fact-checking the

22   information related to the system architecture.  It's a

23   simple process that anyone that's involved in technology

24   goes through in order to make sure that they can validate

25   or invalidate their theory.

Page 144

```
 1                        In this case the theory came back, and I
 2     was able to look at what would probably happen in Georgia
 3     as an example on early January that related to, and it
 4     came true.  The system came down, it came back up.  We
 5     were able to validate other information that we call
 6     offline information in order to validate that there was a
 7     probable system interference.
 8                        Now, whether or not that system
 9     interference was caused by Dominion is -- is not
10     even -- it's not even up for debate.  It's not up for
11     debate.  Dominion has a system that Antrim, Mesa County,
12     and other counties were able to validate would show that
13     in the math of how they calculate votes.
14                        Dominion was complicit in that behavior,
15     that is -- and I think that I have enough expertise and
16     technology that I can come to that conclusion without
17     actually working for Dominion.
18                        MR. CAIN:  I'm prepared to move forward
19     with additional questions which counsel seems to believe
20     that --
21                        MS. HALL:  We're done.  No, your three
22     hours is up, Charlie.  I'm going to do some clarification
23     now with my client here.
24     /////
25     /////
```

Page 145

```
 1                         EXAMINATION
 2     BY MS. HALL:
 3             Q.   So, Joe, you were asked by Mr. Cain about
 4     this contact for your ability to get on a call.  Who -- or
 5     not who reached out to you, but did you reach out to that
 6     person or --
 7             A.   No.
 8             Q.   -- did they reach out to you?
 9                  Explain that.
10             A.   They reached -- they reached out to me.
11             Q.   Can you explain that a little bit more?
12             A.    I never made a proactive approach to a
13     person that got me on the antifa call.  I wasn't the one
14     that did the reaching out.  They reached out to me.
15             Q.   And what was the purpose of you getting on
16     that call?
17             A.   It was just to discover antifa
18     journalists.  And if you go back to October 15th, I
19     believe it was, I'd have to check -- either October 15th
20     or 14th, I was in an FEC meeting.  And I said, We have
21     been -- we have infiltrated antifa.  Based on that call,
22     that I got all the information I was able to collect
23     afterwards, that said that, Hey, we were able to uncover
24     these antifa journalists and uncover these antifa
25     journalists, the next day an antifa journalist wrote an
```

                                              Page 146

1    article about the fact that I had threatened antifa

2    journalists on that -- in that FEC meeting.

3                    That was prior to the election, before I

4    even knew Dominion's name.  I knew their name, but I

5    didn't know the significance of Dominion across the

6    country.

7            Q.    And these journalists were actually doxing

8    you, correct?

9            A.    Yes, and they were using -- they weren't

10   just doxing me.  They were doxing other people.  They

11   were using systems and relationships that they had.

12   People that were working in other places, such as working

13   in vet centers.  That they would gather information of

14   people that owned pets, and they would report those pets

15   to the animal control to say that they were abusing their

16   animals.

17                   They would report people for their kids,

18   to CPS, that said that they were abusing their kids.  So

19   they used their positions in this web of -- or group of

20   people in order to intimidate, threaten, dox, and cause

21   harm to other people in the community.  It wasn't just

22   me.

23                   MS. HALL:  Okay.  We're complete.

24                   MR. ARRINGTON:  I'm going to have some

25   follow up.

                                          Page 147

```
 1                     THE REPORTER:  Who's speaking?

 2                     MR. ARRINGTON:  This is Barry Arlington.

 3                     MS. HALL:  No.  No.  Barry, we're not

 4      going to -- we're not going to agree to that.

 5                     MR. ARRINGTON:  I don't care if you agree,

 6      Andrea.  This is a deposition.  I'm counsel at the

 7      deposition, and I'm going to do some cross-examination.

 8                               EXAMINATION

 9      BY MR. ARRINGTON:

10              Q.   My first question -- so, Mr. Oltmann, I

11      have a couple of questions about your prior testimony.

12      The question is this:  In response to one of Mr. Cain's

13      questions, you said about -- about whether Dr. Coomer was

14      affiliated with antifa.  I thought you said, Nor did I

15      believe --

16                     THE REPORTER:  I'm sorry.  Just a moment.

17      Just a moment.  Just a moment.  Just a moment.  Just a

18      moment, please.  There are multiple people talking, and I

19      cannot hear the question.

20                     MR. ARRINGTON:  I'll repeat the question.

21              Q.   (By Mr. Arrington)  So I believe you said

22      in response to one of Mr. Cain's questions about

23      Dr. Coomer's association with antifa, that, quote -- I

24      tried to jot this down -- quote, Nor did I believe after

25      conducting research he, meaning Dr. Coomer, would
```

                                                        Page 148

1      associate himself with --

2              Did I -- did I misunderstand you?  I

3      thought you believed that he was associated with antifa.

4              A.   Yes, I did.  So let me clarify that.  This

5      is the context part where it's taken out of -- when I did

6      the original research on Eric Coomer, and I found out

7      that he had a doctorate in nuclear engineering, I did

8      not, at that point in time back in September, feel that

9      he was -- he wasn't my target.  I thought maybe he was

10     CIA or FBI.

11             I did not believe -- I couldn't understand

12     why someone who was -- had a doctorate in nuclear

13     engineering would associate himself with antifa.  And

14     since he wasn't the person I was looking for at the time,

15     I just filed all this stuff away for Eric Coomer as he

16     was on that call, but I didn't understand the

17     significance of it.  Does that make sense?

18             When I verify that that's who he was, it

19     just didn't seem normal to me that a person that has a

20     doctorate in -- in nuclear engineering would be involved

21     in this type of -- in this type of organization.

22             So as I went through and revalidated

23     information related to his social posts and started doing

24     more research on Mr. Coomer and, you know, his history of

25     being involved in the skinhead movement and some of the

Page 149

1    other things that he had done related to information

2    we've been able to dig up, I certainly believe that he

3    was a part of the antifa movement and had a significant

4    role in antifa just based on someone else knowing who he

5    was and what his capabilities are and the breadth of what

6    Dominion voting systems does across the nation, the

7    influence that they have.

8                    Does that clarify that?

9           Q.    (By Mr. Arrington)  Yes.  Thank you.

10                   You also said that you provided certain

11   information to Ms. Powell.  I'm going to -- I'm sorry for

12   this.  For some reason there was a misdirection that you

13   didn't get the transcript of your testimony from last

14   month.

15                   But at one point -- I'm reading from the

16   transcript -- it says -- you testified that you may have

17   sent Sidney Powell some of this information.

18                   MR. ARRINGTON:  And for counsel's

19   information, I'm reading from page 138, starting at

20   line 4.  I'll start over.

21          Q.    (By Mr. Arrington)  And you testified that

22   you may have sent Sidney Powell some of this information

23   you were gathering.  You have specific recollection that

24   you did send it to her?  If so, when?

25                   And you answered, So other than the

1     information that I had provided, if I had sent anything to

2     Sidney, it would have been with Randy Corporon on it as

3     far as lawyer to lawyer.

4               So is it a fact that you're -- you did not

5     communicate directly with Ms. Powell, that -- that you

6     communicated with her through Mr. Corporon?

7          A.   Yeah.  So I -- I'm going to say this

8     because I actually went back and listened to everyone

9     else's depositions as well.  I did not have any direct

10    conversations with Sidney Powell.  All right?  Those

11    conversations happened through attorneys.  So me and

12    Sidney Powell directly did not have any conversations.

13         Q.   So you've testified that you've done

14    extensive research regarding Dr. Coomer; is that correct?

15         A.   Yes.

16         Q.   Can you summarize some of the things that

17    you found out about his background that you have personal

18    knowledge of in terms of your research that would lead

19    you -- that would lend credence to your accusation that he

20    was associated with antifa and that he was a -- I don't

21    remember your exact words, but a -- someone who was an

22    agitator or aggressive or however you want to suggest

23    that?

24         A.   Well, there's someone that -- yeah, so as

25    I went through and did research, I was able to uncover

                                          Page 151

1    certain things about Mr. Coomer.  One of which is being a

2    part of the skinhead movement.  Two, the way that he

3    spoke was -- you know, it's pretty -- it's pretty vulgar.

4    And where he speaks that vulgarity and how he speaks it,

5    lend credibility to how antifa acts as well.

6              Then you have the -- the information that

7    Eric wrote specifically about his wife where he talked

8    about sexually battering, urinating on, making bark like

9    a dog and some of the other things that Eric did.  And

10   then publicly put that information out there in an effort

11   to humiliate his wife.

12             Then there's the -- the post that he put

13   up, and the things that he admitted to about being a drug

14   addict and getting in fights and being the person that --

15   that not only is -- you know, I guess a nuclear student

16   or a physicist, that is -- that can beat up people.

17   Right?

18             And I'm paraphrasing some of the things

19   that I have learned about him.  And then you look at the

20   other things that came up related to how he treats

21   people, and talking about other people that had worked

22   with Eric Coomer.

23             So there's just not a lot of redeeming

24   stuff that's out there about Eric Coomer relating to --

25             Q.   Let me ask you this:  Did you have any

```
 1    occasion to find out anything that he personally said
 2    about his own mental health?
 3              A.   It --
 4              MR. CAIN:  Let me -- hold on, Mr. Oltmann.
 5    Mr. Arrington, I've done this in prior depositions, and I
 6    don't want there to be -- my silence to be
 7    misinterpreted.  That I believe you're outside of the
 8    scope of the discovery order, and I would object on that
 9    basis.  But out of deference to you, if I can just have
10    that running understanding, I won't interrupt your
11    questions.
12              MR. ARRINGTON:  I appreciate that,
13    Mr. Cain.  I would suggest that everything that I'm
14    talking about here can be tied back into questions that
15    you asked on direct.  So if the court reporter could read
16    back the question, I'd appreciate it.
17              (The last question was read.)
18              A.   The answer is yes.  He had a writing where
19    he said that -- again, I'm trying to find the writings
20    themself.  But admits to being bipolar, admits to having
21    a drug problem, admits to lying multiple times, not just
22    the times that he's admitted to lying when he said that
23    the posts were fabricated or deleting information.  So
24    he -- there's a habit, I would say, of -- of this.
25              Q.   (By Mr. Arrington)  But did your research
```

Page 153

```
 1    lead to crimes, such as DUIs and jail time?
 2                    MR. CAIN:  Same objections.
 3                    Barry, I didn't understand from your prior
 4    comment if you'll agree that I can just have a running
 5    objection.  We can disagree about scope issues or
 6    propriety of going outside of the discovery order.  But
 7    if I can have a running objection, I won't have to make
 8    it.
 9                    MR. ARRINGTON:  Yes.  We can disagree
10    whether my cross relates back to your direct and,
11    therefore, it would be within the discovery order, and to
12    the extent that your direct was within the discovery
13    order.  And yes, we can agree to your standing objection.
14                    MR. CAIN:  Thank you.
15                    THE REPORTER:  I'm sorry.  Just a moment.
16    Counsel, there -- Counsel, there is background noise
17    coming through Mr. Arrington's mic that I'm having
18    trouble hearing you all the time, Mr. Arrington.
19                    MR. ARRINGTON:  I'm sorry about that.
20                    Could you repeat the last question or
21    reread the last question?
22                    (The last question was read.)
23                    MR. ARRINGTON:  That was the question
24    before last.  Let me make another run at it.
25                    Q.   (By Mr. Arrington)  Did you have occasion
```

Page 154

1    to -- to find out any information about whether he had

2    committed DUIs and been in jail?

3                  A.   Yes.  He bragged about that in some posts

4    that he put on a blog site -- I believe it was a Google

5    blog site -- about having a good lawyer, otherwise, he

6    would have spent quite a bit of time in jail.

7                  And then through subsequent information

8    that I was able to uncovered, it showed that he had

9    multiple DUIs.

10                  MR. ARRINGTON:  That's all of my

11   questions.  Thank you.

12                  MR. CAIN:  Well, unless counsel for

13   Mr. Oltmann is going to allow us to continue, we're done

14   for today.

15                  MS. HALL:  No.  We're done.

16                  THE VIDEOGRAPHER:  Going off -- going off

17   the record/, the time is 2:07.

18                  (Video deposition concluded.)

19                  THE REPORTER:  Same orders, Counsel?

20   Transcript orders?

21                  MR. KIMREY:  I don't know what those

22   orders are.  I can tell you what I want, though.  Should

23   I do that?

24                  THE REPORTER:  Yes.

25                  MR. KIMREY:  So I'd like a rough ASCII.

                                              Page 155

1    How quickly can you produce that?

2                    THE REPORTER:  How soon would you like it?

3                    MR. KIMREY:  I don't want to engage in any

4    sort of cruel and unusual request.  You know, I don't

5    know what else you have.  What's reasonable for you given

6    other things you need to work on?

7                    (Discussion off the record.)

8                    MR. ARRINGTON:  This is Barry Arlington.

9    Do we have to order today or can we order later?  Can we

10   put --

11                   THE REPORTER:  You can order later if

12   you'd like.

13                   MR. ARRINGTON:  Okay.  Thank you.

14                   THE REPORTER:  Mr. Cain, your order?

15                   MR. CAIN:  Whatever Scotty says.  I

16   believe we did a one-day turnaround expedite.

17                   MS. HALL:  And this is Andrea Hall.  We'll

18   just -- whatever, I guess -- yeah, reading and signing.

19   I don't know what your turnaround is on that, but, yeah,

20   we'll take the reading and signing.

21                   THE REPORTER:  Have I covered ordering,

22   counsel?

23                   MS. BOEHMER:  This is Margaret Boehmer on

24   behalf of Eric Metaxas.  We'll take an Etran.  We don't

25   need it expedited, and we do not need a rough.

                                              Page 156

```
 1                    THE REPORTER:  Other counsel?
 2                    MR. HOLWAY:  This is Eric Holway on behalf
 3      of the Trump campaign, and I would like an e-transcript
 4      as well, please.  And no, I don't need it expedited.
 5      Thank you.
 6                    THE REPORTER:  Any other counsel?  No?
 7                    I'm off the record.
 8                        *   *   *   *   *   *   *
 9                    WHEREUPON, the foregoing deposition was
10      concluded at the hour of 2:11 p.m.  Total time on the
11      record was 3 hours and 25 minutes.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              I, JOSEPH OLTMANN, the deponent in the

 2   above deposition, do hereby acknowledge that I have read

 3   the foregoing transcript of my testimony and state under

 4   oath that it, together with any attached Amendment to

 5   Deposition pages, constitutes my sworn testimony.

 6

 7   _____ I have made changes to my deposition

 8   _____ I have NOT made any changes to my deposition

 9

10

                    _____

11                       JOSEPH OLTMANN

12

13   Subscribed and sworn to before me this _____

14   day of _____, 20_____.

15

16   My commission expires: _____

17

18                            _____

                                Notary Public

19

20                            _____

                                Address

21

22

23

24

25     Job No. TX4792290
```

Page 158

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4            I, Laurel S. Tubbs, a Registered

 5   Professional Reporter and Notary Public within the State

 6   of Colorado, do hereby certify that previous to the

 7   commencement of the examination, the deponent was duly

 8   sworn by me to testify to the truth.

 9            I further certify that this deposition was

10   taken in shorthand by me at the time and place herein set

11   forth and thereafter reduced to a typewritten form; that

12   the foregoing constitutes a true and correct transcript.

13            I further certify that I am not related

14   to, employed by, nor of counsel for any of the parties or

15   attorneys herein, nor otherwise interested in the result

16   of the within action.

17            My commission expires September 1, 2023.

18

19            LAUREL S. TUBBS

20            Registered Professional Reporter,
              Certified Realtime Reporter

21            and Notary Public

22

23

24

25

                                          Page 159
```

```
1    Coomer, Eric, Ph.D. v. Donald J. Trump For President, Inc.

2    Joseph Oltmann Job No. 4792290

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____   _____

24   Joseph Oltmann                        Date

25
```

Page 160

1    defrancoi@yahoo.com

2                        September 9, 2021

3    RE: Coomer, Eric, Ph.D. v. Donald J. Trump For President, Inc.

4    DEPOSITION OF: Joseph Oltmann 4792290

5         The above-referenced witness transcript is

6    available for read and sign.

7         Within the applicable timeframe, the witness

8    should read the testimony to verify its accuracy. If

9    there are any changes, the witness should note those

10   on the attached Errata Sheet.

11        The witness should sign and notarize the

12   attached Errata pages and return to Veritext at

13   errata-tx@veritext.com.

14        According to applicable rules or agreements, if

15   the witness fails to do so within the time allotted,

16   a certified copy of the transcript may be used as if

17   signed.

18                        Yours,

19                        Veritext Legal Solutions

20

21

22

23

24

25

**[& - 80]**

| & |
|---|
| **&**   2:4 4:3,7,22 141:24 |

| 0 |
|---|
| **0**   137:23 |
| **0881**   137:23 |

| 1 |
|---|
| **1**   61:15 79:16 159:17 |
| **1-3**   118:15 |
| **10**   29:2 46:20 116:13 |
| **100**   30:17 57:21 60:25 66:21 144:11 |
| **103**   5:17 137:21 138:6 |
| **104**   5:18 93:19,21 95:20,23 |
| **1040**   2:20 |
| **1064**   2:5 |
| **1099**   2:15 |
| **10:04**   5:5 6:4 |
| **117**   5:14 |
| **11:23**   63:2,4 |
| **11:42**   63:4,6 |
| **11:47**   67:14,16 |
| **11:50**   67:16,18 |
| **12**   5:15 |
| **128**   3:13 |
| **12:09**   81:12,13 |
| **12:17**   81:13,15 |
| **12:26**   89:10,11 |
| **12:34**   89:11,14 |
| **12:55**   106:6,7 |
| **13**   117:23 118:11 |
| **131**   5:19 80:17 81:19,23 |
| **137**   5:17 |

**138**   150:19
**13th**   118:14
**14**   96:3
**1400**   2:10
**1437**   1:3
**146**   5:11
**148**   5:12
**14th**   146:20
**15**   52:20 99:16,18
**150**   30:17
**1515**   4:17
**15th**   146:18,19
**1600**   2:10
**17th**   4:7,22
**18**   85:4 133:10
**181**   134:11
**18th**   2:15
**19**   62:23
**191250**   3:17
**1996**   91:6
**1:02**   106:7,9
**1:12**   113:10,11
**1:13**   113:11,13

| 2 |
|---|
| **2**   5:14 79:18,19,22 89:13 112:2 117:22,25 119:14 120:10 122:11 139:7 |
| **20**   52:20 158:14 |
| **2019/2020**   21:16 |
| **2020**   30:6 38:5 48:13 60:13 71:21 82:2 94:10 107:5 108:14 117:23 128:8 142:1 |
| **2021**   1:17 5:5 6:4 60:17 161:2 |
| **2023**   159:17 |
| **205**   14:7,10,11 76:5 |

**206**   14:7 79:13,16 120:10
**207**   14:8 122:12,24
**208**   14:8 79:6,21 79:22
**20cv34319**   1:6
**211**   120:11
**2150**   2:15
**222**   4:12
**22402**   159:19
**2251**   3:8
**24**   104:15
**25**   157:11
**26**   120:17
**26th**   72:3,7,14 74:4 120:21
**27**   119:16
**27th**   71:21 120:8 120:18,20
**2821**   3:22
**29**   5:15 12:22 13:16,18 16:11,15 52:9
**2:07**   155:17
**2:11**   157:10

| 3 |
|---|
| **3**   31:13 79:23 88:2 139:8 157:11 |
| **30**   37:14 42:13 |
| **303-205-7870**   3:5 |
| **303-390-0016**   2:16 |
| **303-443-1749**   3:14 |
| **303-534-5160**   4:8 |
| **303-573-1900**   2:11 |
| **303-667-5105**   93:25 |
| **303-734-3400**   2:21 |
| **303-741-4539**   4:4 |
| **303-749-0062**   3:23 |
| **312-609-7865**   4:13 |

**314-329-5040**   3:18
**3400**   4:7
**3801**   3:4

| 4 |
|---|
| **4**   79:24 150:20 |
| **40**   78:24 |
| **400**   4:3 31:13 |
| **409**   1:7 |
| **45**   78:25 106:11 |
| **46**   5:16 96:25 103:24 |
| **4792290**   160:2 161:4 |

| 5 |
|---|
| **5**   29:1 116:13 |
| **555**   3:22 4:7 |
| **5613**   4:3 |
| **5th**   106:15 125:9 |

| 6 |
|---|
| **6**   108:14 109:25 110:8 |
| **600**   4:17 |
| **60601**   4:13 |
| **63119**   3:18 |
| **6420**   4:22 |
| **6th**   108:17 109:23 110:10 111:9 112:9 113:23 125:9 |

| 7 |
|---|
| **7**   5:11 |
| **70**   54:19,21 55:7 55:21 |
| **719-530-3011**   2:6 |
| **720-931-3200**   4:18 |

| 8 |
|---|
| **8**   1:17 5:5 |
| **80**   5:19 54:19,22 55:8,21 |

**[80014 - amazing]**

| | | | |
|---|---|---|---|
| **80014** 3:22 | **abused** 91:11 | **activities** 125:3 | **affiliation** 55:15 |
| **80111** 2:20 4:4 | **abusing** 147:15,18 | **activity** 41:8 125:3 | **affirmed** 7:3 |
| **80202** 1:4 2:11,16 | **access** 11:5,10,12 | 140:4 | **afraid** 97:18 |
| 4:8,18 | 12:19 14:18 22:15 | **acts** 152:5 | **aggregators** |
| **80210** 3:4 | 28:22 32:7,9,10,11 | **actual** 23:10,18 | 141:14 |
| **80539** 3:9 | 32:18 48:19 49:9 | 26:3,18 34:9 49:9 | **aggressive** 151:22 |
| **80601** 3:13 | 49:10,11 63:12,20 | 64:17 71:24 73:6 | **agitated** 34:7 36:6 |
| **81201** 2:5 | 66:9 85:22 86:7,9 | 73:9 | 46:12,15,17 |
| **830** 3:4 | 87:4,12 88:5 | **add** 97:12 | **agitator** 151:22 |
| **8400** 2:20 | 89:16 90:4,16 | **addict** 152:14 | **ago** 18:7 25:2,2 |
| **8th** 6:4 87:23 | 100:9 102:6 107:5 | **addiction** 91:7 | 28:5 88:7,24 |
| **9** | 107:10 109:3,6,20 | **additional** 145:19 | 135:24 |
| **9** 161:2 | 109:22 110:3,7,11 | **address** 1:3 19:5 | **agree** 6:24 7:1 |
| **90048** 4:23 | 110:18 111:8,10 | 33:21 49:5 90:24 | 59:5 90:11 105:24 |
| **93** 5:18 | 111:15 112:4,19 | 137:1 158:20 | 106:1 110:13 |
| **95** 140:4,15 | 114:2 115:16 | **addresses** 116:20 | 140:23 148:4,5 |
| **96** 5:16 | 117:10,13 128:10 | **adf** 68:12 | 154:4,13 |
| **970-419-8234** 3:9 | 142:7,8 | **adjudication** | **agreed** 89:4,17 |
| 4:23 | **account** 60:16 | 126:18,20 135:11 | **agreeing** 88:19 |
| **a** | 99:5 107:6,9 | **administered** 6:16 | 130:16 |
| **a.m.** 5:5 63:4,4 | 108:7 110:8 | **admits** 153:20,20 | **agreement** 6:21,22 |
| 67:16,16 | 111:15,22,22,23 | 153:21 | **agreements** |
| **ability** 38:15 86:21 | 112:21 | **admitted** 129:24 | 161:14 |
| 137:13 139:21 | **accounts** 111:21 | 152:13 153:22 | **ahead** 52:23,24 |
| 142:8 146:4 | **accuracy** 161:8 | **advice** 28:21 | 97:15 128:16 |
| **able** 17:12 18:2 | **accurate** 85:9 | **advise** 8:12 | 131:3 143:16 |
| 19:2,9,15 51:13 | 119:25 120:4,16 | **advocating** 73:15 | **alignment** 137:15 |
| 53:23 60:22 64:9 | 120:22 121:2 | **affect** 135:17 | **all's** 102:2,3 |
| 64:15 68:25 70:22 | **accusation** 151:19 | 139:17 | **alleged** 71:12 92:8 |
| 74:17 81:2 98:23 | **acknowledge** 6:13 | **affidavit** 5:14 | 125:2 |
| 110:15 111:21 | 6:16 158:2 | 71:20 117:18,21 | **allegedly** 41:4 |
| 112:10 113:16 | **acknowledged** | 118:10,17,21,25 | **alley** 77:12 |
| 114:6,12 129:18 | 136:19 | 119:3,9,11 120:23 | **allotted** 161:15 |
| 135:17 137:12 | **acquire** 33:8 | 121:2,6 122:1,11 | **allow** 10:8 135:18 |
| 138:19 145:2,5,12 | **act** 22:10 | 122:18,24 123:22 | 155:13 |
| 146:22,23 150:2 | **acting** 58:16 | 130:12 131:12,24 | **allowed** 118:25 |
| 151:25 155:8 | **action** 159:16 | **affidavits** 44:8 | **allows** 141:9 |
| **absolutely** 35:7 | **actively** 55:12 | 121:13 126:21 | 142:14 |
| 43:25 139:22 | 58:19 59:4 | **affiliated** 51:2 | **amazing** 58:13 |
| | **activist** 55:13 | 148:14 | 126:14 |

[amended - article]

| | | | |
|---|---|---|---|
| **amended** 127:1 | 125:25 128:11,23 | 59:24 61:2 65:16 | **appearance** 36:9 |
| **amendment** 158:4 | 128:24 130:9 | 65:18 66:16,20 | 36:12 37:11 |
| **america** 1:13 4:10 | 141:1 142:20,22 | 67:20,21 68:17 | **appearances** 2:1 |
| 4:15,20 107:2 | 143:1,12,14,20,22 | 69:15 70:18,22 | 3:1 4:1 |
| **american** 39:13 | 153:18 | 71:10 73:24 74:14 | **appears** 15:2 |
| **amount** 58:14 | **answered** 12:7 | 75:18 77:12,15,20 | **applicable** 161:7 |
| 105:21 125:16 | 22:6 23:14,15 | 79:14 82:16 83:13 | 161:14 |
| 126:14 | 24:17 26:9,11 | 83:13 87:13 108:2 | **appreciate** 85:16 |
| **analyses** 131:21 | 27:2 41:9,10 | 117:19 119:12 | 136:23 153:12,16 |
| **analysis** 131:14,18 | 57:21 94:23 | 120:16 123:3 | **approach** 146:12 |
| 132:1 135:7,25 | 100:22 124:2 | 124:17,25 125:3,6 | **appropriate** 5:2 |
| 136:3 137:4 | 150:25 | 125:8,18 126:5,7 | 88:11 |
| **anderson** 77:18,23 | **answering** 9:7 | 126:15 127:6,9,19 | **approximately** |
| 77:24 78:13 | 28:16 34:17 35:23 | 127:22 128:2,4,6,7 | 58:6 78:23 |
| **andrea** 3:7,10 6:8 | 57:16,17 86:17 | 128:18,22 129:7,9 | **architecture** 141:9 |
| 6:25 148:6 156:17 | 87:22 94:21 | 130:12 131:5,9 | 141:23 142:9 |
| **angeles** 4:23 | 142:19 | 139:10 146:13,17 | 144:22 |
| **anger** 98:15,17 | **answers** 7:25 | 146:21,24,24,25 | **area** 43:3 91:25 |
| **animal** 147:15 | 42:10 | 147:1 148:14,23 | **argument** 116:25 |
| **animals** 147:16 | **anti** 39:13,14 | 149:3,13 150:3,4 | **arima** 131:13,21 |
| **anonymous** 56:22 | **antif** 79:13 | 151:20 152:5 | 131:22 |
| **anonymously** | **antifa** 10:21 11:1,5 | **antifascist** 40:3 | **arlington** 148:2 |
| 69:10 | 11:12,25 12:11 | 41:16 | 156:8 |
| **answer** 8:11,13,20 | 14:20 16:5 17:9 | **antrim** 139:19 | **arranged** 67:21 |
| 9:19 12:6,8,9 | 17:16,22 18:8 | 145:11 | **arrangement** 6:19 |
| 16:21,24 18:11,16 | 19:1,24 20:6 21:6 | **anybody** 34:24 | **arrested** 36:21 |
| 20:24 21:3,4,5,5 | 21:11,14,19 24:1,2 | 43:4 56:2,10 73:6 | 37:9 |
| 22:12 23:16 24:16 | 24:4,5,7,8 30:11 | 73:7 107:4,5 | **arrests** 91:8 |
| 24:19 25:13,19 | 30:15 32:8,12,14 | 132:23 | **arrington** 3:3,3 |
| 26:10,13 28:2 | 32:14 34:1 38:5,7 | **anymore** 30:15 | 5:12 134:12,12,16 |
| 34:18 35:11,15,16 | 38:18,19,22,23,24 | 103:18 | 134:16 147:24 |
| 35:19 36:16,18 | 39:2,6,7,9,9,12,13 | **anyway** 105:8 | 148:2,5,9,20,21 |
| 37:22,24 38:1 | 39:14,20,22,24 | **api** 144:14 | 150:9,18,21 153:5 |
| 39:6 40:18 41:11 | 40:2,4,6,8,13,22 | **apologies** 116:2 | 153:12,25 154:9 |
| 43:9,17 54:6 | 41:2,3,8,13,15 | 128:14 | 154:18,19,23,25 |
| 56:24 57:15 59:8 | 42:5,5 46:25 | **apologize** 82:22 | 155:10 156:8,13 |
| 59:9,10 61:8,10 | 47:17,20 50:8 | **app** 29:3,7,25 63:9 | **arrington's** 154:17 |
| 70:1,11 83:18 | 51:2,3,8 53:24 | 63:12 64:12 | **arringtonpc.com** |
| 84:6 86:4,13,14,18 | 54:4,15 55:11,12 | 114:10,11 | 3:5 |
| 87:20,21 96:7 | 55:16 56:15 58:14 | **appear** 15:12 | **article** 108:18 |
| 102:18 104:1 | 58:16,20,24 59:4 | | 129:23 147:1 |

[articles - behalf]

**articles** 55:14
**ascii** 155:25
**aside** 143:15
**asked** 7:13 15:9
17:7 21:4 24:14
24:17,18 26:11
41:9 49:18 51:6
54:7 55:19 56:24
57:14,19 64:4,5
65:18 73:6,8,10
86:3 88:23 93:11
94:6 99:6 113:5
118:17 121:8
122:1,5,5 127:7
135:5 136:24
137:7 146:3
153:15
**asking** 9:6,7 10:4
22:8 23:13 26:2
26:12,15 28:14,17
36:18 40:6,25
44:16 45:5 51:25
53:25 55:19 61:24
61:25 70:25,25
71:3 83:21 86:11
88:24 89:16 93:3
103:25 121:24
125:16,22 127:4
133:11,23
**aspect** 61:17
**ass** 100:16
**assassinate** 21:8
**assault** 92:8
**assaulted** 92:3
**assembled** 131:5
**assisting** 137:10
**associate** 65:1
129:14 131:9
149:1,13
**associated** 68:12
74:24 75:18

118:19 119:1
122:2 128:2
129:13 149:3
151:20
**association** 125:17
126:6 129:13
148:23
**assume** 45:23
96:19 116:24
124:16
**assuming** 117:4
**attached** 158:4
161:10,12
**attack** 97:22
**attacked** 98:5
**attempt** 48:24,25
**attempted** 31:10
31:25 49:3 74:8
**attempts** 30:25
31:7
**attend** 128:4
**attended** 32:24
**attention** 61:22
**attorney** 6:23
20:22 28:15,18
83:19 84:7
**attorneys** 6:12
10:13 74:21 93:1
93:4 140:15
151:11 159:15
**attributing** 124:13
**august** 85:4
133:10
**aurora** 3:22
**authenticate** 54:2
57:4,7 107:11
**authenticated**
54:4
**available** 11:9
50:1 112:1 113:25
144:14 161:6

**avenue** 2:20 3:4
**aware** 10:19,22
38:2,4,6 81:25
87:17

**b**

**b** 1:11,12,13 3:7
3:11,16,20,21 4:20
15:3
**back** 21:21 26:1
31:4 42:15 48:14
52:6 60:12,13
63:5 67:17 71:10
73:1,5,11 74:21,23
81:14 84:25 88:12
89:1,5,8,12 91:5,6
96:14 100:8 106:8
106:21 107:15
108:17 111:11
113:12 124:4
126:15,22 127:25
130:4 137:2
144:21 145:1,4
146:18 149:8
151:8 153:14,16
154:10
**background** 16:20
37:15 151:17
154:16
**backtrack** 68:18
**backwards** 113:2
**bad** 51:14 94:18
**badgered** 35:17
**balance** 137:14
**ball** 91:10
**ballot** 143:24
**bank** 49:5
**bannock** 1:3
**bar** 88:7 91:2,19
91:21,23 92:8,17
95:16

**bark** 152:8
**barry** 3:3,5 134:12
134:16,20 148:2,3
154:3 156:8
**based** 21:25 54:5
54:24 55:6 60:24
63:11 72:10,17
79:10 91:16 97:24
125:16 132:15
146:21 150:4
**basically** 30:13
99:13
**basis** 55:10 86:18
153:9
**bates** 14:6,7 76:5
79:6 120:10
122:25
**bathroom** 89:21
105:15,18,19
**battering** 41:23
152:8
**bclark** 4:14
**beat** 152:16
**bed** 97:17
**beedle** 50:17,18
52:14 53:1 54:4,8
54:25 55:2,4,8
59:19 60:5,10,11
60:16,20 61:5,11
61:14,21 66:20
80:2 129:2
**beedle's** 59:24
**began** 78:16
**beginning** 6:22
32:4 53:8,8 82:14
89:13
**begins** 6:2
**behalf** 2:2,9,13,18
3:2,6,11,15,20 4:2
4:6,10,15,20
156:24 157:2

Veritext Legal Solutions
800-336-4000

[behavior - call]

**behavior** 90:21
145:14
**behavioral** 137:4
**believe** 24:9,10,11
30:5 31:24 34:3
48:21 52:2 60:8
60:14 63:17 65:4
65:5,7 75:17,22
76:9 77:5 78:24
83:3,6 85:5 90:11
92:10 97:16
112:15 114:12
116:13 117:1,23
118:20 127:8
131:7 135:3
137:23 145:19
146:19 148:15,21
148:24 149:11
150:2 153:7 155:4
156:16
**believed** 149:3
**believes** 38:10
**benefit** 97:2
**best** 28:7 54:24,24
55:6 72:12 73:24
112:18 121:1
**beth** 2:14
**beth.chambers**
2:17
**better** 65:25 66:1
**bev** 15:3,8,10,22
16:3,4 52:17
**beyond** 19:3 20:1
26:18 42:13
103:16
**bias** 139:9
**biased** 88:1
**biden** 139:1
**big** 138:17,18,22
**binder** 7:16,17

**bipolar** 153:20
**bit** 31:4 72:23
106:11 108:2,11
117:17 124:11
141:5 146:11
155:6
**bite** 90:10 125:19
**bkimrey** 4:14
**bkloewer** 2:7
**black** 39:18 133:5
142:4
**blaine** 4:11 13:1,9
120:13 136:13
**blm** 19:1
**blog** 155:4,5
**blow** 100:13 101:1
**board** 78:2
**boehmer** 4:6
156:23,23
**boisterous** 123:18
139:5
**book** 74:9,11
**bookmarked** 79:7
**bothered** 50:16
**bottles** 124:21
**bottom** 14:7 83:8
88:21 93:17
122:25
**boulevard** 4:22
**bounty** 21:16,19
**bowman** 2:4
**box** 2:5 3:8,13,17
133:5 142:4
**brad** 2:3
**bragged** 155:3
**breadth** 150:5
**break** 20:16 62:20
62:25 63:10 85:24
86:2 88:17,23,24
88:25 89:4,5,16,17
89:19 105:15,18

105:19 127:15
**brian** 14:15,15,16
14:19
**brighton** 3:13
**bringing** 78:2
**brought** 46:3
132:25
**bryan** 4:11
**building** 60:2
73:14
**buildings** 124:20
**built** 141:2,6,8,12
142:10,15
**bully** 102:22,22
129:15
**bunch** 85:25 121:3
123:13
**burn** 90:23
**burning** 124:19
**burns** 3:16,17 81:1
81:4,4
**business** 74:20
**businesses** 73:17
73:19,21
**busy** 34:9,10
48:16 74:20 99:16
**button** 93:17
**buttoned** 116:25
**bypass** 137:14

**c**

**c** 6:1
**cain** 2:2,4 5:11 6:7
6:7,24,24 7:6 8:19
8:23 9:1,2 10:1,6
10:8,11 13:1,4,9
13:15,16 15:8
16:24 18:11,15
22:2,3 23:12,13,18
25:23 26:6,7,14,17
26:25 27:3 28:4
28:17,21,22 33:25

34:14,18 36:1,4,5
37:6,8,10,20 38:13
38:16,17,21 39:1
39:17,25 40:12,15
40:22,25 41:6,10
41:12 42:9 45:5
45:11 62:19,21,24
63:7 66:3,5 67:12
67:19 69:14,23
70:3,6,9,10,13,24
71:6 73:22 74:5
80:25 81:8,16,23
82:3,21,25 83:21
84:9,16,19 88:19
89:2,15,23 92:24
93:3 95:3,10 96:6
103:13,19 104:9
104:22 105:20
106:4,10 113:3,14
116:3,15,24 117:4
117:15 118:1,5,7
120:4,15 121:23
121:24 128:16
134:1,5,10,22
136:9,16,23 137:2
138:6 139:11
140:11,23 141:19
143:1,4,13 144:9
145:18 146:3
153:4,13 154:2,14
155:12 156:14,15
**cain's** 148:12,22
**calculate** 145:13
**calendar** 72:1,19
72:21 73:3 74:6
**california** 2:5 4:23
21:9
**call** 10:21,21 11:1
11:5,12,16,24 12:1
12:12,20 13:23
14:4,7,18,24 15:11

15:18,21,25 17:24
18:5,21 22:15
24:13 31:8 32:8
32:18 35:13 38:24
39:12,22 41:24
44:14 46:25 47:5
47:10 48:19,21,22
48:23 49:1,6 50:4
51:4,5,7,8,13,17
51:20 52:1,4,6,8
52:11,13,15,16,21
52:21 53:1,8,18,19
54:1,3,5,11,21
55:6,8,10,11,20
56:4,6,12,17,25
57:6,7,9,20,22
58:1,3,6,9,11,18
59:16,19 60:8
61:5,6,12,20 62:7
66:14,15,19,24
67:2,20,20,21 68:1
68:20,22 69:2,3,5
69:5,9,20 70:14
71:10,11,13,17,25
72:9,13,25 73:24
74:14,23,24 75:1,3
75:6,9,10,12,20
76:7,10,16,19 78:5
78:11,14,16,18,20
79:14 83:12,16,24
84:2 90:15 102:13
106:12 108:2
109:10 117:19
119:12,15 120:16
120:24 121:9
123:3,12,15 125:2
126:8,9,12,16
127:25 131:6
138:17 145:5
146:4,13,16,21
149:16

called   5:3 38:7,19
  38:21 39:7 40:6
  41:2 48:22 94:12
  95:16 97:9 107:21
  110:22 129:3
calling   40:15
  111:6
calls   50:3 51:24
  56:14 68:25 69:16
  69:16,21 70:3,17
  71:1 82:23 84:20
  126:12
camera   45:1
camp   5:19 12:16
  18:17 21:12 76:6
  76:7,11,13,15,19
  80:3,9,10,18 81:18
  82:1,1,5,9 83:1,15
  83:23 84:1,19
  85:17 121:8,25
campaign   157:3
capabilities   150:5
capacity   135:11
care   21:3 22:9
  42:3 148:5
careful   26:21 61:2
carry   114:13,14
carve   125:24
carving   125:18
case   1:6 7:11
  10:17 13:3,10
  38:4,12 39:8
  40:11 104:2 117:1
  132:3 145:1
cases   137:14
castle   25:11 32:21
catalyst   58:24
cause   147:20
caused   98:14
  145:9

ccain   2:6
cd   143:18
cell   31:15 64:17,22
  64:23 65:2,6
centers   147:13
centric   124:11
ceo   126:24 144:3
certain   11:6 49:4,5
  50:12 54:22 55:20
  55:21 78:15 115:7
  123:22 129:1
  132:8,9 144:1
  150:10 152:1
certainly   51:1
  113:4 150:2
certainty   54:11,14
  54:14,18,18 56:5
  57:1,20,22 58:1,2
  58:4 60:3,5,7,7
  61:19,19 128:22
  140:12,15
certificate   159:1
certified   5:7
  159:20 161:16
certify   159:6,9,13
cetera   122:21
chambers   2:14
chanel   1:12 4:10
  4:15,20 13:7
change   102:4
  160:4,7,10,13,16
  160:19
changed   119:23
  139:25
changes   63:19
  158:7,8 161:9
charge   24:12
charged   92:8,13
charles   2:2
charlie   6:7,24 8:17
  8:24 10:1 33:19

34:16 35:22 37:3
  69:18 80:21 81:1
  82:22 88:16 95:8
  96:2 103:9 104:11
  105:16,18 116:12
  133:22 143:3,11
  143:17 145:22
chart   132:5,7,13
charting   132:17
  132:18
charts   133:1
check   25:15,20
  33:14,23 49:22,23
  52:2 73:2 94:13
  146:19
checking   144:21
cherry   96:2
chicago   4:13
choice   76:23
christopher   2:19
cia   149:10
circle   26:1
circumstances
  69:11 98:14
city   43:1
civil   5:2
claim   52:12 57:5
  57:25 58:8 59:17
  103:22 143:3
clarification   118:2
  136:16 145:22
clarify   60:10
  149:4 150:8
clark   4:11 50:25
  51:1 67:1,7
clean   57:10
clear   124:25 139:8
  139:24,24 143:24
client   8:19 28:15
  28:18 38:12 40:15

[client - continued]

40:18 69:21 83:19
84:7 101:13,13
102:11,11,12
103:10,12,15,21
103:23 104:15
145:23
**client's**  41:1
**clients**  116:22
**close**  73:4 79:2
**closer**  65:24 67:10
**cobb**  139:19
**code**  49:9 56:20
57:3 142:3,5
**coffee**  46:18,19
47:3,7
**coincidence**  60:19
**collect**  17:2 18:2
146:22
**collectively**  121:17
130:16
**color**  36:12
**colorado**  1:1 2:11
2:16,20 3:4,9,13
3:22 4:4,8,18 5:8
14:14 21:19 25:5
25:11 50:17 53:12
72:5 109:2 124:18
130:5 139:19
159:6
**come**  34:11 35:8
48:18 52:6 85:17
86:17 88:4 89:5
91:15 97:18,21
115:5 145:16
**comes**  93:24 142:3
**coming**  26:21 98:1
121:13 141:15
154:17
**commencement**
159:7

**commencing**  5:5
**comment**  51:20
82:21 105:10
107:25 154:4
**comments**  91:9
95:9 107:12
123:12 124:9,10
130:15 138:24
**commerce**  144:10
**commission**
158:16 159:17
**commitment**
11:13
**committed**  155:2
**communicate**  9:17
31:15 123:19
151:5
**communicated**
51:24 70:22 151:6
**communicates**
29:11 30:1 41:14
**communicating**
40:1 60:11,15,20
61:11 123:15
**communication**
31:5 56:15,17,18
68:7 70:21 82:9
**communications**
1:11 3:16,20
28:12,23 29:2,5,17
30:2 31:22 61:18
68:3
**communism**  130:3
**communities**
124:19
**community**  73:16
129:15 147:21
**companies**  144:12
**company**  49:18
73:13 141:14
144:3

**compelled**  90:7
**complaints**  74:21
**complete**  119:21
121:1 147:23
**completely**  121:4
**complicit**  145:14
**compromised**
135:14
**computer**  7:19
65:24
**con**  98:13 138:18
138:22
**concerned**  51:10
88:3 121:12
**concerning**  11:4
**conclude**  104:23
129:19 137:20
**concluded**  155:18
157:10
**conclusion**  91:15
127:10,12 138:21
138:23 145:16
**concrete**  49:8
**conducting**  7:22
148:25
**conduit**  10:21 11:1
12:5,11 14:4
17:18 18:20 29:5
37:25 42:13 69:1
70:14 86:7 87:7
96:23 108:3
121:10 122:1
**confer**  89:19,23
**conferral**  36:22
**confirm**  66:21
105:1 136:21
138:7
**confirmed**  33:22
**confirming**  122:2
**conflict**  69:4

**connected**  112:1
144:16,18
**connection**  77:19
82:16,17 97:23
118:23
**connections**  142:6
**cons**  138:17,17,18
**consent**  6:19
**consequences**
86:17 88:12
**conservative**  1:11
3:7,11
**consider**  127:18
**constitutes**  158:5
159:12
**cont'd**  3:1 4:1
**contact**  24:22
27:25 28:5 30:3,4
30:8,23,25 31:8,10
31:14,25 49:3
63:19 64:15 65:8
77:7 79:23 112:21
113:17 146:4
**contacted**  34:7
64:23
**contacting**  17:8
80:4
**contacts**  64:20
**contemporaneou...**
13:22
**content**  107:23
112:19
**context**  7:25 75:22
78:1,1 94:5 96:9
96:13 119:22
149:5
**continue**  155:13
**continued**  60:17
122:12 123:4
141:17

[continues - d]

| | | | |
|---|---|---|---|
| **continues** 22:4 | 113:23 114:4 | **corrected** 104:10 | 127:3 130:18 |
| **contract** 64:6 | 116:11 122:14 | **correctly** 14:16 | **court** 1:1,3,4 6:10 |
| **control** 86:20 91:2 | 123:6,9 124:14 | **correlate** 60:21 | 7:10 11:20 22:4 |
| 91:8 96:22 103:22 | 125:1,17,21 126:5 | **correlated** 58:20 | 38:1 43:7 44:5 |
| 147:15 | 126:11 127:5,8,18 | **correlates** 59:10 | 86:14 87:15 88:13 |
| **convenient** 95:7 | 128:6 129:6,19 | 59:23 | 90:25 114:23 |
| **conveniently** | 130:13 131:4 | **correlation** 61:5 | 116:19,20,23 |
| 101:6 | 133:14,17 135:2,6 | 61:12 | 153:15 |
| **conversation** | 135:6,9,15 139:16 | **correlations** 141:7 | **court's** 64:8 |
| 29:13 32:12 53:16 | 140:16 148:13,25 | **corroborate** 58:15 | **courthouse** 36:19 |
| 54:5 65:20 75:16 | 149:6,15,24 | **corroborated** | 36:20 |
| 78:3 113:6 115:21 | 151:14 152:1,22 | 111:10 | **courtroom** 1:7 |
| 122:19,20 123:2 | 152:24 160:1 | **corrupt** 100:16 | 22:10 36:25 |
| **conversations** | 161:3 | **counsel** 6:5,19 | **cover** 105:23 |
| 47:8 49:23 51:21 | **coomer's** 24:4,5,8 | 7:14 8:11 9:20 | **covered** 87:7 |
| 56:21 63:21 89:18 | 84:21 85:15 86:20 | 13:3,7 23:13 | 128:20 156:21 |
| 151:10,11,12 | 87:13 90:4 91:1 | 28:13,19 36:22 | **covering** 128:9 |
| **convert** 33:9,10 | 93:8 94:10 95:1 | 37:2 44:24 63:15 | **cps** 147:18 |
| **convince** 115:23 | 95:11 99:25 | 63:23 85:2 89:19 | **created** 132:5,7,19 |
| 116:4 | 104:25 108:7 | 89:24 92:19 96:16 | **creates** 141:6 |
| **cool** 103:18 | 110:3,7 115:9 | 103:13 145:19 | **creating** 132:13 |
| **coomer** 1:6 11:24 | 138:12,22 148:23 | 148:6 154:16,16 | **credence** 151:19 |
| 11:24 12:1 15:24 | **copies** 13:6 | 155:12,19 156:22 | **credibility** 97:23 |
| 21:21,23 24:9,10 | **copy** 13:19 133:23 | 157:1,6 159:14 | 121:16 122:3 |
| 24:11 38:12,19 | 136:17 161:16 | **counsel's** 150:18 | 152:5 |
| 39:8 40:21 52:12 | **core** 68:14 | **counties** 145:12 | **crimes** 154:1 |
| 54:1 56:7,8,8,10 | **corporon** 3:21,21 | **country** 34:10 | **criminally** 92:14 |
| 57:2,5,9,18,22,25 | 151:2,6 | 44:8 56:16 100:17 | **cross** 148:7 154:10 |
| 58:8 59:17 60:4 | **corporonlaw.com** | 124:18 126:13,21 | **crude** 136:6 |
| 60:13,13,15,18,23 | 3:23 | 139:9 141:11 | **cruel** 156:4 |
| 61:5,7,9,11,17 | **correct** 7:11 13:21 | 147:6 | **cseerveld** 2:21 |
| 62:8,9,14 82:15 | 14:1 36:7 65:4 | **county** 1:1 139:19 | **cstrial.com** 2:6,7,7 |
| 83:1,5,12 87:4,12 | 71:18,19 72:10 | 139:19,19 145:11 | 2:8 |
| 87:23 88:3,6,15 | 83:24,25 84:18 | **couple** 8:1 18:7 | **currently** 9:11 |
| 90:8,15,21 91:4 | 85:5,10,11 104:3 | 21:13 30:25 31:7 | 21:12,19 46:10 |
| 92:2,8,21 93:2,12 | 108:14,20,20 | 31:7 44:7 48:15 | 64:13 |
| 93:14 96:22 97:23 | 109:8 112:11 | 48:22 51:18 88:7 | **cut** 98:2,3 |
| 100:15,15,15 | 117:24 119:16 | 97:25 141:15 | |
| 103:11 107:21 | 123:6 132:24 | 148:11 | **d** |
| 108:18 109:10 | 138:14 147:8 | **course** 9:18 51:10 | **d** 1:11,12,13 3:7 |
| 111:3 112:3,7 | 151:14 159:12 | 55:11 75:6 119:12 | 3:11,16,20 4:20 |
| | | | 6:1 27:22,24 |

[d.c. - directly]

**d.c.** 133:1
**daily** 1:11 3:7,11
  74:20
**damage** 64:1,2
**damaged** 64:5
**danger** 21:25 44:1
  44:3 65:21 87:12
  91:3 98:8
**dark** 21:18
**dash** 18:19 20:19
**data** 77:13 106:17
  109:5 114:9
  132:14 140:22
  141:7,13
**datasets** 131:25
  132:18,19
**date** 6:3 71:12,24
  72:25 73:6,9 74:7
  74:18 91:5 101:8
  138:11 160:24
**dated** 71:18
**dates** 71:11,11
  73:3
**dating** 60:12 130:4
**dave** 95:4,10
**day** 34:8,9 39:15
  97:4 101:16 103:4
  104:15 109:23
  112:10,12 146:25
  156:16 158:14
**days** 48:22 72:2,14
  73:24 97:25 99:16
  99:19 121:18
  141:15
**deactivated**
  111:23,24
**deal** 57:23 83:19
**dealing** 21:2 43:2
  115:20
**dealt** 69:20

**death** 141:16,17
**debate** 102:10,11
  103:20 145:10,11
**debating** 40:16
**december** 87:23
  106:15 107:4
**decided** 107:1
**declare** 6:17
**deem** 118:2
**deep** 65:17
**defamation** 35:25
  38:12 40:11 143:3
**defamatory** 55:14
**defaming** 59:4
**defendant** 2:13,18
  3:2 4:2,6,10
**defendants** 1:15
  3:6,11,15,20 4:15
  4:20 73:8 103:18
  132:3
**defending** 2:18
  85:3
**deference** 153:9
**define** 46:25 52:7
**definitely** 32:18
**definition** 41:20
**definitively** 53:20
**defranco** 3:12,12
  6:8,8 7:1 143:7
**defrancoi** 3:14
  161:1
**degree** 19:4 54:17
  54:18 59:18 61:19
  112:2 140:12,15
**delete** 101:10,19
  101:25 104:5,8
**deleted** 29:2,6,18
  29:22,25 101:11
  101:14,17,18
  102:4 104:4 107:2

**deletes** 29:1
**deleting** 57:18
  103:7 104:8
  153:23
**demask** 58:24
**demonstrations**
  126:12
**denied** 99:8
**denver** 1:1,4 2:11
  2:16 3:4 4:8,18
  14:14 43:3 48:17
  72:4 130:5
**denying** 98:18,24
  99:9
**depending** 137:19
**deponent** 15:6
  16:22 25:20 28:3
  65:23 66:1,4
  69:22 73:20 80:23
  81:5 89:7 104:18
  104:20 105:17
  106:1 113:1
  115:25 120:7
  128:14 134:8
  138:4 141:1
  143:22 144:8
  158:1 159:7
**deposition** 1:16
  5:3 6:3,13,14,15
  7:22 9:18 10:4
  20:24,25 25:24
  33:14 34:21 37:4
  41:21,22 116:18
  117:19 118:3,4
  136:18,21 140:14
  142:18 148:6,7
  155:18 157:9
  158:2,5,7,8 159:9
  161:4
**depositions** 151:9
  153:5

**describe** 30:8 36:9
  36:12,15,23 37:10
  45:14 50:5 130:24
  131:2,4
**described** 68:20
  122:20
**describing** 71:2
  83:16
**design** 144:11
**desire** 86:21 87:25
**despite** 74:5
**detail** 97:20
**determine** 19:15
**develop** 46:24
**develops** 141:3
**deviations** 136:7,7
  137:5,5
**device** 9:10
**devices** 8:3 56:19
**dexter** 4:16
**diagram** 136:5,6
  137:24,25 138:6,8
  138:13,15
**diagrams** 137:17
**dictate** 90:22
**died** 18:7
**difference** 104:6
**different** 24:18
  54:6 56:18,19
  82:4 137:12
  139:12,14 142:6
  142:21
**difficult** 128:19
**difficulty** 128:17
**dig** 150:2
**diligence** 126:15
**direct** 58:4 151:9
  153:15 154:10,12
**directly** 59:10
  130:18 151:5,12

Veritext Legal Solutions
800-336-4000

[director - endearing]

**director**  135:9
**disagree**  154:5,9
**disclose**  11:13
  34:23 43:7 65:21
  109:15,18
**disclosed**  43:8
**disclosure**  10:20
  10:22
**disclosures**  56:15
  137:22
**discover**  144:15
  146:17
**discovery**  69:20
  83:7 103:17
  121:21 153:8
  154:6,11,12
**discuss**  76:5
**discussed**  52:8
  66:14 76:6
**discussing**  67:20
  76:19
**discussion**  63:3
  67:15 76:10 77:22
  156:7
**disgusting**  55:3
**dispute**  56:10
**disqualify**  19:9
**distracted**  138:18
**district**  1:1
**divulge**  21:20,24
  34:25 48:25 88:13
**dna**  141:8
**doctorate**  149:7
  149:12,20
**document**  5:16
  80:19 82:14
  137:23
**documented**  49:15
  49:17
**documents**  12:21

**dog**  152:9
**doing**  17:8 20:11
  20:11 47:20 51:19
  58:21 65:9 72:7
  72:24,25 73:3
  87:15 99:16,18
  100:12 104:14
  108:24 111:9,16
  111:20,20 112:6
  121:20 124:17
  126:12 131:8
  149:23
**dominion**  14:12
  61:12 72:4 75:16
  82:17 97:22
  100:16 122:21
  126:9,20,23,24
  133:3,4,5 135:10
  135:17 136:8
  137:11,19 138:16
  142:10 143:23
  145:9,11,14,17
  147:5 150:6
**dominion's**  147:4
**dominus**  129:24
**donald**  1:9 2:13
  160:1 161:3
**door**  130:21
**downloaded**
  114:13
**dox**  147:20
**doxing**  147:7,10
  147:10
**dr**  39:8 54:1 56:8
  56:10 57:5,25
  58:8 59:17 60:4
  62:9,14 83:5
  84:21 85:15 90:4
  91:1,4 92:2,8,21
  93:8 94:10 95:1
  95:11 96:22 99:25

  104:25 108:7,18
  110:3,7 111:3
  112:7 113:23
  115:9 116:11
  125:1 127:5,18
  128:6 129:6,19
  130:13,24 131:4
  133:14,17 135:2,6
  135:6 138:12,22
  139:16 140:16
  148:13,23,25
  151:14
**drafted**  119:19,20
**dragged**  48:1
**drank**  85:25
**drc**  2:21
**dropped**  120:6
**drug**  152:13
  153:21
**dsl**  77:21,21
**dtc**  4:3
**due**  21:14 126:15
**dui**  91:8
**duis**  154:1 155:2,9
**duly**  7:3 159:7
**dymond**  2:19

**e**

**e**  6:1,1 15:3 144:10
  157:3 160:3,3,3
**earlier**  68:24
**early**  4:22 30:5
  133:1 145:3
**earlysullivan.com**
  4:24,24
**easier**  136:22
**east**  2:20 3:4
**echo**  97:9,11 99:12
  99:13 104:24
  106:19
**echoed**  100:4,24

**edison**  133:7,7
**education**  73:17
**educational**  37:15
**effect**  30:13 87:18
  124:13
**effort**  152:10
**efforts**  65:12 74:6
  123:13
**either**  39:9 43:12
  56:3,20 60:7 67:1
  70:6 71:2 102:20
  132:3 146:19
**election**  61:3
  97:24 100:17
  102:14 121:19,20
  127:3 133:14,18
  135:2,3,8,12,18
  138:12 139:17
  140:5,16,19,24
  141:20,21 142:24
  143:25 147:3
**elections**  142:24
**electronic**  33:9,11
  72:21
**elk**  108:8,13,21,23
  108:25
**else's**  97:11 99:14
  151:9
**email**  2:6,7,7,8,12
  2:17,17,21 3:5,10
  3:14,19,23 4:5,9
  4:14,14,19,24,24
  5:17 31:6,18
  33:12,21
**emails**  33:10 83:4
**emotions**  98:8
**employed**  42:21
  159:14
**employment**  42:23
**endearing**  77:2

**[ended - fair]**

ended 78:18
enemy 77:11
enforcer 19:1
engage 156:3
engaged 140:4
engineering 149:7
149:13,20
enter 136:17
entered 10:17
136:21
entire 50:9 139:25
entirety 23:5
entitled 5:16
entrepreneur
141:25
environment 59:3
59:12
epiphany 108:13
108:15
equate 126:6
equations 144:19
eric 1:6,12 2:14
4:6 14:11 15:24
18:14 21:21 24:4
24:5,8,9,10,11
38:12,19 39:12,12
40:21 50:20 56:7
57:2,9,18,22 61:12
62:9 67:1 72:4
75:16 82:15 83:1
83:12 86:20 87:4
87:11,13 90:15
93:12 97:23
100:15,15,15,18
102:3 103:10
107:21 109:10
112:3 114:3 117:9
117:13 122:10,12
122:14,21 123:3,6
123:9,14,22
124:14 125:17,21

126:5,9,10,15
127:8 135:15
138:23 149:6,15
152:7,9,22,24
156:24 157:2
160:1 161:3
eric's 124:10
eric.holway 2:17
ernst 141:24
errata 161:10,12
161:13
error 106:9
errors 132:14
esns 143:24
especially 98:7
esq 2:2,3,3,4,9,14
2:14,19 3:3,7,12
3:16,21 4:2,6,11
4:11,16,21,21
essence 107:2
essentially 108:3
estimate 54:24
55:6,24 73:24
et 122:21
ethnicity 36:13
etran 156:24
evasive 24:15,16
42:10,11 111:17
event 126:5
127:22 128:2
events 130:23
everybody 24:7
76:6 134:2
evidence 35:6
44:10 59:11
102:15 114:23
115:1 119:6
124:25 125:5
127:17,18 128:5
exact 36:24 94:19
151:21

exactly 111:19
examination 5:4
5:10 7:5 146:1
148:7,8 159:7
examined 7:3
example 145:3
excentric 123:17
exclude 125:14
excluding 56:9
excuse 126:19
exhibit 5:14,15,16
5:17,18,19 12:22
13:10,16,18 16:11
16:15 52:9 80:17
81:19,23 93:19,21
95:20,23,24 96:25
103:24 117:22,25
120:10 137:21
138:6
exhibits 5:13 7:14
7:15,17 13:2,6,8
93:18 102:16
118:2,4
exist 98:22
existed 82:17
existing 121:22
expectation 119:5
119:8
expedite 156:16
expedited 156:25
157:4
experience 142:23
expert 140:20,24
141:20,21,22
expertise 145:15
experts 104:14
132:4
expires 158:16
159:17
explain 8:1,9 75:8
115:15 143:2

146:9,11
explanation 56:23
59:7 115:19
extended 117:5
extensive 151:14
extent 11:6,7,8
154:12
extremist 41:18

**f**

f 123:19
fabricated 87:24
88:4 153:23
facebook 84:21
85:15,20 86:8
87:7 89:17 90:4
91:3 96:23 101:15
101:24 104:16,17
105:3,4 108:4,5,7
109:4,24 110:3,4,7
110:19,20 111:1,2
111:8,15,23
112:17,20 113:17
114:7,20,23 115:9
117:20 125:8,10
125:16,18 126:16
faces 128:20
fact 19:8 21:3
28:18 38:7 41:24
51:23 52:10 53:18
55:16 58:15,16
59:10 61:13 79:12
92:12 98:12
106:23 121:16
126:23 127:9
128:20 140:2
144:21 147:1
151:4
factually 120:22
fails 161:15
fair 13:14 51:11
55:1,9,24 66:16,16

**[fair - give]**

73:25 76:14 84:5
85:17,18 108:19
122:2 137:9
**fairly** 58:10 74:20
**faith** 73:16
**fall** 28:21
**false** 37:1
**familiar** 144:12
**family** 43:5,11,19
44:17 47:16 97:16
97:19
**far** 69:8 73:1
83:15,23 88:3
130:2 151:3
**fascinating** 51:22
**fascist** 40:3
**fashioned** 72:22
**fbi** 149:10
**fear** 47:24
**fec** 1:10 3:6,11
25:9,12,21 30:22
32:3,20 33:2
34:10 46:1,2,6,9
50:14 58:20 68:12
73:14 146:20
147:2
**fec's** 25:24
**feces** 124:21 125:4
**feel** 88:14 90:6
149:8
**feelings** 42:2
**felt** 121:5
**female** 45:20
**fight** 88:7 91:2,19
91:21,23 92:9,17
95:16
**fights** 152:14
**figure** 35:17 41:1
59:14 69:19 114:1
121:16 144:20

**file** 13:8
**filed** 116:19 119:1
119:3 149:15
**files** 20:13
**filled** 51:22
**finalist** 141:25
**find** 20:9,16 31:5
49:4 58:14 69:16
100:11 101:5
106:23 111:13
113:3 114:12
142:17 144:15
153:1,19 155:1
**finding** 83:14
121:16 126:18
**fine** 27:5 62:21
84:9
**finish** 57:14 86:25
143:14
**finished** 130:25
**firm** 3:3,17
**first** 7:3 8:2 23:8
23:10 27:11,13,16
30:18,19 32:5
48:20 61:13 67:21
76:5 79:12,25
87:20 103:20
109:24 125:7
141:13 148:10
**firsthand** 92:16
**five** 25:2 26:11
28:4 79:2
**flip** 133:14
**flipped** 133:18
135:2
**flipping** 135:8
138:12 140:5,16
**floor** 4:22
**florida** 3:4
**fly** 98:8

**flying** 88:10
**focus** 50:7,8 58:17
58:18,18 70:13
**follow** 82:4 86:1
104:14 108:4
136:22 147:25
**follows** 7:4
**foregoing** 157:9
158:3 159:12
**form** 18:10 26:4
41:5 116:10
159:11
**format** 136:1
**forth** 159:11
**fortify** 79:19
**fortifying** 122:9
122:12 123:4,9,13
123:23 124:1,3,8
**fortune** 144:11
**forward** 13:8 88:4
145:18
**found** 59:13 112:5
149:6 151:17
**four** 13:25 79:1
88:23 136:7
**frankly** 21:21
24:12
**fraud** 97:24
102:14 121:21
**fraudulent** 138:19
**fresh** 143:21
**friend** 45:22,24
77:12 112:7
**friendlies** 67:4
**friendliest** 51:20
**friendly** 114:3
**friends** 43:5,10,19
44:17 104:16
110:3 115:9,11
**front** 7:17 80:16
81:20 88:13

141:11
**frozen** 124:21
**full** 7:7 27:7,10
131:13
**fully** 62:18
**function** 13:11
113:16
**further** 6:15 44:11
126:17 159:9,13
**furthermore**
87:24
**future** 90:22
132:11

**g**

**g** 6:1
**gab** 80:18 81:24
82:5
**gained** 62:4
**games** 23:12
**garner** 93:2
**gateway** 1:12 3:16
3:20
**gather** 48:25
147:13
**gathering** 137:11
150:23
**geared** 68:24
**gentleman** 21:15
**georgia** 139:20
145:2
**getting** 7:24 9:19
32:8 46:25 47:13
48:12 74:21 84:5
85:15 90:16 109:3
109:5 110:3
121:14 128:9
146:15 152:14
**giants** 107:1
**giuliani** 1:10
**give** 7:10 11:8 12:5
12:12 20:23 21:5

Veritext Legal Solutions
800-336-4000

22:24 26:24 32:18
44:19 49:9 54:17
73:2 86:12 88:8
90:2 101:8 109:13
110:25 114:2
117:8 127:11
136:19
**given** 26:22 27:2
27:14 31:14 43:6
48:16 49:4,5
64:17 87:13 88:6
88:11 90:7 115:4
128:18 156:5
**giving** 86:8 93:13
109:12 116:8
**gizer** 4:22
**glad** 30:14,14
**go** 8:10 14:25
19:12,15 27:19
31:4 52:23,24
59:13 65:9 67:11
73:1,5 80:6 81:9
88:12,17 93:10,21
95:13 96:11,14
97:15 100:23
101:6 103:2
104:17 105:2,20
105:24 106:4
109:4 113:7,19
119:12 122:18
128:16 131:3
134:22 143:16
146:18
**goal** 43:23
**goes** 18:25 133:7
144:24
**going** 8:10,10,11
10:1,8 11:19,22
21:3,4,5 22:3,12
26:1,15 34:8,18,23
37:3,22,24 38:17

38:20 39:6,23
40:17,19 42:15
43:14 46:22 51:5
51:12 56:2 57:23
63:1 65:11 67:13
71:10 80:14 81:11
88:16 89:2,7,9,22
90:2,2,23,24 96:6
96:24 97:18
102:21,22 103:16
103:20 104:3,22
105:10,14,20,23
105:24 106:5
107:1 109:8,9,13
109:15,18,19,21
109:21 110:12
111:11 113:1,3,9
117:9 118:22
119:9 123:11
126:17 134:13
138:25 139:1,2
142:1,17 143:13
143:20 145:22
147:24 148:4,4,7
150:11 151:7
154:6 155:13,16
155:16
**good** 20:18 47:19
47:20 105:12
155:5
**google** 155:4
**gordon** 4:2,7
**gotten** 61:22 83:3
**gpm** 4:17
**gqueenan** 4:5
**grabbed** 99:25
**grand** 101:16
103:4
**gray** 4:21
**greenwood** 2:20
4:4

**grew** 48:1
**group** 68:14 129:3
129:6,25 130:14
131:5 132:23
147:19
**groups** 122:12
123:4,9,23 124:1
**grow** 47:25
**grsm.com** 4:9
**guarantee** 26:14
**guess** 46:13 51:4
54:23 55:25 58:12
58:12 60:18 66:8
72:12 77:24 93:19
96:15 97:1 98:10
104:23 105:11
106:25 116:22
129:16 131:23
152:15 156:18
**guessing** 72:15
**gun** 61:1 97:21
**guns** 61:3
**guy** 14:12 21:8,9
34:6 64:12 75:23
75:23 77:15 80:3
80:6 94:16 122:21
140:22

**h**

**h** 160:3
**habit** 153:24
**habits** 90:21
**hair** 36:13
**half** 107:1
**hall** 3:7,8 5:11 6:9
6:25,25 8:17,22,24
15:5 18:10 23:11
23:14,16 26:4,9,14
27:1 28:14,20
33:19 34:13,16
35:22 36:2,4 37:3
37:7,19 38:9,15,25

39:10,21 40:9,14
40:16,17,23,25
41:1,9 42:8 45:2
62:15,20 69:12,18
70:5,8,20 71:4
74:1 80:21 82:20
82:22 83:18 84:6
88:16,22 89:5,20
92:22,25 95:2,8
96:2 103:9,14
104:11,19 105:16
106:3 116:12,17
117:14 133:22
134:3,6,19 136:4
140:8,21,25
142:25 143:2,5,8
143:11,17 145:21
146:2 147:23
148:3 155:15
156:17,17
**hamstring** 56:3
**hand** 30:15,22
**handed** 30:14
**handle** 22:9 28:10
88:10
**hands** 30:18
**handwritten**
72:22
**handy** 131:18
**happen** 34:8 145:2
**happened** 29:24
29:24 32:1 34:5
44:13 48:14 49:23
63:16 71:14 74:4
97:25 120:21
132:11 136:8
151:11
**happening** 48:17
73:13 126:17
132:10

[harm - information]

**harm**  34:25 35:3,7
   147:21
**hart**  143:24
**hatred**  139:9
**hats**  100:16
**he'll**  70:11
**head**  21:17,19
**headless**  144:11
**health**  153:2
**hear**  16:25 25:18
   44:25 45:3,7
   75:15 127:12
   136:11 138:3
   139:1 144:7
   148:19
**heard**  51:9 116:21
   139:2
**hearing**  16:18
   65:23 87:6 154:18
**heavily**  18:8
**heavy**  115:21
**heidi**  50:18 52:14
   53:1,5,13,13,18
   54:2 55:8 60:5,16
   60:20 61:11,14,21
   61:24 66:20 80:1
   129:2
**help**  74:17 77:7
   94:19 106:18
   108:11
**helpful**  82:11
**heroin**  91:7
**herring**  1:13 4:20
**hesitation**  21:24
**hey**  111:15 124:8
   146:23
**hide**  56:14
**hiding**  21:13
**high**  59:18,21,23
   60:4,7,24 61:18
   98:8 140:11

**higher**  97:19
   122:17
**highly**  38:18
**hired**  92:18
**history**  21:23 47:4
   47:6 87:13 88:6
   88:10 107:2
   149:24
**hit**  21:14 80:3
   93:16
**hoft**  1:11 3:15,20
   93:22 96:15,20
**hold**  12:25 20:10
   25:25 81:7 93:21
   98:25 138:5
   140:19 141:20,22
   141:23 153:4
**holes**  142:10
**holway**  2:14 157:2
   157:2
**home**  93:11 108:8
**homes**  129:16
**hone**  53:16
**hope**  44:3
**hour**  62:23 157:10
**hours**  34:23 35:16
   104:15 105:24
   143:9 145:22
   157:11
**house**  93:9 94:3,7
   94:10,11,14,15
   95:1,11 96:1
   97:21 100:1,23
   104:25
**huh**  50:23
**human**  55:3
**humiliate**  152:11
**hunt**  108:8,13
**hunted**  21:10
**hunting**  108:21,23
   108:25

**hurt**  42:2 86:21
   129:14
**hyperbole**  124:11
**hyphen**  77:15

**i**

**icx**  137:13,14
**idea**  48:18 77:11
   84:4 105:12 114:3
   129:10
**identification**  27:8
**identified**  12:22
   61:25 66:13 108:3
**identify**  6:5 19:2
   32:24 42:18 46:13
   52:25 56:2,5,11,25
   57:19 58:7 59:2
   60:6 61:19 68:14
   68:21 75:19
   129:17
**identifying**  18:4
   18:24 19:6
**identities**  56:14
**identity**  11:1,4,11
   12:5 14:3 17:11
   27:12 37:25 52:1
   58:4 116:10
   117:12 128:9
**iii**  2:9
**illinois**  4:13
**imessage**  5:18
**imminent**  21:25
**implications**  142:6
**important**  9:2
   121:5
**improprieties**
   126:23
**inability**  91:8
**incident**  92:13
**include**  9:19
**including**  71:22
   101:15

**incorrect**  29:9
**independent**  53:12
**index**  5:9
**indicate**  6:21
**indicated**  33:25
   67:24 113:14
**individual**  11:4,11
   12:3 21:22 22:1
   22:14 23:1,4,17
   25:1 43:24 46:5
   60:12 65:20 67:7
   87:12 88:9 91:14
   91:18 94:25 141:8
   141:8
**individually**
   113:19
**individuals**  10:20
   11:4,11 60:4 67:2
   92:3,13
**infiltrated**  67:25
   68:2,6 69:15
   146:21
**infliction**  103:22
**influence**  135:4
   139:7,8 150:7
**inform**  42:16
**information**  7:24
   11:9,21,22 12:13
   12:14,19 16:13
   17:20 18:2,4,24
   19:6,8 20:1,4,8,9
   20:17 21:20 22:25
   23:3,5 26:23
   27:15,25 28:15,18
   28:19 29:4 33:7,8
   33:18,23 34:1,2
   42:23 43:6 44:20
   44:25 48:21,25
   49:10,11,11,13
   50:1 52:3,13,14
   53:15 58:15 59:1

[information - june]

59:13 60:10,24
62:4 63:15,16,20
64:7,8,9 65:2,11
65:16,19,20 66:9
70:1 72:4 73:2
84:5 87:5,16 88:5
88:9,14 90:7,16,19
92:5 93:2,13
95:16,18 106:22
109:12 110:25
111:2,3,5,10,11
112:4,9 114:2,13
114:15,19 115:16
116:5 117:5,6,9,10
119:20,24 121:3,4
121:5,15,17 122:6
124:5 125:20
126:4,18 127:7,9
127:11 131:20
132:2,16,20 133:2
137:11 141:16
144:22 145:5,6
146:22 147:13
149:23 150:1,11
150:17,19,22
151:1 152:6,10
153:23 155:1,7
**informed** 106:14
**ingrid** 3:12,12 6:8
6:25 134:21
**initial** 30:8
**initially** 25:8 30:3
**initials** 20:20
23:17 26:18 42:14
**input** 132:16
**ins** 32:23
**inside** 12:20 29:2
29:12 32:14 59:2
59:12 61:14
126:24,25 136:8
137:18,18 143:25

**inspectors** 141:7
**instagram** 111:21
**installed** 64:13
**instructing** 8:19
40:18
**instruction** 70:7
70:12
**instructions** 9:19
**intentional** 103:19
103:22
**interconnect**
144:14
**interest** 32:16,19
35:14 50:5 51:12
**interested** 84:12
159:15
**interesting** 60:9
60:10
**interference** 145:7
145:9
**internet** 57:11
142:7 144:5,7,8,17
144:18
**interrupt** 153:10
**interrupting** 26:16
38:14 70:7
**interview** 122:1
**interviews** 99:16
99:18
**intimidate** 129:16
147:20
**invalidate** 144:25
**invalidated** 138:19
**invest** 113:22
**investigation** 17:6
111:14 113:23
**investigations**
65:17
**investigator** 92:18
95:17

**invited** 34:11
**involved** 17:14
18:8 30:16 41:7
68:5,11,15 73:14
77:24 92:13 119:7
121:25 125:1,2
127:22 129:7,19
131:25 135:7
139:17 140:16
144:23 149:20,25
**involvement** 59:24
59:25 60:1 91:6
**ios** 5:18
**iot** 144:5
**ip** 49:5
**ips** 49:5
**irrational** 90:8
**irregularities**
132:14
**issue** 8:12 35:25
104:10 122:3,4
133:11
**issued** 7:10
**issues** 81:17
141:21 154:5

**j**

**j** 1:9 2:2,13 3:12
3:12 160:1 161:3
**jackson** 2:15
**jacksonkelly.com**
2:17,17
**jail** 154:1 155:2,6
**james** 1:11 3:15,20
**january** 133:2
145:3
**jeremy** 4:21
**jgray** 4:24
**job** 158:25 160:2
**joe** 104:16 114:24
146:3

**joey** 12:16 18:17
21:12 76:6,7,11,12
76:19 77:7,14
79:23 80:2,9,10,18
81:17 82:1,1 83:4
85:17
**john** 81:4
**jojo** 80:2,8
**jonathan** 3:16
**joseph** 1:10,16 3:6
3:11 5:3 6:3 7:2,8
158:1,11 160:2,24
161:4
**jot** 148:24
**journalist** 14:20
19:9,10 41:13
51:3,8 53:24 54:5
54:15 55:12,13,17
59:3 66:20 146:25
**journalistic** 59:12
**journalists** 32:15
34:1 40:1,2,2 50:8
50:15 51:10,14,16
51:18 52:11 55:11
58:14,24 66:16
146:18,24,25
147:2,7
**judge** 7:11 10:17
38:4,8,10,21,22,24
38:24 39:7,7,11
40:6,6,7,10,20,20
40:24 41:3,3,7
42:6 104:2
**july** 30:5,22 48:15
**jump** 106:11
**junction** 101:16
103:4
**june** 38:5 60:12,14
125:9,9

[keep - line]

| k | | | |
|---|---|---|---|
| **keep** 10:10 26:12 | 37:15,18,20,23 | **known** 11:15 | **learned** 16:3 47:14 |
| 26:15 30:2 33:7 | 38:13,22 40:12 | 19:12,14 21:11 | 47:16,19,22,24 |
| 33:20 40:14,23 | 42:19,21 43:1,4,10 | 26:20 27:14 83:12 | 54:25 55:3,7,15,16 |
| 72:19 113:1 124:9 | 43:11,12,17,22,23 | 129:12 | 125:21 152:19 |
| 124:12 138:18 | 44:13,17 45:13,24 | **knows** 18:19 20:19 | **leave** 135:18 |
| **keeping** 123:12 | 46:6,21 47:13 | 23:17 43:4 | **leaving** 30:11 |
| 124:14 130:17 | 48:7,12 50:5,20,23 | **kornfeld** 2:10 | **led** 52:13 127:11 |
| **kelly** 2:15 | 50:25 51:1 54:20 | **kyle** 50:25,25 67:1 | **left** 63:8 75:12 |
| **kept** 29:12 33:6 | 57:4,24 58:2,3 | 67:6 | 124:6 130:2 |
| **key** 74:20 | 62:11,13,16 63:24 | | **leftist** 41:14 |
| **kids** 47:22,25 98:7 | 64:18,25 67:2,11 | **l** | 129:19 |
| 147:17,18 | 69:6 72:18 74:3 | | **leftists** 41:15 |
| **kill** 21:7 97:19 | 76:13 78:7,13,20 | **lack** 86:20 91:1 | **legal** 36:17 71:3 |
| 142:17 | 80:10 82:17,19 | **lacked** 103:21 | 86:9 161:19 |
| **killing** 83:14 | 83:15,23 89:18 | **lacking** 96:22 | **legality** 70:25 |
| **kimrey** 4:11 13:1 | 91:22 92:7,12,15 | **lags** 132:11 | **legally** 70:23 |
| 13:2,5,14 118:1,6 | 93:1 96:7,18,19,20 | **largest** 141:13 | 85:22 86:9 |
| 120:9,13,13 | 97:7 98:9,20 | **lasalle** 4:12 | **lend** 151:19 152:5 |
| 136:13,14 155:21 | 99:11 102:14 | **late** 46:20 71:23 | **length** 135:21 |
| 155:25 156:3 | 105:14 107:24 | **lathrop** 4:17 | **level** 54:10,13,14 |
| **kind** 63:8 100:9 | 109:17 110:6 | **lathropgpm.com** | 59:6 60:5,7 |
| 105:22 110:14 | 112:23 114:1,6,10 | 4:19 | **liberals** 41:18 |
| 125:18 128:1 | 115:3,22 123:14 | **laurel** 5:6 84:16 | **lie** 22:11 104:1 |
| **kits** 142:4 | 124:16 125:15 | 142:17 159:4,19 | **lied** 36:25 |
| **kloewer** 2:3 | 126:7,8,8,9,14 | **law** 3:3,8,12,17,21 | **lieu** 6:16 |
| **knew** 24:13 32:10 | 128:21 129:6 | **law.com** 2:21 | **life** 21:14 91:17 |
| 59:2 68:12 75:24 | 130:8 131:22,23 | **lawsuit** 40:19 | **light** 126:22 |
| 117:9 119:9,10 | 133:13,17 134:17 | 119:6 | **lightening** 106:12 |
| 147:4,4 | 135:1,3,6,9,12,13 | **lawsuits** 119:1 | **lightly** 115:22 |
| **knock** 130:21,21 | 135:16,17,17 | **lawyer** 20:23 | **likelihood** 59:18 |
| **know** 14:23 15:16 | 138:4 140:9 | 73:10 84:12 151:3 | 59:23 60:24 |
| 16:6,8,18 17:15,23 | 141:14,17 142:2 | 151:3 155:5 | 126:16 132:10 |
| 18:23 19:21 21:22 | 142:11,13 147:5 | **lawyers** 73:7 | **likes** 24:10 |
| 23:6,7,8,9,10,18 | 149:24 152:3,15 | 83:22 105:24 | **limelight** 24:11 |
| 23:21,22 24:1,14 | 155:21 156:4,5,19 | 106:14 133:10 | **limitation** 29:15 |
| 24:18 25:4,6,13 | **knowing** 65:10 | 134:1 135:21 | 29:25 |
| 26:2,8,18,18 27:7 | 150:4 | **lead** 34:24 65:19 | **limited** 69:19 96:7 |
| 27:10,11,13,17,20 | **knowledge** 41:4 | 127:8,10 151:18 | 103:16 105:21 |
| 27:21,22,24 31:6 | 75:21 92:16 | 154:1 | **line** 10:2 13:15 |
| 32:6,9 33:13 35:2 | 151:18 | **leaders** 131:5 | 36:11 83:12 |
| | | **leads** 144:21 | 150:20 160:4,7,10 |
| | | **learn** 47:12,15 | |
| | | 48:4 53:17 | |

Veritext Legal Solutions
800-336-4000

[line - members]

160:13,16,19
**liner** 95:24
**lines** 86:6
**list** 50:1 60:2
**listed** 77:3
**listen** 126:2
**listened** 35:2
  126:10 151:8
**listening** 35:14
**litany** 121:13
**literally** 39:14
**litigation** 118:23
**little** 31:4 35:13
  72:23 78:25,25
  82:4 106:11 108:1
  108:11 117:17
  122:17 146:11
**live** 25:3 94:17,18
**lived** 43:1
**lives** 39:19 94:16
**living** 37:18,21
**llc** 1:11 3:8,16,20
**llp** 4:17,22
**located** 8:21 108:8
**locations** 21:13
**log** 65:6
**logged** 15:21
**logs** 33:14
**long** 62:21 78:20
  78:23
**longer** 104:15
**look** 7:23 33:17,22
  56:15 74:17
  107:14 112:23
  113:5 115:20
  125:15 145:2
  152:19
**looked** 63:9,25
  112:2,22 132:7
**looking** 7:23 13:20
  14:12 19:12,14,18

20:21 59:11 63:21
  74:6 79:10 108:17
  111:25 112:5
  113:5 119:11
  125:17 138:14
  144:18 149:14
**looks** 107:14
  137:24
**looting** 124:20
**los** 4:23
**loss** 106:16
**lost** 61:16
**lot** 16:7,9 55:3
  60:22 61:21 73:12
  76:22 94:18
  105:22 121:11
  124:25 131:10
  136:18 152:23
**lots** 68:16 93:12
**louis** 3:18
**loveland** 3:9
**loves** 24:9
**lying** 98:3 153:21
  153:22

**m**

**m** 2:9 3:7 131:13
**ma'am** 73:20
**machine** 126:24
  137:13
**madness** 1:10 3:7
  3:11 143:18
**mail** 97:20
**making** 104:6
  130:22 138:24
  152:8
**male** 37:12 42:13
  45:20,21
**malkin** 1:12 4:2
**man** 18:6
**managed** 144:4

**manifesto** 11:25
  39:15 60:1 125:8
**manipulated**
  137:18,18
**manner** 6:20
**manufactured**
  98:12
**march** 125:3
**marched** 38:5
  41:3
**marching** 39:18
  39:18
**margaret** 4:6
  156:23
**mark** 14:14 17:17
  77:15 80:3
**marked** 81:19
  96:24 137:22
**marks** 77:16
**married** 47:23
  48:4
**marxism** 130:3
**marxist** 60:1
**masks** 128:9
**massive** 59:24,25
  59:25
**material** 74:17
  82:15 83:1
**math** 144:18
  145:13
**mathematical**
  144:19
**matter** 6:18 8:5
  21:2 39:19 78:9
  89:3 97:5 136:15
**mboehmer** 4:9
**mcbride** 109:14
  109:17
**mcrae** 4:22
**mean** 15:12 24:5
  38:10 49:2,16

51:7 53:20 58:2
  62:16 68:4,5 73:1
  73:2,5 77:11 88:8
  88:20 91:10,21,22
  96:19 101:1,18
  106:2 107:12
  108:16 115:3,20
  124:18 131:22
  134:25
**meaning** 76:24,24
  148:25
**means** 104:13
**mechanic** 19:16
**media** 1:11,14 3:7
  3:11 12:1 39:16
  50:12 57:10 80:3
  89:13 102:2
  111:21
**meet** 34:19 35:20
  46:18
**meeting** 25:9
  30:10,22 32:3,20
  33:2 36:6 46:14
  47:2 70:23 120:16
  146:20 147:2
**meetings** 32:23,25
  45:9,25 46:1,6,9
  46:12 68:7
**member** 14:20
  16:5 17:22 19:24
  20:6 21:11 25:12
  25:16 38:19 39:1
  39:8,19 41:2 78:2
  126:6
**members** 21:7
  32:14 33:14 43:11
  43:19 47:16 50:12
  59:4 61:2 65:16
  65:18 66:13 70:18
  83:12,13 84:20
  129:9 130:14

Veritext Legal Solutions
800-336-4000

**[memberships - nonresponsive]**

**memberships** 25:22
**mental** 153:2
**mention** 131:10
**mentioned** 46:12 51:17 66:25 91:2 91:19 92:1 113:21
**mentor** 46:22
**mesa** 139:19 145:11
**messages** 96:4 113:16
**messaging** 141:11
**met** 30:19 34:14 35:25 47:6,7 48:9 48:15 76:12
**metal** 97:17
**metaxas** 1:12 4:6 156:24
**metro** 43:3
**mexico** 108:22,23
**mic** 154:17
**michelle** 1:12 4:2
**mid** 71:14,22
**middle** 24:11 63:18 74:3 83:10 89:3 91:21 102:19 121:17 122:11,17 123:3,15
**millions** 141:12
**mind** 41:2,13 143:21
**mindset** 58:25
**mine** 104:5
**minute** 52:7 56:9 57:24 67:11 81:10 90:23
**minutes** 29:1,2 46:20 62:23 76:20 78:24,25 89:6 106:11 143:10

157:11
**misdirection** 150:12
**misinterpreted** 153:7
**missing** 124:6
**missouri** 3:18
**misunderstand** 149:2
**mms** 5:18
**mobich** 50:22,23 67:1
**modem** 126:25
**modum** 126:24
**moment** 25:18 128:12 138:2 148:16,17,17,17 148:18 154:15
**monday** 98:1
**monitor** 69:9
**month** 150:14
**months** 18:7 21:14 25:2,2 28:4 49:1 61:22 88:7 120:24 141:18
**moses** 7:11 10:17
**motivated** 58:22 88:1
**motivation** 115:17 115:19
**motives** 127:4
**mounting** 102:15
**mouth** 124:10
**mouths** 124:11
**move** 8:18,22,24 16:2 21:13 35:23 40:9 103:12 104:23 105:11 143:5 144:14 145:18

**movement** 19:1 24:2 40:3 58:16 59:24 77:21 125:6 127:22 129:22 149:25 150:3 152:2
**moving** 73:12 121:11 136:23
**msp** 144:4
**muffled** 66:5
**multiple** 35:5 45:14 91:8 137:16 148:18 153:21 155:9
**murderers** 129:14

**n**

**n** 6:1
**nail** 74:18
**name** 6:21 7:7 11:14 12:12,15 14:22 15:2,3,10,12 15:14,20 17:17,25 18:7,18,24,25 19:6 22:16,17,18,19,20 22:22,24 23:8,10 23:18,20,20,21,22 23:24,25 24:3,4,6 24:8 26:3,19 27:8 27:10,11,13,16,23 45:17 50:21 57:1 57:3,11 60:13 68:15 86:11,12 95:1,4,5,6 100:14 110:13 147:4,4
**names** 24:2,2,8 52:15,16 53:2,3,4 56:20,20,20 76:4 109:14 110:13
**nation** 121:14,22 141:14 150:6

**nationwide** 83:13
**nature** 90:8
**navy** 61:12
**necessarily** 58:18 132:25
**need** 21:21 36:11 77:8 85:24 88:17 95:8 105:22 124:9 142:11 156:6,25 156:25 157:4
**needs** 16:25 116:25
**neither** 134:21
**network** 1:13 4:10 4:16,20
**networks** 1:13 4:20
**never** 17:12 27:12 37:8 48:9 64:23 76:12 87:25 100:2 100:6,6 101:23 108:15 139:25 143:24 146:12
**new** 21:16 64:6 108:22,23 129:23 130:14 133:8 136:15
**news** 1:13 4:10,16 4:20
**newsmax** 1:14
**ni** 18:18,20,23,25 19:13,15,21 20:1 20:14 75:23
**night** 7:15 81:25
**nine** 61:22 141:18
**noise** 16:20,22 154:16
**nominee** 141:25
**nonresponsive** 22:2 26:6 121:23

[nope - opinion]

**nope**   103:1 143:4
**normal**   149:19
**north**   4:12
**notarize**   161:11
**notary**   5:7 158:18
 159:5,21
**notated**   33:18
**note**   13:5 63:9
 77:8,14 79:13
 80:1,2 120:9
 161:9
**noted**   139:10
**notes**   5:15 11:15
 11:16 12:14,15,20
 12:23 13:19,21
 14:1,3,8 15:1 16:9
 16:11,12,16 17:2,3
 17:4,5,10 52:2,7
 52:10 56:1,3,4
 61:14,15 66:7,22
 71:17 74:9,13,13
 74:16 76:4 77:4
 79:1,8 81:18
 122:9,9 124:4
**notice**   5:1
**notoriety**   24:9
**november**   94:10
 95:11 108:14,17
 109:23,25 110:8
 110:10 117:23
 118:11,14
**nuclear**   149:7,12
 149:20 152:15
**number**   28:1 31:6
 31:16 49:9 63:11
 63:13,18 64:16,17
 64:22 65:2,6
 89:13 93:24,25
 95:25 113:22
 122:25 139:6,7,8

**numbers**   14:8
**numerous**   107:22
 110:24 126:21

**o**

**o**   6:1 144:9
**oann**   13:7
**oath**   6:16 85:8
 101:12 158:4
**object**   10:1 18:10
 26:4 105:16 153:8
**objecting**   70:8
**objection**   8:17
 22:2 23:11 26:6
 27:1 28:14 34:13
 34:16 35:22 37:19
 38:25 39:10,21
 40:9 62:15 69:12
 69:22,23 70:10,20
 71:4 74:1 82:20
 82:23 83:18 84:6
 89:20 92:22,25
 95:2 116:12
 117:14 121:23
 136:4 140:21,25
 142:25 154:5,7,13
**objections**   6:20
 10:9 36:17,17
 154:2
**observations**   56:4
**observed**   63:10
**obtaining**   121:25
**obvious**   22:10
**obviously**   7:22
 56:9 68:21 72:9
 98:24 106:2
 110:14 123:6
 133:23 143:15
**occasion**   153:1
 154:25
**occur**   48:21 71:12
 71:13

**occurred**   48:12
 57:8 58:6,25
 71:25 72:9,25
 73:25 75:16 84:2
**october**   146:18,19
**office**   3:8,12 8:3,3
 8:7,15 13:8 34:11
 69:6 75:11
**officers**   139:9
**offices**   3:21
**offline**   144:15
 145:6
**oh**   14:9 15:6 38:2
 50:7,23 78:12
 95:7 102:9 105:16
 116:24 127:1
**okay**   11:18 13:14
 13:20,25 15:6,14
 15:24 16:6,15
 17:5,10 19:5,25
 29:14 33:12 34:5
 35:9,20 37:7 38:3
 39:5 44:22 45:5
 45:11,24 46:5,8,24
 47:21 48:18 50:15
 50:19 51:9,16
 52:5,19,23 53:17
 54:6,10,16 59:20
 60:2 61:16 62:6
 64:11 65:12 66:4
 66:8 67:5,19 68:4
 68:9,13,18 69:7
 70:10,17 71:7,8
 72:24 74:23 75:8
 75:11 76:14,24
 77:22 78:12 79:12
 79:16,25 80:7
 81:14 84:14 89:5
 89:15 90:23 92:7
 93:23 94:15,20
 97:10,13 98:13,16

 98:23 99:15,24
 100:3 103:6 105:8
 107:23 108:11,16
 108:24 109:1,7,23
 110:2,16 111:1,13
 111:17 114:5
 117:11,17 118:10
 118:16,25 119:5
 119:10 122:14
 123:1 125:19
 126:3 131:18
 136:9 138:10
 139:11,23 140:23
 141:2 143:5,23
 147:23 156:13
**old**   36:13 37:13
 72:22
**oltmann**   1:10,16
 3:6,11 5:3,14,15
 6:3,9 7:2,8,9,21
 9:2,17 10:12,16
 13:17 20:21 28:23
 30:21 35:2 46:16
 63:7 80:20 81:16
 89:15 104:17
 106:10 113:15
 114:24 118:8
 136:19 143:19
 148:10 153:4
 155:13 158:1,11
 160:2,24 161:4
**olympia**   21:9
**once**   106:20
 139:25 140:1
**online**   103:3
 144:15
**open**   135:18
**openly**   41:14
**opinion**   35:14 51:7
 66:23

[opinions - percent]

| | | | |
|---|---|---|---|
| **opinions** 127:12 | **overall** 119:24 | **pardon** 23:2 | **partner** 48:7 |
| **opposed** 132:11 | **overseas** 142:5 | **park** 47:8,14 | **parts** 73:13 119:21 |
| **opposite** 55:14 | **owned** 147:14 | **parker** 3:22 | 121:11 137:13 |
| **order** 7:10 10:17 | **owning** 126:18 | **parkway** 4:3 | **party** 141:13 |
| 10:20 12:2 38:1 | 135:11 | **parley** 5:16 | **passive** 135:5 |
| 43:7 44:5 56:21 | **p** | **parlor** 96:25 98:22 | **patentholder** |
| 56:21 59:13 64:16 | **p** 6:1 | 98:24 99:1,3,4,4,5 | 126:19 |
| 65:6 74:7 79:8,9 | **p.c.** 1:9 | 99:6,21 100:8 | **path** 46:23 48:2 |
| 87:1,3,3,7,17 90:5 | **p.m.** 81:13,13 | 101:5,6,7 103:24 | 59:14 133:5 |
| 90:22 91:15 93:2 | 89:10,11,11 106:7 | 106:14,16,21,22 | **patterson** 4:3 |
| 95:21 109:11 | 106:7 113:11,11 | 106:24 107:3,5,8 | **pc** 2:10 3:2,21 4:3 |
| 110:11 116:14,19 | 157:10 | 107:14,15 | **pcu** 143:17 |
| 117:3,5 144:1,24 | **p.o.** 2:5 3:8,13,17 | **part** 7:13 25:19 | **pedophiles** 41:17 |
| 145:6 147:20 | **page** 5:10,13 14:5 | 30:11,14 32:12 | 41:19 |
| 153:8 154:6,11,13 | 14:6,8,8,9 61:15 | 38:23 39:5,9,24 | **penalty** 6:18 |
| 156:9,9,11,14 | 76:5 79:3,5,12,16 | 40:8 41:20 45:25 | **people** 17:3,8 |
| **ordered** 11:20 | 79:18,19,22,23,24 | 47:17 60:9,11 | 19:12,14 21:8,24 |
| 86:14 87:16 90:13 | 80:19 91:3 104:16 | 61:8,10 75:7,8,10 | 24:13 31:13 32:13 |
| **ordering** 156:21 | 104:17 109:24 | 76:10 78:13 85:7 | 43:11,11 44:8 |
| **orders** 155:19,20 | 110:4,19 115:9 | 102:14 107:2 | 45:15 47:7 50:9 |
| 155:22 | 119:14 122:11,18 | 120:6 122:16 | 52:1,20 55:14 |
| **organization** | 122:18,22,24 | 125:5 127:9 129:2 | 58:3,4,11,13,19 |
| 17:14 30:12 39:3 | 125:8 134:11 | 129:22,24 130:4 | 59:2,5,12,14 65:15 |
| 129:8,10,11,18,20 | 150:19 160:4,7,10 | 137:5,19 138:13 | 65:17 68:11,14 |
| 130:2,6 149:21 | 160:13,16,19 | 138:22 149:5 | 75:3 93:12 94:6 |
| **organizations** | **pages** 14:1 15:4 | 150:3 152:2 | 94:18 97:20,21 |
| 121:18 | 84:21,23 85:15,20 | **participant** 55:22 | 100:23 110:24 |
| **organize** 105:22 | 86:8 89:17 90:4 | **participants** 15:21 | 111:7 112:1,2,3 |
| **organized** 39:3,4 | 112:17,21 114:7 | **participating** 6:12 | 113:22,25 123:14 |
| 51:24 78:4 | 114:20,23 158:5 | 55:6 | 123:16 129:14,15 |
| **organizing** 77:25 | 161:12 | **participation** | 130:22 132:8 |
| **original** 108:6 | **paid** 61:21 | 18:20 138:12 | 138:20 141:12 |
| 149:6 | **panels** 142:2 | **particular** 21:25 | 142:2,5 147:10,12 |
| **outside** 7:24 9:18 | **papers** 33:7 | 34:4 46:14 49:6 | 147:14,17,20,21 |
| 10:22 125:1 | **paragraph** 83:11 | 50:4,16 53:11,16 | 148:18 152:16,21 |
| 132:23 134:25 | 88:2 131:13 | 56:17 70:14 74:24 | 152:21 |
| 136:24 153:7 | **paragraphs** 124:6 | 84:5 125:13 | **people's** 30:18 |
| 154:6 | **paranoid** 46:18 | 138:13 | 73:16 124:10 |
| **outstanding** | 47:3 | **parties** 6:18 9:18 | **perceive** 7:24 8:12 |
| 137:14 | **paraphrasing** | 81:25 159:14 | **percent** 54:19,22 |
| | 152:18 | | 55:8,21 57:22 |

Veritext Legal Solutions
800-336-4000

[percent - powell]

60:25 66:21 140:4
140:15
perception 54:25
perfect 118:16
perform 141:10
period 23:6 33:3
43:2 48:12 49:4
63:22
perjury 6:18
person 6:17 7:21
10:3 11:14,14
12:4,5,10 16:3
17:21 19:2,16
20:5 23:6,7,9 25:3
25:7 30:9 31:23
34:4 35:25 42:12
42:16 44:1,3,4
45:14,16,17,25
46:2,3,21 47:5
49:18 53:7,11,14
53:15 54:20 55:12
55:16 58:8 59:15
65:21 68:13 75:5
86:7 87:1,13 88:5
88:9,14 90:3,6
91:3 94:22 95:15
98:2,3 109:7,9,16
112:20 115:8,23
116:4 117:12
118:18 127:17
146:6,13 149:14
149:19 152:14
person's 26:2
personal 97:19
151:17
personally 71:9
93:6 153:1
persons 12:10
pertained 18:1
pertaining 16:17

peter 4:21
pets 147:14,14
ph.d. 1:6 160:1
161:3
phone 2:6,11,16
2:21 3:5,9,14,18
3:23 4:4,8,13,18
4:23 28:1 31:6,16
37:5 63:10,13,17
64:1,3,5,6,10,13
64:22,23 65:6,24
83:11 93:24,25
95:24 96:11
112:19 116:1
138:1,5
phonetic 50:22
photos 102:16
physical 37:10
115:1
physically 6:13
8:20 9:24 10:7
physicist 152:16
pick 36:11 63:8
65:24
picked 96:2
picture 64:4,5
99:22,24 100:4,24
104:24
pictures 63:25
111:25
pinpointing 58:13
piqued 32:16,18
pissed 98:6
place 87:17 159:10
places 139:18
147:12
plaintiff 1:7 2:2,9
5:4 6:7
plaintiff's 12:22
52:9 80:17 117:21
120:10

planning 51:23
plates 97:18
platform 144:10
platforms 56:19
57:10
play 29:23
playing 23:12
please 6:5,11,20
7:7 16:21 25:19
30:24 70:7 103:12
105:18 143:2
148:18 157:4
pllc 2:4,15,19
plotted 132:13
pm.me 3:19
point 19:21 39:2
43:15,15 44:15
47:9 50:7 53:6
62:10 65:3 68:13
69:7 70:25 76:12
77:13 78:14 80:10
87:2 88:17 107:9
110:4 118:2
124:18 132:12
149:8 150:15
police 39:14 139:9
political 55:15
59:6
politically 58:22
88:1
popped 52:16,17
posed 88:23
143:19
position 87:8,10
87:11 116:21
139:7,22 141:11
positions 147:19
positively 52:25
possession 96:10
96:21

possible 56:22
59:1 100:20
104:24 121:2,15
138:17
possibly 73:12
post 5:19 96:25
97:12 98:11,14,18
98:21 99:4,14,21
100:6 101:10
104:12 106:14,20
107:11,12,13,16
107:20,24 109:4
110:20 125:13
152:12
posted 21:16
39:15 80:18 81:24
99:5,9,11,17,24
100:11 101:9
103:23 104:24
106:19,23 107:8
107:10 125:7
posting 39:14
80:20 82:1,7
83:10,11
posts 39:13 87:24
98:12,21 99:7
101:7 102:3 104:4
104:5 126:16
139:5 149:23
153:23 155:3
potential 77:12
potentially 118:22
143:14
powder 97:20
powell 1:9,9 3:2,2
85:3 118:20,22
119:1,6 120:10,11
121:8,25 122:11
122:24 140:14
150:11,17,22
151:5,10,12

Veritext Legal Solutions
800-336-4000

[powell's - queenan]

**powell's** 133:10
 134:1 135:21
**prentice** 2:20
**prepared** 10:25
 11:3 90:9 102:18
 136:2 145:18
**present** 6:14 10:7
**presented** 11:25
 26:5 27:4,6
**presents** 91:3
**preserve** 102:6
**preserved** 82:15
 102:8
**preserving** 104:7
**president** 1:9 2:13
 138:24 139:2
 160:1 161:3
**pressure** 124:9,13
 124:15 130:17
**pretty** 34:9,10
 39:3 47:6 48:16
 55:2 59:18 74:19
 115:20 152:3,3
**previous** 32:12
 42:20 69:3,4 91:7
 99:7 112:19
 132:10 159:6
**previously** 96:25
 101:7 111:5,11,22
 116:19 117:22
 129:2 137:21
**price** 4:12
**prick** 35:17
**primary** 76:15
**printed** 7:15
**prior** 72:10,10,14
 108:9 110:4,8
 119:17 120:17
 147:13 148:11
 153:5 154:3

**private** 92:18
 95:17 104:6,7,12
**privilege** 8:12
 83:20 84:8
**privileged** 28:15
 28:19
**pro** 39:13
**proactive** 146:12
**probability** 61:6
 132:7 144:17
**probable** 132:15
 144:20 145:7
**probably** 26:23
 30:17 31:13 39:24
 40:3 46:17 54:18
 61:14 76:20 80:16
 84:15 106:11
 112:22 115:5,19
 123:20 124:22
 137:20 142:17
 145:2
**problem** 26:10
 58:12 86:25
 153:21
**procedure** 5:2
**proceedings** 10:22
 22:11
**process** 47:14
 48:12 113:4
 126:19,20 133:4
 135:11 144:23
**proclaimed**
 129:21 130:4
**produce** 156:1
**produced** 28:12
 81:24 93:22 132:2
**professional** 5:6
 159:5,20
**progressed** 62:5
**progression** 30:21
 30:24

**prohibit** 10:20
 87:4
**project** 21:15
**promptly** 74:22
**pronoun** 54:20
**propriety** 154:6
**protect** 12:2 34:22
**protected** 87:1,2,8
 90:6,11,12 116:14
**protection** 12:2
 87:1,3,3 109:11
**protective** 10:17
 10:19 87:7 90:5
 116:18 117:2,5
**protest** 21:10 38:5
 39:19 41:5
**protests** 68:8
 77:25
**prove** 141:24
**provide** 7:14
 11:21,22 33:12
 44:24 48:19 49:13
 63:12 64:4,5,8,16
 65:2 71:24 84:21
 87:16 115:16
 116:5 117:6,11
 132:23
**provided** 11:10,11
 13:2 44:15 63:25
 69:25 85:2,3 92:5
 95:15 117:22
 127:8 133:2 136:5
 150:10 151:1
**provider** 144:5
**providing** 26:19
 27:8 28:18
**proxy** 58:16
**prpclegal.com** 4:5
**pscott** 4:24
**psl** 77:20

**public** 5:7 102:5
 128:2 136:6
 158:18 159:5,21
**publicly** 91:11
 112:1 113:25
 152:10
**pull** 20:10,16
 113:16 114:6
**pulled** 119:22
**punch** 142:10
**pundit** 1:12 3:16
 3:20
**punish** 44:4
**punished** 44:5,9
**purports** 82:1
**purpose** 34:21
 56:13 66:15
 118:13 146:15
**purposely** 104:1
**pursuant** 5:1
**push** 87:25
**put** 7:15 35:12
 39:14 44:1,3
 49:25 51:13 65:21
 66:10 77:4 90:5
 98:11,14 99:22
 100:14 119:18,25
 134:13 142:12
 152:10,12 155:4
 156:10
**puts** 126:5
**putting** 21:14
 39:13 52:3

**q**

**qualifications** 42:6
**qualifies** 38:22
**qualify** 18:3 40:3
 40:7,8
**quality** 141:6
**queenan** 4:2

Veritext Legal Solutions
800-336-4000

[question - record]

**question**  9:5,7,14
11:2 12:6,7,10,10
14:14 15:9 17:17
18:16,16 22:6,13
23:13,15,19 24:17
24:17,18,21 26:7,9
26:11,12,12,17
27:2,4,6,7,16
28:16 29:16 34:17
34:19 35:11,12,23
37:22,24 39:2,6
40:18 42:20 43:9
43:17 47:1 51:6
54:7 55:23 57:13
57:14,15,16,17,21
59:8 61:17,18
68:22,24 69:13
70:2,11,19 71:16
74:18 77:15,16
80:3 83:19,23
84:7,14,17 86:2,5
86:6,13,15,17,19
87:20,22 88:23
90:3 94:20 96:8
96:17 100:22,25
107:7,9 108:5
110:16 114:8,21
116:2 118:1 123:5
124:2 125:22,23
125:25 126:1,1,2
128:23,24 130:10
131:24 132:17
136:24 140:9
141:19 142:19,20
142:21 143:12,20
148:10,12,19,20
153:16,17 154:20
154:21,22,23
**questioned**  78:8
78:10,11

**questioning**  10:2
40:10
**questions**  7:25
8:10,11,14,20 9:4
9:20 10:5 17:7
22:5 26:16 35:15
35:16,17,18,19
36:16,18 38:1
44:16 46:20 48:23
70:7 73:11 88:24
94:21,24 102:12
102:17,20 103:15
103:25 104:1
119:11 121:9
135:21 143:19
145:19 148:11,13
148:22 153:11,14
155:11
**quibbling**  103:6
**quick**  85:24 88:25
112:23
**quickly**  142:16
156:1
**quit**  23:12 38:14
70:7
**quite**  155:6
**quote**  79:1,2
148:23,24

**r**

**r**  2:14 6:1 27:17,21
131:13 160:3,3
**race**  36:13
**racism**  130:1
**racist**  41:16,19
**racists**  41:17
**radical**  41:14,15
**rallies**  128:4,18
**rally**  39:18 41:4
125:4 126:5
127:19 128:3,6,22

**ran**  73:13 141:14
**randy**  3:21,21
151:2
**range**  54:19 71:11
**rapists**  129:14
**rat**  76:22,24 77:4
**rbc**  3:23
**rd**  18:19 20:19,19
20:23 22:3,7,12,18
22:21 23:6,7,9,17
23:20,22 24:22
26:2,5,20 27:5,14
27:16 28:11,13,23
29:17 30:4 31:22
33:12,18 34:19
35:20 37:11 42:14
42:15 44:17 46:12
50:3 51:12 63:12
64:16,22 65:8
66:10 67:19 69:1
70:13 75:5 78:4
78:12 79:14 86:7
108:3
**reach**  32:6 113:24
146:5,8
**reached**  65:15,16
93:13 94:17
110:24 113:21
146:5,10,10,14
**reaching**  111:6
146:14
**read**  6:11 84:17
108:18 153:15,17
154:22 158:2
161:6,8
**readily**  11:9
**reading**  14:15
150:15,19 156:18
156:20
**reagor**  2:19

**real**  112:23
**really**  59:3 76:13
94:18 98:6 127:6
**realtime**  5:7
159:20
**reason**  8:13 9:4
35:7 107:15
115:24 116:8
133:22 150:12
160:6,9,12,15,18
160:21
**reasonable**  156:5
**recall**  14:25 31:12
34:9 53:9 76:2,3
78:24 107:19,19
114:17
**receive**  13:6
112:13 134:20
**received**  80:14
83:1 109:24
114:19
**recess**  63:4 67:16
81:13 89:11 106:7
113:11
**recht**  2:10
**recklessness**  91:17
**reclaim**  43:14
**recognize**  82:3
**recognized**  112:6
**recollect**  112:18
**recollection**  28:7
66:23 72:12,17
106:19 150:23
**reconnect**  138:20
**record**  6:6,22 13:3
13:5,12 17:1
25:21 33:9,19
49:20 62:22 63:1
63:3,6 64:21,24
67:11,13,15,18
81:9,11,15,23

[record - response]

88:18 89:9,13
99:7 101:25
105:21 106:4,5,23
113:8,8,10,12,15
115:5 119:1
120:10 134:13
136:10 155:17
156:7 157:7,11
**recorded** 9:12
**recording** 8:3 9:9
9:10,11,14
**records** 33:11
96:15 100:9
**recover** 49:6 63:14
64:10,15 106:22
107:16 133:6
**recreate** 74:6
**recruit** 130:14
**recruiting** 122:13
123:4,10,23 124:1
130:12,13,20
**recruitment**
130:19,22
**redeeming** 152:23
**reduced** 135:25
137:7 159:11
**rees** 4:7
**refer** 85:14 119:15
**reference** 80:4,5
**referenced** 81:18
137:8 161:5
**referred** 38:16
39:8 80:8,9 108:8
124:4
**referring** 16:11
17:18 40:14,24
52:9 56:3 61:7
64:2 68:10 76:25
80:1 82:19 92:4
118:3 122:14,22
123:5 124:14

138:7
**reflect** 17:10
**reflected** 14:4
15:25 16:15
138:13
**reflecting** 17:5
136:3
**refusing** 12:6
44:19 86:18
**regard** 39:10
40:10
**regarding** 10:25
83:1 138:11,11
151:14
**registered** 5:6
159:4,20
**regular** 31:20
**reinvent** 85:13
**relate** 83:5 84:7
**related** 19:8 49:1
49:11,24 51:20
52:4 53:15 62:13
67:7 69:2 72:4
73:16 88:9 92:17
98:12 102:12
124:16 125:3
126:18 129:7
130:18 131:20
137:11,13 138:24
138:25 141:11
144:22 145:3
149:23 150:1
152:20 159:13
**relates** 12:13 86:2
124:3 133:2
144:13 154:10
**relating** 70:18
74:14 152:24
**relation** 62:9,17
**relationship** 47:4
48:6

**relationships**
147:11
**release** 90:7
**relevance** 37:19
38:9,25 39:21
69:12 136:4
140:21 142:25
**relevant** 8:6,8,18
8:25 10:2 34:17
35:24 38:11,14,18
40:11,19,20 64:9
69:19 70:5 102:20
103:10,16 141:7
143:3
**reluctant** 116:6
**remember** 31:12
45:19 72:25 76:21
78:1 98:13 100:12
100:13,19 118:18
123:9 131:16
151:21
**remote** 34:22
**remotely** 5:4 6:15
**removed** 63:19
**removes** 64:19
**repeat** 11:2 16:24
25:19 69:13 84:14
85:12 110:16
116:2 148:20
154:20
**repeated** 16:21
**repeating** 84:12
**rephrase** 9:5
**replaced** 63:17
64:6 96:11
**replied** 64:6
**report** 136:1,3
147:14,17
**reporter** 5:6,7
6:10,12 16:19
18:13 25:17 28:2

45:3,7 65:22 66:2
67:9 73:18 81:3
112:24 120:2,5,12
120:14 128:12,15
134:15 138:2
140:7 141:4 144:6
148:1,16 153:15
154:15 155:19,24
156:2,11,14,21
157:1,6 159:5,20
159:20
**reporter's** 159:1
**reporting** 6:15,20
**repost** 99:13,15,21
**reposted** 99:18
100:24
**represent** 6:6
**republic** 2:18 85:3
**request** 63:22 64:7
83:7 156:4
**requirement** 65:7
**reread** 154:21
**research** 17:8
49:18,20 53:25
54:1,2,7,8 58:14
60:23 68:17 73:12
111:9,16,20,20
112:6 124:25
129:18 131:8
148:25 149:6,24
151:14,18,25
153:25
**researching** 65:17
**respect** 15:22 34:5
60:3,5 61:16
**respond** 31:9 32:1
90:2
**responding** 43:16
**response** 8:16
43:13,18,20 44:21
57:13 148:12,22

Veritext Legal Solutions
800-336-4000

[responses - see]

**responses** 22:5
**responsible**
  135:15
**responsive** 55:5
**rest** 96:5,7,12
  100:14
**restate** 100:25
**restroom** 85:25
  89:1,8 90:1
**result** 7:10 12:2
  29:6 66:19 77:9
  108:18 159:15
**results** 49:21
  139:18
**retribution** 21:22
  21:23 116:11
**return** 31:8
  161:12
**revalidated**
  149:22
**reveal** 109:8,9
  116:10
**review** 16:9 96:15
**reviewed** 10:16
  128:7 134:24
**revolution** 59:25
  129:3
**rhetoric** 51:22
  123:11
**richard** 27:19
**rick** 27:20
**rigging** 139:17
**right** 9:24 12:18
  12:21 13:8,13,21
  14:7,11 15:22
  16:8 20:18 26:1
  33:16 34:24 39:14
  46:11 48:11 49:25
  50:2 51:5,25
  52:21 56:1,16
  62:19 63:7 64:13

66:1,9,19,20,25
68:1,18,22 71:16
72:6,7 73:22 75:2
76:1,8,18 81:16
82:11 83:16 85:19
86:4 87:18,22
89:1,8 90:9,10,15
90:17 92:11,20,21
95:10,12 97:24
104:22 107:4
108:1,22 109:3
112:8,10,13 113:7
113:14 115:4,21
118:11,16 119:12
119:16 120:15,24
121:2,7 122:25
123:8,24 124:3,7
124:12 125:14,19
128:1 129:3 130:9
130:11 133:9,11
133:15 134:10
135:20,22 138:22
140:18 151:10
152:17
**rights** 73:16
**rigorous** 142:1
**ringing** 116:1
  138:1
**rion** 1:12 4:10,15
  4:20 13:7
**ripplinger** 4:3
**rklawpc.com** 2:12
**road** 3:22 35:24
**rock** 25:11 32:21
**roger** 27:20
**rogers** 2:9
**role** 150:4
**ron** 53:6
**room** 6:14
**rough** 155:25
  156:25

**round** 106:12
**royal** 68:9
**rudolph** 1:10
**rules** 5:2 161:14
**run** 129:11 154:24
**running** 10:5
  153:10 154:4,7
**rup** 142:4
**ryan** 109:14

**s**

**s** 5:6 6:1 159:4,19
  160:3
**safeguarded** 88:14
**safest** 121:20
**sake** 116:25
**salida** 2:5 91:24
  92:17 94:16,17
  95:10 100:1
**sam** 16:2 17:17,20
  18:4,7
**sane** 91:13
**saw** 15:12 106:20
**saying** 31:11 50:10
  51:11 53:10 55:5
  62:8,10 89:3 91:3
  99:17 100:13
  101:25 123:9
  124:8 130:13
  134:7,17,19,20,21
**says** 82:14 83:11
  95:25 120:19
  150:16 156:15
**scared** 26:21
  46:18 47:3
**scenario** 69:8
  72:16
**schedule** 74:7,19
**scheduling** 69:4
**schematic** 137:8
**school** 37:16 78:2

**science** 144:19
**scope** 103:16
  153:8 154:5
**scores** 141:7
**scott** 4:21
**scotty** 156:15
**scoured** 63:21
**screen** 7:19 80:15
  80:22,24 81:19
  93:15,17,18,20
  97:1
**screenshot** 72:3,6
  84:23 99:25
**screenshots** 85:15
  85:16,20,21 86:8
  86:10 108:7
  109:24 112:10
  115:8
**scroll** 15:5,6
**scytl** 133:7,7
**sean** 50:17,18
**search** 72:4
  113:15
**searching** 20:13
**seating** 9:11
**second** 12:25
  20:10 68:19 79:7
  81:7 85:1 98:25
  122:18,24
**section** 98:10
**secure** 142:13
  144:1
**secured** 142:7
**security** 63:18
  97:21 135:10
  140:20,24 141:20
  141:21 142:24
  144:13
**see** 15:20,24 20:10
  20:13,16 25:15,21
  33:18 49:3 61:3

Page 25

[see - somebody]

64:20 73:3 80:14
80:20,21,23,25
81:2,6,6,7 93:11
93:15,19 94:12,13
95:21,21 96:9
97:1 104:15,19
105:2,3 106:22
109:11 110:24
111:7 112:2
121:19 132:1
136:20 142:22
**seeing** 13:18
**seek** 87:3
**seen** 71:11 82:7,12
93:12 100:6
106:21 127:5,15
127:17,21 128:5
133:21,24 134:3,7
134:18
**seerveld** 2:19
**segue** 52:5
**self** 130:4
**send** 94:9,9,11,15
95:19 96:8,17
97:8,20 150:24
**sense** 50:3 149:17
**sensor** 107:1
**sent** 93:8 94:2,6,12
94:25 95:11,25
96:13 97:7 98:24
110:20 112:17
114:15 134:1,13
134:18 150:17,22
151:1
**sentence** 96:3
122:15
**separately** 9:15
**separation** 112:3
**september** 1:17
5:5 6:4 30:5,22
32:4,5 48:15

71:15,21 72:3,7,14
74:3,4 111:12
119:16 120:8,17
120:18,20 127:25
149:8 159:17
161:2
**sequoia** 143:24
**series** 132:8,9
**seriously** 105:19
**served** 12:11
**service** 144:4
**services** 144:4,11
**session** 41:23
**set** 29:12 30:1
74:25 143:15
159:10
**settings** 102:4
**setup** 93:20
**sexually** 152:8
**share** 13:10 80:15
81:19 93:16 95:24
97:11 100:14
**sharing** 93:18 97:1
**sheer** 121:21
**sheet** 161:10
**sheets** 32:24 33:3
33:17
**shit** 100:13 101:1
**shitbag** 100:15,16
107:21
**shook** 30:15,17,21
**shooting** 124:20
**shop** 46:19
**shorthand** 159:10
**shot** 90:2
**show** 45:9,11 46:1
96:12,24 99:7
104:20 107:12,13
107:14 114:22
115:2 130:22
131:14 132:13

134:8 145:12
**showed** 25:9 32:3
45:17,25 155:8
**showing** 46:6
**shows** 92:2 96:3
**shuffling** 1:10 3:7
3:11 143:18
**side** 16:23 21:24
34:24 35:3 64:8,8
95:8
**sidney** 1:9,9 3:2,2
85:3 118:20
133:10 134:1
150:17,22 151:2
151:10,12
**sign** 32:23 33:2,17
94:3 96:1 118:17
119:9 161:6,11
**signal** 28:9,10,13
28:23 29:1,6,12
31:3,4,23 63:9,12
64:12 65:1,6
94:17 112:15,15
112:17,21 114:6
114:10,11,13,16
**signature** 159:19
**signed** 44:8 117:22
118:10 119:4,20
161:17
**significance** 21:2
147:5 149:17
**significant** 150:3
**signing** 156:18,20
**silence** 43:21
153:6
**similar** 70:17
**simple** 144:23
**single** 58:8 94:23
**sir** 8:9 22:22 23:24
24:15 25:17 42:9
43:22 44:6 55:18

61:24 67:9 87:14
95:23 101:12
118:15 120:6
122:5,23 123:21
127:14 141:4,19
**sisa** 121:18
**sit** 34:22 54:10
58:7 73:22 85:8
96:18 102:21
103:14 114:5,18
114:24 115:3
**site** 155:4,5
**sitted** 9:10
**sitting** 34:12,15,19
35:8,21 43:15
**six** 25:2 28:4
**skarnulis** 2:3,4,7
**skinhead** 129:22
130:6 149:25
152:2
**skinheads** 91:7
129:24,25
**slandering** 59:5
**slanted** 55:13
**slow** 141:5
**small** 73:17,18,20
137:23 138:17,18
**smoking** 61:1,2
**sms** 5:18
**social** 11:25 39:16
57:10 102:2
111:21 139:5
149:23
**socialist** 77:21
**society** 41:17
**solutions** 143:18
161:19
**somebody** 15:10
39:23 64:19 80:8
80:9 93:10 97:11
99:13 109:6,7

[somebody - sure]

110:20 114:2
**somewhat** 51:21
**soon** 156:2
**sorry** 11:23 16:19
18:13 25:17,18
28:2 36:10 42:2
52:23 65:22 67:9
73:18 79:4,5
97:15 105:6
112:24 115:25
120:2 130:24
136:13 140:7
141:4,4 144:6
148:16 150:11
154:15,19
**sort** 87:25 115:5
121:10,20 156:4
**sounded** 53:13
**sounds** 20:18
**south** 3:22
**speak** 53:8 86:21
122:1 127:21
**speaker** 126:5
128:3
**speaking** 10:9
36:17 69:23
122:10 125:4
128:6 136:12
142:16 148:1
**speaks** 152:4,4
**special** 129:25
**specific** 69:20
71:12 74:7 125:22
125:23 129:17
135:22 150:23
**specifically** 17:9
17:13 19:16 64:19
65:14 71:17 87:23
88:15 91:2 93:4
111:1 123:10,25
125:12 126:7

130:13 132:6
152:7
**speculate** 44:23
45:2,6 74:2 78:22
117:16
**speculating** 90:18
90:20
**speculation** 82:23
**spend** 131:10
**spent** 76:18
117:18 125:17
155:6
**spoke** 24:25 83:13
120:12 134:15
152:3
**spoken** 84:1
**spotlight** 81:6
**spread** 56:18
**springs** 14:14
19:17 50:17 53:12
**st** 3:18
**stabbing** 21:10
124:20
**stack** 142:12
**stall** 113:4
**stamp** 14:6,7,9
**stand** 20:20 22:13
40:2 41:15 102:21
104:10 107:23,25
**standard** 29:12
30:1
**standing** 77:25
101:4 154:13
**standpoint** 130:21
139:16 142:9
**stands** 22:14 27:17
27:21,22,24
131:23
**stare** 103:15
**start** 10:4 40:17
150:20

**started** 17:8 30:13
33:1 52:3 75:12
108:17 111:6,9,16
111:20,20,25
149:23
**starting** 102:15
105:9 150:19
**starts** 14:11
**state** 1:1 5:8 6:6
7:7 124:18 158:3
159:5
**statement** 29:10
32:11 66:17 120:6
136:17,20,25
**statements** 82:13
138:25
**states** 21:20
144:12
**stating** 6:21
**stationary** 132:12
**stay** 129:16
**staying** 130:17
**steal** 100:17
**stephen** 4:16
**stephen.dexter**
4:19
**steps** 110:10
**steve** 2:3
**stick** 30:15
**stipulated** 87:6,11
90:12 116:15
**stipulation** 87:9
**stolen** 135:4,19
**stop** 9:5 90:14,14
105:17,18,18
**storey** 51:9
**story** 122:2
**stout** 2:10
**strategy** 135:10
**stream** 5:17

**street** 1:3 2:10,15
4:7,12,17
**strictly** 59:1
**strike** 62:12 110:6
**strong** 130:3
**student** 152:15
**stuff** 91:11 99:23
100:10 102:19
107:3 117:20
119:22 124:5
132:6 149:15
152:24
**stupid** 102:1
**subject** 109:10,11
116:10 117:2
**subjective** 102:18
**subpoena** 49:10
**subscribed** 158:13
**subsequent** 53:17
56:15 74:16 155:7
**subsequently** 16:3
55:7
**substance** 89:18
**suggest** 10:4
151:22 153:13
**suggestion** 136:22
**suite** 2:10,15,20
3:4,22 4:3,7,17
**sullivan** 4:22
**summarize** 66:8
151:16
**summer** 48:13
128:8
**support** 139:10
**supposed** 142:15
**supposedly** 101:8
**sure** 9:6 21:1
39:23 45:1 46:19
49:23 53:14 55:8
58:10 63:24 67:12
87:14 98:15,17

Veritext Legal Solutions
800-336-4000

**[sure - think]**

100:5 101:3 106:3
107:7 114:8,21
130:22 136:9,10
138:24 140:4
144:24
**surprised**  32:17
**surround**  97:17
**surveil**  93:9 94:7
**surveillance**  92:21
93:5,7
**susan**  129:23
**suspect**  105:23
**suspected**  53:7
**swear**  6:11
**swore**  85:8 123:21
**sworn**  7:3 85:4
107:18 136:17,19
136:25 158:5,13
159:8
**system**  126:25
135:12 136:8
137:11,17,19,24
141:2,6,9,23
142:12,14 143:25
144:2,22 145:4,7,8
145:11
**systems**  100:17
126:20 133:3,4
135:10 138:16
142:7,8 144:13
147:11 150:6

**t**

**t**  144:9 160:3,3
**take**  33:10 41:6
48:2 51:19 58:12
62:20,24 66:7
76:7 85:24 86:2
88:17 104:11
105:14,18 112:23
115:22 116:22
138:19 142:11

156:20,24
**taken**  5:4 13:22
101:20,23 149:5
159:10
**talk**  9:1 13:15
38:20 42:4,4,5,7
57:7 66:6 67:6
96:15 108:1
117:17 123:17,25
131:13,24 142:4
**talked**  53:14 67:3
67:7 96:22 108:2
108:4 123:23
125:10,12 133:9
152:7
**talking**  40:22
53:11 77:1,18
81:17 93:4 110:2
117:19 122:10
123:2,14 124:3
125:11 128:1
130:11,17 136:18
137:3 138:8
141:15 142:2,3
148:18 152:21
153:14
**tall**  36:12
**target**  149:9
**targeted**  21:7
**tay**  77:15,18 78:13
**tblf**  3:19
**team**  82:15 83:2
84:20 104:13
**tech**  64:12 106:25
137:5
**technical**  81:17
139:16
**technology**  29:15
64:18 142:13
144:23 145:16

**tell**  19:5 20:11
33:13 42:12 57:16
59:15 78:4 96:12
97:10 100:10
109:19,21,22
110:12,22,23
115:13 123:8
155:22
**telling**  32:17 44:18
56:16 96:23 98:4
**tendency**  98:6
**terms**  29:5 60:19
64:12 77:2 106:18
109:3 119:10
121:10 124:1
125:15 139:12
151:18
**terrorizing**  124:19
**testified**  7:4 32:20
47:13 69:25 95:25
103:21 108:12
135:20,21 137:3
139:12,18 140:12
150:16,21 151:13
**testify**  10:25 11:3
56:5 69:10 135:1
159:8
**testimony**  6:17
7:10 9:23,24 27:5
28:6 29:7 55:24
71:22 72:10 73:23
84:13 85:4,7,9,16
107:18 108:9
115:8 117:7 129:5
133:10 140:3
148:11 150:13
158:3,5 161:8
**tests**  142:1
**text**  31:5,20 94:2,4
94:9 95:19,21,23
96:3,8,10,10,12,17

96:21
**texts**  94:4
**tgp**  1:11 3:16,20
**thank**  60:2 89:6
118:6 120:14
150:9 154:14
155:11 156:13
157:5
**thanks**  130:6
143:11
**thehalllawoffice...**
3:10
**theirs**  84:13
**themself**  153:20
**theory**  144:25
145:1
**thing**  47:25 50:9
58:23 72:2 83:9
97:12 112:16
114:1 121:10
**things**  8:1 32:13
46:21 50:9 51:14
58:20 68:7 76:23
85:14 91:9,12,14
97:22 102:20
104:7 121:12
123:22 124:17
135:16 137:16
144:1,5,8,15,17
150:1 151:16
152:1,9,13,18,20
156:6
**think**  13:9 14:21
21:3 26:23 30:19
31:3,4,6 32:4,10
33:1 38:13 39:22
40:5 46:2,3,22
47:10 48:24 49:22
50:13 52:19 53:23
53:23 56:13 61:1
61:4 64:7 75:13

[think - twitter]

| | | | |
|---|---|---|---|
| 75:24 76:5 77:4 | 33:3 34:3,9,10 | 26:25 30:15 33:20 | **trends** 131:14 |
| 77:20,20,21 80:5 | 37:9 38:11 43:2 | 34:3,8,16 35:22 | **trey** 2:9,12 |
| 80:18 81:5 85:2 | 43:14 48:13,14,16 | 45:2 57:23 62:16 | **trial** 35:9 |
| 88:2,11 90:22 | 49:4 50:12 58:17 | 83:22 89:22 91:23 | **triangulate** 73:6 |
| 92:1 100:2 106:16 | 58:23 61:1 63:2,6 | 104:12 111:14 | **tried** 21:7,8 73:5 |
| 108:22 111:2 | 63:22 67:14,18 | 116:13 117:1 | 81:19 148:24 |
| 115:2,4,11,18 | 69:3 73:13,14,15 | **tomorrow** 25:24 | **trouble** 65:23 |
| 116:9 117:8 | 75:15 76:18 81:9 | 33:15 143:15,18 | 154:18 |
| 119:18,25 121:4 | 81:12,15 82:10,10 | **ton** 123:11 | **true** 13:23 20:2,3 |
| 121:11 125:8 | 89:10,14 90:1 | **tongue** 98:2,3 | 29:19,23 44:2 |
| 129:3 130:15 | 91:12 96:7 103:13 | **top** 79:6 98:10 | 58:9 66:11,12 |
| 132:21 135:16 | 103:21 105:21 | **topic** 89:4 105:13 | 74:7 81:21 85:9,9 |
| 138:7 145:15 | 106:6,9 113:2,4,10 | 135:22 137:21 | 101:21 102:21 |
| **thinking** 80:13 | 113:13,20 115:4 | **topics** 76:15 | 113:17,18 119:17 |
| 140:18 | 115:10 116:20 | 106:13 | 120:18 132:25 |
| **thomas** 2:9 | 117:7 121:12 | **total** 78:21 157:10 | 135:8 145:4 |
| **thought** 47:20 | 123:14 125:15,16 | **totally** 57:11 | 159:12 |
| 50:4 52:4,14,20 | 126:22 127:14 | **touch** 19:20,23 | **truly** 47:20 |
| 53:13 130:25 | 128:13,15 130:5 | 25:7 28:8 66:10 | **trump** 1:9 2:13 |
| 148:14 149:3,9 | 131:7,11 132:8,9 | 77:8 | 138:24 139:2 |
| **thousand** 44:7 | 135:25 137:1 | **trace** 114:18 | 157:3 160:1 161:3 |
| **thread** 96:3 | 139:25 141:24,24 | **training** 79:2,19 | **trust** 22:9 |
| **threaten** 147:20 | 141:25 143:8 | **transcript** 133:21 | **truth** 22:8,9 44:12 |
| **threatened** 44:9 | 149:8,14 154:1,18 | 133:24,24,25 | 98:4 159:8 |
| 97:17 147:1 | 155:6,17 157:10 | 134:7,9,13,25 | **try** 19:23,24 31:14 |
| **threats** 141:16,17 | 159:10 161:15 | 140:6 150:13,16 | 54:2 63:14,14 |
| **three** 13:25 23:14 | **timeframe** 161:7 | 155:20 157:3 | 73:8 106:21 |
| 34:22 35:16 | **timeline** 108:12 | 158:3 159:12 | **trying** 20:9 32:6 |
| 105:24 143:9,10 | **times** 23:14 26:11 | 161:5,16 | 41:1 46:22 65:10 |
| 145:21 | 32:1 35:5 48:16 | **transferred** 133:6 | 65:11,13 66:6 |
| **throw** 102:19 | 64:11 107:22 | **translates** 133:8 | 69:14,16,18,19 |
| **throwing** 124:21 | 116:13 129:23 | **transmission** | 111:17 114:1 |
| 125:4 | 133:8 153:21,22 | 115:2 | 127:11 153:19 |
| **tie** 49:8 126:15 | **today** 10:25 11:3 | **transmittal** 114:7 | **tubbs** 5:6 45:1 |
| **tied** 126:22 153:14 | 54:10 73:23 85:8 | 114:9 | 159:4,19 |
| **ties** 130:3 | 105:25 107:15 | **transmitted** | **turnaround** |
| **tight** 74:19 | 113:20 114:5 | 112:14 114:24 | 156:16,19 |
| **time** 6:4 10:5,9 | 155:14 156:9 | **transparency** | **turned** 127:2 |
| 13:12 20:15 22:4 | **today's** 6:3 | 142:14 | **twice** 21:13 122:24 |
| 24:25 26:15 28:5 | **told** 18:6,9,15 20:1 | **treats** 152:20 | **twitter** 60:12,15 |
| 30:18,19 32:5,17 | 20:7 23:17 26:24 | | 60:16,20 61:11,18 |

Veritext Legal Solutions
800-336-4000

**[twitter - want]**

111:22
**two**   13:25 21:6,6
60:3,22 66:25
75:11 77:15 80:19
92:3 99:16,19
120:24 141:24
152:2
**tx**   161:13
**tx4792290**   158:25
**type**   70:21 100:20
149:21,21
**typed**   100:7
**typewritten**
159:11
**typical**   46:21
**typically**   41:17
**typing**   100:19

**u**

**un**   58:24
**unbelievable**
36:14
**uncover**   17:12
43:23 55:10 65:18
66:16 111:21
146:23,24 151:25
**uncovered**   55:12
66:20 155:8
**uncovering**   70:18
128:17
**underneath**   60:15
**understand**   7:9
9:3,4,6,13,21
11:20,21 12:23
16:20 21:1 25:18
27:5 29:16 35:10
47:1 49:2 63:24
67:10 68:16 75:2
76:25 81:20 86:16
86:16 87:15,19
88:12,12,22 91:18
94:5 99:20 107:7

110:12 112:25
114:8,21 115:7
116:17 136:6
137:9 140:8 144:4
149:11,16 154:3
**understanding**
65:23 100:3
153:10
**understood**   59:22
62:11 75:19
118:21 139:15
**underwhelmed**
51:21
**unfortunately**
11:14
**united**   1:10 3:6,11
50:14 73:15
143:18 144:12
**unrest**   48:16
**unusual**   156:4
**unwilling**   103:23
**urinating**   152:8
**use**   1:4 29:6 49:14
56:19,20 61:4
65:5,5 85:24
88:25 89:7 102:2
122:9 130:20
133:14
**uses**   24:2,7 131:22

**v**

**v**   15:3 160:1 161:3
**validate**   47:9
53:24 111:4 139:6
144:24 145:5,6,12
**validated**   139:4,5
**validating**   114:3
**vanilla**   47:6
**various**   71:11
111:7
**vedder**   4:12

**vedderprice.com**
4:14,14
**verbally**   6:17
**verified**   27:12
**verify**   53:3 62:18
149:18 161:8
**veritas**   21:15
**veritext**   13:12
161:12,19
**veritext.com.**
161:13
**versus**   103:7
**vet**   147:13
**video**   1:16 5:2 6:4
74:24,25 75:2,3
101:15 103:4,11
105:2,3,5,7 127:17
155:18
**video'ing**   75:1
**videoconferenced**
1:16 2:1 3:1 4:1
5:3
**videographer**   6:2
6:10 62:23 63:1,5
67:13,17 81:11,14
89:9,12 106:5,8
113:9,12 143:9
155:16
**videos**   126:10
128:5,8,18
**view**   13:11 117:2
129:7
**village**   2:20 4:4
**visit**   90:1
**vitriol**   98:6
**voice**   120:6 126:11
**volume**   121:21
**volunteered**   93:10
95:12
**volunteers**   94:8

**vote**   138:20
**votes**   133:6 138:19
142:12,13 145:13
**voting**   100:16
126:20,25 132:7,8
132:9 133:3,4
135:10 137:24
138:16 150:6
**vs**   1:8
**vulgar**   152:3
**vulgarity**   152:4
**vulgarness**   123:18
**vulnerabilities**
133:3 135:18
138:16

**w**

**waive**   6:19
**waived**   69:24
**walk**   30:20,23
47:4 52:3 110:10
110:14,18 125:19
125:20 130:21
**walked**   30:10 32:5
126:10
**walking**   133:5
**walks**   138:15
**want**   9:23 13:12
21:20 22:4 32:11
35:7,8,12,13,18
36:20 37:8 38:22
40:12 42:9 44:10
44:13,23 45:1
47:3 57:4,16,24
60:25 63:8 70:1
73:7 81:8 85:12
85:12 87:14 88:4
88:8,20,20 89:17
96:7 100:25
102:10,12,19
105:19 108:4
112:23 114:22

[want - zoom]

123:8 125:24
127:12 131:10
136:10 137:25
151:22 153:6
155:22 156:3
**wanted** 19:20 32:9
32:10 36:19,21
42:7 47:19 65:8
82:13 100:23
111:4 130:14
**wanting** 80:6
**wants** 24:12 35:3
**washington** 21:9
133:1
**waste** 13:12 81:9
103:21
**wasted** 105:22
**wasting** 37:9
127:14
**watching** 100:18
**water** 85:25
124:21
**way** 21:4 27:19
34:23 36:1 44:4,7
60:17 82:4 91:6
97:22 114:18
132:8,9 134:22
140:18 144:18
152:2
**ways** 70:21 138:17
**we've** 21:6 60:22
66:14 67:20 68:20
76:6,6 90:11
105:21,22 108:4
117:18 125:10
150:2
**wearing** 128:9
**web** 21:18 147:19
**week** 31:14 32:5
71:21 119:16,17
120:7,17,19,20

**weeks** 21:6 135:24
**welcome** 13:10
**went** 18:7 35:24
37:16 47:25 48:14
49:17 63:20 89:21
97:22 99:6 100:8
106:21 107:15
122:19 149:22
151:8,25
**whispering** 45:4,8
**white** 37:12 41:17
42:13
**whoa** 120:2,2,3
**wife** 91:11 98:7
152:7,11
**wild** 54:23 55:25
**william** 60:13,15
60:23 61:8,10,17
62:8
**willing** 101:8
110:25 115:16
117:6
**wilshire** 4:22
**win** 39:23 138:25
139:1,3
**wipe** 57:11
**witness** 6:11,17
16:20 161:5,7,9,11
161:15
**woman** 80:1
**wondering** 136:16
**word** 46:18 114:25
122:9 123:19,20
144:7
**words** 29:23 36:24
58:21 74:16 82:25
94:19 97:24 104:5
104:25 116:5
124:13 133:14
151:21

**work** 138:10 156:6
**worked** 21:15
136:7 143:23,24
152:21
**working** 142:23
145:17 147:12,12
**works** 42:18,19
99:21 137:12
**worth** 81:1
**wrecking** 91:10
**wright** 4:22
**write** 53:5 66:6
77:17 91:12 142:5
**writes** 55:13
**writing** 32:13
51:14 58:19 60:1
91:11 124:5 137:8
153:18
**writings** 91:5,13
91:14 153:19
**written** 5:1 33:6
50:11,13,14 61:13
98:9,10,17 129:23
136:1 137:17
**wrong** 13:22 46:17
46:23
**wrote** 52:17 53:4,5
53:15 79:9 91:15
101:3 104:25
119:18 122:8
146:25 152:7
**wynkoop** 4:17

**y**

**yahoo.com** 3:14
161:1
**yan** 18:18,20,23
18:25,25 19:13,13
19:15,15,21,21
20:1,1,14,14 75:23
75:23

**yeah** 40:12 50:20
50:23,25 62:21,24
67:23 69:14 75:25
76:22 77:6 83:21
85:23 97:4,6 98:8
100:5 101:1,20
105:20 112:15
115:3,11,18 116:3
120:1 129:5
131:15,17 136:12
140:11 143:13
151:7,24 156:18
156:19
**year** 58:5,7 60:14
72:18 83:14 85:5
141:25
**yep** 119:13 135:23
**yesterday** 80:18
**york** 21:16 129:23
133:8
**young** 141:24
**youtube** 100:10

**z**

**zach** 2:4
**zbowman** 2:8
**zoom** 7:22 10:4
15:18,18,24 49:3
49:13 51:17 68:22
71:12 74:23 78:5

Veritext Legal Solutions
800-336-4000

Colorado Rules of Civil Procedure

Chapter 4, Disclosure and Discovery

Rule 30

(e) Review by Witness; Changes; Signing. If
requested by the deponent or a party before
completion of the deposition, the deponent shall be
notified by the officer that the transcript or
recording is available. Within 35 days of receipt
of such notification the deponent shall review the
transcript or recording and, if the deponent makes
changes in the form or substance of the deposition,
shall sign a statement reciting such changes and
the deponent's reasons for making them and send
such statement to the officer. The officer shall
indicate in the certificate prescribed by
subsection (f)(1) of this rule whether any review
was requested and, if so, shall append any changes
made by the deponent.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF
CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.