IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| US DOMINION, INC., *et al.*, | | |
| Plaintiffs, | | No. 1:21-cv-02130-CJN |
| v. | | |
| HERRING NETWORKS, INC., *et al.*, | | Judge Carl J. Nichols |
| Defendants. | | |

# <u>**EXHIBIT F**</u>

DATE FILED: October 4, 2021 9:00 AM
FILING ID: 6A78E5F1E0F74
CASE NUMBER: 2020CV34319

# Exhibit A

1

```
DISTRICT COURT, CITY AND COUNTY OF )
DENVER, COLORADO                   )
STATE OF COLORADO                  )
Court Address:                     )
1437 Bannock Street                )
Denver, Colorado  80202            )
_____ )
                                   )
Case No.: 2020CV34319              )
Div./Ctrm.: 409                    )
_____ )
                                   )
Plaintiff:  Eric Coomer, Ph.D.,    )
                                   )
vs.                                )
                                   )
Defendants:  Donald J. Trump for   )
President, Inc.; Sidney Powell;    )
Sidney Powell, P.C.; Defending the )
Republic, Inc.; Rudolph Giuliani;  )
Joseph Oltmann; FEC United;        )
Shuffling Madness Media, Inc., dba )
Conservative Daily; James Hoft; TGP)
Communications, LLC, dba The       )
Gateway Pundit; Michelle Malkin;   )
Eric Metaxas; Chanel Rion; Herring )
Networks, Inc., dba One America    )
News Network; and Newsmax Media,   )
Inc.                               )
_____ )
                                   )
Attorney for Defendants Sidney     )
Powell and Sidney Powell, P.C.     )
Barry K. Arrington                 )
Arrington Law Firm                 )
3801 East Florida Avenue, Suite 830)
Denver, Colorado 80210             )
(303) 205-7870                     )
                                   )
Shaun Pearman                      )
The Pearman Law Firm, P.C.         )
4195 Wadsworth Boulevard           )
Wheat Ridge, Colorado 80033        )
(303) 991-7601                     )
```

_____

VIDEOCONFERENCE OF ERIC COOMER

September 23, 2021

_____

Electronically signed by Jana Mackelprang (001-409-517-3774)                    b80d65b6-8bbf-4bf1-8099-35b26e79cf21

1            The above-entitled videoconference (Zoom)
   deposition was taken on behalf of the Defendants Sidney
2  Powell and Sidney Powell, P.C., on September 23, 2021,
   at 11:33 a.m., before Jana Mackelprang, Certified
3  Realtime Reporter, Registered Professional Reporter,
   and Notary Public.

4

5  VIDEOCONFERENCE APPEARANCES:
   For the Plaintiff:
6            Charles J. Cain, Esq.
             Brad Kloewer, Esq.
7            Steve Skarnulis, Esq.
             Zach Bowman, Esq.
8            Cain & Skarnulis PLLC
             P.O. Box 1064
9            Salida, Colorado 81201
             (719) 530-3011
10           ccain@cstrial.com
             skarnulis@cstrial.com
11           zbowman@cstrial.com

12           Thomas M. Rogers, III (Trey), Esq.
             Recht Kornfield PC
13           1600 Stout Street, Suite 1400
             Denver, Colorado 80202
14           (303) 573-1900
             trey@rklawpc.com

15
   For the Defendant Donald J. Trump For President, Inc.:
16           Eric R. Holway, Esq.
             Nicole Grimmesey, Esq.
17           Jackson Kelly PLLC
             1099 18th Street, Suite 2150
18           Denver, Colorado 80202
             (303) 390-0016
19           eric.holway@jacksonkelly.com
             nicole.grimmesey@jacksonkelly.com

20
   For the Defendant Defending the Republic, Inc.:
21           Michael W. Reagor, Esq.
             Christopher P. Seerveld, Esq.
22           Dymond Reagor, PLLC
             8400 East Prentice Avenue, Suite 1040
23           Greenwood Village, Colorado 80111
             (303) 734-3400
24           mreagor@drc-law.com
             cseerveld@drc-law.com

25

Electronically signed by Jana Mackelprang (001-409-517-3774)                    b80d65b6-8bbf-4bf1-8099-35b26e79cf21

```
 1    VIDEOCONFERENCE APPEARANCES (Continued):

 2    For the Defendants Sidney Powell and Sidney Powell,
      P.C.:
 3              Barry K. Arrington, Esq.
                Arrington Law Firm
 4              3801 East Florida Avenue, Suite 830
                Denver, Colorado 80210
 5              (303) 205-7870
                barry@arringtonpc.com
 6
                Shaun Pearman, Esq.
 7              The Pearman Law Firm, P.C.
                4195 Wadsworth Boulevard
 8              Wheat Ridge, Colorado 80033
                (303) 991-7600
 9              shaun@pearmanlawfirm.com

10    For the Defendants Oltmann, Shuffling Madness Media,
      and FEC United:
11              Andrea M. Hall, Esq.
                P.O. Box 2251
12              Loveland, Colorado 80539
                (970) 419-8234
13              andrea@thehalllawoffice.com

14              Ingrid DeFranco, Esq.
                Law Office of Ingrid J. DeFranco
15              P.O. Box 128
                Brighton, CO, 80601-0128
16
      For the Defendants James Hoft and TGP Communications,
17    LLC, d/b/a The Gateway Pundit:
                Jonathan Burns, Esq.
18              The Burns Law Firm
                P.O. Box 191250
19              St. Louis, Missouri 63119

20    For the Defendant Michelle Malkin:
                Gordon Queenan, Esq.
21              Patterson & Ripplinger, PC
                5613 DTC Parkway, Suite 400
22              Greenwood Village, Colorado 80111
                (303) 741-4539
23              gqueenan@prpclegal.com

24

25
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    b80d65b6-8bbf-4bf1-8099-35b26e79cf21

4

```
1    VIDEOCONFERENCE APPEARANCES (Continued):

2    For the Defendant Eric Metaxas:
             Margaret Boehmer, Esq.
3            Gordon & Rees
             555 17th Street, Suite 3400
4            Denver, Colorado 80202
             (303) 534-5160
5            mboehmer@grsm.com

6    For the Defendants Chanel Rion and One America News
     Network:
7            Blaine Kimrey, Esq.
             Bryan Clark, Esq.
8            Vedder Price
             222 North LaSalle Street
9            Chicago, Illinois 60601
             (312) 609-7865
10           bkimrey@vedderprice.com
             bclark@vedderpice.com

11
             Stephen Dexter, Esq.
12           Lathrop GPM LLP
             1515 Wynkoop Street, Suite 600
13           Denver, Colorado 80202
             (720) 931-3200
14           stephen.dexter@lathropgpm.com

15           Eric Early, Esq.
             Jeremy Gray, Esq.
16           Early Sullivan Wright Gizer & McRae LLP
             6420 Wilshire Boulevard, 17th Floor
17           Los Angeles, California 90048
             eearly@earlysullian.com
18           jgray@earlysullivan.com

19   Also Present:
             Joseph Oltmann
20           Sidney Powell
             Charles Herring
21           Robert Herring
             Abbie Frye, Esq.

22

23

24

25
```

Calderwood-Mackelprang, Inc.  303.477.3500

5

EXAMINATION INDEX

By Mr. Arrington                                    Page 7

By Ms. Hall                                         Page 107




EXHIBIT INDEX
FOR IDENTIFICATION                                 INITIAL
                                                   REFERENCE

Exhibit P18 - "He Was the 'Perfect Villain'           10
    for Voting Conspiracists"

Exhibit P19 - Denver Post "Guest Commentary"          43

Exhibit P21 - "On Edge:  There's a $1,000,000         52
    Bounty on His Head and He Can't go Home"

Exhibit P22 - Screenshots in Coomer's most           100
    recent court filing

Exhibit P23 - Coomer's 80-some Facebook Posts         16

Electronically signed by Jana Mackelprang (001-409-517-3774)                    b80d65b6-8bbf-4bf1-8099-35b26e79cf21

6

1        P R O C E E D I N G S
2        WHEREUPON, the following proceedings were
3    taken pursuant to the Colorado Rules of Civil
4    Procedure.
5              *    *    *    *    *
6        THE COURT REPORTER:  Will counsel please
7    stipulate that court reporter is authorized to
8    administer the oath remotely; that no objection to
9    admissibility of the deposition will be made based on
10   validity of the oath; and that Dr. Coomer is who he
11   says he is so that I may swear him in remotely?
12       MR. ARRINGTON:  So stipulated on behalf
13   of Ms. Powell and Powell, PC.
14       MR. CAIN:  Plaintiff stipulates as well.
15       MR. ARRINGTON:  And since there's so many
16   people involved here, what's typically happened in the
17   past, Jana, is you ask if anyone doesn't stipulate; and
18   if not everybody -- if no one says anything, you can
19   take that as an unanimous stipulation.
20       Does anyone object to that stipulation?
21   Okay.
22       ERIC COOMER, Ph.D.,
23   having been first duly sworn to state the whole
24   truth, testified as follows:
25   >>>

7

1               EXAMINATION
2    BY MR. ARRINGTON:
3        Q.    Thank you for appearing this morning,
4    Dr. Coomer.
5             If you could please just state your name and
6    address for the record.
7        A.    Yes.  Eric Coomer, Salida, Colorado.
8        MR. ARRINGTON:  And before we get
9    started, we're going to make a couple of things for the
10   record.  One of the things that we've been doing in all
11   of these depositions is that an objection by one party
12   will be counted as an objection by all parties.
13       The other stipulation is that Mr. Cain is
14   going to perhaps make some scope objections.
15       And, Mr. Cain, if you would like to
16   state, with that, what you mean by that.
17       MR. CAIN:  Yeah, let me explain.  Just
18   for ease here, if I make an objection as to the scope
19   of the question or the question is seeking privileged
20   information -- so if I say "scope" or "privileged,"
21   that is an instruction by me to Dr. Coomer to not
22   respond to that question because it would exceed the
23   Court's order of September 7th with respect to this
24   deposition.
25       So just to reiterate, if I say "scope,"

8

1    that's an instruction to Dr. Coomer to not respond to
2    that question because it's outside the scope of the
3    order.
4        MR. ARRINGTON:  Okay.  And so stipulated.
5        And the other thing that I would like to
6    clarify --
7        (Distortion.)
8        MR. ARRINGTON:  Mr. Rogers, can you --
9    can you mute, please.
10       Okay, thank you.
11       So the other thing is that I anticipate
12   you'll be making preservation objections as well, and
13   the witness will -- unless you instruct him not to
14   answer, will, after you've made your preservation
15   objection, answer.
16       MR. CAIN:  Yes, thank you.  Absolutely.
17       MR. ARRINGTON:  Okay.
18       Q.    (By Mr. Arrington) So let's get started.
19       Dr. Coomer, typically, at the start of
20   the deposition, we make some -- a record in terms of
21   your capacity to -- to participate in the objection
22   [sic] today.  One of the things that has come to light
23   is that you have, in the past, struggled with
24   substances.  And I wanted to know if you are, in fact,
25   under the influence of any substance today.

9

1        A.    No, I'm not.
2        Q.    Okay.  When is the last time that you
3    ingested cocaine?
4        MR. CAIN:  Objection.  Don't respond to
5    that question.
6        Q.    (By Mr. Arrington) Okay.  When was the
7    last time you used heroin?
8        MR. CAIN:  Objection.  Don't respond to
9    that question.
10       Q.    (By Mr. Arrington) When is the last time
11   you used any mind-altering substance that might affect
12   your ability to answer questions in your capacity
13   today?
14       MR. CAIN:  The same objection.  Don't
15   answer that question.
16       He's indicated he's not under the
17   influence of any substance.
18       Q.    (By Mr. Arrington) I'm going to share my
19   screen.  And I have put up what we're going to mark as
20   Exhibit P --
21       MR. ARRINGTON:  What's the next one?  I
22   think it's 18, isn't it, Jana, P18?
23       THE REPORTER:  Yes.
24       MR. ARRINGTON:  Thank you.
25   >>>

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                    b80d65b6-8bbf-4bf1-8099-35b26e79cf21

10

1      (Exhibit P18 was marked for
2  identification.)
3      Q.   (By Mr. Arrington) This is going to be
4  marked as P18.  This is a New York Times magazine
5  article entitled:  "He Was the 'Perfect Villain' For
6  Voting Conspiracists."
7          Have you seen this article before,
8  Dr. Coomer?
9      A.   Yes, I have.
10     Q.   Have you read it?
11     A.   Yes, I have.
12     Q.   When was the last time you read it?
13     A.   Within the last week.
14     Q.   Within the last week.
15         Do you consider yourself familiar with
16  its contents, then?
17     A.   I gave the interview, yeah.
18     Q.   Okay.  So I'm going to go through this.
19  It's going to be a fairly tedious exercise, but we're
20  going to go through several sections of it and see if
21  you said that to this reporter.
22         It says in the very first paragraph, very
23  first line:  "It was already late on November 9."
24         I presume that's November 9th, 2020; is
25  that correct?

11

1      A.   Correct.
2      Q.   "... when Eric Coomer, then the director
3  of product strategy and security for Dominion Voting
4  Systems, left his temporary office on Daley Plaza in
5  Chicago and headed back to the hotel."
6          So you went to your -- to the hotel in
7  Chicago on November 9th, 2020, correct?
8      MR. CAIN:  Scope.
9      MR. ARRINGTON:  I beg your pardon?
10     MR. CAIN:  Scope.
11     MR. ARRINGTON:  Okay.  So are you going
12  to have a scope objection for each of the times that we
13  say something about this article, Charles?
14     MR. CAIN:  No, I think the order says, as
15  it relates to public statements, Plaintiff's prior
16  public statements, that certain Facebook posts were
17  fabricated.
18         And so those questions don't relate to
19  the fabrication of Facebook posts.
20     MR. ARRINGTON:  Were you present at the
21  hearing last Friday, the status conference, when the
22  Court specifically stated that I was entitled to
23  inquire about this article?
24     MR. CAIN:  I'm reading her order.
25     MR. ARRINGTON:  Okay.  That's not the

12

1  question I asked.
2          Are you denying that last Friday, when
3  you were sitting right there in front of her, she said
4  that I would have the right to inquire about this
5  article?
6      MR. CAIN:  I'm not denying or confirming
7  anything.  I'm just reading her order.
8      MR. ARRINGTON:  Okay.  We'll call the
9  Court right now.
10         Off the record.
11         (Off the record from 11:40 a.m. to 11:47
12  a.m.)
13     MR. ARRINGTON:  Back on the record.
14     Q.   (By Mr. Arrington) Dr. Coomer, can you
15  see Exhibit P18?
16     A.   Yes, I can.
17     Q.   Okay.  And the first thing that's there,
18  I've already read.
19         So you told the New York Times reporter
20  that on November 9th you were in Chicago and went to
21  your hotel.
22     A.   Yes.
23     Q.   And --
24     MR. CAIN:  And, Barry, I'm sorry to
25  interrupt you.  Just to clarify the record, I was able

13

1  to find your statement -- well, someone on my staff
2  did.  And our off-the-record discussion was about the
3  fact that I was fine with you asking Dr. Coomer if he
4  made the statements that are attributed to him in the
5  New York Times article.
6          What you said to the Court --
7      MR. ARRINGTON:  Back off the record.  Off
8  the record, Jana.  I'm not going to have Mr. Cain waste
9  my time.
10     MR. CAIN:  I'll give you back this --
11  this comment.  I'm not trying to waste your time.  You
12  can have the -- whatever the minute is that I'm
13  talking.  I just want to make sure we're on the same
14  page.  Okay?  So just credit this to me, not you.
15         And I think it's consistent with kind
16  of -- both of what we were saying.  So you said, Since
17  the New York Times article, we would -- we agree with
18  counsel that the article is absolutely critical in this
19  case, and I intend, at the deposition next Thursday, to
20  ask a simple question to Mr. Coomer -- Dr. Coomer,
21  rather, I apologize -- did he say the things that are
22  attributed to him in this New York Times article?  And
23  he can either state that he stated it or he didn't, but
24  I don't see why we should not be able to ask that.
25         And the Court said, Yeah, I haven't put

Electronically signed by Jana Mackelprang (001-409-517-3774)                                          b80d65b6-8bbf-4bf1-8099-35b26e79cf21

14

1  any limit on your ability to get that information.
2          And you say, Thank you, Your Honor.
3          So I think that's consistent with what
4  we're talking about, confirming whether he told the
5  New York Times that information.
6          So I think we're on the same page, and
7  you can have whatever time I just took back credited to
8  you.
9      Q.   (By Mr. Arrington) Okay.  We're in the
10  third paragraph.  I've highlighted some information
11  that begins "prone to profanities."
12          Did you tell the New York Times reporter
13  that you were prone to profanities, with a sense of
14  humor that could have blunt force?
15      A.   No, that's not a quote from me.
16      Q.   Okay.  Did you tell the New York Times
17  reporter you travel around the world for competitive
18  endurance bike races?
19      A.   Yes, we did discuss that.
20      Q.   Did you tell the New York Times reporter
21  that you have full-sleeve tattoos, one of Francis
22  Bacon's "Screaming Popes," some Picasso bulls, and
23  half-inch holes in your ears where you once wore what
24  are known as plugs?
25      A.   I discussed my tattoos.  I don't recall

15

1  discussing my piercings.
2      Q.   Okay.  Is that, in fact, true, that --
3      A.   That I have piercings?
4      Q.   Excuse me.  You've got to allow me to
5  finish my questions.
6          Is it, in fact, true that you have
7  full-sleeve tattoos and half-inch holes in your ears
8  where you once wore plugs?
9      A.   I have many tattoos.  I have to actually
10  measure the current diameter of the holes in my ears.
11      Q.   Okay.
12      A.   But they're about a half inch.
13      Q.   Okay.  So you watched -- let's go back to
14  the next paragraph, and then the next one.  It says the
15  video you watched in your hotel room.
16          So did you tell the New York Times or
17  the -- we'll call him the Times reporter -- that you
18  watched a video in your hotel room on November 9th of
19  Mr. Oltmann -- or actually Joe Otto at the time?
20      A.   Yes.  To the best of my recollection,
21  yes.  That's -- that's the timeline we're talking
22  about.
23      Q.   And -- and when you were watching this
24  video on November 9th, about 11 minutes, did you tell
25  the Times reporter that about 11 minutes in, you heard

16

1  Oltmann say your name, the conversation will be about a
2  man named Eric Coomer, and he spelled it out?
3      A.   No, I don't believe I said that to the
4  reporter.  I believe that she watched the video herself
5  and gave -- and gave those time stamps and quotes.
6      Q.   Okay.  Did you, in fact, watch the video
7  on November 9th and hear your name?
8      A.   Yes.
9      Q.   Okay.  We're on page 2 now.
10          Do you remember -- and, again, on
11  November 9th, watching this video in your hotel room,
12  where Max McGuire read from an anonymous open letter
13  that explained that "while there was no formal
14  organization known as 'antifa,' the ideas the public
15  associates with it are worth supporting" -- "the ideas
16  the public associates with it," rather, "are worth
17  supporting"?
18      A.   Can you repeat that question?
19      Q.   Okay.  Do you remember on November 9th,
20  2020, hearing on this video you were watching, Max
21  McGuire read from an anonymous open letter that
22  explained that "while there was no formal organization
23  known as 'antifa,' the ideas the public associates with
24  it are worth supporting"?
25      A.   I don't remember that exact quote coming

17

1  from Mr. McGuire.  I do have a vague recollection that
2  they were going through various private posts of mine,
3  one of which was a satirical Antifa manifesto, in
4  quotes.
5      Q.   What does "satirical" mean?
6      A.   Tongue-in-cheek.  Not serious.
7      Q.   Okay.  I've put up what's going to be
8  marked as Exhibit P23.
9          (Exhibit P23 was marked for
10  identification.)
11      Q.   (By Mr. Arrington) I'm on page 9 of P23.
12          Is this your Facebook post, Mr. Coomer --
13  or Dr. Coomer?
14      A.   It's a repost that I made on my private
15  Facebook, yes.
16      Q.   Okay.
17      A.   I did not author this.  I reposted it.
18      Q.   Okay.  Which -- which part of it is
19  tongue-in-cheek?
20      A.   All of it.
21      Q.   All of it?  Okay.  So let's go back to
22  satirical.
23          I've got a dictionary.com there.
24  Actually, I've asked it for a definition of satirical.
25  It's the use of irony, sarcasm, ridicule, or the like,

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                        b80d65b6-8bbf-4bf1-8099-35b26e79cf21

18

1  in exposing, denouncing, or deriding vice, folly,
2  et cetera.
3          Can we use that as a working definition
4  of satirical?
5          MR. CAIN:  Form.
6          THE DEPONENT:  It's one of.  I'm not
7  going to -- there are a lot of other definitions in
8  there.  Dictionary.com is not the definitive source on
9  definitions of terms.
10         Q.    (By Mr. Arrington) Okay.  So do you
11 dispute that this is what you were using the word
12 "satirical" to mean?
13         A.    It's part of.  I wouldn't say it
14 encompasses all of it, no.
15         Q.    Okay.  So let us us go back to -- let's see
16 what dictionary.com says tongue-in-cheek means, if it
17 has one.
18         No, it's not going to give us one.
19         Whimsical.  How about whimsical, joking,
20 humorous, jocular?  Is that what you meant?
21         A.    Again, those are multiple terms.  I'll
22 pick out sarcastic, satirical, flippant, ironic,
23 irreverent, blithe.  Sure.  Dry.  Farcical.
24         Q.    Okay.  So tell me -- tell me which of
25 those terms apply to this document?  What in it is

19

1  ironic, farcical, whimsical?
2          A.    So, from my best recollection, this
3  anonymous letter was posted the day after the current
4  FBI released the statement saying that there was no
5  such thing as an organized group called Antifa.
6          So it's clear, when it says, Let us be
7  perfectly clear Antifa isn't an organization.  There
8  are no memberships, no meetings, no dues, no rules, and
9  then it goes on to then describe rules and leaders and
10 structure.
11         That, in itself, is a contradiction,
12 which to me is satirical, tongue-in-cheek, irreverent,
13 and trying to make a statement through that sarcasm.
14         Q.    Okay.  So you think the article, as a
15 whole, is satirical.  Are there any particular
16 statements in the article, other than the ones that
17 you've already mentioned, that you believe are ironic
18 or not serious, tongue-in-cheek, whimsical?
19         A.    I'd have to reread the entire article,
20 which if you want me to do that right now, I guess I
21 can, but I would say, on the whole, the document stands
22 in and of itself as a satirical, sarcastic post.
23         MR. ARRINGTON:  Off the record.  We'll
24 let you read this on your own time.  When you're ready,
25 we'll have you set down the page and we'll go.  Go

20

1  ahead.
2          MR. CAIN:  I'm sorry, you're asking to go
3  off the record?
4          MR. ARRINGTON:  We're off the record.
5  I'm not going to let him waste my time while he reads a
6  document word for word.
7          MR. CAIN:  No, I don't agree to that.
8  I've done -- we've done this throughout all of the
9  depositions, and I'm not going to have him study up on
10 a particular document off the record.
11         MR. ARRINGTON:  No, no.  In other
12 depositions, when someone has said that they needed to
13 read an entire document, you and Mr. Skarnulis have
14 said, Okay, we'll go off the record and he can read
15 that document on a break.  And now you're not giving me
16 the same courtesy, Mr. Cain.  And so --
17         MR. CAIN:  I'm not being discourteous.
18         MR. ARRINGTON:  -- we are going to have
19 to reschedule this deposition because of this.  But
20 if -- I'm going to make a record.
21         The witness has said he needs to read an
22 entire single-spaced, four-page document before he can
23 make any comments about it.  And Mr. Cain is insisting
24 that he do that on the record, knowing that I have one
25 hour.

21

1          THE DEPONENT:  No, no.  Hey, I made my
2  statements on this.  I said, as a whole, I view that
3  entire document satirical.  I don't have to parse every
4  single sentence.  Don't need to.  I view the entire
5  document as satirical.
6          There you have it.  That's your answer.
7          Q.    (By Mr. Arrington) And so I get to ask
8  the questions, Dr. Coomer, and one of the questions I'm
9  going to ask is:  Which of these things in there
10 specifically are whimsical, farcical, tongue-in-cheek?
11 And you said you needed to read the entire document
12 before you can do that.
13         A.    Every single line.
14         MR. ARRINGTON:  Every single line.  Okay.
15 A four-page, single-spaced document before he can
16 answer my question, which will probably take up the
17 rest of my deposition time, reading this paper.
18         And so if you're going to insist that he
19 do that on my time, I'm going to make a record of it,
20 and then we'll come back after the Court says you're
21 being ridiculous.
22         Is that what you're going to insist on
23 him doing, Mr. Cain?
24         MR. CAIN:  I'm not going to argue with
25 you.  If there's something specific in this document

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                    b80d65b6-8bbf-4bf1-8099-35b26e79cf21

22

1    that you want him to comment on, then show it to him.
2         MR. ARRINGTON:  That's what I did --
3         MR. CAIN:  I'm sorry --
4         MR. ARRINGTON:  -- I showed it to him.  I
5    asked him a question:  What specific in this document
6    is whimsical, facarical -- farcical, tongue-in-cheek,
7    and he said he had to read the entire document in order
8    to tell me.
9         MR. CAIN:  You can do what you want,
10   Barry.  I'd suggest that you go on the record and ask
11   your questions.
12        MR. ARRINGTON:  Okay.  If I can do what I
13   want, we'll go off the record while he does what he
14   needs to do in order to answer my question.
15        MR. CAIN:  Nope, we're not going to do
16   it.  If there's something in this --
17        MR. ARRINGTON:  And I'm going to ask for
18   fees.  I'm going to ask for fees.
19        MR. CAIN:  -- if there's something in
20   this document that you want to point him to that you
21   need a comment on, then do it.
22        MR. ARRINGTON:  No, Mr. Cain.  I asked
23   him a question about this document, and I asked him to
24   point out what is satirical, whimsical, farcical, and
25   he said he had to read the whole document in order to

23

1    do it, and you're saying he had to do that on the
2    record and waste everybody's time.
3         And we're going to come back in a couple
4    of weeks, whenever the Court reschedules this
5    deposition, and we will do that.
6         MR. CAIN:  You can do what you want.
7    We're here to --
8         MR. ARRINGTON:  You know what?  We're
9    going off the record while we call the Court.
10        Off the record, Jana.
11        MR. CAIN:  I thought we were off the
12   record.
13        MR. ARRINGTON:  I hope we've been off the
14   record.
15        (Discussion off the record from 12:02 p.m.
16   to 12:06 p.m.)
17        MR. ARRINGTON:  Back on the record.
18        We're going to, not adjourn, but recess
19   this deposition pending the resolution of the issue
20   about whether Mr. Cain is to waste half an hour of my
21   hour while his client reads this document.  And so --
22        MR. CAIN:  You're mischaracterizing the
23   situation.
24        MR. ARRINGTON:  I'm characterizing it
25   perfectly.

24

1         And we will -- the Court has asked
2    everybody to go onto its WebEx page, which is public
3    record, at 12:15.  So we will stand in recess.
4         MS. HALL:  Barry?
5         MR. ARRINGTON:  Yeah?
6         MS. HALL:  Barry, I would also ask that
7    we address the New York Times issue with the judge, as
8    well, since she's already going to be on there.
9         MR. ARRINGTON:  Well, I don't think that
10   we have a dispute regarding the New York Times issue.
11   Mr. Cain, who obviously already had the quote in hand,
12   even though he was denying it, has specifically
13   agreed --
14        MR. CAIN:  Barry, look.  I'm trying not
15   to engage because this is ridiculous.  But, no, I
16   didn't have it.  One of my staff folks pulled it while
17   we were talking about it so I could look at it.  Why
18   would you say that?
19        MR. ARRINGTON:  Well --
20        MR. CAIN:  I didn't have it.
21        MR. ARRINGTON:  Okay.  I will take your
22   word for that.  You were not prepared.
23        MR. CAIN:  No, that's not what I said.
24        MR. ARRINGTON:  Okay.  See you --
25   everybody will readjourn after the hearing -- reconvene

25

1    after the hearing.
2         (A recess was taken from 12:08 p.m. to
3    12:38 p.m.)
4         MR. ARRINGTON:  Back on the record.
5    Q.    (By Mr. Arrington) Dr. Coomer, we have
6    Exhibit P23, starting at page 9, on the screen here.
7         Do you see that?
8    A.    Yep.
9    Q.    Okay.  We're going to call this the
10   Antifa Manifesto for short.
11        Is that okay?
12   A.    It's a document that has that title.
13   Q.    Okay.  Well, that's what we'll refer to
14   it as -- for short.
15   A.    It's an alleged -- it's an alleged
16   manifesto.
17   Q.    Okay.  You can characterize it, if you'd
18   like, but we'll refer to it as the Antifa Manifesto for
19   purposes of our discussion today.
20        Have you read the Antifa manifestation --
21   or Manifesto just now, word for word?
22   A.    Yes, I have.
23   Q.    Just a few seconds ago, correct?
24   A.    Well, now we're coming up on a few
25   minutes.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                                b80d65b6-8bbf-4bf1-8099-35b26e79cf21

26

1  Q. Okay.  Is it fresh in your mind?
2  A. Yes, it is.
3  Q. All the statements are fresh in your
4 mind?
5  A. I couldn't recite it verbatim, but, yes,
6 I understand the gist of the article.
7  Q. Okay.  So which of the statements in the
8 document are satirical, the individual statements in
9 the article are satirical?
10  A. Okay.  If you want to ask me about every
11 individual sentence, we can do that.  So I will wait
12 for you to read each individual statement, sentence,
13 and then I will tell you whether I think it's
14 satirical.
15   But let's try to make this easy on
16 everyone:  I think the document, in totality, is a
17 satirical document as laid out in the opening
18 paragraphs where it clearly states:  Also according to
19 the FBI report that was released the day before --
20  Q. Okay.  You're now engaging in a
21 filibuster, wasting my time.
22   So the question that's on the table and
23 that you're not responding to, is which of the
24 statements in the article --
25  A. The document is satirical.

27

1  MR. CAIN:  Hold on.  Object to the
2 sidebar.
3   The question is, which of the statements?
4 So you're going to have to go through and identify
5 which of these paragraph -- or sentences or paragraphs
6 you consider satirical and do that for the entire
7 document.
8  MR. ARRINGTON:  No, I don't have to do
9 that, Mr. Cain.  So I'm going to ask --
10  MR. CAIN:  No, you've asked the question,
11 so Dr. Coomer needs to respond --
12  MR. ARRINGTON:  Are you objecting?  Are
13 you objecting?  Or are you just doing a Wild, Wild West
14 1980s style deposition here?
15   Do you have an objection?  If you don't,
16 you need to be quiet, sir.
17  MR. CAIN:  Yes, you're asking the
18 question --
19  MR. ARRINGTON:  You can't tell me how to
20 run my deposition.  You absolutely cannot do that.
21   If you have an objection, you can put it
22 on the record.  Otherwise, you need to be quiet.
23  MR. CAIN:  What was your question?
24  Q. (By Mr. Arrington) Dr. Coomer, do you
25 remember, from your perusal of this document, reading

28

1 it just a few minutes ago, any specific statement that
2 you thought was whimsical, satirical, tongue-in-cheek,
3 farcical?
4  A. Yes.
5  Q. Which ones?
6  A. Okay.  Let's start at the top.
7   "Public Statements From 'Antifa' In
8 Response To The Threats Issued By United States
9 President Donald Trump," I find satirical.
10  Q. Okay.  What's the next one?
11  A. "Dear Mr. Trump" I find satirical.
12  Q. Okay.
13  A. Please stop scrolling, sir.
14   "Let us be perfectly clear:  'Antifa'
15 isn't an organization.  There's no membership, no
16 meetings, no dues, no rules, no leaders, no structures.
17 It is, literally, an idea and nothing more."
18   I find that satirical because it's in
19 direct contradiction of then President Trump trying to
20 designate the organization that his own FBI said wasn't
21 an organization, as a terrorist organization.  So I
22 find those statements satirical.
23  Q. You think that statement is untrue?  You
24 think Antifa is an organization?
25  A. No, I don't.  I think the statement is

29

1 satirical --
2  Q. Wait.  Wait.
3   Do you think Antifa is an organization?
4  A. No.
5  Q. Do you think that there is membership of
6 Antifa?
7  A. No, I do not.
8  Q. Do you think that Antifa had meetings?
9  A. No, not that I know of.
10  Q. Do you think that people pay dues to
11 Antifa?
12  A. Not that I know of.
13  Q. Do you think that people -- that Antifa
14 has rules?
15  A. Not that I know of.
16  Q. Do you think Antifa has leaders?
17  A. Not that I know of.
18  Q. Do you think Antifa has structure?
19  A. Not that I know of.
20  Q. So do you disagree with anything that
21 that statement says, what we just read?  It's
22 absolutely true, isn't it, in your opinion?
23  A. No, I didn't say it was absolutely true.
24 To the best of my knowledge --
25  Q. What part is untrue?

11 (Pages 26 to 29)

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)             b80d65b6-8bbf-4bf1-8099-35b26e79cf21

---

30

1      A.  Sir, can I --
2      MR. CAIN:  Let him finish his --
3      THE DEPONENT:  Can I finish my answer?
4      **Q.**  **(By Mr. Arrington) Which part of this is**
5 **untrue that we just read?**
6      A.  Something does not have to be untrue to
7 be satire, sir.
8      **Q.  Okay.  And you can say that later on.**
9 **I'm asking you:  Which part of "Antifa**
10 **isn't an organization.  There's no membership, no**
11 **meetings, no dues, no rules, no leaders, no structure,"**
12 **which part of that is untrue?**
13      A.  As far as I know, my personal knowledge,
14 none of it is untrue.
15      **Q.  So you're -- even though those statements**
16 **are true, you still think they're satirical?**
17      A.  Do you want to keep reading the document,
18 sir?
19      **Q.  I've asked you a question.**
20      A.  Yes, I do.
21      **Q.  Okay.  And there are other true**
22 **statements in this document that you think are**
23 **satirical, correct?**
24      A.  There are other statements in this
25 document that I believe are satirical, yes.

---

31

1      **Q.  Okay.  You changed the question.**
2 **There are other true statements in this**
3 **document that you think are satirical, correct?**
4      A.  Possibly.  I'd have to continue to read
5 each individual statement, and we can do that.
6      **Q.  Okay.  So can you -- can you remember any**
7 **untrue statement in this document that you just read?**
8      A.  Any untrue statement.
9      **Q.  I'm not asking you to read it again.  I'm**
10 **asking if you can remember it.  You read it a couple**
11 **minutes ago.**
12 **Do you remember any untrue statements?**
13      A.  And I clearly said that I did not commit
14 the entire document to memory.
15      **Q.  I understand that as well.  What I'm**
16 **asking you is:  Do you have a specific recollection of**
17 **any untrue statement in this document that you read a**
18 **few minutes ago?**
19      A.  Yes, I believe --
20      MR. CAIN:  Form.
21      THE DEPONENT:  -- the author, after
22 stating that there is no membership, meetings, or
23 leaders, then proclaims to be a leader, even though he
24 is not a leader that can release a manifesto.
25      **Q.  (By Mr. Arrington) Let me ask you this:**

---

32

1      **You don't think Antifa exists as an organization, do**
2 **you?**
3      A.  No, I don't.
4      **Q.  And therefore --**
5      A.  I see no evidence of that.
6      **Q.  And, therefore, in your view, it would be**
7 **impossible, by definition, for there to be an Antifa**
8 **cult; isn't that true?**
9      A.  Correct.
10      **Q.  Let's move on.**
11 **Okay.  We're on page 2 of Exhibit P18.**
12 **It says:  "Coomer watched the video in shock."**
13 **Did you tell the Times reporter that you**
14 **watched the video of Mr. Oltmann in shock?**
15      A.  Since that's not in quotes, I'm not sure
16 that that's an exact quote, but I was shocked watching
17 the video.
18      **Q.  Coomer "is adamant that he never**
19 **participated in any antifa phone call."**
20 **Did you tell the Times reporter that?**
21      A.  Yes.
22      **Q.  And, of course, in your opinion, it's**
23 **impossible to participate in an Antifa phone call**
24 **because Antifa doesn't exist, correct?**
25      A.  I -- I also expressly stated multiple

---

33

1 times --
2      **Q.  Sir, I've asked you a question.  You can**
3 **answer a different question when your counsel has his**
4 **time.**
5 **The question I have is:  In your view,**
6 **it's impossible to participate in an Antifa phone call**
7 **because Antifa doesn't exist?**
8      A.  No, it's impossible because I was
9 never -- I was never on a call with Antifa.
10      **Q.  Okay.  So you're now saying that it's**
11 **possible to have an Antifa call; you just weren't on**
12 **it?**
13      A.  No, that's not what I said.  I said I was
14 never on a call with Antifa.
15      **Q.  Which is true, as a matter of definition,**
16 **because Antifa doesn't exist, correct, in your view?**
17      A.  To my -- to my personal recollection, I
18 don't know beyond my own sphere of day-to-day life.
19 Got it?
20      **Q.  Don't know what?**
21      A.  Whether Antifa exists or not.  I don't
22 think it does because I've never come in contact with
23 it.  That's not the same thing as you're implying, that
24 I have somehow made a statement that it's
25 self-inflicted. I've never been on an Antifa call.

---

Electronically signed by Jana Mackelprang (001-409-517-3774)      b80d65b6-8bbf-4bf1-8099-35b26e79cf21

---

34

1　　　Q.　Is it possible -- is it possible for you
2　to be on an Antifa call?
3　　　A.　I have -- me personally?  No, because I'm
4　not a member of that organization, if one exists.
5　　　Q.　So it is an organization?
6　　　A.　Not that I know of.  That's why I'm not a
7　member.
8　　　Q.　But you don't believe that it does?
9　　　A.　According to all of the evidence that
10　I've seen, including from the FBI under the Trump
11　Campaign, the Trump presidency, they said it doesn't
12　exist.  I'll give them the credit.
13　　　Q.　Okay.  So did you tell the Times reporter
14　that before you left for work on November 10, you
15　checked the settings on your Facebook account?
16　　　A.　Yep.
17　　　Q.　Did you wonder whether you had been
18　careless?
19　　　A.　Yes.
20　　　Q.　Did you think that your privacy settings
21　had ensured that your personal posts were only visible
22　to your Facebook friends?
23　　　A.　Yes, that's why I had them set.
24　　　Q.　So everything in this paragraph, if you
25　can just read this paragraph --

---

35

1　　　A.　Well, why don't you read it.  You read
2　the first part.
3　　　Q.　Okay.  Read this paragraph out loud --
4　not out loud but to yourself, to the word "it," and
5　tell me if it's true.
6　　　A.　Yes, that's true.
7　　　Q.　Okay.  So did you tell the New York Times
8　reporter that you had considered yourself a skinhead?
9　　　A.　In the '80s, yes.
10　　　Q.　So it's true that you told the New York
11　Times reporter that you told -- that you considered
12　yourself a skinhead at one time?
13　　　A.　At one time, yes, in the past.  Asked and
14　answered.
15　　　Q.　And so in -- in 2000 you tell -- did you,
16　in 2004, write a climbing board message about your
17　struggles with heroin and cocaine?
18　　　A.　Yes.
19　　　Q.　And how much they had damaged your life?
20　　　A.　Addiction is a horrible disease, yep.
21　　　Q.　Did you tell the New York Times reporter that you
22　were -- in 2004 -- you were on the verge of bankruptcy
23　and had lost your marriage and ended up in prison after
24　being charged with several counts of driving under the
25　influence?

---

36

1　　　A.　I was actually never in prison.  I was in
2　jail.
3　　　Q.　Other than that, you told the New York
4　Times reporter everything that I just quoted?
5　　　A.　Well, the ones that are in quotes, yes.
6　　　Q.　You, in fact, did file bankruptcy,
7　correct?
8　　　A.　Like many unfortunate Americans, yes.
9　　　Q.　So did you tell the New York Times
10　reporter that, in 2016, you were on Facebook when you
11　came across a few posts -- well, let's stop.
12　　　　　Read to yourself from "In 2016" to
13　"linking to both songs" and tell --
14　　　A.　Everything in -- sir, everything in
15　quotes are quotes from me that I said.
16　　　Q.　So everything in article -- in Exhibit
17　P18 that is attributed to you, you in fact told the
18　New York Times reporter?
19　　　A.　Everything that's in quotes are quotes
20　from me, and that is true for the rest of the article.
21　　　Q.　Okay.
22　　　　　MR. ARRINGTON:  Jana, what time -- how
23　much time have we gone?
24　　　　　THE REPORTER:  Well, up to the last
25　break, you had been going 35 minutes, but then there

---

37

1　were 13 minutes off of that.  So let's see what we did
2　since -- I have to go back to the recess and we came
3　back on.
4　　　　　MR. KIMREY:  Can we go off the record?
5　　　　　MR. ARRINGTON:  Yes.  Off the record.
6　　　　　(A recess was taken from 12:53 p.m. to
7　12:55 p.m.)
8　　　　　THE REPORTER:  I have 36 minutes on the
9　record.
10　　　　　MR. ARRINGTON:  Okay.  We've been going
11　for about an hour and half, let's take a --
12　　　　　THE REPORTER:  Oh.
13　　　　　MR. ARRINGTON:  Oh, sorry.  Just so you
14　know, I have much less than 36 minutes.
15　　　　　THE REPORTER:  Much less than 36 minutes?
16　　　　　MR. ARRINGTON:  Let's take a 15-minute
17　break.  We'll go back on the record at -- I'm talking
18　Mountain time -- 1:10.  Okay?
19　　　　　MR. CAIN:  Sure.
20　　　　　(A recess was taken at 12:56 p.m. to 1:13
21　p.m.)
22　　　Q.　(By Mr. Arrington) Dr. Coomer, I put up
23　your declaration, Exhibit A to your recent brief, and
24　it talks about your Facebook posts.  And in paragraph
25　19, it says, "In fear for my life, and in light of

---

Calderwood-Mackelprang, Inc.  303.477.3500

38

1  security professionals' assessment that the threats
2  against me were legitimate, I immediately began
3  deleting my Facebook posts."
4         How many Facebook posts did you delete,
5  Dr. Coomer?
6      A.   I actually don't recall.
7      Q.   How many Facebook posts did you have?
8      A.   I do not recall.
9      Q.   All right.  Did you delete -- going back
10 to Exhibit -- page 2, which we were looking at earlier
11 as Exhibit 23, you've seen Exhibit 23 before, haven't
12 you?
13     A.   I have.
14     Q.   This is a series of about 80 Facebook
15 posts?
16     A.   I've never counted.
17     Q.   Okay.  But you've seen it before and
18 you're familiar with it?
19     A.   Yes.
20     Q.   And you deleted all these Facebook posts?
21     A.   Actually, I'd have to -- I'd actually
22 have to go back and look.  I can't say that with any
23 certainty.
24     Q.   So there are some Facebook posts you
25 didn't delete.

39

1      A.   Well, I certainly didn't delete all my
2  Facebook posts, no.
3      Q.   Let's talk about a particular time frame.
4         From May of 2020 to November 11th, 2020,
5  are there Facebook posts you didn't delete?
6      A.   That I did not delete?  Absolutely.
7      Q.   Okay.
8      A.   Well, actually, maybe.  I'd have to go
9  back and look.
10     Q.   So you don't know how many Facebook posts
11 you deleted.
12     A.   Nope.
13     Q.   Okay.  And so there might be a lot more
14 Facebook posts on your Facebook from this time period
15 of 2020 that you didn't delete.
16     A.   No.  No.  That I can say without a doubt.
17 I know that this is the sum total of Facebook posts
18 that I had.  I cannot tell you definitively which of
19 these I deleted.  None of the posts that I deleted are
20 not contained in this file.
21     Q.   Okay.  So Exhibit P23 contains all of the
22 posts that you deleted?
23     A.   As well as other posts that I may not
24 have deleted.
25     Q.   I see.  Okay.  So --

40

1      A.   So I -- sorry.  I did not delete -- as
2  far as I can recall, I have never deleted a Facebook
3  post until on or around November 9th or 10th.
4      Q.   Did anyone at Dominion tell you to delete
5  these Facebook posts?
6      A.   No.
7      Q.   Did you tell, as an executive of
8  Dominion, that anyone should delete Facebook posts?
9      A.   No.
10     Q.   Are you aware of a Dominion policy that
11 provides that posts of the Dominion employees, either
12 for or against President Trump, should be deleted?
13     A.   No.
14     Q.   Do you believe such a policy does not
15 exist?
16     A.   Such policy does not exist as far as I
17 know.  Actually, that would be -- that would be illegal
18 under Colorado statute.
19     Q.   To do what?
20     A.   To have such a policy.
21     Q.   I see.  Okay.
22         Your declaration goes on to say, "I
23 generally feared for my own safety and was trying to
24 remove information that I understood was being
25 misconstrued and used to falsely suggest I was somehow

41

1  involved in criminal conduct."
2         So when you were deleting these posts,
3  whichever ones you deleted, you understood that someone
4  could construe those -- could misconstrue them as
5  implicating you in wrongful conduct; isn't that
6  correct?
7      A.   No.
8      Q.   Isn't that what you just said in your
9  declaration?
10     A.   No, that's slightly -- that's slightly
11 parsed.  They were misconstruing it to set a narrative.
12 I do not and never have believed that any of this
13 material could be used to construe that I was involved
14 in a criminal enterprise, no.
15     Q.   But you agree that it could be
16 misconstrued, that it could be used as evidence
17 misconstrued that you were engaged in wrongful conduct?
18     A.   I think it could be used to lie about it,
19 yes.  Not misconstrued.  Lied.
20     Q.   Okay.  Let's go back to your --
21     A.   Yes, my affidavit says "misconstrued."
22 Maybe I should have had another sentence.  Misconstrued
23 and then used to lie about a criminal conspiracy.
24     Q.   Mr. --
25     A.   There is nothing -- I have never at any

14 (Pages 38 to 41)

Electronically signed by Jana Mackelprang (001-409-517-3774)                                          b80d65b6-8bbf-4bf1-8099-35b26e79cf21

42

1    time felt that anything in that data, those posts,
2    could ever be used to show criminal intent, no.
3         Q.    Who just suggested that you modify your
4    answer?
5         A.    Pardon me?
6         Q.    Who are you looking at?  Who did you just
7    look at?
8         A.    I can turn my computer around.  I looked
9    at my screen, sir.  I'm the only person in the room
10   that I'm in.
11        Q.    Is anybody communicating with you during
12   this deposition?
13        A.    No.  My cats have meowed at me once or
14   twice.
15        Q.    So you -- we're looking at your
16   declaration again.  It says you understood that these
17   Facebook posts could be misconstrued to suggest --
18        A.    Falsely suggest.
19        Q.    You're going to have to let me ask my own
20   question, sir.
21        You understood that these Facebook posts
22   that you deleted could be misconstrued to suggest that
23   you had been involved in wrongful conduct.  Didn't you
24   understand that?
25        A.    So I will repeat my answer.  Misconstrued

43

1    and then used to falsely suggest.  So I explained that
2    earlier in my clarification.  They could be
3    misconstrued and then used in lies.  That's not the
4    same as being misconstrued on their own.
5         Q.    Understood.  And so this was evidence --
6    this was evidence that you were worried would be
7    misconstrued and falsely used to implicate you in
8    wrongful conduct, so you got rid of it, right?
9         A.    I got rid of it because I was getting
10   death threats, sir.
11        Q.    Okay.
12        MR. ARRINGTON:  Read the question back to
13   him, Court Reporter.
14        Listen very carefully to the question,
15   Dr. Coomer.
16        (Whereupon, the record was read back by
17   the court reporter.)
18        THE DEPONENT:  I deleted the Facebook
19   posts, yes.
20        (Exhibit P19 was marked for
21   identification.)
22        Q.    (By Mr. Arrington) So I've put up
23   Exhibit P19, which is a document called "Guest
24   Commentary."
25        Are you familiar with this document?

44

1         A.    Yeah, that's in The Denver Post.
2         Q.    You wrote it, right?
3         A.    Yes, I did.
4         Q.    And it says, towards the bottom:  "It is
5    unconscionable that certain fringe media personalities
6    looking to increase personal notoriety, website
7    traffic, and ad revenue would continue to prey on the
8    fears of a public."
9         Did you have anyone in particular in mind
10   when you said that?
11        A.    I had multiple personalities in mind.
12        Q.    Which fringe media personalities did you
13   have in mind?
14        A.    I -- off the top of my head, Max McGuire,
15   Joe Oltmann, Michelle Malkin, Sidney Powell, Rudy
16   Giuliani, Eric Trump, Eric Metaxas, Clay Clark, Randy
17   Corporon.
18        Q.    Okay.  And they were -- they were -- you
19   were aware from approximately November 9th of 2020,
20   that they were making the Facebook posts that we just
21   looked at in Exhibit 23 public, right?
22        A.    Yes.  On or about November 9th, yeah.
23        Q.    And so that's what you were talking about
24   in terms of these fringe personalities generating fear
25   by trafficking those Facebook posts?

45

1         A.    Nope.
2         Q.    Okay.  And then it says, "Additionally,
3    any posts on social media channels purporting to be
4    from me have also been fabricated."
5         So you were saying that Facebook posts
6    that --
7         A.    No, I was not --
8         Q.    You're going to have to let me answer
9    my -- ask my questions.  You can talk about what you
10   want to say after the question is completed.
11        Can we have that understanding, sir?
12        A.    Yes, we do.
13        MR. CAIN:  Object to the sidebar.
14        Q.    (By Mr. Arrington) So it says,
15   "Additionally, any posts on social media channels
16   purporting to be from me have also been fabricated."
17        So you were accusing Mr. Oltmann of
18   fabricating those Facebook posts, weren't you?
19        A.    No, I was not.
20        Q.    "I do not have a Twitter account and my
21   Facebook account is not active."
22        You were trying to imply that you didn't
23   have Facebook accounts -- posts such as those exposed
24   by Dr. -- or Mr. Oltmann, weren't you?
25        A.    No, I was not.

15 (Pages 42 to 45)

Calderwood-Mackelprang, Inc.  303.477.3500

46

1    Q.   So you never had those particular
2 Facebook posts in mind when you said that they were
3 being fabricated?
4    A.   Nope.
5    Q.   Okay.  What did you -- what social media
6 posts did you have in mind?
7    A.   So if you scroll up at the top -- and can
8 we get a date stamp on this?
9    Q.   No, I'm asking you a question.
10          What social media posts did you have in
11 mind?
12    A.   Okay.  So, actually, I'll look at the
13 bottom.  The date stamp is December 8th.
14          On December 8th and the week preceding
15 December 8th, when I was writing this op-ed, there were
16 multiple people that had fake accounts that were using
17 my profile pictures and my name and posting things.
18 That is exactly what I had in mind when I wrote this.
19          At the time that this article was
20 published, my Facebook was completely locked down.  It
21 was actually locked down before this, but that's a
22 different question that you haven't asked.
23          So that is exactly what I had in mind.
24 "Purporting" is an active verb in the current context
25 and tense of when I wrote this article.  It does not

47

1 speak --
2    Q.   And so -- are you finished?
3    A.   It does not speak to any past Facebook
4 posts.  Current.
5    Q.   Are you finished?
6    A.   Yep.
7    Q.   So were these fake social media posts in
8 the national news, as far as you know?
9    A.   I have no idea.
10    Q.   Okay.  But you knew that the Facebook
11 posts that Mr. Oltmann had produced and circulated were
12 in national news, right?
13    A.   They were on -- I saw them on -- on his
14 podcasts and various other outlets, yes.
15    Q.   And you knew that they were in the
16 national news.
17    A.   I guess you'd have to define "national
18 news" for me, sir.
19    Q.   What do you think the word "national
20 news" means, Dr. Coomer?  Are you unfamiliar with that
21 term?
22    A.   Again, maybe define it.
23    Q.   You know --
24    A.   Credible news sources?
25    Q.   You have a Ph.D.  Do you know what the

48

1 phrase "national news" means?
2    A.   I know --
3    Q.   We can do this all day long, if you want
4 to.
5    A.   I know what it's commonly conferred to
6 mean.
7    Q.   Give me -- give me your definition of
8 "national news."
9    A.   Credible news that's carried nationally.
10    Q.   And so --
11    A.   I don't know if I would call a podcast
12 national news.
13    Q.   Okay.  So you --
14    A.   I don't know if I would call -- I don't
15 know if I would call random Twitter accounts national
16 news, sir.
17    Q.   Would One America News Network, which
18 has -- which is broadcast nationally, would that be a
19 national news source to you, or are you denying that
20 One America News Network is a national news media
21 outlet?
22    A.   I think they have national -- they have
23 national reach, yes.
24          And I've got to be honest that this ...
25          (Audio distortion.)

49

1          THE DEPONENT:  ... at this point, I'm not
2 sure -- sorry, I'm getting some feedback.  I don't know
3 if somebody needs to mute.
4          MR. CAIN:  Let me look at it.
5          MR. ARRINGTON:  What?
6          MR. CAIN:  I'm seeing if someone is
7 unmuted.
8          MR. ARRINGTON:  Okay.
9          THE DEPONENT:  At this point, I honestly
10 can't say for certain that I saw the Facebook posts on
11 something like OAN.  Where I had seen them, from my
12 recollection, were mostly on Mr. Oltmann's podcasts and
13 random Twitter accounts and also vitriolic e-mails sent
14 to me threatening my life.
15          I can't say for sure if I ever saw those
16 specific Facebook posts on a, quote/unquote, national
17 media outlet.
18    Q.   (By Mr. Arrington) So your testimony here
19 today, under oath, is that on December 8, 2020, you
20 were unaware that the Facebook posts marked as
21 Exhibit P23 were in the national news?
22    A.   As I said, I cannot point to a single,
23 quote/unquote, national media organization that I
24 recall posting them.  I know that they were out in the
25 digital wild.

16 (Pages 46 to 49)

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                                    b80d65b6-8bbf-4bf1-8099-35b26e79cf21

50

1    Q.    So the answer to the question is, as far
2   as you knew on December 8, 2020, they were not in the
3   national news.
4        A.    That's not what I said.
5        Q.    Okay.  So were you or were you not aware
6   on December 8, 2020, that the Facebook posts marked as
7   Exhibit P23 were in the national news?
8        A.    I cannot recall a single media outlet
9   that I saw those Facebook posts on.
10       Q.    Did you have a general awareness that
11  those Facebook posts were in the national news?
12       A.    I had a general knowledge that they were
13  out in the digital universe.
14       MR. ARRINGTON:  Can you read the question
15  back to him, Jana?
16       (Whereupon, the record was read back by
17  the court reporter.)
18       THE DEPONENT:  I cannot recall any
19  national news outlet where I saw those Facebook posts.
20       MR. ARRINGTON:  Okay.  That's the answer
21  to a very different question than what I asked.
22       Could you read it again, please, Jana?
23       MR. CAIN:  Object to form.
24       MR. ARRINGTON:  Listen very carefully to
25  the question, Dr. Coomer.

51

1        (Whereupon, the following record was read
2   back by the court reporter:  "Did you have a general
3   awareness that those Facebook posts were in the national
4   news?")
5        THE DEPONENT:  Statements related to the
6   Facebook posts, I was aware, were being discussed in
7   the national news.  I do not recall whether the actual
8   posts appeared on any national news media outlets.
9        Q.    (By Mr. Arrington) And so it was
10  important to you to address the Facebook posts that you
11  knew were at least being referred to in the national
12  news and rebut them on December 20th -- or December 8,
13  2020, wasn't it?
14       A.    I have never denied that I authored those
15  posts, ever.
16       Q.    Okay.  My question is this:  It was
17  important to you on December 8, 2020, to go into the
18  media and rebut --
19       A.    No.
20       Q.    Okay.  You've got to let me finish.
21       It was important to you on December 8,
22  2020, to go into the media and rebut the idea that you
23  had put those Facebook posts up; isn't that correct?
24       A.    No, absolutely not.  That was not the
25  goal of this at all.  I have never rebutted that I made

52

1   those posts.  Not once, sir.  That was not the goal of
2   that op-ed.
3        The goal of that op-ed was to clear my
4   name that I had no role in any alleged Antifa call, any
5   alleged progressive action call, or any statements of
6   trying to throw the election or doing anything of that
7   sort.  That was the expressed goal of that outlet.
8        (Exhibit P21 was marked for
9   identification.)
10       Q.    (By Mr. Arrington) So I've got Exhibit 21
11  on the screen.  It starts "On Edge."  It's from
12  December 22nd, 2020.
13       Are you familiar with this article from
14  the Ark Valley Voice?
15       A.    Yeah.
16       Q.    Reading from the paragraph on the second
17  page:  "Later in the interview, Coomer reiterated that
18  his Facebook account was dormant for about three and a
19  half years."
20       Is that correct, your Facebook account
21  was dormant for about three and a half years?
22       A.    Yep.
23       Q.    "Until the George Floyd murder."
24       So you opened up your Facebook account in
25  May of 2020 in response to the George Floyd murder?

53

1        A.    To the best of my recollection, yes.
2        Q.    "At that point, he began posting here and
3   there.  He was not the author of the wild posts being
4   circulated.  He doesn't even have a Twitter handle."
5        Did you say that to the Ark Valley Voice?
6        A.    No, I did not.
7        Q.    So you're saying that the Ark Valley
8   Voice just made this up?
9        A.    So I -- I reviewed the interview.
10  There's an audio-video interview that accompanied
11  this -- accompanies this article.  I reviewed that last
12  night.  And at no point did I ever make that statement,
13  that I was not the author of wild posts being
14  circulated.
15       Q.    Did you imply it, if you did not -- if
16  not expressly make it?
17       A.    No.  Again, I reviewed the audio-video.
18       I will also point out that I believe the
19  day after this article appeared is when we filed our
20  original suit.  And in there, I made clear statements
21  that I did author those Facebook posts.
22       So that would have been -- that would
23  certainly supersede any setting the record straight.
24       Q.    So you're saying your original complaint
25  in this case admitted to authoring the Facebook posts?

17 (Pages 50 to 53)

---

54

1    A.    As far as I recall, I believe that that's
2  explicit in the original.  Again, I don't have
3  everything memorized, but that's my recollection.
4          I've certainly never denied the Facebook
5  posts.  In fact, I've actually stood by them.  That's
6  in the New York Times article.
7    Q.    Dr. Coomer, it's your testimony that you
8  did not state in The Denver Post article that you had
9  not -- that the Facebook posts that we've been talking
10  about were fabricated?
11         MR. CAIN:  Form.
12         THE DEPONENT:  That is a fair statement,
13  yes.  I -- I never said or implied that the Facebook
14  posts that were clearly authored by me were fabricated.
15    Q.    (By Mr. Arrington) Go back on the
16  New York Times article.  It says in a paragraph on
17  page 9: "On December 8, Coomer responded to some of the
18  attacks.  In an op-ed for The Denver Post, he called
19  out for the 'fringe media personalities' who 'continue
20  to prey on the fears of a public concerned about the
21  safety and security of our electoral system.'  He also
22  claimed that 'any posts on social media accounts
23  purporting to be from me have also been fabricated.'
24  And yet, Coomer had written posts that Oltmann had
25  highlighted."

---

55

1          So the Times reporter goes on to say,
2  "Asked about the misleading language, Coomer concedes
3  that his writing could have been clearer."
4          Did you concede that your writing could
5  have been clearer, Dr. Coomer?
6    A.    It probably could have been clearer, yep.
7    Q.    And do you agree with the Times reporter
8  that your statement in The Denver Post was misleading,
9  at best?
10    A.    No, I don't.
11    Q.    So it's your testimony that the Facebook
12  posts that were in the media that you knew were out
13  there and were being talked to -- talked about by
14  people like Mr. Oltmann were not what you were
15  referring to, but certain social media posts that you
16  cannot specifically identify were?
17    A.    I'm sorry, when did I say I couldn't
18  identify those?
19    Q.    Well, I asked you to identify one.  What
20  specific social media post did you refer to that has
21  been fabricated?
22    A.    I -- I think I was pretty clear.  There
23  were multiple accounts that were using my name and
24  profile pics and posting things.
25    Q.    Can you remember any specific post that

---

56

1  you believe was fabricated?
2    A.    I -- I've got a screenshot of at least
3  one of them, yeah.  So, yes, I can remember one, yes.
4    Q.    Okay.  What did it say?
5    A.    I think something about being a scary
6  clown, the best of my recollection.
7    Q.    So do you remember any others besides the
8  screenshot that you're looking at right now?
9    A.    I'm not actually looking at a screenshot,
10  sir --
11    Q.    So you --
12    A.    -- it was from my recollection.  But I do
13  have screenshots, yes.
14    Q.    So I thought you said you were looking at
15  a screenshot of one of them.  Okay.
16    A.    No, I said I had a screenshot, sir.
17    Q.    I see.  Okay.
18          So the only specific social media post
19  that you can think of right now, sitting here today
20  that you're referring to in the December 8th Denver
21  Post op-ed was that one about the scary clown?
22    A.    I cannot remember the specifics of
23  multiple posts that had my name and profile picture
24  attached that were posted, but I do know for a fact
25  that there were multiple.

---

57

1    Q.    Okay.  Any others that you can think of
2  other than the --
3    A.    I believe I've --
4    Q.    Let me finish.  Let me finish.
5          Any others that you can think of other
6  than the, quote/unquote, scary clown post?
7    A.    Not that I recall with specifics.
8    Q.    Okay.  So it's your testimony that all of
9  these Facebook posts that Mr. Oltmann had made public
10  and which you knew were out there in the digital wild
11  and that were being referred to in the national media
12  were not what you were trying to assure people about,
13  but only the ones that were not in the national news
14  that you yourself can't even remember were what you
15  were talking about, right?
16         MR. CAIN:  Form.
17         THE DEPONENT:  That's actually not what I
18  said.  I don't know if these posts were out in the
19  digital world.  I assume they were, at least as much as
20  the other posts that were on the Twitter.  So ...
21    Q.    (By Mr. Arrington) You didn't know that,
22  and now you're just speculating, right?
23    A.    No, they were on Twitter, yes.  I know
24  that for a fact.
25    Q.    Did you -- were you aware that any news

---

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                        b80d65b6-8bbf-4bf1-8099-35b26e79cf21

Deposition of Eric Coomer

58

1  media organization had picked them up and ran with
2  them?
3      A.   Not that I recall.
4      Q.   Okay.  So all these social media posts
5  that had not been in the news were what you were
6  talking about and not the ones that had been in the
7  news; is that what you're saying?
8      A.   Yes.  That's why I used the present tense
9  in the verb.  Not had purported to be me, but
10  purporting to be me.  That's the present tense when
11  this article was written.
12      Q.   I think it's a yes-or-no question.
13      MR. ARRINGTON:  Can you read the
14  question, again, Jana?
15      (Whereupon, the following record was read
16  back by the court reporter:  "So all these social media
17  posts that had not been in the news were what you were
18  talking about and not the ones that had been in the
19  news; is that what you're saying?")
20      Q.   (By Mr. Arrington) Yes or no?
21      A.   Again, I don't -- I know that those posts
22  were on Twitter.  So when you say "not in the news," I
23  can't speak to that.  But I am speaking specifically
24  to --
25      Q.   You just said you didn't know whether

59

1  they were in the news or not --
2      THE REPORTER:  Oh --
3      THE DEPONENT:  I'm sorry, you just
4  interrupted me now.
5      Q.   (By Mr. Arrington) Okay.  Did -- let --
6  it sounds like you're backtracking.
7      Are the social media posts -- are you
8  aware of any news organization that had picked up the
9  social media posts that you were, in fact, talking
10  about on December 8 and ran with them?
11      MR. CAIN:  Form.
12      THE DEPONENT:  No, I'm not.
13      Q.   (By Mr. Arrington) Okay.  But you were
14  aware that at least some news organizations had picked
15  up the Facebook posts that Mr. Oltmann had made public?
16      A.   No, I said certain podcasts and Twitter
17  accounts had.  I do not recall whether the news media,
18  national news media, as you put it, had actually posted
19  those.  I -- I can't recall that.
20      Q.   But you do know that they were being
21  talked about in podcasts, and at least Michelle Malkin
22  had talked about them in her podcasts, which had
23  national scope?
24      A.   Yes, they were used to defame me, yes.
25      MR. CAIN:  Object to form.

60

1      Q.   (By Mr. Arrington) I'll ask the question
2  again.
3      You knew that journalists with national
4  following had used -- had referred to the Facebook
5  posts that Mr. Oltmann had made public?
6      MR. CAIN:  Form.
7      THE DEPONENT:  You're asking me to make a
8  judgment on what a journalist is.
9      Q.   (By Mr. Arrington) So are you suggesting
10  that Ms. Malkin was not a journalist?
11      A.   I'm not sure I can make that
12  determination.
13      Q.   Okay.  You knew she had a national
14  following, right?
15      A.   Yes.
16      Q.   Okay.  So you knew that Ms. Malkin, who
17  had a national following, had referred to these
18  Facebook posts, correct?
19      A.   Correct.
20      MR. CAIN:  Form.
21      Q.   (By Mr. Arrington) And yet you were
22  unaware of any national news organization that had
23  covered these fake social media accounts that you say
24  that you were talking about on December 8th?
25      A.   Correct.

61

1      Q.   Okay.  So can you explain why you were
2  worried about the fake social media accounts and felt
3  like you had to explain them in The Denver Post when
4  they hadn't been picked up by anyone talking about
5  them, whereas you were ignoring the Facebook posts that
6  had been picked up?
7      A.   Yes.  It was the death threats.
8      Q.   The death threats as a result of what?
9      A.   Of those fake accounts.
10      Q.   Okay.
11      A.   Some death threats included screenshots
12  of those people, yes.
13      MR. KIMREY:  Mr. Arrington, my wife is
14  summoning me, and I don't know why.  Could we take a
15  brief break of five minutes?
16      MR. ARRINGTON:  Okay.  We'll take a
17  five-minute break.
18      How much time has elapsed, Jana?
19      THE REPORTER:  Let me look at the last
20  starting time.
21      MR. ARRINGTON:  Okay.  Off the record.
22  Thank you.
23      (A recess was taken from 1:47 p.m. to
24  1:56 p.m.)
25      Q.   (By Mr. Arrington) Dr. Coomer --

19 (Pages 58 to 61)

Electronically signed by Jana Mackelprang (001-409-517-3774)                                      b80d65b6-8bbf-4bf1-8099-35b26e79cf21

62

1    MR. CAIN:  Are we on the record?
2    MR. ARRINGTON:  Yes.
3    THE REPORTER:  Yes.
4    Q.   (By Mr. Arrington) Dr. Coomer, please
5  describe the scary clown video that you referred to
6  that you were -- you said you had in mind when you
7  wrote the December 8th Denver Post piece.
8    A.   I never said it was a video.
9    Q.   Okay.  Please describe the scary clown
10 post that you referred to when you were talking about
11 what you had in mind with respect to the December 8th
12 Denver Post piece.
13   A.   There was a Twitter user.  I believe his
14 real name was Larry McDoo.
15   THE REPORTER:  Mc ...
16   THE DEPONENT:  McDoo, M-c-D-O-O.
17   He change his profile pic to be a photo
18 of me from one Halloween costume, and he made several
19 posts over many weeks under my name, purporting to be
20 me at the time.
21   And there were others that I, again,
22 can't recall the details.  At that time, late November,
23 I was in great fear of my life, so I was moving around
24 a lot and under a lot of stress.  So I wasn't always
25 good about --

63

1    Q.   (By Mr. Arrington) You've got a narrative
2  going that has nothing to do with the question.
3    So let me just -- so you're saying the
4  scary clown post was, in fact, an authentic picture of
5  you, just being someone who was using it to impersonate
6  you.  Is that what you're saying?
7    A.   No, that's not what I said.  I said he
8  was using an authentic picture of me as his profile pic
9  and then making other posts under that.
10   Q.   Looking at Exhibit P23, page 56, this is
11 a -- purports to be a Facebook post made by you, Eric
12 Coomer, on October 31, 2016.
13   Is this, in fact, something that you did?
14 Is this your post?
15   A.   Yes.  I've already stipulated to that,
16 sir.
17   Q.   And is that a picture of you on page 56?
18   A.   In Halloween makeup, yes.
19   Q.   Is this the scary clown photo to which
20 you were referring that Mr. McDoo had used as his
21 Twitter handle?
22   A.   Yes.
23   Q.   So when you say you were talking about
24 present social media posts on December 8th, what does
25 "present" mean?  I mean, are you talking about --

64

1    A.   Can --
2    Q.   Well, excuse me.
3    Were you talking about posts that were at
4  that moment going on, or was there sometime in the past
5  that those posts had been going on?
6    A.   Contemporaneous to when I wrote the
7  article.
8    Q.   So immediately as the article was being
9  written, you're only talking about those posts?
10   A.   Yes.
11   Q.   It had -- so even -- even a post that had
12 gone out the day before, you didn't have in mind?
13   A.   No.
14   MR. CAIN:  Form.
15   Q.   (By Mr. Arrington) We had a double
16 negative there, so let me clarify.
17   If a social media post had gone out the
18 day before, it's your testimony that you did not have
19 that social media post in mind because it wasn't
20 contemporaneous with what you were writing at that
21 moment; is that correct?
22   A.   That's reasonable, yeah.
23   Q.   That's -- well, I don't know if it's
24 reasonable or not.  I'm just asking if that's what you
25 had in mind.

65

1    Is that what you meant?
2    A.   Yep.
3    Q.   I'm looking at a Facebook post from
4  Exhibit P23, page 72, dated July 21, 2016.
5    Is this your Facebook post, Dr. Coomer?
6    A.   Yes, it is.
7    Q.   I want you to read it out loud into the
8  record, please.
9    A.   "Rant on," is essentially what the
10 hashtag means.
11   "Facebook friend land - open call ..."
12   "If you are planning to vote for that
13 autocratic, narcissistic fascist asshat blowhard and
14 his Christian jihadist VP pic, UNFRIEND ME NOW!  No,
15 I'm not joking.  I'm all for reasoned political
16 discourse and healthy debate - I'm looking at you,
17 Geoffrey Cushing-Murray, Gus Munem, Benjamin Rice - I
18 disagree with you" there on -- "you three on many
19 philosophical grounds but respect your opinions.  Only
20 an absolute FUCKING IDIOT could ever vote for that
21 wind-bag, fucktard FASCIST RACIST FUCK!  No bullshit, I
22 don't give a damn if you're a friend, family or random
23 acquaintance, pull the level, mark an oval, touch a
24 screen for that carnival barker ... UNFRIEND ME NOW.  I
25 have no desire whatsoever to ever interact with you.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    b80d65b6-8bbf-4bf1-8099-35b26e79cf21

66

1  You are beyond hope, beyond reason.  You are controlled
2  by fear, reaction and bullshit.  Get your shit
3  together.
4        "Oh, if that doesn't persuade you, FUCK
5  YOU!  Seriously, this fucking ass-clown stands against
6  everything that makes this country awesome!  You want
7  in on that?  You deserve nothing but contempt."
8        Hashtag untrump me.
9        "I think that hashtag might go viral."
10       Hashtag taking a stand.
11       End rant.
12       "No really, unfriend me!"
13       Untrump me.
14       You are beyond hope.
15       Really end rant.
16       Actually, I added that word.
17       "Edit, I put the end-tag in the wrong
18  spot ..."
19       "2nd edit, these opinions are rational,
20  and completely my own.  They are based in reason and
21  highly credible.  Though they are not necessarily the
22  thoughts of my employer, though if not, I should
23  probably find another job ... Who wants to work for
24  complete morons?  None of my personal opinions affect
25  my professional conduct or attitudes.  I am

67

1  non-partisan.  I am not, however, willing to stand by
2  and watch this great country be" -- can't read those
3  under the Bates tag -- "saying something, anything."
4        "2nd edit, these opinions" -- oh, here we
5  go, it repeats.
6     Q.   Right here is where you left --
7     A.   Yeah, "I am not, however, willing to
8  stand by and watch this great country be taken over by
9  fascists without saying something, anything."
10    Q.   So you said that these thoughts don't
11 necessarily reflect the thoughts of your employer.
12 That's Dominion Voting Systems, correct?
13    A.   At the time, yes.
14    Q.   Though, if not, you should probably find
15 another job?  Is that what you meant to say?
16    A.   I think that's what's written there, yes.
17    Q.   So it's your view, if the thoughts
18 expressed in this Facebook post did not reflect the
19 thoughts of Dominion Voting Systems, that you should
20 probably find another job?
21    A.   If I thought I worked for fascists, I
22 would quit.
23       MR. ARRINGTON:  Jana, could you read the
24 question, please?
25 >>>

68

1        (Whereupon, the following record was read
2  back by the court reporter:  "So it's your view, if the
3  thoughts expressed in this Facebook post did not reflect
4  the thoughts of Dominion Voting Systems, that you should
5  probably find another job?")
6     Q.   (By Mr. Arrington) Is that true?
7     A.   I think -- I think I answered that.
8     Q.   But is the statement -- is the statement
9  true?  That if the thoughts -- that it was your view on
10 the date of this Facebook post that if the thoughts you
11 expressed in it were not shared by Dominion, you should
12 get another job.
13       MR. CAIN:  Form.
14       THE DEPONENT:  If I thought I worked for
15 fascists, I would quit.
16    Q.   (By Mr. Arrington) Okay.  You've avoided
17 the question again.
18    A.   I don't think I have.
19    Q.   It's a yes-or-no question.  Yes or no --
20    A.   Yes, I don't work for fascists.
21    Q.   Yes or no:  It was your view on the date
22 of this Facebook post that if Dominion didn't share the
23 thoughts you expressed, you should get another job?
24       MR. CAIN:  Form.
25       THE DEPONENT:  I'll answer once again:

69

1  Yes.
2     Q.   (By Mr. Arrington) Okay.
3        MR. KIMREY:  Is that because your
4  answer --
5     Q.   (By Mr. Arrington) It was your view at
6  that time --
7     A.   If Dominion were fascist, I would quit.
8     Q.   Okay.  So the answer is yes.  Okay.
9        So it was your view that if Dominion did
10 not think that only an absolute fucking idiot could
11 ever vote for Donald Trump, you should get another job?
12    A.   No, if they were fascists.
13    Q.   Okay.  So now you're saying that you
14 don't think that Dominion -- Dominion -- let me back
15 up.
16       Now your testimony is that you don't
17 necessarily think you should get another job if
18 Dominion didn't think that only an absolute fucking
19 idiot could vote for Trump?
20       MR. CAIN:  Form.
21       THE DEPONENT:  I -- I clearly stated that
22 if they were fascists, I would get another job.
23    Q.   (By Mr. Arrington) No, you didn't say
24 that at all.
25    A.   Yes, I did.

70

1    Q.    Okay.  So let me ask you this:  Do you
2    believe everything you say here in this post that we
3    just read?
4          MR. CAIN:  Form.
5          THE DEPONENT:  I stand by it, yes.
6    Q.    (By Mr. Arrington) So it's your -- it's
7    your position sitting here today, in 2021, that only an
8    absolute fucking idiot could ever vote for Donald
9    Trump?
10   A.    Yes.
11         MR. CAIN:  Form.
12   Q.    (By Mr. Arrington) You hate Donald Trump,
13   don't you, sir?
14   A.    I do not like him at all.
15   Q.    Let me ask the question again:  You hate
16   Donald Trump, don't you, sir?
17         MR. CAIN:  Form.
18         THE DEPONENT:  I do not like him at all.
19   Q.    (By Mr. Arrington) I'm going to ask it
20   one more time:  Do you or do you not hate Donald Trump?
21   A.    I do not like Donald Trump, sir.
22   Q.    You've avoided the question.  I didn't
23   ask --
24   A.    No, I didn't.
25   Q.    Okay.  I did not ask you whether you

71

1    liked him or not.  I asked you whether you hated him or
2    not.
3          Do you or do you not hate Donald Trump?
4          MR. CAIN:  Form.
5          THE DEPONENT:  I'm not sure I would
6    characterize it as such, no.  I do not like Donald
7    Trump or his policies.
8    Q.    (By Mr. Arrington) You dislike him
9    intensely, don't you?
10   A.    I would say it's intense.
11   Q.    Intense enough to be characterized as
12   hate?
13   A.    I'm not sure about that.
14   Q.    You're not sure, but you may hate Donald
15   Trump; you just don't know; is that what you're saying?
16   A.    No, I said I wasn't sure if you would
17   characterize it as that.
18   Q.    So you're just going to sit here today
19   and say you don't hate -- do -- is it your testimony
20   today that you don't hate Donald Trump?
21   A.    Again, that's -- that's a
22   characterization I'm not ready to agree to.  I dislike
23   Donald Trump intensely, yes.
24   Q.    So you're unwilling to sit here today and
25   say you don't hate him?

72

1          MR. CAIN:  Form.
2          THE DEPONENT:  Again, hate -- hate's a
3    different connotation.
4          MR. ARRINGTON:  Read the question,
5    please, Jana.
6          Listen very carefully to the question,
7    sir.
8          (Whereupon, the following record was read
9    back by the court reporter:  "So you're unwilling to sit
10   here today and say you don't hate him?")
11         MR. CAIN:  Form.
12         THE DEPONENT:  Your double negatives are
13   really confusing a lot of times.
14   Q.    (By Mr. Arrington) All right.  So let me
15   ask --
16   A.    No, I would -- I would say that I don't
17   hate him.  I hate his policies and his fascist
18   tendencies.
19   Q.    So you think he's an autocratic,
20   narcissistic fascist, asshat blowhard, but you don't
21   hate him?
22   A.    I absolutely think all of those are true,
23   yes.
24   Q.    But you don't hate him?
25   A.    Again, I wouldn't characterize it as

73

1    that.
2    Q.    Let me ask you this:  Could you -- do you
3    agree that someone reading this post on page 72 of
4    Exhibit 23 could be excused for thinking that you hate
5    Donald Trump?
6          MR. CAIN:  Form.
7          THE DEPONENT:  I won't speculate on that.
8    Q.    (By Mr. Arrington) No, I'm not asking you
9    to speculate.  I'm asking you if --
10         MR. CAIN:  You are asking that.  Form.
11   Q.    (By Mr. Arrington) I'm asking you if a
12   reasonable person could read the -- in your view, could
13   a reasonable person read what you wrote on page 72 of
14   Exhibit P23 and come to the conclusion that you hate
15   Donald Trump?
16         MR. CAIN:  Form.  Foundation.
17         THE DEPONENT:  I am neither a
18   psychologist nor a grammarian, so I am not qualified to
19   say how somebody might read this.
20   Q.    (By Mr. Arrington) I understand.  I'm not
21   asking you to speak as a psychologist or a grammarian.
22   I'm asking whether you think, Dr. Coomer, whether you
23   think a reasonable person could read what's written on
24   page 72 and come to the conclusion that you hate Donald
25   Trump?

22 (Pages 70 to 73)

Calderwood-Mackelprang, Inc.  303.477.3500

74

1        MR. CAIN:  Form.
2        THE DEPONENT:  Again, I'm not qualified
3   to -- to make that assessment on somebody else's
4   reading.
5        Q.    (By Mr. Arrington) I'm not asking you
6   about somebody else's reading.  I'm asking you about
7   your reading.
8        A.    No, you weren't.
9        Q.    Yes.  I'm asking you if you believe that
10   a reasonable person could come to the conclusion that
11   you hate Donald Trump after reading what's on page 72.
12        MR. CAIN:  Asked and answered.
13        THE DEPONENT:  You're asking whether I
14   can get into the mind of somebody else who is not me,
15   reading this.  I cannot do that.
16        Q.    (By Mr. Arrington) So you're saying that
17   someone may or may not come to the conclusion that you
18   hate Donald Trump from reading page 72; you just can't
19   tell?
20        A.    May or may not.
21        MR. CAIN:  Form.
22        Q.    (By Mr. Arrington) That's your testimony
23   under oath today?
24        A.    Yeah.
25        Q.    That somebody could read this and say,

75

1   Yeah, that guy doesn't have any problems with Donald
2   Trump; he loves him, right?
3        A.    That's not -- that wasn't the question,
4   sir.
5        Q.    Okay.  Okay.  I've put up page 4 of
6   Exhibit P23, a July 6th Facebook post.
7        By the way, did you delete the post on
8   page 72?
9        A.    No idea.  I'd have to go back and look.
10        Q.    You don't know whether you deleted that
11   or not.
12        A.    No.
13        Q.    Do you have a specific recollection of
14   any of the Facebook posts you deleted?
15        A.    No.  I'd have to go back and look.
16        Q.    But you deleted -- do you know how
17   many -- do you know how many Facebook posts you
18   deleted?
19        A.    No.
20        Q.    It could be dozens, it could be three; is
21   that what you're saying?
22        A.    We covered this earlier.  I do not recall
23   how many I deleted.  I can say with absolute fact under
24   oath that nothing I deleted does not appear here.
25        Q.    So up to 80 Facebook posts you deleted;

76

1   is that what you're saying?
2        A.    No, that's not what I said.  I said I
3   don't recall the number I deleted.
4        Q.    So we're on page 4 of Exhibit P23.
5   Please read that into the record starting with "Okay,
6   okay."
7        A.    "Okay, okay.  It was technically June,
8   but I found out recently, and I SOOOO love a good
9   Christmas in July ... Christmas in June?  I dunno, fuck
10   it.  Good riddance, you shitbag - I'm GLAD you're dead.
11   I hope it was painful, but you were probably dosed to
12   high-heaven with your own supply."
13        Q.    Who were you talking about?
14        A.    Jonathan Sackler, the architect of the
15   opioid crisis.  One of them.
16        Q.    So you were glad that Jonathan Sackler
17   was dead and you hoped his death was painful?
18        A.    As a personal sufferer of the opioid
19   crisis --
20        Q.    Mr. Coomer, I asked you a question.
21   You --
22        A.    Yes.  Yeah.  I was happy.  Yep.
23        Q.    Do you think that the average, typical
24   corporate executive, high-salaried, high-ranking
25   corporate executive in his 50s, would be happy that

77

1   someone died and hoped they'd died in a great deal of
2   pain?
3        MR. CAIN:  You don't have to answer that
4   question.  I do have a form objection.  I think it's
5   harassing and irrelevant.
6        If you want to answer it, Dr. Coomer, you
7   can, but you don't have to.
8        THE DEPONENT:  One, I wasn't acting in
9   the capacity of a high-ranking employee of a company.
10   These were my personal statements based on my very
11   personal experience with opiate addiction.  Yeah.
12        Q.    (By Mr. Arrington) Yeah what?
13        A.    I think these were reasonable statements.
14        Q.    That a typical high-ranking executive in
15   his 50s would not say --
16        A.    That's not what I just said.
17        MR. CAIN:  Form.
18        Q.    (By Mr. Arrington) Okay.  What my
19   question is -- it's very -- it's very specific -- you
20   say in here, in your brief, that a lot of what
21   Mr. Oltmann said was absurd on its face because no
22   high-ranking, high-compensated executive would say
23   something like that.
24        I'm asking about this one.  Would a
25   high-ranking, highly compensated executive say

Calderwood-Mackelprang, Inc.  303.477.3500

78

1  something like that?
2         MR. CAIN:  Form.
3         THE DEPONENT:  I've seen lots of evidence
4  of high-ranking executives from many companies doing
5  reprehensible and illegal things.  This is not illegal.
6  So I would say the bar is very low.
7         Q.    (By Mr. Arrington) So you think the
8  typical high-ranking, high-compensated executive in his
9  50s would say something like what you said on page 4,
10 the typical --
11        A.    It wouldn't be out -- it wouldn't be out
12 of the question, nope.
13        Q.    No, I'm not talking about whether it's
14 out of the question on the fringe.  I'm asking if it's
15 a typical thing for a high-ranking, highly compensated
16 executive in his 50s to say.
17        MR. CAIN:  Form.
18        THE DEPONENT:  So, again, I can't speak
19 to that.  I think it's reasonable based --
20        Q.    (By Mr. Arrington) Based on what?
21        A.    I think it's reasonable based on the
22 evidence I've seen of high-ranking executive officials
23 that have done lots of things.
24        I actually don't know that many
25 high-ranking executive officials in their 50s to know

79

1  enough to posit an answer to that.
2         Q.    So it's your testimony sitting here today
3  that you really can't speak to what's typical of
4  high-ranking, highly compensated executives in their
5  50s?
6         A.    No.
7         Q.    Okay.  So let's go on with this.  We've
8  got page 17.  It says -- this is a May 31 Facebook
9  post.
10        Did you post this, sir?
11        A.    Yes.
12        Q.    Is this one of the ones you deleted?
13        A.    Again, I'd have to -- I'd have to
14 cross-check.  I don't know.
15        Q.    You don't know.  Okay.  It says, "Oi
16 Polloi - Pigs For Slaughter."
17        Do you know what "pigs for slaughter" is
18 referring to?  Are they talking about literal pigs, in
19 your view?
20        A.    They could be.
21        MR. CAIN:  Form.
22        Q.    (By Mr. Arrington) It could be?  So you
23 think that -- that "Oi Polloi - Pigs For Slaughter" is
24 about the slaughterhouse industry?
25        A.    I actually don't know.  It's been a while

80

1  since I looked at the lyrics.
2         Q.    Okay.  So it's your testimony, sitting
3  here under the oath -- under oath today that you think
4  "Oi Polloi" might be thinking about the actual
5  slaughter of the actual pigs?
6         Is that what your testimony under oath
7  today is?
8         A.    No, I said I didn't know without seeing
9  the lyrics.
10        Q.    You're saying that you -- it's your
11 testimony under oath today that you have no idea
12 whatsoever what the phrase "Pigs For Slaughter" means
13 in this context, unless you were able to look at the
14 actual lyrics?
15        Is that your testimony under oath, sir?
16        A.    For this song?  Absolutely.
17        Q.    Okay.  So as far as you know, they could
18 be talking about pigs in the slaughterhouse industry?
19        A.    Again, I don't know.  It's been a long
20 time --
21        Q.    That's your testimony --
22        A.    -- since I've listened to this song.
23        Q.    Do you recall ever hearing the song about
24 actual pigs being slaughtered in an actual
25 slaughterhouse?

81

1         MR. CAIN:  Form objection.  Good Lord.
2         MR. ARRINGTON:  That's highly
3  unprofessional, Mr. Cain.
4         THE DEPONENT:  Actually -- actually, I
5  think -- yeah, I think so.  Way back.  And it was more
6  of a metaphor.  It's kind of like Animal Farm.  I seem
7  to recall -- and, again, you're going to probe me
8  and -- I do have a vague recollection of actual -- particularly
9  particularly some punk rock songs, mostly out of the
10 animal rights' wing of punk rock -- that did talk about
11 actual slaughterhouses, yes.
12        Q.    (By Mr. Arrington) So it's your
13 testimony, on page -- that page 17 might be referring
14 to an animal rights' movement song?
15        A.    I don't think so, but, again --
16        Q.    Okay.  Then why did you bring that up?
17        A.    You -- you just asked me if I had any
18 recollection of any song that talked about
19 slaughterhouses.  That's why I brought it up.
20        Q.    Okay.  So it's -- "Pigs For Slaughter" is
21 actually a metaphor for killing cops, isn't it?
22        A.    It can -- it can be.
23        Q.    I'm talking about right here.  You know
24 that, don't you?
25        A.    Asked and answered.

24 (Pages 78 to 81)

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                        b80d65b6-8bbf-4bf1-8099-35b26e79cf21

82

1      Q.    No, no.  I get to ask the questions.
2            You know for a certain fact, sitting here
3    today, that page 17, when it refers to "Pigs For
4    Slaughter" is talking about killing actual cops, isn't
5    it?
6      A.    No, I do not.
7            MR. CAIN:  Form.
8            THE DEPONENT:  I'd have to see the
9    lyrics.  I made that explicit earlier.
10     Q.    (By Mr. Arrington) Page 20 of Exhibit 23
11   talks about "Dead Prez - Cop Shot."  What does "Dead
12   Prez" mean, in your view?
13     A.    That's the name of a band.  They've
14   actually been on the Tonight Show.
15     Q.    Do you know what "Prez" means in this
16   context?
17     A.    Actually, I don't.
18     Q.    Is that -- on page 20, is that the one --
19   one of the posts that you deleted, sir?
20     A.    I do not recall.  I'd have to
21   cross-check.
22     Q.    Page 21 says:  "Fuck the USA."
23           Is that something that you'd stand by
24   today, posting "Fuck the USA" on your Facebook page?
25           MR. CAIN:  Really?  You're asking him

83

1    that question?
2            MR. ARRINGTON:  Yes, sir, I am.
3            MR. CAIN:  Well, we're way beyond --
4            THE DEPONENT:  I --
5            MR. CAIN:  No, Dr. Coomer, hold on.
6            THE DEPONENT:  Yeah.
7            MR. CAIN:  Object to the form.  I don't
8    even -- I cannot believe that you're asking these lines
9    of questions.
10           MR. ARRINGTON:  Improper speaking
11   objection.
12           MR. CAIN:  But for the sake of comedy, I
13   will -- I will object to form.
14           You can answer it, if you can.
15           THE DEPONENT:  I posted that -- I posted
16   that song --
17           MR. ARRINGTON:  Wait.  Wait.  Wait.  With
18   Mr. Cain's speaking objection, we lost the thread.
19     Q.    (By Mr. Arrington) Do you -- the question
20   here is this:  Do you stand by today your decision to
21   put on your Facebook page a statement that says, "Fuck
22   the USA"?
23           MR. CAIN:  Form.
24           THE DEPONENT:  I stand by posting that
25   song, yes.

84

1      Q.    (By Mr. Arrington) And is it your view
2    that that is an appropriate thing for an executive in
3    his 50s, for a voting system company, to say?
4            MR. CAIN:  Form objection.
5            THE DEPONENT:  I posted that as a private
6    individual on a private Facebook --
7            THE REPORTER:  I'm sorry.  Excuse me
8    Mr. -- or, Dr. Coomer, could you say that again?
9            THE DEPONENT:  Sorry.
10           I posted that on a private Facebook page
11   as a private individual, and I stand by my right to do
12   that.  And I would do it again today.
13     Q.    (By Mr. Arrington) Okay, understood.
14           MR. ARRINGTON:  Jana, could you read the
15   question, please.
16           (Whereupon, the following record was read
17   back by the court reporter:  "And is it your view that
18   that is an appropriate thing for an executive in his
19   50s, for a voting system company, to say?")
20           MR. CAIN:  The same objection.
21           THE DEPONENT:  An executive for a voting
22   company, in his 50s, didn't put that up there.
23     Q.    (By Mr. Arrington) Well, I thought you
24   were an executive for a voting system company, in your
25   50s, when you put this up here?

85

1      A.    Well, actually, I wasn't.  I was 49.
2      Q.    Okay.
3      A.    The math is tough, but --
4      Q.    Let me reask the question.
5      A.    I did not --
6      Q.    Do you think it's appropriate for an
7    executive who is 49 to put that up?
8            MR. CAIN:  Form.
9            THE DEPONENT:  I think it's appropriate
10   for every citizen to express their political beliefs.
11     Q.    (By Mr. Arrington) Do you think the
12   typical --
13     A.    Yes.  Yes.  Yes.  Get right down to it.
14   Yep.
15     Q.    What are you affirming?
16     A.    It's appropriate for anybody to put up
17   that information, regardless of what their job is.
18     Q.    Okay.
19     A.    God-given right.  Constitution.
20     Q.    So you think that everything you have a
21   right to do is also appropriate?
22           MR. CAIN:  Form.
23           THE DEPONENT:  Yeah.
24     Q.    (By Mr. Arrington) Okay.  So the next one
25   is N.W.A.  Do you know what that acronym stands for?

25 (Pages 82 to 85)

Electronically signed by Jana Mackelprang (001-409-517-3774)                                          b80d65b6-8bbf-4bf1-8099-35b26e79cf21

86

1      We're talking about page 22 of
2  Exhibit 23, P23.
3      A.   Yes, I do know what it stands for.
4      Q.   What's it stand for?
5      MR. CAIN:  Form.
6      THE DEPONENT:  I'm not going to say the
7  n-word out loud, but --
8      Q.   (By Mr. Arrington) You can just say, "the
9  n-word."
10     A.   I'm sorry?
11     Q.   You can just say the n-word. So you're
12  willing to say "fuck" but not the n-word; is that what
13  you're saying?
14     A.   Well, I'm not a racist, so, yeah.
15     Q.   Okay.  There you go.
16     A.   You keep interrupting me.
17     Q.   So what does N.W.A. stand for?
18     A.   N With Attitude.
19     Q.   Okay.  It says: "Fuck the Police."  Do
20  you think it's appropriate for an executive to put
21  "Fuck the Police" on his Facebook page?
22     MR. CAIN:  Form.
23     THE DEPONENT:  I don't think it's
24  inappropriate at all.
25     Q.   (By Mr. Arrington) Okay.  The other --

87

1  the other question I asked is:  Do you think it's
2  appropriate for a highly ranked, highly compensated
3  executive to put the phrase "Fuck the Police" on his
4  Facebook page?
5      A.   I don't think it's inappropriate.
6      Q.   It could be neutral --
7      A.   Sure.
8      Q.   -- but it's not inappropriate?  Okay.
9      So the question is this:  Is it
10  affirmatively appropriate for an executive in your
11  position at this time to put "Fuck the Police" on his
12  Facebook page?
13     MR. CAIN:  Form.
14     THE DEPONENT:  So we're going to do this
15  on every post, and I will affirmatively say that I had
16  every right to post this.  I think it was appropriate,
17  expressing my personal viewpoints.
18     Whether I was an executive or not --
19     Q.   (By Mr. Arrington) So one of --
20     A.   -- it has no bearing on it.
21     Q.   So one of --
22     A.   You're going to interrupt me again.
23     Q.   So one of your personal viewpoints is
24  that "Fuck the Police" is something that you want to
25  support, the post?

88

1      MR. CAIN:  Form.
2      THE DEPONENT:  I want to support the
3  ending of police murder of people of color.
4      Q.   (By Mr. Arrington) And that's why you
5  think you should say, "Fuck the Police"?
6      A.   Yep.
7      Q.   Okay.  And then it says, "The
8  mutherfuckin villain that's mad."
9      Do you know who you're referring to there
10  in the lyrics?
11     A.   You know, I'm not super up on N.W.A.
12  lyrics.  They're probably talking about cops.
13     Q.   And you think the cops are "mutherfuckin
14  villains"?
15     A.   In certain aspects, yes.  I think one of
16  them was just sentenced to prison for murder, which is
17  pretty villanous.
18     Q.   So you're -- you're familiar with the
19  "Fuck the Police" song?  It's about killing cops,
20  right?  Shooting them --
21     A.   No, I don't believe that's the case.
22     Q.   Okay.  You don't, no.  Okay.
23     MR. KIMREY:  Hey, Barry.  Can we take a
24  short break?
25     MR. ARRINGTON:  Yes.  Off the record for

89

1  five minutes.
2      MR. KIMREY:  Thank you.
3      (A recess was taken from 2:26 p.m. to
4  2:36 p.m.)
5      Q.   (By Mr. Arrington) Dr. Coomer, if I'm not
6  mistaken, a few minutes ago, you said it was
7  appropriate for you to put these things on your
8  Facebook page.
9      MR. CAIN:  Wait, wait.  Time out.  Are we
10  back on the record?
11     MR. ARRINGTON:  I thought we were.  Yeah.
12     MR. CAIN:  Okay.  Can we just -- I'm
13  sorry, why don't we go off real quick.  I don't want to
14  take your time up.  I came in right as you were
15  starting your question.
16     So off the record.
17     (There was a brief discussion off the
18  record.)
19     Q.   (By Mr. Arrington) All right.  So just a
20  few moments ago, I believe, Dr. Coomer, you said it was
21  appropriate for you to put these Facebook posts up.
22     But I'm back at Exhibit P18, and it says,
23  "He," meaning you, Coomer, "he believed every word of
24  what he said on Facebook, but when colleagues later
25  asked him what he was thinking, he was frank:  He had

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    b80d65b6-8bbf-4bf1-8099-35b26e79cf21

90

1    screwed up."
2         What did you mean when you said you had
3    screwed up?  What did you screw up about?
4         A.    Thinking that people would understand
5    that you can have a personal opinion and not act on
6    that bias in a professional capacity.
7         Q.    Okay.  So you didn't think that you had
8    screwed up by putting these vehemently -- let me start
9    over.
10        You did not think that it was
11   inappropriate for the head of security for a major
12   voting machine firm to put on his Facebook page
13   vehemently anti-post Trumps -- anti-Trump posts?
14        A.    No.
15        Q.    Okay.  That was not what you were
16   referring to when you said you screwed up?
17        A.    Not at all.
18        Q.    You screwed up when you just gave the
19   American people too much credit; is that what you're
20   saying?
21        MR. CAIN:  Form.
22        THE DEPONENT:  That's not what I said at
23   all.
24        Q.    (By Mr. Arrington)  Well, I'm trying to
25   understand.

91

1         A.    Maybe Ms. Mackelprang can read back my
2    answer.
3         Q.    No, no.  I'm trying to understand.
4         What did you mean when you said you
5    screwed up?
6         MR. CAIN:  Form.
7         THE DEPONENT:  There is a segment of the
8    population that doesn't understand and can't conceive
9    of having an opinion that they don't act maliciously on
10   and would gladly break the law to see their own ends.
11   And that is not me.
12        Q.    (By Mr. Arrington)  So nothing in your
13   answer just there talked about you screwing up.  So
14   tell me what you did that screwed up.
15        A.    It gives fodder for crazy people that
16   view the world as -- as people that would gladly --
17   I'll say this -- gladly use their supposed influence to
18   do illegal things.
19        Q.    So you screwed up --
20        A.    They can't imagine, they can't imagine
21   having an opinion and being in a position, a supposed
22   position, which I was not in, by the way, to try to
23   affect a free and fair election.  To them, them -- and
24   I'm talking about your clients -- to them, this is
25   inconceivable.

92

1         If they were in my position, they
2    would -- they would use every resource to exploit that.
3    Why?  Because I made some personal statements of a
4    personal political belief.  I screwed up because I gave
5    them fodder because they can twist that and use it to
6    fundraise and continue this farce.
7         That's where I screwed up.  And it's a
8    farce.
9         Q.    So it says, at the very end, quoting you,
10   "I think Dominion as a company would be facing all the
11   same things they are right now without me, Coomer said,
12   but I was an accelerant.  For lack of a better word, I
13   was a perfect villain."
14        What did you mean by you being a perfect
15   villain?
16        A.    I have strong personal beliefs.  I have
17   expressed those in a private setting.  I think those
18   have been used, again, in a concerted campaign of lies
19   and misinformation, malinformation, disinformation, to
20   pretend like there is something actually illegal going
21   on when there isn't.
22        Q.    So if I follow the chain of reasoning,
23   people see that you're vehemently anti-Trump; that
24   you're the director of security for a voting company;
25   that you would act on your vehement anti-Trump views to

93

1    affect the election, and you gave them fodder for
2    perpetuating that narrative.
3         Is that what you're saying?
4         A.    Nope.
5         Q.    Okay.  Which part of what I just said is
6    wrong?
7         A.    The fact that, in my 16-year career in
8    elections, I actually worked to make the vendors, in
9    general, more transparent --
10        Q.    No, no.  So you're not talking about what
11   I just said.
12        A.    Yes, I am.
13        Q.    What I just said was:  If I understand
14   what you're talking about -- and you didn't talk
15   anything about a 16-year career -- that you said you
16   were the perfect villain and that you had screwed up
17   because you had given fodder to people who could use
18   your Facebook posts to advance the narrative that you,
19   in your position at Dominion, had affected the
20   election?
21        A.    Okay.
22        Q.    Is that true?  Is what I just said true?
23        Do you need me to repeat it?
24        A.    I believe --
25        Q.    Sir, is what I just said true?

27 (Pages 90 to 93)

94

1    A.   Let's repeat it then.
2         MR. ARRINGTON:  Could you repeat the
3    question, Jana?
4         And that question is going to be, after
5    she repeats it, is what I said true?  You can have some
6    commentary later.
7         (Whereupon, the following record was read
8    back by the court reporter:  "What I just said was:  If
9    I understand what you're talking about -- and you didn't
10   talk anything about a 16-year career -- that you said
11   you were the perfect villain and that you had screwed up
12   because you had given fodder to people who could use
13   your Facebook posts to advance the narrative that you,
14   in your position at Dominion, had affected the
15   election?")
16        MR. CAIN:  Form.
17        THE DEPONENT:  No.
18   Q.   (By Mr. Arrington) How's what I said not
19   true?
20   A.   There's a key word missing.
21   Q.   Go ahead.
22   A.   Misuse -- two key words; three, I
23   guess -- misuse and lie.
24   Q.   Okay.  So to sum up, you were the perfect
25   villain because your Facebook posts were fodder to

95

1    people who you believe advanced a narrative that you
2    used your position at Dominion to affect the election?
3    A.   Advanced a false and made-up narrative,
4    defamatory narrative, lied multiple times.
5    Q.   So you're saying that it's also made up?
6    A.   Absolutely.
7    Q.   But they're saying that it's not, but you
8    had given them fodder?
9         MR. CAIN:  Form.
10        THE DEPONENT:  I guarantee that --
11        THE REPORTER:  What -- excuse me.  I
12   didn't hear, Charlie, what you said.
13        MR. CAIN:  I said form.  That's short for
14   form objection.
15        THE DEPONENT:  I can say categorically
16   statements of me being on a call, affecting the
17   election, saying that I would ever guarantee that Trump
18   won, are categorically false, made up, and bullshit,
19   without a doubt.  There is no evidence and there never
20   will be.  So ...
21   Q.   (By Mr. Arrington) Dr. Coomer, have you
22   ever attended a BLM Zoom meeting?
23   A.   Nope.
24   Q.   Do you know anybody who is an activist
25   with BLM?

96

1    A.   I can't confirm that.  It's possible.
2    Q.   Do you know Tay Anderson?
3    A.   Never met him.  Never had a conversation
4    with him.  Don't -- only found out who he was once this
5    lawsuit started.
6    Q.   Have you ever been on a Zoom call with
7    someone who you later learned was Tay Anderson?
8    A.   Nope.  Pretty -- pretty sure I made that
9    clear in my declaration.
10        I've never been on a Zoom call about any
11   progressive activities whatsoever, marches, planned
12   protests, anything related other than my job and some
13   therapy after getting death threats from all of this
14   crap.
15        MR. CAIN:  Dr. Coomer, you need to answer
16   the question that he asked you.
17   Q.   (By Mr. Arrington) Do you have any -- do
18   you have any idea why Mr. Oltmann would be searching
19   Eric from Dominion on September 26th --
20        MR. CAIN:  We're getting well outside the
21   scope of what the order is, Mr. Arrington, into general
22   discovery.  Can you try to tailor it to the order,
23   please, to some statement, public statement that he's
24   made, or to the deletion of his Facebook posts?
25        MR. ARRINGTON:  Well, he's made lots of

97

1    statements that Joe Oltmann was lying when he said he
2    was researching Eric from Dominion on September 26th.
3    Q.   (By Mr. Arrington) Let me ask you this:
4    Do you -- do you stand by your statements that you've
5    made to the media that Joe Oltmann was lying when he
6    said he was searching Eric from Dominion in September
7    of 2020?
8         MR. CAIN:  Object to form.  I mean, form
9    objection.
10        THE DEPONENT:  I've never made any such
11   statement.
12   Q.   (By Mr. Arrington) Do you believe he was
13   lying when he said that he was searching Eric from
14   Dominion in September of 2020?
15        MR. CAIN:  Form.
16        THE DEPONENT:  I have no idea.
17   Q.   (By Mr. Arrington) You don't know one way
18   or the other whether he was searching Eric from
19   Dominion in 2020?
20   A.   I have no idea if he was -- no, I have no
21   idea if he was searching Eric Coomer or Eric from
22   Dominion at any time.  I do know that I was never on a
23   call.
24        MR. CAIN:  I've got you at about 11
25   minutes left, Barry.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                                 b80d65b6-8bbf-4bf1-8099-35b26e79cf21

98

1     MR. ARRINGTON:  Thank you.
2     Let's take a five-minute break and I'll
3   see if there's anything else I can talk about.
4     MR. CAIN:  Okay.
5     (A recess was taken at 2:49 p.m. to 2:58
6   p.m.)
7     MR. ARRINGTON:  Back on the record.
8     Q.   (By Mr. Arrington) So, Dr. Coomer, is it
9   your position that it is impossible for you to have
10  affected the election in your position with Dominion?
11    A.   Absolutely impossible.
12    Q.   You're certain of that?
13    A.   Absolutely.  Hands down.
14    Q.   I'm at page 80 of Exhibit P23.  This, in
15  some context, is a comment string to one of your posts.
16    Do you remember this, starting at
17  page 71?
18    A.   I mean, it looks familiar.
19    Q.   Okay.  So this is, starting at page 71,
20  is one of your Facebook posts; is that right?
21    A.   Yeah.  Yeah, that's -- yeah, that's mine.
22    Q.   And the pages that follow are the comment
23  string to it, correct?
24    A.   It appears so, yes.
25    Q.   And the last page, someone named Byron

99

1   Watson says, "Why don't you just change their votes?"
2     And you respond:  "Because that would be
3   illegal."
4     Do you see that?
5     A.   Yep.
6     Q.   Why didn't you respond "Because that would
7   be impossible"?
8     A.   Because it's Facebook.
9     Q.   Because it's Facebook?
10    A.   Yep.
11    Q.   So you're saying that because it's
12  Facebook -- I don't see how that context affects the
13  answer.
14    A.   This is not -- Facebook is not a court of
15  law, a actual public debate.  These were private
16  Facebook messages.  It would be illegal.
17    Q.   It would be illegal?
18    A.   It would be illegal, highly illegal.  So
19  that's a fact.
20    Q.   That is a fact.
21    A.   And it would also be impossible to do
22  undetected.  I didn't feel I needed to express that.  I
23  thought the fact that not contributing to an illegal,
24  felonious act was enough.
25    Q.   So could you understand that someone

100

1   might think, Well, he says he doesn't do it just
2   because it's illegal --
3     A.   Nope.
4     Q.   -- I guess -- let me finish.
5     He says he doesn't do it because he says
6   it's illegal.  It sounds like he could do it, but he
7   just doesn't because it's illegal.
8     A.   No, you would have to be deficient to
9   believe that.
10    Q.   You would have to be deficient to believe
11  that you could affect the election?
12    A.   Yep.
13    (Exhibit P22 was marked for
14  identification.)
15    Q.   (By Mr. Arrington) I pulled up
16  Exhibit P22, which is a screenshot to which you refer
17  in your most recent court filing.  It's dated
18  September 26th, 2020.  And the fifth entry in the
19  screenshot is the one that Mr. Oltmann referred to in
20  his November 13th affidavit.
21    Do you have any idea why Joe Oltmann
22  would be searching search terms "Eric Dominion Denver
23  Colorado" on September 26th, 2020?
24    A.   I have no idea.
25    Q.   Do you deny that Mr. Oltmann was

101

1   searching the search terms "Eric Dominion Denver
2   Colorado" on September 20 -- or September 26th, 2020?
3     MR. CAIN:  Form.
4     THE DEPONENT:  He provided that in
5   discovery.  So, no, I don't dispute that.
6     Q.   (By Mr. Arrington) You talked about the
7   fact that these Facebook posts were private, right?
8     A.   Yes, I did.
9     Q.   And you had 300 friends, approximately?
10    A.   Approximately.
11    Q.   So you think a statement made to 300
12  friends is a private statement?
13    A.   Yes, I do.
14    Q.   If you were in an auditorium with 300
15  people and you said something, would that be a private
16  statement?
17    MR. CAIN:  Form.
18    THE DEPONENT:  If they were people I
19  invited to the auditorium, yes.
20    Q.   (By Mr. Arrington) You say the word
21  "fuck" quite a bit, don't you?
22    MR. CAIN:  You don't have to answer that,
23  if you don't want to.  It's a -- that's a harassing
24  question.
25    MR. ARRINGTON:  It's not a harassing

Electronically signed by Jana Mackelprang (001-409-517-3774)                                                      b80d65b6-8bbf-4bf1-8099-35b26e79cf21

102

1   question. It's to authenticate the documents, in which
2   he --
3         MR. CAIN:  Ask him about a document.  If
4   you want him to authenticate a document, then put it in
5   front of him and he can authenticate it.
6         Q.    (By Mr. Arrington) So in the Facebook
7   post --
8         MR. CAIN:  Asking him, you say the word
9   "fuck" a lot, doesn't authenticate anything.
10        Q.    (By Mr. Arrington) So in the Facebook
11  posts, you use the word "fuck" quite often, don't you?
12        A.    Actually, I'm not sure I can answer that.
13        Q.    You don't know whether you used that word
14  often?
15        A.    Can you define "often"?
16        Q.    Do you want to play definition derby?  Do
17  you know what "often" means?
18        A.    No, I don't in your -- in your terms.
19  Are we talking 1 percent?  5 percent?  20 percent?
20  50 percent?  What's often, sir?
21        Q.    You can define it any way you'd like.
22        A.    Then I would say no.
23        Q.    So your testimony, sitting here under
24  oath today, is you do not use the word "fuck" often?
25        MR. CAIN:  Form.

103

1         THE DEPONENT:  In a Facebook post?
2         Q.    (By Mr. Arrington) No, generally.
3         A.    Again, I won't answer that until you
4   define the terms.
5         Q.    No, I'm asking you -- you can define the
6   terms.  You're --
7         A.    No, you define the term.  You asked the
8   question, sir.
9         Q.    Do you understand what the English word
10  "often" means?
11        A.    Not in your context.
12        Q.    I'm not asking for my context.  I'm
13  asking for you to use the English word "often" as you
14  understand its meaning, and to tell me whether, as you
15  understand the word "often," you use that word "fuck" a
16  lot.
17        A.    I would say I use it less than a lot of
18  people I know.  So then I would characterize it as not
19  often.
20        Q.    Okay.  So your testimony is you do not
21  use the word often?
22        MR. CAIN:  Form.
23        THE DEPONENT:  Until you define, you
24  define -- you brought up sarcasm.  You brought up
25  dictionary.com.  Can you bring up "often" and define

104

1   that term for me, sir?
2         Q.    (By Mr. Arrington) No, I want you to
3   define it.
4         A.    No.  Nope.
5         Q.    So you're refusing to answer the
6   question?  You're refusing to use your own definition
7   of the word "often" to answer the question?
8         Is that what you're going to say?
9   Because if that's the case, just say it and we'll move
10  on.
11        A.    No, you asked the question.  You used the
12  term.  I don't know what your definition of the term
13  is.  So until you provide me with that definition, I
14  can't answer the question.
15        Q.    It doesn't matter what my definition of
16  the term is.  I'm asking you to use your definition of
17  the term.
18        Let me ask you this:  Do you know what
19  the English word "often" means?
20        A.    Frequently.
21        Q.    Okay.  Using that definition of the word
22  "often," do you use the word "fuck" often?
23        MR. CAIN:  Form.
24        THE DEPONENT:  In my understanding of
25  frequently, no.

105

1         Q.    (By Mr. Arrington) So you were head of
2   security for a voting software and machine company,
3   correct?
4         A.    Product strategy and security.
5         Q.    So as the head of security for that
6   company, did you think --
7         A.    Product strategy and security, sir.
8         Q.    Okay.  So you were the head of security,
9   right?
10        A.    No, I was head of product strategy and
11  security.  That's a different role.
12        Q.    Okay.  So in that role, did you think the
13  Facebook posts were private?
14        A.    Yes.
15        Q.    Okay.  So you did not think that any time
16  you put something on the Internet, it's subject to
17  being discovered?
18        A.    No.
19        Q.    Okay.
20        MR. ARRINGTON:  How much time do I have,
21  Jana?
22        THE REPORTER:  I think Charlie is keeping
23  track of the last 11 minutes.
24        MR. CAIN:  Yeah, you're at 9:32.  So
25  you've got a minute and a half.

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                                              b80d65b6-8bbf-4bf1-8099-35b26e79cf21

106

1      MR. ARRINGTON:  So, Andrea, I'm going to
2  give that minute to you, in case I didn't ask all the
3  questions that you wanted me to ask.
4      MS. HALL:  One second, Charlie.
5      THE DEPONENT:  Are we still on the
6  record?
7      THE REPORTER:  Yes.
8      MS. HALL:  I've got a quick stop off the
9  record.
10     MR. KIMREY:  Yeah.  Can we take a break?
11     MR. CAIN:  We literally have 60 seconds
12  left, but --
13     MR. KIMREY:  Can we take a break?  I need
14  to take a break.  Let's take a break.
15     THE DEPONENT:  Does somebody need to pee?
16     MR. KIMREY:  Yes.
17     MR. CAIN:  Very short -- very short break
18  so we can be done.  We've got a minute left on the
19  record.
20         You can stay on, Eric.
21     (A recess was taken from 3:09 p.m. to
22  3:12 p.m.)
23     MS. HALL:  Okay.  I guess we're back on
24  the record.  Is everybody ready?
25     MR. CAIN:  Yes, ma'am.

107

1              EXAMINATION
2  BY MS. HALL:
3      Q.   Okay.  Mr. Coomer, are you antifascist?
4      MR. CAIN:  Form.
5      THE DEPONENT:  I do not like fascists,
6  no.
7      Q.   (By Ms. Hall) So are you antifascist?
8      A.   Yes, I am against fascists, yes.
9      Q.   Again, the question is:  Are you
10  antifascist?
11     MR. CAIN:  Form.
12     THE DEPONENT:  I think I answered that.
13     Q.   (By Ms. Hall) So you are antifascist?
14     A.   I am against fascists, yes.
15     Q.   No.  My question to you is:  Are you
16  antifascist?
17     MR. CAIN:  Form.  Asked and answered.
18     Q.   (By Ms. Hall) Is that a yes?
19     A.   If you're --
20     Q.   You're eating up time.  I'm going to go
21  off the record.
22     A.   No.  If you're asking if I am part of
23  Antifa, which I kind of feel like you're getting to --
24     Q.   No, that's not my question, Mr. Coomer.
25     Mr. Coomer, my question to you is very

108

1  direct:  Are you antifascist?
2      A.   Absolutely.
3      Q.   And is Antifa a truncation of
4  antifascists?
5      MR. CAIN:  Form.
6      THE DEPONENT:  It's a neologism.
7      Q.   (By Ms. Hall) So you agree that Antifa is
8  part of being an antifascist?
9      A.   No.
10     Q.   So do you agree that Antifa is a
11  truncation of antifascists?
12     A.   No, it's a neologism.
13     Q.   What's your definition of neologism?
14     MR. CAIN:  And that's going to be your
15  last answer.
16     THE DEPONENT:  Let's bring up
17  dictionary.com, kids.
18     MR. CAIN:  No.  That can be your -- if
19  you can define it, you've gone your minute.
20         So try to define it, Dr. Coomer, and
21  that's your last answer.
22     THE DEPONENT:  It's a combination of two
23  words truncated into one.
24     Q.   (By Ms. Hall) Antifa is?
25     MR. CAIN:  We're done.  That's it.

109

1  You've had your two hours.
2      MS. HALL:  Well, I think he can answer
3  the question here.
4      THE DEPONENT:  I think we're over time.
5      MS. HALL:  So you're refusing to answer
6  the question?
7      MR. CAIN:  The court order is two hours,
8  so we're done.
9      MS. HALL:  Well, it's funny how you act,
10  Charlie, during a deposition because you always go over
11  time and, you know --
12     MR. KIMREY:  Yeah.  Actually, I want to
13  note, Mr. Cain -- this is Blaine Kimrey for OAN and
14  Chanel Rion -- you said you were giving two extra
15  minutes.  So I think those two extra minutes are
16  Ms. Hall's minutes, unless you're taking those back.
17     MR. CAIN:  No, I didn't.  I already
18  included that, Blaine.  If we want to go off the record
19  and let Jana confirm it, then that's fine.  But by my
20  count now, we're over --
21     MR. CAIN:  Off the record.
22     (Discussion off the record from 3:15 p.m.
23  to 3:17 p.m.)
24     MR. CAIN:  You can answer that and then
25  we're done.

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    b80d65b6-8bbf-4bf1-8099-35b26e79cf21

110

1    THE DEPONENT: So, actually, I just
2  looked it up. Neologism is a newly coined word or
3  expression. The coining or use of new words.
4    MR. KIMREY: That's not the question
5  pending.
6    Could you reread the question, please?
7    MR. CAIN: This is not your witness,
8  Blaine. Let the counsel do it.
9    MS. HALL: Yeah, I mean, he didn't answer
10  the question, Charlie. He's now reading something he
11  just Googled.
12    So, Jana, please read the question to him
13  again.
14    And, Mr. Coomer, please answer the
15  question.
16    THE DEPONENT: And please refer to me as
17  Dr. Coomer.
18    MR. CAIN: Okay. Stop. Just please,
19  everyone.
20    What I've said is we're over the two
21  hours. What I've said is you can respond to Andrea
22  Hall's last question and then we'll be done.
23    So if you need Jana to read that back,
24  Dr. Coomer, to respond to that question, fine. If you
25  can recall it, then you can respond and we'll be done.

111

1    THE DEPONENT: If you can please read it
2  back.
3    (Whereupon, the reporter stated, "The
4  Deponent said, 'It's a combination of two words
5  truncated into one.'
6    "Ms. Hall said, 'Antifa is?'"
7    THE DEPONENT: So I don't know what
8  Antifa refers to.
9    MR. CAIN: Thank you.
10    THE REPORTER: Since we're off the
11  deposition, can everybody tell me what they want?
12    MS. HALL: We'll take an expedited
13  transcript, please. And then we'll just take regular
14  on the video. It doesn't have to be expedited, but a
15  video. But we do need the transcript from today
16  expedited, please.
17    MR. KIMREY: And OAN and Ms. Rion would
18  like expedited on the transcript and the video. And
19  how quickly can we get that?
20    THE REPORTER: Tomorrow.
21    MR. KIMREY: Okay, that's fantastic.
22  Thank you.
23    MR. ARRINGTON: Thank you, gentlemen --
24    MR. KIMREY: I'm sorry. I don't know how
25  this works with Internet depositions, but will the

112

1  video be synchronized with the transcript?
2    THE REPORTER: No, because it's a Zoom.
3  So we didn't have a videographer here that would do
4  that.
5    MR. KIMREY: Okay. Understood. That's
6  fine. Thank you.
7    MR. ARRINGTON: Jana, I'll have an
8  expedited transcript as well, please. Electronic only.
9  Thank you.
10    MR. CAIN: I don't need an expedite,
11  Jana, but I'll have Scotti get in touch with you
12  because I don't know what the order is typically.
13    MS. BOEHMER: Jana, this is Margaret
14  Boehmer on behalf of Eric Metaxas. I'd like an e-tran.
15  I don't believe we need it expedited.
16    MR. HOLWAY: Jana, this is Eric Holway on
17  behalf of the Trump Campaign, and I would like an
18  expedited transcript, please.
19    MR. BURNS: Jana, this is John Burns for
20  TGP Communications and Jim Hoft. We would like an
21  expedited transcript and video, please.
22    THE REPORTER: Thank you.
23    MR. BURNS: Jana, do you need my -- this
24  is John Burns again -- do you need my e-mail address?
25    THE REPORTER: No, I have that, but thank

113

1  you, John.
2    MR. BURNS: Cool. Thank you.
3    MR. QUEENAN: And Gordon Queenan for
4  Michelle Malkin. I don't need an expedited transcript,
5  but I would need it by -- well, you tell me. I need it
6  by next Thursday. Is that semi-expedited?
7    THE REPORTER: You don't need to worry
8  about that. You'll get it soon.
9    MR. QUEENAN: I appreciate it. Thanks.
10    THE REPORTER: I guess we're finished,
11  then.
12    (WHEREUPON, the deposition was concluded
13  at 3:22 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Electronically signed by Jana Mackelprang (001-409-517-3774)                                b80d65b6-8bbf-4bf1-8099-35b26e79cf21

---

**114**

1         I have read the foregoing transcript
2  of my testimony and have indicated the same by my
3  signature.
4
5
6  _____
            ERIC COOMER
7
8  STATE OF COLORADO
9  CITY AND COUNTY OF DENVER
10       Subscribed and sworn to before me by ERIC
11  COOMER, on this _____, 2021.
12       My commission expires:_____.
13
14
15
16  _____
            Notary Public
17
18  _____
            Address
19
20
21  Reporter:  JM
22
23
24
25

---

**115**

1         CERTIFICATE
2  STATE OF COLORADO     )
                 )ss.
3  CITY AND COUNTY OF DENVER )
4      I, Jana Mackelprang, Certified Realtime
  Reporter, Registered Professional Reporter, and Notary
5  Public for the State of Colorado, do hereby certify
  that previous to the commencement of the examination,
6  the said ERIC COOMER was duly sworn by me to testify
  the truth in relation to the matters in controversy
7  between the said parties.
    I further certify that said deposition was
8  taken in shorthand by me and was reduced to typewritten
  form by computer-aided transcription, that the
9  foregoing is a true transcript of the questions asked,
  testimony given, and proceedings had.
10      I further certify that I am not an
  attorney nor counsel nor in any way connected with any
11  attorney or counsel for any of the parties to said
  action or otherwise interested in its event.
12      IN WITNESS WHEREOF, I hereunto affix my
  hand and notarial seal this 23rd day of September,
13  2021.  My commission expires January 24, 2024.
14
15
16  _____
  Jana Mackelprang
17  CRR, RPR, Notary Public
  Calderwood-Mackelprang, Inc.
18
19
20
21
22
23
24
25

---

**116**

1  CALDERWOOD-MACKELPRANG, INC.
  9745 East Hampden Avenue, Suite 220
2  Denver, Colorado 80231
  (303) 477-3500
3
  September 24, 2021
4
  Charles J. Cain, Esq.
5  Brad Kloewer, Esq.
  Steve Skarnulis, Esq.
6  Cain & Skarnulis PLLC
  P.O. Box 1064
7  Salida, Colorado 81201
  Re: Coomer v. Donald J. Trump For President, et al.
8  Deposition of: ERIC COOMER
9  The deposition in the above-entitled matter is ready
  for reading and signing.  Please attend to this matter
10  by complying with ALL blanks checked below:
11  _____ arranging with us at the number listed below
     to read and sign the deposition in our
12       office.
13  XXX having deponent read your copy and sign
     amendment sheets, if any (original signature
14       page enclosed.)
15  _____ reading enclosed deposition, signing
     signature page and correction sheets, if any.
16
17  XXX within 35 days of the date of this letter.
18
19  _____ by _____ due to trial/hearing date of
20  _____.
21  Please be sure that the signature page and amendment
  sheets, if any, are signed before a notary public and
22  returned to our office.  If this matter has not been
  taken care of within said period of time, the
23  deposition will be filed unsigned pursuant to the Rules
  of Civil Procedure.
24  JANA MACKELPRANG, CRR, CSR, RPR
25  cc: Counsel of Record

---

**117**

1  CALDERWOOD-MACKELPRANG, INC.
  9745 East Hampden Avenue, Suite 220
2  Denver, Colorado 80231
  (303) 477-3500
3
  Barry K. Arrington, Esq.
4  Arrington Law Firm
  3801 East Florida Avenue, Suite 830
5  Denver, Colorado 80210
6
7  Re: Coomer v. Donald J. Trump For President, et al.
8
  Dear Mr. Arrington:
9
  Enclosed is the deposition of: ERIC COOMER
10
11  _____ Previously filed.  Forwarding signature page
     and amendment sheets.
12  _____ Signed, no changes.
13  _____ Signed, with changes, copy enclosed.
14  _____ Unsigned, notice duly given _____,
     pursuant to the Rules of Civil Procedure.
15
16  _____ Not signed, notice duly given _____
     since trial is set for _____.
17  _____ No signature required.
18  _____ Signature waived.
19  _____ To be signed in court.
20  _____ Signature pages/amendment sheets to be
     returned to court on date of trial.
21
22  _____ Mailed by Certified Mail No._____.
23  _____ Hand-delivered on approximately _____.
24  JANA MACKELPRANG, CRR, CSR, RPR
25  cc: Counsel of Record

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)               b80d65b6-8bbf-4bf1-8099-35b26e79cf21

**A**
**a.m** 2:2 12:11,12
**Abbie** 4:21
**ability** 9:12 14:1
**able** 12:25 13:24 80:13
**above-entitled** 2:1 116:10
**absolute** 65:20 69:10,18 70:8
75:23
**absolutely** 8:16 13:18 27:20
29:22,23 39:6 51:24 72:22
80:16 95:6 98:11,13 108:2
**absurd** 77:21
**accelerant** 92:12
**accompanied** 53:10
**accompanies** 53:11
**account** 34:15 45:20,21 52:18
52:20,24
**accounts** 45:23 46:16 48:15
49:13 54:22 55:23 59:17
60:23 61:2,9
**accusing** 45:17
**acquaintance** 65:23
**acronym** 85:25
**act** 90:5 91:9 92:25 99:24 109:9
**acting** 77:8
**action** 52:5 115:11
**active** 45:21 46:24
**activist** 95:24
**activities** 96:11
**actual** 51:7 80:4,5,14,24,24
81:8,11 82:4 99:15
**ad** 44:7
**adamant** 32:18
**added** 66:16
**addiction** 35:20 77:11
**Additionally** 45:2,15
**address** 1:2 7:6 24:7 51:10
112:24 114:18
**adjourn** 23:18
**administer** 6:8
**admissibility** 6:9
**admitted** 53:25
**advance** 93:18 94:13
**advanced** 95:1,3
**affect** 9:11 66:24 91:23 93:1
95:2 100:11
**affidavit** 41:21 100:20
**affirmatively** 87:10,15
**affirming** 85:15
**affix** 115:12
**ago** 25:23 28:1 31:11,18 89:6
89:20
**agree** 13:17 20:7 41:15 55:7
71:22 73:3 108:7,10
**agreed** 24:13
**ahead** 20:1 94:21
**al** 116:8 117:7
**alleged** 25:15,15 52:4,5
**allow** 15:4
**amendment** 116:14,21 117:11
**America** 1:14 4:6 48:17,20
**American** 90:19
**Americans** 36:8
**Anderson** 96:2,7
**Andrea** 3:11 106:1 110:21
**andrea@thehalllawoffice.c...**
3:13
**Angeles** 4:17

**animal** 81:6,10,14
**anonymous** 16:12,21 19:3
**answer** 8:14,15 9:12,15 21:6,16
22:14 30:3 33:3 42:4,25 45:8
50:1,20 68:25 69:4,8 77:3,6
79:1 83:14 91:2,13 96:15
99:13 101:22 102:12 103:3
104:5,7,14 108:15,21 109:2,5
109:24 110:9,14
**answered** 35:14 68:7 74:12
81:25 107:12,17
**anti-post** 90:13
**anti-Trump** 90:13 92:23,25
**anticipate** 8:11
**antifa** 17:3 19:5,7 25:10,18,20
28:24 29:3,6,8,11,13,16,18
30:9 32:1,7,19,23,24 33:6,7,9
33:11,14,16,21,25 34:2 52:4
107:23 108:3,7,10,24 111:6,8
**Antifa'** 28:7,14
**antifa,'** 16:14,23
**antifascist** 107:3,7,10,13,16
108:1,8
**antifascists** 108:4,11
**anybody** 42:11 85:16 95:24
**apologize** 13:21
**appear** 75:24
**APPEARANCES** 2:5 3:1 4:1
**appeared** 51:8 53:19
**appearing** 7:3
**appears** 98:24
**apply** 18:25
**appreciate** 113:9
**appropriate** 84:2,18 85:6,9,16
85:21 86:20 87:2,10,16 89:7
89:21
**approximately** 44:19 101:9,10
117:22
**architect** 76:14
**argue** 21:24
**Ark** 52:14 53:5,7
**arranging** 116:12
**Arrington** 1:17,18 3:3,3 5:2
6:12,15 7:2,8 8:4,8,17,18 9:6
9:10,18,21,24 10:3 11:9,11,20
11:25 12:8,13,14 13:7 14:9
17:11 18:10 19:23 20:4,11,18
21:7,14 22:2,4,12,17,22 23:8
23:13,17,24 24:5,9,19,21,24
25:4,5 27:8,12,19,24 30:4
31:25 36:22 37:5,10,13,16,22
43:12,22 45:14 49:5,8,18
50:14,20,24 51:9 52:10 54:15
57:21 58:13,20 59:5,13 60:1,9
60:21 61:13,16,21,25 62:2,4
63:1 64:15 67:23 68:6,16
69:2,5,23 70:6,12,19 71:8
72:4,14 73:8,11,20 74:5,16,22
77:12,18 78:7,20 79:22 81:2
81:12 82:10 83:2,10,17,19
84:1,13,14,18 85:11,24 86:8
86:25 87:19 88:4,25 89:5,11
89:19 90:24 91:12 94:2,18
95:21 96:17,21,25 97:3,12,17
98:1,7,8 100:15 101:6,20,25
102:6,10 103:2 104:2 105:1
105:20 106:1 111:23 112:7
117:4,4,8

**article** 10:5,7 11:13,23 12:5
13:5,17,18,22 19:14,16,19
26:6,9,24 36:16,20 46:19,25
52:13 53:11,19 54:6,8,16
58:11 64:7,8
**asked** 12:1 17:24 22:5,22,23
24:1 27:10 30:19 33:2 35:13
46:22 50:21 55:2,19 71:1
74:12 76:20 81:17,25 87:1
89:25 96:16 103:7 104:11
107:17 115:9
**asking** 13:3 20:2 27:17 30:9
31:9,10,16 46:9 60:7 64:24
73:8,9,10,11,21,22 74:5,6,9
74:13 77:24 78:14 82:25 83:8
102:8 103:5,12,13 104:16
107:22
**aspects** 88:15
**ass-clown** 66:5
**assessment** 38:1 74:3
**asshat** 65:13 72:20
**associates** 16:15,16,23
**assume** 57:19
**assure** 57:12
**attached** 56:24
**attacks** 54:18
**attend** 116:10
**attended** 95:22
**Attitude** 86:18
**attitudes** 66:25
**attorney** 1:16 115:10,11
**attributed** 13:4,22 36:17
**Audio** 48:25
**audio-video** 53:10,17
**auditorium** 101:14,19
**authentic** 63:4,8
**authenticate** 102:1,4,5,9
**author** 17:17 31:21 53:3,13,21
**authored** 51:14 54:14
**authoring** 53:25
**authorized** 6:7
**autocratic** 65:13 72:19
**Avenue** 1:18 2:22 3:4 116:1
117:1,5
**average** 76:23
**avoided** 68:16 70:22
**aware** 40:10 44:19 50:5 51:6
57:25 59:8,14
**awareness** 50:10 51:3
**awesome** 66:6

**B**
**back** 11:5 12:13 13:7,10 14:7
15:13 17:21 18:15 21:20 23:3
23:17 25:4 37:2,3,17 38:9,22
39:9 41:20 43:12,16 50:15,16
51:2 54:15 58:16 68:2 69:14
72:9 75:9,15 81:5 84:17
89:10,22 91:1 94:8 98:7
106:23 109:16 110:23 111:2
**backtracking** 59:6
**Bacon's** 54:17
**band** 82:13
**bankruptcy** 35:22 36:6
**Bannock** 1:3
**bar** 78:6
**barker** 65:24
**Barry** 1:17 3:3 12:24 22:10 24:4

24:6,14 88:23 97:25 117:4
**barry@arringtonpc.com** 3:5
**based** 6:9 66:20 77:10 78:19,20
78:21
**Bates** 67:3
**bclark@vedderprice.com** 4:10
**bearing** 87:20
**beg** 11:9
**began** 38:2 53:2
**begins** 14:11
**behalf** 2:1 6:12 112:14,17
**belief** 92:4
**beliefs** 85:10 92:16
**believe** 16:3,4 19:17 30:25
31:19 34:8 40:14 53:18 54:1
56:1 57:13 62:13 70:2 74:9
83:8 88:21 89:20 93:24 95:1
97:12 100:9,10 112:15
**believed** 41:12 89:23
**Benjamin** 65:17
**best** 15:20 19:2 29:24 53:1 55:9
56:6
**better** 92:12
**beyond** 33:18 66:1,1,14 83:3
**bias** 90:6
**bike** 14:18
**bit** 101:21
**bkimrey@vedderprice.com**
4:10
**Blaine** 4:7 109:13,18 110:8
**blanks** 16:11
**blithe** 18:23
**BLM** 95:22,25
**bloward** 65:13 72:20
**blunt** 14:14
**board** 35:16
**Boehmer** 4:2 112:13,14
**bottom** 44:4 46:13
**Boulevard** 1:21 3:7 4:16
**Bounty** 5:11
**Bowman** 2:7
**Box** 2:8 3:11,15,18 116:6
**Brad** 2:6 116:5
**break** 20:15 36:25 37:17 61:15
61:17 88:24 91:10 98:2
106:10,13,14,14,17
**brief** 37:23 61:15 77:20 89:17
**Brighton** 3:15
**bring** 81:16 103:25 108:16
**broadcast** 48:18
**brought** 81:19 103:24,24
**Bryan** 4:7
**bulls** 14:22
**bullshit** 65:21 66:2 95:18
**Burns** 3:17,18 112:19,19,23,24
113:2
**Byron** 98:25

**C**
**C** 6:1
**Cain** 2:6,8 6:14 7:13,15,17 8:16
9:4,8,14 11:8,10,14,24 12:6
12:24 13:8,10 18:5 20:2,7,16
20:17,23 21:23,24 22:3,9,15
22:19,22 23:6,11,20,22 24:11
24:14,20,23 27:1,9,10,17,23
30:2 31:20 37:19 45:13 49:4
49:6 50:23 54:11 57:16 59:11

59:25 60:6,20 62:1 64:14
68:13,24 69:20 70:4,11,17
71:4 72:1,11 73:6,10,16 74:1
74:12,21 77:3,17 78:2,17
79:21 81:1,3 82:7,25 83:3,5,7
83:12,23 84:4,20 85:8,22 86:5
86:22 87:13 88:1 89:9,12
90:21 91:6 94:16 95:9,13
96:15,20 97:8,15,24 98:4
101:3,17,22 102:3,8,25
103:22 104:23 105:24 106:11
106:17,25 107:4,11,17 108:5
108:14,18,25 109:7,13,17,24
110:7,18 111:9 112:10 116:4
116:6
**Cain's** 83:18
**Calderwood-Mackelprang**
115:17 116:1 117:1
**California** 4:17
**call** 12:8 15:17 23:9 25:9 32:19
32:23 33:6,9,11,14,25 34:2
48:11,14,15 52:4,5 65:11
95:16 96:6,10 97:23
**called** 19:5 43:23 54:18
**campaign** 34:11 92:18 112:17
**capacity** 8:21 9:12 77:9 90:6
**care** 116:22
**career** 93:7,15 94:10
**carefully** 43:14 50:24 72:6
**careless** 34:18
**carnival** 65:24
**carried** 48:9
**case** 1:5 13:19 53:25 88:21
104:9 106:2
**categorically** 95:15,18
**cats** 42:13
**cc** 116:25 117:25
**ccain@cstrial.com** 2:10
**certain** 11:16 44:5 49:10 55:15
59:16 82:2 88:15 98:12
**certainly** 39:1 53:23 54:4
**certainty** 38:23
**CERTIFICATE** 115:1
**Certified** 2:2 115:4 117:21
**certify** 115:5,7,10
**cetera** 18:2
**chain** 92:22
**Chanel** 1:13 4:6 109:14
**change** 62:17 99:1
**changed** 31:1
**changes** 117:12,13
**channels** 45:3,15
**characterization** 71:22
**characterize** 25:17 71:6,17
72:25 103:18
**characterized** 71:11
**characterizing** 23:24
**charged** 35:24
**Charles** 2:6 4:20 11:13 116:4
**Charlie** 95:12 105:22 106:4
109:10 110:10
**checked** 34:15 116:11
**Chicago** 4:9 11:5,7 12:20
**Christian** 65:14
**Christmas** 76:9,9
**Christopher** 2:21
**circulated** 47:11 53:4,14
**citizen** 85:10

**CITY** 1:1 114:9 115:3
**Civil** 6:3 116:23 117:14
**claimed** 54:22
**clarification** 43:2
**clarify** 8:6 12:25 64:16
**Clark** 4:7 44:16
**Clay** 44:16
**clear** 19:6,7 28:14 52:3 53:20
55:22 96:9
**clearer** 55:3,5,6
**clearly** 26:18 31:13 54:14 69:21
**client** 23:21
**clients** 91:24
**climbing** 35:16
**clown** 56:6,21 57:6 62:5,9 63:4
63:19
**cocaine** 9:3 35:17
**coined** 110:2
**coining** 110:3
**colleagues** 89:24
**color** 88:3
**Colorado** 1:1,2,3,19,22 2:9,13
2:18,23 3:4,8,12,22 4:4,13
6:3 7:7 40:18 100:23 101:2
114:8 115:2,5 116:2,7 117:2,5
**combination** 108:22 111:4
**come** 8:22 21:20 23:3 33:22
73:14,24 74:10,17
**comedy** 83:12
**coming** 16:25 25:24
**commencement** 115:5
**comment** 13:11 22:1,21 98:15
98:22
**commentary** 5:9 43:24 94:6
**comments** 20:23
**commission** 114:12 115:13
**commit** 31:13
**commonly** 48:5
**communicating** 42:11
**Communications** 1:12 3:16
112:20
**companies** 78:4
**company** 77:9 84:3,19,22,24
92:10,24 105:2,6
**compensated** 77:25 78:15 79:4
87:2
**competitive** 14:17
**complaint** 53:24
**complete** 66:24
**completed** 45:10
**completely** 46:20 66:20
**complying** 116:11
**computer** 42:8
**computer-aided** 115:8
**concede** 55:4
**concedes** 55:2
**conceive** 91:8
**concerned** 54:20
**concerted** 92:18
**concluded** 113:12
**conclusion** 73:14,24 74:10,17
**conduct** 41:1,5,17 42:23 43:8
66:25
**conference** 11:21
**conferred** 48:5
**confirm** 96:1 109:19
**confirming** 12:6 14:4
**confusing** 72:13

**connected** 115:10
**connotation** 72:3
**Conservative** 1:12
**consider** 10:15 27:6
**considered** 35:8,11
**consistent** 13:15 14:3
**Conspiracists** 5:8 10:6
**conspiracy** 41:23
**Constitution** 85:19
**construe** 41:4,13
**contact** 33:22
**contained** 39:20
**contains** 39:21
**contemporaneous** 64:6,20
**contempt** 66:7
**contents** 10:16
**context** 46:24 80:13 82:16
98:15 99:12 103:11,12
**continue** 31:4 44:7 54:19 92:6
**Continued** 3:1 4:1
**contradiction** 19:11 28:19
**contributing** 99:23
**controlled** 66:1
**controversy** 115:6
**conversation** 16:1 96:3
**Cool** 113:2
**Coomer** 1:7,23 6:10,22 7:4,7,21
8:1,19 10:8 11:2 12:14 13:3
13:20,20 16:2 17:12,13 21:8
25:5 27:11,24 32:12,18 37:22
38:5 43:15 47:20 50:25 52:17
54:7,17,24 55:2,5 61:25 62:4
63:12 65:5 73:22 76:20 77:6
83:5 84:8 89:5,20,23 92:11
95:21 96:15 97:21 98:8 107:3
107:24,25 108:20 110:14,17
110:24 114:6,11 115:6 116:8
116:9 117:7,9
**Coomer's** 5:12,13
**Cop** 82:11
**cops** 81:21 82:4 88:12,13,19
**copy** 116:14 117:13
**corporate** 76:24,25
**Corporon** 44:17
**correct** 10:25 11:1,7 25:23
30:23 31:3 32:9,24 33:16
36:7 41:6 51:23 52:20 60:18
60:19,25 64:21 67:12 98:23
105:3
**correction** 116:16
**costume** 62:18
**counsel** 6:6 13:18 33:3 110:8
115:10,11 116:25 117:25
**count** 109:20
**counted** 7:12 38:16
**country** 66:6 67:2,8
**counts** 35:24
**COUNTY** 1:1 114:9 115:3
**couple** 7:9 23:3 31:10
**course** 32:22
**court** 1:1,2 5:12 6:6,7 11:22
12:9 13:6,25 21:20 23:4,9
24:1 43:13,17 50:17 51:2
58:16 68:2 72:9 84:17 94:8
99:14 100:17 109:7 117:19,20
**Court's** 7:23
**courtesy** 20:16
**covered** 60:23 75:22

**crap** 96:14
**crazy** 91:15
**credible** 47:24 48:9 66:21
**credit** 13:14 34:12 90:19
**credited** 14:7
**criminal** 41:1,14,23 42:2
**crisis** 76:15,19
**critical** 13:18
**cross-check** 79:14 82:21
**CRR** 115:17 116:24 117:21
**cseerveld@drc-law.com** 2:24
**CSR** 116:24 117:24
**cult** 32:8
**current** 15:10 19:3 46:24 47:4
**Cushing-Murray** 65:17

---

**D**

**D** 6:1
**d/b/a** 3:17
**Daily** 1:12
**Daley** 11:4
**damaged** 35:19
**damn** 65:22
**data** 42:1
**date** 46:8,13 68:10,21 116:18
116:19 117:20
**dated** 65:4 100:17
**day** 19:3 26:19 48:3 53:19
64:12,18 115:12
**day-to-day** 33:18
**days** 116:18
**dba** 1:11,12,14
**dead** 76:10,17 82:11,11
**deal** 77:1
**Dear** 28:11 117:8
**death** 43:10 61:7,8,11 76:17
96:13
**debate** 65:16 99:15
**December** 46:13,14,15 49:19
50:2,6 51:12,12,17,21 52:12
54:17 56:20 59:10 60:24 62:7
62:11 63:24
**decision** 83:20
**declaration** 37:23 40:22 41:9
42:16 96:9
**defamatory** 95:4
**defame** 59:24
**Defendant** 2:15,20 3:20 4:2
**Defendants** 1:9,16 2:1 3:2,10
3:16 4:6
**Defending** 1:10 2:20
**deficient** 100:8,10
**define** 47:17,22 102:15,21
103:4,5,7,23,24,25 104:3
108:19,20
**definition** 17:24 18:3 32:7
33:15 48:7 102:16 104:6,12
104:13,15,16,21 108:13
**definitions** 18:7,9
**definitive** 18:8
**definitively** 39:18
**DeFranco** 3:14,14
**delete** 38:4,9,25 39:1,5,6,15
40:1,4,8 75:7
**deleted** 38:20 39:11,19,19,22
39:24 40:2,12 41:3 42:22
43:18 75:10,14,16,18,23,24
75:25 76:3 79:12 82:19

deleting 38:3 41:2
deletion 96:24
denied 51:14 54:4
denouncing 18:1
Denver 1:1,3,19 2:13,18 3:4 4:4
13 5:9 44:1 54:8,18 55:8
56:20 61:3 62:7,12 100:22
101:1 114:9 115:3 116:2
117:2,5
deny 100:25
denying 12:2,6 24:12 48:19
deponent 18:6 21:1 30:3 31:21
43:18 49:1,9 50:18 51:5
54:12 57:17 59:3,12 60:7
62:16 68:14,25 69:21 70:5,18
71:5 72:2,12 73:7,17 74:2,13
77:8 78:3,18 81:4 82:8 83:4,6
83:15,24 84:5,9,21 85:9,23
86:6,23 87:14 88:2 90:22
91:7 94:17 95:10,15 97:10,16
101:4,18 103:1,23 104:24
106:5,15 107:5,12 108:6,16
108:22 109:4 110:1,16 111:1
111:4,7 116:14
deposition 2:1 6:9 7:24 8:20
13:19 20:19 21:17 23:5,19
27:14,20,42 42:12 109:10 111:11
113:12 115:7 116:9,10,12,16
116:23 117:9
depositions 7:11 20:9,12
111:25
derby 102:16
deriding 18:1
describe 19:9 62:5,9
deserve 66:7
designate 28:20
desire 65:25
details 62:22
determination 60:12
Dexter 4:11
diameter 15:10
dictionary.com 17:23 18:8,16
103:25 108:17
died 77:1,1
different 33:3 46:22 50:21 72:3
105:11
digital 49:25 50:13 57:10,19
direct 28:19 108:1
director 11:2 92:24
disagree 29:20 65:18
discourse 65:16
discourteous 20:17
discovered 105:17
discovery 96:22 101:5
discuss 14:19
discussed 14:25 51:6
discussing 15:1
discussion 13:2 23:15 25:19
89:17 109:22
disease 35:20
disinformation 92:19
dislike 71:8,22
dispute 18:11 24:10 101:5
distortion 8:7 48:25
DISTRICT 1:1
Div./Ctrm 1:5
document 18:25 19:21 20:6,10
20:13,15,22 21:3,5,11,15,25

22:5,7,20,23,25 23:21 25:12
26:8,16,17,25 27:7,25 30:17
30:22,25 31:3,7,14,17 43:23
43:25 102:3,4
documents 102:1
doing 7:10 21:23 27:13 52:6
78:4
Dominion 11:3 40:4,8,10,11
67:12,19 68:4,11,22 69:7,9,14
69:14,18 92:10 93:19 94:14
95:2 96:19 97:2,6,14,19,22
98:10 100:22 101:1
Donald 1:9 2:15 28:9 69:11
70:8,12,16,20,21 71:3,6,14,20
71:23 73:5,15,24 74:11,18
75:1 116:8 117:7
dormant 52:18,21
dosed 76:11
double 64:15 72:12
doubt 39:16 95:19
dozens 75:20
Dr 6:10 7:4,21 8:1,19 10:8
12:14 13:3,20 17:13 21:8
25:5 27:11,24 37:22 38:5
43:15 45:24 47:20 50:25 54:7
55:5 61:25 62:4 65:5 73:22
77:6 83:5 84:8 89:5,20 95:21
96:15 98:8 108:20 110:17,24
driving 35:24
Dry 18:23
DTC 3:21
due 116:19
dues 19:8 28:16 29:10 30:11
duly 6:23 115:6 117:14,15
dunno 76:9
Dymond 2:22

———— E ————

E 6:1,1
e-mail 112:24
e-mails 49:13
e-tran 112:14
earlier 38:10 43:2 75:22 82:9
Early 4:15,16
ears 14:23 15:7,10
ease 7:18
East 1:18 2:22 3:4 116:1 117:1
117:5
easy 26:15
eating 107:20
Edge 5:10 52:11
edit 66:17,19 67:4
eearly@earlysullian.com 4:17
either 13:23 40:11
elapsed 61:18
election 52:6 91:23 93:1,20
94:15 95:2,17 98:10 100:11
elections 93:8
electoral 54:21
Electronic 112:8
else's 74:3,6
employee 77:9
employees 40:11
employer 66:22 67:11
enclosed 116:15,16 117:9,13
encompasses 18:14
end-tag 66:17
ended 35:23

ends 91:10
endurance 14:18
engage 24:15
engaged 41:17
engaging 26:20
English 103:9,13 104:19
ensured 34:21
enterprise 41:14
entire 19:19 20:13,22 21:3,4,11
22:7 27:6 31:14
entitled 10:5 11:22
entry 100:18
Eric 1:7,13,23 2:16 4:2,15 6:22
7:7 11:2 16:2 44:16,16 63:11
96:19 97:2,6,13,18,21,21
100:22 101:1 106:20 112:14
112:16 114:6,10 115:6 116:9
117:9
eric.holway@jacksonkelly....
2:19
Esq 2:6,6,7,7,12,16,16,21,21 3:3
3:6,11,14,17,20 4:2,7,7,11,15
4:15,21 116:4,5,5 117:4
essentially 65:9
et 18:2 116:8 117:7
event 115:11
everybody 6:18 24:2,25 106:24
111:11
everybody's 23:2
evidence 32:5 34:9 41:16 43:5
43:6 78:3,22 95:19
exact 16:25 32:16
exactly 46:18,23
examination 5:1 7:1 107:1
115:5
exceed 7:22
excuse 15:4 64:2 84:7 95:11
excused 73:4
executive 40:7 76:24,25 77:14
77:22,25 78:8,16,22,25 84:2
84:18,21,24 85:7 86:20 87:3
87:10,18
executives 78:4 79:4
exercise 10:19
Exhibit 5:6,8,9,10,12,13 9:20
10:1 12:15 17:8,9 25:6 32:11
36:16 37:23 38:10,11,11
39:21 43:20,23 44:21 49:21
50:7 52:8,10 63:10 65:4 73:4
73:14 75:6 76:4 82:10 86:2
89:22 98:14 100:13,16
exist 32:24 33:7,16 34:12 40:15
40:16
exists 32:1 33:21 34:4
expedite 112:10
expedited 111:12,14,16,18
112:8,15,18,21 113:4
experience 77:11
expires 114:12 115:13
explain 7:17 61:1,3
explained 16:13,22 43:1
explicit 54:2 82:9
exploit 92:2
exposed 45:23
exposing 18:1
express 85:10 99:22
expressed 52:7 67:18 68:3,11
68:23 92:17

expressing 87:17
expression 110:3
expressly 32:25 53:16
extra 109:14,15

———— F ————

fabricated 11:17 45:4,16 46:3
54:10,14 55:21 56:1
fabricated.' 54:23
fabricating 45:18
fabrication 11:19
facarical 22:6
face 77:21
Facebook 5:13 11:16,19 17:12
17:15 34:15,22 36:10 37:24
38:3,4,7,14,20,24 39:2,5,10
39:14,14,17 40:2,5,8 42:17,21
43:18 44:20,25 45:5,18,21,23
46:2,20 47:3,10 49:10,16,20
50:6,9,11,19 51:3,6,10,23
52:18,20,24 53:21,25 54:4,9
54:13 55:11 57:9 59:15 60:4
60:18 61:5 63:11 65:3,5,11
67:18 68:3,10,22 75:6,14,17
75:25 79:8 82:24 83:21 84:6
84:10 86:21 87:4,12 89:8,21
89:24 90:12 93:18 94:13,25
96:24 98:20 99:8,9,12,14,16
101:7 102:6,10 103:1 105:13
facing 92:10
fact 8:24 13:3 15:2,6 16:6 36:6
36:17 54:5 56:24 57:24 59:9
63:4,13 75:23 82:2 93:7
99:19,20,23 101:7
fair 54:12 91:23
fairly 10:19
fake 46:16 47:7 60:23 61:2,9
false 95:3,18
falsely 40:25 42:18 43:1,7
familiar 10:15 38:18 43:25
52:13 88:18 98:18
family 65:22
fantastic 111:21
far 30:13 40:2,16 47:8 50:1
54:1 80:17
farce 92:6,8
farcical 18:23 19:1 21:10 22:6
22:24 28:3
Farm 81:6
fascist 65:13,21 69:7 72:17,20
fascists 67:9,21 68:15,20 69:12
69:22 107:5,8,14
FBI 19:4 26:19 28:20 34:10
fear 37:25 44:24 62:23 66:2
feared 40:23
fears 44:8 54:20
FEC 1:11 3:10
feedback 49:2
feel 99:22 107:23
fees 22:18,18
felonious 99:24
felt 42:1 61:2
fifth 100:18
file 36:6 39:20
filed 53:19 116:23 117:10
filibuster 26:21
filing 5:12 100:17
find 13:1 28:9,11,18,22 66:23

67:14,20 68:5
fine 13:3 109:19 110:24 112:6
finish 15:5 30:2,3 51:20 57:4,4
  100:4
finished 47:2,5 113:10
firm 1:18,21 3:3,7,18 90:12
  117:4
first 6:23 10:22,23 12:17 35:2
five 61:15 89:1
five-minute 61:17 98:2
flippant 18:22
Floor 4:16
Florida 1:18 3:4 117:5
Floyd 52:23,25
fodder 91:15 92:5 93:1,17
  94:12,25 95:8
folks 24:16
follow 92:22 98:22
following 6:2 51:1 58:15 60:4
  60:14,17 68:1 72:8 84:16
  94:7
follows 6:24
folly 18:1
force 14:14
foregoing 114:1 115:9
form 18:5 31:20 50:23 54:11
  57:16 59:11,25 60:6,20 64:14
  68:13,24 69:20 70:4,11,17
  71:4 72:1,11 73:6,10,16 74:1
  74:21 77:4,17 78:2,17 79:21
  81:1 82:7 83:7,13,23 84:4
  85:8,22 86:5,22 87:13 88:1
  90:21 91:6 94:16 95:9,13,14
  97:8,8,15 101:3,17 102:25
  103:22 104:23 107:4,11,17
  108:5 115:8
formal 16:13,22
Forwarding 117:10
found 76:8 96:4
Foundation 73:16
four-page 20:22 21:15
frame 39:3
Francis 14:21
frank 89:25
free 91:23
frequently 104:20,25
fresh 26:1,3
Friday 11:21 12:2
friend 65:11,22
friends 34:22 101:9,12
fringe 44:5,12,24 54:19 78:14
front 12:3 102:5
Frye 4:21
fuck 65:21 66:4 76:9 82:22,24
  83:21 86:12,19,21 87:3,11,24
  88:5,19 101:21 102:9,11,24
  103:15 104:22
fucking 65:20 66:5 69:10,18
  70:8
fucktard 65:21
full-sleeve 14:21 15:7
fundraise 92:6
funny 109:9
further 115:7,10

──────── G ────────

G 6:1
Gateway 1:13 3:17

general 50:10,12 51:2 93:9
  96:21
generally 40:23 103:2
generating 44:24
gentlemen 111:23
Geoffrey 65:17
George 52:23,25
getting 43:9 49:2 96:13,20
  107:23
gist 26:6
Giuliani 1:10 44:16
give 13:10 18:18 34:12 48:7,7
  65:22 106:2
given 93:17 94:12 95:8 115:9
  117:14,15
gives 91:15
giving 20:15 109:14
Gizer 4:16
glad 76:10,16
gladly 91:10,16,17
go 5:11 10:18,20 15:13 17:21
  18:15 19:25,25 20:2,14 22:10
  22:13 24:2 27:4 37:2,4,17
  38:22 39:8 41:20 51:17,22
  54:15 66:9 67:5 75:9,15 79:7
  86:15 89:13 94:21 107:20
  109:10,18
goal 51:25 52:1,3,7
God-given 85:19
goes 19:9 40:22 55:1
going 7:9,14 9:18,19 10:3,18,19
  10:20 11:11 13:8 17:2,7 18:7
  18:18 20:5,9,18,20 21:9,18,19
  21:22,24 22:15,17,18 23:3,9
  23:18 24:8 25:9 27:4,9 36:25
  37:10 38:9 42:19 45:8 63:2
  64:4,5 70:19 71:18 81:7 86:6
  87:14,22 92:20 94:4 104:8
  106:1 107:20 108:14
good 62:25 76:8,10 81:1
Googled 110:11
Gordon 3:20 4:3 113:3
GPM 4:12
gqueenan@prpclegal.com
  3:23
grammarian 73:18,21
Gray 4:15
great 62:23 67:2,8 77:1
Greenwood 2:23 3:22
Grimmesey 2:16
grounds 65:19
group 19:5
guarantee 95:10,17
guess 19:20 47:17 94:23 100:4
  106:23 113:10
Guest 5:9 43:23
Gus 65:17
guy 75:1

──────── H ────────

half 15:12 23:20 37:11 52:19,21
  105:25
half-inch 14:23 15:7
Hall 3:11 5:3 24:4,6 106:4,8,23
  107:2,7,13,18 108:7,24 109:2
  109:5,9 110:9 111:6,12
Hall's 109:16 110:22
Halloween 62:18 63:18

Hampden 116:1 117:1
hand 24:11 115:12
Hand-delivered 117:22
handle 53:4 63:21
Hands 98:13
happened 6:16
happy 76:22,25
harassing 77:5 101:23,25
hashtag 65:10 66:8,9,10
hate 70:12,15,20 71:3,12,14,19
  71:20,25 72:2,10,17,17,21,24
  73:4,14,24 74:11,18
hate's 72:2
hated 71:1
head 5:11 44:14 90:11 105:1,5
  105:8,10
headed 11:5
healthy 65:16
hear 16:7 95:12
heard 15:25
hearing 11:21 16:20 24:25 25:1
  80:23
hereunto 115:12
heroin 9:7 35:17
Herring 1:13 4:20,21
Hey 21:1 88:23
high-compensated 77:22 78:8
high-heaven 76:12
high-ranking 76:24 77:9,14,22
  77:25 78:4,8,15,22,25 79:4
high-salaried 76:24
highlighted 14:10 54:25
highly 66:21 77:25 78:15 79:4
  81:2 87:2,2 99:18
Hoft 1:12 3:16 112:20
hold 27:1 83:5
holes 14:23 15:7,10
Holway 2:16 112:16,16
Home 5:11
honest 48:24
honestly 49:9
Honor 14:2
hope 23:13 66:1,14 76:11
hoped 76:17 77:1
horrible 35:20
hotel 11:5,6 12:21 15:15,18
  16:11
hour 20:25 23:20,21 37:11
hours 109:1,7 110:21
How's 94:18
humor 14:14
humorous 18:20

──────── I ────────

idea 28:17 47:9 51:22 75:9
  80:11 96:18 97:16,20,21
  100:21,24
ideas 16:14,15,23
identification 5:6 10:2 17:10
  43:21 52:9 100:14
identify 27:4 55:16,18,19
idiot 65:20 69:10,19 70:8
ignoring 61:5
III 2:12
illegal 40:17 78:5,5 91:18 92:20
  99:3,16,17,18,18,23 100:2,6,7
Illinois 4:9
imagine 91:20,20

immediately 38:2 64:8
impersonate 63:5
implicate 43:7
implicating 41:5
implied 54:13
imply 45:22 53:15
implying 33:23
important 51:10,17,21
impossible 32:7,23 33:6,8 98:9
  98:11 99:7,21
Improper 83:10
inappropriate 86:24 87:5,8
  90:11
inch 15:12
included 61:11 109:18
including 34:10
inconceivable 91:25
increase 44:6
INDEX 5:1,6
indicated 9:16 114:2
individual 26:8,11,12 31:5 84:6
  84:11
industry 79:24 80:18
influence 8:25 9:17 35:25
  91:17
information 7:20 14:1,5,10
  40:24 85:17
ingested 9:3
Ingrid 3:14,14
INITIAL 5:6
inquire 11:23 12:4
insist 21:18,22
insisting 20:23
instruct 8:13
instruction 7:21 8:1
intend 13:19
intense 71:10,11
intensely 71:9,23
intent 42:2
interact 65:25
interested 115:11
Internet 105:16 111:25
interrupt 12:25 87:22
interrupted 59:4
interrupting 86:16
interview 9:17 52:17 53:9,10
invited 101:19
involved 6:16 41:1,13 42:23
ironic 18:22 19:1,17
irony 17:25
irrelevant 77:5
irreverent 18:23 19:12
is?' 111:6
issue 23:19 24:7,10
Issued 28:8

──────── J ────────

J 1:9 2:6,15 3:14 116:4,8 117:7
Jackson 2:17
jail 36:2
James 1:12 3:16
Jana 2:2 6:17 9:22 13:8 23:10
  36:22 50:15,22 58:14 61:18
  67:23 72:5 84:14 94:3 105:21
  109:19 110:12,23 112:7,11,13
  112:16,19,23 115:4,16 116:24
  117:24
January 115:13

Jeremy 4:15
jgray@earlysullivan.com 4:18
jihadist 65:14
Jim 112:20
JM 114:21
job 66:23 67:15,20 68:5,12,23
  69:11,17,22 85:17 96:12
jocular 18:20
Joe 15:19 44:15 97:1,5 100:21
John 112:19,24 113:1
joking 18:19 65:15
Jonathan 3:17 76:14,16
Joseph 1:11 4:19
journalist 60:8,10
journalists 60:3
judge 24:7
judgment 60:8
July 65:4 75:6 76:9
June 76:7,9

_____

                K

K 1:17 3:3 117:4
keep 30:17 86:16
keeping 105:22
Kelly 2:17
key 94:20,22
kids 108:17
killing 81:21 82:4 88:19
Kimrey 4:7 37:4 61:13 69:3
  88:23 89:2 106:10,13,16
  109:12,13,21 110:4 111:17,21
  111:24 112:5
kind 13:15 81:6 107:23
Kloewer 2:6 116:5
knew 47:10,15 50:2 51:11
  55:12 57:10 60:3,13,16
know 8:24 23:8 29:9,12,15,17
  29:19 30:13 33:18,20 34:6
  37:14 39:10,17 40:17 47:8,23
  47:25 48:2,5,11,14,15 49:2,24
  56:24 57:18,21,23 58:21,25
  59:20 61:14 64:23 71:15
  75:10,16,17 78:24,25 79:14
  79:15,17,25 80:8,17,19 81:23
  82:2,15 85:25 86:3 88:9,11
  95:24 96:2 97:17,22 102:13
  102:17 103:18 104:12,18
  109:11 111:7,24 112:12
knowing 20:24
knowledge 29:24 30:13 50:12
known 14:24 16:14,23
Kornfield 2:12

_____

                L

lack 92:12
laid 26:17
land 65:11
language 55:2
Larry 62:14
LaSalle 4:8
late 10:23 62:22
Lathrop 4:12
law 1:18,21 3:3,7,14,18 91:10
  99:15 117:4
lawsuit 96:5
leader 31:23,24
leaders 19:9 28:16 29:16 30:11
  31:23

learned 96:7
left 11:4 34:14 67:6 97:25
  106:12,18
legitimate 38:2
let's 8:18 15:13 17:21 18:15
  26:15 28:6 32:10 36:11 37:1
  37:11,16 39:3 41:20 79:7
  94:1 98:2 106:14 108:16
letter 16:12,21 19:3 116:18
level 65:23
lie 41:18,23 94:23
lied 41:19 95:4
lies 43:3 92:18
life 33:18 35:19 37:25 49:14
  62:23
light 8:22 37:25
liked 71:1
limit 14:1
line 10:23 21:13,14
lines 83:8
linking 36:13
listed 116:12
Listen 43:14 50:24 72:6
listened 80:22
literal 79:18
literally 28:17 106:11
LLC 1:12 3:17
LLP 4:12,16
locked 46:20,21
long 48:3 80:19
look 24:14,17 38:22 39:9 42:7
  46:12 49:4 61:19 75:9,15
  80:13
looked 42:8 44:21 80:1 110:2
looking 38:10 42:6,15 44:6
  56:8,9,14 63:10 65:3,16
looks 98:18
Lord 81:1
Los 4:17
lost 35:23 83:18
lot 18:7 39:13 62:24,24 72:13
  77:20 102:9 103:16,17
lots 78:3,23 96:25
loud 35:3,4 65:7 86:7
Louis 3:19
love 76:8
Loveland 3:12
loves 75:2
low 78:6
lying 97:1,5,13
lyrics 80:1,9,14 82:9 88:10,12

_____

                M

M 2:12 3:11
M-c-D-O-O 62:16
ma'am 106:25
machine 90:12 105:2
Mackelprang 2:2 91:1 115:4,16
  116:24 117:24
mad 88:8
made-up 95:3
Madness 1:11 3:10
magazine 10:4
Mail 117:21
Mailed 117:21
major 90:11
makeup 63:18
making 8:12 44:20 63:9

maliciously 91:9
malinformation 92:19
Malkin 1:13 3:20 44:15 59:21
  60:10,16 113:4
man 16:2
manifestation 25:20
manifesto 17:3 25:10,16,18,21
  31:24
marches 96:11
Margaret 4:2 112:13
mark 9:19 65:23
marked 10:1,4 17:8,9 43:20
  49:20 50:6 52:8 100:13
marriage 35:23
material 41:13
math 85:3
matter 33:15 104:15 116:10,10
  116:22
matters 115:6
Max 16:12,20 44:14
mboehmer@grsm.com 4:5
Mc 62:15
McDoo 62:14,16 63:20
McGuire 16:12,21 17:1 44:14
McRae 4:16
mean 7:16 17:5 18:12 48:6
  63:25,25 82:12 90:2 91:4
  92:14 97:8 98:18 110:9
meaning 89:23 103:14
means 18:16 47:20 48:1 65:10
  80:12 82:15 102:17 103:10
  104:19
meant 18:20 65:1 67:15
measure 15:10
media 1:11,14 3:10 44:5,12
  45:3,15 46:5,10 47:7 48:20
  49:17,23 50:8 51:8,18,22
  54:19,22 55:12,15,20 56:18
  57:11 58:1,4,16 59:7,9,17,18
  60:23 61:2 63:24 64:17,19
  97:5
meeting 95:22
meetings 19:8 28:16 29:8
  30:11 31:22
member 34:4,7
membership 28:15 29:5 30:10
  31:22
memberships 19:8
memorized 54:3
memory 31:14
mentioned 19:17
meowed 42:13
message 35:16
messages 99:16
met 96:3
metaphor 81:6,21
Metaxas 1:13 4:2 44:16 112:14
Michael 2:21
Michelle 1:13 3:20 44:15 59:21
  113:4
mind 26:1,4 44:9,11,13 46:2,6
  46:11,18,23 62:6,11 64:12,19
  64:25 74:14
mind-altering 9:11
mine 17:2 98:21
minute 13:12 105:25 106:2,18
  108:19
minutes 15:24,25 25:25 28:1

31:11,18 36:25 37:1,8,14,15
  61:15 89:1,6 97:25 105:23
  109:15,15,16
mischaracterizing 23:22
misconstrue 41:4
misconstrued 40:25 41:16,17
  41:19,21,22 42:17,22,25 43:3
  43:4,7
misconstruing 41:11
misinformation 92:19
misleading 55:2,8
missing 94:20
Missouri 3:19
mistaken 89:6
misuse 94:22,23
modify 42:3
moment 64:4,21
moments 89:20
morning 7:3
morons 66:24
Mountain 37:18
move 32:10 104:9
movement 81:14
moving 62:23
mreagor@drc-law.com 2:24
multiple 18:21 32:25 44:11
  46:16 55:23 56:23,25 95:4
Munem 65:17
murder 52:23,25 88:3,16
mute 8:9 49:3
mutherfuckin 88:8,13

_____

                N

N 6:1 86:18
n-word 86:7,9,11,12
N.W.A 85:25 86:17 88:11
name 7:5 16:1,7 46:17 52:4
  55:23 56:23 62:14,19 82:13
named 16:2 98:25
narcissistic 65:13 72:20
narrative 41:11 63:1 93:2,18
  94:13 95:1,3,4
national 47:8,12,16,17,19 48:1
  48:8,12,15,19,20,22,23 49:16
  49:21,23 50:3,7,11,19 51:3,7
  51:8,11 57:11,13 59:18,23
  60:3,13,17,22
nationally 48:9,18
necessarily 66:21 67:11 69:17
need 21:4 22:21 27:16,22 93:23
  96:15 106:13,15 110:23
  111:15 112:10,15,23,24 113:4
  113:5,5,7
needed 20:12 21:11 99:22
needs 20:21 22:14 27:11 49:3
negative 64:16
negatives 72:12
neither 73:17
neologism 108:6,12,13 110:2
Network 1:14 4:6 48:17,20
Networks 1:14
neutral 87:6
never 32:18 33:9,9,14,22,25
  36:1 38:16 40:2 41:12,25
  46:1 51:14,25 54:4,13 62:8
  95:19 96:3,3,10 97:10,22
new 10:4 12:19 13:5,17,22 14:5
  14:12,16,20 15:16 24:7,10

35:7,10 36:3,9,18 54:6,16
110:3
**newly** 110:2
**news** 1:14 4:6 47:8,12,16,18,20
47:24 48:1,8,9,12,16,17,19,20
48:20 49:21 50:3,7,11,19 51:4
51:7,8,12 57:13,25 58:5,7,17
58:19,22 59:1,8,14,17,18
60:22
**Newsmax** 1:14
**Nicole** 2:16
nicole.grimmesey@jackson...
2:19
**night** 53:12
**non-partisan** 67:1
**nope** 22:15 39:12 45:1 46:4
78:12 93:4 95:23 96:8 100:3
104:4
**North** 4:8
**notarial** 115:12
**notary** 2:3 114:16 115:4,17
116:21
**note** 109:13
**notice** 117:14,15
**notoriety** 44:6
**November** 10:23,24 11:7 12:20
15:18,24 16:7,11,19 34:14
39:4 40:3 44:19,22 62:22
100:20
**number** 76:3 116:12

─────────────

**O**

**O** 6:1
**OAN** 49:11 109:13 111:17
**oath** 6:8,10 49:19 74:23 75:24
80:3,3,6,11,15 102:24
**object** 6:20 27:1 45:13 50:23
59:25 83:7,13 97:8
**objecting** 27:12,13
**objection** 6:8 7:11,12,18 8:15
8:21 9:4,8,14 11:12 27:15,21
77:4 81:1 83:11,18 84:4,20
95:14 97:9
**objections** 7:14 8:12
**obviously** 24:11
**October** 63:12
**off-the-record** 13:2
**office** 3:14 11:4 116:13,22
**officials** 78:22,25
**oh** 37:12,13 59:2 66:4 67:4
**Oi** 79:15,23 80:4
**okay** 6:21 8:4,10,17 9:2,6 10:18
11:11,25 12:8,17 13:14 14:9
14:16 15:2,11,13 16:6,9,19
17:7,16,18,21 18:10,15,24
19:14 20:14 21:14 22:12
24:21,24 25:9,11,13,17 26:1,7
26:10,20 28:6,10,12 30:8,21
31:1,6 32:11 33:10 34:13
35:3,7 36:21 37:10,18 38:17
39:7,13,21,25 40:21 41:20
43:11 44:18 45:2 46:5,12
47:10 48:13 49:8 50:5,20
51:16,20 56:4,15,17 57:1,8
58:4 59:5,13 60:13,16 61:1,10
61:16,21 62:9 68:16 69:2,8,8
69:13 70:1,25 75:5,5 76:5,6,7
76:7 77:18 79:7,15 80:2,17

81:16,20 84:13 85:2,18,24
86:15,19,25 87:8 88:7,22,22
89:12 90:7,15 93:5,21 94:24
98:4,19 103:20 104:21 105:8
105:12,15,19 106:23 107:3
107:18 111:21 112:5
**Oltmann** 1:11 3:10 4:19 15:19
16:1 32:14 44:15 45:17,24
47:11 54:24 55:14 57:9 59:15
60:5 77:21 96:18 97:1,5
100:19,21,25
**Oltmann's** 49:12
**once** 14:23 15:8 42:13 52:1
68:25 96:4
**one.'** 111:5
**ones** 19:16 28:5 36:5 41:3
57:13 58:6,18 79:12
**op-ed** 46:15 52:2,3 54:18 56:21
**open** 16:12,21 65:11
**opened** 52:24
**opening** 26:17
**opiate** 77:11
**opinion** 29:22 32:22 90:5 91:9
91:21
**opinions** 65:19 66:19,24 67:4
**opioid** 76:15,18
**order** 7:23 8:3 11:14,24 12:7
22:7,14,25 96:21,22 109:7
112:12
**organization** 16:14,22 19:7
28:15,20,21,21,24 29:3 30:10
32:1 34:4,5 49:23 58:1 59:8
60:22
**organizations** 59:14
**organized** 19:5
**original** 53:20,24 54:2 116:14
**Otto** 15:19
**outlet** 48:21 49:17 50:8,19 52:7
**outlets** 47:14 51:8
**outside** 8:2 96:20
**oval** 65:23

─────────────

**P**

**P** 2:21 6:1 9:20
**P.C** 1:10,17,21 2:2 3:2,7
**p.m** 23:15,16 25:2,3 37:6,7,20
37:21 61:23,24 89:3,4 98:5,6
106:21,22 109:22,23 113:13
**P.O** 2:8 3:11,15,18 116:6
**P18** 5:8 9:22 10:1,4 12:15
32:1 36:17 89:22
**P19** 5:9 43:20,23
**P21** 5:10 52:8
**P22** 5:12 100:13,16
**P23** 5:13 17:8,9,11 25:6 39:21
49:21 50:7 63:10 65:4 73:14
75:6 76:4 86:2 98:14
**page** 5:2,3 13:14 14:6 16:9
17:11 19:25 24:2 25:6 32:11
38:10 52:17 54:17 63:10,17
65:4 73:3,13,24 74:11,18 75:5
75:8 76:4 78:9 79:8 81:13,13
82:3,10,18,22,24 83:21 84:10
86:1,21 87:4,12 89:8 90:12
98:14,17,19,25 116:15,16,21
117:10
**pages** 98:22
**pages/amendment** 117:20

**pain** 77:2
**painful** 76:11,17
**paper** 21:17
**paragraph** 10:22 14:10 15:14
27:5 34:24,25 35:3 37:24
52:16 54:16
**paragraphs** 26:18 27:5
**pardon** 11:9 42:5
**Parkway** 3:21
**parse** 21:3
**parsed** 41:11
**part** 17:18 18:13 29:25 30:4,9
30:12 35:2 93:5 107:22 108:8
**participate** 8:21 32:23 33:6
**participated** 32:19
**particular** 19:15 20:10 39:3
44:9 46:1
**particularly** 81:9
**parties** 7:12 115:7,11
**party** 7:11
**Patterson** 3:21
**pay** 29:10
**PC** 2:12 3:21 6:13
**Pearman** 1:20,21 3:6,7
**pee** 116:14
**pending** 23:19 110:5
**people** 6:16 29:10,13 46:16
55:14 57:12 61:12 88:3 90:4
90:19 91:15,16 92:23 93:17
94:12 95:1 101:15,18 103:18
**percent** 102:19,19,19,20
**perfect** 5:8 10:5 92:13,14 93:16
94:11,24
**perfectly** 19:7 23:25 28:14
**period** 39:14 116:22
**perpetuating** 93:12
**person** 42:9 73:12,13,23 74:10
**personal** 30:13 33:17 34:21
44:6 66:24 76:18 77:10,11
87:17,23 90:5 92:3,4,6,16
**personalities** 44:5,11,12,24
**personalities'** 54:19
**personally** 34:3
**persuade** 66:4
**perusal** 27:25
**Ph.D** 1:7 6:22 47:25
**philosophical** 65:19
**phone** 32:19,23 33:6
**photo** 62:17 63:19
**phrase** 48:1 80:12 87:3
**pic** 62:17 63:8 65:14
**Picasso** 14:22
**pick** 18:22
**picked** 58:1 59:8,14 61:4,6
**pics** 55:24
**picture** 56:23 63:4,8,17
**pictures** 46:17
**piece** 62:7,12
**piercings** 15:1,3
**pigs** 79:16,17,18,23 80:5,12,18
80:24 81:20 82:3
**Plaintiff** 1:7 2:5 6:14
**Plaintiff's** 11:15
**planned** 96:11
**planning** 65:12
**play** 102:16
**Plaza** 11:4
**please** 6:6 7:5 8:9 28:13 50:22

62:4,9 65:8 67:24 72:5 76:5
84:15 96:23 110:6,12,14,16
110:18 111:1,13,16 112:8,18
112:21 116:10,21
**PLLC** 2:8,17,22 116:6
**plugs** 14:24 15:8
**podcast** 48:11
**podcasts** 47:14 49:12 59:16,21
59:22
**point** 22:20,24 49:1,9,22 53:2
53:12,18
**police** 86:19,21 87:3,11,24 88:3
88:5,19
**policies** 71:7 72:17
**policy** 40:10,14,16,20
**political** 65:15 85:10 92:4
**Polloi** 79:16,23 80:4
**Popes** 14:22
**population** 91:8
**posit** 79:1
**position** 70:7 87:11 91:21,22
92:1 93:19 94:14 95:2 98:9
98:10
**possible** 33:11 34:1,1 96:1
**Possibly** 31:4
**post** 5:9 17:12 19:22 40:3 44:1
54:8,18 55:8,20,25 56:18,21
57:6 61:3 62:7,10,12 63:4,11
63:14 64:11,17,19 65:3,5
67:18 68:3,10,22 70:2 73:3
75:6,7 79:9,10 87:15,16,25
102:7 103:1
**posted** 19:3 56:24 59:18 83:15
83:15 84:5,10
**posting** 46:17 49:24 53:2 55:24
82:24 83:24
**posts** 5:13 11:16,19 17:2 34:21
36:11 37:24 38:3,4,7,15,20,24
39:2,5,10,14,17,19,22,23 40:5
40:8,11 41:2 42:1,17,21 43:19
44:20,25 45:3,5,15,18,23 46:2
46:6,10 47:4,7,11 49:10,16,20
50:6,9,11,19 51:3,6,8,10,15
51:23 52:1 53:3,13,21,25 54:5
54:9,14,22,24 55:12,15 56:23
57:9,18,20 58:4,17,21 59:7,9
59:15 60:5,18 61:5 62:19
63:9,24 64:3,5,9 75:14,17,25
82:19 89:21 90:13 93:18
94:13,25 96:24 98:15,20
101:7 102:11 105:13
**Powell** 1:9,10,17,17 2:2,2 3:2,2
4:20 6:13,13 44:15
**preceding** 46:14
**Prentice** 2:22
**prepared** 24:22
**present** 1:4 19 11:20 58:8,10
63:24,25
**preservation** 8:12,14
**presidency** 34:11
**President** 1:9 2:15 28:9,19
40:12 116:8 117:7
**presume** 10:24
**pretend** 92:20
**pretty** 55:22 88:17 96:8,8
**previous** 115:5
**Previously** 117:10
**prey** 44:7 54:20

Prez 82:11,12,15
Price 4:8
prior 11:15
prison 35:23 36:1 88:16
privacy 34:20
private 17:2,14 84:5,6,10,11
   92:17 99:15 101:7,12,15
   105:13
privileged 7:19,20
probably 21:16 55:6 66:23
   67:14,20 68:5 76:11 88:12
probe 81:7
problems 75:1
Procedure 6:4 116:23 117:14
proceedings 6:2 115:9
proclaims 31:23
produced 47:11
product 11:3 105:4,7,10
profanities 14:11,13
professional 2:3 66:25 90:6
   115:4
professionals' 38:1
profile 46:17 55:24 56:23 62:17
   63:8
progressive 52:5 96:11
prone 14:11,13
protests 96:12
provide 104:13
provided 101:4
provides 40:11
psychologist 73:18,21
public 2:3 11:15,16 16:14,16,23
   24:2 28:7 44:8,21 54:20 57:9
   59:15 60:5 96:23 99:15
   114:16 115:5,17 116:21
published 46:20
pull 65:23
pulled 24:16 100:15
Pundit 1:13 3:17
punk 81:9,10
purported 58:9
purporting 45:3,16 46:24 54:23
   58:10 62:19
purports 63:11
purposes 25:19
pursuant 6:3 116:23 117:14
put 9:19 13:25 17:7 27:21
   37:22 43:22 51:23 59:18
   66:17 75:5 83:21 84:22,25
   85:7,16 86:20 87:3,11 89:7,21
   90:12 102:4 105:16
putting 90:8

**Q**

qualified 73:18 74:2
Queenan 3:20 113:3,3,9
question 7:19,19,22 8:2 9:5,9
   9:15 12:1 13:20 16:18 21:16
   22:5,14,23 26:22 27:3,10,18
   27:23 30:19 31:1 33:2,3,5
   42:20 43:12,14 45:10 46:9,22
   50:1,14,21,25 51:16 58:12,14
   60:1 63:2 67:24 68:17,19
   70:15,22 72:4,6 75:3 76:20
   77:4,19 78:12,14 83:1,19
   84:15 85:4 87:1,9 89:15 94:3
   94:4 96:16 101:24 102:1
   103:8 104:6,7,11,14 107:9,15

107:24,25 109:3,6 110:4,6,10
   110:12,15,22,24
questions 9:12 11:18 15:5 21:8
   21:8 22:11 45:9 82:1 83:9
   106:3 115:9
quick 89:13 106:8
quickly 111:19
quiet 27:16,22
quit 67:22 68:15 69:7
quite 101:21 102:11
quote 14:15 16:25 24:11 32:16
quote/unquote 49:16,23 57:6
quoted 36:4
quotes 16:5 17:4 32:15 36:5,15
   36:15,19,19
quoting 92:9

**R**

R 2:16 6:1
races 14:18
racist 65:21 86:14
ran 58:1 59:10
random 48:15 49:13 65:22
Randy 44:16
ranked 87:2
rant 65:9 66:11,15
rational 66:19
reach 48:23
reaction 66:2
read 10:10,12 12:18 16:12,21
   19:24 20:13,14,21 21:11 22:7
   22:25 25:20 26:12 29:21 30:5
   31:4,7,9,10,17 34:25 35:1,1,3
   36:12 43:12,16 50:14,16,22
   51:1 58:13,15 65:7 67:2,23
   68:1 70:3 72:4,8 73:12,13,19
   73:23 74:25 76:5 84:14,16
   91:1 94:7 110:12,23 111:1
   114:1 116:12,14
reading 11:24 12:7 21:17 27:25
   30:17 52:16 73:3 74:4,6,7,11
   74:15,18 110:10 116:10,16
readjourn 24:25
reads 20:5 23:21
ready 19:24 71:22 106:24
   116:10
Reagor 2:21,22
real 62:14 89:13
really 66:12,15 72:13 79:3
   82:25
Realtime 2:3 115:4
reask 85:4
reason 66:1,20
reasonable 64:22,24 73:12,13
   73:23 74:10 77:13 78:19,21
reasoned 65:15
reasoning 92:22
rebut 51:12,18,22
rebutted 51:25
recall 14:25 38:6,8 40:2 49:24
   50:8,18 51:7 54:1 57:7 58:3
   59:17,19 62:22 75:22 76:3
   80:23 81:7 82:20 110:25
recess 23:18 24:3 25:2 37:2,6
   37:20 61:23 89:3 98:5 106:21
Recht 2:12
recite 26:5
recollection 15:20 17:1 19:2

31:16 33:17 49:12 53:1 54:3
   56:6,12 75:13 81:8,18
reconvene 24:25
record 7:6,10 8:20 12:10,11,13
   12:25 13:7,8 19:23 20:3,4,10
   20:14,20,24 21:14 22:10,13
   23:2,9,10,12,14,15,17 24:3
   25:4 27:22 37:4,5,9,17 43:16
   50:16 51:1 53:23 58:15 61:21
   62:1 65:8 68:1 72:8 76:5
   84:16 88:25 89:10,16,18 94:7
   98:7 106:6,9,19,24 107:21
   109:18,21,22 116:25 117:25
reduced 115:8
Rees 4:3
refer 25:13,18 55:20 100:16
   110:16
REFERENCE 5:7
referred 51:11 57:11 60:4,17
   62:5,10 100:19
referring 55:15 56:20 63:20
   79:18 81:13 88:9 90:16
refers 82:3 111:8
reflect 67:11,18 68:3
refusing 104:5,6 109:5
regarding 24:10
regardless 85:17
Registered 2:3 115:4
regular 111:13
reiterate 7:25
reiterated 52:17
relate 11:18
related 51:5 96:12
relates 11:15
relation 115:6
release 31:24
released 19:4 26:19
remember 16:10,19,25 27:25
   31:6,10,12 55:25 56:3,7,22
   57:14 98:16
remotely 6:8,11
remove 40:24
repeat 16:18 42:25 93:23 94:1
   94:2
repeats 67:5 94:5
report 26:19
reporter 2:3,3 6:6,7 9:23 10:21
   12:19 14:12,17,20 15:17,25
   16:4 32:13,20 34:13 35:8,11
   35:21 36:4,10,18,24 37:8,12
   37:15 43:13,17 50:17 51:2
   55:1,7 58:16 59:2 61:19 62:3
   62:15 68:2 72:9 84:7,17 94:8
   95:11 105:22 106:7 111:3,10
   111:20 112:2,22,25 113:7,10
   114:21 115:4,4
repost 17:14
reposted 17:17
reprehensible 78:5
Republic 1:10 2:20
required 117:17
reread 19:19 110:6
reschedule 20:19
reschedules 23:4
researching 97:2
resolution 23:19
resource 92:2
respect 7:23 62:11 65:19

respond 7:22 8:1 9:4,8 27:11
   99:2,6 110:21,24,25
responded 54:17
responding 26:23
response 28:8 52:25
rest 21:17 36:20
result 61:8
returned 116:22 117:20
revenue 44:7
reviewed 53:9,11,17
Rice 65:17
rid 43:8,9
riddance 76:10
Ridge 1:22 3:8
ridicule 17:25
ridiculous 21:21 24:15
right 12:3,4,9 19:20 38:9 43:8
   44:2,21 47:12 56:8,19 57:15
   57:22 60:14 67:6 72:14 75:2
   81:23 84:11 85:13,19,21
   87:16 88:20 89:14,19 92:11
   98:20 101:7 105:9
rights' 81:10,14
Rion 1:13 4:6 109:14 111:17
Ripplinger 3:21
Robert 4:21
rock 81:9,10
Rogers 2:12 8:8
role 52:4 105:11,12
room 15:15,18 16:11 42:9
RPR 115:17 116:24 117:24
Rudolph 1:10
Rudy 44:15
rules 6:3 19:8,9 28:16 29:14
   30:11 116:23 117:14
run 27:20

**S**

S 6:1
Sackler 76:14,16
safety 40:23 54:21
sake 83:12
Salida 2:9 7:7 116:7
sarcasm 17:25 19:13 103:24
sarcastic 18:22 19:22
satire 30:7
satirical 17:3,5,22,24 18:4,12
   18:22 19:12,15,22 21:3,5
   22:24 26:8,9,14,17,25 27:6
   28:2,9,11,18,22 29:1 30:16,23
   30:25 31:3
saw 47:13 49:10,15 50:9,19
saying 13:16 19:4 23:1 33:10
   45:5 53:7,24 58:7,19 63:3,6
   67:3,9 69:13 71:15 74:16
   75:21 76:1 80:10 86:13 90:20
   93:3 95:5,7,17 99:11
says 6:11,18 10:22 11:14 15:14
   18:16 19:6 21:20 29:21 32:12
   37:25 41:21 42:16 44:4 45:2
   45:14 54:16 79:8,15 82:22
   83:21 86:19 88:7 89:22 92:9
   99:1 100:1,5,5
scary 56:5,21 57:6 62:5,9 63:4
   63:19
scope 7:14,18,20,25 8:2 11:8
   11:10,12 59:23 96:21
Scotti 112:11

Screaming 14:22
screen 9:19 25:6 42:9 52:11 65:24
screenshot 56:2,8,9,15,16 100:16,19
screenshots 5:12 56:13 61:11
screw 90:3
screwed 90:1,3,8,16,18 91:5,14 91:19 92:4,7 93:16 94:11
screwing 91:13
scroll 46:7
scrolling 28:13
seal 115:12
search 100:22 101:1
searching 96:18 97:6,13,18,21 100:22 101:1
second 52:16 106:4
seconds 25:23 106:11
sections 10:20
security 11:3 38:1 54:21 90:11 92:24 105:2,4,5,7,8,11
see 10:20 12:15 13:24 18:15 24:24 25:7 32:5 37:1 39:25 40:21 56:17 82:8 91:10 92:23 98:3 99:4,12
seeing 49:6 80:8
seeking 7:19
seen 10:7 34:10 38:11,17 49:11 78:3,22
Seerveld 2:21
segment 91:7
self-inflicted 33:25
semi-expedited 113:6
sense 14:13
sent 49:13
sentence 21:4 26:11,12 41:22
sentenced 88:16
sentences 27:5
September 1:24 2:2 7:23 96:19 97:2,6,14 100:18,23 101:2,2 115:12 116:3
series 38:14
serious 17:6 19:18
Seriously 66:5
set 19:25 34:23 41:11 117:16
setting 53:23 92:17
settings 34:15,20
share 9:18 68:22
shared 68:11
Shaun 1:20 3:6
shaun@pearmanlawfirm.com 3:9
sheets 116:14,16,21 117:11,20
shit 66:2
shitbag 76:10
shock 32:12,14
shocked 32:16
Shooting 88:20
short 25:10,14 88:24 95:13 106:17,17
shorthand 115:8
Shot 82:11
show 22:1 42:2 82:14
showed 22:4
Shuffling 1:11 3:10
sic 8:22
sidebar 27:2 45:13
Sidney 1:9,10,16,17 2:1,2 3:2,2

4:20 44:15
sign 116:12,14
signature 114:3 116:14,16,21 117:10,17,18,20
signed 116:21 117:12,13,15,19
signing 116:10,16
simple 13:20
single 21:4,13,14 49:22 50:8
single-spaced 20:22 21:15
sir 27:16 28:13 30:1,7,18 33:2 36:14 42:9,20 43:10 45:11 47:18 48:16 52:1 56:10,16 63:16 70:13,16,21 72:7 75:4 79:10 80:15 82:19 83:2 93:25 102:20 103:8 104:1 105:7
sit 71:18,24 72:9
sitting 12:3 56:19 70:7 79:2 80:2 82:2 102:23
situation 23:23
Skarnulis 2:7,8 20:13 116:5,6
skarnulis@cstrial.com 2:10
skinhead 35:8,12
slaughter 79:16,17,23 80:5,12 81:20 82:4
slaughtered 80:24
slaughterhouse 79:24 80:18 80:25
slaughterhouses 81:11,19
slightly 41:10,10
social 45:3,15 46:5,10 47:7 54:22 55:15,20 56:18 58:4,16 59:7,9 60:23 61:2 63:24 64:17,19
software 105:2
somebody 49:3 73:19 74:3,6 74:14,25 106:15
song 80:16,22,23 81:14,18 83:16,25 88:19
songs 36:13 81:9
soon 113:8
SOOOO 76:8
sorry 12:24 20:2 22:3 37:13 40:1 49:2 55:17 59:3 84:7,9 86:10 89:13 111:24
sort 52:7
sounds 59:6 100:6
source 18:8 48:19
sources 47:24
speak 47:1,3 58:23 73:21 78:18 79:3
speaking 58:23 83:10,18
specific 21:25 22:5 28:1 31:16 49:16 55:20,25 56:18 75:13 77:19
specifically 11:22 21:10 24:12 55:16 58:23
specifics 56:22 57:7
speculate 73:7,9
speculating 57:22
spelled 16:2
sphere 33:18
spot 66:18
ss 115:2
St 3:19
staff 13:1 24:16
stamp 46:8,13
stamps 16:5
stand 24:3 66:10 67:1,8 70:5

82:23 83:20,24 84:11 86:4,17 97:4
stands 19:21 66:5 85:25 86:3
start 8:19 28:6 90:8
started 7:9 8:18 96:5
starting 25:6 61:20 76:5 89:15 98:16,19
starts 52:11
state 1:2 6:23 7:5,16 13:23 54:8 114:8 115:2,5
stated 11:22 13:23 32:25 69:21 111:3
statement 13:1 19:4,13 26:12 28:1,23,25 29:21 31:5,7,8,17 33:24 53:12 54:12 55:8 68:8 68:8 83:21 96:23,23 97:11 101:11,12,16
statements 11:15,16 13:4 19:16 21:2 26:3,7,8,24 27:3 28:7,22 30:15,22,24 31:2,12 51:5 52:5 53:20 77:10,13 92:3 95:16 97:1,4
states 26:18 28:8
stating 31:22
status 11:21
statute 40:18
stay 106:20
Stephen 4:11
stephen.dexter@lathropgp... 4:14
Steve 2:7 116:5
stipulate 6:7,17
stipulated 6:12 8:4 63:15
stipulates 6:14
stipulation 6:19,20 7:13
stood 54:5
stop 28:13 36:11 106:8 110:18
Stout 2:13
straight 53:23
strategy 11:3 105:4,7,10
Street 1:3 2:13,17 4:3,8,12
stress 62:24
string 98:15,23
strong 92:16
structure 19:10 29:18 30:11
structures 28:16
struggled 8:23
struggles 35:17
study 20:9
style 27:14
subject 105:16
Subscribed 114:10
substance 8:25 9:11,17
substances 8:24
sufferer 76:18
suggest 22:10 40:25 42:17,18 42:22 43:1
suggested 42:3
suggesting 60:9
suit 53:20
Suite 1:18 2:13,17,22 3:4,21 4:3,12 116:1 117:1,5
Sullivan 4:16
sum 39:17 94:24
summoning 61:14
super 38:11
supersede 53:23
supply 76:12

support 87:25 88:2
supporting 16:15,17,24
supposed 91:17,21
sure 13:13 18:23 32:15 37:19 49:2,15 60:11 71:5,13,14,16 87:7 96:8 102:12 116:21
swear 6:11
sworn 6:23 114:10 115:6
synchronized 112:1
system 84:3,19,24
system.' 54:21
Systems 11:4 67:12,19 68:4

T

table 26:22
tag 67:3
tailor 96:22
take 6:19 21:16 24:21 37:11,16 61:14,16 88:23 89:14 98:2 106:10,13,14,14 111:12,13
taken 2:1 6:3 25:2 37:6,20 61:23 67:8 89:3 98:5 106:21 115:8 116:22
talk 39:3 45:9 81:10 93:14 94:10 98:3
talked 55:13,13 59:21,22 81:18 91:13 101:6
talking 13:13 14:4 15:21 24:17 37:17 44:23 54:9 57:15 58:6 58:18 59:9 60:24 61:4 62:10 63:23,25 64:3,9 76:13 78:13 79:18 80:18 81:23 82:4 86:1 88:12 91:24 93:10,14 94:9 102:19
talks 37:24 82:11
tattoos 14:21,25 15:7,9
Tay 96:2,7
technically 76:7
tedious 10:19
tell 14:12,16,20 15:16,24 18:24 18:24 22:8 26:13 27:19 32:13 32:20 34:13 35:5,7,15,21 36:9 36:13 39:18 40:4,7 74:19 91:14 103:14 111:11 113:5
temporary 11:4
tendencies 72:18
tense 46:25 58:8,10
term 47:21 103:7 104:1,12,12 104:16,17
terms 8:20 18:9,21,25 44:24 100:22 101:1 102:18 103:4,6
terrorist 28:21
testified 6:24
testify 115:6
testimony 49:18 54:7 55:11 57:8 64:18 69:16 71:19 74:22 79:2 80:2,6,11,15,21 81:13 102:23 103:20 114:2 115:9
TGP 1:12 3:16 112:20
thank 7:3 8:10,16 9:24 14:2 61:22 89:2 98:1 111:9,22,23 112:6,9,22,25 113:2
Thanks 113:9
therapy 96:13
they'd 77:1
thing 8:5,11 12:17 19:5 33:23 78:15 84:2,18
things 7:9,10 8:22 13:21 21:9

46:17 55:24 78:5,23 89:7
91:18 92:11
**think** 9:22 11:14 13:15 14:3,6
19:14 24:9 26:13,16 28:23,24
28:25 29:3,5,8,10,13,16,18
30:16,22 31:3 32:1 33:22
34:20 41:18 47:19 48:22
55:22 56:5,19 57:1,5 58:12
66:9 67:16 68:7,7,18 69:10,14
69:17,18 72:19,22 73:22,23
76:23 77:4,13 78:7,19,21
79:23 80:3 81:5,5,15 85:6,9
85:11,20 86:20,23 87:1,5,16
88:5,13,15 90:7,10 92:10,17
100:1 101:11 105:6,12,15,22
107:12 109:2,4,15
**thinking** 73:4 80:4 89:25 90:4
**third** 14:10
**Thomas** 2:12
**thought** 23:11 28:2 56:14
67:21 68:14 84:23 89:11
99:23
**thoughts** 66:22 67:10,11,17,19
68:3,4,9,10,23
**thread** 83:18
**threatening** 49:14
**threats** 28:8 38:1 43:10 61:7,8
61:11 96:13
**three** 52:18,21 65:18 75:20
94:22
**throw** 52:6
**Thursday** 13:19 113:6
**time** 9:2,7,10 10:12 13:9,11
14:7 15:19 16:5 19:24 20:5
21:17,19 23:2 26:21 33:4
35:12,13 36:22,23 37:18 39:3
39:14 42:1 46:19 61:18,20
62:20,22 67:13 69:6 70:20
80:20 87:11 89:9,14 97:22
105:15,20 107:20 109:4,11
116:22
**timeline** 15:21
**times** 10:4 11:12 12:19 13:5,17
13:22 14:5,12,16,20 15:16,17
15:25 24:7,10 32:13,20 33:1
34:13 35:7,11,21 36:4,9,18
54:6,16 55:1,7 72:13 95:4
**title** 25:12
**today** 8:22,25 9:13 25:19 49:19
56:19 70:7 71:18,20,24 72:10
74:23 79:2 80:3,7,11 82:3,24
83:20 84:12 102:24 111:15
**told** 12:19 14:4 35:10,11 36:3
36:17
**Tomorrow** 111:20
**tongue-in-cheek** 17:6,19
18:16 19:12,18 21:10 22:6
28:2
**Tonight** 82:14
**top** 28:6 44:14 46:7
**total** 39:17
**totality** 26:16
**touch** 65:23 112:11
**tough** 85:3
**track** 105:23
**traffic** 44:7
**trafficking** 44:25
**transcript** 111:13,15,18 112:1,8

112:18,21 113:4 114:1 115:9
**transcription** 115:8
**transparent** 93:9
**travel** 14:17
**Trey** 2:12
**trey@rklawpc.com** 2:14
**trial** 117:16,20
**trial/hearing** 116:19
**true** 15:2,6 29:22,23 30:16,21
31:2 32:8 33:15 35:5,6,10
36:20 68:6,9 72:22 93:22,22
92:25 94:5,19 115:9
**Trump** 1:9 2:15 28:9,11,19
34:10,11 40:12 44:16 69:17
69:19 70:9,12,16,20,21 71:3,7
71:15,20,23 73:5,15,25 74:11
74:18 75:2 95:17 112:17
116:8 117:7
**Trumps** 90:13
**truncated** 108:23 111:5
**truncation** 108:3,21
**truth** 6:24 115:6
**try** 26:15 91:22 96:22 108:20
**trying** 13:11 19:13 24:14 28:19
40:23 45:22 52:6 57:12 90:24
91:3
**turn** 42:8
**twice** 42:14
**twist** 92:5
**Twitter** 45:20 48:15 49:13 53:4
57:20,23 58:22 59:16 62:13
63:21
**two** 94:22 108:22 109:1,7,14,15
110:20 111:4
**typewritten** 115:8
**typical** 76:23 77:14 78:8,10,15
79:3 85:12
**typically** 6:16 8:19 112:12

**U**

**unanimous** 6:19
**unaware** 49:20 60:22
**unconscionable** 44:5
**understand** 26:6 31:15 42:24
73:20 90:4,25 91:3,8 93:13
94:9 99:25 103:9,14,15
**understanding** 45:11 104:24
**understood** 40:24 41:3 42:16
42:21 43:5 84:13 112:5
**undetected** 99:22
**unfamiliar** 47:20
**unfortunate** 36:8
**unfriend** 65:14,24 66:12
**United** 1:11 3:10 28:8
**universe** 50:13
**unmuted** 49:7
**unprofessional** 81:3
**unsigned** 116:23 117:14
**untrue** 28:23 29:25 30:5,6,12
30:14 31:7,8,12,17
**untrump** 66:8,13
**unwilling** 71:24 72:9
**USA** 82:22,24 83:22
**use** 17:25 18:3 91:17 92:2,5
93:17 94:12 102:11,24 103:13
103:15,17,21 104:6,16,22
110:3
**user** 62:13

**Column 3 (V)**

**V**

**v** 116:8 117:7
**vague** 17:1 81:8
**validity** 6:10
**Valley** 52:14 53:5,7
**various** 17:2 47:14
**Vedder** 4:8
**vehement** 92:25
**vehemently** 90:8,13 92:23
**vendors** 93:8
**verb** 46:24 58:9
**verbatim** 26:5
**verge** 35:22
**vice** 18:1
**video** 15:15,18,24 16:4,6,11,20
32:12,14,17 62:5,8 111:14,15
111:18 112:1,21
**videoconference** 1:23 2:1,5
3:1 4:1
**videographer** 112:3
**view** 21:2,4 32:6 33:5,16 67:17
68:2,9,21 69:5,9 73:12 79:19
82:12 84:1,17 91:16
**viewpoints** 87:17,23
**views** 92:25
**Village** 2:23 3:22
**villain** 88:8 92:13,15 93:16
94:11,25
**Villain'** 5:8 10:5
**villains** 88:14
**villanous** 88:17
**viral** 66:9
**visible** 34:21
**vitriolic** 49:13
**Voice** 52:14 53:5,8
**vote** 65:12,20 69:11,19 70:8
**votes** 99:1
**voting** 5:8 10:6 11:3 67:12,19
68:4 84:3,19,21,24 90:12
92:24 105:2
**VP** 65:14
**vs** 1:8

**W**

**W** 2:21
**Wadsworth** 1:21 3:7
**wait** 26:11 29:2,2 83:17,17,17
89:9,9
**waived** 117:18
**want** 13:13 19:20 22:1,9,13,20
23:6 26:10 30:17 45:10 48:3
65:7 66:6 77:6 87:24 88:2
89:13 101:23 102:4,16 104:2
109:12,18 111:11
**wanted** 8:24 106:3
**wants** 66:23
**wasn't** 28:20 51:13 62:24 64:19
71:16 75:3 77:8 85:1
**waste** 13:8,11 20:5 23:2,20
**wasting** 26:21
**watch** 16:6 67:2,8
**watched** 15:13,15,18 16:4
32:12,14
**watching** 15:23 16:11,20 32:16
**Watson** 99:1
**way** 75:7 81:5 83:3 91:22 97:17
102:21 115:10

**we'll** 12:8 15:17 19:23,25,25
20:14 21:20 22:13 25:13,18
37:17 61:16 104:9 110:22,25
111:12,13
**we're** 7:9 9:19 10:19 13:13
14:4,6,9 15:24 19:6 20:4
22:15 23:3,7,8,18 25:9,24
32:11 42:15 76:4 83:3 86:1
87:14 96:20 106:23 108:25
109:4,8,20,25 110:20 111:10
113:10
**we've** 7:10 20:8 23:13 37:10
54:9 79:7 106:18
**WebEx** 24:2
**website** 44:6
**week** 10:13,14 46:14
**weeks** 23:4 62:19
**went** 11:6 12:20
**weren't** 33:11 45:18,24 74:8
**West** 27:13
**whatsoever** 65:25 80:12 96:11
**Wheat** 1:22 3:8
**WHEREOF** 115:12
**whichever** 41:3
**whimsical** 18:19,19 19:1,18
21:10 22:6,24 28:2
**wife** 61:13
**wild** 27:13,13 49:25 53:3,13
57:10
**willing** 67:1,7 86:12
**Wilshire** 4:16
**wind-bag** 65:21
**wing** 81:10
**witness** 8:13 20:21 110:7
115:12
**won** 95:18
**wonder** 34:17
**word** 18:11 20:6,6 24:22 25:21
25:21 35:4 47:19 66:16 89:23
92:12 94:20 101:20 102:8,11
102:13,24 103:9,13,15,15,21
104:7,19,21,22 110:2
**words** 94:22 108:23 110:3
111:4
**wore** 14:23 15:8
**work** 34:14 66:23 68:20
**worked** 67:21 68:14 93:8
**working** 18:3
**works** 111:25
**world** 14:17 57:19 91:16
**worried** 43:6 61:2
**worry** 113:7
**worth** 16:15,16,24
**wouldn't** 18:13 72:25 78:11,11
**Wright** 4:16
**write** 35:16
**writing** 46:15 55:3,4 64:20
**written** 54:24 58:11 64:9 67:16
73:23
**wrong** 66:17 93:6
**wrongful** 41:5,17 42:23 43:8
**wrote** 44:2 46:18,25 62:7 64:6
73:13
**Wynkoop** 4:12

**X**

**XXX** 116:14,18

## Y

**yeah** 7:17 10:17 13:25 24:5
  44:1,22 52:15 56:3 64:22
  67:7 74:24 75:1 76:22 77:11
  77:12 81:5 83:6 85:23 86:14
  89:11 98:21,21,21 105:24
  106:10 109:12 110:9
**years** 52:19,21
**yep** 25:8 34:16 35:20 47:6
  52:22 55:6 65:2 76:22 85:14
  88:6 99:5,10 100:12
**yes-or-no** 58:12 68:19
**York** 10:4 12:19 13:5,17,22
  14:5,12,16,20 15:16 24:7,10
  35:7,10 36:3,9,18 54:6,16

## Z

**Zach** 2:7
**zbowman@cstrial.com** 2:11
**Zoom** 2:1 95:22 96:6,10 112:2

## 0

## 1

**1** 102:19
**1,000,000** 5:10
**1:10** 37:18
**1:13** 37:20
**1:47** 61:23
**1:56** 61:24
**10** 5:8 34:14
**100** 5:12
**1040** 2:22
**1064** 2:8 116:6
**107** 5:3
**1099** 2:17
**10th** 40:3
**11** 15:24,25 97:24 105:23
**11:33** 2:2
**11:40** 12:11
**11:47** 12:11
**11th** 39:4
**12:02** 23:15
**12:06** 23:16
**12:08** 25:2
**12:15** 24:3
**12:38** 25:3
**12:53** 37:6
**12:55** 37:7
**12:56** 37:20
**128** 3:15
**13** 37:1
**13th** 100:20
**1400** 2:13
**1437** 1:3
**15-minute** 37:16
**1515** 4:12
**16** 5:13
**16-year** 93:7,15 94:10
**1600** 2:13
**17** 79:8 81:13 82:3
**17th** 4:3,16
**18** 9:22
**18th** 2:17
**19** 37:25
**191250** 3:18
**1980s** 27:14

## 2

**2** 16:9 32:11 38:10
**2:26** 89:3
**2:36** 89:4
**2:49** 98:5
**2:58** 98:5
**20** 82:10,18 101:2 102:19
**2000** 35:15
**2004** 35:16,22
**2016** 36:10,12 63:12 65:4
**2020** 10:24 11:7 16:20 39:4,4
  39:15 44:19 49:19 52:6
  51:13,17,22 52:12,25 97:7,14
  97:19 100:18,23 101:2
**2020CV34319** 1:5
**2021** 1:24 2:2 70:7 114:11
  115:13 116:3
**2024** 115:13
**205-7870** 1:19 3:5
**20th** 51:12
**21** 52:10 65:4 82:22
**2150** 2:17
**22** 86:1
**220** 116:1 117:1
**222** 4:8
**2251** 3:11
**22nd** 52:12
**23** 1:24 2:2 38:11,11 44:21 73:4
  82:10 86:2
**23rd** 115:12
**24** 115:13 116:3
**26th** 96:19 97:2 100:18,23
  101:2
**2nd** 66:19 67:4

## 3

**3:09** 106:21
**3:12** 106:22
**3:15** 109:22
**3:17** 109:23
**3:22** 113:13
**300** 101:9,11,14
**303** 1:19,22 2:14,18,23 3:5,8,22
  4:4 116:2 117:2
**31** 63:12 79:8
**312** 4:9
**3400** 4:3
**35** 36:25 116:18
**36** 37:8,14,15
**3801** 1:18 3:4 117:5
**390-0016** 2:18

## 4

**4** 75:5 76:4 78:9
**400** 3:21
**409** 1:5
**419-8234** 3:12
**4195** 1:21 3:7
**43** 5:9
**477-3500** 116:2 117:2
**49** 85:1,7

## 5

**5** 102:19
**50** 102:20
**50s** 76:25 77:15 78:9,16,25
  79:5 84:3,19,22,25

**52** 5:10
**530-3011** 2:9
**534-5160** 4:4
**555** 4:3
**56** 63:10,17
**5613** 3:21
**573-1900** 2:14

## 6

**60** 106:11
**600** 4:12
**60601** 4:9
**609-7865** 4:9
**63119** 3:19
**6420** 4:16
**6th** 75:6

## 7

**7** 5:2
**71** 98:17,19
**719** 2:9
**72** 65:4 73:3,13,24 74:11,18
  75:8
**720** 4:13
**734-3400** 2:23
**741-4539** 3:22
**7th** 7:23

## 8

**8** 49:19 50:2,6 51:12,17,21
  54:17 59:10
**80** 38:14 75:25 98:14
**80-some** 5:13
**80033** 1:22 3:8
**80111** 2:23 3:22
**80202** 1:3 2:13,18 4:4,13
**80210** 1:19 3:4 117:5
**80231** 116:2 117:2
**80539** 3:12
**80601-0128** 3:15
**80s** 35:9
**81201** 2:9 116:7
**830** 1:18 3:4 117:5
**8400** 2:22
**8th** 46:13,14,15 56:20 60:24
  62:7,11 63:24

## 9

**9** 10:23 17:11 25:6 54:17
**9:32** 105:24
**90048** 4:17
**931-3200** 4:13
**970** 3:12
**9745** 116:1 117:1
**991-7600** 3:8
**991-7601** 1:22
**9th** 10:24 11:7 12:20 15:18,24
  16:7,11,19 40:3 44:19,22