# Exhibit 3

LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
AMNON Z. SIEGEL (State Bar No. 234981)
asiegel@millerbarondess.com
JESSE K BOLLING (State Bar No. 286267)
jbolling@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

Attorneys for Plaintiff
HERRING NETWORKS, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| HERRING NETWORKS, INC., a California corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>AT&T SERVICES, INC., a Delaware corporation; and AT&T, INC., a Delaware corporation,<br><br>    Defendants. | **CASE NO. 2:16-cv-01636-CAS-AGR**<br><br>**DECLARATION OF CHARLES HERRING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO AT&T INC.'S MOTION TO DISMISS COMPLAINT FOR LACK OF PERSONAL JURISDICTION**<br><br>Filed Concurrently with Opposition, Declaration of Amnon Z. Siegel<br><br>Date:   June 27, 2016<br>Time:   10:00 a.m.<br>Crtrm.:  5<br>Judge:  Hon. Christina A. Snyder |

297978.1

DECLARATION OF CHARLES HERRING

# DECLARATION OF CHARLES HERRING

I, CHARLES HERRING, declare and state as follows:

1. I am over the age of 18 and not a party to this litigation. The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

2. I am the President of Herring Networks, Inc. ("Herring"), an independent, family-owned television company based in San Diego, California and the Plaintiff in this lawsuit. I started the company with my father, Robert Herring Sr., and my brother, Robert Herring Jr. in 2003.

3. In October 2013, I met with Aaron Slator and Ryan Smith of AT&T Services, Inc. at Herring's headquarters in San Diego. During that meeting, Mr. Slator proposed that AT&T acquire a 5% ownership stake in Herring so that Herring's channels would become AT&T-affiliated channels. Once that happened, Mr. Slator said, AT&T would "put" Herring's networks to DirecTV, *i.e.*, require DirecTV to carry our networks under the terms of a "Put Agreement" between AT&T and DirecTV. Mr. Slator told me that Randall Stephenson, CEO of AT&T Inc., both instructed him and gave him the authority to propose this "Put Agreement" to Herring on behalf of AT&T Inc., the parent company in Dallas, Texas. I accepted Mr. Slator's proposal on behalf of Herring (the "Put Right Deal").

4. In the following months, I corresponded via email with AT&T Inc. employees Kalpesh Patel and Michael Janovec regarding the Put Right Deal. Mr. Patel and Mr. Janovec represented to me that they worked together as part of AT&T Inc.'s mergers and acquisitions team in the corporate headquarters in Dallas. In Mr. Patel's emails to me, his signature block represented that he worked for AT&T Inc. in Dallas, Texas. A true and correct copy of an email chain among me, Mr. Patel and Mr. Janovec from December 2013 is attached hereto as **Exhibit 1**. Mr. Patel stated to me that Mr. Janovec was part of his team at the AT&T parent company's mergers and acquisitions group. On the bottom email in this chain, Mr. Patel copied

297978.1

1

DECLARATION OF CHARLES HERRING

Wesley Terrell, whom Mr. Patel described as "our internal attorney …."

5. On behalf of AT&T Inc., Messrs. Patel and Janovec requested extensive financial information from Herring in connection with the Put Right Deal. As they requested, I sent Messrs. Patel and Janovec substantial information about Herring, including balance sheets, profits-and-loss statements, depreciation schedules, as well as Herring's articles of incorporation and bylaws.

6. In December 2013, I arranged a meeting between Herring and AT&T in our corporate headquarters in San Diego, California. Messrs. Patel and Janovec represented to me that they were going to fly in from AT&T's corporate headquarters in Dallas, Texas, to attend the meeting. The meeting took place on January 6, 2014 in San Diego. Messrs. Patel and Janovec personally attended the meeting to discuss the Put Right Deal. During this meeting, Mr. Patel gave me his business card, which indicated that he works for AT&T Inc in Dallas, Texas. A true and correct copy of Mr. Patel's business card is attached hereto as **Exhibit 2**.

7. On February 6, 2014, I had a call with Mr. Coe regarding the Put Right Deal. Mr. Coe told me that the Put Right Deal was being finalized on AT&T's end and would soon be presented to Randall Stephenson, CEO of AT&T Inc. Mr. Coe represented to me that AT&T Inc. was reviewing and had ultimate approval over the Put Right Deal.

8. In May 2014, soon after AT&T announced its plan to acquire DirecTV (the "Acquisition"), I visited AT&T Services, Inc.'s Los Angeles office. At that meeting, Mr. Slator told me that Randall Stephenson, AT&T Inc.'s Chairman and CEO, no longer wanted to move forward with the Put Right Deal. Mr. Slator explained to me that Mr. Stephenson did not want to move forward with the Put Right Deal because Mr. Stephenson did not want to affect the Acquisition and his negotiations with his then-counterpart at DirecTV, Chairman and CEO Mike White. Mr. Slator said that, instead, Mr. Stephenson authorized Mr. Slator to offer Herring a different deal. Mr. Slator proposed that if Herring publicly supported AT&T

during the Acquisition process, AT&T would cause DirecTV to carry Herring's networks after the Acquisition (the "DirecTV Promise"). Mr. Slator told me that Randall Stephenson both instructed him and gave him the authority to make this deal on behalf of AT&T Inc. Based on Mr. Slator's statements, I understood that the DirecTV Promise came directly from AT&T Inc., and I accepted Mr. Slator's proposal on behalf of Herring.

9. On October 13, 2014, I met AT&T executive James Cicconi at the Hyatt Hotel in Washington, D.C. for breakfast. I understand that AT&T claims that Mr. Cicconi only works for AT&T Services and has never worked for AT&T Inc., but from my dealings with him, he appeared to have authority and the ability to act on behalf of the AT&T parent company in Dallas.

10. Mr. Cicconi told me that he was responsible for ensuring that AT&T successfully completed the Acquisition of DirecTV. Mr. Cicconi thanked me for Herring's work in support of the Acquisition. Mr. Cicconi reiterated the DirecTV Promise that Mr. Slator had made to me several months earlier. Mr. Cicconi confirmed that, since Herring had performed its end of the bargain, AT&T would get Herring's networks carriage on DirecTV after the Acquisition. Mr. Cicconi told me that he had authority from his superiors at AT&T Inc. in Dallas, Texas, to make this promise on behalf of AT&T Inc. From my conversations and interactions with Mr. Cicconi, I understood that Cicconi represented AT&T corporate headquarters in Dallas, Texas, not just AT&T Services, Inc.

I declare under penalty of perjury and the laws of the State of California and the United States that the foregoing is true and correct.

Executed on May 20, 2016, at San Diego, California.

_____
CHARLES HERRING

297978.1

3

DECLARATION OF CHARLES HERRING