# Exhibit A

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: December 17, 2021 3:53 PM<br>FILING ID: 18E3B7708C609<br>CASE NUMBER: 2020CV34319 |
| ERIC COOMER, Ph.D.,<br>Plaintiff<br><br>vs.<br><br>DONALD J. TRUMP FOR PRESIDENT, INC.,<br>et al.,<br>Defendants | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiff**<br>Charles J. Cain, No. 51020<br>ccain@cstrial.com<br>Steve Skarnulis, No. 21PHV6401<br>skarnulis@cstrial.com<br>Bradley A. Kloewer, No. 50565<br>bkloewer@cstrial.com<br>Zachary H. Bowman, No. 21PHV6676<br>zbowman@cstrial.com<br>**CAIN & SKARNULIS PLLC**<br>P. O. Box 1064<br>Salida, Colorado 81201<br>719-530-3011 /512-477-5011 (Fax)<br><br>Thomas M. Rogers III, No. 28809<br>trey@rklawpc.com<br>Mark Grueskin, No. 14621<br>mark@rklawpc.com<br>Andrew E. Ho, No. 40381<br>andrew@rklawpc.com<br>**RECHTKORNFELD PC**<br>1600 Stout Street, Suite 1400<br>Denver, Colorado 80202<br>303-573-1900 | Case Number: 2020cv034319<br><br>Division Courtroom:   409 |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
FOR DEFENDANTS' SPECIAL MOTIONS TO DISMISS
UNDER C.R.S. § 13-20-1101**

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Eric Coomer, Ph.D. (Dr. Coomer) files his Proposed Findings of Fact and Conclusions of Law for the Defendants' special motions to dismiss under C.R.S. § 13-20-1101, *et seq.* Dr. Coomer reserves the right to request additional or amended findings.

## I.       PROCEDURAL BACKGROUND

1.       On December 22, 2020, Dr. Coomer filed his Original Complaint asserting claims for defamation, intentional infliction of emotional distress, conspiracy, and injunctive relief against Defendants Joseph Oltmann (Oltmann), FEC United, Inc. (FEC United), Shuffling Madness Media, Inc. dba Conservative Daily (SMM, and together with Oltmann and FEC United, Oltmann, et al.), James Hoft (Hoft), TGP Communications LLC dba The Gateway Pundit (TGP, and together with Hoft, Hoft-TGP), Michelle Malkin (Malkin), Eric Metaxas (Metaxas), Chanel Rion (Rion), Herring Networks, Inc. dba One America News Network (OAN, and together with Rion, OAN-Rion), Newsmax Media, Inc. (Newsmax), Sidney Powell, Sidney Powell, P.C. (Powell, P.C., and together with Sidney Powell, Powell), Rudolph Giuliani (Giuliani), and Donald J. Trump for President, Inc. (Trump Campaign).[1] On February 4, 2021, Dr. Coomer filed his First Amended Complaint, adding Defendant Defending the Republic, Inc. (Defending the Republic, and together with Powell, Powell et al.).[2]

2.       Dr. Coomer's allegations against each defendant are generally the same: their publication of false statements that Dr. Coomer participated in an alleged Antifa conference call; stated on that alleged call that he intended to subvert the 2020 presidential election; and then did

---

[1] *See generally* Orig. Compl.

[2] *See* First Am. Compl. at ¶ 14.

subvert the results of the 2020 presidential election caused him severe emotional and physical distress, as well as harm to his reputation, privacy, safety, earnings, and other unspecified pecuniary interests.[3]

      3.      Several Defendants sought and obtained extensions of their deadlines to file responsive pleadings, largely without objection from Dr. Coomer.[4]   Beginning in mid-February 2021, Defendants filed C.R.C.P. 12(b)(2) and 12(b)(5) motions to dismiss for lack of personal jurisdiction and failure to state a claim.[5]   The parties sought and obtained additional extensions of their deadlines to respond and reply.[6]   After all motions were fully briefed, the C.R.C.P. 12(b)(2) motions were denied.[7]   The C.R.C.P. 12(b)(5) motions remain pending.

      4.      On February 25, 2021, Dr. Coomer and Newsmax jointly requested an extension of the 63-day deadline to file a special motion to dismiss pursuant to Colorado's anti-SLAPP statute, C.R.S. § 13-20-1101.[8]   At the request of the parties, Newsmax's deadline was extended an

---

[3] *See* First Am. Compl. at ¶¶ 51-56 (Oltmann, et al.); ¶¶ 57, 60 (Hoft-TGP); ¶ 58 (Malkin); ¶ 59 (Metaxas); ¶ 61 (OAN-Rion); ¶ 62 (Newsmax); ¶¶ 64-70 (Powell et al.); ¶¶ 64-65 (Giuliani); ¶¶ 63-70 (Trump Campaign); ¶¶ 72-81 (damages).

[4] *See* Jan. 25, 2021 Order (Oltmann, et al.); Jan. 26, 2021 Order (Powell); Feb. 5, 2021 Order (Metaxas); Mar. 10, 2021 Order (Malkin); Mar. 11, 2021 Order (DTR); Apr. 2, 2021 Order (Trump Campaign); *see also* Stipulation, filed Jan. 21, 2021 (Newsmax); Stipulation, filed Feb. 2, 2021 (OAN-Rion); Feb. 2, 2021 Order (OAN-Rion); Stipulation, filed Mar. 4, 2021 (Trump Campaign).

[5] *See* Powell et. al. C.R.C.P. 12(b)(2) Mot., filed Feb. 16, 2021; Metaxas C.R.C.P. 12(b)(2) and 12(b)(5) Mot., filed Feb. 22, 2021; OAN C.R.C.P. 12(b)(5) Mot., filed Feb. 24, 2021; Rion C.R.C.P. 12(b)(2) and 12(b)(5) Mot., filed Feb. 24, 2021; Oltmann et al. C.R.C.P. 12(b)(5) Mot., filed Mar. 18, 2021; Giuliani C.R.C.P. 12(b)(2) Mot., filed Mar. 23, 2021; DTR C.R.C.P. 12(b)(2) Mot., filed Mar. 29, 2021; Trump Campaign C.R.C.P. 12(b)(2) and 12(b)(5) Mot., filed Apr. 16, 2021; Hoft-TGP C.R.C.P. 12(b)(2) and 12(b)(5) Mot., filed Apr. 30, 2021.

[6] *See* Mar. 5, 2021 Order (Pl. Resp. to Powell Mot.); Mar. 16 Order (Pl. Resp. to OAN-Rion Mot.); Mar. 30, 2021 Order (Powell Reply); Apr. 19, 2021 Order (Giuliani Reply); Apr. 27, 2021 Order (Giuliani Reply); Apr. 27, 2021 Order (Pl. Resp. to Trump Campaign Mot.); May 21, 2021 Order (Pl. Resp. to Hoft-TGP Mot.); May 21, 2021 Order (Trump Campaign Reply).

[7] *See* Jun. 21, 2021 Order.

[8] *See* Joint Mot., filed Feb. 25, 2021.

additional 35 days to April 30, 2021.[9]   Several other parties subsequently filed motions for extensions of their own anti-SLAPP deadlines, which were granted.[10]   The Court eventually extended the anti-SLAPP deadline for all defendants to April 30, 2021.[11]   Newsmax later settled and was dismissed.[12]

5.      Metaxas was the only Defendant to file his anti-SLAPP motion in accordance with the original statutory deadline.[13]   On March 4, 2021, Dr. Coomer filed a motion seeking limited discovery for use in responding to Metaxas's motion.[14]   After oral argument, the Court found good cause for limited discovery and granted Dr. Coomer's discovery motion.[15]   Dr. Coomer similarly sought and was eventually granted limited discovery as to all parties.[16]   In response, Powell et al. and Oltmann et al. sought limited discovery of Dr. Coomer, which was also granted.[17]

6.      On April 30, 2021, the remaining Defendants filed their special motions to dismiss.[18]   While the motions are tailored to Dr. Coomer's allegations against each defendant, there is considerable overlap in Defendants' legal arguments given the similarity in publications and claims asserted.   First, all Defendants argue that the anti-SLAPP statute applies to

---

[9] *See* Mar. 1, 2021 Order.

[10] *See* Mar. 4, 2021 Order (Powell); Mar. 10, 2021 Order (Malkin); Mar. 12, 2021 Order (OAN-Rion); Mar. 16, 2021 Order (Oltmann, et al.); Mar. 26, 2021 Order (DTR).

[11] *See* Mar. 24, 2021 Order.

[12] *See* Pl.'s Notice of Voluntary Dismissal, filed Apr. 30, 2021.

[13] *See* Metaxas Mot., filed Mar. 1, 2021.

[14] *See* Pl. Mot. for Expedited Discovery, filed Mar. 4, 2021.

[15] *See* Mar. 9, 2021 Minute Order.

[16] *See* Jun. 8, 2021 Order.

[17] *See* Sept. 7, 2021 Order.

[18] *See* Oltmann, et al. Mot.; Hoft-TGP Mot.; Malkin Mot.; OAN-Rion Mot.; Giuliani Mot.; Powell Mot.; DTR Mot.; Trump Campaign Mot.

Dr. Coomer's claims.[19]  Most argue that the statute applies because the statements at issue were made in connection with an issue of public interest[20] or because the statements were made in connection with an official proceeding.[21]  Some generally argue that it applies because their statements were made in furtherance of their rights to petition or free speech.[22]  Some fail to identify a basis for the application of the statute altogether.[23]

7.     Second, all Defendants argue that Dr. Coomer cannot make a prima facie factual showing of his claims.  Defendants argue that Dr. Coomer's defamation claims fail because he cannot establish publication, falsity, or actual malice.[24]  Some Defendants also raise affirmative defenses to defamation.  OAN-Rion argue that their statements are protected by the fair report privilege and a "newsworthy" exception to defamation.[25]  Oltmann et al., Powell et al., OAN-Rion, and Hoft-TGP argue that their statements are not actionable as mere opinion or hyperbole.[26]  Powell et al., Giuliani, and the Trump Campaign argue their statements allegedly relate to

---

[19] *See* Oltmann, et al. Mot. at 1-4; Malkin Mot. at 5-7; Metaxas Mot. at 6-11; Hoft-TGP Mot. at 9-10, 12-13; OAN-Rion Mot. at 11-13; Powell Mot. at 7-11; DTR Mot. at 8-12; Giuliani Mot. at 6-9; Trump Campaign Mot. at 5-14.

[20] *See* Malkin Mot. at 5-7; Metaxas Mot. at 8-10; Hoft-TGP Mot. at 9-10, 12-13; OAN-Rion Mot. at 11-13; Powell Mot. at 8-10; DTR Mot. at 9-11; Giuliani Mot. at 7-9; Trump Campaign Mot. at 7-11.

[21] *See* Malkin Mot. at 5-6; Metaxas Mot. at 7-8; Trump Campaign Mot. at 11-14.

[22] *See* Hoft-TGP Mot. at 9; Powell Mot. at 10-11; DTR Mot. at 11-12; Giuliani Mot. at 9, n.4; Trump Campaign Mot. at 11-14.

[23] *See generally* Oltmann, et al. Mot.

[24] *See* Oltmann, et al. Mot. at 7-9 (challenging falsity and actual malice); Malkin Mot. at 7-11 (challenging actual malice); Metaxas Mot. at 11 (incorporating C.R.C.P. 12(b)(5) motion to dismiss by reference); Metaxas C.R.C.P. 12(b)(2) and 12(b)(5) Mot. at 8-11 (challenging actual malice); Hoft-TGP Mot. at 15-23 (challenging actual malice); OAN-Rion Mot. at 13-22 (challenging publication, falsity, and actual malice); Powell Mot. at 17-23 (challenging actual malice); DTR Mot. at 18-24 (challenging actual malice); Giuliani Mot. at 16-20 (challenging actual malice); Trump Campaign Mot. at 15-17 (challenging actual malice).

[25] *See* OAN-Rion Mot. at 12.

[26] *See* Powell Mot. at 24-25; DTR Mot. at 24-26; OAN-Rion Mot. at 17; Hoft-TGP Mot. at 16-21.

subsequently filed lawsuits and are, therefore, protected by the litigation privilege.[27]   The Trump Campaign argues that Donald Trump's statements are immune under the Westfall Act[28] and that Eric Trump's statement is immune under the Communications Decency Act.[29]   Hoft-TGP also argue that Dr. Coomer's pleadings were insufficient.[30]

        8.      Most Defendants then argue that at least some of Dr. Coomer's remaining claims fail as they are derivative of his defamation claims.[31]   Most also argue that Dr. Coomer's intentional infliction of emotional distress claims fail because he cannot establish extreme or outrageous conduct and or the requisite intent;[32] that Dr. Coomer's conspiracy claims fail because he cannot establish an unlawful overt act[33] or a meeting of the minds;[34] and that Dr. Coomer's

---

[27] *See* Powell Mot. at 11-17; DTR Mot. at 12-18; Giuliani Mot. at 9-16; Trump Campaign Mot. at 11-12.

[28] *See* Trump Campaign Mot. at 18.

[29] *Id.* at 20.

[30] *See* Hoft-TGP Mot. at 13-14.

[31] *See* Oltmann, et al Mot. at 12 (challenging conspiracy); Malkin Mot. at 11-12 (challenging intentional infliction of emotional distress and conspiracy); Metaxas Mot. at 11 (incorporating C.R.C.P. 12(b)(5) motion to dismiss by reference); Metaxas C.R.C.P. 12(b)(2) and 12(b)(5) Mot. at 13-15 (challenging conspiracy and injunctive relief); Hoft-TGP Mot. at 23 (challenging intentional infliction of emotional distress, conspiracy, and injunctive relief); OAN-Rion Mot. at 22-25 (challenging intentional infliction of emotional distress, conspiracy, and injunctive relief); Powell Mot. at 7, n.5 (challenging injunctive relief); 26-27 (challenging intentional infliction of emotional distress and conspiracy); DTR Mot. at 8, n.5 (challenging injunctive relief); 26-27 (challenging intentional infliction of emotional distress and conspiracy); Giuliani Mot. 21-22 (challenging conspiracy and injunctive relief); Trump Campaign Mot. at 18-19 (challenging intentional infliction of emotional distress and conspiracy).

[32] *See* Oltmann, et al. Mot. at 5 (incorporating intentional infliction of emotional distress arguments in C.R.C.P. 12(b)(5) motion to dismiss by reference); Oltmann, et al. C.R.C.P. 12(b)(5) Mot. at 23-25; Malkin Mot. at 11-12; Metaxas Mot. at 11 (incorporating C.R.C.P. 12(b)(5) motion to dismiss by reference); Metaxas C.R.C.P. 12(b)(2) and 12(b)(5) Mot. at 11-13; OAN-Rion Mot. at 22-23; Powell Mot. at 25-26; DTR Mot. at 26-27; Giuliani Mot. at 20-21.

[33] *See* Oltmann et al. Mot. at 12; Malkin Mot. at 12-13; Metaxas Mot. at 11 (incorporating C.R.C.P. 12(b)(5) motion to dismiss by reference); Metaxas C.R.C.P. 12(b)(2) and 12(b)(5) Mot. at 13-14; OAN-Rion Mot. at 24; Powell Mot. at 26-27; DTR Mot. at 27; Giuliani Mot. at 21.

[34] *See* Oltmann et al. Mot. at 12; Malkin Mot. at 12-13; Metaxas Mot. at 11 (incorporating C.R.C.P. 12(b)(5) motion to dismiss by reference); Metaxas C.R.C.P. 12(b)(2) and 12(b)(5) Mot. at 13; Hoft-TGP Mot. at 18-19; OAN-Rion Mot. at 24; Powell Mot. at 26-27; DTR Mot. at 27; Giuliani Mot. at 21.

request for injunctive relief fails because it is a prior restraint on speech, not narrowly tailored, or has not yet been adjudicated.[35]

9.     Following several months of limited discovery, Dr. Coomer filed his Omnibus Response to all Defendants' arguments and affirmative defenses.[36]  On reply, several Defendants attempted to expand the scope of their original arguments by arguing that additional bases for constitutional protections apply;[37] that additional statements are immune under the Communications Decency Act;[38] that certain statements are protected opinions and hyperbole;[39] and that a "conditional" litigation privilege afforded prelitigation statements bars Dr. Coomer's causes of action.[40]   Some Defendants attempted to raise entirely new arguments, arguing constitutional protections could be invoked when other defendants created the matter of public concern;[41] the incremental harm doctrine precluded Dr. Coomer's claims;[42] vicarious liability could not be established for certain parties;[43] and for the Court to weigh the veracity of certain statements and credibility of certain witnesses.[44]  Because these new and expanded arguments were raised by the respective Defendants for the first time on reply, they are untimely and are not

---

[35] *See* Oltmann, et al. Mot. at 13-15; OAN-Rion Mot. at 25; Powell Mot. at 7, n.5; DTR Mot. at 8, n.5; Giuliani Mot. at 22.

[36] Dr. Coomer filed an initial response to Defendant Metaxas's special motion to dismiss on April 7, 2021 but reserved his right to supplement or amend the evidence offered in support.  *See* Pl.'s Resp. at ¶ 23.

[37] *See* Malkin Reply at 12-13, Metaxas Reply at 6.

[38] *See* Oltmann, et al. Reply at 13, Trump Campaign Reply at 7-8.

[39] *See* Metaxas Mot. at 6-8.

[40] *See* DTR Reply at 12-15.

[41] *See* Malkin Reply at 13-14; OAN-Rion Reply at 16.

[42] *See* OAN-Rion Reply at 18-20.

[43] *See* Oltmann, et al. Reply at 13-17; DTR Reply at 2-8, 11.

[44] *See* Malkin Reply at 7-10; OAN-Rion Reply at 3-5, 20-21; Powell Reply at 1-11, 12-14; Trump Campaign Reply at 8-11.

considered for purposes of this Order.  *See People v. Czemerynski*, 786 P.2d 1100, 1107 (Colo. 1990).  Additionally, to the extent these challenges attempt to raise factual disputes, such issues are reserved for a finder of fact and equally not considered for purposes of this Order.  *See Baral v. Schnitt*, 376 P.3d 604, 608 (Cal. 2016); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

10.     On October 13-14, 2021, the Court heard oral argument on all Defendants' special motions.

## II.     STANDARD OF REVIEW

11.     Anti-SLAPP laws serve a limited purpose—to dismiss frivolous claims targeting constitutional rights.  These laws were enacted specifically to combat SLAPPs—strategic lawsuits against public participation.  They are intended to enable courts to dismiss frivolous cases brought with the intent to chill a person's constitutional rights.  *FilmOn.com Inc. v. DoubleVerify Inc.*, 439 P.3d 1156, 1160 (Cal. 2019).  They provide a procedural mechanism invoked in limited circumstances early in a case for the purpose of dismissing meritless claims.  *Baral*, 376 P.3d at 608 (Cal. 2016) ("The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech.  It only provides a procedure for weeding out, at an early state, *meritless* claims arising from protected activity") (emphasis in original).  However, they do not bar meritorious claims.

12.     Colorado recently enacted an anti-SLAPP statute to prevent the "abuse of the judicial process" through frivolous lawsuits that are strategically filed to unfairly subject individuals to costly, meritless litigation.  *See* C.R.S. § 13-20-1101(1)(a).  Similar to anti-SLAPP

laws generally, the statute is limited to dismissal of meritless claims arising from protected activity and, otherwise, expressly requires courts to "protect the rights of persons to file meritorious lawsuits for demonstrable injury." *See* C.R.S. § 13-20-1101(1)(b). Given the recent enactment of the anti-SLAPP statute, there is limited authority in Colorado construing and applying its terms. However, the anti-SLAPP statute was modeled on California's anti-SLAPP statute, which has nearly identical terms. As such, case law interpreting and applying the California anti-SLAPP statute is persuasive for purposes of interpreting and applying the Colorado anti-SLAPP statute. This authority recognizes that the statute imposes a two-step analysis.

13.     First, courts must determine whether the statute applies. Under this step, the movant bears the initial burden to show the anti-SLAPP statute applies to a plaintiff's claims. *Kieu Hoang v. Phong Minh Tran*, 60 Cal. App. 5th 513, 524-25 (2021). The statute applies when a claim arises from any action taken "in furtherance of the person's right of petition or free speech under the United States constitution or the state constitution in connection with a public issue." C.R.S. § 13-20-1101(3)(a). The statute identifies four specific acts that constitute protected activity under the statute, which include: (1) statements "made before a legislative, executive or judicial proceeding or any other official proceeding authorized by law;" (2) statements "made in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other official proceeding authorized by law;" (3) statements "made in a place open to the public or a public forum in connection with an issue of public interest;" and (4) "[a]ny other conduct or communication in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." C.R.S. § 13-20-1101(2)(a)(I)-(IV). However, each of these categories can be distilled

down to two necessary bases for a protected act under the statute—there must be an official proceeding or there must be a matter of public concern. *See id.* These bases correspond to the rights of petition and freedom of speech, in which not every statement made constitutes a protected act. *See* C.R.S. § 13-20-1101(3)(a). Defendants have the burden to establish their actions giving rise to Dr. Coomer's claims meet these bases and constitute protected activity.

14. Second, if the statute applies, then the plaintiff must establish that there is a reasonable likelihood that the plaintiff will prevail on each claim to which the statute applies. *See* C.R.S. § 13-20-1101(3)(a). This is a low burden in which the plaintiff must merely show that a legally sufficient, or prima facie, factual basis exists for his claims. *Baral*, 376 P.3d at 608-09. In evaluating whether a plaintiff has made a prima facie showing, courts do not weigh the evidence or resolve conflicting factual claims. *Id.* Instead, courts accept the plaintiff's evidence as true and limit their evaluation of a "defendant's showing only to determine if it defeats the plaintiff's claims as a matter of law." *Id.* Claims with the requisite minimal merit proceed. *Id.* This review is described as a "summary judgment like procedure," wherein courts consider the pleadings as well as affidavits and other evidence to determine whether the plaintiff has satisfied this minimal burden. *See id.* at 608; *see also* C.R.S. § 13-20-1101(3)(b). At this stage of the proceeding, evidence merely must be "capable of being admitted at trial, i.e., evidence which is competent, relevant and not barred by a substantive rule." *See Sweetwater Un. High Sch. Dist. v. Gilbane Bldg. Co.*, 434 P.3d 1152, 1161-63 (Cal. 2019) (citing *Fashion 21 v. Coal. For Humane Immigrant Rights of L.A.*, 117 Cal. App. 4th 1138, 1145 (2004)). Courts have recognized to strike a complaint for failure to meet evidentiary obstacles that may be overcome at trial would not serve the

anti-SLAPP statute's protective purposes, which are to end meritless suits early, not to abort potentially meritorious claims due to lack of discovery.  *See id.* at 1163.

### III.   FINDINGS OF FACT

*A.*   ***Dr. Eric Coomer***

15.   Dr. Coomer is a private individual.[45]  At the time of the 2020 presidential election, Dr. Coomer was privately employed by Dominion as the Director of Product Strategy and Security.[46]  Dominion provided election equipment and services to governmental bodies in at least thirty different states during the 2020 presidential election.[47]  Dr. Coomer, as an employee of Dominion, assisted with these services.[48]  Neither Dominion nor Dr. Coomer were governmental employees or controlled the election or the governmental bodies they were assisting.

*B.*   ***2020 Presidential Election***

16.   In the weeks leading up to the November 3, 2020 presidential election, former president Trump, his campaign, his agents, and many of his supporters began alleging widespread voter fraud and conspiracy theories to explain President Trump's projected loss.[49]  The conspiracy theories surrounding voting machines proved especially popular, with allegations against Dominion appearing as early as November 5, 2020.[50]  The propagation of these theories continued

---

[45] *See* Ex. A, Coomer Dec. at ¶ 10.  All references to exhibits are to those identified in Plaintiff's Omnibus Response.

[46] *Id.* at ¶ 2.

[47] *Id.* at ¶ 9.

[48] *Id.*

[49] *Id.* at ¶ 12.

[50] *See* Ben Collins, *OAnon's Dominion voter fraud conspiracy theory reaches the president*, NBC NEWS, Nov.- 13, 2020, https://www.nbcnews.com/tech/tech-news/q-fades-qanon-s-dominion-voter-fraud-conspiracy-theory-reachesn1247780.

even after the election results were announced in President Biden's favor on November 7, 2020.[51]
Allegations against Dr. Coomer first appeared a few days later on November 9, 2020.[52]

17.     In November and December 2020 alone, over 60 election related lawsuits were filed across the country by former president Trump and his supporters to challenge the legitimacy of the election results.[53]  Of these lawsuits, the parties identified some that were filed on behalf of former president Trump or the Trump Campaign in federal courts in Montana, New Jersey, Nevada, Pennsylvania, and Michigan.[54]  The parties also identified some filed by Powell in federal courts in Arizona, Georgia, Wisconsin, and Michigan.[55]  Only one of the Trump Campaign's identified lawsuits references Dominion,[56] and only Powell's identified lawsuits reference Dr. Coomer.[57]  To date, these lawsuits have been dismissed or withdrawn.[58]

18.     All allegations of election fraud have been firmly rejected by credible sources.  On

---

[51] *See* Ex. A, Coomer Dec. at ¶ 13.

[52] *Id.* at ¶ 15; Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 13:2-11.

[53] *See* First Am. Compl. at ¶ 50; *see also* Malkin Mot. at 5 (identifying 60 lawsuits); Metaxas Mot. at 8 (same); OAN-Rion Mot. at 6 (same); Trump Campaign Mot. at 13 (identifying lawsuits generally); Powell Mot. at 6 (identifying lawsuits filed by Powell); Giuliani Mot. at 9, n.4 (identifying a lawsuit filed by the Trump Campaign).

[54] *See* Trump Campaign Mot. at 13, n.3 (citing *Donald J. Trump for President, Inc. v. Bullock*, 491 F. Supp. 3d 814 (D. Mont. 2020); *Donald J. Trump for President, Inc. v. Murphy*, No. 3:20-cv-10753 (D. NJ.); *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-cv-01445-JCM-VCF (D. Nev.). *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-cv-02078-MWB (M.D. Penn. Nov. 9, 2020)); *see also* Giuliani Mot. at 9, n.4 (citing *Donald J. Trump for President v. Benson*, No. 1:20-cv-01083-JTN-PJG (W.D. Mich.)).

[55] *See* Trump Campaign Mot. at 13, n.3 (citing *Bowyer v. Ducey, et al.*, No. 2:20-cv-02321-DJF (D. Ariz.); *Pearson v. Kemp, et al.*, No. 1:20-cv-04809-TCB (N.D. Ga.); *Feehan v. Wis. Elections Comm'n, et al.*, No. 2:20-cv-01771-PP (E.D. Wisc.); *King v. Whitmer, et al.*, No. 2:20-cv-13134-LVP-RSW (E.D. Mich.)); Powell Mot. at 6, 12 (same); DTR Mot. at 7, 13 (same).

[56] *See Donald J. Trump for President v. Benson*, No. 1:20-cv-01083-JTN-PJG (W.D. Mich.).

[57] *See supra* n.55.

[58] *See supra* n.54-55.

November 12, 2020, the Cybersecurity & Infrastructure Security Agency (CISA), a standalone federal agency under the Department of Homeland Security, issued a Joint Statement from the Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees confirming that there is "no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised" and that the 2020 presidential election was the most secure in American history.[59]  Then U.S. Attorney General William Barr confirmed "to date, we have not seen fraud on a scale that could have effected a different outcome in the election."[60]  Several states also conducted manual recounts without detecting any evidence of fraud.[61]

19.     By December 9, 2020, state elections officials tasked with verifying the election and vote counts had certified the election results across all 50 states and the District of Columbia.[62] Electors met and formally cast their ballots with President Joe Biden securing 306 electoral votes and winning the popular vote by more than seven million votes.[63]  Congress counted the electoral votes, and on January 6, 2021, former vice president Mike Pence declared Joe Biden the winner of the presidential election.[64]

C.     *Joseph Oltmann, FEC United, Inc., Shuffling Madness Media, Inc.*

---

[59] *See* Ex. M-1, PX 67.

[60] *See* Ex. O, Halderman Dec. at ¶ 19.

[61] *Id.* at ¶ 47.

[62] *See* Pl.'s First Am. Compl., at ¶ 46.

[63] *See* Ex. A, Coomer Dec. at ¶ 13; *see also* Pl.'s First Am. Compl., at ¶ 46.

[64] *See* Pl.'s First Am. Compl., at ¶ 46.

20.     Oltmann is a business owner and political activist based in Colorado.[65]  He is the founder and authorized representative of FEC United, a non-profit corporation formed in Colorado.[66]  He is a co-host for the Conservative Daily podcast, which broadcasts from Colorado and publishes almost daily podcasts on various online platforms.[67]  He was also the founder and authorized representative for SMM, which until July 9, 2021 conducted business under the trade name Conservative Daily.[68]

21.     Oltmann, individually and as a representative of FEC United, was actively involved in political events and rallies in support of former president Trump and the Colorado Republican Party leading up the 2020 presidential election.[69]  Similarly, Oltmann published podcasts on Conservative Daily in support of former president Trump both individually and as a representative of SMM.[70]  In these roles, Oltmann began advancing various allegations of fraud leading up to the election, including claims that public health measures in response to the Covid-19 pandemic were intended to allow for election fraud, and various claims of ballot harvesting.[71]  Despite these allegations, prior to the election Oltmann indicated his belief that former president Trump would

---

[65] *See* Ex. D-2, Oltmann-SMM, Sept. 9, 2021 Depo. Tr. at 7:15-9:2; 23:23-24:11.

[66] *See* Ex. C-2, Oltmann-FEC United, Sept. 9, 2021 Depo. Tr. at 7:10-13.

[67] *See* Ex. D-3, Oltmann-CD Solutions, Sept. 9, 2021 Depo. Tr. at 32:15-18.

[68] *See* Ex. D-2, Oltmann-SMM, Sept. 9, 2021 Depo. Tr. at 7:8-17; 14:11-23; *see also* Ex. D-1, PX 92-93.

[69] See Ex. C-2, Oltmann-FEC United, Sept. 9, 2021 Depo. Tr. at 8:7-12:7.

[70] *See* Ex. B-10 Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 5, 2020); B-11 Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 6, 2020).

[71] *See* Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 2:25-3:5, 8:25-9:10; *see also* Pl.'s Amend. Compl. at ¶¶ 4, 8, 52-53, 56-71, 85, 91-94.

win reelection.[72]

22.      However, as the results for the election began to come in and former president Trump's loss became clear, Oltmann again began advancing allegations of fraud to explain the loss, including claims of ballot harvesting and late-night ballot dumps at ballot collection centers.[73]

23.      On November 9, 2020, after the results of the election were called for President Joe Biden, Oltmann co-hosted a Conservative Daily Podcast.  On that podcast, Oltmann alleged to have learned almost two months earlier of a conspiracy to elect the president of the United States.[74] Oltmann claimed he gained this information while infiltrating an Antifa conference call with unknown and unverified participants.[75]  Oltmann alleged one of the unknown participants was referred to as "Eric" and "the Dominion guy."[76]  Oltmann paraphrased this "Eric" as stating on the call, "Don't worry about the election, Trump is not gonna win.  I made f-ing sure of that."[77] Oltmann claimed to have subsequently identified the speaker by Google searching the terms

---

[72] *See* Ex. B-8, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Sept. 9, 2020); Ex. B-9, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Aug. 5, 2020)

[73] *See* Ex. A, Coomer Dec. at ¶ 15; Ex. B-8, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Sept. 9, 2020); Ex. B-9, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Aug. 5, 2020); Ex. B-10, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 5, 2020); Ex. B-11, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 6, 2020); *see also* Pl.'s Amend. Compl. at ¶ 53.

[74] *See* Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 18:19-21:11; *see also* Pl.'s Amend. Compl. at ¶¶ 5, 52-53.

[75] *Id.*; *see also* Ex. F-1, Malkin, July 27, 2021, PX 15; Ex. G-1, Metaxas, Aug. 13, 2021, PX 97, Tr. 3:15-25, 6:6-7:3; Ex. G-2, The Eric Metaxas Radio Show, YOUTUBE (Nov. 24, 2020).

[76] *See* Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 19:8-23; *see also* Pl.'s Amend. Compl. at ¶ 52.

[77] *See* Ex. B-3, Joseph Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 19:24-20:7; *see also* Pl.'s Amend. Compl. at ¶ 52.

"Eric," "Dominion," and "Colorado."[78]   Oltmann then identified Dr. Coomer as the alleged

speaker[79] and accused him of "controlling elections," while disclosing Dr. Coomer's name, his

photograph, and his place of employment.[80]   In review of this publication, the substance of

Oltmann's statements alleged that Dr. Coomer participated in this alleged Antifa conference call;

that he stated on this call his intent to subvert the presidential election; and that he then did in fact

subvert the election.   Dr. Coomer unequivocally denies these allegations.[81]

24.     Oltmann began repeatedly republishing these allegations against Dr. Coomer, both

individually and as a representative of FEC United, across numerous media platforms.[82]   Oltmann

has also continued to republish these allegations against Dr. Coomer on the Conservative Daily

podcast, both individually and as a representative of SMM.   At this time, there are dozens of

---

[78] *See* Ex. G-2, The Eric Metaxas Radio Show, *Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss*, YOUTUBE (Nov. 24, 2020); Ex. G-1, Metaxas, Aug. 13, 2021, PX 97, Tr. 8:20-25; *see also* Pl.'s Amend. Compl. at ¶ 52; n.74.

[79] *See* Ex. G-2, The Eric Metaxas Radio Show, *Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss*, YOUTUBE (Nov. 24, 2020); Ex. G-1, Metaxas, Aug. 13, 2021, PX 97, Tr. 8:20-9:24; *see also* Pl.'s Amend. Compl. at ¶¶ 6, 59; n.80, 115.

[80] *See* Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 3:8-13.

[81] See Ex. A, Coomer Dec. at ¶ 18.

[82] Ex. F-1, Malkin, July 27, 2021, PX 15, at 3:51; Ex. E-1, Hoft-TGP, Aug. 10, 2021, PX 86; Ex. A-1, pub. 11, Oltmann et. al., WAKE UP! WITH RANDY CORPORON (Nov. 14, 2020) at 43:10; Ex. A-1, pub. 13, Oltmann et. al., THE DEB FLORA SHOW (Nov. 15, 2020) at 3:40; Ex. A-1, pub. 11, Oltmann et. al., THE GATEWAY PUNDIT (Nov. 16, 2020) at 0:15; Hoft-TGP, Aug. 10, 2021, PX 87; Ex. A-1, pub. 22, Oltmann et. al., THE PETER BOYLES SHOW, (Nov. 17, 2020) at 24:29; Ex. A-1, pub. 23, Oltmann et. al., THE PETER BOYLES SHOW, (Nov. 18, 2020) at 6:14; Ex. A-1, pub. 24, Ex. A-1, pub. 33, Oltmann et. al., WAKE UP! WITH RANDY CORPORON (Nov. 21, 2020) at 30:02; Ex. I-1, Herring-OAN, July 30, 2021, PX 32 at 22:00; Ex. G-2, THE ERIC METAXAS SHOW (Nov. 24, 2020) at 4:58; Ex. F-1, Malkin, July 27, 2021, PX 17 at 11:55; Ex. A-1, pub. 61, Oltmann et. al., THE PROFESSOR'S RECORD, (Apr. 20, 2021), at 16:00; THE DEEP RIG (Zero Hour Alchemy, 2021); Ex. A-1, pub. 63, Oltmann et. al., FRANK TV (May 3, 2020) at 6:18; Ex. A-1, pub. 68, Oltmann et. al., STEEL TRUTH PODCAST (June 22, 2021); Ex. A-1, pub. 64, Oltmann et. al., THE CHUCK AND JULIE SHOW (May 5, 2020) at 28:26; Ex. A-1, pub. 72, Oltmann, Speech at Reawaken America Tour, (July 18, 2021) at 3:07; Ex. A-1, pub. 73, Oltmann et. al., INTHEMATRIXXX PODCAST (Aug. 4, 2021) at 5:09; Ex. A-1, pub. 74, Oltmann et. al., MIKE LINDELL CYBER SYMPOSIUM (Aug. 11, 2021) at 6:34; Ex. A-1, pub. 75, Oltmann et. al., STEVE BANNON'S WAR ROOM PODCAST (Aug. 11, 2021) at 1:35.

podcasts in the record specifically targeting Dr. Coomer.[83]

25.    Oltmann has continued to republish these allegations against Dr. Coomer across social media platforms, including Twitter, Parler, Facebook and Telegram, at times referring to Dr. Coomer as a "liar,"[84] a "terrorist,"[85] or a "shitbag."[86]

26.    The nature and severity of Oltmann's allegations—and the means through which he allegedly obtains his information—have escalated.  Oltmann has denigrated Dr. Coomer by referring to him as "trash," "evil," and a "sociopath;"[87] monitored Dr. Coomer's activities and stated, "I have people in Salida that literally are following him around and saying, 'Alright, Joe. Here's where he's at next.  Here's where he's at next.  I found him.  He's staying in this basement, up here.  Oh, he's at this house now;"[88] posted and shared photos of Dr. Coomer's house;[89] encouraged his audience to harass Dr. Coomer with statements such as "I want everybody to put on their social media account, 'Where is Eric Coomer?;'"[90] and repeatedly called for violence, including calling for the civil war, and repeatedly asserting that Dr. Coomer could be put to death for treason.[91]  Oltmann has even bragged about harassing and threatening Dr. Coomer's friends

---

[83] *See generally,* Ex. A-1, pubs. 1-4, 17, 25, 29, 35, 40, 42-51, 53-54, 56, 60, 63, 66; Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-6, Oltmann et. al., CONSERVATIVE DAILY PODCAST (Dec. 28, 2020).

[84] *See* Ex. A-1, pub. 71.

[85] *Id.* at pub. 77.

[86] *See* Ex. I-1, PX 46.

[87] *Id.* at pubs. 1, 19, 52, 68, 77.

[88] *Id.* at pub. 48.

[89] *See* Ex. I-1, PX 46.

[90] *See* Ex. A-1, pub. 45.

[91] *Id.* at pubs. 2-5.

and acquaintances, demanding incriminating information and promising retribution if they did not deliver.[92]   In one instance, Oltmann claimed he called Dr. Coomer's friend  and threatened that he would "be the next person that [Oltmann] put[s] on Twitter" if he hung up the phone.[93]  It is unclear the full extent of the allegations Oltmann has made against Dr. Coomer given the quantity and scope of his publications, which Oltmann continues to publish.   However, Dr. Coomer is the person Oltmann et al. specifically named in relation to their allegations of election fraud, making Dr. Coomer the face of the Dominion conspiracy theory.[94]

27.     Oltmann et al. have offered no evidence in support of their allegations against Dr. Coomer.   Oltmann et al. do not know Dr. Coomer and had no personal knowledge of Dr. Coomer at the time of the alleged Antifa conference call.[95]  Oltmann et al. have not disclosed any witness with personal knowledge that identified Dr. Coomer on the alleged Antifa conference call.[96]  Oltmann et al. have not identified any expertise or reliable methodology with which Oltmann identified Dr. Coomer on the alleged Antifa conference call.[97]  Instead, Oltmann et al.'s allegations against Dr. Coomer were based on Oltmann's speculation of an alleged Google search and alleged YouTube videos of Dr. Coomer he claims to have subsequently watched at a later undisclosed time.[98]  These are not reliable methodologies for identification.  Similarly, Oltmann

---

[92] *See* Ex. E-3a.

[93] *Id*.

[94] *See supra* n.82.

[95] *See* Ex. A, Coomer Dec. at ¶ 15; Ex. A-1, pub. 74.

[96] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo. Tr. at 15:20-20:18.

[97] *See* Ex. A, Coomer Dec. at ¶ 15.

[98] *See* Ex. F-3, at 6:8-7:8.

et al. have no personal knowledge of any election fraud involving Dr. Coomer.[99]  Oltmann et al. have not disclosed any witness with personal knowledge of any election fraud committed by Dr. Coomer.[100]  Oltmann et al. have offered no evidence of election fraud committed by Dr. Coomer.[101]  And Oltmann et al. have not identified any expertise in elections systems with which to identify election fraud.[102]  Instead, Oltmann et al.'s allegations of fraud were based on Oltmann's speculation of Dr. Coomer's Facebook posts and his employment with Dominion, neither of which include evidence of election fraud.[103]  The Facebook posts themselves are limited to Dr. Coomer's personal and political beliefs, which have no probative value as to the allegations made.[104]

28.     Otherwise, Oltmann et al.'s allegations are based on anonymous sources—specifically unknown and unverified speakers on an Antifa call Oltmann allegedly infiltrated.[105]  Only after Dr. Coomer filed suit did Oltmann et al. claim to have personal knowledge of other participants on the purported call.[106]  However, the witnesses Oltmann et al. directly or indirectly identified have denied any knowledge of such a call, denied any knowledge of the statements Oltmann alleged occurred on the call, and denied any knowledge of Dr. Coomer on such a call.[107]

---

[99] *See* Ex. V-5, at 52:10-53:6.

[100] *Id.*

[101] *See* Ex. V-5, at 52:10-53:6.

[102] *See* Ex. B-2, Oltmann, Sept. 8, 2021 Depo. Tr. at 140:18-22.

[103] *See* Ex. B-3, Oltmann, et al., Conservative Daily Podcast (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 19:8-13.

[104] *See* Ex. A, Coomer Dec. at ¶ 48.

[105] *See* Ex. A-1, pub. 1.

[106] *See* Ex. V-5, at 29:13-17.

[107] *See* Ex. Q, Beedle Dec. at ¶¶ 14-15; Ex. T, Maulbetsch Dec. at ¶¶ 5-6; Ex. U, Anderson Dec. at ¶¶ 10-13.

No other participants have come forward and Oltmann has not disclosed any other alleged participants.[108]  Regardless, Oltmann's alleged knowledge of some participants does not impute knowledge of the relevant unknown and unverified speakers on which Oltmann et al. based their claims.  Those alleged speakers remain anonymous.

29.     Oltmann et al.'s allegations regarding the alleged Antifa call itself have varied. Oltmann at al. initially provided no explanation for how Oltmann infiltrated the alleged Antifa call.[109]  Oltmann then claimed to have gained access from Heidi Beedle.[110]  However, Heidi Beedle has stated she has no knowledge of the alleged call or Oltmann at al.'s allegations.[111]  Oltmann et al. have since acknowledged Oltmann's claim that she was on the call was a "wild guess."[112] Oltmann et al. now claims another unnamed Antifa member gave Oltmann access to the call but have refused to disclose the alleged witness's name.[113]  Oltmann et al. have not identified when the purported call occurred, at times placing the call in mid-to late-September[114] and at times stating it occurred on or about the week of September 27, 2020.[115]  Whereas a screenshot Oltmann allegedly took of the Google search of the terms "Eric," "Dominion," and "Denver Colorado" is dated September 26, 2020, which would place the Google search before the call.[116]  However,

---

[108] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo. Tr. at 11:13-22, 56:1-62:2.

[109] *See* Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 8:5-7.

[110] *Id*. at 18:4-18.

[111] *See* Ex. Q, Beedle Dec. at ¶¶ 14-15.

[112] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo. Tr. at 54:10-23.

[113] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo. Tr. at 11:13-22, 56:1-62:2.

[114] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo Tr. at 71:10-72:15.

[115] *See* Ex. K-1, PX 2.

[116] *See* Ex. B-5.

Oltmann et al.'s placement of the call changed again with the filing of their reply in support of their special motion to dismiss.  Specifically, Oltmann at al. introduced in their reply the Declaration of John "Tig" Tiegen (Tiegen), who claims Oltmann alleged a call occurred sometime between September 17 and September 21, 2020.[117]  Notably, Tiegan's description of Oltmann's allegations did not include Dr. Coomer, Dominion, or election fraud, but, instead, only theories that "journalists were trying out some propaganda."[118]  Tiegen himself has no personal knowledge of an alleged call or of Oltmann et al.'s allegations against Dr. Coomer.[119]  Oltmann et al. have provided no record evidence of the call itself, such as electronic records contemporaneously made that list identifying information such as the date, time, or method of the call.[120]  Instead, Oltmann et al. have provided undated notes Oltmann alleges he took during the call.[121]  Similarly, the method of communication has also changed with Oltmann first alleging it was a phone call only to now allege it was a Zoom call.[122]  Moreover, Oltmann et al. have no recording of the call despite Oltmann having allegedly accessed it to investigate Antifa.[123]

        30.     Throughout the limited discovery allowed pursuant to the anti-SLAPP statute, Oltmann repeatedly refused to disclose relevant information.  Specifically, at an evidentiary hearing on July 7, 2021, Oltmann refused to disclose information about how he accessed the

---

[117] *See* Oltmann et. al. Reply, at Ex. G, Dec. of Johnathan Tiegen AKA "Tig," ¶¶ 11-14.

[118] *See id.* at ¶ 15.

[119] *See id.* at ¶¶ 11-15.

[120] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo Tr. at 71:10-72:15.

[121] *Id.*

[122] *Id*. at 15:18-16:1.

[123] *See* Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 19:8-20:15, 75:25-76:21.

alleged Antifa call.  The Court found that his testimony was "evasive and not credible," and concluded that, for purposes of the Colorado Reporter's Privilege, C.R.S. § 13-90-119, Oltmann's "statements regarding that conference call are probably false."[124]  The Court then ordered Oltmann to disclose the identity of his alleged conduit to the Antifa call.[125]  Oltmann persisted in defying that order.[126] Oltmann has also refused to disclose the identity of the individual who allegedly gave him access to Dr. Coomer's Facebook profile, again in defiance of a Court order.[127]  Given Oltmann et al.'s refusal to disclose evidence ordered by the Court, the Court ruled that it would not consider Oltmann et al.'s claims as to the source, timing or manner in which Oltmann received the Facebook posts or permit Oltmann et al. to contest Dr. Coomer's evidence or claims regarding the source, manner, or timing of Oltmann's receipt of information regarding Dr. Coomer's Facebook posts.[128]

31.     By contrast, Dr. Coomer unequivocally denies Oltmann at al.'s allegations.[129] Dr. Coomer has averred under oath that he did not participate in any alleged call; he did not state an intent to subvert the election in any alleged call; and he did not take any actions to subvert the election.[130]  Dr. Coomer has put forward sworn statements of witnesses Oltmann et al. directly or

---

[124] *See* Ex. V-5, July 7, 20221 Hearing Tr. at 90:22-91:7.

[125] *Id*. at 92:14-18.

[126] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo. Tr. at 11:13-22, 56:1-62:2.

[127] *See* Ex. B-2, Oltmann, Sept. 8, 2021 Depo. Tr. at 86:5-17.

[128] *Id.*; *see also* Oct. 12, 2021 Order Re: Pl.'s Second Mot. for Sanctions Against the Oltmann Defs. Pursuant to C.R.C.P. 37.

[129] *See* Ex. A, Coomer Dec. at ¶ 18.

[130] *Id*.

indirectly identified in relation to the alleged call that similarly deny Oltmann et al.'s allegations.[131]

32.     Dr. Coomer provided the Court with expert evidence showing that Oltmann et al.'s allegations of voter fraud against Dr. Coomer were not possible as Dominion machines are not capable of bulk adjudication and that private safeguards and multiple independent layers of security at the local, state, federal levels all either prevent such manipulation or would make any such attempted manipulation easily discoverable.[132]   Dr. Halderman, a nationally-recognized election security expert, provides the Court with examples of how Dr. Coomer sought to improve transparency in the vote adjudication process to make fraud *easier to detect* as well as evidence that the defendants' vote rigging allegations were "always implausible, consisting of wild speculation, readily debunked claims, and incoherent technical assertions, and months of subsequent investigations and audits have both failed to vindicate their theories and added further evidence that the election outcome was correctly decided."[133]   The Court accepts Dr. Halderman's expert opinion for purposes of the pending motions.

33.     Dr. Coomer provided the Court with expert evidence challenging the investigation and reporting of Oltmann's allegations by the media defendants.[134]   Dr. Coomer proffered, and the Court accepts Fred Brown, Jr., as an expert on journalistic standards and practices at this stage of the proceedings.[135]   Brown has four decades of experience both as a reporter/editor at the Denver

---

[131] *See* Ex. Q, Beedle Dec.; Ex. T, Maulbetsch Dec.; Ex. U, Anderson Dec.

[132] *See* Ex. A, Coomer Dec. at ¶¶ 5-7; 40-46; *see generally* Ex. O, Halderman Dec.

[133] *See* Ex. O, Halderman Dec. at ¶¶ 7 and 40-48.

[134] *See generally* Ex. N, Brown Dec.

[135] *See id.*

Post and teaching journalism to students at University of Denver.[136]  Brown opined that the media defendants relied on objectively unreliable information, unreliable sources such as Ron Watkins, unreliable affiants, and exhibited an unacceptable failure to even attempt to verify the facts through obvious sources.[137]  Brown gave examples in his declaration of conduct that was "an affront to fundamental journalistic standards and practice" or exhibited a clear conflict of interest.[138]  While Brown refused to speculate on the parties' subjective motivations, he opined that the media defendants' "failure to report on widely accepted, verifiable information that conflicts with their assumptions, may legitimately be characterized as a reckless disregard for the truth."[139]  The Court accepts Brown's expert opinion for purposes of the pending motions.

34.    Dr. Coomer provided the Court with expert evidence from Mike Rothschild, an author and conspiracy theorist / QAnon expert, who opined that many of the defendants perpetuated and sponsored unsupported election fraud conspiracy theories which were consistent with the QAnon disinformation campaign.[140]  The defendants' support of the debunked QAnon election fraud claims further supports Dr. Coomer's contention that the publication of defamatory statements about Dr. Coomer was part of defendants' overall goal of delegitimizing the 2020 election.  The Court accepts Rothschild's expert opinion for purposes of the pending motions.

35.    Oltmann et al. had both political and financial motivations to delegitimize the results of the election by defaming Dr. Coomer.  Oltmann is an ardent supporter of former

---

[136] *See id*. at ¶¶ 4-5.

[137] *See, e.g., id.* at ¶¶17, 48, 128-129, and 133.

[138] *See id.* at ¶¶ 38-44, 131.

[139] *See id.* at ¶ 134.

[140] *See* Ex. P, Rothschild Dec. at ¶¶ 81-86.

president Trump and frequently advocates for conservative causes, often through FEC United.[141] Following Oltmann's publication of claims against Dr. Coomer, his Conservative Daily podcast gained new listeners and quickly climbed the podcast rankings.[142]  Oltmann et al. have used this new exposure to promote FEC United to a wider audience.[143]

36.     Oltmann et al. conceived of a storyline regarding the results of the presidential election, which is reflected in their allegations of elections fraud leading up to and after the election.[144]  Oltmann et al. consciously set out to conform their allegations against Dr. Coomer to that storyline given the limitations of Oltmann's investigation, which failed to identify witnesses with personal knowledge of the allegations; to obtain corroborating evidence in support of the allegations; to consult with experts on election systems regarding the allegations; or to contact either Dr. Coomer or Dominion to confirm the allegations.[145]  Instead, Oltmann et al. continued to publish the allegations even after learning both Dr. Coomer and Dominion stated they were false.[146]  Similarly, Oltmann et al. rejected reports from CISA and former Attorney General Barr regarding the legitimacy of the election.[147]

---

[141] *See* Ex. C-2, Oltmann-FEC United, Sept. 9, 2021 Depo. Tr. at 8:25-9:8.

[142] *See* Ex. D-4, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 5, 2020) (identifying podcast as #119 most popular political podcast in America), (Nov. 6, 2020) (identifying podcast as #108 most popular political podcast in America), (Nov. 9, 2020) (identifying podcast as #81 most popular political podcast in America), (Nov. 10, 2020) (identifying podcast as #62 most popular political podcast in America), (Nov. 14, 2020) (identifying podcast as #53 most popular political podcast in America), (Nov. 19, 2020) (identifying podcast as #28 most popular political podcast in America), (Dec. 2, 2020) (identifying podcast as #8 most popular political podcast in America).

[143] *See* Ex. D-2, Oltmann-SMM, Sept. 9, 2021 Depo. Tr. at 35:23-37:14.

[144] *See* Ex. B-8; B-9; B-10; B-11.

[145] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo. Tr. at 11:13-22, 56:1-62:2; Ex. A, Coomer Dec. at ¶¶ 16, 23, 34, 36.

[146] *See generally* Ex. A-1, pubs. 47-77.

[147] *See* Ex. D-3, Oltmann-CD Solutions, Sept. 9, 2021 Depo. Tr. at 28:23-32:2.

37.     Oltmann et al. have not retracted any of their publications about Dr. Coomer.[148] Instead, they remain publicly available to this day.[149]

**D.     Michelle Malkin**

38.     Malkin is a political commentator and the host of a program called #MalkinLive, which was broadcast from Colorado and published on YouTube from May 2020 until March 2021.[150] She was also the host of a program on Newsmax called "Sovereign Nation," which has since been cancelled.[151] Since November 2020, Malkin has had roughly two million Twitter followers.[152]

39.     Malkin was one of the first Defendants to interview Oltmann and publish his statements about Dr. Coomer.   On November 13, 2020, Malkin first interviewed Oltmann on #MalkinLive, which was posted on YouTube.[153] Upon review of this publication, the substance of both Malkin's and Oltmann's statements alleged that Dr. Coomer participated in an Antifa conference call; that he stated on this call his intent to subvert the presidential election; and that he then did in fact subvert the election.[154] Oltmann began the interview by repeating his previous statements regarding Dr. Coomer's alleged participation in the Antifa conference call, and Malkin stated that her interview with Oltmann provided her audience with "information vital to the

---

[148] *See* Ex. V-1, Demand for Retraction.

[149] *See generally* Ex. A-1.

[150] *See* Ex. F-1, PX 15; PX 17.

[151] *See* Ex. F-1, Malkin, Jul. 27, 2021 Depo. Tr. at 85:21-87:17.

[152] *Id.* at 30:20-22.

[153] *See* Ex. F-1, PX 15.

[154] *See* Ex. F-3, #MalkinLive Tr. at 5:2-23; 15:5-11; 20:12-21:7; 26:24-27:9.

systemic stealing of the election."[155]  Referring to Dr. Coomer's alleged participation in the Antifa call, Malkin claimed Oltmann "got to hear the unhinged rantings of this lunatic in charge of security at Dominion Voting Systems."[156]  After identifying Dr. Coomer as the anonymous "Eric," Malkin and Oltmann discussed their allegations of criminal conduct against Dr. Coomer, with Oltmann explicitly stating that Dr. Coomer committed treason and should be put to death.[157]

40.     Throughout the interview, both Malkin and Oltmann insisted they were presenting facts.  Malkin presented Oltmann as an "eyewitness account of the fraud that's going on"[158] and noted that Oltmann had been censored by Twitter for "telling the truth."[159]  Oltmann repeated Malkin's sentiment on several occasions, stating that "It is truth, a hundred percent truth"[160] and that he "[was] not making any of this up."[161]

41.     Malkin began repeatedly publishing these allegations against Dr. Coomer across numerous media platforms including YouTube and Twitter.  In two consecutive tweets posted on November 13, 2020, Malkin posted a link to the Oltmann interview followed by her statement, "Joe Oltmann speaks out about Dominion Systems, Antifa radical Eric Coomer & Twitter's suspension of his account!"[162]  Hours later, Malkin posted another series of tweets promoting the interview and repeating Oltmann's claims:

---

[155] *Id.* at 2:1-9.

[156] *Id.* at 20:12-21:7.

[157] *Id.* at 26:24-27:9.

[158] *Id.* at 2:23-3:9.

[159] *Id.* at 2:23-3:9.

[160] *Id.* at 13:10-19.

[161] *Id.* at 15:5-8.

[162] *See* Ex. A-1, pub. 6.

Joe Oltmann (now banned on Twitter) exposes pro-Antifa, cop-hatred inciting rants of #EricCoomer, VP of strategy/security of Dominion Voting Systems. "What if I told you he is a major shareholder" in Dominion & "owns patents associated with other voting systems?"[163]

Full interview with #joeoltmann on #ericcoomer #dominion here ==>[164]

What are they trying to hide? #DominionVotingSystems" [links to now deleted tweet from Joey Camp][165]

42.     Throughout the following week, Malkin published multiple tweets promoting the Oltmann interview and Dr. Coomer-related hashtags.  For example, on November 15, 2020, Malkin wrote, "ICYMI – Dominion, Antifa, and #EricCoomer exposed by Joe Oltmann on #MalkinLive last week."[166]  On November 16, 2020, Malkin posted a link to an article from The Gateway Pundit that identified Dr. Coomer as an "unhinged sociopath" and wrote, "ICYMI: #ExposeDominion #WhoIsEricCoomer #JoeOltmann."[167]   On November 19, 2020, Malkin published another series of tweets linking the Oltmann interview, and stating "In case you missed it: My interview with #joeoltmann from six days ago exposing #EricCoomer #Antifa #Expose Dominion" and "#ExposeDominion #ExposeEricCoomer."[168]

43.     On November 28, 2020, Malkin interviewed Oltmann on her Newsmax program "Sovereign Nation."  Malkin introduced Oltmann to her audience by stating:

Who has control over our elections?  Who has dominion over our votes?  Is it we the people or is it the electronic voting oligarchs?   Without full election

---

[163] *See* Ex. F-4.

[164] *See* Ex. F-1, PX 20.

[165] *See* Ex. F-1, PX 21.

[166] *See* Ex. F-1, PX 22.

[167] *See* Ex. F-1, PX 23.

[168] *See* Ex. F-1, PX 24.

transparency, there can be no election peace.  Next up, Denver businessman Joe Oltmann joins me to discuss his shocking discoveries about Dominion vice president of strategy and security, Eric Coomer, plus much more.  Stay tuned.[169]

44.     Malkin specifically invited Oltmann to discuss Dr. Coomer, stating, "I want you to tell our audience at Sovereign Nation who exactly Eric Coomer is and why it matters in these ongoing battles against election fraud across the country."[170]  Upon review of these publications, the substance of Malkin's and Oltmann's statements alleged that Dr. Coomer participated in an Antifa conference call; that he stated on this call his intent to subvert the presidential election; and that he then did in fact subvert the election.  Oltmann stated:

> So Eric Coomer is the Director of Strategy and Security for Dominion Voting Systems.  He's also affiliated with or a part of the Antifa movement, and frankly, he has the ability – he has a doctorate in nuclear physics and has the ability to put his finger on the scale and has, I believe, put his finger on the scale of the election across our country.[171]

45.     Despite later acknowledging that she had no working theory of how Dr. Coomer could have rigged the election,[172] Malkin emphasized the seriousness of Oltmann's allegations and in so doing, again accused Dr. Coomer of committing election fraud: "And the reason why this is so alarming -- and it's obvious, but it should be spelled out -- is that this is one of the highest ranking officials at Dominion Voting Systems, which has penetrated our election system across the country and of course around the world."[173]  Oltmann agreed, asserting that "[Dr. Coomer]

---

[169] *See* Ex. F-1, PX 17; Ex. A-1, pub. 41.

[170] *Id.*

[171] *Id.*

[172] *See* Ex. F-1, Malkin, Jul. 27, 2021 Depo. Tr. at 73:18-25.

[173] *See* Ex. F-1, PX 17; Ex. A-1, pub. 41.

truly is the mastermind" and that "he's a large shareholder in Dominion Voting Systems."[174]  To date, Malkin has not put forward any evidence in support of her statements about Dr. Coomer. Further, Malkin specifically named Dr. Coomer in relation to her allegations of election fraud, making Dr. Coomer the face of the Dominion conspiracy theory.[175]

46.     Given Oltmann's lack of personal knowledge, lack of expertise, and lack of evidence in support of his allegations against Dr. Coomer, Malkin had sufficient reason to know Oltmann was an unreliable source.[176]  Oltmann had disclosed to Malkin that his allegations were based on unknown and unverified participants on an unknown and unverified call.[177]  Malkin failed to ask Oltmann about how he accessed the alleged Antifa call,[178] about the notes he claims he took during the call,[179] or about the identities of the other alleged participants, even though these participants would have been allegedly able to corroborate Oltmann's allegations.[180]  In fact, Malkin has admitted that she had not investigated Oltmann's allegations[181] nor attempted to contact Dr. Coomer or Dominion[182] or any other alleged call participants[183] before inviting Oltmann to appear on both of her programs.

---

[174] *Id.*

[175] *See generally* Ex. F-1, PX 15; PX 17.

[176] *See supra* at § III(C).

[177] *See* Ex. F-3, #MalkinLive Tr. at 4:24-5:23.

[178] *See generally* Ex. F-3; Ex. F-1, PX 17; Malkin Mot. at Ex. A-2.

[179] *See* Ex. F-1, Malkin, Jul. 27, 2021 Depo. Tr. at 70:2-7.

[180] *Id.* at 71:8-22; 126:8-20.

[181] *Id.* at 16:23-17:18; 29:22-30:4.

[182] *Id.* at 70:15-22; 71:8-22; 72:7-24.

[183] *Id.* at 126:8-20.

47.     Malkin conceived of a storyline regarding the results of the presidential election, which is reflected in her allegations of elections fraud leading up to and after the election. [184] Malkin consciously set out to conform her allegations against Dr. Coomer to that storyline, given her reliance on Oltmann, failure to investigate, and disregard of authoritative sources rejecting all fraud allegations.[185]

48.     Malkin had both political and financial motivations to delegitimize the results of the election.  Malkin is a supporter of former president Trump[186] and gained national exposure advancing allegations of fraud in relation to the election and against Dr. Coomer.[187]  Malkin's publications were even relied upon by other defendants, including Hoft-TGP, Metaxas, OAN-Rion, and Powell et al., in publishing their own allegations against Dr. Coomer.[188]

49.     Malkin has not retracted any of her publications about Dr. Coomer, and they remain publicly available to this day.[189]

**E.     James "Jim" Hoft and TGP Communications, LLC**

50.     Hoft is the founder and editor of TGP, a political website and blog conducting

---

[184] *See* Ex. F-5; F-6.

[185] *See* Ex. F-1, Malkin, Jul. 27, 2021 Depo. Tr. at 73:1-16; 109:14-110:2.

[186] *See generally* Ex. F-1, PX 15; PX 17.

[187] *Id*.

[188] *See* Ex. E-1, Hoft-TGP, Aug. 10, 2021 Depo. Tr. at 30:3-15, 33:6-34:17, 37:19-38:2, 124:10-21; Ex. G-1, Metaxas, Aug. 13, 2021 Depo. Tr. at 69:18-70:2; Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 15:21-16:1, 18:12-19:7, 73:16-20, 81:16-82:15, 115:2-7, 116:23-117:17, 150:14-19, 160:15-23; Ex. I-1, OAN, July 30, 2021 Depo. Tr. at 11:22-12:21, 14:6-14, 28:17-22, 30:17-19, 62:4-9; Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 10:14-21, 11:20-12:1, 15:10-18, 26:15-27:4, 41:13-16, 57:22-58:3, 65:22-66:8, 72:15-23, 73:8- 15, 88:22-89:6, 92:11-22, 96:4-16, 98:10-15, 108:22-109:7.

[189] *See* Ex. V-1, Demand for Retraction.

business under the trade name The Gateway Pundit.[190]  As a founder, editor, and contributing author, Hoft is an authorized representative for TGP.[191]

51.    Shortly after the presidential election, on November 13, 2020, Hoft-TGP began publishing articles and interviews based on Oltmann's allegations against Dr. Coomer.[192]  Hoft personally authored most of TGP's numerous articles discussing Dr. Coomer and approved the rest before publication.[193]  Upon review of these publications, the substance of Hoft-TGP's statements alleged that Dr. Coomer participated in an Antifa conference call; that he stated on this call his intent to subvert the presidential election; and then did in fact subvert the election.[194] Hoft-TGP's allegations against Dr. Coomer are often first found in the articles' titles like:

> Dominion Voting Systems Officer of Strategy and SECURITY Eric Coomer Admitted in 2016 Vendors and Election Officials Have Access to Manipulate the Vote[195]
>
> Report: Anti-Trump Dominion Voting Systems Security Chief was Participating in Antifa Calls, Posted Antifa Manifesto Letter to Trump Online[196]
>
> Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath – His Internet Profile Is Being Deleted and Erased[197]
>
> BREAKING: SECOND VIDEO REVEALED of Dominion Voting System's Eric Coomer Explaining to Elections Officials How to Switch Votes (VIDEO)[198]

---

[190] *See* Ex. E-1, Hoft, Aug. 10, 2021 Depo. Tr. at 7:13-18; 9:8-11.

[191] *Id.*

[192] *See* Ex. E-1, PX 86; Ex. E-1, PX 87; Ex. E-3.

[193] *Id.*; *see also* Ex. E-4-14; Ex. E-1, Hoft, Aug. 10, 2021 Depo. Tr. at 9:8-11.

[194] *See* Ex. E-1-14.

[195] *See* Ex. E-1, PX 86.

[196] *See* Ex. E-1, PX 87.

[197] *See* Ex. E-3.

[198] *See* Ex. E-4.

BALD-FACED LIES: Dominion Says Assertions of Vote Switching Are 'Completely False' – But We Have Two Videos of Dominion Executive Eric Coomer Showing How to Switch Votes[199]

Developing: Dominion's Anti-Trump Executive Eric Coomer Owns Patents on Adjudication Process That Investigators Found Skimmed Votes from Trump in Michigan[200]

WAKE UP AMERICA! Bold Billionaire Offers $1 Million Bounty for Dominion's, Eric Coomer's Comeuppance[201]

52.     However, the articles themselves are replete with similar allegations.   On November 14, 2020, Hoft-TGP stated that Dr. Coomer participated in "Antifa Calls" and relied on the November 13, 2020 #MalkinLive interview in alleging that Oltmann infiltrated an Antifa call and discovered Dr. Coomer's participation.[202]   On November 16, 2020, Hoft-TGP restated Oltmann's previous allegations but went on to state that Dr. Coomer is "mentally ill and a sociopath," "an unhinged Trump hater and Antifa supporter," and a "lunatic."[203]   Hoft-TGP make similar statements again on December 27, 2020.[204]   Hoft-TGP specifically name Dr. Coomer in relation to their allegations of election fraud, making Dr. Coomer the face of the Dominion conspiracy theory.[205]

53.     Hoft-TGP repeatedly imputed criminal conduct to Dr. Coomer.  On November 27,

---

[199] *See* Ex. E-8.

[200] *See* Ex. E-10.

[201] *See* Ex. E-11.

[202] *See* Ex. E-1, PX 87.

[203] *See* Ex. E-3.

[204] *See* Ex. E-10.

[205] *See generally* Ex. E-1-14.

2020, Hoft-TGP published photos and videos of Dr. Coomer alongside statements like "Dominion Voting Systems is in a panic as more and more Americans learn of their role in stealing the 2020 election from President Donald Trump."[206]  On December 17, 2020, Hoft-TGP published an article entitled "More on Dominion Voting Machines: They Could Easily Duplicate Votes and Security Threats Were Virtually Ignored" that included statements like "there may be a good case for perjury" against Dr. Coomer.[207]   On December 28, 2020, Hoft-TGP published an article alerting its readers to a "bounty" for Dr. Coomer's "comeuppance" and stating that Dr. Coomer "can be seen in training videos explaining to users 'adjudication' functions on the vote machine that could allegedly be used to alter votes, singularly or in bulk, if a nefarious user chose to do so."[208]  This video does not support the allegations made and, instead, appears to include only limited excerpts of a longer presentation.[209]  Dr. Coomer has put forward evidence these excerpts are misleading and do not accurately describe the adjudication process or its purpose.[210]   On January 4, 2021, Hoft-TGP published another photo of Dr. Coomer alongside statements describing the updates to Georgia's voting machines as "illegal."[211]

54.     Hoft-TGP and Oltmann have insisted they were presenting facts.  On November 13, 2020, Hoft-TGP stated that "Joe Oltmann did a deep dive on Eric Coomer" and described Oltmann

---

[206] *See* Ex. E-8.

[207] *See* Ex. E-9.

[208] *See* Ex. E-11.

[209] *Id.*

[210] *See* Ex. A, Coomer Dec. at ¶¶ 5-7; *see also* Ex. O, Halderman Dec. at ¶¶ 35-48.

[211] *See* Ex. E-1, PX 88.

as the only one "investigating [Dr.] Coomer, his far left background and his role at Dominion."[212] In an audio interview on November 16, 2020, Hoft said to Oltmann: "You have information that's truthful and should be released and is very much, there's nothing wrong with it and they're going to just shut you down because you're exposing absolute fraud."[213]

55.    Hoft-TGP's articles and interviews about Dr. Coomer were published on TGP's website, as well as republished across other media platforms.[214]  To date, Hoft-TGP have not put forward any evidence in support of their statements about Dr. Coomer.[215]

56.    Given Oltmann's lack of personal knowledge, lack of expertise, and lack of evidence in support of his allegations against Dr. Coomer, Hoft-TGP had sufficient reason to know Oltmann was an unreliable witness.[216]  Oltmann had disclosed to Hoft-TGP that his allegations were based on unknown and unverified participants on an unknown and unverified call.[217]  Yet Hoft-TGP relied almost exclusively on Oltmann as their only source and admitted that they have never attempted to find corroborating evidence.[218]   Hoft-TGP never attempted to contact Dr. Coomer, asked to see the notes Oltmann claims he took during the call, or asked about the identities of the other alleged participants.[219]

57.    Hoft-TGP conceived of a storyline regarding the results of the presidential election,

---

[212] *See* Ex. E-1, PX 86.

[213] *See* Ex. E-3a.

[214] *See* Ex. F-1, PX 23; *see also See* Ex. I-1, PX 33.

[215] *See* Ex. E-1, Hoft, Aug. 10, 2021 Depo. Tr. at 46:15-17; 51:6-10.

[216] *See supra* at § III(C).

[217] *See* Ex. E-3a.

[218] *See* Ex. E-1, Hoft, Aug. 10, 2021 Depo. Tr. at 32:17-33:6.

[219] *Id.* at 20:25-21:22, 32:13-24; 50:4-7.

which is reflected in their allegations of elections fraud leading up to and after the election.[220]

Hoft-TGP consciously set out to conform their allegations against Dr. Coomer to that storyline,

given their reliance on Oltmann, failure to investigate, and disregard of authoritative sources

rejecting all fraud allegations.   Hoft-TGP financially benefitted from this conduct as their

post-election coverage resulted in increased subscriptions, increased advertising revenue, and

notoriety as a pro-Trump grassroots leader.[221]   Hoft-TGP have not retracted any of their

publications about Dr. Coomer, and they remain publicly available to this day.[222]

## F.   *Eric Metaxas*

58.   Metaxas is an author, speaker, and host of the radio program and podcast called

The Eric Metaxas Radio Show.  Metaxas is employed by Salem Media, which broadcasts his

program on various media networks and platforms across the United States.[223]  A video version of

The Eric Metaxas Radio Show is also published on YouTube.[224]  Since November 2020, Metaxas

has had roughly 206,000 YouTube subscribers.[225]

59.   On November 24, 2020, Metaxas interviewed Oltmann on The Eric Metaxas Show

during a segment called "Joe Oltmann Discusses How A Security Genius at Dominion Voting

Promised Antifa Members a Trump Loss."[226]  Upon review of this publication, the substance of

---

[220] *Id.* at 62:18-64:11; 66:19-69:21.

[221] *See* Ex. E-1, Hoft, Aug. 10, 2021 Depo. Tr. at 73:4-74:20.

[222] *See* Ex. V-1, Demand for Retraction.

[223] *See* Pl.'s Resp. to Metaxas 12(b)(2) Mot. at Coomer Dec., at ¶¶ 6, 9.

[224] *See* Ex. G-1, PX 97 at 15:18-23.

[225] *See* Ex. A, Coomer Dec. at ¶ 35.

[226] *See* Ex. G-2; Ex. G-1, PX 97 at 2:8-17.

both Metaxas's and Oltmann's statements alleged that Dr. Coomer participated in an Antifa conference call; that he stated on this call his intent to subvert the presidential election; and that he then did in fact subvert the election.[227]  These statements started almost immediately as Metaxas introduced the segment: "Eric Coomer also seems to be so viciously, insanely anti-Trump that Eric Coomer of Dominion is also involved with Antifa.  We just thought we'd get Joe Oltmann to tell the story."[228]  Oltmann repeated his previous statements regarding Dr. Coomer's alleged participation in the Antifa conference call.[229]  Oltmann continued, "We were dealing with a person that could put his finger firmly on the American voice and tip the scale of the election very easily, and that frankly he was doing it."[230]  Not only did Metaxas endorse Oltmann's allegations, he went on to claim Dr. Coomer is "pro-Antifa, despises not just Donald Trump, but it seems to me if you're pro-Antifa, despises America."[231]  Metaxas continued, comparing Dr. Coomer to the Unabomber and "Marxist shock troops" and implying he is evil, anti-American, and "flirt[s] with insanity and violence."[232]  Metaxas specifically named Dr. Coomer in relation to his allegations of election fraud, making Dr. Coomer the face of the Dominion conspiracy theory.[233]

60.     Metaxas went on to state Dr. Coomer had engaged in criminal conduct:

Well, there's levels of stupidity and evil and we know that not everybody is on the same level, that there are some people that they just hate Trump but then there are other nefarious actors like Mr. Coomer and others who, you know, they're -- it's

---

[227] *See* Ex. G-1, Metaxas, Aug. 13, 2021 Depo. Tr. at 5:7-8:6; 14:7-16; 28:22-29:23.

[228] *Id.* at 2:8-16.

[229] *Id.* at 5:7-8:6.

[230] *Id.* at 14:7-16.

[231] *Id.* at 11:6-8.

[232] *Id.* at 15:2-9.

[233] *See generally* Ex. G-1, Metaxas, Aug. 13, 2021 Depo. Tr.; Ex. G-2.

hard to know what to say other than there is wickedness, there is evil here because nothing that they're doing, even if you hate Trump, I have many friends who hate Trump, but they would never do what we're talking about.  What we're talking about is evil. In fact, let's just say this.  It's extremely criminal and these folks know they're going to go to jail for the rest of their lives.[234]

. . .

Eric Coomer, has he gone into hiding?  What is he thinking?  Does he know he's going to go to prison for the rest of his life?[235]

61.     During the interview, Oltmann repeatedly alleged that he was presenting facts:

"[T]his isn't all made up.  This isn't hyperbole that we're just throwing out there.  This is absolute

fact."[236]  Metaxas emphasized the alleged significance of Oltmann's claims to the wider narrative

of election fraud surrounding the 2020 election:

The idea that anyone would dare to try to mess with our elections, many patriots have died, suffered and died so that we could have what we have, and I cannot think of anything more despicable and more worthy of our doing everything we can, including give our lives if necessary to fight for this.  And so that's why I'm so glad to be speaking with you and getting this information out.  People need to understand.  I keep saying we need a thousand Paul Revere's to get this information out.  This is utterly unacceptable.  There's no way that anyone will accept the presidency of Joe Biden under this black cloud now unless they can prove that this was a fair election, there is no way the American people with all this evidence coming out are going to accept it.[237]

62.     Metaxas went on to promote the November 24, 2020 interview on Twitter, where

he included a link to the interview and wrote, "Today Joe Oltmann explained how after infiltrating

Antifa he bumped into someone working w/them named Eric Koomer [sic] – who was the head of

---

[234] *See* Ex. G-1, Metaxas, Aug. 13, 2021 Depo. Tr. at 28:22-29:10.

[235] *Id.* at 26:13-16.

[236] *Id.* at 28:14-16.

[237] *Id.* at 22:8-24.

Security and Safety at #Dominion – and who PROMISED the Antifa folks that "effing" Trump WOULD NOT WIN! Please RT."[238]

63.    Given Oltmann's lack of personal knowledge, lack of expertise, and lack of evidence in support of his allegations against Dr. Coomer, Metaxas had sufficient reason to know Oltmann was an unreliable witness.[239]  Oltmann had disclosed to Metaxas that his allegations were based on unknown and unverified participants on an unknown and unverified call.[240]  Metaxas failed to ask Oltmann about how he accessed the alleged Antifa call, about the notes he claims he took during the call, or about the identities of the other alleged participants, even though these participants would have been allegedly able to corroborate Oltmann's allegations.[241]  In fact, Metaxas knew what Oltmann intended to discuss on his show but admitted that he had not investigated Oltmann's allegations[242] nor attempted to contact Dr. Coomer or Dominion or any other alleged call participants before inviting Oltmann to appear on his program.[243]

64.    Metaxas conceived of a storyline regarding the results of the presidential election, which is reflected in his allegations of elections fraud leading up to and after the election.[244]  For example, soon after the election was called for President Biden, Metaxas had already claimed that "If an election bears signs of fraud – so that the will of the people was thwarted – it is not an

---

[238] *See* Ex. G-5.

[239] *See supra* at § III(C).

[240] *See* Ex. G-1, PX 97 at 5:7-8:6.

[241] *See* Ex. G-1, Metaxas, Aug. 13, 2021 Depo. Tr. at 28:5-19.

[242] *Id.* at 21:10-23:11-20.

[243] *Id.* at 28:5-19; 30:3-20.

[244] *See* Ex. G-9*;* Ex. G-5.

official election. STAY TUNED.  And pray.  This is absolutely not over, despite what some seem to think.  The American people will not roll over."[245]  Metaxas consciously set out to conform his allegations against Dr. Coomer to this storyline, given his reliance on Oltmann, failure to investigate, and disregard of authoritative sources rejecting all fraud allegations.[246]

65.     Metaxas had both political and financial motivations to delegitimize the results of the election.  Metaxas is a supporter of former president Trump[247] and sought national attention advancing allegations of fraud in relation to the election and against Dr. Coomer.[248]

66.     Metaxas has not retracted any of his publications about Dr. Coomer, and they remain publicly available to this day.[249]

## G.    *OAN and Chanel Rion*

67.     Herring Networks, Inc. owns and operates OAN, a national conservative news network with bureaus in San Diego and Washington D.C.[250]  Charles Herring and the Herring family own OAN and exercise direct control over the content published by OAN.[251]  Rion is OAN's Chief White House Correspondent.[252]  Rion produces and hosts program specials that are nationally broadcast on OAN and often posted on Rion's personal website and YouTube.[253]  Rion

---

[245] *Id.*

[246] *See* Ex. G-1, Metaxas, Aug. 13, 2021 Depo. Tr. at 39:15-25; 46:19-47:1; 73:21-74:21.

[247] *See generally* Ex. G-1; G-2.

[248] *See generally* Ex. G-1; G-2; G-3; G-4; G-5; G-6; G-7; G-8; G-9.

[249] *See* Ex. V-1, Demand for Retraction.

[250] *See* Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 63:25-65:2; 66:19-67:6.

[251] *See* Ex. I-1, OAN, July 30, 2021 Depo. Tr. at 10:17-11:6; *see also* Ex. R, Golingan Dec. at ¶¶ 5, 14; Ex. C.

[252] *See* Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 30:20-25.

[253] *Id.*

began working for OAN in 2019[254] and has no formal journalism training.[255]

68.    OAN was one of the first entities that Oltmann reached out to with his claims about Dr. Coomer.  On the morning of November 10, 2020, the day after Oltmann originally published his allegations against Dr. Coomer on the Conservative Daily, he informed OAN that he had "massive amounts of information on Eric Coomer."[256]  In a follow up email that same afternoon, Oltmann wrote, "Now I want to start that I cannot verify on this call that it is the same Eric but let me tell you as I jotted down notes what I discovered."[257]  Within days, Oltmann was in contact with Rion, who was preparing a story on Dominion Voting Systems.[258]  Rion did not know who Dr. Coomer was at the time and had to familiarize herself with his role at Dominion.[259]  On November 15, 2020, Rion told Oltmann that she was "working with Rudy [Giuliani] and Sidney [Powell]" and that she "would like to include [him] in the special."[260]

69.    On November 17, 2020, Rion tweeted #EricCoomer alongside "Trump won't win. I made F***ing sure of that."[261]  The tweet attached another tweet from Ron Watkins, former administrator of the online message board 8chan, that claimed Dominion's voting software "Allows staff to adjust tally based on review of scanned ballot images."[262]  On November 21, 2020,

---

[254] *Id.* at 30:10-19.

[255] *Id*. at 29:10-14.

[256] *See* Ex. I-1, PX 34.

[257] *See* Ex. I-1, PX 35.

[258] *See* Ex. I-1, PX 37.

[259] *See* Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 115:2-23.

[260] *See* Ex. I-1, PX 37.

[261] *See* Ex. I-1, PX 33.

[262] *Id.*

Rion tweeted again, this time promoting her program "Dominion-izing the Vote" and claiming that the FBI should have been investigating Dominion employees.[263]

70.     OAN broadcast Rion's "Dominion-izing the Vote" on November 21, 2020.[264]  This program was an "H Story" required by Charles Herring to be given priority broadcasting.[265]  The report included an interview with Ron Watkins, who OAN-Rion presented as a "large systems technical analyst."[266]  Watkins stated that "your vote doesn't matter in these districts with the Dominion machines in them, because these 2-6 people trained by Dominion have ultimate control."[267]  OAN-Rion concluded the Watkins segment by wondering aloud, "to what extent was this actually designed by the top, on purpose?"[268]  This segue led into an interview with Oltmann that focused on Dr. Coomer.

71.     In the pre-recorded interview, OAN-Rion introduced Oltmann by stating, "Joe, you infiltrated an antifa conference call this past September and accidentally came upon a top Dominion Voting Systems executive named Eric Coomer.  Describe your call and what it led you to find."[269]  Oltmann then proceeded to repeat his claims about Dr. Coomer, specifically that Dr. Coomer was on an Antifa conference call, that he stated on that call that he had rigged the election, and that he did in fact rig the election.  Rather than challenge Oltmann's allegation that

---

[263] *See* Ex. A-1, pub. 32.

[264] *See* Ex. I-1, PX 32.

[265] *See* Ex. R, Golingan Dec. at ¶ 14; Exs. A-E.

[266] *See* Ex. I-1, PX 32.

[267] *Id.*

[268] *Id.*

[269] *Id.*

Dr. Coomer "tipped the scales of the election," Rion stated, "In Coomer's case, he was in a position of power to actually act on his rage against Trump and Trump voters.  What does he mean when he says 'Trump won't win.  I made f-ing sure of that? Nothing?"[270]  Referencing Dr. Coomer, Rion went on to state that Dominion's "antifa drenched engineers are hell bent on deleting half of America's voice."[271]  OAN-Rion name Dr. Coomer in relation to their allegations of election fraud, making him the face of the Dominion conspiracy theory.[272]

72.     On November 24, 2020, OAN again used its official Twitter account to promote the Rion interview with Oltmann: "Dominion executive: Trump is not going to win. I made f***ing sure of that. [YouTube link] via @YouTube @ChanelRion #OANN."[273]

73.     Given Oltmann's lack of personal knowledge, lack of expertise, and lack of evidence in support of his allegations against Dr. Coomer, OAN-Rion had sufficient reason to know Oltmann was an unreliable witness.[274]   Oltmann had disclosed to OAN-Rion that his allegations were based on unknown and unverified participants on an unknown and unverified call,[275] and he had explicitly stated that he could not confirm whether or not the "Eric" on the alleged call was actually Dr. Coomer.[276]  OAN-Rion failed to ask Oltmann about how he accessed the alleged Antifa call,[277] about the notes he claims he took during the call, or about the identities

---

[270] *Id*.

[271] *Id*.

[272] *See id.*

[273] *See* Ex. A-1, pub. 38.

[274] *See supra* at § III(C).

[275] *See* Ex. I-1, PX 35.

[276] *Id.*

[277] See Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 78:21-79:5.

of the other alleged participants, even though these participants would have been allegedly able to corroborate Oltmann's allegations.[278]  OAN was aware that there was no video or audio recording of the call[279] and that Oltmann claimed to have accessed the Antifa call through Heidi Beedle, yet ignored her as a potential source to corroborate Oltmann's allegations.[280]  Rion failed to verify the credibility of her sources for "Dominion-izing the Vote," including Ron Watkins.[281]  Rion has admitted that she had not investigated Oltmann's allegations nor attempted to contact Dr. Coomer or Dominion[282] or any other alleged call participants[283] before inviting Oltmann to appear on OAN.  OAN published the "Dominion-izing the Vote" segment, knowing it was false.[284]

74.     OAN-Rion conceived of a storyline regarding the results of the presidential election, which is reflected in their allegations of elections fraud leading up to and after the election.[285]  To this end, OAN reporters worked closely with Giuliani and the Trump Campaign, with any reporting by OAN reporter, Christina Bobb, being subject to the Trump Campaign's express approval.[286]  OAN-Rion consciously set out to conform their allegations against Dr. Coomer to that storyline, given their reliance on Oltmann, failure to investigate, and disregard of authoritative sources rejecting fraud allegations.

---

[278] *Id.* at 79:22-80:17; 80:23-81:15; 84:1-13.

[279] *See* Ex. I-1, OAN, July 30, 2021 Depo. Tr. at 21:20-22:9.

[280] *Id*. at 27:17-23; 32:24-34:5.

[281] *See* Ex. R, Golingan Dec. at ¶ 11; *see generally* Exhibit P, Rothschild Dec.

[282] *See* Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 89:13-90:20.

[283] *Id*. at 80:8-81:15.

[284] *See* Ex. R, Golingan Dec. at ¶¶ 5, 12-15, 17.

[285] *See* Ex. I-2; I-3; I-4; Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 40:11-41:21.

[286] *See* Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 30:4-20.

75.     OAN-Rion had political and financial motivations to delegitimize the results of the election.  OAN-Rion sought national exposure promoting support for former president Trump and in advancing allegations of fraud in relation to the election and against Dr. Coomer.[287]

76.     OAN-Rion has not retracted any of their publications about Dr. Coomer, and they remain publicly available to this day.[288]

## H.     *Sidney Powell, Powell, P.C., and Defending the Republic*

77.     Powell is an attorney practicing out of Dallas, Texas.[289]  Powell, P.C. is Powell's law firm.[290]  Defending the Republic is a Texas-based 501(c)(4) corporation directed and represented by Powell and Powell, P.C.[291]  Powell formed Defending the Republic as a fundraising organization and website in order to solicit donations to fund her election-related litigation.[292]  Powell's statements regarding Dr. Coomer were often immediately followed by a request for donations to Defending the Republic.[293]

78.     Throughout the relevant time period, Powell interchangeably acted individually and on behalf of the Trump Campaign, Defending the Republic, and Powell, P.C.[294]  President Trump tweeted on November 14, 2020 that Powell was on the legal team, and Giuliani introduced her as

---

[287] *See generally* Ex. A-1, pub. 32, 38; Ex. I-1, PX 32-33.

[288] *See* Ex. V-1, Demand for Retraction.

[289] *See* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 25:1-3, 115:17.

[290] *Id.* at 8:9-12.

[291] *See* Ex. L-1, DTR, Aug. 4, 2021 Depo. Tr. at 13:10-17, 14:11-13.

[292] *See* Pl.'s Resp. to DTR 12(b)(2) Mot. at ¶¶ 14-15.

[293] *Id.*

[294] *Id.*; *see also* Ex. M-3; Ex. K-1, PX 5 (identifying Powell as "Attorney for President Trump").

a part of the team at the November 19, 2020 press conference.[295]  When asked whether she was working with Giuliani at that time, her response was "Yes and no."[296]

79.    A Defending the Republic website appears to have been established as early as November 10, 2020, and was promoted on Fox News' Lou Dobbs Tonight.[297]  The site was used to solicit funds for Powell's litigation, which included Oltmann's affidavit regarding Dr. Coomer.[298]  While Powell testified that she was representing Powell, P.C. in her legal efforts to overturn the election, she hoped to be paid from Defending the Republic donations at some point.[299]

80.    On November 19, 2020, the Trump Campaign provided an update on its legal challenges to the election from the Republican National Committee in Washington D.C.[300]  Among those who spoke at the press conference were personal attorneys for President Trump and then attorneys for the Trump Campaign, Powell, Giuliani, and Jenna Ellis.

81.    Upon review of this publication, the substance of Powell's statements alleged that Dr. Coomer participated in an Antifa conference call, that the call was recorded, that he stated he had rigged the election for Joe Biden and was "going to f- Trump," and that he had in fact rigged

---

[295] *See* Ex. K-1, PX 6, PX 3.

[296] *See* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 21:10-19.

[297] *See* Ex. L-2.

[298] *See, e.g.*, Ex. K-5 (promoting the "Kraken" suits and seeking donations on behalf of Defending the Republic as a 501(c)(4) organization).

[299] *See* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 98:21-99:4; 101:16-102:1.

[300] *See generally* Ex. K-1, PX 3.

the election.[301]  Powell also alleged incorrectly that Dr. Coomer was a member of Smartmatic.[302]

82.     As the press conference continued, Powell continued making other allegations about Dominion and Smartmatic,[303] saying that "people can [ ] go in and change whatever they want," and that the ratio of votes could be weighted by the use of an alleged algorithm.[304]  Powell declared that votes were "injected into the machine."[305]  Powell made numerous allegations about hacking, mentioning another algorithm for "vote-flipping."[306] Powell also appeared to refer to the video of Dr. Coomer explaining the adjudication process, falsely stating there was video of "him" admitting that they changed a million votes with no problem.[307]  Dr. Coomer is the only person Powell specifically named during her speech, making him the face of the Dominion and Smartmatic conspiracy theory.[308]

83.     On November 20, 2020, Newsmax host Howie Carr interviewed Powell on "The Howie Carr Show."[309]  During that interview, Carr asked Powell whether Dr. Coomer had actually stated: "Don't worry about President Trump, I already made sure that he's going to lose the election."  Powell responded by asserting the alleged facts were true: "Yes, it's true.  We have an

---

[301] *See* Ex. K-1, PX 3 at 35.

[302] *Id.*

[303] Many of the Defendants are confused about alleged ties between Dominion and Smartmatic, unaffiliated competitors in the election technology space.  Smartmatic was not a factor in any battleground state, as its software was only used in Los Angeles County, California for the 2020 election.  *See* Smartmatic Fact Checks, https://www.smartmatic.com/us/lawsuit-updates-fact-checks/.

[304] *See* Ex. K-1, PX 3 at 32:4-33:3.

[305] *Id.* at 33:9-13.

[306] *Id.* at 33:1-34:22; *see also* Ex. E-1, PX 86.

[307] *See* Ex. K-1, PX 3 at 34:23-35:1.

[308] *See generally* Ex. K-1, PX 3.

[309] *See* Ex. K-4.

affidavit to that effect, and I think we have a copy of the call."[310]  Powell also closed her appearance by implying that Dr. Coomer had committed a crime: "It's called a confession in a courtroom, it's called a confession."[311]

84.    The same day, Powell appeared on Fox News' Mornings with Maria Bartiromo where she alleged she had "Eric Coomer admitting on tape that he rigged the election for Biden and hated Trump."  Powell also alleged she had pictures of Dr. Coomer "in other countries helping people rig elections," that Dr. Coomer had a long history of doing so, and that "I'm sure that it's for money."[312]

85.    Powell had sufficient reason to know Oltmann was an unreliable witness.  During her deposition, Powell stated that she learned of the accusations against Dr. Coomer from the #MalkinLive interview with Oltmann and Oltmann's affidavit.[313]  Oltmann disclosed in that interview his lack of personal knowledge, experience, and evidence as well as his personal motivations.  Further, to this day, Powell cannot articulate what role Dr. Coomer would have played in any election fraud.[314]  Instead, she referred to Dr. Coomer as a "gnat in the tsunami of information that was being thrown at me."[315]

---

[310] *Id.*

[311] *Id.*

[312] *See* Ex. K-1, PX 5.

[313] *See* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 10:14-22, 15:10-16:10.

[314] *Id.* at 12:2-9; 13:2-8; 97:10-17.

[315] *Id.* at 13:16-17.

86.     Powell believed she was provided Oltmann's affidavit by Jenna Ellis, who was working with Giuliani.[316]  Powell claimed she was unaware that Joe Oltmann hosted a podcast or had advanced rhetoric in favor of former president Trump.[317]  Powell did not ask Oltmann how Dr. Coomer would have influenced the outcome of the election.[318]  Powell did not vet Oltmann's affidavit or its contents other than watching his interview with Malkin.[319]  The only thing Powell claims to have known about Oltmann was what was in that interview and his affidavit.[320]  Powell never reached out to Dr. Coomer to verify any information regarding her allegations.[321]

87.     Instead, Powell et al. conceived of a storyline regarding the results of the presidential election, which is reflected in their allegations of the elections fraud leading up to and after the election.   Powell et al.'s allegations regarding Dr. Coomer and Dominion were very similar to allegations Powell had made prior to the election regarding a program called "Hammer and Scorecard" that would have allegedly been able to switch 3% of the national presidential election vote total.[322]  Further, Powell et al.'s allegations of fraud immediately after the election continued to advance similar allegations of fraud before focusing on Dr. Coomer and Dominion.[323]

88.     Powell neglected to read any of the sources rebutting accusations of election fraud,

---

[316] *Id.* at 30:2-4.

[317] *Id.* at 125:22-126:20.

[318] *Id.* at 14:21-15:2.

[319] *See id.* at 27:15-28:18.

[320] *Id.* at 32:3–34:4.

[321] *Id.* at 58:4–19.

[322] *See id.* at 104:21-107:10.

[323] *See* Ex. K-6.

such as the CISA report, the Michigan report, or the statements of Attorney General Barr.[324]

89.     Powell et al. had both political and financial motivations to delegitimize the results of the election.  Powell is a supporter of former president Trump.[325]  Powell et al. gained national exposure advancing allegations of fraud in relation to the election and against Dr. Coomer.[326] Powell et al.'s allegations accompanied and furthered her efforts to raise funds for Defending the Republic.[327]

90.     Powell et al. have not retracted any of their publications about Dr. Coomer, and they remain publicly available to this day.[328]

## I.     *Rudolph Giuliani*

91.     Giuliani is an attorney that was licensed in the state of New York with his practice based in New York City.[329]  He has served as the U.S. Attorney for the Southern District of New York, the mayor of New York City, and as an and authorized representative for Donald Trump as well as the Trump Campaign.[330]

92.     On November 19, 2020, Giuliani appeared with Sidney Powell at the Republican National Convention, where Powell published statements against Dr. Coomer and Dominion.[331]

---

[324] *See* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 94:12-96:3.

[325] *See generally* Ex. K-1, PX 3.

[326] *See* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 102:7-16.

[327] *See, e.g*., Ex. K-5 (promoting the "Kraken" suits and seeking donations on behalf of Defending the Republic as a 501(c)(4) organization).

[328] *See* Ex. V-1, Demand for Retraction.

[329] *See* Ex. V-2, New York Bar Association Opinion re Giuliani.

[330] *See* Giuliani Mot. at 2; *see also* Ex. K-1, PX 3 at 3:12-14.

[331] *See generally* Ex. K-1, PX 3; *see also* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 64:1-16.

Giuliani introduced himself and Powell, stating "This is representative of our legal team.  We are representing President Trump and we're representing the Trump Campaign."[332]   Giuliani explained that Powell's statements would follow his, indicating a collective message by the legal team.[333]  Giuliani added his statements to Powell's, including allegations that Dr. Coomer was a "vicious man" that was "close to Antifa," "biased" against the former president Trump, and who had not only indicated an intent to "fix the election" but committed a crime in relation to it.[334] Giuliani emphasized, "I've tried a hundred cases. I prosecuted some of the most dangerous criminals in the world.  I know crimes.  I can smell them. You don't have to smell this one.  I can prove it to you 18 different ways."[335]   Upon review of this publication, the substance of the statements alleged that Dr. Coomer participated in an Antifa conference call; that he stated on this call his intent to subvert the presidential election; and that he then did in fact subvert the election. Giuliani specifically named Dr. Coomer in relation to his allegations of election fraud, making Dr. Coomer the face of the Dominion conspiracy theory.[336]

93.     Giuliani had reason to know his information regarding Dr. Coomer was unreliable. Prior to making statements regarding Dr. Coomer at the November 19, 2020 press conference, Giuliani spent virtually no time investigating Dr. Coomer or the Antifa call.[337]  When asked what his theoretical attorney bill would be on "Coomer time" before the November 19 press conference,

---

[332] *See* Ex. K-1, PX 3 at 3:12-14.

[333] *Id.* at 3:14-21.

[334] *Id.* at 49:14-50:7.

[335] *Id.* at 50:1-4.

[336] *See generally* Ex. K-1, PX 3.

[337] *See* Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 47:3-18.

Giuliani stated, "Before the press conference, gosh almighty, I bet it's not an hour."[338]

94.     Giuliani testified that he also relied on Col. Phil Waldron (Waldron) of Allied Security Operations Group (ASOG) for his information on Dr. Coomer.[339]  ASOG had performed a forensic audit of voting tabulators in Antrim County, Michigan, which was debunked by the Michigan Senate Oversight Committee.[340]   The information Giuliani acquired from Waldron appears to be derived from Oltmann's allegations against Dr. Coomer, as the substance of the statements is substantially the same.[341]  Giuliani testified he had about a four-minute conversation with Waldron regarding Dr. Coomer.[342]  Giuliani was told that there was a recording of the Antifa call and there were "a couple of witnesses" who could corroborate the story.  From there, Giuliani alleges to have read some media reports about Dr. Coomer and some of his social media posts.[343]

95.     This was the extent of Giuliani's investigation regarding accusations he made about Dr. Coomer.  Giuliani never spoke to Oltmann (who he referred to as Olzheimer);[344] did not have any information as to whether Oltmann was credible (or not);[345] never tried to listen to the (non-existent) recording he thought actually existed;[346] did not try to talk to the other "Antifa people"

---

[338] *Id.* at 45:19-20.

[339] *Id.* at 41:7-43:9, 46:14-50:17.

[340] *See* Ex. B-2, Oltmann, Sept. 8, 2021, PX 107 at 15.

[341] *See* Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 40:10-44:5, 44:23-45:9.

[342] *Id.*; *see also* Ex. A-1 at pub. 75.

[343] *See* Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 47:19-55:12.

[344] *Id.* at 60:18-61:18.

[345] *Id.* at 120:8-20.

[346] *Id.* at 133:6-11.

on the call;[347] does not recall reviewing Oltmann's notes of the alleged call;.[348] did not reach out to Dr. Coomer or Dominion;[349] and had access to research by the communications department but did not receive a copy of the research on Dr. Coomer, Dominion, and Smartmatic.[350]   Instead, Giuliani stated on multiple occasions that he was allegedly constrained by time and was unable to conduct his own investigation of Dr. Coomer.[351]

96.      In his deposition, Giuliani acknowledged that if Dr. Coomer had rigged the election it would have been a crime and likely would have been in concert with Dominion.[352]   Generally, throughout his deposition, Giuliani continued to maintain the validity of his various election fraud theories involving Dominion, Smartmatic, and Sequoia; the existence of "fugazi" voting machines; fraud in various battleground states; and the same theories that lead to the suspension of his law license in New York.[353]   But, when asked for his theory on Dr. Coomer's participation in this fraud, Giuliani stated, "I mean I could guess but it would not be an educated guess."[354]

97.      Giuliani discounted any official sources that found there was no evidence of widespread election fraud.  He discounted CISA even though he was on the cybersecurity advisory committee when CISA was created; he called CISA's election security report a "totally phony report"; and he said the Department of Homeland Security was afraid to investigate the fraud

---

[347] *Id.* at 133:12-19.

[348] *Id.* at 133:20-134:8.

[349] *Id.* at 134:9-15.

[350] *Id.* at 134:16-136:20.

[351] *See, e.g.,* Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 120:8-122:13.

[352] *Id.* at 58:10-22.

[353] *Id.* at 71:19-83:20, 104:9-108:4.

[354] *Id.* at 83:21-84:3.

claims.[355]

98.     Likewise, Giuliani discounted the Trump Campaign's internal memo on Dr. Coomer, Dominion, and Smartmatic, calling it a "corporate document" and explaining that there were members of the Trump Campaign who were trying to undermine his efforts because "they wanted Trump to lose because they could raise more money."[356]  Giuliani further stated that the Trump Campaign was trying to keep things from him and undermine the litigation, citing to alleged Republication National Convention memos and internal Trump Campaign memos telling campaign officials not to cooperate with Giuliani and Jenna Ellis.[357]

99.     Ultimately, Giuliani filed no litigation involving Dr. Coomer.[358]  Giuliani explained that the Trump Campaign's strategy changed in December 2020, and they had given up on the courts in favor of a strategy of going directly to various state legislatures.[359]   At that point, Dr. Coomer became a "small player."[360]

100.     Further, Giuliani had political motivations to delegitimize the results of the election. Giuliani is a supporter of former president Trump.[361]  Giuliani sought national attention advancing allegations of fraud in relation to the election and against Dr. Coomer.[362]  When Giuliani was asked why he felt he needed to speak about Dr. Coomer at the press conference (as opposed to saying

---

[355] *Id.* at 160:11-161:15, 164:21-165:24.

[356] *Id.* at 159:9-160:7.

[357] *Id.* at 139:14-144:20.

[358] *Id.* at 108:16-109:7.

[359] *Id.* at 98:16-99:23.

[360] *Id.* at 104:9-23.

[361] *See generally* Ex. K-1, PX 3.

[362] *Id.*

nothing), Giuliani replied:

> It was my obligation at that time to give the public all the facts that I had because we had had an unprecedented three weeks of censorship unheard of in the United States which had followed three months of censorship on the Hunter Biden hard drive, which the American people elected a president without knowing the complete evidence of how he was engaged for 30 years of taking bribes through his son, which his son spells out in great deal in the hard drive and the American people have never seen it. . . .[363]

101.    Further, Giuliani conceived of a storyline regarding the results of the presidential election, which is reflected in his allegations after the election.  Giuliani collaborated with other parties in early efforts to contest election results even before his allegations against Dr. Coomer. Giuliani was at the White House on election night on November 3, 2020.[364]  In the early morning hours of November 4, 2020, former President Trump alleged: "Frankly, we did win this election." After an Oval Office meeting with former president Trump later that day, Giuliani took over the Trump Campaign's legal team.[365]  Giuliani received no compensation for his role other than reimbursement of expenses.[366]

102.    Immediately after Joe Biden was declared the winner on November 7, 2020, Giuliani appeared at a press conference in front of Four Seasons Total Landscaping to make multiple accusations of voter fraud.[367]  Giuliani alleged that votes for Trump had "disappeared," and that Philadelphia had a "history of voter fraud," even including alleged dead voters.[368]  Giuliani

---

[363] *See* Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 124:8-125:22.

[364] *Id.* at 168:21-24.

[365] *Id.* at 27:6-28:3.

[366] *Id.* at 27:6-13.

[367] *See* Ex. M-1, PX 65.

[368] *Id.*

then consciously set out to conform his allegations against Dr. Coomer to this storyline of election fraud.

103.    Giuliani also cooperated with OAN reporter, Christina Bobb (Bobb), in his efforts to contest the election results.  Prior to the November 19 press conference, Bobb was approved as part of the Trump Campaign's legal team.[369]  Giuliani had gotten to know OAN's president, Charles Herring, "very well" when Rion and OAN did a documentary with Giuliani on "Ukrainian collusion."[370]  Bobb provided the Trump Campaign with alleged election fraud information she gathered about Arizona, Michigan, and eventually Georgia.[371]  Giuliani agreed with Charles Herring about the terms of the arrangement, which included Giuliani approving when Bobb could report on information obtained while working for Giuliani.[372]  Bobb ultimately took over a lot of the Trump Campaign's investigation in Michigan.[373]

104.    Giuliani has not retracted his publications regarding Dr. Coomer, and they remain publicly available to this day.[374]

## J.    *Trump Campaign*

105.    The Trump Campaign is a corporation organized for the purpose of electing Donald Trump president.  Following the election, the Trump Campaign allowed Giuliani to assume control

---

[369] *See* Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 30:4-20.

[370] *Id.* at 88:3-13.

[371] *Id.* at 88:21-89:14.

[372] *Id.* at 89:23-91:22, 93:23-94:3.

[373] *Id.* at 65:8-66:4.

[374] *See* Ex. V-1, Demand for Retraction.

over much of its public messaging and legal efforts to subvert the campaign results.[375]  At least

early on, that included cooperation with Powell.[376]  Former president Trump tweeted on November

14, 2020 that Powell was on his legal team.[377]

106.     On November 17, 2020, Eric Trump, who the Trump Campaign refers to as its

"surrogate speaker," retweeted the story from Hoft-TGP and stating that Dr. Coomer said "Don't

worry about the election, Trump's not gonna win.  I made f*cking sure of that!"[378]  By as early as

November 12, 2020, former President Trump himself tweeted the allegation that Dominion had

"deleted 2.7 million Trump votes Nationwide."[379]  These allegations continued despite CISA's

joint statement with other governmental entities that "[t]here is no evidence that any voting system

deleted or lost votes, changed votes, or was in any way compromised."[380]  On November 17, 2020,

Chris Krebs, the head of CISA, was fired.[381]  Former president Trump then went on to retweet

Rion's story "Dominion-izing the Vote" for OAN on November 21, 2020.[382]

107.     On November 19, 2020, Giuliani appeared with Powell at the Republican National

Convention for a press conference as authorized representatives on behalf of the Trump

Campaign.[383]  The substance and gist of Giuliani and Powell's statements at the press conference

---

[375] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 44:8-10; 47:8-15.

[376] *See* Ex. K-1, PX 6; PX 3.

[377] *See* Ex. M-3.

[378] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 58:12-15; PX 69.

[379] *See* Ex. M-1, PX 66.

[380] *See* Ex. M-1, PX 67.

[381] *See* David E. Sanger and Nicole Perlroth, *Trump Fires Chris Krebs, Official Who Disputed Election Fraud Claims*, N.Y. Times, Nov. 17, 2020, https://www.nytimes.com/2020/11/17/us/politics/trump-fires-christopher-krebs.html.

[382] *See* Ex. M-1, PX 70; Ex. M-1, PX 71.

[383] *See generally* Ex. K-1, PX 3.

alleged that Dr. Coomer participated in an Antifa conference call; that he stated on this call his intent to subvert the presidential election; and that he then did in fact subvert the election.

108.    Powell went on multiple nationally televised news programs before and after the November 19, 2020 press conference to repeat the allegations regarding Dr. Coomer.[384]  During these programs Powell was identified as a representative of the Trump Campaign.[385]

109.    Shortly after the election, Giuliani and his legal team set up their offices in Trump Campaign headquarters, where he would coordinate efforts to contest the election results.[386] During this time the Trump Campaign itself had done research debunking many of the allegations by Giuliani and Powell, but the Trump Campaign failed to share this information with either Giuliani or Powell.  After Giuliani moved into the Campaign headquarters, the Trump Campaign neglected any prior efforts to filter its own research to agents speaking on behalf of the Trump Campaign.  According to the Campaign's representative Sean Dollman:

> So when Mr. Giuliani came in as legal – or as a lawyer, he – he and his team took over a conference room.  And we spent, I mean, years setting up an internal process of where documents would go, who sees them, and then making sure that people review them, and approvals.
>
> But when Mr. Giuliani came in with his team, the – that whole approval chain, that whole – everything pretty much went out the window.[387]

110.    The Trump Campaign had reason to know the allegations against Dr. Coomer were unreliable.  Prior to the press conference on November 19, 2020, the Trump Campaign performed

---

[384] *See, e.g.,* Ex. K-1, PX 5.

[385] *Id.*

[386] *Id.* at 44; *see also* Ex. J-1, Giuliani, Aug. 14, 2021, Depo. Tr. at 29:22-30:25.

[387] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 44:8-10, 47:8-15.

its own research into the accusations regarding Dr. Coomer and Dominion.  In the only email chain produced by the Trump Campaign, Zach Parkinson requested researchers look into the accusations regarding Dominion, stating: "Let's cut this off at 10:30.  Have more dead voters we'll need to get to in the morning."[388]

111.    The memo produced by the Trump Campaign shows that, at least internally, the Trump Campaign found there was no evidence to support the conspiracy theories regarding Dominion and Dr. Coomer.   That memo found in part: "Dominion and Smartmatic Are Independent Companies that Split from Each Other in 2012;" "Dominion Has Not [Sic] Direct Ties to Venezuela;" "There Is No Evidence That Dominion's CEO Or Any Other Leader Of The Group Has Ties to Antifa;" and "There is no evidence Coomer is a member or has any ties to Antifa."[389]

112.    The memo itself purportedly never made it to Giuliani, even though Giuliani continued to make public statements regarding Dr. Coomer and allegations of election fraud.[390] Giuliani, Powell, and Eric Trump continued to allege Dr. Coomer and Dominion were to blame for election fraud without providing them with the Campaign's own research debunking those theories.[391]

113.    The Trump Campaign made no effort to correct statements made by Giuliani and Powell, and stated that "at this point in time, . . . [they] were still investigating and trying to get

---

[388] *See* Ex. M-1, PX 68 at TC-01.

[389] *See* Ex. M-1, PX 68 at TC-03-04.

[390] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 62:19-63:24; *see also* Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 162:13-163:24.

[391] *Id.*

facts together."[392]  The Trump Campaign also claimed to be unaware that Oltmann, the source of

Giuliani's and Powell's allegations regarding Dr. Coomer, was the host of a conservative podcast

who had held rallies in support of President Trump and made allegations of election fraud even

before the election.[393]  Giuliani and Powell performed virtually none of their own research into

Oltmann or verifying the statements they made at the November 19 press conference.[394]

114.    The Trump Campaign conceived of a storyline regarding the results of the

presidential election, which is reflected in its allegations leading up to and immediately following

the election.  As early as July 2020, former president Trump stated in an interview with Chris

Wallace of Fox News: "I think mail-in voting is going to rig the election. I really do."[395]  The

Trump Campaign's efforts to contest the election results as fraudulent began immediately after

election day, even before Dr. Coomer became a subject of those efforts.  In the early morning

hours of November 4, 2020, before the total votes were ever counted, former President Trump

announced "This is a fraud on the American public. This is an embarrassment to our country.  We

were getting ready to win this election. Frankly, we did win this election."[396]  Former president

Trump also tweeted in part: "We are up BIG, but they are trying to STEAL the Election.  We will

never let them do it."[397]

115.    The representative for the Trump Campaign, Sean Dollman, could only explain that

---

[392] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 38:10-16.

[393] *Id.* at 38:6-39:19.

[394] *See supra* at ¶¶ 85-88, 93-98.

[395] Ex. M-1, Trump Campaign, Aug. 9, 2021; PX 62, at 24.

[396] *See* Ex. M-1, PX 65.

[397] Ex. M-1, PX 64.

immediately after the election the Trump Campaign "felt like" there was "some type of fraud," but could not give detail on why, and admitted they were still "looking into the facts" at the time.[398]

116.    Despite still reportedly "looking into the facts," on November 7, 2020, Giuliani appeared at a press conference in front of Four Seasons Total Landscaping to make his first accusations of voter fraud.[399]  Giuliani alleged that votes for former president Trump had "disappeared," and that Philadelphia had a "history of voter fraud," even including alleged dead voters.[400]  The Trump Campaign made no effort to correct statements made by Giuliani, and stated that "at this point in time, . . . [they] were still investigating and trying to get facts together."[401]

117.    The Trump Campaign had political and financial motivations to delegitimize the results of the election.  The Trump Campaign maintained national exposure advancing allegations of fraud in relation to the election against Dr. Coomer while garnering political support.[402] Throughout this time the Trump Campaign continued to raise funds to support its efforts to contest the election results and to pay Trump Campaign debt.[403] Regarding these fundraising efforts, Trump Campaign representative Sean Dollman testified:

> I think there was a lot of people within the United States that were – wanted answers and wanted to entrust their funds and their money to the campaign, to look into it, right?

---

[398] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 25:6-20; 29:19-24.

[399] Ex. M-1, PX 65.

[400] *Id*.  This same reference to dead voters was made in Zach Parkinson's email to the research team requesting information on the Dominion and Dr. Coomer allegations.

[401] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 38:10-16.

[402] *See generally* Ex. K-1, PX 3.

[403] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 30:11-13; 32:19-24; *see also* Ex. M-2, Trump Campaign, Aug. 13, 2021 Depo. Tr. at 46:20-47:5 (admitting fundraising efforts likely involved challenging election results).

> They had nowhere – not nowhere else to turn, but the President and the campaign was an entity they put their donations and money behind before.[404]

118.    While the Trump Campaign filed a number of lawsuits challenging the election results, none alleged Dr. Coomer had any role in changing the election results.[405]   Nevertheless, the Trump Campaign never made any retraction or clarification regarding defamatory statements by its agents or representatives.[406]

119.    Even today the Trump Campaign, through its representative, stated there was some kind of election fraud but could not state why.[407]   At one point the Campaign's representative stated the Campaign believed the election was the result of fraud because they "have no underlying definite facts that it wasn't."[408]  The Campaign could not articulate how it thought Dr. Coomer had anything to do with the alleged election fraud.[409]

120.    Today the Trump Campaign continues to take the position that the election was the result of fraud but has no facts it can point to in support of that, and no idea how Dr. Coomer would have aided in alleged election fraud. [410]  The Trump Campaign has not retracted its publications regarding Dr. Coomer, and they remain publicly available to this day.[411]

---

[404] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 73:1-7.

[405] *Id.* at 25:10-18.

[406] *Id.* at 32:21-33:3. When asked whether anyone at the Trump Campaign asked Giuliani to stop making allegations regarding Dominion or Dr. Coomer, the Trump Campaign's representative said he could not answer due to privilege. *Id.* at 17:15-18:17.

[407] *Id.* at 27:5-11.

[408] *Id.* at 74:19-75:6.

[409] *Id.* at 74:19-75:6.

[410] *Id.* at 74:19-75:6.

[411] *See* Ex. V-1, Demand for Retraction.

### K.      *Dr. Coomer's injuries and damages*

121.    As a direct consequence of Defendants' false statements, Dr. Coomer faced an onslaught of harassment, threats of violence, and credible death threats against himself, his family, and his home.[412]  Defendants' conduct has caused Dr. Coomer severe emotional distress, including anxiety and depression for which he has sought medical treatment.[413]  Defendants' conduct has also destroyed Dr. Coomer's ability to continue working in elections, resulting in lost wages and other negative harm.[414]

## IV.      CONCLUSIONS OF LAW

### A.      *Defendants have not met their burden to establish the anti-SLAPP statute applies.*

122.    Defendants have the initial burden to show that Colorado's anti-SLAPP statute applies to Dr. Coomer's claims.  *See Kieu Hoang*, 60 Cal. App. 5th at 524-25.  To establish that the statute applies, Defendants must demonstrate that Dr. Coomer's claims arise out of protected activity delineated under the anti-SLAPP statute.  *See* C.R.S. § 13-20-1101(3)(a); *see also Baral*, 376 P.3d at 608.  Collateral allusions to protected activity are insufficient to subject a cause of action to the anti–SLAPP statute.  *Freeman v. Schack*, 154 Cal. App. 4th 719, 728-30 (2007); *Hanover Ins. Co. v. Fremont Bank*, 68 F. Supp. 3d 1085, 1097-99 (N.D. Cal. 2014).  Instead, the defendant's act underlying the plaintiff's cause of action must itself have been an act in furtherance of the right of petition or free speech in connection with a public issue.  *Rand Res., LLC v. City of Carson*, 433 P.3d 899, 907 (Cal. 2019).  Courts look to the principal thrust or gravamen of the

---

[412] *See* Ex. A, Coomer Dec. at ¶¶ 19-20, 53; *see generally* Ex. W, Bania Dec.

[413] *See* Ex. A, Coomer Dec. at ¶ 53.

[414] *Id.*

plaintiff's cause of action as well as the specific nature of the speech at issue to determine whether the anti-SLAPP statute applies.  *See Hanover Ins. Co.*, 68 F. Supp. 3d at 1097; *see also Rand Res., LLC*, 433 P.3d at 909-10 (finding "[w]hat a court scrutinizing the nature of speech in the anti-SLAPP context must focus on is the speech at hand, rather than the prospects that such speech may conceivably have indirect consequences for an issue of public concern"); *Paul v. Friedman*, 95 Cal. App. 853, 866 (2002) (finding "[t]he statute does not accord anti-SLAPP protection to suits arising from any act having any connection, however remote, with an official proceeding.  The statements or writings in question must occur in connection with 'an issue under consideration or review' in the proceeding").

123.    Dr. Coomer asserts claims for defamation, intentional infliction of emotional distress, and conspiracy based on statements expressly or implicitly made by Defendants alleging he participated in an Antifa conference call; he made statements on that call that he intended to subvert the 2020 presidential election; and he did in fact subvert the 2020 presidential election. Defendants must establish their specific statements constitute protected activity under the anti-SLAPP statute.  Defendants have not met this burden.

> i.    ***Defendants' statements were not made in connection with an existing matter of public concern.***

124.    Defendants assert that their statements regarding Dr. Coomer were in connection with an existing matter of public concern.[415]  While the Colorado anti-SLAPP statute was recently enacted with limited authority interpreting its terms, there is a wealth of authority addressing the constitutional issues underlying these terms.  Like other anti-SLAPP statutes, the Colorado

---

[415] *See* Malkin Mot. at 5-7; Metaxas Mot. at 8-10; Hoft-TGP Mot. at 9-10, 12-13; OAN-Rion Mot. at 11-13; Powell Mot. at 8-10; DTR Mot. at 9-11; Giuliani Mot. at 7-9; Trump Campaign Mot. at 7-11.

anti-SLAPP statute applies "only to lawsuits which are based upon activities closely tied to the right to petition and the freedom of speech." *See Briggs v. Eden Council for Hope & Opportunity*, 969 P.2d 564, 581 (Cal. 1999); *see also* C.R.S. § 13-20-1101(2), (3) (limiting the statute to "act[s] in furtherance of a person's right of petition or free speech under the United States constitution or the state constitution in connection with a public issue").

125.    Protections for public speech from liability for defamation were first addressed in *N.Y. Times, Co. v. Sullivan.* 376 U.S. 254 (1964).  There, the United States Supreme Court recognized that speech by the governed regarding the public officials governing them goes to the "very center of the constitutionally protected area of free expression." *Id.* at 292.  To preserve that speech, the court in *Sullivan* found the constitution delimited libel actions "brought by public officials against critics of their official conduct" unless the official proved the statement was made with actual malice. *Id.* at 279-83.  The protections for speech under *Sullivan* are limited to claims brought by public officials.  While the United States Supreme Court has yet to "determine how far down the lower ranks of government employees the 'public official' designation would extend," it has made clear this designation extends solely to "those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966).

126.    Protections for public speech were then extended to public figures in *Curtis Publ'g Co. v. Butts*. 388 U.S. 130 (1967).  There, the United States Supreme Court found that private individuals through their position or activities could command sufficient public interest to warrant heightened constitutional protections for speech regarding them. *Id.* at 154-55.  Individuals may be general public figures when it is shown they have attained general fame and notoriety.

*Waldbaum v. Fairchild Publ'n Inc.*, 627 F.2d 1287, 1294-95 (D.C.C. 1980).  Otherwise, individuals may be limited purpose public figures when it is shown they "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved."  *Id.* at 1296 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)).  To determine whether an individual is a public figure, courts examine "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation."  *Id.*  Courts look to whether there was an existing matter of public concern; whether a plaintiff had thrust themselves to the forefront of that public concern so as to command public interest; and whether the alleged defamation related to the plaintiff's involvement in that public concern.  *Id.* at 1296-98.

127.    Protections for public speech were briefly extended again to matters of public concern with the United States Supreme Court's plurality decision in *Rosenbloom v. Metromedia, Inc.* 403 U.S. 29 (1971).  However, the United States Supreme Court contracted those protections just three years later in *Gertz*, finding such protections not only abridged a legitimate state interest in protecting private individuals' reputations but also inadequately identified constitutionally protected interests.  *See* 418 U.S. at 339-48.  The court recognized in *Gertz* that private individuals who have not relinquished any interest in the protection of their good name have a compelling interest in redress for injury inflicted by defamation.  *See id.* at 345.  As such, the court in *Gertz* deferred to States to define for themselves the appropriate standard of liability for the defamation of private individuals.  *See id.* at 347.

128.    Following this decision, the Colorado Supreme Court adopted the plurality decision in *Rosenbloom* and extended state constitutional protections to speech made in connection with

matters of public concern.[416]  *See Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1105-06 (Colo. 1982).  Crucial to the court's analysis in *Diversified* was the recognition that "[t]he public's primary interest is in the event; the public focus is on the *conduct of the participant* and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety."  *See id.* at 1106 (citing *Rosenbloom*, 403 U.S. at 43) (emphasis added).

129.    Some of the Defendants argue that Dr. Coomer is a public official.[417]   These arguments fail as Dr. Coomer is not a government employee and Dr. Coomer's private employment did not involve or appear to involve substantial responsibility or control over the conduct of governmental affairs.  *See Rosenblatt*, 383 U.S. at 85.  That Dr. Coomer's then employer provided equipment and services to county and state governments did not make either his employer or Dr. Coomer a de facto government employee and did not cede to Dr. Coomer control of government functions.  *See Gertz*, 418 U.S. at 351 (rejecting arguments that proximity to government officials or functions could render an individual a "de facto public official," stating "[o]ur cases recognize no such concept").

130.    Some of the Defendants argue that Dr. Coomer is a public figure.[418]   These arguments equally fail as Defendants have not established an existing public controversy at the time of their defamation.  To determine whether a controversy existed at the time of Defendants' defamation, courts examine whether persons were discussing a specific question.  *Waldbaum*,

---

[416] The Colorado Supreme Court first adopted the plurality standard from *Rosenbloom* in *Walker v. Colo. Springs Sun, Inc.*, but not the definition of actual malice.  538 P.2d 450 (1975).  In *Diversified*, the Colorado Supreme Court adopted the definition of actual malice.  *See Diversified*, 653 P.2d at 1105-06.

[417] *See* Hoft-TGP Mot. at 7.

[418] *See* Oltmann Mot. at 7; Hoft-TGP Mot. at 7; OAN-Rion Mot. at 20-22; Powell Mot. at 24; DTR Mot. at 24, Giuliani Mot. at 16, n.7.

627 F.2d at 1296-97.  A general concern or interest, like the election, will not suffice.  *See id.*;

*Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) (finding a general concern about public

expenditures insufficient to invoke constitutional protections and requiring a particular

controversy); *see also FilmOn.com Inc.*, 439 P.3d at 1166-67 (recognizing that defendants cannot

merely offer a "synecdoche theory" of public interest, defining their narrow dispute by its slight

reference to the broader public).  Defendants have put forward no evidence of an existing, specific

controversy at the time of their defamation.  That is because the controversy at issue, Dr. Coomer's

alleged subversion of the presidential election, did not exist until Defendants defamed Dr. Coomer.

This is consistent with well-settled constitutional doctrine that precludes a defendant from creating

its own defense.  *See, e.g.*, *Hutchinson*, 443 U.S. at 135 (finding "[t]hose charged with alleged

defamation cannot, by their own conduct, create their own defense by making the claimant a public

figure"); *see also Waldbaum*, 627 F.2d at 1295, n.19 (finding the court must examine the

controversy as it existed before the defamation was published because, "[o]therwise, the press

could convert a private individual into a general public figure simply by publicizing the defamation

itself and creating a controversy surrounding it").

131.    Further, Defendants have put forward no evidence establishing that Dr. Coomer

commanded sufficient public interest to warrant heightened constitutional protections for speech.

*See Gertz*, 418 U.S. at 339-348.  Dr. Coomer is a private individual.  Although known in some

professional circles, his private employment did not attain general fame and notoriety in the

community.  *See id.* at 351-52 ("We would not lightly assume that a citizen's participation in

community and professional affairs rendered him a public figure for all purposes.  Absent clear

evidence of general fame or notoriety in the community, and pervasive involvement in the affairs

of society, an individual should not be deemed a public personality for all aspects of his life."). Prior to Defendants' defamation, Dr. Coomer did not thrust himself into the vortex of the specific public issue, nor did he engage the public's attention to influence its outcome. *See id.* Defendants' reliance on statements Dr. Coomer made to the press *after* the defamation is misplaced as the public figure designation is analyzed before the defamation was published. *See Waldbaum*, 627 F.2d at 1295, n.19. Moreover, statements made to the press after the defamation occurred is a well-settled means with which to redress the injury. *See Gertz*, 418 U.S. at 344 ("The first remedy of any victim in defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation."); *Diversified*, 653 P.2d at 1107 ("A private figure subjected to unfavorable publicity should not forfeit protection from defamation as a price of his response.").

132.    Because Dr. Coomer is neither a public official nor public figure, application of the anti-SLAPP statute here turns on whether Defendants' statements regarding Dr. Coomer involved a matter of public concern.   Whether a statement is a matter of public concern is a legal determination based on "the content, form, and context of the statements, in conjunction with the motivation or 'point' of the statements as revealed by the whole record." *McIntyre v. Jones*, 194 P.3d 519, 525 (Colo. App. 2008).   Courts make this determination on a case-by-case basis. *See Williams v. Cont'l Airlines, Inc.*, 943 P.2d 10, 17-18 (Colo. App. 1996).   Essentially private interests do not become public merely because they attract interest. *See Time, Inc. v. Firestone*, 424 U.S. 448, 454-55 (1976); *see also Diversified*, 653 P.2d at 1107.   As with public figures, constitutional protections here turn on whether there is a legitimate public interest about which information is needed or appropriate. *See Williams*, 943 P.2d at 17; *Waldbaum*, 627 F.2d at

1296-97 ("A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way.").  A legitimate public interest must be specific and have existed prior to the defamation. *See Hutchinson*, 443 U.S. at 135; *Waldbaum*, 627 F.2d at 1295, n.19.  Again, Defendants cannot create the public issue.  *See Diversified*, 653 P.2d at 1107; *Smiley's Too, Inc. v. Denver Post Corp.*, 935 P.2d 39, 41 (Colo. App. 1996).  Instead, the focus is on the public event and the plaintiff's conduct in relation to that event.  *See Diversified,* 653 P.2d at 1106; *Rosenbloom*, 403 U.S. at 43.

133.    Generally, private individuals and their private employment are not considered matters of public concern.  *See Williams*, 943 P.2d at 17-18; *McIntyre,* 194 P.3d at 525-27.  In the context of public figures, the Colorado Supreme Court has recognized a reluctance "to make too easy a finding that one is a public figure."  *See Diversified,* 653 P.2d at 1107.  This is equally if not more applicable to private individuals and the forfeiture of their protection from defamation for matters of public concern.  As the United States Supreme Court recognized in *Gertz*, public officials and public figures have both exposed themselves to increased risk of injury while maintaining greater public access to counteract false statements than private individuals.  *Gertz*, 418 U.S. at 344-45.  In contrast, private individuals have not relinquished any interest in the protection of their reputation and, consequently, have a more compelling interest in redress for injury.  *Id.* at 345-46.  "Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are more deserving of recovery."  *Id.*  While there are compelling interests in public speech, they are balanced against equally legitimate interests in the protection of reputation.  *See Keohane v. Stewart*, 882 P.2d 1293, 1297 98 (Colo. 1994) ("The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no

more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.") (citing *Rosenblatt*, 383 U.S. at 92-93, (Stewart, J., concurring)).  Courts must be cognizant of and maintain the boundaries between public and private interests, especially when making ad hoc determinations of what information is relevant to self-government.  *See Gertz*, 418 U.S. at 346.  Too easy a determination of public interest risks effacing a legitimate state interest in protecting private individuals' reputations. *See id*. at 345-47; *see also Diversified*, 653 P.2d at 1111-15 (dissent, Erickson, J.) (identifying public policy concerns underlying ad hoc determinations of public concern).

### a.   Oltmann, FEC United, and Shuffling Madness Media

134.   Oltmann et al. have failed to establish their statements concerning Dr. Coomer involved a matter of public concern.[419]  Oltmann et al. offer no evidence of an existing controversy at the time of their statements.  *See Waldbaum*, 627 F.2d at 1296-97.  Rather, the controversy at issue, Dr. Coomer's alleged subversion of the presidential election, did not exist until Oltmann et al. defamed Dr. Coomer.  Constitutional doctrine precludes Oltmann et al.'s defamation from creating their own defense.  *See, e.g.*, *Diversified*, 653 P.2d at 1107; *Smileys Too, Inc.*, 935 P.2d at 41. Oltmann et al.'s reliance on the election generally is insufficient as this is not a specific public controversy or dispute.  *See Hutchinson*, 443 U.S. at 135.  Further, Oltmann et al. offer no evidence of Dr. Coomer's involvement in the alleged public controversy prior to their defamation. *See Diversified*, 653 P.2d at 1106 (finding the "public focus is on the conduct of the participant and the content, effect, and significance of the conduct"); *Rosenbloom*, 403 U.S. at 43 (same).

---

[419] *See* Oltmann et al. Mot. at 5-9; Oltmann et al. Reply at 2-6.

Because Oltmann et al.'s statements did not involve a matter of public concern, they cannot serve as a basis for a special motion to dismiss under the anti-SLAPP statute.

### b.    *Malkin*

135.    Malkin has failed to establish her statements concerning Dr. Coomer involved a matter of public concern.[420]  Malkin offers no evidence of an existing controversy at the time of her statements.  *See Waldbaum*, 627 F.2d at 1296-97.  Rather, the controversy at issue, Dr. Coomer's alleged subversion of the presidential election, did not exist until Malkin defamed Dr. Coomer.  Constitutional doctrine precludes Malkin's defamation from creating her own defense.  *See, e.g.*, *Diversified*, 653 P.2d at 1107; *Smileys Too, Inc.*, 935 P.2d at 41.  Malkin's reliance on the election generally is insufficient as this is not a specific public controversy or dispute.  *See Hutchinson*, 443 U.S. at 135.  Further, Malkin offers no evidence of Dr. Coomer's involvement in the alleged public controversy prior to her defamation.  *See Diversified*, 653 P.2d at 1106; *Rosenbloom*, 403 U.S. at 43.  Because Malkin's statements did not involve a matter of public concern, they cannot serve as a basis for a special motion to dismiss under the anti-SLAPP statute.

### c.    *Hoft and TGP Communications*

136.    Hoft-TGP have failed to establish their statements concerning Dr. Coomer involved a matter of public concern.[421]  Hoft-TGP offer no evidence of an existing controversy at the time of their statements.  *See Waldbaum*, 627 F.2d at 1296-97.  Rather, the controversy at issue, Dr. Coomer's alleged subversion of the presidential election, did not exist until Hoft-TGP defamed

---

[420] *See* Malkin Mot. at 5-7; Malkin Reply at 11-13.

[421] *See* Hoft-TGP Mot. at 12-13; Hoft-TGP Reply at 6-8.

Dr. Coomer.  Constitutional doctrine precludes Hoft-TGP's defamation from creating their own defense.  *See, e.g.*, *Diversified*, 653 P.2d at 1107; *Smileys Too, Inc.*, 935 P.2d at 41. Hoft-TGP's reliance on the election generally is insufficient as this is not a specific public controversy or dispute. *See Hutchinson*, 443 U.S. at 135.  Further, Hoft-TGP offer no evidence of Dr. Coomer's involvement in the alleged public controversy prior to their defamation. *See Diversified*, 653 P.2d at 1106; *Rosenbloom*, 403 U.S. at 43.  Because Hoft-TGP's statements did not involve a matter of public concern, they cannot serve as a basis for a special motion to dismiss under the anti-SLAPP statute.

### d.    Metaxas

137.    Metaxas has failed to establish his statements concerning Dr. Coomer involved a matter of public concern.[422]  Metaxas offers no evidence of an existing controversy at the time of his statements.  *See Waldbaum*, 627 F.2d at 1296-97.   Rather, the controversy at issue, Dr. Coomer's alleged subversion of the presidential election, did not exist until Metaxas defamed Dr. Coomer.  Constitutional doctrine precludes Metaxas's defamation from creating his own defense.  *See, e.g.*, *Diversified*, 653 P.2d at 1107; *Smileys Too, Inc.*, 935 P.2d at 41.  Metaxas's reliance on the election generally is insufficient as this is not a specific public controversy or dispute. *See Hutchinson*, 443 U.S. at 135.  Further, Metaxas offers no evidence of Dr. Coomer's involvement in the alleged public controversy prior to his defamation. *See Diversified*, 653 P.2d at 1106; *Rosenbloom*, 403 U.S. at 43.  Because Metaxas's statements did not involve a matter of public concern, they cannot serve as a basis for a special motion to dismiss under the anti-SLAPP statute.

---

[422] *See* Metaxas Mot. at 9-11; Metaxas Reply at 4-6; Metaxas Supp. Reply at 3-6.

###### e.    *OAN and Rion*

138.    OAN-Rion have failed to establish their statements concerning Dr. Coomer involved a matter of public concern.[423]  OAN-Rion offer no evidence of an existing controversy at the time of their statements.  *See Waldbaum*, 627 F.2d at 1296-97.  Rather, the controversy at issue, Dr. Coomer's alleged subversion of the presidential election, did not exist until OAN-Rion defamed Dr. Coomer.  Constitutional doctrine precludes OAN-Rion's defamation from creating their own defense.  *See, e.g.*, *Diversified*, 653 P.2d at 1107; *Smileys Too, Inc.*, 935 P.2d at 41.  OAN-Rion argue their publication occurred after other defendants had made Dr. Coomer a public controversy and, therefore, their publication is protected.  However, OAN-Rion's publication itself was a republication of the same defamatory statements.  OAN-Rion cite no authority that permits defamation to serve as the basis for a public concern, regardless of whether it was the original or republished defamation.   Further, OAN-Rion's reliance on the election generally is also insufficient as this is not a specific public controversy or dispute.  *See Hutchinson*, 443 U.S. at 135.  Finally, OAN-Rion offer no evidence of Dr. Coomer's involvement in the alleged public controversy prior to their defamation.  *See Diversified*, 653 P.2d at 1106; *Rosenbloom*, 403 U.S. at 43.  Because OAN-Rion's statements did not involve a matter of public concern, they cannot serve as a basis for a special motion to dismiss under the anti-SLAPP statute.

###### f.    *Powell, Powell P.C., and Defending the Republic*

139.    Powell et al. have failed to establish their statements concerning Dr. Coomer involved a matter of public concern.[424]  Powell et al. offer no evidence of an existing controversy

---

[423] *See* OAN-Rion Mot. at 11-13; OAN-Rion Reply at 6-8.

[424] *See* Powell Mot. at 8-10; DTR Mot. at 9-11; Powell Reply at 1.

at the time of their statements.  *See Waldbaum*, 627 F.2d at 1296-97.  Rather, the controversy at

issue, Dr. Coomer's alleged subversion of the presidential election, did not exist until Powell et al.

defamed Dr. Coomer.  Constitutional doctrine precludes Powell et al.'s defamation from creating

their own defense.  *See, e.g.*, *Diversified*, 653 P.2d at 1107; *Smileys Too, Inc.*, 935 P.2d at 41.

Powell et al.'s reliance on the election generally is insufficient as this not a specific public

controversy or dispute.  *See Hutchinson*, 443 U.S. at 135.  Further, Powell et al. offer no evidence

of Dr. Coomer's involvement in the alleged public controversy prior to their defamation.

*See Diversified*, 653 P.2d at 1106; *Rosenbloom*, 403 U.S. at 43.  Because Powell et al.'s statements

did not involve a matter of public concern, they cannot serve as a basis for a special motion to

dismiss under the anti-SLAPP statute.

### g.    *Giuliani*

140.    Giuliani has failed to establish his statements concerning Dr. Coomer involved a

matter of public concern.[425]  Giuliani offers no evidence of an existing controversy at the time of

his statements.  *See Waldbaum*, 627 F.2d at 1296-97.  Rather, the controversy at issue,

Dr. Coomer's alleged subversion of the presidential election, did not exist until Giuliani defamed

Dr. Coomer.  Constitutional doctrine precludes Giuliani's defamation from creating his own

defense.  *See, e.g.*, *Diversified*, 653 P.2d at 1107; *Smileys Too, Inc.*, 935 P.2d at 41.  Giuliani's

reliance on the election generally is insufficient as this is not a specific public controversy or

dispute.  *See Hutchinson*, 443 U.S. at 135.  Further, Giuliani offers no evidence of Dr. Coomer's

involvement in the alleged public controversy prior to his defamation.  *See Diversified*, 653 P.2d

at 1106; *Rosenbloom*, 403 U.S. at 43.  Because Giuliani's statements did not involve a matter of

---

[425] *See* Giuliani Mot. at 6-9.

public concern, they cannot serve as a basis for a special motion to dismiss under the anti-SLAPP statute.

### h.    *Trump Campaign*

141.    The Trump Campaign has failed to establish its statements concerning Dr. Coomer involved a matter of public concern.[426]  The Trump Campaign offers no evidence of an existing controversy at the time of its statements.  *See Waldbaum*, 627 F.2d at 1296-97.  Rather, the controversy at issue, Dr. Coomer's alleged subversion of the presidential election, did not exist until the Trump Campaign's defamed Dr. Coomer.  Constitutional doctrine precludes the Trump Campaign's defamation from creating its own defense.  *See, e.g.*, *Diversified*, 653 P.2d at 1107; *Smileys Too, Inc.*, 935 P.2d at 41. The Trump Campaign's reliance on the election generally is insufficient as this is not a specific public controversy or dispute.  *See Hutchinson*, 443 U.S. at 135.  Further, the Trump Campaign offers no evidence of Dr. Coomer's involvement in the alleged public controversy prior to its defamation.  *See Diversified*, 653 P.2d at 1106; *Rosenbloom*, 403 U.S. at 43.  Because the Trump Campaign's statements did not involve a matter of public concern, they cannot serve as a basis for a special motion to dismiss under the anti-SLAPP statute.

### ii.    *Defendants' statements were not made in connection with an official proceeding.*

142.    Some Defendants assert that their statements were made in connection with an official proceeding.[427]  For statements to be made "in connection with" an issue under review by a judicial body, they must have a direct connection with issues under review in a judicial proceeding and must be directed to persons with an interest in the proceeding.  *See Hanover Ins.*

---

[426] *See* Trump Campaign Mot. at 9-11; Trump Campaign Reply at 2-3.

[427] *See* Malkin Mot. at 5; Powell et al. Mot. at 10-11; DTR Mot. at 10-11; Giuliani Mot. at 9, n.4; Trump Campaign Mot. at 5, 11-14; Giuliani Reply at 7; Trump Campaign Reply at 3.

*Co.*, 68 F. Supp. 3d at 1101 (declining to find that statements were made in connection with an official proceeding when the statements did not reference attorneys in the litigation or the litigation itself); *McConnell v. Innovative Artists Talent & Literary Agency, Inc.*, 175 Cal. App. 4th 169, 178 (2009) (declining to find statements were made in connection with litigation because they did not relate to issues in dispute in those proceedings); *Paul*, 95 Cal. App. 4th at 866-68 (declining to find published statements regarding a broker's personal life related to issues pending in arbitration, stating "[t]he statements or writings in question must occur in connection with 'an issue under consideration or review' in the proceeding" and "a lawyer's attempt to inject an issue into a proceeding does not render the issue relevant"). It is insufficient to argue that a statement is tangentially connected to issues under review. *See McConnell*, 175 Cal. App. 4th at 178. Instead, there must be a sufficient, causal nexus between the statements and the issues under review. *See Paul*, 95 Cal. App. 4th at 866-67.

### a.   *Oltmann, FEC United, and Shuffling Madness Media*

143.   Oltmann et al. did not argue in their special motion to dismiss that their statements were made in connection with an official proceeding.[428]   However, in their reply, Oltmann et al. broadly assert a right to petition as a basis for application of the anti-SLAPP statute.[429]   To the extent this is an effort to argue a new basis for application of the anti-SLAPP statute, it is untimely and unsupported.   Oltmann et al. have neither identified any specific judicial proceedings nor explained how their statements were connected to issues under review in those proceeding. *See Hanover Ins. Co.*, 68 F. Supp. 3d at 1101.   Oltmann et al.'s statements themselves did not

---

[428] *See* Oltmann, et al. Mot. at 1-4.

[429] *See* Oltmann, et al. Reply at 2-6.

identify any judicial proceedings.  *See id.*  Oltmann et al.'s statements were not directed to specific persons with an interest in the proceedings.  *See id.*  Instead, Oltmann et al. rely on the existence of judicial proceedings generally concerning the election.  This is insufficient to establish a causal nexus between the statements and the issues under review.  *See e.g., Rand Res., LLC v. City of Carson*, 433 P.3d 899, 906 & 911 (Cal. 2019); *McConnell*, 175 Cal. App. 4th at 178; *Paul*, 95 Cal. App. 4th at 866.  Because Oltmann et al.'s statements were not made in connection with an official proceeding, they cannot serve as a basis for a special motion to dismiss under the anti-SLAPP statute.

### b.      *Malkin*

144.      Malkin has failed to establish her public statements concerning Dr. Coomer were made in connection with an official proceeding.[430]  Malkin has neither identified any specific judicial proceedings nor explained how her statements were connected to issues under review in those proceeding.  *See Hanover Ins. Co.*, 68 F. Supp. 3d at 1101.  Malkin's statements themselves did not identify any judicial proceedings.  *See id.*  Malkin's statements were not directed to persons with a specific interest in the proceedings.  *See id.*  Instead, Malkin relies on the existence of judicial proceedings generally concerning the election.  This is insufficient to establish a causal nexus between the statements and the issues under review.  *See e.g., Rand Res., LLC*, 433 P.3d at 906 & 911; *McConnell*, 175 Cal. App. 4th at 178; *Paul*, 95 Cal. App. 4th at 866.  Because Malkin's statements were not made in connection with an official proceeding, they cannot serve as a basis for a special motion to dismiss under the anti-SLAPP statute.

---

[430] *See* Malkin Mot. at 5.

### c.  Metaxas

145.    Metaxas has failed to establish his public statements concerning Dr.  Coomer were made in connection with an official proceeding.[431]  Metaxas has neither identified any specific judicial proceedings nor explained how his statements were connected to issues under review in those proceeding.  *See Hanover Ins. Co.*, 68 F. Supp. 3d at 1101.  Metaxas's statements themselves did not identify any judicial proceedings.  *See id.*  Metaxas's statements were not directed to persons with a specific interest in the proceedings.  *See id.*  Instead, Metaxas relies on the existence of judicial proceedings generally concerning the election.  This is insufficient to establish a causal nexus between the statements and the issues under review.  *See e.g., Rand Res., LLC v. City of Carson*, 433 P.3d at 906 & 911; *McConnell*, 175 Cal. App. 4th at 178; *Paul*, 95 Cal. App. 4th at 866.  Because Metaxas's statements were not made in connection with an official proceeding, they cannot serve as a basis for a special motion to dismiss under the anti-SLAPP statute.

### d.  Powell, Powell P.C., and Defending the Republic

146.    Powell et al. have failed to establish their public statements concerning Dr. Coomer were made in connection with an official proceeding.[432]  In their special motions to dismiss, Powell et al. only identify proceedings that were filed after they made defamatory statements about Dr. Coomer.  However, Powell et al. provide no explanation for how their statements were made in connection with these proceedings or issues under consideration or review.[433]  The statements

---

[431] *See* Metaxas Mot. at 7-8.

[432] *See* Powell Mot. at 10-11; DTR Mot. at 10-11.

[433] *Id.*; *see also Pearson v. Kemp*, No. 1:20-cv-04809-TCB (N. D. Ga); *King v. Whitmer*, No. 2:20-cv-13134-LVP-RSW (E.D. Mich.), *Feehan, et al., v. Wis. Elections Comm'n*, No. 2:20-cv-01771-PP (E.D. Wisc.); *Bowyer v. Ducey*, No. 2:20-cv-023210DJH (D. Ariz.).

themselves neither referenced the proceedings nor were directed at parties with a specific interest

in them.  *See Hanover Ins. Co.*, 68 F. Supp. 3d at 1101.  Powell et al.'s reliance on judicial

proceedings generally is insufficient to establish a causal nexus between the statements and the

issues under review.  *See e.g., Rand Res., LLC*, 433 P.3d at 906 & 911; *McConnell*, 175 Cal. App.

4th at 178.  Further, Powell et al.'s allegations against Dr. Coomer were unsupported.  Any effort

to inject unsupported allegations into a judicial proceeding does not make them relevant to that

proceeding or "under consideration or review."  *See Paul*, 95 Cal. App. 4th at 867-68 ("A lawyer's

attempt to inject an issue into a proceeding does not render the issue relevant, nor can the attempted

injection of an irrelevant matter transform it into an issue 'under consideration or review' in the

proceeding.").  Powell et al. has provided no evidence their allegations were "under consideration

or review" prior to the dismissal of these cases.[434]  Rather, Powell has acknowledged that affidavits

referring to Dr. Coomer "were not relevant to the legal issues" under review.[435]  Ultimately, the

right to petition is sought in a court of law, not the court of public opinion.  *See Siedl v. Greentree*

*Mortg. Co.*, 30 F. Supp. 2d 1292, 1315 (D. Colo. 1998).  Powell et al.'s attempts to expand that

right and related privileges to statements made to the public at large is not supported under the

law.  *See id.*  Because Powell et al.'s statements were not made in connection with an official

---

[434] *See supra* at n.433.

[435] *See* Powell Reply at 15, n.32 (stating "Judge Parker held that many of the affidavits submitted by Powell (including the 11/13/20 Affidavit) were not relevant to the legal issues at bar, and therefore 'the affiants' credibility and the truth or falsity of their affidavits have no bearing on the court's ruling").

proceeding, they cannot serve as a basis for a special motion to dismiss under the anti-SLAPP statute.

> ### e.  *Giuliani*

147.    Giuliani has failed to establish his public statements concerning Dr. Coomer were made in connection with an official proceeding.[436]  The only proceeding Giuliani references in his special motion to dismiss is *Donald J. Trump for President, et al. v. Benson*, a proceeding that was voluntarily dismissed the same day as his statements against Dr. Coomer.[437]  It is unclear how Giuliani's statements were made in connection with this proceeding, especially given that Giuliani was not counsel in the proceeding; his statements neither referenced the proceeding nor were directed at parties with a specific interest in the proceeding; Dr. Coomer was not involved or referenced in the proceeding; and the legal issues between his statements and the proceeding were distinct. *See Hanover Ins. Co.*, 68 F. Supp. 3d at 1101.  Giuliani's reliance on judicial proceedings generally concerning the election is insufficient to establish a causal nexus between the statements and the issues under review.  *See e.g., Rand Res., LLC*, 433 P.3d at 906 & 911; *McConnell*, 175 Cal. App. 4th at 178; *Paul*, 95 Cal. App. 4th at 866.  Because Giuliani's statements were not made in connection with an official proceeding, they cannot serve as a basis for a special motion to dismiss under the anti-SLAPP statute.

---

[436] *See* Giuliani Mot. at 9, n.4; Giuliani Reply at 7.

[437] *See Donald J. Trump for President v. Benson*, No. 1:20-cv-01083-JTN-PJG (W.D. Mich.) at Dkt. 33.

f.      *Trump Campaign*

148.    The Trump Campaign has failed to establish its public statements concerning Dr. Coomer were made in connection with an official proceeding.[438]  In its special motion to dismiss, the Trump Campaign cites proceedings that were filed both before and after it made defamatory statements about Dr. Coomer.  But the proceedings filed before its statements did not involve Dr. Coomer or the Trump Campaign's allegations against him,[439] and the Trump Campaign was not a party nor otherwise involved in the proceedings filed after.[440]  The Trump Campaign provides no explanation for how its statements about Dr. Coomer were made in connection with these proceedings or issues under consideration or review.  The statements themselves neither referenced these proceedings nor were directed at parties with a specific interest in the proceedings.  *See Hanover Ins. Co.*, 68 F. Supp. 3d at 1101.  The Trump Campaign's reliance on judicial proceedings generally is insufficient to establish a causal nexus between the statements and the issues under review.  *See e.g., Rand Res., LLC*, 433 P.3d at 906 & 911 (Cal. 2019); *McConnell*, 175 Cal. App. 4th at 178.  Further, the Trump Campaign's attenuated reliance on Powell's subsequently filed proceedings is similarly misplaced.  *See Paul*, 95 Cal. App. 4th at 867-68.   Powell's allegations against Dr. Coomer were unsupported.   Any effort to inject unsupported allegations into a judicial proceeding does not make them relevant to that proceeding or "under consideration or review."  *See Paul*, 95 Cal. App. 4th at 867-68.  The Trump Campaign

---

[438] *See* Trump Campaign Mot. at 11-14; Trump Campaign Reply at 3.

[439] *See* Trump Campaign Mot. at 13, n. 3; *Donald J. Trump for President, Inc. v. Bullock*, 491 F. Supp. 3d 814 (D. Mont. 2020); *Donald J. Trump for President, Inc. v. Murphy*, No. 3:20-cv-10753 (D. NJ.); *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-cv-01445-JCM-VCF (D. Nev.). *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-cv-02078-MWB (M.D. Penn. Nov. 9, 2020).

[440] *See* Trump Campaign Mot. at 13, n. 3; *supra* n.433.

also has provided no evidence their allegations were "under consideration or review" prior to the dismissal of these cases.[441]  Rather, Powell acknowledged affidavits referencing Dr. Coomer "were not relevant to the legal issues" actually under review.[442]  Again, the right to petition is sought in a court of law, not the court of public opinion.  *See Seidl.*, 30 F. Supp. 2d at 1315.  The Trump Campaign's attempts expand that right and related privileges to statements made to the public at large is not supported under the law and certainly not for litigation with which it had no connection. *See id.*  Because the Trump Campaign's statements were not made in connection with an official proceeding, they cannot serve as a basis for a special motion to dismiss under the anti-SLAPP statute.

## B. *Even if the anti-SLAPP statute applied, Dr. Coomer has established a reasonable likelihood of success on his claims.*

149.    Regardless of whether the Colorado anti-SLAPP statute applies, Dr. Coomer has established that his claims are meritorious.  In the second step of the anti-SLAPP analysis, courts assess whether a plaintiff has sufficient evidence to establish a "reasonable likelihood that the plaintiff will prevail on the claim[s]" to which the statute applies.  C.R.S. § 13-20-1101(3)(a). California's anti-SLAPP statute has nearly identical language for the evidentiary standard that a plaintiff must meet to defeat an anti-SLAPP motion.  *See* Code Civ. Proc. § 425.16(b)(1) (stating that, if the anti-SLAPP statute applies to any of the plaintiff's claims, the court should still not dismiss the claims if the plaintiff establishes "that there is a probability that the plaintiff will prevail on the claim.").  California interprets this to mean that, so long as a plaintiff can present evidence

---

[441] *See supra* at n.433.

[442] *See* Powell Reply at 15, n.32

of a prima facie showing for each claim, the court must not dismiss the claims. *See Baral*, 376 P.3d at 608-09; *see also Wilson v. Cable News Network, Inc.*, 444 P.3d 706, 718 (Cal. 2019) (finding plaintiff "need not prove her case to the court; the bar sits lower, at a demonstration of 'minimal merit'") (citations omitted). Other states likewise only require a prima facie showing of evidence to defeat dismissal under the anti-SLAPP statute. *See, e.g., In re Lipsky*, 411 S.W.3d 530, 543 (Tex. App.—Fort Worth 2013, no pet.). This is a low burden for plaintiffs to carry.

150.   In making this assessment, the Court only looks to whether the plaintiff "has stated a legally sufficient claim and made a prima facie factual showing." *Baral*, 376 P.3d at 608. The Court does not weigh the evidence and must accept all evidence in the plaintiff's favor as true. *Id.* at 608–609. As the California Supreme Court noted in *Baral*:

> The anti-SLAPP statute does not insulate defendants from any liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, meritless claims arising from protected activity.

*Id.* (emphasis in original). Once a plaintiff provides the minimum quantum of evidence to show a legally cognizable claim, the plaintiff has satisfied its burden under the second prong. *See id.*

151.   Defendants argue that the anti-SLAPP statute applies to all claims that Dr. Coomer has brought against them for (1) defamation, (2) intentional infliction of emotional distress, (3) civil conspiracy, and (4) request for permanent injunction. Although Defendants advance different bases, they collectively argue that Dr. Coomer cannot establish a likelihood of success on his claims. However, Dr. Coomer has made a prima facie showing that his claims are viable under Colorado law.

### i.    Dr. Coomer has established a prima facie showing of defamation.

152.    Under Colorado law, the elements for defamation are: (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication." *Williams v. Dist. Court, Second Judicial Dist., City & Cnty. of Denver*, 866 P.2d 908, 911 n.4 (Colo. 1993).

153.    If a defamatory statement does not involve a public official, public figure, or a matter of public concern, at trial the plaintiff must only prove defamation by a preponderance of the evidence. *McIntyre*, 194 P.3d at 524.  However, if the statement does pertain to a matter of public concern or a public official or figure, there are two additional burdens the plaintiff must prove at trial: (1) the statement's falsity by clear and convincing evidence and (2) that the defendant published the statement with actual malice. *Id.*; *see also Broker's Choice of Am., Inc. v. NBC Universal, Inc.*, 861, F.3d 1081, 1110 (10th Cir. 2017) (recognizing truth is strictly a defense unless the plaintiff is a public official, figure, or matter of public concern where heightened constitutional protections apply).  At this stage of the proceeding, a plaintiff need only establish a reasonable probability that he would be able to produce at trial clear and convincing evidence of falsity and actual malice. *See Anderson*, 477 U.S. at 252; *see also Young v. CBS Broad., Inc.*, 212 Cal. App. 4th 551, 562 (2012); *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1576 (2005).  Here, heightened constitutional protections do not apply because Dr. Coomer is not a public official, public figure, or matter of public concern.  However, even if these protections applied, Dr. Coomer has established prima facie evidence of Defendants' defamation, including falsity and actual malice.

### a.    Oltmann, FEC United, and Shuffling Madness Media

154.    As to the first element, Dr. Coomer has put forward prima facie evidence that Oltmann made defamatory, false statements of fact concerning Dr. Coomer.  These statements include allegations that "Eric" the "the Dominion guy" participated in an Antifa call; said he made "f-ing sure" that "Trump is not gonna win [the presidential election];" and that he was in fact "controlling the elections."   There is no dispute that Oltmann made these statements about Dr. Coomer, both individually and as a representative of FEC United, which Oltmann identified when publishing his statements.[443]  In its reply, Shuffling Madness Media argues for the first time that it is not the proper party as to the claims asserted.[444]  Not only is this argument untimely but refuted by prima facie evidence showing Shuffling Madness Media operated under the trade name Conservative Daily at the time of Oltmann's statements, which is the primary media platform and podcast through which Oltmann published his statements concerning Dr. Coomer.

155.    Oltmann et al. argue their statements are opinions and hyperbolic rhetoric that cannot be proven true or false.[445]  For a statement to be actionable as defamatory, it must at least express or imply a verifiably false fact about the plaintiff.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990); *Burns v. McGraw Hill Broad. Co., Inc.*, 659 P.2d 1351, 1360 (Colo. 1983).  Statements of opinion can also be actionable if they imply provably false facts or rely upon stated facts that are provably false.  *See Milkovich*, 497 U.S. at 20.  In deciding whether a statement expressed or implied a false statement of fact, courts consider the entire statement, the context in

---

[443] *See generally* Oltmann, et al. Mot.; Oltmann, et al. Reply.

[444] *See* Oltmann, et al. Reply at 15-16.

[445] *See* Oltmann, et al. Mot. at 9-12.

which it was made, and whether a reasonable person would conclude that the statements at issue expressed or implied a false fact.  *See Burns*, 659 P.2d at 1360.  The reasonable person standard does not require that a majority of the community consider the statement defamatory, but, instead, a substantial and respectable minority of the community.  *See Keohane*, 882 P.2d at 1299, n.9.

156.    In reviewing the entire statements and the context in which they were made, Oltmann et al. alleged that Dr. Coomer participated in an Antifa conference call, stated on that call that he intended to subvert the presidential election, and then that he did in fact subvert the presidential election.  These are verifiable facts.  Dr. Coomer either participated in the call or he did not; he either made the statement or he did not; and he either committed election fraud or he did not. Dr. Coomer has unequivocally declared that these statements are false.  For purposes of the anti-SLAPP statute, Dr. Coomer's evidence is accepted as true.  *See Baral*, 376 P.3d at 608-09. Further, this evidence is uncontroverted.  Absent Oltmann's testimony, Oltmann et al. have put forward no evidence in support of their allegations against Dr. Coomer.  Oltmann proffered himself as a witness to the allegations made but had no personal knowledge of Dr. Coomer so as to identify him on the alleged Antifa call; no personal knowledge of any election fraud committed by Dr. Coomer; and no expertise with which to form the allegations made.  Instead, Oltmann et al. seemingly relied on Dr. Coomer's Facebook posts.  However, the posts were limited to Dr. Coomer's personal and political beliefs, neither of which prove or disprove Oltmann's allegations.  Oltmann has acknowledged that the anonymous "Eric" on the call was only identified by another anonymous source that he cannot identify or verify.  As such, Oltmann et al.'s allegations were speculation, which is not evidence.  While Oltmann claims to believe his

allegations, subjective beliefs without facts are not evidence.  Similarly, inferences must be based on provable facts, which Oltmann has not presented.

157.    To the extent Oltmann et al. formed opinions, such as claims that Dr. Coomer is a "liar," "terrorist," or "sociopath," there is prima facie evidence these opinions are actionable as they are built on the above false statements of fact.  *See Milkovich*, 497 U.S. at 18-19; *see also NBC Subsidiary, Inc. v. The Living Will Center*, 879 P.2d 6, 11 (Colo. 1994); Restatement (Second) of Torts § 566, cmt. c.  Further, accusations of criminal activity, even if in the form of opinion, are not constitutionally protected and are actionable.  *See Keohane v. Stewart*, 882 P.2d 1293, 1304 (Colo. 1994).  Oltmann et al.'s statements about Dr. Coomer impute a criminal offense—here, election fraud—and, therefore, are actionable regardless of whether they are in the form of an opinion.

158.    As to the second element, there is prima facie evidence that Oltmann et al. published the defamatory statements against Dr. Coomer to third parties.  These publications were made across numerous media platforms including podcasts, radio broadcasts, online articles, social media posts, and television broadcasts.  In its reply brief, FEC United argues that it is immune from liability for its publication of statements under Section 230 of the Communications Decency Act (CDA).[446]  Again, this argument is untimely and unsupported given the CDA creates a federal immunity from state law causes of action that protects providers and users of interactive computer services from being treated as publishers or speakers of information originating from third parties. *See* 47 U.S.C. §§ 230(c)(1), (e)(3); *see also Silver v. Quora, Inc.*, 666 F. App'x 727, 729 (10th Cir. 2016).  FEC United's liability stems from its own publication of statements through Oltmann and

---

[446] *See* Oltmann, et al. Reply at 13.

not from interactive, user-generated content.  *Cf. Zeran v. America Online Inc.*, 129 F.3d 327, 329 (4th Cir. 1997) (involving posts on AOL online bulletin board); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 420 (1st Cir. 2007) (involving posts on defendant's online message board).

159.   As to the third element, there is prima facie evidence that Oltmann et al. negligently published their defamatory statements.  Evidence that Oltmann et al. failed to investigate the allegations against Dr. Coomer, lacked corroborating evidence in support of their allegations, and based their allegations on speculation and conjecture are sufficient to support a finding of negligence.  *See Quigley*, 43 F. Supp. 2d at 1180 ("Failure to investigate obvious sources of refutation or corroboration of statements, especially when there is no time-pressure on their publication, may indicate not only negligence, but the higher standard of actual malice.").  Because Dr. Coomer is not a public official or figure, and because Oltmann's statements regarding Dr. Coomer do not involve a matter of public concern, Dr. Coomer does not need to prove actual malice as an element of his defamation claim.  However, even were the heightened actual malice standard to apply, there is prima facie evidence that Oltmann et al. acted with actual malice in publishing their statements.

160.   Actual malice "requires at a minimum that the statements were made with reckless disregard for the truth."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989); *Diversified Mgmt., Inc.*, 653 P.2d at 1110-11.  To prove actual malice, "the plaintiff must demonstrate that the defendant in fact entertained serious doubts as to the truth of the statement . . . or acted with a high degree of awareness of its probable falsity."  *Lewis*, 832 P.2d at 1122-23. Reckless disregard "cannot be fully encompassed in one infallible definition" and is not limited to

specific bases.  *See St. Amant*, 390 U.S. at 730.  Instead, actual malice can be inferred from objective circumstantial evidence, which can override a defendant's protestations of good faith.  *See Brown v. Petrolite Corp.*, 965 F.2d 38, 46-47 (5th Cir. 1992).  Circumstantial evidence of actual malice can include when a story is fabricated by a defendant or is the product of his imagination;  when a defendant relies on anonymous sources; when a defendant has reason to know that a source is unreliable; when the allegations made are inherently improbable that only a reckless person would publish them; when a defendant intentionally avoids the truth; when a defendant's allegations conform to a preconceived storyline; and when a defendant has an incentive or motive to make the defamatory statements.  *See, e.g.*, *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 157-58 (1967); *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).  All of these bases are present here.

161.    The United States Supreme Court analyzed evidence sufficient to establish actual malice in *Curtis*.  There, the court analyzed a case involving allegations that the athletic director for the University of Georgia conspired to rig the football game with the University of Alabama.  *See* 388 U.S. at 135-36.  These allegations were based on a witness to an alleged telephone conversation between the athletic director for Georgia and the coach for Alabama that outlined Georgia's offensive plays and how Georgia planned to defend in advance of the game.  *See id.* at 136.  While the allegations necessitated an investigation given the seriousness of the charges and injury that would result, the publisher relied solely on an affidavit from the witness to the alleged call and conducted no additional investigation.  *See id.* at 157-58. The publisher did not review the witness's alleged notes of the call; interview other witnesses allegedly present when the call occurred; review the game itself to see if the allegations were accurate; or determine whether

Alabama adjusted its plans based on the alleged call.  *See id.*  It neither assigned nor consulted a football expert to assess the allegations.  *See id.*  There was evidence the publisher was motivated to publish the allegations as part of a policy intended to change its image, and it assigned writers to assist on the story that were separately involved in another libel action involving the Alabama football coach.  *See id.*  Further, no subsequent investigation was made after the athletic coach informed the publisher that the allegations were untrue.  *See id.* at 169-170.  The United States Supreme Court found this evidence sufficient to establish actual malice as the publisher recklessly disregarded the truth.  *See id.*  Subsequent decisions have upheld the court's analysis.  *See St. Amant*, 390 U.S. at 732; *see also Harte-Hanks Comm'ns Inc.*, 491 U.S. at 692-93.

162.    The facts at issue in *Curtis* are analogous to the facts at issue here.  As in *Curtis*, the allegations of fraud in this case are premised on a purported witness to a call.  Similarly, here there is reason to question the reliability of the witness.  Oltmann had no personal knowledge of the allegations made against Dr. Coomer.  Oltmann did not know Dr. Coomer.  Instead, Oltmann premised his allegations against Dr. Coomer on unknown and unverified speakers on an alleged phone call.  Oltmann identified no expertise or reliable means with which he subsequently identified the speakers on the alleged call.  Oltmann identified no expertise in election systems or evidence to support his allegations against Dr. Coomer.  There is prima facie evidence that Oltmann fabricated his allegations.  Further, like *Curtis*, the allegations here necessitated an investigation and corroborating evidence given the seriousness of the charges.  Yet Oltmann et al. did not obtain witnesses or evidence in support of their allegations or consult with experts on election systems to confirm their allegations.  Instead, they disregarded credible sources of information that refuted their allegations, including statements by CISA and former U.S. Attorney

General Barr that there was no evidence of widespread fraud.  There is prima facie evidence that Oltmann et al.'s allegations against Dr. Coomer were inherently improbable considering the lack of evidence supporting Oltmann's claims and the extensive evidence disproving all claims of election fraud.  Oltmann et al.'s allegations against Dr. Coomer conformed to a preconceived storyline of fraud they advanced leading up and after the election.  Further, there is evidence that Oltmann et al. had political and financial incentive to defame Dr. Coomer, both to support former president Trump and to gain national exposure.  This evidence is sufficient to support a finding of actual malice.  *See Curtis Publ'g Co.*, 388 U.S. at 157-58; *see also Kuhn v. Trib.-Republican Publ'g Co.*, 637 P.2d 315, 319 (Colo. 1981); *Burns*, 659 P.2d at 1361-62.

163.    As to the fourth element, Oltmann et al.'s publication is actionable irrespective of special damages.  "If a libelous communication is defamatory per se, damage is presumed, and a plaintiff need not plead special damages."  *Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004). A statement is defamatory per se if the defamatory meaning is apparent from its face.  *Id.* Statements that impute a criminal offense or a matter incompatible with the individual's business, trade, profession, or office are defamatory on their face.  *Id.*  Whether a statement is defamatory is a question of law.  *Id.*   Here, Oltmann et al. published statements that alleged Dr. Coomer fraudulently elected the president of the United States by compromising election voting systems. These statements imputed a criminal offense.  Further, given that Dr. Coomer was employed as the Director of Product Strategy and Security for a company that provided voting equipment and support services to states across the United States, Oltmann et al.'s statements also imputed a matter incompatible with Dr. Coomer's profession.  As such, Oltmann et al.'s statements are defamatory per se, and Dr. Coomer is not required to prove special damages.  However, even were

special damages to apply, there is prima facie evidence that Dr. Coomer has suffered serious emotional distress, pecuniary loss, and other damages that were caused by Oltmann et al.'s defamatory statements.

164.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against Oltmann et al.

### b.    Malkin

165.    As to the first and second elements, Dr. Coomer has put forward prima facie evidence that Malkin made defamatory, false statements of fact concerning Dr. Coomer.  These statements include allegations that Dr. Coomer was the anonymous "Eric" on the Antifa call, that he stated on the Antifa call that he intended to subvert the presidential election, and that he did in fact "penetrate[ ] our election system across the county and of course around the world."  There is no dispute that Malkin published the statements at issue.[447]  Malkin is the host of the program #MalkinLive, which she publishes on YouTube.  There is prima facie evidence that in this role, Malkin both invited Oltmann to be interviewed and published Oltmann's statements regarding Dr. Coomer.  Malkin then actively promoted her interviews with Oltmann, republishing them on Twitter.  Similarly, Malkin was the host of the program Sovereign Nation on Newsmax.  There is prima facie evidence that in this role Malkin again invited Oltmann to be interviewed so as to publish his allegations on Newsmax's Sovereign Nation program.  To the extent that Malkin republished Oltmann's allegations, Malkin is equally liable for such republication as "the republication of false defamatory statements is as much a tort as the original publication." See Dixson v. Newsweek, Inc., 562 F.2d 626, 631 (10th Cir. 1977); see also Colo. Jury Instr.,

---

[447] See generally Malkin Mot.; Malkin Reply.

Civil 22:7 (citing Restatement (Second of Torts § 578 (1977)) ("Each time that libelous matter is communicated by a new person, a new publication has occurred, which is a separate basis of tort liability . . . It is no defense that the second publisher names the author or original publisher of the libel.").

166.    As to the third element, there is prima facie evidence that Malkin negligently published her defamatory statements.  Evidence that Malkin failed to investigate the allegations against Dr. Coomer, lacked corroborating evidence in support, and based her statements on Oltmann's allegations alone are sufficient to support a finding of negligence.  *See Quigley*, 43 F. Supp. 2d at 1180.  While Dr. Coomer does not need to prove actual malice as an element of his defamation claim, there is prima facie evidence that Malkin acted with actual malice in publishing her statements.

167.    Here, Malkin's allegations against Dr. Coomer were based on Oltmann's allegations without substantial independent support.  Malkin had reason to question the reliability of Oltmann as a witness given the nature of his allegations and the lack of evidence in support.  Yet, there is prima facie evidence Malkin did not investigate the allegations against Dr. Coomer; did not review the notes Oltmann allegedly took during the call; did not seek other witnesses or evidence in support; and did not consult with experts on election systems to confirm the allegations made.  Instead, there is evidence that Malkin disregarded credible sources of information that refuted the allegations, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud.  There is evidence the allegations against Dr. Coomer were inherently improbable.  Yet, Malkin republished these allegations.  There is evidence that Malkin's allegations against Dr. Coomer conformed to a preconceived storyline of fraud given her

allegations of fraud leading up to and after the election.  Further, there is evidence that Malkin had incentive to defame Dr. Coomer both in support of former president Trump and to gain national exposure.  This evidence is sufficient to support a finding of actual malice.  *See Curtis Publ'g Co.*, 388 U.S. at 157-58; *see also Kuhn v. Trib.-Republican Publ'g Co.*, 637 P.2d 315, 319 (Colo. 1981); *Burns*, 659 P.2d at 1361-62.  Malkin's efforts to weigh evidence or challenge the credibility of witnesses are not relevant to this analysis.  *See Baral*, 376 P.3d at 608-09.  Further, Malkin's own speculation as to the alleged Antifa conference call and Dr. Coomer's Facebook posts are similarly not evidence and do nothing to bolster the "believability" of Oltmann's allegations or overcome Dr. Coomer's prima facie evidence of actual malice.[448]

168.    As to the fourth element, Malkin's publication is actionable irrespective of special damages.  *See Gordon*, 99 P.3d at 79.  Malkin published statements alleging Dr. Coomer committed election fraud.  These statements are defamatory per se as they imputed Dr. Coomer committed a crime and imputed matters incompatible with Dr. Coomer's profession.  *See id.*  Even were special damages to apply, there is prima facie evidence that Dr. Coomer has suffered serious emotional distress, pecuniary loss, and other damages that were caused by Malkin's defamatory statements.

169.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against Malkin.

### c.    *Hoft and TGP*

170.    As to the first element, Dr. Coomer has put forward prima facie evidence that Hoft-TGP made defamatory, false statements of fact concerning Dr. Coomer.  These statements

---

[448] *See* Malkin Reply at 7-10.

include allegations that Dr. Coomer "was participating in Antifa calls," that he intended to subvert the presidential election, and then that he did "manipulate," "skim," and "steal" votes.  There is no dispute that Hoft-TGP made the statements at issue.[449]  Hoft is the owner of TGP as well as an editor and writer for TGP.  In that role, Hoft authorized the publication of articles regarding Dr. Coomer on TGP's website.  These articles were either drafted by Hoft or subject to his editorial control.  Instead, Hoft-TGP challenge whether Dr. Coomer sufficiently pleaded the defamatory statements at issue.  The Court has already addressed this issue and determined that Dr. Coomer's pleading was sufficient.[450]

171.    Hoft-TGP also argue that their statements are protected as opinion and hyperbolic rhetoric.[451]  In reviewing Hoft-TGP's entire statements and the context in which they were made, their arguments similarly fail.  Hoft-TGP alleged that Dr. Coomer participated in an Antifa conference call, stated on that call that he intended to subvert the presidential election, and then did in fact subvert the presidential election.  These statements express or imply verifiably false facts about Dr. Coomer and, therefore, are actionable.  *See Milkovich*, 497 U.S. at 19-20; *Burns*, 659 P.2d at 1360.  Dr. Coomer has unequivocally declared that these statements are false.  Not only is this evidence accepted as true at this stage of the proceeding, but it is uncontroverted.  *See Baral*, 376 P.3d at 608-09.  Absent Oltmann's testimony, Hoft-TGP similarly have not put forward evidence in support of their allegations against Dr. Coomer.

---

[449] *See generally* Hoft-TGP Mot.; Hoft-TGP Reply.

[450] *See* Sept. 15, 2021 Order Denying Hoft-TGP C.R.C.P. 12(e) Mot.; *see also* Order Regarding Pl.'s Resp. to All Defendants' Objections, Dec. 5, 2021 at 10.

[451] *See* Hoft-TGP Mot. at 16-21; Hoft-TGP Reply at 4.

172.     Hoft-TGP also contend they are not liable for their opinions because they fully disclosed the facts upon which they relied.[452]  Statements of opinion may not be actionable when the facts underlying them are nondefamatory and fully disclosed.  *See* Restatement (Second) of Torts § 566, cmt. c.  However, the publication of false statements of fact is itself actionable regardless of whether an opinion was formed.  *See id.*  To the extent that Hoft-TGP formed opinions, including that Dr. Coomer is "mentally ill and a sociopath," "an unhinged Trump hater and Antifa supporter," and a "lunatic," those opinions are premised on false statements of fact and, therefore, are actionable.  *See id.*; *see also Milkovich*, 497 U.S. at 18-19; *see also NBC Subsidiary, Inc.*, 879 P.2d at 11.  Further, there is evidence that Hoft-TGP did not fully disclose the facts upon which they formed their opinions.  *See Burns*, 659 P.2d at 1360 61; *Keohane*, 882 P.2d 1302-04. For example, Hoft-TGP published statements alleging there were notes, recordings, and witnesses of the purported call that were not disclosed.  Hoft-TGP published statements alleging to have video evidence that Dr. Coomer showed how votes could be altered that evidence shows to be inaccurate and incomplete.  Hoft-TGP also presented Oltmann as a witness, despite his having no personal knowledge of the allegations made against Dr. Coomer.  As such, there is prima facie evidence that Hoft-TGP both withheld information and positioned themselves to be perceived as having additional knowledge.  *See Burns*, 659 P.2d at 1360 61; *Keohane*, 882 P.2d 1302-04. Regardless, Hoft-TGP's statements impute a criminal offense, which is actionable even if in the form of an opinion.  *See Keohane*, 882 P.2d at 1304.

173.     As to the second element, it is undisputed that Hoft-TGP published their defamatory statements against Dr. Coomer to third parties as these statements were published on TGP's

---

[452] *See* Hoft-TGP Mot. at 16-21.

website.  To the extent that Hoft-TGP republished Oltmann's allegations, Hoft-TGP are equally liable for such republication as "the republication of false defamatory statements is as much a tort as the original publication."  *See Dixson*, 562 F.2d at 631; *see also* Colo. Jury Instr., Civil 22:7.

174.    As to the third element, there is prima facie evidence that Hoft-TGP negligently published their defamatory statements.  Evidence that Hoft-TGP failed to investigate the allegations against Dr. Coomer, lacked corroborating evidence in support, and based their allegations on Oltmann's allegations alone are sufficient to support a finding of negligence.  *See Quigley*, 43 F. Supp. 2d at 1180.  While Dr. Coomer does not need to prove actual malice as an element of his defamation claim, there is prima facie evidence that Hoft-TGP acted with actual malice in publishing their statements.

175.    Here, Hoft-TGP's allegations against Dr. Coomer were based on Oltmann's allegations without substantial independent support.  Hoft-TGP also had reason to question the reliability of Oltmann as a witness given the nature of his allegations and lack of evidence in support.  Yet there is prima facie evidence Hoft-TGP did not investigate the allegations against Dr. Coomer; did not review the notes Oltmann allegedly took during the call; did not seek other witnesses or evidence in support; did not consult with experts on election systems to confirm the allegations made.  Instead, there is evidence that Hoft-TGP disregarded credible sources of information that refuted their allegations, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud.  There is evidence the allegations against Dr. Coomer were inherently improbable.  Yet Hoft-TGP republished these allegations.  There is evidence that Hoft-TGP allegations against Dr. Coomer conformed to a preconceived storyline of fraud given their allegations of fraud leading up and after the election.  Further, there

97

is evidence that Hoft-TGP had political and financial incentive to defame Dr. Coomer, as their statements resulted in increased subscriptions, increased advertising revenue, and notoriety as a supporter of former president Trump.  This evidence is sufficient to support a finding of actual malice as well as overcome Hoft-TGP's professions of good faith.  *See, e.g.*, *Curtis Publ'g Co.*, 388 U.S. at 157-58; *St. Amant*, 390 U.S. at 732.

176.   As to the fourth element, Hoft-TGP's publication is actionable irrespective of special damages. *See Gordon*, 99 P.3d at 79.  Hoft-TGP published statements alleging Dr. Coomer committed election fraud.  These statements are defamatory per se as they imputed Dr. Coomer committed a crime and imputed matters incompatible with Dr. Coomer's profession.  Even were special damages to apply, there is prima facie evidence that Dr. Coomer has suffered serious emotional distress, pecuniary loss, and other damages that were caused by Hoft-TGP's defamatory statements.

177.   For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against Hoft-TGP.

### d.   Metaxas

178.   As to the first element, Dr. Coomer has put forward prima facie evidence that Metaxas made defamatory, false statements of fact concerning Dr. Coomer.  These statements include allegations that Dr. Coomer participated in an Antifa call, "promised Antifa members a Trump loss," and then subverted the presidential election.  There is no dispute that Metaxas made the statements at issue.  Metaxas is the host of the radio program and podcast, The Eric Metaxas Radio Show, which Metaxas publishes through national radio broadcasts as well as on his website and YouTube.  There is prima facie evidence that in that role, Metaxas both invited Oltmann to be

interviewed and published Oltmann's statements regarding Dr. Coomer.  Metaxas then actively promoted his interviews with Oltmann, republishing them on Twitter.

179.    For the first time in his supplemental reply, Metaxas argues, like the defendants above, that his statements are protected opinion and hyperbolic rhetoric.[453]  While this argument is untimely, it also fails for the same reasons outlined above.  Metaxas alleged that Dr. Coomer participated in an Antifa conference call, stated on that call that he intended to subvert the presidential election, and then did in fact subvert the presidential election.  These statements are actionable because they express or imply verifiably false facts about Dr. Coomer.  *See Milkovich*, 497 U.S. at 19-20; *Burns*, 659 P.2d at 1360.  Dr. Coomer has unequivocally declared that these statements are false.  This evidence is accepted as true.  *See Baral*, 376 P.3d at 608-09.  This evidence is also uncontroverted because, absent Oltmann's testimony, Metaxas has not put forward any evidence in support of his allegations against Dr. Coomer.  Regardless, Metaxas's statements impute a criminal offense, which is actionable even if in the form of an opinion.  *See Keohane*, 882 P.2d at 1304.

180.    As to the second element, it is undisputed that Metaxas published his defamatory statements against Dr. Coomer to third parties as these statements were published on his website, on YouTube, and through national radio broadcasts.[454]  To the extent that Metaxas republished Oltmann's allegations, Metaxas is equally liable for such republication as "the republication of false defamatory statements is as much a tort as the original publication."  *See Dixson*, 562 F.2d at 631; *see also* Colo. Jury Instr., Civil 22:7.

---

[453] *See* Metaxas Supp. Reply at 6-8.

[454] *See generally* Metaxas Mot.

181.     As to the third element, there is prima facie evidence that Metaxas negligently published his defamatory statements.  Evidence that Metaxas failed to investigate the allegations against Dr. Coomer, lacked corroborating evidence in support, and based his allegations on Oltmann's statements alone are sufficient to support a finding of negligence.  *See Quigley*, 43 F. Supp. 2d at 1180.  While Dr. Coomer does not need to prove actual malice as an element of his defamation claim, there is prima facie evidence that Metaxas acted with actual malice in publishing his statements.

182.     Here, Metaxas's allegations against Dr. Coomer were based on Oltmann's allegations without substantial independent support.  Metaxas also had reason to question the reliability of Oltmann as a witness given the nature of his allegations and the lack of evidence in support.  Yet, there is prima facie evidence Metaxas did not investigate the allegations against Dr. Coomer; did not review the notes Oltmann allegedly took during the call; did not seek other witnesses or evidence in support; and did not consult with experts on election systems to confirm the allegations made.  Instead, there is evidence that Metaxas disregarded credible sources of information that refuted the allegations, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud.  There is evidence the allegations against Dr. Coomer were inherently improbable.  Yet Metaxas republished these allegations. There is evidence that Metaxas's allegations against Dr. Coomer conformed to a preconceived storyline of fraud given his allegations of fraud after the election.  Further, there is evidence that Metaxas had incentive to defame Dr. Coomer both in support of former president Trump and to fain national exposure.  This evidence is sufficient to support a finding of actual malice.  *See, e.g.*, *Curtis Publ'g Co.*, 388 U.S. at 157-58 (1967).

183.     As to the fourth element, Metaxas's publication is actionable irrespective of special damages.  *See Gordon*, 99 P.3d at 79.   Metaxas published statements alleging Dr. Coomer committed election fraud.  These statements are defamatory per se as they imputed Dr. Coomer committed a crime and imputed matters incompatible with Dr. Coomer's profession.  *See id.*  Even were special damages to apply, there is prima facie evidence that Dr. Coomer has suffered serious emotional distress, pecuniary loss, and other damages that were caused by Metaxas' defamatory statements.

184.     For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against Metaxas.

### e.     *OAN and Rion*

185.     As to the first element, Dr. Coomer has put forward prima facie evidence that OAN-Rion made defamatory, false statements of fact concerning Dr. Coomer.  These statements include allegations that Dr. Coomer participated in an Antifa conference call, that he was "hell bent on deleting half of America's voice," and that he subverted the presidential election.  There is no dispute that OAN-Rion made the statements at issue.   Rion is the Chief White House Correspondent for OAN, a national news network.   OAN authorized the publication of Rion's news segments regarding Dr. Coomer.  In their reply, OAN-Rion argue for the first time that they cannot be held to Dr. Coomer for statements made about Dominion.[455]  Not only is this argument untimely, there is prima facie evidence that OAN-Rion inextricably linked Dr. Coomer to Dominion such that no discernable distinction between references to Dr. Coomer and Dominion existed.  *See Gordon*, 99 P.3d at 80-81 (finding identity can be inferred from prior statements).

---

[455] *See* OAN-Rion Reply at 9-11.

186.    Further, OAN-Rion also argue, like the defendants above, that their statements are protected opinion and hyperbolic rhetoric.[456]  This argument similarly fails.  OAN-Rion alleged that Dr. Coomer participated in an Antifa conference call, stated on that call that he intended to subvert the presidential election, and then did in fact subvert the presidential election.  These statements are actionable because they express or imply verifiably false facts about Dr. Coomer. *See Milkovich*, 497 U.S. at 19-20; *Burns*, 659 P.2d at 1360.  Dr. Coomer has unequivocally declared that these statements are false.  This evidence is accepted as true.  *See Baral*, 376 P.3d at 608-09.  This evidence is also uncontroverted because, absent Oltmann's testimony, OAN-Rion has failed to put forward any evidence in support of their allegations against Dr. Coomer. OAN-Rion's attacks on Dr. Coomer's credibility and speculation surrounding whether an Antifa call actually occurred do not overcome Dr. Coomer's prima facie evidence for purposes of the anti-SLAPP statute.  Regardless, OAN-Rion's statements impute a criminal offense, which is actionable even if in the form of an opinion.  *See Keohane*, 882 P.2d at 1304.

187.    As to the second element, it is undisputed that OAN-Rion published their defamatory statements against Dr. Coomer to third parties as these statements were published on the OAN network, YouTube, Twitter, and Rion's personal website.  To the extent that OAN-Rion republished Oltmann's allegations, OAN-Rion are equally liable for such republication as "the republication of false defamatory statements is as much a tort as the original publication." *See Dixson*, 562 F.2d at 631; *see also* Colo. Jury Instr., Civil 22:7.

188.    As to the third element, there is prima facie evidence that OAN-Rion negligently published their defamatory statements.  Evidence that OAN-Rion failed to investigate the

---

[456] *See* OAN-Rion Mot. at 17-18.

allegations against Dr. Coomer, lacked corroborating evidence in support, and based their allegations on Oltmann's statements alone are sufficient to support a finding of negligence. *See Quigley*, 43 F. Supp. 2d at 1180. While Dr. Coomer does not need to prove actual malice as an element of his defamation claim, there is prima facie evidence that OAN-Rion acted with actual malice in publishing their statements.

189.    Here, OAN-Rion's allegations against Dr. Coomer were based on Oltmann's allegations without substantial independent support. OAN-Rion also had reason to question the reliability of Oltmann as a witness given the nature of his allegations and the lack of evidence in support. Yet, there is prima facie evidence OAN-Rion did not investigate the allegations against Dr. Coomer; did not review the notes Oltmann allegedly took during the call; did not seek other witnesses or evidence in support; and did not consult with experts on election systems to confirm the allegations made. Instead, there is evidence that OAN-Rion disregarded credible sources of information that refuted the allegations, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud. There is evidence the allegations against Dr. Coomer were inherently improbable. Yet OAN-Rion republished these allegations. There is evidence that OAN-Rion's allegations against Dr. Coomer conformed to a preconceived storyline of fraud given their allegations of fraud leading up to and after the election. Further, there is evidence that OAN-Rion had incentive to defame Dr. Coomer both in support of former president Trump and as a conservative news network seeking national attention. This evidence is sufficient to support a finding of actual malice. *See, e.g.*, *Curtis Publ'g Co.*, 388 U.S. at 157-58. OAN-Rion's efforts to weigh evidence or challenge the credibility of witnesses are not relevant to this analysis. *See Baral*, 376 P.3d at 608-09. Further, OAN-Rion's own speculation as to the

alleged Antifa conference call and Dr. Coomer's Facebook posts are similarly not evidence and do nothing to bolster Oltmann's allegations or overcome Dr. Coomer's prima facie evidence of actual malice.[457]

190.    As to the fourth element, OAN-Rion's publications are actionable irrespective of special damages.   *See Gordon*, 99 P.3d at 79.   OAN-Rion published statements alleging Dr. Coomer committed election fraud.   These statements are defamatory per se as they imputed Dr. Coomer committed a crime and imputed matters incompatible with Dr. Coomer's profession. *See id.*   Even were special damages to apply, there is prima facie evidence that Dr. Coomer has suffered serious emotional distress, pecuniary loss, and other damages that were caused by OAN-Rion's defamatory statements.

191.    OAN-Rion attempt to advance a "newsworthy" exception to avoid liability for defamation.[458]   However, this exception does not exist.   In fact, Colorado courts expressly reject protecting speech based solely on what a news organization deems newsworthy.   *See Diversified Mgmt. Inc.*, 653 P.2d at 1107.   Instead, OAN-Rion's argument appears to confuse this purported exception with the neutral reporting privilege created by the Second Circuit, which protects media defendants against defamation claims for the publication of *neutral* and *accurate* reports of newsworthy charges made by responsible and prominent organizations against public figures. *See Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 120 (2d Cir. 1977).   However, that privilege has not been adopted by the U.S. Supreme Court, the Tenth Circuit, or Colorado state

---

[457] *See* OAN-Rion Reply at 3-5.

[458] *See* OAN-Rion Mot. at 12.

courts.[459]  Even were this privilege recognized in Colorado, it would not apply here.  OAN-Rion's

statements are neither neutral nor accurate reports of newsworthy charges, especially given the

credible evidence rejecting their allegations at that time.  *Cf. Edwards*, 556 F.2d at 120 (finding

the article's author "did not in any way espouse the Society's accusations," but instead was the

"exemplar of fair and dispassionate reporting").  OAN-Rion failed to establish that Oltmann is a

responsible or prominent source as contemplated in *Edwards*.  C*f.* 556 F.2d at 116 (involving

statements made by a nationally known ornithological society).  And OAN-Rion failed to establish

that Dr. Coomer is a public figure.  *See Dixson*, 562 F.2d at 631 (rejecting application of *Edwards*

where victim was a private individual); *Khawar v. Globe Int'l, Inc.*, 965 P.2d 696, 707 (Cal. 1998)

(recognizing an absolute privilege against private figures "would be inconsistent with the United

States Supreme Court's insistence on the need for balancing the First Amendment interest in

promoting the broad dissemination of information relevant to public controversies against the

reputation interests of private figures").  The Superior Court in Delaware recently rejected a similar

argument made by Fox News, finding that Dominion's claims that Fox ignored contrary evidence

and promoted a narrative that "Dominion committed election fraud" negated any argument that

Fox's reporting was accurate and dispassionate.  *See US Dominion, Inc., et al v. Fox News*

*Network, LLC*, C.A. No. N21C-03-257, at 42-44 (Del. Super. Ct. Dec. 16, 2021) (Order Denying

---

[459] The Third Circuit has gone so far as to expressly reject the privilege, noting that allowing publication "without fear of a libel suit even if the publisher 'has serious doubts regarding their truth' . . . is contrary to the Supreme Court's ruling in *St. Amant*" and inconsistent with its ruling in *Gertz*.  *Dickey v. CBS Inc.*, 583 F.2d 1221, 1225-26, n.5 (3d Cir. 1978).

Defendant's Motion to Dismiss).[460]  The evidence of OAN-Rion's reporting here similarly does not support application of the neutral reporting privilege, even if it were available.

192.    OAN-Rion additionally argue that the filing of an affidavit by Oltmann in subsequent judicial proceedings immunizes them from liability for defamation under the fair report privilege.[461]  OAN-Rion's reliance on this privilege is misplaced.  The fair report privilege protects reports of judicial proceedings that are fair and substantially correct.  *See Quigley*, 327 F.3d at 1062.  It does not apply to reporting before any judicial action has been taken, does not extend to reporting on preliminary pleadings, and cannot extend beyond accurate reporting of the judicial proceedings.  *See id.*  The privilege does not apply merely because Oltmann later memorialized some of his allegations against Dr. Coomer in an affidavit.  Moreover, the basis of Dr. Coomer's claims against OAN-Rion extend well beyond reporting of Oltmann's sworn statements in a judicial proceeding.

193.    OAN-Rion also argue, for the first time on reply, that the incremental harm doctrine bars Dr. Coomer's recovery as a matter of law.[462]  This argument is untimely.  Even so, this doctrine has not been adopted in Colorado.  *See Bustos v. A & E Television Networks*, 646 F.3d 762, 765 (10th Cir. 2011); *see also Anderson v. Colorado Mountain News Media Co.*, No. 18-cv-02934-CMA-CPG, 2019 WL 3321843, at * 8 (D. Colo. May 20, 2019).  Under the incremental harm doctrine, malicious or false statements may not be actionable where there are unchallenged or nonactionable parts of a particular publication that are damaging, and the malicious and false

---

[460] Available at:  https://courts.delaware.gov/Opinions/Download.aspx?id=327750

[461] *See* OAN-Rion Mot. at 15-16.

[462] *See* OAN-Rion Reply at 18-20.

statements fail to cause any incremental harm above what is caused by the remainder of the publication. *See Tonnessen v. Denver Pub. Co.*, 5 P.3d 959, 965 (Colo. App. 2000). The doctrine has been applied once in Colorado, but that case is not instructive here. *See id.* at 964-66 (applying "limited" doctrine to avoid liability where newspaper was reporting statements on courthouse steps that were essentially identical to the testimony just given inside). Nor was the doctrine accurately applied. *See Bustos*, 646 F.3d at 766, n* (10th Cir. 2011) (noting the court in *Tonnessen* stops "well short" of the typical incremental harm doctrine and could likely be "just a logical extension of the doctrine of fair report"). Even were this doctrine recognized, the incremental harm inquiry is limited to statements contained in the *same* publication. *See Tonnessen*, 5 P.3d at 965-66; *see also Bustos*, 646 F.3d at 765. OAN-Rion improperly attempt to compare the harm to Dr. Coomer globally, including harm allegedly caused by Dr. Coomer's own social media posts and interviews with other publications. That is not the appropriate inquiry.

194.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against OAN-Rion.

### f.    *Powell, Powell P.C., and Defending the Republic*

195.    As to the first and second elements, Dr. Coomer has put forward prima facie evidence that Powell et al. made defamatory, false statements of fact concerning Dr. Coomer. These statements include allegations that Dr. Coomer participated in an Antifa conference call, made statements on that call that he was "going to f- Trump," and then subverted the presidential election. There is no dispute that Powell made the statements at issue. There is prima facie evidence that Powell published the statements regarding Dr. Coomer on her own behalf, as a representative of her entities, Powell, P.C. and Defending the Republic, and as a representative of

the Trump Campaign.  These statements were first made during a televised press conference at the Republican National Convention.  Powell then actively promoted her statements, republishing them on a national media tour.  To the extent that Powell et al. republished Oltmann's allegations, Powell et al. are equally liable for such republication as "the republication of false defamatory statements is as much a tort as the original publication."  *See Dixson*, 562 F.2d at 631; *see also* Colo. Jury Instr., Civil 22:7.

196.    In its reply, Defending the Republic argues for the first time that it is not the proper party as to the claims asserted.[463]  Not only is this argument untimely but refuted by prima facie evidence showing Defending the Republic was soliciting donations at the time of Powell's statements.

197.    Further, Powell et al. argue, like the defendants above, that their statements are protected opinion and hyperbolic rhetoric.[464]  This argument fails for the same reasons outlined above.  Powell et al. alleged that Dr. Coomer participated in an Antifa conference call, stated on that call that he intended to subvert the presidential election, and then did in fact subvert the presidential election.  These statements are actionable because they express or imply verifiably false facts about Dr. Coomer.  *See Milkovich*, 497 U.S. at 19-20; *Burns*, 659 P.2d at 1360. Dr. Coomer has unequivocally declared that these statements are false.  This evidence is accepted as true.  *See Baral*, 376 P.3d at 608-09.  This evidence is also uncontroverted because, absent Oltmann's testimony, Powell et al. have not put forward any evidence in support of their

---

[463] *See* DTR Reply at 1-7.

[464] *See* Powell Mot. at 24-25; DTR Mot. at 24-26.

allegations against Dr. Coomer.  Regardless, Powell et al.'s statements impute a criminal offense, which is actionable even if in the form of an opinion.  *See Keohane*, 882 P.2d at 1304.

198.    As to the third element, there is prima facie evidence that Powell et al. negligently published their defamatory statements.  Evidence that Powell et al. failed to adequately investigate the allegations against Dr. Coomer, lacked corroborating evidence in support, and based their statements on Oltmann's allegations alone are sufficient to support a finding of negligence. *See Quigley*, 43 F. Supp. 2d at 1180.  While Dr. Coomer does not need to prove actual malice as an element of his defamation claim, there is prima facie evidence that Powell, et al. acted with actual malice in publishing their statements.

199.    Here, Powell et al.'s allegations against Dr. Coomer were based on Oltmann's allegations without substantial independent support.  Powell et al. also had reason to question the reliability of Oltmann as a witness given the nature of his allegations and the lack of evidence in support.  Yet, there is prima facie evidence Powell et al. did not investigate the allegations against Dr. Coomer; did not review the notes Oltmann allegedly took during the call; did not seek other witnesses or evidence in support; did not consult with experts on election systems to confirm the allegations made.  Instead, there is evidence that Powell et al. disregarded credible sources of information that refuted the allegations, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud.  There is evidence the allegations against Dr. Coomer were inherently improbable.  Yet Powell et al. republished these allegations. There is evidence that Powell et al.'s allegations against Dr. Coomer conformed to a preconceived storyline of fraud given their allegations of fraud leading up to and after the election.  Further, there is evidence that Powell et al. had incentive to defame Dr. Coomer both in support of former

president Trump and to gain national exposure and financial contributions. This evidence is sufficient to support a finding of actual malice. *See, e.g.*, *Curtis Publ'g Co.*, 388 U.S. at 157-58. Powell et al.'s efforts to weigh evidence or challenge the credibility of witnesses are not relevant to this analysis. *See Baral*, 376 P.3d at 608-09. Further, Powell et al.'s own speculation as to the alleged Antifa conference call and Dr. Coomer's Facebook posts are similarly not evidence and do nothing to bolster Oltmann's allegations or overcome Dr. Coomer's prima facie evidence of actual malice.

200.    As to the fourth element, Powell et al.'s publications are actionable irrespective of special damages. *See Gordon*, 99 P.3d at 79. Powell et al. published statements alleging Dr. Coomer committed election fraud. These statements are defamatory per se as they imputed Dr. Coomer committed a crime and imputed matters incompatible with Dr. Coomer's profession. *See id.* Even were special damages to apply, there is prima facie evidence that Dr. Coomer has suffered serious emotional distress, pecuniary loss, and other damages that were caused by Powell et al.'s defamatory statements.

201.    To avoid liability for their statements, Powell et al. argue that the various election-related lawsuits immunize their statements about Dr. Coomer under the litigation privilege.[465] The litigation privilege (or shield) is not intended to immunize any and all statements an attorney may make on a client's behalf. Rather, the application of the privilege requires a court to "consider the nature of the duties performed and whether such duties are an essential and integral part of the judicial process." *Patterson v. James*, 454 P.3d 345, 350 (Colo. App. 2018) (internal quotations omitted). Importantly, the privilege does not apply to statements made to the news media. *See*

---

[465] *See* Powell Mot. at 5, 11-17; DTR Mot. at 5-6, 12-18.

*Seidl*, 30 F. Supp. 2d at 1314-15; *see also Green Acres*, 688 P.2d at 623 (holding there was no privilege where attorneys made statements in a press conference).  This limitation is intended to afford a measure of protection to a victim for publication to the public at large, which is precisely what Dr. Coomer is alleging here.  *See Cache la Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 438 F. Supp. 2d 1288, 1294 (D. Colo. 2006).  The consistent reasoning in cases applying the litigation privilege in Colorado "is that each non-judicial officer performed a function pursuant to a court directive, which was related to the judicial process."  *Awai v. Kotin*, 872 P.2d 1332, 1336 (Colo. App. 1993).  In asserting this privilege, Powell et al. rely on various lawsuits filed to challenge the election results.  However, Dr. Coomer's claims against Powell et al. are based on statements made to national media—not on statements made in those lawsuits.  Thus, Colorado's litigation privilege does not apply to protect Powell et al. from Dr. Coomer's defamation claims, and any election-related litigation filed before or after the alleged defamation is irrelevant.  *See Kleier Advert., Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036m 1043-44 (10th Cir. 1990).

202.    Moreover, the litigation privilege applies only to statements made prior to a judicial proceeding when those statements have "some relation to a proceeding that is contemplated in good faith and under serious consideration."  *See Begley v. Ireson*, 399 P.3d 777, 782 (Colo. App. 2017).  Because Powell et al. have not presented any evidence that they considered, in good faith, pursuing litigation against Dr. Coomer, their statements may still be actionable, even if made by means other than press conference or media appearance.  Further, Powell et al. have not presented any evidence the lawsuits filed were served in any integral way by the alleged defamation.  *See Awai*, 872 P.2d at 1336 ("[I]t is still necessary to establish that the acts performed were intimately related and essential to the judicial decision-making process."); *see also Paul*,

95 Cal. App. 4th at 867-68.  In fact, Powell has acknowledged affidavits referencing Dr. Coomer "were not relevant to the legal issues" under review.[466]  Accordingly, the Court rejects Powell et al.'s assertions of good faith and the application of the litigation privilege to their pre-litigation statements.

203.    Defending the Republic attempts, for the first time on reply, to create a distinction between an "absolute" and a "conditional" litigation privilege.[467]  But when analyzing an attorney's prelitigation statements, the distinction between an absolute and a conditional, or qualified, privilege is ultimately irrelevant.  *See Begley*, 399 P.3d at 791 ("Whether this privilege is characterized as absolute or qualified is beside the point.").  The inquiry remains whether the prelitigation statements were made in connection with prospective litigation and whether the litigation was contemplated in good faith.  *Id.*  It is unclear how Powell et al.'s statements were made in connection with prospective litigation or contemplated in good faith given their allegations against Dr. Coomer were unsupported.  Applying Defending the Republic's interpretation of the litigation privilege here would reward Powell's post-defamation filing of bad faith and meritless lawsuits, realizing the fear articulated in *Begley*.  *See* 399 P.3d at 781 (rejecting the extension of protections provided statements made during court proceedings to prelitigation statements because it could "encourage or protect attorneys who file bad faith litigation in order to immunize otherwise tortious conduct").

204.    Even where the privilege applies, it can be lost by a finding of actual malice, *see Burke v. Greene*, 963 P.2d 1119, 1122 (Colo. App. 1998), or by unnecessary publication of

---

[466] *See* Powell Reply at 15, n.32.

[467] *See* DTR Reply at 12-15.

privileged statements to news media or "those wholly unconnected with the judicial process." *See Seidl*, 30 F. Supp. 2d at 1314; *see also Club Valencia Homeowners Ass'n, Inc. v. Valencia Assocs.*, 712 P.2d 1024, 1027 (Colo. App. 1985) ("the maker of the statement and the recipient must be involved in and closely connected with the proceeding").   When analyzing statements made to the press, the attorney's intent is relevant.   Statements made solely for the purpose of publicity are not privileged.   *See Seidl*, 30 F. Supp at 1315.   Here, there is sufficient evidence to support a finding of actual malice.   There is also sufficient evidence that Powell et al.'s purpose in publishing their statements to the press was pure publicity.   Thus, even if the privilege did apply, Powell et al. would not be entitled to its protections.

205.   For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against Powell et al.

### g.   *Giuliani*

206.   As to the first and second elements, Dr. Coomer has put forward prima facie evidence that Giuliani made defamatory, false statements of fact concerning Dr. Coomer.   These statements include allegations that Dr. Coomer was "close to Antifa" and participated in an Antifa call, that he intended to "fix the election," and that he did in fact subvert the presidential election. There is no dispute that Giuliani published the statements at issue.[468]   There is prima facie evidence that Giuliani published the statements regarding Dr. Coomer, both individually and as a representative of the Trump Campaign, including during a televised press conference at the Republican National Convention.   To the extent Giuliani republished Oltmann's allegations, Giuliani is equally liable for such republication as "the republication of false defamatory

---

[468] *See generally* Giuliani Mot.; Giuliani Reply.

statements is as much a tort as the original publication." *See Dixson*, 562 F.2d at 631; *see also* Colo. Jury Instr., Civil 22:7.

207.    As to the third element, there is prima facie evidence that Giuliani negligently published his defamatory statements.  Evidence that Giuliani failed to adequately investigate the allegations against Dr. Coomer, lacked corroborating evidence in support, and based his statements on Oltmann's allegations alone are sufficient to support a finding of negligence.  *See Quigley*, 43 F. Supp. 2d at 1180.  While Dr. Coomer does not need to prove actual malice as an element of his defamation claim, there is prima facie evidence that Giuliani acted with actual malice in publishing his statements.

208.    Here, Giuliani's allegations against Dr. Coomer were based on Oltmann's allegations without substantial independent support.  Giuliani also had reason to question the reliability of his sources given the nature of the allegations and lack of evidence in support.  Yet there is prima facie evidence Giuliani did not investigate the allegations against Dr. Coomer; did not seek witnesses or evidence in support of the allegations; did not review research prepared by the Trump Campaign, including an internal memo rejection the claims; and did not consult with experts on election systems to determine whether the allegations against Dr. Coomer were accurate.  Instead, there is evidence that Giuliani disregarded credible sources of information that refuted the allegations, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud.  There is evidence the allegations against Dr. Coomer were inherently improbable.  Yet Giuliani republished these allegations.  There is evidence that Giuliani's allegations against Dr. Coomer conformed to a preconceived storyline of fraud given his allegations of fraud after the election.  Further, there is evidence that Giuliani had incentive to

defame Dr. Coomer both in support of former president Trump and to maintain national attention. This evidence is sufficient to support a finding of actual malice. *See Curtis Publ'g Co.*, 388 U.S. at 157-58 (1967); *see also Kuhn v. Trib.-Republican Publ'g Co.*, 637 P.2d 315, 319 (Colo. 1981); *Burns*, 659 P.2d at 1361-62.

209.    As to the fourth element, Giuliani's publication is actionable irrespective of special damages. *See Gordon*, 99 P.3d at 79. Giuliani published statements alleging Dr. Coomer committed election fraud. These statements are defamatory per se as they imputed Dr. Coomer committed a crime and imputed matters incompatible with Dr. Coomer's profession. *See id.* Even were special damages to apply, there is prima facie evidence that Dr. Coomer has suffered serious emotional distress, pecuniary loss, and other damages that were caused by Giuliani's defamatory statements.

210.    Like Powell et al., Giuliani relies on the various election-related lawsuits to argue that his statements about Dr. Coomer are immunized under the litigation privilege.[469] However, Giuliani was not involved in any election-related lawsuits referencing Dr. Coomer. Further, the litigation privilege does not apply because Dr. Coomer's claims against Giuliani are based on statements made to the national media, not on statements made in those lawsuits. *See Seidl*, 30 F. Supp. 2d at 1314-15; *see also Green Acres*, 688 P.2d at 623. Nor can Giuliani establish that his pre-litigation statements were made in good faith contemplation of litigation against Dr. Coomer given the lack of evidence in support of the allegations. *See Begley*, 399 P.3d at 782. Moreover, even if the privilege did apply, Giuliani would not be entitled to its protections because there is

---

[469] *See* Giuliani Mot. at 9-16; Giuliani Reply at 7.

sufficient evidence to support a finding of actual malice and the purpose of publishing their statements to the press was publicity.

211.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against Giuliani.

### h.    *Trump Campaign*

212.    As to the first and second elements, Dr. Coomer has put forward prima facie evidence that the Trump Campaign, through its agents made defamatory, false statements of fact concerning Dr. Coomer.  These statements include allegations that Dr. Coomer participated in an Antifa conference call, made statements on that call that he intended to subvert the presidential election, and that votes for Trump had in fact "disappeared."  There is prima facie evidence that the Trump Campaign, through its agents Powell and Giuliani, published the statements regarding Dr. Coomer.  The Trump Campaign then actively promoted the statements about Dr. Coomer through a national media tour.  To the extent the Trump Campaign republished Oltmann's allegations, the Trump Campaign is equally liable for such republication as "the republication of false defamatory statements is as much a tort as the original publication."  *See Dixson*, 562 F.2d at 631; *see also* Colo. Jury Instr., Civil 22:7.

213.    As to the third element, there is prima facie evidence that the Trump Campaign negligently published its defamatory statements.  Evidence that the Trump Campaign failed to adequately investigate the allegations against Dr. Coomer, lacked corroborating evidence in support, and based its allegations on Oltmann's statements alone are sufficient to support a finding of negligence.  *See Quigley*, 43 F. Supp. 2d at 1180.  In publishing its statements, the Trump Campaign even ignored evidence expressly rejecting any connection between Dr. Coomer and

claims of election fraud.  While Dr. Coomer does not need to prove actual malice as an element of his defamation claim, there is prima facie evidence that the Trump Campaign acted with actual malice in publishing its statements.

214.    Here, the Trump Campaign's allegations against Dr. Coomer were based on Oltmann's allegations without substantial independent support.  The Trump Campaign also had reason to question the reliability of Oltmann as a witness given the nature of his allegations and the lack of evidence in support.  The Trump Campaign even had an internal memo rejecting the allegations.  Further, there is prima facie evidence the Trump Campaign did not adequately investigate the allegations against Dr. Coomer; did not review the notes Oltmann allegedly took during the call; did not seek other witnesses or evidence in support of the allegations; and did not consult with experts on election systems to determine whether the allegations against Dr. Coomer were accurate.  Instead, there is evidence that the Trump Campaign disregarded credible sources of information that refuted the allegations at the time they were made, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud.  There is evidence the allegations against Dr. Coomer were inherently improbable.  Yet the Trump Campaign republished these allegations.  There is evidence that the Trump Campaign's allegations against Dr. Coomer conformed to a preconceived storyline of fraud given its allegations leading up to and after the election.  Further, there is evidence that the Trump Campaign had incentive to defame Dr. Coomer both in support of former President Trump and to continue to solicit funds to contest the election results.  This evidence is sufficient to support a finding of actual malice.  *See Curtis Publ'g Co.*, 388 U.S. at 157-58 (1967); *see also Kuhn*, 637 P.2d at 319; *Burns*, 659 P.2d at 1361-62.  Further, the Trump Campaign's own speculation as to the alleged Antifa call and

Dr. Coomer's Facebook posts are similarly not evidence and do nothing to bolster Oltmann's allegations or overcome Dr. Coomer's prima facie evidence of actual malice.[470]

215.    As to the fourth element, the Trump Campaign's publications are actionable irrespective of special damages.  *See Gordon*, 99 P.3d at 79.  The Trump Campaign published statements alleging Dr. Coomer committed election fraud.  These statements are defamatory per se as they imputed Dr. Coomer committed a crime and imputed matters incompatible with Dr. Coomer's profession.  *See id.*  Even were special damages to apply, there is prima facie evidence that Dr. Coomer has suffered serious emotional distress, pecuniary loss, and other damages that were caused by the Trump Campaign's defamatory statements.

216.    Like its agents above, the Trump Campaign relies on the various election-related lawsuits to argue that its statements about Dr. Coomer were immunized under the litigation privilege.[471]  However, the Trump Campaign was not involved in any election-related lawsuits referencing Dr. Coomer.  Further, the litigation privilege does not apply because Dr. Coomer's claims against the Trump Campaign are based on statements made to the national media, not on statements made in those lawsuits.  *See Seidl*, 30 F. Supp. 2d at 1314-15; *see also Green Acres*, 688 P.2d at 623.  Nor can the Trump Campaign establish that its pre-litigation statements were made in good faith contemplation of litigation against Dr. Coomer given the lack of evidence in support of its allegations.  *See Begley*, 399 P.3d at 782.  Moreover, even if the privilege did apply, the Trump Campaign would not be entitled to its protections because there is sufficient evidence

---

[470] *See* Trump Campaign Reply at 10-11.

[471] *See* Trump Campaign Mot. at 11-14; Trump Campaign Reply at 3-7.

to support a finding of actual malice and the purpose of publishing its statements to the press was publicity.

217.    The Trump Campaign next argues that it is immune from liability under the Westfall Act for former president Trump's Twitter posts about Dr. Coomer because President Trump was acting within the scope of his federal employment at the time of his posts.[472]  While the Westfall Act provides immunity for federal employees acting within the scope of their office or employment, it does not grant absolute immunity for that employee's conduct.  28 U.S.C. §§ 2679(b)(1), (d).  Rather, if the Attorney General or the court certifies that an employee was acting within the scope of their employment at the time the tortious conduct occurred, the United States will be substituted as the defendant in the litigation.  *Id.* at §§ 2679(d)(1), (3).  The Trump Campaign offers no certification from the Attorney General that President Trump was acting within the scope of his employment, nor does it seek such certification from the Court.  The Trump Campaign fails altogether to identify the President's scope of employment or explain how defaming Dr. Coomer falls within it.  The Trump Campaign further fails to explain how the Westfall Act precludes its own liability, especially considering former president Trump has not been sued in his individual capacity.

218.    The Trump Campaign also argues that it is immune from liability under Section 230 of the CDA because Eric Trump was a "mere distributor/re-publisher" when he posted Oltmann's alleged defamatory statements about Dr. Coomer on Twitter.[473]  For the first time on

---

[472] *See* Trump Campaign Mot. at 18.

[473] *Id.* at 20.

reply, the Trump Campaign attempts to expand this argument to include former president Trump and his tweets.[474]  While the Trump Campaign's attempt to expand this argument is untimely, the application of Section 230 to Eric Trump's and President Trump's tweets strains the reach of CDA immunity.  The United States Supreme Court has recently cautioned against the "sweeping immunity" some courts have read into the CDA, noting that "[e]xtending [this] immunity beyond the natural reading of the text can have serious consequences."  *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 18 (2020).  Here, Eric Trump did not merely republish another party's statements, he directly attributed false statements about the election to Dr. Coomer and, in the process, published his own defamation to his millions of Twitter followers.  Thus, the Trump Campaign's reliance on *Barrett v. Rosenthal*, 146 P.3d 510 (Cal. 2006) is misplaced.

219.    Further, even were Eric Trump or former president Trump considered "mere" distributors or re-publishers, this immunity does not extend to a provider's or user's distribution of information it knew or had reason to know was defamatory.  *See Malwarebytes, Inc.*, 141 S. Ct. 15-16.  There is sufficient evidence that Eric Trump, former president Trump, and the Trump Campaign had reason to know Oltmann's statements about Dr. Coomer were false, precluding Section 230 immunity.  Finally, the Trump Campaign again fails to explain how the CDA precludes its own liability considering neither Eric Trump nor former president Trump have been sued in their individual capacities.

220.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against the Trump Campaign.

---

[474] *See* Trump Campaign Reply at 7-8.

120

### ii.    Dr. Coomer has established a prima facie showing of intentional infliction of emotional distress.

221.    Dr. Coomer has made a prima facie showing for intentional infliction of emotional distress.  A claim for intentional infliction of emotional distress requires proof that "(1) the defendant(s) engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress." *Mackall v. JPMorgan Chase Bank, N.A.*, 356 P.3d 946, 955 (Colo. App. 2014) (citing *Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2002), *aff'd*, 90 P.3d 228 (Colo. 2004)). Claims for intentional infliction of emotional distress that are premised on defamatory publications are subject to the same constitutional protections for public speech as applied to claims for defamation.  *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50-52 (1988).  If a statement involves a public official, public figure, or matter of public concern, the plaintiff must also prove falsity and actual malice.  *See id.*  For purposes of this review, a plaintiff need only establish a reasonable probability that he would be able to prove falsity and actual malice at trial. *See Anderson*, 477 U.S. at 252; *see also Young*, 212 Cal. App. 4th at 562 (2012); *Ampex Corp.*, 128 Cal. App. 4th at 1576 (2005).  However, here heightened constitutional protections do not apply because Dr. Coomer is not a public official, public figure, or matter of public concern.  Even if these protections applied, Dr. Coomer has established prima facie evidence of falsity and actual malice.

### a.    Oltmann, FEC United, and Shuffling Madness Media

222.    As to the first element, Dr. Coomer has put forward prima facie evidence that Oltmann et al. engaged in extreme and outrageous conduct.  Extreme and outrageous conduct exists when "the recitation of the facts to an average member of the community would arouse his

resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Han Ye Lee v. Colorado Times, Inc.*, 222 P.3d 957, 963 (Colo. App. 2009). Courts have found allegations of extreme and outrageous conduct sufficient when the statements at issue defame, denigrate, harass, or threaten the plaintiff. *See, e.g.*, *Han Ye Lee*, 222 P.3d at 963 65 (finding a newspaper's unverified statements that a wife failed to testify in her husband's murder trial outrageous); *Meiter v. Cavanaugh*, 580 P.2d 399, 401 (Colo. App. 1978) (finding a tenant's statements suggesting a special influence in judicial proceedings and mocking a landlord's serious physical condition outrageous); *Montoya v. Bebensee*, 761 P.2d 285, 286-90 (Colo App. 1988) (finding alleged bad faith reports of child abuse by an unlicensed mental health provider outrageous); *Ellis v. Buckley*, 790 P.2d 875, 877 (Colo. App. 1990) (finding accusations of theft against an employee with no evidence outrageous); *Rugg v. McCarty*, 476 P.2d 753, 754 56 (Colo. 1970) (finding requests for payment and threats to garnish wages without a judgment outrageous); *Donaldson v. Am. Banco Corp. Inc.*, 945 F. Supp. 1456, 1465 66 (D. Colo. 1996) (finding derogatory comments by a supervisor to pregnant employees outrageous); *Mass v. Martin Marietta Corp.*, 805 F. Supp. 1530, 1543 44 (D. Colo. 1992) (finding racial slurs in an employment setting outrageous). Such a finding is not necessarily predicated on a pattern of conduct.

223.    This is best illustrated in *Han Ye Lee*. There, a plaintiff sued a newspaper for causing her severe emotional distress with a defamatory newspaper article that falsely reported that she declined to testify in her husband's murder trial. *Han Ye Lee*, 222 P.3d at 964. The article implied that the plaintiff was disloyal to her husband and impugned her integrity. *Id.* Further, the evidence established that the defendants published the article recklessly and without verifying the

information.  *Id.*  The court in *Han Ye Lee* explained that a reasonable jury could find such defamatory statements by a newspaper article were extreme and outrageous.  *Id.*

224.    Like *Han Ye Lee*, Oltmann et al. have impugned Dr. Coomer's integrity and reputation by alleging Dr. Coomer conspired to defraud the American public from democratically electing their next president.  It is difficult to comprehend statements more extreme and more damaging than the ones Oltmann et al. have made regarding Dr. Coomer, especially given the fact that Dr. Coomer's professional career was in election services.  There is evidence Oltmann et al. repeatedly, without evidence, falsely accused Dr. Coomer of overturning the presidential election.  These allegations imputed criminal conduct, accused Dr. Coomer of being mentally ill, a sociopath, and claimed that "not one person has said that this person is a decent human being." Further, there is evidence Oltmann et al.'s allegations incited threats of real violence against Dr. Coomer by disclosing his home address, encouraging the public to find him, and calling for him to be put to death.  This is sufficient to establish a prima facie showing that Oltmann et al.'s defamatory statements were extreme and outrageous.

225.    As to the second element, there is prima facie evidence that Oltmann et al. acted recklessly and with the intent to cause Dr. Coomer severe emotional distress.  Intent exists when a defendant engages in conduct with the purpose of causing severe emotional distress to another person or knows that his conduct is certain or substantially certain to have that result.  *Culpepper v. Pearl St. Bldg. Inc.*, 877 P.2d 877, 882-83 (Colo. 1994).  Recklessness exists when, at the time of the conduct, a defendant knew or reasonably should have known that there was a substantial probability that his conduct would cause another severe emotional distress.  *Id.*  Given the nature and scope of Oltmann et al.'s defamation, there is prima facie evidence they knew or should have

known there was a substantial probability that their conduct would cause Dr. Coomer severe emotional distress.  Although heightened constitutional protections for public speech are not applicable here, Dr. Coomer has put forward prima facie evidence establishing both falsity and Oltmann et al.'s actual malice.

226.    As to the third element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by Oltmann et al.'s statements.  *See Paulson v. State Farm Mut. Auto. Ins. Co.*, 867 F. Supp. 911, 919 (C.D. Cal. 1994) (noting that, in order to establish severe emotional distress, the plaintiff must "prove that he suffered objective symptoms of distress.").  Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

227.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against Oltmann et al.

### b.    Malkin

228.    As to the first element, Dr. Coomer has put forward prima facie evidence that Malkin engaged in extreme and outrageous conduct.  Like the defendants above, there is evidence that Malkin repeatedly, without evidence, falsely accused Dr. Coomer of overturning the presidential election.  These allegations imputed criminal conduct as well as professional misconduct.  Further, there is evidence Malkin's allegations incited threats of real violence against Dr. Coomer. This is sufficient to establish a prima facie showing that Malkin's defamatory statements were extreme and outrageous.

229.    As to the second element, there is prima facie evidence that Malkin acted recklessly and with the intent to cause Dr. Coomer severe emotional distress.  Given the nature and scope of Malkin's defamation, there is prima facie evidence she knew or should have known there was a substantial probability that her conduct would cause Dr. Coomer severe emotional distress. *See Culpepper*, 877 P.2d at 882-83. Although heightened constitutional protections for public speech are not applicable here, Dr. Coomer has put forward prima facie evidence establishing both falsity and Malkin's actual malice.

230.    As to the third element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by Malkin's statements. *See Paulson*, 867 F. Supp. at 919.  Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

231.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against Malkin.

### c.    *Hoft and TGP Communications*

232.    As to the first element, Dr. Coomer has put forward prima facie evidence that Hoft-TGP engaged in extreme and outrageous conduct.  Like the defendants above, there is evidence that Hoft-TGP repeatedly, without evidence, falsely accused Dr. Coomer of overturning the presidential election.  These allegations imputed criminal conduct as well as professional misconduct.  There is evidence Hoft-TGP labeled Dr. Coomer an "unhinged sociopath" in an article that was shared with millions of people.  Further, there is evidence Hoft-TGP's allegations

incited threats of real violence against Dr. Coomer, including posting an article advertising a million-dollar bounty on Dr. Coomer.  This is sufficient to establish a prima facie showing that Hoft-TGP's defamatory statements were extreme and outrageous.

233.    As to the second element, there is prima facie evidence that Hoft-TGP acted recklessly and with the intent to cause Dr. Coomer severe emotional distress.  Given the nature and scope of Hoft-TGP's defamation, there is prima facie evidence they knew or should have known there was a substantial probability that their conduct would cause Dr. Coomer severe emotional distress.  *See Culpepper*, 877 P.2d at 882-83.  Although heightened constitutional protections for public speech are not applicable here, Dr. Coomer has put forward prima facie evidence establishing both falsity and Hoft-TGP's actual malice.

234.    As to the third element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by Hoft-TGP's statements.  *See Paulson*, 867 F. Supp. at 919.  Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

235.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against Hoft-TGP.

### d.    Metaxas

236.    As to the first element, Dr. Coomer has put forward prima facie evidence that Metaxas engaged in extreme and outrageous conduct.  Like the Defendants above, there is evidence that Metaxas without evidence, falsely accused Dr. Coomer of overturning the

presidential election.   These allegations imputed criminal conduct as well as professional misconduct.   Further, there is evidence Metaxas's allegations incited threats of real violence against Dr. Coomer.   This is sufficient to establish a prima facie showing that Metaxas's defamatory statements were extreme and outrageous.

237.   As to the second element, there is prima facie evidence that Metaxas acted recklessly and with the intent to cause Dr. Coomer severe emotional distress.   Given the nature and scope of Metaxas's defamation, there is prima facie evidence he knew or should have known there was a substantial probability that his conduct would cause Dr. Coomer severe emotional distress.   *See Culpepper*, 877 P.2d at 882-83. Although heightened constitutional protections for public speech are not applicable here, Dr. Coomer has put forward prima facie evidence establishing both falsity and Metaxas's actual malice.

238.   As to the third element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by Metaxas's statements.   *See Paulson*, 867 F. Supp. at 919.   Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

239.   For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against Metaxas.

        *e.      OAN and Rion*

240.   As to the first element, Dr. Coomer has put forward prima facie evidence that OAN-Rion engaged in extreme and outrageous conduct.   Like the Defendants above, there is

evidence that OAN and Rion without evidence, falsely accused Dr. Coomer of overturning the presidential election.  These allegations imputed criminal conduct as well as professional misconduct.  Further, there is evidence OAN-Rion's allegations incited threats of real violence against Dr. Coomer. This is sufficient to establish a prima facie showing that OAN-Rion's defamatory statements were extreme and outrageous.

241.   As to the second element, there is prima facie evidence that OAN-Rion acted recklessly and with the intent to cause Dr. Coomer severe emotional distress.  Given the nature and scope of OAN-Rion's defamation, there is prima facie evidence they knew or should have known there was a substantial probability that their conduct would cause Dr. Coomer severe emotional distress.  *See Culpepper*, 877 P.2d at 882-83. Although heightened constitutional protections for public speech are not applicable here, Dr. Coomer has put forward prima facie evidence establishing both falsity and OAN-Rion's actual malice.

242.   As to the third element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by OAN-Rion's statements.  *See Paulson*, 867 F. Supp. at 919.   Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

243.   For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against OAN-Rion.

### f.     *Powell, Powell P.C., and Defending the Republic*

244.    As to the first element, Dr. Coomer has put forward prima facie evidence that Powell et al. engaged in extreme and outrageous conduct.  Like the Defendants above, there is evidence that Powell et al. without evidence, falsely accused Dr. Coomer of overturning the presidential election.   These allegations imputed criminal conduct as well as professional misconduct.  Further, there is evidence Powell et al.'s allegations incited threats of real violence against Dr. Coomer. This is sufficient to establish a prima facie showing that Powell et al.'s defamatory statements were extreme and outrageous.

245.    As to the second element, there is prima facie evidence that Powell et al. acted recklessly and with the intent to cause Dr. Coomer severe emotional distress.  Given the nature and scope of Powell et al.'s defamation, there is prima facie evidence they knew or should have known there was a substantial probability that their conduct would cause Dr. Coomer severe emotional distress.  *See Culpepper*, 877 P.2d at 882-83. Although heightened constitutional protections for public speech are not applicable here, Dr. Coomer has put forward prima facie evidence establishing both falsity and Powell et al.'s actual malice.

246.    As to the third element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by Powell et al.'s statements.  *See Paulson*, 867 F. Supp. at 919.  Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

247.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against Powell et al.

g.    *Giuliani*

248.    As to the first element, Dr. Coomer has put forward prima facie evidence that Giuliani engaged in extreme and outrageous conduct.  Like the Defendants above, there is evidence that Giuliani without evidence, falsely accused Dr. Coomer of overturning the presidential election.  These allegations imputed criminal conduct as well as professional misconduct.  Further, there is evidence Giuliani's allegations incited threats of real violence against Dr. Coomer. This is sufficient to establish a prima facie showing that Giuliani's defamatory statements were extreme and outrageous.

249.    As to the second element, there is prima facie evidence that Giuliani acted recklessly and with the intent to cause Dr. Coomer severe emotional distress.  Given the nature and scope of Giuliani's defamation, there is prima facie evidence he knew or should have known there was a substantial probability that his conduct would cause Dr. Coomer severe emotional distress.  *See Culpepper*, 877 P.2d at 882-83. Although heightened constitutional protections for public speech are not applicable here, Dr. Coomer has put forward prima facie evidence establishing both falsity and Giuliani's actual malice.

250.    As to the third element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by Giuliani's statements.  *See Paulson*, 867 F. Supp. at 919.  Because Dr. Coomer

has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

251.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against Giuliani.

### h.    *Trump Campaign*

252.    As to the first element, Dr. Coomer has put forward prima facie evidence the Trump Campaign engaged in extreme and outrageous conduct.   Like the Defendants above, there is evidence that Trump Campaign without evidence, falsely accused Dr. Coomer of overturning the presidential election.   These allegations imputed criminal conduct as well as professional misconduct.   Further, there is evidence the Trump Campaign's allegations incited threats of real violence against Dr. Coomer. This is sufficient to establish a prima facie showing the Trump Campaign's defamatory statements were extreme and outrageous.

253.    As to the second element, there is prima facie evidence the Trump Campaign acted recklessly and with the intent to cause Dr. Coomer severe emotional distress.  Given the nature and scope of the Trump Campaign's defamation, there is prima facie evidence it knew or should have known there was a substantial probability that its conduct would cause Dr. Coomer severe emotional distress.  *See Culpepper*, 877 P.2d at 882-83. Although heightened constitutional protections for public speech are not applicable here, Dr. Coomer has put forward prima facie evidence establishing both falsity and the Trump Campaign's actual malice.

254.    As to the third element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional

distress caused by the Trump Campaign's statements.  *See Paulson*, 867 F. Supp. at 919.  Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

255.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against the Trump Campaign.

### iii.      Dr. Coomer has established a prima facie showing of conspiracy.

256.    Dr. Coomer has made a prima facie showing of civil conspiracy.  To prevail on a claim for civil conspiracy, a plaintiff must prove five elements: "(1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."  *Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo. App. 2006). Conspiracy is a derivative claim based on underlying unlawful conduct.  *See Colo. Cmty. Bank v. Hoffman*, 338 P.3d 390, 397 (Colo. 2013).  Here, Dr. Coomer has premised his conspiracy claims on his claims for defamation and intentional infliction of emotional distress.

### a.      Oltmann, FEC United, and Shuffling Madness Media

257.    As to the first three elements, Dr. Coomer has put forward prima facie evidence that Oltmann, FEC United, and Shuffling Madness Media agreed, by words and conduct, to defame Dr. Coomer.  This was an agreement between two or more persons.  The object to be accomplished was to undermine the legitimacy of the 2020 presidential election by defaming and intentionally inflicting emotional distress on Dr. Coomer.  There is prima facie evidence of a meeting of the

minds on this object and the respective course of action.  This agreement extended to the other defendants in this case.

258.    Dr. Coomer does not need to prove express agreement to establish conspiracy. *See Schneider v. Midtown Motor Co.*, 854 P.2d 1322, 1326-27 (Colo. App. 1992).   Rather, conspiracy may be implied by course of conduct or other circumstantial evidence providing some indicia of agreement.  *Id.* at 1327; *Ferraro v. Convercent, Inc.*, No. 17-CV-00781-RBJ, 2017 WL 4697499, at *5 (D. Colo. Oct. 19, 2017).   Indeed, because few, if any, "smoking guns" are ever discovered, most conspiracy claims are established by circumstantial evidence.  *Lee v. State Farm Mut. Auto. Ins. Co.*, 249 F.R.D. 662, 669 (D. Colo. 2008) ("Circumstantial evidence is not only permissible in determining whether there is illicit conduct or agreement, it is indeed the usual and customary basis for doing so.  Direct evidence is seldom available and few so called 'smoking guns' are ever discovered.  What individuals actually do—and perhaps more significantly what they do not do—is more probative.").  As such, an agreement to conspire may "be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances."  *Wyatt v. Union Mortgage Co.*, 598 P.2d 45, 52 (Cal. 1979). "Tacit consent as well as express approval will suffice to hold a person liable as a coconspirator."  *Id.*

259.    The appellate court in *Schneider* recognized that conspiracy may be implied by a course of conduct and other circumstantial evidence providing "some indicia of agreement in an unlawful means or end."  *See* 854 P.2d at 1326-27.  There the court found that a car dealership's sales to an unlicensed motorist at discount prices to encourage repeat purchases while knowing of the motorist's reckless driving was sufficient evidence for a jury to find a tacit agreement between the dealership and motorist to commit a tortious act.  *See* 854 P.2d at 1326-27.  Similarly, the

appellate court in *Saint John Church in Wilderness v. Scott* found protestors' promotion, preparation, and participation in a protest were sufficient evidence to establish a conspiracy to commit a private nuisance. *See* 194 P.3d 475, 480 (Colo. App. 2008).

260.    Here, there is prima facie evidence that Oltmann conspired with the other defendants in this case. There is evidence Oltmann, as an authorized representative of FEC United and Shuffling Madness Media, defamed and intentionally inflicted emotional distress on Dr. Coomer. Further, there is evidence Oltmann directly coordinated with and served as the source for the other Defendants' defamation and intentional infliction of emotional distress, which includes directly providing information to the Defendants, agreeing to interviews with the Defendants, and publishing the actionable statements in concert with the other Defendants. Indirectly, Oltmann also served as the source of the defamation, which the other Defendants relied upon by republishing his allegations against Dr. Coomer.

261.    As to the fourth element, there is prima facie evidence that Oltmann et al. did defame and intentionally inflict emotional distress on Dr. Coomer, which are unlawful tortious acts. *See See Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049, 1054–55 (Colo. 1995).

262.    As to the fifth element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress caused by Oltmann et al.'s defamation and intentional infliction of emotional distress. *See Paulson*, 867 F. Supp. at 919. Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

263.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for conspiracy against Oltmann et al.

### b.   Malkin

264.    As to the first three elements, Dr. Coomer has put forward prima facie evidence that Malkin agreed with Oltmann, by words and conduct, to defame Dr. Coomer.  This was an agreement between two or more persons.  The object to be accomplished was to undermine the legitimacy of the 2020 presidential election by defaming and intentionally inflicting emotional distress on Dr. Coomer.  There is prima facie evidence of a meeting of the minds on this object and the respective course of action given Malkin's publication of Oltmann's allegations.

265.    There is also prima facie evidence this agreement extended to the other defendants in this case.  As stated above, this conspiracy is unique among conspiracies in that the agreement to delegitimize the results of the election in the event former president Trump lost were overtly public.  Allegations questioning the legitimacy of the 2020 presidential election occurred both prior to and after the election and were led by former president Trump, his campaign, and his supporters.  There is evidence that Malkin was not only aware of but participated in these efforts, advancing various allegations of fraud, which included allegations that Dr. Coomer subverted the presidential election.  As part of those efforts, there is evidence that Malkin directly coordinated with and relied upon Oltmann as the source of their allegations against Dr. Coomer.  Malkin acquired information from Oltmann, agreed to interview Oltmann, and published the actionable statements in concert with Oltmann.  This course of conduct is the same across defendants.  As such, there is evidence that each of the defendants agreed to defame Dr. Coomer for purposes of delegitimizing the election and directly or indirectly relied on Oltmann as the source of their allegations.  *See Schneider*, 854 P.2d at 1326-27; *Saint John Church in Wilderness*, 194 P.3d at 480.

266.     As to the fourth element, there is prima facie evidence that Malkin did defame and intentionally inflict emotional distress on Dr. Coomer, which are unlawful tortious acts. *See Resolution Trust Corp.*, 898 P.2d at 1054–55.   Malkin argues without support some form of special immunity for news media defendants from conspiracy claims.[475]   While there are heightened constitutional protections for public speech in certain circumstances, there is no special immunity for news media defendants from liability for tortious acts committed in the scope of their reporting.   *Curtis Publ'g Co.*, 388 U.S. at 150 (finding news media defendants have "no special immunity from the application of general laws" and "no special privilege to invade the rights and liberties of others").

267.     As to the fifth element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress caused by Malkin's defamation and intentional infliction of emotional distress.   *See Paulson*, 867 F. Supp. at 919.   Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

268.     For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for conspiracy against Malkin.

### c.     *Hoft and TGP Communications*

269.     As to the first three elements, Dr. Coomer has put forward prima facie evidence that Hoft and TGP agreed, by words and conduct, to defame Dr. Coomer.   This was an agreement between two or more persons.   The object to be accomplished was to undermine the legitimacy of the 2020 presidential election by defaming and intentionally inflicting emotional distress on Dr. Coomer.   There is prima facie evidence of a meeting of the minds on this object and the

---

[475] *See* Malkin Reply at 14-15.

respective course of action as Hoft, as an authorized representative of TGP, defamed and intentionally inflicted emotional distress on Dr. Coomer.

270.    There is also prima facie evidence this agreement extended to the other defendants in this case.  This conspiracy is unique among conspiracies in that the agreement to delegitimize the results of the election in the event former president Trump lost were overtly public.  Allegations questioning the legitimacy of the 2020 presidential election occurred both prior to and after the election and were led by former president Trump, his campaign, and his supporters.  There is evidence that Hoft-TGP were not only aware of but participated in these efforts, advancing various allegations of fraud, which included allegations that Dr. Coomer subverted the presidential election.  As part of those efforts, there is evidence that Hoft-TGP directly coordinated with and relied upon Oltmann as the source of their allegations against Dr. Coomer.  Hoft-TGP acquired information from Oltmann, agreed to interview Oltmann, and published the actionable statements in concert with Oltmann.  This course of conduct is the same across defendants.  As such, there is evidence that each of the defendants agreed to defame Dr. Coomer for purposes of delegitimizing the election and directly or indirectly relied on Oltmann as the source of their allegations. *See Schneider*, 854 P.2d at 1326-27; *Saint John Church in Wilderness*, 194 P.3d at 480.

271.    As to the fourth element, there is prima facie evidence that Hoft-TGP did defame and intentionally inflict emotional distress on Dr. Coomer, which are unlawful tortious acts. *See Resolution Trust Corp.*, 898 P.2d at 1054–55.

272.    As to the fifth element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress caused by Hoft-TGP's defamation and intentional infliction of emotional

distress.  *See Paulson*, 867 F. Supp. at 919.  Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

273.     For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for conspiracy against Hoft-TGP.

### d.     *Metaxas*

274.     As to the first three elements, Dr. Coomer has put forward prima facie evidence that Metaxas agreed with Oltmann, by words and conduct, to defame Dr. Coomer.  This was an agreement between two or more persons.  The object to be accomplished was to undermine the legitimacy of the 2020 presidential election by defaming and intentionally inflicting emotional distress on Dr. Coomer.  There is prima facie evidence of a meeting of the minds on this object and the respective course of action given Metaxas's publication of Oltmann's allegations.

275.     There is also prima facie evidence this agreement extended to the other defendants in this case.  As stated above, this conspiracy is unique among conspiracies in that the agreement to delegitimize the results of the election in the event former president Donald Trump lost were overtly public.  Allegations questioning the legitimacy of the 2020 presidential election occurred both prior to and after the election and were led by former president Trump, his campaign, and his supporters.  There is evidence that Metaxas was not only aware of but participated in these efforts, advancing various allegations of fraud, which included allegations that Dr. Coomer subverted the presidential election.  As part of those efforts, there is evidence that Metaxas directly coordinated with and relied upon Oltmann as the source of their allegations against Dr. Coomer.  Metaxas acquired information from Oltmann, agreed to interview Oltmann, and published the actionable statements in concert with Oltmann.  This course of conduct is the same across defendants.  As

such, there is evidence that each of the defendants agreed to defame Dr. Coomer for purposes of delegitimizing the election and directly or indirectly relied on Oltmann as the source of their allegations. *See Schneider*, 854 P.2d at 1326-27; *Saint John Church in Wilderness*, 194 P.3d at 480.

276.    As to the fourth element, there is prima facie evidence that Metaxas did defame and intentionally inflict emotional distress on Dr. Coomer, which are unlawful tortious acts. *See Resolution Trust Corp.*, 898 P.2d at 1054–55.

277.    As to the fifth element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress caused by Metaxas's defamation and intentional infliction of emotional distress. *See Paulson*, 867 F. Supp. at 919.   Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

278.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for conspiracy against Metaxas.

### e.    *OAN and Rion*

279.    As to the first three elements, Dr. Coomer has put forward prima facie evidence that OAN and Rion agreed, by words and conduct, to defame Dr. Coomer.  This was an agreement between two or more persons.  The object to be accomplished was to undermine the legitimacy of the 2020 presidential election by defaming and intentionally inflicting emotional distress on Dr. Coomer.  There is prima facie evidence of a meeting of the minds on this object and the respective course of action as Rion was an authorized agent of OAN and published statements on OAN's broadcasting network.

280.     There is also prima facie evidence this agreement extended to the other defendants in this case.  As stated above, this conspiracy is unique among conspiracies in that the agreement to delegitimize the results of the election in the event former president Trump lost were overtly public.  Allegations questioning the legitimacy of the 2020 presidential election occurred both prior to and after the election and were led by former president Trump, his campaign, and his supporters.  There is evidence that OAN-Rion were not only aware of but participated in these efforts, advancing various allegations of fraud, which included allegations that Dr. Coomer subverted the presidential election.  There is also evidence OAN-Rion directly coordinated with the Trump Campaign and its agents to advance these allegations.  As part of those efforts, there is evidence that OAN-Rion directly coordinated with and relied upon Oltmann as the source of their allegations against Dr. Coomer.  OAN-Rion acquired information from Oltmann, agreed to interview Oltmann, and published actionable statements in concert with Oltmann.  This course of conduct is the same across defendants.  As such, there is evidence that each of the defendants agreed to defame Dr. Coomer for purposes of delegitimizing the election and directly or indirectly relied on Oltmann as the source of their allegations.  *See Schneider*, 854 P.2d at 1326-27; *Saint John Church in Wilderness*, 194 P.3d at 480.

281.     As to the fourth element, there is prima facie evidence that OAN-Rion did defame and intentionally inflict emotional distress on Dr. Coomer, which are unlawful tortious acts. *See Resolution Trust Corp.*, 898 P.2d at 1054–55.

282.     As to the fifth element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress caused by OAN-Rion's defamation and intentional infliction of

emotional distress. *See Paulson*, 867 F. Supp. at 919.  Because Dr. Coomer has suffered objective

and verifiable symptoms of distress, he has made a prima facie showing for this element.

283.   For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that

he will prevail on his claims for conspiracy against OAN-Rion.

### f.   Powell, Powell P.C., and Defending the Republic

284.   As to the first three elements, Dr. Coomer has put forward prima facie evidence

that the Powell, Powell, P.C., and Defending the Republic agreed, by words and conduct, to defame

Dr. Coomer.  This was an agreement between two or more persons.  The object to be accomplished

was to undermine the legitimacy of the 2020 presidential election by defaming and intentionally

inflicting emotional distress on Dr. Coomer.  There is prima facie evidence of a meeting of the

minds on this object as Powell, as an authorized representative of Powell P.C. and Defending the

Republic, defamed and intentionally inflicted emotional distress on Dr. Coomer.

285.   There is also prima facie evidence this agreement extended to the other defendants

in this case.  As stated above, this conspiracy is unique among conspiracies in that the agreement

to delegitimize the results of the election in the event former president Trump lost were overtly

public.  Allegations questioning the legitimacy of the 2020 presidential election occurred both

prior to and after the election and were led by former president Trump, his campaign, and his

supporters.  There is evidence that Powell et al. not only aware of but participated in these efforts,

advancing various allegations of fraud, which included allegations that Dr. Coomer subverted the

presidential election.  As part of those efforts, there is evidence that Powell et al. coordinated with

and relied upon Oltmann as the source of their allegations against Dr. Coomer.  Powell et al. further

republished Oltmann's allegations.  This course of conduct is the same across defendants.  As

such, there is evidence that each of the defendants agreed to defame Dr. Coomer for purposes of delegitimizing the election and directly or indirectly relied on Oltmann as the source of their allegations.  *See Schneider*, 854 P.2d at 1326-27; *Saint John Church in Wilderness*, 194 P.3d at 480.

286.    As to the fourth element, there is prima facie evidence the Powell et al. did defame and intentionally inflict emotional distress on Dr. Coomer, which are unlawful tortious acts. *See Resolution Trust Corp.*, 898 P.2d at 1054-55.

287.    As to the fifth element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress caused by Powell et al.'s defamation and intentional infliction of emotional distress.  *See Paulson*, 867 F. Supp. at 919.  Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

288.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for conspiracy against Powell et al.

### g.    *Giuliani*

289.    As to the first three elements, Dr. Coomer has put forward prima facie evidence that Giuliani, Powell, and the Trump Campaign agreed, by words and conduct, to defame Dr. Coomer.  This was an agreement between two or more persons.  The object to be accomplished was to undermine the legitimacy of the 2020 presidential election by defaming and intentionally inflicting emotional distress on Dr. Coomer.  There is prima facie evidence of a meeting of the minds on this object and the respective course of action as Giuliani and Powell were authorized agents of the Trump Campaign and published their statements on the Trump Campaign's behalf at the same national press conference.

290.     There is also prima facie evidence this agreement extended to the other defendants in this case.  As stated above, this conspiracy is unique among conspiracies in that the agreement to delegitimize the results of the election in the event former president Trump lost were overtly public.  Allegations questioning the legitimacy of the 2020 presidential election occurred both prior to and after the election and were led by former president Trump, his campaign, and his supporters.  There is evidence that Giuliani was not only aware of but participated in these efforts, advancing various allegations of fraud, which included allegations that Dr. Coomer subverted the presidential election.  There is also evidence Giuliani directly coordinated with OAN-Rion to advance these allegations.  As part of those efforts, there is evidence that Giuliani indirectly relied upon Oltmann as the source of his allegations against Dr. Coomer.  Giuliani further republished Oltmann's allegations.  This course of conduct is the same across defendants.  As such, there is evidence that each of the defendants agreed to defame Dr. Coomer for purposes of delegitimizing the election and directly or indirectly relied on Oltmann as the source of their allegations.  *See Schneider*, 854 P.2d at 1326-27; *Saint John Church in Wilderness*, 194 P.3d at 480.

291.     As to the fourth element, there is prima facie evidence the Giuliani did defame and intentionally inflict emotional distress on Dr. Coomer, which are unlawful tortious acts. *See Resolution Trust Corp.*, 898 P.2d at 1054–55.

292.     As to the fifth element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress caused by the Giuliani's defamation and intentional infliction of emotional distress.  *See Paulson*, 867 F. Supp. at 919.  Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

293.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for conspiracy against the Giuliani.

### h.    *Trump Campaign*

294.    As to the first three elements, Dr. Coomer has put forward prima facie evidence that the Trump Campaign, Powell, and Giuliani agreed, by words and conduct, to defame Dr. Coomer.  This was an agreement between two or more persons.  The object to be accomplished was to undermine the legitimacy of the 2020 presidential election by defaming and intentionally inflicting emotional distress on Dr. Coomer.  There is prima facie evidence of a meeting of the minds on this object and the respective course of action as Giuliani and Powell were authorized agents of the Trump Campaign and published their statements on the Trump Campaign's behalf at the same national press conference.

295.    There is also prima facie evidence this agreement extended to the other defendants in this case.  As stated above, this conspiracy is unique among conspiracies in that the agreement to delegitimize the results of the election in the event former president Trump lost were overtly public.  Allegations questioning the legitimacy of the 2020 presidential election occurred both prior to and after the election and were led by former president Trump, his campaign, and his supporters.  There is evidence that the Trump Campaign was not only aware of but participated in these efforts, advancing various allegations of fraud, which included allegations that Dr. Coomer subverted the presidential election.  There is also evidence the Trump Campaign directly coordinated with OAN-Rion to advance these allegations.  As part of those efforts, there is evidence that the Trump Campaign, through its agents, directly and indirectly coordinated with and relied upon Oltmann as the source of its allegations against Dr. Coomer.  The Trump

Campaign further republished Oltmann's allegations.  This course of conduct is the same across defendants.  As such, there is evidence that each of the defendants agreed to defame Dr. Coomer for purposes of delegitimizing the election and directly or indirectly relied on Oltmann as the source of their allegations.  *See Schneider*, 854 P.2d at 1326-27; *Saint John Church in Wilderness*, 194 P.3d at 480.

296.    As to the fourth element, there is prima facie evidence the Trump Campaign did defame and intentionally inflict emotional distress on Dr. Coomer, which are unlawful tortious acts.  *See Resolution Trust Corp.*, 898 P.2d at 1054–55.

297.    As to the fifth element, there is prima facie evidence that Dr. Coomer has suffered severe emotional distress caused by the Trump Campaign's defamation and intentional infliction of emotional distress.  *See Paulson*, 867 F. Supp. at 919.  Because Dr. Coomer has suffered objective and verifiable symptoms of distress, he has made a prima facie showing for this element.

298.    For the foregoing reasons, Dr. Coomer has established a reasonable likelihood that he will prevail on his claims for conspiracy against the Trump Campaign.

### iv.    Dr. Coomer has established a prima facie showing for injunctive relief.

299.    Dr. Coomer requests a permanent injunction against Defendants in the event he prevails on his claims for defamation and intentional infliction of emotional distress.  Only some of the Defendants raised challenges to Dr. Coomer's request for injunctive relief.[476]  To prevail on a request for permanent injunction, a party must prove: "(1) he or she has achieved actual success on the merits; (2) irreparable harm will result unless the injunction is issued; (3) the threatened

---

[476] *See* Oltmann, et al. Mot. at 13-15; Hoft-TGP Mot. at 23; Metaxas Mot. at 11 (incorporating C.R.C.P. 12(b)(5) motion to dismiss by reference); Metaxas C.R.C.P. 12(b)(2) and 12(b)(5) Mot. at 14-15; OAN-Rion Mot. at 25; Powell Mot. at 7, n.5; DTR Mot. at 8, n.5; Giuliani Mot. at 22.

injury outweighs the harm that the injunction may cause to the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Langlois v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 78 P.3d 1154, 1158 (Colo. App. 2003). Injunctive relief is appropriate when a defendant continues to publish defamatory statements about an individual. *Sunward Corp. v. Dun & Bradstreet, Inc.*, 568 F. Supp. 602, 609 (D. Colo. 1983), *rev'd on other grounds*, 811 F.2d 511 (10th Cir. 1987) ("First Amendment rights are not absolute, and if the First Amendment right is not deemed paramount, injunctive relief is appropriate if there is no adequate remedy at law."); *see also Beauharnais v. People of State of Ill.*, 343 U.S. 250, 256, (1952) (noting that defamatory statements are not entitled to First Amendment protection).

300.     Injunctive relief is not a claim subject to review under C.R.S. § 13-21-1101, *et seq.* It is a remedy Dr. Coomer has sought in the event he prevails on his claims against Defendants. As such, review of that relief at this stage of the proceeding is premature and unwarranted. The Court denies Defendants' challenges to this relief.

301.     Even were this relief subject to review at this time, Dr. Coomer has made a prima facie showing for permanent injunctive relief. Dr. Coomer has established a reasonable probability of prevailing on each of his claims against Defendants and, therefore, a likelihood of succeeding on the merits of his case.

302.      Dr. Coomer has established irreparable harm unless the injunction is issued. There is prima facie evidence that Defendants published false and defamatory statements about Dr. Coomer.   There is also evidence that Defendants have not retracted or removed these statements. "[D]efamatory statements are so egregious and intolerable because the statement destroys an individual's reputation: a characteristic which cannot be bought, and one that, once

lost, is extremely difficult to restore." *Keohane*, 882 P.2d at 1298 (citing *Curtis Publ'g Co.*, 388 U.S. at 152 (noting that libel is as serious as the keeping of dangerous animals and the use of explosives).  Courts have long recognized the irreparable, incalculable injuries people suffer from defamatory statements.  *See id.*; *see also Hayes v. Todd*, 15 So. 752, 755 (Fla. 1894) (discussing why there is such a compelling interest in preventing and redressing attacks upon an individual's reputation).  The evidence of damages Dr. Coomer has suffered to his reputation, privacy, and safety is sufficient to establish that irreparable harm would result if an injunction against Defendants was not issued.

303.    Dr. Coomer has further put forward evidence sufficient to show the threatened injury to him would outweigh the harm that injunctive relief may cause to Defendants.  Defamation has no constitutional value or protection.  Whereas a person's reputation is a protected liberty interest.  *Gertz*, 418 U.S. at 341.  The harm to Dr. Coomer's reputation, privacy, and safety outweighs the injunctive relief sought to compel the removal of published statements that have been adjudicated as defamatory.

304.    Similarly, there is evidence that injunctive relief will not adversely affect a public interest.  There is no constitutional value in false statements of fact.  *See Gertz*, 418 U.S. at 340.  To the contrary, the public has an active interest in ensuring that there are remedies for defamatory statements.  *See Keohane*, 882 P.2d at 1298.  Here, there will be no adverse public interest if Defendants cannot publish statements determined to be defamatory.

305.    Subject to the adjudication of his claims, Dr. Coomer has established a prima facie basis for injunctive relief.

**C.**   ***Defendants' requests for attorney's fees are not warranted under the anti-SLAPP statute and are denied.***

306.   The purpose of the Colorado anti-SLAPP statute is to ensure that "participation in matters of public significance" is not "chilled through abuse of the judicial process." C.R.S. § 13-20-1101(1)(a).  At the same time, the Colorado Legislature sought to "protect the rights of persons to file meritorious lawsuits for demonstrable injury." C.R.S. § 13-20-1101(b).

307.   In line with that purpose, section (4)(a) of the statute provides in part that "a prevailing defendant on a special motion to dismiss is entitled to recover the defendant's attorney's fees and costs." C.R.S. § 13-20-1101(4)(a).  Conversely, the statute provides that "[i]f the court finds that a special motion to dismiss is frivolous or is solely intended to cause unnecessary delay . . . the court shall award costs and reasonable attorney fees to a plaintiff prevailing on the motion." *Id.*  The statute does not define "prevailing," nor have any courts in Colorado interpreted this provision under the statute.   Under California law, the determination as to whether a party "prevails" on an anti-SLAPP motion lies with the discretion of the trial court.  *See Mann v. Quality Old Time Serv., Inc.*, 139 Cal. App. 4th 328, 340 (2006).  Courts interpreting the California anti-SLAPP statute have held that "fees awarded to a defendant who was only partially successful on the anti-SLAPP motion should be commensurate with the extent to which the motion changed the nature and character of the lawsuit in a particular way." *Mann*, 139 Cal. App. 4th at 340.  In certain cases, a defendant's success at only dismissing certain claims can be an "illusory victory" if it fails to change the landscape of facts relevant to determining the rest of the lawsuit, thus making an award of any fees inappropriate.  *See Moran v. Endres*, 135 Cal. App. 4th 952, 954 (2006).  This is comparable to awards under C.R.S. § 13-17-201 where fees are awarded only when

an entire tort action is dismissed and not merely individual claims.  *See Dubray v. Intertribal Bison Coop.*, 192 P.3d 604, 606-07 (Colo. App. 2008).

308.   Because Defendants have not prevailed on their special motions to dismiss, Defendants are not entitled to costs or reasonable attorneys' fees.

Respectfully submitted,

*/s/ Charles J. Cain*

Charles J. Cain, No. 51020
Steve Skarnulis, No. 21PHV6401
Bradley A. Kloewer, No. 50565
Zachary H. Bowman, No. 21PHV6676
Thomas M. Rogers III, No. 28809
Mark Grueskin, No. 14621
Andrew Ho, No. 40381

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Proposed Findings of Fact and Conclusions of Law for the Defendants' special motions to dismiss under C.R.S. § 13-20-1101, *et seq.* has been served on all parties receiving notice through ICCES on this 17th day of December 2021.

*/s/ Charles J. Cain*

Charles J. Cain