## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| US DOMINION, INC., *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> HERRING NETWORKS, INC., *et al.*, <br><br> *Defendants*. | Civil Action No. 1:21-cv-02130 (CJN) |

## MEMORANDUM OPINION

US Dominion, Inc. and other related corporate entities claim that One America News Network ("OAN"), as well as four other Defendants associated with OAN, defamed Dominion in connection with the 2020 presidential election.  Defendants have moved to dismiss or stay this action under the *Colorado River* doctrine.  Alternatively, Defendants move to transfer this case to the United States District Court for the District of Colorado.  And should the Court deny both motions, three Defendants—OAN, Robert Herring, and Charles Herring—argue that the claims against them must be dismissed for lack of personal jurisdiction.  For the reasons that follow, the Court denies Defendants' motions.

### I.    Factual Background

### A.  The Parties

US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (together, "Dominion") are organized as US Dominion, Inc., a Delaware corporation with its principal place of business in Denver, Colorado.  *See* Compl. ¶¶ 14, 54, ECF No. 1. Dominion contracts with state and local governments across the country to supply its voting

systems and services in elections. *Id.* ¶ 55. Local election officials use Dominion's voting machines to tabulate votes and count paper ballots. *Id.* ¶ 56.

OAN is a cable news company wholly owned by Herring Networks, Inc. *Id.* ¶ 17. Although headquartered in California, OAN also has an operational presence in the District of Columbia. *Id.* For example, OAN maintains a news bureau and a studio in the District, and some of its content is produced here. *Id.* Aside from its cable news channel, OAN runs social media accounts and releases content on its website, OANN.com, as well as on digital platforms like YouTube and Rumble. *Id.*

Robert Herring is the CEO of OAN, and his son, Charles Herring, is the President of the network. *Id.* ¶ 18. Dominion alleges that the Herrings exercise tight control over the network's news coverage, especially when it comes to stories of high import. *Id.* Some of those stories are referred to internally as "H stories," which are stories that OAN *must* run upon request from the Herrings. *Id.* ¶ 19. For these stories, Dominion alleges, the Herrings assume full editorial control over the content—the usual editorial team in California plays little to no role. *Id.*

Chanel Rion is the Chief White House Correspondent for OAN. *Id.* ¶ 21. She resides in the District of Columbia and works out of OAN's D.C. bureau. *Id.* Christina Bobb is the former host of "Weekly Briefing" on OAN, which is recorded in and broadcast from the District of Columbia. *Id.* ¶ 22. Like Rion, Bobb is a District resident and worked out of OAN's D.C. bureau. *Id.*

Dominion claims that OAN and the other Defendants defamed it by spreading false statements about its role in the 2020 election. Most of these statements were broadcast by OAN on its cable channel.

### B.  Examples of Allegedly Defamatory Statements

Dominion's complaint organizes the allegedly defamatory statements under 25 headings. *See id.* ¶ 305(a)–(y).  The statements included under each heading vary in length and content, as well as in the identity of the speaker, but they all feature a common allegation:  The 2020 presidential election was either compromised or rigged, and Dominion's voting machines were responsible.

Shortly after the election, for example, OAN broadcast a segment on its cable channel titled, "REPORT: DOMINION DELETED 2.7M TRUMP VOTES NATIONWIDE." *Id.* ¶ 305(a). Similar claims were made in the following days and months.  For instance, Rion claimed on air that Dominion's voting system was "proven to have actually glitched in favor of Biden in at least three states." *Id.*  ¶ 305(b).  She also stated that "the bottom line is votes were switched from President Trump to President—to now Joe Biden, and it happened in dozens of states, and it's a Dominion System software glitch that we are going to dig into." *Id.* ¶ 305(c).

Other statements asserted that Dominion intentionally manipulated the vote.  Soon after the election, an individual named Joe Oltmann appeared on an OAN program and claimed that a former Dominion executive named Eric Coomer had bragged on a conference call that "Trump is not going to win, I made F'ing sure of that." *Id.* ¶ 305(d).  A few days later, in an OAN special called "Dominion-izing the Vote," Oltmann repeated his allegation against Coomer. *Id.* ¶ 305(f). OAN re-aired "Dominion-izing the Vote" twice in December 2020. *Id.* ¶ 305(i)–(j).

Around the same time, former New York City mayor Rudy Giuliani appeared on a live OAN broadcast and stated that Dominion may be "getting paid millions to help Biden win." *Id.* ¶ 305(h).  In another OAN broadcast, Giuliani claimed that Dominion's voting machines were "programmed to give somewhere between a two and five percent advantage [to Biden]." *Id.*

¶ 305(k).  And in still another broadcast, Giuliani stated that "the Dominion machines . . . were basically built to cheat."  *Id.* ¶ 305(n).

Mike Lindell, founder and CEO of My Pillow, Inc., also made frequent appearances on OAN.  Over several months, OAN aired—and re-aired—multiple documentaries made by and starring Lindell, including "Absolute Proof with Mike Lindell," "Scientific Proof with Mike Lindell," "Absolute Interference with Mike Lindell," and "Absolutely 9-0 with Mike Lindell."  *Id.* ¶ 305(p)–(x).  These programs included numerous statements about Dominion's role in the 2020 election.  For example, Lindell announced:  "I have proof, a hundred percent proof that our country was attacked by China, by Communism coming in, this foreign interference to our elections through the machines, Dominion, Smartmatic, ES & S, all of them."  *Id.* ¶ 305(s).  In multiple OAN segments, Lindell repeated his claim that China influenced the 2020 election by hacking Dominion's voting machines.  *Id.* ¶ 305(t)–(u).

In a May 2021 broadcast, Bobb discussed fraud in the 2020 election.  She stressed that "[t]he only people who had absolute control over the election equipment was Dominion."  *Id.* ¶ 305(v).  She lamented that local election officials "didn't bother to insure that there was no manipulation," but instead "just took Dominion's word for it, despite the fact that there were weird mathematical patterns, and many experts stated the numbers indicated fraud."  *Id.*

The above quotes are just a sample of the allegedly defamatory statements that Dominion claims Defendants made (or disseminated).  Because Defendants do not move to dismiss for failure to state a claim, the Court need not decide whether Dominion has adequately alleged that these and other statements are defamatory.  Instead, the Court includes the statements to provide the factual context needed to decide the pending motions.

## II.   Procedural Background

In August 2021, Dominion filed this suit.  All Defendants later moved to dismiss or stay the action under the doctrine established in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).  *See* Defs.' Mot. to Dismiss, Stay, or Transfer ("Defs.' Mot."), ECF No. 41.  According to Defendants, federal deferral is appropriate because there is a parallel action pending in Colorado state court.  *See Coomer v. Donald J. Trump for President, Inc.*, Case No. 2020CV034319.  That action—which predates this one by nearly eight months and names OAN and Rion as defendants—was filed by Eric Coomer, the former Dominion executive who allegedly bragged about rigging the 2020 election.  Coomer no longer works for Dominion, and Dominion is not a party to the Colorado suit.  *See* Defs.' Mot. at 9, 14 n.8.

Defendants also filed two alternative motions.  First, all Defendants move to transfer this case to the United States District Court for the District of Colorado under 28 U.S.C. § 1404(a).  *Id.* at 16.  Second, OAN and the Herrings move to dismiss the claims against them for lack of personal jurisdiction.  *Id.* at 27.

## III.   Legal Standards

"The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it."  *Colo. River*, 424 U.S. at 813 (quotations omitted).  The Supreme Court has recognized several different types of abstention.  *See*, *e.g.*, *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941); *Younger v. Harris*, 401 U.S. 37 (1971).  The *Colorado River* doctrine,[1] in particular, "permits a federal court to stay or dismiss

---

[1] Although courts often use the phrase "*Colorado River* abstention," the Court of Appeals has suggested that this is a misnomer, because the doctrine does not rest "'on considerations of state-

a federal action in favor of a concurrent action in state court under 'exceptional circumstances.'" *Edge Inv., LLC v. District of Columbia*, 927 F.3d 549, 550 (D.C. Cir. 2019) (quoting *Colo. River*, 424 U.S. at 813)).  Such deferral "rest[s] on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Colo. River*, 424 U.S. at 817 (cleaned up).  When a court invokes *Colorado River*, "it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983).

"For the convenience of parties and witnesses" and "in the interest of justice," a court may transfer a case "to any other district . . . where it might have been brought." 28 U.S.C. § 1404(a). The decision to transfer a case is within the district court's discretion and calls for "an individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quotations omitted).  "The moving party bears the initial burden of establishing that transfer is proper." *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of Interior*, 358 F. Supp. 3d 1, 6 (D.D.C. 2019).

To survive a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff must establish "a factual basis for the exercise of personal jurisdiction over the defendant." *Fawzi v. Al Jazeera Media Network*, 273 F. Supp. 3d 182, 185 (D.D.C. 2017) (quotations omitted).  "In the absence of an evidentiary hearing," the plaintiff "can satisfy that burden with a *prima facie* showing" of pertinent jurisdictional facts. *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (quotations omitted).  This showing may rest on the pleadings, *see id.*, and "factual discrepancies

---

federal comity or on avoidance of constitutional decisions.'" *Edge*, 927 F.3d at 554 n.5 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 14–15 (1983)).

appearing in the record must be resolved in favor of the plaintiff," *Crane v. New York Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990).

## IV.    Analysis

### A. *Colorado River*

The *Colorado River* doctrine seeks to avoid duplicative litigation when there are parallel proceedings pending in state and federal court.  Both the Supreme Court and the Court of Appeals have repeatedly held, however, that "the pendency of an action in the state court is [generally] no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Colo. River*, 424 U.S. at 817 (quotations omitted); *Edge*, 927 F.3d at 552 (quotations omitted).  That is because federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River*, 424 U.S. at 817.

For this reason, only "exceptional circumstances" and "the clearest of justifications will warrant" deferral based on concurrent state and federal proceedings. *Edge*, 927 F.3d at 552–53 (quotations omitted).  When a federal court invokes *Colorado River*, it "necessarily contemplates that," upon resolution of the state proceeding, it "will have nothing further to do in resolving any substantive part of the case." *Moses H. Cone*, 460 U.S. at 28.  If the federal court "has any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all." *Id.*

Defendants argue that this case should be dismissed in its entirety—or at the very least stayed—under *Colorado River*.  Defs.' Mot. at 10.  They contend that deferral is warranted because, in their view, this action and the *Coomer* action involve the same parties and the same allegedly defamatory statements. *Id.* at 12–13.  According to Defendants, deferral is therefore necessary to avoid potentially conflicting findings and judgments. *Id.* at 13.

Dominion counters by arguing that the federal abstention doctrines—including the *Colorado River* doctrine—allow for *dismissal* only of suits seeking equitable relief, not suits that (like Dominion's) seek damages.  *See* Dominion's Opp'n to Defs.' Mot. ("Dominion's Opp'n") at 4–5, ECF No. 45 (citing *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 719 (1996)).  What is more, Dominion contends that this action and the *Coomer* action are not "parallel"—and thus *Colorado River* is wholly inapposite—because the cases involve different parties and different issues.  *Id.* at 7–9.  And even putting all that aside, Dominion maintains that this case does not present the type of "exceptional circumstances" warranting deferral.  *Id.* at 11.

Dominion is correct that *Quackenbush* forecloses Defendants' request for *dismissal*.  There, the Supreme Court explained that "federal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary."  *Quackenbush*, 517 U.S. at 731.  As for suits seeking damages, the Supreme Court observed that it has "applied abstention principles . . . only to permit a federal court to enter a stay order that *postpones* adjudication of the dispute, not to dismiss the federal suit altogether."  *Id.* at 719.

Defendants argue that it is far from settled that *Quackenbush*, which involved *Burford* abstention, applies to cases involving the *Colorado River* doctrine.  *See* Defs.' Reply in Support of the Mot. to Dismiss, Stay, or Transfer ("Defs.' Reply") at 9, ECF No. 47.  But Defendants "do[] not explain why that distinction matters, especially in light of *Quackenbush*'s references to the Court's general abstention principles."  *Jefferson-11th St., LLC v. District of Columbia*, Civ. A. No. 19-1416 (CJN), 2020 WL 3035038, at *4 (D.D.C. June 5, 2020) (quotations omitted).  Simply put, a fair reading of *Quackenbush* does not permit the *dismissal* of this case under *Colorado River*.

But the Court still may enter a *stay* if *Colorado River*'s "exceptional-circumstances test" is met. *Edge*, 927 F.3d at 553 (quoting *Moses H. Cone*, 460 U.S. at 19). As to the possibility of this litigation being stayed, Dominion contends that *Colorado River* is inapplicable as a threshold matter because this case and the litigation in Colorado are not "parallel actions" but instead involve *different* parties and *different* issues. And, Dominion argues, exceptional circumstances do not justify deferral.

Dominion's threshold argument has merit. After all, if the state and federal proceedings are not parallel—that is, if the proceedings involve different parties litigating different issues— then it is hard to see how the state-court litigation could be an "adequate vehicle for the complete and prompt resolution of the issues between the parties" in federal court. *Moses H. Cone*, 460 U.S. at 28; *see also id.* ("[T]he decision to invoke *Colorado River* necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case, whether it stays or dismisses.").

Other courts have accordingly adopted some version of Dominion's proposed threshold test. *See, e.g., vosRosenberg v. Lawrence*, 849 F.3d 163, 168 (4th Cir. 2017) ("In deciding whether [to defer under *Colorado River*], a court must first determine whether the federal and state actions are parallel," which requires "substantially the same parties litigat[ing] substantially the same issues." (quotations omitted)); *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 518 (7th Cir. 2001) ("In evaluating the propriety of the district court's decision to abstain under *Colorado River*, we must first determine whether the federal and foreign proceedings are parallel."); *Ambrosia Coal & Constr. Co. v. Pages Morales*, 368 F.3d 1320, 1330 (11th Cir. 2004) ("[W]e hold that *Colorado River* analysis is applicable as a threshold matter when federal and state proceedings involve substantially the same parties and substantially the same issues."). Courts in this District have

applied the same principle.  *See*, *e.g.*, *Saddler v. AMEC Foster Wheeler Env't & Infrastructure, Inc.*, 253 F. Supp. 3d 210, 219–20 (D.D.C. 2017) (concluding that the absence of the sole federal defendant from the state-court action "alone[] provide[d] sufficient basis to deny" the defendant's deferral request, because the state action could not "possibly resolve the dispute between the parties in [the federal] action").

Applying this threshold test here, the Court concludes that deferral is improper because this action and the *Coomer* action are not parallel proceedings under *Colorado River*.  To begin, there is minimal overlap between the parties in the cases.  The sole plaintiff in the Colorado case— Eric Coomer, a former Dominion employee who has no current affiliation with the company—is not a party here, and of the 14 defendants named in the Colorado action, only two—OAN and Rion—are also named in this federal action.  *See id.* at 220 (concluding that deferral was improper because the sole defendant in the federal action was not a party in the state action).

Defendants argue that Coomer "effectively *is* Dominion and every statement OAN has made about Dominion is also a statement about Dr. Coomer (and *vice versa*)."  Defs.' Reply at 1. To support this contention, Defendants cite a statement from Coomer in which he asserts that he is "the face of the Dominion conspiracy theory" and that there is "no discernable distinction between references to Dr. Coomer and Dominion."  *Id.*  And at oral argument, Defendants even claimed that issues decided against Coomer in the state action will have preclusive effect against Dominion in this federal action.  *See* 4/20/2022 Oral Argument Tr. 8:4–8.

Not so.  When asked to provide their best evidence for the proposition that Dominion and Coomer are the same party, counsel for Defendants responded, "My best argument for that is that Dr. Coomer says he is Dominion."  *Id.* at 68:17–21.  Coomer may have said that, but his saying it does not make it so.  After all, Coomer is no longer an employee of Dominion.  Nor did he file his

suit on Dominion's behalf.  To the contrary, Coomer's complaint alleges that OAN (and others) "invaded *his* privacy, threatened *his* security, and fundamentally defamed *his* reputation across this country."  Coomer Compl. ¶ 1, ECF No. 41-11 (emphasis added).  And he requests relief ordering OAN (and others) "to remove any and all defamatory publications made about *Dr. Coomer*," not publications made about Dominion.  *Id.* at 63–64 (emphasis added).[2]

Defendants' second argument is more modest.  They argue that two cases are parallel for purposes of *Colorado River* so long as the parties are "substantially similar."  Defs.' Reply at 3.  The Court of Appeals has not had occasion to define substantial similarity, but another circuit has explained that parties are "substantially the same under the *Colorado River* doctrine [if] they have nearly identical interests."  *Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1019 (7th Cir. 2014) (quotations omitted).

But even if Coomer and Dominion have identical interests, a fundamental problem remains—there is virtually no overlap between the issues in the two cases.  In its recent order denying the defendants' anti-SLAPP motions, the Colorado court confirmed that the *Coomer* action centers on the allegation that Coomer bragged on a conference call about subverting the 2020 election.  *See Coomer v. Donald J. Trump for President, Inc.*, Case No. 2020CV034319, 2022 WL 12611311, at *1, 36–51 (Colo. Dist. Ct. May 13, 2022).  Regardless of how the Colorado court resolves that issue, it will not address all the other statements at issue here.  *See* Compl. at ¶ 305(a)–(y).

The Court is therefore not persuaded that the *Coomer* action "will be an adequate vehicle for the complete and prompt resolution of the issues between the parties."  *Moses H. Cone*, 460

---

[2] Defendants insist that they intend to join Dominion as a party in the *Coomer* action.  *See* Defs.' Reply at 22.  But "[t]he issue is whether [the *Coomer* action], as it *currently* exists, *is* a parallel, state-court proceeding."  *Crawley v. Hamilton Cty. Comm'rs*, 744 F.2d 28, 31 (6th Cir. 1984).

U.S. at 28.  Instead, deferral would only delay the adjudication of Dominion's claims.  That said, the Court of Appeals has never applied a threshold test in one of its *Colorado River* cases to determine whether the state and federal proceedings are parallel.  Instead, the Court of Appeals considers various factors to assess whether *Colorado River*'s exceptional-circumstances test is satisfied.  *See, e.g., Edge*, 927 F.3d at 554–61.  Those factors include the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, the order in which jurisdiction was obtained by the concurrent forums, whether federal or state law controls, and whether the state forum will adequately protect the interests of the parties.  *See id.* at 554, 554 n.6.  "[I]t is not enough that the factors favoring deferral outnumber those opposed (or neutral).  Rather, the factors favoring deferral must themselves be exceptional."  *Id.* at 554.  The Court will therefore consider whether those factors favor deferral.

The first factor—the inconvenience of the federal forum for the parties involved—does not favor deferral.  Two of the Defendants reside in the District of Columbia, and OAN maintains a news bureau and a studio here.  As for the Herrings, Dominion alleges that the two regularly conduct business in the District.  *See* Compl. ¶ 20.  At the very least, Defendants identify no exceptional circumstances that would warrant deferral based on this factor.

The second factor is the desirability of avoiding piecemeal litigation.  In condemning "piecemeal litigation," the Supreme Court in *Colorado River* was not condemning "the mere risk of duplicating efforts and different results."  *Edge*, 927 F.3d at 555.  As the Court explained, "the mere potential for conflict in the results of adjudications, does not, without more, warrant staying exercise of federal jurisdiction."  *Colo. River*, 424 U.S. at 816.  Instead, deferral is justified under this factor only if "the circumstances enveloping th[e] cases will *likely* lead to piecemeal litigation

that is *abnormally excessive or deleterious*." *Edge*, 927 F.3d at 556 (quotations omitted) (emphasis added).

Yet here, as in *Edge*, "mere duplication and potential inconsistency—in their simplest forms—are all we have." *Id.* Indeed, the case for deferral is arguably weaker here than it was in *Edge*, because in that litigation, "the vast majority of claims [asserted] in federal court were also asserted in the Superior Court," "both cases [arose] from the same core set of facts," and "the issues [would] be resolved largely by reference to the same evidence." *Id.* (cleaned up). Moreover, because OAN and Rion are parties to both actions, the doctrines of res judicata and collateral estoppel may apply to them, which mitigates some of the risk of inconsistent results. *See id.*

In short, Defendants do not identify any exceptional circumstances that would likely lead to "abnormally excessive or deleterious" inconsistencies between the state and federal actions at issue. *Id.* ("[H]ypothetical conflicts over discrete issues do not amount to an exceptional circumstance."). This case instead presents "a garden-variety example of two lawsuits proceeding concurrently in two courts." *Id.*

The next factor is the order of jurisdiction. It is certainly the case, as Defendants note, that the *Coomer* action was filed nearly eight months before the federal action. Defs.' Mot. at 13. Even so, "there is nothing exceptional about the relative progress of the two cases." *Edge*, 927 F.3d at 557; *see also id.* (holding that a fifteen-month gap between case filings did not present an exceptional circumstance justifying deferral, in contrast to a case with a four-year gap). Indeed, not much has happened in the *Coomer* action—the court relatively recently denied the defendants' special motions to dismiss under Colorado's anti-SLAPP statute, which provides a procedural mechanism for dismissing frivolous claims in the early stages of a case. Because the relative progress of the two cases is not exceptional, this factor does not favor deferral.

13

Next up is whether federal or state law controls. Defendants contend that Colorado law governs this case, and they stress that Colorado law on defamation affords greater protection to speech than the First Amendment. Defs.' Mot. at 13–14. Even if Defendants were right that Colorado law controls—and it is not clear that they are—this factor would not support deferral. That is because "[t]he mere absence of federal law . . . does not counsel in favor of abstention, particularly where, as here, there are no complex or novel state law issues." *1443 Chapin St., LP v. PNC Bank, Nat. Ass'n*, 718 F. Supp. 2d 78, 85 (D.D.C. 2010). Defendants have not identified a complex or novel state law question in this case; they simply contend that Colorado applies the familiar "actual malice" standard to a broader range of speech. And even if the legal issues were complex, "[t]he presence of novel or difficult state-law questions in federal court litigation is not exceptional. Federal courts exercising diversity jurisdiction frequently decide just such questions." *Edge*, 927 F.3d at 559.

The final factor is whether the state court could adequately protect the interests of the parties. To be sure, there is no reason to doubt the Colorado court in this regard. But this fact, essentially standing alone, cannot justify the surrender of the Court's jurisdiction. Again, in applying *Colorado River*, the lodestar is whether *exceptional* circumstances warrant deferral. *See Moses H. Cone*, 460 U.S. at 25–26. That high bar is not met by a mere showing that a state court could adequately hear the case. *See 1443 Chapin St.*, 718 F. Supp. 2d at 85.

In sum, Defendants have not identified any "exceptional circumstances" that can overcome the Court's "virtually unflagging obligation to exercise its jurisdiction." *Edge*, 927 F.3d at 561 (quotations omitted). Considering all the relevant factors, "with the balance heavily weighted in favor of the exercise of jurisdiction," *Moses H. Cone*, 460 U.S. at 16, the Court holds that federal deferral is unwarranted under *Colorado River*.

### B.  Transfer

In the alternative, Defendants move to transfer this case to the United States District Court for the District of Colorado.  The Court conducts a two-step inquiry to determine whether to grant that motion.  First, the Court must consider "whether the transferee forum is one where the action 'might have been brought' originally."  *Forest Cty. Potawatomi Cmty. v. United States*, 169 F. Supp. 3d 114, 117 (D.D.C. 2016) (quoting 28 U.S.C. § 1404(a)).  Second, the Court must consider "whether private and public interest factors weigh in favor of transfer."  *Id.*  Private interest factors include:  "(1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof."  *Brannen v. Nat'l R.R. Passenger Corp.*, 403 F. Supp. 2d 89, 92 (D.D.C. 2005).  Public interest factors include:  "(1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home."  *Id.* at 95.

Defendants' motion to transfer fails at step one.  As the movants, Defendants "bear[] the initial burden of establishing that transfer is proper."  *Mandan, Hidatsa & Arikara Nation*, 358 F. Supp. 3d at 6.  Yet Defendants did not even try to show that Dominion could have properly filed this suit in Colorado.  For starters, Defendants' opening brief offers zero analysis on whether a Colorado court could exercise personal jurisdiction over them.  Defendants simply assert that they would "stipulate to personal jurisdiction in Colorado for the purposes of this case."  Defs.' Mot. at 16.  But "the § 1404(a) phrase 'where it might have been brought' can[not] be interpreted to mean . . . 'where it may now be rebrought, with defendants' consent.'"  *Hoffman v. Blaski*, 363 U.S. 335, 342–43 (1960).  The alternative, said the Supreme Court, "would empower a District Court, upon a finding of convenience, to transfer an action to any district desired by the defendants and in

which they were willing to waive their statutory defenses as to venue and jurisdiction over their persons, regardless of the fact that such transferee district was not one in which the action 'might have been brought' by the plaintiff." *Id.* at 344.

Defendants also do not devote a single sentence—in either their opening brief or their reply—to the question of venue. Venue is proper in the district where (1) any defendant resides, if all defendants reside in the same state; (2) "a substantial part" of the events giving rise to the suit occurred; or (3) if venue would not be proper in any district for those reasons, wherever the defendants are subject to personal jurisdiction. 28 U.S.C. § 1391(b). Yet no Defendant resides in Colorado. Nor could Defendants plausibly argue that conduct in Colorado comprises "a substantial part" of the events giving rise to Dominion's claims, which focus on statements made by Defendants. Defendants have thus failed to establish that Dominion could have properly filed this suit in the District of Colorado, and their motion to transfer can be denied on that basis alone.

In addition, neither the private nor the public interest factors weigh in favor of transfer. Start with the private interest factors. "[A]lthough the plaintiff's choice of forum is usually granted substantial weight, it is given less deference when the plaintiff chooses a foreign forum." *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 69 (D.D.C. 2021) ("*Dominion I*"). Still, "a plaintiff's choice of a foreign forum is entitled to some weight when there is a nexus between that forum and the events giving rise to the plaintiff's claims." *Id.* Such a nexus exists here: Dominion alleges that "OAN's Dominion-related content was produced and broadcast through OAN's Washington, D.C. office." Compl. ¶ 17.

Defendants argue that their choice of forum—Colorado—is entitled to deference because Dominion is headquartered in Colorado and because Coomer has already sued OAN and Rion there. Although "a defendant's choice of forum is a consideration when deciding a § 1404(a)

motion, it is not ordinarily entitled to deference." *Douglas v. Chariots for Hire*, 918 F. Supp. 2d 24, 32 (D.D.C. 2013).   And when, as here, "Defendants move to transfer over Plaintiff's opposition, they must establish that the added convenience and justice of litigating in their chosen forum overcomes the deference ordinarily given to Plaintiff's choice." *Id.*  Defendants have not made that showing.  After all, Rion is a District of Columbia resident, and as explained below, OAN conducts extensive business here.

The next factor—where the claims arose—also weighs against transfer.  "Courts in this district have held that claims 'arise' under 28 U.S.C. § 1404(a) in the location where the corporate decisions underlying those claims were made, or where most of the significant events giving rise to the claims occurred."  *Id.* (cleaned up).  Based on Dominion's Complaint, that location is the District of Columbia, because that is where allegedly defamatory segments were made, filmed, and/or produced.  *See* Compl. ¶¶ 17, 21–22.  By contrast, Defendants do not identify *any* conduct in Colorado that gives rise to Dominion's claims.

The remaining private interest factors—the convenience of the parties and witnesses, and the ease of access to sources of proof—likewise do not favor transfer.  Rion and Bobb reside in the District of Columbia, and OAN conducts substantial business here.  As for the Herrings, Dominion alleges that they have engaged in business negotiations in the District and regularly travel to OAN's D.C. bureau for purposes of oversight.  *See id.* ¶ 20; *see also* Dominion's Opp'n, Ex. 3 ¶ 9 (Declaration of Charles Herring).  At the very least, the Court finds that the Herrings would suffer only a minor inconvenience by being forced to travel to the District; that inconvenience does not tip the scales in favor of transfer.

As to the convenience of potential witnesses—who, according to the parties' briefing, are spread out across the country—the Court finds that this factor does not weigh heavily in favor of

either forum.  Although Colorado may be more convenient for some witnesses, the District of

Columbia will likely be more convenient for others.  Finally, much of the relevant evidence will

be based in the District, because that is where the allegedly defamatory statements were filmed

and produced.  *See* Compl. ¶¶ 17, 21–22.  To be sure, evidence related to the integrity of

Dominion's voting machines will likely be based in Colorado, because that is where Dominion is

headquartered.  But "technological advances have significantly reduced the weight of the ease-of-

access-to-proof factor."  *Douglas*, 918 F. Supp. 2d at 33 (quotations omitted).

Turning to the public interest factors, Defendants argue that Colorado law applies and thus

the District of Colorado is more familiar with the governing law.  Because this action was filed in

the District of Columbia, D.C. choice-of-law rules apply.  *Wu v. Stomber*, 750 F.3d 944, 949 (D.C.

Cir. 2014).  And under D.C. choice-of-law principles, the Court must "apply the tort law of the

jurisdiction that has the most significant relationship to the dispute."  *Id.* (quotations omitted).  This

inquiry turns on "[1] where the injury occurred, [2] where the conduct causing the injury occurred,

[3] the domicile, residence, nationality, place of incorporation and place of business of the parties,

and [4] the place where the relationship is centered."  *Id.* (quotations omitted).

Dominion claims that it suffered reputational injury nationwide; its injuries, it asserts, are

not centered in either Colorado or the District of Columbia.  *See* Compl. ¶¶ 301–02 (noting that

Defendants' allegedly defamatory statements have placed "Dominion's contracts in more than two

dozen states and hundreds of counties and municipalities at risk").  Allegedly defamatory

broadcasts that caused Dominion's injury, by contrast, were filmed and produced at OAN's D.C.

bureau.  Indeed, none of Defendants' allegedly defamatory conduct occurred in Colorado. What is

more, although Dominion is headquartered in Colorado, no Defendant is based there—again, Rion

and Bobb are D.C. residents, and OAN and the Herrings conduct substantial business in the

District.  Finally, both sides agree that the fourth factor—where the parties' relationship is centered—is neutral because the parties do not have a relationship centered in either forum. Accordingly, it is not obvious that Colorado law will apply; at a minimum, "it is as likely at this stage that District of Columbia substantive law will apply given [Dominion's] theory of tortious conduct," and Defendants have "not shown that it is more likely than not that the transferee forum would have more familiarity with the applicable law."  *Robinson v. Eli Lilly and Co.*, 535 F. Supp. 2d 49, 54 (D.D.C. 2008).

As for the remaining public interest factors, the relative congestion of the court calendars offers little guidance—the median time from filing to trial is shorter in the District of Colorado, while the median time from filing to disposition is shorter here.[3]  Finally, Defendants have not identified a "local interest" in Colorado that can outweigh the District of Columbia's interest in deciding Dominion's claims, given that some of the conduct underlying those claims occurred here.  *See Dominion I*, 554 F. Supp. 3d at 71 ("Minnesota's interest in deciding controversies regarding the Lindell Defendants is outweighed by this district's interest in controversies arising from events that occurred here.").

In sum, Defendants have failed to show that transfer is warranted for two independent reasons.  First, Defendants made no effort to show that the District of Colorado "is one where the action 'might have been brought' originally."  *Forest Cty. Potawatomi Cmty.*, 169 F. Supp. 3d at 117 (quoting 28 U.S.C. § 1404(a)).  Second, neither the private nor the public interest factors weigh in favor of transfer.

---

[3]  United States District Courts – National Judicial Caseload Profile, US Courts, https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0630.2022_0.pdf (last visited Oct. 31, 2022).

## C.  Personal Jurisdiction

OAN and the Herrings also move to dismiss the claims against them for lack of personal jurisdiction.  A federal court has personal jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."  Fed. R. Civ. P. 4(k)(1)(A).  "If a District of Columbia court could exercise jurisdiction over the Defendants, then so can this Court."  *Dominion I*, 554 F. Supp. 3d at 65.

"A court may assert general, or all purpose, jurisdiction over a defendant in its home state," or it "may exercise specific, or case-based, jurisdiction over a defendant if the plaintiff's claims arise out of or relate to the defendant's forum state contacts."  *Smartmatic USA Corp. v. Herring Networks, Inc.*, Civ. A. No. 21-2900 (CJN), --- F. Supp. 3d ---, 2022 WL 2208913, at *3 (D.D.C. June 21, 2022) (cleaned up).  Here, Dominion asserts only specific jurisdiction.  *See* Dominion's Opp'n at 37–38; Defs.' Reply at 22 n.18 (noting that Dominion does not argue that the Court has general jurisdiction over OAN or the Herrings).

To assess whether personal jurisdiction exists, the Court "must first examine whether jurisdiction is applicable under [D.C.'s] long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process."  *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).  The District of Columbia's long-arm statute authorizes personal jurisdiction "over a person, who acts directly or by an agent, as to a claim for relief arising from the" person:

(1) transacting any business in the District of Columbia;

(2) contracting to supply services in the District of Columbia;

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; [or]

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C. Code § 13-423(a). "The District's first prong has been given an expansive interpretation that coextends with the Fourteenth Amendment's Due Process Clause," which requires that a defendant have "minimum contacts with the state in which the plaintiff filed the lawsuit." *Smartmatic USA*, --- F. Supp. 3d ---, 2022 WL 2208913, at *3 (quotations omitted). The burden is on Dominion to establish personal jurisdiction over each Defendant, but "factual discrepancies appearing in the record must be resolved" in Dominion's favor. *See Crane*, 894 F.2d at 456.

### 1. OAN

In *Smartmatic USA*, the Court held that it had specific personal jurisdiction over Smartmatic's defamation claims against OAN. *See* --- F. Supp. 3d ---, 2022 WL 2208913, at *3–5. In doing so, the Court observed that "OAN launched its network through a partnership with *The Washington Times*; leases office and studio space in the District; built a broadcast studio in the District; broadcasts television programs from the District; issues press releases from the District; advertises in the District to promote its network; and produces and disseminates content (including allegedly false and defamatory statements about Smartmatic) from the District." *Id.* at *3. The Court also noted that "but for OAN leasing television production studio and office space, advertising its programming, and promoting its network with guests, OAN's allegedly false and defamatory statements would not have made it on the airwaves." *Id.*

So too here. Like Smartmatic, Dominion claims that OAN's allegedly defamatory statements arise out of OAN's business transactions in the District. Specifically, Dominion alleges that OAN maintains and operates a news bureau in the District; films, produces, reviews, edits, and broadcasts programming from the District, including the allegedly defamatory programming

at issue here; and employs (or employed) the D.C.-resident individuals who made some of the statements while on air in the District.  *See* Compl. ¶¶ 17, 21–22, 43.  These facts suffice to establish personal jurisdiction under § 13-423(a)(1) of the District's long-arm statute, which covers, among other things, "'business transactions' in the everyday sense of commercial deal-making activities like advertising, operating office space, and performing contracts."  *Smartmatic USA*, --- F. Supp. 3d ---, 2022 WL 2208913, at *3.  They also suffice to establish personal jurisdiction under the Due Process Clause.  *See GTE New Media Servs. Inc.*, 199 F.3d at 1347 ("Section (a)(1)'s 'transacting any business' clause generally has been interpreted to be coextensive with the Constitution's due process requirements and thus to merge into a single inquiry."); *see also Smartmatic USA*, --- F. Supp. 3d ---, 2022 WL 2208913, at *5 ("[I]f § 13-423(a)(1) has been satisfied then any added requirement emanating from the Due Process Clause has been satisfied, too.").

Personal jurisdiction also exists under the District's long-arm statute because OAN allegedly "caus[ed] tortious injury in the District of Columbia by an act or omission in the District of Columbia."  D.C. Code § 13-423(a)(3).  Again, Dominion alleges that OAN made numerous defamatory statements in the District.  *See* Compl. ¶ 43.  And although those statements may have caused injury nationwide, Dominion plausibly alleges that it suffered injury in the District as well—the District, after all, is home to many influential policymakers with whom Dominion has an interest in maintaining its reputation.  *See Dominion I*, 554 F. Supp. 3d at 67.

OAN contends that specific jurisdiction is lacking here because Dominion's claims do not arise from OAN's business transactions in the District.  *See* Defs.' Mot. at 29–30; *see also* Defs.' Reply at 23.  According to OAN, Dominion's claims instead arise from news segments that were broadcast nationwide from California.  Defs.' Mot. at 18 n.9.  But Dominion also alleges that OAN

filed, produced, reviewed, and edited the defamatory programming at its D.C. bureau. *See* Compl. ¶ 43. Put another way, if Dominion's allegations are true—and OAN offers no basis for concluding otherwise—then OAN's D.C. bureau was the editorial epicenter for the programming at issue.

At oral argument, OAN advanced a new theory by arguing that the so-called "newsgathering exception" bars the exercise of personal jurisdiction. Putting aside whether OAN may have forfeited this argument by not presenting it in its briefs, the newsgathering exception does not apply here. Under the exception, news outlets "whose presence in Washington consists of mere collection of news material for use in subsequent publication elsewhere" are not subject to personal jurisdiction under D.C.'s long-arm statute.[4] *Shirlington Limousine and Transp., Inc. v. San Diego Union-Trib.*, 566 F. Supp. 2d 1, 4 (D.D.C. 2008). But OAN did not merely gather news in the District; instead, as alleged by Dominion, OAN also filmed and produced defamatory programming here. *Cf. id.* at 2 (noting that "the research, writing, and publication [of the defamatory articles] took place entirely within San Diego" and that the D.C. bureau provided "no assistance . . . in preparing the[] articles"). And far from covering news "for a local audience outside the District," *Lewy v. S. Poverty L. Ctr., Inc.*, 723 F. Supp. 2d 116, 127 (D.D.C. 2010), OAN "aimed its allegedly defamatory and false statements to at least some residents of the District," *Smartmatic USA*, --- F. Supp. 3d ---, 2022 WL 2208913, at *4; *see also Lewy*, 723 F. Supp. 2d at 127 ("SPLC's newsgathering efforts . . . are aimed at a national audience that includes D.C. residents.").

---

[4] The Court assumes without deciding that the newsgathering exception applies to D.C. Code §§ 13-423(a)(1) and (3).

## 2.   The Herrings

For substantially the same reasons discussed above, the Herrings are also subject to personal jurisdiction in the District.  According to the Complaint, the Herrings exercised complete control over the Dominion-related content produced at OAN's D.C. bureau.  Specifically, Dominion alleges that "[t]he false Dominion stories were examples of what were referred to internally at OAN as 'H stories'—that is, stories that the Herrings personally approved and required OAN to run, with the Herrings exercising control over their content, and without the California editorial team (or anyone else) fact checking the stories or vetting sources."  Compl. ¶ 19; *see also id.* ¶ 20 ("The Herrings both regularly send information to and receive information from the Washington, D.C. bureau as part of their close oversight and editorial supervision of the work done by the reporters there.").  Charles Herring, for example, allegedly "reviewed drafts, and approved final drafts for broadcasting, of at least some of the false Dominion stories," *id.* ¶ 19, and "he regularly travels to OAN's Washington, D.C. bureau as part of his oversight and control of its operations," *id.* ¶ 20.  Robert Herring, for his part, is described as the "de facto news director" for the network, and he exercises "a ton of influence over every aspect of the newscast."  *Id.* ¶ 18 (quotations omitted).

In short, Dominion has alleged that the Herrings transacted business in the District by personally overseeing and directing publication of the Dominion-related content at OAN's D.C. bureau.  That allegation is enough to support personal jurisdiction under both the District's long-arm statute, *see* §§ 13-423(a)(1), (a)(3), and the Due Process Clause.[5]

_____

[5] Even if the Herrings did not themselves make the allegedly defamatory statements, Dominion's claims, as alleged, still arise from or relate to the Herrings' transactions in the District because "one is liable for the publication of defamation by a third person whom as his servant, agent or otherwise he directs or procures to publish defamatory matter."  Restatement (Second) of Torts § 577, cmt. f.

### V.    Conclusion

For the above reasons, the Court denies Defendants' motions in full.  An Order will be entered contemporaneously with this Memorandum Opinion.

DATE:  November 7, 2022

_____
CARL J. NICHOLS
United States District Judge

---

Moreover, the Herrings cannot find shelter in the so-called "corporate shield" doctrine—a doctrine that the Court of Appeals recently repudiated.  *See Urquhart-Bradley v. Mobley*, 964 F.3d 36, 46 (D.C. Cir. 2020) ("[C]ourts cannot ignore contacts made by the individual just because they were made in his or her capacity as an employee or corporate officer.  Contacts are contacts and must be counted.").