**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| US DOMINION, INC., *et al.*, <br><br> Plaintiffs/Counterclaim Defendants, <br><br> v. <br><br> HERRING NETWORKS, INC., *et al.*, <br><br> Defendants/Counterclaim Plaintiffs/Third-Party Plaintiffs, <br><br> v. <br><br> AT&T SERVICES, INC., *et al.*, <br><br> Third-Party Defendants. | Case No. 1:21-cv-02130-CJN <br><br> Judge Carl J. Nichols |

**THIRD-PARTY DEFENDANT AT&T SERVICES, INC.'S MEMORANDUM OF**
**POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**

Marcellus McRae (admitted *pro hac vice*)
M. Theodore Takougang (admitted *pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071
MMcRae@gibsondunn.com
TTakougang@gibsondunn.com

Ashley E. Johnson (admitted *pro hac vice*)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
AJohnson@gibsondunn.com

Howard S. Hogan (DC Bar No. 492002)
1050 Connecticut Avenue, N.W.
Washington, DC 20036
HHogan@gibsondunn.com

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

    A.    Dominion Sues Herring for Defamation ................................................ 3

    B.    Herring Sues AT&T Services, Mr. Kennard, and Others in California State Court ................................................................................................................... 3

    C.    Herring Responds to Setbacks in San Diego by Filing Counterclaims and a Third-Party Complaint in This Case ....................................................... 4

SUMMARY OF ARGUMENT ............................................................................................ 8

LEGAL STANDARD .......................................................................................................... 8

ARGUMENT ...................................................................................................................... 10

    A.    Herring Fails to Allege a Plausible Causation Theory to Support Its Indemnity Claim ............................................................................................ 10

    B.    The Contractual Indemnification Claim Must Be Dismissed Against AT&T Services Because AT&T Services Assigned the Contract to DIRECTV ....................................................................................................... 14

    C.    Herring Fails to Plausibly Allege That AT&T Services Breached the Non-Disparagement Clause of the Contract ........................................... 17

        1.    Statements by CNN and HBO Personalities Are Not Attributable to AT&T Services and Do Not Constitute Disparagement Under the Contract ..................................................................................... 17

        2.    Mr. Kennard's Alleged Statements Do Not Constitute Disparagement, and Could Not Have Triggered an Indemnification Obligation ............................................................................................... 21

CONCLUSION .................................................................................................................. 23

## TABLE OF AUTHORITIES

Page(s)

CASES

*Ahmed v. U.S. Dep't of Homeland Sec.*,
2022 WL 17851410 (D.D.C. July 7, 2022)............................................................................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................................9

*Belizan v. Hershon*,
434 F.3d 579 (D.C. Cir. 2006) ...........................................................................................9, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................................................9

*\*Braun v. U.S. Postal Service*,
2017 WL 4325645 (D.D.C. Sept. 27, 2017) ..........................................................................12

*Brookens v. Solis*,
635 F. Supp. 2d 1 (D.D.C. 2009) ..........................................................................................9

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
287 F. Supp. 2d 1118 (C.D. Cal. 2003)................................................................................17

*\*Christian v. Giant Food Stores*,
2022 WL 594532 (D.D.C. Feb. 28, 2022)..............................................................................12

*Conant v. Wells Fargo Bank, N.A.*,
24 F. Supp. 3d 1 (D.D.C. 2014) ............................................................................................9

*Cuscinetti v. Beaver Precision Products*,
1996 WL 743801 (N.D. Cal. Dec. 23, 1996) ........................................................................15

*DriveWealth, LLC v. Elec. Transaction Clearing, Inc.*,
2019 WL 8227082 (C.D. Cal. Dec. 23, 2019) ......................................................................21

*\*Eaton Hydraulics Inc. v. Cont'l Cas. Co.*,
132 Cal. App. 4th 966 (2005)...............................................................................................16

*Ellington v. EMI Music, Inc.*,
24 N.Y. 3d 239 (2014) ..........................................................................................................19

*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978)..............................................................................................................21

# TABLE OF AUTHORITIES
## (*Cont'd.*)

Page(s)

*Florio v. Gallaudet Univ.*,
    619 F. Supp. 3d 36 (D.D.C. 2022) ...................................................................22

*Freedom Watch, Inc. v. Google, Inc.*,
    368 F. Supp. 3d 30 (D.D.C. 2019) ...................................................................9

*Harris v. Mayorkas*,
    2022 WL 3452316 (D.D.C. Aug. 18, 2022)......................................................12

*\*Hearn Pac. Corp. v. Second Gen. Roofing, Inc.*,
    247 Cal. App. 4th 117 (2016)...........................................................................14

*Hellenic Petroleum v. Sacramento Energy Res.*,
    2019 WL 4747794 (E.D. Cal. Sept. 30, 2019)..................................................22

*\*Heppler v. J.M. Peters Co.*,
    73 Cal. App. 4th 1265 (1999)...........................................................................17

*Herring Networks, Inc. v. AT&T Inc., et al.*,
    No. 37-2022-00008623-CU-BC-CTL (San Diego Superior Ct.) ......................4

*Hinton v. Corr. Corp. of Am.*,
    624 F. Supp. 2d 45 (D.D.C. 2009) ...................................................................9

*Kaempe v. Myers*,
    367 F.3d 958 (D.C. Cir. 2004) .........................................................................10

*Kashmiri v. Regents of Univ. of Cal.*,
    156 Cal. App. 4th 809 (2007)...........................................................................20

*Klein v. Chevron U.S.A., Inc.*
    202 Cal. App. 4th 1342 (2012)..........................................................................21

*Liftech Consultants Inc. v. Samsung Shipbuilding & Heavy Indus., Ltd.*,
    2010 WL 4510905 (N.D. Cal. Nov. 2, 2010)....................................................17

*Revitch v. DIRECTV, LLC*,
    977 F.3d 713 (9th Cir. 2020)........................................................................17, 18

*Roden v. AmerisourceBergen Corp.*,
    186 Cal. App. 4th 620 (2010)............................................................................20

*Sandza v. Barclays Bank PLC*,
    151 F. Supp. 3d 94 (D.D.C. 2015) .................................................................9, 14

# TABLE OF AUTHORITIES
## (*Cont'd.*)

Page(s)

*SEC v. RPM Int'l, Inc.*,
 282 F. Supp. 3d 1 (D.D.C. 2017) ....................................................................9, 18

*\*Smith v. Shimizu*,
 544 F. Supp. 2d 15 (D.D.C. 2008) .......................................................................12

*Tule Lake Comm. v. City of Tulelake*,
 2020 WL 1169273 (E.D. Cal. Mar. 11, 2020) .....................................................19

*Unova, Inc. v. Acer Inc.*,
 363 F.3d 1278 (Fed. Cir. 2004)............................................................................19

*US Dominion, Inc. v. Fox News Network, LLC*,
 2021 WL 1153152 (Del. Super. Ct.) (filed Mar. 26, 2021).....................................6

*\*Valley Crest Landscape Dev., Inc. v. Mission Pools of Escondido, Inc.*,
 238 Cal. App. 4th 468 (2015)...............................................................................16

*Veg-Mix, Inc. v. U.S. Dep't of Agric.*,
 832 F.2d 601 (D.D.C. 1987).....................................................................................9

*VKK Corp. v. Nat'l Football League*,
 244 F.3d 114 (2d Cir. 2001) .................................................................................19

**STATUTES**

*\*Cal. Civ. Code § 1457 ...........................................................................................14

Cal. Civ. Code § 1644 ..............................................................................................19

**OTHER AUTHORITIES**

AT&T Inc., Form 8-K (June 15, 2018),
 https://www.sec.gov/Archives/edgar/data/732717/000119312518194502/d609728d8k.htm.18

Black's Law Dictionary (10th ed. 2014)...................................................................19

Jacob Shamsian, *Trump-ally media outlet OAN quietly deleted articles about Dominion despite publicly doubling down on election conspiracy theories*, BUSINESS INSIDER, Jan. 20, 2021, https://www.businessinsider.com/oan-deletes-articles-about-dominion-voting-election-conspiracy-2021-1 ...............................................................................13

Michael M. Grynbaum, *One America News, the Network That Spreads Conspiracies to the West Wing*, THE NEW YORK TIMES, June 9, 2020 .................................................13

Philip Bump, *The most fervently pro-Trump cable network offers a concise lesson in creating fake news*, THE WASHINGTON POST, June 15, 2020.......................................13

## TABLE OF AUTHORITIES
### (*Cont'd.*)

Page(s)

**RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................................................9

**INTRODUCTION**

After *eighteen months* of defending against Dominion's defamation lawsuit, Herring decided it was AT&T Services, Inc.'s fault that it got sued. According to Herring, Dominion sued Herring not because of the many allegedly disparaging statements made by Herring about Dominion (as detailed in Dominion's complaint), but because of allegedly disparaging statements about Herring made by AT&T Inc.'s Chairman of the Board, William Kennard, as well as certain CNN and HBO on-air personalities. And because those statements purportedly caused Dominion's lawsuit, Herring claims that AT&T Services must indemnify Herring under the terms of an unrelated carriage agreement by which AT&T Services and DIRECTV agreed that DIRECTV would broadcast Herring's One America News Network and A Wealth of Entertainment television channels.

Herring's unsupported assertions and contradictory reasoning fall far short of stating a plausible claim for indemnification and should be dismissed for at least three reasons:

- *First*, and most glaringly, Herring's claim rests on the utterly implausible theory that Dominion decided to sue Herring because CNN and HBO personalities allegedly disparaged OAN on-air and because Mr. Kennard allegedly disparaged OAN in private correspondence with individuals not alleged to be affiliated with Dominion. Herring offers not a single fact to explain why Dominion would have been influenced in any way by commentary by these individuals, much less facts from which the Court can plausibly infer that the alleged disparagement caused Dominion to sue. To the contrary, Dominion has already stated categorically that it sued Herring not because of some third party's conduct, but because Herring accused Dominion of helping to rig the 2020 presidential election. Even worse, in the case of Mr. Kennard, his allegedly disparaging statements occurred two months *after* Dominion had already sued Herring, rendering

Herring's causation theory not just implausible, but impossible.

- *Second*, as Herring concedes in its Amended Third-Party Complaint, AT&T Services "fully assigned" the carriage agreement with Herring to DIRECTV. AT&T Services had no indemnity obligation before this assignment because the indemnity claim had not yet accrued. And post-assignment, AT&T Services has no indemnity obligation because it is no longer a party to the contract.

- *Third*, even if AT&T Services were still bound by the carriage agreement, Herring offers no well-pleaded allegations to support its theory that AT&T Inc.'s ownership of CNN and HBO is sufficient to impute CNN and HBO commentators' statements to AT&T Services. Herring's theory of imputation is based exclusively on conclusory assertions, speculation, and legal conclusions, none of which can overcome a motion to dismiss. And Herring's attempt to impute Mr. Kennard's alleged statements to AT&T Services fails too because Mr. Kennard's statements were not disparaging and could not have caused Dominion's lawsuit.

Herring's Amended Third-Party Complaint is not its first attempt to blame AT&T Services for its woes; Herring already sued AT&T Services, along with DIRECTV, AT&T Inc., and Mr. Kennard, in San Diego Superior Court, alleging, among other things, that AT&T Services and AT&T Inc. breached the carriage agreement by allegedly disparaging Herring. Having seen the bulk of its claims against DIRECTV dismissed under California's anti-SLAPP law (the claims against AT&T Services, which have similar flaws, are the subject of various motions to dismiss expected to be argued later this year), Herring attempts a federal court do-over by contorting the disparagement claim from San Diego into an indemnification claim in this Court. Because Herring

has not plausibly pleaded any breach of the carriage agreement by AT&T Services, much less any breach that proximately caused Dominion's lawsuit, and because AT&T Services is no longer a party to the contract, this desperate gambit should be dismissed.

## BACKGROUND

### A.     Dominion Sues Herring for Defamation

On August 10, 2021, Dominion[1] filed a detailed 213-page complaint alleging that Herring Networks, Inc., Charles Herring, Robert Herring, Chanel Rion, and Christina Bobb (collectively, "Herring") were liable for defamation *per se* based on Herring's "outlandish and far-fetched fictions" and "spiral of lies" that Dominion committed election fraud by rigging the 2020 presidential election. ECF No. 1 ¶¶ 2–3. After requesting and receiving two extensions of time to respond to the complaint, *see* ECF Nos. 27, 40, Herring moved to dismiss or stay the case under the *Colorado River* doctrine, and, alternatively, moved to transfer the case to the United States District Court for the District of Colorado. ECF No. 41. The Court denied the motion on November 7, 2022. ECF Nos. 55, 56. Herring again requested two extensions of time to answer the complaint, which the Court again granted. ECF Nos. 57, 58. Herring answered Dominion's complaint on January 20, 2023. ECF No. 59. At no point during this period did Herring mention AT&T Services or "contractual indemnity" in any of its various filings.

### B.     Herring Sues AT&T Services, Mr. Kennard, and Others in California State Court

Seven months after getting sued by Dominion in this Court, Herring on March 7, 2022 filed a lawsuit in San Diego Superior Court against AT&T Services, AT&T Inc., Mr. Kennard, and DIRECTV, LLC ("DIRECTV") ("San Diego Lawsuit"). *See* Third-Party Defendants' Request for

---

[1] For purposes of this motion, "Dominion" refers collectively to Plaintiffs US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation.

Judicial Notice ("RJN"), McRae Ex. 1, *Herring Networks, Inc. v. AT&T Inc., et al.*, No. 37-2022-00008623-CU-BC-CTL (San Diego Superior Ct.), Complaint.  In that suit, Herring alleges, among other things, that AT&T Services breached the non-disparagement provision of a contract under which AT&T Services and DIRECTV agreed that DIRECTV would broadcast Herring's One America News Network ("OAN") and A Wealth of Entertainment television channels ("Contract").  Herring also alleges that AT&T Services and Mr. Kennard tortiously interfered with the Contract by influencing DIRECTV's decision not to renew the Contract with Herring, even though the Contract does not provide Herring any right of renewal.  *See* RJN, McRae Ex. 1.  In bringing its San Diego Lawsuit, Herring made no mention of AT&T Services' purported "contractual indemnity" obligation, and certainly did not claim that the alleged disparagement led to Dominion's suit filed in this Court months earlier.

All defendants in the San Diego Lawsuit filed motions to dismiss the complaint and motions to strike under California's anti-SLAPP law, and AT&T Inc. and Mr. Kennard also filed motions to quash for lack of personal jurisdiction.  On January 13, 2023, the San Diego court in large part granted DIRECTV's motion to strike and motion to dismiss. RJN, McRae Ex. 3, *Herring Networks, Inc. v. AT&T Inc., et al.*, No. 37-2022-00008623-CU-BC-CTL (San Diego Superior Ct.), Minute Order dated January 13, 2023.  In doing so, the court adopted the core arguments that AT&T Services makes in its separate motions to dismiss and strike.  *Id.*  Assuming the San Diego court applies the same reasoning to AT&T Services' motions as it applied to DIRECTV's motions, Herring's claims will be all but foreclosed.

## C.  Herring Responds to Setbacks in San Diego by Filing Counterclaims and a Third-Party Complaint in This Case

On February 3, 2023, just three weeks after its loss in the San Diego Lawsuit (and nearly a year and a half after Dominion sued Herring), Herring filed Counterclaims against Dominion

and a Third-Party Complaint against AT&T Services and Mr. Kennard that largely recycles the disparagement allegations from the San Diego Lawsuit, this time under a manufactured claim of "indemnification."[2] As in the San Diego case, here, Herring alleges that after a lawsuit between the parties, AT&T Services, DIRECTV, and Herring entered into the Contract in March 2017, pursuant to which DIRECTV would broadcast OAN and A Wealth of Entertainment for five years.[3] ECF No. 85 ("Am. Third-Party Compl.") ¶¶ 39–41, 44. AT&T Services later assigned its interest in the Contract to DIRECTV. *Id.* ¶ 42. Herring alleges that, in April 2020, CNN and HBO media personalities purportedly began disparaging OAN. *Id.* ¶¶ 56–66.

According to Herring, Reuters on October 6, 2021 published an article entitled "How AT&T helped build far-right One America News," in which a reporter claimed that AT&T financially supported OAN. *See id.* ¶¶ 102–07. AT&T Services put out a statement denying the allegations in the article, and according to Herring, "liberal organizations" began criticizing AT&T based on its perceived support of OAN. *Id.* ¶¶ 103–04. On January 14, 2022, DIRECTV allegedly informed Herring that it would not be renewing the Contract for "political" reasons. *Id.* ¶ 120. Herring further alleges that critical statements by HBO and CNN media personalities in 2020 and 2021, and by Mr. Kennard in October 2021 (*id.* ¶¶ 68–71, 188), caused Dominion to sue Herring.[4]

---

[2] On May 5, 2023, Herring filed its Amended Third-Party Complaint making similarly baseless allegations, but Christina Bobb did not join that pleading and instead dropped her claims against AT&T Services and Mr. Kennard in response to Mr. Kennard's notice of his intent to seek Rule 11 sanctions for the original Third-Party Complaint. *See* ECF No. 85. After Mr. Kennard again sent notice of his intent to seek Rule 11 sanctions—this time in response to the Amended Third-Party Complaint—the remaining Herring Third-Party Plaintiffs (*i.e.*, Herring Networks, Inc., Charles Herring, Robert Herring and Chanel Rion) voluntarily dismissed their claims against Mr. Kennard. *See* ECF No. 101. Accordingly, Mr. Kennard is no longer a party in these proceedings.

[3] The Contract is governed by California law. Contract § 13.

[4] In addition to the many reasons this theory is nonsensical, it defies belief given Dominion's defamation lawsuits against Fox News, Newsmax, and others, especially considering that

Herring premises its claims here, and in San Diego, on a convoluted and speculative conspiracy theory that Mr. Kennard influenced (in some vague and unidentified way) DIRECTV's and Dominion's independent decisions because of Mr. Kennard's politics and his involvement with Staple Street.

Based on this hypothesis, Herring's Amended Third-Party Complaint asserts a single cause of action against AT&T Services: contractual indemnity. *Id.* ¶¶ 184–91. Herring claims that under the Contract, AT&T Services should be defending Herring against Dominion's defamation suit because it was AT&T Services' breach of the Contract that precipitated Dominion's suit in the first place. *Id.* ¶¶ 188–91. Herring offers no explanation linking Dominion's decision to sue with the allegedly disparaging statements of CNN and HBO commentators, or with Mr. Kennard's private communications with individuals unaffiliated with Dominion.[5] In fact, Herring pleads the exact opposite: Dominion was motivated not by any statements by AT&T Services, news commentators, or Mr. Kennard (whose allegedly disparaging statements occurred *after* Dominion had already sued Herring), but by a desire "to unlawfully interfere with, disparage, and destroy viewpoints politically and financially detrimental to [it]." *Id.* ¶ 13. And at no point did Herring

---

Dominion's lawsuit against Fox News predates its lawsuit against Herring by almost five months. *See US Dominion, Inc. v. Fox News Network, LLC*, 2021 WL 1153152 (Del. Super. Ct.) (filed Mar. 26, 2021). Clearly, Dominion was independently bringing these defamation claims against news organizations that made allegedly false statements about Dominion in connection with the presidential election, including the instant one against Herring.

[5] Herring alleges that the statements of CNN and HBO media personalities are attributable to AT&T Services because AT&T Services is owned by AT&T Inc. and CNN and HBO were also at the time owned by AT&T Inc. through its WarnerMedia division. *See* Am. Third-Party Compl. ¶¶ 23, 56–66.

ever notify or inform AT&T Services that it was asserting an indemnification right, as required by the indemnification notice provisions of the Contract.[6]

Herring's theory of indemnification relies on two provisions of the Contract—Sections 8.2(a) and 16.3. Section 8.2 states, in relevant part:[7]

> Affiliate shall indemnify, defend and hold harmless each of [Herring], its parent company and its Affiliated Companies, contractors, subcontractors, authorized agents, each supplier to [Herring] of any portion of any Service under this Agreement and each participant therein and the directors, officers, employees and agents of [Herring] . . . from, against and with respect to any and all claims, demands, actions, or causes of action, damages, liabilities, threatened claims, costs and expenses (including reasonable outside attorneys' and experts' fees) incurred in connection with **any third-party claim** against [Herring] **to the extent arising out of (a) Affiliate's breach or alleged breach of any provision of this Agreement**. . . .

Contract § 8.2 (emphases added); Am. Third-Party Compl. ¶ 185 (quoting this portion of Section 8.2 as the relevant provision).

Section 16.3 of the Contract, the non-disparagement provision, states, in relevant part:

> <u>Non-Disparagement</u>. The Parties further agree that the Parties, **the AT&T Related Parties**, the Programmer Related Parties, **and their respective Representatives** during the Term of this Agreement and for two (2) years thereafter, **shall not directly or indirectly** (or encourage, suggest or organize any other individual, entity or third party or their Representatives to) (1) **disparage (including, without limitation, via the Services, blogging, social media, press interviews and/or any public statement) the other Party**, the Programmer Related Parties, the AT&T Related Parties, and/or their respective Representatives       **The Parties further agree that Section 16.3 shall not apply** (a) to the extent necessary to comply with the Law; (b) **to any proceeding before any government, judicial, legislative or administrative body, or any arbitrator**; or (c) to any governmental inquiry or request.

---

[6] Section 8.3 of the Contract requires a party to provide written notice of the legal proceeding, the underlying facts, and the amount of any claim for which the party is seeking indemnification. *See* ECF No. 85-2 ("Contract") § 8.3.  If Herring truly believed it was owed indemnification for a potential $1.6 billion judgment, Herring surely would have followed the indemnification notice requirements to the letter.

[7] The term "Affiliate" means AT&T Services and DIRECTV.  Contract at p. 1; Am. Third-Party Compl. ¶ 45.

Contract § 16.3 (emphases added).[8]

The term "Representatives" is also central to Herring's claim against AT&T Services. The Contract defines "Representatives" as "any individual or entity over which a Party or an AT&T Related Party or Programmer Related Party . . . exercises influence." Am. Third-Party Compl. ¶ 56 n.3 (quoting Contract § 16.1.3).

## SUMMARY OF ARGUMENT

Herring's indemnity cause of action fails to state a claim for three independent reasons. *First*, Herring's conspiracy-laden and conclusory allegations that purported disparagement by AT&T Services *caused* Dominion to sue Herring are implausible on their face. The Amended Third-Party Complaint fails to allege a single fact plausibly suggesting that Dominion filed suit because certain CNN and HBO commentators criticized OAN on air, or because Mr. Kennard expressed negative views of OAN in private correspondence to individuals unaffiliated with Dominion (*e.g.*, other members of AT&T Inc.'s Board of Directors). In fact, many of the allegedly disparaging statements from CNN and HBO commentators, and *all* of the alleged statements from Mr. Kennard, occurred *after* Dominion filed suit against Herring, so these statements could not have caused Dominion's suit under any circumstances. *Second*, AT&T Services fully assigned the Contract to DIRECTV before Dominion's lawsuit was filed, and, thus, before any cause of action for indemnification could possibly accrue. *Third*, the allegations that AT&T Services violated the non-disparagement provision are conclusory, based on conjecture, and contradicted by the Contract itself.

## LEGAL STANDARD

The Court must dismiss a cause of action that fails to state a claim upon which relief can

---

[8] The term "AT&T Related Parties" includes "members of the Board of Directors," such as Mr. Kennard.

be granted. Fed. R. Civ. P. 12(b)(6). A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible only when the court can reasonably infer from the factual content pleaded that the defendant is liable for the alleged misconduct. *See generally id.* While the Court "must construe the complaint in the light most favorable" to the plaintiff and "accept as true all reasonable factual inferences drawn from well-pleaded allegations," it need not "accept legal conclusions or mere conclusory statements as true." *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 36 (D.D.C. 2019); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" do not state a claim.). Dismissal with prejudice is warranted if "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006) (quotation omitted).

In deciding a Rule 12(b)(6) motion, a court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced . . . by the defendant." *Conant v. Wells Fargo Bank, N.A.*, 24 F. Supp. 3d 1, 11 (D.D.C. 2014) (cleaned up). In addition, at any stage of the proceeding, a court may consider "matters about which the Court may take judicial notice." *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 47 (D.D.C. 2009) (citation omitted). These matters include "official court records," *Veg-Mix, Inc. v. U.S. Dep't of Agric.*, 832 F.2d 601, 607 (D.D.C. 1987); "prior lawsuits," *Brookens v. Solis*, 635 F. Supp. 2d 1, 6 (D.D.C. 2009); other "public records, including SEC filings," *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 10 n.4 (D.D.C. 2017); and "the existence of newspaper articles" and "press coverage," *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 113–14 (D.D.C. 2015).

Furthermore, courts are not required to "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).[9]

## ARGUMENT

Herring brings a claim for contractual indemnity against AT&T Services based on the outlandish theory that critical commentary of OAN by CNN and HBO news personalities, and by Mr. Kennard in private correspondence with a handful of individuals unaffiliated with Dominion, breached the Contract's non-disparagement provision, and *that* disparagement—not Herring's alleged falsehoods about Dominion—somehow *caused* Dominion to sue Herring, thereby triggering AT&T Services' obligation to indemnify Herring. Herring's claim must be dismissed because the underlying allegations are implausible, contradicted by facts capable of judicial notice, and contrary to established law and settled principles of contract interpretation.

**A.      Herring Fails to Allege a Plausible Causation Theory to Support Its Indemnity Claim**

Herring's indemnity claim must be dismissed because the Amended Third-Party Complaint is devoid of *any* facts plausibly suggesting that CNN's Brian Stelter's and HBO's John Oliver's alleged "disparagement" of OAN somehow "caused" Dominion's lawsuit against Herring, as required to trigger the indemnification provision. Am. Third-Party Compl. ¶¶ 187–88. To the extent Herring's indemnification claim against AT&T Services is based on attributing Mr. Kennard's allegedly disparaging statements to AT&T Services, *id.* ¶ 188, the indemnity claim fails because Herring does not, and cannot, plausibly allege that Mr. Kennard's purported statements—statements that occurred two months *after* Dominion filed suit—caused Dominion to

---

[9] AT&T Services is concurrently filing a Request for Judicial Notice. Each of the documents referred to therein has been incorporated by reference into the Amended Third-Party Complaint or is otherwise an appropriate subject of judicial notice and can be relied on by this Court.

sue Herring.  Herring's Amended Third-Party Complaint also fails to plausibly allege *any* facts suggesting *any* link between any such statements and Dominion's lawsuit.  Indeed, given that the statements were made in private correspondence two months after Dominion filed its lawsuit, Herring cannot even allege that Dominion was *aware* of the statements at issue when it filed suit, let alone that the statements "caused" the lawsuit.

Herring's other causation theory—that Dominion sued it because CNN commentators and HBO's John Oliver criticized OAN—is nonsensical and contradicts Dominion's own allegations.  As Dominion's complaint makes clear, Dominion sued Herring for defamation *per se* because Herring allegedly published "false and defamatory statements of fact about Dominion," ECF No. 1 ¶ 305, including that "Dominion committed election fraud by rigging the 2020 Presidential Election," and that "Dominion's software and algorithms manipulated vote counts in the 2020 Presidential Election," *id.* ¶ 3.  Nothing in Dominion's 213-page complaint suggests that its allegations of defamation are cover for a claim *really* brought because individuals on CNN and HBO criticized OAN, much less explains why Dominion would care about those criticisms.  Indeed, many of these alleged statements (like *all* of Mr. Kennard's purportedly disparaging statements) occurred *after* Dominion filed its lawsuit on August 10, 2021, so they could not have "caused" the lawsuit.  *See* Am. Third-Party Compl. ¶ 62 (alleging disparaging statements by HBO's Oliver on October 10, 2021); *id.* ¶ 63 (alleging disparagement by CNN reporters on October 6, 2021); ¶ 64 (alleging disparagement by CNN's Jake Tapper on October 7, 2021).  Herring's *speculation* that a handful of other statements made by CNN and HBO news personalities, *see id.* ¶¶ 56–61, prompted Dominion to file suit against it is insufficient to state a plausible claim for indemnification.  *See Ahmed v. U.S. Dep't of Homeland Sec.*, 2022 WL 17851410, at *3 (D.D.C. July 7, 2022) (Nichols, J.) (dismissing claim where plaintiff failed to

allege facts to support conclusion); *Harris v. Mayorkas*, 2022 WL 3452316, at *6 (D.D.C. Aug. 18, 2022) (dismissing plaintiff's discrimination claims because she failed to allege facts from which causation could be plausibly inferred).

Courts routinely dismiss claims that are facially implausible or based on rank speculation. For example, in *Smith v. Shimizu*, the court dismissed as "clearly baseless" the plaintiff's claims that federal employees had conspired to steal her identity and take property belonging to her and her family, which allegedly included the United States Botanical Gardens and the Smithsonian Institution. 544 F. Supp. 2d 15, 16–17 (D.D.C. 2008) (noting that a previous lawsuit filed by the plaintiff was dismissed because the complaint contained "factual allegations that are so implausible as to be fantastic or delusional") (cleaned up). Similarly, in *Christian v. Giant Food Stores*, the court dismissed the plaintiff's complaint alleging that he suffered flu-like symptoms, blurred vision, and organ damage after consuming the defendant's shelf-stable food products. 2022 WL 594532, at *1 (D.D.C. Feb. 28, 2022). The court found that the allegations were "so deficient that they are implausible on their face," and also pointed to the plaintiff's failure to allege any facts supporting his belief that the products made him sick. *Id.* at *2. The plaintiff's claims in *Braun v. U.S. Postal Service* were dismissed as "simply implausible" where he alleged that his legal name was unlawfully changed in the post office's national database, which resulted in electronic surveillance of the plaintiff that made it impossible for him to get a job. 2017 WL 4325645, at *8 (D.D.C. Sept. 27, 2017). Here, Herring's claim—that the cause of Dominion's decision to sue Herring after months of *OAN's* allegedly defamatory statements about Dominion was really CNN and HBO commentators criticizing Herring—is similarly fanciful and unsubstantiated, and therefore should be dismissed.

If the Court were to accept at the pleading stage Herring's allegation that Dominion sued it "to unlawfully interfere with, disparage, and destroy viewpoints politically and financially detrimental to [Dominion]," or that Dominion was engaged in "a larger, coordinated, well-financed scheme to build up the 'Dominion' brand and weaponize it as a profit-making litigation machine while taking down Herring and unlawfully destroying its ability to operate in the media business," Herring's indemnification claim would become even less plausible than it already is. Am. Third-Party Compl. ¶¶ 13, 15. That is, Herring theorizes that Dominion—as well as AT&T Services and numerous other parties—attempted to harm Herring because of its political views. But whether Herring held those views, and whether Dominion sought to suppress them, are facts independent of whether CNN and HBO news personalities, or Mr. Kennard, ever said a word about OAN or Herring. Herring certainly does not, and could not, allege that Dominion was somehow unaware until HBO's John Oliver criticized Herring that Herring had criticized Dominion, too.

Indeed, such a claim would make no sense. During the time when Mr. Kennard and commentators on CNN and HBO are alleged to have made the defamatory statements about Herring, there was extensive media coverage critical of OAN and widespread reporting on OAN's criticisms of Dominion. *See, e.g.*, Michael M. Grynbaum, *One America News, the Network That Spreads Conspiracies to the West Wing*, THE NEW YORK TIMES, June 9, 2020, https://www.nytimes.com/article/oann-trump.html?smid=url-share; Philip Bump, *The most fervently pro-Trump cable network offers a concise lesson in creating fake news*, THE WASHINGTON POST, June 15, 2020, https://www.washingtonpost.com/politics/2020/06/15/most-fervently-pro-trump-cable-network-offers-concise-lesson-creating-fake-news/; Jacob Shamsian, *Trump-ally media outlet OAN quietly deleted articles about Dominion despite publicly doubling down on election conspiracy theories*, BUSINESS INSIDER, Jan. 20, 2021,

https://www.businessinsider.com/oan-deletes-articles-about-dominion-voting-election-
conspiracy-2021-1.[10]   Herring does not even try to allege that Dominion was unaware of this
extensive coverage, or explain why Dominion would have needed someone else to criticize
Herring before it would sue Herring for Herring's well-publicized defamatory statements.  And
even if Dominion was, for some unexplained reason, motivated by the fact that others criticized
Herring and OAN rather than by its own interests, Herring makes no attempt to plead facts
suggesting that it was John Oliver's or Brian Stelter's comments (as opposed to anyone else's) that
catalyzed Dominion's lawsuit.  These pleading failures, along with the facial implausibility of the
allegations that were actually made, are fatal to Herring's indemnification claim and warrant
dismissal with prejudice.  *Belizan*, 434 F.3d at 583 (explaining that dismissal with prejudice is
warranted where "the allegation of other facts consistent with the challenged pleading could not
possibly cure the deficiency").

**B.      The Contractual Indemnification Claim Must Be Dismissed Against AT&T Services
          Because AT&T Services Assigned the Contract to DIRECTV**

          Herring claims that AT&T Services is contractually obligated to "indemnify, defend, and
hold harmless" Herring in this litigation pursuant to Section 8.2 of the Contract.  Am. Third-Party
Compl. ¶¶ 184–91.  But as Herring acknowledges, AT&T Services "fully assigned" that Contract
to DIRECTV.  *Id.* ¶ 42; *see also* RJN, Hall Ex. 1, Assignment Agreement between AT&T Services,
Inc. and DIRECTV, LLC, dated July 31, 2021 ("Assignment Agreement").  An assignor is not
bound or secondarily liable under the assigned contract if the counterparty consents to the
assignment. Cal. Civ. Code § 1457 ("The burden of an obligation may be transferred with the
consent of the party entitled to its benefit          "); *Hearn Pac. Corp. v. Second Gen. Roofing, Inc.*,

---

[10] The Court "may take judicial notice of the existence of newspaper articles" and the fact that
there has been "extensive press coverage" of issues relevant to the action.  *Sandza*, 151 F. Supp.
3d at 113–15.

247 Cal. App. 4th 117, 148–49 (2016) (explaining that California law "protect[s] *the party to be benefited* from the effects of the assignment of an obligation" by eliminating secondary liability for the assignor if the counterparty consents to the assignment) (emphasis in original) (cleaned up). The *Cuscinetti v. Beaver Precision Products* case that Herring references is in accord with this basic tenet of California contract law. Am. Third-Party Compl. ¶ 42 n.2. There, the court explained that absent consent, an assignor remains secondarily liable on a contract. *Cuscinetti*, 1996 WL 743801, at *6 (N.D. Cal. Dec. 23, 1996).

Here, however, Herring *contracted away* its right to consent. The Contract expressly provides that "no consent shall be necessary in the event of assignment" by AT&T Services to "an Affiliated Company." Contract § 12. The Contract expressly defines AT&T Services and DIRECTV as "Affiliate," and defines "Affiliated Company" to mean "with respect to any person or entity, any other person or entity . . . under common control . . . with such person or entity." *Id.* at 1. Herring alleges that AT&T Services and DIRECTV are "Affiliated Companies." *See* Am. Third-Party Compl. ¶¶ 35–37 (pleading that AT&T Services is wholly owned, and DIRECTV is majority-owned, by AT&T Inc.); *see also* RJN, Hall Ex. 2, Notice of Assignment from AT&T Services, Inc. and DIRECTV, LLC to Herring Networks, Inc. dated July 28, 2021 ("Notice of Assignment") (stating that DIRECTV "will continue to be an affiliated entity of AT&T Services"). As Herring puts it, "DIRECTV was still 100 percent owned by AT&T" in the period "April 2020 through mid-2021," and, in fact, DIRECTV was wholly owned by AT&T at the time of assignment. Am. Third-Party Compl. ¶¶ 56–57; RJN, Hall Ex. 2, Notice of Assignment. Herring also concedes that its consent was thus not required for the assignment to be effective. *See* Am. Third-Party Compl. ¶ 42 (explaining that AT&T Services could freely assign the Contract to an "Affiliated Company," such as DIRECTV).

The Contract's assignment provision further provides that the "Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the [p]arties." Contract § 12. Pursuant to this provision, any purported indemnification obligation by AT&T Services ceased upon assignment. Accordingly, because the assignment to DIRECTV was effective as of July 31, 2021, and Dominion did not sue Herring until August 10, 2021, AT&T Services cannot be liable for any indemnification claim.[11]

Under California law, an indemnity claim does not accrue until the party seeking indemnification is held liable and makes a payment. *Valley Crest Landscape Dev., Inc. v. Mission Pools of Escondido, Inc.*, 238 Cal. App. 4th 468, 481 (2015) ("A cause of action for breach of an express indemnity agreement (contractual indemnity) accrues when the indemnit[ee] sustains the loss by paying the money sought to be indemnified from the indemnit[or]."). As to Herring's claim that AT&T Services must defend Herring in this litigation, such a claim does not accrue until the indemnitee makes a demand for defense and the indemnitor refuses to defend, none of which happened here, and which Herring fails to allege in any event. *See Eaton Hydraulics Inc. v. Cont'l Cas. Co.*, 132 Cal. App. 4th 966, 973 (2005) ("A cause of action for refusal to defend accrues upon discovery of loss or harm, i.e., when the insurer refuses to defend.") (cleaned up). Accordingly, any potential claim to "indemnify, defend, and hold harmless Herring and any of its directors, officers, employees and agents" would necessarily accrue after the assignment. Am. Third-Party Compl. ¶ 189. It follows that this claim must be dismissed with prejudice against AT&T Services because it is no longer a party to the Contract.

---

[11] Herring received notice of the assignment on July 28, 2021, and the Assignment Agreement was dated effective as of July 31, 2021. RJN, Hall Ex. 2, Notice of Assignment at 1; RJN, Hall Ex. 1, Assignment Agreement at 1.

**C.      Herring Fails to Plausibly Allege That AT&T Services Breached the Non-Disparagement Clause of the Contract**

Even if AT&T Services were somehow bound by the Contract notwithstanding the assignment, Herring's claim would still fail because it does not allege any acts by AT&T Services that would trigger the Contract's indemnification provision.  The statements Herring alleges were made by CNN and HBO personalities are not attributable to AT&T Services and do not violate the non-disparagement provision.  Mr. Kennard's statements also cannot support an indemnification claim—even assuming those statements were disparaging (they were not), those statements could not have led to Dominion's lawsuit because they occurred *after* the suit was already filed.

**1.      Statements by CNN and HBO Personalities Are Not Attributable to AT&T Services and Do Not Constitute Disparagement Under the Contract**

An indemnity agreement is construed according to basic principles of contract interpretation.  *Liftech Consultants Inc. v. Samsung Shipbuilding & Heavy Indus., Ltd.*, 2010 WL 4510905, at *3 (N.D. Cal. Nov. 2, 2010).  As such, the language of the agreement governs so long as it "is clear and explicit and does not lead to absurd results."  *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 717 (9th Cir. 2020).  To prevail on an indemnity claim, "the indemnitee must prove that liability is covered by the contract, that liability existed, and the extent thereof."  *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1199 (C.D. Cal. 2003).  "Indemnity provisions are . . . strictly construed against the indemnitee," and, as with all contracts, "should be read in a manner that renders them reasonable and capable of being put into effect."  *Heppler v. J.M. Peters Co.*, 73 Cal. App. 4th 1265, 1278 (1999).

The gravamen of Herring's claim is the conclusory allegation that AT&T Services breached the non-disparagement clause of the Contract via news reporting and critical commentary on CNN and HBO because the media personalities who made the allegedly disparaging remarks

are "representatives" of AT&T Services.[12] Am. Third-Party Compl. ¶¶ 56–66, 187. This theory fails for at least two reasons.

*First*, CNN and HBO were not owned by AT&T Inc. at the time the Contract was signed, and there are no plausible allegations supporting Herring's contention that CNN and HBO media personalities are "Representatives" of AT&T Services, which is a legally and factually distinct entity from AT&T Inc. *See* Am. Third-Party Compl. ¶¶ 56–64. AT&T Services never owned CNN and HBO; they were owned by AT&T Inc., which is also the parent company of AT&T Services. *Id.* ¶¶ 35, 37. Further, AT&T Inc. did not even own CNN and HBO at the time AT&T Services signed the Contract (March 9, 2017)—AT&T acquired Time Warner (CNN and HBO's then-current parent company) on June 14, 2018, more than a year later. Contract at 40; AT&T Inc., Form 8-K at Item 2.01 (June 15, 2018), https://www.sec.gov/Archives/edgar/data/732717/000119312518194502/d609728d8k.htm.[13] A contract written in the present tense does not, without more, cover or bind entities, affiliates, or any other company that did not fall within coverage of the agreement at the time it was signed. *Revitch*, 977 F.3d at 717–18 (holding that DIRECTV could not qualify as an "affiliate" of AT&T Mobility for purposes of a services agreement when that agreement was signed *before* AT&T Inc.

---

[12] Herring also alleges that AT&T Inc. (*not* AT&T Services) disparaged OAN in AT&T Inc.'s 2023 Notice of Annual Meeting of Stockholders and Proxy Statement. Am. Third-Party Compl. ¶ 65, Ex. D (ECF No. 85-4). Curiously, Herring failed to identify for the Court where exactly in the 92-page proxy statement this alleged disparagement appears. As is abundantly clear from the document itself, this allegedly disparaging statement was part of a "Stockholder Proposal" put forth by "The Nathan Cummings Foundation," a shareholder of AT&T Inc.; the statement was *not* made by either AT&T Inc. or AT&T Services. Am. Third-Party Compl., Ex. D (ECF No. 85-4) at 13. Moreover, even if this statement could be attributed to AT&T Services, Herring's claim for indemnification would still fail because the statement was made in 2023 and therefore could not have been the cause of Dominion filing this lawsuit in 2021.

[13] The Court may take judicial notice of "public records, including SEC filings." *RPM Int'l*, 282 F. Supp. at 10 n.4.

acquired DIRECTV and brought DIRECTV and AT&T Mobility under the same corporate ownership); *see Unova, Inc. v. Acer Inc.*, 363 F.3d 1278, 1282 (Fed. Cir. 2004) (applying California law and holding that a release from liability provision "written in the present tense . . . most naturally does not refer to [a party's] future parents"); *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001) (rejecting argument that a release provision could cover future affiliates because the "reference to 'affiliates' and the definition of the word are stated in the present tense" and nothing in the definition "indicates the inclusion of future rather than present members"); *Ellington v. EMI Music, Inc.*, 24 N.Y. 3d 239, 246 (2014) ("Absent explicit language demonstrating the parties' intent to bind future affiliates of the contracting parties, the term 'affiliate' includes only those affiliates in existence at the time that the contract was executed."). Here, the Contract was written in the present tense, so it could not apply to CNN and HBO news personalities whose employers were not even under AT&T Inc.'s corporate ownership at the time the Contract was signed.

Furthermore, there is no principle of contract law that would allow Herring to characterize CNN's Stelter, HBO's Oliver, and the others, as "Representatives" under the Contract. "The words of a contract are to be understood in their ordinary and popular sense," Cal. Civ. Code § 1644, which courts determine by looking to "general dictionary definitions," *Tule Lake Comm. v. City of Tulelake*, 2020 WL 1169273, at *3 (E.D. Cal. Mar. 11, 2020). Here, the key word "Representative" is defined to mean individuals over which AT&T Services "exercises influence." Am. Third-Party Compl. ¶ 56 n.3 (quoting Contract § 16.1.3). "Influence," in turn, means that *AT&T Services* was able to use "pressure, authority, or power . . . to induce action or change the decisions or acts of" individuals at CNN and HBO, particularly by regulating the expression of political views on the air by members of the media. *Influence*, Black's Law Dictionary (10th ed.

2014). But the Amended Third-Party Complaint contains no factual allegations suggesting that AT&T Services "exercise[d] influence" over CNN and HBO personalities under this meaning; indeed, while the Amended Third-Party Complaint hints at *AT&T Inc.'s* ownership of Time Warner (which owned CNN and HBO), it offers no theory explaining how *AT&T Services* would have had influence over CNN and HBO. At the time, AT&T Services and Time Warner (also known as WarnerMedia) were sister companies under a common owner: AT&T Inc. Herring makes no allegation, let alone a plausible one, indicating how AT&T Services could exert influence over Time Warner/WarnerMedia given its relative position in the corporate hierarchy, much less that AT&T Services could or did influence the content of political commentators appearing on WarnerMedia channels. Claims premised on such conclusory and logically inconsistent allegations cannot survive a motion to dismiss.

*Second*, Herring's interpretation of the non-disparagement clause is unreasonably overbroad and would lead to absurd results by which a routine non-disparagement provision would preclude the independent news media from a broad swath of protected speech. *Roden v. AmerisourceBergen Corp.*, 186 Cal. App. 4th 620, 651 (2010) ("[W]e must interpret a contract in a manner that is reasonable and does not lead to an absurd result."); *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809, 842 (2007) ("The interpretation of a contract must be fair and reasonable, not leading to absurd conclusions.") (cleaned up). Under Herring's interpretation of the Contract, AT&T Services "breache[s]" the agreement's non-disparagement provision any time a CNN or HBO reporter, commentator, or host critically reports on OAN. Am. Third-Party Compl. ¶ 187. That interpretation would also mean that *Herring* breached the agreement every time OAN critically reported on CNN, which it did routinely. And the unavoidable corollary of this interpretation is that AT&T Services must review and pre-clear every statement about OAN made

on CNN and HBO to ensure there is no "disparagement." That is absurd on its face, and the Amended Third-Party Complaint is devoid of any factual allegations suggesting that the parties intended such an impractical and draconian restriction on speech. And it is especially absurd because it assumes that AT&T Services, in exchange for carrying OAN on DIRECTV, forfeited by contract "the special and constitutionally recognized role of [the news media] in informing and educating the public, offering criticism, and providing a forum for discussion and debate." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 781 (1978). Such an onerous and constitutionally suspect obligation cannot reasonably be read into the Contract's non-disparagement provision. *DriveWealth, LLC v. Elec. Transaction Clearing, Inc.*, 2019 WL 8227082, at *3 (C.D. Cal. Dec. 23, 2019) (rejecting interpretation of a contract that, "[t]aken to its logical extreme," would produce "an absurd result for a commercial contract"); *Klein v. Chevron U.S.A., Inc.* 202 Cal. App. 4th 1342, 1384 (2012) ("[W]e must determine whether the alleged agreement is 'reasonably susceptible' to the meaning ascribed to it in the complaint.").

> ## 2. Mr. Kennard's Alleged Statements Do Not Constitute Disparagement, and Could Not Have Triggered an Indemnification Obligation

Herring's allegations regarding Mr. Kennard's purported disparaging statements fare no better. Mr. Kennard's statements were not only not "disparagement," but also could not possibly have caused Dominion to file its lawsuit against Herring because the statements were made two months *after* Dominion filed its lawsuit. That is, given that the premise of Herring's claim is that AT&T Services must indemnify it because its breaches of the Contract caused Dominion to sue Herring, statements made *after* the suit was filed cannot possibly support the claim. All of Herring's theories with respect to Mr. Kennard fail for this reason alone. Herring's arguments also fail for two other reasons.

*First*, Herring alleges that Mr. Kennard characterized OAN as "toxic" in private one-on-one email communications with a fellow board member and two personal acquaintances. Am. Third-Party Compl. ¶¶ 69–71. But Herring offers no further explanation to link Dominion's decision to sue with the allegedly disparaging statements in Mr. Kennard's private communications with individuals unaffiliated with Dominion, nor does Herring allege that Dominion was even *aware* of the statements. Moreover, "[s]tatements that consist of merely loose, figurative, or hyperbolic language . . . or the expression of opinion, will not constitute 'disparagement.'" *Hellenic Petroleum v. Sacramento Energy Res.*, 2019 WL 4747794, at *3 (E.D. Cal. Sept. 30, 2019) (applying California law). "Whether [the defendants] made statements of 'fact' or of 'opinion' is a question of law for the court." *Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36, 46 (D.D.C. 2022) (citation omitted) (alteration in original). This use of "toxic" in personal email communications clearly reflected his view of the public perception of OAN at the time, not a statement of fact.

*Second*, Herring concocts a new allegation in its Amended Third-Party Complaint that Dominion's "lawsuit itself is a significant violation by Kennard of the non-disparagement provision." *Id.* ¶ 199. But the very section that Herring alleges Mr. Kennard breached (Section 16.3) expressly carves out statements in a litigation. Contract § 16.3 ("[T]his Section 16.3 shall not apply . . . to any proceeding before any government, judicial, legislative or administrative body, or any arbitrator . . . ."). Under this provision, even assuming that Mr. Kennard had directed Dominion's lawsuit against Herring, and even if AT&T Services could be responsible for Dominion's actions in this regard, AT&T Services would not be liable under the Contract because suing Herring for defamation is expressly permitted by the Contract. And of course, the Amended

Third-Party Complaint lacks any specific allegations showing that Mr. Kennard directed Dominion to file suit against Herring.

## CONCLUSION

For the foregoing reasons, AT&T Services respectfully asks the Court to dismiss with prejudice Herring's claim for contractual indemnity against AT&T Services.

Dated:  June 20, 2023

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

*/s/* Howard S. Hogan

Howard S. Hogan (DC Bar No. 492002)

1050 Connecticut Avenue, N.W.
Washington, DC 20036
HHogan@gibsondunn.com

Marcellus McRae (admitted *pro hac vice*)
M. Theodore Takougang (admitted *pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071
MMcRae@gibsondunn.com
TTakougang@gibsondunn.com

Ashley E. Johnson (admitted *pro hac vice*)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
AJohnson@gibsondunn.com

*Attorneys for Third-Party Defendant AT&T Services, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of June 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which I understand to have served counsel for the parties.

 */s/* Howard S. Hogan
Howard S. Hogan (DC Bar No. 492002)

1050 Connecticut Avenue, N.W.
Washington, DC 20036
HHogan@gibsondunn.com

Marcellus McRae (admitted *pro hac vice*)
M. Theodore Takougang (admitted *pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071
MMcRae@gibsondunn.com
TTakougang@gibsondunn.com

Ashley E. Johnson (admitted *pro hac vice*)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
AJohnson@gibsondunn.com

*Attorneys for Third-Party Defendant AT&T Services, Inc.*