**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| US DOMINION, INC., et al., | |
| Plaintiffs/Counterclaim Defendants | |
| v. | Case No. 1:21-cv-02130-CJN |
| HERRING NETWORKS, INC., et al., | |
| Defendants/Counterclaim Plaintiffs/Third-Party Plaintiffs | Judge Carl J. Nichols |
| v. | |
| AT&T SERVICES, INC., et al, | |
| Third-Party Defendants. | |

**THE HERRING PARTIES' RESPONSE IN OPPOSITION TO US DOMINION; STAPLE STREET CAPITAL; AND AT&T SERVICES' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.          Legal Standard ............................................................................................1

II.         Argument and Authorities ...........................................................................2

    A.     The Court Should Deny Dominion's Motion to Dismiss Count I and Staple Street's Motion to Dismiss Count III (Tortious Interference with Business Relationship/Contract). .........................................................................................5

    B.     The Court Should Deny Dominion's Motion to Dismiss Count II and Staple Street's Motion to Dismiss Count IV (Tortious Interference with Business Expectancy). ...........................................................................................11

    C.     The Court Should Deny AT&T's Motion to Dismiss Count V (Indemnity). .......13

        (1) The Term of the Agreement ........................................................................17

        (2) The Scope of the Disparagers .....................................................................18

        (3) Scope of the Disparagement ........................................................................20

        (4) The Method of Distribution .........................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................... 1, 2, 3, 5, 13

*Baer v. Associated Life, Ins. Co.*,
  202 Cal. App. 3d 117 (Cal. Ct. App. 1988) ........................................17

*Banneker Ventures, LLC v. Graham*,
  798 F.3d 1119 (D.C. Cir. 2015) ........................................................4

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................1, 2

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002) ........................................................11

*Guttenberg v. Emery*,
  68 F. Supp. 3d 184 (D.D.C. 2014) ....................................................6

*Hartford Casualty Ins. Co. v. Swift Distrib., Inc.*,
  326 P.3d 253 (Cal. 2014) ...............................................................20

*Jefferson v. Collins*,
  905 F. Supp. 2d 269 (D.D.C. 2012) ..................................................4, 5

*Korea Supply Co. v. Lockheed Martin Corp.*,
  63 P.3d 937 (Cal. 2003) ............................................................12, 13

*McCarty v. Beach*,
  10 Cal. 461 (Cal. 1858) ................................................................14

*McFadden v. Wash. Metro. Area Transit Author.*,
  949 F. Supp. 2d 214 (D.D.C. 2013) ...........................................2, 5, 13

*Mpoy v. Rhee*,
  758 F.3d 285 (D.C. Cir. 2014) ..........................................................1

*Newmyer v. Sidwell Friends Sch.*,
  128 A.3d 1023 (D.C. 2015) ..............................................................7

*Palin v. N.Y. Times Co.*,
  940 F.3d 804 (2d Cir. 2019) ..........................................................2, 5

*ProMex, LLC v. Hernandez*,
    781 F. Supp. 2d 1013 (C.D. Cal. 2011) ................................................................14

*Raiser v. Ventura Coll. of Law*,
    488 F. App'x 219 (9th Cir. a2012) .......................................................................15

*Richards v. Gelsomino*,
    240 F. Supp. 3d 173 (D.D.C. 2017) ....................................................................1, 4

*Sanchez v. Medicorp Health Sys.*,
    618 S.E.2d 331 (Va. 2005) ......................................................................................3

*Shusha, Inc v. Century-National Ins. Co.*,
    87 Cal. App. 5th 250 (Cal. Ct. App. 2022) .........................................................13

*Snepp v. United States*,
    444 U.S. 507 (1980) (*per curiam* ) ....................................................................19

*Yahoo Inc v. Nat'l Union Fire Ins. Co.*,
    519 P.3d 992 (Cal. 2022) ......................................................................................16

**Statutes**

Cal. Civ Code § 1457 .....................................................................................................17

Cal. Civ. Code § 3360 ....................................................................................................14

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................................1, 3

iii

Defendants/Counterclaim Plaintiffs Herring Networks, Inc., d/b/a One America News Network ("Herring"), Charles Herring, Robert Herring, Sr., and Chanel Rion (collectively, the "Herring Parties") file this their response in opposition to Dominion's,[1] Staple Street's,[2] and AT&T's[3] motions to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) and, in support thereof, state the following:

## I.      LEGAL STANDARD

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must presume the truth of a complaint's factual allegations, although it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). The court then asks whether the facts alleged suffice "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

On a motion to dismiss, the court may generally consider "facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Mpoy v. Rhee*, 758 F.3d 285, 291 n. 1 (D.C. Cir. 2014) (internal quotation marks omitted); *Richards v. Gelsomino*, 240 F. Supp. 3d 173, 177 (D.D.C. 2017). To survive a motion to dismiss for failure to state a claim, the complaint must contain sufficient factual matter,

---

[1] "Dominion" refers to Plaintiffs US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (collectively "Counterclaim Defendants").

[2] Herring originally sued Staple Street Capital LLC, an entity that we have been informed is defunct. (Dkt. 100 at 1; *see also* Dkt. 115-1 (corrected filing)). In its motion to dismiss, Staple Street Capital II LP and Staple Street Capital-A LP (collectively "Staple Street") state that Staple Street does not object to its substitution for the defunct entity. (Dkt. 100 at 2.)

[3] "AT&T" refers to Third-Party Defendant AT&T Services, Inc.

accepted as true, to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *McFadden v. Wash. Metro. Area Transit Auth.*, 949 F. Supp. 2d 214, 219 (D.D.C. 2013). A plaintiff receives the "benefit of all inferences that can be derived from the facts alleged." *Id.* At the pleading stage, the concern is not the particularity of the factual allegations, but with whether the complaint *in toto* renders plaintiff's entitlement to relief plausible. *Twombly*, 550 U.S. at 569 n.14. "[I]t is not the district court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory. The test is whether the complaint is plausible, not whether it is less plausible than an alternate explanation." *Palin v. N.Y. Times Co*., 940 F.3d 804, 815 (2d Cir. 2019) (*citing Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement...") (internal quotation marks omitted)).

## II.    ARGUMENT AND AUTHORITIES

Dominion's motion seeks to dismiss the Amended Counterclaim on the grounds that Herring has allegedly not pled factual allegations to support a finding of agency. (Dkt. 99 at 2; *see also* Dkt. 114-1 at 2 (corrected filing).) Staple Street also contends that Herring's claims are premised solely on a legal conclusion that Kennard was Staple Street's agent. (Dkt. 100 at 2; *see also* Dkt. 115-1 at 2 (corrected filing).) Staple Street incorporates by reference Dominion's argument that the allegations about Kennard's relationship with Staple Street are legally insufficient. (*Id.*)

Counts I and II, however, are against Dominion and Counts III and IV are against Staple Street, for tortious interference with business relationship/contract and tortious interference with business expectancy. (*See* Am. Counterclaim, Dkt. 85 ¶¶ 150–83.) Dominion's pleas that the

factual allegations regarding Kennard's position on the Operating Executive Board of Directors and investment in Dominion are false and incorrect are of no moment since they must be taken as true for purposes of Fed. R. Civ. P. 12(b)(6). (Dkt. 99 at 2); *see Iqbal*, 556 U.S. at 678. Staple Street argues no more than to say the claims against it are premised solely on a legal conclusion that Kennard was Staple Street's agent. (Dkt. 100 at 2.)

The facts supplied by the Amended Counterclaim and the exhibits thereto, however, demonstrate that Herring's allegations are not limited solely to Kennard but encompass other agents such as Hootan Yaghoobzadeh, Staple Street's managing director who is "at the center" of managing Dominion's legal disputes and playing "whatever part we could in helping Dominion…." (*See, e.g.*, Dkt. 85, Exs. A, K, and L; *see also Team*, STAPLE STREET CAP., https://www.staplestreetcapital.com/Team) ("Mr. Yaghoobzadeh assembled the legal team, established the objectives for, and approved and helped set and execute the legal strategy of not only seeking justice and compensation for the damage caused Dominion, but also creating accountability….").

The Amended Counterclaim also pleads facts, including Kennard's CV together with his various board positions, which are more than enough to suggest to third parties that he has the power to influence not only AT&T, AT&T Services, and DIRECTV but Dominion and Staple Street as well. (Am. Counterclaim Dkt. 85 ¶¶ 72–82, 88.) Under apparent agency, an agency is "created by operation of law and established by a principal's actions that would reasonably lead a third person to conclude that an agency exists,' regardless of whether the principal and agent intended to establish an agency relationship." *Sanchez v. Medicorp Health Sys.*, 618 S.E.2d 331, 333 (Va. 2005). Under the facts pleaded here and the totality of the circumstances, AT&T, Staple

3

Street, and Dominion's actions installing Kennard in positions of influence within the companies would reasonably lead third parties to conclude that agency relationships exist with Kennard.



. (Dkt. 99 at 4; Dkt. 85 Exs. J and L.) Federal Rule of Civil Procedure 10(c) "does not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading simply because the documents were attached to the complaint to support an alleged fact." *Richards*, 240 F. Supp. at 178. When considering what facts to accept as true, "it is necessary to consider why a plaintiff attached the documents, who authored the documents, and the reliability of the documents." *Id.*

. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 n.6 (D.C. Cir. 2015).

They did not purport to nor is Herring required to adopt their factual contents as a whole. *See id.*

Dominion's reliance on *Jefferson v. Collins*, 905 F. Supp. 2d 269, 284–85 (D.D.C. 2012), for the proposition that an allegation of agency is subject to a motion to dismiss is readily distinguishable because, in that case, the plaintiffs advanced "only a conclusory allegation that Collins retained the Renovator Defendants to act as his agent[s] for remodeling the Property for resale." Here, the allegations in the Amended Counterclaim are not merely conclusory allegations,

they are supported by exhibits showing Kennard's positions with Dominion and Staple Street. In context, these factual allegations, as well as those related to Kennard's interactions and association with Dominion and Staple Street, are sufficient to allow the Court to draw a reasonable inference that he was, at times, acting on behalf of Counterclaim Defendants and Staple Street. (*See* Am. Counterclaim Dkt. 85 ¶¶ 78–81, 88.) Moreover, as acknowledged by the court in *Collins*, "the existence of an agency relationship is ordinarily a question of fact which, depending upon the existence of disputed issues of material fact, is more appropriately addressed on summary judgment or at trial." *McFadden*, 949 F. Supp. 2d at 222.

Dominion goes on to contend that Counterclaims Counts I and II for tortious interference are based on a "fanciful, implausible" notion that Kennard was acting for AT&T, Dominion, and Staple Street. (Dkt. 99 at 4.) But, as noted above, the test is whether the complaint is plausible, not whether it is less plausible than an alternate explanation. *Palin*, 940 F.3d at 815 (*citing Iqbal*, 556 U.S. at 678). The existing facts in the record make that plausible showing that Kennard acted on behalf of Dominion and Staple Street, in addition to AT&T.

A.   **The Court Should Deny Dominion's Motion to Dismiss Count I and Staple Street's Motion to Dismiss Count III (Tortious Interference with Business Relationship/Contract).**

At base, Dominion complains that OAN[4] failed to plead breach of the non-disparagement provision because, according to Dominion, the statements attached to the Amended Counterclaim (Dkt. 85 Exs. C, E, F, G, H, and I) were private communications by "Kennard, as AT&T Chairman," with AT&T officers about damage control and "people who were threatening to cut ties with AT&T" because of extensive media criticism that "OAN was toxic." (Dkt. 99 at 11.) Dominion does not provide any support for its conclusory statement that all the communications

---

[4] "OAN" refers to Counterclaim Plaintiff Herring Network, Inc.'s One America News Network.

by Kennard were made solely in his role as Chairman of AT&T, rather than also made due to his role with Staple Street/Dominion. ████████████████████████████████████████ ████████████████████████████ (*See* Dkt. 85 Exs. K and L.) Consequently, at this stage it is impossible to discern which of Kennard's multiple roles were being utilized when he made those communications, Staple Street/Dominion or AT&T, or both. Discovery in this matter may shed light on that issue, but for purposes of defeating the motions to dismiss, any lingering doubt as to whether Kennard acted on behalf of more than just AT&T would suffice to preclude dismissal.

████████████████████████████████████████████████████████
████████████████████████████████████

In fact, as stated in the Amended Counterclaim, while Kennard was serving as Chair of AT&T, he was also a founding investor of Staple Street and serving as its Operating Executive Board member. (Am. Counterclaim, Dkt. 85 ¶¶ 8, 25.) As an Executive Board member at Staple Street, Kennard is principally focused on the communications and media sectors. *Team*, STAPLE STREET CAP., https://www.staplestreetcapital.com/Team.

Dominion contends that the communications "can hardly be said to rise to the level of a breach of the non-disparagement provision by AT&T let alone by non-parties Dominion and Staple Street." (Dkt. 99 at 11.) It cites *Guttenberg v. Emery,* 68 F. Supp. 3d 184, 186-87 (D.D.C. 2014) for the proposition that non-disparagement clauses cannot be enforced against non-parties to the relevant agreement. (*Id.*) *Guttenberg* is inapposite because it involved a non-disparagement clause in a settlement agreement between two individual dentists. *Guttenberg*, 68 F. Supp. 3d at 186. Suit was filed for breach of the agreement against one of the dentists and his wife for defamation. The wife was dismissed because she was not a party to the agreement. *Id*. at 186-87.

The scope of the Affiliation Agreement, on the other hand, is quite expansive and includes not only the signatories but "Affiliated Companies" as the Amended Counterclaim explains at paragraphs 43-49, 53-54. (*See* Am. Counterclaim, Dkt. 85 Ex. B at 1.) ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

The non-disparagement provision states the AT&T Related Parties and their respective Representatives "shall not directly or indirectly (or encourage, suggest or organize any other individual, entity or third party or their Representatives to) (1) disparage … or (3) engage in any activity that impugns, or otherwise casts, the other Party, the Programmer Related parties,…and or their respective Representatives in a negative light…." (*Id*. § 16.3.)

Contrary to Dominion's argument, therefore, ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ clearly fall within the scope of the non-disparagement provision. (*See, e.g.*, Am. Counterclaim at Ex. F, Dkt. 85 ¶ 70–71; *see also id.* Exs. G and H.)

Under D.C. law, a *prima facie* case of tortious interference with a contract or business relationship requires "(1) existence of a valid contractual or other business relationship; (2) [the defendant's] knowledge of the relationship; (3) intentional interference with that relationship by

[the defendant]; and (4) resulting damage." *Newmyer v. Sidwell Friends School*, 128 A.3d 1023, 1038 (D.C. 2015).

Applying these elements to this case, the Amended Counterclaim alleges AT&T Services, DIRECTV, and Herring entered into an Affiliation Agreement dated March 9, 2017. (Am. Counterclaim, Dkt. 85 ¶ 41; *id.* Ex. B.) For several years thereafter, Herring and AT&T enjoyed a profitable, mutually beneficial business relationship through which AT&T (through AT&T Services and DIRECTV) carried Herring's two television networks, One America News Network ("OAN") and A Wealth of Entertainment ("AWE"), and was paid commissions via selling advertising on OAN and AWE. (Am. Counterclaim, Dkt. 85 ¶ 6.) As a result of the contractual carriage and advertising arrangements, AT&T, AT&T Services, DIRECTV, and Herring thrived by growing OAN into one of the most popular cable channels on DIRECTV's platform. (*Id.* ¶ 7.)

According to Staple Street's managing director and co-founder Hootan Yaghoobzadeh, Staple Street, who owns a controlling stake in Dominion, was proud to have played a part in helping Dominion in achieving its goals in the lawsuit against Fox News for its 2020 election coverage, including an exorbitant settlement of $787 million. Staple Street is the majority owner of US Dominion, Inc., which in turn is the sole owner of Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation (collectively "Dominion"). (*Id.* ¶ 24.)  In discussing the settlement, counsel for Dominion noted that "Money is accountability, and we got that today from Fox…But we're not done yet. We've got some other people who have some accountability coming towards them." (Am. Counterclaim, Dkt. 85 Ex. A.) OAN's coverage of the 2020 presidential election also upset Dominion and Staple Street. (Am. Counterclaim, Dkt. 85 ¶ 8.)

At some point before August 2021, Dominion/Staple Street determined that the destruction of Herring would be beneficial to their political and business interests. (*Id.* ¶ 97.) They sought to

8

cut off Herring's ability to earn revenue to help fund speech, including speech critical of Dominion and its litigation defense. (*Id.* ¶ 100.) On August 10, 2021, Dominion, under the direction of Staple Street, filed the underlying lawsuit against Herring alleging, as they did against Fox News, that they were defamed in connection with OAN's coverage of the 2020 presidential election and seeking at least $1.6 billion dollars. (*Id.* ¶ 98.) Shortly thereafter, Dominion and Staple Street began to put pressure on AT&T to ensure that DIRECTV ceased carrying OAN. (*Id.* ¶ 101.)

Articles and press statements from liberal organizations including the NAACP, Media Matters, the Lincoln Project, and Common Cause critical of AT&T's relationship with OAN, followed. (*Id.* ¶¶ 105–09.) ██████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ AT&T, in response to a Reuters' article titled "*How AT&T Helped Build the Far-Right [OAN]*," released a statement providing confidential information about the Affiliation Agreement and disavowed any financial interest in OAN. (*Id.* ¶ 103.) ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████) ████████████████████████████████████████ ████████████████████████████████████ At the same time, ████████████ ████████████████████████████████████████ was also an Operating Executive Board member of Dominion's majority owner, Staple Street, who was invested in

helping the Dominion properties succeed and be as profitable as possible, including ensuring that

the Dominion entities silence their opponents and critics. (Am. Counterclaim, Dkt. 85 ¶ 94.)

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████ ██████████ █ ██████████ ██████████ ████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████ Yaghoobzadeh is the lead board member/chairman of Dominion Voting Systems, who is

spearheading and overseeing the series of defamation lawsuits brought by Dominion against Fox,

OAN and others. *See Team*, STAPLE STREET CAP., https://www.staplestreetcapital.com/Team

("Mr. Yaghoobzadeh assembled the legal team, established the objectives for, and approved and

helped set and execute the legal strategy of not only seeking justice and compensation for the

damage caused Dominion, but also creating accountability… ."). Additionally, there were

meetings with AT&T, the NAACP, and others related to the carriage of OAN, ████████████

████████████████████████████████████████████████████" (Am. Counterclaim, Dkt.

85 ¶ 113; *id.* Ex. H.) In January 2022, OAN was informed that DIRECTV decided not to renew

the Affiliation Agreement and that the decision was made at the board level and was "political."

(*Id.* ¶ 120.)

The pressure to disavow and terminate the contractual and business relationship between AT&T and OAN imposed by Dominion and Staple Street, among others, caused AT&T and DIRECTV to breach the confidentiality and non-disparagement provisions of the Affiliation Agreement by disparaging OAN as toxic and the Herrings as liars, but also disclosing confidential terms of the Affiliation Agreement, including but not limited to information that the term of the Agreement was to end soon and ultimately publically announcing its non-renewal.  Kennard was personally involved in the decision not to renew OAN. (*Id.* ¶ 90.) Dominion and Staple Street's tortious interference with the Affiliation Agreement and Herrings' business relationship with DIRECTV and AT&T, resulted in injury to Herrings' reputation, business relationships and monetary damage.

Accordingly, the Amended Counterclaim states a plausible claim for relief against Dominion on Count 1 and Staple Street on Count III. The motions to dismiss those counts should be denied.

**B.** **The Court Should Deny Dominion's Motion to Dismiss Count II and Staple Street's Motion to Dismiss Count IV (Tortious Interference with Business Expectancy).**

To survive a motion to dismiss a tortious interference with a prospective business claim, a plaintiff must plead "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). From March 2017 until April 2022, Herring had a mutually beneficial and mutually profitable relationship with DIRECTV and various other carriers. (*See, e.g.*, Am. Counterclaim, Dkt. 85 ¶¶ 6–7, 33–34, 38, 41, 43–45.) As of the third quarter of 2021, AT&T's own data showed that OAN was a top-performing network, ranked 24th (excluding broadcast networks) out of over 300 channels, putting

11

OAN in the top 10 percent of channels offered via DIRECTV. (*Id.* ¶ 33.) AWE also demonstrated excellent performance since its inception; is distributed domestically on dozens of cable systems; received regional Emmy awards and nominations; and as of Q3 2021, AWE performed in the top 35 percent of the channel lineup according to AT&T's own data. (*Id*. ¶ 34.) In the fall and winter of 2021-2022, Kennard and AT&T's representatives were in direct contact and negotiations with the Herrings claiming that there was no reason to be concerned about extending the contract and that they would continue to do business as usual, leading Herring to believe that carriage would continue on DIRECTV. (*Id.* ¶ 117.)

Dominion and Staple Street were aware of the relationship between OAN and AT&T. (*Id.* ¶¶ 74–76, 161, 169; *see also id.* Ex. L.) However, in their quest to cut off Herring's ability to earn revenue to help fund speech, including speech critical of Counter Defendants and to withstand this litigation, Counter Defendants and Kennard exercised their influence by disparaging OAN, influenced AT&T and persuaded DIRECTV to change the status quo and non-renew the Affiliation Agreement. (*Id.* ¶¶ 100, 163–64.) Herring was damaged through loss of its expected future business relationship with DIRECTV, the loss of carriage on DIRECTV, as well as carriage and future business relationships with other providers, including Verizon Fios and Frontier. (*Id.* ¶ 166.) The Amended Counterclaim, therefore, has stated a plausible claim for tortious interference with business expectancy and the motions should be denied.

Dominion contends the claim for tortious interference with contractual expectation fails because Herring cannot plead a legally cognizable "wrongful act" to support a tortious interference claim citing a California Supreme Court case, *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 953-954 (Cal. 2003). In *Korea Supply*, however, the California court noted the independent wrongfulness requirement differentiates California from other states and the

Restatement Second of Torts because it more narrowly defines actionable conduct under the tort. *Id*. at 954. The court continued, "[u]nlike California, the Restatement Second of Torts does not require a plaintiff to plead that a defendant engaged in an independently wrongful act in order to show 'improper' interference." *Id*. at 955. Instead, a general intent plus the actor's motive or purpose to interfere is enough to subject a defendant to liability under the Restatement. *Id.* Dominion's reliance on California law is unpersuasive here. But, even if a separate wrongful act were required, and it is not, Kennard/Dominion and Staple Street's actions in defaming Herring as a liar, disparaging OAN as toxic and disseminating confidential information from the Affiliation Agreement suffice as independent wrongful acts.

Staple Street's motion to dismiss should also be denied because, contrary to its own wholly conclusory statement that the Amended Counterclaim pleads nothing more than labels, conclusions, and formulaic recitation of the elements, the Amended Counterclaim together with the exhibits attached thereto has pled a facially plausible claim that allows the court to draw a reasonable inference that Staple Street is liable for the misconduct alleged in Counts III and IV. (*See, e.g*., Am. Counterclaim, Dkt. 85 ¶¶ 74–77, 90, 94-101, 110, 114, 117, 127, 130–32, including but not limited to *id.* Exs. J, K and L); *see Iqbal*, 556 U.S. at 678; *McFadden,* 949 F. Supp. 2d at 219.

Accordingly, the motions to dismiss Counts II and IV should be denied in their entirety.

**C.      The Court Should Deny AT&T's Motion to Dismiss Count V (Indemnity).**

Herring alleges that AT&T (the Affiliate) breached its indemnity agreement (Am. Counterclaim, Dkt. 85 Ex. B §§ 8.2, 16.3) with Herring Networks, Inc. (Programmer). The elements of a breach of contract claim under California law which the parties chose (*id.* § 13) are: (1) the existence of the contract; (2) plaintiff's performance or excuse for nonperformance;

(3) defendant's breach; and (4) the resulting damages to the plaintiff. *Shusha, Inc v. Century-National Ins. Co.,* 87 Cal. App. 5th 250, 266 (Cal. Ct. App. 2022).

AT&T does not contest the first element ("The Contract expressly defines AT&T Services…" (Dkt. 113-1 at 15)) nor does it claim non-performance by Herring besides the failure to give notice which it mentions only in a footnote (Dkt. 113-1 at 7 n.6.) AT&T does not claim a material breach. As to the third element AT&T does not contest that it has failed to "defend and hold harmless (Herring)" (Am. Counterclaim, Dkt. 85 Ex. B § 8.2) and admits that disparagement was alleged ("because of allegedly disparaging statements about Herring … Herring claims AT&T Services must indemnify Herring" (Dkt. 113-1 at 1)).[5] In fairness, AT&T does argue that (i) "it wasn't me" claiming that CNN and HBO statements are not attributable to it and (ii) Mr. Kennard's statements are not disparaging. We will address those arguments, *infra.*

AT&T apparently attacks the fourth element "the resulting damages to the Plaintiff" claiming that it is implausible that "those statements purportedly caused Dominion's lawsuit." (Dkt. 113-1 at 1.) AT&T's argument, although it doesn't specifically say so, is that the language requiring indemnity occurs only "to the extent arising out of … (AT&T Services') breach or alleged breach of any provision of this Agreement." And it ignores that provision of the Agreement which states that disparagement by one Party "could cause the other Party … significant harm." (Am. Counterclaim, Dkt. 85 Ex. B § 16.3.)

California law has long recognized that a "breach of contract action lies, though no actual damages be sustained." *McCarty v. Beach*, 10 Cal. 461, 464 (Cal. 1858). That common law rule is now memorialized in statute. *See* Cal. Civ. Code § 3360. "[W]hen a breach of duty has caused no

---

[5] A detailed recitation of the disparaging statements are set out in paragraphs 57–66 of the Amended Counterclaim as "mere examples" of the disparagement. (Dkt. 85.)

appreciable detriment to the party affected, he may yet recover nominal damages." *Id.* Section 3360 has been applied to contract actions. *ProMex, LLC v. Hernandez*, 781 F. Supp. 2d 1013, 1019 (C.D. Cal. 2011).

Herring pleads that the non-disparagement here has caused "significant harm" but even if it has not, dismissal is inappropriate under California law because Herring is, at least, entitled to nominal damages. *See Raiser v. Ventura Coll. of Law,* 488 F. App'x 219, 222 (9th Cir. 2012) (Dismissal of plaintiff's breach of contract claim, related to the failure to provide him with non-academic expulsion hearing, was improper because under California law, inability to show actual damages did not preclude recover for breach of contract).

AT&T's plausibility analysis converts the causation element into an inquiry into Dominion's motives. But this is not a case where *scienter* is an element which might require a heightened pleading. Herring has alleged breach of an extraordinarily broad Non-Disparagement Clause (Am. Counterclaim, Dkt. 85 Ex. B, § 16.3), and AT&T only passingly challenges that disparagement has occurred only that it is an "utterly implausible theory that Dominion decided to sue Herring" based on the disparagement. (Dkt. 113-1 at 1.) It complains that "Herring offers not a single fact to explain why Dominion would have been influenced in any way by … the alleged disparagement [which] caused Dominion to sue." (*Id.*)

Herring and Dominion are not on the best of terms, so uncovering direct evidence of Dominion's motives may ultimately prove challenging. Nor, we predict, is Dominion likely to fess up in depositions, although emails often uncover unpleasant truths as Dominion discovered in related litigation for which it was handsomely rewarded. But such evidence should not be demanded of Herring at the motion-to-dismiss stage.

Here, it is enough to plausibly suggest that Dominion is moved by publicity (it is aggressively represented by the world class PR firm Hamilton Place Strategies) and that the disparaging comments made by AT&T's Affiliated Companies may have influenced to some degree Dominion's motives. OAN will be a wounded target (and thus an easier settlement litigant), or a disparaged entity will have less jury appeal. At this stage, it is premature and unfair to ask Herring to satisfy the straw man AT&T erects remembering that the indemnity is not an all or nothing proposition. It only applies "to the extent arising out of." It may be that Dominion was motivated to "some extent" to sue based upon the disparaging comments, although there were almost certainly other factors at work. Discovery might reveal its motivations (besides seeking a monetary windfall).

After all, "an utterly implausible theory" (Dkt. 113-1 at 1) should not be confused with contractual language which, if followed, might lead to what the Court or a rational observer might consider an implausible result. While Dominion's motives will certainly be the subject of discovery and might later play a role in the damages analysis, it does not call for dismissal at this stage.

So, Herring has adequately alleged all of the elements of its claim. We turn now to AT&T's attack on the alleged disparagement itself which implicated breach. To fully analyze Herring's claim, the Court must turn to the contract. Under California law (as in most jurisdictions) the intention of the parties at the time of the agreement is paramount. *Yahoo Inc v. Nat'l Union Fire Ins. Co.,* 519 P.3d 992, 997 (Cal. 2022) ("[T]he mutual intention of the parties at the time the contract is formed governs interpretation."). If the language of the contract is clear and explicit it governs without further inquiry. *Id.* The contract's language demonstrates that the parties intended a broad non-disparagement obligation. (Am. Counterclaim, Dkt. 85 Ex. B § 16.3.)

16

**(1) The Term of the Agreement**

First, the term extends for "the Term of this Agreement and for two (2) years thereafter." (*Id.*) All of the alleged disparagement occurred within the term or its two-year tail. Both DIRECTV, LLC, a California limited liability company, and AT&T Services, Inc., a Delaware corporation are parties to the Agreement. But in what appears to be a corporate sleight of hand, AT&T Services purportedly "assigned" the Agreement to an entity that was already a party to the Agreement DIRECTV LLC on July 28, 2021, and thus claims it "is not bound or secondarily liability under the assigned contract (because) the counterparty consent(ed) to the assignment" (Dkt. 113-1 at 14) relying upon Section 1457 of the California Civil Code which states that "the burden of an obligation may be transferred with the consent of the party entitled to its benefit **but not otherwise ...**" (emphasis added).

AT&T concedes there was no consent but argues (*breathlessly*) that "Herring *contracted away* its right to consent." (Dkt. 113-1 at 15 (emphasis in original).) It cites Section 12 of the Agreement, which says "no consent shall be necessary" when the assignment is to a party. Whether necessary or not, the fact is there was no consent and California courts would not countenance this effort by AT&T to escape liability. As the court wrote in *Baer v. Associated Life, Ins. Co.*, 202 Cal. App. 3d 117, 123 (Cal. Ct. App. 1988), "Throughout the years, our courts have interpreted this statute liberally and held that: 'The obligations of an assignor of a contract continue to rest upon him and he will be required to respond to the other party in the event of a default on the part of the assignee.'" When the statute says **"but not otherwise"** it must mean something. It does here.

In any event, many but not all of the disparaging comments predated the assignment. We do not understand that AT&T claims absolution for even those defaults, but we shall see. In the

17

event AT&T's assignment argument has merit, in whole or in part, Herring seeks leave to join DIRECTV LLP as a third party defendant.

AT&T also seeks an escape hatch for William Kennard who wore various hats as we have previously described. It makes the point that Kennard's pleaded comments were made after the lawsuit. But the only temporal limitation on the Agreement is that the disparaging comments must be made during the term or during the two-year tail. Kennard's comments admittedly fall within that time frame; these are only his public comments. The Agreement contemplates all sorts of private publications which will have to await discovery. But the comments pleaded adequately demonstrate that Kennard was disparaging Herring.

### (2) The Scope of the Disparagers

In response to AT&T's "it wasn't me" argument we again turn to the Agreement which states that the disparagement need not be direct but could be stated "directly or indirectly" and the Parties need not even publish the disparagement themselves but may not "encourage, suggest or organize any other individual, entity or third party or their Representative" to do so. (Am. Counterclaim, Dkt. 85 Ex. B § 16.3.)

The Non-Disparagement applies to the Parties which are defined as "Herring, DIRECTV LLC, AT&T Services, Inc." and "its Affiliated Companies" which is defined to include "with respect to any person or entity, any other person or entity directly or indirectly controlling, controlled by or under common control (i.e., the power to direct affairs by reason of ownership of voting stock, by contract or otherwise) with such person or entity." (*Id.* at 1.)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



."

AT&T argues that the disparagement by CNN and HBO, which AT&T "acquired … on June 14, 2018" (Dkt. 113-1 at 18), is inapplicable because it occurred after the Agreement was signed. There is nothing in the Agreement that states that only disparagement at the time of its signing triggers a breach. The cases cited by AT&T in support of their argument are off point. Herring is not trying to hold CNN or HBO liable. It is merely enforcing a broad non-disparagement clause (which runs both ways—Herring is bound as well—and was negotiated at arm's length by sophisticated parties) which covers statements made during the Term of the Agreement and for two years thereafter.

Finally, we note AT&T's contention that the contract's interpretation is "especially absurd" (*id.* at 21) because AT&T would have "forfeited by contract the special and constitutionally recognized role of [the news media] in informing and educating the public, offering criticism and providing a forum for discussion and debate." *Id.* These are all critically important and cherished rights that AT&T (which drafted the Agreement) should have presumable considered when it insisted on the broad definitions contained in the Agreement. It is certainly the law that these rights can be altered by contract. *See Snepp v. United States,* 444 U.S. 507 (1980) (*per curiam* ) (contract

with CIA overrode former officer's First Amendment right to publish a book in violation of contract).

### (3) Scope of the Disparagement

AT&T asserts that "Kennard's alleged statements do not constitute disparagement" but then wanders into the argument that the statement could not possibly have caused Dominion to sue. Unlike the person and entities who are covered by section 16.3, disparagement is not defined but it is well understood in California law. The California Supreme Courts holds that "disparagement involves two distinct but related specificity requirement. A false or misleading statement (1) must specifically refer to the plaintiff's product or business , and (2) must clearly derogate that product or business. Each requirement must be satisfied by express mention or by clear implication." *Hartford Cas. Ins. Co. v. Swift Distrib., Inc.,* 326 P.3d 253, 261 (Cal. 2014).

AT&T does not even discuss this definition nor does it argue that the alleged comments do not qualify. The currently known statements have been adequately plead.

### (4) The Method of Distribution

The agreement contemplates both public and private distribution which calls for discovery. The Agreement covers "including, without limitation, via the Services, blogging, social media, press interviews and or any public statement" and the Agreement prohibits encouraging, suggesting that any other individual or entity disparage. The disparagement may be either "direct" or "indirect". (Am. Counterclaim, Dkt. 85 Ex. B § 16.3.)

Herring has adequately plead all of the elements of contract and the motion to dismiss should be denied.

Dated: July 5, 2023                    Respectfully submitted,

                                       By: */s/ Charles L. Babcock*
                                           Jonathan D. Neerman (*D.D.C. admission pending*)
                                           D.C. Bar No. 90003393
                                           jneerman@jw.com
                                           Charles L. Babcock *(admitted pro hac vice)*
                                           cbabcock@jw.com
                                           Jackson Walker LLP
                                           2323 Ross Avenue, Suite 600
                                           Dallas, TX 75201
                                           T: (214) 953-5664
                                           F: (214) 661-6899

                                           */s/ R. Trent McCotter*
                                           R. Trent McCotter (D.C. Bar No. 1011329)
                                           Boyden Gray & Associates
                                           801 17th St NW, #350
                                           Washington, DC 20006
                                           (202) 706-5488
                                           mccotter@boydengrayassociates.com

                                       **COUNSEL FOR DEFENDANTS HERRING
                                       NETWORKS, INC., D/B/A ONE AMERICA NEWS
                                       NETWORK, CHARLES HERRING, ROBERT
                                       HERRING, SR., AND CHANEL RION**

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of July 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which I understand to have served counsel for the parties.

*/s/ Charles L. Babcock*
Charles L. Babcock