UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

US DOMINION, INC., *et al.*,

    *Plaintiffs*,

v.

HERRING NETWORKS, INC., *et al.*,

    *Defendants*.

Civil Action No. 1:21-cv-02130 (CJN)

### MEMORANDUM OPINION

Plaintiffs Dominion and Staple Street sued Defendant Herring (the operator of One America News Network) for defamation in connection with the 2020 presidential election.[1] Herring thereafter filed a third-party complaint against AT&T Services, claiming that AT&T Services must cover Herring's defense and indemnify it for any damages resulting from Dominion's suit. Herring also asserted counterclaims against Dominion and Staple Street, alleging that they tortiously interfered with its business relationships and contracts. AT&T Services, Dominion, and Staple Street all move to dismiss Herring's claims against them. For the reasons that follow, the Court grants the motions.

### I.

1. The facts relevant to this opinion date back to 2013, when AT&T—the owner of a "significant media business through its WarnerMedia division"—sought "to compete with Fox

---

[1] For the purposes of this opinion, "Dominion" refers to plaintiffs and counterclaim-defendants US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation; "Staple Street" refers to plaintiff and counterclaim-defendant Staple Street Capital LLC; and "Herring" refers to defendants and counterclaim-plaintiffs Herring Networks, Inc., Charles Herring, Robert Herring, Chanel Rion, and Christina Bobb.

1

News Network with an alternative conservative-leaning network." Am. Countercl. and Third-Party Compl. ("Countercl.") ¶¶ 35, 38, ECF No. 85. Herring stepped up by launching One America News Network ("OAN") at AT&T's "urging." Countercl. ¶ 38. A few years later, AT&T acquired DIRECTV, "the country's largest paid satellite TV provider." Countercl. ¶ 36. And Herring eventually entered into a contract (the "Affiliation Agreement") with DIRECTV and AT&T's subsidiary, AT&T Services. Countercl. ¶ 41. The agreement covers topics including confidentiality, non-disparagement, and indemnification. Countercl. ¶¶ 41, 48, 49.

In November 2020, William Kennard was appointed the Chairman of AT&T's Board of Directors. Countercl. ¶ 81. He also served on AT&T's Public Policy and Corporate Reputation Committee. Countercl. ¶ 82. In addition to his roles at AT&T, Kennard was "a member of the Operating Executive Board of Directors of Staple Street," a private equity company "which is the majority owner of" Dominion, a company that supplies voting systems and services in elections.[2] Countercl. ¶ 78. ██████████████████████████████████ Countercl. ¶¶ 79, 80.

Trouble regarding AT&T's connection with OAN surfaced about a year into Kennard's tenure on AT&T's Board. In October 2021, Reuters published an article titled "How AT&T helped build far-right One America News." Countercl. ¶ 101. "Immediately upon release of the Reuters article, liberal organizations began publicly criticizing AT&T for its relationship with OAN." Countercl. ¶ 104. The NAACP, for example, "accused AT&T of causing 'irreparable damage to

---

[2] Dominion denies that Kennard was ever "on any kind of Board of Directors" for Staple Street. Dominion Corrected Mot. to Dismiss at 2, ECF No. 114. And Staple Street contends that Herring has sued the wrong entity because "Staple Street Capital LLC" is "an entity that was voluntarily canceled and has been defunct since 2017" and that it is instead "Staple Street Capital II LP" and "Staple Street Capital II-A LP" that have an ownership interest in Dominion. Staple Street Corrected Mot. to Dismiss at 1, 2, ECF No. 115. The Court assumes that the facts pleaded in the counterclaim are true at this stage. But, as always, the Court's recitation of alleged facts does not indicate their veracity.

our democracy'" and "demanded that AT&T de-platform OAN from DIRECTV."  Countercl. ¶¶ 105, 114.  Ultimately, DIRECTV "decided not to renew the Affiliation Agreement" with Herring, dropping OAN.  Countercl. ¶ 120.

2.  This litigation ultimately arose in August of 2021, when Dominion sued Herring for defamation based on Herring's statements that Dominion facilitated election fraud in the 2020 presidential election.  Compl. ¶¶ 2–3, ECF No. 1; *see also US Dominion, Inc. v. Herring Networks, Inc.*, 639 F. Supp. 3d 143, 151 (D.D.C. 2022).  Most of these statements were broadcast by OAN on its cable channel.  *Dominion*, 639 F. Supp. 3d at 151.  A year and a half later, and as particularly relevant here, Herring filed counterclaims against Dominion and Staple Street and a third-party complaint against AT&T Services and Kennard.[3]  *See* ECF No. 60.

Herring's claim against AT&T Services centers on the Affiliation Agreement.  Herring alleges that AT&T Services is contractually obligated to indemnify Herring because AT&T Services "proximately caused" Dominion's defamation suit against Herring when it breached the contract's non-disparagement provision.  Countercl. ¶¶ 185–191.  The breaches, Herring says, occurred when Kennard and on-air personalities at CNN and HBO (then-owned by AT&T) criticized Herring.  Countercl. ¶¶ 56, 185–191.  Herring alleges, for example, ▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and that CNN hosts and HBO comedian John Oliver questioned OAN's scruples and impact on society.  Countercl. ¶¶ 56–66, 70.

Herring's counterclaims against Dominion and Staple Street are for tortious interference.  Herring alleges that Dominion and Staple Street (acting through Kennard) caused DIRECTV to not renew the Affiliation Agreement and caused AT&T and DIRECTV to breach the agreement's non-disparagement and confidentiality provisions.  Countercl. ¶¶ 150–183.

---

[3] Herring has voluntarily dismissed its claims against Kennard.  *See* ECF No. 101

AT&T Services, Dominion, and Staple Street move to dismiss.

## II.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts must accept as true all factual allegations in a complaint, the same deference is not owed to legal conclusions. *Id.* Plaintiffs therefore cannot rely on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* Nor are courts "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

### A.

Herring's contractual indemnity claim cannot survive AT&T Services' motion to dismiss. According to Herring, AT&T Services must cover its costs, attorney's fees, and damages incurred as a result of Dominion's defamation suit. Herring's theory is rooted in the Affiliation Agreement, which states that AT&T Services "shall indemnify, defend and hold harmless . . . against and with respect to any and all claims, demands, actions, or causes of action, damages, liabilities threatened claims, costs and expenses . . . incurred in connection with any third-party claim . . . to the extent arising out of [AT&T Services'] breach or alleged breach of any provision of this Agreement." Countercl. ¶ 185. Herring alleges that "AT&T Services breached the non-disparagement provision" of the Agreement because its representatives, such as Kennard and "representatives at CNN and HBO" disparaged Herring. Countercl. ¶¶ 187, 188. And, according to Herring, these breaches led to Dominion's lawsuit. Countercl. ¶ 188.

The problem is that Herring does not plead facts tying Dominion's lawsuit to the allegedly disparaging statements. Thus, Herring has not plausibly pleaded that Dominion's defamation suit against Herring in any way "arose out of" the disparaging statements, as the contract requires.

For starters, many of the disparaging statements to which Herring alludes were made *after* Dominion sued Herring, undercutting Herring's theory of causation. Dominion sued Herring in August 2021. *See* ECF No. 1. But all of Kennard's disparaging statements came several months later, in October 2021, *see* Countercl. ¶¶ 68-71, and the same is true of many of the statements by HBO's and CNN's on-air personalities, *see* Countercl. ¶¶ 62-65. The counterclaim identifies only four instances of allegedly disparaging HBO- or CNN-affiliated comments that predate Dominion's suit against Herring. *See* Countercl. ¶¶ 57-59, 61. And some of those comments came so far in advance that it is hard to believe they precipitated Dominion's suit—for example, John Oliver's April 2020 statements on HBO about OAN's "dirt stupid reporting," Countercl. ¶ 61.

More fundamentally, Herring has not pleaded a single fact plausibly linking the disparaging statements and Dominion's lawsuit. Nor has Herring presented any plausible theory for why Dominion's decision to sue Herring would have been influenced by those statements. To the contrary, there are "[o]bvious alternative explanation[s]" for why Dominion sued Herring. *Iqbal*, 556 U.S. at 682. In fact, Herring's own allegations point to two: profit and politics. Herring alleges that Dominion's lawsuit is the product of a "coordinated, well-financed scheme to build up the 'Dominion' brand and weaponize it as a profit-making litigation machine while taking down Herring (among others)." Countercl. ¶ 15. And it alleges that Dominion sued "based on . . . viewpoint discrimination, political power, selfish profit motives, backroom handshake shenanigans, and improper manipulation of government influence" and that Dominion acted to "interfere with, disparage, and destroy viewpoints politically and financially detrimental to" it.

5

Countercl. ¶ 13. As Herring points out, Dominion received $787.5 million from a similar suit it filed against Fox. Countercl. ¶¶ 2, 87. In light of these allegations, it is hard to believe that Dominion might have spared Herring if not for John Oliver's jokes or the statements of CNN reporters, especially when Herring fails to allege any fact suggesting that those statements played any role at all.

Further undermining the plausibility of Herring's story of causation is the fact that OAN was the subject of widespread critical coverage from outlets unaffiliated with AT&T. AT&T Services cites several examples of withering coverage from the New York Times, Washington Post, and Business Insider.[4] AT&T Services Mem. in Supp. of Mot. to Dismiss ("AT&T Br.") at 13–14, ECF No. 113-1. Herring provides no reason why Dominion's lawsuit would have been triggered by AT&T-affiliated criticism of Herring rather than by similar aspersions from others.

Herring barely attempts to overcome these hurdles. It does not dispute that it has not "offer[ed] a single fact to explain why Dominion would have been influenced in any way by . . . the alleged disparagement." Herring Resp. to Mots. to Dismiss ("Herring Br.") at 15–16, ECF No. 120 (quoting AT&T Br. at 1). Instead, Herring argues that it should be enough that it has "plausibly suggest[ed] . . . that the disparaging comments . . . may have influenced to some degree Dominion's motives." Herring Br. at 16. Unfortunately for Herring, it is black-letter law that such speculation about mere possibilities cannot overcome a motion to dismiss. *Iqbal*, 556 U.S. at 679.

None of this is to say that Herring was required to plead that the alleged disparaging statements were the *sole* reason for Dominion's suit. After all, the indemnification provision obligates AT&T Services to indemnify Herring against third-party claims "*to the extent arising*

---

[4] The Court takes "judicial notice of the existence of [these] newspaper articles." *Sandza v. Barclays Bank*, 151 F. Supp. 3d 94,113 (D.D.C. 2015).

6

*out of* [AT&T Services'] breach." Countercl. ¶ 185 (emphasis added). But still, Herring was required to plead facts rendering it plausible that Dominion's suit was *in some way* influenced by the disparaging statements. It failed to do so because "the well pleaded facts," here "do not permit the court to infer more than the mere possibility" of such a connection. *Iqbal*, 556 U.S. at 679.

Changing tack, Herring argues that these arguments about causation simply serve to mitigate damages, and that it should be allowed to proceed to recover nominal damages so long as AT&T breached the contract in some way. Herring Br. at 14–15. This misses the point. Herring's failure to allege a link between the allegedly disparaging comments and Dominion's suit means it has failed to plausibly plead that AT&T Services is under any contractual obligation to indemnify it. In essence, Herring proceeds as if it has brought a breach-of-contract suit against AT&T Services based on violations of the non-disparagement provisions. But Herring's counterclaim contains no such theory, and Herring cannot amend its counterclaim through its briefing. *See Budik v. Ashley*, 36 F. Supp. 3d 132, 144 (D.D.C. 2014).

### B.

Herring's tortious interference clams against Dominion and Staple Street do not survive either. Even assuming that Herring was the victim of tortious interference, Herring must establish that *Dominion or Staple Street* (the two relevant counterclaim defendants) is legally responsible for it. Herring's theory is that Kennard tortiously interfered with Herring's relationship with DIRECTV and AT&T while "at times, acting on behalf of" Dominion and Staple Street—*i.e.*, acting as their agent—making Dominion and Staple Street liable for his actions. Herring Br. at 5. But Herring's well-pleaded facts do not plausibly support this Kennard-as-agent theory.

"In determining whether one party (the agent) was acting on behalf of another party (the principal)," D.C. courts look "to the facts of the relationship" and "examine[] several relevant

7

factors, including control, contracts or agreements, and the words and actions of the principal." *FDS Rest., Inc. v. All Plumbing Inc.*, 241 A.3d 222, 241 (D.C. 2020). This boils down to a two-part test: "First the court must look for evidence of the parties' *consent* to establish a principal-agent relationship. Second, the court must look for evidence that the activities of the agent are subject to the principal's *control*." *Jackson v. Loews Washington Cinemas*, 944 A.2d 1088, 1097 (D.C. 2008) (citations omitted). At the end of the day, control, or the lack thereof, is "usually" "determinative." *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000).

Applying these standards, the Court concludes that Herring has failed to allege facts indicating that Kennard acted as Dominion's or Staple Street's agent. In its brief, Herring does not clearly lay out the allegations it thinks best supports its position. *See* Herring Br. at 3 (referencing "facts supplied by the Amended Counterclaim and the exhibits thereto" and "facts pleaded here and the totality of the circumstances"). But even mining the 267-page counterclaim and attachments for itself, the Court does not find sufficient support. The relevant allegations can be roughly synthesized as follows:

- Kennard has ties to Dominion and Staple Street: He is a "founding investor" and "a member of the Operating Executive Board of Directors of Staple Street," ▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Countercl. ¶¶ 78-80.

- Kennard has ties to AT&T: He is "the board chairman for AT&T, sets the agenda for and directly formulates AT&T and its subsidiaries' strategic policy." Countercl. ¶ 53. Kennard "also sits on AT&T's Public Policy and Corporate Reputation Committee, which has 'the authority to review AT&T's management of its brands.'" Countercl. ¶ 82.

- "OAN's coverage of the 2020 presidential election upset [Dominion], Staple Street, and . . . Kennard." Countercl. ¶ 8.

- Dominion and Staple Street have a financial interest in winning defamation lawsuits: Dominion and Staple Street made money from a defamation lawsuit against Fox regarding its coverage of the 2020 election. Countercl. ¶ 87. Dominion has filed defamation suits against others too for statements regarding the 2020 election. Countercl. ¶ 93.

8

- ███████████████████████████████████████████ and so is incentivized to "ensur[e] that the Dominion entities silence their opponents such as Herring . . . in the marketplace of ideas." Countercl. ¶ 94. "[P]ressuring carriers to take OAN off the air" would "cut[] off Herring's ability to earn revenue to help fund speech . . . critical of" Dominion and fund "Herring's litigation defense." Countercl. ¶ 100.

- In 2021, after Reuters published an article titled, "How AT&T helped build far-right One American News," "liberal organizations began publicly criticizing AT&T for its relationship with OAN," leading to "mounting pressure to remove OAN from the airwaves." Countercl. ¶¶ 102, 104, 117.

- In early 2022, DIRECTV ultimately "decided not to renew" its agreement with Herring, allegedly under pressure from "outside forces, such as AT&T and/or Kennard." Couneterl. ¶ 120. Herring reaches this conclusion in part based on claims that "AT&T owns 70 percent of DIRECTV" and that "it is likely irrefutable that Kennard, Chairman of the Board and a member of AT&T's Public Policy and Reputation Committee, provided input on how to respond to the demands to drop OAN." Countercl. ¶ 145.

- The decision to drop OAN was "not in the best interests of AT&T and its shareholders." Countercl. ¶ 132.

- Dominion, "through Staple Street and Kennard, determined that the destruction of Herring would be beneficial to their political and business interests" and accordingly "under the direction of Staple Street and Kennard," filed this lawsuit against Herring." Countercl. ¶¶ 97-98.

Taking all this as true, "[a]t most, it can be inferred from these allegations" that Kennard, Dominion, and Staple Street "shared a common interest." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 112 (D.D.C. 2010). Herring's theory seems to be that Dominion and Staple Street must have been involved with Kennard-connected actions adverse to OAN because actions that hurt OAN help Dominion, Staple Street, and Kennard. But "regardless of how united two parties might be with respect to any particular issue, there can be no principal-agent relationship absent some indication that the position of one of the entities was taken at the direction of the other." *Id.* (cleaned up). In other words, it is not enough for Herring to plead facts indicating Dominion, Staple Street, and Kennard share common goals and have some sort of relationship. Those are

9

"facts that are merely consistent with" liability. *Iqbal*, 556 U.S. at 678. Herring must plead additional facts to render it plausible that Kennard was subject to Dominion or Staple Street's control when he engaged in the interfering conduct.

It has not done so. If fact, when it comes to the most significant alleged act of interference—DIRECTV's decision to drop OAN—Herring's pleadings again provide an "[o]bvious alternative explanation" for Kennard's behavior that has nothing to do with his ties to Dominion or Staple Street. *Iqbal*, 556 U.S. at 682. In particular, Herring's allegations strongly suggest that DIRECTV dropped OAN, and publicly announced its intention to do so, because of public pressure on DIRECTV's majority owner, AT&T. Thus, to the extent Kennard was involved with AT&T's and DIRECTV's decision to end its association with OAN, Herring's own allegations suggest that he was acting on behalf of AT&T in response to public pressure on the company. Further undercutting Herring's position is the additional fact that companies not alleged to be linked to Kennard, Dominion, or Staple Street at all ("including Verizon Fios and Frontier") also dropped OAN. Countercl. ¶ 166. All of this is quite inconsistent with the notion that AT&T and DIRECTV's action must have been influenced by Dominion or Staple Street.[5]

Perhaps recognizing its inability to establish an actual agency relationship here, Herring all but abandons that theory in its briefing. Instead, Herring turns to the doctrine of apparent authority, under which an agent's dealings with a third party can bind the principal even when the usually

---

[5] For the sake of clarity, the Court specifies that there is no indication that any of the other potentially alleged interfering acts were taken under Dominion's or Staple Street's control either. ████████████████████████████████████████████████████████████████████████████████████████ *See* Countercl. ¶¶ 69, 70, 71, 154, 171 & Ex. C, Ex. F, Ex. G. And to the extent Herring claims that Dominion and Staple Street are responsible for the alleged disparaging comments on HBO and CNN, it pleads no facts that indicate Kennard caused any of those comments or, even assuming he did, that he was acting under Dominion or Staple Street's control at the time. *See* Countercl. ¶¶ 173.

required control does not exist. *See* Herring Br. at 5; *Makins v. District of Columbia*, 861 A.2d 590, 593 (D.C. 2004). Apparent authority arises "when the principal places an agent in a position which causes a third person to reasonably believe the principal had consented to the exercise of authority the agent purports to hold." *Id.* at 594. Herring claims that "AT&T, Staple Street, and Dominion's actions installing Kennard in positions of influence within the companies would reasonably lead third parties to conclude that agency relationships exist with Kennard." Herring Br. at 7–8.

But this theory too misses the mark. It is implausible that DIRECTV (or whoever the relevant third parties are—Herring does not specify) would have viewed Kennard's allegedly interfering acts as being on behalf of Dominion or Staple Street, rather than on behalf of AT&T or himself. After all, Kennard was the chairman of AT&T's Board and on AT&T's Public Policy and Reputation Committee and (when it came to DIRECTV) communicating to a company owned by AT&T in the wake of public criticism of AT&T.

Moreover, Herring's pleadings indicate that Kennard's connections to Dominion and Staple Street were not widely known. According to Herring, ███████████████████ ███████████████████████████████████████████████████████████ ████████████████ Countercl. ¶ 74. During Kennard's tenure as Chair of AT&T's Board of Directors, there was no "information about . . . Kennard's role as a member of Staple Street's Operating Executive Board of Directors" or "Staple Street's investment in Dominion" on Staple Street's website. Countercl. ¶ 81. On top of that, "AT&T and Kennard have" made "information" about Kennard's connections to Dominion and Staple Street "difficult . . . to discover" and have "repeatedly highlighted that Kennard is the 'independent' Chairman of the Board of Directors of AT&T." Countercl. ¶ 89. In light of these allegations, it is not plausible that third parties would

11

have viewed Kennard as Dominion's or Staple Street's agent when he engaged in the alleged tortious interference.

Herring maintains that "Kennard's CV together with his various board positions . . . are more than enough to suggest to third parties that he has the power to influence not only AT&T, AT&T Services, and DIRECTV but Dominion and Staple Street as well." Herring Br. at 3. But even if true, this argument misunderstands apparent agency. The question is not whether a third party might conclude that *Kennard could influence Dominion or Staple Street*; the question is whether a third party would reasonably conclude that *Dominion or Staple Street had control over Kennard's actions* involving AT&T and DIRECTV. And to that question, "yes" is not a plausible answer.[6]

Because Herring has not plausibly alleged that Kennard was acting as Dominion's or Staple Street's agent at the time of the alleged tortious interference, Herring's counterclaims against Dominion and Staple Street must be dismissed.

---

[6] Herring throws a final Hail Mary in its brief. Herring now says that its tortious interference claims were always premised on other would-be agents in addition to Kennard. Herring Br. at 3 ("Herring's allegations are not limited solely to Kennard but encompass other agents such has Hootan Yaghoobzedeh, Staple Street's managing director."). But the counterclaim's description of the tortious interference causes of action repeatedly and uniformly state that Dominion and Staple Street interfered "through the actions of their agent Kennard" and mention no one else. *See* Countercl. ¶¶ 152, 154, 155, 156, 157, 158, 161, 162, 163, 164, 165, 166, 169, 171, 171, 175, 178, 181, 183. The new character Herring brings to the fore—Hootan Yaghoobzadeh—was mentioned only three times in the body of the counterclaim: once to establish Staple Street's citizenship for purposes of diversity jurisdiction, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Countercl. ¶¶ 24, 75, 76. Again, Herring cannot amend its counterclaim through its briefs. *See supra* p. 7; *Budik*, 36 F. Supp. 3d at 144.

## III.

For the above reasons, the Court grants the motions to dismiss. An order will be entered contemporaneously with this opinion.

DATE: April 1, 2024

_____
CARL J. NICHOLS
United States District Judge