**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| US DOMINION, INC., *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:21-cv-02130-CJN-MAU |
| HERRING NETWORKS, INC., D/B/A ONE AMERICA NEWS NETWORK, *et al.*, | |
| Defendants. | |

**<u>MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 8

   I.   Dominion Cannot Satisfy Its "Daunting" Burden on Actual Malice. ................................ 8

      A.   At Summary Judgment, Dominion Has the Burden of Showing Actual Malice at the Time of Publication, by Clear and Convincing Evidence. ...................................................... 8

      B.   A "Daunting" Showing Is Required to Demonstrate Actual Malice at the Time of Publication by Clear and Convincing Evidence. .................................................................... 9

      C.   Dominion's Broadside Theories Cannot Satisfy the "Daunting" Showing Required....11

      D.   A Publication-by-Publication Review Further Confirms Dominion Cannot Satisfy its "Daunting" Standard.......................................................................................................... 20

   II.   At the Very Least, Summary Judgment Is Warranted for Mr. Robert Herring on Actual Malice and Publication...................................................................................................... 34

   III.   None of the Challenged Statements Is Defamatory *Per Se*, False, Nor "Of-and-Concerning" Dominion. ............................................................................................... 36

      A.   Relevant Legal Standards ...................................................................................... 36

      B.   No Statement was Defamatory *Per Se*, False, *and* Of-and-Concerning Dominion...... 41

   IV.   Summary Judgment Is Appropriate on Damages......................................................... 68

      A.   The Only Measure of Defamation Damages for a Corporation Is Lost Profits. ........... 68

      B.   Dominion Cannot Raise a Triable Claim that the Complained-of Publications Caused Any Lost Profits........................................................................................................... 70

      C.   No Damages Are Warranted Against Mr. Robert Herring and Charles Herring........... 74

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Pol'y Grp., LLC*,
  975 F. Supp. 2d 1 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015) ...................... *passim*

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................................................6, 9

*Armstrong v. Thompson*,
  80 A.3d 177 (D.C. 2013) ..................................................................................... *passim*

*Arpaio v. Cottle*,
  No. 1:18-cv-02387, 2019 WL 11322515 (D.D.C. Dec. 3, 2019) ...........................20

*Art-Metal-USA Inc. v. United States*,
  753 F.2d 1151 (D.C. Cir. 1985)...................................................................42, 68, 69, 70

*Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*,
  383 F. Supp. 2d 32 (D.D.C. 2005) .........................................................................62

*Barrett v. Atl. Monthly Grp. LLC*,
  No. 1:22-cv-49, 2024 WL 4119400 (D.D.C. Sept. 9, 2024).....................................39

*Bauman v. Butowsky*,
  377 F. Supp. 3d 1 (D.D.C. 2019) ........................................................................ *passim*

*Baumback v. Am. Broadcasting Cos.*,
  161 F.3d 1 (4th Cir. 1998) ......................................................................................8

*Benic v. Reuters Am., Inc.*,
  357 F. Supp. 2d 216 (D.D.C. 2004) ...............................................................37, 42, 54, 56

*Bennett v. FedEx Off. & Print Servs., Inc.*,
  No. CV 21-2349, 2022 WL 2072599 (D.D.C. June 9, 2022) ..................................52

*Blankenship v. NBCUniversal, LLC*,
  60 F.4th 744 (4th Cir. 2023) ...................................................................................9

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984).........................................................................................37, 55

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002) ...............................................................................71

*Calloway v. Cent. Charge Serv.*,
    440 F.2d 287 (D.C. Cir. 1971) ........................................................................70

*Chandler v. Berlin*,
    691 F.Supp.3d 118 (D.D.C. 2023) .................................................................68

*Clyburn v. News World Commc'ns, Inc.*,
    903 F.2d 29 (D.C. Cir. 1990) ...........................................................................8

*Cobb v. Time, Inc.*,
    278 F.3d 629 (6th Cir. 2002) .........................................................................20

*Comput. Aid, Inc. v. HewlettPackard Co.*,
    56 F. Supp. 2d 526 (E.D. Pa. 1999) ..............................................................69

*Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*,
    No. 1:00CV98K, 2001 WL 670927 (D. Utah Mar. 26, 2001) ......................69

*Compuware Corp. v. Moody's Invs. Servs., Inc.*,
    499 F.3d 520 (6th Cir. 2007) .........................................................................14

*Contemporary Mission, Inc. v. Famous Music Corp*.,
    557 F.2d 918 (2d Cir. 1977)...........................................................................71

*Curling v. Raffensperger* (*Curling II*),
    493 F. Supp. 3d 1264 (N.D. Ga. 2020) .............................................3, 17, 22

*Curling v. Raffensperger* (*Curling III*),
    702 F. Supp. 3d 1303 (N.D. Ga. 2023) ......................................................1, 2

*Denton v. Hernandez*,
    504 U.S. 25 (1992)..........................................................................................16

*Deripaska v. Associated Press*,
    282 F. Supp. 3d 133 (D.D.C. 2017) ..............................................................41

*Donald J. Trump for President, Inc. v. WP Co.*,
    No. 20-626 (RC), 2023 WL 1765193 (D.D.C. Feb. 3, 2023) .....................18

*Florio v. Gallaudet Univ.*,
    619 F. Supp. 3d 36 (D.D.C. 2022) ...............................................40, 42, 43, 44

*Foretich v. Advance Mag. Publishers, Inc.*,
    765 F. Supp. 1099 (D.D.C. 1991) .......................................................... *passim*

*Fridman v. Bean LLC*,
    No. 17-2041, 2019 WL 231751 (D.D.C. Jan. 15, 2019)........................37, 56

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)........................................................................................38

*In re Giuliani*,
  214 N.Y.S.3d 366 (App. Div. 2024)...............................................................18

*Golden Palace, Inc. v. Nat'l Broadcasting Co.*,
  386 F. Supp. 107 (D.D.C. 1974).....................................................................49

*Green v. CBS Inc.*,
  286 F.3d 281 (5th Cir. 2002) ................................................................. *passim*

*\*Greenbelt Coop. Publ'g Ass'n v. Bresler*,
  398 U.S. 6 (1970)................................................................................... *passim*

*\*Guilford Transp. Indus., Inc. v. Wilner*,
  760 A.2d 580 (D.C. 2000) ..................................................................... *passim*

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989)..................................................................................10, 13

*Hindu Am. Found. v. Viswanath*,
  646 F. Supp. 3d 78 (D.D.C. 2022) ..................................................................15

*\*Jankovic v. Int'l Crisis Grp.*,
  822 F.3d 576 (D.C. Cir. 2016) ............................................................... *passim*

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
  909 F.3d 446 (D.C. Cir. 2018).........................................................................68

*KLEO AG v. Rivada Networks, Inc.*,
  No. 1:22-cv-01664, 2022 WL 22626490 (D.D.C. Nov. 2, 2022) (Friedrich, J.)............ *passim*

*Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*,
  678 F. Supp. 3d 62 (D.D.C. 2023) ..................................................................68

*KTRK Television v. Felder*,
  950 S.W.2d 100 (Tex. App.—Houston [14th Dist.] 1997)...............................39

*Lane v. Random House, Inc.*,
  985 F. Supp. 141 (D.D.C. 1985)..................................................................5, 56

*Latif v. Obama*,
  677 F.3d 1175 (D.C. Cir. 2011).......................................................................72

*Levan v. Cap. Cities/ABC, Inc.*,
  190 F.3d 1230 (11th Cir. 1999) .......................................................................10

*Liberty Lobby, Inc. v. Rees*,
    852 F.2d 595 (D.C. Cir. 1988) ................................................................9

*Lohrenz v. Donnelly*,
    223 F. Supp. 2d 25 (D.D.C. 2002) ..................................................12, 13

*\*Lohrenz v. Donnelly*,
    350 F.3d 1272 (D.C. Cir. 2003) .......................................................*passim*

*Mar-Jac Poultry, Inc. v. Katz*,
    773 F. Supp. 2d 103 (D.D.C. 2011) ..................................................*passim*

*McFarlane v. Esquire Mag.*,
    Civ. No. 92-0711, 1994 WL 510088 (D.D.C. June 8, 1994), *aff'd*, 74 F.3d
    1296 (D.C. Cir. 1996) .....................................................................31

*\*McFarlane v. Sheridan Square Press*,
    91 F.3d 1501 (D.C. Cir. 1996) ........................................................*passim*

*Meyer Grp. Ltd. v. Rayborn*,
    695 F. Supp. 3d 39 (D.D.C. 2023) .........................................................46

*Milkovich v. Lorain J. Co.*,
    497 U.S. 1 (1990) .....................................................................40, 57

*Moldea v. N.Y. Times Co.*,
    15 F.3d 1137 (D.C. Cir. 1994) ...............................................................38

*Moldea v. N.Y. Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994) ...............................................................38

*Montgomery v. Risen*,
    197 F. Supp. 3d 219 (D.D.C. 2016) .................................................*passim*

*Murray v. Amalgamated Transit Union*,
    183 F. Supp. 3d 6 (D.D.C. 2016) ..........................................................68

*Myers v. Plan Takoma, Inc.*,
    472 A.2d 44 (D.C. 1983) ............................................................2, 40, 56

*\*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ......................................................................2, 4

*Nunes v. WP Co.*,
    No. 1:21-cv-00506, 2024 WL 3504066 (D.D.C. June 14, 2024) (Nichols, J.) ............... *passim*

*Nwosu v. Bolduc*,
    No. 23-cv-3841, 2024 WL 1050339 (D.D.C. Mar. 10, 2024) ...............................71

*OAO Alfa Bank v. Ct. for Pub. Integrity*,
    387 F. Supp. 2d 20 (D.D.C. 2005) .................................................................8, 10

*\*Ollman v. Evans*,
    750 F.2d 970 (D.C. Cir. 1984) ...................................................................... *passim*

*Phila. Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986)........................................................................................1, 38

*Pippen v. NBCUniversal Media, LLC*,
    734 F.3d 610 (7th Cir. 2013) ................................................................................19

*Q Int'l Courier Inc, v. Seagraves*,
    No. 95-1554, 1999 WL 1027034 (D.D.C. 1999) ..................................................42

*Raboya v. Shrybman & Assocs.*,
    777 F. Supp. 58 (D.D.C. 1991) ............................................................................37

*Robertson v. District of Columbia*,
    269 A.3d 1022 (D.C. 2022) ..................................................................................37

*Robertson v. McCloskey*,
    680 F. Supp. 414 (D.D.C. 1988) .............................................................70, 71, 74

*Schoen v. Wash. Post*,
    246 F.2d 670 (D.C. Cir. 1957) ..............................................................................71

*Secord v. Cockburn*,
    747 F. Supp. 779 (D.D.C. 1990) ....................................................................20, 31

*Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*,
    585 F. Supp. 2d 815 (E.D. Va. 2008) ..............................................................69, 70

*Snyder v. Phelps*,
    562 U.S. 443 (2011)............................................................................................1, 2

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)................................................................................................8

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ............................................................................72

*Tah v. Glob. Witness Publ'g, Inc.*,
    991 F.3d 231 (D.C. Cir. 2021)..................................................................13, 15, 19

*Tavoulareas v. Piro*,
    759 F.2d 90 (D.C. Cir.), *vacated in part on other grounds*, 763 F.2d 1472
    (D.C. Cir. 1985) ...............................................................................24, 35, 36

vii

*Tavoulareas v. Piro*,
    817 F.2d 762 (D.C. Cir. 1987) (en banc) ................................................8, 9, 14, 35

*US Dominion, Inc. v. Byrne*,
    600 F. Supp. 3d 24 (D.D.C. 2022) (Nichols, J.) .......................................37, 40

*US Dominion Inc., v. My Pillow, Inc.*,
    No. 1:21-cv-00445 (D.D.C.) .............................................................................31

*US Dominion, Inc. v. Powell*,
    554 F. Supp. 3d 42 (D.D.C. 2021) (Nichols, J.) ................................. *passim*

*W.G. Cornell Co. v. Ceramic Coating Co.*,
    626 F.2d 990 (D.C. Cir. 1980) ........................................................................71

*Waldbaum v. Fairchild Publc'ns, Inc.*,
    627 F.2d 1287 (D.C. Cir. 1980) ........................................................................8

*Washburn v. Lavoie*,
    357 F. Supp. 2d 210 (D.D.C. 2004) ...............................................................37

*Waskow v. Associated Press*,
    462 F.2d 1173 (D.C. Cir. 1972) .................................................... *passim*

*Weyrich v. New Republic, Inc.*,
    235 F.3d 617 (D.C. Cir. 2001) ...............................................................36, 40

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990) ........................................................................36

*Xereas v. Heiss*,
    933 F. Supp. 2d 1 (D.D.C. 2013) .............................................................39, 43

*Zimmerman v. Al Jazeera Am., LLC*,
    246 F. Supp. 3d 257 (D.D.C. 2017) ...............................................................39

**Other Authorities**

*U.S. Const. amend. I ................................................................................ *passim*

53 C.J.S. Libel and Slander § 38....................................................................36

Fed. R. Civ. P. 56(a) ................................................................................1, 68

Restatement (Second) of Torts § 571..............................................................60

Defendants move this Court for an order granting summary judgment under Fed. R. Civ. P. 56(a). They request a 90-minute hearing (45 minutes for each side).

## INTRODUCTION

Plaintiffs'[1] single count of Defamation *Per Se*[2] attacks certain statements contained in 23 separate publications and 2 alleged republications,[3] purportedly by these media Defendants,[4] concerning the 2020 Presidential election over the course of eight months. The claim therefore meets the First Amendment at its apex[5] given that the Plaintiffs are public figures *and* public officials performing, as their name suggests, the vital governmental function of recording votes on their electronic *Voting Systems* in over half of the United States.[6]

The speech at issue is on a matter of public concern which "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."[7] Defendants reported on "the security, reliability, and functionality of state election systems, classified by the U.S. Homeland Security Department as critical national infrastructure [operating] . . . in a world where cybersecurity challenges have exponentially increased in the last decade." *Curling v. Raffensperger* (*Curling III*), 702 F. Supp. 3d 1303, 1381 (N.D. Ga. 2023). The importance of these

---

[1] There are three Plaintiffs, collectively "Dominion." Although they all have different interests and circumstances, for the purposes of this motion only they are treated as one.

[2] (Dkt. 1 ¶¶ 304–31.)

[3] (Dkt. 1 ¶ 305(a–y).)

[4] The Defendants are Herring Networks d/b/a One America News Network, Robert Herring, Sr., and Charles Herring (collectively, "OAN").

[5] *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986) ("When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law.").

[6] Statement of Uncontested Material Facts in support of Defendants' Motion for Summary Judgment ("Statement") § B.

[7] *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).

issues "cannot be overstated" and involve "complex evidence, legal issues, and events, heated by the political stresses of the era." *Id*.

Plaintiffs' claim must, therefore, be measured "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."[8] The First Amendment protects core political debate, even if Dominion might find it offensive, because we have chosen "to protect even hurtful speech on public issues to ensure that we do not stifle public debate."[9]

"At the threshold it is the court, not the jury, that must vigilantly stand guard against even slight encroachments on the fundamental constitutional right of all citizens to speak out on public issues without fear of reprisal."[10] Indeed, Plaintiffs themselves allege, "The First Amendment is a cherished cornerstone of our democracy."[11]

The importance of this speech was foreshadowed just a few years earlier when, in a 2017 national election, Nicolas Maduro, the Venezuelan Presidential candidate, rigged electronic voting machines creating "at least one million" fake votes in his favor using a Smartmatic Voting

---

[8] *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

[9] *Phelps*, 562 U.S. at 461.

[10] *Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 50 (D.C. 1983).

[11] (Dkt. 1 ¶ 317.) We note, in fairness, that Plaintiffs contend, in the next sentence, that the First Amendment does not apply in this case, *id.*, as do all defamation plaintiffs recalling the colloquy from the play *Night and Day* between the actor Peter Evans and the incomparable British actress Maggie Smith during the play's U.S. premier at the Eisenhower Theatre of the Kennedy Center. Evans (as the character Jacob Milne): "That's the whole point [of a free press]. No matter how imperfect things are, if you've got a free press everything is correctable, and without it everything is concealable." To which Smith (as Ruth Carson) replies: "I'm with you on the free press. It's the newspapers I can't stand." Tom Stoppard, *Night and Day* 62 (1st ed. 1979).

System.[12] Specific concern about Dominion's Voting System surfaced when the Texas Secretary of State denied certification on June 20, 2019, and then, after a retest, in January of 2020.[13]

Senators Elizabeth Warren, Ron Wyden, and Amy Klobuchar, all Democrats, wrote to Dominion Voting Systems' majority shareholder on December 6, 2019, stating that "voting systems across the country [are] 'prone to security problems'" and noted that in a 2019 election "the Democratic candidate's electronic tally showed he received an improbable 164 votes out of 55,000 cast."[14] The previous March, Senator Klobuchar wrote Dominion's CEO, John Poulos, and others that "the integrity of our elections remains under serious threat [and] . . . the integrity of our elections is directly tied to the machines we vote on—the products that you make."[15]

Three weeks prior to the 2020 election, United States District Judge Amy Totenberg wrote in a lawsuit challenging Dominion's system in Georgia that after delving deep into the "true risks posed by the new [Dominion] voting system as well as its manner of implementation," she found that "[t]hese risks are neither hypothetical nor remote . . . . The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the [Dominion] system does not benefit the public or citizens' confident exercise of the franchise."[16] The Court concluded on an ominous note that "[t]he Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?'— but 'when it will happen,' especially if further protective measure are not taken."[17] Indeed,

---

[12] Ex. B-12 at 1; *see also* Ex. B-13. The Court will recall that Smartmatic also sued OAN for defamation in this court. *Smartmatic USA Corp. v. Herring Networks, Inc. d/b/a One America News Network*, No. 21-cv-02900-CJN (D.D.C. Nov. 3, 2021).

[13] Ex. B-14.

[14] Ex. C-32 at 1, 3.

[15] Ex. C-33 at 1.

[16] *Curling v. Raffensperger* (*Curling II*), 493 F. Supp. 3d 1264, 1341 (N.D. Ga. 2020).

[17] *Id.* at 1342.

18

With these concerns from prominent officials of both parties and a respected federal judge in mind, the 2020 presidential election was held and pre-election fears were realized when the results showed data irregularities, including a well-known example in Antrim County, Michigan, where one of the Plaintiffs' systems erroneously reflected that thousands of votes were cast for Joe Biden when, in fact, the votes belonged to Donald Trump.[19]

The controversy surrounding the 2020 Presidential Election began almost immediately after the November 3 vote when the President tweeted "crooked election" (a week before the first complained-of publication on November 12), and it endures today as has been chronicled by virtually every other media outlet *in the world*, including the small, family-owned, Defendant One America News Network.

For example, the *New York Times* reported on June 6, 2022, that "**A candidate in Georgia who appeared to get few Election Day votes was actually in first place.**"[20] This race occurred in DeKalb County, Georgia, and the *Times* quoted " election officials" as describing "the problems" with Dominion's voting systems as "a computer programming error."[21] President Trump has never retreated from his claim that the election was "rigged" and repeated it less than a month ago.[22] On March 25, 2025 he signed an executive order entitled: "PRESERVING AND PROTECTING THE

---

[18] Ex. C-34 at 1.

[19] Statement § H.i.

[20] Ex. B-15.

[21] *Id.* at 2.

[22] Ex. B-16 ("The biggest crime of all is that THE 2020 PRESIDENTIAL ELECTION WAS RIGGED! I (MAGA!) WON THE ELECTION BY MILLIONS OF VOTES, AND EVERYONE KNOWS IT.").

INTEGRITY OF AMERICAN ELECTIONS,"[23] which will negatively impact Dominions' current systems and ownership in a variety of ways.

Some of the President's Cabinet nominees were asked during 2025 confirmation hearings whether they believed the 2020 election was stolen.[24] These questions alone (and there were many to Attorney General nominee Pam Bondi and other nominees) demonstrate that the public controversy lives on, important and current enough to occupy the Senate's valuable time in confirmation hearings.

As with many debates of consequence, the resolution of this one will never be resolved to the satisfaction of all or even a significant segment of the population. The government through the Warren Commission, for example, determined that Lee Harvey Oswald acted alone in assassinating President John F. Kennedy. Many remain unconvinced, but as this Court has held, debates over such hotly disputed matters of core political interest are not the stuff of defamation.[25] A statement that Plaintiff was "guilty" of misleading the American public by arguing that Oswald did **not** act alone "cannot be objectively verified without resolving thirty years of controversy surrounding the Kennedy assassination . . . [because] the 'truth' has remained camouflaged since

---

[23] Pres. Donald J. Trump, *Preserving and Protecting the Integrity of American Elections*, White House (Mar. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preserving-and-protecting-the-integrity-of-american-elections/; Ex. K, Exec. Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 28, 2025).

[24] Senator Dick Durbin asked Pam Bondi, the nominee for Attorney General: "Are you prepared to say today [January 15, 2025], under oath, without reservation, that Donald Trump lost the presidential contest to Joe Biden in 2020?" Senator Mazie Hirono asked her who won the 2020 presidential election. Senator Alex Padilla challenged Ms. Bondi: "So I ask you today [January 15, 2025], do you have any evidence of election fraud or irregularities in the 2020 election?" Ex. B-17; *The Nomination of the Honorable Pamela Jo Bondi to Be Attorney General of the United States: Nomination Hearing Before the S. Comm. on the Judiciary*, U.S. Senate Comm. on the Judiciary (Jan. 15, 2025), https://www.judiciary.senate.gov/committee-activity/hearings/the-nomination-of-the-honorable-pamela-jo-bondi-to-be-attorney-general-of-the-united-states.

[25] *Lane v. Random House, Inc.*, 985 F. Supp. 141, 150–52 (D.D.C. 1985).

1963, notwithstanding protracted analysis and debate."[26] So too here.

Because these First Amendment interests are so vital to our democracy, the Constitution requires Dominion to demonstrate "actual malice," an essential element of their claim, with convincing clarity even at the summary judgment stage.[27] Furthermore, "as a matter of constitutional law" the Court must determine whether under "these circumstances" a reasonable reader would have understood that Plaintiffs were being charged by Defendants with the commission of a serious crime,[28] which is required for *per se* defamation,[29] Plaintiffs' sole claim.

In addition, OAN indisputably truthfully reported the allegations of, for example, Rudy Giuliani, Sidney Powell, and others on this matter of public concern, which is the truth that counts and not the truth of the underlying allegations. If, as is uncontested, OAN accurately reported the allegations, then falsity, another element of Plaintiffs' claim, is negated. The press is not required to negate falsity of the underlying facts of the *allegations* in a subsequent defamation case.

Otherwise, the press would not dare report on allegations about, for example, another possible Maduro-level vote rigging or "technical errors [that] made it appear that [a candidate] had not mustered a single Election Day vote in a vast majority of precincts" in DeKalb County,[30] lest it face after-the-fact defamation suits and demands to prove the rigging *did not* happen or there was not a single vote recorded. Maduro and his government would surely deny the election was rigged and say there is no such evidence, so the test cannot be in the eye of the beholder. The common (and some statutory) law imposes this sensible requirement, which is compelled by the

---

[26] *Id.* at 150–51.

[27] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986).

[28] *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 12–14 (1970).

[29] *E.g.*, *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 16 (D.D.C. 2019).

[30] Vigdor, *supra* note 20.

First Amendment under these circumstances where the press is reporting on allegations regarding matters of public concern spoken by other speakers, most of whom, it should be noted, have been separately sued by Plaintiffs.

Summary judgment is warranted on the grounds of (i) no clear and convincing evidence of actual malice which is, alternatively, negated as a matter of law; (ii) no "defamation *per se*" as a matter of law; and (iii) no falsity as a matter of law because (a) the complained-of publications cannot be objectively verified, (b) the complained-of publications are protected opinion, hyperbole or rhetoric and/or (c) OAN truthfully reported allegations on a matter of public concern.

Defendants also move for summary judgment on damages because Dominion's "enterprise" theory is improper as a matter of law, as is their "incidental expense" argument. Lost profits are a proper measure of damages for corporate plaintiffs such as Dominion, but they cannot demonstrate and have no evidence that any lost profits were caused by the allegedly defamatory statements of OAN, which Dominion's Complaint labels a "cable news irrelevancy,"[31] resulting in nearly two billion dollars of harm, including over a hundred lost election-systems contracts across the U.S. and Canada. *This is the same nearly two billion dollars of damages* Dominion claimed against OAN reporters Christina Bobb and Chanel Rion, recently dismissed voluntarily and without any settlement, Fox (since settled), Newsmax (ready for trial), Rudy Giuliani, Sidney Powell, Mike Lindell, My Pillow, and Patrick Byrne (all pending). Dominion is not entitled to presume damages either, as a matter of law.

After thorough discovery, including dozens of depositions and over a hundred subpoenas, not a single election jurisdiction or official said OAN had anything to do with their decisions regarding Dominion. Many of them had never even heard of OAN. Plaintiffs cannot demonstrate

---

[31] (Dkt. 1 ¶ 324.)

and have no evidence of causation which, alternatively, is negated as a matter of law.

## ARGUMENT

### I.    Dominion Cannot Satisfy Its "Daunting" Burden on Actual Malice.

#### A.    At Summary Judgment, Dominion Has the Burden of Showing Actual Malice at the Time of Publication, by Clear and Convincing Evidence.

Public figures or public officials must demonstrate the defendant had "actual malice" at the time of the challenged statements. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). The "public official" and "public figure" categories are broad: courts have recognized numerous circumstances in which a plaintiff becomes one—or both—and is required to prove actual malice. *Waldbaum v. Fairchild Publc'ns, Inc.*, 627 F.2d 1287, 1294–97 (D.C. Cir. 1980) (public figures); *Baumback v. Am. Broadcasting Cos.*, 161 F.3d 1, 3–4 (4th Cir. 1998) (public officials). Dominion has conceded it must show actual malice.[32] In any event, under D.C. law, "[c]orporate plaintiffs are treated as public figures as a matter of law in defamation actions brought against mass media defendants involving matters of legitimate public interest." *OAO Alfa Bank*, 387 F. Supp. 2d at 47–48. That test is undoubtedly met here, given that the allegations surround the highly contested 2020 election, and the suit is brought against a broadcast media entity, albeit a small, family-owned one.[33]

---

[32] (Dkt. 194-10 at 12 (acknowledging "Dominion's burden of demonstrating actual malice"); Dkt. 205-2 at 11; Dkt. 206-2 at 11; Dkt. 1 ¶ 306.)

[33] Even if Dominion were not treated as a public figure based on its corporate status, it would qualify as a limited purpose public figure under the D.C. Circuit's seminal decision in *Waldbaum*, which held that a plaintiff is a limited purpose public figure if: (1) there is a public controversy (here, the security of electronic voting systems); (2) the plaintiff played more than a trivial or tangential role in the controversy (here, Dominion chose to engage in activities of inherent public interest: manufacturing U.S. voting machines); and (3) the alleged defamatory statement is germane to the plaintiff's participation in the controversy (here, the complained-of publications relate directly to the broader public controversy over the security of electronic voting systems). *Waldbaum*, 627 F.2d at 1296-98; *see also Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 31 (D.C. Cir. 1990); *Tavoulareas v. Piro*, 817 F.2d 762, 772–73 (D.C. Cir. 1987) (en banc); *OAO Alfa Bank v. Ct. for Pub. Integrity*, 387 F. Supp. 2d 20, 42 (D.D.C. 2005) (applying Waldbaum test to

Given the unique First Amendment concerns, the Supreme Court and D.C. Circuit have long held that the plaintiff has the burden *even at summary judgment* to demonstrate actual malice at the time of publication, and that showing must be by clear and convincing evidence. *See Anderson*, 477 U.S. at 255–56; *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 598 (D.C. Cir. 1988) ("[T]he first amendment requires that a public figure bear the burden of proving . . . actual malice. The requirements of showing 'clear and convincing proof' of actual malice . . . are also 'applicable when considering a motion for summary judgment.'" (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292–93 (D.C. Cir. 1988))).

Actual malice must be based "solely upon . . . the information that was available to and considered by the defendant prior to publication." *McFarlane v. Sheridan Square Press*, 91 F.3d 1501, 1508 (D.C. Cir. 1996). The Court must "exercise particularly careful review," and "make an independent examination of the whole record." *Tavoulareas*, 817 F.2d at 789 (quoting *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963)). During this inquiry, the "proper focus is on the state of mind of the persons in the organization having responsibility for the publication." *Waskow v. Associated Press*, 462 F.2d 1173, 1175 n.4 (D.C. Cir. 1972) (citation altered) (quoting *N.Y. Times*, 376 U.S. at 287). Identifying an employee responsible for the publication is essential—without that, the plaintiff cannot prove actual malice. *E.g.*, *Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 762–63 (4th Cir. 2023) (entering summary judgment for media defendant because "the record does not identify which staff members actually inserted the 'felon' language into the scripts").

### B.    A "Daunting" Showing Is Required to Demonstrate Actual Malice at the Time of Publication by Clear and Convincing Evidence.

As this Court has explained, the irreducible requirement for actual malice is that "the

---

natural person plaintiffs). Applying these factors, Dominion clearly is a limited purpose public figure for its defamation claim in this case.

plaintiff must offer evidence that the defendant in fact harbored subjective doubt" about the truth of the subject statement at the time it was published. *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 60 (D.D.C. 2021) (Nichols, J.) (quoting *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016)). "[B]ecause of the heightened burden imposed by the clear and convincing standard and the challenges associated with offering evidence about state of mind, *this standard is not easily met, even at summary judgment*." *Jankovic*, 822 F.3d at 590 (emphasis added).

The D.C. Circuit has labeled the actual malice showing required as "daunting." *Id.* And, as this Court has stressed, "few public figures have been able clearly and convincingly to prove that the scurrilous things said about them were published by someone with 'serious doubts as to the truth of his publication." *Nunes v. WP Co.*, No. 1:21-cv-00506, 2024 WL 3504066, at *5 n.2, 9 (D.D.C. June 14, 2024) (Nichols, J.) (citation altered) (quoting *McFarlane*, 91 F.3d at 1515) (granting summary judgment to defendant news organization).

When it comes to proving actual malice by clear and convincing evidence, it is irrelevant whether the defendants were "negligen[t]" or "should have investigated [the] story more fully," *Nunes*, 2024 WL 3504066, at *5, *8, or that a "reasonably prudent man" would not "have published, or would have investigated before publishing," *id.* at *8 (quoting *St. Amant*, 390 U.S. at 731), or had alleged profit motives or even "ill will or 'malice' in the ordinary sense of the term," *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989). Also irrelevant are alleged "lapses in ethics and judgment," *OAO Alfa*, 387 F. Supp. 2d at 56, and likewise any alleged failure to "actually corroborate" even "a questionable source," *McFarlane*, 91 F.3d at 1509. The actual malice standard is so high that even statements like "I don't care about the truth" or "the truth is irrelevant to me"—which are *not* present here—are *still insufficient*. *Levan v. Cap. Cities/ABC, Inc.*, 190 F.3d 1230, 1241 & n.33 (11th Cir. 1999).

As shown next, Dominion cannot satisfy its "daunting" burden. *Jankovic*, 822 F.3d at 590.

## C.    Dominion's Broadside Theories Cannot Satisfy the "Daunting" Showing Required.

Dominion tries to make up in volume what it lacks in substance, spending 50 pages of its Complaint listing allegedly defamatory statements, most of which consist of Dominion's lengthy editorializing or cherry-picked selections of transcripts (Dkt. 1 ¶ 305) where Dominion fails to identify which parts it thinks are actually defamatory *per se*. This kitchen-sink approach reveals how tenuous Dominion's claims are. Dominion cannot prevail at the summary judgment stage on actual malice—the highest standard in civil law—simply by carpet bombing the Court and OAN in the hopes that somehow something finds its way through.

Defendants proceed first by addressing those generic arguments Dominion has made, then proceeding publication-by-publication to doubly confirm the lack of clear-and-convincing evidence of actual malice as to any specific broadcast.

### 1.    *There is No Direct Evidence of Actual Malice for Any Broadcast.*

Importantly, not a single witness or document states or indicates that OAN subjectively harbored serious doubts about any of the challenged statements at the time they were made. The OAN hosts, anchors, and reporters connected to the programming each attest that they did not harbor serious doubts as to the truth of the challenged statements. Statement § J; Ex. D ¶¶ 6–9, 11, 13; Ex. F ¶¶ 5–17; Ex. H ¶¶ 4–6; Ex. I ¶¶ 4–10; Ex. F ¶¶ 4–27; Ex. G ¶¶ 4–7; Ex. J ¶¶ 3, 5, 7–9. During depositions, Dominion did not even ask OAN witnesses whether they harbored serious doubts of falsity at the time of publication. Dominion knew the answer would be negative and wished to proceed instead via innuendo and editorializing. Even two days after the 2021 Inauguration, OAN refused to refer to "President Biden." Ex. C-20 at 178:9–14. True believers cannot possess actual malice.

11

### 2.    *There is No Duty to Investigate Sources or Stories.*

It is a "non-starter" as a matter of law to contend there is a duty to investigate before publication or to correct after the fact. *Jankovic*, 822 F.3d at 590. Whether a defendant "should have investigated [the] story more fully" is legally irrelevant to actual malice. *Nunes*, 2024 WL 3504066, at *17 (Nichols, J.). And there is no "duty to corroborate" even when the source is of questionable credibility. *McFarlane*, 91 F.3d at 1509–10.

Circuit caselaw demonstrates what an insurmountable burden Dominion faces here. In *Jankovic*, for example, there was no actual malice as a matter of law even though the sources were Serbian press outfits known to be "sensationalist[s] bordering on libel" and others were "notorious for spreading rumors and outright lies," and the publisher even had reason to be "wary" of the press reports. 822 F.3d at 594, 597. Similarly, in *Lohrenz v. Donnelly*, the D.C. Circuit affirmed the district court's finding that there was insufficient evidence of actual malice despite plaintiff's contention that defendant: (1) was "informed clearly and repeatedly that her information was incorrect"; (2) "never sought to obtain a full copy of plaintiff's training records"; (3) "selectively edited the portion of plaintiff's training records that she did have in her possession"; and (4) published a report that contained "factual errors." *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 53, 55 (D.D.C. 2002); *see also Lohrenz v. Donnelly*, 350 F.3d 1272, 1286 (D.C. Cir. 2003).

Even though there is no duty to "interview[] those with first-hand knowledge," *McFarlane*, 91 F.3d at 1510, OAN often did so anyway. As explained below in the publication-by-publication section, they relied on detailed sourcing, as well as interviews with the President's lawyers and representatives and subject matter experts.

The standard here is so daunting that even "the fact that a news organization possesses information (such as items in a clipping file) which indicates the falseness of a news item does not establish that the organization acted with knowledge of the falseness." *Waskow*, 462 F.2d at 1175

n.4.

### 3.    *Inherent Bias, Preconceived Storylines, and Allegedly Improper Motivations are Legally Irrelevant to Actual Malice.*

Dominion claims OAN had "inherent bias" and a "preconceived story line." (Dkt. 1 ¶¶ 322–23.) Even if true, that is irrelevant. The D.C. Circuit has held there is no actual malice where the defendant was "on a mission to advance a preconceived story line," "acted on the basis of a biased source," and had "incomplete information." *Lohrenz*, 350 F.3d at 1283–84.

In fact, even "evidence tending to show that the defendant *published in bad faith*" is not sufficient for a plaintiff to avoid summary judgment. *Jankovic*, 822 F.3d at 590 (emphasis added). "[V]irtually any work of investigative journalism begins with some measure of suspicion," and "[t]he implications of [Dominion's] theory are breathtaking: they would find support for an inference of actual malice in a wide swath of investigative journalism that turns out to be critical of its subject." *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 241, 243 (D.C. Cir. 2021).

Dominion similarly suggests that Defendants had an incentive to defame Dominion to curry favor with then-and-now-President Trump. (Dkt. 1 ¶ 305(a).) But "[t]he motivations behind defendants' communications—inspired by political differences or otherwise—*do not impact* whether defendants acted with actual malice as a matter of law." *Nunes*, 2021 WL 3550896, at *5 (Nichols, J.) (emphasis added).

Relatedly, claims that Defendants sought to "make a profit," (Dkt. 1 ¶¶ 324, 330), by increasing viewership are insufficient. "Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice." *Harte-Hanks*, 491 U.S. at 667. In any event, the substantial majority of OAN's income—a broadcast contract with AT&T—did not depend on viewership. Ex. D ¶ 4.

Dominion has also argued that OAN employees had a conflict of interest in reporting about

the election, but even "assuming that such a conflict of interest existed," it "do[es] not provide a sufficient basis for finding actual malice." *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 527 (6th Cir. 2007).

### 4.    Journalistic Standards are Legally Irrelevant to Actual Malice.

During depositions, Dominion spent an inordinate amount of time asking about journalistic training and standards. *E.g.*, Ex. C-9 at 31:16–33:9; Ex. C-12 at 50:2–52:13. That is likewise irrelevant as a matter of law because actual malice cannot be shown even by "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Jankovic*, 822 F.3d at 590.

Of course, Defendants' conduct did not rise to anything like that. As demonstrated below, they relied on guests and sourcing. But even if there were an extreme departure from standards, Dominion still loses. In determining actual malice, courts "do not sit 'as some kind of journalism review seminar offering our observations on contemporary journalism and journalists.' Neither do juries." *Tavoulareas*, 817 F.2d at 796 (quoting *Tavoulareas v. Piro*, 759 F.2d 90, 145 (D.C. Cir.), *vacated in part on other grounds*, 763 F.2d 1472 (D.C. Cir. 1985).

### 5.    Competing or "Debunked" Storylines are Legally Irrelevant to Actual Malice.

Dominion has suggested that the alleged "debunking" of several stories demonstrates OAN's actual malice at the time of publication. (Dkt. 1 ¶¶ 305(a), 318, 319, 326.) That is insufficient as a matter of law. "Nor, further, does it suffice for a plaintiff merely to proffer 'purportedly credible evidence that contradicts a publisher's story.'" *Jankovic*, 822 F.3d at 590.

Dominion admits that "numerous other broadcasters reported at times on [allegedly] debunked election fraud allegations." (Dkt. 1 ¶ 328.) And there was likewise significant reporting

by others regarding "glitches" in Dominion's products.[34] Such a "plethora" of other news articles and evidence aligning with the defendant's reporting defeats actual malice. *Montgomery v. Risen*, 197 F. Supp. 3d 219, 260 (D.D.C. 2016).

Dominion claims that OAN should have "framed their reporting by noting that the allegations had been widely debunked." (Dkt. 1 ¶ 328.) The First Amendment's protections do not turn on a poll of what most reporters think. As Judge Mehta explained, it does not state even a *plausible* defamation claim to argue that the defendant's story "directly contradict[ed]" "extensive publicly available and readily accessible financials and other documents." *Hindu Am. Found. v. Viswanath*, 646 F. Supp. 3d 78, 98 (D.D.C. 2022). If Dominion was right, stories ridiculed by so-called "experts" would no longer be protected by the First Amendment. "It would be sadly ironic for judges in our adversarial system to conclude . . . that the mere taking of an adversarial stance is antithetical to the truthful presentation of facts." *Tah*, 991 F.3d at 243 (alteration in original).

In any event, OAN *did* sometimes make "disclosure[s]" that cut against their alleged perspective, which "tend[s] to dispel any claim of actual malice." *Jankovic*, 822 F.3d at 594. "Such admissions, i.e., reporting perspectives at odds with the publisher's own, 'tend[] to rebut a claim of malice, not to establish one.'" *Lohrenz*, 350 F.3d at 1286 (alteration in original). Several of these are discussed below in the publication-by-publication review.

Further, OAN *invited a Dominion representative on-air* to debate and discuss matters relating to Dominion and the 2020 election. Ex. C-37 at APP 2755. Going further, OAN even offered Dominion "certain editorial control before the show(s) air" and invited Dominion "to provide suggestions as to how it would like the show(s) to be prepared and reported." *Id*. Dominion

---

[34] *E.g.*, Ex. B-1; Ex. B-2; Ex. B-3; Ex. B-4; Ex. B-5; Ex. B-6; Ex. B-7; Ex. B-8; Ex. B-9; Ex. B-10; Ex. B-11.

declined, but that invitation is the exact opposite of what someone with actual malice would do.

> **6.** **There is No Evidence that OAN Subjectively Believed Their Reporting Was "Inherently Improbable"—And It Wasn't.**

Dominion generically suggests that OAN's stories were "inherently improbable" to an objective observer, (Dkt. 1 ¶ 319), and that this somehow satisfies the requirement of showing actual malice by clear-and-convincing evidence. Dominion is wrong on the law and on the facts.

*First*, actual viewers and hypothetical objective observers are legally irrelevant. Dominion must show the relevant responsible person at OAN "would have been *subjectively aware* that [the statement] was inherently improbable." *Jankovic*, 822 F.3d at 595 (emphasis added); *Lohrenz*, 350 F.3d at 1283. If the mere fact that a story seems improbable to some set of viewers (real or hypothetical) could provide evidence of actual malice, there would be widescale elimination of protections for critical media reporting. Dominion asks the Court to "disregard the age-old insight that many allegations might be 'strange, but true; for truth is always strange, Stranger than fiction.'" *Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (quoting Lord Byron, Don Juan, canto XIV, stanza 101).

*Second*, even if *objective* inherent improbability were a factor, Dominion still falls far short. The D.C. Circuit has held as a matter of law that claims cannot be "inherently improbable" when government officials are taking them seriously: "we cannot conclude that the inherent improbability of the allegation itself supports a finding of actual malice; when Sheridan Square published Ben–Menashe's book, the Senate Foreign Relations Committee was taking his allegation of an October Surprise seriously enough to hold hearings on the matter, and the House of Representatives had commissioned the Task Force specifically to investigate this story." *McFarlane*, 91 F.3d at 1513.

Allegations of serious flaws with voting machines and even the possibility of intentional,

massive vote flipping were made both before and after the 2020 election by prominent government officials. One prominent voting machine company had admitted in 2017 that its machines were manipulated on a nationwide basis so Nicolas Maduro could rig the Venezuelan election by adding "at least one million" fake votes. Neuman, *supra* note 12. In the United States, Democrat Senators Klobuchar and Warren repeatedly warned before the 2020 election that electronic voting machines were susceptible to widescale hacking and manipulation and that "foreign adversaries are actively trying to undermine our system of democracy, and will target the 2020 election." Ex. C-33 at APP 2691; *see also* Ex. C-38; Ex. C-32.

Specific to Dominion's machines, Judge Amy Totenberg wrote just a few months before the 2020 election that she had "delved deep into the true risks posed by the new [Dominion] voting system as well as its manner of implementation," and she found that "[t]hese risks are neither hypothetical nor remote," and there was "convincing[] . . . evidence that this is not a question of 'might this actually ever happen?'—but 'when it will happen,' especially if further protective measure are not taken." *Curling II*, 493 F. Supp. 3d at 1341–42. Further, Dominion had twice been rejected (in 2019 and 2020) by the state of Texas due to similar security concerns. Statement § F.i.

Dominion itself acknowledges that before Election Day 2020, the sitting President of the United States had said there was a serious prospect "the election is rigged" and there would be "massive fraud." (Dkt. 1 ¶ 64.) There were undoubtedly unusual patterns of voting returns during the 2020 election,[35] and immediately after the election, the then-sitting President and his agents— several of whom, like Giuliani and Powell, were former DOJ lawyers—were making accusations of widespread fraud. Not only were these individuals representing the President, but they were also lawyers who had ethical obligations. As the New York Appellate Division stated, Giuliani's

---

[35] Statement § H.i.

"singular reputation and position as the personal attorney for the then President of the United States gave his acts and words a special currency to the public." *In re Giuliani*, 214 N.Y.S.3d 366, 384 (App. Div. 2024).

Nor can Dominion try to evade its burden by suggesting that things had changed months later. In January 2021, the doubts about the reliability of the voting figures were still so serious that over 100 members of Congress voted to reject certification of certain states' elector slates.[36] President Trump was re-elected in 2024 despite continuing to insist the 2020 election was rigged. He maintains that position to this day, and even now in 2025, Senate-confirmed officials have stated they still believe the 2020 election was rigged.

Dominion may wish to label all of these lawyers, officials, and even Judges as peddling a "fantastical" conspiracy theory, but these stories prove that claims of widespread electronic voting fraud were not inherently improbable, even viewed objectively (which isn't the test anyway, as explained above). *See McFarlane*, 91 F.3d at 1513; *see also Donald J. Trump for President, Inc. v. WP Co.*, No. 20-626 (RC), 2023 WL 1765193, at *5 (D.D.C. Feb. 3, 2023) (concluding that allegations that the Trump Campaign engaged in "collusion [with] Russian hacking" during the 2016 election were not inherently improbable, even it had been widely debunked).

### 7. OAN's Reactions to Dominion Demonstrate a <u>Lack</u> of Actual Malice.

Dominion attempts to bootstrap actual malice by claiming that OAN's decision not to take down reporting in response to Dominion's swarm of retraction letters is itself evidence of actual malice. (Dkt. 1 ¶¶ 325–26.) But a publisher "need not accept 'denials [by the plaintiff], however vehement; such denials are so commonplace in the world of polemical charge and countercharge

---

[36] Harry Stevens et al., *How Members of Congress Voted on Counting the Electoral College Vote*, Wash. Post (Jan. 7, 2021, at 12:48 ET), https://www.washingtonpost.com/graphics/2021/politics/congress-electoral-college-count-tracker/.

that, in themselves they hardly alert the conscientious reporter to the likelihood of error.'" *Tah*, 991 F.3d at 242. Thus, a "demand letter that is ignored, without more, does not demonstrate actual malice." *Powell*, 554 F. Supp. 3d at 63 (Nichols, J.). And, accordingly, "actual malice cannot be inferred from a publisher's failure to retract a statement" even if "it learns it to be false." *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013).

Defendants *did not ignore* Dominion's demand letters. Defendants sent detailed responses prepared in consultation with media lawyers. Ex. C-39; Ex. C-37; Ex. C-40; Ex. C-41. In fact, Defendants went further and ███████████████████████████████████████ ████████████████████████████████. Ex. C-37 at APP 2755. Dominion declined and never bothers to explain how OAN could harbor actual malice while ███████████████ ███████████.

Dominion has also suggested actual malice is shown from when OAN allegedly reposted statements after "remov[ing]" them because they had been "debunked." (Dkt. 1 ¶ 318.) This argument makes no sense: it insists (falsely) that OAN are recalcitrant defamers who nonetheless routinely took down material because of serious doubts about it—but then reposted it later anyway. "Heads Dominion wins, tails OAN loses."

### 8.    *Dominion Cannot "Aggregate" Factors to Show Actual Malice.*

Nor can Dominion attempt to show actual malice by viewing the factors above in the aggregate. Adding up a line of zeroes still equals zero. Moreover, the D.C. Circuit has set a stunningly high burden for showing actual malice via aggregation, precisely to avoid plaintiffs circumventing what is the highest standard known to civil law. For example, in a case featuring a "failure to contact any individual who would have had first-hand knowledge," a "lack of corroboration," a reliance on a source with "credibility" issues, and sourcing that was "inconsisten[t]," the D.C. Circuit still concluded the "cumulative force of the evidence" of actual

malice was "*very weak*." *McFarlane*, 91 F.3d at 1510–12, 1514 (emphasis added).

Dominion's claims are even weaker than those in *Arpaio v. Cottle*, where Judge Mehta ruled the plaintiff had not *plausibly* alleged actual malice despite well-pleaded allegations that "Defendants failed to investigate seriously false allegations," "purposefully avoided interviewing anyone who could contradict their story," "did not seek meaningful comment from anyone who could provide a different perspective," "did not seek comment from Plaintiff or his lay or legal representatives," "were out to get Plaintiff," and had "a preconceived view or slant about Plaintiff." No. 1:18-cv-02387, 2019 WL 11322515, at *1 (D.D.C. Dec. 3, 2019) (citation altered). Again, those allegations "taken together" and accepted as true did not even survive Rule 12(b)(6). *Id.* Dominion has a much higher burden on summary judgment but has even weaker arguments.

> **D.     A Publication-by-Publication Review Further Confirms Dominion Cannot Satisfy its "Daunting" Standard.**

All the evidence in this case demonstrates the relevant OAN employees did not harbor serious doubt about the truth of the relevant broadcasts, and further conducted research and sourcing—including numerous first-hand reports—for their stories, as demonstrated by the publication-by-publication review below.

Dominion may believe these sources and reports are not credible, but that falls far short of showing clear-and-convincing evidence of actual malice at the time such statements were published, especially given that reporters often must rely on sources who are willing to risk personal attack for speaking out. *See, e.g.*, *Secord v. Cockburn*, 747 F. Supp. 779, 793–94 (D.D.C. 1990) ("[T]he mere fact that divided opinion exists among reporters as to the credibility of an individual does not reflect on defendant's state of mind and actual malice," even when the sources are "convicted felons"); *Cobb v. Time, Inc.*, 278 F.3d 629, 638 (6th Cir. 2002) (holding that reliance on a source with a "criminal background," who was being "paid" for his information, some of

which was "bizarre," and who was a drug user did not constitute evidence of actual malice).

***1. Para. 305(a): Nov. 12, 2020, Newsroom Broadcast re Edison Research.***

This broadcast related to others' reporting on data underlying an Edison Research report. [redacted]. Ex. C-20 at 128:18–24. [redacted]. Ex. C-35 at APP 2701. The News Director at the time did not know or believe that any statement of fact in this broadcast was false, nor did she entertain serious doubt as to its truth. She also did not believe any statement of fact in the broadcast was inherently improbable. Ex. E ¶ 6.

The story was also expressly caveated with language like an "unaudited analysis of data" and even attributed the potential loss of votes to "so called 'glitches,'" Ex. A-1 at 2:4, 12, which undermines Dominion's claim that OAN was pushing a theory that Dominion intentionally manipulated votes, as glitches indicate the issues were *not* intentional. The word "glitch" indicates that something unexpected or unintentional happened, usually a "minor malfunction." *Glitch*, Merriam-Webster, https://www.merriam-webster.com/dictionary/glitch (last visited June 8, 2025). The use of such statements "'tend[] to rebut a claim of malice, not to establish one.'" *Lohrenz*, 350 F.3d at 1286 (alteration in original).

As explained above, it is irrelevant whether this story was objectively implausible. All that matters is whether Fifield subjectively had such views, [redacted]. Ex. C-20 at 145:6–19. In any event, it was not inherently improbable that there had been mass vote switching. As explained above, a prominent voting machine company had admitted in 2017 that its machines were manipulated so Nicolas Maduro could rig the Venezuelan election by adding "at least one million" fake votes. Neuman, *supra* note 12. Judge Totenberg had ruled in 2020 that even in the United States and with Dominion machines, "these risks are neither hypothetical nor remote," and

there was "convincing[] . . . evidence that this is not a question of 'might this actually ever happen?'—but 'when it will happen,' especially if further protective measure are not taken." *Curling II*, 493 F. Supp. 3d at 1341–42.

Those fears were given credence when thousands of votes for Trump were shown as being for Biden in Antrim County, Michigan. Statement § H.i. Even to this day, the sitting President himself still insists the election was rigged. No part of this story was inherently improbable, despite how much Dominion may not want people to talk about it.

### 2.    *Para. 305(b): Nov. 13, 2020, Newsroom Broadcast re Glitches.*

This broadcast featured an interview of OAN reporter Chanel Rion, who has stated she did not harbor serious doubts about the truth of the story at the time of publication, nor did she think it was inherently improbable. Ex. F ¶¶ 5, 8, 17. *See also* Ex. E ¶ 9 (News Director swearing the same) Rion said Dominion's system was "proven to have actually glitched in favor of Biden in at least three states," and she referenced a "[p]rime example [as] Antrim Country in Michigan where 6,000 ballots had been affected by the Dominion voting machines and how they were digitally somehow glitching towards Biden," but "[w]hen they caught this mistake on a software level they were able to change the results, and it turned out the so-called Biden win country was actually a Trump win because of the software glitch." Ex. A-2 at 2:12–15, 21–3:2.

Rion's invocation of the true story about Antrim County, *see* Ex. B-1; Ex. B-3; Ex. B-4; Ex. B-5; Ex. B-6; Ex. B-10, demonstrates her honest belief, research, and sourcing, which are detailed further below when discussing Paragraph 305(f), where Rion did a report on voting issues. Further, her use of phrases like "glitched" undercuts Dominion's claim of actual malice because they are inconsistent with intentional vote flipping, as explained above. *See Lohrenz*, 350 F.3d at 1286. Finally, nothing in this story was inherently improbable, given the long history of concerns about and actual examples of voting machines being manipulated on a widespread basis.

3.    *Para. 305(c): Nov. 14, 2020, Real America with Dan Ball Broadcast.*

This broadcast features a longer exchange between host Dan Ball and Rion, both of whom have declared they harbored no serious doubts about the truth of the story at the time of publication, nor did they think it was inherently improbable. Ex. H ¶¶ 4–6; Ex. F ¶¶ 5, 9, 17. Ball testified that he had seen dozens of emails and reports and claims from whistleblowers that votes had been flipped from Trump to Biden. Ex. C-8 at 222:6–9.

Rion quotes Dominion itself—hardly what someone with actual malice would do—by saying that "the Dominion system[s] software company itself said this was, in fact, a glitch" in Antrim County. Ex. A-3 at 5:25–6:5. At one point, even though nothing required him to do so, Ball even corrected Rion when she unintentionally misspoke about which direction those votes had flipped, which shows Ball's lack of actual malice. *Id.* at 4:9–16. Rion's honest belief, research, and sourcing are further detailed below when discussing Paragraph 305(f).

Further, although objective implausibility is not the test (as explained above), the Antrim County situation confirmed that worries about massive numbers of votes flipping in Dominion's voting systems were far from unfounded, especially given the long history of concerns about and actual examples of voting machines being manipulated on a widespread basis.

4.    *Para. 305(d): Nov. 16, 2020, Newsroom Broadcast re Coomer.*

This broadcast features Rion with guest Joe Oltmann, who reported hearing first-hand a Dominion executive (Eric Coomer) say on a call, "Don't worry about the election. Trump is not going to win. I made effing sure of that." Ex. A-4 at 2:9–17. Rion has sworn she harbored no serious doubts about the truth of this story at the time of publication, nor did she think it was inherently improbable. Ex. F ¶¶ 5, 10, 17. And, again, there is no duty to interview those with first-hand knowledge, but here Rion did so.

██████████████████████████████████████████████████████

██████████████████████████████████ Ex. C-35 at APP 2701–02. ████████

██████████████████████████████████████████████████████

███████████████████

Finally, given the long history of concerns about and actual examples of voting machines being manipulated on a widespread basis, this story was not inherently improbable.

### 5.     *Para. 305(e): Nov. 21, 2020, Chanel Rion Tweet.*

In this Tweet, Rion replies "[y]es, they are" to a tweet asking whether "states that trump won" that used "dominion software" are "corrupt too." (Dkt. 2-13 at 2.) At the outset, Defendants cannot be held liable for this post. The "proper focus" for actual malice is on "the persons in the organization having responsibility for the publication of the item," *Waskow*, 462 F.2d at 1175 n.4 (citation altered) (quoting *N.Y. Times*, 376 U.S. at 287), but ███████████████████████████████

█████████████████████████████████████, Ex. C-3 at 111:21–112:3. For similar reasons, Dominion cannot prove that OAN published her tweet because OAN never "wrote, edited, or published the statement in question." *Tavoulareas v. Piro*, 759 F.2d 90, 136 (D.C. Cir.), *aff'd in relevant part*, 763 F.2d 1472 (D.C. Cir. 1985) (en banc). Dominion, as we have mentioned, voluntarily and without settlement dismissed Rion from this case.

In any event, Rion denies harboring any serious doubts about the truth of this statement at the time of publication, nor did she think it was inherently improbable. Ex. F ¶¶ 5, 13, 17. This tweet, although posted in her personal capacity, was nevertheless informed by her reporting on OAN, where she relied on extensive sourcing and research, and accordingly a claim of actual malice would fail for the reasons discussed below for Paragraph 305(f).

Finally, her remark about "states" being corrupt undercuts any claim of actual malice as to Dominion, because it is contrary to the theory that Dominion itself was intentionally flipping votes.

      *6.      Para. 305(f): Nov. 21, 2020, Dominion-izing the Vote.*

This is a feature piece anchored, written, and produced by Rion about questions raised regarding Dominion and voting machines more generally. Ex. A-5. ██████████████████ ████████████████████. *See* Ex. C-5 at 258:25–259:4. Charles Herring and Rion have both declared they harbored no serious doubts about the truth of this story at the time of publication, nor did they think it was inherently improbable. Ex. F ¶¶ 5, 11, 17; Ex. D ¶¶ 8–9.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████:

- ████████████████████████████████████████
  ████████████████████████
- ██████████████████████████████████
- ██████████████████████████████
- ██████████████████████████████████
  ████████████████████
- ██████████████████████████████████
  ████████████████
- ██████████████████████████████████
  ████████████████
- ████████████████████
- ██████████████████████████████████
  ████████

██████████████████████████. Ex. C-35 at APP 2702–06.

Again, no such research is required, but this extraordinary legwork strongly undercuts any implication of actual malice, and stories from the N.Y. Times about "hack[ing] an election" only confirm that concerns about even intentional vote manipulation were far from being objectively unfounded (which again isn't legally relevant to actual malice anyway).

Rion also conducted interviews with former high-level officials like Giuliani, individuals with first-hand information like Oltmann, and individuals with knowledge about hacking machines like Watkins. The story also emphasizes Dominion machines allegedly having "glitches" and being "fragile and error prone," etc.—which all undercut any claim of actual malice because that is inconsistent with the theory that Dominion was intentionally flipping votes, as explained above. Indeed, guest Watkins emphasized that "vote workers in places like Arizona" were the ones whose behavior was suspicious, as they could *take advantage* of Dominion software glitches—which likewise undercuts any claim of actual malice as to Dominion.

Rion made other "disclosure[s]" that cut against OAN's alleged perspective, behavior that "tend[s] to dispel any claim of actual malice." *Jankovic*, 822 F.3d at 594. Most notably, she acknowledged during this program that "[o]fficials were quick to declare this theft [of election equipment] had nothing to do with the election and was not malicious at all."

Nothing in this story is inherently improbable, for all the reasons given above: 2017 Venezuela, Judge Totenberg's rulings in 2020, Dominion's repeated rejections for security flaws, the drumbeat of concerns by Democrat politicians, and the flipped vote in Antrim County.

For the same reasons, there is no clear-and-convincing evidence of actual malice surrounding a tweet advertising *Dominion-izing the Vote*. Dkt. 1 ¶ 305(f).

### 7. *Para. 305(g): Nov. 23, 2020, Breaking News Live with Patrick Hussion.*

In this broadcast, Rion interviews Patrick Byrne, the billionaire founder of Overstock.com, who claimed he had previously been hired by Texas to investigate vulnerabilities in voting systems. Ex. A-6(a) 2:16–3:4.

Despite having no duty to interview potential sources, Rion did so anyway and interviewed Byrne, who claimed first-hand knowledge from being hired by Texas to investigate voting issues. Rion demonstrates her diligence by saying she has "spoken to [Byrne's] guys behind the scenes,"

and "they seem very knowledgeable and they've pulled incredible data." Ex. A-6(b) at 4:10–11.

Rion swears she harbored no serious doubts about the truth of this story at the time of publication, nor did she think it was inherently improbable. Ex. F ¶¶ 5, 14, 17. And again, nothing in this story is inherently improbable, for all the reasons given above. *See also* Ex. E ¶ 12 (OAN San Diego News Director swearing the same)

> **8.    Para. 305(h): Dec. 4, 2020, *In Focus with Stephanie Hamill.***

In this broadcast, OAN host Stephanie Hamill interviews Giuliani, who says Dominion is "in bed" with officials, is "phony," and suggests was "getting paid millions to help Biden win." Ex. A-7 at 4:21–24.

Whether Giuliani harbored actual malice is irrelevant in this case against OAN. "[A]ctual malice may not be attributed outside *respondeat superior*," meaning a plaintiff thus must demonstrate it "only through evidence of the information available to, and conduct of, [a defendant's] employees." *McFarlane*, 74 F.3d at 1303. Accordingly, the "proper focus" for actual malice is on "the persons in the organization having responsibility for the publication." *Waskow*, 462 F.2d at 1175 n.4 (citation altered) (quoting *N.Y. Times*, 376 U.S. at 287).

There is no evidence that OAN host Hamill harbored any serious doubts about the truth of this statement at the time of publication, nor that she believed it was inherently improbable. And again, despite having no duty to do so, she interviewed a former high-ranking DOJ official who represented President Trump. Ex. C-35 at APP 2707.

Nothing in this story is inherently improbable, for the reasons above.

> **9.    Para. 305(i): Dec. 5, 2020, Rebroadcast of *Dominion-izing the Vote.***

This is a rebroadcast and fails for all the reasons covered above for Paragraph 305(f).

> **10.    Para. 305(j): Dec. 19, 2020, Rebroadcast of *Dominion-izing the Vote.***

This is a rebroadcast and fails for all the reasons covered above for Paragraph 305(f).

### 11.     *Para. 305(k): Dec. 24, 2020, Breaking News Live with Patrick Hussion.*

Host Patrick Hussion plays a video of Giuliani in this broadcast. Hussion says, "Giuliani says recent forensic audits found Dominion voting machines were programmed to give Joe Biden an automatic advantage over any number of Trump votes." Ex. A-8 at 3:1–4. And then Giuliani himself responds, "We believe, from what we saw in Michigan, that the machines have an inaccurate vote, that they're programmed to give Biden somewhere between a two and five percent advantage." *Id.* at 3:5–8.  There is no evidence that Hussion harbored any serious doubts about the truth of this statement, nor that he thought it was inherently improbable.  *See also,* Ex. E ¶ 15 (OAN San Diego News Director swearing same).

As above, whether Giuliani harbored actual malice is irrelevant. *Waskow*, 462 F.2d at 1175 n.4. Defendants relied on an interview with Giuliani, a former high-ranking DOJ official who represented the President. ███████████████████████████████████████████
████████████████████████. Ex. C-35 at APP 2707–08. Finally, nothing in this story is inherently improbable, for the reasons above.

### 12.     *Para. 305(l): Dec. 30, 2020, Newsroom.*

OAN anchor Mike Dinow plays a video of Sidney Powell. Dinow says, "Powell says Donald Trump won a second term in office on election night, and Democrat officials had to use all tools they had to prevent that. She adds this includes foreign meddling, electronic manipulation of votes, and expelling poll watchers." Ex. A-9 at 2:10–14. Powell herself says, "The flipping of votes by Dominion is even advertised in their . . . ability to do that, to run a fraction, to make a Biden vote count 1.26 percent and a Trump vote to only count .74. They've done it before," and references "Venezuela." *Id.* at 2:15–20.

As above, whether Powell harbored actual malice is irrelevant here, *see Waskow*, 462 F.2d at 1175 n.4, and Dinow denies harboring any serious doubts about the truth of this statement at the

time of publication, nor did he think it was inherently improbable. Ex. I ¶¶4–5, 9. *See also* Ex. E

¶ 18 (News Director swearing the same). ███████████████████████████████████

███. *See* Ex. C-22 at 105:24–106:13, 122:17–21, 146:22–147:1.

As with several statements above, OAN had no duty to conduct such interviews but

nonetheless ████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████ Ex. C-35 at APP 2708–09. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████. Ex. C-17 at 215:22–216:10.

Nothing in this story is inherently improbable, for all the reasons given above.

### 13.    *Para. 305(m): Jan. 1, 2021, Newsroom.*

OAN anchor Emily Finn plays a video of Giuliani, who describes him as claiming "phony

ballots" were introduced "by Democrat officials and Mainland China." Ex. A-10 at 2:2–10. As

above, whether Giuliani harbored actual malice is irrelevant, *see Waskow*, 462 F.2d at 1175 n.4,

and there is no evidence that Finn harbored serious doubts about the truth of this statement, nor

that she thought it was inherently improbable. *See* Ex. E ¶ 21 (News Director swearing the same)

As with several statements above, OAN relied on direct statements from a former high-

ranking DOJ official who represented the President. ████████████████████

████████████████████████████████████████████████████

██████████████████████████ Ex. C-35 at APP 2709; Bruce Golding, *Giuliani*

*Alleges 'National Conspiracy' by Democrats to Steal 2020 Election*, N.Y. Post (Nov. 19, 2020, at

23:19 ET), https://nypost.com/2020/11/19/giuliani-alleges-national-conspiracy-by-dems-to-steal-

election/. Further, for the same reasons as above, nothing in this story is inherently improbable, especially given Giuliani's position and DOJ experience.

### 14.    Para. 305(n): Jan. 2, 2021, Bobb Interview with Giuliani.

Host Christina Bobb interviews Giuliani, who claims "the election was stolen" because "votes were entered secretly" in key states by "ballots that were brought in in the middle of the night." Ex. A-11 at 2:22–3:4, 3:25–4:1. He concludes, "That's how you have more votes than voters because a physical voter didn't actually make that vote. And of course, the Dominion machines were the machines that we used, which are basically built to cheat." *Id.* at 4:15–18.

As above, whether Giuliani harbored actual malice is irrelevant, *see Waskow*, 462 F.2d at 1175 n.4, and Bobb denies harboring any serious doubts about the truth of this statement at the time of publication, nor did she think it was inherently improbable. Ex. J ¶¶ 5–7. ██████████ █████████████████████████████████████████. Ex. C-7 at 104:13–105:7, 105:23– 106:6. As with several statements above, OAN relied on an interview with a former high-ranking DOJ official who represented the President.

Further, for the same reasons as above, nothing in this story is inherently improbable.

### 15.    Para. 305(o): Jan. 27, 2021, Newsroom.

OAN anchor Mike Dinow features Christina Bobb interviewing mathematician Edward Solomon, who says, "Biden won exactly the same percentage points across multiple precincts at designated times of day long enough to change the advantage." Ex. A-12 at 2:9–11. Dominion is never even mentioned. *See id.*

As above, whether Solomon harbored actual malice is irrelevant, *see Waskow*, 462 F.2d at 1175 n.4, and Dinow and Bobb deny harboring any serious doubts about the truth of this statement at the time of publication, nor did they think it was inherently improbable. Ex. I ¶¶ 4, 5, 8, 10; Ex. J ¶¶ 5, 8. *See also* Ex. E ¶ 24 (News Director swearing the same).

30

Further, nothing in this story is inherently improbable, for all the reasons given above.

### 16. *Para. 305(p): Feb. 5, 2021, Absolute Proof with Mike Lindell.*

This program was solely authored and produced by Mike Lindell, who had agreed to purchase advertisement airtime, and OAN had no involvement in the creation, production, writing, or editing of any of the Lindell programs. Ex. D ¶ 12. Lindell has never been employed by OAN. *Id.* Dominion has separately sued Lindell for the very same program.[37]

Whether Lindell harbored actual malice is irrelevant in this case against OAN. "[A]ctual malice may not be attributed outside *respondeat superior*," meaning a plaintiff thus must demonstrate it "only through evidence of the information available to, and conduct of, [a defendant's] employees." *McFarlane*, 74 F.3d at 1303. Actual malice cannot be imputed even for independent contractors, *Secord*, 747 F. Supp. at 787, even when they were *specifically* "hired to write" the challenged statements, *McFarlane v. Esquire Mag.*, Civ. No. 92-0711, 1994 WL 510088, at *11 (D.D.C. June 8, 1994), *aff'd*, 74 F.3d 1296 (D.C. Cir. 1996). But OAN did not hire Lindell to do anything—let alone to write the challenged programs. ███████████████████████ ████████████████████. Ex. C-42 at APP 2778.

In this suit against OAN, the "proper focus" is on "the persons in the organization having responsibility for the publication," *Waskow*, 462 F.2d at 1175 n.4, which was Charles Herring, President of OAN, who denies harboring serious doubts about the truth of the statements at the time of publication, nor did he think they were inherently improbable, Ex. D ¶ 13.

OAN put a disclaimer on several of the airings to make clear that ████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████

---

[37] *US Dominion Inc., v. My Pillow, Inc.*, No. 1:21-cv-00445 (D.D.C.).

███████████████████████████████████████████

██████████████████████████████████████ Ex. C-43 at APP 2781. Again, such

statements strongly "rebut a claim of malice." *Lohrenz*, 350 F.3d at 1286.

Further, the test is not whether Lindell's story was objectively improbable, but even if that were the test, Dominion still fails. As explained above, there were years of concerns by states, judges, Democrat politicians, and even verified examples of massive, intentional vote-flipping using electronic voting machines, like in the 2017 Venezuelan election. Even today, the President insists this happened in 2020 in the United States. Dominion may wish to sweep those views under the rug, but they were certainly not inherently improbable in 2020 and 2021.

### 17. Para. 305(q): Feb. 11, 2021, A Screening and Conversation of Absolute Proof.

This is another Lindell broadcast and fails for the reasons above for Paragraph 305(p).

### 18. Para. 305(r): Apr. 3, 2021, Scientific Proof with Mike Lindell.

This is another Lindell broadcast and fails for the reasons above for Paragraph 305(p).

### 19. Para. 305(s): Apr. 22, 2021: Absolute Interference with Mike Lindell.

This is another Lindell broadcast and fails for the reasons above for Paragraph 305(p).

### 20. Para. 305(t): Apr. 29, 2021: One-on-One with Mike Lindell.

OAN host Natalie Harp interviews Lindell, who contends that China launched an "attack" by infiltrating voting machines. Ex. A-13 at 5:14–17. Dominion is barely even mentioned. *See id.* As above, whether Lindell harbored actual malice is irrelevant here, *see Waskow*, 462 F.2d at 1175 n.4, and there is no evidence that Harp harbored any serious doubts about the truth of this statement at the time of publication, nor that she thought it was inherently improbable. This broadcast further fails to demonstrate actual malice for all the same reasons covered above for Paragraph 305(p).

### 21. Para. 305(u): May 3, 2021, Pearson Sharp.

OAN host Pearson Sharp interviews Lindell, who continues to argue that "China hacked into our election and [flipped] millions upon millions of votes." Ex. A-14 at 4:18–19. As above, whether Lindell harbored actual malice is irrelevant, *see Waskow*, 462 F.2d at 1175 n.4, and Sharp denies harboring any serious doubts about the truth of this statement at the time of publication, nor did he think it was inherently improbable. Ex. G ¶¶ 4–7. This broadcast further fails to demonstrate actual malice for all the reasons covered above for Paragraph 305(p).

### 22. Para. 305(v): May 22, 2021, Weekly Briefing with Christina Bobb.

Bobb offers her opinions about election fraud and what state officials should do. Ex. A-15 at 3:19–4:2. She barely mentions Dominion. *See id.* at 2:7–10. She denies harboring any serious doubts about the truth of her statements at the time of publication, nor did she think any were inherently improbable. Ex. J ¶¶ 5, 9. Further, for the same reasons as above, nothing in this story is inherently improbable.

### 23. Para. 305(w): June 4, 2021, The Real Story with Natalie Harp.

OAN host Natalie Harp interviews Lindell, who continues with his belief that the election results were the result of "the machine fraud . . . of this cyberattack with mostly from China, using the Democrat Party." Ex. A-16 at 5:10–17. He barely mentions Dominion. *See id.* at 4:21.

As above, whether Lindell harbored actual malice is irrelevant, *see Waskow*, 462 F.2d at 1175 n.4, and there is no evidence that Harp harbored any serious doubts about the truth of this statement at the time of publication, nor that she thought it was inherently improbable.

This broadcast further fails to demonstrate actual malice for all the same reasons covered above for Paragraph 305(p).

### 24. Para. 305(x): June 4, 2021, Absolutely 9-0 with Mike Lindell.

This is a piece by Lindell where he again reiterates his belief that the election results were

"a 100 percent an attack by China on our country through these machines." Ex. A-22 at 2:18–19. He barely mentions Dominion. *See id.* at 2:8, 15:15, 18:20. This broadcast fails to demonstrate actual malice for all the reasons covered above for Paragraph 305(p).

### 25.    *Para. 305(y): June 29, 2021, Evening News.*

Anchor Shane Althaus interviews Lindell about his views on the election. *See* Ex. A-17. Again, Dominion barely comes up. *See id.* at 4:2. Whether Lindell harbored actual malice is irrelevant. *See Waskow*, 462 F.2d at 1175 n.4. ███████████████████ ████████████████ Ex. C-27 at 148:15–18, ████████████████████ ████████████████, *id.* at 149:17–150:21. ██████████████████ █████████████████. *Id.* at 181:23–25. And there is no evidence that Althaus harbored any serious doubts about the truth of this statement at the time of publication, nor that she thought it was inherently improbable. *See also* Ex. E ¶ 27 (News Director swearing the same) This broadcast further fails to demonstrate actual malice for the reasons above for Paragraph 305(p).

* * * * *

The actual malice standard is reserved for cases with strong evidence that defendants subjectively harbored serious doubts—but there is nothing remotely approaching that here. OAN and their employees honestly believed these stories, which were supported by the 2017 rigged Venezuelan vote, Judge Totenberg's rulings in 2020, Dominion's repeated rejections for security flaws, the drumbeat of concerns by Democrat politicians, the flipped votes in Antrim County, and statements by former high-ranking DOJ officials and even the sitting President.

If Dominion had its way, the media would face liability for reporting on things like the Maduro allegations unless and until they were somehow "proven" to the satisfaction of even Maduro himself. The First Amendment prohibits such muzzling.

## II.    At the Very Least, Summary Judgment Is Warranted for Mr. Robert Herring on

**Actual Malice and Publication.**

At the very least, summary judgment is appropriate for individually named defendant Robert Herring, who did not personally write, edit, or publish *any* of the challenged statements. *See* Ex. C-36 at APP 2720–25. This defeats two elements of Dominion's claim: actual malice and publication.

As noted above, the "proper focus" for actual malice is on "the persons in the organization having responsibility for the publication of the item." *Waskow*, 462 F.2d at 1175 n.4 (citation altered). But Mr. Herring was not personally responsible for the publication of any of the broadcasts, let alone whatever *specific language* Dominion thinks was defamatory *per se*. Dominion cannot show—let alone by clear-and-convincing evidence—that Mr. Herring harbored actual malice as to broadcasts he was not responsible for, which is all of them.

Separately, because Mr. Herring is individually named as a defendant, Dominion must establish *publication* of a challenged statement by Mr. Herring—but the D.C. Circuit has held this separate element is satisfied only where the defendant "wrote, edited, or published the statement in question." *Tavoulareas*, 759 F.2d at 136. The person must have done "the *actual* writing or editing" or publishing. *Id.* Publication is *not* shown where the defendant (1) would "bring to a newspaper's attention allegations of wrongdoing made by others," including "by incredible witnesses"; (2) conferred during the course of the media company's investigation; and (3) was even designated a "Special Correspondent" for the company. *Id.* at 101, 136–37.

Mr. Herring never "wrote, edited, or published" any of "the statement[s] in question," and therefore "the First Amendment precludes" holding him *personally* liable. *Id.* at 136. Even if he did occasionally "bring to [others'] attention" potential story ideas "to be investigated," that is insufficient as a matter of law to "hold [him] responsible as a *principal* for the *final publication*." *Id.* at 137 (emphases in original). This rule is so strict that in *Tavoulareas*, the D.C. Circuit directed

35

judgment in favor of a defendant—notwithstanding the jury's verdict *against* him—even though he had brought the relevant (and "incredible") allegations to the newspaper's attention, conferred during the course of its investigation, and was even designated a "Special Correspondent" for the matter. *Id.* at 101, 136–37. The case against Mr. Herring is far weaker.

### III.    None of the Challenged Statements Is Defamatory *Per Se*, False, Nor "Of-and-Concerning" Dominion.

The lack of clear and convincing evidence of actual malice is sufficient to end this case. But Dominion's claims fail for the additional reason that none of the challenged statements are (1) defamatory *per se*, (2) false, and (3) of-and-concerning Dominion, each of which is required.

#### A.    Relevant Legal Standards

##### 1.    Defamation Per Se

Dominion has alleged only one count: defamation *per se*. (Dkt. 1 at 154.) Whether a statement is capable of a defamatory *per se* meaning is a question of law for the Court. *See Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001); *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990). The Court also must consider the full context of each statement, not cherry-picked snippets. *See Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984).

Dominion's decision to allege defamation *per se* has two important consequences. *First*, the Court can look only to the challenged statements on their "face—without the aid of extrinsic proof," *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 115 (D.D.C. 2011), and without any reference to implication or "innuendo," *Foretich v. Advance Mag. Publishers, Inc.*, 765 F. Supp. 1099, 1105 (D.D.C. 1991); *see also Nunes*, 2022 WL 997826, at *3 (differentiating between defamation *per se* and defamation by implication). This also means the words must be susceptible of only one meaning: a clear defamatory *per se* statement. 53 C.J.S. Libel and Slander § 38.

*Second*, defamation *per se* is a supercharged version of defamation that can be shown only

through a narrow set of alleged conduct. As Judge Leon has explained, "defamation per se . . . occurs when a defendant falsely accuses the plaintiff of committing a crime or other unlawful act." *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 16 (D.D.C. 2019); *see US Dominion, Inc. v. Byrne*, 600 F. Supp. 3d 24, 30 (D.D.C. 2022) (Nichols, J.); *Raboya v. Shrybman & Assocs.*, 777 F. Supp. 58, 59 (D.D.C. 1991).

That means the following things—as a matter of law—are *not* defamatory *per se*:

- "[A]llegations of unsatisfactory job performance." *Robertson v. District of Columbia*, 269 A.3d 1022, 1032 (D.C. 2022).

- Statements that the plaintiff "did something wrong." *Benic v. Reuters Am., Inc.*, 357 F. Supp. 2d 216, 222 n.4 (D.D.C. 2004) (citation altered).

- Statements that led some readers to "*assume[]* that [the plaintiff] had committed a crime," *id.* at 222 (emphasis added), such as accusing someone of "child neglect," *Raboya*, 777 F. Supp. at 59, or of "blackmail[ing]" city officials, *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970).

- "[A]ccus[ing] [the plaintiff] of fraud and deception." *KLEO AG v. Rivada Networks, Inc.*, No. 1:22-cv-01664, 2022 WL 22626490, at *1 (D.D.C. Nov. 2, 2022) (Friedrich, J.) (second alteration in original).

- Vague or unclear statements, especially when they represented "'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512–13 (1984).

- Statements that reasonable viewers would have quickly "questioned" or "discredited." *Washburn v. Lavoie*, 357 F. Supp. 2d 210, 215 (D.D.C. 2004) (holding that "the accuracy of any legal characterization made by mere undergraduate students would have been summarily questioned, discredited, or both by any reasonable listener"—and thus the statements were not capable of a defamatory meaning, let alone defamatory *per se*).

- Statements "associating somebody with a foreign government," unless it was a crime to do so at the time. *Fridman v. Bean LLC*, No. 17-2041, 2019 WL 231751, at *4 (D.D.C. Jan. 15, 2019) (quoting *Jankovic*, 494 F.3d at 1091).

- Questions, including "rhetorical" ones, because "the author's use of a question made clear [her] lack of definitive knowledge and invited the reader to consider various possibilities." *Abbas v. Foreign Pol'y Grp., LLC*, 975 F. Supp. 2d 1, 15–16 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015).

As explained below statement-by-statement, *see* Part III.B, none of the complained-of publications satisfies the extraordinarily high burden of showing defamation *per se*. That independently warrants granting summary judgment to Defendants.

### 2.     *Falsity in the Context of Media Reports of Newsworthy Allegations*

Dominion also must separately prove the falsity of the complained-of publications. *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000); *see Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974).

Dominion must demonstrate that the complained-of publications "express or imply a verifiably false fact about the plaintiff." *Powell*, 554 F. Supp. 3d at 57 (Nichols, J.). Dominion must show the broadcasted statement was "so obviously false" that no reasonable person could find that the complained-of publications were supportable interpretations of the underlying facts. *Guilford*, 760 A.2d at 591 (citing *Washington v. Smith*, 80 F.3d 555, 557 (D.C. Cir. 1996)). Any doubts redound to OAN: "[W]here the question of truth or falsity is a close one, a court should err on the side of non-actionability." *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 317 (D.C. Cir. 1994). Whether a challenged statement is capable of being proven false is a question of law for the Court. *See Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144 (D.C. Cir. 1994).

Critically, the Supreme Court has held that in the context of the media reporting newsworthy allegations, falsity means only whether the media accurately reported the allegations. Where "the articles published . . . were accurate and truthful reports of what had been said" by others on "matters of . . . governmental interest and importance," there could be no claim that the publisher engaged in "the knowing use of falsehood or a reckless disregard of whether the statements made were true or false." *Greenbelt*, 398 U.S. at 11–13. Since the early days of the Republic, newspapers have reported on allegations made about matters of public concern. But none of those allegations would get reported if the media knew it could face liability unless it later

might have to *prove* the underlying allegations *themselves* were true.

Accordingly, the lower courts have long recognized that when it comes to determining falsity of newsworthy allegations reported by "media defendants," the inquiry is *not* whether the underlying "allegations are true," but rather whether "*the allegations were made and accurately reported*" by the defendant. *Green v. CBS Inc.*, 286 F.3d 281, 284 (5th Cir. 2002) (emphasis added). "Otherwise, the media would be subject to potential liability every time it reported an investigation of alleged misconduct or wrongdoing by a private person, public official, or public figure." *KTRK Television v. Felder*, 950 S.W.2d 100, 105 (Tex. App.—Houston [14th Dist.] 1997).

Members of this Court have applied the same rule. A published "account of what 'several Palestinians' told the author . . . is not defamatory because it is not an assertion of false fact," but rather was truthfully "reporting on what people in the region have said to [the author]." *Abbas*, 975 F. Supp. 2d at 19. The author truthfully reported allegations—and that meant the claim of falsity failed. Other decisions follow suit. *See, e.g.*, *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 279 (D.D.C. 2017) ("[T]he contention that Sly 'named' Plaintiffs as users of PEDs is not false; Sly unquestionably states that Zimmerman and Howard use PEDs . . . . ."). Even if the reporting goes beyond mere repetition of the allegation, that still "is not enough" for the plaintiff to show that reporting allegations was false. *Barrett v. Atl. Monthly Grp. LLC*, No. 1:22-cv-49, 2024 WL 4119400, at *11 (D.D.C. Sept. 9, 2024).

Further, even setting aside the truthful reporting of others' allegations, a statement cannot be deemed false unless it is *provably* false; otherwise, it is merely an opinion. *See Xereas v. Heiss*, 933 F. Supp. 2d 1, 18 (D.D.C. 2013). As this Court has noted, "statements of opinion regarding matters of public concern cannot be defamatory if they do *not* contain or imply a provably false fact." *Powell*, 554 F. Supp. 3d at 57 (Nichols, J.). Statements that are "loosely definable" or

"variously interpretable" likewise cannot support an act for defamation. *Ollman*, 750 F.2d at 980. A statement with a number of possible meanings is by its nature unverifiable and therefore non-actionable. *Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36, 47 (D.D.C. 2022).

"If it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, the statement is not actionable." *Id.* at 46 (citation altered). Thus, hyperbolic rhetoric, figurative language, suspicions, expressions of outrage, and conclusions or interpretations based on disclosed facts all receive full constitutional protection because they cannot be "false" in the legal sense. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20–21 (1990).

Further, the First Amendment "demands" that statements be considered in their proper context. *Weyrich*, 235 F.3d at 625. "[I]n the course of legitimate debate over issues of public importance, offensive rhetoric on the borderline between fact and opinion is to be expected, and such statements are much more deserving of constitutional protections than similar statements made for purely private motives." *Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 47 (D.C. 1983).

"Any risk that full and vigorous exposition and expression of opinion on matters of public interest may be stifled must be given great weight. In areas of doubt and conflicting considerations, it is thought better to err on the side of free speech." *Id.* at 48–49.

### 3.    *"Of-and-Concerning" Dominion.*

Dominion must also demonstrate that the complained-of publications were "'of and concerning' the plaintiff." *Byrne*, 600 F. Supp. 3d at 32 (Nichols, J.). "A statement satisfies this requirement if it leads 'the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed.'" *Id.* But a statement is not "of and concerning" the plaintiff simply because readers might "misread the passage" and erroneously assume it is about the plaintiff. *Jankovic*, 494 F.3d at 1091–92. Further, "[a] corporation is not defamed by communications defamatory of its officers, agents or stockholders," because

statements about those individuals are not "of and concerning" the corporation itself. *Id.* at 1089 (alteration in original) (quoting Restatement (Second) of Torts § 561 cmt. b).

<p style="text-align:center">* * * * *</p>

As explained next, not even one of Dominion's prolix list of complained-of publications can run the gauntlet of proving defamatory *per se* meaning, falsity, and of-and-concerning Dominion. Summary judgment is accordingly proper for this independent reason.

### B.    No Statement was Defamatory *Per Se*, False, *and* Of-and-Concerning Dominion.

Dominion's Complaint asserts twenty-five challenged broadcasts, running for fifty pages, typically without identifying which part(s) of the broadcasts/statements they think are defamatory *per se*, false, and of-and-concerning Dominion. But Dominion "cannot state a free-floating claim for defamation unmoored" to specifically identified false and defamatory *per se* statements. *See Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 149 (D.D.C. 2017).

Further, ████████████████████████████████████████████████████, *see* Ex. C-18 at 536:8–14, and during a hearing, counsel for Dominion finally agreed this case "is not at all" about statements that Dominion software had "defect[s]." Ex. C-44 at 15:7–13. Despite these concessions, Dominion has not withdrawn its prolix list of claims about statements discussing such defects, which comprise the vast majority of statements in this case. Accordingly, Defendants must address each publication in turn.

### 1.    *Para. 305(a): Nov. 12, 2020, Newsroom Broadcast re Edison Research.*

This broadcast related to others' reporting on data underlying an Edison Research report. Relying on several sources, including a Gateway Pundit article, the OAN anchor stated that "[a]ccording to an unaudited analysis of data obtained from Edison Research, states using Dominion voting systems may have switched as many as 435,000 votes from President Trump to

<p style="text-align:center">41</p>

Joe Biden, and the author also finds another 2.7 million Trump votes appear to have been deleted by Dominion," but "[a]nalysts say the theft and destruction of votes are attributed to so called glitches in Dominion software." Ex. A-1 at 2:2–14.

*Not Defamatory Per Se.* Dominion seizes on the screen chyron saying "REPORT: DOMINION DELETED 2.7M TRUMP VOTES NATIONWIDE." (Dkt. 1 ¶ 305(a).) But "headlines are to be construed in conjunction with their accompanying articles," *Q Int'l Courier Inc, v. Seagraves*, No. 95-1554, 1999 WL 1027034, at *4 (D.D.C. 1999), and—as noted above— the anchor on screen stated in her *very next sentence* that "[a]nalysts say the theft and destruction of votes are attributed *to so called glitches in the Dominion software*." Having "glitching" software is not defamatory *per se*, as it does not directly accuse Dominion of a crime. The word "glitch" indicates that something unexpected or unintentional happened, i.e., "minor malfunction." *Glitch*, Merriam-Webster, https://www.merriam-webster.com/dictionary/glitch (last visited June 8, 2025).

Such statements perhaps mean that Dominion might have done "something wrong," i.e., it was lazy or had poorly engineered its software, but that it still not nearly enough for defamation *per se*, *Benic*, 357 F. Supp. 2d at 222 n.4, especially given that Dominion is barred from recourse to implication or innuendo, *Foretich*, 765 F. Supp. at 1105, and false statements about a plaintiff's property, products, or services sound in injurious falsehood, not defamation, *see Art-Metal-USA Inc. v. United States*, 753 F.2d 1151, 1155 & n.6 (D.C. Cir. 1985). In fact, even if some viewers erroneously "*assumed* that [Dominion] had committed a crime," that is *still* insufficient for defamation *per se*. *Benic*, 357 F. Supp. 2d at 222 (emphasis added).

*No Verifiably False Fact.* Phrases like "glitch" have no precise meaning and thus are not actionable. *See, e.g.*, *Florio*, 619 F. Supp. 3d at 47. The broadcast is also replete with cautionary language: "appear to have been deleted," "unaudited analysis of data," "states . . . may have

42

switched as many as 435,000 votes," "the author also finds another 2.7 million Trump votes appear to have been deleted," "[a]nalysts say," the "destruction of votes are attributed to so-called glitches," and "the extent to which this affected results." These are not provably false because they do not communicate specific messages about discernible facts. *See Florio*, 619 F.Supp.3d at 47; *Ollman*, 750 F.2d at 985–86; *Bauman*, 377 F. Supp. 3d at 11 (inclusion of the word "finds" weighs in favor of opinion and lacks provability); *Xeras*, 933 F. Supp. 2d at 19 (statements that plaintiff engaged in "dishonest" and "deceptive" business practices were not provably false).

*OAN Truthfully Reported Others' Newsworthy Allegations.* In this context, the inquiry is *not* whether the underlying "allegations are true," but rather whether "the allegations were made and accurately reported" by the media defendant. *Green*, 286 F.3d at 284. Accurate "reporting on what people . . . have said" about newsworthy matters is simply not "false" from a legal perspective. *Abbas*, 975 F. Supp. 2d at 19; *see Greenbelt*, 398 U.S. at 11–13. Here, OAN truthfully reported others' newsworthy allegations, and thus such statements cannot be false vis-à-vis OAN.

### 2.    *Para. 305(b): Nov. 13, 2020, Newsroom Broadcast re Glitches.*

This broadcast featured an exchange between OAN anchor Jennifer Franco and guest Chanel Rion. Rion said Dominion's system was "proven to have actually glitched in favor of Biden in at least three states,"[38] and she referenced a "[p]rime example [of] Antrim Country in Michigan where 6,000 ballots had been affected by the Dominion voting machines and how they were digitally somehow glitching towards Biden," but "when they caught this mistake on a software level they were able to change the results, and it turned out the . . . so-called Biden-win county was actually a Trump win because of the software glitch." Ex. A-2 at 2:11–3:2.

---

[38] Dominion erroneously claims that this broadcast said Dominion "had been 'proven' to have switched votes." (Dkt. 1 ¶ 110.) The Court should disregard Dominion's editorializing and misquotations.

*Not Defamatory Per Se.* The allegations are solely about "glitches," "glitching," "mistakes on a software level," etc. As explained above for Paragraph 305(a), such remarks are not close to being defamatory *per se*. Even phrases like "glitched in favor of Biden" or "votes were switched from President Trump to . . . Joe Biden" fall far short of being defamatory *per se.* That described a well-known incident where Dominion systems reflected thousands of votes for Donald Trump as actually being for Joe Biden in Antrim County, Michigan. Statement § H.i.. Dominion admits this happened but claims it was user error, while others disagree and say it was a software glitch. Ex. B-1. But either way, it was not a direct accusation of *intentional and criminal* conduct by Dominion. Indeed, Rion made clear that the vote-switching was a "mistake," directly contrary to a claim of intentional vote-shifting.

*No Verifiably False Fact.* Dominion's system reflected flipped votes from Trump to Biden in Antrim County. Statement § H.i. Dominion admits this happened but claims it was user error, while others say it was a software glitch. Ex. B-1. But either way, thousands of votes *were* flipped in Dominion's system.

Terms like "proven to have actually glitched," "somehow glitching," "Dominion really came to the forefront," "questionable in terms of their results," "ballots had been affected," "they were digitally somehow glitching towards Biden," and "caught this mistake on a software level" are all incapable of being proven true or false because they lack precise meaning or are susceptible to different interpretations. *See Florio*, 619 F. Supp. 3d at 47.

### 3.     *Para. 305(c): Nov. 14, 2020, Real America with Dan Ball Broadcast.*

This broadcast features a longer exchange between host Dan Ball and guest Chanel Rion, who says there are "irregularities when it comes to the data that they are sharing. And one thing we're noticing is this massive swapping of data," and "we're talking about votes that only go one direction." Ex. A-3 at 3:16–4:2. She later says "Pennsylvania is the largest switch that we're

44

noticing in which 220,000 votes went from President Trump to Joe Biden," and she also references Georgia and Michigan, where "a county clerk had caught this glitch," says it was either "a glitch" or "human error," and—notably—says that "Dominion system[s] software company itself said this was, in fact, a glitch." *Id.* at 4:24–5:2, 5:16–20, 6:1–2. And she finishes with "it's a Dominion Systems software glitch that we are going to dig into." *Id.* at 7:17–18.

**Not Defamatory Per Se.** As with Paras. 305(a) and (b), these statements are not remotely close to being defamatory *per se*. They reference glitches, human error, switches, etc.—not a single accusation of criminal conduct or tantamount behavior, let alone intentionally by Dominion itself.

**No Verifiably False Fact.** Rion's statements that "[i]t is something we need to be looking into" and "it's a Dominion system software glitch that we are going to dig into" are speculative and suggest a degree of uncertainty, i.e., a hypothesis and inquiry rather than objectively verifiable facts that a crime had been committed by Dominion. *See Mar-Jac*, 773 F. Supp. 2d at 122–23 (holding that statement "still 'trying to find out'" is speculative language and hypothesis, not implying objectively verifiable facts). The terms "massive swapping," "very alarming," "some irregularities," and "this is not an insignificant data glitch or abnormality" are not verifiably false statements; rather, they are Rion's subjective views and interpretation of the data that cannot "undergird a claim of defamation." *Bauman*, 377 F. Supp. 3d at 10–11; *Montgomery v. Risen*, 197 F. Supp. 3d 219, 249 (D.D.C. 2016) (a person's opinion concerning where an event ranks is a quintessential example of subjective opinion).

Finally, as explained above, it's also *true* that Dominion systems saw a significant and erroneous switch of thousands of votes from Trump to Biden in Antrim County, as Rion explained.

### 4.    *Para. 305(d): Nov. 16, 2020, Newsroom Broadcast re Coomer.*

This broadcast features Chanel Rion with guest Joe Oltmann, who reports hearing first-hand a Dominion executive (Eric Coomer) say, "paraphrasing," "Don't worry about the election.

Trump is not going to win. I made effing sure of that." Ex. A-4 at 2:9–17. Oltmann says he also researched Coomer and thought "he was not just Antifa, he was – he was responsible for putting his fingers on the – the scales of our election." *Id.* at 3:19–21. Rion notes that "[i]f Coomer is investigated and found to have indeed tampered with a presidential election, such an action could be tried for treason." *Id.* at 4:2–4.

      ***Not Of-And-Concerning Dominion.*** This broadcast is about Coomer, and statements about Dominion *executives* cannot be defamatory *per se* to Dominion because "[a] corporation is not defamed by communications defamatory of its officers, agents or stockholders." *Jankovic*, 494 F.3d at 1089 (alteration in original) (quoting Restatement (Second) of Torts § 561 cmt. b); *see Meyer Grp. Ltd. v. Rayborn*, 695 F. Supp. 3d 39, 66 (D.D.C. 2023) (defendant's "statements relate solely to [TMG founder] Meyer and not TMG" itself).

      ***Not Defamatory Per Se.*** It is unclear what the statement even meant ("I made effing sure of that."). It cannot be defamatory *per se* because some kind of innuendo or implication would be needed to make it even suggest, let alone directly accuse, someone of a crime.

      ***OAN Truthfully Reported Others' Newsworthy Allegations.*** OAN truthfully reported these newsworthy allegations, and the inquiry is *not* whether the underlying "allegations are true." *Green*, 286 F.3d at 284; *see Greenbelt*, 398 U.S. at 11–13; *Abbas*, 975 F. Supp. 2d at 19. That means the statements are not legally false vis-à-vis OAN.

      ***No Verifiably False Fact.*** Vague statements about making "effing sure of that" are not provably false. Likewise not false is Rion's forward-looking statement that "[i]f Coomer [Dominion executive] is investigated and found to have indeed tampered with a presidential election, such an action could be tried for treason." It "is clear that the challenged statements represent [the speaker's] own interpretation of those facts, leaving the reader free to draw his own

46

conclusions," which this Court has held defeats a subsequent defamation claim. *Powell*, 554 F. Supp. 3d at 58–59 (citation altered).

### 5. Para. 305(e): Nov. 21, 2020, Chanel Rion Tweet.

In this Tweet, Rion replies "Yes, they are" to a tweet asking whether "states that trump won" that used "dominion software" are "corrupt too." (Dkt. 2-13 at 2.) Rion rhetorically says, "Ask: why did NC take so long to call after 98% precincts were reporting a Trump win? ALL votes processed by Dominion must be audited." *Id.*

**Not Of-And-Concerning Dominion.** From context, it is clear that Rion is accusing the "states"—not Dominion—and even asks why "NC" took so long. The only reference to Dominion is a statement that says all the votes they processed "must be audited."

**Not Defamatory Per Se.** There is no direct accusation of a crime or similar conduct. Allegations of being "corrupt" are not even defamatory, let alone defamatory *per se*. *See, e.g.*, *KLEO*, 2022 WL 22626490, at *1. Rion's rhetorical question cannot be defamatory *per se*. *Abbas*, 975 F. Supp. 2d at 15–16. "Indeed, the invitation . . . for the reader to form her own opinion is not libel, rather it 'is the paradigm of a properly functioning press.'" *Id.* (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1096 (4th Cir. 1993)).

**Inactionable Opinion, Hyperbole, and Rhetoric.** Accusations of being "corrupt" or having votes recounted are also inactionable opinion and rhetoric. *E.g.*, *KLEO*, 2022 WL 22626490, at *1.

### 6. Para. 305(f): Nov. 21, 2020, Dominion-izing the Vote.

This is a feature piece anchored, written, and produced by Chanel Rion about questions raised regarding voting. *See* Ex. A-5. Rion relied on dozens of sources to put together the piece. *See supra* Part I.D.6. Dominion mischaracterizes what Rion actually said, (Dkt. 1 ¶ 135(f)), but the Court looks to "the published article itself," not Dominion's misquotations. *Guilford*, 760 A.2d at 602 (quoting *Tavoulareas*, 817 F.2d at 781).

***Not Defamatory Per Se***. Dominion argues it was defamatory *per se* simply to use the title "Dominion-izing the Vote," (Dkt. 1 ¶ 305(f)), but that phrase says absolutely nothing on its face about Dominion committing crimes or tantamount behavior. One could just as easily imagine Dominion itself using the phrase to tout its involvement in elections across the country.

The broadcast refers to Dominion machines allegedly having "glitches," "anomalies" from stray marks, "irregularities," "vulnerabilities," and "errors," and being "fragile and error prone," etc. As explained above regarding Paragraph 305(a), none of those is even close to being defamatory *per se*. *See Anomaly*, Merriam-Webster, https://www.merriam-webster.com/dictionary/anomaly (last visited June 6, 2025) ("something different, abnormal, peculiar, or not easily classified"). Dominion claims that "false inferences" were made that Dominion had engaged in intentional vote flipping, (Dkt. 1 ¶ 305(f)), but a claim for defamation *per se* bars reliance on innuendo, inferences, or extrinsic evidence. *E.g.*, *Mar-Jac*, 773 F. Supp. 2d at 115; *Foretich*, 765 F. Supp. at 1105; *Nunes*, 2022 WL 997826, at *3.[39]

Likewise not defamatory *per se* are Rion's questions like, "What does [Coomer] mean when he says Trump won't win. I made F-ing sure of that. Nothing?"; "To what extent was this actually designed by the top on purpose?"; "So what makes the machines fragile and error prone?"; and "Dare we dig deeper?" Ex. A-5 at 8:7–8, 17:1–2, 20:12–13, 20; *See Abbas*, 975 F. Supp. 2d at 15–16. Dominion lists more such questions at Paragraph 305(f) that were in a Twitter video, which Dominion admits are "rhetorical questions." But such questions are not actionable as a matter of law. "That [Dominion] would prefer that readers do not answer the questions in [a certain way] is not sufficient to support [its] defamation claim," let alone a defamation *per se* claim. *Id.* at 16.

---

[39] In any event, courts cannot *"*hold [a defendant] responsible for every inference a reader might reasonably draw from his article [as it] would undermine the uninhibited discussion of matters of public concern." *Guilford*, 760 A.2d at 601.

Rhetorical questions are also incapable of being proven false and thus fail for that additional reason. *Id.* at 15–16.

Rion featured a guest, Ron Watkins, who discussed the risk of exploiting vulnerabilities in Dominion's software. *See* Ex. A-5 at 8:13–7. But Watkins's statements about intentional vote flipping were not levied at Dominion. Rather, he says that "vote workers in places like Arizona" were the ones whose behavior was suspicious, as they could *take advantage* of Dominion software glitches. *Id.* at 15:18–22. He emphasized that "you need to be most concerned about activist IT people," and he said "somebody" had "stolen a laptop and USB drive." *Id.* at 8:13–14. At every step, his claims about intentional vote flipping were leveled against "competent hacker[s], thie[ves] or paid-off poll worker[s]," who could "game the Dominion system." *Id.* at 16:22–25. This makes clear he *isn't* accusing Dominion itself of intentionally flipping votes. Rather, Dominion's vulnerable system could be the *victim* of others' conduct. That is confirmed by the opening portion of the broadcast (which Dominion conveniently omits from the Complaint) that cites Texas's conclusion that Dominion was too fragile and error prone and could not be trusted for safe and secure elections. *Id.* at 8:3–6.

These statements about Dominion vulnerabilities are a subjective view of the machines' vulnerabilities, not an assertion of criminal conduct by Dominion. *See Golden Palace, Inc. v. Nat'l Broadcasting Co.*, 386 F. Supp. 107, 110 (D.D.C. 1974) (corporation cannot be defamed "as to the quality of its product.").[40] Watkins also expressed his concerns regarding the keys to the machines

---

[40] Those statements include: "algorithms for ballots," "fonts," "algorithm for handling an anomaly, that is a stray mark or bleed through," "the machines are disastrously vulnerable," "vote adjudication," "the system for detecting anomalies can be set up by altering gamma settings," "the computer may or may not throw out your vote," "oddly read," "a capital I and a lower case L are nearly indistinguishable," "if the scanning system detects any anomaly on your ballot, then you are not counted," and "the biggest red flag about Dominion was its algorithm." Ex. A-5 at 12:9–24, 13:22–14:2, 14:9–23, 15:8–9.

and that if one is lost, as happened in a Philadelphia warehouse robbery, the security of the election may be in jeopardy, because "[d]o you trust a random thief who has administrative access to the voting machines?" Ex. A-5 at 10:21–11:3, 11:20–24. Dominion complains that it did not operate in Philadelphia County in 2020, (Dkt. 1 ¶ 305(f)), but even if erroneous, this is not defamatory *per se*, as operating in Philadelphia was not a crime.

Although not listed as a separate broadcast, Dominion also claims that a tweet advertising *Dominion-izing the Vote* was defamatory *per se* because it said Dominion "has had a history of problems. Stolen laptops, 'switched' votes, Clinton ties, Antifa CEOs, undeniable data." (Dkt. 1 ¶ 305(f).) Again, none of these are defamatory *per se*. "Problems" are like "glitches": not criminal. "Stolen laptops" is ambiguous—the most natural reading is that Dominion's laptops had been stolen by *someone else*. The use of quotation marks around "switched" indicates in the context of a short tweet that Dominion systems had seen votes flip due to glitches—the well-known event in Antrim County, Michigan. Referencing "Clinton" and "Antifa" ties may cast Dominion in a negative light, but it does not accuse directly of a crime. That is especially the case regarding the "CEOs" because "a corporation is not defamed by communications defamatory of its officers, agents or stockholders." *Jankovic*, 494 F.3d at 1089. The final, shorn reference to "undeniable data" is unclear but certainly doesn't amount to an accusation of a crime.

**OAN Truthfully Reported Others' Newsworthy Allegations.** OAN truthfully reported Watkins's newsworthy allegations, meaning they cannot be false vis-à-vis OAN. *See Greenbelt*, 398 U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19.

**No Verifiably False Fact.** Dominion's system *did* have glitches and did show flipped votes, as explained above in Paragraph 305(b). Further, statements like "we look at Dominion Voting Systems and its role in the 2020 presidential elections, glitches, errors, money trails to powerful

Democrats" are not actionable because words such as "glitches," "errors," and "money trails" lack precise meaning and lack provability. *See Bauman,* 377 F. Supp. 3d at 11 (comment that "he finds Bauman's involvement . . . extremely suspicious" lacks provability).

As for the tweet publicizing the broadcast, none of the statements are provably false, as they are unclear, subjective, and have multiple meanings.

***Inactionable Opinion, Hyperbole, and Rhetoric.*** Rion also offered her own opinions in the broadcast, which makes those aspects non-actionable. For example, she says, "You don't catch the criminal, but you decide you know their motive. Interesting judicial logic, Philadelphia." Ex. A-5 at 11:13–15. This is classic opinion, not a statement of fact. *See Armstrong v. Thompson*, 80 A.3d 177, 187–88 (D.C. 2013) (statements suggesting plaintiff engaged in "serious integrity violations" and "unethical behavior" were unverifiable opinions that "reflected one person's subjective view of the underlying conduct."). The same applies to Powell's statement that "[t]here should never be another election in this country . . . using a Dominion voting machine"—a statement of her personal belief.

Further, Watkin's and Rion's statements include cautionary language, rhetorical hyperbole, and are undeniably expressions of "a subjective view, interpretation, a theory, conjecture, [and] surmise" that are not provably false and thus cannot undergird a claim for defamation let alone defamation *per se*. *See Bauman*, 377 F. Supp. 3d at 16.

### 7.    *Para. 305(g): Nov. 23, 2020, Breaking News Live with Patrick Hussion.*

In this broadcast, Rion interviews Patrick Byrne, the billionaire founder of Overstock.com.

***Not Defamatory Per Se.*** Like Paragraph 305(f) above, Dominion admits its claim here is premised on "false inferences," but those are irrelevant for a claim of defamation *per se*. *Mar-Jac*, 773 F. Supp. 2d at 115; *Foretich*, 765 F. Supp. at 1105; *Nunes*, 2022 WL 997826, at *3. For example, Dominion alleges that the title "100% Rigged" demonstrates that Defendants endorsed

statements that Dominion committed election fraud by (1) "flipping votes from Trump to Biden," (2) "manipulating vote counts to steal the election" and (3) "designing its systems and machines for the express purpose of being hacked in order to rig elections." (Dkt. 1 ¶ 305(g).) But the actual broadcast never makes such statements. Dominion's editorializing and innuendo are barred in a defamation *per se* case.

Statements referring to "election irregularities . . . rooted in Dallas's use of Dominion voting machines," Ex. A-6(a) at 3:2–3, are not defamatory *per se*, as "irregularities" are like the "glitches" and "problems" discussed above (i.e., no accusation of a crime), nor is such a statement even about Dominion's conduct: it refers to *Dallas's use. See Bennett v. FedEx Off. & Print Servs., Inc.*, No. CV 21-2349, 2022 WL 2072599, at *3 (D.D.C. June 9, 2022). Nor is it a crime to operate in Dallas. Similar is Rion's statement, "Byrne says the election was 100% rigged," Ex. A-6(b) at 4:19–20, as "rigged" is ambiguous and also does not directly accuse Dominion of a crime.

Rion says that Byrne has "put together a group of individuals who are trying to crack down on the fraud that is Dominion." But caselaw holds that "accus[ing] [the plaintiff] of fraud and deception" is "insufficient to render the[ statements] defamatory as a matter of law," let alone defamatory *per se*. *KLEO*, 2022 WL 22626490, at *1 (second alteration in original). And that is especially the case here, given that just seconds later, Rion says she meant that there are "backdoor ways in which votes by the thousands could be changed, manipulated or deleted" because of Dominion's software flaws. Ex. A-6(a) at 3:11–16. Likewise not defamatory *per se* are Rion's questions like "Have you seen a clear pattern between the major swing states in this regard?" Ex. A-6(b) at 4:12–13.

***OAN Truthfully Reported Others' Newsworthy Allegations.*** OAN truthfully reported Byrne's newsworthy allegations, meaning they are not legally false as to OAN. *See Greenbelt*, 398

U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19.

**No Verifiably False Fact.** None of the statements are a specifically disprovable fact, e.g., comments about an election being "rigged," which has no clear factual meaning.

**Inactionable Opinion, Hyperbole, and Rhetoric.** For similar reasons, Byrne's statements are also matters of opinion and his interpretation of facts. Similar are Rion's statements like saying that Byrne is "on a mission to save the republic from a deadly virus, widespread machine and election fraud . . . by funding a niche group of experts . . . who are trying to crack down on the fraud that is Dominion," Ex. A-6(a) at 2:9–14, which are rhetoric and hyperbole. Phrases like "Biden vote dumps that are statistically impossible," "'20 Election 100% Rigged," and "election was 100% rigged" are non-actionable opinion, Ex. A-6(b) at 3:5–6, 4:19–20, particularly given the surrounding context of the broadcast and the ongoing widespread debate and disagreement about the election results. *See Montgomery*, 197 F. Supp. 3d at 249 ("cancer con-artists' and "practitioners of fraud"" were nonactionable expressions), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017).

### 8.    *Para. 305(h): Dec. 4, 2020, In Focus with Stephanie Hamill.*

OAN host Stephanie Hamill interviews Giuliani. Ex. A-7.

**Not Defamatory Per Se.** Giuliani says Dominion is "in bed" with officials and is "phony," but such statements are not defamatory, let alone defamatory *per se*. *Id.* at 4:21–24; *see KLEO*, 2022 WL 22626490, at *1. Even Giuliani saying Dominion was "getting paid millions to help Biden win," Ex. A-7 at 4:23–24, is not a direct accusation of a crime but instead requires innuendo or resort to extrinsic evidence. *Mar-Jac*, 773 F. Supp. 2d at 115; *Foretich*, 765 F. Supp. at 1105; *Nunes*, 2022 WL 997826, at *3. Giuliani vaguely references "ballots get[ting] taken out from under a . . . table," Ex. A-7 at 4:4–5, but that is not defamatory *per se* because there is no direct accusation of a crime, and in any event, he makes clear he pins this on "the Biden people and the democrats," meaning it is not "of-and-concerning" Dominion. Ex. A-7 at 3:21–22.

*OAN Truthfully Reported Others' Newsworthy Allegations.* The statements in this broadcast are not false in a legal sense because OAN truthfully reported Giuliani's newsworthy allegations. *Greenbelt*, 398 U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19.

*Inactionable Opinion, Hyperbole, and Rhetoric.* Giuliani's expressions of "a subjective view, an interpretation, a theory, conjecture, or surmise"—like "help[ing] Biden win"—are not provably false and thus cannot undergird a claim of defamation. *Bauman,* 377 F. Supp. 3d at 10–11 (quoting *Guilford*, 760 A.2d at 597).

### 9. Para. 305(i): Dec. 5, 2020, Rebroadcast of Dominion-izing the Vote.

This is a rebroadcast and fails for all the reasons covered above for Paragraph 305(f).

### 10. Para. 305(j): Dec. 19, 2020, Rebroadcast of Dominion-izing the Vote.

This is a rebroadcast and fails for all the reasons covered above for Paragraph 305(f).

### 11. Para. 305(k): Dec. 24, 2020, Breaking News Live with Patrick Hussion.

Host Patrick Hussion plays a video of Giuliani in this broadcast. Hussion says, "Giuliani says recent forensic audits found Dominion voting machines were programmed to give Joe Biden an automatic advantage over any number of Trump votes." Ex. A-8 at 3:1–4. And then Giuliani himself responds, "We believe, from what we saw in Michigan, that the machines have an inaccurate vote, that they're programmed to give Biden somewhere between a two and five percent advantage." *Id.* at 3:5–7.

*Not Defamatory Per Se.* These statements are not defamatory *per se* as to Dominion. The statements use the passive voice: *someone* programmed Dominion machines to give Biden an advantage, but Giuliani does not say Dominion itself did so. Innuendo cannot be considered in a defamation *per se* claim. Further, even if some people might have seen this and erroneously "*assumed* that [Dominion] had committed a crime," that is *still* insufficient for defamation *per se*. *Benic*, 357 F. Supp. 2d at 222 (emphasis added); *Guilford*, 760 A.2d at 589.

***OAN Truthfully Reported Others' Newsworthy Allegations.*** █████████████

███████████████████████████████████, Ex. C-24 at 243:5–12, 243:19–244:14, and that

defeats a claim of falsity. *See Greenbelt*, 398 U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F.

Supp. 2d at 19. The headline of "President Trump: Election Fraud Is Proven Fact" falls in the same

category, as OAN accurately reported President Trump's newsworthy allegations, which

themselves do not state a provably false fact.

### 12. Para. 305(l): Dec. 30, 2020, Newsroom.

OAN anchor Mike Dinow plays a video of Sidney Powell. Dinow says, "Powell says

Donald Trump won a second term in office on election night, and Democrat officials had to use all

tools they had to prevent that. She adds this includes foreign meddling, electronic manipulation of

votes, and expelling poll watchers." Ex. A-9 at 2:10–14. Powell herself says, "The flipping of votes

by Dominion is even advertised in their . . . ability to do that, to run a fraction to make a Biden

vote count 1.26 percent and a Trump vote to only count .74. They've done it before," and references

"Venezuela." *Id.* at 2:15–20. Dinow then accurately reports Powell's statement: "Powell goes on

to say voter fraud in this election was so rampant because President Trump's landslide victory was

breaking the Dominion algorithm." *Id.* at 2:21–23.

***Not Defamatory Per Se.*** There is no direct accusation of a crime by Dominion. Even the

term "flipping of votes" does not qualify. █████████████████████████████████████

█████████████████████████████████" Ex. C-11 at 72:13–18, surely referring to "flipping

of votes" did not accuse Dominion of a crime. Further, when Powell says Dominion

"advertised . . . their ability to do that, to run a fraction" assigning certain weight to Trump and

Biden votes, Ex. A-9 at 2:15–20, it is unclear to what she is referring—it seems to be some prior

advertisement Dominion itself made about how its software works. But vague remarks or ones

requiring innuendo or inferences are not defamatory *per se*, as a matter of law. *See Bose*, 466 U.S.

at 512–13. Her reference to Venezuela is also unclear; in any event, "associating somebody with a foreign government would not ordinarily be defamatory"—let alone defamatory *per se*. *Fridman*, 2019 WL 231751, at \*4. Even if any such statements led viewers to "*assume*[] that [Dominion] had committed a crime," that is still insufficient. *Benic*, 357 F. Supp. 2d at 222 (emphasis added).

Further, even if such a statement were seen as saying Dominion "advertised" its ability to pre-determine weights for votes, that likewise is insufficient to be defamatory *per se* because saying Dominion *advertised* something doesn't accuse Dominion of having committed a crime.

**OAN Truthfully Reported Others' Newsworthy Allegations.** Dinow accurately reports and states Powell's newsworthy allegations, and that defeats a claim of falsity. *See Greenbelt*, 398 U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19. That includes a headline accurately reporting what Powell had said: "Powell: Election Fraud Now Obvious Because Trump's Landslide Victory Broke Dominion 'Vote-Switch' Algorithm." (Dkt. 1 ¶ 305(l).)

**Inactionable Opinion, Hyperbole, and Rhetoric.** In context, Powell is providing commentary and opinion regarding a matter of public concern: foreign meddling, electronic manipulation of votes, and expelling poll watchers in the 2020 presidential election. The public's concern over that election reflects "differing interpretations of the murky facts . . . that will never be verifiable to everyone's satisfaction," *Lane*, 985 F. Supp. at 151–52, and thus are not actionable.

The same holds true here: there simply is no means by which a court can assess these statements without examining the election on a nationwide basis. The extensive debate over the 2020 election demonstrates that the facts will never be verifiable to everyone's satisfaction and, therefore, the statements are merely argument and opinion. Further, where statements are published in a public debate or in a "setting in which the audience may anticipate efforts to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole," vague charges such as "the

flipping of votes" are not factual assertions of crime but rather an expression of opinion. *See Myers*, 472 A.2d at 49–50 (holding "the vague charge that plaintiff 'entered into a corrupt relationship with Councilman Stone' was not a factual assertion of crime, but rather an expression of opinion").

### 13.    *Para. 305(m): Jan. 1, 2021, Newsroom.*

OAN anchor Emily Finn plays a video of Giuliani. Finn first says, "Giuliani details the meddling with this year's elections by Democrat officials and Mainland China, who he says used phony ballots in the hacking of Dominion machines." Ex. A-10 at 2:2–5. Giuliani then says, "When nobody was really looking, in the middle of the night, they injected 107,040 votes for Biden at 6:34 a.m." *Id.* at 2:6–8. Finn says, "Giuliani says the high number of fake votes overloaded election systems, causing key states to stop their counts on election night." *Id.* at 2:11–13. Finn concludes, "Giuliani says the Democrat Party ran a nationwide conspiracy plot together with Dominion and China and other foreign countries and companies to steal President Trump's victory." *Id.* at 2:23–3:1.

***Not Defamatory Per Se.*** These statements are not defamatory *per se* as to Dominion. Finn says that Giuliani's first claim is against "Democrat officials and mainland China," who "hack[ed] Dominion machines." That made Dominion *the victim*, not the perpetrator. As for the final statement where Giuliani vaguely claimed there was a "plot" with Dominion "to steal" a "victory," that is not a direct accusation of a crime—and thus not actionable.

***OAN Truthfully Reported Others' Newsworthy Allegations.*** Finn accurately reports and states Giuliani's newsworthy allegations, and that defeats a claim of falsity. *See Greenbelt*, 398 U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19.

***Inactionable Opinion, Hyperbole, and Rhetoric.*** Even Giuliani's claim that there was a "plot" with Dominion "to steal" a "victory" amounts to vague hyperbole or rhetoric, not a provable fact. *See Milkovich*, 497 U.S. at 20–21. It was "'used not to implicate underlying acts but "merely

57

in a loose, figurative sense" to demonstrate strong disagreement' with another.'" *Bauman*, 377 F. Supp. 3d at 11 (quoting *Sigal Const. Corp. v. Stanbury*, 586 A.2d 1204, 1210–11 (D.C. 1991)).

### 14.    *Para. 305(n): Jan. 2, 2021, Bobb Interview with Giuliani.*

Host Christina Bobb interviews Giuliani, who claims "the election was stolen" because "votes were entered secretly" in key states by "ballots that were brought in in the middle of the night." Ex. A-11 at 2:20–3:4, 3:25–41. He concludes, "That's how you have more votes than voters, because a physical voter didn't actually make that vote. And of course, the Dominion machines were the machines that we used, which are basically built to cheat." *Id.* at 4:15–18.

**Not Defamatory Per Se.** The broadcast contains no defamatory *per se* statement as to Dominion. Giuliani talks at length about his claim that paper ballots were shipped in and falsely counted, which again points the finger at others, *not Dominion*. There is only one passing reference to Dominion, where Giuliani notes its machines were used and "which are basically built to cheat." But that is not defamatory *per se* either because it is not an accusation of a crime. In context of the full discussion about paper ballots allegedly being shipped in and counted, it is also clear that "basically built to cheat" alludes to the widely publicized problems with Dominion machines being susceptible to manipulation by bad actors—but again, innuendo and allegations of defects are not defamatory *per se*.

**OAN Truthfully Reported Others' Newsworthy Allegations.** Bobb accurately reports and states Giuliani's newsworthy allegations, and that defeats a claim of falsity. *See Greenbelt*, 398 U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19.

**No Verifiably False Fact.** "Built to cheat" is a vague phrase that "communicates no specific message about a discernible fact to an uninformed hearer." *Bauman*, 377 F. Supp. 3d at 11 (quoting *Rosen v. Am. Isr. Pub. Affs. Comm., Inc.*, 41 A.3d 1250, 1258 (D.C. 2012)).

**Inactionable Opinion, Hyperbole, and Rhetoric.** Giuliani also offered his own opinions

in the broadcast about machines being "built to cheat." This is classic opinion, not a statement of fact. *See Armstrong*, 80 A.3d at 187–88 (statements suggesting plaintiff engaged in "serious integrity violations" and "unethical behavior" were unverifiable opinions that "reflected one person's subjective view of the underlying conduct.").

### 15.    *Para. 305(o): Jan. 27, 2021, Newsroom.*

OAN anchor Mike Dinow features Christina Bobb interviewing guest Edward Solomon. Bobb describes Solomon's findings as "Biden won exactly the same percentage points across multiple precincts at designated times of day long enough to change the advantage," and references Fulton County, Georgia, Ex. A-12 at 2:9–12. Solomon then says, "[T]his can only have been done by an algorithm." *Id.* at 3:1–2.

**Not Of-And-Concerning Dominion.** This broadcast never even mentions Dominion. Nor is there any vague allusion to it, either. The guest does refer to Fulton County, and Dominion apparently expects viewers would somehow know the arcane fact that Dominion machines "operate" in Fulton County—and thus conclude he *must have been* talking about Dominion. (Dkt. 1 ¶ 305(o).) But defamation *per se* means Dominion cannot rely on "the aid of extrinsic proof." *Mar-Jac Poultry*, 773 F. Supp. 2d at 115. And in any event, no reasonable viewers could have identified, on the spot, that Dominion was operating in Fulton County in November 2020, and thus would not reasonably be led to conclude the speaker was referring to Dominion. *See Jankovic*, 494 F.3d at 1091. ██████████████████████████████████████████████. Ex. C-11 at 137:23–24.

**Not Defamatory Per Se.** There is no direct accusation, let alone against Dominion, of a crime or tantamount behavior. Further, Dominion openly admits an "inference" is needed for this broadcast to allegedly be defamatory, (Dkt. 1 ¶ 305(o)), but such inferences are prohibited when it comes defamation *per se*, as explained above.

*OAN Truthfully Reported Others' Newsworthy Allegations.* Bobb accurately reports and states Solomon's newsworthy allegations, and that defeats a claim of falsity. *See Greenbelt*, 398 U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19.

### 16.    *Para. 305(p): Feb. 5, 2021, Absolute Proof with Mike Lindell.*

Lindell purchased airtime to run this program. As explained above in Part I.D, OAN was not involved in the preparation of the segment.

*Not Defamatory Per Se.* There is no direct accusation of a crime by Dominion. To be sure, Lindell mentions Dominion, but he primarily insists that *China* intentionally hacked and rigged the election using Dominion machines: "these machines were used to steal our election *by other countries, including China.*" Ex. A-18 at 3:17–18. A guest speaker, Phil Waldron, says that *another* company has "access to the code and the testing for Dominion" and is in China. *Id.* at 15:9–13. Given the context, he is accusing China. *See Ollman*, 750 F.2d at 979.

Another guest, Matthew DePerno, cites a report that says, "We conclude that the Dominion Voting System is intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results," and he cites "this machine in Antrim County [that] generates errors at a rate of 68 percent based on ballots that you put in the machine." Ex. A-18 at 88:11–14, 89:1–4. But defamation *per se* cannot be shown by suggesting another is *capable* of committing a crime or even had criminal *intention* or design. Restatement (Second) of Torts § 571 (cmt. c).

*OAN Truthfully Reported Others' Newsworthy Allegations.* Even if these statements were OAN's (they are not), like many broadcasts above, the statements are not false in a legal sense because OAN accurately reported Lindell's and Waldron's newsworthy allegations, and that defeats a claim of falsity. *See Greenbelt*, 398 U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19. The same is true for DePerno, who is directly quoting a report's newsworthy allegations. Accurate reporting on that newsworthy allegation defeats falsity.

*Inactionable Opinion, Hyperbole, and Rhetoric.* Lindell and his guests offered their opinions and interpretations, which makes those aspects non-actionable. *See Armstrong*, 80 A.3d at 187–88; *Bauman*, 377 F. Supp. 3d at 16; *Montgomery*, 197 F. Supp. 3d at 249.

> **17.     Para. 305(q): Feb. 11, 2021, A Screening and Conversation of Absolute Proof.**

In this broadcast, Lindell again discusses his view that the election was somehow rigged.

*Not Defamatory Per Se.* The transcript is difficult to follow and understand. But nowhere does Lindell accuse Dominion of a crime or tantamount behavior. He mentions them only once, in a rhetorical manner: "[I]f you're Dominion . . . that's been proven 10 times over. . . . I'm 100 percent, 100 percent that we have all the proof." Ex. A-19 at 41:22–42:9. Again, it is entirely unclear what he is even talking about. Confusing and vague statements cannot be defamatory *per se* because, at least, they would require innuendo, extrinsic evidence, or nuance. If Lindell was referring to Dominion when he said, "they're all liars," *id.* at 41:20–21, that is not even defamatory, let alone defamatory *per se*. *See KLEO*, 2022 WL 22626490, at *1.

*OAN Truthfully Reported Others' Newsworthy Allegations.* Even if these statements were OAN's (they are not), OAN accurately reported Lindell's newsworthy allegations, and that defeats falsity. *See Greenbelt*, 398 U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19.

*Inactionable Opinion, Hyperbole, and Rhetoric.* As above, Lindell offered his own opinions and interpretations in the broadcast, which makes those aspects non-actionable. *See Armstrong*, 80 A.3d at 187–88; *Bauman*, 377 F. Supp. 3d at 16; *Montgomery*, 197 F. Supp. 3d at 249. Further, statements like "they're all liars" are obvious examples of nonactionable hyperbole.

> **18.     Para. 305(r): Apr. 3, 2021, Scientific Proof with Mike Lindell.**

Lindell and a guest reiterate their belief that election results were "done by an algorithm."

*Not Defamatory Per Se.* Like Paragraph 305(q), the statements are not defamatory *per se*

as to Dominion. Lindell mentions them only once, in a vague manner: "it can only be done by machines. I can't stress that enough. . . . And they all rhyme with Dominion. Oh, wait. There's others, Smartmatic, ES&S, all of them. You know, all of these." Ex. A-20 at 44:4–9. Like Paragraph 305(q), it is unclear what he is even saying about Dominion. Confusing and vague statements cannot be defamatory *per se*.

*OAN Truthfully Reported Others' Newsworthy Allegations.* Even if these statements were OAN's (they are not), the statements are not false in a legal sense because OAN accurately reported Lindell's newsworthy allegations. *See Greenbelt*, 398 U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19.

*Inactionable Opinion, Hyperbole, and Rhetoric.* Again, Lindell offered his own opinions and interpretations in the broadcast, which makes those aspects non-actionable. *See Armstrong*, 80 A.3d at 187–88; *Bauman*, 377 F. Supp. 3d at 16; *Montgomery*, 197 F. Supp. 3d at 249. Further, statements like "they all rhyme with Dominion" and "it can only be done by machines" are examples of nonactionable hyperbole.

### 19.    Para. 305(s): Apr. 22, 2021: Absolute Interference with Mike Lindell.

Lindell continues with his belief that the election was not reliable. Ex. A-21.

*Not Defamatory Per Se.* As with his prior pieces, Lindell is emphatic that China—not Dominion—was the one that engaged in bad behavior: "our country was attacked by China, by communism coming in, this foreign interference to our elections through the machines, Dominion, Smartmatic, ES&S, all of them." *Id.* at 3:9–12. That is the only reference to Dominion. That is not defamatory *per se* as to Dominion, as it is at most an inference of glitchy or hackable software. *Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32, 40 (D.D.C. 2005).

*OAN Truthfully Reported Others' Newsworthy Allegations.* Even if these statements were OAN's (they are not), OAN accurately reported Lindell's newsworthy allegations, and that defeats

falsity. *Greenbelt*, 398 U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19.

     ***Inactionable Opinion, Hyperbole, and Rhetoric.*** As before, Lindell offered his own

opinions and interpretations in the broadcast, which makes those aspects non-actionable. *See*

*Armstrong*, 80 A.3d at 187–88; *Bauman*, 377 F. Supp. 3d at 16; *Montgomery*, 197 F. Supp. 3d at

249. Further, statements like "communism coming in" and "through the machines, Dominion,

Smartmatic, ES&S, all of them" are examples of nonactionable hyperbole and similarly incapable

of being proven false.

          **20.     *Para. 305(t): Apr. 29, 2021: One-on-One with Mike Lindell.***

     OAN host Natalie Harp interviews Lindell, who argues the 2020 Election was unreliable.

     ***Not Defamatory Per Se.*** As with the Lindell programming above, he accuses China—not

Dominion—of bad behavior: "this attack by China on our country through these machines;

Dominion, Smartmatic," and "China did this, took our election done [*sic*] through these machines."

Ex. A-13 at 3:8–13, 5:13–14. That is not defamatory *per se* as to Dominion because it does not

accuse it of a crime; indeed, it makes Dominion seem like the victim. The only other reference to

Dominion is when Lindell says "[s]hame on" them for using "lawfare, you know, us[ing] lawsuits

and threats to . . . take away our freedoms, our First Amendment right of free speech" and also

"go[ing] after My Pillow." *Id.* at 24:22–25:5. Criticizing a company for filing lawsuits does not

accuse it of a crime, and thus it is not defamatory *per se*.

     ***OAN Truthfully Reported Others' Newsworthy Allegations.*** OAN accurately reported

Lindell's newsworthy allegations, and that defeats a claim of falsity. *See Greenbelt*, 398 U.S. at

11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19.

     ***Inactionable Opinion, Hyperbole, and Rhetoric.*** Again, Lindell offered his own opinions

and interpretations in the broadcast, which makes those aspects non-actionable. *See Armstrong*, 80

A.3d at 187–88; *Bauman*, 377 F. Supp. 3d at 16; *Montgomery*, 197 F. Supp. 3d at 249. Further,

statements like "attack by China on our country through these machines" and "shame on them" are obvious examples of nonactionable hyperbole.

### 21.    Para. 305(u): May 3, 2021, Pearson Sharp.

OAN host Pearson Sharp interviews Lindell, who continues to argue that the election results were unreliable. Ex. A-14.

**Not Defamatory Per Se.** As with his prior statements, Lindell accuses China—not Dominion: "China hacked into our election and [flipped] millions upon millions of votes," and he concludes by saying "China attacked our country." *Id.* at 4:18–19, 12:22. He even says "these machines where it got hacked, Dominion, Smartmatic, Hart, all of them are the same, ES&S. . . . [Y]ou just say Dominion, but it's all machines." *Id.* at 4:15–17. Again, Lindell is accusing China of infiltrating *all* voting machines, not accusing Dominion of a crime. That means the statements are not defamatory *per se*.

At one point, Lindell is talking about his lost business and says, "Did you hear about Dominion and China attacking our country?" *Id.* at 7:19–20. But that is likewise not defamatory *per se* because it is a rhetorical question.

**OAN Truthfully Reported Others' Newsworthy Allegations.** The statements are not false in a legal sense because OAN accurately reported Lindell's newsworthy allegations. *See Greenbelt*, 398 U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19.

**No Verifiably False Fact.** Phrases like "attacking our country" are vague and not verifiably false—and thus inactionable.

**Inactionable Opinion, Hyperbole, and Rhetoric.** Again, Lindell offered his own opinions and interpretations in the broadcast, which makes those aspects non-actionable. *See Armstrong*, 80 A.3d at 187–88; *Bauman*, 377 F. Supp. 3d at 16; *Montgomery*, 197 F. Supp. 3d at 249.

### 22.    *Para. 305(v): May 22, 2021, Weekly Briefing with Christina Bobb.*

Bobb offers her opinions about election fraud. Again, there is no actionable statement here.

***Not Defamatory Per Se.*** Bobb says nothing that was defamatory *per se* as to Dominion, which is barely even mentioned. She says, "[t]he only people who had absolute control over the election equipment was Dominion. The county didn't bother to ensure that there was no manipulation. They just took Dominion's word for it, despite the fact that there were weird mathematical patterns and many experts stated the numbers indicated fraud." Ex. A-15 at 2:7–12. Nowhere does Bobb accuse Dominion of a crime. She instead charges election officials with failing to oversee the election and ensure there had not been abuse, so she tells viewers to "[c]ontact your state and local officials and tell them you want to conduct an audit." *Id.* at 4:14–15.

***Inactionable Opinion, Hyperbole, and Rhetoric.*** Bobb also offered several of her own opinions, which are likewise not actionable: "We must clean out the corruption of past elections before we can build up and strengthen our future elections. It's not enough for state and local officials to say, Okay, okay, we'll make sure we're good going forward. We cannot move forward until our past is cleaned out. It's important for Americans to get involved and hold their leaders accountable. . . . It is possible that this fraud is so much bigger than any of us believed, that most states were manipulated in some way." *Id.* at 3:22-4:14. These are all opinions.

### 23.    *Para. 305(w): June 4, 2021, The Real Story with Natalie Harp.*

OAN host Natalie Harp interviews Lindell, who contends the election results were suspect.

***Not Defamatory Per Se.*** Like in his prior statements, Lindell focuses on China, not Dominion. The transcript runs for pages, yet there is literally only one mention of Dominion—and it a passing remark about prominent "Democrats that bad mouthed the machines . . . and the Dominion machines and Smartmatic" before the 2020 election—which is not defamatory *per se*. Ex. A-16 at 4:19–22. Again, the overall context makes clear that the accusations of intentional

vote-flipping were leveled at China, not Dominion. *See Ollman*, 750 F.2d at 979 (must focus on overall context).

**OAN Truthfully Reported Others' Newsworthy Allegations.** OAN accurately reported Lindell's newsworthy allegations, and that defeats a claim of falsity. *See Greenbelt*, 398 U.S. at 11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19.

**Inactionable Opinion, Hyperbole, and Rhetoric.** Harp offered her own opinion that "[w]e will find fraud, election-changing amounts of fraud." Ex. A-16 at 2:6–7. But that is not a statement of provable fact but only an opinion and prediction regarding what the future will hold. And Harp's later statement in the same broadcast that "all this fraud is coming out" is clearly opinion based on disclosed facts (and not specific as to Dominion or the type of fraud she is opining about, anyway). *Id.* at 7:7–14. At most, these are examples where "it is clear that the challenged statements represent [the speaker's] own interpretation of those facts, leaving the reader free to draw his own conclusions," which this Court has held defeats a subsequent defamation claim. *Powell*, 554 F. Supp. 3d at 58–59 (citation altered).

### 24.    *Para. 305(x): June 4, 2021, Absolutely 9-0 with Mike Lindell.*

This is a piece where Lindell reiterates his belief that the election results were suspect.

**Not Defamatory Per Se.** Lindell barely references Dominion and instead emphasizes how *China* "orchestrated," "attack[ed]," and "flipped" votes "through these Dominion" machines. Ex. A-22 at 2:4–18, 15:7–18. He reiterates that "China did it." *Id.* at 18:21. Context makes quite clear that the accusations were leveled at China, not Dominion. *See Ollman*, 750 F.2d at 979 (must focus on overall context); *Guilford*, 760 A.2d at 588–89 (context clarified that blackmail accusation hyperbolic and not accusation of a crime).

**OAN Truthfully Reported Others' Newsworthy Allegations.** OAN accurately reported Lindell's newsworthy allegations, and that defeats a claim of falsity. *See Greenbelt*, 398 U.S. at

11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19.

 ***Inactionable Opinion, Hyperbole, and Rhetoric.*** As above, Lindell offered his own

opinions and interpretations, which makes those aspects non-actionable. *See Armstrong*, 80 A.3d

at 187–88; *Bauman*, 377 F. Supp. 3d at 16; *Montgomery*, 197 F. Supp. 3d at 249.

  **25.**  ***Para. 305(y): June 29, 2021, Evening News.***

 Anchor Shane Althaus interviews Lindell about his views on the election.

 ***Not Defamatory Per Se.*** The transcript runs for pages, yet Lindell barely references

Dominion. He said he would hold a "mock election" where hackers would "hack each—at the

Dominion level, the county level, the Secretary of State's level" to try to flip votes using a

Dominion machine. Ex. A-17 at 3:19–4:9. But saying you will have someone try to hack a

Dominion machine is not defamatory *per se*. And, as with his prior statements, to the extent he is

accusing anyone of intentionally flipping votes, it is China. "[T]he CCP used the Democrat Party

to take our country." *Id.* at 6:16–17.

 ***OAN Truthfully Reported Others' Newsworthy Allegations.*** OAN accurately reported

Lindell's newsworthy allegations, and that defeats a claim of falsity. *See Greenbelt*, 398 U.S. at

11–13; *Green*, 286 F.3d at 284; *Abbas*, 975 F. Supp. 2d at 19. Similarly, ███████████

█████████████████████████████████████████████████████

████████, Ex. C-27 at 141:4–7, which confirms OAN accurately reported these allegations.

 ***Inactionable Opinion, Hyperbole, and Rhetoric.*** Again, Lindell offered his own opinions

and interpretations in the broadcast, which makes those aspects non-actionable. *See Armstrong*, 80

A.3d at 187–88; *Bauman*, 377 F. Supp. 3d at 16; *Montgomery*, 197 F. Supp. 3d at 249. Further,

statements like "the CCP used the Democrat Party to take our country" are obvious examples of

nonactionable hyperbole.

<div align="center">* * * * *</div>

For none of the complained-of broadcasts can Dominion demonstrate falsity and defamatory *per se* meaning that was of-and-concerning Dominion. Summary judgment is warranted on this independent basis.

## IV.    Summary Judgment Is Appropriate on Damages.

The Court need not reach the issue of damages given that summary judgment is appropriate on the entirety of Dominion's defamation *per se* claim for several, independent grounds. Nevertheless, summary judgment is also properly awarded on Dominion's claimed damages.

"Legal damages, like liability, can be determined via the summary judgment mechanism." *Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, 678 F. Supp. 3d 62, 72 n.3 (D.D.C. 2023). It is therefore "entirely proper under Rule 56(a)" to "move[] to eliminate some or all forms of damages across the board." *Murray v. Amalgamated Transit Union*, 183 F. Supp. 3d 6, 19 (D.D.C. 2016).

### A.  The Only Measure of Defamation Damages for a Corporation Is Lost Profits.

To the extent Dominion argues damages for its defamation *per se* claim should be presumed, D.C. Circuit caselaw forecloses the claim. Presumed damages are not available to this defamation claim brought by a public figure/official involving speech on matters of public concern. *Chandler v. Berlin*, 691 F.Supp.3d 118, 128 n.5 (D.D.C. 2023). Under D.C. law, corporate plaintiffs in defamation cases—unlike human plaintiffs—are limited to recovering lost profits: "[T]he law of libel has long reflected the distinction between corporate and human plaintiffs by limiting corporate recovery to actual damages in the form of lost profits." *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 461–62 (D.C. Cir. 2018); *see Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1156 (D.C. Cir. 1985) ("[A] corporation suing for defamation . . . may only recover actual damages in the form of lost profits.").

Thus, a corporate plaintiff cannot recover for alleged harms to "standing, reputation, prestige, and goodwill," even when it's alleged to have resulted in "injury to its business and

substantial loss of sales." *Art Metal-U.S.A.*, 753 F.2d at 1155. Nor can a corporate plaintiff seek to circumvent this rule by claiming that it seeks "to protect 'not its corporate reputation but rather its pecuniary interest in its products," as this is an "illusory distinction." *Id.* at 1155–56.

### 1.    Lost "Enterprise Value" is Unrecoverable as a Matter of Law.

Dominion claims approximately $900 million in lost "enterprise value," Dkt. 1 ¶ 303—i.e., the diminution of the alleged value of the companies. Dominion also claims approximately $800 million in lost "opportunities to improve value"—i.e., to increase the alleged value of the companies going forward. But a decline in enterprise value (or a lost opportunity to "increase" that value) is not "lost profits" and thus is unrecoverable. Courts routinely reject recovery for things like "lost market capitalization" as it is not a form of "special damages" from defamation, holding instead that the plaintiff is "required to prove the loss of a *specific* sale or sales." *Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*, No. 1:00CV98K, 2001 WL 670927, at *3–4 (D. Utah Mar. 26, 2001) (citing authorities), *aff'd*, 312 F.3d 1292 (10th Cir. 2002); *see Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*, 585 F. Supp. 2d 815, 824 (E.D. Va. 2008) (effects on "stock price" were not "purely economic damages" but rather flowed from "reputational" harms that were unrecoverable); *Comput. Aid, Inc. v. HewlettPackard Co.*, 56 F. Supp. 2d 526, 540 (E.D. Pa. 1999) (holding that evidence of stock price changes "d[id] not provide the kind of direct evidence required on summary judgment to raise an issue of material fact on the issue of special damages"); W.P. Keeton et al., Prosser & Keeton on the Law of Torts § 128 at 971 (5th ed. 1984) ("[T]he plaintiff [must] establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales.").

Lost enterprise value is also duplicative of the value of lost contracts, confirming that lost enterprise value is not *separately* recoverable. *See* Ex. C-21 at 41:6–10 (█████████████████████ ████████████████████████████████████████).

### 2. Out-of-Pocket Expenses Are Unrecoverable as a Matter of Law.

Dominion claims over $3 million in expenses "to mitigate the harm to its business" from the so-called "viral disinformation campaign" and in "private security" costs. (Dkt. 1 ¶¶ 286–87.) But courts have recognized that "out-of-pocket expenses" made "in an effort to restore [plaintiff's] corporate image" are best described as "a reputational damage claim," rather than an "economic" damage claim, *Smithfield Foods*, 585 F. Supp. 2d at 824, and thus are unrecoverable in this context.

Further, although this Court has suggested in the Rule 12(b)(6) context that security expenses the plaintiff "would not have incurred if not for [a defendant's] alleged defamation" may count towards the amount-in-controversy in a case, *Powell*, 554 F. Supp. 3d at 74, OAN respectfully contends that the D.C. Circuit's decades-long precedent limiting corporate recovery to lost profits precludes recovery of out-of-pocket expenses altogether, as they are not lost profits.

In any event, Dominion lacks evidence sufficient to raise a genuine issue of material fact that such expenses were *caused by Defendants*. *See Powell*, 554 F. Supp. 3d at 74.

### 3. Impugned Integrity, Ethics, Honesty, and Goodwill are Unrecoverable as a Matter of Law.

Summary judgment is appropriate on Dominion's request for damages for "impugn[ing]" its "integrity, ethics, honesty" and "goodwill." (Dkt. 1 ¶¶ 303, 313.) These types of alleged reputational-harm damages are not recoverable for corporate plaintiffs. *See Art Metal-U.S.A.*, 753 F.2d at 1155. Nor are these actual damages in the form of lost profits. *See id.* at 1156.

## B. Dominion Cannot Raise a Triable Claim that the Complained-of Publications Caused Any Lost Profits.

Lost business and contracts qualify as recoverable lost profits, but Dominion's claims fail here for another reason: lack of causation. "[S]*pecific evidence evidencing the financial harm resulting from the libel* is required before compensation for economic harm can be awarded." *Robertson v. McCloskey*, 680 F. Supp. 414, 415 (D.D.C. 1988) (emphasis added). Moreover, a

defamation plaintiff must affirmatively prove both the fact and the cause of harm as a prerequisite to recovery. *Calloway v. Cent. Charge Serv.*, 440 F.2d 287, 289 (D.C. Cir. 1971) (special damages require "showing actual pecuniary or material loss resulted from the conduct of the defamer").

Even in a defamation *per se* case, special damages may not be presumed but must be proven, including causation and subject to standards of certainty. *See Robertson*, 680 F. Supp. at 415 n.2 (citing Restatement (Second) of Torts § 906(b) cmt. a) ("The recovery of damages for pecuniary harm is restricted by the rules as to causation . . . and unlike recovery for bodily harm and emotional distress, is subject to more or less definite *standards of certainty*." (emphasis added))); *see also W.G. Cornell Co. v. Ceramic Coating Co*., 626 F.2d 990, 994 (D.C. Cir. 1980) ("[E]stablishing the fact of damages is the responsibility of plaintiff."); *Contemporary Mission, Inc. v. Famous Music Corp*., 557 F.2d 918, 926 (2d Cir. 1977) ("[T]he existence of damage must be certain . . . .").

Dominion, therefore, must "identify the particular customers whose business had been lost or facts showing an established business and amount of sales before and after the disparaging publication, along with evidence of causation." *Browning v. Clinton*, 292 F.3d 235, 245 (D.C. Cir. 2002). Those damages must be proven "with particularity and specif[ic] facts showing that such damages were the natural and direct result of the defendant's conduct." *Id.* In *Schoen v. Washington Post*, the D.C. Circuit held that the plaintiff "must show that the decrease in income was the natural and proximate consequence of the alleged inaccuracies in the article, and not the result of other causes, such as the unfavorable publicity naturally emanating from the legitimate news story." 246 F.2d 670, 671 (D.C. Cir. 1957); *see Nwosu v. Bolduc*, No. 23-cv-3841, 2024 WL 1050339, at *2 n.1 (D.D.C. Mar. 10, 2024) (must prove defamation "caused her 'economic or pecuniary' losses").

Dominion cannot meet its burden. Rather, Dominion tries to lump together OAN with non-

parties and claim they somehow all together and individually caused billions in damages. The Complaint itself admits that Dominion's alleged losses include those caused by "others," i.e., not Defendants. (Dkt. 1 ¶ 293.) The Complaint further claims OAN was a "cable news irrelevancy" during the relevant time (*id.* ¶ 324)—directly contrary to Dominion's grandiose claims that Defendants caused billions in damages.

Exhaustive discovery bore this out. Dominion implausibly claims it lost over a hundred election contracts *because of OAN*, despite its small viewership. To test these assertions, Defendants issued 108 third-party subpoenas to claimed lost U.S. jurisdictions, plus five open records requests to Canadian jurisdictions. And Defendants also took almost two dozen depositions of election officials, focusing on those where Dominion claimed the largest losses.

*But not a single jurisdiction or official* ever said—either in their deposition or in response to Defendants' subpoenas—that any decision not to contract with Dominion was *because of* Defendants, let alone because of the complained-of publications. ████████████████ ████████████████████████████████ Ex. C-2 at 69:15– 18; Ex. C-10 at 8:14–19; Ex. C-14 at 67:1-13; Ex. C-23 at 10:4–8; Ex. C-29 at 11:4–16; Ex. C-15 at 97:14–21; Ex. C-13 at 9:3-8, 32:20–23; Ex. C-4 at 58:12–16; Ex. C-19 at 47:25–48:6; Ex. C-25 at 47:4–11; Ex. C-31 at 13:19–14:5; *see generally* Statement § L.

Those statements and the jurisdictions' underlying decisions are entitled to a presumption of regularity because they are "the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). "The presumption applies to government-produced documents no less than to other official acts." *Latif v. Obama*, 677 F.3d 1175, 1178 (D.C. Cir. 2011). Dominion has not produced any such contrary evidence—let alone

clear evidence to overcome such a presumption. 

*E.g.*, Ex. C-19 at 62:1–19 (

); Ex. C-31 at 29:5–30:10 (

), 80:19–81:22 (

); Ex. C-10 at

73:23–74:4 (                                              ); Ex. C-2 at 104:2–11, 110:22–111:17

(                              ); Ex. C-15 at 72:6–17, 78:17–79:9 (

); Ex. C-26 at 83:14–24 (                                   );

Ex. C-25 at 86:12–22 (                                   ).

Dominion can recover damages here only by pointing to specific, recoverable damages caused specifically by the complained-of publications. This is not enterprise liability, nor does Dominion allege (let alone prove) a conspiracy. OAN cannot be held liable for whatever Dominion thinks *other* defendants in *other* cases might have said or done. And no evidence shows damages caused by the complained-of publications. The weakness of Dominion's position is confirmed by its insistence that every lost contract or business opportunity is simultaneously the fault of each defendant in its bevy of defamation cases: Dominion says the damages are all OAN's fault, yet somehow also entirely the fault of Fox, Newsmax, Powell, Giuliani, Lindell, and others.

But what Dominion cannot do (and what it *must* do to avoid summary) is raise a genuine issue of material fact with evidence that any of the 25 complained-of publications specifically caused any of the 113 claimed lost profits jurisdictions.[41] Evidence obtained from the claimed lost

---

[41] Though a stipulation has not been formally entered, Dominion has agreed to remove five claimed loss jurisdictions from their lost-profits damages claim as part of an agreed resolution of OAN's Motion for Rule 37(e) Sanctions for Plaintiffs' Failure to Preserve Electronically Stored

jurisdictions directly refutes any such fact issue.

Nor can Dominion's bevy of experts save its claim. Dominion's "damages" expert
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████ . . . ." Ex. C-21 at 59:5–8. ██
██████████████████████████████████████████ Another expert ████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
█████████████ Ex. C-1 at 83:20–92:19. Dominion's "causation" expert ████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
█████████████ Ex. C-16 at 88:5–89:12, 196:3–198:8. And a fourth expert ████████
███████████████████████████ (which, as discussed above, is not recoverable) ████
██████████████████████████. Ex. C-30 at 116:17–117:24; *Robertson*, 680 F.
Supp. at 415 n.2 ("The recovery of damages for pecuniary harm is restricted by the rules as to
causation . . . . (quoting Restatement (Second) of Torts § 906(b) (1977))).

In short, none of Dominion's experts (individually or together) can connect the dots
between the specific complained-of publications and the specific jurisdictions where Dominion
claims lost profits. That means summary judgment must be granted on causation, especially in
light of government officials uniformly stating Defendants had nothing to do with their decisions.

### C.    No Damages Are Warranted Against Mr. Robert Herring and Charles Herring.

At the very least, the Court should grant summary judgment on damages in favor of Mr.

---

Information: City of Campbell River, British Columbia; Elbert County, Colorado; Fulton County, Georgia; Macon County, Tennessee; Shelby County, Tennessee. (Dkt. 238.) The parameters of the resolution are being negotiated as of the time of filing of this Motion.

Robert Herring and Charles Herring. There is no evidence that they individually caused any damages, and Dominion's causation, procurement, and damages experts ███████████ ████████████████████████████████████████████████████████. Ex. C-16 at 159:16–22 (███████████████████████████████████ ██████); Ex. C-30 at 116:17–117:15 ██████████████████████████████ ███████); Ex. C-21 at 48:24–49:24 (███████████████████████████████ ██████████████████████).

Dated: June 13, 2025

By: */s/ R. Trent McCotter*

**JACKSON WALKER LLP**
Charles L. Babcock
(admitted *pro hac vice*)
Nancy W. Hamilton
(admitted *pro hac vice*)
John. K. Edwards
(admitted *pro hac vice*)
Joel R. Glover
(admitted *pro hac vice*)
Bethany Pickett Shah
(admitted *pro hac vice*)
Christina M. Vitale
(admitted *pro hac vice*)
Gabriela Barake
(admitted *pro hac vice*)
Victoria C. Emery
(admitted *pro hac vice*)
Shannon M. Wright
(admitted *pro hac vice*)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Tel: (713) 752-4200
Fax: (713) 308-4110
cbabcock@jw.com
nhamilton@jw.com
jedwards@jw.com
jglover@jw.com
bpickett@jw.com

cvitale@jw.com
gbarake@jw.com
temery@jw.com
swright@jw.com

Jonathan D. Neerman
D.C. Bar No. 90003393
Carl C. Butzer
(admitted *pro hac vice*)
Minoo Sobhani Blaesche
(admitted *pro hac vice*)
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Tel: (214) 953-5664
Fax: (214) 661-6899
jneerman@jw.com
cbutzer@jw.com
mblaesche@jw.com

Joshua A. Romero
(admitted *pro hac vice*)
Sean F. Gallagher
(admitted *pro hac vice*)
100 Congress Avenue, Suite 1100
Austin, TX 78701
Tel: (512) 236-2000
Fax: (512) 391-2131
jromero@jw.com
sgallagher@jw.com

**BOYDEN GRAY PLLC**
R. Trent McCotter
D.C. Bar No. 1011329
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of June 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which I understand to have served counsel for the parties.

<div align="right">

*/s/ R. Trent McCotter*
R. Trent McCotter

</div>